## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | | |
|---|---|---|
| REIYN KEOHANE, | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | Case No. 4:24-cv-434 |
| | : | |
| RICKY D. DIXON, in his | : | |
| official capacity as Secretary | : | |
| of the Florida Department of | : | |
| Corrections; CLAYTON WEISS | : | |
| in his official capacity as Health | : | |
| Services Director of the Florida | : | |
| Department of Corrections; | : | |
| GARY HEWETT, in his official | : | |
| capacity as Warden of | : | |
| Wakulla Correctional Institution, | : | |
| | : | |
| *Defendants*. | : | |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff Reiyn Keohane ("Plaintiff"), by and through undersigned counsel, brings this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, against Defendants Ricky D. Dixon, Secretary of the Florida Department of Corrections, in his official capacity; Clayton Weiss, Health Services Director of

the Florida Department of Corrections, in his official capacity; and Gary Hewett,

Warden of Wakulla Correctional Institution, in his official capacity.

## <u>INTRODUCTION</u>

On September 30, 2024, at Florida Department of Corrections ("FDC") facilities across the state, inmates with gender dysphoria were rounded up and informed that FDC policy concerning the treatment of inmates with gender dysphoria had been changed, "up to and including hormone therapy." They were specifically told that they would no longer have access to clothing and grooming standards that accord with their gender identity and would have 30 days to comply. Transgender women like Keohane were told that those who did not cut their hair in compliance with male grooming standards would be forcibly shorn, and those who did not turn in their female undergarments and feminine canteen items would be disciplined.

The new policy established by FDC on September 30, 2024, Health Services Bulletin 15.05.23, entitled "Mental Health Treatment of Inmates with Gender Dysphoria," provides that "State law prohibits the Department from expending any state funds to purchase cross-sex hormones for the treatment of gender dysphoria. Section 286.311, Florida Statutes. The Department shall comply with this statutory requirement unless compliance with the U.S. Constitution or a court decision

requires otherwise." The new policy does not have a provision for clothing and grooming accommodations.

Prior FDC policy, dating back to 2017, recognized that both hormone therapy and other accommodations to facilitate transition can be medically necessary for those diagnosed with gender dysphoria.  Under the former policy, FDC medical staff determined that hormone therapy was medically necessary for Keohane.  She and many other inmates with gender dysphoria have long been provided hormone therapy and permitted to follow clothing and grooming standards that accord with their gender identity.  For Keohane and others, access to this medical care and accommodations has been critical to alleviating the distress of gender dysphoria.

Absent injunctive relief from this Court, on October 30, 2024, all transgender persons diagnosed with gender dysphoria who are in FDC custody will be forced to have their hair shorn as well as lose the other accommodations they depend on to live in accordance with their gender identity. Additionally, all inmates who are currently receiving hormone therapy to treat gender dysphoria, as deemed medically necessary for them by FDC medical or mental health staff, are at imminent risk of losing their care.

The planned withdrawal of medical treatment and accommodations for inmates with gender dysphoria is not based on an assessment of any inmate's individual medical needs. Rather, it is a blanket policy that strips inmates of

treatment and accommodations that have been deemed medically necessary for them, regardless of the impact on their health and well-being.

This draconian policy violates the Eighth Amendment and jeopardizes the health of Keohane and many others. Keohane therefore files this action on behalf of herself and a proposed class of similarly situated individuals, to seek emergency injunctive relief in the form a temporary restraining order and preliminary injunction to prevent the FDC from denying any individual medical care or accommodations based on this blanket policy. Because of the stated October 30, 2024, deadline for compliance with grooming and clothing standards and threatened actions against those who fail to comply, Keohane respectfully requests a hearing and disposition prior to that date.

## JURISDICTION AND VENUE

1.      Plaintiff Keohane brings this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the Eighth Amendment to the United States Constitution.

2.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

3.      Venue is proper in the Northern District of Florida under 28 U.S.C. § 1391(b) because the Florida Department of Corrections resides in this district.

## PARTIES

4

## I.    <u>Named Plaintiff</u>

4.    *Plaintiff Reiyn Keohane ("Keohane")* is a transgender woman in the custody of FDC. She is serving a fifteen-year sentence and is currently incarcerated at the Wakulla Annex in Crawfordsville, Florida. She has been in the custody of FDC since 2014.

5.    Keohane has been receiving hormone therapy from FDC to treat her gender dysphoria since 2016.  She has been provided grooming and clothing accommodations by FDC since at least 2018.  She depends on this treatment and these accommodations for her health and well-being.

