**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

REIYN KEOHANE,            :
                                :
      *Plaintiff*,          :
                                :
v.                          :     Case No. 4:24-cv-434
                                :
RICKY D. DIXON, in his        :
official capacity as Secretary   :
of the Florida Department of    :
Corrections; CLAYTON WEISS  :
in his official capacity as Health  :
Services Director of the Florida  :
Department of Corrections;     :
GARY HEWETT, in his official   :
capacity as Warden of         :
Wakulla Correctional Institution, :
                                :
      *Defendants*.     :

<u>**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION AND INCORPORATED
MEMORANDUM OF LAW**</u>

## I.   INTRODUCTION

In 2018, this Court found that a Florida Department of Corrections ("FDC")

policy that denied certain transgender inmates access to hormone therapy without

consideration of medical necessity to be violative of the Eighth Amendment and,

though FDC had changed its policy, permanently enjoined the policy after finding

that the voluntary cessation exception to mootness applied. The Court further

ordered that Reiyn Keohane be provided with hormone therapy (absent medical

contraindications) for the duration of her time at FDC. On appeal, FDC argued that their change in policy had mooted aspects of the case, that "FDC has shown significant, genuine interest in improving the care it provides for gender dysphoria," and there "simply is no competent evidence to suggest that FDC will roll back Keohane's treatment when this case is resolved." Brief for Appellant, at 49, *Keohane v. Fla. Dep't of Corr.*, No. 18-14096 (11th Cir. Nov. 19, 2018) (attached hereto as Exhibit 7) [hereinafter "FDC Appellant Brief"]. The Eleventh Circuit agreed with FDC, noting that "government actors are more likely than private defendants 'to honor a professed commitment to changed ways.'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267-68 (11th Cir. 2020) (internal citation omitted). If only it were so.

Less than four years later, FDC has rolled back its policy and the care it provides for gender dysphoria. On September 30, 2024, at FDC facilities across the state, inmates with gender dysphoria were rounded up and informed that FDC policy concerning the treatment of inmates with gender dysphoria had been changed, including access to clothing, grooming, and canteen policies, as well as hormone therapy. They were told they have 30 days to get in compliance; after which, they would have their heads forcibly shaved and receive disciplinary action for possessing any female undergarments and makeup. Declaration of Reiyn Keohane, ¶¶ 19–26 ("Keohane Decl."); Declaration of Daniel Tilley, ¶ 8 ("Tilley Decl.").

That same day, FDC replaced its Procedure 403.012, "Identification and Management of Inmates Diagnosed with Gender Dysphoria " ("FDC Policy 403.012") (attached hereto as Exhibit 3)—which provides for hormone therapy where medically indicated and for grooming, clothing, and canteen accommodations to assist in transitioning—with Health Services Bulletin 15.05.23 ("HSB 15.05.23" or "Health Bulletin") (attached hereto as Exhibit 4) which bans hormone therapy and makes no provision for grooming, clothing, or canteen accommodations. The Health Bulletin requires FDC to abide by Florida Statutes, Section 286.311, formerly known as Senate Bill 254 ("Section 286.311"), which prohibits the use of state funds for hormone therapy, "unless compliance with the U.S. Constitution or a court decision requires otherwise." HSB 15.05.23.IX.B.

The imminent deprivation to Plaintiff and the proposed class members of hormone therapy and FDC clothing, grooming, and canteen policies consistent with their gender identity will result in serious pain, anguish, and catastrophic health consequences. Defendants are aware of these harms—indeed, FDC previously implemented the now-rescinded FDC Policy 403.012 precisely to stop these harms—but nonetheless plan to enforce Section 286.311 and HSB 15.05.23. Such enforcement on October 30, 2024, will violate the Eighth Amendment rights of incarcerated transgender individuals, unless this Court immediately intervenes.

Plaintiff seeks emergency relief to maintain the status quo, protect the health of all proposed class members, and to prevent irreparable harm.

## II.    FACTUAL BACKGROUND

### a.  Gender Dysphoria

"Gender identity" is a well-established concept in medicine, referring to one's internal sense of oneself as belonging to a particular gender. Transgender individuals have a gender identity that differs from their birth-assigned sex. For some but not all transgender people, the incongruence between gender identity and assigned gender results in gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from that incongruence. *Keohane*, 952 F.3d at 1262 (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 451 (5th ed. 2013). Gender dysphoria is a recognized condition with treatment protocols followed by clinicians to provide evidence-based treatment.

Gender dysphoria can be ameliorated and managed through treatment. The standards of care for the treatment of gender dysphoria are currently set forth in the World Professional Association for Transgender Health (WPATH) Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 (2022) (*available                                                                  at* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644).    These recommendations are also mirrored in the Endocrine Society's clinical practice guideline:  "Endocrine    Treatment    of    Gender-Dysphoric/Gender-Incongruent

Persons: An Endocrine Society* Clinical Practice Guideline." (*available at* https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence) ("ES Guideline").

The WPATH promulgated Standards of Care ("SOC") are recognized guidelines for the treatment of persons with gender dysphoria and inform medical treatment. The American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology and the American Society of Plastic Surgeons all endorse treatment protocols in accordance with the SOC. *See, e.g*., American Medical Association Resolution 223 (A-23) (2023); Endocrine Society Position Statement, Transgender Health (2020); American Psychological Association, Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science (2024).

