Appeal No. 18-14096-H

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### REIYN KEOHANE,

Plaintiff/Appellee,

vs.

### FLORIDA DEPARTMENT OF CORRECTIONS,

Defendant/Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
No. 4:16-cv-511-MW-CAS

---

### BRIEF OF APPELLANT
### FLORIDA DEPARTMENT OF CORRECTIONS

---

Daniel Russell
William D. Hall
Attorneys for Appellant
Jones Walker LLP
215 South Monroe Street, Suite 130
Tallahassee, FL 32301
Telephone: (850)425-7805
Facsimile: (850)-425-7815
Email: drussell@joneswalker.com

Kirkland E. Reid
Attorney for Appellant
Jones Walker LLP
11 N. Water Street
Suite 1200
Mobile, Alabama 36602
Telephone:    (251) 432-1414
Facsimile:     (251) 439-7358
kreid@joneswalker.com

Appeal No. 18-14096-H
Keohane v. Florida Department of Corrections

## CERTIFICATE OF INTERESTED PERSONS

Counsel for Appellant Florida Department of Corrections certifies that, to the best of his knowledge, the following persons and corporations may have an interest in the outcome of this case:

1.    Abudu, Nancy G.
       (Counsel for Plaintiff-Appellee)

2.    Akins, Elizabeth C.
       (Counsel for Plaintiff-Appellee)

3.    American Civil Liberties Union, Inc.
       (Counsel for Plaintiff-Appellee)

4.    American Civil Liberties Union Foundation, Inc.
       (Counsel for Plaintiff- Appellee)

5.    American Civil Liberties Union Foundation of Florida, Inc.
       (Counsel for Plaintiff- Appellee)

6.    American Civil Liberties Union of Florida, Inc.
        (Counsel for Plaintiff-Appellee)

7.    Blanco, Ileana
       (Counsel for Plaintiff-Appellee)

8.    Cooper, Leslie J.
       (Counsel for Plaintiff-Appellee)

9.    DLA Piper LLP (US)
       (Counsel for Plaintiff-Appellee)

10.    Dunbar, Marc W.
        (Counsel for Defendant-Appellant)

11.    Florida Department of Corrections
        (Defendant-Appellant)

Appeal No. 18-14096-H
Keohane v. Florida Department of Corrections

    12.    Hall III, William D.
            (Counsel for Defendant-Appellant)

    13.    Jones, Julie
            (Defendant-Appellant; Secretary of the Florida Department of
            Corrections)

    14.    Jones Walker LLP
            (Counsel for Defendant-Appellant)

    15.    Keohane, Reiyn
            (Plaintiff-Appellee)

    16.    Kingsmill, Allison B.
            (Counsel for Defendant-Appellant)

    17.    Reid, Kirkland E.
            (Counsel for Defendant-Appellant)

    18.    Russell, Daniel R.
            (Counsel for Defendant-Appellant)

    19.    Tilley, Daniel B.
            (Counsel for Plaintiff-Appellee)

    20.    Walker, Hon. Mark E.
            (District Court Judge)

Appeal No. 18-14096-H
Keohane v. Florida Department of Corrections

## CORPORATE DISCLOSURE STATEMENT

        Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3 Defendant-Appellant, Florida Department of Corrections, states that there are no corporate disclosures.

        Respectfully submitted,

/s/ Kirkland E. Reid
KIRKLAND E. REID
Attorney for Florida Department of Corrections

OF COUNSEL:

JONES WALKER LLP
11 N. Water Street
Suite 1200
Mobile, AL  36602
Telephone:  (251) 439-1414
Facsimile:   (251) 439-7358

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Julie Jones, in her official capacity as Secretary of the Florida Department of Corrections ("FDC"), respectfully requests oral argument. FDC believes that oral argument will assist the Court in its analysis of the important constitutional and penological issues raised by the district court's final order.

i

## <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTERESTED PERSONS .....................................................C1

CORPORATE DISCLOSURE STATEMENT ....................................................C3

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF CITATIONS ........................................................................iv

STATEMENT OF JURISDICTION........................................................ viii

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE...................................................................2

STATEMENT OF FACTS .......................................................................5

STANDARD OF REVIEW ....................................................................15

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT .........................................................................................19

I.    FDC HAS NOT BEEN DELIBERATELY INDIFFERENT TO
PLAINTIFF'S GENDER DYSPHORIA ......................................................19

    A.    FDC's treatment far surpasses the Constitutional threshold..............19

    B.    No FDC official is subjectively aware that refusing to provide an
exception to uniform grooming standards subjects plaintiff to a
wanton risk of serious harm ...............................................................29

    C.    The district court erred in finding FDC failed to meet community
standards ..........................................................................................38

II.   THE DISTRICT COURT WRONGFULLY HELD THAT FDC
WOULD DISCONTINUE PLAINTIFF'S TREATMENT ........................47

III.    THE DISTRICT COURT FAILED TO CONSIDER THE PRISON LITIGATION REFORM ACT ....................................................................50

CONCLUSION ...................................................................................53

CERTIFICATE OF COMPLIANCE ....................................................54

CERTIFICATE OF SERVICE .............................................................55

iii

## <u>TABLE OF CITATIONS</u>

**Page(s)**

**Cases**

*Arnold v. Wilson*,
    2014 WL 7345755 (E.D. Va. Dec. 23, 2014)...............................................29, 37

*Barnhill v. Cheery*,
    2008 WL 759322 (M.D. Fla. Mar. 20, 2008) ..................................33, 34, 35, 37

*Bismark v. Fisher*,
    213 F. App'x 892 (11th Cir. 2007).....................................................................24

*Blake v. Pryse*,
    444 F.2d 218 (8th Cir. 1971) .............................................................................27

*Brown v. Plata*,
    563 U.S. 493 (2011)......................................................................................50, 52

*Campbell v. Sikes*,
    169 F.3d 1359 (11th Cir. 1999) .........................................................................24

*Carter v. Broward Cnty. Sheriff's Dep't Med. Dep't*,
    558 F. App'x 919 (11th Cir. 2014).................................................................32, 34

*Casey v. Hall*,
    2011 WL 5583941 (M.D. Fla. Nov. 16, 2011)............................................27, 28

*Chatham v. Adcock*,
    334 F. App'x 281 (11th Cir. 2009)................................................................21, 32

*DeBlasio v. Johnson*,
    128 F. Supp. 2d 315 (E.D. Va. 2000) ................................................................27

*Doe v. Wooten*,
    747 F.3d 1317 (11th Cir. 2014) .........................................................................47

*Druley v. Patton*,
    601 F. App'x 632 (10th Cir. 2015)....................................................................37

*Farmer v. Brennan*,
    511 U.S. 825 (1994).............................................................................19, 20, 29

iv

*Farrow v. West*,
    320 F.3d 1235 (11th Cir. 2003) ............................................................31, 32, 43

*Fields v. Smith*,
    653 F.3d 550 (7th Cir. 2011) .......................................................................20, 23

*Harris v. Thigpen*,
    941 F.2d 1495 (11th Cir. 1991) ............................................................19, 34, 36

*Hood v. Dep't of Children & Families*,
    2014 WL 757914 (M.D. Fla. Feb. 26, 2014).........................................25, 26, 32

*Hudson v. McMillan*,
    503 U.S. 1 (1992)...................................................................................................21

*Johnson v. Breeden*,
    280 F.3d 1308 (11th Cir. 2002) .........................................................................50

*Knight v. Thompson*,
    797 F.3d 934 (11th Cir. 2015) ...........................................................................29

*Kosilek v. Spencer*,
    774 F.3d 63 (1st Cir. 2014)........................................................22, 23, 24, 37, 52

*Kothman v. Rosario*,
    558 F. App'x 907 (11th Cir. 2014) ...............................................................20, 35

*LaBranch v. Terhune*,
    192 F. App'x 653 (9th Cir. 2006) ......................................................................27

*Lamb v. Norwood*,
    899 F.3d 1159 (10th Cir. 2018) .............................................................21, 22, 33

*Larkin v. Reynolds*,
    39 F.3d 1192 (10th Cir. 1994) ...........................................................................27

*Leonard v. Dep't of Corr. Fla.*,
    232 F. App'x 892 (11th Cir. 2007) ...............................................................32, 35

*Loeber v. Andem*,
    487 F. App'x 548 (11th Cir. 2012) .........................................................32, 34, 46

v

*Long v. Nix*,
   877 F. Supp. 1358 (S.D. Iowa 1995) ...................................................26

*McElligott v. Foley*,
   182 F.3d 1248 (11th Cir. 1999) .................................................32, 36

*McKune v. Lile*,
   536 U.S. 24 (2002)..........................................................................29

*Meriwether v. Faulkner*,
   821 F.2d 408 (7th Cir. 1987) ....................................................35, 37

*Murray v. United States Bureau of Prisons*,
   106 F.3d 401 (6th Cir. 1997) ..........................................................28

*Pell v. Procunier*,
   417 U.S. 817 (1974).........................................................................19

*Praylor v. Tex. Dep't of Criminal Justice*,
   430 F.3d 1208 (5th Cir. 2015) ...................................................26, 37

*Rhodes v. Chapman*,
   452 U.S. 337 (1981).................................................................19, 37

*Rizzo v. Goode*,
   423 U.S. 362 (1976).........................................................................46

*Smith v. Hayman*,
   2010 WL 948822 (D.N.J. Feb. 19, 2010) ..................................26, 29

*Supre v. Ricketts*,
   792 F.2d 958 (10th Cir. 1986) .....................................22, 33, 35, 38

*Taylor v. Gandy*,
   2012 WL 6062058 (S.D. Ala. Nov. 15, 2012)..................................27

*Thomas v. Bryant*,
   614 F.3d 1288 (11th Cir. 2010) .......................................................15

*Townsend v. Jefferson County*,
   601 F.3d 1152 (11th Cir. 2010) .......................................................29

*Troiano v. Supervisor of Elections*,
   382 F.3d 1276 (11th Cir. 2004) ...................................................................15, 47

