IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | | |
|---|---|---|
| REIYN KEOHANE, et al. | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Case No. 4:24-cv-434 |
| | : | |
| RICKY D. DIXON, in his official capacity as Secretary of the Florida Department of Corrections; CLAYTON WEISS in his official capacity as Health Services Director of the Florida Department of Corrections; GARY HEWETT, in his official capacity as Warden of Wakulla Correctional Institution, | : | |
| | : | |
| *Defendants.* | : | |

## DECLARATION OF REIYN KEOHANE

My name is Reiyn Keohane. I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare:

1. I am a 30-year-old transgender woman serving a fifteen-year sentence in the custody of the Florida Department of Corrections ("FDC"). I am currently

incarcerated at the Wakulla Correctional Institution ("Wakulla CI"), specifically in the Wakulla Annex, located in Crawfordville, Florida.

2. Since age 12, I knew that my gender identity was female, and it did not align with my male-assigned sex at birth.

3. From age 14, I presented as female and began socially transitioning— wearing female-typical clothing, hairstyles, and cosmetics.

4. At age 16, I was diagnosed by a licensed medical professional with Gender Identity Disorder.

5. At age 17, I legally changed my name to "Reiyn" to conform with my gender identity. I had been using the name Reiyn socially prior to the formal legal name change.

6. In August 2013, at 19 years-old, I began hormone therapy—Estrace (estradiol) and Aldactone (spironolactone)—under the recommendation and care of licensed medical professionals.

7. In September 2013, I was arrested and taken into custody at Lee County Jail. At Lee County Jail, I was refused hormone therapy, despite my requests to continue care. The Lee County Jail did not require me to cut my hair.

8. In July 2014, I accepted a plea deal of 15 years, with the understanding that I would be provided hormone therapy after being transferred to FDC custody.

    Maintaining hormone therapy was a deciding factor in my acceptance of the plea.

9. On July 17, 2014, I was committed to the custody of the FDC. Since then, I have been transferred between numerous FDC facilities, including the South Florida Reception Center, DeSoto CI, Charlotte CI, Dade CI, Everglades CI, Jefferson CI, Zephyrhills CI, Santa Rosa CI, Wakulla CI (the Annex), Florida State Prison, and Suwanee CI. I have been at the Wakulla Annex for most of the past 6 years, with two brief trips to Florida State Prison in 2020 and Suwanee CI in 2021.

10. Soon after entering FDC custody in 2014, I requested treatment for my gender dysphoria, making clear the need for both hormone therapy and the ability to dress and groom in accordance with female grooming standards to be able to socially transition as recommended by medical guidelines for the treatment of gender dysphoria. I raised this in numerous conversations with FDC medical and mental-health officials, and through informal and formal grievances and appeals. Prior to filing a lawsuit in 2016, although officials confirmed my diagnosis, all treatment apart from mental-health counseling was denied. I was told unequivocally that I would not be placed on hormone replacement therapy while in FDC custody. The FDC's "freeze-frame" policy prohibited treatment for gender dysphoria that was not being provided upon entry into

FDC custody. Although I had been on hormone therapy when I entered the Lee County Jail, because I was taken off my hormone medication in the jail, the FDC deemed me not to have been on hormone therapy when I entered FDC custody. And although I had at times been using bras and makeshift female undergarments that I had obtained, these were confiscated. I was told that such clothing is unauthorized in a male institution. This history is explained in greater detail in my prior case. *Keohane v. Jones*, 4:16-cv-511 (N.D. Fla.).

11. The harm it caused me to be without hormone therapy and access to female clothing and grooming standards was significant. For example, while at DeSoto CI, on one occasion I attempted to hang myself, and on another occasion, I attempted self-castration. This history, and two additional instances of attempted suicide, are explained in greater detail below.

12. Because my numerous grievances and my constant pleading with FDC officials to provide medical care were unsuccessful, I obtained legal representation for help.

13. On August 15, 2016, a lawsuit was filed on my behalf in the Northern District of Florida to compel the FDC to treat my medical needs.

