**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| **REIYN KEOHANE,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Case No. 4:24-cv-00434-AW-MAF |
| ) | |
| **RICKY DIXON,** *et al.*, ) | |
| ) | |
| *Defendants.* ) | |

# THE FDC OFFICIALS' REPLY IN
# SUPPORT OF MOTION TO DISMISS

The FDC Officials[1] submit this Reply in Support of their Motion to Dismiss (Doc. 28).

## INTRODUCTION

Plaintiff's entire Response rests on mischaracterizations. First, Plaintiff ignores the plain language of FDC's grievance policy to claim unavailability to the policy by Plaintiff. Second, Plaintiff repeatedly asserts that HSB 15.05.23 constitutes a "blanket ban" on both hormone therapy and access to female grooming and canteen items. In fact, HSB 15.05.23 plainly provides for individualized evaluations to determine whether hormone therapy remains medically necessary to treat each inmate's gender dysphoria. Moreover, far from "banning" access to female grooming and canteen items, HSB 15.05.23 remains silent on the matter; nothing other than Plaintiff's unfounded speculation suggests the FDC Officials would deny these accommodations if the individual evaluation process resulted in a finding of medical necessity for a particular inmate. Plaintiff's mischaracterizations cannot save the Complaint.

## ARGUMENT

**I.     PLAINTIFF FAILED TO EXHAUST ADMINISTRATIVE REMEDIES.**

---

[1] Defined terms used herein carry the same meaning as in the FDC Officials' Memorandum in Support of their Motion to Dismiss (Doc. 29).

1

The FDC Officials demonstrated that Plaintiff failed to properly exhaust available administrative remedies. (Doc. 29, 13-20). In response, Plaintiff claims FDC's formal grievance process was "unavailable" because Plaintiff could not complete it before HSB 15.05.23 would go into effect. (Doc. 39, 9-12). Plaintiff's argument ignores the plain language of FDC's grievance process and Plaintiff's failure to comply with that process.

FDC's grievance process provides a pathway for inmates to expedite the grievance process in situations the inmate claims as "emergencies." Specifically, Florida Administrative Code r. 33-103.007(3) allows inmates to file "[e]mergency grievances" directly to the Office of the Secretary, and the Bureau of Policy Management and Inmate Appeals must "[p]rovide a formal response" to any such grievance "within 15 calendar days[.]" (See also Doc 29-1, ¶ 3.d., the "Direct Grievance"). Plaintiff clearly knew about this process, as Plaintiff filed an improper Direct Grievance on October 3, 2024; specifically, Plaintiff's Direct Grievance failed to provide a basis for bypassing the Formal Grievance process. (Id., ¶¶ 5–6, 8). On October 16, 2024, Plaintiff timely received a response to the Direct Grievance, which notified Plaintiff of its impropriety. (Id., ¶ 8). Had Plaintiff properly filed the Direct Grievance on October 3 (by, for example, indicating that it qualified as an "emergency" in light of the alleged impending enforcement deadline), FDC Policy required the Bureau to respond by October 18, 2024, well

2

before Plaintiff's alleged "October 30th enforcement date." (Doc. 39, 11). Thus, contrary to Plaintiff's argument, FDC's grievance process remained "capable of use" by Plaintiff for "the accomplishment of a purpose" well before the date Plaintiff alleges irreparable harm would occur. Ross, 578 U.S. at 642. (Doc. 39, 11). Plaintiff simply failed to put the grievance process to proper use. Notably, Plaintiff made no attempt to defend the improper Direct Grievance. (Doc. 39, 9 n.1 (noting only that Plaintiff received a timely response to the Direct Grievance pointing out the impropriety of the Direct Grievance)).

Thus, Plaintiff could have exhausted administrative remedies through the Direct Grievance process **before** the alleged October 30th "enforcement date." "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Geter v. Baldwin State Prison, 974 F.3d 1348, 1354 (11th Cir. 2020) (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006)); Blake v. Carter, 2024 WL 4244098, at *2 (N.D. Fla. July 24, 2024), report and recommendation adopted, 2024 WL 4246679 (N.D. Fla. Aug. 8, 2024) (holding, and collecting cases also holding, that prisoner-plaintiffs in FDC custody exhaust administrative remedies by filing a *proper* Direct Grievance to the Office of the Secretary). Plaintiff cannot now complain that "[i]t was not possible for Plaintiff to complete the formal grievance process in advance of GDC's

3

October 30th enforcement date," when FDC policy provided a method for inmates to use in such "emergency" circumstances and Plaintiff failed to follow it. (Doc. 39, 11).

