## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

REIYN KEOHANE,                  :
                                :
    *Plaintiff*,                :
                                :
v.                              :    Case No. 4:24-cv-00434-AW-MAF
                                :
RICKY D. DIXON, et al.,         :
                                :
    *Defendants*.               :

## PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR A PRELIMINARY INJUNCTION AND CLASS CERTIFICATION

### INTRODUCTION

On September 30, 2024, the Florida Department of Corrections ("FDC") rescinded Procedure 403.012 and implemented Health Services Bulletin 15.05.23 ("Health Bulletin"). Defendants go to great lengths to refute that this policy is a ban on hormone therapy and clothing and grooming accommodations for gender dysphoria, presumably because they are aware that the Eleventh Circuit has clearly said that a blanket policy precluding treatment without "even consider[ing] whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'" *Keohane v. Fla. Dep't of Corr.*, 952 F.3d 1257, 1266-67 (11th Cir. 2020) ("Keohane I"). But FDC's written policy and actions clearly show that they have implemented a ban.

Defendants defend a straw man that bears no resemblance to the policy being challenged. They characterize the Health Bulletin as providing "individualized, comprehensive care and treatment of inmates diagnosed with gender dysphoria," ECF 38 (FDC's Response to Plaintiff's Motion for Preliminary Injunction ("PI Response")) at 8, 23-24—implying that this treatment may include hormone therapy—but they ignore what the policy actually says:

> State law prohibits the Department from expending any state funds to purchase cross-sex hormones for the treatment of Gender Dysphoria. Section 286.311, Florida Statutes. The Department shall comply with this statutory requirement unless compliance with the U.S. Constitution or a court decision requires otherwise.

ECF 4-4 (Health Bulletin) § IX(B). This statutory prohibition, and FDC's stated intent to comply, is mentioned nowhere in their brief or declarations. And Defendants' response is silent as to how prison staff are to determine what the Constitution requires.

Defendants point to the Health Bulletin's reference to the possibility of a "variance" from this prohibition to permit hormone therapy for an inmate "in rare instances," but they ignore that variances "shall only be sought" "if necessary to comply with the U.S. Constitution or court decision" and may only be approved if the treating physician can provide certain research evidence that FDC has already determined does not exist. *See infra* at 6, 9-10. Defendants steadfastly refuse to acknowledge these provisions of the policy that were prominently raised in

Plaintiff's motion (and response to their Motion to Dismiss), *see, e.g.*, *id.* at 20-22; ECF 39 ("MTD Response") at 4, 10, 15, 21, 22, or explain how they do not provide a barrier to treatment.[1]

In addition to Defendants' characterization of the Health Bulletin being at odds with its plain terms, it is difficult to credit Defendants' suggestion that hormone therapy remains available to inmates with gender dysphoria when medically necessary for them given that the change in policy was based in part on FDC's purported assessment that hormone therapy is harmful and not effective at treating gender dysphoria. Health Bulletin § IX(A); ECF 38-1 (Declaration of Dr. Danny Martinez ("Martinez Decl.")) ¶¶ 8-13. They ask this Court to accept that they believe the treatment is harmful and ineffective, and also that they will determine this supposedly harmful, ineffective treatment to be medically necessary for some inmates with gender dysphoria. They can't have it both ways.

With respect to clothing and grooming accommodations, while Defendants' opposition to Plaintiff's motion for a preliminary injunction did not dispute that FDC's new policy constituted a ban on such accommodations, they changed their tune in their reply in support of their motion to dismiss. There, they claim that FDC's

---

[1] Despite the Health Bulletin's provision for "variances," it effectively precludes hormone therapy. At minimum, it creates unclear requirements beyond medical necessity that create a significant risk that Plaintiff and other inmates with a medical need for hormone therapy will be denied treatment.

