```
 1                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF FLORIDA
 2                      TALLAHASSEE DIVISION
                   Case No:  4:24-cv-00434-AW-MAF
 3


 4
      REIYN KEOHANE,
 5
              Plaintiff,                    Tallahassee, Florida
 6                                          December 9, 2024
          v.                                9:01 a.m. – 12:46 p.m.
 7    RICKY D. DIXON, in his official capacity  Pages 1–160
      as Secretary of the Florida Department of
 8    Corrections, et al.,

 9            Defendants.
      _____
10


11       TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION
                 BEFORE THE HONORABLE ALLEN WINSOR
12                  UNITED STATES DISTRICT JUDGE


13

14    APPEARANCES:

15    For the Plaintiff:   Daniel B. Tilley, Esq.
                           Samantha J. Past, Esq.
16                         American Civil Liberties Union
                           Foundation of Florida
17                         4343 West Flagler Street
                           Suite 400
18                         Miami, Florida 33134

19                         Li Nowlin-Sohl, Esq.
                           Leslie Cooper, Esq.
20                         American Civil Liberties Union Foundation
                           125 Broad Street
21                         New York, New York 10004

22    For the Defendants:  Kenneth S. Steely, Esq.
                           William J. Cranford, III, Esq.
23                         Butler Snow, LLP
                           200 West Side Square
24                         Suite 100
                           Huntsville, Alabama 35801

25
```

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER–AIDED TRANSCRIPTION**

```
 1    Appearances Continued:

 2                        Daniel A. Johnson, Esq.
                         Florida Department of Corrections
 3                        501 South Calhoun Street
                         Tallahassee, Florida 32399
 4
      Reported by:       Dawn M. Savino, RPR, CRR
 5                        Official United States Court Reporter
                         111 North Adams Street
 6                        Tallahassee, Florida 32301
                         (850) 521-3674
 7                        Dawn_Savino@flnd.uscourts.gov
 8    _____
```

9:01 AM  9          (Court called to order)

9:01 AM 10          THE COURT:  Everyone have a seat, please.

9:02 AM 11          We're here in case 4:24-CV-434, it's Keohane versus

9:02 AM 12   Dixon, and we'll start with appearances for the plaintiff.

9:02 AM 13          MR. TILLEY:  Good morning, Your Honor.  Daniel Tilley

9:02 AM 14   for plaintiff.

9:02 AM 15          MS. NOWLIN-SOHL:  Good morning, Your Honor.  Li

9:02 AM 16   Nowlin-Sohl for plaintiff.

9:02 AM 17          MS. COOPER:  Good morning.  Leslie Cooper for

9:02 AM 18   plaintiff.

9:02 AM 19          MS. PAST:  Good morning.  Samantha Past for plaintiff.

9:02 AM 20          THE COURT:  Okay.  Good morning to all of you.

9:02 AM 21          And for the defense?

9:02 AM 22          MR. STEELY:  Good morning, Your Honor.  Kenneth Steely

9:02 AM 23   for the defendants.

9:02 AM 24          MR. CRANFORD:  Good morning, Your Honor.  William

9:02 AM 25   Cranford for the defendants.

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

9:02 AM 1          MR. JOHNSON:  Good morning, Your Honor.  Dan Johnson

9:02 AM 2     for the defendants.

9:02 AM 3          THE COURT:  Okay.  Very good.

9:02 AM 4          Well, we are here on two motions.  The initial motion

9:02 AM 5     filed at the outset of the case, the preliminary injunction and

9:02 AM 6     temporary restraining order motion.  Also the defendants'

9:02 AM 7     motion to dismiss.

9:02 AM 8          I figured it would make sense to argue them together.

9:02 AM 9     Obviously they're different standards and different burdens,

9:02 AM 10    we're all aware of that, but I thought we would just have the

9:02 AM 11    plaintiff present everything, and then the defense, and then

9:02 AM 12    the plaintiff again with rebuttal.

9:02 AM 13         I'll make sure, though, that each side has a chance to

9:03 AM 14    say whatever it wants, and so if there's a point that comes up

9:03 AM 15    in rebuttal, we're not going to stick to a real strict division

9:03 AM 16    of time and sequencing here.

9:03 AM 17         But I did want to address, at the outset, there's some

9:03 AM 18    evidentiary issues.  We have new affidavits, and I'd said in a

9:03 AM 19    previous order that, at least as to the plaintiff's affidavits

9:03 AM 20    with the reply of these two other inmates, there can be

9:03 AM 21    argument today about whether I should consider those, and then

9:03 AM 22    I gave the defense an opportunity to file supplemental

9:03 AM 23    affidavits in response to that and said we can talk about

9:03 AM 24    whether to accept those also today.

9:03 AM 25         It does strike me, though, in preparing for this that

9:03 AM 1    it doesn't seem like this is a whole lot of meaningful factual

9:03 AM 2    disputes based on the evidence that's been submitted, and I

9:03 AM 3    wanted to get the parties' views on that.  We have the

9:03 AM 4    affidavits you're challenging, Mr. Steely, these other inmates.

9:04 AM 5    You know, you've not come up -- you've challenged well, maybe

9:04 AM 6    they're not buying the level of makeup that they suggest, but

9:04 AM 7    in terms of the basic facts which is a number of inmates,

9:04 AM 8    including the plaintiff, were receiving hormone therapy still

9:04 AM 9    are.  At least some of the inmates have had haircuts and

9:04 AM 10   changes in clothing allowed and things like that.  But it's not

9:04 AM 11   clear to me that there's much in terms of factual disputes.

9:04 AM 12          But at any rate I did want to, I guess, start off by

9:04 AM 13   asking each side what their position is on the state of the

9:04 AM 14   evidence now, whether you have any live testimony to present

9:04 AM 15   Mr. Tilley, and same for you Mr. Steely, what the position is

9:04 AM 16   on the other side's affidavits, and things like that.

9:04 AM 17          So I guess do you want to start, Mr. Tilley?

9:04 AM 18          MR. TILLEY:  Sure, Your Honor.  Thank you.

9:04 AM 19          We would propose that all of the declarations,

9:04 AM 20   including the rebuttal and sur-reply declarations, come in as

9:04 AM 21   evidence, and that the plaintiff's declaration and the other

9:05 AM 22   declarations on the plaintiff's side also serve as the direct

9:05 AM 23   testimony of those individuals.

9:05 AM 24          THE COURT:  Okay.  And you don't have any live

9:05 AM 25   testimony for today?

9:05 AM 1          MR. TILLEY:  We would seek to cross-examine Dr.

9:05 AM 2    Martinez.

9:05 AM 3          THE COURT:  Okay.  All right.  And that's all.

9:05 AM 4          MR. TILLEY:  That's correct.

9:05 AM 5          THE COURT:  Okay.  And then Mr. Steely, what's the

9:05 AM 6    defense view?

9:05 AM 7          MR. STEELY:  Yes, Your Honor.  We're fine with the

9:05 AM 8    affidavits coming in as well.  They show -- like you said, Your

9:05 AM 9    Honor, they show the facts that are out there.  The inmates are

9:05 AM 10   still receiving hormone treatment.  Those that were receiving

9:05 AM 11   hormone treatment are still receiving hormone treatment so the

9:05 AM 12   facts laid out as they were, we were able to gather the

9:05 AM 13   evidence to file in response to those affidavits, so those are

9:05 AM 14   fine.

9:05 AM 15         THE COURT:  Okay.

9:05 AM 16         MR. STEELY:  We don't anticipate presenting any live

9:05 AM 17   evidence.  And from that standpoint, we were going to object to

9:05 AM 18   plaintiffs calling Dr. Martinez just as rebuttal -- I mean,

9:05 AM 19   just as cross because we're not putting him on for direct.

9:05 AM 20         THE COURT:  Okay.  So is this something you-all have

9:05 AM 21   talked about?

9:05 AM 22         Going back to the motion for clarification last week,

9:06 AM 23   it wasn't clear to me exactly what was being sought.  There was

9:06 AM 24   some discussion about well, are the prisoners going to be here

9:06 AM 25   and things like that.  Obviously they're not.  Nobody asked for

9:06 AM 1    them to be here.  And then you had said at the initial hearing

9:06 AM 2    that you were going to put on live testimony, Mr. Steely, and I

9:06 AM 3    think principally we were talking about experts at the time

9:06 AM 4    which are not part of this case, at least at this stage.

9:06 AM 5           But have you-all talked about this -- I guess it's a

9:06 AM 6    disagreement about whether Dr. Martinez will testify?  Have you

9:06 AM 7    all talked about this?

9:06 AM 8           MR. STEELY:  Yes, Your Honor.

9:06 AM 9           THE COURT:  Okay.  And so what is it that the

9:06 AM 10   plaintiff is asking for me to do?  Are you going -- is he here?

9:06 AM 11          MR. STEELY:  Yes, Your Honor.

9:06 AM 12          THE COURT:  Okay.  So you would just ask to call him

9:06 AM 13   and put him on?

9:06 AM 14          MR. TILLEY:  That's correct, Your Honor.

9:06 AM 15          THE COURT:  What's the objection to that if he's here?

9:06 AM 16          MR. STEELY:  The only objection was -- well, there

9:06 AM 17   were two, Your Honor.  First that they were calling just to

9:06 AM 18   cross on the fact that he's not being put up for direct.  So

9:06 AM 19   they're crossing him based just on his declaration, which is

9:06 AM 20   out of the norm.

9:06 AM 21          Additionally, they attempted to --

9:06 AM 22          THE COURT:  Well, couldn't they call him and put him

9:06 AM 23   on as direct?

9:06 AM 24          MR. STEELY:  They could, Your Honor.  They attempted

9:07 AM 25   to file -- the reason he's here today, Your Honor, is they

9:07 AM 1    filed -- they submitted a subpoena at 3:00 on Friday.  We

9:07 AM 2    initially objected to it.  We had a call with plaintiffs and

9:07 AM 3    explained that that was ineffective service.  Dr. Martinez was

9:07 AM 4    at a conference in Orlando, so he didn't get the subpoena maybe

9:07 AM 5    until this morning.  So we were objecting to the fact that that

9:07 AM 6    was improper service of the subpoena.  But we agreed --

9:07 AM 7            THE COURT:  But he is here, so that's a moot point.

9:07 AM 8            MR. STEELY:  He is here.  As opposed to -- yes, Your

9:07 AM 9    Honor.  As opposed to fighting over a motion to quash at 3:00

9:07 AM 10   on Friday, we made sure that he was here, Your Honor.

9:07 AM 11           THE COURT:  Okay.  What's the prejudice if he just

9:07 AM 12   gets on and answers a few questions?  I assume it's not a

9:07 AM 13   lengthy examination?

9:07 AM 14           MR. TILLEY:  We intend to test the declaration.  You

9:07 AM 15   know, he says that he was responsible or part of the team that

9:07 AM 16   was taking away the old policy and implementing the new policy,

9:07 AM 17   and he's part of the implementation of the new policy, and he's

9:07 AM 18   one of the individuals that has to sign off on a variance to a

9:07 AM 19   policy, and there is a factual dispute about the extent to

9:08 AM 20   which care is being taken away, whether there's a blanket ban

9:08 AM 21   on --

9:08 AM 22           THE COURT:  I get all that.  But I mean, you're not --

9:08 AM 23   are you talking about two hours or 30 minutes?  Or what are you

9:08 AM 24   talking about?

9:08 AM 25           MR. TILLEY:  Yeah.  I think it depends on where the --

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

9:08 AM 1    the answers that he provides, but I think it would be a

9:08 AM 2    significant cross-examination.  But the intent certainly is not

9:08 AM 3    to go down rabbit holes that have no bearing on providing --

9:08 AM 4    directing the Court to the evidence that would be relevant to a

9:08 AM 5    preliminary relief.

9:08 AM 6        THE COURT:  Okay.  The objection is -- the subpoena

9:08 AM 7    piece of things is sort of moot, I guess, but the procedural

9:08 AM 8    objection is just that they would have to call him as direct

9:08 AM 9    evidence?

9:08 AM 10        MR. STEELY:  So he would be called on cross, Your

9:08 AM 11    Honor.  And the reason --

9:08 AM 12        THE COURT:  We did talk about this at the initial

9:08 AM 13    hearing when they were seeking depositions and things like

9:08 AM 14    that, and you had said at the time your plan was to present

9:08 AM 15    your evidence live, and I think they kind of objected to that.

9:08 AM 16        But it does seem -- we're all here, it just doesn't

9:08 AM 17    seem like there's a good reason not to just go forward and get

9:08 AM 18    the evidence.

9:08 AM 19        MR. STEELY:  Well, we have him here, Your Honor, for

9:09 AM 20    that reason.  The reason that we were objecting is if plaintiff

9:09 AM 21    haven't proved their prima facie case to go forward, we

9:09 AM 22    wouldn't have to put on any evidence to move forward, right?

9:09 AM 23        THE COURT:  I see.

9:09 AM 24        MR. STEELY:  So if they haven't met their burden,

9:09 AM 25    there's no reason to put Dr. Martinez on to be crossed.

9:09 AM 1          THE COURT:  Okay.  I see what you're saying.  Well,

9:09 AM 2    that's overruled, and you can call him.

9:09 AM 3          Let's walk through the logistics of the rest of the

9:09 AM 4    morning though.  So you've got that to do, whether you call it

9:09 AM 5    direct or cross.  And then that's all -- I think you said,

9:09 AM 6    Mr. Tilley, that's all of the evidence that you would present,

9:09 AM 7    that in conjunction with the other declarations that are

9:09 AM 8    already in?

9:09 AM 9          MR. TILLEY:  Correct.  The declarations that have been

9:09 AM 10   submitted, the examination of Dr. Martinez, and then the

9:09 AM 11   exhibits that we prepared binders for that are -- that are in

9:09 AM 12   the record.

9:09 AM 13         THE COURT:  They've already been filed.

9:09 AM 14         MR. TILLEY:  Right.  There's -- yeah.  They're

9:09 AM 15   exhibits that are already in the record, or there's exhibits

9:09 AM 16   that have come from discovery that we've obtained from the

9:10 AM 17   other side as well.

9:10 AM 18         THE COURT:  Okay.  So some are already part of what's

9:10 AM 19   been filed, some are not.

9:10 AM 20         MR. TILLEY:  Correct.

9:10 AM 21         THE COURT:  Okay.  And then from the defense side, you

9:10 AM 22   may have answered this already, you're going to present the

9:10 AM 23   affidavits that are already in and that's all?

9:10 AM 24         MR. STEELY:  Yes, Your Honor.

9:10 AM 25         THE COURT:  Okay.  Is there any issue with these

9:10 AM 1    exhibits?

9:10 AM 2            MR. STEELY:  No, Your Honor.

9:10 AM 3            THE COURT:  Okay.  All right.  Then we'll just go

9:10 AM 4    ahead with the evidence, and you can call Dr. Martinez.  Do be

9:10 AM 5    as concise as you can so we can keep things moving here, and

9:10 AM 6    then we'll have -- that will close the record, and then we'll

9:10 AM 7    have argument.

9:10 AM 8            MR. TILLEY:  That sounds good, Your Honor.

9:10 AM 9            We call Dr. Martinez.

9:10 AM 10           THE COURT:  All right.

9:11 AM 11           MS. COOPER:  Your Honor, would it be helpful to

9:11 AM 12   provide a binder of our exhibits for you?

9:11 AM 13           THE COURT:  Sure.

9:11 AM 14           MS. COOPER:  And may I place one on the witness stand?

9:11 AM 15           THE COURT:  That would be fine.  And I guess, you have

9:11 AM 16   one of these as well, Mr. Steely?

9:11 AM 17           MR. STEELY:  Your Honor, we were going with the

9:11 AM 18   documents that were already filed on the record.  If you need

9:11 AM 19   me to provide additional documents, I can.

9:11 AM 20           THE COURT:  No, no, no.  I'm sorry.  You have one you

9:11 AM 21   got from plaintiffs --

9:11 AM 22           MR. STEELY:  Oh, yes.  Yes, Your Honor.

9:11 AM 23           THE COURT:  Okay.  No, I don't need anything that's

9:11 AM 24   already in the file.

9:11 AM 25           COURTROOM DEPUTY:  If you'll just come right up here.

9:11 AM  1          Doctor, please stand, raise your right hand.

9:11 AM  2          DR. DANNY MARTINEZ, DEFENSE WITNESS, SWORN.

9:12 AM  3          COURTROOM DEPUTY:  Be seated, please.

9:12 AM  4          For the record, please state your name and spell your

9:12 AM  5  last name.

9:12 AM  6          THE WITNESS:  My name is Dr. Danny Martinez.  M A R T

9:12 AM  7  I N E Z.

9:12 AM  8          COURTROOM DEPUTY:  Thank you.

9:12 AM  9          MS. COOPER:  Good morning.  Is this -- is this okay?

9:12 AM 10  I don't see it lit.  Okay.  Thank you.

9:12 AM 11                    CROSS-EXAMINATION

9:12 AM 12     BY MS. COOPER:

9:12 AM 13  Q.  Good morning, Dr. Martinez.  My name is Leslie Cooper, I'm

9:12 AM 14  one of the attorneys for the plaintiff.  I have some questions

9:12 AM 15  for you about the policy change regarding the treatment of

9:12 AM 16  gender dysphoria as you discussed in your declaration.

9:12 AM 17          I'd like you -- you have a binder in front of you.  Do

9:12 AM 18  you see that white binder?  If you could turn to Tab Number 5?

9:12 AM 19  Actually -- actually, I'm sorry.  I told you the wrong number.

9:13 AM 20          Okay.  That is the correct number.  Do you see the

9:13 AM 21  document with the --

9:13 AM 22  A.  I see HSB 15.05.23 action plan?

9:13 AM 23  Q.  Thank you.  Yes.  That's the one.

9:13 AM 24          Have you seen this before?

9:13 AM 25  A.  This particular document?  No, ma'am.

9:13 AM 1    Q.   Okay.  So you don't know who wrote this document.

9:13 AM 2    A.   I do not.

9:13 AM 3    Q.   Okay.  I'd like you to look down, and there's some gray --

9:13 AM 4    grayed out material, and then there's some in white.  The third

9:13 AM 5    one in white.  Okay?  And if you'll read along with me, conduct

9:13 AM 6    group meetings with inmates on treatment for gender dysphoria.

9:13 AM 7    Inmate will be advised that the alternative canteen and

9:13 AM 8    quarterly order menus will be rescinded, and they will have to

9:13 AM 9    comply with the grooming standard in accordance with their

9:14 AM 10   biological sex.  Inmate will be given 30 days, 10-24-24, to

9:14 AM 11   come into compliance with the grooming standards and to

9:14 AM 12   consume, dispose or mail alternate canteen items home at FDC's

9:14 AM 13   expense.

9:14 AM 14   A.   If I may, that was actually pushed back a week.

9:14 AM 15   Q.   Thank you.  But that is what happened?  Is that correct?

9:14 AM 16   A.   More or less.  Yes.

9:14 AM 17   Q.   Yes.  Okay.  So all of the inmates with gender dysphoria

9:14 AM 18   were told that alternate canteen items would be rescinded and

9:14 AM 19   they'd have to comply with male grooming standards in 30 days?

9:14 AM 20   A.   Not by October the 24th, by October the 31st.

9:14 AM 21   Q.   Thank you.  Thank you.

9:14 AM 22        If you can turn to the next document that is Number 6?

9:14 AM 23        THE COURT:  That was just -- for the record, that was

9:14 AM 24   46-6 we were talking about, and 6 is 46-2.  Go ahead.

9:14 AM 25        MS. COOPER:  Thank you.

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

9:14 AM  1     BY MS. COOPER:

9:14 AM  2   Q.  Have you turned to Number 6?  And it says stripped

9:15 AM  3   regarding undergarments, hair and alternate canteen items.  Do

9:15 AM  4   you see that in front of you?

9:15 AM  5   A.  I have.

9:15 AM  6   Q.  Have you seen this before?

9:15 AM  7   A.  This particular document, no.

9:15 AM  8   Q.  Okay.  I'd like you to read along with me where it says

9:15 AM  9   regarding hair.  Do you see that partway down?

9:15 AM 10   A.  You said regarding hair?

9:15 AM 11   Q.  Regarding hair.

9:15 AM 12   A.  Yes.

9:15 AM 13   Q.  It says you must bring your hair into compliance with Rule

9:15 AM 14   33-602.101 FAC care of inmates, Paragraph 4, to align with your

9:15 AM 15   assigned institution no later than 30 calendar days from the

9:15 AM 16   date of this notice.  Failure to do so will result in you being

9:15 AM 17   ordered to cut your hair.  Noncompliance will result in formal

9:15 AM 18   disciplinary action and may result in force being used to bring

9:15 AM 19   you into compliance with established grooming standards per

9:15 AM 20   Rule 33-602.101 FAC care of inmates Paragraph 5, 5 A and B and

9:15 AM 21   C.  Excuse me.  And 6.

9:16 AM 22     And then regarding -- sorry.  I left out the

9:16 AM 23   undergarments one at the top.  It says, if you'll read along

9:16 AM 24   with me:  You must exchange any undergarments in your

9:16 AM 25   possession for those authorized for use at your assigned

9:16 AM 1   institution per Rule 33-602.101 FAC care of inmates, no later

9:16 AM 2   than 30 calendar dates from the date of notice.  Failure to do

9:16 AM 3   so will result in formal disciplinary action and confiscation

9:16 AM 4   of unauthorized action.

9:16 AM 5          And then just at the bottom regarding alternative

9:16 AM 6   canteen items, it's the same thing about rescinding the

9:16 AM 7   alternative canteen items; is that correct?

9:16 AM 8   A.   Yes.

9:16 AM 9   Q.   Okay.  And this script was read to inmates with gender

9:16 AM 10  dysphoria at Florida prisons on September 30th?

9:16 AM 11  A.   September 30th of this year.  Yes, ma'am.

9:16 AM 12  Q.   Okay.  And the hair standard referenced in the hair

9:16 AM 13  portion, that rule requires hair to be cut above the ears and

9:16 AM 14  collar; is that correct?

9:16 AM 15  A.   Yes.

9:17 AM 16  Q.   Okay.  Let's look at Number 7.  It's a document entitled

9:17 AM 17  Frequently Asked Questions Regarding Gender Dysphoria for

9:17 AM 18  Non-healthcare Staff, September 19, 2024.

9:17 AM 19         Have you seen this before?

9:17 AM 20  A.   Yes.

9:17 AM 21  Q.   Did you write it?

9:17 AM 22  A.   Mostly, yes.

9:17 AM 23  Q.   Who else wrote it?

9:17 AM 24  A.   The members of the Office of Health Services which included

9:17 AM 25  the director Clayton Weiss, myself, the director -- the chief

9:17 AM 1    of mental health services.

9:17 AM 2    Q.  I'm sorry.  Can you repeat?  I didn't hear the last part.

9:17 AM 3    A.  The chief of mental health services as well.

9:17 AM 4    Q.  Is that Dr. Klein?

9:17 AM 5    A.  That's Dr. Klein, yes.

9:17 AM 6    Q.  Okay.

9:17 AM 7    A.  Would have been present and, you know, made edits where

9:17 AM 8    appropriate.

9:17 AM 9    Q.  Okay.

9:17 AM 10        THE COURT:  And this is 46-3 already filed.

9:17 AM 11        MS. COOPER:  Thank you.

9:17 AM 12    BY MS. COOPER:

9:17 AM 13    Q.  And this was information to be provided to FDC non-medical

9:17 AM 14    staff regarding the change in the gender dysphoria policy; is

9:17 AM 15    that correct?

9:18 AM 16    A.  That's correct.

9:18 AM 17    Q.  Okay.  And just to speed things up, this policy also -- or

9:18 AM 18    this statement also makes clear that inmates with gender

9:18 AM 19    dysphoria will no longer be able to follow female hair

9:18 AM 20    standards, have female undergarments or have female canteen

9:18 AM 21    items; is that correct?

9:18 AM 22    A.  That's correct.

9:18 AM 23    Q.  Okay.  And this document reflects current policy?

9:18 AM 24    A.  Yes.

9:18 AM 25    Q.  Okay.  So under the current policy, no inmates with gender

9:18 AM  1    dysphoria in male prisons may follow female clothing and

9:18 AM  2    grooming standards, or get female canteen items; is that

9:18 AM  3    correct?

9:18 AM  4    A.  Yes.

9:18 AM  5    Q.  Okay.  And that applies to all inmates with gender

9:18 AM  6    dysphoria in male prisons.  They've all been informed that they

9:18 AM  7    can no longer follow female clothing and grooming standards or

9:18 AM  8    order female canteen items.

9:18 AM  9    A.  Unless they were out to court, they weren't present that

9:18 AM 10    day, they would have been informed later than September the

9:18 AM 11    30th.  But yes, that's mostly correct.

9:19 AM 12    Q.  Yes.  And they've all been required to comply by October

9:19 AM 13    30th; is that correct?

9:19 AM 14    A.  That's also correct.

9:19 AM 15    Q.  Okay.  If you could turn to Document 10.  Okay.  And just

9:19 AM 16    for reference, it is Document 46-4, and am I right that this is

9:19 AM 17    a medical record from plaintiff Reiyn Keohane's file?

9:19 AM 18    A.  Yes.

9:19 AM 19    Q.  And if you look at the top right it says removed GD

9:19 AM 20    accommodations pass, date of service 10-9-2024.

9:19 AM 21          Have you seen this document before?

9:19 AM 22    A.  I do not recall seeing it, but I'm aware of these types of

9:19 AM 23    notes in the electronic medical record.

9:19 AM 24    Q.  Okay.  So this document was indicating that her gender

9:19 AM 25    dysphoria accommodations pass was being removed; is that

9:19 AM 1    correct?

9:19 AM 2    A.  Yes.

9:19 AM 3    Q.  And if you go further down, it says other incidental note

9:19 AM 4    in the text there?  Other service?  Are you with me?

9:20 AM 5    A.  In bold?

9:20 AM 6    Q.  In bold, yes.  And I'm going to read what it says there.

9:20 AM 7    It says removed GD accommodations pass.  Note, remove GD

9:20 AM 8    accommodations pass to bring into compliance with HSB 15.05.23.

9:20 AM 9            So that's why the pass was removed; is that right?

9:20 AM 10   A.  That's correct.

9:20 AM 11   Q.  Okay.  So the HSB is the Health Service Bulletin that we're

9:20 AM 12   talking about?  15.05.23, right?

9:20 AM 13   A.  That's correct.

9:20 AM 14   Q.  Yeah.  That HSB does not permit clothing and grooming

9:20 AM 15   accommodations for inmates with gender dysphoria, correct?

9:20 AM 16   A.  It does not.

9:20 AM 17   Q.  Okay.  So if we were to review the medical records of the

9:20 AM 18   other inmates with gender dysphoria, they would have similar

9:20 AM 19   documents in their files too?

9:20 AM 20   A.  That would be my expectation, yes.

9:20 AM 21   Q.  Okay.

9:20 AM 22            MR. CRANFORD:  Objection.

9:20 AM 23            THE COURT:  I'm sorry.  There was an objection?

9:20 AM 24            MR. CRANFORD:  It calls for speculation.

9:20 AM 25            THE COURT:  That's overruled.  If you have anything to

9:20 AM  1    add or have you already answered it?

9:20 AM  2             THE WITNESS:  I've already answered it.

9:20 AM  3             THE COURT:  I have a question.  An accommodations pass

9:21 AM  4    that's talked about, is that just related to hair and dress and

9:21 AM  5    things like that, or does that include hormone?

9:21 AM  6             THE WITNESS:  That does not include hormone therapy,

9:21 AM  7    sir.

9:21 AM  8             THE COURT:  Thank you.

9:21 AM  9             THE WITNESS:  In addition to opposite sex clothing, it

9:21 AM 10    would include stuff like shaving cream and female hair brush.

9:21 AM 11             THE COURT:  Okay.  But people who are receiving or

9:21 AM 12    were receiving hormone treatment, that's not under what the

9:21 AM 13    department would call a GD accommodations pass.  That's just

9:21 AM 14    separate.

9:21 AM 15             THE WITNESS:  No, sir.  It's a separate --

9:21 AM 16             THE COURT:  Okay.  Thank you.

9:21 AM 17       BY MS. COOPER:

9:21 AM 18    Q.  So for plaintiff Reiyn Keohane, there's been a pause on the

9:21 AM 19    removal of her GD accommodations pass because of this

9:21 AM 20    litigation, right?

9:21 AM 21    A.  No.

9:21 AM 22    Q.  No?

9:21 AM 23    A.  No.

9:21 AM 24    Q.  She has had that pass removed, and she's no longer

9:21 AM 25    permitted to follow grooming standards?

9:21 AM 1    A.  Inmate patient Keohane is on the list of those individuals

9:22 AM 2    who are to be re-evaluated under the new HSB.

9:22 AM 3    Q.  Sorry.  I'm still on the gender dysphoria accommodations,

9:22 AM 4    not the hormone therapy portion.

9:22 AM 5        So with respect to the gender dysphoria accommodations

9:22 AM 6    here has her pass was removed, but the implementation of that

9:22 AM 7    has been paused for the moment, right?  She has not been forced

9:22 AM 8    to have her hair cut or give up her undergarments or makeup at

9:22 AM 9    this point, correct?

9:22 AM 10   A.  Inmate patient Keohane is on the list of gender dysphoria

9:22 AM 11   patients who are to be re-evaluated under the new policy.

9:22 AM 12   Until such time, nothing will change in terms of what the

9:22 AM 13   services that Keohane is receiving.

9:22 AM 14   Q.  Right.  But all of the other --

9:22 AM 15   A.  And that's the same for all other inmates with the

9:22 AM 16   diagnosis of gender dysphoria.

9:22 AM 17   Q.  But all other inmates with the diagnosis of gender

9:22 AM 18   dysphoria have been forced to comply by October 30th with the

9:22 AM 19   hair standards and grooming standards and the canteen items,

9:22 AM 20   correct?

9:22 AM 21   A.  This was the expectation, but they're all in the process of

9:22 AM 22   being re-evaluated.  So it has not been implemented on any of

9:23 AM 23   them so far as of today.

9:23 AM 24   Q.  So the promise to face discipline if they did not comply

9:23 AM 25   with getting their hair cut by October 30th, was that -- that

9:23 AM  1    was not implementation of the policy?

9:23 AM  2    A.  Again, all inmates in the Florida Department of Corrections

9:23 AM  3    who have a diagnosis of gender dysphoria are on a list to be

9:23 AM  4    re-evaluated under the new policy.

9:23 AM  5    Q.  And -- but it's also your testimony that they were informed

9:23 AM  6    on September 30th that if they did not comply with the male

9:23 AM  7    grooming and clothing and canteen standards by October 30th,

9:23 AM  8    they would face discipline, correct?

9:23 AM  9    A.  Yes.  That was the message, but we are putting them --

9:23 AM 10    we've put them all on the list to be re-evaluated under the new

9:23 AM 11    policy, and until such time that policy has not been

9:23 AM 12    implemented.

9:23 AM 13    Q.  Isn't it true that because they were going to face

9:23 AM 14    discipline if they did not comply, that everybody has gotten

9:24 AM 15    their hair cut and given over their female items because they

9:24 AM 16    were told they would be disciplined if they didn't?

9:24 AM 17    A.  Some of them have done so, yes.  But again, as I'll

9:24 AM 18    reiterate, they're all on a list to be re-evaluated according

9:24 AM 19    to the new policy.

9:24 AM 20    Q.  Are you aware of any inmates besides Reiyn Keohane that is

9:24 AM 21    going around with long hair and still wearing makeup in prison?

9:24 AM 22    A.  That I could name?  No.

9:24 AM 23    Q.  You're not aware of any.

