# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

REIYN KEOHANE; SASHA
MENDOZA; SHEILA DIAMOND;
CARTER JACKSON; and NELSON
BOOTHE,

    *Plaintiffs*,

      v.

RICKY D. DIXON, in his official
capacity as Secretary of the Florida
Department of Corrections; CLAYTON
WEISS, in his official capacity as
Health Services Director of the Florida
Department of Corrections; GARY
HEWETT, in his official  capacity as
Warden of Wakulla Correctional
Institution; ALONZO HORNER, in his
official capacity as Warden of
Homestead Correctional Institution;
and NAN JEFFCOAT, in her official
capacity as Warden of Florida
Women's Reception Center,

    *Defendants*.

Case No. 4:24-cv-434

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs Reiyn Keohane, Sasha Mendoza, Sheila Diamond, Carter Jackson, and Nelson Boothe[1] ("Plaintiffs"), by and through undersigned counsel, bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, against Defendants Ricky D. Dixon, Secretary of the Florida Department of Corrections, in his official capacity; Clayton Weiss, Health Services Director of the Florida Department of Corrections, in his official capacity; Gary Hewett, Warden of Wakulla Correctional Institution, in his official capacity; Alonzo Horner, Warden of Homestead Correctional Institution, in his official capacity; and Nan Jeffcoat, Warden of Florida Women's Reception Center, in her official capacity.

## <u>INTRODUCTION</u>

On September 30, 2024, at Florida Department of Corrections ("FDC") facilities across the state, inmates with gender dysphoria were rounded up and informed that FDC policy concerning the treatment of inmates with gender dysphoria had been changed, "up to and including hormone therapy." They were specifically told that they would no longer have access to clothing and grooming standards that accord with their gender identity and would have 30 days to comply.

---

[1] Plaintiffs are identified in FDC databases respectively as Reiyn J. Keohane (DC # Y55036), George Mendoza (DC # 099172), Kelvin L. Coleman Jr. (DC # 971855), Candace K. Jackson (DC # V29455), and Natasha D. Boothe (DC # A62460).

Transgender women like Keohane, Mendoza, and Diamond were told that those who did not cut their hair in compliance with male grooming standards would be forcibly shorn, and those who did not turn in their female undergarments and feminine canteen items would be disciplined. Transgender men like Jackson and Boothe were told that those who did not turn in their male undergarments and male canteen items would be disciplined.

The new policy established by FDC on September 30, 2024, Health Services Bulletin 15.05.23, entitled "Mental Health Treatment of Inmates with Gender Dysphoria," provides that "State law prohibits the Department from expending any state funds to purchase cross-sex hormones for the treatment of gender dysphoria. Section 286.311, Florida Statutes. The Department shall comply with this statutory requirement unless compliance with the U.S. Constitution or a court decision requires otherwise." In addition, hormone therapy is not listed as a treatment option; rather, the policy provides that, in what it deems to be the "rare instances" where hormone therapy is determined medically necessary, "a variance may be approved." But the requirements for a "variance" include elements unrelated to an individual's medical need, some of which appear unachievable under the policy's own terms or would delay medically necessary care for a year. For example, to obtain a "variance," the treating physician must provide scientific research demonstrating the effectiveness of this treatment, which the policy itself says does not exist. The new policy, including the "variance" requirements and the prohibition on funding for

hormone therapy, create a serious risk of hormone therapy being denied or delayed even when it is medically necessary.

The new policy also does not have a provision for clothing and grooming accommodations, thereby prohibiting inmates from abiding by FDC's clothing and grooming policies consistent with their gender identity, regardless of the impact on their health.

Prior FDC policy, dating back to 2017, recognized that both hormone therapy and other accommodations to facilitate transition can be medically necessary for those diagnosed with gender dysphoria. Under the former policy, FDC healthcare personnel determined that hormone therapy was medically necessary for Plaintiffs. Plaintiffs Keohane, Mendoza, Jackson, and Boothe and many other inmates with gender dysphoria have long been provided hormone therapy. And under the former policy, they were permitted to follow clothing and grooming standards that accord with their gender identity. Their access to this medical care and accommodations has been critical to alleviating the distress of gender dysphoria.

Absent injunctive relief from this Court, Plaintiffs and all transgender persons with gender dysphoria who are in FDC custody will continue to be denied access to the clothing and grooming accommodations they depend on to live in accordance with their gender identity and, thus, alleviate the distress of their gender dysphoria. Being stripped of these accommodations has exacerbated Plaintiffs' gender dysphoria and significantly impacted their health. Additionally, absent injunctive

relief, all inmates like Keohane, Boothe, Jackson, and Mendoza who are currently receiving hormone therapy to treat gender dysphoria, as deemed medically necessary for them by FDC healthcare personnel, are at imminent risk of losing their care. And inmates like Diamond who have been approved for hormone therapy to treat gender dysphoria, as deemed medically necessary for them by FDC healthcare personnel, but have not received treatment, are at risk of that care never being provided.

This draconian policy violates the Eighth Amendment and jeopardizes the health of Plaintiffs and many others. Plaintiffs therefore file this action on behalf of themselves and a proposed class of similarly situated individuals, to seek injunctive relief to prevent the FDC from i) continuing to deny all inmates with gender dysphoria access to clothing and grooming accommodations regardless of their need for such accommodations for their health, and ii) withdrawing or denying medically necessary hormone therapy based on FDC requirements that are unrelated to a person's treatment needs.

## JURISDICTION AND VENUE

1.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the Eighth Amendment to the United States Constitution.

