# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

REIYN KEOHANE; SASHA
MENDOZA; SHEILA DIAMOND;
KARTER JACKSON; and NELSON
BOOTHE,

      *Plaintiff*,

v.

RICKY D. DIXON, et al.,

      *Defendants*.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 4:24-cv-00434-AW-MAF

## **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................1

II.   SUMMARY OF ARGUMENT ........................................................................4

III.  BACKGROUND ..............................................................................................6

   A.   Gender Dysphoria and Its Treatment ...............................................6

   B.   Defendants' New Policy: Health Services Bulletin 15.05.23 .........8

   C.   Plaintiffs Keohane, Mendoza, Diamond, Jackson, and Boothe Are Being Subjected to the Challenged Policy ...........................................................11

IV.   ARGUMENT...................................................................................................16

   A.   The Requirements of Rule 23(a) are Satisfied. .............................17

     1.   Numerosity ...............................................................................17

     2.   Commonality.............................................................................18

     3.   Typicality .................................................................................23

     4.   Adequacy of Representation ....................................................25

   B.   Class Certification is Appropriate Under Fed. R. Civ. P. 23(b)(2). ..............27

   C.   Undersigned Counsel Should be Appointed Class Counsel Under Fed. R. Civ. P. 23(g)........................................................................................30

V.   CONCLUSION.................................................................................................32

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)......................................................................................................16

*Anderson v. Garner*,
22 F. Supp. 2d 1379 (N.D. Ga. 1997) .........................................................................29

*Baxley v. Jividen*,
338 F.R.D. 80 (S.D.W.Va. 2020).................................................................................23

*Braggs v. Dunn*,
317 F.R.D. 634 (M.D. Ala. 2016)..............................................................16, 22, 27, 29

*Butler v. Suffolk Cnty.*,
289 F.R.D. 80 (E.D.N.Y. 2013) ..................................................................................19

*Cox v. Amer. Cast Iron Pipe Co.*,
784 F.2d 1546 (11th Cir. 1986) .............................................................................17, 18

*DL v. District of Columbia*,
713 F.3d 120 (D.C. Cir. 2013).................................................................................19, 20

*Dockery v. Hall*,
No. 3:13-cv-326-WHB-JCG, 2018 WL 11424799 (S.D. Miss. Feb. 14, 2018) .....................22

*Dunn v. Dunn*,
219 F. Supp. 3d 1100 (M.D. Ala. 2016) ......................................................................22

*Dunn v. Dunn*,
318 F.R.D. 652 (M.D. Ala. 2016).............................................................................23, 24

*Fields v. Smith*,
653 F.3d 550 (7th Cir. 2011) ........................................................................................31

*Georgia State Conference of Branches of NAACP v. State*,
99 F.R.D. 16 (S.D. Ga. 1983) ......................................................................................30

*Griffin v. Carlin*,
755 F.2d 1516 (11th Cir. 1985) ....................................................................................25

*Henderson v. Thomas*,
289 F.R.D. 506 (M.D. Ala. 2012)................................................................................24

*Holmes v. Continental Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ............................................................................28

*Hughes v. Judd*,
    No. 12 Civ. 568, 2013 WL 1821077 (M.D. Fla. Mar. 27, 2013)............................................19

*Iglesias v. Fed. Bureau of Prisons*,
    Case No. 19-CV-415-NJR, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021) ...............................31

*Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of
    Correction*,
    No. 08 Civ. 1317, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012) ...........................................19

*Baby Neal ex rel. Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994)................................................................................................19, 27

*Keohane v. Fla. Dep't of Corr. Sec.*,
    952 F.3d 1257 (11th Cir. 2020) .......................................................................................31

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987) .........................................................................................32

*Kornberg v. Carnival Cruise Lines, Inc.*,
    741 F.2d 1332 (11th Cir. 1984) ..................................................................................24, 25

*L.H. v. Schwarzenegger*,
    No. CIV. S–06–2042, 2007 WL 662463 (E.D. Cal. Feb. 28, 2007).....................................20

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985) .........................................................................................19

*Lippert v. Baldwin*,
    No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017)...............................................21

*M.D. v. Perry*,
    294 F.R.D. 7 (S.D. Tex. 2013)...........................................................................................22

*Mills v. Foremost Ins. Co.*,
    511 F.3d 1300 (11th Cir. 2008) .......................................................................................17

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ........................................................18, 19, 21, 24, 27

*Prado-Steiman ex rel. Prado v. Bush*,
    221 F.3d 1266 (11th Cir. 2000) ..................................................................................23, 24

*Rosas v. Baca*,
    No. 12 Civ. 428 DDP, 2012 WL 2061694 (C.D. Cal. June 7, 2012).....................................19

*Scott v. Clarke*,
     61 F. Supp. 3d 569 (W.D. Va. 2014) ......................................................................21

*Taig v. Currey*,
     No. 9:21-CV-80391-RLR, 2022 WL 18539319 (S.D. Fla. June 28, 2022)............................18

*Unknown Parties v. Johnson*,
     163 F. Supp. 3d 630 (D. Ariz. 2016) ....................................................................20

*Valley Drug Co. v. Geneva Pharm., Inc.*,
     350 F.3d 1181 (11th Cir. 2003) .....................................................................16, 25

*Vega v. T-Mobile USA, Inc.*,
     564 F.3d 1256 (11th Cir. 2009) ..........................................................................23

W*al-Mart Stores, Inc. v. Dukes*,
     564 U.S. 338 (2011).............................................................................18, 22, 27

*Williams v. Mohawk Indus., Inc.*,
     568 F.3d 1350 (11th Cir. 2009) ..........................................................................23

*Zayre-Brown v. N.C. Dep't of Pub. Safety*,
     No. 3:22-cv-191-MOC-DCK, 2024 WL 410243 (W.D.N.C. Feb. 2, 2024)............................31

**Statutes**

Fed. R. Civ. P. 23(a) ..........................................................1, 4, 16, 17, 22, 23, 25

Fed. R. Civ. P. 23(b)(2).........................................................1, 4, 27, 28, 29, 30

Fed. R. Civ. P. 23(g) ...........................................................................30

Florida Statutes, Section 286.311 ..................................................................9

