# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

| | |
|---|---|
| REIYN KEOHANE; SASHA MENDOZA; SHEILA DIAMOND; KARTER JACKSON; and NELSON BOOTHE, | : : : : : |
| *Plaintiff*, | : : |
| v. | :    Case No. 4:24-cv-00434-AW-MAF |
| RICKY D. DIXON, et al., | : : : |
| *Defendants*. | : |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# I. INTRODUCTION

This Court should certify Plaintiffs' proposed class. Defendants assert that because variances to permit hormone therapy have been approved for 11 inmates and because others are continuing to receive hormone therapy without a variance, Plaintiffs and members of the putative class are not at risk of being denied medically-necessary hormone therapy and, thus, lack standing to challenge HSB 15.05.23 (Dkt. 4-4) (the "HSB") and fail to satisfy the requirements of Rule 23. But Defendants have not revoked or modified the HSB, which, as discussed below, poses a serious risk to all putative class members. There is a live controversy to be decided. Whether the policy harms Plaintiffs is a merits question that does not bear on the appropriateness of class certification. With respect to the denial of accommodations for social transition, Defendants conflate the requirements of class certification with success on the merits. And their opposition rests on a profound misreading of Eighth Amendment law and their assertion that FDC policy does not ban such accommodations cannot be squared with the record.

# II. ARGUMENT

## A. Hormone Therapy

Defendants argue that, because 11 members of the putative class, including Plaintiff Keohane, have been approved for a variance to continue receiving

hormone therapy, and because others continue to receive treatment without a variance, members of the putative class face no risk of being denied medically-necessary hormone therapy. This assertion is meritless. Defendants have not revoked or revised the HSB, which explicitly provides that there will be no hormone therapy without a variance[1], and that there will be no variances unless the following two requirements are met: i) a treating doctor "can demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the etiological basis" of gender dysphoria. HSB § IX.C.1; and ii) a prerequisite of one year of psychotherapy, HSB (VII) and (IX). With respect to the first requirement, Defendants have admitted that the etiological basis of gender dysphoria is unknown. *See* FDC Officials' Objections and Responses to Named Plaintiffs' Third Composite Written Discovery Requests, response to interrogatory no. 10 (Ex. A). Thus, if FDC were to follow its policy, no inmate could ever receive a variance because there could be no evidence that hormone therapy treats an unknown etiological basis for this condition. The second requirement means a delay of a year or more despite inmates' current need for treatment.

  The fact that Defendants have deviated from these requirements to approve variances in 11 cases does not remove the risk of the HSB being applied to

---

[1] The HSB makes no provision that inmates already receiving hormone therapy at its inception will continue to do so while awaiting a variance.

members of the putative class to deny them treatment. That some doctors at some facilities recommended a variance without scientific evidence that hormone therapy addresses the etiology of gender dysphoria, and perhaps without the prerequisite one year of psychotherapy, does not mean all medical providers will feel they can recommend hormone therapy given the language of the policy. Nor is it clear that the variance review team, which must approve all variances, will continue to do so in contravention of the HSB's requirements. Thus, that 11 of the 135 inmates already receiving hormone therapy had variances approved in the 7 months since the policy change in no way establishes that everyone with a medical need for hormone therapy will be approved for a variance. Moreover, the 11 people who received variances remain at risk of having hormone therapy withdrawn because under the HSB, they must be re-evaluated every 90 days for the first year and every 180 days thereafter. HSB 15.05.23 § IX.C.1. As long as the policy remains on the books, members of the putative class are at risk of hormone therapy being discontinued by someone following the requirements of the HSB.

    Defendants' argument that Plaintiff Diamond is not at risk of being denied treatment is baffling as they do not dispute that an FDC healthcare provider recommended hormone therapy for her as medically necessary in January 2024

3

(Dkt. 78-5, Declaration of Sheila Diamond ("Diamond Dec.") ¶ 13), and she still is not receiving treatment 16 months later.[2]

Finally, all putative class members remain at risk of being denied hormone therapy for the additional reason that state law (Fla. Stats. § 286.311 or SB 254) bans FDC from funding such treatment. FDC currently relies on the generosity of a third party – Centurion Health – to provide hormone therapy *gratis* to inmates who need it. They have no obligation to do this, which means the therapy is at risk.

