# EXHIBIT A

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 24-11299

———————————————

ROBBIN AMANDA BAYSE,
a.k.a. Robert Bayse,

Plaintiff-Appellee,

*versus*

TIMOTHY WARD,
Commissioner, et al.,

Defendants,

TED PHILBIN,
Warden,
MS. SHELTON,
Deputy Warden of Care and Treatment,
MS. HARVEY,
Deputy Warden of Security,

Defendants-Appellants.

2                    Opinion of the Court                    24-11299

—————————————

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 1:22-cv-00024-JRH-BKE

—————————————

Before WILLIAM PRYOR, Chief Judge, and LUCK and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether qualified immunity shields state prison officials from a lawsuit alleging that their denial of a transgender prisoner's request to grow long hair and wear makeup, earrings, and nail polish violated the prisoner's right to be free from cruel and unusual punishment. *See* U.S. CONST. amend. VIII. Robert Bayse, an inmate at a Georgia prison for male convicts, suffers from gender dysphoria and borderline personality disorder and receives cross-sex hormone therapy and mental-health counseling at that prison. At another prison, Bayse was also allowed to follow female grooming and cosmetic standards. But Bayse's current treatment plan does not prescribe those social transitioning accommodations. Bayse sued several prison officials after they denied these accommodations. *See* 42 U.S.C. § 1983. The district court denied the officials' motion for summary judgment based on qualified immunity. We vacate and remand with instructions to grant the officials qualified immunity because they did not violate the Eighth Amendment.

## I. BACKGROUND

Robert Bayse is a prisoner who identifies as a transgender woman named Robbin. Bayse is serving two concurrent life sentences after being convicted of rape, aggravated sodomy, and child molestation in 1998. While in custody, Bayse was diagnosed with gender dysphoria and has received several forms of treatment for this condition. Bayse meets with an endocrinologist every three to six months. Bayse takes a daily testosterone suppressant and an every-other-week estrogen supplement. Bayse also receives mental-health counseling for both gender dysphoria and borderline personality disorder.

In October 2019, Georgia State Prison instituted a comprehensive treatment plan for Bayse. The plan listed gender dysphoria as Bayse's "[p]rincipal [d]iagnosis" and borderline personality disorder as an "[o]ther [d]iagnos[i]s." It outlined an "[i]ntervention [s]trategy" that involved "continu[ing] to utilize hormone therapy to affirm [Bayse's] female identity" and "affirm[ing] [Bayse's] gender through utilizing she/her/hers pronouns and female titles." It also allowed Bayse to "continue to wear female undergarments"; "follow grooming and cosmetic standards consistent with those of . . . women incarcerated by the Georgia Department of Corrections (including make up, earrings, nail polish, and hair length)"; and "participate in weekly . . . community meetings [and] twice monthly individual therapy sessions."

In January 2020, Bayse was transferred to Augusta State Medical Prison where Bayse continued to take hormones and

receive mental-health counseling. But no medical professional at Augusta State Medical Prison ever prescribed the social transitioning accommodations to allow Bayse to follow female grooming and cosmetic standards. Instead, prison officials repeatedly told Bayse that these accommodations violated Department of Corrections policy.

At some point in 2020, medical professionals at Augusta State Medical Prison gave Bayse a new comprehensive treatment plan. The plan listed borderline personality disorder as Bayse's "[p]rincipal [d]iagnosis" and gender dysphoria as an "[o]ther [d]iagnos[i]s." It outlined an "[i]ntervention [s]trategy" that involved learning "coping skills to decrease depressive episodes," "meet[ing] with [a] mental health counselor [once] a month . . . for individual counseling," "meet[ing] [twice] per week for suicide precautions," and "see[ing] psychiatry every 60 days." The plan did not include any social transitioning accommodations that permitted Bayse to adhere to female grooming and cosmetic standards. Bayse continued to receive cross-sex hormone therapy even though the plan did not mention that form of treatment.