## II.    <u>Class of Incarcerated Persons</u>

6.    Plaintiff Keohane brings this action on her own behalf and on behalf of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Civil Rules of Civil Procedure.

7.    The class of incarcerated persons (the "class") is defined as: all incarcerated persons in custody of the FDC who: i) are or will be diagnosed by FDC medical or mental health personnel with gender dysphoria, and ii) are currently being provided—or, absent the new policy announced on September 30, 2024—would be considered for hormone therapy and/or access to clothing and grooming standards that accord with their gender identity.

8.    As defined, the class meets all the requirements of Rule 23(a).

9.    The class is so numerous that joinder of all members is impracticable. Upon information and belief, approximately 80 incarcerated people from the Wakulla Annex, and, upon information and belief, many more from the three other FDC facilities designated for housing and providing services to individuals diagnosed with gender dysphoria, will lose access to medically necessary treatment and accommodations for gender dysphoria starting on October 30, 2024.

10.    The FDC operates an additional 139 facilities statewide. Numerous additional class members are likely to be incarcerated in those facilities.

11.    Additional class members will become incarcerated in the custody of the FDC in the future. They will not receive hormone therapy and/or clothing and grooming accommodations for gender dysphoria, even if they are diagnosed with this serious medical condition by FDC medical and mental health staff and deemed by FDC medical and mental health staff to have a medical need for such treatment and/or accommodations. Regardless of need, medical treatment and accommodations will be denied because of Defendants' enforcement of a blanket policy prohibiting treatment.

12.    There are questions of law or fact common to the class. If Defendants are permitted to enforce their blanket policy, all members of the class will be subject to a common harm: the denial of medical treatment and/or accommodations for their diagnosed gender dysphoria, regardless of their medical need for such treatment or

accommodations. All members seek the same relief: an injunction preventing enforcement of this blanket ban on medical treatment and grooming and clothing accommodations for individuals with gender dysphoria in FDC custody. This lawsuit also presents common questions of law, including whether Defendants' actions violate the Eighth Amendment's protections against cruel and unusual punishment.

13.    Plaintiff Keohane's claims are typical of those of the class. Plaintiff Keohane and current proposed class members are all incarcerated transgender persons who have been diagnosed by the FDC with gender dysphoria and who Defendants are currently providing hormone therapy and/or access to clothing and grooming standards that accord with their gender identity.

14.    Plaintiff Keohane is an adequate representative of the class. She does not have conflicts with other members of the class, she seeks the same relief as other members of the class, and she will represent the class fairly and adequately.

15.    The class representative is also adequately represented by counsel. Counsel includes the American Civil Liberties Union Foundation of Florida and the American Civil Liberties Union Foundation. Counsel have experience litigating class actions in federal court, including civil rights lawsuits on behalf of transgender persons and incarcerated persons.

16.    The requirements of Rule 23(b)(2) are met in that Defendants have acted, or will act, on grounds generally applicable to the class, and final injunctive

relief and corresponding declaratory relief are appropriate respecting the class. FDC's new policy precludes the provision of hormone therapy, and persons employed by the FDC have notified Plaintiff Keohane that the policy for treating inmates with gender dysphoria has changed, "up to and including hormone therapy," and that they will no longer have access to grooming and clothing standards that accord with their gender identity.

### III.  **Defendants**

17.  *Defendant Ricky D. Dixon ("Dixon")* is sued in his official capacity as the Secretary of FDC. Dixon "is responsible for planning, coordinating, and managing the corrections system of the state." Fla. Stat. § 20.315(3).  Dixon "shall ensure that the programs and services of the department are administered in accordance with state and federal laws, rules, and regulations, with established program standards, and consistent with legislative intent." *Id.* Dixon is also responsible for the implementation and enforcement of FDC's policies and procedures.

18.  *Defendant Clayton Weiss ("Weiss")* is sued in his official capacity as Health Services Director of FDC. Weiss is responsible for the "delivery of health services to [incarcerated individuals] within the system," with "direct professional authority over such services." Fla. Stat. § 20.315(3)2. Weiss oversees those who have denied, or will deny, Plaintiff Keohane's and proposed class members' medical

treatment and accommodations for gender dysphoria, even though Weiss knows that such treatment and accommodations are medically necessary, and that Plaintiff Keohane and proposed class members are at substantial risk of serious harm if their treatment or accommodations are withdrawn or denied.