In addition, numerous courts have recognized the Standards of Care promulgated by WPATH as authoritative. *See*, *e.g*., *Edmo v. Corizon, Inc*., 935 F.3d 757, 769 (9th Cir. 2019) (noting that "[m]ost courts agree" that WPATH guidelines "are the internationally recognized guidelines for the treatment of individuals with

gender dysphoria" and collecting cases); *Williams v. Kincaid*, 45 F.4th 759, 767 n.3 (4th Cir. 2022); *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), vacated on other grounds sub nom. *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020).

Dressing, grooming, and presenting oneself in a manner consistent with one's gender identity is an important part of treatment for gender dysphoria. *See* SOC at S107. These elements of gender expression, when indicated for an individual, reduce gender dysphoria and improve mental health. *Id.* And for almost all individuals with persistent, well-documented gender dysphoria, hormone therapy is an essential and medically indicated treatment to alleviate the distress of the condition. *See* SOC, Chapter 12. Hormone therapy reduces the secondary sex characteristics of the person's sex assigned at birth and helps the person acquire congruent secondary sex characteristics (i.e., for transgender women, breast development, redistribution of body fat, cessation of male pattern baldness, and reduction of body hair).

Gender dysphoria left untreated or inadequately treated, "can lead to debilitating distress, depression, impairment of function, substance use, self-surgery to alter one's genitals or secondary sex characteristics, self-injurious behaviors, and even suicide." *Edmo v. Corizon, Inc*., 935 F.3d 757, 769 (9th Cir. 2019) The depression and hopelessness associated with the condition causes suicidal ideation, which results in actual suicide for many individuals. Transgender women with

gender dysphoria without access to appropriate care are often so desperate for relief that they resort to life-threatening attempts at auto-castration (the removal of one's testicles) or auto-penectomy (the removal of one's penis).. In sum, the results of providing inadequate treatment are predictable and dire, and take one of three paths: profound psychological decompensation, attempts at surgical self-treatment, or suicidality and suicide.

In addition to the risks outlined above, the potential risks of harm are more severe here than in most other cases where people may be cut off from hormone therapy that they have relied on for years—regardless of medical need or medical risk of withdrawing care—because not only will individuals be cut off of the treatment that may have kept them stabilized and alive for many years, but some individuals who have had an orchiectomy and need hormone therapy in the absence of the body's endogenous production of hormones will have no recourse to maintain hormone production. As the SOC recognize: "The consequences of abrupt withdrawal of hormones or lack of initiation of hormone therapy when medically necessary include a significant likelihood of negative outcomes, such as surgical self-treatment by autocastration, depressed mood, increased gender dysphoria, and/or suicidality." SOC at S106 (citations omitted).

The SOC are clear: transgender "persons who enter an institution on an appropriate regimen of gender-affirming hormone therapy should be continued on

the same or similar therapies and monitored according to the SOC Version 8," and transgender "persons who are deemed appropriate for de novo gender-affirming hormone therapy should be started on such therapy just as they would be outside of an institution," *id.*; and transgender persons should be allowed to obtain appropriate clothing and grooming items concordant with their gender expression, as [r]esearch indicates social transition and congruent gender expression have a significant beneficial effect on the mental health of TGD people." *Id.* at S107 (citations omitted). This is basic medical care and treatment. FDC has allowed this care when medically indicated for inmates with gender dysphoria for several years and has provided hormone therapy to some transgender inmates for even longer. It is dangerous enough to not increase treatment appropriately for those who need it, but cutting people off treatment is a level of callousness that has not even been contemplated for years.

### b. FDC's Policy on the Treatment of Inmates with Gender Dysphoria Until September 2024

For many years, the FDC's Procedure Number 602.053, Specific Procedure (2)(a)5, required that, "[i]nmates who have undergone treatment for [gender dysphoria] will be maintained only at the level of change that existed at the time they were received by the Department." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1262–63 (11th Cir. 2020) (quoting policy). Under this "freeze-frame" policy, a transgender inmate's medical care was determined not by their current,

individualized medical needs, but rather by the treatment they were or were not receiving at the time of their incarceration. *Id.* at 1263.

In August 2016, after two years of her requests for hormone therapy and access to the FDC's female clothing and grooming standards being denied, Reiyn Keohane filed a lawsuit against FDC officials, alleging that the denials and Procedure Number 602.053 violated the Eighth Amendment. *See* Complaint, *Keohane v. Jones*, No. 4:16-cv-511, ECF No. 1 (N.D. Fla., August 15, 2016). Two weeks after the lawsuit was filed, FDC referred Keohane to an endocrinologist, who prescribed her hormone therapy. Approximately eight weeks after the lawsuit was filed, "FDC formally repealed its freeze-frame policy and replaced it with a policy that calls for individualized assessment and treatment of inmates who claim to be suffering from gender dysphoria and related conditions." *Keohane*, 952 F.3d at 1263.

On or about July 13, 2017, FDC formally issued the new policy, Procedure 403.012, titled "Identification and Management of Transgender Inmates and Inmates Diagnosed with Gender Dysphoria" (attached hereto as Exhibit 2). This policy was revised on November 13, 2019. Under this policy, inmates diagnosed with gender dysphoria had access to, among other things "evaluation for hormonal treatment" and accommodations to "assist in transitioning." FDC Policy 403.012 at 5–6.