*Turner v. Solorzano*,
   228 F. App'x 922 (11th Cir. 2007) ...................................................................34

*United States v. Sec'y, Fla. Dept. of Corr.*,
   778F.3d 1223 (11th Cir. 2015) .........................................................................50

*White v. Farrier*,
   849 F.2d 322 .....................................................................................................37

*Wilson v. Silcox*,
   151 F. Supp. 2d 1345 (N.D. Fla. 2001) ............................................................21

**Statutes**

18 U.S.C. §3626(a)(1)(a) ........................................................................................50

28 U.S.C. §1291 .....................................................................................................ix

28 U.S.C. § 1331 .....................................................................................................ix

28 U.S.C. § 1343(a)(3)............................................................................................ix

**Rules**

Fed.R.App.P. 4(a)(1)...............................................................................................ix

Fed. R. App. P. 32(a)(7)(B) ...................................................................................54

Fla. Admin. Code r. 33-602.101 ..............................................................................9

**Other Authorities**

U.S. Const. amend. VIII...................................................................................*passim*

## <u>STATEMENT OF JURISDICTION</u>

The district court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). Jurisdiction is proper in this Court under 28 U.S.C. §1291. This appeal arises from an Order on the Merits (doc. 171) and Final Judgment (doc. 172) issued by the United States District Court for the Northern District of Florida on August 22, 2018. FDC timely appealed that order and final judgment pursuant to Fed.R.App.P. 4(a)(1) on September 21, 2018. (doc. 179).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in concluding that FDC's treatment of plaintiff's gender dysphoria currently violates the Eighth Amendment's prohibition on cruel and unusual punishment.

2.     Whether the district court erred in determining that FDC was likely to return to a prior repealed policy on the treatment of gender dysphoria when no competent evidence supports such a determination.

3.     Whether the district court erred by failing to consider or give effect to the requirements of the Prison Litigation Reform Act.

1

## STATEMENT OF THE CASE

a.    Nature of the Case

Plaintiff Reiyn Keohane ("plaintiff" or "Keohane") is an inmate in the custody of the FDC.  Keohane entered FDC custody after pleading no contest in 2014 to attempted second degree murder.  Keohane has been diagnosed with gender dysphoria, a "medical diagnosis for the incongruence between one's gender identity and one's sex assigned at birth."  (doc. 1 at ¶ 28).  Although Keohane's external anatomy is that of a male, Keohane's self-reported internal sense is that of a female.

The district court determined that FDC's treatment of and accommodations to plaintiff – hormone therapy, mental health counseling, issuance of a bra, use of female pronouns – failed to satisfy the Eighth Amendment's protection against cruel and unusual punishment.  (doc. 171).

FDC believes that the treatment it is providing Keohane satisfies this Court's deliberate indifference jurisprudence, and that the district court erred in denying FDC's motion for summary judgment and entering a permanent injunction.

b.    Course of Proceedings

Appellee Reiyn Keohane filed a complaint for declaratory and injunctive relief on August 15, 2016, seeking a declaration that FDC was deliberately indifferent to plaintiff's medical needs and requesting a permanent injunction directing FDC to provide plaintiff hormone therapy and access to female clothing

2

and grooming standards.  (doc. 1).  With the complaint, Keohane filed a motion for preliminary injunction asking the district court to require FDC to provide plaintiff with hormone therapy and access to female clothing and grooming standards.  (doc. 3 at 34).

FDC filed a motion to dismiss the complaint (doc. 20), as well as a response in opposition to plaintiff's motion for preliminary injunction.  (doc. 23).  On October 19, 2016, the district court held a hearing on the motion for preliminary injunction, and, at the end of the hearing, the district court denied the motion.  (doc. 48, 51).  In addition, the district court denied FDC's motion to dismiss.  (doc. 50).[1]  FDC then filed its answer denying the material allegations of the complaint.  (doc. 54).

After extensive discovery, FDC filed its motion for summary judgment, memorandum in support thereof, and evidentiary submission.  (doc. 123, 124, 125). The motion for summary judgment was denied, without hearing.  (doc. 138).  After denial of FDC's motion for summary judgment, the parties proceeded to trial.  On July 19-20, 2017, the district court conducted a bench trial.  (doc. 140, 141).

At the district court's direction, the parties submitted post-trial proposed orders on August 14, 2017.  (doc. 150, 151).  One year later, on August 22, 2018,

---

[1] The district court granted the motions to dismiss filed by individual defendants Trung Van Le and Francisco Acosta.  (doc. 50).  Eventually, the remaining individual defendant Teresita Dieguez was voluntarily dismissed from the case.  (doc. 93).

the district court entered its order on the merits (doc. 171) and final judgment (doc. 172), entering therein a permanent injunction against FDC in favor of Keohane requiring FDC "to permit Ms. Keohane access to Defendant's female clothing and grooming standards and requiring Defendant to continue to provide Ms. Keohane with hormone therapy so long as it is not medically contraindicated. . . ."  (doc. 171 at 61).

On September 21, 2018, FDC timely filed its notice of appeal with the district court of the order and final judgment.  (doc. 179).

4

### STATEMENT OF FACTS[2]

In September 2013, plaintiff was charged with attempted second degree murder for stabbing her female roommate in the neck and stomach, causing "life threatening injuries." (doc. 23-1). Plaintiff was apprehended after fleeing the crime scene on a moped where she[3] was found "armed with two knives and a loaded AR15 magazine in [plaintiff's] pocket." (*Id.*). Plaintiff pled guilty to the crime charged, and was sentenced to fifteen (15) years in prison, which she began serving in July 2014. (doc. 133 at 9). Plaintiff is currently in the custody of the FDC. (*Id.*).

Plaintiff is a biological male who identifies as female and was diagnosed with gender dysphoria in 2010, prior to incarceration. (doc. 1 at ¶ 28).

### A.    Gender Dysphoria, Generally

Gender dysphoria is the "medical diagnosis for the incongruence between one's gender identity and one's sex assigned at birth." (*Id.* at ¶ 15). Thus, although plaintiff's "external anatomy" is that of a male, her "internal sense" is that plaintiff is a woman. (*Id.* at ¶¶ 11, 13).

---

[2] Admitted facts are set out in the parties' Pretrial Stipulation. (doc. 133 at 9-15).

[3] FDC will refer to plaintiff using female pronouns as part of the treatment and recognition of her gender dysphoria.

5

The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care") recommend guidance for health professionals to assist individuals with gender dysphoria. (doc. 3-16).  The Standards of Care provide the following treatment options for gender dysphoria: (1) changes in gender expression and role; (2) hormone therapy; (3) surgery; and (4) psychotherapy. (*Id.*).  The Standards of Care do not require or prohibit any particular treatment but state that the "particular course of medical treatment" should "var[y] based on the individualized needs of the person." (doc. 3-16). In addition, the Standards of Care "are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender, and gender-nonconforming people.  (*Id.*).

### B.   Plaintiff's Treatment of Gender Dysphoria

#### 1.   <u>Mental Health and Psychological Counseling</u>

Plaintiff's gender dysphoria has been treated with an "individualized service plan" of mental-health care. (doc. 1 at ¶ 55; doc. 129-11 at 53-55; doc. 129-7 at 60, 84-87, 96-102).  This treatment includes mental-health counseling.  (doc. 44-2 at ¶ 3; doc. 129-12 at 13-16).  Keohane candidly testified that such counseling was an effort by FDC to alleviate her gender dysphoria.  (doc. 145 at 81).

#### 2.   <u>Hormone Therapy</u>

Plaintiff filed administrative grievances and appeals asserting that this mental-health care is insufficient treatment, and that she instead needed hormone therapy,

in accordance with the "prescription [she had] when [she] was arrested." (doc. 1 at ¶ 37). Plaintiff had been receiving this prescribed hormone therapy for six weeks when she was arrested. (doc. 145 at 85-86). In plaintiff's grievances, she has asserted that "[t]o deny" hormone therapy "is to cause depression and suicidal tendencies, which [plaintiff] must face on a daily basis." (doc. 1 at ¶ 53).

Plaintiff asserts that the requests for hormone therapy were denied under FDC's "freeze-frame policy," under which "[i]nmates who have undergone treatment for [gender dysphoria] will be maintained only at the level of change that existed at the time they were received by the Department." (*Id.* at ¶¶ 55, 85).

Dr. Marlene Hernandez, who at the time oversaw the provision of medical care at plaintiff's prison, recommended that plaintiff be referred to an outside endocrinologist, Dr. Eugenio Angueira-Serrano, for treatment. (doc. 42-1 at 74). Dr. Angueira-Serrano prescribed hormone therapy to plaintiff on September 2, 2016. (doc. 129-2 at 25-27). Since September 2, 2016, plaintiff has been receiving the hormone therapy. (doc. 133 at 11).

The specific hormones were prescribed by Dr. Angueira-Serrano, and will be provided to plaintiff for as long as plaintiff's treatment team believes the hormones are medically necessary to treat her gender dysphoria. (doc. 44-2 ¶ 5; doc. 129-1 at 161-64).

7

Plaintiff has continuously received hormone therapy since September 2, 2016, and plaintiff has made clear on several occasions to various members of the medical team that the hormone therapy and mental health counseling helps with gender dysphoria issues and overall mood. (doc. 129-8 at 70-74; doc. 129-7 at 94-98, 108; 129-2 at 43-49; doc. 145 at 85-88). Hormone therapy has also caused physical changes, such as reduced hair growth and overall feminization. (doc. 145 at 72). Plaintiff also testified that the hormones have provided her with "improved mental clarity" and they help plaintiff "see [herself] more as the way [she has] always wanted to be." (*Id.* at 73).

Plaintiff has no suicidal ideation when the prescribed medication is timely delivered. (doc. 129-8 at 70, 85-86). FDC will continue to provide the treatment it is now providing—hormone therapy and mental-health counseling—as long as its medical professionals continue to believe that those treatments are medically necessary. (doc. 44-2 at ¶¶ 4-5; doc. 129-1 at 161-64).