14. Shortly after the lawsuit was filed, within a matter of weeks, the FDC provided me with hormone therapy. However, I was still denied access to

female clothing and grooming standards. In my previous lawsuit, I filed a declaration explaining the impact:

> 3. On September 2, 2016, shortly after I filed this lawsuit, I was taken to see an endocrinologist and started on hormone therapy. It is a relief that after two years of pleading, I am finally able to be back on hormones, although I feel worried about whether that will continue given how long the FDC denied this treatment and the lack of doctors here with experience treating gender dysphoria. Moreover, the Department of Corrections still refuses to allow me to live consistently with my female gender identity as outlined in the standards of care for the treatment of gender dysphoria and supported by my medical providers prior to my incarceration. Specifically, I am not allowed to wear women's underwear or bras; I am not allowed to grow my hair as female inmates are (instead, I am required to wear my hair according to the standards for male inmates, which is above the ears); and I am not permitted to purchase make-up that female inmates are allowed to buy and use. This causes terrible distress because all this tells me that I'm not the woman I am, and it prevents me from living as a woman and seeing a woman when I look in the mirror.
>
> 4. The inability to wear women's underpants and bras is extremely distressing for the additional reason that it forces me to constantly be aware of the parts of my body that I feel are wrong. Boxers, which are the only underwear available, don't let you conceal or hold down your genitals as women's underpants do. Having to feel my genitals moving around and be aware of them all the time is torturous. And not being able to wear bras makes me feel vulnerable and exposed. In addition, now that I'm back on hormone therapy, I'm beginning to have breast development. I tried to purchase women's underpants, bras, and make-up (eyeliner, eye shadow, and lip gloss) at the quarterly order in July of this year, and those items were denied

based on facility restriction. We have another quarterly order this month, and I will be requesting the same items.

5. At times, I've been able to get bras and women's underpants by bartering with other inmates who sew. When I was at Desoto CI, my female undergarments were discovered during a search and confiscated. I told the officer that this was a violation of my rights, and as a result I got a DR (disciplinary report) and 30 days in the box. After the DR hearing, I tried to hang myself because I felt so hopeless. This was in October 2014. After that, officers threatened that if they catch me with women's underwear again, they'll take it, and they also threatened to cut my hair. This and the denial of other medical treatment made me feel so hopeless that I tried to castrate myself by cutting my testicle. This was in January 2015.

6. On Tuesday, September 13, 2016, I was forced to have my hair cut. Around 1:00am, they came to my cell and took me downstairs to the front of the dorm, where officials do shaves and haircuts on shower nights. They told me I was going to get a haircut. I repeatedly said that I was not getting my hair cut. I was slammed into the glass in the front of the dorm. I told them I was transgender and have a lawsuit about this and they should wait until this goes to court. One officer said there's no rule that if you're transgender, you don't get haircuts; it just means you get searched separately. I asked to speak to the captain, and then I was taken back to my cell. The captain arrived and I showed him the lawsuit docments and explained that I was going to court on this issue. The captain said that I was either going to come out and cut my hair or he would pepper spray me, call a cell extraction team, write a bunch of DRs, and then they would cut my hair. They then took me back downstairs, and they cut my hair. They cut it into a buzz cut, less than 1/4 inch all around.

7. After my hair was cut, I hated myself. I could not stand to look at myself in the mirror. I punched the wall and mirror several times to the point where my hand swelled up because it would distract me

6

from what I was feeling. I very strongly considered many ways to hurt or kill myself. It is miserable to be so angry at oneself for just being "wrong" and have there be nothing you can do about it. It's awful to live this way, with other people telling you that this is the way you are—that I'm not female.

8. I wrote a grievance about my forced haircut, explaining that it was extremely traumatic, but I have not yet heard a response.