Even aside from Plaintiff's failure to properly utilize the Direct Grievance process, Plaintiff still failed to exhaust. Federal law recognizes no exception to the PLRA's exhaustion requirement merely where a complaint alleges that irreparable harm will occur before the exhaustion period. Indeed, the Eleventh Circuit held that the district court likely erred in refusing to consider a PLRA exhaustion argument before granting a preliminary injunction requiring certain COVID-19 precautions at a detention center. Swain v. Junior, 958 F.3d 1081, 1091-92 (11th Cir. 2020) ("So long as [administrative] remedies are 'available' to the prisoner, a 'court may not excuse a failure to exhaust, even to take special circumstances into account.'") (quoting Ross v. Blake, 578 U.S. 632, 639 (2016)) (internal alterations omitted). The Eleventh Circuit reached this conclusion even where the plaintiffs alleged that the "undeniable urgency of the situation" required preliminary injunctive relief. Swain, Case No. 20-11622, Appellee's Br. at 1. Plaintiff provides no authority suggesting federal law excuses Plaintiff's failure to exhaust the Formal Grievance process, especially in light of Plaintiff's improper Direct Grievance. Instead, Circuit precedent provides directly to the contrary. Gipson v. Renninger, 750 F. App'x 948, 952–53 (11th Cir. 2018) (prisoner-plaintiff in FDC custody failed to exhaust

4

administrative remedies where, as Plaintiff did here, he filed a lawsuit after return of an improper direct grievance "[i]nstead of refiling his grievance following the informal and formal procedures provided for the in Florida Administrative Code"). Thus, Plaintiff's (1) failure to properly exhaust the Direct Grievance process; and (2) filing of the Complaint prior to exhausting the Formal Grievance prove fatal to Plaintiff's claim.

## II.   PLAINTIFF LACKS STANDING TO ASSERT CLAIMS REGARDING HORMONE TREATMENT.

The FDC Officials established that, to possess standing to seek injunctive relief, Plaintiff must establish "'a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury.'" (Doc. 29, 20-21 (quoting Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994)). Plaintiff's Response confirms Plaintiff's inability to cite such a threat. Instead, Plaintiff continues to mischaracterize HSB 15.05.23 as "'a blanket policy determination that, in effect, categorically prohibits hormone therapy, regardless of medical need.'" (Doc. 39, 15 (quoting Compl., ¶ 55)). According to Plaintiff, "[t]he establishment of a policy prohibiting treatment is sufficient to establish an imminent risk of treatment being cut off." (Id., 17). The plain language of HSB 15.05.23 proves Plaintiff's statements false.[2] Under HSB 15.05.23, "[i]n rare instances *deemed*

---

[2] The Court may consider the contents of HSB 15.05.23 on this Motion because it "is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its

5

*medically necessary*, a variance may be approved to permit the use of cross-sex hormones to treat an inmate's Gender Dysphoria." (Doc. 4-4, 7) (emphasis added). Thus, far from banning hormone therapy "regardless of medical need," HSB 15.05.23 explicitly provides for hormone therapy where "medically necessary."

Apparently recognizing the weakness of the "blanket ban" argument, Plaintiff acknowledges that HSB 15.05.23 provides for "variances," but Plaintiff mischaracterizes the variance provisions. According to Plaintiff, "with the imminent risk of hormone therapy being cut off at any moment, Plaintiff could not wait to pursue a variance before commencing this action." (Doc. 39, 17-18). However, for inmates currently receiving hormone therapy, like Plaintiff, HSB 15.05.23 provides for an "evaluat[ion] by the MDST to determine if the diagnosis is still warranted." (Doc. 4-4, 8). For "inmates whose diagnosis is no longer warranted, titration and discontinuation of cross-sex hormone therapy should be initiated over a period of nine weeks." (Id.). Thus, Plaintiff faces no "imminent risk of hormone therapy being cut off at any moment."[3] Plaintiff's speculation about possibly losing access

---

authenticity is not challenged." Johnson v. City of Atlanta, 107 F.4th 1292, 1300 (11th Cir. 2024).