rescission of Procedure 403.012's accommodations for clothing and grooming in accordance with one's gender identity and the Health Bulletin's failure to include the same accommodations is not a ban, and Plaintiff's characterization of it as such is "unfounded speculation." ECF 41 (Reply to MTD) at 1. However, the evidence overwhelmingly shows that FDC categorically prohibits such accommodations. On September 30, 2024, FDC told all transgender women—without individualized evaluations—that they would no longer be permitted to abide by FDC's female clothing and grooming standards and gave them a document entitled "Script Regarding Undergarments, Hair, and Alternate Canteen Items" to sign, saying that they would need to be in compliance with male clothing and grooming standards by October 30, 2024, or face disciplinary action. *See* ECF 46-2 ("Script"). FDC's FAQs for non-healthcare staff dated September 19, 2024, also unequivocally state that inmates with gender dysphoria must comply with the clothing and grooming requirements of their "biological sex." *See* ECF 46-3 ("FAQ"). And FDC's October 9, 2024, medical record for Plaintiff states that her provider "[r]emoved [gender dysphoria] accommodations pass to bring into compliance with HSB 15.05.23." *See* ECF 46-4. Defendants cannot revoke the clothing and grooming accommodations for all inmates with gender dysphoria in one fell swoop under the banner of the Health Bulletin, and then claim these accommodations are not banned.

Plaintiff seeks preliminary relief to maintain the status quo and protect herself and the proposed class from the imminent risk of losing treatment for gender dysphoria that FDC has previously deemed medically necessary for them, along with accommodations that FDC medical and mental health staff have been prescribing, and upon which Plaintiff and the proposed class depend for their health and well-being, while this litigation proceeds. None of Defendants' arguments against the preliminary injunction have merit.

## ARGUMENT

## I.    PLAINTIFF HAS STANDING TO CHALLENGE THE HEALTH BULLETIN'S PROVISIONS REGARDING HORMONE THERAPY

Defendants assert that Plaintiff lacks standing to challenge the hormone provisions of the Health Bulletin because she "faces no risk" of her hormone therapy being discontinued. PI Response at 15. Plaintiff incorporates her arguments in her response to the motion to dismiss. MTD Response at 8-15. In addition, these undisputed facts establish Plaintiff's standing to challenge the hormone provisions:

- "Prior FDC policy, dating back to 2017, recognized that . . . hormone therapy . . . can be medically necessary for those diagnosed with gender dysphoria". ECF 1 ("Compl.") at 3.

- "Under the former policy, FDC medical staff determined that hormone therapy was medically necessary for Keohane" and other inmates with gender dysphoria, and FDC has provided it to them for years. *Id.*

- The Health Bulletin provides that FDC will comply with the state law prohibiting state funds from being used "to purchase cross-sex hormones for the treatment of gender dysphoria," unless "the U.S. Constitution or a court decision requires otherwise." Health Bulletin § IX.B.

- The Health Bulletin states that "[i]n rare instances deemed medically necessary, a variance may be approved to permit the use of cross-sex hormones to treat an inmate's Gender Dysphoria." A variance "shall only be sought" "if necessary to comply with the U.S. Constitution or court decision,"[2] *id.* § IX.C, and an inmate may only be assessed for such treatment if "the treating physician can demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the etiological basis of the pathology. Such evidence must be based on sound scientific methods and research that were subject to the formal peer review process." *Id.* § IX.C.1.

- The Health Bulletin also states that "[s]tudies [of cross-sex hormone therapy] presenting the benefits to mental health, including those claiming that the services prevent suicide, are either low or very low quality and rely on unreliable methods." *Id.* § IX.A.

---

[2] It appears that inmates themselves may not seek variances, as presumably FDC does not defer to inmates' assessments of what the Constitution requires.

These undisputed facts establish an imminent risk that, due to Defendants' actions, Plaintiff will lose the hormone treatment that FDC medical staff have long deemed medically necessary for her. Even if FDC's policy could be considered something other than a blanket ban on hormone therapy, the barriers it imposes create a serious risk of treatment being discontinued even if it remains medically necessary for her. This injury is redressable by a ruling preliminarily enjoining enforcement of the Health Bulletin's provisions concerning hormone therapy.