9:24 AM 24    A.  I work in the office in Tallahassee, so these inmates are

9:24 AM 25    in our correctional institutions.  I see them when I go to the

9:24 AM 1  correctional institutions.  So I haven't been to, for example,

9:24 AM 2  Wakulla and any of the other institutions where gender

9:24 AM 3  dysphoric patients have been housed in some time, in a couple

9:24 AM 4  of months.  So to answer your question accurately and

9:24 AM 5  currently, I cannot.

9:24 AM 6  Q.  You don't know.

9:25 AM 7  A.  I do not.

9:25 AM 8  Q.  Okay.  So you were saying that -- well, let me ask it this

9:25 AM 9  way.  So under the current policy, there are no circumstances

9:25 AM 10  under which an inmate with gender dysphoria could be provided

9:25 AM 11  access to female clothing and grooming standards, correct?

9:25 AM 12  A.  Under no circumstances?

9:25 AM 13  Q.  That inmates with gender dysphoria could be provided access

9:25 AM 14  to female clothing and grooming standards, the gender dysphoria

9:25 AM 15  accommodations they used to have.

9:25 AM 16  A.  From October the 31st, that is correct.

9:25 AM 17  Q.  Right.  They no longer can access those.

9:25 AM 18  A.  Those items are no longer available.  If that's what you're

9:25 AM 19  asking, yes.

9:25 AM 20  Q.  Okay.  So when you're referring to re-evaluation, that is

9:25 AM 21  more related to the question of potential hormone therapy?  Is

9:25 AM 22  that right?

9:25 AM 23  A.  It is in regard to everything.  All aspects of their care.

9:25 AM 24  Q.  So now -- I'm sorry if I'm confused.  So are you saying

9:26 AM 25  that there are circumstances under which in an evaluation an

9:26 AM 1    inmate could be deemed to require or have a need for female

9:26 AM 2    clothing and grooming standards?

9:26 AM 3    A.  There's no evidence to suggest that that would be medically

9:26 AM 4    necessary for an inmate with the diagnosis of gender dysphoria.

9:26 AM 5    Q.  For any inmate with gender dysphoria.

9:26 AM 6    A.  Yes.

9:26 AM 7    Q.  So it's your position that that's never medically necessary

9:26 AM 8    for any person with gender dysphoria.

9:26 AM 9    A.  There's no evidence to corroborate, to prove that.

9:26 AM 10   Q.  So then does that mean that no inmates will be provided

9:26 AM 11   access to gender dysphoria accommodations, I'm using that as

9:26 AM 12   shorthand for the female clothing and grooming accommodations.

9:26 AM 13   I'm sorry.  I have to finish the question for the court

9:26 AM 14   reporter.  Even if they're evaluated, there would be no

9:26 AM 15   prospect of getting access to those accommodations.

9:27 AM 16   A.  From October the 31st of 2024, that is correct.

9:27 AM 17   Q.  Okay.  Now, I just want to ask a couple questions about

9:27 AM 18   bras.  Because my understanding, and tell me if this is

9:27 AM 19   correct, that for those inmates who have sufficient breast

9:27 AM 20   development that they require a bra for a medical support need,

9:27 AM 21   that that can be approved.  But if they don't have enough

9:27 AM 22   breast development to require it for support, they cannot be

9:27 AM 23   given a bra for a gender dysphoria accommodation.  Is that

9:27 AM 24   correct?

9:27 AM 25   A.  They're all evaluated individually, and they're staged by

9:27 AM 1    their Tanner score, Tanner being the level of breast

9:27 AM 2    development that they have.  That's determined by a medical

9:27 AM 3    professional.  And if the medical professional deems that the

9:27 AM 4    breast tissue requires support, they will be given a medical

9:27 AM 5    bra pass.  But that is determined on an individual,

9:28 AM 6    case-by-case basis.

9:28 AM 7    Q.  Understood.  So if an inmate does not have enough breast

9:28 AM 8    tissue to need a medical bra pass, they would not be allowed to

9:28 AM 9    wear a bra for a gender dysphoria accommodation, correct?

9:28 AM 10   A.  That is correct.

9:28 AM 11   Q.  Okay.  Now, can access to female grooming and clothing

9:28 AM 12   standards, and the ability to dress and groom in accordance

9:28 AM 13   with one's female identity -- gender identity, help alleviate

9:28 AM 14   gender dysphoria?

9:28 AM 15   A.  Again, there's no medical evidence of medical necessity of

9:28 AM 16   those items for an individual with the diagnosis of gender

9:28 AM 17   dysphoria.

9:28 AM 18   Q.  And can you tell us what definition of medical necessity

9:28 AM 19   you're using when you make that statement?

9:28 AM 20   A.  I can give you an example.  If you have an upper

9:28 AM 21   respiratory tract -- bacterial upper respiratory tract

9:28 AM 22   infection, you require antibiotics.  That's medical necessity.

9:28 AM 23   Q.  Hmm-hmm.  So if something could alleviate the distress --

9:29 AM 24   A.  Growing your hair or wearing a bra will not cure you of

9:29 AM 25   your bacterial pneumonia.

9:29 AM 1    Q.  So is a medical necessity standard only one that cures or

9:29 AM 2    could alleviating pain and distress also be medically

9:29 AM 3    necessary?

9:29 AM 4    A.  Again, growing your hair and wearing a bra will not cure

9:29 AM 5    you of your bacterial pneumonia.  Only antibiotics will do

9:29 AM 6    that.  So in that -- in my example, antibiotics is medically

9:29 AM 7    necessary, not growing hair or wearing a bra.

9:29 AM 8    Q.  Okay.  So my understanding then, I think you're saying that

9:29 AM 9    if the treatment does not cure a condition, it's not medically

9:29 AM 10   necessary.  But if it alleviates the pain, it's still not

9:29 AM 11   medically necessary if it doesn't cure it; is that correct?

9:29 AM 12   A.  Well, we can provide medication for pain which would be

9:29 AM 13   pain medication.

9:29 AM 14   Q.  But doesn't cure the underlying condition, right?  It could

9:29 AM 15   still be medically necessary, correct?

9:29 AM 16   A.  The medical necessity, again, would be the antibiotic.  But

9:30 AM 17   if the patient was additionally in pain, they would be given

9:30 AM 18   some form of analgesic.

9:30 AM 19   Q.  And that's not medically necessary in your definition.

9:30 AM 20   A.  If they're in pain, they would be provided analgesic.

9:30 AM 21   Q.  Is it medically necessary.  Just trying to understand where

9:30 AM 22   you're drawing the line here.

9:30 AM 23   A.  Again, pain is relative.  Okay.  When I had my wisdom teeth

9:30 AM 24   removed, I had local anesthetic.  When my brother had his

9:30 AM 25   wisdom teeth removed, he had general anesthesia.  He, you know,

9:30 AM 1    was unconscious for the procedure because he has a low

9:30 AM 2    threshold for pain.  It's on an individual, case-by-case basis.

9:30 AM 3    Q.  So it can be medically necessary for some individuals, pain

9:30 AM 4    relief, even if it doesn't cure a condition.

9:30 AM 5    A.  Yes.

9:30 AM 6    Q.  So let me ask the question a different way, because it

9:30 AM 7    sounds like you have a special definition of medical necessity.

9:30 AM 8    A.  Medical necessity is curative.  I don't own the definition

9:30 AM 9    of medical necessity.

9:30 AM 10   Q.  So it means cure.

9:30 AM 11   A.  Yes.

9:31 AM 12   Q.  So insulin is not medically necessary for diabetics since

9:31 AM 13   it doesn't cure it?  It lets you function, but doesn't fix your

9:31 AM 14   pancreas, right?

9:31 AM 15   A.  Again, which type of diabetic?

9:31 AM 16   Q.  Type 1.

9:31 AM 17   A.  It would be curative.

9:31 AM 18   Q.  It's curative?

9:31 AM 19   A.  Yes.

9:31 AM 20   Q.  It cures the pancreas.

9:31 AM 21   A.  A Type 1 diabetic does not produce insulin.  They would die

9:31 AM 22   wrought without it.

9:31 AM 23   Q.  Okay.  Let me ask it differently.  Putting aside the term

9:31 AM 24   medical necessity, can access to female grooming and clothing

9:31 AM 25   standards to live and socially transition to be living in

9:31 AM 1    accordance with your gender help alleviate the symptoms of

9:31 AM 2    gender dysphoria?

9:31 AM 3    A.  In the literature, the definition of transitioning has a

9:31 AM 4    very, very blurry -- it's sort of an all -inclusive term.

9:31 AM 5         What I would say is this:  That it would be

9:31 AM 6    psychologically pleasing, but it's not medically necessary.

9:32 AM 7    Q.  Can it alleviate the gender dysphoria symptoms?

9:32 AM 8    A.  It's not clear in the literature that that is the case, and

9:32 AM 9    there isn't a single definition of transitioning that

9:32 AM 10   demonstrates that to be the case, to be a medical necessity.

9:32 AM 11   Q.  And that psychologically pleasing language, you got that

9:32 AM 12   from Dr. Levine; is that right?

9:32 AM 13   A.  No, ma'am.  Although yes, Dr. Levine mentions it in his

9:32 AM 14   testimony and in his articles, but it's not exclusive to Dr.

9:32 AM 15   Levine.

9:32 AM 16        And which Dr. Levine are you speaking of, by the way?

9:32 AM 17   Q.  Dr. Stephen Levine.  Yes.

9:32 AM 18   A.  Okay.

9:32 AM 19   Q.  Okay.

9:32 AM 20   A.  Dr. Cantor, several other authors have used the same

9:32 AM 21   language.

9:32 AM 22   Q.  Hmm-hmm.  What has been the impact that you have been told

9:32 AM 23   of inmates losing access to female clothing and grooming

9:32 AM 24   standards?

9:32 AM 25   A.  Grievances.

9:33 AM 1    Q.  Grievances.  Okay.  What have been the reports of the

9:33 AM 2    doctors who treat these patients?

9:33 AM 3    A.  Preliminary.

9:33 AM 4    Q.  And what is that preliminary information?

9:33 AM 5    A.  Regarding?

9:33 AM 6    Q.  Well, what has been the reports on how this -- pulling

9:33 AM 7    these accommodations away has affected inmates?

9:33 AM 8    A.  They have grieved.  They've submitted grievances.

9:33 AM 9    Q.  Have the doctors shared any concerns about the impact on

9:33 AM 10   the patients?

9:33 AM 11   A.  Not so far, no.

9:33 AM 12   Q.  So no, no doctors have raised concerns about this.

9:33 AM 13   A.  To me or to our office, no.

9:33 AM 14   Q.  To anybody else?

9:33 AM 15   A.  Not that I'm aware.

9:33 AM 16   Q.  Okay.

9:33 AM 17   A.  And to be clear, the grievances were specifically stating

9:33 AM 18   that they were not receiving their hormones, they have not

9:33 AM 19   stopped receiving their hormones.

9:34 AM 20   Q.  Hmm-hmm.  Were there grievances about losing access to

9:34 AM 21   female clothing and grooming standards?

9:34 AM 22   A.  There have been, yes.

9:34 AM 23   Q.  Have they described any harm to their mental health as a

9:34 AM 24   result?

9:34 AM 25   A.  They have described anxiety.

9:34 AM 1    Q.  Hmm-hmm.  Have any inmates required hospitalization or, you

9:34 AM 2    know, heightened treatment because of worsening of gender

9:34 AM 3    dysphoria since the grooming and clothing standards were taken

9:34 AM 4    away?

9:34 AM 5    A.  There have been a few which have required additional mental

9:34 AM 6    health services.

9:34 AM 7    Q.  What kind of services?

9:34 AM 8    A.  Individualized service.  One-on-one.

9:34 AM 9    Q.  And that's because their gender dysphoria worsened?

9:34 AM 10   A.  Again, I don't want to speculate but again, the grievances

9:34 AM 11   that have come to my desk, to my office, have been the fear of

9:35 AM 12   losing hormone treatment.  None of the individuals with gender

9:35 AM 13   dysphoria who have been prescribed hormones in the past prior

9:35 AM 14   to the implementation of the new policy have stopped receiving

9:35 AM 15   their hormones.

9:35 AM 16   Q.  Right.  But we were talking about the grooming standards,

9:35 AM 17   and you said some people have required additional mental health

9:35 AM 18   services.  Is that because their gender dysphoria worsened

9:35 AM 19   having had those accommodations removed?

9:35 AM 20   A.  There have been a handful of grievances that state they

9:35 AM 21   have anxiety for losing those items.

9:35 AM 22   Q.  How many inmates self-harmed in terms of their genitals or

9:35 AM 23   otherwise after the grooming standards were taken away?

9:35 AM 24   A.  None so far.

9:35 AM 25   Q.  Okay.  Has there been any reports of increased suicidality

9:35 AM 1  or suicidal ideation or suicide attempts by inmates after the

9:35 AM 2  grooming standards were taken away?

9:35 AM 3  A.  None so far that I'm aware of.

9:35 AM 4  Q.  Hmm-hmm.  Okay.  But you mentioned reports of increased

9:36 AM 5  anxiety.  What about depression?

9:36 AM 6  A.  Not that I'm aware of.

9:36 AM 7  Q.  Okay.

9:36 AM 8  A.  Again, the grievances mostly state fear of losing their

9:36 AM 9  hormone treatment.  None of them have been -- those with the

9:36 AM 10  diagnosis of gender dysphoria and are receiving cross-sex

9:36 AM 11  hormones, none of them have stopped receiving their cross-sex

9:36 AM 12  hormones.

9:36 AM 13  Q.  Have you checked in with the doctors who treat patients

9:36 AM 14  with gender dysphoria to see how patients are faring since the

9:36 AM 15  policy was changed and the grooming and clothing accommodations

9:36 AM 16  were rescinded?

9:36 AM 17  A.  That would be a question better asked of the chief of

9:36 AM 18  medical -- sorry.  That would be a better question to ask the

9:36 AM 19  chief of mental health services.

9:36 AM 20  Q.  So you have not.

9:36 AM 21  A.  I do not regularly.  She does.

9:36 AM 22  Q.  Has she done that in this situation?  Checked in on how

9:36 AM 23  patients are doing having lost these accommodations?

9:36 AM 24  A.  It would only be speculative.

9:36 AM 25           MR. CRANFORD:  Objection, Your Honor.  Speculation.

9:37 AM 1   How is he going to know if Dr. Klein has checked in with any

9:37 AM 2   inmates.  He'd have to cross the department --

9:37 AM 3         THE COURT:  It's not calling for speculation.  If he

9:37 AM 4   doesn't know, he doesn't know.  But certainly he could know.

9:37 AM 5         THE WITNESS:  I was just going to say it would only be

9:37 AM 6   speculation on my part.

9:37 AM 7     BY MS. COOPER:

9:37 AM 8   Q.  So you don't know.

9:37 AM 9   A.  I do not know.

9:37 AM 10  Q.  You haven't made sure that that happened.

9:37 AM 11  A.  I haven't made sure what has happened?

9:37 AM 12  Q.  That anybody checked in with the doctors to see how the

9:37 AM 13  patients were doing since these accommodations were rescinded.

9:37 AM 14  A.  They normally check in with us.

9:37 AM 15  Q.  Okay.

9:37 AM 16        THE COURT:  Who is the "they"?

9:37 AM 17        THE WITNESS:  Sorry, I apologize.  The individual

9:37 AM 18  providers at the individual institutions.  If they're having

9:37 AM 19  any difficulty with any individual inmate, regardless of their

9:37 AM 20  diagnosis, they would report that to us.

9:37 AM 21        THE COURT:  I see.  Thank you.

9:37 AM 22    BY MS. COOPER:

9:37 AM 23  Q.  And by "us," do you mean Dr. Klein?  Because she's chief of

9:37 AM 24  mental health?

9:37 AM 25  A.  If it were a mental health issue, she would be the direct

9:37 AM 1   contact.  If it were a medical issue, I would be the direct

9:37 AM 2   contact.

9:37 AM 3   Q.  So you wouldn't be the one they would go to if there were

9:38 AM 4   problems with mental health since the rescission of the policy.

9:38 AM 5   A.  Not directly, no.

9:38 AM 6   Q.  Okay.  I want to switch gears and ask some questions with

9:38 AM 7   the hormone policy now.  Let's go to Tab 1, and that is your

9:38 AM 8   declaration.  And you'll see -- I want to go to the last

9:38 AM 9   exhibit of your declaration which is the new Health Services

9:38 AM 10  Bulletin, Exhibit C.  It's at the back of that.  Have you found

9:38 AM 11  that?

9:38 AM 12          MS. COOPER:  And that's document 38-1, Your Honor.

9:38 AM 13  Okay.

9:38 AM 14      BY MS. COOPER:

9:38 AM 15  Q.  I think it's after what you're looking at now.

9:38 AM 16  A.  Exhibit B?

9:38 AM 17  Q.  No, Exhibit C.  Sorry.

9:38 AM 18  A.  Yes.

9:39 AM 19  Q.  Okay.  And if you can turn -- well, first of all, this is

9:39 AM 20  the Health Services Bulletin 15.05.23, correct?

9:39 AM 21  A.  Yes.

9:39 AM 22  Q.  Okay.  If you can turn to the section that's called

9:39 AM 23  Variances, section Roman numeral nine.

9:39 AM 24  A.  Yes.

9:39 AM 25  Q.  And I'd like to look at Section B, and I want you to read

9:39 AM 1    along with me.  It says state law prohibits the department from

9:39 AM 2    expending any state funds to purchase cross-sex hormones for

9:39 AM 3    the treatment of gender dysphoria.  Section 286.311 Florida

9:39 AM 4    Statutes.  The department shall comply with this statutory

9:39 AM 5    requirement unless compliance with the US Constitution, or a

9:39 AM 6    court decision, requires otherwise.

9:39 AM 7         I'm just going to ask you to read along with me a bit

9:39 AM 8    of the next section because it will be a predicate to some

9:39 AM 9    questions I have.

9:39 AM 10        Now, if we look at C.  In rare instances deemed

9:39 AM 11   medically necessary, a variance may be approved to permit the

9:39 AM 12   use of cross-sex hormones to treat an inmate's gender

9:40 AM 13   dysphoria.  Variances must be unanimously approved after review

9:40 AM 14   by a team consisting of the chief of medical services, the

9:40 AM 15   chief of mental health services, and the chief clinical

9:40 AM 16   advisor, and shall only be sought, one, after satisfying all

9:40 AM 17   preceding provisions of this policy, and two, if necessary to

9:40 AM 18   comply with the US Constitution or a court decision.

9:40 AM 19        And just the last part I want to read with me is

9:40 AM 20   Subsection 1 under C.  Variances should only be considered

9:40 AM 21   after completion of the treatment protocol in Section 7.  An

9:40 AM 22   inmate may be assessed for cross-sex hormone therapy if the

9:40 AM 23   treating physician can demonstrate with documented evidence

9:40 AM 24   that such treatment may improve clinical outcomes by treating

9:40 AM 25   the etiological basis of the pathology.  Such evidence must be

9:40 AM 1    based on sound scientific methods and research that were

9:40 AM 2    subjected to the formal peer review process.  Any

9:41 AM 3    recommendation for cross-sex hormone therapy must be supported

9:41 AM 4    by a consensus of the MDST.  The need for continued cross-sex

9:41 AM 5    hormone therapy will be re-evaluated every 90 days during the

9:41 AM 6    first year of use, and every 180 days thereafter, or as

9:41 AM 7    determined by the MDST.  This will be documented in the ISP.

9:41 AM 8            So MDST, is that the Multi-Disciplinary -- can you

9:41 AM 9    tell us what that stands for?

9:41 AM 10   A.  Multi-Disciplinary Services Team.

9:41 AM 11   Q.  Okay.

9:41 AM 12   A.  And an ISP is Individualized Service Plan.

9:41 AM 13   Q.  Thank you.  Okay.  So this is all part of the new policy

9:41 AM 14   regarding treatment with hormone therapy, correct?

9:41 AM 15   A.  Yes.

9:41 AM 16   Q.  Okay.  So I have some questions about variances.  So as

9:41 AM 17   we've read, this HSB, Health Services Bulletin, says a variance

9:41 AM 18   can only be sought if it's required to comply with the US

9:41 AM 19   Constitution, right?  Or court order.

9:41 AM 20   A.  That's only half of it.

9:42 AM 21   Q.  Well, but that is a prerequisite.  You can't get a variance

9:42 AM 22   unless it's necessary to comply with the US Constitution or a

9:42 AM 23   court order, correct?

9:42 AM 24   A.  Again, that's only half of what the statement says.

9:42 AM 25   Q.  What's the other half that you're referring to?

9:42 AM 1    A.  They can demonstrate with documented evidence that such

9:42 AM 2    treatment may improve clinical outcomes by treating the

9:42 AM 3    etiological basis of the pathology.

9:42 AM 4    Q.  That's an additional requirement, correct?

9:42 AM 5    A.  No, that's the first requirement.  And also what you said

9:42 AM 6    which, if there's a court ruling that requires it, that would

9:42 AM 7    be another reason to provide it.

9:42 AM 8    Q.  Or if the constitution requires it.  Right?  It has to be

9:42 AM 9    --

9:42 AM 10   A.  I meant the same thing, yes.

9:42 AM 11   Q.  Okay.  But if we look at B, it says the department shall

9:42 AM 12   comply with the statutory requirement unless compliance with

9:42 AM 13   the US Constitution or a court decision requires otherwise.

9:42 AM 14   Period.  Right?

9:42 AM 15   A.  Again, that -- referring to the state law that was passed

9:42 AM 16   over a year ago.

9:42 AM 17   Q.  Yes.

9:43 AM 18   A.  And none of our gender dysphoric patients with the

9:43 AM 19   diagnosis have stopped receiving their hormone therapy.

9:43 AM 20   Q.  But I'm just asking about this policy.  It says the

9:43 AM 21   department will comply with the statutory requirement unless

9:43 AM 22   compliance with the US Constitution or court decision require

9:43 AM 23   otherwise.  That is the policy, right?

9:43 AM 24   A.  We are constitutionally obligated to provide comprehensive

9:43 AM 25   medical care to our inmates.  That is in line with that policy.

9:43 AM  1    Nothing has changed.

9:43 AM  2    Q.  Okay.

9:43 AM  3    A.  That's true of gender dysphoria or my bacterial pneumonia

9:43 AM  4    example, or any other condition for that matter.

9:43 AM  5    Q.  Okay.  And a variance must be approved by the chiefs of

9:43 AM  6    medicine, mental health and clinical care, right?

9:43 AM  7    A.  Yes.

9:43 AM  8    Q.  And so you're the chief of medicine, Dr. Klein mental

9:43 AM  9    health, right?  And is Dr. Santiago the chief of clinical care?

9:43 AM 10    Is that correct?

9:43 AM 11    A.  She's the chief clinical advisor.

9:43 AM 12    Q.  Is that who this is referring to?

9:44 AM 13    A.  Yes.

9:44 AM 14    Q.  Okay.  And so under what circumstances is hormone therapy

9:44 AM 15    constitutionally required?

9:44 AM 16    A.  Again, under our medical necessity.

9:44 AM 17    Q.  And on your definition that if it cures the condition.  If

9:44 AM 18    it's -- it's only medically necessary if it cures the

9:44 AM 19    condition, correct?

9:44 AM 20    A.  That is the underlying meaning, yes.

9:44 AM 21    Q.  Okay.  So these are synonymous in your understanding?  If a

9:44 AM 22    treatment can cure gender dysphoria, it's constitutionally

9:44 AM 23    required.  Is that correct?

9:44 AM 24    A.  We are constitutionally required to provide comprehensive

9:44 AM 25    care to all of our inmates, regardless of the diagnosis.

9:44 AM 1    Q.  But comprehensive care --

9:44 AM 2    A.  I'm not twisting myself into a pretzel here.  It's stating

9:44 AM 3    the same thing.

9:44 AM 4    Q.  Comprehensive care only to the extent you can cure, but not

9:44 AM 5    alleviate pain that doesn't cure, right?  That's not required

9:45 AM 6    constitutionally?  Or is it?

9:45 AM 7    A.  Again, pain would require analgesic, not growing hair or --

9:45 AM 8    Q.  Say depression.

9:45 AM 9    A.  -- wearing a bra.

9:45 AM 10   Q.  Just -- I mean, I'm really struggling with this because

9:45 AM 11   people have depression and they can get medications that can

9:45 AM 12   help alleviate -- I have to finish the question so the court

9:45 AM 13   reporter can write it down.  They may get medication to

9:45 AM 14   alleviate the depression, but it doesn't cure the depression.

9:45 AM 15   Right?

9:45 AM 16   A.  It's a mental health diagnosis.  They would need just --

9:45 AM 17   they would need therapy, and they might need pharmacological

9:45 AM 18   therapy.

9:45 AM 19   Q.  And that might be medically necessary even though it

9:45 AM 20   doesn't cure depression, correct?

9:45 AM 21   A.  That's on an individual, case-by-case basis.  There are a

9:45 AM 22   multitude of pharmacological agents that have been clinically

9:45 AM 23   proven to improve depression in some patients, not all; and

9:45 AM 24   there are different types of psychological therapy that have

9:45 AM 25   shown improvement in some patients, but not all.

9:46 AM 1    Q.  So for other conditions, it could be medically necessary

9:46 AM 2    for an individual to get treatment that helps alleviate a

9:46 AM 3    condition without curing it.  But for gender dysphoria, the

9:46 AM 4    policy says you can only get treatment if it cures it.  Is that

9:46 AM 5    correct?

9:46 AM 6    A.  Again, this is on an individual, patient-by-patient basis.

9:46 AM 7    It's impossible to generalize.

9:46 AM 8    Q.  So hormone therapy might cure gender dysphoria for some

9:46 AM 9    people but not for other people?  Is that your position?

9:46 AM 10   A.  The literature is not particularly strong, but it has been

9:46 AM 11   given to patients and it has shown a very limited amount of

9:46 AM 12   alleviation of their gender dysphoria.  But yes, to that

9:46 AM 13   extent, that is what the evidence, the evidence-based medicine,

9:46 AM 14   has shown us.

9:47 AM 15   Q.  Hmm-hmm.  Let's look at -- back at the section you read, C

9:47 AM 16   1.  And I'll just refresh your memory here.  It says an inmate

9:47 AM 17   may be assessed for cross-sex hormone therapy if the treating

9:47 AM 18   physician can demonstrate with documented evidence that such

9:47 AM 19   treatment may improve clinical outcomes by treating the

9:47 AM 20   etiological basis of the pathology.  Such evidence must be

9:47 AM 21   based on sound scientific methods and research that were

9:47 AM 22   subject to the formal peer review process.

9:47 AM 23          So this is a requirement before a variance can be

9:47 AM 24   granted, correct?

9:47 AM 25   A.  Yes.

9:47 AM 1    Q.   Okay.  What does etiological basis mean as used here?

9:47 AM 2    A.   The source of the cause of the condition.

9:47 AM 3    Q.   Okay.  And the pathology that this is referring to is

9:47 AM 4    gender dysphoria, correct?

9:47 AM 5    A.   Yes.

9:47 AM 6    Q.   Okay.  So the policy would require -- in order for a

9:47 AM 7    variance to be considered, the doctor who treats the patient

9:47 AM 8    needs to produce evidence showing that hormone therapy treats

9:48 AM 9    the cause of gender dysphoria, right?  Absent that, a variance

9:48 AM 10   cannot be granted, correct?

9:48 AM 11   A.   Effectively, yes.

9:48 AM 12   Q.   Okay.  But if the doctor were able to present evidence

9:48 AM 13   showing that hormone therapy significantly alleviates the

9:48 AM 14   symptoms and the distress of gender dysphoria, that would not

9:48 AM 15   be enough to meet the requirements of the policy to get a

9:48 AM 16   variance; is that correct?

9:48 AM 17   A.   The underlying requirement is medical necessity.

9:48 AM 18   Q.   The underlying requirement here says it has -- the evidence

9:48 AM 19   must show that it treats the etiological basis of the

9:48 AM 20   pathology.

9:48 AM 21        So my question is if there were lots of evidence that

9:48 AM 22   a doctor could show that it treats the symptoms and helps

9:48 AM 23   alleviate the gender dysphoria but does not get to the root

9:48 AM 24   cause, as you put it, of gender dysphoria, that would not be

9:48 AM 25   sufficient evidence to get a variance, correct?

9:48 AM 1    A.  That's not the language that you've read in the statement,

9:48 AM 2    no.

9:49 AM 3    Q.  All right.  The language I read in the statement says --

9:49 AM 4    sorry.  The treating physician has to demonstrate with

9:49 AM 5    documented evidence that such treatment may improve clinical

9:49 AM 6    outcomes by treating the etiological basis of the pathology.

9:49 AM 7    That's the language.

9:49 AM 8    A.  Yes.

9:49 AM 9    Q.  Okay.

9:49 AM 10   A.  Yes, it is.

9:49 AM 11   Q.  So -- okay.  That is the requirement for the physician to

9:49 AM 12   show.

9:49 AM 13   A.  Medical necessity.  Yes.

9:49 AM 14   Q.  Well -- and that language.  Are you writing that language

9:49 AM 15   out?  Is that no longer part of the policy?  I'm genuinely

9:49 AM 16   confused here.

9:49 AM 17   A.  What specifically are you confused about.

9:49 AM 18   Q.  Well, you keep saying medical necessity rather than

9:49 AM 19   research showing that it improves clinical outcomes by treating

9:49 AM 20   the etiological basis of the pathology, which is what the

9:49 AM 21   policy says.

9:49 AM 22   A.  It is synonymous.

9:49 AM 23   Q.  Oh, right.  Because medical necessity, your definition is

9:50 AM 24   cure, not alleviate or treat, right?  It has to cure.

9:50 AM 25   A.  It must be medically necessary.

9:50 AM 1    Q. Which means to cure.

9:50 AM 2    A. It must be medically necessary.

9:50 AM 3    Q. So you don't want to answer that question.

9:50 AM 4    A. Well, you gave the example of the diabetic. Again, the

9:50 AM 5    Type 1 diabetic would require insulin. You are correct, it

9:50 AM 6    will not cure the diabetic, but the diabetic will die

9:50 AM 7    otherwise.

9:50 AM 8    Q. And the depression example -- you will -- it is medically

9:50 AM 9    necessary for some individuals to have antidepressants even

9:50 AM 10   though it doesn't cure depression.

9:50 AM 11   A. Correct.

9:50 AM 12   Q. Okay.

9:50 AM 13   A. And again, that's on an individual service plan. Not all

9:50 AM 14   medications work on all patients with depression or anxiety or

9:50 AM 15   any other mental health condition.

9:50 AM 16   Q. Now, did you -- were you the one who wrote the language

9:50 AM 17   about etiological basis in the policy, or did someone else

9:50 AM 18   write that?

9:50 AM 19   A. It was co-written.

9:50 AM 20   Q. By who?

9:51 AM 21   A. Myself and Dr. Klein.

9:51 AM 22   Q. Anybody else?

9:51 AM 23   A. In consultation with other members of the Department of

9:51 AM 24   Health Services, including Mr. Weiss. But mostly myself and

9:51 AM 25   Dr. Klein.

9:51 AM 1    Q.  And individuals outside of the department?

9:51 AM 2    A.  No.

9:51 AM 3    Q.  No input from anyone outside of the department?

9:51 AM 4    A.  Not that I'm aware of.

9:51 AM 5    Q.  Could it happen with you not being aware, since you wrote

9:51 AM 6    it?

9:51 AM 7    A.  We signed off on this statement.  So again, mainly myself,

9:51 AM 8    mainly Dr. Klein, some input from our director of health

9:51 AM 9    services, but ultimately we signed off on the finished product.

9:51 AM 10   Q.  Okay.  And why did you use that language though?  Why

9:51 AM 11   didn't you just say evidence that the treatment alleviates

9:51 AM 12   gender dysphoria?

9:51 AM 13   A.  Where?

9:52 AM 14   Q.  In that passage we were just reading about the etiological

9:52 AM 15   basis.