2.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

3.    Venue is proper in the Northern District of Florida under 28 U.S.C. § 1391(b) because the Florida Department of Corrections resides in this district.

## PARTIES

### I.    Named Plaintiffs

4.    *Plaintiff Reiyn Keohane ("Keohane")* is a transgender woman in the custody of FDC. She is currently incarcerated at the Wakulla Annex in Crawfordsville, Florida. She has been in the custody of FDC since 2014. Keohane has been receiving hormone therapy from FDC to treat her gender dysphoria since 2016. She had been provided clothing and grooming accommodations by FDC from at least 2018 until December 30, 2025. Both hormone therapy and clothing and grooming accommodations have been critical to her health and well-being.

5.    *Plaintiff Sasha Mendoza ("Mendoza")* is a transgender woman who has been in the custody of FDC since 1985. She is currently incarcerated at the Wakulla Annex in Crawfordsville, Florida. Mendoza was diagnosed with gender dysphoria in July 2020 by FDC healthcare personnel and approved for clothing and grooming accommodations. She began hormone therapy for gender dysphoria in 2022 under the recommendation and care of FDC healthcare personnel. On or around September 30, 2024, FDC revoked her clothing and grooming accommodations. Both hormone therapy and clothing and grooming accommodations have been critical to her health and well-being.

6.    *Plaintiff Sheila Emerald Diamond ("Diamond")* is a transgender woman who has been in the custody of FDC since 2017. She is currently incarcerated at the Wakulla Annex in Crawfordsville, Florida. Diamond was

diagnosed with gender dysphoria and recommended clothing and grooming accommodations as well as hormone therapy by FDC healthcare personnel on January 23, 2024. Diamond was informed that these recommendations had to be approved by a Tallahassee-based Gender Dysphoria Review Team ("GDRT") in order to receive her accommodations passes and hormones. However, upon information and belief, the GDRT stopped meeting and to date, over a year later, Diamond has not received hormone therapy or clothing and grooming accommodations.

7.     *Plaintiff Carter Jackson ("Jackson")* is a transgender man in the custody of FDC. He is currently incarcerated at the Homestead Correctional Institution in Florida City, Florida. Jackson was diagnosed with gender dysphoria and approved for clothing and grooming accommodations and hormone therapy by FDC healthcare personnel in 2022. Beginning in January 2023, Jackson was receiving hormone therapy in the form of injections. However, on or about October 2024, FDC stopped providing injections, replacing them with testosterone gel, which does not maintain his testosterone level in the male range. On or around October 10, 2024, FDC confiscated Jackson's male undergarments and hygiene products. Both hormone therapy and clothing and grooming accommodations have been critical to his health and well-being.

8.     *Plaintiff Nelson Boothe ("Boothe")* is a transgender man who has been in the custody of FDC since September 18, 2024. He is currently incarcerated at the

Florida Women's Reception Center in Ocala, Florida. Prior to his incarceration, Boothe was diagnosed with gender dysphoria in 2015 by licensed medical professionals. He has been receiving hormone therapy since 2015. Prior to incarceration, and during his incarceration until September 2024, he received this treatment in the form of injections. Since November 2024, FDC has instead been providing Boothe testosterone gel which is not as effective for him as injections. Hormone therapy has been critical to his health and well-being. Boothe is not being provided with clothing or grooming accommodations, which has exacerbated his gender dysphoria.

## II.    **Class of Incarcerated Persons**

9.    Plaintiffs bring this action on their behalf and on behalf of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Civil Rules of Civil Procedure.

10.    The class (the "class") is defined as: all current and future incarcerated persons in custody of the FDC who: i) have gender dysphoria and ii) absent the new policy, would be provided hormone therapy and/or clothing and grooming accommodations to treat their gender dysphoria if deemed medically necessary for them.

11.    As defined, the class meets all the requirements of Rule 23(a).

12.    The class is so numerous that joinder of all members is impracticable. At least 180[2] incarcerated people in FDC custody as of September 29, 2024, have been diagnosed with gender dysphoria, all of whom had accommodations passes until they were rescinded, and approximately 107 have been prescribed hormone therapy.

13.    Additional class members will become incarcerated in the custody of the FDC in the future. They will not receive clothing and grooming accommodations for gender dysphoria, even if they are diagnosed with gender dysphoria and such accommodations would be recommended and approved by FDC healthcare personnel for their gender dysphoria absent the new policy. They will also be at serious risk of being denied hormone therapy even if it is deemed medically necessary for them as a result of the new policy.

14.    There are questions of law or fact common to the class. If Defendants are permitted to enforce the new policy, all members of the class will be subject to common harms: i) the denial of accommodations for their gender dysphoria, regardless of their medical need; and ii) the risk of hormone therapy being withdrawn or denied despite their medical need for such treatment because the requirements for a "variance" to authorize hormone therapy include significant barriers unrelated to

_____

[2] As of September 29, 2024, FDC reported that there were 181 transgender individuals in FDC custody diagnosed with gender dysphoria. However, on January 25, 2025, one transgender woman, Sauge Smith (DC # N9170), died, upon information and belief, by suicide.

medical need. All members seek the same relief: an injunction preventing enforcement of the ban on clothing and grooming accommodations and prohibiting the application of FDC's new policy concerning hormone therapy that includes significant barriers for approval of treatment unrelated to their medical need for such treatment. This lawsuit also presents common questions of law, including whether Defendants' actions violate the Eighth Amendment's protections against cruel and unusual punishment.