**Other Authorities**

NCCHC, *Transgender and Gender Diverse Health Care in Correctional Settings*,
     available at https://www.ncchc.org/wp-content/uploads/Transgender-and-
     Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf ...............................8

Wright & Miller, 7AA *Fed. Prac. & Proc. Civ.* § 1776.1 (3d ed.) .............................27

John P. Frank, Response to 1996 Circulation of Proposed Rule 23 on Class
     Actions, in 2 WORKING PAPERS OF THE ADVISORY COMMITTEE ON
     CIVIL RULES ON PROPOSED AMENDMENTS TO CIVIL RULE 23, at
     260, 266 (Admin. Office of the U.S. Courts ed., 1997),.......................................28

# I.    INTRODUCTION

This case presents a legal and factual dispute well-suited for resolution on a class basis, as it meets all the requirements of Fed. R. Civ. P. 23(a) and (b)(2). Plaintiffs are individuals with gender dysphoria held in Florida prisons whose medically necessary health care is being denied, withdrawn and/or gravely threatened by the Florida Department of Corrections ("FDC") as a result of a recent policy change.

Gender dysphoria is a serious medical condition characterized by clinically significant distress that can result from the incongruity between an individual's gender identity and the sex they were designated at birth. If left untreated, the clinically significant distress caused by gender dysphoria can impair the individual's ability to function in everyday life and cause depression, anxiety, substance abuse, self-harm, and suicidality.  The widely accepted medical protocols for the treatment of gender dysphoria include social transition and hormone therapy to enable the individual to live in accordance with their gender identity.  It is well-recognized in the medical field that such treatment can effectively alleviate gender dysphoria.[1]

On September 30, 2024, FDC rescinded its prior policy on the treatment of individuals with gender dysphoria, Procedure 403.012, "Identification and

---

[1] These facts were all alleged in the First Amended Complaint, ECF 66 at ¶¶ 25–29, and are supported by the expert testimony of Dr. Dan Karasic, discussed in the Background below.

1

Management of Inmates Diagnosed with Gender Dysphoria," ("Procedure 403.012") which—consistent with accepted standards in the medical community for treating gender dysphoria—provided for clothing and grooming accommodations to allow for social transition, as well as hormone therapy when medically necessary.

FDC replaced Procedure 403.012 with a new "Health Services Bulletin," known as HSB 15.05.23. The new policy does not permit clothing and grooming accommodations for individuals with gender dysphoria regardless of their individual needs or the impact that the denial of those accommodations has on their gender dysphoria. Under this new policy, transgender women must dress and groom as men, and transgender men must dress and groom as women.

Additionally, HSB 15.05.023 has a default rule prohibiting hormone therapy that is based in part on a state law prohibiting expending state funds to purchase cross-sex hormones for the treatment of gender dysphoria. The new policy allows for "variances" to permit treatment if certain conditions—including conditions unrelated to an individual's medical need (*see* Section III.B, *infra*, explaining policy)—are met. Therefore, under the new policy, individuals with gender dysphoria are at risk of hormone therapy being delayed, withdrawn or denied despite having a medical need for such treatment.

2

All Plaintiffs have been diagnosed with gender dysphoria by prison healthcare personnel. Plaintiffs Reiyn Keohane, Sasha Mendoza, Karter Jackson,[2] and Nelson Boothe have been prescribed hormone therapy by prison healthcare personnel who deemed this treatment medically necessary for them and have been receiving that care for some time.  Ex. D, Declaration of Sasha Mendoza ¶¶ 9–10 ("Mendoza Decl."); Ex. C, Declaration of Reiyn Keohane ¶¶ 9, 17 ("Keohane Decl."); Ex. G, Declaration of Nelson Boothe ¶¶ 8–12 ("Boothe Decl."); Ex. F, Declaration of Karter Jackson ¶ 9 ("Jackson Decl.").  Prior to September 30, 2024, prison healthcare personnel also provided them with accommodations passes that allowed them to access clothing and grooming standards that accorded with their gender identity, enabling them to socially transition. Mendoza Decl. ¶¶ 8, 11; Keohane Decl. ¶¶ 18–19, 21; Boothe Decl. ¶¶ 13–14; Jackson Decl. ¶ 9.  When HSB 15.05.23 went into effect, those accommodations passes were rescinded, and these Plaintiffs do not know if they will be approved for variances to allow their hormone therapy to continue.  Mendoza Decl. ¶¶ 12–15; Keohane Decl. ¶¶ 23–31; Boothe Decl. ¶¶ 13–15; Jackson Decl. ¶¶ 12–15. Plaintiff Sheila Diamond was previously approved for hormone therapy and accommodation passes by prison healthcare personnel, but the

---

[2] Mr. Jackson's first name was inadvertently misspelled in Plaintiffs' First Amended Complaint as "Carter" rather than "Karter." *See* ECF 66. Plaintiffs will use the correct spelling forthwith.

hormone treatment and accommodations pass have not been provided to her. Ex. E, Declaration of Sheila Diamond ¶¶ 11–15 ("Diamond Decl.").

## II.   SUMMARY OF ARGUMENT

Plaintiffs brought an Eighth Amendment claim arguing that, in implementing the new policy, which denies and threatens to deny medically necessary health care, FDC is deliberately indifferent to the medical needs of plaintiffs and those similarly situated to them.  ECF 66, First Amended Complaint.  At the certification stage, a Court must look at whether the action before it can be resolved on a class-wide basis in accordance with the requirements of Fed. R. Civ. P. 23(a) and 23(b).  Here, Plaintiffs submit that the legal and factual issues before the Court are eminently suitable for resolution on a class basis.  The factual predicate is simple:  FDC has issued HSB 15.05.23, which i) no longer permits clothing and grooming accommodations for individuals with gender dysphoria regardless of medical need, and ii) conditions access to an exception from the general prohibition against hormone therapy on criteria unrelated to individual medical need, putting individuals with gender dysphoria at risk of being denied hormone therapy even when they have a medical need for it.  The policy is, thus, subjecting Plaintiffs and putative class members to current suffering by effectively precluding social transition, and the serious risk of further additional suffering due to loss of medically necessary hormone therapy.