### 1. Plaintiffs Have Standing and Their Claims are Not Moot

Defendants argue that Plaintiffs lack standing to pursue their claims because Plaintiff Keohane and 10 others received variances and other inmates are currently receiving hormone therapy without a variance. Standing is determined at the time the complaint is filed, *see, e.g.*, *Lang v. Washington County*, No. 22-0057-JB-MU, 2022 WL 16840358, *4 (S.D. Ala. Sept. 30, 2022), and none of the Named Plaintiffs had received a variance when the complaint and amended complaint were filed. To the extent Defendants mean to argue Plaintiffs' claims are moot,

---

[2] Their argument that her claim is limited to the *denial* of medical care, not *delays* inappropriately misstates and narrows Plaintiffs' claim, which is about deliberate indifference to a serious medical need. Delaying treatment for a serious medical need can constitute deliberate indifference in violation of the Eighth Amendment. *See, e.g.*, *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003).

they are not.³ There is no foundation for Defendants' apparent contention that Plaintiffs Mendoza, Jackson, Boothe, and Diamond can count on getting variances for medically-necessary care just because variances were approved for Keohane and ten others by deviating from the HSB's requirements.

"[W]hen a defendant contends that a plaintiff's claim has become moot as a result of the defendant's own independent decision to cease some disputed action, it usually 'bears the ... burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Keohane v. Florida Department of Corrections Sect'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) ("*Keohane I*"); *Id.* at 1266-70 (withdrawal of offending policy, combined with evidentiary *indicia* demonstrating the permanence of FDC's change, allowed the Court to conclude that the "voluntary cessation" exception to the mootness doctrine did not apply). FDC has not come close to meeting this burden. It has not withdrawn or revised the HSB or done anything else that makes it "absolutely clear" that inmates with gender dysphoria with a medical need for hormone therapy will be approved for variances despite the requirements of the HSB.⁴

---

³ "The doctrine of mootness provides that the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Tanner Adver. Group, LLC v. Fayette County*, 451 F.3d 777, 785 (11th Cir. 2006) (*en banc*) (citations and internal quotations omitted).
⁴ There are additional reasons Plaintiffs' claims are not moot. For Plaintiff Keohane, the "picking off" exception to mootness also applies. *See, e.g., Wilson v.*

## 2. The Requirements of Rule 23 are Satisfied.

Defendants' arguments about Rule 23—which turn on the asserted lack of risk of loss of hormone therapy—fail for the same reasons as their arguments about standing and mootness. The HSB remains in place and threatens every gender dysphoric inmate with denial, delay, or withdrawal of hormone therapy. Additionally, these contentions ask the court to rule on merits issues, not assess the appropriateness of class certification under Rule 23. Whether the HSB imposes barriers to hormone therapy that put people at risk of being denied medically-necessary care goes to the core merits of this case.

Looking at the Rule 23(a) requirements, Dr. Martinez stated that there are currently 135 FDC inmates with gender dysphoria currently receiving hormone therapy, and 98 awaiting an evaluation for hormone therapy. Martinez Dec. ¶ 7. All are subject to the HSB which is more than adequate to satisfy numerosity.

---

*Gordon*, 822 F.3d 934, 947-951 (6th Cir. 2016). After she filed her complaint, she was quickly put through the reevaluation process required by the new policy when there was no indication any other inmates were being reevaluated, and she was among the first to receive a variance. Dkt. 83-1, Declaration of Dr. Danny Martinez ("Martinez Dec.") ¶ 5. For Plaintiff Diamond and others who are newly incarcerated or newly diagnosed with gender dysphoria, the denial of hormone therapy based on the one-year psychotherapy requirement of the HSB is "capable of repetition yet evading review" and "inherently transitory". *See, e.g.*, *Wilson*, 822 F.3d at 944-47. These exceptions to mootness recognize that a "case or controversy" may continue even after the offending policy or condition has ceased.