In April or May 2020, Bayse briefly met with Warden Ted Philbin. Bayse showed Warden Philbin the treatment plan from Georgia State Prison and complained that prison officials were telling Bayse that the social transitioning accommodations violated Department of Corrections policy. Warden Philbin told Bayse that he would investigate the issue.

The dispute over the social transitioning accommodations escalated. On June 8, 2020, Bayse filed a grievance against Deputy Warden of Security Tamika Harvey for "yell[ing]" at Bayse to "[g]et a hair cut" despite knowing of Bayse's gender dysphoria. Mental-Health Director Donna Young met with Bayse to discuss this complaint and explained that Department of Corrections Standard Operating Procedure 507.04.68 states, "If a diagnosis of Gender Dysphoria is reached, a treatment plan will be developed that promotes the physical and mental health of the patient. The development of the treatment plan is not solely dependent on services provided or the offender's life experiences prior to incarceration." Bayse stormed out of Young's office saying, "[Y]ou better not mess with my fucking hair."

On June 12, Bayse met with Warden Philbin, Deputy Warden Harvey, Deputy Warden of Care and Treatment Ruthie Shelton, Young, and Mental-Health Counselor Minnie Davis. Bayse testified that Davis explained that Bayse's "treatment plan had been changed" such that Bayse "c[ould]n't wear . . . makeup, . . . earrings, . . . [or] nail polish, and . . . had to cut [Bayse's] hair." Warden Philbin told Bayse that the treatment plan from Georgia State Prison violated Department of Corrections policy. And Deputy Warden Harvey told Bayse that Bayse would have to "cut [Bayse's] hair, . . . [and] take off [Bayse's] makeup, nail polish, and . . . earrings." Bayse later alleged that Warden Philbin also stated, "[Bayse] was not born a female, that [Bayse] was born with a penis and that if [Bayse] was a female, then [Bayse] would not be in a male prison," and that Deputy Warden Harvey said, "Bayse, you have a

dick between your legs. You're a male and not a female." Warden Philbin denied saying that the treatment plan from Georgia State Prison was against prison policy or anything about Bayse being born male, and Deputy Warden Harvey denied making the statement about Bayse being a male. Young's notes from the meeting described Bayse as "loud and disrespectful."

On June 24, Bayse met with a psychologist about Bayse's "emotional distress due to circumstances regarding gender dysphoria." The psychologist recorded that Bayse asserted a "'right' to be treated as a female" and "displayed affective instability and irritability." And when she tried to prepare Bayse "for the inevitable event of getting a haircut," Bayse "walk[ed] out." The prison continued to provide mental-health counseling in the ensuing months, but Bayse often refused to cooperate.

In March 2021, Deputy Warden Harvey instructed Captain Ramondo Gaines that Bayse needed a haircut to comply with the prison's standard operating procedures. Captain Gaines enlisted Officers Jason Smith and Cordero Campbell to assist. Bayse testified that the officers held Bayse down while another inmate cut Bayse's hair. Captain Gaines and Officer Smith denied that Bayse was held down with any force. But the contemporaneous incident report checked the box that "[h]ands-[o]n" force was used. After the haircut, Officers Smith and Campbell escorted Bayse to the crisis stabilization unit, where Bayse stayed for two days. Within three days of being released from this supervision, Bayse attempted self-castration.

24-11299                Opinion of the Court                7

Bayse sued several prison officials. *See* 42 U.S.C. § 1983. Bayse's *pro se* complaint alleged that the officials' refusal to grant Bayse social transitioning accommodations constituted deliberate indifference in violation of the Eighth Amendment. *See* U.S. CONST. amend. VIII. Bayse named four groups of officials as defendants: supervisory officials with statewide positions and wardens, officers, and mental-health providers at Augusta State Medical Prison. After an initial screening, the district court dismissed Bayse's claims against the supervisory officials.