19.    *Defendant Gary Hewett ("Hewett")* is sued in his official capacity as the Warden of the Wakulla Correctional Institution. As Warden, Hewett is responsible "to supervise the governance, discipline, and policy of the state correctional institutions and to enforce all orders and rules." Fla. Stat. § 944.09(2).

20.    At all times relevant herein, each Defendant was acting in the course and scope of their employment and under color of state law.

## **FACTUAL ALLEGATIONS**

### Gender Dysphoria is a Serious Medical Condition Requiring Treatment

21.    "Gender dysphoria" is a serious medical condition characterized by clinically significant distress that can result from the incongruity between one's gender identity and the sex they were designated at birth. It is included in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5").

22.    Gender dysphoria is treatable, and, with appropriate care, individuals can manage the symptoms. However, if left untreated, the clinically significant distress caused by gender dysphoria can impair one's ability to function in everyday

life, leading to serious medical problems like debilitating depression, substance abuse, self-harm, suicidal ideation, and suicide.

23.    The widely accepted standards for treating gender dysphoria are published by the World Professional Association for Transgender Health and the Endocrine Society.  These medical guidelines are recognized by the major medical and mental-health professional groups, including the American Medical Association and the American Psychiatric Association, as authoritative standards for treating gender dysphoria.

24.    Under these guidelines, treatment for gender dysphoria is designed to help individuals live congruently with their gender identity and thus eliminate clinically significant distress. This often includes social transition—dressing, grooming, and living one's life consistently with one's gender identity—and hormone therapy. Like treatment for various other medical diagnoses, the particular course of medical treatment varies based on the individualized needs of the person.

25.    According to the National Commission on Correctional Healthcare, inmates with gender dysphoria should be provided treatment in accordance with the same accepted standards.

<u>Treatment for Plaintiff Keohane's Gender Dysphoria</u>

26.    Keohane has known that she has a female gender identity since age 12.

10

27.    At age 13, Keohane began seeing a psychiatrist and a therapist. From age 14 on, with the support and guidance of these medical professionals, she began socially transitioning, wearing female-typical clothing, hairstyles, and cosmetics.

28.    At age 16, Keohane was diagnosed by a licensed medical professional with Gender Identity Disorder.[1]

29.    At age 17, she legally changed her name to "Reiyn" to conform with her gender identity. She had been using the name "Reiyn" socially prior to the formal legal name change.

30.    In 2013, when she was 19 years-old, Keohane began hormone therapy—estrogen and a testosterone suppressant—under the recommendation and care of licensed medical professionals.

31.    In September 2013, Keohane was arrested and taken into the custody of the Lee County Jail. At Lee County Jail, she was denied hormone therapy, despite her repeated requests to continue care.

32.    In July 2014, she accepted a plea deal of 15 years, with the understanding that she would be provided hormone therapy after being transferred to FDC custody. Maintaining hormone therapy was a deciding factor in her acceptance of the plea.

---

[1] Gender identity disorder is an earlier diagnosis used in prior versions of the DSM.

33.    On July 17, 2014, Keohane was committed to the custody of FDC. She was transferred between numerous FDC facilities from 2014 until 2018. Since 2018, she has been primarily in custody at the Wakulla Annex.

34.    Soon after entering FDC custody, Keohane requested treatment for her gender dysphoria, making clear the need for both hormone therapy and the ability to dress and groom in accordance with female grooming standards.

35.    Keohane requested treatment for her gender dysphoria in numerous conversations with FDC medical and mental-health officials, and through informal and formal grievances and appeal processes, across FDC institutions, to no avail. Although FDC officials confirmed my diagnosis, all treatment for her gender dysphoria, apart from mental-health counseling, was denied.

36.    Although she had at times been using bras and makeshift female undergarments, these were confiscated. She was told that such clothing was unauthorized in a male institution.

37.    The harm it caused Keohane to be without hormone therapy and access to female clothing and grooming standards was significant and resulted in an attempted self-castration and attempts to end her life.

38.    Because her numerous grievances and constant pleading with FDC officials to provide medical care were unsuccessful, Keohane obtained legal representation for help.

39.     On August 15, 2016, a lawsuit was filed on Keohane's behalf in the Northern District of Florida to compel FDC to treat her medical needs. *Keohane v. Jones*, 4:16-cv-511-MW-CAS (N.D. Fla.).

40.     Within a matter of weeks after the lawsuit was filed, FDC began providing hormone therapy to Keohane, and in 2017, six days before trial in the case, it amended its policy concerning treatment for gender dysphoria. The new policy, described further below, recognized that both hormone therapy and other accommodations to facilitate transition can be medically necessary for those diagnosed with gender dysphoria. .