Under the policy, a Gender Dysphoria Review Team (GDRT) was responsible for reviewing "recommendations for the treatment and management of

inmates diagnosed with Gender Dysphoria to ensure individualization in the decision-making process." *Id.* at 3. Section 4, "Gender Affirming Hormonal Therapy," laid out the specific procedures for hormonal therapy when it was determined to be medically necessary and not contraindicated for an inmate. *Id.* at 5–6. Section 5, "Accommodations for Inmates with a Diagnosis of Gender Dysphoria," provided for access to alternate canteen and quarterly order menus; the use of make-up inside the housing unit; the ability to abide by FDC's female hair standards; and uniforms and undergarments consistent with the inmate's gender identity. *Id.* at 6.

### c.   FDC's Announced Change of Policy

On September 30, 2024, FDC rescinded FDC Policy 403.012 and implemented Health Services Bulletin 15.05.23. *See* Exhibit 5, Grievance and Response; HSB 15.05.23. The Health Bulletin bans hormone therapy and is silent as to social transition accommodations, including canteen items, make-up, hair standards, and uniforms and undergarments, effectively revoking those treatments. The only treatments it provides for inmates with gender dysphoria are addressing medical and psychiatric comorbidities through psychotherapy and psychotropic medications; psychotherapy for gender dysphoria; and consideration of psychotropic medications to alleviate symptoms of gender dysphoria. HSB 15.05.23 § VII.

The first way that the Health Bulletin bans hormone therapy is by requiring compliance with S.B. 254 (codified at Florida Statute § 286.311), which prohibits FDC "from expending any state funds to purchase cross-sex hormones for the treatment of Gender Dysphoria," "unless compliance with the U.S. Constitution or a court decision requires otherwise."[1] HSB 15.05.23 § IX.B.

The second way the Health Bulletin bans hormone therapy is by purporting to provide it only in circumstances so constricted, they are non-existent. It states that "[i]n rare instances deemed medically necessary, a variance may be approved to permit the use of cross-sex hormones to treat an inmate's Gender Dysphoria," and variances "shall only be sought (1) after satisfying all preceding provisions of this policy and (2) if necessary to comply with the U.S. Constitution or a court decision." HSB 15.05.23 § IX.C. In addition, the treating physician must "demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the *etiological basis* of the pathology. Such evidence must be based on sound scientific methods and research that were subject to the formal peer review process." HSB 15.05.23 § IX.C.1. (emphasis added).

---

[1] A savings clause is purely theoretical if it has no mechanism or standard for being invoked. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021); *Louisiana v. Biden*, No. 2:21-CV-778, 2021 WL 4312502, at *8 (W.D. La. Aug. 23, 2021), *report and recommendation adopted*, No. 2:21-CV-0778, 2021 WL 4314795 (W.D. La. Sept. 22, 2021) (purely theoretical savings clause offered no mechanism to implement in a manner consistent with the law other than simply refusing to implement).

If that weren't already enough, the inmate must also satisfy all the requirements of the treatment protocol in Section VII of the Health Bulletin. The treatment protocol is not grounded in the widely accepted community standards. *Compare* HSB 15.05.23 § VII with SOC and ES Guideline. Nor does it take into account the individual's medical needs, for example requiring psychotherapy for a year in the prison setting, regardless of the amount of psychotherapy the individual has already received and whether they are already receiving hormone therapy. HSB 15.05.23 § VII.A.5.

Plaintiff and the proposed class members were informed of the changes in the Health Bulletin on September 30, 2024. Upon information and belief, all female transgender inmates were gathered at their respective institutions and, surrounded by abnormally heightened security, informed that their treatment for gender dysphoria would be changing in 30 days. Compl. ¶¶ 58-61. This includes hormone therapy and restrictions on female clothing, canteen items, and grooming. *Id*. ¶ 60. They were further told that if they do not comply after 30 days, their heads would be forcibly shaved, all female clothing and canteen items would be confiscated, and they would suffer disciplinary action. *Id*.

### d. Plaintiff

Plaintiff Reiyn Keohane ("Keohane*"*) is a transgender woman in the custody of the FDC.[2] She is serving a fifteen-year sentence and is currently incarcerated at the Wakulla Annex in Crawfordsville, Florida. She has been in the custody of the FDC since 2014. Keohane knew her gender identity did not align with her sex assigned at birth since she was 12 years old. At age 14, she began socially transitioning—wearing female-typical clothing, hairstyles, and cosmetics; at age 16 she received a diagnosis by a licensed medical professional for gender identity disorder; and at age 19, she began hormone treatment therapy.

Shortly after beginning her hormone therapy, in September 2013, Keohane was arrested and taken into custody at the Lee County Jail. There, she was refused hormone therapy despite her repeated requests. In July 2014, she accepted a plea deal and was committed to the custody of FDC. Although FDC officials confirmed this diagnosis of a serious medical condition, she was refused all care for her gender dysphoria aside from mental-health counseling, including hormone therapy and the ability to dress and groom in accordance with FDC's female standards, and the bras and makeshift female undergarments Keohane obtained were confiscated. Keohane

---

[2] The following facts relating to Ms. Keohane are contained in her Declaration in support of this Motion.

experienced significant harm due to the denial of hormone therapy and the ability to present as female. She attempted suicide or self-castration on several occasions.

On August 15, 2016, she sued to compel FDC to treat her serious medical need. Shortly after the lawsuit was filed, FDC provided Keohane with hormone therapy and rescinded its policy that had prevented Keohane from receiving hormone therapy. For 8 years, Keohane has been provided with hormone therapy, and for 6 years, she has been provided access to female clothing and grooming standards. She has worn her hair long, she wears makeup, and she wears women's clothing and undergarments. Dozens of other transgender women at Wakulla CI have been provided with the same social transition care since 2018.