### 3.    Hair Length Exception, Female Undergarments, and Makeup

Plaintiff has also demanded to be able to wear "female underwear" and "grow[] her hair" in female styles. (doc. 1 at ¶¶ 36, 66). In response to plaintiff's breast enlargement caused by the hormone therapy, she was provided a sports bra on May 2, 2017. (doc. 145 at 73; doc. 133 at 10). Before that time, plaintiff would

attempt her own "treatment" by making "makeshift bras and underwear and wearing them." (doc. 145 at 33). Prior to the district court's Order, FDC denied plaintiff access to panties due to a lack of medical necessity and because of security concerns. (doc. 146 at 154).

Although plaintiff prefers long hair, she agrees, one can wear a "feminine" hairstyle without having hair longer than the "ear or collar." (doc. 129-8 at 127-30). When asked whether having long hair and makeup might affect her safety in a male prison, the plaintiff stated that she already receives "unwanted sexual attention" and that "it's not [her] job to make [herself] ugly, make [herself] less of a target." (doc. 145 at 75-76).

Plaintiff's requests to wear female underwear and makeup and to grow long hair violate FDC policies. Fla. Admin. Code r. 33-602.101 provides that "[i]nmates shall at all times wear ... regulation clothing," which for male inmates includes "under shorts" and for female inmates includes "panties" and a "bra or athletic bra." 33-602.101(2). Rule 33-602.101 further provides that "[m]ale inmates shall have their hair cut short to medium uniform length at all times with no part of the ear or collar covered." *Id.* at 33-602.101(4). However, FDOC has agreed that, if such requests are deemed medically necessary, they will be fulfilled. (doc. 146 at 34).

Plaintiff's medical team at FDC does not believe that permitting plaintiff to grow longer hair or wear female clothing within the male prison facility are

medically necessary for the treatment of plaintiff's gender dysphoria at this time. (doc. 129-11 at 29, 68-72, 79, 80-83; doc. 129-7 at 94-98, 105-108; doc. 129-2 at 23, 43-49; doc. 129-12 at 12-16; 90-94; 97-100).

FDC's retained medical expert, Dr. Stephen B. Levine, also believes that long hair and access to makeup are not medically necessary for the treatment of plaintiff's gender dysphoria. (doc. 105-4; doc. 129-9 at 51, 69-72; 85-93; 100-01). Dr. Levine made clear that such accommodations would be "psychologically pleasing" to the plaintiff and could be part of a gender dysphoria patient's treatment plan. (doc. 146 at 116-18). He does not equate that phrase with what is "medically necessary," however. (*Id.* at 74). Dr. Levine analogizes hair and makeup in this context to the vitamins a person chooses to take versus the care a doctor would provide. (*Id.* at 77). The former is based on the individual's belief of what will benefit him or her, and the latter is based on the medical professional's observations and knowledge. (*Id.*). Dr. Levine also stated that the accommodations that FDC is making for plaintiff (pronouns, bra, separate shower, hormones, counseling) constitute appropriate gender dysphoria treatment. (doc. 146 at 99-100, 129-130).

Plaintiff's medical team at FDC, based on their evaluations with plaintiff and their clinical judgments, do not believe that plaintiff, at this time, is at a substantial risk for self-harm or severe psychological pain in being required to comply with the FDC's policies on hair and grooming standards. (doc. 129-11 at 29, 68-72, 79-83;

doc. 129-7 at 94-98, 105, 108; doc. 129-2 at 23, 46-49; doc. 129-12 at 12-16; 90-94;
97-100).

Plaintiff's medical team at FDC believes that her current treatment regimen
of hormone therapy and mental health counseling, in addition to pronoun usage and
other accommodations, suffices to address plaintiff's gender dysphoria and is
adequate as a medical matter to treat plaintiff. (doc. 129-11 at 29, 68-72, 79-83; doc.
129-7 at 94-98, 105, 108; doc. 129-2 at 23, 43-49; doc. 129-12 at 12-16; 90-94; 97-
100). As stated previously, Dr. Levine concurs that FDC is appropriately treating
plaintiff's gender dysphoria, even if other accommodations would be "pleasing" to
her. (doc. 146 at 114, 99-101, 129-130).

In her deposition, Dr. Arnise Johnson testified regarding the discussions
amongst Keohane's mental health treatment team. That team was made up of
Johnson, Andre Rivero, and Sonel Baute. (doc. 129-7 at 60). Johnson testified that
they discussed what social transitioning could look like for Keohane in the confines
of prison. (*Id*. at 83). She also stated that they discussed Keohane's requests for
hormones, hair, make-up, and underwear. (*Id*. at 84, 86, 87, 93, 97, 100, 101, 102,
114). The team supported providing Keohane with hormone therapy. (*Id*. at 87).
Johnson added that if Keohane's other requests were not allowed, then the treatment
team would provide "support and guidance and counsel and psychotherapy and
support around what the client is allowed to have." (*Id*. at 96). The team discussed

11

how to "support and encourage" Keohane to help her "be well" despite these denials. (*Id*. at 101-102). Johnson made clear that, if she believed "prison policy compromised an inmate's health," then she would ask for an exception to such a policy. (*Id*. at 99, 119). It would be up to the team as a whole to request such an exception. Johnson testified, however, that she did not believe that Keohane's requests were medically necessary. (*Id*. at 94). FDC has also adopted a new policy regarding treatment of gender dysphoria that will "provide specific guidance on expectations for treatment of this population from both a medical and mental health perspective." (doc. 129-1 at 68; doc. 146 at 27-28).

Plaintiff's retained medical expert, Dr. George Brown, stated that it is medically necessary for her to be able to access makeup, wear female undergarments, and grow long hair, even though incarcerated. (doc. 105-2). He testified that presenting as a person's identified gender is "part of the medically necessary components for the treatment of gender dysphoria." (doc. 145 at 169). Dr. Brown stated his belief that, in some instances, breast augmentation surgery could be medically necessary in that context. (doc. 145 at 203). Generally, he is of the belief that transgender female inmates residing in male prisons should be allowed access to the same items and privileges that inmates in female institutions are. (*Id.* at 203-04). He does not believe this constitutes a "blanket policy," though. (*Id.* at 204).

12

Dr. Brown added, however, that not all feminine items could be reasonably allowed in a prison setting. For example, he stated that high heeled shoes and jewelry such as "stud earrings" would present too much of a security risk to be provided to an inmate seeking to present as female. (doc. 145 at 191). On cross examination at trial, Dr. Brown stated that an inmate "might not" be entitled to such items even if the inmate considered them essential to their gender presentation. (doc. 145 at 206-207). Such a distinction between gender presentation items is not included in the WPATH standards. (doc. 3-16).

FDC's policies regarding hair length and uniform grooming policies are premised on the obligation "to secure safety and security in prisons; and to ensure that they are operated effectively and efficiently." (doc. 129-18 at 7; doc. 129-15 at 46-47; 61-62; 93-95; 109-13; 119-21; doc. 23-2; doc. 37-1 at 23-29; 34-35). James Upchurch testified as FDC's security expert. He noted that there are a "lot of advantages to maintaining uniformity in the inmate population in a prison setting." (doc. 146 at 134). These include more easily detecting contraband and maintaining a "structured environment" where inmates know what is expected of them. (doc. 146 at 135-36).

Upchurch clearly stated his concerns regarding the security implications of allowing plaintiff to grow her hair long and wear makeup and female underwear. He said that presenting in such a way would make her a "target" for

13

sexual assault. (doc. 146 at 149).  If an inmate or a gang of inmates attempted to harm her in such a way, prison staff could potentially face "serious injury" as a result of attempting to intervene and protect her. (*Id.* at 150).  In a question to Upchurch, the district court asked whether FDC is in a "heads we lose, tails we lose" situation where it had to either (a) face litigation for not providing the care requested or (b) face unacceptable security repercussions if it provides such care.  (*Id.* at 150-51). Upchurch generally agreed, although he added that FDC could seek alternative placements that might be safer for her. (*Id.*). He added, though, that solitary confinement was not a legal or proper solution and that any public setting presented dangers. (*Id.* at 152-54).

Although Upchurch had concerns regarding any feminization of plaintiff in a male prison, he stated that each accommodation given to her in this regard "increases the danger." (*Id.* at 155).  Such a combination of feminine presentation would be "something that has never been seen in" FDC.  (*Id.* at 156).

14

## STANDARD OF REVIEW

The district court's entry of a permanent injunction is reviewed under an abuse of discretion standard. *Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010). However, the district court's underlying conclusion that an Eighth Amendment violation occurred in this case is reviewed de novo. *Id.* Corresponding issues of fact are reviewed for "clear error." *Id.*

The district court's voluntary cessation analysis necessarily involves the question of mootness and is therefore reviewed de novo. *Troiano v. Supervisor of Elections*, 382 F.3d 1276 (11th Cir. 2004). Findings of fact are reviewed for clear error. *Id.*

15

## <u>SUMMARY OF THE ARGUMENT</u>

In treating Keohane's gender dysphoria, FDC has done the following: provided hormone therapy for plaintiff since September 2, 2016; provided consistent mental health counseling; issued plaintiff a bra; allowed plaintiff to shower separately from her male counterparts; housed plaintiff in the safest possible way without having to isolate her, including with another transgender inmate; and worked to ensure plaintiff is referred to with female pronouns. Despite these specific accommodations to plaintiff's gender dysphoria, the district court nevertheless found that FDC is deliberately indifferent to plaintiff's medical needs and has violated the Eighth Amendment's prohibition on cruel and unusual punishment.

The record in this case establishes that FDC, far from being indifferent to Keohane's medical need, has affirmatively treated her medical need with appropriate and well-recognized treatments. Keohane herself acknowledged that these treatments were provided in an effort to help, and that they do, in fact, help. Given plaintiff's own concession that the treatments provided are helpful, it is legal error to hold, as the district court did, that FDC has been deliberately indifferent to plaintiff's needs.