9. While in prison, I have never voluntarily cut my hair. When I first arrived at the South Florida Reception Center in July 2014, everyone was required to cut their hair. When I told an officer that I didn't want my hair cut, he slapped me on the face and threatened to hurt me more if I didn't get my hair cut, so I did. After I was taken to Charlotte CI's "CSU" (I believe this means Crisis Stabilization Unit), I tried everything I could to not get my hair cut, but I was told that I could not shave if I did not allow them to cut my hair, and shaving is so important to me that I ultimately agreed to do so. Later, after returning to Dade CI from the Charlotte County Jail, I was told that they would just keep me in handcuffs in a holding cell until I agreed to let them cut my hair. I tried to explain my need not to get my hair cut, but they forced me to have it cut anyway. Later, when I left Dade CI, they insisted that everyone who was to be transported had to cut their hair. I was handcuffed and taken outside, and I was told that if I did not go back and get my hair cut, they would shut off the cameras and would beat me and put me back on the bus with a whole bunch of DRs. They cut my hair and did not remove the handcuffs until they finished. To my recollection, these are the only times in prison that I have had my hair cut, up to the most recent forced haircut. At the Charlotte County Jail, officials did not make me cut my hair, and they did not restrict my ability to wear female undergarments.

10. Since I was 14 years old until I was incarcerated, I have been wearing female-typical cosmetics, clothing, and hairstyles, and my

7

hair was at least shoulder length. The one exception was around February 2013. I was overweight, and my doctor had told me that I could not start hormone therapy until losing weight. I was so uncomfortable with my body that I wondered if it could be because of my weight and that if I lost the weight, I would no longer be uncomfortable with my body. So I wore gender neutral clothing, got a short haircut and embarked on a serious weight-loss effort. But within a few months, after losing about 70 pounds, it was clear to me that that was not the issue; I knew I was a woman and I was certain about moving forward with my transition. By August, I began hormone therapy. At the time my arrest photo was taken in September 2013, my hair was still relatively short because I was in the process of growing it back. At the time I believe the photo was taken, my hair was about the same length as when my hair was forcibly cut last month. While in the Lee County Jail, I had no intention of ever cutting my hair, nor did I do so. When I arrived in prison, my hair was to my shoulders.

11. Every day that goes by without access to female undergarments and grooming standards, I experience significant distress. I cannot imagine surviving without the ability to live as a woman, which I cannot do if forced to wear boxers and follow male grooming standards (including having a very short male haircut and no make-up).

*Keohane v. Jones*, 4:16-cv-511 (N.D. Fla.), ECF No. 33-3 (filed Oct. 6, 2016).

15. There were also times in custody when my hormone therapy was unavailable for a period of time, and I felt so bad and distressed that I attempted suicide.

16. On July 13, 2017, during the course of the previous litigation, the FDC amended its policy concerning treatment for gender dysphoria. The FDC

removed the "freeze-frame" policy and developed a new policy, Procedure 403.012, that explicitly provided for access to hormone therapy upon entry into FDC custody. It was later amended to provide access to female clothing and grooming standards when indicated for a patient with gender dysphoria.

17. For over 6 years—since the day after trial in the prior litigation—, Wakulla CI has been following Procedure 403.012 with respect to my hormone therapy and access to female clothing and grooming standards. I have been receiving hormone therapy and I have been able to groom according to female grooming standards, including wearing my hair long and wearing makeup, and I have been allowed to wear women's clothing (grey t-shirts instead of white) and undergarments. Dozens of other transgender women that I know at Wakulla CI have also been provided hormone therapy and access to female undergarments and grooming standards under this policy since 2018.

18. Being able to receive hormone therapy and follow female clothing and grooming standards has made it possible to deal with a large amount of the distress and dysphoria. Being forced to comply with a male standard that female inmates are not forced to comply with causes a huge spike of distress and dysphoria at the time and ongoing afterwards. Without this care, I could not function.

19. I had thought that the denial of my current treatment for gender dysphoria was behind me, but that changed on Monday, September 30, 2024. On that day, all transgender inmates in Wakulla CI were informed treatment for gender dysphoria would be changing.

20. To inform us of this change in policy, the transgender inmates were rounded up in the visitation park, with the "DART team"—officers dressed in camouflage often used to quell riots—present.

21. There were roughly 80 transgender inmates present in total. We were told to line up single-file in a straight line in our dormitory groups without talking.

22. There was an abnormally high staff presence both outside and inside the visitation park. In addition, the entire administrative and high-ranking staff were present. Among the many officers in attendance were Warden Hewitt, Assistant Warden Rummel, Assistant Warden Comerford, Major Weirick, and Colonel Paynter. There were also officers surveying us from the Central Tower while holding large guns. While we were being lined up outside, one of the officers said, "make sure they line them up where the ones with guns can see them."