[3] As the FDC Officials stated in connection with Plaintiff's Motion for Preliminary Injunction, Plaintiff received an evaluation, and the MDST preliminarily recommended that Plaintiff continue receiving hormones. (Doc. 38, 22; Doc. 38-1, ¶ 23).

to hormone therapy at some point in the future fails to confer standing on Plaintiff to raise this claim.

In a last-ditch effort to save this claim, Plaintiff argues that "[d]iscovery will be necessary to obtain information about the 'variance' process and whether the requirements are achievable for individuals with a medical need for such treatment and comport with constitutional standards." (Doc. 39, 15). However, if Plaintiff ultimately receives a variance, Plaintiff will need no discovery regarding the variance process, as Plaintiff will suffer no injury. Moreover, "'[d]iscovery should follow the filing of a well-pleaded complaint. It is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim.'" Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1367 (11th Cir. 1997) (quoting Kaylor v. Fields, 661 F.2d 1177, 1184 (8th Cir. 1981)). See also Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009) (holding that the "doors of discovery [are not unlocked] for a plaintiff armed with nothing more than conclusions."). Plaintiff's speculation that HSB 15.05.23 *might* result in the discontinuation of Plaintiff's hormone therapy at some unspecified future time cannot establish standing and does not provide Plaintiff access to discovery.

### III. ISSUE PRECLUSION BARS PLAINTIFF'S CLAIM REGARDING CLOTHING AND GROOMING ACCOMMODATIONS.

Issue preclusion bars Plaintiff's clothing-and-grooming claim, because Plaintiff litigated that claim in Keohane I. (Doc. 29, 22-28). In response to the

7

Motion, Plaintiff again mischaracterizes HSB 15.05.23, claiming it constitutes a "blanket policy, which takes away access to female clothing and grooming standards that FDC has been providing to Plaintiff and other inmates with gender dysphoria since at least 2018, regardless of her current medical need for these accommodations." (Doc. 39, 19-20). In fact, HSB 15.05.23 remains silent about access to female clothing and grooming standards. Nothing in HSB 15.05.23 prohibits the provision of these items if they are determined medically necessary for an inmate through the individual evaluation process. As the Eleventh Circuit acknowledged in Keohane I, "the denial of these accommodations was based on the medical judgment of her medical providers at the time." (Doc. 39, 21). Plaintiff argues that "Plaintiff and FDC's circumstances have dramatically changed since" Keohane I. (Id.). Plaintiff alleges that, in 2017, FDC enacted a policy that allowed inmates with gender dysphoria access to female clothing and grooming standards. (Id., 21-22). Plaintiff claims "it is medically necessary for Plaintiff and other members of the proposed class to continue to access clothing and grooming standards that accord with their gender identity." (Id., 22).

Plaintiff recycles the same argument made and rejected in Keohane I: that medically necessary treatment for gender dysphoria requires access to social transitioning items. 952 F.3d at 1274. Here, Plaintiff continues to assert Plaintiff's own belief that social transitioning is medically necessary but fails to allege that

8

*Plaintiff's medical providers* deem it medically necessary. Thus, Plaintiff cannot demonstrate a change in circumstances sufficient to overcome issue preclusion.

### IV. PLAINTIFF FAILED TO STATE AN EIGHTH AMENDMENT CLAIM.

Plaintiff cited zero authority outside of Keohane I in support of the Eighth Amendment claim, and unsurprisingly so—none exists. (See Doc. 39, 23–25). Plaintiff can state an Eighth Amendment claim only by alleging facts sufficient to plausibly establish that the FDC Officials demonstrated "deliberate indifference to [Plaintiff's] serious medical needs[.]" Wade v. McDade, 106 F.4th 1251, 1255 (11th Cir. 2024) (quoting Estelle v. Gamble, 429 U.S. 97, 104–05 (1976)). And, to establish deliberate indifference, Plaintiff must plausibly allege that the FDC Officials acted with "subjective recklessness as used in the criminal law;" namely, that the FDC Officials were "actually, subjectively aware that [their] own conduct caused a substantial risk of serious harm to [Plaintiff]." Wade, 106 F.4th at 1262 (quoting Farmer v. Brennan, 511 U.S. 825, 839 (1994)). Plaintiff failed to allege facts satisfying this stringent standard as to either the clothing-and-grooming or the hormone-treatment elements of the Eighth Amendment claim.