## II.    PLAINTIFF HAS A LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Plaintiff has exhausted her administrative remedies.

Plaintiff incorporates her response to Defendants' motion to dismiss. MTD Response at 5-8.

### B. Plaintiff is not precluded from challenging the denial of access to clothing and grooming accommodations.

Defendants argue that issue preclusion bars Plaintiff from challenging the denial of clothing and grooming accommodations. It does not.

As discussed in the MTD Response, incorporated herein, *Keohane I* turned on a medical assessment of Plaintiff's medical needs at the time of the trial in that case seven years ago. Since then, much has changed. After FDC enacted Procedure 403.012 in 2017, allowing for grooming and clothing accommodations for inmates with gender dysphoria, a psychologist from the Office of Health Services issued Plaintiff a "GD accommodation pass" covering hair length, female undergarments,

7

and alternate canteen items. *See* ECF 46-5 ("GD Accommodation Pass"). These accommodations have alleviated the painful distress of gender dysphoria for Plaintiff. ECF 16-2 (Amended Keohane Decl.). The Health Bulletin takes these gender dysphoria accommodations away without considering whether an inmate has a medical need for them. As a result of these changed circumstances, Plaintiff's claim regarding gender dysphoria accommodations is not issue-precluded.

C. <u>FDC's current policy regarding the treatment of gender dysphoria is not constitutionally adequate.</u>

Defendants do not contest that Plaintiff has gender dysphoria and that is it a serious medical condition. They assert that there is no deliberate indifference and that "[a]t most, Plaintiff disagrees with an anticipated choice of treatment the FDC Officials established through HSB 15.05.23." PI Response at 2.

But unlike the cases they cite, including *Keohane I*, this case does not involve a disagreement with a medical decision made by prison medical staff[3] regarding the course of treatment for an inmate. *See, e.g.*, *id.* at 21. In the cases cited by Defendants, the courts denied the plaintiffs' claim that the denial of a particular treatment to them constituted deliberate indifference after finding that the course of

---

[3] The new policy inexplicably involves *non-medical* staff in the medical decision-making, including *diagnosing* gender dysphoria. Once a psychologist diagnoses an inmate with gender dysphoria, the MDST—comprised of leadership from the medical, mental health, and *security* teams—must unanimously approve the diagnosis. Martinez Decl. ¶ 15; PI Resp. at 9.

treatment offered was constitutionally adequate to address their individual medical needs. None of those cases involved a blanket policy that prohibited a particular treatment from ever being considered for an inmate. In *Kosilek v. Spencer*, in rejecting plaintiff's challenge to the denial of sex reassignment surgery, the court noted that "the DOC has specifically disclaimed any attempt to create a blanket policy regarding SRS," and "any such policy would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs." *Kosilek v. Spencer*, 774 F.3d 63, 90-91 (1st Cir. 2016). Notably, the court emphasized that the evidence showed that her current course of treatment—which included hormone therapy and feminine clothing and accessories—alleviated her gender dysphoria. *Id.* at 90.

The law is clear that blanket policies that prohibit a particular treatment for a serious medical need without considering the individual's medical needs constitute deliberate indifference. *Keohane I*, 952 F.3d at 1266-67; *Kosilek*, 774 F.3d at 91.

Defendants do not appear to dispute this law. Rather, they argue that the Health Bulletin is not a blanket ban on any treatment, asserting that it provides for "individualized treatment programming as clinically indicated" and the "MDST *already preliminarily recommended* that Plaintiff continue receiving hormones. *Id.* (emphasis in original). But as discussed above, Defendants ignore the plain language of the Health Bulletin. And the "preliminary" recommendation of hormone therapy

for Plaintiff made by the MDST in no way establishes the availability of hormone therapy for those who have a medical need for it. Defendants' response provides no assurance that a variance for hormone therapy can or will be approved by the variance review team, particularly when Defendants refuse to say what standard is applied (and by whom) to determine if treatment is constitutionally required or address the fact that the policy predetermined that the peer reviewed literature it demands to grant a variance does not exist. Moreover, the same Health Bulletin that Defendants say permits hormone therapy for inmates with gender dysphoria also states that such treatment is both harmful and ineffective. Health Bulletin § IX (A); *see also* Martinez Decl. ¶¶ 10, 12. Their attempt to have it both ways—arguing that they view hormone therapy as harmful and ineffective *and* that Plaintiff and the Court should nevertheless rest assured that it will be available to inmates with gender dysphoria who need it despite the language in the Health Bulletin—is untenable.[4]