9:52 AM 16   A.  Again, the intention was medical necessity.  Is this

9:52 AM 17   treatment medically necessary for this specific patient with

9:52 AM 18   this specific condition.

9:52 AM 19   Q.  Okay.

9:52 AM 20   A.  And that would be true of any other condition and any other

9:52 AM 21   patient.

9:52 AM 22   Q.  So for other medical treatments you only provide treatment

9:52 AM 23   when it treats the etiological basis?  Is that true?

9:52 AM 24   A.  Medically necessary treatment is the goal, yes.

9:52 AM 25   Q.  So treating -- okay.  Sorry.  I'm just going to move on,

9:52 AM 1    because I think we're clear here.

9:52 AM 2    A.  Just so I'm clear, we are clear, we do not deny our Type 1

9:52 AM 3    diabetics insulin, if that was the implication.

9:52 AM 4    Q.  No, it was not the implication.

9:52 AM 5    A.  And you are correct, it's not a cure, but we are

9:52 AM 6    constitutionally mandated to provide comprehensive medical care

9:52 AM 7    for all of our inmates.  So that inmate with Type 1 diabetes,

9:52 AM 8    we can't cure him or her of Type 1 diabetes, but they will

9:52 AM 9    receive their insulin on a timely manner.

9:53 AM 10   Q.  Hmm-hmm.  And comprehensive care, you used that term a few

9:53 AM 11   times.  Does that include care that would alleviate pain that

9:53 AM 12   doesn't necessarily cure a condition?

9:53 AM 13   A.  It includes medically necessary care.

9:53 AM 14   Q.  Including care that does not cure a condition but would

9:53 AM 15   alleviate the pain of a condition for some individuals.

9:53 AM 16   A.  For the Type 1 diabetic, insulin.

9:53 AM 17   Q.  For the depressed person?

9:53 AM 18   A.  For the depressed person, any --

9:53 AM 19   Q.  Okay.  Okay.  So that language of etiological basis doesn't

9:53 AM 20   appear in other standards for treatment that the department

9:53 AM 21   uses; is that right?

9:53 AM 22   A.  It's synonymous with medical necessity which appears

9:53 AM 23   throughout.

9:53 AM 24   Q.  But my question was did the term etiological basis get used

9:53 AM 25   in other medical policies at FDC.

9:54 AM 1    A.  I can think of oncology care.  So, yes.

9:54 AM 2    Q.  That would be one, but it's not typically used in all of

9:54 AM 3    the --

9:54 AM 4    A.  We have over 600 HSB's.  I couldn't tell you off the top of

9:54 AM 5    my head.  No, I cannot.

9:54 AM 6    Q.  Okay.  Now, you've done a review of the research on hormone

9:54 AM 7    therapy and its use for gender dysphoria, correct?

9:54 AM 8    A.  I've done the research on?

9:54 AM 9    Q.  On the effectiveness of hormone therapy to treat gender

9:54 AM 10   dysphoria.

9:54 AM 11   A.  I have.

9:54 AM 12   Q.  Okay.  Are you aware of any studies that show that hormone

9:54 AM 13   therapy treats the etiological basis for gender dysphoria?

9:54 AM 14   A.  Am I aware of any study that?

9:54 AM 15   Q.  That show that hormone therapy treats the etiological basis

9:54 AM 16   of gender dysphoria.

9:54 AM 17   A.  Yes.

9:54 AM 18   Q.  What research is that?

9:55 AM 19   A.  It's listed here.

9:55 AM 20   Q.  To move us along, is it the research that was in that

9:55 AM 21   document that you sent to Dr. Klein on January 23rd of this

9:55 AM 22   year with a list of 266 references?  Is that what you're

9:55 AM 23   possibly referring to?  I just want to save us time.

9:55 AM 24   A.  It could be.

9:55 AM 25   Q.  Hmm-hmm.

9:55 AM 1    A.  If you had it to show me, I could answer definitively.  But

9:55 AM 2    that would be speculative.

9:55 AM 3    Q.  Yeah, I could show you.  Let's look at Number 9.  There are

9:55 AM 4    three documents here, and just for context so that you know

9:55 AM 5    what we're looking at, these were documents that were attached

9:55 AM 6    to an email you sent to Dr. Klein.  One of them is the

9:55 AM 7    Endocrine Society guidelines, one is the Pediatric Endocrine

9:55 AM 8    Society position statement, and then there's a document at the

9:55 AM 9    end called references that has a whole bunch of studies

9:55 AM 10   referenced.  Do you see that?

9:55 AM 11   A.  Yes.

9:56 AM 12   Q.  Is that the research you're talking about?

9:56 AM 13   A.  It could be.  How long ago are you stating that I sent this

9:56 AM 14   email?

9:56 AM 15   Q.  Well, if you'll look with me at Number 8, the document

9:56 AM 16   right before that, the first email at the top, it says Dr.

9:56 AM 17   Klein, after a brief search I am providing you with the

9:56 AM 18   Endocrine Society clinical practice guidelines for the

9:56 AM 19   treatment of transsexual persons.  The second document is the

9:56 AM 20   position statement on transgender health from the Pediatric

9:56 AM 21   Endocrine Society.  Lastly, the third document is a list of

9:56 AM 22   scholarly references lending support to treating transgender

9:56 AM 23   patients, and this is dated January 23, 2023.

9:56 AM 24        Does that refresh your recollection?

9:56 AM 25   A.  It does.

9:56 AM 1    Q.  Okay.  So this list of -- are these studies that you're

9:56 AM 2    referring to before just now?

9:56 AM 3    A.  Yes.

9:56 AM 4    Q.  Okay.  So there is research that shows that hormone therapy

9:57 AM 5    treats the etiology of gender dysphoria.

9:57 AM 6    A.  Yes.

9:57 AM 7    Q.  And is any of that research methodologically sound and

9:57 AM 8    reliable?

9:57 AM 9    A.  So the highest level of research would be a randomized

9:57 AM 10   clinical trial, specifically a double-blind randomized clinical

9:57 AM 11   trial.  And in none of the three documents listed here is there

9:57 AM 12   a randomized clinical trial or any randomized clinical trial

9:57 AM 13   included.

9:57 AM 14   Q.  So it's not sound in your view.

9:57 AM 15   A.  That's the wrong language.

9:57 AM 16   Q.  All right.  I can ask it a different way.

9:57 AM 17         If we go back to the HSB attached -- it's in Document

9:57 AM 18   1 at the end, the part we were reading, it not only requires

9:57 AM 19   the treating physician to demonstrate with documented evidence

9:58 AM 20   that such treatment may improve clinical outcomes by treating

9:58 AM 21   the etiological basis of the pathology, it also goes on to say

9:58 AM 22   such evidence must be based on sound scientific methods and

9:58 AM 23   research that were subject to the formal peer review process.

9:58 AM 24         So in your view is there research on the etiological

9:58 AM 25   basis -- sorry.  Research showing that hormone therapy treats

9:58 AM 1   the etiological basis of gender dysphoria that meets that

9:58 AM 2   standard?

9:58 AM 3   A.  Do you have the examples of my email?

9:58 AM 4   Q.  Those do meet that standard?

9:58 AM 5   A.  Again, they do not include randomized clinical trials.

9:58 AM 6   They do not include double-blind randomized clinical trials

9:58 AM 7   which are the gold standard for proving the effectiveness of

9:58 AM 8   any therapy.

9:58 AM 9   Q.  So, you see, we're trying to understand whether -- how this

9:58 AM 10  standard can be met, and the standard says there must be the

9:58 AM 11  type of evidence we described, and it must be -- it must be

9:59 AM 12  sound scientific methods and research, right?

9:59 AM 13         So my question for you is does the research that

9:59 AM 14  exists meet the standard that is required here?  That doctors

9:59 AM 15  can show that the treatment alleviates or -- sorry.  The

9:59 AM 16  treatment addresses the etiological basis and it is subject to

9:59 AM 17  sound scientific methods.

9:59 AM 18  A.  What is the question?

9:59 AM 19  Q.  Okay.  Under the policy, we're looking at C 1, right?  To

9:59 AM 20  get a variance, to even ask for one, the treating physician has

9:59 AM 21  to show that -- evidence that treatment may improve clinical

9:59 AM 22  outcomes by treating the etiological basis of the pathology.

9:59 AM 23  Such evidence must be based on sound scientific methods and

9:59 AM 24  research.

9:59 AM 25         Is there such research meeting this standard that is

10:00 AM 1    required under the policy for a variance to be sought?

10:00 AM 2    A.   There is the examples that I sent.

10:00 AM 3    Q.   I'm sorry.  I couldn't hear you.

10:00 AM 4    A.   They are the examples that I sent to Dr. Klein in January

10:00 AM 5    of 2023 that you referred to earlier.

10:00 AM 6    Q.   They are based on sound scientific methods.

10:00 AM 7    A.   They do not include double-blind randomized clinical trials

10:00 AM 8    which are considered to be the gold standard for any form of

10:00 AM 9    therapy or treatment.

10:00 AM 10   Q.   So they are not sound scientific -- I'm just trying to get

10:00 AM 11   an answer.  Do they meet the standard of sound scientific

10:00 AM 12   methods.

10:00 AM 13   A.   So if you're measuring clinical research for its validity,

10:00 AM 14   its value, it's -- how sound is this research --

10:00 AM 15   Q.   Hmm-hmm.

10:00 AM 16   A.   -- the best form of research, again, would be a double --

10:00 AM 17   any type of random clinical trial, but a double-blind

10:00 AM 18   randomized clinical trial is the gold standard.  Nowhere in

10:00 AM 19   those sources that you referenced earlier that I had e-mailed

10:01 AM 20   to Dr. Klein and Dr. Santiago, nowhere is there a double-blind

10:01 AM 21   randomized clinical trial, or a randomized clinical trial to

10:01 AM 22   prove that point.  So just --

10:01 AM 23   Q.   So does this research meet the standard --

10:01 AM 24   A.   You changed the language.  I don't mean to interrupt you.

10:01 AM 25   You changed the language.  You are weighing the validity of

10:01 AM 1    these findings.  And again, they do not use the gold standard.

10:01 AM 2    They use lower quality studies to arrive at that conclusion.

10:01 AM 3        Why do I mention them?  Because that's all that's

10:01 AM 4    available.  I can only go by the research that has been

10:01 AM 5    published, and that is what has been published.

10:01 AM 6    Q.  So is it your position that only double-blind randomized

10:01 AM 7    clinical trials are sound research, or other kinds of research

10:01 AM 8    can be sound research too?

10:01 AM 9    A.  I don't have ownership of this opinion.  The opinion of the

10:01 AM 10   scientific and medical community is that a double-blind

10:01 AM 11   randomized clinical trial is the gold standard for any

10:02 AM 12   research.

10:02 AM 13   Q.  And is every -- I'm trying -- the policy says it has to be

10:02 AM 14   based on sound scientific methods.  I'm trying to understand

10:02 AM 15   your position, as the person who will be implementing requests

10:02 AM 16   for the variance, whether the research you know of constitutes

10:02 AM 17   sound scientific methods and would meet this standard, or is

10:02 AM 18   there no such research that meets this standard?

10:02 AM 19   A.  The research to date on gender dysphoria does not include a

10:02 AM 20   double-blind randomized clinical trial, which is the gold

10:02 AM 21   standard.

10:02 AM 22        MS. COOPER:  Your Honor, if I can ask for an

10:02 AM 23   instruction to answer this question.  I don't think I ask it

10:02 AM 24   any more clearly.

10:02 AM 25        THE WITNESS:  I'm answering it --

10:02 AM 1          MR. CRANFORD:  Your Honor, it's been asked and

10:02 AM 2     answered multiple times.  Mr. Martinez has given his answer.

10:02 AM 3          MS. COOPER:  It has not been answered.

10:02 AM 4          THE COURT:  Just a minute.  Your question is the

10:02 AM 5     policy says we're only going to rely on certain categories of

10:02 AM 6     science, and then your follow-up question is does this

10:02 AM 7     particular document meet that.

10:02 AM 8          MS. COOPER:  Or does the evidence, the research meet

10:02 AM 9     that standard.  Is it possible for a doctor to be able to

10:03 AM 10    present evidence that meets this standard.  You know the

10:03 AM 11    research, does it meet that standard.

10:03 AM 12         THE WITNESS:  Many have, and you pointed to the

10:03 AM 13    examples that I gave to Dr. Klein and Dr. Santiago.  Many have.

10:03 AM 14       BY MS. COOPER:

10:03 AM 15    Q.  Have met the standard of sound methods, sound scientific

10:03 AM 16    methods, as the policy requires.

10:03 AM 17    A.  They have not met the gold standard, no.

10:03 AM 18         MS. COOPER:  I didn't ask the gold standard.

10:03 AM 19         THE COURT:  Just a minute.  Let me ask this question.

10:03 AM 20         Would you categorically reject for consideration any

10:03 AM 21    study that did not meet the gold standard in making your

10:03 AM 22    determinations under this policy?

10:03 AM 23         THE WITNESS:  No.

10:03 AM 24         THE COURT:  I think that's what you were getting at.

10:03 AM 25         MS. COOPER:  Thank you.  That's part of it.

10:03 AM 1       BY MS. COOPER:

10:03 AM 2    Q.  So is it your view that there is evidence meeting this

10:03 AM 3    standard that a doctor could show to obtain a variance for a

10:03 AM 4    patient?

10:03 AM 5    A.  Again, the sources that you mentioned earlier that I

10:03 AM 6    emailed to Dr. Klein.

10:03 AM 7    Q.  Meet that standard.

10:04 AM 8    A.  They suggest that the use of hormones to treat gender

10:04 AM 9    dysphoria alleviates the signs and symptoms of gender

10:04 AM 10   dysphoria.

10:04 AM 11   Q.  Hmm-hmm.  Okay.  Now, let's look at -- staying on the same

10:04 AM 12   document, the HSB, 9 A.  The first provision under variances.

10:04 AM 13   I don't want to waste the Court's time reading the entire

10:04 AM 14   paragraph, but if you need to read it to give yourself context

10:04 AM 15   feel free, but I want to point you to the last --

10:04 AM 16   A.  I'm sorry.  Can you repeat where you are?

10:04 AM 17   Q.  Yes.  Under Roman numeral nine, Variances, Subsection A.

10:04 AM 18   A.  Thank you.

10:04 AM 19   Q.  Okay.  And if you flip to the next page, the last sentence

10:04 AM 20   says studies presenting the benefits to mental health,

10:04 AM 21   including those claiming that the services prevent suicide, are

10:04 AM 22   either low or very low quality and rely on unreliable methods.

10:04 AM 23       Now, this is talking about research on hormone therapy

10:04 AM 24   for gender dysphoria, right?

10:04 AM 25   A.  Yes.

10:05 AM  1    Q.  So the policy itself is saying that the studies that are

10:05 AM  2    out there are low or very low quality and rely on unreliable

10:05 AM  3    methods, correct?

10:05 AM  4    A.  There are no randomized clinical trials.

10:05 AM  5    Q.  I'm just asking what this says.  Did I read it correctly

10:05 AM  6    what this says?

10:05 AM  7    A.  There are no randomized clinical trials to prove those

10:05 AM  8    claims.

10:05 AM  9    Q.  And they are unreliable methods it says here, correct?

10:05 AM 10    A.  Many of them have a cohort pool of seven patients that were

10:05 AM 11    followed for six months, 12 patients that were followed for a

10:05 AM 12    year and a half.  The evidence and the validity of the findings

10:05 AM 13    is very low.

10:05 AM 14    Q.  Okay.  And it says here in the policy unreliable methods,

10:05 AM 15    correct?  That's what the policy says.

10:05 AM 16    A.  I gave you two previous examples, yes.

10:05 AM 17    Q.  But that is what it says.  Okay.

10:05 AM 18         THE COURT:  That is what the policy says.  We've all

10:05 AM 19    got the policy.  You can move right along.

10:05 AM 20         MS. COOPER:  Thank you.

10:05 AM 21         THE COURT:  Sure.

10:05 AM 22       BY MS. COOPER:

10:06 AM 23    Q.  So the HSB itself is saying that the requisite research to

10:06 AM 24    be able to request a variance for a patient does not exist;

10:06 AM 25    isn't that right?

| | | |
|---|---|---|
| 10:06 AM | 1 | A.  It's based on very low-quality scientific research. |
| 10:06 AM | 2 | Q.  Given that the policy says that to request a variance it |
| 10:06 AM | 3 | has to be based on sound scientific methods in Subsection C, |
| 10:06 AM | 4 | but in Subsection A it says that this research relies on |
| 10:06 AM | 5 | unreliable methods, how is it possible to possibly present the |
| 10:06 AM | 6 | research that would allow a doctor to get a variance for a |
| 10:06 AM | 7 | patient? |
| 10:06 AM | 8 | A.  Again, I point to the sources that I sent to Dr. Klein in |
| 10:06 AM | 9 | the email that you mentioned earlier.  Although there is much |
| 10:06 AM | 10 | more research out there that is also of even lower quality. |
| 10:06 AM | 11 | Q.  Hmm-hmm.  So the research that you sent to Dr. Klein could |
| 10:06 AM | 12 | be sufficient to obtain a variance, for a doctor to obtain a |
| 10:06 AM | 13 | variance for a patient. |
| 10:06 AM | 14 | A.  This is the research that's available. |
| 10:06 AM | 15 | Q.  That didn't answer my question.  Let me ask it again. |
| 10:07 AM | 16 | The research you provided to Dr. Klein would be -- if |
| 10:07 AM | 17 | a doctor were to present that, that would be sufficient for |
| 10:07 AM | 18 | them to seek a variance for a patient? |
| 10:07 AM | 19 | A.  Again, that would be on an individual determination for |
| 10:07 AM | 20 | each individual patient. |
| 10:07 AM | 21 | Q.  I'm not sure I can understand that because it doesn't talk |
| 10:07 AM | 22 | about how it applies.  I mean, there's a separate inquiry, I |
| 10:07 AM | 23 | get that, that it has to be medically necessary for a patient |
| 10:07 AM | 24 | before you get anywhere.  But this requirement of establishing |
| 10:07 AM | 25 | that there's research showing that it treats the etiological |

10:07 AM 1  basis and is based on sound research, that's not connected to a

10:07 AM 2  patient.  That just exists or it doesn't exist, right?

10:07 AM 3  A.  I don't see how you can divorce the two.

10:07 AM 4  Q.  Okay.  Now, so as far as I understand the HSB, it says both

10:07 AM 5  that the research shows that hormone therapy is not -- that

10:07 AM 6  there's no reliable studies indicating that hormone therapy is

10:07 AM 7  effective, but variances can be provided in the rare instances

10:08 AM 8  in which it's medically necessary.

10:08 AM 9        How can treatment be considered medically necessary if

10:08 AM 10  FDC seems to have determined in this policy that there's no

10:08 AM 11  research showing that it's effective?

10:08 AM 12  A.  There is low-quality research from the sources that were

10:08 AM 13  mentioned earlier suggesting that hormone therapy is a

10:08 AM 14  treatment for gender dysphoria.

10:08 AM 15  Q.  An effective treatment.

10:08 AM 16  A.  There is low-quality research in the items mentioned

10:08 AM 17  earlier suggesting that it is a form of treatment, medically

10:08 AM 18  necessary treatment for individuals with gender dysphoria, but

10:08 AM 19  that determination would need to be made on a case-by-case

10:08 AM 20  basis supported by what's available in the literature.

10:08 AM 21  Q.  Hmm-hmm.  So just on process-wise, under the HSB who can

10:08 AM 22  request a variance?  The treating physician?  Is that right?

10:09 AM 23  A.  The individual evaluating the inmate.

10:09 AM 24  Q.  Okay.  Is that the only person who could request a

10:09 AM 25  variance?

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

10:09 AM 1    A.  I'm not understanding your question.

10:09 AM 2    Q.  Well, say the therapist who works with the patient.  Could

10:09 AM 3    that person request a variance?

10:09 AM 4    A.  It would be a consensus of the MDST.

10:09 AM 5    Q.  So the inmate herself could not request a variance.

10:09 AM 6    A.  Not without going through the formal evaluation process.

10:09 AM 7    Q.  Hmm-hmm.  Okay.

10:09 AM 8         Now, you mentioned before that nobody has been taken

10:09 AM 9    off hormone therapy yet.  Can you -- have requests --

10:09 AM 10   A.  I did not say that.

10:09 AM 11   Q.  You did not say that.  Okay.  Have patients been taken off

10:09 AM 12   hormone therapy since the implementation of the new policy?

10:09 AM 13   A.  No.

10:09 AM 14   Q.  Okay.  Pardon me.  I heard that before.

10:10 AM 15        Have requests for variances been made?

10:10 AM 16   A.  No.

10:10 AM 17   Q.  You mentioned earlier there's a process of re-evaluating

10:10 AM 18   every patient with gender dysphoria; is that right?

10:10 AM 19   A.  Under the new policy, yes.

10:10 AM 20   Q.  Hmm-hmm.  What is the status of that?  I mean, have

10:10 AM 21   patients started to be evaluated yet?

10:10 AM 22   A.  Yes, and we thought that the process would take six months,

10:10 AM 23   but we already know it's going to take longer than that.

10:10 AM 24   Q.  Okay.  Have any of the processes -- sorry.  Have any of the

10:10 AM 25   variance evaluation processes worked their way through to the

10:10 AM 1    three chiefs?  I'll say you, Dr. Klein and Dr. Santiago

10:10 AM 2    determining whether a variance should be approved?

10:10 AM 3    A.  No.

10:10 AM 4    Q.  None have gotten that far?

10:10 AM 5    A.  Not yet.

10:10 AM 6    Q.  Okay.  Now, I understand that Reiyn Keohane was

10:10 AM 7    provisionally approved for hormone therapy in the evaluation

10:11 AM 8    that was done for her, but that it hadn't gotten to the MDST

10:11 AM 9    yet or to the variance committee, correct?

10:11 AM 10   A.  That was the preliminary finding, yes.

10:11 AM 11   Q.  Has that moved forward any further yet?  Has there been a

10:11 AM 12   final finding yet?

10:11 AM 13   A.  There are hundreds of patients in this cohort.  No.

10:11 AM 14   Q.  No?  Okay.  Have other patients been provisionally approved

10:11 AM 15   for hormone therapy?

10:11 AM 16   A.  No.

10:11 AM 17   Q.  Just Reiyn.

10:11 AM 18   A.  To my knowledge, yes.

10:11 AM 19   Q.  Okay.  When is the plan to start that process?

10:11 AM 20   A.  Again, we thought it would take six months.  It's taking

10:11 AM 21   longer than that.  We're finding from our vendor, Centurion,

10:11 AM 22   they need more time.

10:11 AM 23   Q.  So Reiyn is the only person who's been evaluated so far.

10:11 AM 24   A.  Again, this would be a better question for the chief of

10:11 AM 25   mental health services Dr. Klein.

10:11 AM  1    Q.  But as far as you know.

10:11 AM  2    A.  They report directly to her.

10:12 AM  3    Q.  Hmm-hmm.  Okay.  So --

10:12 AM  4    A.  They, I mean the psychologists that conduct the evaluations

10:12 AM  5    at the individual institutions that house gender dysphoric

10:12 AM  6    patients.

10:12 AM  7    Q.  Okay.  So at this point in time no variances have been

10:12 AM  8    approved yet, correct?

10:12 AM  9    A.  No determinations have been made.

10:12 AM 10    Q.  Either way.  Right?

10:12 AM 11    A.  Yes.

10:12 AM 12    Q.  Okay.  One question about the protocol for titration for

10:12 AM 13    those inmates who will be discontinued.  I understood from your

10:12 AM 14    -- your declaration uses two -- mentions two different time

10:12 AM 15    frames.  If you want to go look at your declaration, that's Tab

10:12 AM 16    1 again.  In Paragraph 21 you say it would happen over a

10:12 AM 17    nine-week period, but in Paragraph 22 you say it would happen

10:13 AM 18    over 90 days, and I'm just wondering was one of those a

10:13 AM 19    mistake?  Which is correct?

10:13 AM 20    A.  It would have been a typo.  It's nine weeks.

10:13 AM 21    Q.  Nine weeks.  So it's a nine-week titration period.  So

10:13 AM 22    that's a little bit more than two months.  Okay.  Thanks for

10:13 AM 23    clarifying.

10:13 AM 24    A.  To be clear about that, it would not be -- if a

10:13 AM 25    determination were made, they would not be suddenly taken off

10:13 AM  1    hormone treatment.

10:13 AM  2    Q.  It would be over nine weeks.

10:13 AM  3    A.  It would be over a nine-week extended period.

10:13 AM  4    Q.  Okay.  So going back to plaintiff, Reiyn Keohane, we talked

10:13 AM  5    a moment ago about the preliminary determination that she

10:14 AM  6    should continue hormone therapy.  Was that based on a

10:14 AM  7    determination that hormone therapy continues to be medically

10:14 AM  8    necessary for her?

10:14 AM  9    A.  At this time, yes.

10:14 AM 10    Q.  Okay.  But she can't be approved for hormone therapy unless

10:14 AM 11    there's a final decision by the MDST and approval of the

10:14 AM 12    variance from the three chiefs, correct?

10:14 AM 13    A.  Yes.

10:14 AM 14    Q.  Okay.  And we discussed the fact that plaintiff's medical

10:14 AM 15    file indicated that the gender dysphoria accommodation pass was

10:14 AM 16    removed.  Just to be clear, if the preliminary injunction is

10:14 AM 17    denied, she will have to cut her hair and stop wearing makeup

10:14 AM 18    and women's undergarments like all the other inmates with

10:14 AM 19    gender dysphoria, correct?

10:14 AM 20    A.  Yes.

10:14 AM 21    Q.  Okay.  There will not be an evaluation of whether she

10:14 AM 22    should continue to have those accommodations if the preliminary

10:14 AM 23    injunction is denied.

10:15 AM 24    A.  There would not be an evaluation --

10:15 AM 25    Q.  Right.  It would just automatically happen that she would

10:15 AM 1    be denied those accommodations, like the rest of the inmates

10:15 AM 2    with gender dysphoria.

10:15 AM 3    A.  An individual determination would need to be made for each

10:15 AM 4    individual patient.

10:15 AM 5    Q.  About denying the clothing and grooming standards?  I'm not

10:15 AM 6    talking about hormone therapy here.

10:15 AM 7    A.  What are you talking about specifically?

10:15 AM 8    Q.  The gender dysphoria accommodations in the form of access

10:15 AM 9    to female clothing and grooming standards.  If the preliminary

10:15 AM 10    injunction is denied, she will have to follow male grooming and

10:15 AM 11    clothing standards, correct?

10:15 AM 12    A.  If the preliminary injunction is denied, yes.

10:15 AM 13    Q.  Okay.

10:15 AM 14    A.  But that would be an individual case-by-case determination

10:15 AM 15    for each individual.

10:15 AM 16          THE COURT:  As to haircuts?  Well, which is it?  So I

10:15 AM 17    guess I'm not clear.  I understand it's the hormones you're

10:15 AM 18    saying it would be an individual assessment, but let's just

10:15 AM 19    talk about haircuts, for example.  Would there be an individual

10:15 AM 20    assessment about whether a particular inmate could keep long

10:16 AM 21    hair?  Or would it just be nobody gets to keep long hair.

10:16 AM 22          THE WITNESS:  Again, it would be an individual

10:16 AM 23    assessment.

10:16 AM 24          THE COURT:  Okay.  So some people might still be able

10:16 AM 25    to have long hair and women's underwear and things like that.

10:16 AM 1          THE WITNESS:  They would not have access to the

10:16 AM 2     garments.  They would not have access to the alternate canteen

10:16 AM 3     because the alternate canteen is no longer available.  However,

10:16 AM 4     should a provider come to the determination about something

10:16 AM 5     like hair length, it would have to be on an individual service

10:16 AM 6     plan for that individual, and it would have to be evaluated.

10:16 AM 7          THE COURT:  Okay.

10:16 AM 8          MR. STEELY:  Your Honor, I think we've created some

10:16 AM 9     confusion here this morning.  So from the defense standpoint,

10:16 AM 10    we'll stipulate to the fact that the grooming standards, the

10:16 AM 11    hair and the canteen items have been removed.  Right?  That

10:16 AM 12    they're not available.

10:16 AM 13         THE COURT:  Okay.

10:16 AM 14         MR. STEELY:  That has happened and that's going

10:17 AM 15    forward.  I think we've created confusion by going back and

10:17 AM 16    forth from hormones and accommodations.

10:17 AM 17         THE COURT:  What you're saying is consistent with what

10:17 AM 18    my understanding was coming into the hearing.  That's been

10:17 AM 19    paused as to the actual named plaintiff, but with respect to

10:17 AM 20    everyone else, that's the new policy and that's that.

10:17 AM 21         MR. STEELY:  And I think there's some confusion.  If

10:17 AM 22    you're looking at a continuum of what's going on, if somebody

10:17 AM 23    gets re-evaluated later, if something is added.  But as of

10:17 AM 24    right now the grooming standards and the canteen items have

10:17 AM 25    been removed for individuals.

10:17 AM  1          MS. COOPER:  And just to be clear on the stipulation,

10:17 AM  2  that they are not available based on an individual assessment

10:17 AM  3  going forward.

10:17 AM  4          MR. STEELY:  Right now they are -- well, going forward

10:17 AM  5  is where you're going to start making --

10:17 AM  6          MS. COOPER:  Well, right now --

10:17 AM  7          MR. STEELY:  Right now, they're not available.  If

10:17 AM  8  somebody goes forward and gets re-evaluated, they go see their

10:17 AM  9  therapist, they go see their psychologist, there's a different

10:17 AM 10  standard.  But right now, today, those items are not available.

10:17 AM 11  They have been removed.

10:17 AM 12          MS. COOPER:  All right.  I'm sorry.  I still -- Your

10:17 AM 13  Honor, I think that's created a little bit more confusion than

10:17 AM 14  clarity for me about whether or not, you know, given that

10:17 AM 15  inmates were told they would be subject to discipline if they

10:18 AM 16  did not get their haircut and give up all of their things, and

10:18 AM 17  that the policy that was made available to other non-medical

10:18 AM 18  staff made clear that there is no hair, no grooming, no canteen

10:18 AM 19  items, no undergarments available, period, that does not sound

10:18 AM 20  like a policy that says except when, you know, somebody may

10:18 AM 21  change their mind in the future.  It is -- you're saying they

10:18 AM 22  can get individually evaluated to get hair and undergarments

10:18 AM 23  and canteen items, but the policy says no, it's not available.

10:18 AM 24          THE WITNESS:  That's not what I'm saying.

10:18 AM 25          MS. COOPER:  Okay.  So --

10:18 AM 1        THE COURT:  Well -- and now you've injected another

10:18 AM 2   level of confusion because the policy doesn't address those

10:18 AM 3   items was my understanding.

10:18 AM 4        MS. COOPER:  When I say "the policy," I meant the

10:18 AM 5   documents that we looked at where the staff were informed that

10:18 AM 6   the current policy is none of these things.

10:18 AM 7        THE COURT:  I see.  You're not talking about the

10:18 AM 8   Health Services Bulletin that we're talking about.

10:19 AM 9        MS. COOPER:  No.  No.

10:19 AM 10        THE COURT:  I got it.

10:19 AM 11        MS. COOPER:  I'm sorry, Your Honor.

10:19 AM 12        THE COURT:  Go ahead.

10:19 AM 13        MS. COOPER:  But I am in the sense, because in Reiyn

10:19 AM 14   Keohane's file it said grooming -- gender dysphoria

10:19 AM 15   accommodation pass rescinded per HSB 15.05.23.  So at least the

10:19 AM 16   FDC's interpretation is that under the HSB they are no longer

10:19 AM 17   able to provide access to female clothing and grooming

10:19 AM 18   accommodations.

10:19 AM 19      BY MS. COOPER:

10:19 AM 20   Q.  And so just so we're clear, we already confirmed that if

10:19 AM 21   the PI, the preliminary injunction, is denied, Reiyn will be

10:19 AM 22   required to get her haircut and give up her makeup and

10:19 AM 23   undergarments, correct?