15.    Plaintiffs' claims are typical of those of the class. They all claim that the new policy's categorical ban on clothing and grooming accommodations regardless of medical need, and its imposition of barriers to approval for hormone therapy that are unrelated to their medical needs are causing or putting them at risk of significant harm to their health and constitute deliberate indifference to a serious medical need.

16.    Plaintiffs are adequate representatives of the class. They do not have conflicts with other members of the class, they seek the same relief as other members of the class, and they will represent the class fairly and adequately.

17.    The class representatives are also adequately represented by counsel. Counsel includes the American Civil Liberties Union Foundation of Florida, the American Civil Liberties Union Foundation, and Steptoe LLP. Counsel have experience litigating class actions in federal court, including civil rights lawsuits on behalf of transgender persons and incarcerated persons.

18.    The requirements of Rule 23(b)(2) are met in that Defendants have acted, or will act, on grounds generally applicable to the class, and final injunctive relief and corresponding declaratory relief are appropriate respecting the class. FDC's new policy (1) is a blanket ban on clothing and grooming accommodations, and FDC staff have removed clothing and grooming items from Plaintiffs and members of the proposed class; and (2) imposes significant barriers to hormone therapy treatment for Plaintiffs and all proposed class members, creating a serious risk of hormone therapy being delayed or denied even when medically necessary.

### III.    **Defendants**

19.    *Defendant Ricky D. Dixon ("Dixon")* is sued in his official capacity as the Secretary of FDC. Dixon "is responsible for planning, coordinating, and managing the corrections system of the state." Fla. Stat. § 20.315(3). Dixon "shall ensure that the programs and services of the department are administered in accordance with state and federal laws, rules, and regulations, with established program standards, and consistent with legislative intent." *Id.* Dixon is also responsible for the implementation and enforcement of FDC's policies and procedures.

20.    *Defendant Clayton Weiss ("Weiss")* is sued in his official capacity as Health Services Director of FDC. Weiss is responsible for the "delivery of health services to [incarcerated individuals] within the system," with "direct professional authority over such services." Fla. Stat. § 20.315(3)2. Weiss oversees those who have

denied, or will deny, Plaintiffs and proposed class members' medical treatment and accommodations for gender dysphoria, even though Weiss knows that such treatment and accommodations are medically necessary, and that Plaintiffs and proposed class members are at substantial risk of serious harm if their treatment or accommodations are withdrawn or denied.

21.    *Defendant Gary Hewett ("Hewett")* is sued in his official capacity as the Warden of the Wakulla Correctional Institution. As Warden, Hewett is responsible "to supervise the governance, discipline, and policy of the state correctional institutions and to enforce all orders and rules." Fla. Stat. § 944.09(2).

22.    *Defendant Nan Jeffcoat ("Jeffcoat")* is sued in her official capacity as the Warden of Florida Women's Reception Center. As Warden, Jeffcoat is responsible "to supervise the governance, discipline, and policy of the state correctional institutions and to enforce all orders and rules." Fla. Stat. § 944.09(2).

23.    *Defendant Alonzo Horner ("Horner")* is sued in his official capacity as Warden of Homestead Correctional Institution. As Warden, Horner is responsible "to supervise the governance, discipline, and policy of the state correctional institutions and to enforce all orders and rules." Fla. Sta. § 944.09(2).

24.    At all times relevant herein, each Defendant was acting in the course and scope of their employment and under color of state law.

## **FACTUAL ALLEGATIONS**

### Gender Dysphoria is a Serious Medical Condition Requiring Treatment

25.    "Gender dysphoria" is a serious medical condition characterized by clinically significant distress that can result from the incongruity between one's gender identity and the sex they were designated at birth. It is included in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5").

26.    Gender dysphoria is treatable, and, with appropriate care, individuals can manage the symptoms. However, if left untreated, the clinically significant distress caused by gender dysphoria can impair one's ability to function in everyday life, leading to serious medical problems like debilitating depression, substance abuse, self-harm, suicidal ideation, and suicide.

27.    The widely accepted standards for treating gender dysphoria are published by the World Professional Association for Transgender Health and the Endocrine Society. These medical guidelines are recognized by the major medical and mental-health professional groups, including the American Medical Association and the American Psychiatric Association, as authoritative standards for treating gender dysphoria.

28.    Under these guidelines, treatment for gender dysphoria is designed to help individuals live congruently with their gender identity and thus eliminate clinically significant distress. This often includes social transition—dressing, grooming, and living one's life consistently with one's gender identity—and hormone therapy. Like treatment for various other medical diagnoses, the particular course of medical treatment varies based on the individualized needs of the person.

29.     According to the National Commission on Correctional Healthcare, inmates with gender dysphoria should be provided treatment in accordance with the same accepted standards.

<u>FDC's Procedure 403.012</u>

30.     In July 2017, FDC issued Procedure 403.012, "Identification and Management of Transgender Inmates and Inmates Diagnosed with Gender Dysphoria" ("FDC Policy 403.012"). The policy was amended on November 13, 2019.

31.     In its final form, the third section of the FDC Policy 403.012, titled "Treatment for Gender Dysphoria" read:

> Treatment interventions will focus on the ambivalence and/or dysphoria regarding gender identity, social transitioning, assisting with adjustment to incarceration, and community re-entry. Gender-affirming hormonal medication will be prescribed as clinically indicated.

32.     In the following section, "Gender Affirming Hormonal Therapy," the policy provided for hormone therapy to be provided to inmates with gender dysphoria when health care staff determines it is medically necessary and not contraindicated.