4

The legal questions are also straightforward: does HSB 15.05.23's blanket denial of clothing and grooming accommodations for individuals with gender dysphoria regardless of medical need, and its hormone therapy policy that includes eligibility criteria unrelated to individual medical need, constitute deliberate indifference to the health of individuals in the custody of FDC suffering from gender dysphoria?  The relief sought is clear: an injunction prohibiting FDC officials from imposing a categorical prohibition on clothing and grooming accommodations regardless of medical need, and imposing conditions for eligibility for hormone therapy that are unrelated to individual medical need.

Plaintiffs therefore ask this Court to certify a class of:

"all current and future incarcerated persons in custody of the FDC who: i) have gender dysphoria, and ii) absent the new policy, would be provided hormone therapy and/or clothing and grooming accommodations to treat their gender dysphoria if deemed medically necessary for them."

All of the requirements of Rule 23 are met.  There are approximately 180 inmates in FDC custody who have been diagnosed with gender dysphoria, *see* ECF 46-7 at 3, Response to Interrogatory No. 2, readily satisfying the numerosity requirement.  ECF 46-7 at 3, Response to Interrogatory No. 2.  The named Plaintiffs also satisfy the commonality requirement: their claims depend upon a common contention that HSB 15.05.23 denies them access to treatment decisions for gender dysphoria based on individual medical needs.  They meet the typicality requirement

5

because they are members of the class they seek to represent; they have gender dysphoria requiring treatment; and their access to treatment has been and will continue to be affected by HSB 15.05.23. *See generally*, Diamond Decl.; Mendoza Decl.; Keohane Decl.; Boothe Decl.; Jackson Decl.  Finally, they satisfy the adequacy requirement because they understand their obligations as class representatives and have engaged qualified counsel who are able to effectively litigate this case.  Diamond Decl. ¶¶ 22–23; Mendoza Decl. ¶¶ 18–19; Keohane Decl. ¶¶ 34–36; Boothe Decl. ¶ 18; Jackson Decl. ¶¶ 18–19.

Plaintiffs further ask the Court to appoint their counsel, who have the experience and resources to fairly and adequately represent the interests of the class, as class counsel should the putative class be certified.

Plaintiffs have conferred with counsel for Defendants pursuant to N.D. Fla. Loc. R. 7.1(B), and Defendants oppose this motion.

### III.    BACKGROUND

#### A. Gender Dysphoria and Its Treatment[3]

"Gender identity" refers to an individual's deeply felt, inherent sense of their gender. Ex. A, Declaration of Dr. Dan H. Karasic, M.D. ("Karasic Decl.") ¶ 33. For

---

[3] The Background section on gender dysphoria and its treatment is primarily based on the expert declaration of Dr. Dan H. Karasic.  Dr. Karasic is a psychiatrist with more than three decades of experience in the diagnosis and treatment of gender dysphoria and has treated thousands of patients with this condition.  Karasic Decl. ¶¶ 5–6. Although this information relates predominately to the merits issues,

most people, their sex assigned at birth, or assigned sex, matches their gender identity. *Id.* ¶ 34. For transgender people, their assigned sex does not align with their gender identity. *Id.* ¶ 34. Gender identity is not subject to voluntary change and medical authorities recognize that efforts to change an individual's gender identity are ineffective and harmful. *Id.* ¶ 35–36.

The incongruence between a person's gender identity and birth-assigned sex can cause distress, which is called gender dysphoria. Gender dysphoria is a serious condition recognized and defined by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th). Its two major diagnostic criteria can be summarized as 1) a marked incongruence between an individual's expressed gender identity and their assigned gender; and 2) clinically significant distress or impairment in social, occupational, or other important area of functioning. Karasic Decl. ¶ 43. When untreated, gender dysphoria can cause significant distress, putting people at increased risk of depression, anxiety, self-harm, and suicidality and impairing the ability to function in daily life. Karasic Decl. at 45.

The widely accepted approach to the treatment of this condition is to eliminate the distress of gender dysphoria by helping the patient live consistently with their

---

Plaintiffs include it to ensure that the Court understands the nature of Plaintiffs' claims and why resolution on a class basis is appropriate.

gender identity by aligning their presentation and body with their gender identity. *Id.* ¶ 47, 53, 56, 58. This includes social transition—changing appearance (e.g. garments, hair, make-up) and social role; changing signifiers of gender, including name and pronouns; and public presentation in the identified gender— and medical interventions such as hormone therapy. *Id.* ¶ 59, 61. These treatment recommendations, which are included in clinical practice guidelines issued by the World Professional Association of Transgender Health ("WPATH") and the Endocrine Society, are accepted by every major medical and mental health professional organization in the country. *Id.* ¶ 47–56. Decades of clinical experience and research have demonstrated the effectiveness of social transition and hormone therapy in alleviating gender dysphoria and improving mental health. *Id.* ¶ 67–72.

These treatment protocols apply in prison settings and are supported by the National Commission on Correctional Healthcare (NCCHC). *Id.* ¶ 57; *see also* NCCHC, *Transgender and Gender Diverse Health Care in Correctional Settings*, available at https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf.

### B. Defendants' New Policy: Health Services Bulletin 15.05.23

Prior to September 30, 2024, FDC provided healthcare to individuals with gender dysphoria in accordance with Procedure 403.012, "Identification and Management of Transgender Inmates and Inmates with Gender Dysphoria." Section

(3)(d) of Procedure 403.012 provided that "[g]ender-affirming hormonal medication will be prescribed as clinically indicated."  Section (4)(c) directed that inmates not already receiving hormone therapy at the time of intake were permitted to start hormone therapy if the prison's "Gender Dysphoria Review Team" (GDRT) determined that the therapy was medically necessary. Further, Section (5) of the same procedure, "Accommodations for Inmates with a Diagnosis of Gender Dysphoria", provided that "[t]o assist in transitioning," facilities would permit accommodations such as the use of make-up, undergarments, and hairstyling.

With an effective date of September 30, 2024, Health Bulletin 15.05.23, "Mental Health Treatment of Inmates with Gender Dysphoria," ("HSB 15.05.23" or the "Health Bulletin") took a much different approach.  First, it makes no allowances for clothing and grooming accommodations and it is undisputed that all accommodations passes for gender dysphoria have been rescinded. ECF 57, Transcript of Dec. 9, 2024 Hearing at 59:8–25. Second, it prohibits FDC from expending any funds on hormone therapy for gender dysphoria, "unless compliance with the U.S. Constitution or a court decision requires otherwise," [4] HSB 15.05.23.IX.B, but states that "[i]n rare instances deemed medically necessary a variance may be approved to permit the use of cross-sex hormones to treat an

---

[4] The statute prohibiting the expending of funds on hormone therapy for gender dysphoria does not contain any exceptions. Florida Statutes, Section 286.311.