Regarding commonality, Defendants argue that Plaintiffs have not provided sufficient evidence of "the existence of the statewide . . . policies and practices that allegedly expose all members of the putative class to a substantial risk of serious harm," because, they claim, the policy poses no substantial risk of harm to the class given that 11 variances have been approved. The FDC Officials' Memorandum of Law in Opposition to Named Plaintiffs' Motion for Class Certification ("Opp."), Dkt. 83, at 21. But this is inaccurate, since the HSB and SB 254 remain in place. Moreover, Defendants once again conflate Rule 23(a)'s requirements with the merits. Plaintiffs need not **prove** the substantial risk of serious harm at this juncture; they need only show that the determination of whether the policy poses a substantial risk of serious harm is a "common contention . . . of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Whether the policy poses a risk of harm is a common question of fact. And as Defendants note, when inmates provide evidence of systemic policies "that **allegedly** expose all inmates in that system to a substantial risk of serious future harm, Rule 23(a)(2) is satisfied." Opp. at 21 (citations omitted and emphasis added). The requirements of the HSB, SB 254, the fact that seven months have

7

passed and few have received variances, and the fact that Plaintiff Diamond has still not been provided hormone therapy constitute evidence of the risk.[5]

Defendants' typicality argument rests entirely on the flawed premise that Named Plaintiffs lack standing and should be rejected for the same reasons discussed in Section II(A)(1), *supra*. Their argument against Plaintiffs' "adequacy" is that Plaintiffs Keohane, Mendoza, Boothe, and Jackson continue to receive hormone treatment, and therefore have "no incentive to pursue claims related to hormones." Opp. at 26. They have every incentive to do so because they are subject to the HSB and remain at risk of not getting or losing a variance. Diamond still has not received any hormone therapy. All Named Plaintiffs thus share an interest in challenging the HSB and do not have interests antagonistic to those of other class members. *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985).

Finally, Rule 23(b)(2) is satisfied because the HSB harms all putative class members by threatening to deny, delay, or withdraw their medically-necessary hormone therapy. Class-wide injunctive relief will ensure that gender dysphoric inmates receive medically-necessary treatment. *Holmes v. Continental Can Co.*,

---

[5] That the Court found based on the limited evidence before it at the preliminary injunction hearing that Plaintiffs failed to demonstrate imminent risk of denial of medically-necessary hormone therapy does not mean that Plaintiffs will be unable to do so after discovery exploring the implementation of the policy and the terms of Centurion's willingness to pay out of pocket for the treatment that FDC is statutorily prohibited from paying for.

8

706 F.2d 1144, 1155 (11th Cir. 1983). Defendants argue that the HSB does not harm the class, so there is no relief to be had. Opp. at 27. But again, this factual assertion is unfounded and, in any case, is a merits argument. Should the Court determine that the HSB is unconstitutional, an injunction would provide relief to the putative class by removing the risk.

Defendants further argue that because the HSB requires FDC to provide hormone treatment if constitutionally required, any injunction would be no more than an "obey-the-law" injunction. Opp. at 27. But Defendants have not agreed that the Eighth Amendment requires the provision of hormone therapy. And the HSB imposes requirements beyond constitutional necessity: for a variance to be granted, additional provisions of the policy must also be satisfied. *See* HSB 15.05.23 § IX.C ("Variances…shall only be sought (1) after satisfying all preceding provisions of this policy *and* (2) if necessary to comply with the U.S. Constitution or a court decision.") (emphasis added). This is not a situation where Plaintiffs seek an injunction that simply tells Defendant to "obey the law," Opp. at 27; they seek to enjoin the HSB. *See* First Amended Complaint, Dkt. 66, at 35–36. Defendants have not shown such an injunction would be "incapable of enforcement." Opp. at 27.[6]

---

[6] Under Defendants' reasoning, *any* policy with a constitutional savings clause would be immune from constitutional challenge. The Supreme Court has rejected constitutional savings clauses that are "absolutely inconsistent with the provisions of the act" in which they are found. *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 23 (2020) (*quoting AT&T Co. v. Cent. Off. Tel., Inc.*, 542 U.S. 214, 228 (1998)).

9

### B. Social Transition Accommodations

Defendants make two arguments in opposition to class certification with respect to Plaintiffs' challenge to the denial of accommodations for purposes of social transition: i) Because, they claim, reasonable disagreement exists in the medical community over whether social transitioning can ever be medically necessary for individuals with gender dysphoria, Plaintiffs failed to provide sufficient evidence that the removal of social transition accommodations exposes the proposed class to a substantial risk of serious harm; ii) They claim commonality is not satisfied because social transition accommodations would be provided by FDC if medical providers determined they were medically necessary for a particular inmate. As discussed below, neither of these arguments has merit.