The wardens—Warden Philbin, Deputy Warden Shelton, and Deputy Warden Harvey—and the officers—Captain Gaines and Officer Smith—moved to dismiss Bayse's claims against them on the grounds of sovereign immunity and failure to exhaust administrative remedies. The mental-health providers—Young, Davis, and Psychologist Paul Clements—moved to dismiss the claims against them on the grounds of failure to exhaust administrative remedies and failure to state a claim. The district court granted the wardens and officers' motion as to the official-capacity claims for monetary relief. But it denied the motions as to the rest of the claims against the wardens, officers, and mental-health providers.

The remaining parties moved for summary judgment. Bayse argued that the wardens, officers, and mental-health providers were liable under section 1983 because they failed to provide adequate medical care for Bayse's gender dysphoria, including by not adhering to the standards of care established by the World Professional Association for Transgender Health. The mental-health

providers contended that they were not liable because they had no authority to override the prison's standard operating procedures for hair length and cosmetics and they provided adequate medical care for Bayse's gender dysphoria. And they attached declarations from Clements and Davis stating that in their "professional opinion[s] . . . , the[] female grooming and cosmetic accommodations would not be appropriate or clinically indicated for . . . Bayse and would not address the primary diagnosis of Borderline Personality Disorder." The wardens and officers argued that they were shielded by qualified immunity and that Bayse's deliberate-indifference claims failed because they were not involved in any medical decisions and Bayse received other treatment for gender dysphoria.

A magistrate judge issued a report and recommendation that recommended denying summary judgment to all parties except for the officers who did not participate in the denial of any treatment. He recommended denying summary judgment to Bayse because Bayse did not provide a statement of undisputed material facts, as required by the local rules, and because "reasonable jurors could disagree concerning whether [the wardens and mental-health providers] . . . acted with deliberate indifference." He found that "[Bayse] has failed to submit any evidence of medical necessity" and explained that neither Bayse's previous treatment plan nor the World Professional Association for Transgender Health's standards of care "constitute[d] evidence of medical necessity."

The magistrate judge also recommended denying summary judgment to the wardens and mental-health providers. He rejected their interpretation of Department of Corrections Standard Operating Procedure 507 to be a blanket ban on social transitioning accommodations as "incorrect" and "pretextual." He concluded that "reasonable jurors could find [that they] failed to establish [that] social transitioning accommodations were not medically necessary." He explained that Clements's and Davis's declarations stating that Bayse's requested accommodations were not clinically indicated were insufficient because they were "rife with ambiguity" and based on the false premise that granting such an exemption conflicted with prison policy. And he rejected the wardens' argument that there was no constitutional violation because Bayse received other treatment for gender dysphoria.

The magistrate judge also recommended denying the wardens qualified immunity. He concluded that it was clearly established that they could not deny medically necessary social transitioning accommodations for Bayse's gender dysphoria. Although the magistrate judge acknowledged that "the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose," *Jenkins ex rel. Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997) (en banc) (citation omitted), he relied on an unpublished circuit decision and a district court decision to conclude that the wardens had "fair warning that denial, discontinuation, or interference with medically necessary treatment for gender dysphoria constituted

deliberate indifference." And he distinguished our published deci-
sion in *Keohane v. Florida Department of Corrections Secretary*, 952 F.3d
1257 (11th Cir. 2020), as being "based on the plaintiff's failure to
establish medical necessity and the defendant's proof of an unam-
biguous and enforceable application of prison policy."

The mental-health providers and wardens objected to the
report and recommendation. The mental-health providers argued
that the magistrate judge misapplied the standard for deliberate in-
difference because there was no evidence that the accommoda-
tions were medically necessary. They also disputed his framing that
Standard Operating Procedure 507 was the "starting point" for
Bayse's treatment plan and his discrediting of Clements's and Da-
vis's declarations. The wardens argued that the magistrate judge
defined clearly established law at too high a level of generality.
They criticized him for relying on nonbinding decisions to decipher
clearly established law and for misinterpreting *Keohane*. And they
contended that he erred by placing the burden on them to prove a
lack of medical necessity.

The district court adopted the report and recommendation.
It added that the magistrate judge's qualified-immunity analysis
was correct because "there need not exist a case requiring specific
treatment for a particular diagnosis." The wardens appeal the de-
nial of qualified immunity.