41.     Keohane has had access to female clothing and grooming standards since at least 2018.  She is able to wear her hair long, wear makeup, and wear female undergarments.

42.     The hormone therapy and ability to follow female clothing and grooming standards has made it possible for her to live as the woman that she is and, thus, alleviated the painful distress of gender dysphoria.

<u>FDC's Procedure 403.012</u>

43.     In July 2017, FDC issued Procedure 403.012, "Identification and Management of Transgender Inmates and Inmates Diagnosed with Gender Dysphoria" ("FDC Policy 403.012"). The policy was amended on November 13, 2019.

44.    In its final form, the third section of the FDC Policy 403.012, titled "Treatment for Gender Dysphoria" read:

> Treatment interventions will focus on the ambivalence and/or dysphoria regarding gender identity, social transitioning, assisting with adjustment to incarceration, and community re-entry. Gender-affirming hormonal medication will be prescribed as clinically indicated.

45.    In the following section, "Gender Affirming Hormonal Therapy," the policy provided for hormone therapy to be provided to inmates with gender dysphoria when health care staff determines it is medically necessary and not contraindicated.

46.    Section 5, referring to "Accommodations for Inmates with a Diagnosis of Gender Dysphoria," stated:

> To assist in transitioning, facilities designated by the Department will: 1. provide alternate canteen and quarterly order menus in addition to the menus available to other inmates at the facility; 2. allow inmates to wear make-up inside the housing unit. Make-up will be removed prior to departing the housing unit; 3. allow inmates to grow and style their hair in accordance with the female hair standards as stated in Rule 33-602.101, F.A.C.; and 4. issue opposite gender inmate uniform and under garments. Inmates will be issued the approved type, but may purchase other types of under garments independently from either the alternate canteen or quarterly menu. These items can be worn outside of the housing unit.

47.    For over six years, the Wakulla Annex—and, upon information and belief, FDC more generally—has been following this policy and providing appropriate treatment for gender dysphoria to the individuals in its custody, including hormone therapy and access to female clothing and grooming standards—

14

specifically, access to female undergarments, female canteen items such as makeup, and the female hair-length policy.

FDC's Health Services Bulletin 15.05.23

48.     FDC replaced Procedure 403.012 with Health Services Bulletin 15.05.23 ("HSB 15.05.23" or "Health Bulletin"), as of September 30, 2024. The subject of HSB 15.05.23 is "Mental Health Treatment of Inmates with Gender Dysphoria."

49.     The Health Bulletin provides for the following treatments for inmates with gender dysphoria: addressing medical and psychiatric comorbidities through psychotherapy and psychotropic medications; psychotherapy for gender dysphoria; and consideration of psychotropic medications to alleviate symptoms of gender dysphoria.

50.     The Health Bulletin states that state law—Florida Statutes, Section 286.311, formerly known as Senate Bill 254 ("Section 286.311")—"prohibits the Department from expending any funds to purchase cross sex hormones for the treatment of gender dysphoria," and that the "Department shall comply with this statutory requirement unless compliance with the U.S. Constitution or a court decision requires otherwise." HSB 15.05.23.IX.B.

51.     The next paragraph purports to provide an avenue for possible exceptions to the prohibition on hormone therapy, stating that "[i]n rare instances

15

deemed medically necessary, a variance may be approved to permit the use of cross sex hormones to treat the inmate's gender dysphoria." However, it goes on to state that variances "shall only be sought" "if necessary to comply with the U.S. Constitution or a court decision." And no guidance is provided on how to determine if hormone therapy for an individual is necessary to comply with the U.S. Constitution, or who makes that determination.

52.    Additional requirements to obtain a variance make clear that these are requirements that are not meant to be met. In discussing the requirements for a variance, the Health Bulletin states that "[a]n inmate may be assessed for cross-sex hormone therapy" only if "the treating physician can demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the etiological basis of the pathology. Such evidence must be based on sound scientific methods and research that were subject to the formal peer review process." HSB 15.05.23 § IX.C.1. This has nothing to do with the individual inmate's medical circumstances; it is a demand for certain scientific evidence.  And the demand is for evidence showing that hormone therapy will treat the *root cause* of gender dysphoria; it is not enough to show that treatment alleviates the distress of the condition, which is the purpose of hormone therapy. Additionally, the Health Bulletin has predetermined that the evidence it demands for a variance does not exist,

16

characterizing studies on the benefits of hormone therapy as relying on "unreliable methods." HSB 15.05.23 § IX.A.[2]

53.    The provision for variances establishes an impossible standard and is nothing more than a mirage.

54.    The Health Bulletin bans hormone therapy for inmates with gender dysphoria.

55.    Under this new policy, medical treatment for inmates with gender dysphoria is determined not by their current medical needs and individual medical determinations, but rather based on a blanket policy determination that, in effect, categorically prohibits hormone therapy, regardless of medical need.