Accessibility to hormone therapy as well as the ability to wear female clothing and follow female grooming standards has enabled Keohane to live as the woman that she is, alleviating the painful distress of her gender dysphoria. When forced to abide by male standards in the past while incarcerated, she has experienced huge spikes of distress and dysphoria both at the time the care was removed as well as long-lasting effects. For Keohane, gender-affirming care is crucial to her ability to function. Hormone therapy coupled with the ability to wear her hair long and women's clothing like underwear and bras are instrumental for her to cope with the symptoms of her gender dysphoria.

## III.   ARGUMENT

A temporary restraining order or preliminary injunction is warranted if the moving party shows "(1) a substantial likelihood of ultimate success on the merits; (2) the TRO is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the TRO would inflict on the non-movant; and (4) the TRO would serve the public interest." *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995); accord *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Where circumstances are such that even the time needed to hear a request for a preliminary injunction is too long to prevent irreparable harm, a temporary restraining order may be issued while a court considers a request for a preliminary injunction. *See United States v. Kaley*, 579 F.3d 1246, 1264 (11th Cir. 2009) (Tjoflat, J., concurring) ("TROs are 'designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction.'" (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 2951, at 253 (2d. ed. 1995)).

As fully set forth below, Plaintiffs meet all of the factors supporting a temporary restraining order and the requested relief should be granted because: (i) Plaintiffs' claim that the FDC's plan to categorically withdraw medically necessary care from inmates with gender dysphoria in violation of the Eighth Amendment is likely to succeed on the merits, (ii) Plaintiffs and the proposed class will suffer

irreparable harm if the FDC is permitted to withdraw medically necessary care that Plaintiffs and the proposed class members have been receiving for years, (iii) the relief requested poses no harm to the FDC, and (iv) the public interest strongly favors upholding the Constitution and preventing avoidable injury to individuals held in government custody.

### a. Plaintiffs Have a Substantial Likelihood of Ultimate Success on the Merits

The Eighth Amendment prohibits the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend. VIII. "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Corrections officials violate the bar on cruel and unusual punishments when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The Eighth Amendment standard requires that the alleged deprivation be "objectively, sufficiently serious," and requires, subjectively, that the official acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). In the Eleventh Circuit, "an objectively serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"—that, "if left unattended, poses a

substantial risk of serious harm." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)).

   i. <u>Plaintiffs' Gender Dysphoria is an Objectively Serious Medical Need for Purposes of the Eighth Amendment.</u>

   It is uncontested in this case that Plaintiffs and members of the proposed class have gender dysphoria. Gender dysphoria is a medical condition codified in the DSM-V, and there is a medical consensus that it is a serious medical condition requiring treatment. *See supra*, Section II.a. FDC itself has previously recognized that gender dysphoria can be a serious medical condition and that Plaintiff Reiyn Keohane has a serious medical need for treatment for her gender dysphoria. *Keohane*, 387 F.3d at 1266. Other circuits have also consistently recognized gender dysphoria, and the attendant risks caused by untreated gender dysphoria, to be a serious medical condition for the purposes of the Eighth Amendment. *E.g.*, *Edmo*, 935 F.3d at 785; *Fields v. Smith*, 653 F. 3d 550, 555–56 (7th Cir. 2011); *De'lonta v. Johnson*, 708 F.3d 520, 525–26 (4th Cir. 2013); *Kosilek v Spencer*, 774 F.3d 63, 86 (1st Cir. 2014). Plaintiff and the proposed class members' gender dysphoria, which has been diagnosed and treated by Defendants and their agents, is a serious medical need for purposes of the Eighth Amendment.

    ii.  <u>By Categorically Cutting Off Treatment, Defendants Have Acted with Deliberate Indifference.</u>

Defendants' decision to cut off Plaintiff and the proposed class members' medically necessary treatment for their serious medical condition constitutes deliberate indifference for the purposes of the Eighth Amendment.

The Eighth Amendment requires that prisoners be provided with adequate medical care based on an individualized assessment of medical need. *See Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) (holding that the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy ... is the paradigm of deliberate indifference" (quotation omitted)). Given this need for individualized assessment, exclusionary policies that bar certain forms of medical treatment regardless of medical need for the treatment violate the Eighth Amendment. *See id.* at 1068 (prison policy of barring cataract surgery where one eye would retain functionality without room for medical determination constituted deliberate indifference to plaintiff's serious medical need); *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (denial of hepatitis C treatment to a prisoner based on a policy that a particular drug could not be administered to inmates with recent history of substance abuse could constitute deliberate indifference since policy did not allow exceptions based on medical need); *Mahan v. Plymouth Cnty. House of Corr.*, 64 F.3d 14, 18 n.6 (1st Cir. 1995) ("inflexible" application of prescription policy may violate Eighth Amendment); *Jorden v. Farrier*, 788 F.2d 1347, 1349 (8th

Cir. 1986) (application of prison pain medication policies must be instituted in a manner that allows individualized assessments of need).