The district court focused the majority of its Order on activities occurring prior to September, 2016, and prior to plaintiff being provided hormone therapy. The district court also erroneously determined that FDC, at the conclusion of this

16

litigation, would roll back Keohane's accommodations.  There is, however, no competent evidence in the record to support the district court's determination. Indeed, FDC has adopted a new policy regarding gender dysphoria treatment, which adoption in and of itself establishes an unambiguous change in procedure.

The record evidence hardly supports the district court's analysis of the voluntary cessation doctrine, but rather establishes that FDC has shown significant, genuine interest in improving the care it provides for gender dysphoria. This includes improved used of pronouns, increased training for treatment team members, and updated treatment guidelines.  Simply put, if the care and treatment afforded plaintiff here is tantamount to deliberate indifference, then the deliberate indifference standard as established by this Court, and others, has been rendered meaningless.  In its place would be a medical standard requiring every desire and whim of an inmate to be met.

Again, FDC is treating Keohane's gender dysphoria in the following ways: hormone therapy; mental health counseling; provision of a bra; use of female pronouns; private shower use; and housing assignments designed to be as safe as possible.  FDC's medical expert, Dr. Levine, credited by the district court, testified unequivocally that these things constitute adequate care.  Accordingly, the district court erred in determining FDC has been deliberately indifferent to Keohane's gender dysphoria.

17

Moreover, when evaluating whether prison officials have been deliberately indifferent to a medical need, their concerns and polices regarding security should be included in that determination.  Such officials are granted wide-ranging deference in creating rules to ensure overall prison safety.  Here, the district court failed to adequately consider FDC's clearly-articulated security concerns in this case.  And, as part and parcel of the district court's failure to consider security concerns, it also failed to give effect to the Prison Litigation Reform Act ("PLRA"), as required.

The district court reached a conclusion that is supported by neither the record nor the law.  This Court should reverse the district court's Order and render judgment in FDC's favor.

18

## ARGUMENT

**I. FDC HAS NOT BEEN DELIBERATELY INDIFFERENT TO PLAINTIFF'S GENDER DYSPHORIA**

### A. FDC's treatment far surpasses the Constitutional threshold

Many women have short hair, just as other women do not wear makeup. Despite these obvious and observable phenomena, the district court determined that FDC's refusal to allow an exception to its generally applicable hair length and grooming standards constitutes a violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment.

It is well established, however, that restrictions on a prisoner's hair, clothing, or grooming standards are not sufficiently serious deprivations to trigger Eighth Amendment protections. The Eighth Amendment requires that prison officials provide "humane conditions" and adequate health care to inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). It does not, however, "mandate comfortable prisons." *Id*. (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

Clearly, prison conditions may not "involve the wanton and unnecessary infliction of pain." *Rhodes*, 452 U.S. at 347. However, because "[l]awful incarceration" by necessity "brings about the necessary withdrawal or limitation of many privileges or rights," the State is not required to make prisoners as comfortable as they would be outside prison. *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (internal quotation marks omitted); *see also Harris v. Thigpen*, 941 F.2d

19

1495, 1511 at n.24 (11th Cir. 1991) ("[N]othing in the Eighth Amendment . . .

requires that [prisoners] be housed in a manner most pleasing to them.") (internal

quotation marks omitted).

To sustain an Eighth Amendment claim for failure to provide adequate health

care, an inmate must show that prison officials "acted with deliberate indifference

to serious medical needs." *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). The

case law is clear that gender dysphoria constitutes a serious medical need. *Id*. at

555. To be "deliberately indifferent" to such a need, a plaintiff must establish that a

defendant "(1) had subjective knowledge of a risk of serious harm, (2) disregarded

that risk, and (3) did so by conduct that was more than mere negligence." *Kothman*

*v. Rosario*, 558 F. App'x 907, 910 (11th Cir. 2014). The alleged deprivation of the

plaintiff's rights must be so "objectively, sufficiently serious" that it amounts to

"the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S.

at 834 (internal quotation marks omitted). In such a situation, a prison official must

"know[] of and disregard[] an excessive risk to inmate health or safety"; that is, he

or she "must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he [or she] must also draw the inference."

*Id*. at 837.

Thus, a prisoner must establish that the defendant official was "informed" or

otherwise actually knew that, without the sought-after treatment, the prisoner would

20

be placed at substantial risk of suffering serious harm. *See*, *e.g.*, *Chatham v. Adcock*, 334 F. App'x 281, 289 (11th Cir. 2009). Although a risk of purely psychological harm potentially may suffice, that harm must be "severe," *Wilson v. Silcox*, 151 F. Supp. 2d 1345 (N.D. Fla. 2001); akin to the harm caused by a "guard placing a revolver in [an] inmate's mouth and threatening to blow [the] prisoner's head off." *Hudson v. McMillan*, 503 U.S. 1, 16 (1992) (Blackmun, J., concurring) (citing this as an example of the kind of "infliction[] of psychological harm—without corresponding physical harm—that might prove to be cruel and unusual punishment").

Indeed, a week before the final order in this case was issued, the Tenth Circuit affirmed summary judgment on behalf of the Kansas Department of Corrections in an Eighth Amendment-gender dysphoria case where the inmate was receiving, among other treatments, hormone treatment and counseling. *Lamb v. Norwood*, 899 F.3d 1159, 1160 (10th Cir. 2018). The evidence in that case showed that the treatment had "proven beneficial," and the court concluded that, based partly on that treatment, no "reasonable factfinder" could conclude that deliberate indifference was shown. *Id*. The court added that it has "consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants." *Id*.

21

*Lamb* noted that a previous decision, *Supre v. Ricketts,* 792 F.2d 958 (10th Cir. 1986), was an older case and that science in the area of gender dysphoria had advanced since that opinion was issued. *Id.* at 1162. However, the court stated that, even if some medical assumptions were to change, *Supre* still provided the correct "analytical framework." (*Id.*).

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014), an en banc opinion, also provides an in-depth analysis of many of the issues presented here. In that case, the lower court's grant of injunctive relief relating to the denial of sexual reassignment surgery was reversed. The First Circuit noted that the inmate was receiving mental health treatment, "female, gender-appropriate clothing and personal effects," and hormone therapy to treat her gender dysphoria. *Id.* at 69-70. It noted that such treatment was "proven to alleviate [the inmate's] mental distress," and was thus not constitutionally inadequate. *Id.* at 90. *Kosilek* also makes clear the significance of security concerns in crafting an appropriate course of treatment for gender dysphoria. Such matters are "inherent in the functioning of a penological institution" and "must be given significant weight." *Id.* at 83. Prison officials are granted "wide-ranging deference" in this area and, even if they decide to deny care for a condition outright, such a denial is not an Eighth Amendment violation if it is "based on

22

legitimate concerns regarding prisoner safety and institutional security."[4] *Id.* at 83. The court also noted that it "takes no great stretch of the imagination" to assume that housing a transgender female inmate in a male facility presents real and serious security concerns. *Id.* at 92.

In cases such as *Kosilek* and the present matter, where various courses of treatment are proposed "which are reasonably commensurate with the medical standards of prudent professionals" and which "provide [the inmate] with a significant measure of relief," deliberate indifference should not be found.[5] *Id.* at 90. Even if a certain treatment is "disfavored by some in the field," it will be deemed acceptable if a knowledgeable medical provider offers it as an option. *Id.* at 91-92. Further, the subjective prong of the deliberate indifference analysis would require some showing that prison officials knew or understood that the treatment chosen was inadequate. *Id*. at 91.

Here, the record is clear that FDC, and its medical professionals, continue to treat plaintiff's gender dysphoria. Plaintiff receives the sought-after hormone

---

[4] Other courts have noted, though, that such deference is not afforded for security decisions "taken in bad faith and for no legitimate purpose." *Fields v. Smith*, 653 F.3d 550, 557-558 (7th Cir. 2011)

[5] It should be noted that Dr. Levine was the defense expert in *Kosilek*. In both that case and at trial here, his credentials were not questioned and his opinions as to what constitutes adequate treatment for gender dysphoria were given weight.

23

medication, as well as individualized counseling with licensed health care professionals. (doc. 42-1; doc. 129-12 at 13-16; doc. 133 at 10). And, a medical pass was issued allowing plaintiff to wear a bra. (doc. 133 at 10). Given these undisputed facts, the district court erred in finding an Eighth Amendment violation.

Indeed, only plaintiff's retained experts claim that long hair and access to make-up are medically necessary. (doc. 105-2; doc. 105-3). In *Campbell v. Sikes*, however, this Court recognized that, although a plaintiff's expert's testimony may be relevant for the objective prong of an Eighth Amendment claim (whether the sought-after treatment is medically necessary), such testimony is irrelevant to the subjective element because it cannot show that the defendant actually knows that the "present course of treatment" is inadequate. 169 F.3d 1353, 1370-72 (11th Cir. 1999). This Court has explained further that, "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor." *Bismark v. Fisher*, 213 F. App'x 892, 896-97 (11th Cir. 2007).

Moreover, when evaluating whether prison officials have been deliberately indifferent to a medical need, their concerns and policies regarding security should be included in that determination. *Kosilek, supra* at 83-84. Such officials are granted "[w]ide-ranging deference" in creating rules to ensure overall prison safety. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)). Thus, if a certain type

24

of care is denied because of "legitimate concerns" regarding safety and security, that denial may not constitute deliberate indifference. *Id*.

Both Wes Kirkland (doc. 23-2) and James Upchurch  (doc. 129-18) have cogently expressed the rationale for FDC's grooming policies, and the serious problems associated with granting exceptions and providing unequal treatment to particular inmates.  (doc. 129-15 at 46-47; 61-62; 93-95; 109-13; 119-21; doc. 37-1 at 23-29; 34-35).   Such exceptions pose significant security risks to the institutional safety FDC is charged with ensuring.  (*Id*.).