23. In the roughly 10 years that I have been incarcerated, I have never witnessed that amount of security present. There were more than double the regular number of officers, amounting to what seemed to me for the FDC to be a "high

alert" situation. My understanding is that special authorization is required for officers to be bearing firearms and the extra-large cans of pepper spray, as they were on that day.

24. When we arrived inside the visitation park about an hour after being led outside the dorm, an unidentified individual from Centurion Health (the FDC-contracted medical provider) and Colonel Paynter provided very brief statements. First, the person from Centurion Health stated that due to "changes in the medical opinion on treatment of gender dysphoria," our treatment for gender dysphoria would be changing, "up to and including hormone therapy." The Centurion representative was reading from a single piece of paper that we were not provided. Then, Colonel Paynter seemed to read portions of a document that we were then asked to sign. He explained that restrictions would begin being enforced in 30 days, at which point they would order all transgender inmates to shave our heads, would confiscate all female clothing and canteen items, and would issue boxers as a replacement for our undergarments. If we did not comply, he said that we would be subject to "disciplinary action." No further information was provided, and we were told if we spoke, we would face disciplinary action. We were not allowed to ask questions.

25. After these two statements were made, we were individually called to sign a document. We were not given the opportunity to read the paper or to ask any clarifying information about what we were signing. One officer specifically said to not read the document and to just sign it. My assumption is that the document was some sort of statement of notice regarding the 30-day period and disciplinary action that would occur if we did not comply with shaving our heads and relinquishing our female clothing and canteen items. My name was called first, and I drew a large "X" over the signature area in an effort to indicate my refusal.

26. This whole incident was extremely traumatic. The coercion, intimidation, withholding of vital information about our healthcare, and active threats of "discipline" made an already awful environment even worse.

27. The following Friday, October 4, 2024, the same group of about 80 of us were summoned and ordered to visit Dr. Cortes for Tanner Stage evaluations—measuring the size of our breasts—to determine if we would "qualify" for a bra.

28. On Wednesday, October 9, 2024, the Multi-Disciplinary Services Team ("MDST") met with the same list of people. For my dorm, the first person to speak was Dr. Tapia, the regional mental health director, who said that they were from the MDST and were going to have a few questions for us. A woman

with a laptop asked two questions and said don't say anything except a "yes" or a "no." The first question was about my use of a bra, and the second question was about my use of hormone therapy. Most people were done in maybe 30 seconds.

29. After the September 30 meeting, I filed two grievances regarding the decision to cut off my healthcare. I filed one at the institutional level and another one directly to the Secretary's office. The one I filed at the institution level stated: FDC's "announced change to policy for treatment of Gender Dysphoria is unconstitutional, in violation of the 8th Amendment prohibiting cruel and unusual punishment; it is a blank denial not only with no medical basis, but flying in the face of all established medical standards, which require a considered individual plan for each individual based on their specific needs." I also described my serious medical need for hormone therapy and access to female clothing and grooming standards.

30. I received a response from the institutional-level grievance on October 18, although the response was dated October 10. The response to the institutional-level grievance that I received on Friday, October 18, stated: "An investigation reveals the following: 403.012 Identification and Management of Inmates Diagnosed with Gender Dysphoria was recently rescinded. However, protocols set forth in HSB 15.05.23 which went into effect on 9/30/2024 exist

to ensure the continued appropriate assessment, therapy, and monitoring of your physical and mental health needs. As appropriate services are being provided to you, your grievance/appeal is denied."

31. FDC staff have reiterated their intent to enforce the new policy concerning haircuts and female undergarments and grooming. For example, when Captain Wilson walks through our dorms for inspection, he has been announcing the number of days before he'll discipline us for not cutting our hair. I have heard him say, "Y'all better get right before then or it will be bad if you don't."

32. I could not function day to day without this care. It is the only thing that's preventing me from not functioning.

I, Reiyn Keohane, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dated: 10/23/24                            /s/ Reiyn Keohane
                                           **Reiyn Keohane**