First, as to the clothing-and-grooming element, Plaintiff argues that Keohane I "turned on the court's determination that … [Plaintiff's] medical providers made the medical determination that she did not have a medical need for access to female clothing and grooming standards." (Doc. 39, 23–24 (quoting Keohane v. Sec'y, Fla.

9

Dep't of Corr., 952 F.3d 1257, 1266–67 (2020)).  Then, Plaintiff alleges that "it is medically necessary for her and members of the proposed class to continue to have access to these medical accommodations."  (Doc. 39, 24 (quoting Compl., ¶ 71)).  But, Plaintiff omitted the crucial, dispositive step: Plaintiff made no allegation that *any of Plaintiff's medical providers* ever determined that Plaintiff required clothing-and-grooming accommodations as a matter of medical necessity.  (See Compl.).  That the FDC Officials may, at one time, have allowed Plaintiff to dress and groom in a "psychologically pleasing" manner does not mean they *knew* that rescinding these accommodations would place Plaintiff at a substantial risk of serious harm.  Keohane I, 952 F.3d at 1274; Wade, 106 F.4th at 1262.  Plaintiff's allegation that the FDC Officials "are aware that denying Plaintiff and members of the proposed class access to female clothing and grooming standards would cause them serious harm" (Doc. 39, 24 (quoting Compl., ¶ 72)) thus constitutes nothing more than a "[t]hreadbare recital[] of the elements of a[n Eighth Amendment] cause of action, supported by mere conclusory statements[.]"  Iqbal, 556 U.S. at 678.  Plaintiff therefore failed to state an Eighth Amendment claim as to the FDC Officials' alleged denial of Plaintiff's preferred clothing and grooming standards.

The hormone-treatment element of Plaintiff's Eighth Amendment claim also fails.  First, and as the FDC Officials described throughout their briefing in this case, Plaintiff makes no allegation that the FDC Officials determined that *Plaintiff* would

no longer receive hormone treatment. (See Compl.). Instead, Plaintiff's argument rests on a mischaracterization of HSB 15.05.23 as a "blanket ban" on hormone treatment. Again, its plain language establishes that it constitutes no such thing. (See Doc. 4-4). While Plaintiff may *disagree* with the course of treatment established by HSB 15.50.23, Plaintiff failed to plausibly allege that the FDC Officials demonstrated deliberate indifference in establishing it. Keohane I, 952 F.3d at 1277 (holding that "[f]or better or worse, prisoners aren't constitutionally entitled to their preferred treatment plan or to medical care that is great, "or even very good.'") (quoting Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991)). This is especially true where, as here, a legitimate debate exists in the medical community as to the proper standard of care for the treatment of a certain condition. Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1273 (11th Cir. 2020) (holding that "[b]ecause the plaintiffs here are receiving medical care—and because the adequacy of that care is the subject of genuine, good-faith disagreement between healthcare professionals—we are hard-pressed to find that the Secretary has acted in so reckless and conscience-shocking a manner as to have violated the Constitution.").

The very face of HSB 15.05.23 demonstrates the existence of a legitimate medical debate as to the efficacy of cross-sex hormone treatment for gender dysphoria. (Doc. 4-4, 3 n.4 (noting that "[i]n the scientific research literature, there

11

has been a gradual shift from definitive "'gender-affirmative care,'" which prioritizes access to medical interventions, to a more conservative approach that addresses psychiatric comorbidities and psychotherapeutically explores the developmental etiology of the gender dysphoria.")) (quoting Levine, S.B., Abbruzzese, E., Current Concerns About Gender-Affirming Therapy in Adolescents, Curr. Sex Health Rep 15, 113-123 (2023)). (See also id., 4 n.5). Similarly, Plaintiff alleges that "[t]he widely accepted standards for treating gender dysphoria are published by the World Professional Association for Transgender Health ["WPATH"] and the Endocrine Society." (Compl., ¶ 23). But other courts noted the sharp debate as to whether WPATH establishes the "standards of care" for the treatment of gender dysphoria for Eighth Amendment purposes. Gibson v. Collier, 920 F.3d 212, 221 (5th Cir. 2019) (noting that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate") (citing Kosilek v. Spencer, 774 F.3d 63, 68-96 (1st Cir. 2014) (en banc)); Kosilek, 774 F.3d at 91 ("The choice of a medical option that, although disfavored by some in the field, is presented by competent professionals does not exhibit a level of inattention or callousness to a prisoner's needs rising to a constitutional violation."). See also Eknes-Tucker v. Governor of Ala., 114 F.4th 1241, 1261 (11th Cir. 2024) ("recent revelations indicate that WPATH's lodestar is ideology, not science") (Lagoa, J., concurring in the denial of rehearing *en banc*).