Defendants try to justify their new policy by claiming it is necessary to ensure that inmates receive mental health therapy. PI Response at 5-6.[5] Procedure 403.012

---

[4] For the same reason, to the extent Defendants are taking the position that a ban on hormone therapy is justified by "good-faith debate" about whether hormone therapy is an appropriate treatment for gender dysphoria (PI Response at 24), their insistence that this treatment is available to inmates with gender dysphoria precludes such a defense.

[5] Dr. Martinez suggests that an increase in grievances after the issuance of Procedure 403.012 indicates the inadequacy of a treatment regimen based solely on hormone therapy. Martinez Decl., ¶ 6; *see also* PI Response at 23. That inference is not

offered, but had no requirements for, such therapy. ECF 4-3 at 4. Whatever concerns Defendants may have about inmates failing to attend therapy sessions, Martinez Decl. ¶ 6, prohibiting hormones has no connection with the purported goal of ensuring mental health therapy. Defendants offer no reason why they could not make mental health therapy a requirement without banning hormone therapy.

Defendants (in their MTD Reply) also attempt to convince the Court that the Health Bulletin is not a blanket ban on grooming and clothing accommodations to address gender dysphoria, but, as discussed above, the FDC's own documents confirm that it is. *See supra* at 3-4. Defendants further defend this blanket policy based on an erroneous reading of *Keohane I* as holding, as a matter of law, that the denial of access to female clothing and grooming standards for inmates with gender dysphoria can never violate the Eighth Amendment, regardless of medical need. *See* PI Response at 24-25. As discussed above, it did not. Rather, the *Keohane I* court found that denial of clothing and grooming accommodations was based on the medical judgment of her providers at the time.[6]

_____

apparent, but even accepting it as true, it still would not explain the decision to prohibit hormone therapy.

[6] The court also mentioned security concerns, but did not suggest that that alone could justify the denial of these accommodations if the accommodations were found to be medically necessary for an individual. The court noted that FDC witnesses testified that allowing Plaintiff to access female clothing and grooming standards would pose a security risk, but that "if [those] requests are deemed medically necessary, they will be fulfilled," and FDC would "take additional security measures as needed." *Keohane*, 952 F.3d at 1264.

The *Keohane I* court recognized that a blanket policy precluding treatment without "even consider[ing] whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference,'" and, thus, "other courts considering similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment." *Keohane*, 952 F.3d at 1266–67. This is precisely what the new policy is—a blanket policy prohibiting certain gender dysphoria accommodations regardless of medical necessity.

For Plaintiff and others, the ability to follow female clothing and grooming standards for the past 6 years and receive hormone therapy has "alleviated the painful distress of gender dysphoria." Compl. ¶¶ 41,42; ECF 46-10 (Declaration of Michelle Ward ("Ward Decl.")) ¶ 10; ECF 46-11, (Declaration of Sasha Mendoza ("Mendoza Decl.")) ¶¶ 9, 11. Cutting off this accommodation based on the new blanket policy that does not consider the medical needs of Plaintiff or the proposed class members puts them at risk of or has already caused severe psychological harm, Compl. ¶ 77; Ward Decl. ¶¶ 10, 16-19; Mendoza Decl. ¶¶ 9, 11, and constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment.