10:19 AM 24   A.  Yes.

10:19 AM 25   Q.  Okay.  And it's not -- a doctor can't save her from that

10:19 AM 1    right now.

10:19 AM 2    A.  From?

10:19 AM 3    Q.  From losing those grooming and clothing accommodations.

10:19 AM 4    There's not an opportunity for an exception available.

10:19 AM 5    A.  Currently, no.

10:20 AM 6    Q.  Okay.  Now -- oh, and just one last thing about Reiyn.  I'd

10:20 AM 7    like to show you Document 12 which actually is two documents

10:20 AM 8    put together.  They are -- appear to be medical records from

10:20 AM 9    Reiyn's file.  Just to be clear -- did you find those?

10:20 AM 10   A.  Yes.

10:20 AM 11   Q.  Up at the top right it says medical support bra pass not

10:20 AM 12   issued.  So do I understand correctly that she's been evaluated

10:20 AM 13   and determined that her breast size does not require a medical

10:20 AM 14   pass for a bra?

10:20 AM 15   A.  That is correct.

10:20 AM 16   Q.  Right.  So then if --

10:20 AM 17   A.  That evaluation was done by Dr. Cortez.

10:20 AM 18   Q.  Okay.  So if the preliminary injunction is denied, she will

10:20 AM 19   not be able to ware a bra, correct?

10:20 AM 20   A.  She will not receive a medical bra pass.

10:20 AM 21   Q.  And she will not be allowed to wear a bra, correct?

10:21 AM 22   A.  Inmate patient Keohane will not receive a medical pass for

10:21 AM 23   a bra.

10:21 AM 24   Q.  Are you saying she will otherwise be allowed to wear one

10:21 AM 25   even though she won't have a pass?

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

10:21 AM 1    A.  Inmate patient Keohane would not have access to one, only

10:21 AM 2    if receiving a medical bra pass.

10:21 AM 3    Q.  And if she got one, it would be confiscated?

10:21 AM 4    A.  Yes.

10:21 AM 5    Q.  Okay.  In the defendants' response to plaintiff's

10:21 AM 6    interrogatories, they said that as of September 29th of this

10:21 AM 7    year there were 181 inmates diagnosed with gender dysphoria,

10:21 AM 8    and that all of them were receiving gender dysphoria

10:21 AM 9    accommodations, the clothing and grooming and canteen items,

10:21 AM 10   and 107 were receiving hormone therapy.  Does that sound right?

10:21 AM 11   A.  I do not have those numbers in front of me.  I don't know.

10:21 AM 12   Q.  Okay.  Well, what I want to know is do you know whether the

10:21 AM 13   numbers provided include inmates who have a provisional

10:21 AM 14   diagnosis of gender dysphoria, who never got a formal final

10:22 AM 15   diagnosis yet?

10:22 AM 16   A.  Can you rephrase that?

10:22 AM 17   Q.  Yeah.  Does that number include people who have a

10:22 AM 18   provisional diagnosis?  Who haven't been told they formally

10:22 AM 19   have a diagnosis yet?

10:22 AM 20   A.  It might.  I don't know.

10:22 AM 21   Q.  Okay.

10:22 AM 22   A.  Again, the better person to ask that question would be Dr.

10:22 AM 23   Klein, the chief of mental health services.

10:22 AM 24   Q.  Hmm-hmm.  But for anybody receiving hormone therapy from

10:22 AM 25   the department, it was because it was determined by department

10:22 AM 1    medical providers that it was medically necessary for them,

10:22 AM 2    correct?

10:22 AM 3    A.  Yes.

10:22 AM 4    Q.  Okay.  And under the new policy, all of them could

10:22 AM 5    potentially have that treatment rescinded.  Potentially.

10:22 AM 6    A.  These individuals are all going to be re-evaluated under

10:22 AM 7    the new policy, and that determination will be made on an

10:22 AM 8    individual service plan basis.

10:23 AM 9    Q.  Okay.  I'm just wondering, these people already were

10:23 AM 10   evaluated for gender dysphoria and they're going to be

10:23 AM 11   re-evaluated for the diagnosis.  Why is that?  Is there a

10:23 AM 12   different criteria being used besides the DSM criteria for

10:23 AM 13   gender dysphoria?

10:23 AM 14   A.  There are many criteria.

10:23 AM 15   Q.  What criteria are used by the department, or will be used?

10:23 AM 16   A.  We have looked at the DSM criteria.

10:23 AM 17   Q.  Will it follow the DSM to evaluate for gender dysphoria?

10:23 AM 18   A.  We felt that the changes to the policy were an improvement

10:23 AM 19   from the old policy.

10:23 AM 20   Q.  I'm asking what criteria will be used to evaluate and

10:23 AM 21   determine if somebody has gender dysphoria.

10:23 AM 22   A.  It's listed in the HSB.

10:23 AM 23   Q.  Can you show me where?

10:23 AM 24   A.  Through the evaluation process.

10:24 AM 25   Q.  Yeah.  If you can show me, it's in Document 1 at the end.

10:24 AM 1    A.  So it's on Page 3 of 8 where it talks about evaluation, and

10:24 AM 2    it formally spells it out on Page 4 of 8, letter C.  We made

10:24 AM 3    specific changes from the old HSB specifically in this area to

10:24 AM 4    be more attuned to the DSM criteria.

10:24 AM 5    Q.  Okay.  So if I understand it, Section C that you're

10:24 AM 6    pointing to, it says the following complement of assessment

10:24 AM 7    instruments, with any additional instruments if they become

10:24 AM 8    available in the future, should be used as applicable to

10:24 AM 9    evaluate the inmate.  And it lists various things like clinical

10:24 AM 10   interview, sex offender screening and selection, adaptive

10:25 AM 11   behavior checklist, Wechsler Adult Intelligence Scale.  Some of

10:25 AM 12   these are instruments that mental health people use to evaluate

10:25 AM 13   patients; is that right?

10:25 AM 14   A.  They are psychometric tests.

10:25 AM 15   Q.  Gotcha.  These are going to be used to determine if

10:25 AM 16   somebody has gender dysphoria?

10:25 AM 17   A.  Yes.

10:25 AM 18   Q.  Are these instruments designed to evaluate gender

10:25 AM 19   dysphoria?

10:25 AM 20   A.  There is no such instrument.  There's no test, there's no

10:25 AM 21   study, no one test or study that can be done to determine if an

10:25 AM 22   individual has gender dysphoria.

10:25 AM 23   Q.  Are you familiar with the DSM's diagnostic criteria for

10:25 AM 24   gender dysphoria?

10:25 AM 25   A.  Again, there's no test, there's no study.  It is a clinical

| | | |
|---|---|---|
| 10:25 AM | 1 | diagnosis. |
| 10:25 AM | 2 | Q.  Right.  And so -- but you are familiar with that diagnosis. |
| 10:25 AM | 3 | A.  It is a clinical diagnosis.  There's no -- |
| 10:25 AM | 4 | Q.  Are you familiar.  I'm just asking if you're familiar with |
| 10:25 AM | 5 | it. |
| 10:25 AM | 6 | A.  Yes. |
| 10:25 AM | 7 | Q.  Okay.  And so -- and that -- those diagnostic criteria are |
| 10:26 AM | 8 | generally used by mental health providers to assess and |
| 10:26 AM | 9 | diagnose gender dysphoria, correct? |
| 10:26 AM | 10 | A.  Yes. |
| 10:26 AM | 11 | Q.  Uh-huh.  But it sounds like under the new policy, that no |
| 10:26 AM | 12 | longer applies for FDC that -- well let me ask.  Will that |
| 10:26 AM | 13 | criteria be considered in the evaluation of an inmate's gender |
| 10:26 AM | 14 | dysphoria? |
| 10:26 AM | 15 | A.  It is considered here. |
| 10:26 AM | 16 | Q.  Yes.  It is considered. |
| 10:26 AM | 17 | A.  The item I mentioned on Page 4 of 8 of the HSB. |
| 10:26 AM | 18 | Q.  It has it in there?  Sorry if I am not finding it. |
| 10:26 AM | 19 | A.  The criteria listed in the DSM-5 Revised is clinical.  Is a |
| 10:26 AM | 20 | clinical -- you arrive at it at a clinical diagnosis, and is |
| 10:26 AM | 21 | also a diagnosis of exclusion.  You have to rule out other |
| 10:26 AM | 22 | pathologies before you arrive at the diagnosis of gender |
| 10:26 AM | 23 | dysphoria.  That is how it is written in the DSM-5 Revised. |
| 10:27 AM | 24 | Q.  So the department mental health providers do consider the |
| 10:27 AM | 25 | criteria under the DSM diagnosis in evaluating patients in this |

10:27 AM 1    new policy?

10:27 AM 2    A.  Not only gender dysphoria, but all other mental health

10:27 AM 3    conditions.

10:27 AM 4    Q.  I'm asking about gender dysphoria.  Do they use the

10:27 AM 5    diagnostic criteria for gender dysphoria?

10:27 AM 6    A.  Yes.

10:27 AM 7    Q.  And where does it say that?  I'm sorry.  I didn't see it.

10:27 AM 8    A.  They attempt to measure it with these psychometric tests.

10:27 AM 9    Q.  No, just does it say it anywhere in here that they look at

10:27 AM 10   the DSM criteria?  That that's relevant to the assessment?  I

10:27 AM 11   just -- I don't see it, so I was just wondering if you could

10:27 AM 12   point it out.

10:27 AM 13   A.  It's on Page 1.

10:27 AM 14   Q.  1?

10:27 AM 15   A.  Yes.  1 of 8.  It's a footnote.

10:28 AM 16   Q.  Oh, to establish -- this is -- I'm just reading it for the

10:28 AM 17   Court.  To establish professional guidelines for the mental

10:28 AM 18   health, evaluation and treatment of inmates meeting the

10:28 AM 19   diagnostic criteria for gender dysphoria, and diagnostic

10:28 AM 20   criteria is at Footnote 1 citing the DSM.

10:28 AM 21          Okay.  You're saying then that those are considered,

10:28 AM 22   but somebody might meet the criteria, but might not be

10:28 AM 23   diagnosed based on some of these other instruments that are

10:28 AM 24   used; is that right?

10:28 AM 25   A.  We arrive at the criteria using those psychometric tests.

10:28 AM 1    Q.  Use the psychometric test to determine if somebody meets

10:28 AM 2    the criteria for gender dysphoria --

10:28 AM 3    A   That is correct.

10:28 AM 4    Q.  -- such as having marked and sustained difference in their

10:28 AM 5    gender identity from their gender, use these psychometric

10:28 AM 6    tests?

10:28 AM 7    A.  Yes, that is correct.

10:28 AM 8    Q.  Okay.  So is it -- under the new policy, somebody who might

10:28 AM 9    meet the criteria by somebody just applying the DSM might not

10:28 AM 10   meet the criteria for gender dysphoria under the FDC standard;

10:28 AM 11   is that correct?

10:29 AM 12   A.  I'm sorry.  Can you restate the question?

10:29 AM 13   Q.  Right.  Under your new standard, is it possible that an

10:29 AM 14   inmate who meets the criteria under the DSM by a provider

10:29 AM 15   that's just applying the diagnostic criteria may not be deemed

10:29 AM 16   to have gender dysphoria even though somebody just applying

10:29 AM 17   that standard would deem them to have gender dysphoria because

10:29 AM 18   you use all these additional tests.

10:29 AM 19   A.  I would answer it this way:  In another setting outside of

10:29 AM 20   the prison system, if someone were using less psychometric

10:29 AM 21   testing, it could be possible that they arrive at the

10:29 AM 22   conclusion that the patient has gender dysphoria.  But these

10:29 AM 23   are the tests that we use to determine whether or not the

10:29 AM 24   individual has the criteria as listed in the DSM-5 Revised.

10:29 AM 25   Q.  Hmm-hmm.  Okay.  And is that the way practitioners

10:29 AM 1    ordinarily practice in this field?

10:30 AM 2    A.  We have looked at other state standard for psychometric

10:30 AM 3    testing.  I can tell you that California and the state of

10:30 AM 4    Washington also uses a similar battery of psychometric tests to

10:30 AM 5    arrive at whether or not the individual meets the criteria as

10:30 AM 6    outlined for gender dysphoria in the DSM-5 Revised.

10:30 AM 7    Q.  Okay.  Okay.

10:30 AM 8          THE WITNESS:  I'm sorry.  Could I have a glass of

10:30 AM 9    water?

10:30 AM 10          MS. COOPER:  Can we get the witness water?

10:30 AM 11          THE COURT:  I may have some water right here.  I

10:30 AM 12    usually have water right here.  I do not.  Do you have some?

10:30 AM 13    Okay.  They got it.  Oh, thank you.  Sure.  That would be fine.

10:30 AM 14    Thank you.

10:31 AM 15          MS. COOPER:  I'll let you get hydrated first.

10:31 AM 16          THE COURT:  While he's doing that, Ms. Cooper, do you

10:31 AM 17    want to give us a ballpark of how much longer we have?  We're

10:31 AM 18    about at half the morning and we're going to have a break here

10:31 AM 19    at some point.  I rarely go longer than two hours just for our

10:31 AM 20    court reporter, and some of you may need a break so we'll

10:31 AM 21    definitely break before the argument is completed.

10:31 AM 22          But with this witness, would you have an estimate?

10:31 AM 23          MS. COOPER:  It's very hard to say.  Depends on his

10:31 AM 24    answers.

10:31 AM 25          THE COURT:  Your best guess would be what?

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

10:31 AM 1          MS. COOPER:  Probably not more than an hour.

10:31 AM 2          THE COURT:  Another hour?

10:31 AM 3          MS. COOPER:  I don't think it's going to be that much

10:31 AM 4     more.

10:31 AM 5          THE COURT:  Okay.  Let's do try to pick up the pace a

10:31 AM 6     little bit.  I think some of this is --

10:31 AM 7          MS. COOPER:  Yes.  I am trying, Your Honor.

10:31 AM 8          THE COURT:  All right.

10:31 AM 9          MS. COOPER:  Are you all right, Dr. Martinez?

10:31 AM 10          THE WITNESS:  Yes.

10:31 AM 11     BY MS. COOPER:

10:31 AM 12     Q.  Do you have clinical experience with patients with gender

10:31 AM 13     dysphoria?

10:31 AM 14     A.  In diagnosing them before assuming my role as the chief of

10:32 AM 15     medical services?  No.  My involvement with patients with

10:32 AM 16     gender dysphoria was limited to a time that I worked at an HIV

10:32 AM 17     clinical in San Juan, Puerto Rico, but we only dealt with their

10:32 AM 18     HIV medical needs, testing and medicine.  We did not address

10:32 AM 19     the hormone component of their therapy.

10:32 AM 20     Q.  So that's -- you don't have personal experience treating

10:32 AM 21     gender dysphoria.

10:32 AM 22     A.  I do not.

10:32 AM 23     Q.  Okay.  Are you familiar with the medical records of Florida

10:32 AM 24     inmates with gender dysphoria?

10:32 AM 25     A.  I have reviewed some, yes.

10:32 AM 1    Q.  Hmm-hmm.  And do those records indicate that hormone

10:32 AM 2    therapy has been helpful to patients?

10:32 AM 3    A.  In some cases there's evidence to that effect.

10:32 AM 4    Q.  Okay.  And do the records indicate whether the access to

10:32 AM 5    female clothing and grooming standards has helped address their

10:32 AM 6    gender dysphoria?

10:33 AM 7    A.  That I'm aware of, no.  But again, the better person to ask

10:33 AM 8    that question would be the chief of mental health services, Dr.

10:33 AM 9    Klein.

10:33 AM 10   Q.  Okay.  So I want to switch gears and ask a few questions

10:33 AM 11   about the circumstances surrounding the rescission of the

10:33 AM 12   previous policy procedure 403.012 and replacement with the new

10:33 AM 13   Health Services Bulletin.

10:33 AM 14        I'd like to show you Document Number 3.  And just for

10:33 AM 15   the record, it's HSB 15.05.23, operational plan updated

10:33 AM 16   9-24-2024.

10:33 AM 17        If you'll look -- well, first of all, are you familiar

10:33 AM 18   with this document?

10:33 AM 19   A.  I have seen it before, yes.

10:33 AM 20   Q.  Hmm-hmm.  Where did it come from?

10:33 AM 21   A.  It came from the Office of Health Services.

10:33 AM 22   Q.  Okay.  So were you involved in drafting it?

10:34 AM 23   A.  I edited some of this, yes.

10:34 AM 24   Q.  Okay.  Who else was involved in preparing it?

10:34 AM 25   A.  Again my immediate superior, the Director of the Office of

10:34 AM 1    Health Services Mr. Clayton Weiss, and the Chief of Mental

10:34 AM 2    Health Services Dr. Klein.

10:34 AM 3    Q.  And nobody outside of FDC.

10:34 AM 4    A.  No one outside FDC that I'm aware of.

10:34 AM 5    Q.  Okay.  And if you'd just look at the top under purpose, it

10:34 AM 6    says due to recent changes in medical consensus, the Florida

10:34 AM 7    Department of Corrections is required to change some of its

10:34 AM 8    policies regarding treatment of gender dysphoria.

10:34 AM 9         Who required FDC to change policies regarding the

10:34 AM 10   treatment of gender dysphoria?

10:34 AM 11   A.  Again, there had been change in the literature that had

10:34 AM 12   contraindicated treatment in some populations for gender

10:34 AM 13   dysphoria.

10:34 AM 14   Q.  So no outside individual or entity required the change in

10:34 AM 15   policy?

10:35 AM 16   A.  No outside individual or entity --

10:35 AM 17   Q.  Outside of FDC.

10:35 AM 18   A.  That I'm aware of, no.

10:35 AM 19   Q.  Okay.

10:35 AM 20   A.  Again, there were recent reports published indicating a

10:35 AM 21   change in treatment methodology, specifically in the United

10:35 AM 22   Kingdom, the Cass Report.  And there was also a study that was

10:35 AM 23   commissioned by AHCA, the Agency for Healthcare Administration,

10:35 AM 24   and they paid a study to be done regarding the treatment of

10:35 AM 25   gender dysphoria.  This was done by a research group out of

10:35 AM 1    McMaster University in Canada.  And I believe a set of those

10:35 AM 2    findings are in these documents that you've provided for me

10:35 AM 3    today.

10:35 AM 4    Q.  Yes.  And just to be clear --

10:35 AM 5    A.  Those are just -- I could go on all day, but those are some

10:35 AM 6    of the biggest reports that were recently published regarding

10:35 AM 7    changes in recommendations to the treatment of gender

10:36 AM 8    dysphoria.  This is an HSB.  Just to speak globally, again, we

10:36 AM 9    have over 600 in the department, Office of Health Services, and

10:36 AM 10   they're reviewed on an annual basis.  But if there's changes in

10:36 AM 11   treatment or if there's changes in recommendations -- I will

10:36 AM 12   give you just one example, not to be long the answer, there was

10:36 AM 13   a decrease in the age to start doing mammography.  So we pulled

10:36 AM 14   our HSB for mammograms and we made that change.  This is no

10:36 AM 15   different.

10:36 AM 16   Q.  Okay.  And just to be clear, the Cass Report you talked

10:36 AM 17   about from the UK, that was just about the treatment of minors,

10:36 AM 18   right?  Not adults.

10:36 AM 19   A.  Up to the age of 18, yes.

10:36 AM 20   Q.  Okay.  Now, you mentioned that you and Dr. Klein and Doctor

10:36 AM 21   -- is it Dr. Weiss or Mr. Weiss?

10:36 AM 22   A.  Mr. Weiss.

10:36 AM 23   Q.  Mr. Weiss.  Were involved in the development of the policy

10:36 AM 24   and no one else; is that right?

10:36 AM 25   A.  It was mainly the three of us, yes.

10:37 AM  1    Q.  And who was it -- who else was not mainly involved, but a

10:37 AM  2    little bit involved?

10:37 AM  3    A.  The Office of Health Services in general.

10:37 AM  4    Q.  Okay.  And nobody outside of FDC reviewed or had to approve

10:37 AM  5    it?

10:37 AM  6    A.  Not to my knowledge, no.

10:37 AM  7    Q.  Okay.  And were healthcare providers within FDC who treat

10:37 AM  8    patients with gender dysphoria consulted?

10:37 AM  9    A.  Regarding?

10:37 AM 10    Q.  Regarding the change in policy?

10:37 AM 11    A.  Yes.

10:37 AM 12    Q.  Who?

10:37 AM 13    A.  So some of the psychologists that work under Dr. Klein --

10:37 AM 14    Q.  Okay.

10:37 AM 15    A.  -- were asked for input, but they did not author the

10:37 AM 16    document ultimately.

10:37 AM 17    Q.  Hmm-hmm.  So no one from the Florida Agency for Healthcare

10:37 AM 18    Administration, you called it AHCA, was involved in developing

10:37 AM 19    or approving the policy?

10:38 AM 20    A.  They call themselves AHCA.

10:38 AM 21    Q.  They call themselves AHCA.  Fine.

10:38 AM 22    A.  We studied that report regarding gender dysphoria.  We used

10:38 AM 23    it as background for coming up with our new HSB.

10:38 AM 24    Q.  Hmm-hmm.  But nobody from AHCA was involved in either

10:38 AM 25    developing your policy or approving your policy?

10:38 AM 1    A.  Not to my knowledge, no.

10:38 AM 2    Q.  Hmm-hmm.  Anybody from the governor's office?

10:38 AM 3    A.  Not to my knowledge, no.

10:38 AM 4    Q.  Hmm-hmm.  And who was in charge of -- who had the final

10:38 AM 5    approval over the policy?  Was that you?

10:38 AM 6    A.  If you go to the last page?

10:38 AM 7    Q.  Of the policy?

10:38 AM 8         THE COURT:  Are you talking about the policy itself or

10:38 AM 9    this operational plan?

10:38 AM 10         THE WITNESS:  The HSB.

10:38 AM 11    BY MS. COOPER:

10:38 AM 12    Q.  Excuse me.  I'm sorry?

10:38 AM 13    A.  The final page of the HSB should be signed by Mr. Weiss.

10:38 AM 14    Q.  It is.  It is.  So he had the final say.

10:39 AM 15    A.  He is the director of the Office of Health Services.  He

10:39 AM 16    has the final say on every single HSB we publish.

10:39 AM 17    Q.  Hmm-hmm.  Is there anything in here that you did not

10:39 AM 18    support but you were overridden?

10:39 AM 19    A.  No.

10:39 AM 20    Q.  Okay.  Were you in favor of rescinding policy 403.012?

10:39 AM 21    A.  I have been with the department since August of 2020.

10:39 AM 22    Shortly after beginning, I was made aware that I was

10:39 AM 23    responsible for the medical component of treatment for inmates

10:39 AM 24    with gender dysphoria.  As you pointed out, I did not have

10:39 AM 25    previous experience treating patients with gender dysphoria so

10:39 AM 1    I took it upon myself to educate myself.  I took the WPATH

10:39 AM 2    provider course, WPATH being the world association for

10:40 AM 3    transgender health, and tried to familiarize myself as much as

10:40 AM 4    I could with this area of medicine.

10:40 AM 5    Q.  Hmm-hmm.  So did you support rescinding policy or procedure

10:40 AM 6    403.012?

10:40 AM 7    A.  I did not like our old policy.  I thought it was an

10:40 AM 8    incomplete policy.  And prior to Dr. Klein becoming the chief

10:40 AM 9    of Mental Health Services, I had many conversations with her

10:40 AM 10   predecessor, Dr. Dean Aufderheide, and we talked many times

10:40 AM 11   about making changes, but nothing was made concrete.

10:40 AM 12   Q.  Okay.

10:40 AM 13   A.  So to answer your question, we have been thinking about

10:40 AM 14   changing this policy for a long time.

10:40 AM 15   Q.  Hmm-hmm.  What was Tim Fitzgerald's role in the change of

10:40 AM 16   policy?

10:40 AM 17   A.  None that I'm aware of.

10:40 AM 18   Q.  And he's the chief of staff of the Florida Department of

10:40 AM 19   Corrections, right?

10:40 AM 20   A.  Yes.

10:40 AM 21   Q.  He's not a doctor?

10:40 AM 22   A.  He's not a doctor.  He works directly with the secretary

10:41 AM 23   who -- Secretary Ricky Dixon is -- he's the highest ranking

10:41 AM 24   person in the department of the Florida Department of

10:41 AM 25   Corrections.

10:41 AM 1  Q.  Okay.  Let's look at Number 8.  We touched on this before.

10:41 AM 2  It's a series of emails.  And if you'll look at the bottom of

10:41 AM 3  the page, there's an email from Tim Fitzgerald sent on January

10:41 AM 4  18, 2023 to Suzonne Klein, the chief of mental health, right?

10:41 AM 5  And if you'll read with me, it says ma'am, please see link to

10:41 AM 6  AHCA report.  There are a number of hyperlinks in the report.

10:41 AM 7  Their acting general counsel Andrew Sharen, S H A R E N, would

10:41 AM 8  be the POC to start the conversation.  AHCA is in current

10:41 AM 9  litigation on the Florida official position, and their rule of

10:42 AM 10 using state funds for gender-affirming care for adults.  I

10:42 AM 11 believe we should work with them and their experts as we update

10:42 AM 12 our policy in this area.  Please see me if you have any more

10:42 AM 13 questions on the matter.  And then there is a link, and that

10:42 AM 14 link, am I correct, is to the report you mentioned before that

10:42 AM 15 you included with your declaration, right?

10:42 AM 16 A.  I believe it is.  But again, this email was sent to Dr.

10:42 AM 17 Suzonne Klein, so she would be the better person to ask the

10:42 AM 18 particulars of this email.

10:42 AM 19 Q.  Hmm-hmm.  But she forwarded that to you on January 23rd,

10:42 AM 20 right?  If you look at the email above that, right?

10:42 AM 21 A.  That's correct.

10:42 AM 22 Q.  Okay.  And just to be clear, the A C H A, that appears to

10:42 AM 23 be a typo.  That it's AHCA that he's referring to, right?

10:42 AM 24 A.  Yes.

10:42 AM 25 Q.  Okay.

10:42 AM 1   A.  And that's consistent with the hyperlink, yes.

10:42 AM 2   Q.  Okay.  And if you -- let's look at that report, which is

10:43 AM 3   Exhibit B to your declaration.  And I'd like you to look at

10:43 AM 4   Page 38 of that report.

10:43 AM 5   A.  I'm sorry.  Which tab?

10:43 AM 6   Q.  It's Tab 1, your declaration.  It's an exhibit, Exhibit B

10:43 AM 7   to your declaration.

10:43 AM 8   A.  Yes.

10:43 AM 9   Q.  And if you'll look at Page 38, did you get to 38?

10:43 AM 10  A.  Yes.

10:43 AM 11  Q.  Okay.  And if you'll read with me at the top.  It has a

10:43 AM 12  heading, generally accepted professional medical standards

10:43 AM 13  recommendation.  And under that it says this report does not

10:43 AM 14  recommend sex reassignment treatment as a health service that

10:43 AM 15  is consistent with generally accepted professional medical

10:43 AM 16  standards.  Available evidence indicates that the services are

10:43 AM 17  not proven save or effective treatments for gender dysphoria.

10:43 AM 18       Did I read that right?

10:43 AM 19  A.  You did.

10:43 AM 20  Q.  Yeah.  And the treatments they're referring to would

10:43 AM 21  include hormone therapy for gender dysphoria, correct?

10:44 AM 22  A.  They mention it specifically, yes.

10:44 AM 23  Q.  Yes.  Okay.  So that was the conclusion of the AHCA report

10:44 AM 24  that Mr. Fitzgerald sent to Dr. Klein when he asked her to work

10:44 AM 25  with AHCA in updating the FDC policy; is that right?

10:44 AM 1    A.  It appears to be so, yes.

10:44 AM 2    Q.  And so Dr. Klein forwarded this -- sorry?

10:44 AM 3    A.  I would simply point out that the conclusion of this report

10:44 AM 4    is that the services are not considered treatment.  Again, we

10:44 AM 5    continue to provide hormone therapy for all of the incarcerated

10:44 AM 6    individuals in FDC who have the diagnosis of gender dysphoria.

10:44 AM 7    Q.  Okay.  I think I understand your distinction, but the

10:44 AM 8    conclusion is they're not safe or effective treatments for

10:44 AM 9    gender dysphoria, correct?

10:44 AM 10   A.  That is what they are purporting, yes.

10:44 AM 11   Q.  Okay.  Do you disagree?

10:44 AM 12        THE COURT:  Just to go back, there are people I

10:44 AM 13   thought from the interrogatories, and maybe I'm

10:45 AM 14   misunderstanding, there are people who have been diagnosed with

10:45 AM 15   gender dysphoria in the Department of Corrections who were

10:45 AM 16   receiving hormone treatment and still are receiving hormone

10:45 AM 17   treatment, but there was a separate category of persons I

10:45 AM 18   thought who had a gender dysphoria diagnosis but were not

10:45 AM 19   receiving hormones for whatever reason.

10:45 AM 20        THE WITNESS:  The only reason that they would not be

10:45 AM 21   receiving hormones is that they would have gone through the

10:45 AM 22   formal evaluation process, they would have been approved for

10:45 AM 23   hormones, but they would have refused receiving them because

10:45 AM 24   they would have understood the long-term side effects of said

10:45 AM 25   medication and decided that they didn't want to risk the

10:45 AM 1    long-term side effects.

10:45 AM 2         THE COURT:  Okay.  I just -- just as a factual matter

10:45 AM 3    that there are people with the diagnosis who are not and have

10:45 AM 4    not been receiving hormones, correct?

10:45 AM 5         THE WITNESS:  There is a small handful.  But again,

10:45 AM 6    they would have refused after being formally evaluated and

10:45 AM 7    given the diagnosis.  Anyone with the diagnosis is offered the

10:45 AM 8    hormone therapy.

10:45 AM 9         THE COURT:  Okay.

10:45 AM 10        BY MS. COOPER:

10:46 AM 11   Q.  So, really?  You're saying there are people who were

10:46 AM 12   diagnosed with gender dysphoria, but the healthcare provider

10:46 AM 13   determined they didn't have a medical need for hormone therapy

10:46 AM 14   or it was contradicted for some reason?

10:46 AM 15   A.  That is exactly not what I'm saying.  I'm saying in the

10:46 AM 16   examples the judge is pointing out, all of those individual

10:46 AM 17   were evaluated for gender dysphoria, it was -- the MDST arrived

10:46 AM 18   at the conclusion that they had the diagnosis.  They were

10:46 AM 19   offered medication, they refused to take the medication because

10:46 AM 20   they understood the long-term side effects of that medication,

10:46 AM 21   and they decided to refuse.

10:46 AM 22   Q.  And this is in their medical records when we look at them

10:46 AM 23   later?

10:46 AM 24   A.  They would have a formal refusal in their medical record.

10:46 AM 25   Q.  Okay.  Okay.