33.     Section 5, referring to "Accommodations for Inmates with a Diagnosis of Gender Dysphoria," stated:

> To assist in transitioning, facilities designated by the Department will: 1. provide alternate canteen and quarterly order menus in addition to the menus available to other inmates at the facility; 2.

13

allow inmates to wear make-up inside the housing unit. Make-up will be removed prior to departing the housing unit; 3. allow inmates to grow and style their hair in accordance with the female hair standards as stated in Rule 33-602.101, F.A.C.; and 4. issue opposite gender inmate uniform and under garments. Inmates will be issued the approved type, but may purchase other types of under garments independently from either the alternate canteen or quarterly menu. These items can be worn outside of the housing unit.

34.     For over six years, various FDC correctional institutions have been following this policy and providing appropriate treatment for gender dysphoria to the individuals in its custody, including hormone therapy and access to clothing and grooming accommodations—specifically, access to female and male undergarments, female and male canteen items such as makeup and hygiene products, and the female and male hair-length policies.

FDC's Health Services Bulletin 15.05.23

35.     FDC replaced Procedure 403.012 with Health Services Bulletin 15.05.23 ("HSB 15.05.23" or "Health Bulletin", also referred to as the "new policy"), as of September 30, 2024. The subject of HSB 15.05.23 is "Mental Health Treatment of Inmates with Gender Dysphoria."

36.     The Health Bulletin provides for the following treatments for inmates with gender dysphoria: addressing medical and psychiatric comorbidities through psychotherapy and psychotropic medications; psychotherapy for gender dysphoria; and consideration of psychotropic medications to alleviate symptoms of gender dysphoria.

14

37.    The Health Bulletin states that state law—Florida Statutes, Section 286.311, formerly known as Senate Bill 254 ("Section 286.311")—"prohibits the Department from expending any funds to purchase cross sex hormones for the treatment of gender dysphoria," and that the "Department shall comply with this statutory requirement unless compliance with the U.S. Constitution or a court decision requires otherwise." HSB 15.05.23.IX.B.

38.    The next paragraph purports to provide an avenue for possible exceptions to the prohibition on hormone therapy, stating that "[i]n rare instances deemed medically necessary, a "variance" may be approved to permit the use of cross sex hormones to treat the inmate's gender dysphoria." However, it goes on to state that "variances" "shall only be sought" "if necessary to comply with the U.S. Constitution or a court decision." And no guidance is provided on how to determine if hormone therapy for an individual is necessary to comply with the U.S. Constitution, or who makes that determination.

39.    There are additional requirements for a "variance" unrelated to the medical necessity of treatment for a particular inmate. In discussing the requirements for a "variance," the Health Bulletin states that "[a]n inmate may be assessed for cross-sex hormone therapy" only if "the treating physician can demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the etiological basis of the pathology. Such evidence must be based on sound scientific methods and research that were subject to the formal peer review process."

15

HSB 15.05.23 § IX.C.1. This has nothing to do with the individual inmate's medical circumstances; it is a demand for certain scientific evidence. And the demand is for evidence showing that hormone therapy will treat the *root cause* of gender dysphoria; it is not enough to show that treatment alleviates the distress of the condition, which is the purpose of hormone therapy. Additionally, the Health Bulletin has predetermined that the evidence it demands for a "variance" does not exist, characterizing studies on the benefits of hormone therapy as relying on "unreliable methods." HSB 15.05.23 § IX.A. This requirement is, thus, not only unrelated to an individual's medical need but also appears to be an impossible standard to meet.

40. Additionally, the Health Bulletin provides that a "variance" shall only be sought "after satisfying all preceding provisions of this policy," which, among other things, require at least one year of psychotherapy in FDC custody "to ameliorate the symptoms of gender dysphoria" prior to consideration of a "variance." Thus, even if the other requirements for a "variance" could somehow be met, the policy mandates a significant delay in care regardless of an individual's medical need to start hormone therapy or prior treatments. For example, an individual who enters FDC custody after years of receiving psychotherapy and hormone therapy would be required to discontinue hormone therapy for at least one year under the new policy.

41.    While the Health Bulletin states that "a variance may be approved," it is not clear how that is possible—and for how long—given that it also recognizes that "State law prohibits the Department from expending any state funds to purchase cross-sex hormones for the treatment of gender dysphoria. Section 286.311, Florida Statutes." FDC Chief of Medical Services, Dr. Danny Martinez, has stated that the continued provision of hormone therapy to Plaintiffs and members of the proposed class since the enactment of section 286.311 has been paid for by Centurion Health, the private contractor that provides medical services at FDC facilities. Transcript of Preliminary Injunction Hearing on December 9, 2024, pg. 94.  It is not clear what agreement or other arrangements have been made with respect to this private funding of care for individuals in FDC custody and whether and for how long it will continue.

42.    The final section of the Health Bulletin requires that all inmates receiving hormone therapy be reevaluated to determine if their gender dysphoria *diagnosis* is still warranted. HSB 15.05.23 § IX.D. If the Multidisciplinary Services Team—which includes non-healthcare FDC staff—determines that their diagnosis of gender dysphoria "is no longer warranted," their hormone therapy will be titrated over a period of nine weeks.

43.    The Health Bulletin does not provide any possibility of clothing and grooming accommodations for inmates diagnosed with gender dysphoria.

44.    The Health Bulletin also provides that any individual who is diagnosed with gender dysphoria is automatically classified with a minimum mental health

17

score of S-3[3], HSB 15.05.23 § V, which, among other things, limits opportunities for housing and programming.

45.    The treatment protocols contained in the Health Bulletin depart from well-accepted standards for the treatment of gender dysphoria and are unsupported by scientific evidence.