Inmate's gender dysphoria." *Id* at IX.C.  A "variance" "shall only be sought" "if necessary to comply with the U.S. Constitution or a court decision"; no guidance is given on who makes that determination or how.  *Id*.

One condition for a variance is that a person may only be assessed for hormone therapy if the "treating physician can demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the etiological basis of the pathology.  Such evidence must be based on sound scientific methods and research that were subject to the formal peer review process." *Id*.  As Dr. Karasic explains, this research requirement is an impossible requirement to meet because, like many mental health and other conditions, the etiology of gender dysphoria is not known and treatment is not aimed at the etiological basis but rather the symptoms—here, the distress of gender dysphoria. Karasic Decl. ¶ 85. Defendants themselves admit that the etiology of gender dysphoria is unknown. *See*, Ex. J, Defendants' Response to Interrogatory No. 10. Additionally, the Health Bulletin itself has predetermined that the research doesn't exist, characterizing the studies on the benefits of hormone therapy as relying on "unreliable methods." HSB 15.05.23 § IX.A.

Another condition is that "all preceding provisions of this policy" must be satisfied, which includes at least one year of psychotherapy in FDC custody, regardless of medical need and whether the person was already receiving hormone

therapy. HSB 15.05.23 § IX.A; HSB 15.05.23 § VII.A.5. Thus, even if the other requirements for a variance could be met, the policy therefore mandates a significant delay in treatment even if the individual has a current need for hormone therapy.

In sum, the Health Bulletin denies all putative class members clothing and grooming accommodations, regardless of their medical need for them. And it puts them at significant risk of being denied hormone therapy because some of the requirements for a variance are unrelated to an individual's medical need for hormone therapy, and thus, hormone therapy could be denied even when medically necessary.

### C. Plaintiffs Keohane, Mendoza, Diamond, Jackson, and Boothe Are Being Subjected to the Challenged Policy

Each Plaintiff has been denied medically necessary care pursuant to, and following the implementation of, HSB 15.05.23.  The Policy denies all Plaintiffs access to clothing and grooming accommodations to enable them to socially transition, which is an important part of treatment of gender dysphoria.  *See* Section III(A), *supra*.  And as none of them have been told if they will be approved for a variance to be able to continue or start hormone therapy, Mendoza Decl. ¶ 15; Keohane Decl. ¶ 31; Boothe Decl. ¶ 15; Jackson Decl. ¶ 14; Diamond Decl. ¶¶ 14–15, they all face potential loss or denial of that treatment.

Plaintiff Boothe is a transgender man in the custody of FDC at Florida Women's Reception Center.  Boothe Decl. ¶ 1.  Prior to entering FDC custody on

11

September 18, 2024, Boothe had been receiving testosterone injections for nearly a decade based on a healthcare professional's diagnosis of gender dysphoria and recommendation of such treatment. *Id*. ¶ 8. Upon entering FDC custody, Boothe was denied any hormone treatment for a period of six months, which caused physical withdrawal symptoms and a re–onset of his menstrual cycle, which had been suppressed for many years and which caused intense gender dysphoria. *Id*. ¶ 118. Although FDC provided him testosterone gel after he filed a grievance for the denial of any hormone therapy, the gel is not effective for him and does not consistently suppress menstruation. *Id*. ¶ 128. FDC staff also confiscated Boothe's male clothing and personal care items. *Id*. ¶ 13–14. Since these interruptions to his care for gender dysphoria, Boothe has experienced weight loss, insomnia, depression, anxiety, self-isolation, and suicidal ideation. *Id*. ¶ 16.

Plaintiff Jackson is a transgender man in the custody of FDC at Florida Women's Reception Center. Jackson Decl. ¶ 1. In 2022, Jackson was diagnosed by FDC healthcare personnel with gender dysphoria and approved for hormone therapy injections and access to male clothing and alternate canteen items consistent with his gender identity, and he received such medication and accommodations. *Id*. ¶ 9. In October 2023, FDC stopped providing Jackson with injections of hormone therapy and replaced that treatment with testosterone gel. After starting on the gel, his testosterone levels significantly dropped, so much so that he began menstruating

again, and an FDC nurse told him that the level can no longer be classified as a male's level. *Id.* ¶ 10. FDC staff also confiscated Jackson's male clothing and alternate canteen items. *Id.* ¶ 12. Jackson feels like the new policy is forcing him to detransition. *Id.* ¶ 16. The loss of clothing and grooming accommodations and ineffective hormone therapy have caused Jackson to experience increased gender dysphoria and fear that the thoughts of suicide he experienced prior to treatment will return. *Id.* ¶ 16.

Plaintiff Keohane is a transgender woman in the custody of FDC at Wakulla Correctional Institution (Wakulla Annex). Keohane Decl. ¶ 1. She was diagnosed with Gender Identity Disorder (a precursor diagnosis to gender dysphoria, see Karasic Dec. ¶ 40) and began hormone therapy in 2013, prior to being incarcerated. *Id.* ¶¶ 6–9. After entering the custody of FDC in 2014, she was denied both hormone therapy and clothing and grooming accommodations. *Id.* ¶¶ 12–14. The harm it caused Keohane to be without hormone therapy and access to female clothing and grooming standards was severe, and resulted in an attempted self-castration and attempts to end her life. *Id.* ¶¶ 15.

As a result of litigation and an FDC policy change, Keohane began receiving hormone therapy in 2016, and starting in 2017, was permitted to follow female clothing and grooming standards. *Id.* ¶¶ 16–19. Receiving this treatment alleviated the painful distress of gender dysphoria. *Id.* ¶ 21.

After FDC implemented HSB 15.05.23, FDC confiscated Keohane's female underwear and cosmetics and she was required to have her long hair cut short. *Id.* ¶¶ 27–28. Being forced to present as a man has exacerbated her gender dysphoria. *Id.* ¶ 29. She avoids seeing her reflection in the mirror, isolates herself from others—even avoiding going to the mess hall—because she doesn't want to be in the world like this. *Id.* Because of the new policy, Keohane also lives in constant fear of the recission of her hormone therapy. *Id.* ¶¶ 31, 33.