### 1.  The "Reasonable Disagreement" Argument

Defendants argue that "[b]ecause reasonable disagreement exists over the medical necessity of social transitioning, Named Plaintiffs failed to provide sufficient evidence that the removal of social-transitioning accommodations exposes all inmates in their proposed class to a substantial risk of serious future harm." Opp. at 32.

Even if their position on the law were correct, whether social transition accommodations can be medically necessary for individuals with gender dysphoria is a merits question that does not affect the appropriateness of class certification.

10

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class." Whether the categorical denial of social transition accommodations puts members of the proposed class at risk of being denied medically-necessary care is a common question of fact, and whether that violates the Eighth Amendment is a common question of law.

In any case, Defendants completely misunderstand the relevant Eighth Amendment law. Citing *Keohane I*, they argue that "[w]here there is reasonable disagreement about appropriate medical treatment, preferring one reasonable course over another does not violate the Constitution." Opp. at 29. But in *Keohane I*, there was disagreement about whether social transition was medically necessary for Keohane based on an individual assessment of her needs at that time. *See*, *Keohane I*, at 1274 ("the testifying medical professionals were—and remain— divided over whether social transitioning is medically necessary to Keohane's gender-dysphoria treatment"). The court did not deny her claim on the grounds that there is disagreement within the medical community about whether social transition can *ever* be medically necessary for anyone. Indeed, it distinguished other cases ruling in favor of transgender inmates' challenges to blanket medical policies in part on the basis that in *Keohane I*, the defendant clarified that under the policy at the time, it would "make exceptions for social-transitioning-related requests if deemed medically necessary." *Id*. at 1275 n.11. *See also*, *id*. at 1266–67.

There is no basis in law for Defendants' position that reasonable disagreement within the medical community about the propriety of ever using a particular treatment can justify denying an inmate that treatment based on a categorical ban without regard to the individual's medical needs.

Thus, even if the declaration of Defendant's expert, child and adolescent psychiatrist Dr. Kristopher Kaliebe, were entitled to weight and reflected a reasonable disagreement within the medical community about social transition,[7] that would not establish that the ban satisfies the Eighth Amendment, much less that it does not harm members of the proposed class to preclude accommodations for social transition.

---

[7] In fact, Dr. Kaliebe's declaration cannot be taken seriously because he offers nothing but perfunctory, conclusory statements—virtually all of which are unsupported by evidence—to support his opinion that social transition is never medically necessary. And he offers nothing to contradict the testimony of Dr. Karasic indicating the mental health benefits of social transition for people with gender dysphoria. *See* Karasic Dec. ¶¶ 67–68. Dr. Kaliebe also lacks experience that would qualify him as an expert to testify about gender dysphoria in adults (or patients of any age). In over 20 years of practice seeing thousands of patients, he has only seen about 17 patients with gender dysphoria, mostly minors. *See* Ex. B, Deposition of Dr. Kaliebe in *K.C. v. Ind. Members of Medical Licensing Bd. of Ind.*, Case No 1:23-cv-00595 (S.D. Ind.), Dkt. 58-7, at 35:7-10-36:1. And he does not claim to have conducted any research regarding gender dysphoria or to have published any peer reviewed literature in this area; just letters to the editor and an opinion piece. The fact that Dr. Kaliebe is a psychiatrist alone does not establish that he is qualified to testify about every subject within the field of psychiatry. *See, e.g., O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992) ("no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty.").

### 2. Defendants' contention that Plaintiffs failed to show a systematic policy of denying social transition accommodations.