## II. STANDARDS OF REVIEW

We "review a denial of qualified immunity *de novo* and, on a
motion for summary judgment, view the evidence in the light most

favorable to the nonmoving party." *Nelson v. Tompkins*, 89 F.4th 1289, 1295 (11th Cir. 2024). When an interlocutory appeal of a denial of qualified immunity implicates issues involving both evidentiary sufficiency and whether the law was clearly established, we have "two options regarding how to deal with [a] factual issue." *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996). "We may accept the district court's findings of fact if they are adequate." *Nelson*, 89 F.4th at 1296 (citation and internal quotation marks omitted). "Or, we may conduct our own analysis of the facts in the light most favorable to the plaintiff." *Id.* (citation and internal quotation marks omitted). Yet "we will not disturb a factual finding by the district court if there is any record evidence to support that finding." *Stanley v. City of Dalton*, 219 F.3d 1280, 1287 (11th Cir. 2000).

### III. DISCUSSION

"[Q]ualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1332 (11th Cir. 2025) (citation and internal quotation marks omitted). To establish qualified immunity, "[t]he officer bears the initial burden to prove that he acted within his discretionary authority." *Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017). The burden then shifts to the plaintiff to establish "that the officer[] violated the constitutional rights at issue" and "that those rights were clearly established at the time of the alleged misconduct." *King v. Pridmore*, 961 F.3d 1135, 1142 (11th Cir. 2020).

12                          Opinion of the Court                          24-11299

The Eighth Amendment prohibits the "inflict[ion]" of "cruel and unusual punishments," U.S. CONST. amend. VIII, and the Fourteenth Amendment bars state officials from violating the Eighth Amendment, *id.* amend. XIV; *Robinson v. California*, 370 U.S. 660, 666–67 (1962). Because prisoners rely on prison officials to treat their medical needs, the Eighth Amendment requires officials "to provide minimally adequate medical care to those whom they are punishing by incarceration." *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991). But this care need not "be perfect, the best obtainable, or even very good." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (citation and internal quotation marks omitted).

Prison officials violate the prohibition on cruel and unusual punishments when they act with "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A deliberate-indifference claim entails both an objective and a subjective component." *Keohane*, 952 F.3d at 1266. As to the objective component, an inmate must establish, "as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (citation and internal quotation marks omitted). And as to the subjective component, an inmate must prove that "the defendant acted with subjective recklessness as used in the criminal law." *Id.* (citation and internal quotation marks omitted).

The "deliberate indifference . . . standard . . . is a high standard." *West v. Tillman*, 496 F.3d 1321, 1333 (11th Cir. 2007); *see also*

*Johnson v. Lewis*, 83 F.4th 1319, 1327 (11th Cir. 2023) ("Deliberate indifference . . . is a 'steep hill' for a plaintiff to climb." (citation omitted)); *Keohane*, 952 F.3d at 1277 (acknowledging the "low deliberate-indifference bar" that prison officials must clear); *Hoffer*, 973 F.3d at 1271 (reiterating "the stringency of the deliberate-indifference standard"). "[P]risoners aren't constitutionally entitled to their preferred treatment plan . . . ." *Keohane*, 952 F.3d at 1277. A denial of medical care constitutes deliberate indifference "only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505 (citation and internal quotation marks omitted).

At summary judgment, the moving party's burden "depend[s] on which party would bear the burden of proof on a disputed issue at trial." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024). The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this 'initial responsibility' by showing that there is an absence of evidence to support the nonmoving party's case . . . ." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citation omitted). If the moving party makes that

14                    Opinion of the Court                    24-11299

showing, "the nonmoving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion." *Id.*

The district court ruled that "reasonable jurors could find [that the wardens and mental-health providers] failed to establish [that] social transitioning accommodations were not medically necessary." But the wardens argue that the district court erred because it was Bayse's burden to prove that the accommodations were medically necessary. And they contend that, at worst, the existence of a dispute over whether the accommodations were medically necessary defeats a claim for deliberate indifference under the Eighth Amendment. Bayse responds that the record supports the ruling that there is a genuine dispute of fact about whether the accommodations were medically necessary.