56.    In addition to prohibiting hormone therapy, the Health Bulletin does not provide any possibility of grooming and clothing accommodations for inmates diagnosed with gender dysphoria.

---

[2] The Health Bulletin also says a variance shall only be sought "after satisfying all preceding provisions of this policy," which, among other things, require at least one year of psychotherapy "to ameliorate the symptoms of gender dysphoria" prior to consideration of a variance.  Thus, even if the other requirements could somehow be met, it appears that inmates receiving hormone therapy might be required to discontinue treatment for at least a year to undergo this therapy requirement.

57.    The treatment protocols contained in the Health Bulletin depart from well-accepted standards for the treatment of gender dysphoria and are unsupported by scientific evidence.

<u>The Announcement of the New Policy to Inmates with Gender Dysphoria</u>

58.    On September 30, 2024, Keohane and all inmates diagnosed with gender dysphoria in Wakulla CI were rounded up and informed that there was a change in policy regarding the treatment of gender dysphoria.

59.    Apparently recognizing how this information would impact these inmates, FDC provided an unusually high security presence, including officers surveying the group from the central tower while holding large guns. In the roughly 10 years that Keohane has been incarcerated, she has never witnessed that amount of security present.  The entire administrative and high-ranking staff were present.

60.    Keohane and the other inmates with gender dysphoria were told by an unidentified individual from Centurion Health, the FDC-contracted medical provider, that their treatment for gender dysphoria would be changing, "up to and including hormone therapy." They were specifically informed that they would no longer be permitted to follow female grooming and clothing standards, and that compliance with the male standards would begin being enforced in 30 days, at which point they would order them to comply with the male grooming standards, confiscate all female clothing and canteen items, and issue boxers as a replacement for their

18

undergarments. If they did not comply, their heads would be forcibly shaved and they would be subject to "disciplinary action."

61.    Upon information and belief, similar roundups of inmates with gender dysphoria for purposes of informing them of the change in FDC policy regarding the treatment of gender dysphoria took place at other Florida prisons.

62.    On October 4, 2024, the same group of about 80 inmates with gender dysphoria at Wakulla were ordered to visit the Medical Center to have their breasts examined to determine if they would qualify for an exception to be able to wear bras for physical support purposes.

Exhaustion of Administrative Remedies

63.    Plaintiff Keohane has fully exhausted her administrative remedies to the extent required by the Prison Litigation Reform Act.

64.    On October 3, 2024, Keohane submitted a formal grievance at the institutional level. *See* Fla. Admin. Code § 33-103.005(1) ("Inmates shall utilize the informal grievance process prior to initiating a formal grievance. Inmates may skip this step and initiate the process at the formal institutional level for issues pertaining to the following: grievance of an emergency nature, . . . medical grievance . . . ."). In that grievance, Keohane stated that FDC's "announced change to policy for treatment of Gender Dysphoria is unconstitutional, in violation of the 8th Amendment prohibiting cruel and unusual punishment; it is a blank denial not only

with no medical basis, but flying in the face of all established medical standards, which require a considered individual plan for each individual based on their specific needs." Keohane also described her serious medical need for hormone therapy and access to female clothing and grooming standards.

65.     Keohane submitted a formal grievance to Defendant Secretary Dixon. *See* Fla. Admin. Code § 33-103.005(1) ("Inmates may proceed directly to the Office of the Secretary on the following issues as governed by subsection 33-103.007(6), F.A.C.: grievance of emergency nature . . . ."); Fla. Admin. Code 33-103.007(3)(b) ("An emergency grievance may be filed directly with the Secretary.").

66.     Keohane received a response from the institutional-level grievance on October 18, although the response was dated October 10. The response stated: "An investigation reveals the following: 403.012 Identification and Management of Inmates Diagnosed with Gender Dysphoria was recently rescinded. However, protocols set forth in HSB 15.05.23 which went into effect on 9/30/2024 exist to ensure the continued appropriate assessment, therapy, and monitoring of your physical and mental health needs. As appropriate services are being provided to you, your grievance/appeal is denied."