Courts have routinely held prison policies that automatically exclude certain forms of treatment for gender dysphoria violate the Eighth Amendment. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (alleged blanket ban on gender confirmation surgery and denial of gender confirmation surgery to plaintiff with severe symptoms, including repeated self-castration attempts, states an Eighth Amendment claim); *Fields v. Smith,* 653 F.3d 550 (7th Cir. 2011) (holding that a state law that barred hormone therapy and sex reassignment surgery as possible treatments for prisoners with gender dysphoria facially violated the Eighth Amendment); *De'Lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003) (holding that a prisoner with gender dysphoria stated a claim for deliberate indifference where the Department of Corrections withheld hormone therapy pursuant to a policy against providing such treatment and not the medical judgment of qualified providers).

That a particular treatment does not require a prescription does not mean it is not medically necessary. *See*, *e.g.*, *Kosilek v. Spencer*, 774 F.3d 63, 69 –70, 90 (1st Cir. 2014) (noting that the inmate was receiving mental health treatment, "female, gender-appropriate clothing and personal effects," and hormone therapy to treat her gender dysphoria, and that such treatment was "proven to alleviate [the inmate's] mental distress"); FDC Appellant Brief at 16 (describing steps FDC has taken to

"treat[] Keohane's gender dysphoria," including issuance of a bra, and female pronoun usage); FDC Appellant Brief at 39 (noted that all medical witnesses—including FDC's doctors—agreed that appropriate pronoun usage is highly important to those with gender dysphoria); *see also* FDC Appellant Brief at 22 (describing *Kosilek*).

FDC, in reliance on a recent Florida statute and the Health Bulletin, is categorically denying treatments for gender dysphoria. By prohibiting state funds to be used for "sex-reassignment prescriptions or procedures," Section 286.311 imposes a blanket ban against the provision of medical care to treat gender dysphoria in state carceral settings, without exception or regard for medical need. HSB 15.05.23 states that FDC will abide by the Section 286.311.

The Health Bulletin also bans hormone therapy. It mentions the possibility of an exception, but establishes an impossible standard. In the "rare instances" that hormone therapy is deemed medically necessary, it can only be provided if certain treatment protocols inconsistent with standards of care are met and if it is "necessary to comply with the U.S. Constitution or a court decision." HSB 15.05.23 § IX.C. And an inmate "may be assessed for hormone therapy" only if the treating physician can "demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the etiological basis of the pathology. Such evidence

must be based on sound scientific methods and research that were subject to the formal peer review process." HSB 15.05.23 § IX.C.1.

First, the predetermined "rarity" of the medical necessity of hormone therapy is a reflection of FDC's mistaken belief that hormone therapy is not an appropriate treatment for gender dysphoria. *See* HSB 15.05.23, IX.A; *id*. at n.6 (citing *Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria*, Agency for Healthcare Administration (June 2022)). This belief, combined with a treatment protocol far afield from widely accepted standards of care, will predictably result in FDC determining that hormone therapy is almost never—if not never—medically necessary. Second, there is no guidance on how it will be determined, or by whom, if an individual's medically necessary hormone therapy is viewed by FDC as constitutionally necessary.

Third, hormone therapy is not intended to treat the *etiological* basis of gender dysphoria; hormone therapy helps align a person's secondary sex characteristics with their gender identity, thereby alleviating the distress that results from the incongruity between their gender identity and sex assigned at birth. It does not treat the root cause of their gender dysphoria—having a gender identity different from one's sex assigned at birth—because that is not something that needs to be fixed. *See* DSM-V (treatment for gender dysphoria should focus on alleviating the distress and not trying to change the person's gender identity). Regardless, there is no justification

for withholding treatment because it fails to target the etiological basis of a pathology. This would be akin to withholding pain medication for a migraine because the medication does not target the etiological basis for the person's migraines. Furthermore, the Health Bulletin has predetermined that the supporting evidence it demands does not exist, characterizing studies on the benefits of hormone therapy as relying on "unreliable methods." HSB 15.05.23 § IX.A.

In addition, the Health Bulletin—in its silence on the topics—prohibits other transition treatments for inmates with gender dysphoria by not allowing transgender inmates to abide by FDC's grooming, dress, and canteen policies consistent with their gender identity. *See generally* HSB 15.05.23; *see also* Compl. ¶ 60 (describing all transgender inmates being told that in 30 days, their female clothing and canteen items would be confiscated and their heads forcibly shaved to comply with FDC's male grooming policy).

Defendants are aware that treatment for Plaintiff and the proposed class members' gender dysphoria requires medical care and accommodations to assist in transitioning because they are currently receiving such treatment from Defendants and Defendants' own health care providers. For years, FDC has understood that hormone therapy and clothing, grooming, and canteen standards consistent with one's gender identity are beneficial for some inmates with gender dysphoria. *See* FDC Policy 403.012(4), (5). Indeed, after starting Plaintiff Keohane on hormone

therapy, FDC stated that "her mental state has improved" and hormone therapy "relieved some of the distress associated with gender dysphoria." FDC Appellant Brief at 40. Despite this, FDC is universally withdrawing treatments for gender dysphoria that it has provided for years, without regard for medical necessity. A categorical ban on treatments that FDC knows to be necessary and effective is the epitome of deliberate indifference.