And, courts have routinely held that a prison's regulation of its inmates' hair length, clothing, and grooming standards does not violate the Eighth Amendment. For instance, in *Hood v. Dep't of Children & Families*, 2014 WL 757914 (M.D. Fla. Feb. 26, 2014), the plaintiff, a transgender woman, alleged that she was constitutionally entitled to wear "female clothing" in accordance with the same WPATH Standards of Care relied on here.  *Id.* at *2.  The civil commitment center, citing its policy prohibiting residents from wearing female clothing, took the position that any such clothing found in the plaintiff's possession would be considered "contraband," and filed a motion to dismiss. *Hood*, *supra* at *1–2. The court granted the motion and dismissed the complaint, finding

> no ... authority indicating that a transgender person has the
> right to choose the clothing worn while confined or that
> the facility is constitutionally obligated to purchase all the

25

> clothing and feminine products requested. In fact, generally, federal courts have held the opposite. *See, e.g., Murray v. United States Bureau of Prisons*, 106 F.3d 401 (6th Cir. 1997) (transsexual prisoner not entitled to wear clothing of his choice and prison officials do not violate the Constitution simply because the clothing is not aesthetically pleasing); *Star v. Gramley*, 815 F. Supp. 276 (C.D. Ill. 1993) (noting that provision of female clothing to transsexual prisoner would be unduly burdensome for prison official and would make little fiscal sense); *Jones v. Warden of Stateville Corr. Ctr.*, 918 F. Supp. 1142 (N.D. Ill. 1995) ("Neither the Equal Protection Clause nor the First Amendment arguably accord [Plaintiff] the right of access to women's clothing while confined in a state prison.").

*Id.* at *8. The cases collected in *Hood* are merely a partial list. *See Praylor v. Tex. Dep't of Criminal Justice*, 430 F.3d 1208, 1208–09 (5th Cir. 2015) (rejecting prisoner's Eighth Amendment claim that he was entitled to an injunction instructing the defendant "to provide him with ... brassieres"); *Smith v. Hayman*, 2010 WL 948822 at *13 (D.N.J. Feb. 19, 2010) ("Prison authorities must have the discretion to decide what clothing will be tolerated in a male prison and the denial of female clothing and cosmetics is not a constitutional violation."); *Long v. Nix*, 877 F. Supp. 1358, 1361, 1366 (S.D. Iowa 1995) (finding no Eighth Amendment violation where "[h]undreds of times, [the plaintiff] ha[d] asked for, and prison officials had denied, permission to receive and wear women's clothing and make-up").

26

The law is equally clear that the Eighth Amendment does not require that prisoners be permitted to wear any particular hairstyle. Courts around the country and in this Circuit have held that "limits on hair length" do not constitute denials of "'the minimal civilized measures of life's necessities.'" *LaBranch v. Terhune*, 192 F. App'x 653, 653–54 (9th Cir. 2006) (quoting *Farmer*, 511 U.S. at 834); *see also DeBlasio v. Johnson*, 128 F. Supp. 2d 315, 325–26 (E.D. Va. 2000) (prison's hair restrictions were "part and parcel of" "the ordinary discomfort accompanying prison life" (internal quotation marks omitted)), *aff'd*, 13 F. App'x 96 (4th Cir. 2001); *Larkin v. Reynolds*, 39 F.3d 1192, 1994 WL 624355 at *2 (10th Cir. 1994) (Table) ("forced compliance with the" prison's "grooming code" was not "unnecessary and wanton infliction of pain" illegal under the Eighth Amendment); *Blake v. Pryse*, 444 F.2d 218, 219 (8th Cir. 1971) (hair-length requirement, "however annoying it may be to petitioner personally, does not deprive him of any federal or civil constitutional right"); *Taylor v. Gandy*, 2012 WL 6062058 at *4 (S.D. Ala. Nov. 15, 2012) (a prisoner's "disagreement with the" prison's haircut policy "fails to demonstrate that Defendants acted with deliberate indifference"); *Casey v. Hall*, 2011 WL 5583941 at *3 (M.D. Fla. Nov. 16, 2011) (requirement that plaintiff "shave his hair" "is not a 'serious' or 'extreme' condition, or one that violates 'contemporary standards of decency'").

27

This holds true even as to transgender plaintiffs. In *Murray v. U.S. Bureau of Prisons*, the Sixth Circuit considered a claim by a transgender prisoner that the prison's failure to continue to provide her "hair and skin products that she claim[ed were] necessary for her to maintain a feminine appearance" violated the Eighth Amendment. 106 F.3d 401 (Table), 1997 WL 34677, at *2 (6th Cir. 1997). The Sixth Circuit had little difficulty determining that the claim failed, explaining that "[c]osmetic products are not among the minimal civilized measure of life's necessities." *Id.*

The rationale behind this overwhelming caselaw is simple: "restrictions placed on [a prisoner's] choice of haircut," or choice of undergarments, simply "do no present the type of deprivation of life's necessities that rise to an Eighth Amendment violation." *Casey*, 2011 WL 5583941 at *3 (citing *Chandler v. Crosby*, 379 F.3d 1278, 1298 (11th Cir. 2004)). Plaintiff is receiving the hormone therapy, individualized mental health counseling, and bra deemed medically necessary. (doc. 129-11 at 29, 68-72, 79-83; doc. 129-7 at 94-98, 105-108; doc. 129-2 at 23, 43-49; doc. 129-12 at 12-16; 90-94; 97-100). Although plaintiff might be more comfortable also having the hairstyle or clothing of plaintiff's choice, plaintiff's inability to wear long hair and makeup is justified by legitimate

28

penological concerns,[6] and therefore is merely among the "significant restrictions,

inherent in prison life, on rights and privileges free citizens take for granted."

*McKune v. Lile*, 536 U.S. 24, 40 (2002).

> **B.** **No FDC official is subjectively aware that refusing to provide an exception to uniform grooming standards subjects plaintiff to a wanton risk of serious harm**

Because the Cruel and Unusual Punishments Clause applies only to

*punishment*, "a claim of deliberate indifference requires proof of more than gross

negligence." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).

As stressed previously, to be "deliberately indifferent," the prison official must

subjectively "know[] of and disregard[] an excessive risk to inmate health or safety."

*Farmer*, 511 U.S. at 837. Again, to establish an Eighth Amendment violation, a

prisoner must establish that the defendant official was "informed" or otherwise

---

[6] For example, this Court has recently recognized that requiring prisoners to maintain short hair can (1) prevent prisoners from easily changing their appearances upon escape; (2) prevent prisoners from using long hair "to conceal weapons and contraband"; (3) address "hygiene ... concerns"; and (4) promote[] order and discipline while removing a physical characteristic that inmates can use to form gangs." *Knight v. Thompson*, 797 F.3d 934, 944–45 (11th Cir. 2015). Further, other courts have explained that permitting a transgender prisoner housed with men to dress as a woman and wear longer hair than otherwise permitted at the prison "could pose a security risk to [her] safety and the safety of others," *Smith v. Hayman*, 2010 WL 9488822 at *13 (D.N.J. Feb. 19, 2010), primarily by creating "an increased risk of sexual assault." *Arnold v. Wilson*, 2014 WL 7345755 at *3, 7 (E.D. Va. Dec. 23, 2014).

*actually knew* that, without the sought-after treatment, the prisoner would be placed at substantial risk.

Here, there is no record evidence that any FDC individual *actually knew* that disallowing female underwear, makeup, or hair past the ear or collar subjects plaintiff to a wanton and substantial risk of serious harm. The complaint alleges that plaintiff has engaged in genital mutilation, has attempted suicide, and has thoughts of "self-harm and suicide." (doc. 1 at ¶¶ 37, 49, 59). But plaintiff has repeatedly tied the potential for self-harm to requests for *hormone therapy*, not requests to wear female underwear and grow long hair. *(Id.* at ¶¶ 37; doc. 129-8 at 85-86).

Plaintiff explained that the suicide attempts on April 8, 2017, and April 10, 2017, were a result of the staff's failure to provide the prescribed medication for three days. (doc. 129-8 at 70, 85-86). Since again receiving the proper medication plaintiff's overall mood and mental health has improved. (doc. 145 at 72-73). Keohane further testified that since September 2, 2016, the longest delay in receiving the prescribed hormone medication has been three days. (doc. 145 at 86-88).

In addition, plaintiff's medical team has testified that in their clinical judgment, they do not believe that plaintiff, at this time, is at a substantial risk for self-harm or severe psychological pain in being required to comply with the FDC's policies on hair and grooming standards. (doc. 129-11 at 29, 68-72, 79-83; doc.

30

129-7 at 94-98, 105, 108; doc. 129-2 at 23, 43, 46-49; doc. 129-12 at 12-16; 90-94;

97-100). FDC's retained medical expert, Dr. Levine, also does not believe that

plaintiff is at a substantial risk for self-harm or severe psychological pain in being

required to comply with the FDC's policies on hair and grooming standards. (doc.

105-4; doc. 129-9 at 51, 69-72; 85-93; 100-01).[7]

There is simply no evidence that any FDC official had *subjective
knowledge* that, even if plaintiff were provided with hormone therapy and mental

health counseling, there would *still* be a substantial risk of serious harm because

plaintiff was precluded from being able to wear makeup or grow long hair. This

fact alone compels reversal.

This Court's case law "has provided guidance concerning the distinction

between" actionable "deliberate indifference" and inactionable conduct that does not

rise above the level of "gross negligence." *See Farrow v. West*, 320 F.3d 1235, 1246

(11th Cir. 2003). For instance, the cases have made clear that "an official acts with

---

[7] To be sure, plaintiff's experts claim that any current well-being is due to plaintiff's
expectation of prevailing in the lawsuit, and, if plaintiff does not prevail completely,
plaintiff may decompensate. (doc. 105-2; doc. 105-3). *But see Kosilek, supra* at 94
(recognizing the "unacceptable precedent" that would be established in dealing with
future threats of suicide by inmates to force the prison authorities to comply with the
prisoners' particular demands and noting that "such threats are not uncommon in
prison settings and require firm rejection by the authorities").