At bottom, however, the Court need not determine *what in fact* constitutes the "standard of care;" the mere fact that a good-faith debate exists defeats Eighth Amendment liability. Hoffer, 973 F.3d at 1273. Plaintiff therefore failed to plausibly allege that the FDC Officials acted with deliberate indifference to the serious medical needs of any inmate with gender dysphoria in enacting HSB 15.05.23. The Court should dismiss Plaintiff's Eighth Amendment claim.

## V. PLAINTIFF'S COMPLAINT FAILS TO ALLEGE FACTS SUPPORTING THE CLASS ALLEGATIONS.

Plaintiff does not and cannot dispute that, if Plaintiff lacks standing to pursue individual claims, Plaintiff cannot serve as a class representative. (Doc. 29, 27-28). Plaintiff's remaining arguments regarding class certification rely on the same mischaracterization of HSB 15.05.23 as Plaintiff's other arguments and likewise fail.

Plaintiff again claims HSB 15.05.23 constitutes "1) a blanket ban on access to clothing and grooming accommodations for inmates with gender dysphoria regardless of medical need, and ii) a blanket ban on hormone therapy with a provision for purported exceptions that imposes a standard that is impossible to meet, or, at a minimum, imposes requirements beyond medical necessity and contemplates exceptions being granted only in 'rare instances.'" (Doc. 39, 28). Plaintiff claims "all members of the proposed class are harmed by the blanket policy and they would all benefit from the blanket policy being enjoined so that they can be treated in accordance with their medical needs." (Id.). However, as set forth

13

above, the plain language of HSB 15.05.23 demonstrates the falsity of Plaintiff's allegations that the policy constitutes a "blanket ban" on either hormone therapy or clothing and grooming accommodations. The policy's mere existence therefore injures no one. To the contrary, no inmate suffers any possible harm unless and until that inmate receives a denial of medically necessary treatment—a result the Complaint fails to allege on behalf of Plaintiff or any class member. Moreover, an inmate who cannot even allege a denial of medically necessary treatment cannot adequately represent a class of inmates who do allege such a denial. Accordingly, the Court should dismiss Plaintiff's class allegations.

## CONCLUSION

For the reasons explained above, Plaintiff's arguments in the Response fail, and the Court should dismiss Plaintiff's Complaint.

Dated: November 22, 2024.

/s/ *Kenneth S. Steely*
Kenneth S. Steely
*One of the Attorneys for the FDC Officials*

William R. Lunsford
Kenneth S. Steely
William J. Cranford III (*pro hac vice*)
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, Alabama 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com

14

kenneth.steely@butlersnow.com
will.cranford@butlersnow.com

Daniel A. Johnson (Florida Bar No. 91175)
**FLORIDA DEPARTMENT OF CORRECTIONS**
501 South Calhoun Street
Tallahassee, FL 32399-2500
Telephone: (850) 717-3605
dan.johnson@fdc.myflorida.com

15

## **CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this 22nd day of November, 2024:

Daniel B. Tilley (Florida Bar No. 102882)
Samantha J. Past (Florida Bar No. 1054519)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org

Li Nowlin-Sohl (Admitted in Washington only)*
Leslie Cooper
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
*Pro Hac Vice admission granted*

*Attorneys for Plaintiffs*

                                              */s/ Kenneth S. Steely*
                                              *Of Counsel*

## **CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

    I hereby certify that this Memorandum allowed by N.D. Fla. Loc. R. 7.1(I) and the Court's Order allowing a Reply (Doc. 37) contains 3,100 words, not exceeding 3,200 total words as required by N.D. Fla. Loc. R. 7.1(E) and (I).

                                              */s/ Kenneth S. Steely*
                                              *Of Counsel*