III.    **A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM TO PLAINTIFF AND MEMBERS OF THE PROPOSED CLASS**

*Clothing and grooming accommodations*

Defendants have already been enforcing their new blanket policy against grooming and clothing accommodations. *See* Ward Decl. ¶¶ 15-17; Mendoza Decl. ¶ 9; Script. Inmates have been forced to cut their long hair above their ears, *see* Script (citing FAC 33-602.101), had their female undergarments confiscated, and had to turn over their makeup and hair accessories, *see* Script; Ward Decl. ¶¶ 15-17. Two inmates described the impact of losing these accommodations: "The loss of my hair, along with female undergarments and makeup, has been earth-shattering for me. The thoughts about self-castration and suicidality that I experienced before treatment came flooding back like a tidal wave. I stay awake crying many nights." Ward Decl. ¶ 18; *see also* Mendoza Decl. ¶ 9. A preliminary injunction is needed to prevent this from happening to Plaintiff, and to ensure that the proposed class members can resume following the female clothing and grooming standards that FDC medical staff had prescribed them to address their gender dysphoria.

Defendants do not dispute that the removal of clothing and grooming accommodations will harm inmates with gender dysphoria. Instead, they argue that *Keohane I* means this is not a constitutionally recognizable harm. But as discussed above, that case did not hold that denying clothing and grooming accommodations

for gender dysphoria can never rise to the level of a constitutional harm. Taking away accommodations prescribed by FDC medical staff to address Plaintiff and proposed class members' gender dysphoria, which they have relied upon for years for their health and well-being, pursuant to a blanket ban without considering their medical needs has and will cause irreparable harm.

*Hormone therapy*

Absent a preliminary injunction, Plaintiff and the proposed class members are also at imminent risk of being stripped of the hormone therapy that FDC medical staff has deemed medically necessary for them, which would cause irreparable harm. When hormone therapy was unavailable for periods of time in the past, Plaintiff felt so distressed she attempted suicide. Amended Keohane Decl. ¶ 15; *see also* Ward Decl. ¶ 10 (citing self-harm and suicidality prior to treatment). Defendants do not appear to contest that having this care discontinued would cause irreparable harm. Rather, they argue Plaintiff has not shown that she and the proposed class members are at imminent risk of losing this care. She has and they are.

Defendants put great stock in the fact that "[t]he MDST already preliminarily determined that Plaintiff will stay on hormones." PI Response at 25. But this preliminary determination is cold comfort when, as discussed above, there is nothing in Defendants' response that provides any assurance that a variance can or will be approved by the variance review team. *See also* Mendoza Decl. ¶ 12 (inmates were

informed on September 30 that the future of their hormone therapy treatment was "unknown").

Defendants further argue that "no inmate faces the immediate withdrawal of hormone treatment" because "[e]ven if the MDST determines that any inmate should stop receiving hormone therapy," "[t]he total discontinuation of hormone treatment will take at least three (3) months from October 31, 2024." *Id.* As an initial matter, the Health Bulletin provides that the titration process is "over a period of nine weeks." Health Bulletin § IX(D). Either way, this argument fails for two reasons. First, even by Defendants' admission, inmates could have their hormone therapy completely stopped as soon as January 31. The suggestion that this case can be resolved on the merits by January 31 defies reality. A preliminary injunction is the only way to avoid this harm. Additionally, the process of titrating doses is, in itself, an irreparable harm. When a patient is prescribed a dose of medicine to treat a condition, providing them less than the therapeutic dose is a harm.

\*    \*    \*

Plaintiff has established that FDC's new policy poses an imminent risk of loss of hormone therapy and gender dysphoria accommodations that FDC medical staff have prescribed for her and members of the proposed class, putting them at risk of irreparable harm that can only be prevented by issuing a preliminary injunction to maintain the status quo while the case proceeds.

15

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION

As discussed above, the harm to Plaintiff and proposed class members should hormone therapy and clothing and grooming accommodations be stripped away is severe.