10:46 AM 1    Now, going back to this portion of the AHCA report
10:46 AM 2  that we're talking about -- actually, let me withdraw that.
10:46 AM 3    We talked about the fact that you received the email
10:46 AM 4  from Dr. Klein, as did Dr. Santiago, forwarding Tim
10:47 AM 5  Fitzgerald's email that included this report and asked you to
10:47 AM 6  work with AHCA in developing the policy.
10:47 AM 7    Did you have any conversations with Dr. Klein and Dr.
10:47 AM 8  Santiago about what Tim Fitzgerald was asking you all to do?
10:47 AM 9  A.  We did not.  I did have conversations regarding the
10:47 AM 10  findings of the report with Dr. Klein.
10:47 AM 11  Q.  What was discussed?  What did you say?
10:47 AM 12  A.  The page you are indicating, Page 38.
10:47 AM 13  Q.  Did you say whether you agreed with it?
10:47 AM 14  A.  No, we did not say that.  We tried to look back at the
10:47 AM 15  actual studies that they were looking at and agreed that,
10:47 AM 16  again, there's not a single double-blind randomized clinical
10:47 AM 17  trial in what's in the published literature, therefore there's
10:47 AM 18  no gold standard clinical trial done to, once and for all,
10:47 AM 19  prove just exactly how effective this treatment would be for
10:47 AM 20  gender dysphoric patients.
10:47 AM 21    There are other forms of studies, and I don't want to
10:48 AM 22  get into the weeds, retrospective studies, surveys of that
10:48 AM 23  nature in small cohorts of patients for short periods of time
10:48 AM 24  that suggest that the therapy helps.
10:48 AM 25  Q.  Hmm-hmm.  So did you and Dr. Klein disagree with the

10:48 AM 1    conclusion here that available evidence indicates that the

10:48 AM 2    services are not proven safe or effective treatments for gender

10:48 AM 3    dysphoria?

10:48 AM 4    A.  We agreed with the Cass Report that --

10:48 AM 5    Q.  That's about youth though, right?  That doesn't have

10:48 AM 6    anything to do with this.

10:48 AM 7    A.  We agreed with the Cass Report that there was insufficient

10:48 AM 8    evidence that this works for minors.

10:48 AM 9    Q.  Did you agree that there was insufficient evidence that it

10:48 AM 10   works for adults?

10:48 AM 11   A.  We agreed that there is limited evidence of low quality,

10:48 AM 12   mostly of low quality indicating that hormone therapy is

10:48 AM 13   helpful for this patient population.

10:48 AM 14   Q.  But you did not agree with the statement that available

10:48 AM 15   evidence indicates that the services are not proven safe or

10:48 AM 16   effective treatments for gender dysphoria?  Did you disagree

10:49 AM 17   with that?

10:49 AM 18   A.  Again, the literature is very thin in terms of its

10:49 AM 19   validity.

10:49 AM 20   Q.  So you agree with that statement.

10:49 AM 21   A.  I neither agree nor disagree.

10:49 AM 22   Q.  Okay.

10:49 AM 23   A.  There's simply not strong enough clinical studies done to

10:49 AM 24   prove one way or the other.  There is a sufficient amount of

10:49 AM 25   clinical study done.  Again, the Cass report, yes you are

10:49 AM 1  correct, it only talks about minors, but it is conclusive.  It

10:49 AM 2  was a four-and-a-half year study.  It is conclusive, right?

10:49 AM 3  The United Kingdom did a 180-degree turn on their previous

10:49 AM 4  policy regarding transgender minors as a result of that report.

10:49 AM 5  Q.  Okay.  Again, we're talking about adults here, right?

10:49 AM 6  We're not talking about minors in state custody in this case.

10:49 AM 7  A.  We need to do the same report for adults is my suggestion

10:50 AM 8  to anybody listening.

10:50 AM 9  Q.  Now, did you and Dr. Klein follow Tim Fitzgerald's

10:50 AM 10  direction to work with AHCA and their experts in updating your

10:50 AM 11  policy?

10:50 AM 12  A.  I did not.

10:50 AM 13  Q.  Did Dr. Klein?

10:50 AM 14  A.  Not that I'm aware.  We did read the report.

10:50 AM 15  Q.  Hmm-hmm.  So you didn't work with any of their experts.

10:50 AM 16  A.  Their experts -- this was the result of a study that AHCA,

10:50 AM 17  again the Agency for Healthcare Administration in the state of

10:50 AM 18  Florida, this is the report, the final report of a study that

10:50 AM 19  they commissioned by a research group out of McMaster

10:50 AM 20  University in Canada.

10:50 AM 21  Q.  Okay.  So it wasn't that you talked with any of the

10:50 AM 22  experts.

10:50 AM 23  A.  We read the report.

10:50 AM 24  Q.  Gotcha.  Okay.  Were you given any instructions that the

10:50 AM 25  new policy had to comply with the AHCA report?

10:50 AM 1    A.  Not to my knowledge.

10:50 AM 2    Q.  So you were not aware of -- nobody told you that.

10:50 AM 3    A.  I'm sorry?

10:50 AM 4    Q.  Nobody told you that the policy that you come up with has

10:50 AM 5    to comply with the AHCA report conclusions.

10:51 AM 6    A.  I don't believe our policy complies with the AHCA report.

10:51 AM 7    The AHCA report has a blanket ban.  Again, all the inmate

10:51 AM 8    patients with the diagnosis of gender dysphoria in the Florida

10:51 AM 9    Department of Corrections who were recommended hormones

10:51 AM 10   continue on their hormone therapy.

10:51 AM 11   Q.  At the moment, until the evaluation.  I understand that.

10:51 AM 12   But my question is --

10:51 AM 13   A.  This is a blanket ban which anyone can clearly read from

10:51 AM 14   Page 28.  We did not --

10:51 AM 15   Q.  You're talking about the AHCA report.

10:51 AM 16   A.  That is correct.  That is not what our HSB states.

10:51 AM 17   Q.  But my question was whether you were given any -- were you

10:51 AM 18   or Dr. Klein, anyone working on this, were given any direction

10:51 AM 19   that the policy should comport with or conform to that policy.

10:51 AM 20        MR. CRANFORD:  Judge, I'm going to object.  It's been

10:51 AM 21   asked and answered.

10:51 AM 22        THE COURT:  Well, I don't think that has been

10:51 AM 23   answered, but you can answer that.

10:51 AM 24        THE WITNESS:  If what you are stating is correct, then

10:51 AM 25   our policy would be a blanket ban.

10:51 AM 1        BY MS. COOPER:

10:51 AM 2     Q.  Well, if they followed the instructions.  I'm just asking

10:51 AM 3     whether you were told to, not whether you did.

10:51 AM 4     A.  I was not told and I did not do.

10:52 AM 5     Q.  Okay.  And you're not aware that -- if Dr. Klein was told

10:52 AM 6     to conform to the AHCA report.

10:52 AM 7     A.  To my knowledge, no.  But again, the better person to ask

10:52 AM 8     that question would be Dr. Klein, the chief of Mental Health

10:52 AM 9     Services.

10:52 AM 10    Q.  Okay.  So I want to go back to the email, I think it's

10:52 AM 11    number -- Document 8, the email you wrote to Dr. Klein where

10:52 AM 12    you provided the Endocrine Society clinical practice guidelines

10:52 AM 13    and the Pediatric Endocrine Society --

10:52 AM 14    A.  Again, which tab please?

10:52 AM 15    Q.  I'm sorry.  It's Number 8.

10:52 AM 16    A.  Yes.

10:52 AM 17    Q.  Right.  So right after -- same day or in the same hour of

10:52 AM 18    Dr. Klein forwarding you this information from Tim Fitzgerald

10:52 AM 19    saying please work with AHCA and here's the report, she

10:52 AM 20    forwarded that to you and Dr. Santiago, and then you wrote back

10:53 AM 21    to Dr. Klein copying Dr. Santiago saying after a brief search,

10:53 AM 22    I am providing you with the Endocrine Society guideline, the

10:53 AM 23    Pediatric Endocrine Society statement and the references,

10:53 AM 24    right?  Why did you do that?

10:53 AM 25    A.  Because they were not in agreement with the AHCA report.

10:53 AM 1    And again, we -- this is the clinical research that's

10:53 AM 2    available.

10:53 AM 3    Q.  Hmm-hmm.

10:53 AM 4    A.  Again, it does not meet the gold standard, but that is

10:53 AM 5    what's out there.

10:53 AM 6    Q.  Hmm-hmm.

10:53 AM 7    A.  So we had to -- you know, doing our due diligence to write

10:53 AM 8    this policy, to re-write a new policy in compliance with the

10:53 AM 9    latest research on gender dysphoria, right?  We had to take a

10:53 AM 10   dispassionate look at everything that was out there.  On the

10:53 AM 11   one hand you have the AHCA report which recommends a blanket

10:53 AM 12   ban, and on the other hand you have the recommendations by the

10:53 AM 13   Endocrine Society and others.

10:53 AM 14   Q.  Hmm-hmm.  Okay.

10:53 AM 15   A.  We didn't cherry-pick the research that's available.  We

10:53 AM 16   tried to dispassionately do a meta-analysis, that is to say

10:54 AM 17   look at everything that's been published on this subject.  This

10:54 AM 18   was hundreds of hours of work between myself and Dr. Klein.

10:54 AM 19   This was not something that we slapped together over a weekend

10:54 AM 20   over a couple of beers, no.  This was deliberately delineated

10:54 AM 21   and thought out and re-written until we have the product that

10:54 AM 22   you see here.

10:54 AM 23   Q.  And is it your understanding that Dr. Klein agreed with the

10:54 AM 24   conclusions of the AHCA report that this treatment is not

10:54 AM 25   effective?

10:54 AM 1  A.  Again, the better person to ask that question would be Dr.

10:54 AM 2  Klein.

10:54 AM 3  Q.  So you don't know.

10:54 AM 4  A.  Other research says not.

10:54 AM 5  Q.  You're saying other research disagrees --

10:54 AM 6  A.  I didn't do the research.  And the research was considered

10:54 AM 7  by some medical journals sufficiently strong to publish.  If

10:54 AM 8  they were totally frivolous, they wouldn't have been published.

10:54 AM 9  But if you look at the metrics, okay, the confidence intervals,

10:55 AM 10 et cetera, okay, the evidence is very thin.

10:55 AM 11 Q.  I just want to make sure I'm clear when you talk about the

10:55 AM 12 research.  So you're saying the research that you shared with

10:55 AM 13 Dr. Klein isn't consistent with the conclusions of the research

10:55 AM 14 in the AHCA report, or the conclusions of the AHCA report; is

10:55 AM 15 that right?

10:55 AM 16 A.  Let me put it this way.  A lot of the research that the

10:55 AM 17 Endocrine Society and the Pediatric Endocrine Society point at

10:55 AM 18 are some of the same articles that are in the AHCA report.  But

10:55 AM 19 the AHCA report arrived at a different conclusion than the

10:55 AM 20 Endocrine Society or the Pediatric Endocrine Society.  So

10:55 AM 21 again, we didn't cherry-pick this research.  It's out there,

10:55 AM 22 anyone can read this, and the conclusions are different.

10:55 AM 23 Q.  Hmm-hmm.  But you ultimately -- you're saying you didn't

10:55 AM 24 reach the same conclusion as the AHCA report because you're

10:55 AM 25 saying the FDC policy is not a blanket ban, that it is --

10:55 AM 1     A.  It is not.

10:56 AM 2     Q.  And it can be provided when medically necessary.

10:56 AM 3     A.  Using the psychometric testing to test the validity of the

10:56 AM 4     criteria established by the DSM-5 Revised for the diagnosis of

10:56 AM 5     gender dysphoria, yes.  We don't claim that this is the be-all

10:56 AM 6     and end-all.  If new research comes out that shows that there's

10:56 AM 7     another psychometric test that's better, we will consider

10:56 AM 8     adopting it.

10:56 AM 9     Q.  Was Reiyn Keohane's provisional -- you know, the

10:56 AM 10    provisional recommendation to continue hormone therapy, was

10:56 AM 11    that based on having -- her having done the psychometric tests?

10:56 AM 12    A.  My understanding is yes, but again, the better person to

10:56 AM 13    ask would be Dr. Klein.

10:56 AM 14    Q.  Hmm-hmm.  Okay.  So your view on what you came to, your

10:56 AM 15    view of the policy, is that it would allow people to get

10:56 AM 16    hormone therapy in some cases.  You believe if they can --

10:57 AM 17    A.  If it is deemed medically necessary by the multi-discipline

10:57 AM 18    specialist team, services team, if it's deemed medically

10:57 AM 19    necessary, the variance will be given.

10:57 AM 20    Q.  Okay.  Why does it say in rare instances it may be deemed

10:57 AM 21    medically necessary in the policy?

10:57 AM 22    A.  We have about 88,000 inmates in the Florida Department of

10:57 AM 23    Corrections, of which 2,000 identify as transgender, and of

10:57 AM 24    which only 150 are the very vocal minority who insist that they

10:57 AM 25    have gender dysphoria and that they're not receiving sufficient

10:57 AM 1    treatment.

10:57 AM 2    Q.  Hmm-hmm.

10:57 AM 3    A.  Or that we're denying them hormones, which we are following

10:57 AM 4    the guidelines as they're written and we are providing them

10:57 AM 5    hormones for those who qualify for the diagnosis of gender

10:57 AM 6    dysphoria.

10:58 AM 7    Q.  Okay.  So the fact that the state legislature passed a law

10:58 AM 8    saying no state funds for this treatment, that was never a part

10:58 AM 9    of the discussion involved in the -- planning this new policy?

10:58 AM 10   A.  Again, that happened over a year ago and we continued to

10:58 AM 11   provide hormones to all of our patient inmates with the

10:58 AM 12   diagnosis of gender dysphoria.

10:58 AM 13   Q.  Hmm-hmm.  Right.  But it's recognized in the HSB, right?

10:58 AM 14   That you will follow that except when constitutionally

10:58 AM 15   required.  When the constitution requires otherwise, right?

10:58 AM 16   A.  We have the federally mandated requirement to provide

10:58 AM 17   comprehensive care to our patients.  If they have a diagnosis

10:58 AM 18   of gender dysphoria, and if it's considered medically necessary

10:58 AM 19   to treat them with hormones, we have continued to do so in

10:58 AM 20   compliance with all federal mandates.

10:58 AM 21   Q.  Hmm-hmm.  You have continued to do so so far, and there

10:58 AM 22   will be this re-evaluation subject to those criteria we went

10:59 AM 23   through about establishing that the research shows that it

10:59 AM 24   treats the etiological basis of the condition, right?  That all

10:59 AM 25   has to happen.

10:59 AM 1    A.  In addition to meeting the criteria through the series of

10:59 AM 2    psychometric tests that I pointed out earlier, yes.

10:59 AM 3    Q.  So sitting here now, you can't say whether it's likely that

10:59 AM 4    these inmates will get hormone therapy or not once the process

10:59 AM 5    runs its course, can you?

10:59 AM 6    A.  Again, that will be done on an individualized basis.

10:59 AM 7    Q.  I mean -- so you don't know whether any of -- so is it fair

10:59 AM 8    to say it could be that they all continue with hormone therapy,

10:59 AM 9    or that they all get taken off of hormone therapy?  We just

10:59 AM 10   don't know yet?  Or something in between?

10:59 AM 11   A.  It's impossible to say.  They are all going to be

10:59 AM 12   re-evaluated, and it will be on an individual basis, and on the

10:59 AM 13   determination of the Multi-Disciplinary Services Team as to

10:59 AM 14   whether or not they should continue on therapy.

10:59 AM 15   Q.  And then the three chiefs have to approve the variance

11:00 AM 16   based on the criteria of the policy being met, right?

11:00 AM 17   A.  Yes.

11:00 AM 18         THE COURT:  Ms. Cooper, we've gone over all this.

11:00 AM 19   You've been going two hours.

11:00 AM 20         MS. COOPER:  I'm sorry.  I will move on.  I thought he

11:00 AM 21   was saying something different and I wanted to clarify.  Okay.

11:00 AM 22         BY MS. COOPER:

11:00 AM 23   Q.  You know, in your declaration, Paragraph 8, I want to ask

11:00 AM 24   you --

11:00 AM 25         THE COURT:  Actually, let's do this.  It has been two

11:00 AM 1    hours since the hearing started, so we'll take a break now.

11:00 AM 2            MS. COOPER:  I think I'm getting close to wrapping up,

11:00 AM 3    but if you want to take a break --

11:00 AM 4            THE COURT:  We'll take a break anyway, then you can

11:00 AM 5    wrap up, hopefully quickly, and then the other side will have

11:00 AM 6    questions, and then I know we'll have some argument.  So we'll

11:00 AM 7    take a break.

11:00 AM 8            Why don't we come back at 11:15 by that clock, that

11:00 AM 9    will give everyone 15 minutes, and we'll continue then.

11:00 AM 10           MS. COOPER:  Thank you so much.

11:00 AM 11           COURT SECURITY OFFICER:  All rise.  This Court's now

11:00 AM 12   in recess.

11:00 AM 13           (Brief recess)

11:15 AM 14           THE COURT:  We'll just pick up right where we left

11:15 AM 15   off.

11:15 AM 16           MS. COOPER:  Okay.

11:15 AM 17       BY MS. COOPER:

11:16 AM 18   Q.  Hi there.  I just have a couple of questions about some of

11:16 AM 19   the content of your declaration where you talked about some of

11:16 AM 20   the reasons you had thought the policy for treating gender

11:16 AM 21   dysphoria should be changed.  And just to move us quickly

11:16 AM 22   through, I'll summarize but tell me if I'm getting this wrong.

11:16 AM 23   That you pointed out that the reasons there was a need for

11:16 AM 24   revision was inmates were not attending therapy sessions, there

11:16 AM 25   were no mechanisms to re-evaluate inmates or discontinue

11:16 AM 1    hormone therapy if deemed not to be medically necessary any

11:16 AM 2    longer.

11:16 AM 3              Is that a fair summary of the concerns you raised?

11:16 AM 4    A.   Those are some.

11:16 AM 5    Q.   What were the others?

11:16 AM 6    A.   We didn't have any good psychometric testing in the old

11:16 AM 7    policy in terms of whether -- in terms of the veracity of what

11:16 AM 8    the inmate was reporting.  For example, their social history,

11:16 AM 9    their psychosexual history.  We included a battery of

11:16 AM 10   psychometric tests which could be used, may or may not be used.

11:17 AM 11             We did not have a psychometric test to determine if

11:17 AM 12   the inmate patient was on the autism spectrum.  This is another

11:17 AM 13   large problem.  You mentioned Levine earlier.  In his research

11:17 AM 14   he points out that in the free population, about half of all

11:17 AM 15   transgender patients, specifically gender dysphoric patients,

11:17 AM 16   about half of them are on the autism spectrum.  Almost exactly

11:17 AM 17   half.  Right?  That is nowhere near the case in our -- in the

11:17 AM 18   inmate patients in our custody.  They don't meet a 20%

11:17 AM 19   threshold.

11:17 AM 20             So, again, we decided to include additional

11:17 AM 21   psychometric testing to test if they were on the autism

11:17 AM 22   spectrum and to test the validity of what they were -- the

11:17 AM 23   veracity of what they were saying in terms of their past social

11:17 AM 24   and sexual history.

11:17 AM 25   Q.   So that goes to the diagnosis component; is that right?

11:17 AM 1   A.  Trying to make -- again, it's a clinical diagnosis.

11:18 AM 2   There's no test.  There's no specific -- and I can't take an

11:18 AM 3   x-ray.  You know, nothing of that sort is available to

11:18 AM 4   ultimately give the diagnosis of gender dysphoria.

11:18 AM 5         Also, which often gets lost in the DSM-5 Revised

11:18 AM 6   definition of gender dysphoria, it is a diagnosis of exclusion,

11:18 AM 7   right?  You don't put it first.  It's like fibromyalgia.  You

11:18 AM 8   have to rule out 14 or so other medical conditions before you

11:18 AM 9   can point to, okay, I think it's fibromyalgia, right?  So this

11:18 AM 10  was also some of the problems that we were seeing in the

11:18 AM 11  literature that by -- the way I read the AHCA report, that's

11:18 AM 12  why they came to the conclusion that they did.

11:18 AM 13  Q.  Okay.  Well, given the concerns you raised in your

11:18 AM 14  declaration about the prior policy, why have a default rule

11:18 AM 15  saying no hormone therapy except in these, you know,

11:18 AM 16  constitutionally required circumstances, rather than just

11:18 AM 17  address, you know, the need for additional therapy or

11:19 AM 18  compliance with therapy and the need for re-evaluation?  Why

11:19 AM 19  have that default rule of no hormone therapy?

11:19 AM 20  A.  It's included in the HSB.  Additional -- we also are

11:19 AM 21  offering additional psychotherapy.

11:19 AM 22  Q.  But why the default rule about no hormone therapy?

11:19 AM 23  A.  I'm not sure what you mean.

11:19 AM 24  Q.  Well, you know, the rule says state law prohibits the

11:19 AM 25  department from expending any state funds to purchase cross-sex

11:19 AM 1     hormones for the treatment of gender dysphoria, citing the

11:19 AM 2     statute.

11:19 AM 3     A.  Again, that law was over a year ago.

11:19 AM 4     Q.  I'm not finished.  Sorry.  The department shall comply with

11:19 AM 5     this statutory requirement unless compliance with the US

11:19 AM 6     Constitution or a court decision requires otherwise.

11:19 AM 7     A.  I will simply repeat my statement.  We have a federally --

11:19 AM 8     we are federally mandated to provide comprehensive medical care

11:19 AM 9     to the inmates in our custody.  That includes inmates with a

11:19 AM 10    diagnosis of gender dysphoria.  The law to which you have

11:19 AM 11    referred to several times now was passed maybe a year, a year

11:20 AM 12    and a half ago now, and none of the gender dysphoric inmates in

11:20 AM 13    our custody has been denied hormones due to the passing of that

11:20 AM 14    law.

11:20 AM 15    Q.  They haven't been evaluated yet under the new process.

11:20 AM 16    A.  The law was passed before we issued the HSB I will remind

11:20 AM 17    you.

11:20 AM 18    Q.  Why is it mentioned?  Why is the law mentioned in

11:20 AM 19    Subsection B of the HSB then if you're ignoring it?

11:20 AM 20    A.  Because it's the law and we must comply with it also.

11:20 AM 21    Q.  Okay.  Who pays for hormone therapy of inmates?

11:20 AM 22    A.  We contract with an outside vendor to provide the actual

11:20 AM 23    hands-on clinical care to the inmates in our custody, and they

11:20 AM 24    are covering the cost of hormones.

11:20 AM 25    Q.  Just out of their own pocket, out of just --

11:20 AM 1    A.  To be in compliance with the law that is mentioned in the

11:20 AM 2    HSB, that is correct, yes.

11:20 AM 3    Q.  And just to clarify, if we go back to your declaration,

11:21 AM 4    Paragraph 8, you talk about completing an independent

11:21 AM 5    assessment of the medical literature related to treatment of

11:21 AM 6    gender dysphoria, including contributions by Dr. Levine and Dr.

11:21 AM 7    Cantor.

11:21 AM 8            Is that what you were talking about before of just

11:21 AM 9    reading their report, the AHCA report, or something else?

11:21 AM 10   A.  I don't recall exactly what you're referring to.

11:21 AM 11   Q.  The contributions of Dr. Stephen Levine and Dr. James

11:21 AM 12   Cantor, where do they come in?

11:21 AM 13   A.  They are experts in the field of -- Dr. Levine is a

11:21 AM 14   psychiatrist.

11:21 AM 15   Q.  I'm sorry.  Let me rephrase, because I know the Court is

11:21 AM 16   mindful of time.  That was not the question about who they are

11:21 AM 17   but like --

11:21 AM 18   A.  I'm sorry.  You asked me who they are.

11:21 AM 19   Q.  No, no.  How did they come in -- how did their

11:21 AM 20   contributions show up?  Is it in the AHCA report or some other

11:21 AM 21   way?

11:21 AM 22   A.  It's in multiple reports.  Dr. Stephen Levine is a

11:21 AM 23   psychiatrist who has over 50 years of experience treating

11:22 AM 24   patients with gender dysphoria, and Dr. James Cantor is a

11:22 AM 25   clinical psychologist out of the University of Toronto who is

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

11:22 AM 1    also an expert on the subject.

11:22 AM 2    Q.  Did you talk to them?

11:22 AM 3    A.  We read what they have -- what they have published in the

11:22 AM 4    literature.

11:22 AM 5    Q.  Is that what you meant by their contributions, their

11:22 AM 6    literature that they wrote?

11:22 AM 7    A.  What I meant is that we looked at everything that's out

11:22 AM 8    there.  Again, the AHCA report has a blanket ban on the same

11:22 AM 9    studies that other people have said otherwise.  So we -- I

11:22 AM 10   state that we looked at all of it before coming at this

11:22 AM 11   determination.  The good, the bad and the ugly.

11:22 AM 12   Q.  I think you've answered the question.  I thought -- I

11:22 AM 13   misread your declaration suggesting you collaborated with them.

11:22 AM 14   You're just talking about reading their publications.

11:22 AM 15   A.  Yes.

11:23 AM 16   Q.  Okay.  If we can just look at Document 13.  Do you have

11:23 AM 17   that there?  It appears to be a medical record regarding, it

11:23 AM 18   says here, psycho-ed group.  Is that a group therapy group?

11:23 AM 19   A.  That is correct.

11:23 AM 20   Q.  Hmm-hmm.  And it appears, I understand that plaintiff did

11:23 AM 21   not attend this one, but it provides a summary of the group.

11:23 AM 22   The substance and purpose of the group.

11:23 AM 23        And the last sentence says patient learned the first

11:23 AM 24   two symptoms that often alleviate with medical hormonal

11:23 AM 25   therapy, de-personalization and de-realization.  So do I

11:23 AM 1    understand from this that the FDC group therapy program is

11:23 AM 2    teaching inmates with gender dysphoria that hormone therapy can

11:23 AM 3    alleviate certain symptoms of gender dysphoria?

11:23 AM 4    A.  I can't speak to that.  I didn't write the note.  You will

11:24 AM 5    see that the therapy offered was refused, and I can corroborate

11:24 AM 6    that inmate patient Keohane has a very long documented history

11:24 AM 7    of refusing mental health offered to him.  Her.

11:24 AM 8    Q.  Was it -- the date of service was listed as 8-14-24, this

11:24 AM 9    year.  Do you see that up at the top?  Is that correct?

11:24 AM 10   A.  That appears to be correct, yes.

11:24 AM 11   Q.  So understanding that plaintiff did not attend this

11:24 AM 12   session, the session that was attended by others, they were

11:24 AM 13   taught by FDC staff the benefits of medical hormonal therapy to

11:24 AM 14   alleviate symptoms of gender dysphoria, correct?  In August.

11:24 AM 15   A.  I didn't write this note.  I can agree with you that what

11:24 AM 16   you have read is exactly what's on this paper, yes.

11:24 AM 17   Q.  Okay.  Just another timing question.  Going back to your

11:25 AM 18   declaration in Paragraph 13, you mention that a comprehensive

11:25 AM 19   -- sorry.  A policy was developed in December 2023, and I

11:25 AM 20   understand it was ruled out in September 2024.  Can you explain

11:25 AM 21   that timing?

11:25 AM 22            THE COURT:  Which paragraph were you referencing?

11:25 AM 23            MS. COOPER:  Paragraph 13.

11:25 AM 24            THE COURT:  Thank you.

11:25 AM 25            THE WITNESS:  I do apologize.  We have -- we spent so

11:25 AM 1    much time going over this policy, I would literally need to

11:25 AM 2    look at my notes to go and tell you the play by play of when

11:25 AM 3    exactly everything was done.  Is that what you're asking?

11:26 AM 4         MS. COOPER:  Well, it's curious to me that you said

11:26 AM 5    the policy was created in September of '23, but it was

11:26 AM 6    announced in September of '24 and I was just trying to

11:26 AM 7    understand why.

11:26 AM 8         THE WITNESS:  I hope that I made it clear that since I

11:26 AM 9    started in August of 2023, we had been trying to come up with

11:26 AM 10   an edit to the HSB.  The hard date is what it was after doing

11:26 AM 11   all of the research that I mentioned before.  And after

11:26 AM 12   multiple conversations with Mr. Weiss, after multiple

11:26 AM 13   conversations with Dr. Klein, after reading this dearth of

11:26 AM 14   articles that are included in this exhibit, we made certain

11:26 AM 15   changes at certain times, but the total policy change was on

11:26 AM 16   September 31st of this year.

11:26 AM 17        MS. COOPER:  Okay.  30th, right?  30 days has

11:26 AM 18   September.  Okay.

11:26 AM 19        THE WITNESS:  You are correct.

11:26 AM 20      BY MS. COOPER:

11:26 AM 21   Q.  Almost through.  Just have a couple more things.  You know,

11:26 AM 22   we've been talking about the hormone therapy.  I'm wondering,

11:27 AM 23   you know, under procedure 403.012, the prior policy, we talked

11:27 AM 24   about how that provided for grooming and clothing

11:27 AM 25   accommodations, gender dysphoria accommodations in shorthand,

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

11:27 AM 1    right?  That allowed inmates to get a GD accommodation pass,

11:27 AM 2    correct?  Under the prior policy.

11:27 AM 3    A.  The alternative canteen was available to the gender

11:27 AM 4    dysphoric population.

11:27 AM 5    Q.  And female grooming, hair length and undergarments,

11:27 AM 6    correct?

11:27 AM 7    A.  The alternative canteen was available, yes, and those items

11:27 AM 8    were included that you mentioned in the alternative --

11:27 AM 9    Q.  The hair length?

11:27 AM 10   A.  I'm sorry?

11:27 AM 11   Q.  The hair?  That was not alternative canteen, right?  That

11:27 AM 12   was just grooming standard, right?  That they can grow their

11:27 AM 13   hair.

11:27 AM 14   A.  Yes, you are correct.

11:27 AM 15   Q.  Okay.  And why were these accommodations removed from the

11:27 AM 16   new policy?

11:27 AM 17   A.  There's no scientific evidence to conclude that they are

11:27 AM 18   medically necessary to treat gender dysphoria.

11:27 AM 19   Q.  So you researched that question too?

11:27 AM 20   A.  This was a comprehensive review of the old policy, and a

11:28 AM 21   comprehensive review of the literature to date on gender

11:28 AM 22   dysphoria which had changed over time.

11:28 AM 23   Q.  Hmm-hmm.

11:28 AM 24   A.  And continues to evolve.  And as it evolves, we will

11:28 AM 25   re-evaluate the HSB if need be.

11:28 AM 1    Q.  And whose idea was it to remove the gender dysphoria

11:28 AM 2    accommodations?

11:28 AM 3    A.  This was a product of a very long discussion.  It began

11:28 AM 4    with one particular product that had been made available in the

11:28 AM 5    alternative canteen that had been weaponized.

11:28 AM 6            So the debate then become, you know, do we just get

11:28 AM 7    rid of that?  What would we include in its stead.  It was

11:28 AM 8    thought that they would have a wooden handle comb.  Well, then

11:28 AM 9    that was weaponized.  So eventually it just became it would be

11:28 AM 10   a better idea if these items were not available.

11:28 AM 11   Q.  And what about --

11:28 AM 12   A.  And in addition to the fact that there was nothing in the

11:29 AM 13   research to establish that it was medically necessary to treat

11:29 AM 14   patients diagnosed with gender dysphoria.

11:29 AM 15   Q.  Uh-huh.  So it went from a weaponized canteen item, to

11:29 AM 16   removing underwear and hair length accommodations?

11:29 AM 17   A.  So while they had availability of undergarments, right?

11:29 AM 18   They were not able to wear said undergarments everywhere.  They

11:29 AM 19   were allowed to do so in a limited area so as not to disturb

11:29 AM 20   their fellow inmates.

11:29 AM 21   Q.  Right.  But that's taken away now.

11:29 AM 22   A.  Yes.

11:29 AM 23   Q.  Okay.  And who was the person who first suggested in the

11:29 AM 24   team of people who developed this policy we should get rid of

11:29 AM 25   the undergarments and hair length?

11:29 AM 1    A.  Again, it started as a security conversation and it ended

11:29 AM 2    as a ban.

11:29 AM 3    Q.  Yeah.  Did anybody among the three of you push back at that

11:29 AM 4    idea of taking away all of these accommodations?

11:29 AM 5    A.  None that I'm aware of.

11:30 AM 6    Q.  Okay.  So it wasn't removing these accommodations to

11:30 AM 7    promote anybody's mental health.  That wasn't the reason behind

11:30 AM 8    it; is that right?

11:30 AM 9    A.  I'm sorry?