<u>The Announcement of the New Policy to Inmates with Gender Dysphoria</u>

46.    On September 30, 2024, Keohane, Diamond, and all inmates diagnosed with gender dysphoria in Wakulla Correctional Institution were rounded up and informed that there was a change in policy regarding the treatment of gender dysphoria.

47.    Apparently recognizing how this information would impact these individuals, FDC provided an unusually high security presence, including officers surveying the group from the central tower while holding large guns. In the roughly 10 years that Keohane has been incarcerated, she has never witnessed that amount of security present. The entire administrative and high-ranking staff were present.

48.    Keohane, Diamond, and the other inmates with gender dysphoria were told by an unidentified individual from Centurion Health, the FDC-contracted

---

[3] *See* STATE OF FLORIDA CORRECTIONAL MEDICAL AUTHORITY, 2022-2023 ANNUAL REPORT & UPDATE ON THE STATUS OF ELDERLY OFFENDERS IN FLORIDA'S PRISONS at 7, https://flcma.gov/wp-content/uploads/FY-22-23-Annual-Report-final.pdf ("Mental health grades reflect the level of psychological treatment inmates require. Grades range from S1, requiring the least level of psychological treatment, to S6, requiring the highest level of treatment.").

medical provider, that their treatment for gender dysphoria would be changing, "up to and including hormone therapy." They were specifically informed that they would no longer be permitted to follow female grooming and clothing standards, and that compliance with the male standards would begin being enforced in 30 days, at which point they would order them to comply with the male grooming standards, confiscate all female clothing and canteen items, and issue boxers as a replacement for their undergarments. If they did not comply, their heads would be forcibly shaved, and they would be subject to "disciplinary action."

49.     On October 4, 2024, the same group of about 80 inmates with gender dysphoria at Wakulla Correctional Institution were ordered to visit the medical center to have their breasts examined to determine if they would qualify for an exception to be able to wear bras for physical support purposes.

50.     On September 30, 2024, all transgender inmates at Lake Correctional Institution, including Mendoza, were escorted to the mental health office and taken to a conference room full of FDC officials.

51.     There, they were told that there was an FDC procedure change, they had 30 days to cut their hair and surrender canteen items, and the future of their hormone therapy treatment was unknown, subject to an evaluation.

52.     If they did not comply, they were told that they would face disciplinary action.

53.    When Mendoza asked Major Wyatt who ordered or made this FDC policy change, he stated "Governor Ron DeSantis."

54.    On September 30, 2024, all the transgender individuals at Florida Women's Reception Center were rounded up and read a copy of the new policy. They were told that they had 30 days to send all of their male clothing, grooming, and alternate canteen items home or they would be subject to disciplinary action. However, only 10 days later, FDC officials confiscated their belongings not compliant with the new policy.

55.    Similar roundups of inmates with gender dysphoria for the purpose of informing them of the change in FDC policy regarding the treatment of gender dysphoria took place at other Florida prisons.

<u>Treatment for Plaintiffs' Gender Dysphoria</u>

*Plaintiff Keohane*

56.    Keohane has known that she has a female gender identity since age 12.

57.    At age 13, Keohane began seeing a psychiatrist and a therapist. From age 14 on, with the support and guidance of these medical professionals, she began socially transitioning, wearing female-typical clothing, hairstyles, and cosmetics.

58.    At age 16, Keohane was diagnosed by a licensed medical professional with Gender Identity Disorder.[4]

---

[4] Gender identity disorder is an earlier diagnosis used in prior versions of the DSM.

59.    At age 17, she legally changed her name to "Reiyn" to conform with her gender identity. She had been using the name "Reiyn" socially prior to the formal legal name change.

60.    In 2013, when she was 19 years-old, Keohane began hormone therapy—estrogen and a testosterone suppressant—under the recommendation and care of licensed medical professionals.

61.    In September 2013, Keohane was arrested and taken into the custody of the Lee County Jail. At Lee County Jail, she was denied hormone therapy, despite her repeated requests to continue care.

62.    In July 2014, she accepted a plea deal of 15 years, with the understanding that she would be provided hormone therapy after being transferred to FDC custody. Maintaining hormone therapy was a deciding factor in her acceptance of the plea.

63.    On July 17, 2014, Keohane was committed to the custody of FDC. She was transferred between numerous FDC facilities from 2014 until 2018. Since 2018, she has been primarily in custody at the Wakulla Annex.

64.    Soon after entering FDC custody, Keohane requested treatment for her gender dysphoria, making clear the need for both hormone therapy and the ability to dress and groom in accordance with female standards.

65.    Keohane requested treatment for her gender dysphoria in numerous conversations with FDC healthcare personnel, and through informal and formal

grievances and appeal processes, across FDC institutions, to no avail. Although FDC healthcare personnel confirmed her diagnosis, all treatment for her gender dysphoria, apart from mental health counseling, was denied.

66.    Although she had at times been using bras and makeshift female undergarments, these were confiscated. She was told that such clothing was unauthorized in a male institution.

67.    The harm it caused Keohane to be without hormone therapy and access to female clothing and grooming standards was significant and resulted in an attempted self-castration and attempts to end her life.

68.    Because her numerous grievances and constant pleading with FDC officials to provide medical care were unsuccessful, Keohane obtained legal representation for help.

69.    On August 15, 2016, a lawsuit was filed on Keohane's behalf in the Northern District of Florida to compel FDC to treat her medical needs. *Keohane v. Jones*, 4:16-cv-511-MW-CAS (N.D. Fla.).