The loss of clothing and grooming accommodations and the stress of knowing her hormone therapy could be stopped at any time have caused serious harm to her mental and physical health. *Id.* ¶ 4. Her gender dysphoria has worsened and she is experiencing depression, anxiety, social isolation and having thoughts of taking her own life as well as the urge to self-harm. Since experiencing the constant fear and associated stress about her treatment, she has also been suffering from severe headaches, insomnia, fatigue, lack of energy, and body aches. *Id.*

Plaintiff Diamond is a transgender woman in the custody of FDC at Wakulla Correctional Institution (Wakulla Annex). Diamond Decl. ¶ 1. In 2022, Diamond was given a preliminary diagnosis of gender dysphoria by prison healthcare providers. *Id.* ¶ 12. That diagnosis was confirmed on January 23, 2024, by Drs. Joshi and Leacock, psychologists at FDC, who recommended that she receive hormone therapy and access to clothing and grooming accommodations. *Id.* ¶ 13.

14

Despite receiving a diagnosis of gender dysphoria and despite the recommendations of prison psychologists, FDC has never provided Diamond hormone therapy or an accommodations pass to follow female clothing and grooming standards. *Id.* ¶¶ 13–17. FDC confiscated the female personal care items and undergarments that Diamond had on October 30, 2024. *Id.* ¶ 19. The failure of FDC to provide the care recommended to treat Diamond's gender dysphoria has caused her severe depression, anxiety, self-esteem issues, and thoughts of suicide. *Id.* ¶ 20.

Plaintiff Mendoza is a transgender woman in the custody of FDC at Wakulla Correctional Institution (Wakulla Annex). Mendoza Decl. ¶ 1. In July 2020, prison healthcare personnel evaluated and diagnosed Mendoza with gender dysphoria and recommended approval for her to maintain female clothing and grooming accommodations, which she received. *Id.* ¶ 8. On July 21, 2021, prison healthcare personnel additionally recommended hormone therapy as a treatment to alleviate Mendoza's gender dysphoria, and she began that treatment in 2022. *Id.* ¶¶ 9–10. Since the implementation of HSB 15.05.23, Diamond's female undergarments and personal items have been confiscated, though she received a medical pass for a bra for physical breast support. *Id*. ¶¶ 12–14. As a result of FDC's changes in policy, which prevent her from living consistent with her gender identity and have her in fear of losing her hormone therapy, Mendoza is experiencing a dramatic deterioration in her physical and mental health, including increased feeling of

15

anxiety and depression, loss of appetite, trouble sleeping, and worsened thoughts of suicide. *Id.* ¶ 16.

## IV.    ARGUMENT

A plaintiff seeking class certification must satisfy each of the requirements of Rule 23(a) of the Federal Rules of Civil Procedure, and at least one of the three criteria for certification under Rule 23(b). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997). It is axiomatic that a court deciding whether to certify a class does not rule on the merits of the action, make findings of fact or issue conclusions of law except as may be necessary to determine whether the Plaintiff has met the requirements of Rule 23. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003); *Braggs v. Dunn*, 317 F.R.D. 634, 652 (M.D. Ala. 2016) ("The court's role at the class-certification stage is not to decide the underlying claims, but rather to determine whether the requirements for certification are met.").

The propriety of class certification here is clear—not only from the face of Plaintiffs' complaint—but also based on the evidence submitted herewith. Discovery is underway, but far from over. Nevertheless, it has progressed sufficiently to permit Plaintiffs to make a strong evidentiary showing that this case meets all the requirements of Rule 23(a) and 23(b)(2).

**A. The Requirements of Rule 23(a) are Satisfied.**

For a district court to certify a class action, a putative class must first satisfy the prerequisites of "numerosity, commonality, typicality, and adequacy of representation" and at least one of the alternative requirements of Rule 23(b). Fed. R. Civ. P. 23; *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1307–08 (11th Cir. 2008) (citations omitted).

### 1.    Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." The Eleventh Circuit has indicated that more than forty members is generally enough to satisfy the rule. *See Cox v. Amer. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) ("[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.").

At least 180 persons in FDC custody as of September 29, 2024, have been diagnosed with gender dysphoria. ECF 46-7 at 3, Response to Interrogatory No. 2. All 180 had clothing and grooming accommodation passes until they were rescinded, and 107 had been prescribed hormone therapy by a health care provider. *Id.* at 3, Response to Interrogatory No. 3.[5]   Undoubtedly, additional class members will

---

[5] Defendants most recent discovery responses state that 150 people in FDC custody are receiving gender-affirming hormone therapy. *See* Ex. J at 3. Either number is sufficient to satisfy the numerosity requirement.

become incarcerated in FDC in the future, at which point their care will become subject to HSB 15.05.23. These numbers readily satisfy the numerosity requirement. *See Cox,* 784 F.2d at 1553; *Taig v. Currey*, No. 9:21-CV-80391-RLR, 2022 WL 18539319, at *4 (S.D. Fla. June 28, 2022) ("The Court finds that it would be impracticable to join all 100 plaintiffs in this action and the numerosity element is thus satisfied.").

### 2.    Commonality

Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." This requires the "plaintiff to demonstrate that the class members have suffered the same injury" so that the resolution of the individual claims would also resolve other class members' claims "in one stroke." W*al-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (quotation omitted). "Their claims must depend upon a common contention" and that contention "must be of such a nature that it is capable of class[-]wide resolution." *Id.* at 350; *see also Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ("Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.") (internal quotation marks and citation omitted). Emphasis is on a common *answer* that drives resolution of the litigation. *See Dukes*, 564 U.S. at 350.