Defendants argue that Plaintiffs failed to "provide sufficient evidence of systemic and centralized policies or practices" denying social transition accommodations. This is bewildering given that Defendants have stipulated that since the policy change last September, accommodations for social transition are no longer available. *See* Dkt. 57, Transcript of Dec. 9, 2024, Hearing ("Tr. PI Hearing"), at 59:8-12. In any case, Plaintiffs included the following evidence of a systemic policy in their motion: i) FDC rescinded Policy 403.012, which provided for accommodations for social transition, and replaced it with the HSB, which does not; ii) after the new policy was announced, all inmates with gender dysphoria were advised that clothing and grooming accommodations would no longer be permitted under the new policy and that they had one month to be in compliance or would face discipline. Dkt. 78-3, Declaration of Reiyn Keohane ("Keohane Dec.") ¶ 24; Dkt. 78-4, Declaration of Sasha Mendoza ("Mendoza Dec.") ¶ 12; iii) the Named Plaintiffs had their clothing and grooming items that accorded with their gender identity confiscated after the policy change. Keohane Dec. ¶ 27; Mendoza Dec. ¶ 14; Diamond Dec. ¶ 19; iv) all accommodations passes for gender dysphoria have been rescinded since the change in policy. Tr. PI Hearing at 59:8–25. Evidence submitted in support of the motion for a preliminary injunction further

13

establishes a systematic blanket policy of prohibiting social transition accommodations. *See* Dkt. 46-2, 46-3, 46-6.

Defendants now say that notwithstanding this record, FDC policy is not a prohibition on social transition accommodations. They point to Dr. Martinez's declaration, which is carefully worded to say that to date "no FDC inmate received a determination by a treating medical professional that social accommodations or alternate canteen items were medically necessary treatment for gender dysphoria," Martinez Dec. ¶ 12, and goes on to say that "while HSB 15.05.23 does not address social transitioning accommodations, should a determination be made by FDC medical providers that social accommodations represent a medically necessary treatment for a particular inmate, FDC will provide them to the extent medically necessary." *Id*. ¶ 13. But he does not say any inmate has been evaluated to determine if such accommodations are medically necessary for them, or that FDC medical providers have been told that they may consider and recommend such accommodations even though the documents discussed above announced that they were no longer permitted under the HSB.

Defendants' point to Dr. Martinez's testimony at the preliminary injunction hearing that "should a provider come to the determination about something like hair length, it would have to be on an individual service plan for that individual, and it would have to be evaluated," but they fail to mention that at that precise

14

moment, counsel for Defendants interjected to stipulate that the grooming standards have been removed and are not available. Tr. PI Hearing, at 57:14-59:12; *see* specifically *id.* at 59:8-16 (Mr. Steely: "Your Honor, I think we've created some confusion here this morning. So, from the defense standpoint, we'll stipulate to the fact that the grooming standards, the hair and the canteen items have been removed. Right? That they're not available." Court: "Okay." Mr. Steely: "That has happened and that's going forward."). Defendants' counsel referenced the possibility of individualized evaluations for social transition accommodations in the future, but only if there were a different standard in place. *Id*. at 59:21-62:5 (specifically *id.* at 60:7-11) (Mr. Steely: "Right now, they're not available. If somebody goes forward and gets re-evaluated, they go see their therapist, they go see their psychologist, **there's a different standard**. But right now, today, those items are not available. They have been removed.") (emphasis added); *see also id.* at 61:20-62:2 (Dr. Martinez confirmed that currently there is "not an opportunity for an exception" for "grooming and clothing accommodations").

Plaintiffs have demonstrated that all members of the proposed class are subject to the same policy of categorically denying these accommodations.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted.

Dated: May 28, 2025

Respectfully submitted,

/s/ Samantha J. Past
Samantha J. Past (Florida Bar No. 1054519)
Daniel B. Tilley (Florida Bar No. 102882)
**American Civil Liberties Union Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org

Li Nowlin-Sohl (Admitted in Washington only)*
Leslie Cooper
**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org

Anthony Anscombe*
Darlene Alt†
Emily Shook*
Laurel Taylor *
**Steptoe LLP**
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Tel. (312) 577-1300
aanscombe@steptoe.com
dalt@steptoe.com
eshook@steptoe.com
lataylor@steptoe.com

Michelle Fraling*
**American Civil Liberties Union Foundation**
915 15th Street NW, 6th Floor
Washington DC, 20005
Tel: (917) 710-3245
michelle.fraling@aclu.org

*Counsel for Plaintiffs*

\* *Admitted pro hac vice*
† *Pro hac vice application forthcoming*

## CERTIFICATE OF COMPLIANCE (LOCAL RULE 7.1(I))

This Reply is fifteen pages in length and does not exceed the page limit granted by the Court (ECF Nos. 84, 85).

/s/   Samantha J. Past
Counsel for Plaintiffs