Our decision in *Hoffer v. Secretary, Florida Department of Corrections* squarely resolves the burden issue in favor of the wardens. 973 F.3d 1263. There, we reversed a district court for "impermissibly flipp[ing] the burden of proof" for a deliberate-indifference claim. *Id.* at 1274. We explained that "[o]ur precedent is clear that an inmate bears the burden of proving all aspects of his Eighth Amendment claim." *Id.* "So it wasn't the [official]'s burden to demonstrate that [a certain] treatment . . . isn't medically necessary; it was the plaintiffs' burden to prove that such treatment *is* necessary." *Id.*; *see also Celotex*, 477 U.S. at 325 (explaining that "the burden is [not] on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material

fact"). The district court was wrong to deny the wardens summary judgment on the ground that *they* failed to establish that the social transitioning accommodations were *not* medically necessary. Under *Hoffer*, the burden was on Bayse to prove medical necessity. And because, as the district court acknowledged, Bayse "failed to submit any evidence of medical necessity," Bayse cannot establish a constitutional violation.

Bayse resorts to two ancillary pieces of evidence to argue that the social transitioning accommodations were medically necessary: Bayse's previous treatment plan from Georgia State Prison and the standards of care promulgated by the World Professional Association for Transgender Health. But this evidence is insufficient to satisfy Bayse's burden—even as the nonmovant on summary judgment. *See Celotex*, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

The district court correctly concluded that these sources "do[] not constitute evidence of medical necessity." The social transitioning accommodations can be "psychologically pleasing" without being "strictly medically necessary." *Keohane*, 952 F.3d at 1274 (citation and internal quotation marks omitted). Bayse offers no evidence that considerations of medical necessity motivated these accommodations, so the previous treatment plan lacks probative value. *See Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018) ("Speculation does not create a *genuine* issue

16                    Opinion of the Court                    24-11299

of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (citation and internal quotation marks omitted)). And the standards of care from the Association—by their own terms—are "[f]lexible [c]linical [g]uidelines" that list "[c]hanges in gender expression" as a mere "option[]" for treatment. These *general* standards are far too equivocal to be evidence that social transitioning accommodations were medically necessary *for Bayse*.

The district court also erred in its analysis of whether the wardens violated clearly established law. "In this circuit, the law can be 'clearly established' for qualified immunity purposes *only* by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins*, 115 F.3d at 826 n.4 (emphasis added) (citation omitted). "[U]npublished case law . . . and [decisions] from the district courts [are] unavailing . . . because only binding precedent can clearly establish a right for qualified immunity purposes." *Gilmore v. Hodges*, 738 F.3d 266, 279 (11th Cir. 2013); *see also J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018) ("Unpublished cases . . . do not serve as binding precedent and cannot be relied upon to define clearly established law." (citation omitted)). And "dicta cannot clearly establish the law for qualified immunity purposes." *Jones v. Cannon*, 174 F.3d 1271, 1288 n.11 (11th Cir. 1999).

Despite our clear command not to rely on nonprecedential decisions, the district court relied on an unpublished circuit

decision and a district court decision to support its ruling that the wardens violated clearly established law. *See Kothmann v. Rosario*, 558 F. App'x 907, 912 (11th Cir. 2014); *Diamond v. Owens*, 131 F. Supp. 3d 1346, 1375 (M.D. Ga. 2015). This reliance "transgressed the fundamental rule that courts of this circuit are bound by the precedent of this circuit." *In re Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015). Moreover, the wardens explained in their objections to the magistrate judge's report and recommendation that neither *Kothmann* nor *Diamond* could "provide a basis for denying [them] qualified immunity." Our *published* decision in *Keohane* should have made it clear that the wardens did not violate clearly established law. Moving forward, district courts would be wise not to make the same mistake.

## IV. CONCLUSION

We **VACATE** and **REMAND** with instructions to grant qualified immunity to the wardens.