67.     Keohane intends to, or has already, filed an appeal from the institutional-level response.

68.     As of October 23, 2024, Keohane had not received a response to the grievance addressed directly to the Secretary or any appeal from the institutional-level response.

## CLAIM FOR RELIEF

### Count I

**Denial of Medically Necessary Treatment in Violation of the Eighth Amendment to the United States Constitution (42 U.S.C. § 1983)**

69.     Plaintiff Keohane repeats and realleges the allegations in all preceding paragraphs of this complaint as if fully set forth herein.

70.     Plaintiff Keohane and the proposed class members are transgender people who have been or will be diagnosed with gender dysphoria, a serious medical condition. Without necessary treatment, Plaintiff Keohane and members of the proposed class will suffer irreparable physical and psychological harm.

71.     It is medically necessary for Plaintiff Keohane and members of the proposed class to receive the hormone therapy that FDC staff has deemed medically necessary for them—or would deem medically necessary for them absent the new policy prohibiting hormone therapy—as well as access to clothing and grooming standards that accord with their gender identity.

72.     Defendants are aware that Plaintiff Keohane and members of the proposed class have gender dysphoria and require the hormone therapy and/or clothing and grooming accommodations they have been provided.  They are also

21

aware that denying them hormone therapy and/or the clothing and grooming accommodations they have been provided would cause them serious harm.

73.    Defendants are responsible for providing adequate and necessary treatment to Plaintiff Keohane and members of the proposed class, including treatment for individuals diagnosed with gender dysphoria.

74.    Defendants nevertheless are withdrawing medically necessary hormone therapy and clothing and grooming accommodations from Plaintiff Keohane and members of the proposed class. This is not based on a medical judgment concerning their medical needs or individual assessments. It is a blanket policy that applies regardless of medical needs.

75.    Defendants' new policy that took effect on September 30, 2024, establishes a blanket prohibition that denies medical treatment and accommodations to Plaintiff Keohane and members of the proposed class without consideration of any medical judgement formed by health care providers.

76.    As a result of being denied hormone therapy and/or access to female clothing and grooming standards by Defendants, Plaintiff and members of the proposed class will suffer severe psychological distress and physical harm, including suicidal ideation and self-harm.

77.    Defendants' deliberate actions of denying, reducing, and cutting off needed medical treatment for Plaintiff Keohane and members of the proposed class

has caused or will cause them severe physical and psychological harm and puts them at grave risk for worsening physical and psychological symptoms.

78.    This denial of treatment violates the Eighth Amendment's prohibition on cruel and unusual punishment and is deliberate indifference to a serious medical need.

79.    Defendants have acted, and continue to act, with deliberate indifference to Plaintiff Keohane's and members of the proposed class's serious medical needs, and to the substantial risk of serious harm to Plaintiff Keohane and members of the proposed class.

80.    As a result of Defendants' actions described herein, Plaintiff Keohane and members of the proposed class will imminently suffer, and in the absence of injunctive relief, will continue to suffer irreparable physical and psychological harm.

81.    At all relevant times, Defendants and other FDC officials were acting under color of state law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Keohane respectfully requests that this court enter judgement in their favor and against Defendants as follows:

(a) Declare Defendants' practices of banning medically necessary treatment and accommodations for inmates with gender dysphoria as a violation of the Eighth Amendment to the United States Constitution;

(b) Issue emergency temporary injunctive relief, preliminary injunctive relief, and permanent injunctive relief enjoining Defendants, their contractors, employees, agents, and successors in office from enforcing Section 286.311 and Health Bulletin 15.05.23 or any other blanket policy precluding hormone therapy or clothing and grooming accommodations for inmates with gender dysphoria;

(c) Grant provisional and permanent certification of the class;

(d) Award Plaintiff Keohane and members of the proposed class their reasonable attorneys' fees, litigation expenses, and other reasonable costs incurred in connection with this action from Defendants, pursuant to 42 U.S.C. § 1988; and

(e) Award all other relief that this Court deems just, proper, and appropriate.

Dated: October 25, 2024

Respectfully submitted,

/s/Daniel B. Tilley
Daniel B. Tilley (Florida Bar No. 102882)
Samantha J. Past (Florida Bar No. 1054519)
**American Civil Liberties Union Foundation of Florida**

4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org

Li Nowlin-Sohl (Admitted in Washington only)
Leslie Cooper
**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org

*Counsel for Plaintiff*