### b. Plaintiffs Will Suffer Irreparable Harm Absent a Temporary Restraining Order

To obtain a preliminary injunction, Plaintiff and the proposed class need not demonstrate that irreparable injury is inevitable, but only that it "is likely in the absence of an injunction." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008). Here, irreparable injury is inevitable and imminent. All inmates with gender dysphoria have been informed that by October 30, 2024, they must cut their hair to male standards and turn in any bras, female undergarments, or alternate canteen items or face a forced haircut and disciplinary action. This care that assists in their transitioning and alleviates their gender dysphoria will be abruptly stopped. Discontinuing medically necessary care will imminently cause irreparable injuries, including increased risk of suicidality, self-harm, anxiety and depression. *See Edmo* at 797-798 ("severe, ongoing psychological distress" and a "high risk of self-castration and suicide" constitute irreparable harm). Additionally, Plaintiff and the proposed class members will also suffer irreparable harm in the deprivation of their

constitutional rights. *See Edmo* at 798 (deprivation of one's "constitutional right to adequate medical care is sufficient to establish irreparable harm.")

Keohane has already endured the horrifying effects of being denied care for her gender dysphoria, and being forced to discontinue her care would be devastating to her. *See*, *e.g.*, *supra,* Section II.d; Keohane Decl. at 6 (discussing trauma of having her head forcibly shaved); Keohane Decl. at 8 (past unavailability of hormone therapy caused great distress and a suicide attempt); Keohane Decl. at 5-6 (women's underwear alleviate gender dysphoria by concealing and holding down genitalia, whereas the male-issue boxers exacerbate her dysphoria).  Access to gender-affirming hormone therapy and accommodations is the only thing allowing Keohane to function, Keohane Dec. at ¶ 32, and reductions in care have led, and will lead, to severe decompensation of her health. Keohane Dec. at ¶¶ 15, 18. If HSB 15.05.23 is permitted to go into effect, Plaintiff Keohane and the proposed class members will once again suffer these harms.

### c. The Balance of Harms Strongly Favors Plaintiffs and a Temporary Restraining Order Is In the Public Interest

The balance of equities and public interest weigh in Plaintiffs' favor because Defendants will suffer no harm if the Court grants the requested relief, and the public interest is served when courts protect constitutional rights. The Court considers these factors jointly when a plaintiff seeks emergency relief against the government. *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020).

The balance of harms strongly favors the Plaintiffs. The harms caused by categorically withdrawing medically necessary care for Plaintiffs and the proposed class members are severe. Every day without access to hormone therapy and that they are forced to abide by male grooming and clothing standards will exacerbate their gender dysphoria. Allowing these bans to go into effect will cause Plaintiff and class members' mental health to deteriorate and their risk of future suicidality and self-harm to increase. The risk to their mental and physical health is both great and certain.

On the other side of the scale, Defendants will not suffer any harm – much less irreparable harm – from providing necessary medical care to Plaintiffs consistent with their constitutional obligations. Further, Defendants have been providing this medically necessary care to Plaintiffs for years without experiencing harm.

Finally, the public interest weighs strongly in favor of Plaintiffs. As the Eleventh Circuit explained in *Otto v. City of Boca Raton*, "neither the government nor the public has any legitimate interest in enforcing [] unconstitutional" conduct. 981 F.3d 854, 870 (11th Cir. 2020); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("The public has no interest in enforcing an unconstitutional ordinance."). The public has an interest in ensuring the continued dignity of incarcerated individuals, and "'inherent in that dignity is the recognition of serious medical needs, and their adequate and effective treatment' pursuant to the

Eight Amendment's mandated standard of care." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (quoting the district court and finding no abuse of discretion.)

## IV.   PROVISIONAL CLASS CERTIFICATION IS WARRANTED

This case challenges a blanket ban on the provision of gender-affirming care that will impact scores, if not hundreds, of transgender people incarcerated with the FDC. This case is appropriate for class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(2). While the Court may issue preliminary injunctive relief prior to formal certification of the class, 2 Newberg and Rubenstein on Class Actions § 4:30 (6th ed.) (collecting cases), the Court may also provisionally certify the class for purposes of the TRO and preliminary injunction. *See Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1043 (9th Cir. 2012) (rejecting argument that Rule 23(b)(2) does not permit provisional class certification for preliminary injunctive relief, as "[t]he plain language of FRCP 23(b)(2) does not restrict class certification to instances when final injunctive relief issues; it only requires that final injunctive relief be appropriate."); *see also Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016) ("certification of a class is always provisional in nature until the final resolution of the case").[3] Plaintiff asks the Court to preliminarily enjoin the FDC's

---

[3] A requirement of final class certification prior to issuance of preliminary injunctive relief would make it nearly impossible for courts to act expeditiously where needed to preserve the status quo or prevent irreparable harm, and would be inconsistent with the plain language of Rule 23(b)(2).

policy as it pertains to the class and if needed, to provisionally certify the class. In the alternative, Plaintiff asks the Court to certify the class.

Plaintiffs seeking class certification must meet four factors under Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, Plaintiff seeks certification pursuant to Fed. R. Civ. P. 23(b)(2), which Plaintiff satisfies because Defendants have acted or refused to act on grounds generally applicable to the class. *See* Fed. R. Civ. P. 23(b)(2).

### a. The Putative Class is Sufficiently Numerous.

The numerosity requirement of Rule 23(a) is satisfied where the number of potential plaintiffs is "so numerous that joinder of all members" of the class would be "impracticable." Fed. R. Civ. P. 23(a)(1). There is no fixed size requirement to demonstrate numerosity, but "generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co*., 784 F.2d 1546, 1553 (11th Cir. 1986) (citations omitted). "A plaintiff need not show the precise number of members in the class," *Evans v. U.S. Pipe & Foundry Co*., 696 F.2d 925, 930 (11th Cir. 1983), and "[e]stimates as to the size of the proposed class are sufficient for a class action to proceed," *Hively v.*

*Northlake Foods, Inc*., 191 F.R.D. 661, 666 (M.D. Fla. 2000). The Court may also "make common sense assumptions in order to find support for numerosity." *Evans*, 696 F.2d at 930.