31

deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Id.*

But that a plaintiff is entitled to *some* treatment for his serious medical needs does not mean that he is "entitled to treatment of his choice," *Hood, supra* at *9 (M.D. Fla. Feb. 18, 2015); or even that the treatment must rise above a level that would constitute "medical malpractice" under state tort law. *See, e.g., Chatham*, 334 F. App'x at 287– 88. Instead, so long as the prison provides the plaintiff with at least *some* treatment, and that treatment is not "so cursory as to" in reality "amount to no treatment at all," this Court has held again and again that the low bar of deliberate indifference is satisfied. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (internal quotation marks omitted); *see also Carter v. Broward Cnty. Sheriff's Dep't Med. Dep't*, 558 F. App'x 919, 22 (11th Cir. 2014) ("A simple difference in medical opinion between the medical staff and an inmate as to the latter's diagnosis or course of treatment does not establish deliberate indifference."); *Loeber v. Andem*, 487 F. App'x 548, 549 (11th Cir. 2012) ("The Defendants did not ignore Plaintiff's ... condition; instead they chose an alternative treatment ... to address [it]."); *Leonard v. Dep't of Corr. Fla.*, 232 F. App'x 892, 894–95 (11th Cir. 2007) ("[A] difference of opinion between an inmate and prison medical staff does not—by itself—give rise to a claim under the Eighth Amendment.").

32

Courts have repeatedly applied these fundamental principles to the treatment of gender dysphoria.  For instance, in *Supre, supra,* discussed in *Lamb v. Norwood, supra*, the plaintiff, a biologically male prisoner who had "engaged in various forms of mutilation of his sex organs," requested to be treated with estrogen to treat his gender dysphoria. *Id.* at 960.  The prison instead prescribed "testosterone replacement therapy and mental health treatment," and the plaintiff sued. *Id.*  The Tenth Circuit held that the failure to provide the plaintiff with his *preferred* treatment did not constitute deliberate indifference, because the prison had at least provided him with *some* treatment:

> While the medical community may disagree among themselves as to the best form of treatment for plaintiff's condition, the Department of Corrections made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs. The medical decision not to give plaintiff estrogen until further study does not represent cruel and unusual punishment. This case ... does not present a situation where there was a total failure to give medical attention. At most, plaintiff might have made a case for negligence or medical malpractice, but he could not have established a constitutional violation.

*Id.* at 963.

Similarly, in *Barnhill v. Cheery*, 2008 WL 759322 (M.D. Fla. Mar. 20, 2008), the plaintiff was a biological male who had been diagnosed with gender dysphoria, had been prescribed estrogen for 17 years before going to prison, and had been living as a female for 15 years before going to prison.  *Id.* at *1–2. "[H]is

33

female hormone treatments ceased" once he arrived in prison, and the prison instead put the plaintiff on a regimen of mental health counseling. *Id.* at 12. The plaintiff sued, alleging that the Eighth Amendment required the prison to continue his hormone therapy, but the court disagreed. The plaintiff's preference for hormone therapy over psychological care reflected "a simple difference in medical opinion" that "does not constitute deliberate indifference." *Id.* at *13 (internal quotation marks omitted). Thus, because the plaintiff had been receiving "mental health counseling for transsexualism," his "medical needs clearly ha[d] not been disregarded" within the meaning of the Eighth Amendment. *Id.* at *11.

If the prison's medical officials reasonably believe that the treatment rendered is "adequate as a medical matter," as is the case here, then there is no Eighth Amendment violation, because a prisoner "cannot establish deliberate indifference based solely on his desire to receive some other kind of care." *Turner v. Solorzano,* 228 F. App'x 922, 924 (11th Cir. 2007); *see also Loeber v. Andem,* 487 F. App'x 548, 549 (11th Cir. 2012) ("Plaintiff's disagreement with the course of treatment employed fails to support an inference that Defendants acted with [deliberate indifference ...").  In other words, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the ... course of treatment" simply cannot "support a claim of cruel and unusual punishment." *Harris v. Thigpen,* 941 F.2d at 1505 (collecting cases); *accord Carter v. Broward*

34

*Cnty. Sheriff's Dep't Med. Dep't,* 558 F. App'x 919, 22 (11th Cir. 2014); *Leonard v. Dep't of Corr. Fla.,* 232 F. App'x 892, 894-95 (11th Cir. 2007).

This principle, "that courts should not second-guess the judgment of [the prison's] medical professionals as to a particular treatment's propriety" indisputably applies to cases involving gender dysphoria. *Kothmann v. Rosario,* 558 F. App'x 907, 910-11 (11th Cir. 2014); *see also Supre, supra* at 963 (prison officials not required to provide hormone therapy to prisoner with gender dysphoria because they "made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiffs medical needs"); *Meriwether v. Faulkner,* 821 F.2d 408, 414 (7th Cir. 1987) ("[G]iven the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgment of prison officials as to the appropriate form of medical treatment.").

Thus, as the Middle District of Florida concluded in *Barnhill,* after canvassing the case law on Eighth Amendment claims by prisoners with gender dysphoria, "the majority of appellate courts" have held that if an inmate with gender dysphoria "is being provided some form of treatment deemed adequate by a physician, federal courts should defer to the informed judgment of the prison officials." *Barnhill, supra* at *12.

35

Here, Keohane is receiving appropriate medical care for gender dysphoria, and will continue to be treated. (doc. 129-22; doc. 129-1 at 161-64).   Thus, plaintiff's gender dysphoria is being treated, and the fact that plaintiff would prefer to *also* be permitted to access makeup and grow longer hair represents "a simple difference in medical opinion between the prison's medical staff and the inmate as to the course of treatment," which, in this Circuit, cannot, *as a matter of law,* "support a claim of cruel and unusual punishment." *Harris,* 941 F.2d at 1505.

Plaintiff's experts simply argue that dressing, grooming, and presenting oneself to others in accordance with one's gender identity is part of the treatment protocols under the WPATH Standards of Care.  (doc. 105-2; doc. 105-3). But the test under the Eighth Amendment is not whether the treatment provided is perfectly commensurate with the most up-to-date medical recommendations; it is, again, whether the treatment is "so cursory as to amount to no treatment at all." *McElligott*, 182 F.3d at 1255; *see also Harris v. Thigpen*, 941 F.2d at 1510 ("[I]t is not constitutionally required that [medical care provided to prisoners] be perfect, the best obtainable, or even very good.").   There can be no serious contention that FDC's substantial treatment of plaintiff's gender dysphoria is tantamount to the wanton infliction of pain on plaintiff, or that it amounts "to no treatment at all."

Nor could plaintiff reasonably so contend. The WPATH Standards of Care do not even purport to constitute the *sine qua non* of proper medical treatment for

36

gender dysphoria; instead, as plaintiff and plaintiff's own experts concede, the Standards of Care provide that the "particular course of medical treatment" should "var[y] based on the individualized needs of the person."  (doc. 1 at ¶ 24).  S*ee also Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) ("The Standards of Care are intended to provide *flexible directions for the treatment* of [gender dysphoria]"); *accord, e.g., Kosilek, supra* at 87; *Arnold v. Wilson*, 2014 WL 7345755, at *9 (E.D. Va. Dec. 23, 2014) (prison officials not required to "rigidly follow WPATH standards").  Despite this case law, the district court's Order has established the WPATH Standards of Care as the *constitutional minimum* in any deliberate indifference analysis involving transgender issues.   Such an unsupported determination compels reversal.  *See, e.g., Rhodes*, 452 U.S. at 346 ("Eighth Amendment judgments should neither be nor appear to be merely the subjective views of judges.").

Moreover, although "there is disagreement," both in the medical community and in the courts, as to "the proper treatment for" gender dysphoria, *Barnhill*, 2008 WL 759322 at *12, most "circuits that have considered the issue have concluded that declining to provide a transsexual with hormone treatment does not amount to acting with deliberate indifference to a serious medical need." *Praylor*, 430 F.3d at 1209; *see also White v. Farrier*, 849 F.2d 322, 327 ("[I]nmates do not have a constitutional right to hormone therapy."); *Meriwether v. Faulkner*, 821 F.2d 408,

413 (7th Cir. 1987) (prisoner with gender dysphoria "does not have a right to any particular type of treatment, such as estrogen therapy"); *Supre*, 792 F.2d at 963 ("The medical decision not to give plaintiff estrogen until further study does not represent cruel and unusual punishment.").

Accordingly, if not even hormone therapy is constitutionally required for gender dysphoric prisoners, it is inconceivable to think that a prison official (like FDC here) who has *actually provided* the prisoner with hormone therapy (in addition to continued mental health counseling and a bra) but has refused to, in addition, provide makeup or an exception from long-standing generally applicable hair length policies has acted with deliberate indifference toward the prisoner.

### C.    The district court erred in finding FDC failed to meet community standards

The district court, in part, determined that FDC was deliberately indifferent by significantly departing from "community standards" in its treatment of plaintiff's gender dysphoria.  Keohane claims that if she is not allowed to grow her hair to shoulder-length or wear make-up and female underwear, then she cannot present as female. She asserts that community standards relating to the treatment of gender dysphoria (mainly the WPATH Standards of Care) compel that she be allowed these things in prison. Keohane repeatedly testified that she will kill herself if she does not prevail on all of these requests.  (doc. 145 at 51, 90, 92-94).

38

FDC, however, has recognized Keohane's gender dysphoria diagnosis and has provided treatment that allows her to present herself as female. Keohane's testimony made clear that her main problem with FDC's refusals to allow grooming exceptions is that they seemingly imply she is "not a real woman." (*Id.* at 74). Keohane called this "the most offensive, degrading, hurtful thing that can be said to a transgendered woman." (*Id.* at 74-75). The feeling of being treated as being "fake," she testified, causes "the most severe feelings of depression." (*Id.)* FDC's medical expert, Dr. Levine, echoed this, testifying that much of gender dysphoria goes to a wish that others will "perceive [someone with gender dysphoria] as a woman and treat [them] as a woman." (doc. 146 at 72*)*. Although FDC has denied several of Keohane's cosmetic requests (for both lack of medical necessity and serious security concerns), it has made numerous other accommodations to her status as a transgender female.