The only interest Defendants can point to on the other side is an interest in deference to "the operation of the state prison system without judicial interference." PI Response at 27. But none of the cases they cite for this principle suggest that this interest tips the scales in a balancing of the equities. *Swain v. Junior* cited concrete harms the jail would experience should the requested preliminary injunction be granted, not an abstract interest in deference. *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (noting that requiring jail to implement certain covid procedures would take resources away from other county operations necessary to fight the pandemic). And *Turner v. Safley* made clear that deference to the prison is not always warranted, observing that "federal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (invalidating prison policy restricting inmate marriages).[7]

---

[7] Citing *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (2023), Defendants suggest that the state is entitled to some special deference in cases involving limits on treatment for gender dysphoria. PI Response at 28. *Eknes-Tucker* stands for no such proposition. It merely noted that issues of safety and well-being of children, "[a]bsent a constitutional mandate to the contrary," are reserved to the legislature. *Eknes-Tucker*, 80 F.4th at 1231.

Defendants' asserted interest in deference to FDC decision-making does not outweigh the concrete, significant harm of being stripped of medically necessary care.

## V.    CLASS-WIDE RELIEF IS APPROPRIATE

Arguments against class-wide relief fail for the reasons set forth in Plaintiff's response to the motion to dismiss. MTD Response at 21-27; *see also* ECF 46-7 at 3-4 (supporting numerosity: as of September 29, 2024, FDC housed 181 inmates with gender dysphoria, all of whom possessed "alternate canteen and grooming passes," and 107 of whom had prescriptions for hormone therapy). Defendants raise the new argument that because they have "preliminarily approved" Plaintiff's continued hormone therapy, she cannot seek injunctive relief on behalf of the proposed class. PI Response at 25-26. As the Supreme Court has made clear, permitting defendants to "pick off" or "buy off" named plaintiffs' individual claims prior to class certification "would undermine the purposes and utility of the class action mechanism." *Sos v. State Farm Mut. Auto. Ins. Co.*, No. 21-11769, 2023 WL 5608014, at *10 (11th Cir. Aug. 30, 2023) (citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338–40 (1980). Here, Defendants have not even "picked off" Plaintiff's claim—they have only said that they *might*[8] pick it off.

---

[8] Defendants have made no promise of Plaintiff receiving actual approval to continue her medically necessary hormone therapy; they have made no indication that she is

## VI.    THE PLRA DOES NOT BAR RELIEF.

Defendants contend that various PLRA requirements bar relief. They do not.

There is no reason this Court cannot grant injunctive relief that meets the narrowness / least-intrusive-means requirements. Defendants say the relief sought is too prescriptive because it seeks a total bar on enforcement of the Health Bulletin even though not all inmates considered for hormone therapy would necessarily receive it. PI Response at 34. But all Plaintiff is seeking is to remove the blanket policy and return to decision-making based on an individual's medical need. Nothing in Plaintiff's requested relief would require FDC to provide treatment to inmates who lack a medical need for it. *See* Compl. at 24.

Defendants also reference the requirement that a court must make findings required by the PLRA to grant preliminary injunctive relief that permits a government official to violate state law. PI Response at 33. Here, they appear to be acknowledging that Section 286.311, Fla. Stat., referenced in the Health Bulletin, prohibits FDC from providing hormone therapy to inmates. There is no reason the Court could not make the necessary findings.

---

likely to be granted a variance; and they have failed to respond to the seemingly insurmountable barriers to variances that Plaintiff has identified.

Defendants also note that any preliminary injunctive relief the Court issues will expire by operation of law after 90 days, but this is no barrier to relief. None of these provisions of the PLRA preclude Plaintiff's claim.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that this Court grant Plaintiff's motion for preliminary injunction, certify a provisional class (or in the alternative, certify the class), and award class-wide relief.

## <u>Certificate of Compliance</u>

The relevant parts of this motion contain 4,194 words. *See* ECF 44 (Order Granting Mot. to Expand Word Limit).

Dated: November 26, 2024

Respectfully submitted,

<u>/s/ Samantha J. Past</u>
Samantha J. Past (Florida Bar No. 1054519)
Daniel B. Tilley (Florida Bar No. 102882)
**American Civil Liberties Union Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org

Li Nowlin-Sohl (Admitted in Washington only)
Leslie Cooper
**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org

*Counsel for Plaintiff*