11:30 AM 10   Q.  It wasn't the thought that taking away these accommodations

11:30 AM 11   will improve anybody's mental health.

11:30 AM 12   A.  That was not the conclusion, no.

11:30 AM 13   Q.  So it was the conclusion that the research does not support

11:30 AM 14   these accommodations so we don't need them?

11:30 AM 15   A.  There is not -- that I'm aware of, from all of the things

11:30 AM 16   that we went over, there was nothing to support that claim and

11:30 AM 17   therefore, I was not against the removal of the alternative

11:30 AM 18   canteen.

11:30 AM 19   Q.  Were you the one who proposed it?

11:30 AM 20   A.  No.  Again, it started as a security conversation and it

11:30 AM 21   wound up as a ban.

11:30 AM 22   Q.  Right.  And who proposed -- I'm still trying to understand

11:30 AM 23   who among you proposed getting rid of the hair length

11:30 AM 24   accommodation and the undergarment availability?

11:31 AM 25   A.  I don't recall.  This was a very, very long conversation

11:31 AM 1    going over a long period of time.  I cannot recall who exactly.

11:31 AM 2    I can recall how it started and I can tell you how it ended.

11:31 AM 3    Q.  Okay.  One quick question about the re-evaluation process.

11:31 AM 4    In your declaration, Paragraph 15, it says that when inmates

11:31 AM 5    are re-evaluated for gender dysphoria, if a psychologist

11:31 AM 6    diagnoses an inmate, the diagnosis must be approved by various

11:31 AM 7    people including the head of security.

11:31 AM 8         Why is the head of security involved in approving a

11:31 AM 9    diagnosis?

11:31 AM 10   A.  Where are you exactly?

11:31 AM 11   Q.  Paragraph 15 at the bottom of Page 8.  Once a psychologist?

11:31 AM 12   A.  Yes.

11:31 AM 13   Q.  Yeah.

11:31 AM 14   A.  I'm sorry.  Your question again?

11:31 AM 15   Q.  It says here once a psychologist diagnoses an inmate with

11:31 AM 16   gender dysphoria, the Multi-Disciplinary Services Team

11:31 AM 17   consisting of leadership from the medical, mental health and

11:32 AM 18   security teams, reviews the inmate's medical and mental health

11:32 AM 19   records.  To receive approval of a gender dysphoria diagnosis

11:32 AM 20   and treatment, the MDST must unanimously approve of the

11:32 AM 21   diagnosis.

11:32 AM 22         Why is the security person involved in approving a

11:32 AM 23   diagnosis?

11:32 AM 24   A.  So the psychometric testing that I mentioned earlier would

11:32 AM 25   be done by the clinician.  But security is involved because of

11:32 AM 1    the security of the inmate, right?  If they have this diagnosis

11:32 AM 2    and they're taking these hormones and they will experience

11:32 AM 3    bodily changes, they could be in jeopardy, they could be

11:32 AM 4    victimized.  So they have to -- you know, we also involve

11:32 AM 5    what's called the PRIA coordinator, which is the Prison Rape

11:32 AM 6    Elimination Act coordinator, and this is for housing purposes.

11:32 AM 7    So that, you know, once they have this diagnosis, you know, we

11:32 AM 8    know who these patients are and that they are housed in a safe

11:32 AM 9    environment where having this diagnosis will not be deleterious

11:32 AM 10   to them or to other inmates.

11:33 AM 11   Q.  Why is a security person approving the diagnosis?  They're

11:33 AM 12   not a doctor.

11:33 AM 13   A.  They do not perform the psychometric testing.  They are

11:33 AM 14   only involved insomuch as placement for the safety of the

11:33 AM 15   patient.

11:33 AM 16   Q.  So it's just incorrectly written in your declaration that

11:33 AM 17   they have to approve the diagnosis?

11:33 AM 18   A.  They're included in the conversation in terms of placement.

11:33 AM 19   Q.  Do they have to approve the diagnosis or no?

11:33 AM 20   A.  If the psychologist deems in their criteria that they are

11:33 AM 21   evaluated, they would sign off on the document that they are

11:33 AM 22   aware that this person is eligible, this diagnosis, and that we

11:33 AM 23   have to house them accordingly.

11:33 AM 24   Q.  Okay.  And I just have probably one or two questions about

11:33 AM 25   --

11:33 AM 1    A.   And just to be clear, and the PRIA coordinator would also

11:33 AM 2    be involved in those type of decisions for the same purpose.

11:33 AM 3    Q.   Okay.  Just a couple questions about the supplemental or

11:33 AM 4    second declaration that you submitted.  And if you want to look

11:33 AM 5    at it, it's Number 2 regarding two other inmates, Michelle

11:34 AM 6    Mendoza -- I'm sorry Michelle Ward and Sasha Mendoza.

11:34 AM 7         And I understand from your declaration you were

11:34 AM 8    suggesting that because they haven't ordered female canteen

11:34 AM 9    makeup items in the last two years, they must not really be

11:34 AM 10   wearing makeup.  Is that what you were suggesting?

11:34 AM 11   A.   I was addressing a grievance that one or both of them made

11:34 AM 12   complaining about a lack of makeup, and they had not --

11:34 AM 13   according to the medical record, they had not purchased the

11:34 AM 14   canteen items for two years to my recollection.

11:34 AM 15   Q.   And just to be clear, the grievance was about the new

11:34 AM 16   policy saying no more makeup, right?

11:34 AM 17   A.   They were specifically grieving that they did not have

11:34 AM 18   access to makeup when they had not, in fact, purchased anything

11:34 AM 19   from the alternative canteen in two years.

11:34 AM 20   Q.   And that grievance was after September 30th, right?  It was

11:34 AM 21   related to the new policy just to be clear.

11:34 AM 22   A.   Again, part of my responsibility for the Florida Department

11:35 AM 23   of Corrections is to answer grievances, and Florida Department

11:35 AM 24   of Corrections inmates love to grieve.  I deal with this --

11:35 AM 25   Q.   I'm asking about the timing.  That's all.

11:35 AM 1    A.  -- all day every day.  I cannot tell you the exact date of

11:35 AM 2    that grievance.

11:35 AM 3    Q.  Okay.  Now, the fact that somebody isn't purchasing makeup

11:35 AM 4    from canteen doesn't mean they're not wearing makeup, correct?

11:35 AM 5    A.  They hadn't purchased it in two years, and the grievance

11:35 AM 6    was specifically addressing that they wanted access to makeup

11:35 AM 7    and they were being denied.

11:35 AM 8    Q.  Hmm-hmm.  And do you know how long makeup lasts?

11:35 AM 9    A.  I do not.

11:35 AM 10   Q.  Okay.  So you don't know whether they were wearing makeup

11:35 AM 11   in prison.

11:35 AM 12   A.  If you're speaking specifically of inmate patient Ward or

11:35 AM 13   inmate patient Mendoza, I only have the photograph in the EMR

11:35 AM 14   to go by.  They were not wearing makeup on their photographs in

11:35 AM 15   the electronic medical record.

11:35 AM 16   Q.  But you don't know whether they wore it when they were

11:35 AM 17   permitted to.

11:35 AM 18   A.  Again, all we know is the purchase history.

11:35 AM 19   Q.  So you don't know.

11:36 AM 20   A.  We know when was the last time they purchased from the  --

11:36 AM 21   what and when they purchased from the alternative canteen.

11:36 AM 22   Q.  Okay.  I think I just have one last question that I think

11:36 AM 23   was not clearly answered earlier, and I just want to make sure

11:36 AM 24   we have a chance to get it which is, so you're one of the three

11:36 AM 25   people charged with determining whether a variance should be

11:36 AM 1  approved, correct?

11:36 AM 2  A.  That is correct.

11:36 AM 3  Q.  And you have researched the literature on hormone therapy,

11:36 AM 4  correct?

11:36 AM 5  A.  What's available, yes.

11:36 AM 6  Q.  Yeah.  And what I am trying to understand is whether as

11:36 AM 7  somebody who has reviewed the research and as one of the three

11:37 AM 8  people who has to decide whether a variance can be permitted,

11:37 AM 9  is the existing research sufficient to meet the requirement in

11:37 AM 10  HSB 15.03.23 of the type of research that's required for a

11:37 AM 11  doctor to show to allow for a variance.

11:37 AM 12  A.  I can't say I understand your question.

11:37 AM 13  Q.  Okay.  I'm just going to turn to the language of it again

11:37 AM 14  in case there's any confusion.  That this is in the HSB on 9 C.

11:37 AM 15  It says variance should only be considered after completion of

11:37 AM 16  the treatment protocol in Section 7.  An inmate may be assessed

11:37 AM 17  for cross-sex hormone therapy if the treating physician can

11:37 AM 18  demonstrate with documented evidence that such treatment may

11:37 AM 19  improve clinical outcomes by treating the etiological basis of

11:37 AM 20  the pathology.

11:37 AM 21        Is there research in the world right now that -- you

11:37 AM 22  have reviewed the research, that meets that standard that could

11:38 AM 23  allow for a variance?

11:38 AM 24  A.  There is very low validity research that arrived at that

11:38 AM 25  conclusion.

11:38 AM 1    Q.  So could this -- could a physician -- is there research in

11:38 AM 2    the world, that you know of, that could satisfy that standard?

11:38 AM 3    A.  There is research, published research of low validity that

11:38 AM 4    comes to that conclusion.

11:38 AM 5    Q.  Well, that's not answering that question of whether it

11:38 AM 6    could satisfy the standard of the HSB in order to issue a

11:38 AM 7    variance.

11:38 AM 8    A.  That will be determined on an individual case-by-case

11:38 AM 9    basis.

11:38 AM 10   Q.  The research is the research.  The research is not about

11:38 AM 11   the individual.

11:38 AM 12   A.  I can't make a global statement about -- universal global

11:38 AM 13   statement, right?  The science behind the treatment for gender

11:38 AM 14   dysphoria is not as robust as it needs to be.

11:38 AM 15   Q.  Okay.

11:38 AM 16   A.  We will require, okay, the strongest of those studies be

11:38 AM 17   presented to make the case that yes, we feel that this

11:39 AM 18   individual will continue to benefit from receiving hormone

11:39 AM 19   therapy, they qualify for the diagnosis of gender dysphoria.

11:39 AM 20   Q.  And so is there a universe of research that shows that

11:39 AM 21   treatment may improve clinical outcomes by treating the

11:39 AM 22   etiological basis of the pathology.  Does that research exist

11:39 AM 23   or are we just spinning our wheels and there's not going to be

11:39 AM 24   any approval of a variance because that research doesn't exist.

11:39 AM 25   I'm not getting an answer.

11:39 AM 1    A.  The approval of the variances will be done on the

11:39 AM 2    individual basis on the determination of the MDST for each and

11:39 AM 3    every individual patient who is considered for the diagnosis of

11:39 AM 4    gender dysphoria.

11:39 AM 5    Q.  So sitting here right now, you can't say that research that

11:39 AM 6    meets that standard exists.

11:39 AM 7    A.  There is research of low validity that arrives at that

11:39 AM 8    conclusion.

11:39 AM 9    Q.  Does it meet the standard.  That's all I'm asking.  Does it

11:39 AM 10   meet the standard in the HSB in 9 C 1.

11:39 AM 11   A.  We would apply that research to the individual patient at

11:40 AM 12   the time of re-evaluation and make that determination then.

11:40 AM 13   Q.  So if one doctor comes forward for a patient with research,

11:40 AM 14   and you were to conclude yes, that research does show that

11:40 AM 15   treatment may improve clinical outcomes by treating the

11:40 AM 16   etiological basis of the pathology, wouldn't that mean that FDC

11:40 AM 17   is then on notice that that standard has been met for

11:40 AM 18   everybody?  Or does somebody's access to care depend on the

11:40 AM 19   research skills of the doctor treating them and the ability to

11:40 AM 20   find the right studies.

11:40 AM 21   A.  That's true for every clinician.  Their ability to diagnose

11:40 AM 22   and treat is only based on their expertise.

11:40 AM 23   Q.  Yeah, but the document -- this is calling for studies --

11:40 AM 24   A.  You can't treat what you don't know.

11:40 AM 25   Q.  What's that?

11:40 AM 1    A.  You can't treat what you don't know.

11:40 AM 2    Q.  Yes.  So if -- well, let me ask you this way.  If a doctor

11:41 AM 3    puts forth that evidence and says that the evidence improves

11:41 AM 4    clinical outcomes by treating the etiological basis of the

11:41 AM 5    pathology.  Again, this is not asking about individual inmate,

11:41 AM 6    it's about the body of research.  If one doctor brings that

11:41 AM 7    forward, wouldn't that be sufficient for all patients that,

11:41 AM 8    okay, that standard in the requirement, in the policy is met?

11:41 AM 9    A.  If at some point in the future a randomized clinical trial

11:41 AM 10   testing the validity of hormone treatment in adults with a

11:41 AM 11   diagnosis of gender dysphoria was done with a large enough

11:41 AM 12   cohort and could prove absolutely, without a doubt, that this

11:41 AM 13   treatment improves, helps, whatever term you prefer, yes, it

11:41 AM 14   would be included in the evaluation of every single -- should

11:41 AM 15   be included in the evaluation of every single patient.

11:41 AM 16   However, no such randomized clinical trial to date exists on

11:42 AM 17   that subject.

11:42 AM 18   Q.  So therefore, the standard of the policy is not met?

11:42 AM 19        MR. CRANFORD:  Objection.  Your Honor, we've been over

11:42 AM 20   this and over this, and the question has been asked and

11:42 AM 21   answered multiple times.

11:42 AM 22        THE COURT:  Yeah, I think we have.  I mean, I

11:42 AM 23   understand -- I think there's a miscommunication here.  I

11:42 AM 24   understand the testimony to be they'll look at whatever

11:42 AM 25   research is available in context of all the other factors and

110

11:42 AM 1  make an individual determination.  And --

11:42 AM 2      MS. COOPER:  Well, so I understand this policy as

11:42 AM 3  having a threshold requirement that you can't even evaluate for

11:42 AM 4  a variance until a treating doctor can show this body of

11:42 AM 5  research that meets this standard of showing that this kind of

11:42 AM 6  treatment can treat the etiological basis.  And the Doctor, as

11:42 AM 7  far as I've heard, has not answered whether that research

11:42 AM 8  exists.

11:42 AM 9      THE COURT:  You've asked him a dozen different ways

11:42 AM 10  whether some people might get this treatment under this policy

11:42 AM 11  and he said yes.  He said we'll make an individual

11:42 AM 12  determination.  Some may get it, some may not.

11:43 AM 13      MS. COOPER:  I think he did say that it would be an

11:43 AM 14  individual determination.  I don't think he said whether

11:43 AM 15  anybody would get it.

11:43 AM 16      THE COURT:  He said it's impossible to know because

11:43 AM 17  there's going to be an individual determination.

11:43 AM 18      MS. COOPER:  Right.  But there's also, in addition,

11:43 AM 19  this threshold requirement of a certain body of literature that

11:43 AM 20  must exist.

11:43 AM 21      THE COURT:  And their point is you've asked about

11:43 AM 22  this, and I think that's correct.  And, you know, we've been

11:43 AM 23  going two hours and a half of cross-examination.

11:43 AM 24      MS. COOPER:  I don't feel that there was an answer of

11:43 AM 25  whether that research was satisfying, but if that's his answer,

11:43 AM 1    that's his answer.

11:43 AM 2              I think I have nothing further.

11:43 AM 3              THE COURT:  Okay.  Thank you.

11:43 AM 4              MS. COOPER:  Thank you.

11:43 AM 5              THE COURT:  Any questions from the defense?

11:43 AM 6              MR. CRANFORD:  Just briefly, Your Honor.

11:43 AM 7              THE COURT:  Okay.

11:43 AM 8                        REDIRECT EXAMINATION

11:43 AM 9        BY MR. CRANFORD:

11:43 AM 10    Q.  Dr. Martinez, just for ease sake, I want to talk about what

11:43 AM 11    we just -- what you were just discussing with --

11:43 AM 12              THE COURT:  I'm sorry.  For what sake?

11:44 AM 13              MR. CRANFORD:  For ease sake.  Let's just start there.

11:44 AM 14        BY MR. CRANFORD:

11:44 AM 15    Q.  With what you were talking about with plaintiff's counsel.

11:44 AM 16    If I understood you correctly, what you were describing is

11:44 AM 17    there's a body of research available on whether gender

11:44 AM 18    dysphoria hormone treatment is effective in treating the

11:44 AM 19    symptoms of gender dysphoria; is that right?

11:44 AM 20    A.  Yes.

11:44 AM 21    Q.  All that's available at this time you've described is

11:44 AM 22    low-quality research; is that right?

11:44 AM 23    A.  Essentially, yes.

11:44 AM 24    Q.  Okay.  And what I think I understood you to say is there is

11:44 AM 25    research available that has determined that gender hormone

11:44 AM 1   therapy can be effective in alleviating the symptoms of gender

11:44 AM 2   dysphoria for individuals -- for certain individuals; is that

11:44 AM 3   right?

11:44 AM 4   A.  Yes.

11:44 AM 5   Q.  And so the determination of whether that evidence exists

11:44 AM 6   for any individual inmate diagnosed with gender dysphoria

11:44 AM 7   within the Florida Department of Corrections would then be

11:45 AM 8   contingent upon an individual analysis and application of that

11:45 AM 9   research to that individual's circumstances, correct?

11:45 AM 10   A.  Just like any other diagnosis, yes.

11:45 AM 11   Q.  Okay.  I want to go back to that portion of the HSB, and if

11:45 AM 12   you still have it in front of you, would you please turn to it.

11:45 AM 13   I believe it's under on Page 7.  This is -- for the record,

11:45 AM 14   this document was previously entered as an exhibit, Document

11:45 AM 15   4-4 on the record.  Under Subsection B, the first full

11:45 AM 16   paragraph on that page.  Do you see what I'm referring to?

11:45 AM 17   A.  State law?

11:45 AM 18   Q.  Yes.  That provision, correct me if I'm wrong, only applies

11:46 AM 19   to the expenditure of state funds in purchasing hormone

11:46 AM 20   treatment therapy, correct?

11:46 AM 21   A.  That's correct.

11:46 AM 22   Q.  It has no bearing on the actual provision of hormone

11:46 AM 23   therapy to inmates within the Florida Department of

11:46 AM 24   Corrections, correct?

11:46 AM 25   A.  That is correct.

11:46 AM  1    Q.  There's nothing in that subsection there that says state

11:46 AM  2    law prohibits the Florida Department of Corrections from

11:46 AM  3    providing hormone treatment for gender dysphoria.

11:46 AM  4    A.  No.

11:46 AM  5    Q.  Okay.  Earlier you were asked about or -- I'm sorry.  I

11:46 AM  6    think you offered the analogy of an individual who might be

11:46 AM  7    prescribed pain medication.  Do you recall that testimony?

11:46 AM  8    A.  I do.

11:46 AM  9    Q.  Is there a general medical consensus within the scientific

11:46 AM 10    community that pain medication is effective in treating pain?

11:47 AM 11    A.  Yes.

11:47 AM 12    Q.  Is there that same consensus with regards to social

11:47 AM 13    transitioning for gender dysphoric inmates?

11:47 AM 14    A.  No.  The definition of transitioning are very, very wide.

11:47 AM 15    It means different things to different people, and it's

11:47 AM 16    indicating different things in different research studies.

11:47 AM 17    Q.  Okay.  Thank you.  I want to look back to the prior

11:47 AM 18    procedure which in the record is Document 4-3, the previous

11:47 AM 19    policy procedure 403.012.  Do you still have that available?

11:47 AM 20    A.  It's under the same tab?  Yes.

11:47 AM 21    Q.  Okay.  If you would look under general guidelines, section

11:47 AM 22    one.

11:47 AM 23    A.  I haven't found it.

11:47 AM 24    Q.  You have that?

11:47 AM 25    A.  I haven't found it.  What tab is it under?

11:48 AM 1              THE COURT:  It's right in front of that.  It will have

11:48 AM 2     4-3 at the top.

11:48 AM 3              MR. CRANFORD:  Tab Number 1 if you're looking for it.

11:48 AM 4              MS. COOPER:  If I can help, it's Exhibit 1.

11:48 AM 5              MR. STEELY:  In the notebook.

11:48 AM 6              THE WITNESS:  Goes from 48 to 40 --

11:48 AM 7     BY MR. CRANFORD:

11:48 AM 8     Q.  Exhibit A.  Do you see the Exhibit A page?

11:48 AM 9     A.  Sorry.  Exhibit B?

11:48 AM 10    Q.  Exhibit A.

11:48 AM 11    A.  What page?  Procedure 403-012.  What section?

11:48 AM 12    Q.  So go to the section on Page 3 of that.

11:48 AM 13    A.  Yes.

11:48 AM 14    Q.  Procedure entitled gender dysphoria review team, role and

11:48 AM 15    responsibility.  Do you see that section?

11:48 AM 16    A.  Yes.

11:49 AM 17    Q.  Under Subsection A, do you see where it says that the GDRT

11:49 AM 18    has the authority and responsibility to review recommendations

11:49 AM 19    for the treatment and management of inmates diagnosed with

11:49 AM 20    gender dysphoria.  Do you see that?

11:49 AM 21    A.  I do.

11:49 AM 22    Q.  Do you see under Subsection B where it says the GDRT will

11:49 AM 23    convene quarterly to address in the treatment and management of

11:49 AM 24    inmates diagnosed with gender dysphoria?

11:49 AM 25    A.  Yes.  Just as clarification, it mentions at least

11:49 AM 1   quarterly.  We would, in fact, meet every three to six weeks.

11:49 AM 2   Q.  Okay.  And I want you to go to the next page, Page 4, under

11:49 AM 3   Subsection 3 there, treatment for gender dysphoria.  Do you see

11:49 AM 4   that?

11:49 AM 5   A.  I do.

11:49 AM 6   Q.  Under Subsection A, doesn't it indicate that inmates

11:49 AM 7   diagnosed with gender dysphoria shall have access to necessary

11:49 AM 8   mental health treatment at each of the designated gender

11:49 AM 9   dysphoria facilities?

11:49 AM 10  A.  It does.

11:49 AM 11  Q.  Treatment will include, but not be limited to, clinical

11:50 AM 12  group therapy, psychoeducational group interventions twice

11:50 AM 13  weekly, and individual psychotherapy at least every 30 days; is

11:50 AM 14  that right?

11:50 AM 15  A.  That's correct.

11:50 AM 16  Q.  In any of Subsection 3, and I'll let you look so we can

11:50 AM 17  move more quickly through here, is there any mention of the

11:50 AM 18  alternative canteen grooming standards or social

11:50 AM 19  accommodations?

11:50 AM 20  A.  No, there is not.

11:50 AM 21  Q.  Okay.  And in fact, if you'll go to Page 6 --

11:50 AM 22  A.  Yes.

11:50 AM 23  Q.  -- there's a separate section here, Subsection 5, correct?

11:50 AM 24  A.  Yes.

11:50 AM 25  Q.  And it's entitled accommodations for inmates with a

11:50 AM 1    diagnosis of gender dysphoria.  Do you see that?

11:50 AM 2    A.  I do.

11:50 AM 3    Q.  Is there anywhere in this section of the prior policy that

11:50 AM 4    indicates that accommodations for inmates such as grooming

11:50 AM 5    standards, such as the alternative canteen, have ever been

11:51 AM 6    determined by the department to be medically necessary

11:51 AM 7    treatment?

11:51 AM 8    A.  No.

11:51 AM 9    Q.  Is it your understanding that they were treated differently

11:51 AM 10   -- that social accommodations were treated differently than

11:51 AM 11   treatment under the prior policy?

11:51 AM 12   A.  That is correct.

11:51 AM 13   Q.  Are you aware of anyone in the Florida Department of

11:51 AM 14   Corrections, any inmate, receiving a determination by a medical

11:51 AM 15   professional that social accommodations and alternate canteen

11:51 AM 16   items were medically necessary for their treatment?

11:51 AM 17   A.  I have not.

11:51 AM 18        MR. CRANFORD:  I think that's all I have, Judge.

11:51 AM 19        THE COURT:  Okay.  Thank you.  You can step down,

11:51 AM 20   Doctor.

11:51 AM 21        I want to close the loop on these documents and

11:52 AM 22   exhibits.  A number of them were already in the file, some of

11:52 AM 23   these emails were not.

11:52 AM 24        Are you moving those into evidence, Ms. Cooper?

11:52 AM 25        MS. COOPER:  Yes.

11:52 AM 1          THE COURT:  Let's go through them just to make sure

11:52 AM 2    the record is clear.

11:52 AM 3          Under Tab 3, this is the operational plan September

11:52 AM 4    24th.  You're moving that in?

11:52 AM 5          MS. COOPER:  Yes, Your Honor.

11:52 AM 6          THE COURT:  Okay.  Any objection to that?

11:52 AM 7          MR. CRANFORD:  No, Your Honor.

11:52 AM 8          THE COURT:  Okay.  So that is admitted.

11:52 AM 9          Do you have paper copies of these for the clerk?  I

11:52 AM 10   can pull them right out of this notebook if you want to do it

11:52 AM 11   that way.

11:52 AM 12         MR. CRANFORD:  Your Honor, we also have copies as

11:52 AM 13   well.

11:52 AM 14         THE COURT:  I'm sorry?

11:52 AM 15         MR. CRANFORD:  We also have copies as well if there's

11:52 AM 16   any issue.

11:52 AM 17         THE COURT:  I can just hand them right out of this

11:52 AM 18   notebook.

11:52 AM 19         MS. COOPER:  The witness binder can be given to the

11:52 AM 20   clerk.

11:52 AM 21         COURTROOM DEPUTY:  I can take that one and just pull

11:52 AM 22   them out.

11:52 AM 23         THE COURT:  Okay.  So we'll just note them now and you

11:52 AM 24   can grab the exhibits.  This is Tab 3.  That's admitted, it's

11:53 AM 25   marked Bates Number 3765 on the first page.

11:53 AM  1          The next tab under four, this is Bates 3771, it's an

11:53 AM  2    update.  I don't recall if this was --

11:53 AM  3          MS. COOPER:  Yeah, we didn't use that.  I think you

11:53 AM  4    can disregard that one.

11:53 AM  5          THE COURT:  Okay.  Number 5, you did reference this,

11:53 AM  6    and this is already in the record at 46-6.

11:53 AM  7          Seven is already in the record.

11:53 AM  8          MS. COOPER:  Hmm-hmm.

11:53 AM  9          THE COURT:  Eight is the email that you referenced.

11:53 AM 10    It begins Bates 3773.  Any objection to this?

11:53 AM 11          MR. CRANFORD:  No, Your Honor.

11:53 AM 12          THE COURT:  Okay.  So you're moving that in, Ms.

11:53 AM 13    Cooper?

11:53 AM 14          MS. COOPER:  Yes.

11:53 AM 15          THE COURT:  What's under Tab 8?

11:53 AM 16          MS. COOPER:  Yes.

11:53 AM 17          THE COURT:  That's admitted.

11:53 AM 18          And then under Tab 9 is this report.

11:53 AM 19          MS. COOPER:  Yeah, those were the attachments to those

11:53 AM 20    emails.  We would be moving to have those admitted as well.

11:53 AM 21          THE COURT:  Okay.  That begins Bates 3777.  That will

11:53 AM 22    be admitted.  It's under Tab 9.

11:54 AM 23          The medical records under 10 -- excuse me, 10 is

11:54 AM 24    already part of the record as is 11.

11:54 AM 25          Twelve is a new medical record.  I believe this is one

PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

11:54 AM 1    of the ones you referenced today.

11:54 AM 2            MS. COOPER:  Yeah, we would like to move to have those

11:54 AM 3    admitted.

11:54 AM 4            THE COURT:  Okay.  Any objection to that?

11:54 AM 5            MR. CRANFORD:  No, Your Honor.

11:54 AM 6            THE COURT:  Okay.  Bates 61 then is admitted.  That is

11:54 AM 7    medical record dated October 31st.  It's got that date at the

11:54 AM 8    top anyway, as does the next one which is under Tab 13, it's

11:54 AM 9    Bates 229.

11:54 AM 10            MS. COOPER:  Yes.  We'd move to admit that as well.

11:54 AM 11            THE COURT:  All right.  And the next one under Tab 14.

11:54 AM 12            MS. COOPER:  We did not use that one.  You can

11:54 AM 13    disregard.

11:54 AM 14            THE COURT:  Okay.  Then that one will not be included.

11:54 AM 15            MS. COOPER:  I believe the rest of them are all in the

11:54 AM 16    record.  Oh, actually, we didn't use the others.

11:54 AM 17            THE COURT:  The others are all part of the record

11:54 AM 18    anyway.

11:54 AM 19            So that clarifies that, and I believe at the outset

11:55 AM 20    the defense said they do not have any exhibits or do you want

11:55 AM 21    to add?

11:55 AM 22            MR. STEELY:  No, Your Honor.

11:55 AM 23            (Plaintiff's Exhibits 3, 8, 9, 12 and 13 in evidence -

11:55 AM 24    see DE 53-1 for description of exhibits)

11:55 AM 25            THE COURT:  So does either side have any additional

11:55 AM 1    evidence that it wants to present?

11:55 AM 2          MR. TILLEY:  No, Your Honor.

11:55 AM 3          THE COURT:  Okay.  Then we will move into the

11:55 AM 4    arguments.  And we'll start with plaintiff.

11:55 AM 5          We're here principally on the preliminary injunction

11:55 AM 6    motion.  A lot of the arguments overlap with the motion to

11:55 AM 7    dismiss, but we'll just take it in that order.

11:55 AM 8          And whoever is going to present for the plaintiff.

11:55 AM 9    It's on already.

11:55 AM 10          MS. NOWLIN-SOHL:  It's on already?  The other has a

11:55 AM 11    red light.

11:55 AM 12          THE COURT:  Right, that one doesn't for whatever

11:55 AM 13    reason.  Good morning.

11:55 AM 14          MS. NOWLIN-SOHL:  All right.  Thank you, Your Honor.

11:55 AM 15    Li Nowlin-Sohl for plaintiff.

11:55 AM 16          It is undisputed here that gender dysphoria is a

11:55 AM 17    serious medical condition.  It's also undisputed that FDC has

11:56 AM 18    been providing hormone therapy, medically necessary hormone

11:56 AM 19    therapy, for plaintiff and the proposed class members for

11:56 AM 20    years.

11:56 AM 21          It is also undisputed that FDC has been providing

11:56 AM 22    clothing and grooming accommodations to inmates with gender

11:56 AM 23    dysphoria assist in transitioning for years as well.

11:56 AM 24          At no point have defendants disputed that hormone

11:56 AM 25    therapy and the female clothing and grooming accommodations

11:56 AM 1    have been beneficial for plaintiff and the proposed class

11:56 AM 2    members.

11:56 AM 3         They also do not dispute that it will be harmful for

11:56 AM 4    them to be cut off from their hormone therapy and these social

11:56 AM 5    transition items.

11:56 AM 6         Rather, they argue that despite the language of the

11:56 AM 7    health bulletin, there is no real or imminent risk of female

11:56 AM 8    hormone therapy being cut off, that female clothing and

11:56 AM 9    grooming items are never medically necessary, and that there

11:56 AM 10   could one day in the future potentially be individualized

11:56 AM 11   exceptions to this ban on clothing and grooming items.

11:57 AM 12        This Health Services Bulletin prohibits hormone

11:57 AM 13   therapy for inmates to comply with the state law prohibiting

11:57 AM 14   funds to allow such treatment.  It says that there might be a

11:57 AM 15   variance in some instances.  And to be clear on the way that

11:57 AM 16   this policy works, a variance only comes into play after a

11:57 AM 17   medical provider has determined that hormone therapy is

11:57 AM 18   medically necessary for an inmate.  So the medical necessity

11:57 AM 19   determination is not in and of itself sufficient.  There must

11:57 AM 20   be the medical necessity determination, and then the person

11:57 AM 21   must go through this complicated variance process that has a

11:57 AM 22   lot of barriers.  And these barriers make it nearly impossible,

11:57 AM 23   if not impossible, for someone to receive hormone therapy.