70.    Within a matter of weeks after the lawsuit was filed, FDC began providing hormone therapy to Keohane, and in 2017, six days before trial in the case, it amended its policy concerning treatment for gender dysphoria. The new policy recognized that both hormone therapy and other accommodations to facilitate transition can be medically necessary for those diagnosed with gender dysphoria.

71.    Keohane had access to female clothing and grooming standards since at least 2018 until December 2024.[5] During that period, she was able to wear her hair long, wear makeup, and wear female undergarments.

72.    The hormone therapy and ability to follow female clothing and grooming standards made it possible for her to live as the woman that she is and, thus, alleviated the painful distress of gender dysphoria.

73.    The withdrawal of clothing and grooming accommodations—including being forced to have her hair cut short, wear men's underwear, and stop wearing makeup—has exacerbated her gender dysphoria.

74.    As a result of the implementation of HSB 15.05.23, on October 31, 2024, Keohane was re-evaluated by Dr. Joshi, a psychologist, who reconfirmed her diagnosis of gender dysphoria. Upon information and belief, pursuant to FDC's new policy, Dr. Joshi sent her recommendation report regarding Keohane's diagnosis and proper treatment to the "central office" at Tallahassee. Keohane has received no further information about whether a "variance" will be granted to allow her to continue receiving hormone therapy.

75.    Keohane is living in constant fear that her hormone treatment might be taken away. She has experienced the detrimental effects of not having her treatment.

---

[5]Keohane was permitted to maintain her clothing and grooming accommodations beyond the October 30, 2024, deadline for compliance with male clothing and grooming standards because she had a motion for preliminary injunction pending. That motion was denied in December 2024.

This uncertainty and fear coupled with the removal of clothing and grooming accommodations has resulted in increased gender dysphoria, severe anxiety, depression, insomnia, fatigue, social isolation, suicide ideations as well as the urge to self-harm.

*Plaintiff Mendoza*

76.    Mendoza has known that she is female since she was 15 years old.

77.    In 1985, Mendoza was committed to FDC custody. She is currently housed at Wakulla Annex.

78.    In 1993, Mendoza began socially transitioning and going by the name "Sasha".

79.    In July 2020, after being evaluated by FDC healthcare personnel, she was diagnosed with gender dysphoria. FDC subsequently approved her for female clothing and grooming accommodations. She began wearing female underwear and cosmetics and grew out her hair.

80.    On July 21, 2021, FDC healthcare personnel recommended hormone therapy treatment to alleviate her gender dysphoria.

81.    Under the recommendation and care of FDC healthcare personnel, she began hormone therapy in 2022.

82.    The clothing and grooming accommodations and hormone treatment alleviated the distress of gender dysphoria. And because she felt more like herself

and was more comfortable in her body, her depression and anxiety significantly decreased, her appetite increased, and her insomnia decreased.

83.    On September 30, 2024, while in custody at Lake Correctional Institution, all transgender inmates were told that there was an FDC policy change regarding treatment of gender dysphoria, which could affect their ability to continue hormone therapy and rescinded clothing and grooming accommodations. They were further told that if they did not comply with male clothing and grooming standards, they would face disciplinary action.

84.    On September 30, 2024, Mendoza was examined by Dr. Mesa and received a medical pass for a bra for breast support, valid for one year. She is otherwise required to follow male clothing and grooming standards.

85.    Due to institutional transfers, Mendoza's female clothing and grooming items were gradually confiscated. Beginning in November 2024 through January 2025, her female undergarments such as panties, grooming items like tweezers, shampoo, conditioner, hair elastics, and cosmetics or makeup were taken.

86.    Mendoza has not yet been reevaluated under HSB 15.05.23 to determine if she will be approved for a "variance" to allow her to continue receiving hormone therapy.

87.    As a result of the change in policy—which has prohibited her from dressing and grooming consistently with her female gender identity and has her living in fear of being withdrawn from hormone therapy—Mendoza's mental and

physical health has dramatically deteriorated, including increased anxiety, depression, loss of appetite, and trouble sleeping, and thoughts of suicide have worsened.

*Plaintiff Diamond*

88.    Since Diamond can remember, she has always known that she has a female gender identity.

89.    At age 7, she began using the name "Sheila."

90.    Beginning as a child, Diamond was often female-presenting, wearing clothing traditionally considered for women, applying makeup, and growing her red-curly hair long.

91.    At age 11, she was removed from Howard Middle School, a public school located in Ocala, Florida, and placed in an alternative school because of her transgender identity.

92.    By the time Diamond was a teenager, when she moved away from her disapproving family, she dressed and groomed consistently with her female gender identity in her daily life.

93.    Diamond has been in FDC custody since 2017.

94.    She requested an evaluation for gender dysphoria soon after entering the custody of FDC, however, it wasn't until she received outside help from a non-profit organization that she was able to receive an evaluation several years later.

95.     In 2022, Dr. Smith evaluated Diamond and made a provisional diagnosis of gender dysphoria at Jackson Correctional Institution. As a result of the diagnosis, Diamond was supposed to be transferred to Wakulla Correctional Institution within 30 days. However, it took outside intervention to ignite the transfer, which did not happen until 2023.

96.     On January 23, 2024, after a year-long evaluation process, Dr. Joshi and Dr. Leacock, psychologists at FDC, confirmed Diamond's diagnosis of gender dysphoria and recommended she receive clothing and grooming accommodations and hormone therapy.

97.     Diamond was informed that before she could receive her accommodations passes and hormone therapy, these recommendations by FDC healthcare personnel had to be approved by the GDRT in Tallahassee.