The existence of a systemic policy that exposes a proposed class to a substantial risk of harm has supported the finding of commonality. *See Hughes v. Judd,* No. 12 Civ. 568, 2013 WL 1821077, at \*23 (M.D. Fla. Mar. 27, 2013), *report and recommendation adopted as modified,* No. 12 Civ. 568, 2013 WL 1810806 (M.D. Fla. Apr. 30, 2013) ("Plaintiffs' claims related to these [prison] conditions are capable of class-wide resolution: Plaintiffs seek permanent injunctive and declaratory relief that would enjoin allegedly unconstitutional behavior as applied to the entire class. Importantly, the questions of law are applicable in the same manner to each potential class member…. Each class member, if proceeding separately against Defendants, would need to meet the same test under the Eighth and Fourteenth Amendments to prevail."); *Parsons*, 754 F.3d at 681–82;[6] *but see DL v.*

---

[6] *See also, e.g., Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) ("Whether the County was aware of and deliberately indifferent to the conditions at the [prison] is a common question subject to class-wide resolution."); *Rosas v. Baca*, No. 12 Civ. 428 DDP (SHx), 2012 WL 2061694, at \*3 (C.D. Cal. June 7, 2012) ("In a civil rights suit such as this one … commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. Under such circumstances, individual factual differences among class members pose no obstacle to commonality."); *Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Correction*, No. 08 Civ. 1317 TWP-MJD, 2012 WL 6738517, at \*18 (S.D. Ind. Dec. 31, 2012) ("The mentally ill prisoners here, have demonstrated through a wealth of evidence, that the class is united by the common question of whether the lack of treatment and isolated living conditions in IDOC facilities violate the Eighth Amendment."); *LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir. 1985) (holding that commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members); *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) (holding that the individual factual

*District of Columbia*, 713 F.3d 120, 126–27 (D.C. Cir. 2013) (concluding that commonality had *not* been shown where the plaintiffs in a putative IDEA class action had not identified a "single or uniform policy or practice that bridges all their claims").

Here, questions of law and fact are common to the class. All existing and future class members are subject to common harms and risk of additional harms from the Health Bulletin. They all have gender dysphoria and are denied or at risk of being denied medically necessary care because of it. They all are and will be denied clothing and grooming accommodations regardless of their medical need. And they all will have the determination about whether they can continue or begin hormone therapy made using criteria that are unrelated to their individual medical need for that treatment, putting them at risk of medically necessary care being denied.

Likewise, all members seek the same relief: an injunction preventing the enforcement of the Health Bulletin's ban on accommodations and the use of criteria for hormone therapy that are unrelated to individual medical need. The common

---

differences among the individual litigants or groups of litigants will not preclude a finding of commonality); *L.H. v. Schwarzenegger*, No. CIV. S–06–2042 LKK/GGH, 2007 WL 662463, at *12 (E.D. Cal. Feb. 28, 2007) (holding that system wide deficiencies in the California juvenile parole system affect all of the putative class members with disabilities, regardless of the specific nature of their disability); *Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 638 (D. Ariz. 2016) ("Plaintiffs need not demonstrate that all class members have been or will be subjected to identical harms" to show commonality).

20

question of law that will resolve this litigation is whether Defendants' blanket denial of accommodations and the use of criteria for hormone therapy that are unrelated to individual medical need constitute deliberate indifference in violation of the Eighth Amendment.

In this case, Plaintiffs have asserted both current harm from the Health Services Bulletin that they are all experiencing, and the risk of additional future harms. Even where only a risk of future harm is at stake, resolution of claims through a class action is appropriate. As one court explained in a case involving a challenge to the adequacy of prison medical care, while no potential class member "can know in advance whether [they] will receive adequate and timely care … or know exactly what form of harm he will suffer from the absence of such care, every single inmate has allegedly been placed at a substantial risk of future harm due to the general unavailability of constitutionally adequate care." *Parsons*, 754 F.3d at 679; *see also Scott v. Clarke*, 61 F. Supp. 3d 569, 586 (W.D. Va. 2014) ("Plaintiffs allege that the policies and practices at FCCW… reflect substandard medical care on the part of the Defendants. Whether these policies and practices place the Plaintiffs and other current and future FCCW prisoners at a substantial risk of serious harm to which the Defendants are deliberately indifferent implicates questions of fact and law common to the entire putative class."); *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *4 (N.D. Ill. Apr. 28, 2017) ("The Court agrees with

21

these courts and finds that by identifying specific policies and practices that allegedly put inmates with serious medical needs at substantial risk for harm, plaintiffs have met Rule 23's commonality requirement."); *Dockery v. Hall*, No. 3:13-cv-326-WHB-JCG, 2018 WL 11424799, at *5–6 (S.D. Miss. Feb. 14, 2018) ("Because Plaintiffs claim that they are all subjected to the same policies and practices at EMCF, which expose them to the same substantial risks of serious harm, the Court finds the Rule 23(a) commonality requirement remains satisfied."). Courts within the Eleventh Circuit have held the same. *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1123 (M.D. Ala. 2016) ("In the end, whether plaintiffs have already been harmed by the practices they challenge is, although relevant, not dispositive of their claims…. What these plaintiffs must show is that they have been subjected to the harmful policies and practices at issue, not (necessarily) that they have already been harmed by these policies and practices."); *Braggs*, 317 F.R.D. at 656 ("[B]eing subjected to a substantial risk of serious harm is an actionable constitutional injury, even when a prisoner's physical or mental condition has not yet been detrimentally impacted.").

Thus, the question of whether the hormone therapy provisions of the Health Bulletin pose a risk of serious harm to inmates with gender dysphoria can be answered as to the entire class "in one stroke." *Dukes*, 564 U.S. at 350; *see also M.D. v. Perry*, 294 F.R.D. 7, 45 (S.D. Tex. 2013) (holding, in a prisoner class action suit, that "[t]he fact of whether [prison] policies subject class members to an unreasonable

22

risk of harm, and whether that risk is so unreasonable as to rise to a constitutional violation, can be proven on the basis of class[-]wide evidence without individualized inquiries"); *Baxley v. Jividen*, 338 F.R.D. 80, 87 (S.D.W.Va. 2020) (finding commonality where at least one common question of law exists: "whether the Defendant's health care policies and practices evince deliberate indifference to the medical and mental health care needs of pretrial detainees and inmates in the regional jails"). Plaintiffs have satisfied the commonality requirement.