Moreover, because the proposed class includes future members, traditional joinder is not practicable. *See Hill v. Butterworth*, 170 F.R.D. 509, 514 (N.D. Fla. 1997) (joinder of unknown future class members is impracticable and supports satisfaction of numerosity requirement); *Phillips v. Joint Legis. Comm. on Performance & Expenditure Review of Miss*., 637 F.2d 1014, 1022 (5th Cir. 1981) (same). Future class members will suffer the same injury absent injunctive relief from Defendants' deliberate indifference to the unsafe conditions in the jail. Class relief targeting these unconstitutional conditions is therefore appropriate because, regardless of the size of the class, traditional joinder is not practicable.

Here, Plaintiff has identified approximately 80 class members in the Wakulla facility. Upon information and belief, approximately 120 class members at Wakulla, Dade Correctional Institution, and Lake Correctional Institution were informed of the Health Bulletin in a similar manner. Tilley Decl. ¶ 8. Upon information and belief, FDC operates four facilities that house inmates with gender dysphoria, so the number is likely greater than 120. In any event, 120 current class members is sufficient, particularly where, as here, new members will continually join the class in the future.

### b. The Named Plaintiff's Claims Raise Common Issues of Law and Fact and Are Typical of the Class.

The commonality requirement of Rule 23(a)(2) requires plaintiffs seeking class certification to show that their claims "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541; *see also Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). Claims need not be identical to satisfy this requirement, and variations within the class are permissible. *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 n.14 (11th Cir. 2000).

The typicality requirement of Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The focus of typicality is whether the class representative's interest is aligned enough with the proposed class members to stand in their shoes for purposes of the litigation. *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1275 (11th Cir. 2009). Because the considerations underlying commonality and typicality overlap considerably, the Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S 147, 157 n.13 (1982). By their nature, civil rights cases often easily demonstrate commonality and typicality because the defendants' actions are "central to the claims of all class members irrespective of their individual circumstances and the disparate

effects of the conduct." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994) (internal citation omitted).

Here, there are questions of law or fact common to the class and Plaintiff's claims are typical of the class. Without the TRO and preliminary injunction, Defendants will enforce Section 286.311 and HSB 15.05.23 uniformly against all members of the class. This lawsuit presents common questions of law, including whether Section 286.311 and HSB 15.05.23 violate the Eighth Amendment. If Defendants are permitted to enforce Section 286.311 and HSB 15.05.23, all members of the class will continue to be subject to a common impact: the cessation of gender-affirming care and/or inability to obtain gender-affirming care regardless of their medical need. All class members seek the same relief: an injunction preventing enforcement of Section 286.311 to the extent that it prohibits the use of state funds to pay for medically necessary treatment for people in state custody and HSB 15.05.23.

Moreover, Plaintiff's claims are typical of those of the class. Plaintiff and class members are all injured in the same way: they are all transgender adults with gender dysphoria who seek to continue receiving gender-affirming care prohibited by Section 286.311 and HSB 15.05.23 and who, absent an injunction, are, or would be, prohibited from receiving such care, regardless of their medical needs, because of Defendants' enforcement of Section 286.311 and HSB 15.05.23. Further, Section

286.311 and HSB 15.05.23 do not allow for the consideration of a transgender individual's specific circumstances. It is the fact that Defendants will enforce the ban on certain gender-affirming treatments across the board to all transgender individuals incarcerated in Florida prisons that renders enforcement "conduct" common to the class. Though each class member's treatment plan for gender dysphoria is unique, this is no barrier to class-wide relief, as the only issue here is the constitutionality of the categorical ban on certain care. Defendants' common course of conduct toward the class—certain care will be prohibited regardless of each person's medical needs—means there is no need for individualized determinations of the propriety of injunctive relief. *See* 7A Wright et al., *Federal Practice and Procedure: Civil* § 1763 at 203.

### c. The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy means "that the class representative has common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel." *Piazza v. Ebsco Indus., Inc*., 273 F.3d 1341, 1346 (11th Cir. 2001); *see also Valley Drug Co. v. Geneva Pharmaceuticals, Inc*., 350 F.3d 1181, 1189 (11th Cir. 2003) ("adequacy of representation analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and

(2) whether the representatives will adequately prosecute the action." (internal citation and quotations omitted)). These criteria are satisfied here.

Regarding the first prong, Plaintiff is an adequate representative of the class because her interests are completely aligned with, and are not antagonistic to, the interests of the other class members. Plaintiff has a substantial stake in these proceedings and, like other class members, has a strong interest in enjoining Defendants' blanket policy and having access to necessary gender dysphoria treatments.

Regarding the second prong, the Plaintiff meets the requirement that she will adequately prosecute the action. She is represented in this case by highly qualified and experienced civil rights attorneys who are able and willing to conduct this litigation on behalf of the class. Plaintiffs' counsel, the American Civil Liberties Union Foundation of Florida and the American Civil Liberties Union Foundation, have ample experience in class action cases involving federal civil rights claims and have the resources to fully litigate this lawsuit. *See, e.g.*, *CAIR Florida, Inc. v. Miami-Dade Co.*, No. 1:15cv23324 (S.D. Fla.) (challenging denial of Halal diets to Muslim inmates); *Carruthers v. Israel*, No. 76cv6086 (S.D. Fla.) (involving mental health, excessive force and religious freedom claims related to conditions of confinement against Broward County Jail). Additionally, they have substantial experience litigating Eighth Amendment claims on behalf of transgender litigants.