FDC is working to ensure that Keohane is referred to with female pronouns. (doc. 146 at 14). Dr. Timothy Whalen, chief clinical advisor at FDC, testified that this would be the most appropriate way for Keohane to present as female (and socially transition) in a male prison. (*Id*. at 30). All medical witnesses agreed that appropriate pronoun usage is highly important to those with gender dysphoria. (doc. 145 at 148, 163, 169; doc. 146 at 30, 71-72, 129-130). Dr. Levine called it "deeply satisfying" for a transgender woman to be referred to "as a she." (doc. 146 at 72). Keohane also emphasized the importance of this, testifying that pronouns are "an

39

aspect of social transition or the socialization that accompanies that." (doc. 129-8 at 111). She referred to it as a "hate crime" to refer to a transgender person using the wrong pronoun. (*Id.*). Although this might appear to be a minor accommodation, the use of pronouns is central to Keohane's wishes. FDC's commitment to appropriate pronoun use runs counter to any assertion of deliberate indifference.

Keohane also is being treated with hormone therapy. (doc. 133 at 11-12). She has made clear that such treatment is important to her, stating at one point that it was the only thing that mattered in her life. (doc. 3-6 at 1). Since FDC began providing Keohane with hormone therapy, her body has become more feminized and her mental state has improved. (doc. 145 at 72-73; doc. 129-8 at 73-75). She also testified that her mood has improved and that she now sees herself more like she has always wanted to. (doc. 145 at 73). In fact, Dr. Whalen testified that Keohane's improvements from hormone therapy have caused FDC to view this treatment more favorably. (doc. 146 at 50). Hormone therapy has significantly feminized Keohane's appearance, furthering her social transition, and has relieved some of the distress associated with gender dysphoria.

Keohane also has been issued a bra. (doc. 133 at 10). Keohane desired a bra for gender presentation purposes and went to great lengths to obtain one. (doc. 145 at 33, 73; doc. 129-8 at 110). She is now permitted to wear one. Thus, Keohane will now be able to present, in part, in the way desired because of the requested bra.

40

Keohane is allowed to shower separately from her male counterparts.  (doc. 145 at 101-02).  Keohane stated that this was an accommodation that she wanted and appreciated.  (doc. 145 at 102; doc. 129-8 at 112).  Dr. Levine testified that, as part of social transitioning, transgender women do not want to shower or use the bathroom around other men.  (doc. 146 at 70).  Dr. Levine called such an accommodation "treatment" that recognizes "the person's unique psychological state."  (*Id*. at 129-130).  There is no question that this decision stems at least partly from valid security concerns.  Regardless, this is one more accommodation directed at recognizing and alleviating Keohane's gender dysphoria.

FDC has attempted to house Keohane in the safest possible way without having to isolate her. At Everglades CI, she was housed for part of the time with another transgender inmate. (doc. 129-8 at 113).  Keohane had asked the housing sergeant at that facility to "take into consideration that [she is] transgender and not comfortable and at risk with a cisgender male as a roommate." (*Id.* at at 114). The sergeant met that request. (*Id.)*.  At Jefferson CI, where Keohane was housed during the trial, she was housed in the "55 and older" dorm.  Keohane testified that she feels safer in that dorm than she had in other similar units.  (doc. 145 at 70-71).  Again, FDC's housing assignments expressly take into consideration Keohane's status as a transgender female.

Further, Keohane has consistently received mental health counseling during her time in FDC's custody. Ms. Sonel Baute testified that they would talk about "anything from family to daily things on the compound to whether she's doing okay or not that day." (doc. 129-3 at 28). One of Baute's main goals was to develop "coping strategies" with Keohane to keep her from decompensating. (*Id*. at 28). As stated earlier, the treatment team as a whole discussed the need to use therapy to help her cope with the denial of the grooming requests she has made. (doc. 129-7 at 96). Keohane testified that she believed that Baute was truly trying to help alleviate her dysphoria. (doc. 145 at 81; doc. 129-8 at 81). After a traumatizing incident in prison, Keohane turned to Baute, who was able to assist Keohane in multiple ways. (doc. 129-8 at 120-21). Keohane also has seen a counselor at Jefferson CI, although she was less pleased with the counseling she received there. (doc. 145 at 81-82). At trial, Keohane stated that counseling was "never something that [she] specifically requested" and deemed the benefits "very minor." (*Id.* at 101).

All testifying doctors stated that counseling is an important part of gender dysphoria treatment. (doc. 145 at 146-47; doc. 146 at 15, 20, 22, 67). It is also a point of emphasis in the WPATH Standards of Care and the National Commission on Correctional Health Care (NCCHC) Standards. (doc. 3-16 at 7; doc. 137-18 at 1). Clearly, Keohane does not put the same emphasis on counseling that these particular standards do. It is clear, however, that different patients need different forms of

treatment. And, FDC has made this widely-accepted form of treatment a priority from the beginning.

Keohane has offered no evidence that the counseling offered was constitutionally inadequate. Although the record is scant on exactly what was discussed in these sessions, it was Keohane's burden to show that counseling was grossly insufficient and that FDC subjectively knew this. *Burnette, supra* at 1330. Further, Keohane testified that she found her counseling with Baute to be beneficial, and that the treatment team was trying to help. (doc. 129-8 at 73-75; doc. 145 at 81). Because FDC concededly is trying to help it cannot be seen as being deliberately indifferent to Keohane's dysphoria. *See, e.g., Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003).

Keohane has made clear that the most important aspect of her gender dysphoria treatment is being viewed as an authentic woman. The accommodations that have been made for her all go to the heart of this. By using appropriate pronouns, FDC acknowledges plaintiff's medical diagnosis. By giving her hormone therapy, her body has become more feminine. By allowing her to shower separately, FDC is making clear that it recognizes her circumstances. Although Keohane may want more, FDC is doing all that it believes it should do, with appropriate consideration given to security concerns, to treat Keohane's dysphoria.

43

Beyond this, Keohane also has failed to prove that there truly are any established "community standards" relating to gender presentation. Keohane's medical expert, Dr. Brown, and FDC's expert, Dr. Levine, both agree that how a person identifies is subjective.  (doc. 145 at 148, 210; doc. 146 at 58-59).  Dr. Whalen, using the WPATH Standards, agreed.  (doc. 146 at 29).  A fair reading of the testimony and evidence shows that it is medically important for a patient with gender dysphoria to be able to present in some way with his or her identified gender. There is, however, no evidence suggesting that hair length, make-up, underwear, or anything else in particular is "standard" for the treatment of gender dysphoria.

The medical witnesses also agreed that certain items that might be a part of social transition could not be allowed in a prison setting.  (doc. 129-9 at 132-34, 138-39, 142-43).  Dr. Brown testified that stud earrings, for example, would not be a feasible prison accommodation, even if desired by the transgender inmate.  (doc. 145 at 191, 206). Neither Dr. Brown nor the WPATH standards provides any guidance on where the constitutional line should be drawn for acceptable gender presentation in a prison setting.  Although the parties disagree on where to draw that line, Dr. Brown concedes that FDC may preclude certain things based on security concerns. (*Id*. at 206).

FDC has made the determination that, in addition to not being medically necessary, long hair, make up, and women's underwear fall into Dr. Brown's

44

category of stud earrings. FDC's security expert, James Upchurch, testified at length that the increased femininity that comes with these requests makes Keohane a potential "target" for sexual assault or other harm, thereby increasing the risk not only for Keohane but for prison staff, as well. (doc. 146 at 149-150, 155-58). Moreover, the district court did not decide the appropriateness of FDC's grooming and security policies, nor did Keohane challenge those policies. (*Id.* at 142-47).

Dr. Brown also suggested that the appropriate treatment standard for allowable inmate exceptions would be for FDC to offer whatever female inmates are allowed. (doc. 145 at 172, 203-204). This contention is not included in the WPATH standards, which Dr. Brown helped author. (doc. 3-16; doc. 145 at 156). It is also, quite clearly, a blanket policy that would apply equally to all inmates with gender dysphoria regardless of their individual needs. Other courts have recognized that prisons may not employ a blanket policy in the treatment of gender dysphoria. *Kosilek, supra* at 91. If blanket policies are legally and medically inappropriate, then Dr. Brown's proposal misses the mark.

There is no evidence that FDC was aware (or even should have been aware) that long hair, make-up, or female underwear are inherently required for the treatment of gender dysphoria. Neither the WPATH nor NCCHC standards discusses those things in this context. (doc. 3-16; doc. 137-18). Further, what each patient will want or need in this respect is different, as illustrated by both Dr.

45

Levine's and Dr. Brown's testimony. (doc. 146 at 109-110; doc. 145 at 210-12). Dr. Brown also conceded that some requests (such as earrings) are not acceptable in a prison environment because of security concerns, regardless of the inmate's desire. (doc. 145 at 206).

This lack of evidence of deliberate indifference, as well as the wide latitude that courts have historically granted governmental agencies in injunctive cases such as this one, compels a finding that Keohane has not met her burden. *See, e.g., Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976). In addition, it is well-settled that a prison's medical providers are entitled to deference and that an inmate may not dictate his or her course of treatment. *Loeber v. Andem*, 487 F. App'x 548, 549 (11th Cir. 2012) ("Plaintiff's disagreement with the course of treatment employed fails to support an inference that defendants acted with disregard. . .").

Further, Keohane cannot reasonably contend that she has not benefited from the hormone therapy and other treatment that FDC has provided, particularly given her own testimony. Although she might not be wholly satisfied, such successful care clearly satisfies the constitutional requirements that courts have set for prisons. *Loeber, supra* at 549 ("Inadvertent failure to provide adequate medical care, negligence in diagnosis or treatment, or medical malpractice, without more, fails to state a cognizable deliberate indifference claim.") (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)).