11:57 AM 24        THE COURT:  Isn't that part of the medical necessity

11:57 AM 25   determination, though?  In other words, it's not that the DOC

11:57 AM 1   determines it is medically necessary and then someone else

11:57 AM 2   determines that notwithstanding that, it will be provided.  I

11:57 AM 3   thought the team, the multi-disciplinary team, was just making

11:58 AM 4   its own determination about medical necessity and its decision

11:58 AM 5   was sort of the final decision.

11:58 AM 6        MS. NOWLIN-SOHL:  So I do think they're separate.  And

11:58 AM 7   if you look at the language of the Health Services Bulletin on

11:58 AM 8   Page 7 in Section C, it says in rare instances deemed medically

11:58 AM 9   necessary a variance may be approved to permit the use of

11:58 AM 10  cross-sex hormones to treat gender dysphoria.  And then it kind

11:58 AM 11  of lays out all of the requirements for a variance.

11:58 AM 12       So my read of this is that the variance requirements

11:58 AM 13  are separate from the medical necessity requirement, and that

11:58 AM 14  makes sense, right?  A medical necessity determination made by

11:58 AM 15  a doctor does not normally involve all these factors, right?

11:58 AM 16  Like, they don't determine is this required by the

11:58 AM 17  constitution, is it treating the etiological basis which, you

11:58 AM 18  know, as Dr. Martinez said is curative, but there are plenty of

11:58 AM 19  instances where medication does not need to be curative, even

11:58 AM 20  though that is imposed here.

11:58 AM 21       THE COURT:  Your read on this is the one possible

11:59 AM 22  outcome is the final decision-makers here, this three panel or

11:59 AM 23  three-member panel, concludes that for a particular individual

11:59 AM 24  this treatment is medically necessary, but they would not --

11:59 AM 25  nevertheless not authorize it?

11:59 AM 1          MS. NOWLIN-SOHL:  Correct.  Yes.  I think, you know,

11:59 AM 2    earlier in the policy it goes through like the diagnosis and

11:59 AM 3    the evaluation, right?  That's all laid out there to get to the

11:59 AM 4    point of medical necessity.  And then in Section C, once

11:59 AM 5    medical necessity has been established, you still have to go

11:59 AM 6    through the variant steps.

11:59 AM 7          THE COURT:  I see.

11:59 AM 8          MS. NOWLIN-SOHL:  And so that is our concern is that

11:59 AM 9    these barriers imposed by the variance mean that this treatment

11:59 AM 10   is almost never going to be possible, if never possible.  And I

11:59 AM 11   think this was kind of indicative in Dr. Martinez's testimony

11:59 AM 12   is that the variance requires that there be a body of evidence

11:59 AM 13   going to the etiological basis of the treatment, and that it

12:00 PM 14   has to be based on what -- quote, sound scientific methods and

12:00 PM 15   research subject to the formal review process.

12:00 PM 16          And Dr. Martinez has said that he's spent hundreds of

12:00 PM 17   hours looking at this research, that he is, you know, part of

12:00 PM 18   the three-person team that approves the variances, but he

12:00 PM 19   couldn't say today whether or not that body of research exists.

12:00 PM 20   And if it doesn't exist, it doesn't exist for anybody and

12:00 PM 21   nobody is going to get the variance.

12:00 PM 22          And he was talking about this gold standard in

12:00 PM 23   medicine of this randomized control trials, and then said there

12:00 PM 24   are no randomized control trials.  And so our concern is that

12:00 PM 25   this body of evidence doesn't exist.  He was talking about

12:00 PM 1   applying it in an individualized basis, but it's not clear how

12:00 PM 2   that's individualized, right?  The body of research is what it

12:00 PM 3   is.  If the person has a medical necessity, it's no different

12:00 PM 4   from person A versus person B, right?  Like, there's a body of

12:00 PM 5   evidence about insulin treating Type 1 diabetes.  That's not an

12:00 PM 6   individualized application from one person with Type 1 diabetes

12:00 PM 7   versus the next.

12:01 PM 8        THE COURT:  And so your proposed fact-finding, if

12:01 PM 9   that's what you would call it, would be that as a factual

12:01 PM 10  matter the plaintiff has demonstrated that no person will

12:01 PM 11  obtain a variance under this policy?

12:01 PM 12        MS. NOWLIN-SOHL:  I don't think we have to go as far

12:01 PM 13  as no person, but that it is --

12:01 PM 14        THE COURT:  I mean, your whole -- this goes back to --

12:01 PM 15  I guess my first question is what are you really challenging

12:01 PM 16  here?  Is it the existence of the policy, or is it the

12:01 PM 17  perspective feared termination of the hormone therapies.  And I

12:01 PM 18  understand we've got this separate thing about the clothing,

12:01 PM 19  but put that to the side for now.

12:01 PM 20        Because you cite cases, including dicta, in Keohane 1

12:01 PM 21  saying that there is deliberate indifference if there is this

12:01 PM 22  categorical ban.  And then at places in your briefing and in

12:01 PM 23  the complaint it says what we would like is an injunction

12:01 PM 24  precluding the state from using this policy to deny the hormone

12:01 PM 25  treatment.  In other places it reads as though you're seeking

12:01 PM 1    an order that would require them to provide the hormone

12:01 PM 2    treatment.

12:02 PM 3         I think those are different things, and I think that

12:02 PM 4    gets at exactly what this case is about.  If, for example, I

12:02 PM 5    determined that the policy at issue here, this new Health

12:02 PM 6    Services Bulletin, is not a blanket ban and does, in fact, call

12:02 PM 7    for individualized assessment based on medical necessity, if

12:02 PM 8    that's what the policy means, and I understand that you-all

12:02 PM 9    don't view it that way, but if that is the determination, then

12:02 PM 10   I think any claim that I should enjoin the policy would be

12:02 PM 11   over, and you'd be left with, if you are even presenting this

12:02 PM 12   argument, that there should be an injunction requiring the

12:02 PM 13   hormone treatment.  And for that, we really don't have -- I

12:02 PM 14   don't know if that's even when you're asking.

12:02 PM 15        MS. NOWLIN-SOHL:  Yeah.  So I think there's a couple

12:02 PM 16   things in there.  And the injunction, right, is to maintain the

12:02 PM 17   status quo that FDC has been operating under for the last

12:02 PM 18   several years, right?  And under that policy, it's not that

12:03 PM 19   they're required to provide anyone with hormones, it's that

12:03 PM 20   there is a medical necessity determination if someone needs

12:03 PM 21   hormones, and if they do, they're provided hormones.  That that

12:03 PM 22   is sufficient.

12:03 PM 23        And our concern with this policy, which we do think is

12:03 PM 24   a ban, but even if there is some wiggle room there that the

12:03 PM 25   requirements for the variance are so demanding that they also

12:03 PM 1     violate the Eighth Amendment, right?  That it's no longer about

12:03 PM 2     what's medically necessary, that there's so many barriers in

12:03 PM 3     place that that is also deliberate indifference and in

12:03 PM 4     violation of the Eighth Amendment.

12:03 PM 5          THE COURT:  How would that violate the Eighth

12:03 PM 6     Amendment if it turned out, in fact, that someone didn't

12:03 PM 7     require this as medically necessary?  I'm not saying that's the

12:03 PM 8     case here, but if you -- for example, if the prison system said

12:03 PM 9     we're going to categorically ban chemotherapy.  Doesn't matter

12:03 PM 10    whether a doctor says you need it or not, we're just not doing

12:03 PM 11    it.  And then somebody comes along and says it's indisputable

12:03 PM 12    that I have this medical need for chemotherapy, that person has

12:03 PM 13    stated an Eighth Amendment violation, right?  But if someone

12:04 PM 14    else comes along and says that policy is unconstitutional, but

12:04 PM 15    as applied to me maybe I do or maybe I don't need it, then

12:04 PM 16    there wouldn't be an Eighth Amendment, right?

12:04 PM 17         I guess I'm struggling to understand how there could

12:04 PM 18    be a violation in the abstract if it turns out that an

12:04 PM 19    individual person does not need these drugs.

12:04 PM 20         MS. NOWLIN-SOHL:  Right.  Because I think with this

12:04 PM 21    policy, the doctor is not allowed to consider, right?  Like,

12:04 PM 22    the ban on the treatment is put in place, so it's not allowed

12:04 PM 23    to make an individualized determination.  So yes, there will be

12:04 PM 24    some people who don't need this treatment, but the fact that

12:04 PM 25    there's a ban means that they're not able to even be

12:04 PM 1    considered.  That it's not part of the evaluation.

12:04 PM 2          THE COURT:  I got it.  So going back to my earlier

12:04 PM 3    question then, if the determination is this is not a

12:04 PM 4    categorical ban, and you've not proven that the department will

12:04 PM 5    not do what they say they're going to do which is make an

12:04 PM 6    individualized medical necessity determination and provide

12:05 PM 7    hormones for those for whom it determines have medical

12:05 PM 8    necessity, then you just lose, right?

12:05 PM 9          MS. NOWLIN-SOHL:  So the individualized determination,

12:05 PM 10   you also have to take into account all of these steps, right?

12:05 PM 11   So if it was just the department saying we're doing an

12:05 PM 12   individualized determination based on medical necessity alone,

12:05 PM 13   then yes, I think that would be a constitutional policy.  This

12:05 PM 14   is more than that.

12:05 PM 15        THE COURT:  Okay.  In other words, you're not saying

12:05 PM 16   that Keohane right now -- I mean, I'm sure it's your bottom

12:05 PM 17   line position that there is a need for the treatment.  But

12:05 PM 18   you're not saying I have to make that determination, and you've

12:05 PM 19   not proven that Keohane needs the treatment.

12:05 PM 20        MS. NOWLIN-SOHL:  Correct.

12:05 PM 21        THE COURT:  Okay.  So in other words, if the

12:05 PM 22   department had just come along and said we realized, inmate

12:05 PM 23   group, you-all have been getting hormone treatment for two

12:05 PM 24   years under the old policy; the new policy is we're going to do

12:05 PM 25   a re-evaluation and some of you might still get it, some of you

12:05 PM  1    might not, you don't have any constitutional claim there.  You

12:06 PM  2    would just wait and see if your client got it and then if they

12:06 PM  3    didn't, you might or might not bring a claim depending on what

12:06 PM  4    you think the medical necessity was for your client.

12:06 PM  5                MS. NOWLIN-SOHL:  I think it would depend on the

12:06 PM  6    details of the new policy and what the requirements are, right?

12:06 PM  7    So this isn't a claim that anyone is necessarily specifically

12:06 PM  8    entitled to hormones.  I think in this instance we're dealing

12:06 PM  9    with a population of people who the FDC has already made that

12:06 PM 10    medical necessity determination, and they are receiving

12:06 PM 11    hormones.  But we're saying this --

12:06 PM 12                THE COURT:  But that's not a violation, right?  I

12:06 PM 13    mean, the FDC could make a medical determination and then

12:06 PM 14    change its mind, right?

12:06 PM 15                MS. NOWLIN-SOHL:  Yes.

12:06 PM 16                THE COURT:  Okay.  And so you're not -- at the end of

12:06 PM 17    the day, as of today, you are not advancing the position that

12:06 PM 18    as an Eighth Amendment matter your client is entitled to

12:06 PM 19    hormone treatment right now.

12:06 PM 20                MS. NOWLIN-SOHL:  Correct.

12:06 PM 21                THE COURT:  Okay.  Got it.  It's just the policy.  So

12:06 PM 22    the relief would be make a determination without regard to the

12:06 PM 23    policy, this new policy.

12:06 PM 24                MS. NOWLIN-SOHL:  Yes.  To maintain the status quo of

12:06 PM 25    the old policy that FDC has been operating under for the last

12:07 PM 1    several years while this litigation played out.  Yeah.

12:07 PM 2              THE COURT:  Okay.

12:07 PM 3              MS. NOWLIN-SOHL:  And so I just want to walk through

12:07 PM 4    those barriers again on the variance.  And I know we've kind of

12:07 PM 5    been over this, but it just, I think, bears repeating one more

12:07 PM 6    time.  These are barriers that are far removed from the

12:07 PM 7    practice of medicine and the determination of medical

12:07 PM 8    necessity, right?

12:07 PM 9              That there is a security person involved that has to

12:07 PM 10   be unanimously voting that the diagnosis applies to a person,

12:07 PM 11   right?

12:07 PM 12             That the medical necessity definition here means to

12:07 PM 13   cure, which Dr. Martinez said is not actually applicable in

12:07 PM 14   certain other circumstances such as diabetes or depression.

12:07 PM 15             That the presumption that hormone therapy is only

12:07 PM 16   going to be provided in rare instances, and that it is only

12:07 PM 17   provided when required by the constitution.  It's, again, not

12:07 PM 18   clear who makes that determination of what that standard is and

12:07 PM 19   who will do it.

12:07 PM 20             And then also requiring this body of research that it

12:08 PM 21   seems from Dr. Martinez's testimony does not exist at this

12:08 PM 22   time.  So all of those are requirements that must be made in

12:08 PM 23   addition to medical necessity.

12:08 PM 24             And so whether labeled as a ban or not, the health

12:08 PM 25   bulletin is putting the plaintiff and the members of the

12:08 PM 1    proposed class at significant risk of having their care, that

12:08 PM 2    has been deemed medically necessary for them by the medical

12:08 PM 3    staff, taken away for reasons unrelated to the medical

12:08 PM 4    necessity and their medical needs.

12:08 PM 5          Defendants argue that because therapy is available for

12:08 PM 6    people, that there's an individualized determination and no

12:08 PM 7    Eighth Amendment violation.  But that is incorrect, and that's

12:08 PM 8    not the law.  But by denying inmates access to this treatment

12:08 PM 9    based on a blanket policy and these very high barriers rather

12:08 PM 10   than a determination of just individual medical need,

12:08 PM 11   defendants are deliberately indifferent to plaintiff's and the

12:08 PM 12   proposed class members serious medical needs.

12:08 PM 13         I also wanted to touch on what we were discussing

12:09 PM 14   about the clothing and grooming accommodations.  That, you

12:09 PM 15   know, the defendants had said in their reply on the motion to

12:09 PM 16   dismiss that this was not actually a ban.  I think all of the

12:09 PM 17   evidence put forth today is clear that this is a ban.  That Dr.

12:09 PM 18   Martinez, you know, at least twice referred to it as a ban.

12:09 PM 19   That the script that was provided to all of the inmates to

12:09 PM 20   review and sign said that, you know, this is a ban that's not

12:09 PM 21   allowed, and that also the FAQ said that people are only

12:09 PM 22   allowed to groom and dress consistent with their quote,

12:09 PM 23   unquote, biological sex.

12:09 PM 24         THE COURT:  Where is the -- there's no evidence that

12:09 PM 25   that would be medically necessary, right?  I mean, if you go

12:09 PM 1   back to -- they make an argument about Keohane 1 and issue

12:09 PM 2   preclusion, and I think you're right to say that's not issue

12:09 PM 3   preclusion because kind of a that-was-then, this-is-now kind of

12:09 PM 4   thing.  But under the "now", there's no evidence that it would

12:10 PM 5   be medically necessary to do those things, correct?

12:10 PM 6        MS. NOWLIN-SOHL:  So I think their argument relies on

12:10 PM 7   a reading of Keohane 1 that says it can never be medically

12:10 PM 8   necessary.  I don't think that's what Keohane 1 said.

12:10 PM 9        THE COURT:  That's where I agree with you.  So I'm

12:10 PM 10  saying if you -- they're saying it's issue preclusion,

12:10 PM 11  Keohane's litigated this and lost, the end.  You say no, what

12:10 PM 12  was litigated before was whether it was appropriate seven years

12:10 PM 13  ago; what we're challenging now is whether it's appropriate

12:10 PM 14  now.  And the conclusion from the Eleventh Circuit before was

12:10 PM 15  you did not -- I say you, I don't know if you were part of that

12:10 PM 16  team or not, did not prove that it was medically necessary

12:10 PM 17  seven years ago, and your point is that doesn't preclude our

12:10 PM 18  proving today that it's medically necessary now.

12:10 PM 19       But for purposes of where we are right now, you've

12:10 PM 20  just not proven that at all, right?

12:10 PM 21       MS. NOWLIN-SOHL:  I want to, kind of, I think, shift

12:10 PM 22  that perspective a little bit, because what FDC has been doing,

12:10 PM 23  they've been providing this care to people for years now.  And

12:10 PM 24  if you look at the medical record, Plaintiff Keohane has an

12:11 PM 25  accommodation pass that is, you know, issued by her

12:11 PM 1    psychologist that says, you know, she should get hair and

12:11 PM 2    alternate canteen items and clothing.  And our understanding is

12:11 PM 3    that other inmates in the proposed class have similar

12:11 PM 4    accommodations pass also issued by the Office of Health

12:11 PM 5    Services and signed off by a psychologist.

12:11 PM 6         What FDC has done is they've removed that from

12:11 PM 7    everybody on one day without an individualized determination.

12:11 PM 8    And so I think at this point in the case we don't need to prove

12:11 PM 9    that it is medically necessary for each person; I think that

12:11 PM 10    the fact that it is a ban, and there was no individualized

12:11 PM 11    determination of medical necessity is sufficient for Eighth

12:11 PM 12    Amendment purposes to show deliberate indifference.

12:11 PM 13         THE COURT:  You don't have to prove that it would

12:11 PM 14    medically necessary for someone somewhere?

12:11 PM 15         MS. NOWLIN-SOHL:  I mean, I think that determination

12:11 PM 16    was somewhat already made by FDC, right?  The psychologist was

12:11 PM 17    providing these accommodations and now they've taken it all

12:11 PM 18    away without this individualized determination.  So they

12:11 PM 19    haven't looked into whether it's medically necessary, and

12:11 PM 20    there's case law saying that, like, these blanket bans are kind

12:11 PM 21    of the paradigm of deliberate indifference.  And so again --

12:12 PM 22         THE COURT:  And what are those -- I mean, I know we've

12:12 PM 23    talked about this a minute ago, but there's a Ninth Circuit

12:12 PM 24    case that more or less says that, and then there's dicta in

12:12 PM 25    Keohane 1.  Is there something else?

12:12 PM 1          MS. NOWLIN-SOHL:  Those are the two main ones that I

12:12 PM 2    see.  But, you know, there's also several cases about, kind of,

12:12 PM 3    prohibitions on gender dysphoria treatments generally, that

12:12 PM 4    these blanket bans are a violation of the Eighth Amendment.

12:12 PM 5    And I think those are the Rosati case --

12:12 PM 6          THE COURT:  But back to the clothing and things,

12:12 PM 7    there's no evidence in this record that those are appropriate

12:12 PM 8    treatments or medical treatments at all.  I mean, if your point

12:12 PM 9    is they can't take away something they have been providing,

12:12 PM 10   that would be a new Eighth Amendment rule, right?  I mean, the

12:12 PM 11   constitutional standard is a very difficult one.  Departments

12:12 PM 12   provide above that sometimes, sometimes at the constitutional

12:13 PM 13   standard.  If they provide below it, we end up in court.

12:13 PM 14         But wouldn't you have to prove that this was medically

12:13 PM 15   necessary for someone at some point?  And I don't think you can

12:13 PM 16   do that by just saying they used to provide it.

12:13 PM 17         MS. NOWLIN-SOHL:  Right.  And I think over the course

12:13 PM 18   of the case that we will.  At the preliminary injunction stage

12:13 PM 19   --

12:13 PM 20         THE COURT:  That's what I'm talking about is the

12:13 PM 21   preliminary injunction stage.

12:13 PM 22         MS. NOWLIN-SOHL:  Yes.  So at the preliminary

12:13 PM 23   injunction stage, right, we are saying this has been medically

12:13 PM 24   necessary, it is beneficial and it is causing this harm.

12:13 PM 25         THE COURT:  But where is the evidence that it has been

12:13 PM 1    medically necessary, I guess is what I'm asking.  I understand

12:13 PM 2    there's evidence, including from your client, that it's

12:13 PM 3    important and beneficial, psychologically pleasing is the term

12:13 PM 4    that was used today and in the previous case.

12:13 PM 5         But to say that it is something that would be so

12:13 PM 6    obviously to someone that it would constitute an Eighth

12:13 PM 7    Amendment violation not to provide haircut variances and

12:13 PM 8    undergarments and things like that, I don't see that evidence

12:13 PM 9    here at all.

12:14 PM 10        MS. NOWLIN-SOHL:  So I think if you look at the

12:14 PM 11   declarations of plaintiff Keohane and then Ms. Ward and Ms.

12:14 PM 12   Mendoza, they talk about the necessity of these items to them

12:14 PM 13   and to their mental health.

12:14 PM 14        THE COURT:  But that's a subjective thing.  I mean,

12:14 PM 15   I've read those, I understand them and I believe them that it's

12:14 PM 16   very distressing to them not to have this.  That makes logical

12:14 PM 17   sense.  But it's a whole different inquiry about whether the

12:14 PM 18   Eighth Amendment requires it.

12:14 PM 19        MS. NOWLIN-SOHL:  Well, I think the medical necessity

12:14 PM 20   determination is subjective, right?  It is as to each

12:14 PM 21   individual, so it's not going to be medically necessary for

12:14 PM 22   each person in the class.  But it is going to be medically

12:14 PM 23   necessary for some of these people, right?  For their mental

12:14 PM 24   health.  And they've talked about, kind of, the distress that

12:14 PM 25   they are experiencing, the suicidality, the thoughts of

12:14 PM 1    self-harm because these have been taken away.  And so we're

12:14 PM 2    already seeing those harms, and the medical necessity of those

12:14 PM 3    treatments for them.

12:14 PM 4            And so our point is that it is medically necessary for

12:14 PM 5    some people, and this blanket ban is deliberately indifferent

12:14 PM 6    to that fact.

12:14 PM 7            THE COURT:  Okay.  I understand the argument.  I think

12:15 PM 8    on that you've got a difficult, difficult argument.  But I

12:15 PM 9    understand it.  At the preliminary injunction stage I'm talking

12:15 PM 10   about.

12:15 PM 11           MS. NOWLIN-SOHL:  Okay.  So just kind of -- just,

12:15 PM 12   yeah, wrapping up on that, you know, and again, defendants have

12:15 PM 13   offered to medical justification for why these treatments were

12:15 PM 14   removed and were taken away, right?  Dr. Martinez mentioned one

12:15 PM 15   alternate canteen item, but that still doesn't explain why all

12:15 PM 16   these were taken away.  And again, they haven't disputed that

12:15 PM 17   the rescission of this policy is harming plaintiff and the

12:15 PM 18   proposed class members.

12:15 PM 19           So again, now turning to the irreparable harm,

12:15 PM 20   plaintiffs and the proposed class members have been receiving

12:15 PM 21   these treatments for years, including the hormone therapy and

12:16 PM 22   the social accommodations.  That they may not be cut off from

12:16 PM 23   hormone therapy for a few more months does not negate the need

12:16 PM 24   for a preliminary injunction.  We don't have to wait until they

12:16 PM 25   actually suffer the harm to seek a PI and, in fact, some of the

12:16 PM 1    class members are suffering the harms of having the clothing

12:16 PM 2    and grooming accommodations removed.

12:16 PM 3         The health bulletin makes it very clear that it is

12:16 PM 4    going to be a very rare situation that someone gets hormone

12:16 PM 5    therapy, and it may not happen at all.  Defendants point to

12:16 PM 6    this titration process of, you know, trying to show that it's

12:16 PM 7    not imminent.  But, you know, I think titration doesn't negate

12:16 PM 8    the imminence of it.  It just means you're starting this

12:16 PM 9    sooner.  And titration itself is harmful, right?  That a doctor

12:16 PM 10   has prescribed you a certain amount of hormones, and now you

12:16 PM 11   are being forced to take less than that.  So I do think that

12:16 PM 12   this harm is very imminent and some of it is already happening.

12:16 PM 13        And kind of turning to the individual declarant.  So

12:17 PM 14   plaintiff Keohane talks in her declaration about how past

12:17 PM 15   unavailability of hormones has caused her great distress and

12:17 PM 16   suicidality.  She's talked about, like, the importance to her

12:17 PM 17   of having long hair, and presenting as a woman, and how the

12:17 PM 18   women's undergarments alleviate her dysphoria.

12:17 PM 19        THE COURT:  Can I ask you a question about that?  I

12:17 PM 20   just want to make sure I understand what's happening with the

12:17 PM 21   hair and things like that.

12:17 PM 22        Is it your understanding that other inmates are now

12:17 PM 23   forced to get haircuts, but your client is still on pause with

12:17 PM 24   everything?  In other words, your client has not had any

12:17 PM 25   haircut or taken away of any clothing or anything like that; is

12:17 PM 1    that correct?

12:17 PM 2              MS. NOWLIN-SOHL:  That is our understanding, and I

12:17 PM 3    think our understanding of our agreement with defense counsel.

12:17 PM 4              THE COURT:  Okay.  That's what I thought, but there

12:17 PM 5    was a little bit of ambiguity earlier in the morning.

12:17 PM 6              MS. NOWLIN-SOHL:  Yes.  But as Dr. Martinez testified,

12:17 PM 7    right?  If this PI were not to be granted, that she would have

12:17 PM 8    those taken away immediately under the current policy.

12:18 PM 9              Ms. Ward also talks about how receiving hormone

12:18 PM 10   therapy and female clothing and grooming accommodations were

12:18 PM 11   life-changing for her, that she started to feel whole for the

12:18 PM 12   first time.  And in the past she has had thoughts of suicidal

12:18 PM 13   ideation and self-castration, and that these treatments really

12:18 PM 14   reduced those thoughts for her, and this is hormone therapy

12:18 PM 15   and, again, being able to present as a woman.

12:18 PM 16             And so, you know, hormone therapy is treatment in part

12:18 PM 17   because it helps your body align with your gender identity and

12:18 PM 18   your presentation, right?  And that is true for the grooming

12:18 PM 19   and the hair, that being able to present with hair in a

12:18 PM 20   feminine manner and clothing and makeup is treatment, because

12:18 PM 21   it helps you in your presentation align with your gender

12:18 PM 22   identity.

12:18 PM 23             THE COURT:  Are there cases finding an Eighth

12:18 PM 24   Amendment violation on those?

12:18 PM 25             MS. NOWLIN-SOHL:  I am -- I'm not aware of any at this

12:18 PM 1   time.  Yeah.

12:19 PM 2          And so -- and Ms. Ward has said that the changes in

12:19 PM 3   this policy over the last, kind of, what, 40 days roughly have

12:19 PM 4   been earth-shattering for her.  That the thoughts of suicide

12:19 PM 5   and self-harm have returned, and that she often lays awake

12:19 PM 6   crying at night.

12:19 PM 7          Ms. Mendoza talks about how these -- the

12:19 PM 8   accommodations for clothing and grooming have helped alleviate

12:19 PM 9   her depression and anxiety, and since they've been taken away

12:19 PM 10  herself esteem, her depression, her loss of appetite, her

12:19 PM 11  sleep, all of those have been worse for her.  And so these

12:19 PM 12  harms are very real and very significant.

12:19 PM 13         Touching really quickly on alternate canteen items,

12:19 PM 14  the lists of purchase history were put in, but the defendants

12:19 PM 15  have not said that Ms. Ward and Ms. Mendoza are not using

12:19 PM 16  makeup, that they weren't wearing makeup, or that they didn't

12:19 PM 17  have to turn them in or face disciplinary action.  And so that

12:19 PM 18  has not actually been refuted, they're just saying they haven't

12:19 PM 19  purchased them in the last two years.

12:20 PM 20         And So then lastly, turning to the third and fourth

12:20 PM 21  elements of the PI, the balance of the harms and the public

12:20 PM 22  interest.  The balance of the harms weigh heavily in favor of

12:20 PM 23  plaintiffs here.  There are very concrete harms that they are

12:20 PM 24  currently suffering and will suffer if this treatment is taken

12:20 PM 25  away.  The defendants have not identified any harms that will

12:20 PM  1    result from maintaining the status quo as it has been for the

12:20 PM  2    last several years.  They point to the kind of general interest

12:20 PM  3    of operation of the prison system without judicial

12:20 PM  4    interference.  But that is generalized and it doesn't tip the

12:20 PM  5    scales, and if it did, it would be almost impossible to get a

12:20 PM  6    PI in any situation involving prisons, and the public has an

12:20 PM  7    interest in not have constitutional policies enforces, and

12:20 PM  8    ensuring the dignity and appropriate medical care for those who

12:20 PM  9    are incarcerated.

12:20 PM 10         So that's what I have on the PI.  Do you want me to

12:20 PM 11    touch on the motion to dismiss or to wait until --

12:20 PM 12         THE COURT:  Well, here's what I want.  I had some

12:21 PM 13    questions.  I wanted you to touch on exhaustion, which goes

12:21 PM 14    both the PI and the motion to dismiss.  And then what I think

12:21 PM 15    would make the most sense would be if you have any additional

12:21 PM 16    argument that goes just to the motion to dismiss that you've

12:21 PM 17    not gone over, you can go over that too as opposed to treating

12:21 PM 18    them totally separately.  You've submitted a brief on the

12:21 PM 19    motion to dismiss, a lot of arguments are the same, but I will

12:21 PM 20    give you an opportunity to saying anything else on the motion

12:21 PM 21    to dismiss.

12:21 PM 22         But on the exhaustion, we talked about this a little

12:21 PM 23    bit on the telephone hearing, I think the second one we had.

12:21 PM 24    It seems to me there's two different pieces to your exhaustion

12:21 PM 25    argument.  One is that it's a dead-end and so there's no

12:21 PM 1    availability because it's going to get denied no matter what.

12:21 PM 2    And then separate from that is this timing piece to say it's

12:21 PM 3    unavailable because we couldn't get relief on time.

12:21 PM 4        And as a practical matter, the second one makes a lot

12:22 PM 5    of sense.  But you go back and you look at the PLRA cases and

12:22 PM 6    they're pretty strict on this.  And it seems like the logical

12:22 PM 7    extension of your position would be any time a plaintiff wants

12:22 PM 8    something very quickly, whether it's something serious or

12:22 PM 9    something not serious, they can avoid exhaustion by saying it's

12:22 PM 10   not available to me.

12:22 PM 11       So part of the purpose of the PLRA was to filter out

12:22 PM 12   unserious cases, people suing over peanut butter sandwiches and

12:22 PM 13   things like that, but it seems like by your logic if someone

12:22 PM 14   said I want X, Y, Z by next Friday, and the process takes 30

12:22 PM 15   days so there's no available remedy for my request to have

12:22 PM 16   something by next Friday, it would seem like that would

12:22 PM 17   undermine the whole purpose of the PLRA and not be consistent

12:22 PM 18   with what it says and what the cases have said about it.

12:22 PM 19       And so I wonder if you could talk about that a little

12:22 PM 20   bit.

12:22 PM 21       MS. NOWLIN-SOHL:  So I think the situation is unique

12:23 PM 22   in that there is a concrete deadline that we are aware of,

12:23 PM 23   which I don't think, kind of, exists in most situations or in

12:23 PM 24   the cases that were cited by defendants, including the COVID

12:23 PM 25   cases.  That there was a very clear date that plaintiff

12:23 PM 1    and the proposed class were told that this policy would go into

12:23 PM 2    effect, and that these things would happen, including some of

12:23 PM 3    these things that are irreversible, right?  Like -- well,

12:23 PM 4    mostly irreversible.  Cutting your hair.  You know, it will

12:23 PM 5    grow back, but it will take years.  And so that harm is not one

12:23 PM 6    that can easily be undone.

12:23 PM 7          And so in this situation with FDC has imposed this

12:23 PM 8    very strict deadline, things are going to happen and it's not

12:23 PM 9    possible to exhaust a formal grievance process to that, I think

12:23 PM 10   that does rise to the level of this is a remedy that's not

12:23 PM 11   available.