98.     She was told that the GDRT was "put on pause" and has received no further information nor the recommended clothing and grooming accommodations or hormone therapy.

99.     Though Diamond did not have a pass for clothing and grooming accommodations, she had long hair that she wore in braids and was wearing female undergarments and makeup that she had made or purchased from other inmates. She knew this put her at risk of discipline but took the risk because of how it would impact her gender dysphoria to have to dress and groom as a man.

100.   Not long after the Health Bulletin was announced on September 30, 2024, Diamond cut her hair short to be in compliance out of fear of having her head forcibly shaved if she did not.

101.   On October 30, 2024, FDC officials confiscated Diamond's bras, panties, makeup, and female hygiene products. About two weeks later, FDC confiscated all of Diamond's additional female clothing and grooming items through an involuntary search of inmate property commonly referred to as a "shake down."

102.   Since cutting her hair and having her female underwear and grooming items removed from her, Diamond is suffering every day. She is experiencing severe depression, anxiety, self-esteem issues, and suicidal thoughts, and her gender dysphoria has increased.

*Plaintiff Jackson*

103.   Jackson knew since he was about 9 years old that he had a male gender identity.

104.   He entered custody of FDC in 2014.

105.   In 2022, he began seeing FDC healthcare personnel for help with the distress he was feeling related to his gender.

106.   In December 2022, he was diagnosed with gender dysphoria and approved for hormone therapy treatment and clothing and grooming accommodations by FDC healthcare personnel. In January 2023, he began

receiving testosterone injections as recommended by FDC healthcare personnel. A few months later he received his passes for clothing and grooming accommodations.

107.    On or about October 2023, FDC stopped providing hormone therapy by way of injections, replacing them with testosterone gel. Once he began the gel, his testosterone levels significantly dropped, so much so he began menstruating again, and an FDC nurse told him the level can no longer be classified as a male's level. For his health, Jackson has continuously requested to receive injections again, however FDC refuses to provide them.

108.    On September 30, 2024, all the transgender individuals at Florida Women's Reception Center, where he was housed at the time, were rounded up, read a copy of the Health Bulletin, and told that they had 30 days to send all of their male clothing, grooming, and alternate canteen items home or face disciplinary action.

109.    On or around October 10, 2024, FDC confiscated Jackson's male clothing and grooming items, including boxers and male deodorant.

110.    On or around December 2024, all of the transgender individuals at Florida Women's Reception Center were called to mental health for what was referred to as a "reevaluation," where they, as a group, met a few mental health counselors and members of the FDC medical staff. There, they were given an option to "sign-out" of the program, meaning if they signed the provided paper,

they were agreeing to no longer receive testosterone gel or any treatment for gender dysphoria. Jackson did not sign out. The only question they were asked was if they wanted to "sign out or stay," with no further context. They did not ask Jackson any medical questions, and the meeting lasted only a few minutes.

111.   Jackson has received no information indicating if he has been approved for a "variance" to be able to continue receiving the testosterone gel.

112.   Given the Health Bulletin, Jackson does not know if he will be able to continue receiving any hormone therapy.

113.   Because his male clothing and grooming accommodations have been taken away and he is no longer receiving effective hormone therapy—and does not know if he will be able to continue receiving even the gel testosterone going forward—, he is experiencing depression, extreme emotions, increased gender dysphoria, and decreased self-esteem. Jackson feels that the new policy is forcing him to detransition. Jackson experienced suicidal ideation before beginning his treatment for gender dysphoria and he fears such thoughts will soon return.

*Plaintiff Boothe*

114.   Boothe has known that he is male since he was around 8 years old.

115.   Since 2014, when he was 17 years old, he began socially transitioning and going by the name "Nelson".

116.   After extensive evaluation, Boothe was diagnosed with gender dysphoria in 2015 by healthcare professionals and was recommended to begin

hormone therapy. Shortly thereafter, Boothe began taking injections of testosterone.

117.    Boothe entered the custody of FDC on September 18, 2024. He is currently housed at the Florida Women's Reception Center.

118.    Boothe asked to continue his hormone therapy upon entering FDC custody. However, only after grieving the lack of care was he able to receive testosterone gel about a month and half later.

119.    The sudden lack of any hormone treatment for around 6 weeks after receiving such treatment for over a decade resulted in Boothe becoming ill, including withdrawal symptoms like extreme fatigue, muscle spasms, loss of appetite, severe anxiety, weight loss, and nausea. In addition, after having been suppressed by testosterone for many years, his menstrual cycle began again, causing intense dysphoria.

120.    The testosterone gel he is being provided does not have the same effect as the injections he had been receiving. For example, it is not sufficient to suppress menstruation and, thus, prevent the dysphoria that accompanies that.

121.    Boothe's boxers and male hygiene items such as male deodorant, soap, and body wash were confiscated upon entry and he has not been provided with any clothing, grooming, or alternate canteen item accommodations passes.

122.    FDC provided Boothe a shower accommodation pass to allow him to shower separately from the women in the facility but revoked the pass a few weeks

31

later. He was told the pass was removed because it was an accommodation provided with the program created for transgender inmates and the program no longer exists—it was terminated on or around November 2024 because of the Health Bulletin.

123.   On February 21, 2025, Boothe was called to the mental health office to be reevaluated for gender dysphoria. The mental health counselor who evaluated him confirmed his gender dysphoria diagnosis. Boothe has received no information indicating if he was approved for a "variance" to be able to continue receiving hormone therapy.