### 3.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class" and the typicality requirement presents "somewhat of a low hurdle." *Dunn v. Dunn*, 318 F.R.D. 652, 666 (M.D. Ala. 2016) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n. 13, (1982)) (finding typicality satisfied in proposed class of prisoners with range of disabilities who alleged prison's failure to implement certain policies and procedures had the effect of consistently violating their rights). Although commonality and typicality overlap, *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1278–79 (11th Cir. 2000), the focus of typicality is whether the class representatives' interest is aligned enough with the proposed class members to stand in their shoes for purposes of the litigation. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009); *see also Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (class

23

representatives' claims are typical if they "arise from the same event or pattern or practice and are based on the same legal theory" as the class claims; they need not be identical) (internal quotation marks omitted). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Parson*, 754 F.3d at 685 (internal quotation marks and citation omitted).

In this case, Plaintiffs all bring the same claim: the Health Bulletin's categorical ban on clothing and grooming accommodations and its provisions concerning hormone therapy—which use criteria unrelated to individual medical need, cause actual serious harm and the risk of additional serious harm. *See Dunn*, 318 F.R.D. at 666 (finding typicality satisfied in prison disability discrimination proposed class where "the named plaintiffs brought the same claims as the class"); *Henderson v. Thomas*, 289 F.R.D. 506, 511 (M.D. Ala. 2012) (finding commonality and typicality satisfied where "the plaintiffs claim that they have the same disability and that the defendants'… policy affects them in similar ways").

Likewise, Plaintiffs all predicate their claims on the same legal theory— unconstitutional denial of necessary medical care in violation of the Eighth Amendment. *See Prado-Steiman ex rel. Prado*, 221 F.3d at 1279 n.14 (noting that "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences") (internal quotation marks omitted); *Kornberg v.*

*Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) ("A sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory. … A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class."). Accordingly, Plaintiffs readily satisfy the typicality requirement.

### 4. Adequacy of Representation

Finally, Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." This requirement "involves questions [1] of whether the plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and [2] of whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985); *see also Valley Drug Co.*, 350 F.3d at 1189. The second prong requires that there be no major conflicts between the proposed class representatives and the class. *See id.* ("[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issue in controversy.") (citations omitted). A fundamental conflict thwarting adequate representation exists "where some party members claim to have

25

been harmed by the same conduct that benefitted other members of the class." *Id.* at 1189–90.

Counsel in this case are extremely well-qualified, experienced, and able to conduct the litigation. Counsel have extensive experience litigating complex class actions and federal civil rights claims, including cases involving the rights of transgender people, incarcerated people, and incarcerated transgender people, and have committed the necessary resources to litigating this case. *See*, *infra*, Section IV.C.

It is also clear that named Plaintiffs will adequately represent the putative class, as demonstrated by their declarations. Diamond Decl. ¶¶ 22–23; Mendoza Decl. ¶¶ 18–19; Keohane Decl. ¶¶ 34–36; Boothe Decl. ¶¶ 18–19; Jackson Decl. ¶¶ 18–19. No member of the putative class has benefitted from the Health Bulletin, including named Plaintiffs. Plaintiffs and members of the putative class are all being harmed in the same way by the challenged policy and seek the same relief to alleviate that harm. *See* Diamond Decl. ¶ 24 (attesting to seeking relief that "makes FDC cease the harm happening to myself and others"); Mendoza Decl. ¶ 20 (same); Keohane Decl. ¶ 36 (same); Boothe Decl. ¶ 19 (same); Jackson Decl. ¶ 20 (same). Plaintiffs will represent the class fairly and adequately.

26

**B. Class Certification is Appropriate Under Fed. R. Civ. P. 23(b)(2).**

Certification is appropriate under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360 (citation omitted).

"Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities." *Braggs*, 317 F.R.D. at 667 (citing *Bumgarner v. NCDOC*, 276 F.R.D. 452, 457 (E.D.N.C. 2011). In fact, "the primary role of [Rule 23(b)(2)] has always been the certification of civil rights class actions." *Parsons*, 754 F.3d at 686 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of class actions for declaratory and injunctive relief)); *see also Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 64 (3d Cir. 1994) ("The writers of Rule 23 intended that subsection (b)(2) foster institutional reform by facilitating suits that challenge widespread rights violations of people who are individually unable to vindicate their own rights."); Wright & Miller, 7AA *Fed. Prac. & Proc. Civ.* § 1776.1 (3d ed.) ("Rule 23(b)(2)

27

class actions have been utilized to challenge prison policies or procedures alleged to … violate the prisoners' Eighth Amendment rights to be free from cruel and unusual punishment. …").[7]

In certifying a class under Rule 23(b)(2), two basic requirements must be met: (1) the class members must have been harmed in essentially the same way; and (2) the common injury may properly be addressed by class wide injunctive or equitable remedies. *Holmes v. Continental Can Co*., 706 F.2d 1144, 1155 (11th Cir. 1983) ("[T]he claims contemplated in a [Rule 23](b)(2) action are *class* claims, claims resting on the same grounds and applying more or less equally to all members of the class.") (emphasis in original).

Defendants here have acted and will continue to act on grounds generally applicable to the class and final injunctive relief and corresponding declaratory relief are appropriate respecting the class.  FDC's policy, set forth in the Health Bulletin, is a blanket ban on clothing and grooming accommodations and sets forth criteria for hormone therapy that include factors unrelated to individual medical need. That policy is applied to all individuals with gender dysphoria in FDC custody. This

---

[7] *See also* John P. Frank, *Response to 1996 Circulation of Proposed Rule 23 on Class Actions*, in 2 WORKING PAPERS OF THE ADVISORY COMMITTEE ON CIVIL RULES ON PROPOSED AMENDMENTS TO CIVIL RULE 23, at 260, 266 (Admin. Office of the U.S. Courts ed., 1997), "If there was [sic] single, undoubted goal of the [Advisory] [C]ommittee, the energizing force which motivated the whole rule, it was the firm determination to create a class action system which could deal with civil rights and, explicitly, segregation.").

results in actual denial of medically necessary care (accommodations) and the substantial risk of denial of additional medically necessary care (hormone therapy) to the class that may be adequately addressed by enjoining enforcement of FDC's current policy. Accordingly, Plaintiffs have satisfied the requirements of Rule 23(b)(2). *See Braggs*, 317 F.R.D. at 667 ("the problems of which [plaintiffs] complain and the remedies they seek are systemic.") (emphasis in original).