*See*, *e.g.*, *Iglesias v. Bureau of Prisons*, No. 19-cv-00415 (S.D. Ill.) (achieved settlement for incarcerated transgender woman to receive gender-affirming surgeries); *Zayre-Brown v. North Carolina Dep't of Public Safety*, No. 22-cv-191 (W.D. N.C.) (Eighth Amendment challenge to denial of gender-affirming surgery for incarcerated transgender woman). Counsel represented Plaintiff Keohane in an earlier related matter against FDC and are very familiar with the claims and arguments presented in this case. *See Keohane v. Jones*, No. 4:16-cv-511 (N.D. Fla).

### d. Plaintiff Seeks Injunctive Relief that Is Generally Applicable to the Class

In addition to satisfying the requirements of Rule 23(a), the proposed class satisfies Rule 23(b)(2), which requires that the party opposing certification have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See also Heffner v. Blue Cross & Blue Shield of Alabama, Inc*., 443 F.3d 1330, 1345 (11th Cir. 2006) ("Certification under Rule 23(b)(2) is proper when the relief sought necessarily affects all class members.").

Plaintiff and the proposed class members challenge a statute and policy of general applicability; Defendants intend to enforce Section 286.311 and HSB 15.05.23 and such enforcement will immediately and detrimentally affect the Plaintiff and members of the proposed class. Plaintiff and the proposed class seek to prevent this injury by enjoining HSB 15.05.23 and portions of Section 286.311.

### e. The Court Should Appoint Plaintiff's Attorneys as Class Counsel Pursuant to Rule 23(g).

Rule 23(g)(1) provides that "unless a statute provides otherwise, a court that certifies a class must appoint class counsel." Rule 23(g)(1)(A) outlines the factors relevant to the appointment of class counsel: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

All of these factors weigh in favor of appointing the undersigned as class counsel. The attorneys of the American Civil Liberties Union Foundation and ACLU of Florida Foundation possess substantial expertise litigating class actions and constitutional and civil rights actions on behalf of transgender plaintiffs, including Eighth Amendment claims on behalf of transgender prisoners. *See supra*, Section IV.c. The plaintiffs' attorneys are adequate class counsel and should be so appointed pursuant to Rule 23(g).

### f. The Class Claims Are Exhausted

Under the Prison Litigation Reform Act ("PLRA"), "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. s.

1997e(a). "An inmate need exhaust only such administrative remedies as are 'available.'" *Ross v. Blake*, 578 U.S. 632, 648 (2016). "[A]n administrative procedure is unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief." *Id.* at 633.

Here, Plaintiff's administrative remedies are "unavailable" for two reasons. First, it is not possible to fully complete the grievance and appeal process within the 30-day period between the time FDC provided notice of the removal of treatment and when it will actually remove treatment. FDC's administrative remedies are thus not "available" for purposes of obtaining emergency temporary injunctive relief challenging Section 286.311 and HSB 15.05.23. Second, because Section 286.311and HSB 15.05.23 are blanket bans on care that are binding on FDC, no grievance process is "available" to challenge their imposition because the procedure is a "dead end—with officers unable … to provide any relief." *Id.* Indeed, the grievance that Plaintiff submitted at the institutional level received a response simply stating that the old policy no longer applied and that HSB 15.05.23 would be followed. *See* Ex. 5. Under the new policy regime, no exception is permitted for access to female clothing and grooming standards, and both the policy and state law provide a categorical ban on hormone therapy. No relief is available from FDC's administrative process. Plaintiff has therefore satisfied the exhaustion requirements of the PLRA.

In light of Keohane's exhaustion of her individual claims, other class members have vicariously exhausted their claims. *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) (ruling the exhaustion by one class member satisfies the PLRA's exhaustion requirement for the certified class); *see also St. Jules v. Savage*, 512 F.2d 881, 882 (5th Cir. 1975) (holding where a state court "rejected, without opinion" the "single constitutional challenge" of an individual, the class claims were also exhausted because "individual consideration of each petition would serve no useful purpose").

## V.    CONCLUSION

This is precisely the type of case warranting temporary relief "to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). Absent a TRO from this Court, on October 30, Plaintiffs and the proposed class members will lose access to gender-affirming care that treats their gender dysphoria. They will all have their hair forcibly shaved to meet the short male grooming standard and lose female undergarments and grooming items they were previously provided by FDC and that they need to live in accordance with their female gender identity.  And Section 286.311 and HB 15.05.23 will prohibit them from continuing to receive or receiving hormone therapy.  For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a Temporary

Restraining Order and for Provisional Class Certification, and that the Court permit

the parties to set a briefing schedule for Plaintiffs' Motion for Preliminary Injunction.

Dated: October 25, 2024

Respectfully submitted,

<u>/s/ Daniel B. Tilley</u>
Daniel B. Tilley (Florida Bar No. 102882)
Samantha J. Past (Florida Bar No. 1054519)
**American Civil Liberties Union Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org

Li Nowlin-Sohl (Admitted in Washington only)
Leslie Cooper
**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org

*Counsel for Plaintiff*