46

## II.    THE DISTRICT COURT WRONGFULLY HELD THAT FDC WOULD DISCONTINUE PLAINTIFF'S TREATMENT

The district court determined that FDC might return to a prior policy on the treatment of gender dysphoria and therefore found that the voluntary cessation principle was not satisfied.  (doc. 171 at 14-21).  The voluntary cessation doctrine stands for the principle that a party's decision to stop illegal activity "does not moot a case" and allows a court to ensure that such a party will not "return to his old ways." *Troiano v. Supervisor of Elections,* 382 F.3d 1276, 1282-83 (11th Cir. 2004). Pursuant to this doctrine, a private party must demonstrate that "there is no reasonable expectation that the wrong will be repeated" in order for the issue to be moot. *Id.* at 1283. Government entities, however, are due a "rebuttable presumption that the objectionable behavior will not recur." *Id.*

In determining whether this presumption has been overcome, the court should consider (1) whether the cessation was "unambiguous" (2) whether it "appears to be the result of substantial deliberation or is simply an attempt to manipulate jurisdiction" and (3) whether the change has been "consistently applied." *Doe v. Wooten*, 747 F.3d 1317, 1323 (11th Cir. 2014).  When a public entity repeals or amends a policy, as FDC has done here, that action in and of itself is often "a clear indicator of unambiguous termination." *Id.* at 1322.

Keohane rests her argument primarily on Plaintiff's Exhibit 26, which is

47

referenced as "December 2016 grievance from other inmate." (doc. 137-13). In this exhibit, admitted over objection (doc. 145 at 8-11), an unknown inmate made a request for hormone therapy. The reply from Dr. Dieguez states that this inmate "will be maintained at the level that existed at the time [the inmate was] received" by FDC. Further, the response states that this inmate should provide medical records to FDC so that it may review any prior gender dysphoria treatment, and it informs the inmate of her further review/appeal rights on this issue.

No information or context regarding this exhibit was offered at trial. No evidence was offered regarding why this decision was made. No evidence was offered regarding what happened after this document was created. No evidence was offered about the inmate who made the request or the inmate's condition. Moreover, Keohane concedes that FDC has adopted a new policy regarding gender dysphoria treatment.[8] Despite this concession, the district court nevertheless found that FDC may revert to a former policy based on this single mystery grievance. (doc. 171 at 17-18).

This Court should reject any contention that FDC still has a "freeze-frame" policy. The new policy is in evidence. (doc. 133, Ex. 2). All FDC employees and contractors are required to follow adopted policies once published. (doc. 129-1 at

---

[8] *See* doc. 133, Plaintiff's Ex. 2, Defendant's Ex. 2.

48

19-20).   To the extent that someone applies the wrong standard to an inmate grievance, that inmate could appeal that decision by simply pointing to the current procedure. Any possible one-time misstatement of FDC policy cannot be used to prove that FDC is flouting those requirements generally. This is especially true in light of the treatment actually being provided to Keohane, which is wholly inconsistent with a freeze-frame policy.

Both sides agree that a new policy was adopted. This in and of itself establishes an unambiguous change in procedure. Keohane presented no evidence that FDC is attempting to manipulate jurisdiction in this case, and FDC has shown significant, genuine interest in improving the care it provides for gender dysphoria. This includes improved use of pronouns, increased training for treatment team members, and updated treatment guidelines.   (doc. 146 at 27-28).   In fact, FDC established a diagnostic and training facility dedicated to transgender issues – a facility described to the district court by Dr. Whalen in response to the district court's own questions. (*Id.*).

There simply is no competent evidence to suggest that FDC will roll back Keohane's treatment when this case is resolved. In light of this, Keohane has not overcome the rebuttable presumption necessary to establish the voluntary cessation doctrine.  The district court erred in holding otherwise.

49

III.    **THE DISTRICT COURT FAILED TO CONSIDER THE PRISON LITIGATION REFORM ACT**

The district court's Order (doc. 171) should be reversed because it violates the Prison Litigation Reform Act ("PLRA"), which requires that claims such as the ones made by Keohane here meet certain statutory requirements. The PLRA also requires courts to remain within narrowly-drawn boundaries when ordering prospective injunctive relief against prison administrators. Specifically, any prospective relief requested in such a suit must be "narrowly drawn," extend "no further than necessary to correct the violation of the federal right," and be "the least intrusive means necessary to correct the violation of the federal right." 18 U.S.C. §3626(a)(1)(a). The scope of any remedy that is ordered must be "proportional to the scope of the violation." *Brown v. Plata*, 563 U.S. 493, 531 (2011).

A district court must make specific factual findings in its order regarding the "need, narrowness, intrusiveness" requirement of the PLRA. *Johnson v. Breeden*, 280 F.3d 1308, 1326 (11th Cir. 2002); *United States v. Sec'y, Fla. Dept. of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015). The court must "discuss those factors and enter findings that are as specific to the case as the circumstances permit." *Johnson*, 280 F.3d at 1326.

The district court's Order granting prospective relief states, in part, as follows:

> This Court further enters a PERMANENT INJUNCTION against Defendant requiring it to permit Ms. Keohane

50

> access to Defendant's female clothing and grooming standards and requiring Defendant to continue to provide Ms. Keohane with hormone therapy so long as it is not medically contraindicated and while Ms. Keohane remains in Defendant's custody.

(doc. 171 at 61).

The Order fails to mention the PLRA or make any of the required findings. The district court made no attempt to show that the Order is narrowly tailored to treat Keohane's gender dysphoria. In fact, the district court has created a blanket policy (transgender women inmates in male facilities must have access to the privileges afforded to those in female prisons) that will clearly extend beyond this case. The Order invites all other allegedly gender dysphoric inmates to now demand access to all female inmate clothing and grooming standards, whether or not those standards would be deemed medically necessary to any particular inmate.[9] Both this broad decree and the failure to include any specific findings in the Order require reversal.

The PLRA also requires that a district court give "substantial weight to any adverse impact on public safety…caused by the relief." In order to provide such weight, courts must "give due deference to informed opinions as to what public

---

[9] Moreover a "narrowly drawn" analysis would require consideration whether some female inmate grooming and clothing standards would reasonably apply to plaintiff. Plaintiff remains biologically male and thus does not require some property items related to female biological functions; however, the Order leaves the door open for plaintiff to demand such items simply because they are permissible for females to possess.

51

safety requires, including the considered determinations of state officials…" *Brown*, 563 U.S. at 543.  This does not mean that a court must find "no possible adverse impact" in order to grant relief.  *Id.* at 534.  Rather, it must simply "consider the public safety consequences of its order" and seek to "mitigate those consequences while still achieving an effective remedy of the constitutional violation."  *Id.*

The Order affords no weight to the testimony in the record regarding FDC's legitimate security concerns.  It simply disregards such concerns or unfairly labels them the product of "ignorance and bigotry." (doc. 171 at 31, 41).  This despite the fact that, during the trial, the district court explicitly acknowledged the "heads we lose, tails we lose" situation FDC was presented with in addressing Keohane's demands.  FDC's security expert, Mr. Upchurch, agreed with the district court that this dilemma was troublesome and gave specific reasons why.  (doc. 146 at 150-52).  Nothing in Upchurch's testimony even remotely suggests bigotry.

The First Circuit in *Kosilek* has also expressly concluded that housing a transgender female in a male facility presents real and serious security concerns. *Kosilek, supra* at 93.  However, despite raising this important issue at trial, the Order presents FDC's security concerns as if they have no legitimacy whatsoever.  Instead of seeking to mitigate any potential consequences on security, the district court seemed to assume that such consequences do not exist.  The district court's failure to comply with relevant federal law in and of itself requires the Order to be reversed.

## <u>CONCLUSION</u>

The district court's Order reaches a legal conclusion at odds with the facts and the law. Far from being deliberately indifferent to Keohane's gender dysphoria, FDC continues to provide numerous, and helpful, treatment options and accommodations to Keohane. There is no evidence these options will be rolled back. Accordingly, the district court's entry of a permanent injunction should be reversed and judgment rendered in FDC's favor. Alternatively, the case should be remanded to the district court due to the district court's failure to consider the requirements of the Prison Litigation Reform Act.

Respectfully submitted,

/s/ Kirkland E. Reid

Kirkland E. Reid
Jones Walker LLP
11 North Water Street, Ste. 1200
Mobile, Alabama  36602
Telephone:  251-439-7513
Facsimile:  251-439-7358
Email:  kreid@joneswalker.com

Daniel Russell
William D. Hall
Jones Walker LLP
215 South Monroe Street, Suite 130
Tallahassee, FL 32301
Telephone:  (850)425-7805
Facsimile:  (850-425-7815
Email: drussell@joneswalker.com
Attorneys for Appellant

53

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)

because the brief contains 11,503 words, excluding those parts of the brief exempted

by Eleventh Circuit Rule 32-4.

Date: November 19, 2018.

*/s/ Kirkland E. Reid*
_____

Kirkland E. Reid
Attorney for Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 19th day of November, 2018, electronically filed the foregoing using the Court's ECF system, which will send notice to the following persons:

Daniel Tilley
ACLU Foundation of Florida, Inc.
4343 W. Flagler Street
Suite 400
Miami, FL 33134
dtilley@aclufl.org

Leslie Cooper
American Civil Liberties Union
125 Broad Street
18th FL
New York, NY 10004
lcooper@aclu.org

Elizabeth Akins
DLA Piper LLP
1201 W. Peachtree Street
Suite 2800
Atlanta, GA 30309
liza.akins@dlapiper.com

I further certify that on the same day I also mailed the original and six (6) copies of the brief to the Clerk of the Eleventh Circuit Court of Appeals, 56 Forsyth Street, N.W., Atlanta, Georgia 30303 by USPS Overnight Mail.

/s/ Kirkland E. Reid
Kirkland E. Reid

55