12:23 PM 12         THE COURT:  But then why do cases not say that?  I

12:23 PM 13   would have thought the response brief would say well, here's a

12:23 PM 14   bunch of circuit cases where they've said you don't have to

12:23 PM 15   exhaust because such and such was going to go into effect very

12:23 PM 16   soon, and there's not time to go through the process.  And I

12:23 PM 17   just haven't seen that.

12:23 PM 18         MS. NOWLIN-SOHL:  Yeah, and I don't know how often

12:24 PM 19   this happens as a factual matter.  This is a little bit, maybe

12:24 PM 20   an aberration, just kind of factually, that there's a policy

12:24 PM 21   that's such a drastic change from the prior policy and that

12:24 PM 22   it's going into effect on a set day, and happening very

12:24 PM 23   quickly, faster than the formal grievance process can take

12:24 PM 24   place.

12:24 PM 25         And so that was kind of my read in having looked at

12:24 PM  1    the cases of why this might happen is that this doesn't come up

12:24 PM  2    frequently.

12:24 PM  3         THE COURT:  You know, do you take it claim by claim or

12:24 PM  4    -- I know you got one count here, but there are different

12:24 PM  5    pieces here.  I mean, so even if we except that the haircut is

12:24 PM  6    irreparable, which it's not in an absolute sense, but to your

12:24 PM  7    point it could be years.  But things like makeup, I mean,

12:24 PM  8    that's not irreparable.  If it were just about makeup you

12:24 PM  9    wouldn't have filed this as an emergency I take it, and you

12:24 PM 10    would have gone through the process.  Don't you agree?

12:24 PM 11         MS. NOWLIN-SOHL:  I can't speculate as to what we have

12:24 PM 12    done.

12:24 PM 13         THE COURT:  There's a spectrum though, right?

12:24 PM 14         MS. NOWLIN-SOHL:  Yes.  And I think we have to look at

12:24 PM 15    this cohesively, that at the time the plaintiff and the class

12:24 PM 16    members had not seen the policy and so they're relying on what

12:25 PM 17    they had been told, that, you know, that all of these

12:25 PM 18    accommodations were going to be taken away, and things like

12:25 PM 19    makeup and some of these clothing items that they've had to

12:25 PM 20    purchase, right?  And so, like, they can't necessarily just

12:25 PM 21    easily replace them either.  But it was also taken away up to

12:25 PM 22    and including hormone therapy.  So everything was on the table

12:25 PM 23    at that time.

12:25 PM 24         And at this point, defendants are not, you know,

12:25 PM 25    disputing that these claims have been exhausted.

12:25 PM 1          THE COURT:  Let me ask about that.  I understand that,

12:25 PM 2     and there was this, I guess, footnote in the motion to dismiss

12:25 PM 3     response saying that you can dismiss it, we'll re-file it.  And

12:25 PM 4     it may seem like a waste of effort to dismiss a case to have it

12:25 PM 5     refiled, but to their point, I mean, you agree, and I don't

12:25 PM 6     think there's any room for disagreement, that what the cases

12:25 PM 7     say is if there is no exhaustion, at the time of filing I have

12:26 PM 8     to dismiss and I can't, sort of, just say well, it's even

12:26 PM 9     exhausted now.  I mean, I understand everyone seems to agree

12:26 PM 10    that it's been exhausted now, and it may seem horribly

12:26 PM 11    inefficient to go through these extra steps, but that is what

12:26 PM 12    the law would require if there's not an exhaustion.

12:26 PM 13         MS. NOWLIN-SOHL:  And that there wasn't an available

12:26 PM 14    remedy to exhaust, then yes.  And then --

12:26 PM 15         THE COURT:  Right.  Right.  If you prove there's no

12:26 PM 16    available remedy, then you've gotten past exhaustion and we

12:26 PM 17    just move on.  But if the answer is you haven't shown that,

12:26 PM 18    there's really no other argument that you did exhaust, right?

12:26 PM 19         MS. NOWLIN-SOHL:  Yes.

12:26 PM 20         THE COURT:  Okay.  So if there was an available

12:26 PM 21    remedy, then I don't have the option of saying well, it's been

12:26 PM 22    exhausted now so we'll continue.  You agree with that, right?

12:26 PM 23         MS. NOWLIN-SOHL:  And so in that instance we would ask

12:26 PM 24    the Court to kind of maintain this record, that the plaintiff

12:26 PM 25    will re-file as quickly as possible and that --

12:26 PM 1          THE COURT:  No, I understand that, but I would not

12:26 PM 2     have the legal option to say if there was an available remedy,

12:27 PM 3     they should have exhausted.  They did not exhaust.  But because

12:27 PM 4     it's now been exhausted, we will just carry on.  I do not have

12:27 PM 5     that legal option, correct?

12:27 PM 6          MS. NOWLIN-SOHL:  That is our understanding and we

12:27 PM 7     would argue that there was not an available remedy.

12:27 PM 8          THE COURT:  Okay.  All right.

12:27 PM 9          And then factually there were two grievances.  There

12:27 PM 10    was the direct one with the secretary.  They say there wasn't

12:27 PM 11    compliance because it didn't have certain information at the

12:27 PM 12    beginning.  Do you dispute that?

12:27 PM 13         MS. NOWLIN-SOHL:  No.

12:27 PM 14         THE COURT:  Okay.  So that one would not be -- well,

12:27 PM 15    you don't dispute that.

12:27 PM 16         The other one was submitted as an informal one, and

12:27 PM 17    then it was not followed up on.

12:27 PM 18         MS. NOWLIN-SOHL:  It was submitted as a formal

12:27 PM 19    grievance.

12:27 PM 20         THE COURT:  Okay.  By skipping informal.

12:27 PM 21         MS. NOWLIN-SOHL:  And just to clarify, the emergency

12:27 PM 22    grievance -- they say in their briefing that it didn't meet

12:27 PM 23    these requirements, but the response that she received was a

12:27 PM 24    little bit less clear than that, and it said the grounds for

12:27 PM 25    seeking the direct ones were not satisfactory.  And so it's a

12:28 PM 1    little bit unclear as to whether, you know, they were saying

12:28 PM 2    that she hadn't met the requirements or that they didn't view

12:28 PM 3    it as an emergency.

12:28 PM 4            THE COURT:  Okay.  But there was not a representation

12:28 PM 5    consistent with the rule on it that here's why we're skipping

12:28 PM 6    the usual process.  I thought that's what they were saying.

12:28 PM 7            MS. NOWLIN-SOHL:  That is what they're saying, yes.

12:28 PM 8            THE COURT:  Okay.  All right.

12:28 PM 9            I think that's all the questions I had on exhaustion.

12:28 PM 10           I did have a question about the statute, and I

12:28 PM 11   understand the statute is mentioned in the policy that you're

12:28 PM 12   challenging, and I guess I'm curious how much that fits in

12:28 PM 13   here.  Because if the statute didn't exist, your claim would be

12:28 PM 14   more or less the same, correct?

12:28 PM 15           MS. NOWLIN-SOHL:  Yes.  That is my understanding.

12:28 PM 16           THE COURT:  Okay.  So how does that factor in here?

12:28 PM 17   The witness made the point, and this is clear, I mean, it's a

12:29 PM 18   year and a half old or something like that.  I may have

12:29 PM 19   misunderstood, but I think maybe the testimony was it's not

12:29 PM 20   even really factually an issue because someone else pays for

12:29 PM 21   this and it's not paid with state dollars.  Is that how you

12:29 PM 22   understood the testimony?

12:29 PM 23           MS. NOWLIN-SOHL:  That's what I understand it to be at

12:29 PM 24   this time, but I would flag that it is the state's

12:29 PM 25   responsibility to provide this care, and relying on the

12:29 PM 1    generosity of a third-party to just pay for this treatment is a

12:29 PM 2    little bit concerning, and it may also be a motivation to kind

12:29 PM 3    of reduce the number of people receiving this treatment.  So

12:29 PM 4    it's hard to rely on that.

12:29 PM 5         THE COURT:  Okay.  I was maybe -- that was just maybe

12:29 PM 6    a point of curiosity because I did not understand that to be

12:29 PM 7    the case before today.  But at any rate, whether the statute

12:29 PM 8    says the state can pay for this, can do this, can't do this,

12:29 PM 9    can't pay for anything, at the end of the day we're here on the

12:29 PM 10   Eighth Amendment and -- okay.

12:29 PM 11        So it seems like the statute's not much of a factor

12:29 PM 12   here.

12:29 PM 13        MS. NOWLIN-SOHL:  I mean, I think it is a factor to

12:30 PM 14   the extent they've incorporated into the Health Bulletin and

12:30 PM 15   say that they will abide by it, and that it says that this care

12:30 PM 16   cannot be provided with state funds.  And i think that kind of

12:30 PM 17   sets the tone for them to say it will be rare instances, even

12:30 PM 18   with medical necessity and then the variance.  So I do think it

12:30 PM 19   is part of this and needs to be read holistically.

12:30 PM 20        THE COURT:  I understand that.

12:30 PM 21        Did you have anything else on the motion to dismiss or

12:30 PM 22   anything else at all?

12:30 PM 23        MS. NOWLIN-SOHL:  I wanted to touch briefly on the

12:30 PM 24   class certification points.  And so, you know, historically

12:30 PM 25   courts were able to issue preliminary injunctions and relief on

12:30 PM 1    a class-wide basis prior to formal class certification.  It's a

12:30 PM 2    little bit unclear at this time how that has changed in light

12:30 PM 3    of the Supreme Court's decision in Poe V Labrador.  And we

12:30 PM 4    still think that the Court can do that, but if not, I think

12:30 PM 5    there's, you know, two other avenues that the Court can pursue

12:30 PM 6    here.

12:30 PM 7          So one is a provisional class certification.  We cite

12:30 PM 8    some cases out of the Ninth Circuit that talk about that.

12:31 PM 9    There's nothing in the language of Rule 23 that prohibits that,

12:31 PM 10   and defendants, in their briefing, also acknowledge the Court's

12:31 PM 11   ability to provisionally certify the class, stating in their

12:31 PM 12   preliminary injunction response that, quote, if the Court

12:31 PM 13   provisionally certifies the class and orders class-wide

12:31 PM 14   preliminary injunctive relief, the class expires along with the

12:31 PM 15   preliminary injunction after 90 days.  So, like, that mechanism

12:31 PM 16   is acknowledged, that it's kind of, a 90-day provisional class

12:31 PM 17   certification.

12:31 PM 18         If the Court is hesitant to do a provisional class

12:31 PM 19   certification, we believe that class certification is warranted

12:31 PM 20   here and that we've met all of the requirements.

12:31 PM 21         THE COURT:  Okay.  And the relief would be -- the

12:31 PM 22   class relief you would seek would be the same as what we were

12:31 PM 23   talking about at the outset of your preparation, which would be

12:31 PM 24   something saying you cannot enforce this policy, but not to say

12:31 PM 25   that you must provide hormone treatment or these other social

12:31 PM  1    things to anybody, correct?

12:31 PM  2        MS. NOWLIN-SOHL:  Right.  Those would be

12:32 PM  3    determinations based on medical necessity with the policy

12:32 PM  4    enjoined.

12:32 PM  5        THE COURT:  Because I think you submitted some

12:32 PM  6    interrogatories saying there is some not insubstantial number

12:32 PM  7    of people who have the diagnosis of gender dysphoria, but are

12:32 PM  8    not and have not been receiving hormone treatment.

12:32 PM  9        MS. NOWLIN-SOHL:  Correct.

12:32 PM 10        THE COURT:  Okay.  And then there is perhaps another

12:32 PM 11    category of person who is transgender, but does not have gender

12:32 PM 12    dysphoria, correct?

12:32 PM 13        MS. NOWLIN-SOHL:  Potentially, yes.

12:32 PM 14        THE COURT:  Okay.  Anything else?

12:32 PM 15        MS. NOWLIN-SOHL:  I think that's it, Your Honor.

12:32 PM 16        THE COURT:  You can confer with your team if you'd

12:32 PM 17    like.

12:32 PM 18        MS. NOWLIN-SOHL:  And Your Honor, in response to your

12:32 PM 19    question earlier about whether there were any cases on, kind

12:32 PM 20    of, the clothing and grooming standards being medically

12:32 PM 21    necessary, my colleagues have found a case that I can also give

12:33 PM 22    you the citation.  But it's Hicklin, and it's -- looks like

12:33 PM 23    2018WL806764.  Then also --

12:33 PM 24        THE COURT:  What was the name on that one?

12:33 PM 25        MS. NOWLIN-SOHL:  Hicklin.  And then is it --

12:33 PM  1          THE COURT:  Hicklin?

12:33 PM  2          MS. NOWLIN-SOHL:  H I C K L I N.

12:33 PM  3          THE COURT:  Oh.  Hicklin, okay.

12:33 PM  4          MR. TILLEY:  Versus Precynthe, P R E C Y N T H E.

12:33 PM  5          MS. NOWLIN-SOHL:  It looks like there's two citations

12:33 PM  6   for that case.  So the second one is 2021WL5881766.

12:33 PM  7          THE COURT:  Okay.  So you said you had another case,

12:33 PM  8   it's just the two citations for the same case?

12:33 PM  9          MS. NOWLIN-SOHL:  Yes.

12:33 PM 10          THE COURT:  Got it.

12:33 PM 11          Anything else?

12:33 PM 12          MS. NOWLIN-SOHL:  No, Your Honor.

12:33 PM 13          THE COURT:  Thank you very much, and I will give you

12:33 PM 14   rebuttal.

12:34 PM 15          MR. STEELY:  Good afternoon, Your Honor.

12:34 PM 16          THE COURT:  Good afternoon.

12:34 PM 17          MR. STEELY:  So for efficiency purposes, I'm willing

12:34 PM 18   to just answer what questions you have.  We filed briefs, we've

12:34 PM 19   got everything that's written in the briefs.  I can walk you

12:34 PM 20   through the arguments or I can respond to whatever questions

12:34 PM 21   you might have to be more efficient.

12:34 PM 22          THE COURT:  Well, one, I wanted to go back to what you

12:34 PM 23   were saying was the stipulation here about what I'll call the

12:34 PM 24   social things, the non-hormone treatments, the hair and

12:34 PM 25   undergarment and things like that.

12:34 PM 1          The current situation is that is being enforced across

12:34 PM 2     the board except as to the plaintiff, the named plaintiff?

12:34 PM 3          MR. STEELY:  That is correct, Your Honor.

12:34 PM 4          THE COURT:  Okay.  And the current policy is that's

12:34 PM 5     how that will be without -- you know, there's not going to be

12:34 PM 6     an individual determination.

12:34 PM 7          MR. STEELY:  So for enforcement of the current policy

12:34 PM 8     yes, Your Honor.  The reason -- where it got muddy was if

12:34 PM 9     somebody presents to a doctor in the future, and a doctor makes

12:34 PM 10    a determination that's medically necessary, that's a different

12:34 PM 11    process.

12:34 PM 12         THE COURT:  Okay.

12:35 PM 13         The plaintiff, in the papers, makes a point about this

12:35 PM 14    AHCA report, it being inconsistent with the policy here.  And I

12:35 PM 15    guess the witness today testified that they are inconsistent.

12:35 PM 16         How do those things work together, or if the FDC's

12:35 PM 17    position is that AHCA was incorrect, why does it rely on that

12:35 PM 18    at all?

12:35 PM 19         MR. STEELY:  So I think what the witness was trying to

12:35 PM 20    say, Your Honor, is he looked at a holistic body of evidence,

12:35 PM 21    right?  He looked at AHCA, he took the WPATH course, he

12:35 PM 22    reviewed hundreds of hours worth of research to go into

12:35 PM 23    creating this policy.

12:35 PM 24         And I think if you're looking at it from the

12:35 PM 25    standpoint of how does AHCA's policy apply, there's a

12:35 PM 1    difference when you're in the Department of Corrections, right?

12:35 PM 2    You have different standards, you have different policy, you

12:35 PM 3    have different ways to go forward.  So I think there's just a

12:35 PM 4    fundamental difference of application.

12:35 PM 5         So from a standpoint of whether it's a blanket ban,

12:36 PM 6    from that one standpoint, I haven't evaluated that, but that's

12:36 PM 7    what Dr. Martinez stated.  And to confirm, the HSB is not.

12:36 PM 8         THE COURT:  I was talking to your colleague about the

12:36 PM 9    blanket ban issue, and I guess what I'm struggling to

12:36 PM 10   understand is if there were a blanket ban on something that

12:36 PM 11   everyone agreed some portion of the population needed,

12:36 PM 12   chemotherapy for example, how does that get evaluated, and is

12:36 PM 13   there an avenue to say under the Eighth Amendment you win,

12:36 PM 14   plaintiff, without showing that you have an actual need for

12:36 PM 15   that.  And there is that part of the question is what you make

12:36 PM 16   of the dicta in Keohane 1 when you're talking about -- saying

12:36 PM 17   what we would say if it weren't moot, things like that.

12:36 PM 18        But walk me through how that would be -- forget about

12:36 PM 19   this case for a second, because there's a dispute about, one,

12:36 PM 20   whether it's a blanket ban, and two, whether people need these

12:37 PM 21   services.  But if it were -- if you had a situation where there

12:37 PM 22   was a blanket ban of something that everyone agrees a

12:37 PM 23   substantial portion of the people need, and someone brings a

12:37 PM 24   suit, walk me through how that's resolved and whether or not

12:37 PM 25   you would need to make a determination that the plaintiff had

12:37 PM 1    an actual need for whatever was banned versus the plaintiff may

12:37 PM 2    or may not, but the ban is obviously going to be problematic in

12:37 PM 3    at least some applications, whether as to the plaintiff or

12:37 PM 4    others.

12:37 PM 5            MR. STEELY:  All right.  So that's a very difficult

12:37 PM 6    hypothetical, Your Honor, but let me see if I can walk through

12:37 PM 7    this.

12:37 PM 8            All right.  So from an Eighth Amendment standpoint,

12:37 PM 9    right?  Anybody bringing an Eighth Amendment claim, they have

12:37 PM 10   to prove, one, that this is a serious medical need, right?  So

12:37 PM 11   you've covered that part with your hypothetical.  Then they

12:37 PM 12   have to show that the individuals that are stopping the access

12:38 PM 13   to the serious medical need, one, know that this is a serious

12:38 PM 14   medical need, and they're acting with reckless criminal --

12:38 PM 15   recklessness under the criminal law standard, right?  So

12:38 PM 16   they're acting with criminal recklessness.  And they know that

12:38 PM 17   their actions are going to impact that person, right?  So those

12:38 PM 18   are the things that you have to know.

12:38 PM 19           And then there's a follow-on that if their decision,

12:38 PM 20   whatever decision it is they make, is a reasonable decision,

12:38 PM 21   right?  So they go on some other path, and it's a reasonable

12:38 PM 22   decision, there's not an Eighth Amendment violation.

12:38 PM 23           So that's maybe too simplistic for a response, but I

12:38 PM 24   can try to give it in more detail.

12:38 PM 25           THE COURT:  Well, that would all be true if you were

12:38 PM  1    talking about an individual person who was actually claiming

12:38 PM  2    that he or she needed this service, right?  And here, the claim

12:38 PM  3    is just that the policy shouldn't preclude it.  If something

12:38 PM  4    else precludes it, fine, but this policy shouldn't.

12:38 PM  5         MR. STEELY:  I think that takes us back to our

12:38 PM  6    standing argument as well, Your Honor. So if you don't have

12:38 PM  7    standing to bring this claim, right?  You're not denied this --

12:39 PM  8    you're not denied access to this medical necessity, then you

12:39 PM  9    don't have the standing to bring this claim and you can't

12:39 PM 10    represent a class, right?  You don't have the standing to be

12:39 PM 11    here.

12:39 PM 12         And that goes back to our original standing argument.

12:39 PM 13    You have to have the injury in fact, right?  It's got to be an

12:39 PM 14    injury to you to bring the claim.

12:39 PM 15         THE COURT:  They say in their earlier appeal the

12:39 PM 16    department acknowledged that the treatment was medically

12:39 PM 17    necessary and that there was a serious medical need for the

12:39 PM 18    hormones.  Is that correct, and what do I make of that at this

12:39 PM 19    stage?

12:39 PM 20         MR. STEELY:  So as long as we're talking about

12:39 PM 21    treatment, we have hormones --

12:39 PM 22         THE COURT:  Is it correct that you made that

12:39 PM 23    acknowledgement or made that concession in the earlier appeal,

12:39 PM 24    and if so what does that --

12:39 PM 25         MR. STEELY:  In the original Keohane case that there

12:39 PM 1    was a medical necessity for the hormone treatment. Yes, Your

12:39 PM 2    Honor, that was made in the original case, that there was a

12:39 PM 3    medical necessity. And I believe you heard Dr. Martinez say

12:40 PM 4    today that it is still in inmate Keohane's file that it's a

12:40 PM 5    medical necessity for hormone treatment. That's why inmate

12:40 PM 6    Keohane, and every other inmate that has been receiving

12:40 PM 7    hormones, they're still receiving the hormones. The hormones

12:40 PM 8    are part of the evaluation process that each inmate has to go

12:40 PM 9    through in order to determine whether these continue to be

12:40 PM 10    medically necessary.

12:40 PM 11        THE COURT: Okay. Then same question I asked the

12:40 PM 12    other side about the statute. What am I to make of that? And

12:40 PM 13    did I understand the testimony correctly that the department is

12:40 PM 14    moving funds in a different way to avoid the application of

12:40 PM 15    that? I mean, I don't know that that matters here, but I was

12:40 PM 16    trying to understand where the statute fits in, if at all.

12:40 PM 17        I'll tell you, just for what it's worth, when I first

12:40 PM 18    was assigned the case and was looking at all this on a very

12:40 PM 19    expedited basis, I saw that the statute was referenced. It's

12:40 PM 20    not something that I was familiar with this and I thought it

12:40 PM 21    was going to be the heart of this case, and assumed it was kind

12:40 PM 22    of a brand new statute, and I look it up and it's not. It's

12:41 PM 23    not a brand new statute, and it's also not really central to

12:41 PM 24    this case. You heard the other side say it factors in, and I

12:41 PM 25    understand that argument.

12:41 PM 1          But then today was the first I heard that somebody

12:41 PM 2     else pays for it to comply with the statute.

12:41 PM 3          MR. STEELY:  Yes, Your Honor.  So that section of the

12:41 PM 4     HSB talks to expending funds, right.  So the state can't expend

12:41 PM 5     funds to purchase these unless there's two the exceptions.

12:41 PM 6     That it violates the US Constitution if you don't do it, or

12:41 PM 7     there's a court order to do it, right?  So that's payment.  So

12:41 PM 8     the state can't pay for it without those exceptions.

12:41 PM 9          But the state is not paying for it, and hasn't been

12:41 PM 10    paying for it, and the inmates continue to receive the hormone

12:41 PM 11    treatment.

12:41 PM 12         THE COURT:  Okay.  So is that the same thing as saying

12:41 PM 13    some people are receiving it where the Eighth Amendment does

12:41 PM 14    not require their receiving it?

12:41 PM 15         MR. STEELY:  I'm not certain I understand the

12:41 PM 16    question.

12:41 PM 17         THE COURT:  I guess before today, before this issue

12:41 PM 18    came up, I understood the statute said you can't pay for this

12:41 PM 19    which, in many ways, would mean you can't have it.  I

12:41 PM 20    understand you're saying it's a little different there.

12:42 PM 21    Obviously whether it says it or not, if the Eighth Amendment

12:42 PM 22    requires a service, it's no answer to say that the statute

12:42 PM 23    doesn't allow it.  So this recognition in the policy that it

12:42 PM 24    will be provided if the Eighth Amendment requires it is sort of

12:42 PM 25    just stating what the law has to be.

12:42 PM 1          So I thought the position of the state, if they were

12:42 PM 2     complying with the statute, would be the people who are

12:42 PM 3     receiving it are constitutionally entitled to it and therefore

12:42 PM 4     we don't have to give effect to this statute and can stand in

12:42 PM 5     the way of the Eighth Amendment.  As I understand it now,

12:42 PM 6     you're saying they may or may not be constitutionally entitled

12:42 PM 7     to it in the past, but we're complying with the statute by

12:42 PM 8     virtue of arranging someone else to pay for it.

12:42 PM 9          MR. STEELY:  No, Your Honor, we're doing both.  Right?

12:42 PM 10    So only people who are required, from a medical necessity, to

12:42 PM 11    receive the hormone treatment is receiving the hormone

12:42 PM 12    treatment.  So that would check off the box of it would be a

12:42 PM 13    violation of the US Constitution if you didn't provide it,

12:43 PM 14    right?  Because it's a medical necessity.

12:43 PM 15          On the other side, the department isn't paying for it.

12:43 PM 16    So the state's not paying for it.  So it's -- they have --

12:43 PM 17    they're covered both ways, Your Honor.

12:43 PM 18          THE COURT:  I see.  Okay.

12:43 PM 19          On the exhaustion, you agree it's exhausted now, and I

12:43 PM 20    guess there's agreement on both sides that that's neither here

12:43 PM 21    nor there for purposes of the defense that you've raised.

12:43 PM 22          MR. STEELY:  Yes, Your Honor.  The final response

12:43 PM 23    came, I believe it was November 7th, and that's in the

12:43 PM 24    declaration that we provided.

12:43 PM 25          THE COURT:  Okay.  So the dismissal that you're

12:43 PM  1     seeking would just lead to an immediate re-filing of the

12:43 PM  2     lawsuit and we would be right back here, right?

12:43 PM  3          MR. STEELY:  Your Honor, I don't know that we have the

12:43 PM  4     ability to just ignore it, right?  So, they didn't exhaust and

12:43 PM  5     that's -- like you said, the PLRA isn't really forgiving there.

12:43 PM  6          THE COURT:  I mean, you can waive it.  People waive

12:43 PM  7     those defenses.  I'm not saying you should and I'm not here to

12:43 PM  8     tell you to do that, but I'm not sure that you can't waive it.

12:43 PM  9     But at any rate you haven't waived it.

12:43 PM 10          MR. STEELY:  Correct.

12:43 PM 11          THE COURT:  Okay.  With the recognition that if that's

12:44 PM 12     how you prevail, it wouldn't do a whole lot of practical good

12:44 PM 13     in the long term.

12:44 PM 14          MR. STEELY:  I understand, Your Honor.

12:44 PM 15          THE COURT:  Okay.  As we stand here now, other than

12:44 PM 16     your objection to allowing them to cross-examine Dr. Martinez

12:44 PM 17     which I addressed, there's no objection to anything that's been

12:44 PM 18     presented in terms of my ability to consider it as evidence

12:44 PM 19     like these -- the things you'd moved to strike, that's all

12:44 PM 20     behind us now?

12:44 PM 21          MR. STEELY:  Yes, Your Honor.

12:44 PM 22          THE COURT:  Okay.  Anything else at all?

12:44 PM 23          MR. STEELY:  If you have no further questions, Your

12:44 PM 24     Honor, no.

12:44 PM 25          THE COURT:  Okay.  Thank you.

12:44 PM 1          Any rebuttal?

12:44 PM 2          MS. NOWLIN-SOHL:  Just a couple of quick points, Your

12:44 PM 3    Honor.

12:44 PM 4          So Mr. Steely was talking about how, you know, if the

12:45 PM 5    US Constitution -- it would violate the US Constitution to not

12:45 PM 6    provide treatment if it was medically necessary.  But this

12:45 PM 7    isn't a policy that says if it's medically necessary you get

12:45 PM 8    this treatment.  It says if it's medically necessary, you have

12:45 PM 9    to jump through all of these other hoops to get the treatment.

12:45 PM 10   And that's why we think that this policy violates the US

12:45 PM 11   Constitution.

12:45 PM 12         THE COURT:  Was not the sum and substance of the

12:45 PM 13   testimony today, though, that this will be provided to people

12:45 PM 14   for whom it is medically necessary?

12:45 PM 15         MS. NOWLIN-SOHL:  They are saying that, but I think

12:45 PM 16   they're also, like, failing to address all of these other

12:45 PM 17   hurdles that there are.  That there are -- it's easy to say

12:45 PM 18   that, but then when you look at the actual policy and the

12:45 PM 19   hurdles and the inability to say that yes, there is an evidence

12:45 PM 20   base that would satisfy this requirement, I think our concern

12:45 PM 21   is that it still violations the constitution, that that's not

12:45 PM 22   actually accurate, and that there's all of these other barriers

12:45 PM 23   unrelated to medical necessary.

12:45 PM 24         The second point that I wanted to make is there's a

12:45 PM 25   lot of focus on the fact that a lot of people are still

12:45 PM  1   receiving hormone therapy and, therefore, everything's fine.

12:46 PM  2   But by Dr. Martinez's own admission, the policy hasn't really

12:46 PM  3   gone into effect yet as it relates to hormone therapy, that

12:46 PM  4   these people haven't been re-evaluated.  And so I think the

12:46 PM  5   fact that people are continuing to receive hormone therapy now

12:46 PM  6   should be given very little weight as to how the policy will

12:46 PM  7   actually be put into practice, because it has not been put into

12:46 PM  8   practice yet.

12:46 PM  9          THE COURT:  Okay.  But it's your burden to prove that

12:46 PM 10   it would be put into practice in a way that essentially cancels

12:46 PM 11   out any true or open-minded medical necessity determination.

12:46 PM 12          MS. NOWLIN-SOHL:  Yes, and I do think we have met that

12:46 PM 13   burden, Your Honor.

12:46 PM 14          THE COURT:  Okay.  Anything else at all?

12:46 PM 15          MS. NOWLIN-SOHL:  No.

12:46 PM 16          THE COURT:  Okay.  Well, thank you to both sides for

12:46 PM 17   the presentation.  The briefing was helpful.

12:46 PM 18          I'm not going to rule right this second, but I am

12:46 PM 19   going to rule hopefully in the short term.  I know there's some

12:46 PM 20   time sensitivity here, and I'm going to get out a ruling as

12:46 PM 21   soon as I can.

12:46 PM 22          Anything else at all for today from either side?

12:46 PM 23          MR. TILLEY:  Not from plaintiff.

12:46 PM 24          MR. STEELY:  Not from defendant, Your Honor.

12:46 PM 25          THE COURT:  Okay.  Court's adjourned.  You all have a

**PROCEEDINGS RECORDED BY STENOGRAPHIC REPORTER**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

12:46 PM  1    good day.

12:47 PM  2          COURT SECURITY OFFICER:  All rise.  This Honorable

12:47 PM  3    Court is now adjourned.  You can go about your business.

12:47 PM  4          (PROCEEDINGS CONCLUDED)

12:47 PM  5                C E R T I F I C A T E

12:47 PM  6          I certify that the foregoing is a correct transcript from
the record of the proceedings in the above-entitled matter.  Any
redaction of personal data identifiers pursuant to the Judicial

12:47 PM  7    Conference Policy on Privacy is noted within the transcript.

12:47 PM  8    <u>1-9-2025</u>          <u>/s/ Dawn M. Savino, R.P.R., C.R.R.</u>
Date          DAWN M. SAVINO, R.P.R., C.R.R.

12:47 PM  9

**I N D E X**

12:47 PM 10

**WITNESSES**

12:47 PM 11

ALL WITNESSES:                       PAGE:

12:47 PM 12

For Defense:

12:47 PM 13

  Dr. Danny Martinez:

12:47 PM 14    Cross-Examination by Ms. Cooper        11:11
    Redirect Examination by Mr. Cranford    111:8

12:47 PM 15

**EXHIBITS**

12:47 PM 16

NO.:    DESCRIPTION:                 PAGE:

12:47 PM 17

For Plaintiff:

12:47 PM 18

3, 8, 9,  :

12:47 PM 19    12 & 13
          In evidence              119:23

12:47 PM 20

12:47 PM 21

22

23

24

25