124.   The lack of clothing and grooming accommodations, coupled with receiving insufficient testosterone, has caused him to experience adverse physical and mental health consequences including weight loss, insomnia depression, anxiety, self-isolation, and suicidal ideation.

125.   Boothe is also living in fear that even his testosterone gel treatment will be taken away given the HSB. He is already suffering from the switch from testosterone injections to the less effective gel and if he were to be denied any testosterone, he doesn't believe he would be able to survive.

## CLAIM FOR RELIEF

### Count I

### Denial of Medically Necessary Treatment in Violation of the Eighth Amendment to the United States Constitution (42 U.S.C. § 1983)

126.    Plaintiffs repeat and reallege the allegations in all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

127.    Plaintiffs and the proposed class members are transgender people who have been or will be diagnosed with gender dysphoria, a serious medical condition. Without necessary treatment, Plaintiffs and members of the proposed class will suffer irreparable physical and psychological harm.

128.    It is medically necessary for Plaintiffs and members of the proposed class to receive the hormone therapy that FDC healthcare personnel has deemed medically necessary for them—or would deem medically necessary for them absent the new policy—as well as access to clothing and grooming standards that accord with their gender identity.

129.    Defendants are aware that Plaintiffs and members of the proposed class have gender dysphoria and require the hormone therapy and/or clothing and grooming accommodations they have been provided or recommended. They are also aware that denying them clothing and grooming accommodations is causing serious harm. They are further aware that denying them hormone therapy that they have been provided or recommended would cause or is causing them serious harm.

130. Defendants are responsible for providing adequate and necessary treatment to Plaintiffs and members of the proposed class, including treatment for gender dysphoria.

131. Defendants nevertheless are withdrawing medically necessary clothing and grooming accommodations from Plaintiffs and members of the proposed class, not based on a medical judgment concerning their medical needs or individual assessments. And Defendants' new policy puts Plaintiffs and members of the proposed class at serious risk of having hormone therapy withdrawn or denied, despite a medical need for this treatment.

132. Defendants' Health Bulletin establishes a blanket prohibition that denies clothing and grooming accommodations to Plaintiffs and members of the proposed class without consideration of any medical judgement formed by health care providers, as well as imposes requirements for obtaining hormone therapy that are unrelated to their medical needs and appear unachievable.

133. As a result of Defendants' implementation of the Health Bulletin, Plaintiffs and members of the proposed class are and will continue to suffer severe psychological distress and physical harm, including suicidal ideation and self-harm.

134. Defendants' deliberate actions of denying, reducing, and cutting off needed medical treatment and accommodations for Plaintiffs and members of the proposed class has caused or will cause them severe physical and psychological

harm and puts them at grave risk for worsening physical and psychological symptoms.

135. This denial of treatment violates the Eighth Amendment's prohibition on cruel and unusual punishment and is deliberate indifference to a serious medical need.

136. Defendants have acted, and continue to act, with deliberate indifference to Plaintiffs and members of the proposed class's serious medical needs, and to the substantial risk of serious harm to Plaintiffs and members of the proposed class.

137. As a result of Defendants' actions described herein, Plaintiffs and members of the proposed class are suffering and/or will imminently suffer, and in the absence of injunctive relief, will continue to suffer irreparable physical and psychological harm.

138. At all relevant times, Defendants and other FDC officials were acting under color of state law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this court enter judgement in their favor and against Defendants as follows:

(a) Declare Defendants' policy and practice of i) banning clothing and grooming accommodations for inmates with gender dysphoria regardless of medical need, and ii) imposing significant barriers to access to hormone therapy  that

are unrelated to medical need, putting them at risk of treatment being denied or delayed even when medically necessary, constitute a violation of the Eighth Amendment to the United States Constitution;

(b) Issue permanent injunctive relief enjoining Defendants, their contractors, employees, agents, and successors in office from enforcing Section 286.311 and Health Bulletin 15.05.23 or any other policy that i) denies clothing and grooming accommodations for inmates with gender dysphoria, regardless of their medical need for such care, or ii) denies or delays hormone therapy for inmates with gender dysphoria based on requirements that are unrelated to their medical needs.

(c) Certify the class;

(d) Award Plaintiffs and members of the proposed class their reasonable attorneys' fees, litigation expenses, and other reasonable costs incurred in connection with this action from Defendants, pursuant to 42 U.S.C. § 1988; and

(e) Award all other relief that this Court deems just, proper, and appropriate.

Dated: March 11, 2025

Respectfully submitted,

/s/ Daniel B. Tilley
Samantha J. Past (Florida Bar No. 1054519)
Daniel B. Tilley (Florida Bar No. 102882)
**American Civil Liberties Union Foundation of Florida**

36

4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org

Li Nowlin-Sohl (Admitted in Washington only)
Leslie Cooper
**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org

Michelle Fraling (Admitted in Washington D.C. only)
**American Civil Liberties Union Foundation**
915 15th Street NW, 6th Floor
Washington DC, 20005
Tel: (917) 710-3245
michelle.fraling@aclu.org

Anthony Anscombe (Admitted in Illinois and California; *pro hac vice forthcoming*)
Darlene Alt (Admitted in Illinois; *pro hac vice forthcoming*)
Emily Shook (Admitted in Illinois only; *pro hac vice forthcoming*)
Laurel Taylor (Admitted in New York; *pro hac vice forthcoming*)
**Steptoe LLP**
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Tel. (312) 577-1300
aanscombe@steptoe.com
dalt@steptoe.com
eshook@steptoe.com
lataylor@steptoe.com

*Counsel for Plaintiffs*