Plaintiffs here are in a more favorable position than the proposed class certified in *Braggs*, where state prisoners brought a putative class action against state department of corrections officials alleging violations of the Eighth and Fourteenth Amendments in provisions of mental health treatment policies. *Id.* at 639–40. In *Braggs*, "the fact that some class members may have thus far received appropriate mental-health care and therefore might not yet have been harmed by the challenged policies and procedures [did] not defeat certification." *Id.* at 667, n.44. Moreover, the Court held that "even if not all of the class members were subjected to a substantial risk of serious harm—that is, even if it were sure that the risk would not materialize with respect to some mentally ill prisoners—certification would still be appropriate." *Id.*; *see also Anderson v. Garner*, 22 F. Supp. 2d 1379, 1386 (N.D. Ga. 1997) ("'[A]ll the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for one or more of them to seek relief under Rule 23(b)(2).'") (citing *Johnson v. American Credit Co. of Georgia*, 581 F.2d 526, 532

(5th Cir. 1978)); *Georgia State Conference of Branches of NAACP v. State*, 99 F.R.D. 16, 35–36 (S.D. Ga. 1983) ("What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class."). Defendants' Health Bulletin sets forth a policy that has already harmed and will harm every member of the proposed class such that certification is appropriate under Rule 23(b)(2).

### C. Undersigned Counsel Should be Appointed Class Counsel Under Fed. R. Civ. P. 23(g).

Federal Rule of Civil Procedure 23(g) requires that the court appoint class counsel for any class that is certified. Fed. R. Civ. P. 23(g)(1).  Class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In determining whether this requirement is met, courts consider: (1) the work counsel has done in identifying or investigating potential claims in the actions; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

Counsel in this matter are experienced litigators of complex civil rights matters and class action lawsuits in federal court, and are knowledgeable of and experienced in cases involving constitutional law, including various constitutional claims on behalf of transgender people and Eighth Amendment claims on behalf of

prisoners, including transgender prisoners. Ex. H, Declaration of Li Nowlin-Sohl ¶¶ 4–10 ("Nowlin-Sohl Decl."); Ex. I, Declaration of Daniel Tilley ¶¶ 4–7 ("Tilley Decl."); Ex. B, Declaration of Anthony Anscombe ¶¶ 5–9 ("Anscombe Decl."). The ACLU and ACLU of Florida are currently and have previously litigated class action Eighth Amendment denial of healthcare claims on behalf of incarcerated transgender people in federal court, as well as individual gender-affirming care cases for incarcerated transgender people. *See e.g.,* Nowlin-Sohl Decl. and Tilley Decl. (citing *Kingdom v. Trump*, No. 1:25-cv-00691 (D.D.C., March 7, 2025) (pending) and *Robinson v. Labrador*, No. 1:24-cv-00306-DCN (D. Idaho Sep. 3, 2024) (pending)); *see also Zayre-Brown v. N.C. Dep't of Pub. Safety,* No. 3:22-cv-191-MOC-DCK, 2024 WL 410243 (W.D.N.C. Feb. 2, 2024); *Iglesias v. Fed. Bureau of Prisons,* Case No. 19-CV-415-NJR, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021); *Keohane v. Fla. Dep't of Corr. Sec.,* 952 F.3d 1257 (11th Cir. 2020); and *Fields v. Smith,* 653 F.3d 550 (7th Cir. 2011).

Counsel has also conducted extensive investigation into the impact of the Health Bulletin on transgender persons with gender dysphoria in FDC custody. Nowlin-Sohl Decl. ¶ 11; Tilley Decl. ¶ 8. Finally, counsel has ample financial and human resources to litigate this matter. *See e.g.,* Nowlin-Sohl Decl. ¶ 12; Tilley Decl. ¶ 9; Anscombe Dec ¶ 9. In other words, counsel possesses "sufficient vigor" and sufficient resources to adequately represent the class and prosecute this action.

31

*See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) (citations omitted).  They have retained a nationally recognized expert on the treatment of gender dysphoria, Dr. Dan Karasic, to serve as an expert witness in this case, as well as a highly qualified Florida psychologist, Dr. Jennifer Evans, to conduct evaluations of Plaintiffs.

All of the factors considered in determining whether counsel can fairly and adequately represent the interests of the class are met.

## V.    CONCLUSION

For these reasons, Plaintiffs Reiyn Keohane, Sasha Mendoza, Sheila Diamond, Carter Jackson, and Nelson Boothe, on behalf of themselves and similarly situated persons, therefore respectfully request that this Court certify a class of all current and future incarcerated persons in custody of the FDC who (i) have gender dysphoria and (ii) absent HSB 15.05.23, would be provided hormone therapy and/or clothing and grooming accommodations to treat their gender dysphoria if deemed medically necessary for them, and allow them and class counsel to seek declaratory and injunctive relief to prevent FDC from i) denying clothing and grooming accommodations for inmates with gender dysphoria, regardless of their medical need for such care, and ii) denying or delaying hormone therapy for inmates with gender dysphoria based on requirements that are unrelated to their medical needs.  And they further request that the Court appoint their counsel to serve as class counsel.

Dated: April 9, 2025

Respectfully submitted,

/s/ Daniel B. Tilley
Samantha J. Past (Florida Bar No. 1054519)
Daniel B. Tilley (Florida Bar No. 102882)
**American Civil Liberties Union Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org

Li Nowlin-Sohl (Admitted in Washington only)*
Leslie Cooper
**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org

Anthony Anscombe*
Darlene Alt†
Emily Shook*
Laurel Taylor (Admitted in New York)†
**Steptoe LLP**
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Tel. (312) 577-1300
aanscombe@steptoe.com
dalt@steptoe.com
eshook@steptoe.com
lataylor@steptoe.com

Michelle Fraling*
**American Civil Liberties Union Foundation**
915 15th Street NW, 6th Floor
Washington DC, 20005
Tel: (917) 710-3245
michelle.fraling@aclu.org

*Counsel for Plaintiffs*

*\* Admitted pro hac vice*
*† Pro hac vice application forthcoming*

33

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I hereby certify that this Motion and Incorporated Memorandum of Law contains **7,749** words and does not exceed 8,000 total words, as required by N.D. Fla. Loc. R. 7.1(F)

/s/    Daniel Tilley
Counsel for Plaintiffs