IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| REIYN KEOHANE, *et al*, | : |
| | : |
| *Plaintiffs*, | : |
| | : |
| v. | : Case No. 4:24-cv-434-AW-MAF |
| | : |
| RICKY D. DIXON, in his official capacity as Secretary of the Florida Department of Corrections; *et al*, | : |
| | : |
| *Defendants*. | : |

**PLAINTIFFS' OPPOSITION TO CENTURION'S
MOTION FOR PROTECTIVE ORDER**

**I.  Introduction**

Plaintiffs respectfully request that this Court deny the Motion of Centurion of Florida LLC ("Centurion") for a Protective Order (the "Motion") limiting Plaintiffs' opportunity to question Centurion about changes in Florida Department of Corrections' ("FDC's") policies regarding hormone therapy. Centurion seeks to preclude this discovery based on the Court's order denying class certification with respect to hormone therapy on the ground that Plaintiffs did not establish standing. This argument fails for two reasons.

First, that the Court declined to certify a class regarding hormone therapy—via an interlocutory order—neither effected a dismissal of Plaintiffs' claim regarding hormone therapy nor limited Plaintiffs' ability to conduct discovery to support their individual claims and Article III standing.

Centurion's understanding and implementation of the new HSB 15.05.23 (the "Policy"), and its input on FDC's revised hormone therapy procedure, are critical to understanding Plaintiffs' risk that FDC will either refuse to grant variances, or will withdraw them during the required semi-annual re-evaluations. FDC has acknowledged that there are no peer reviewed studies showing that hormone therapy improves clinical outcomes by treating the etiologic basis of the pathology, which makes its evidentiary standard for variances unattainable. (**Ex. 1**, Martinez Rule 30(b)(6) Dep. at 180:19-181:12). And the Centurion providers have the most direct knowledge of the harms that would result if inmates lost their hormone therapy. Deposition topics 7, 9, 13, 14, 15, 20, 23, and 24 seek this information.

Second, Plaintiffs seek discovery into the origins of the Policy, including the provisions regarding hormone therapy, because FDC's limitations on hormone therapy and its elimination of social transition accommodations both stem from the same Policy. Discovery strongly suggests that the impetus for the new Policy was political, rather than medical judgment. It would be impossible to explore the actual impetus for the Policy if Plaintiffs cannot ask about hormone therapy. Moreover,

even if the Policy actually did result from a shift in medical consensus as FDC claims, any alleged shift encompasses both hormone therapy and social transition accommodations. Plaintiffs cannot fully probe the factual bases for FDC's denial of social accommodations without taking discovery regarding hormone therapy.

The Court confirmed both of these points in its Order issued earlier today, denying Defendants' recent motion for a protective order, and reasoning:

> Defendants broadly assert that the class-certification order (ECF No. 125) forecloses all further discovery related to hormone treatment. But as Plaintiffs correctly note, the individual claims related to hormone treatment remain pending, so discovery on that topic is still permitted. Further, information about what animated the new policy relates to both the hormone-treatment and social-accommodations aspects of Plaintiffs' claim.

(ECF 139 at 4).

## II. Background

### A. Class Certification Motion and Order

On October 22, 2025, this Court issued its ruling on Plaintiffs' Motion for Class Certification (ECF 125). The Court certified 23(b)(2) class of inmates seeking social transition accommodations, but denied certification of a class seeking to ensure continued availability of hormone therapy. The Court concluded that class certification was not appropriate because no Plaintiff had shown standing to pursue claims relating to hormone therapy, as FDC continued to provide hormones to them after implementing the Policy.

B. *Efforts to Resolve This Dispute Informally*

The only reason that Centurion's Rule 30(b)(6) deposition did not occur long before the Court issued its class certification order is that Centurion did not timely, or fully, respond to Plaintiffs' document subpoena. Centurion did not complete its production until October 27, 2025.

After providing Centurion with their list of 30(b)(6) deposition topics in June and September, 2025, Plaintiffs served Centurion with this 30(b)(6) deposition subpoena on October 24, 2025.

On November 4 and 7, 2025, Centurion sent emails challenging the discoverability of Centurion's knowledge of, and recommended revisions to, the Policy regarding hormone therapy. Centurion argued that the Court's order on class certification deprived Plaintiffs of standing to seek this information. Plaintiffs responded by email that the Court's order did not dismiss their claims relating to hormone therapy, and that evidence regarding hormone therapy was also relevant to the claim relating to social transition accommodations. (**Ex. 2**, Nov. 4-7 Email Chain). No further consultation occurred, and Centurion filed its motion on November 21, 2025.

C. *The Challenged Demands*

As required by L.R. 26.1(D), these are the deposition topics to which Centurion has objected:

4

- **Topic 7**: The impact of hormone replacement therapy on the physical and mental health of individuals in FDC custody diagnosed with gender dysphoria who have received such treatment.

- **Topic 9**: Centurion's knowledge of and involvement with the rescission of Procedure 403.012, including … b) the reasons or rationales for changing the requirements related to hormone therapy.

- **Topic 13**: Centurion's knowledge of and involvement in the implementation of the provisions in HSB 15.05.23 regarding the requirements for "variances" to permit the provision of hormone therapy, including directions or guidance provided by FDC to its own or Centurion personnel and any communications from FDC to FDC and/or Centurion medical and mental health providers concerning variances.

- **Topic 14:** Centurion's knowledge of and involvement with the FDC's GDRT and/or MDST, including whether Centurion personnel play any role in determining whether a variance for hormone therapy will be granted.

- **Topic 15:** Centurion's knowledge of the number of variances for hormone therapy that have been requested by individuals in FDC custody, and how many of those have been i) approved, ii) denied, or iii) are pending.

- **Topic 20:**  The impact of the change in policy from Procedure 403.012 to HSB 15.05.23 on individuals with gender dysphoria, – including … ii) the fear of hormone therapy being discontinued, including but not limited to any inmates experiencing suicidal ideation, or attempting to self-harm or commit suicide, and any measures that were required to address these harms such as hospitalizations or suicide watches.

- **Topic 23**: Any agreement, formal or informal, whereby Centurion agreed to pay for, not seek reimbursement for, or otherwise provide for hormone therapy for FDC inmates with gender dysphoria after Section 286.311 went into effect, including the terms of any such agreement, the discussions leading up to that agreement, and discussions pursuant to that agreement.

- **Topic 24**: Centurion's considerations and reasons for agreeing to pay for hormone therapy for FDC inmates with gender dysphoria, and the individuals involved in reaching that decision.

5

*D. Relevance of Discovery From Centurion Regarding Hormone Therapy*

Centurion personnel were percipient witnesses to the preparation, rollout, and implementation of the Policy by FDC. Indeed, they tried to temper FDC's efforts to restrict gender affirming care. Centurion's parent company's policies ▌ ▌ ▌ (Ex. 3, ▌ ▌) (Under Seal), and Centurion personnel advocated for changes to the Policy to ensure that inmates would continue to receive both.

Beginning with its implementation in 2017, and furthered by its revision in 2019, FDC's Policy 403.012 allowed inmates to receive both social transition accommodations and hormone therapy. Centurion's mental health and medical practitioners regularly recommended both for gender dysphoric inmates, and FDC's Gender Dysphoria Review Team routinely approved these treatments. As of August 2022, when Dr. Danny Martinez (FDC's Chief of Medical Services) participated in FDC's annual review of policy 403.012, he had no changes to recommend, thus leaving intact FDC's policy of providing *both* hormone therapy and social transition accommodations.

But political influences soon led to changes. In 2022, Florida's Agency for Health Care Administration ("AHCA") published a report that concluded that

hormone therapy is "not consistent with generally accepted medical treatment standards." Another Court in this District has since made a factual finding that the process that led to the AHCA report "was, from the outset, a biased effort to justify a predetermined outcome, not a fair analysis of the evidence." *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1281 (N.D. Fla. 2023). The Court noted that the creation of the report came at the direct request of the Governor's office. *Id.*

Discovery in this case shows that in early January, 2023, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (**Ex. 4**, FDC_OFFICIALS_024865) (Under Seal). Two days later, FDC's Chief of Staff, Tim Fitzgerald, contacted Dr. Kline (FDC's Chief of Mental Health Services) to talk about FDC's policy on treating gender dysphoric inmates. Mr. Fitzgerald is not a medical doctor or a mental health professional. On January 18, 2023, he sent an email to Dr. Kline attaching a link to the AHCA report and told Dr. Kline:

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

(**Ex. 5**, FDC_OFFICIALS_045490) (Under Seal).

7

In May, 2023, Governor DeSantis signed into law Senate Bill 254, which barred the use of state funds to pay for hormone therapy to treat gender dysphoria. FDC immediately drafted a policy to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (**Ex. 6**, FDC_OFFICIALS_047011) (Under Seal). But FDC reached an agreement with Centurion that Centurion would cover the costs of providing hormones, and later revised the draft policy to allow for hormone therapy if certain requirements were met, but accommodations remained unavailable.

FDC asked Centurion to comment and provide edits on the new HSB Policy. And Centurion did provide edits, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (**Ex. 7**, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓) (Under Seal).

FDC rejected these revisions, which do not appear in the final version. (*See* ECF 4-4, final version of the Policy). Centurion also pushed back on delivering a message to inmates that there have been "recent changes in medical consensus," and asking FDC to remove that language or have FDC deliver this message instead of

Centurion. (**Ex. 8**, CENT PROD 000082). FDC made Centurion's Regional Directors ("RDs") deliver that message anyway. (**Ex. 9**, CENT PROD 002662).

Plaintiffs should be entitled to take discovery into how Centurion understands the Policy and prepares variance requests under the Policy, Centurion's knowledge of the impetus of the Policy both as to hormone treatment and social transition accommodations (and whether it was prompted by political motivations rather than medical need), whether Centurion believes that the Policy harms inmates with gender dysphoria (contrary to Defendants' assertions), why Centurion proposed modifications to the Policy, and why those proposals were ultimately rejected.

**III. Argument**

*A. The Court's Denial of Class Certification Does Not Preclude the Requested Discovery*

Centurion's argument against discovery concerning hormone therapy is that in the Court's class certification ruling, it held that Plaintiffs failed to demonstrate standing with respect to their claim for hormone therapy, and therefore any questions about hormone therapy are irrelevant. But the Court rejected this argument in rejecting Defendants' recent motion for a protective order. (ECF 139 at 4). As the Court noted, Plaintiffs still have their individual hormone therapy claims. The Federal Rules of Civil Procedure provide vehicles for defendants to dispose of claims due to a plaintiff's lack of standing, such as FRCP 12(b)(1) and FRCP 56, with specific requirements for each. Rule 23 is not one of those vehicles. This Court

9

previously denied Defendants' Rule 12(b) motion to dismiss for lack of standing. (ECF 58 at 2). Accordingly, Plaintiffs are entitled to obtain discovery relevant to their claims or defenses—including standing. FRCP 26(b). Tellingly, Defendants have filed no further motions seeking dismissal or summary judgment on Plaintiffs' hormone therapy claim.

This Court's ruling on class certification does not serve to dismiss (or grant summary judgment) on Plaintiffs' claims regarding hormone therapy; it is an interlocutory ruling on the issue of whether the case may proceed on a class-wide basis. The Court's order said that "Plaintiffs have not shown that any Plaintiff has standing to pursue any claim related to hormone treatment. Thus, they have not met their burden ***at this stage*** to show that class certification is appropriate as to this subclaim." (ECF 125 at 9) (emphasis added). But while the Court denied class certification as to the hormone therapy subclaim, it did not *dismiss* Plaintiffs' hormone therapy subclaim—which Plaintiffs continue to press in their individual capacity—and did not limit discovery related to that subclaim.

In addition, "[c]lass certification orders also are not final judgments impervious to lower court review and revision. On the contrary, Rule 23(c)(1) specifically empowers district courts to alter or amend class certification orders at any time prior to a decision on the merits. That power is ***critical***, because the scope and contour of a class ***may change radically as discovery progresses*** and more

information is gathered about the nature of the putative class members' claims." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1273 (11th Cir. 2000) (emphasis added). A district court "retains the ability, and **perhaps even a duty**, to alter or amend a certification decision . . . **to recognize the importance of new facts**." *Shin v. Cobb Cty. Bd. of Educ.*, 248 F.3d 1061, 1064 (11th Cir. 2001) (emphasis added). "The rationale behind Rule 23(c)(1) is that a certification decision should be made '[a]s soon as practicable,' even though later events or discoveries may mandate a different result." *Gill-Samuel v. Nova Biomedical Corp.*, 298 F.R.D. 693, 699 (S.D. Fla. 2014) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 13 (1983)).

Rule 23 thus does not envision a situation where (1) Plaintiffs move for class certification "[a]t an early practicable time" (formerly "as soon as practicable") under Fed. R. Civ. P. 23(c)(1)(A) without the benefit of complete discovery, (2) the Court denies certification, and then (3) prohibits the Plaintiffs from seeking additional discovery on the issue. The case law above makes clear that this is the very thing Rule 23(c)(1)(C) was designed to prevent. Discovery in this case remains open, and Plaintiffs should have the ability to develop a complete record and consider whether to bring a motion under Rule 23(c)(1)(C) in light of "new facts" or "subsequent developments."

Centurion provides no case law to suggest that a ruling on class certification has the effect of dismissing a claim. Such an argument is illogical and contrary to the Federal Rules.

B. *The Discovery Sought is Highly Relevant.*

Information in Centurion's possession is directly relevant to Plaintiffs' claims. "A Rule 45 subpoena should be enforced unless it is clear that the evidence sought can have no possible bearing on the issues." *Classic Soft Trim, Inc. v. Albert*, No. 6:18-CV-1237-ORL-78-GJK, 2020 WL 6730978, at *2 (M.D. Fla. Oct. 8, 2020) (quotation marks and citation omitted).

1. <u>The Discovery Sought is Necessary to Establishing Plaintiffs' Standing Regarding Their Hormone Therapy Claim</u>

Defendants argue that Plaintiffs do not have standing because they are currently receiving hormones. But how Centurion understands the Policy and prepares variance requests is critical to understanding the risk Plaintiffs Boothe and Jackson face of not receiving a variance to continue hormone therapy, as well as the risk faced by all of the Plaintiffs that FDC will discontinue their hormones in the regular reviews of variances. There are questions about the implementation of the Policy given its origins as a total ban on hormone therapy, language proscribing hormone therapy unless certain circumstances warranting an exception are met, and the requirement of one year of psychotherapy prior to consideration for a variance. The requirement that doctors show evidence that hormone therapy treats the

12

(unknown) etiological basis of gender dysphoria is especially problematic, since FDC states that such literature does not exist. **Topic 13, 14, 15, and 20** cover all of this.

And while Defendants argue that hormone therapy is continuing for Plaintiffs, they have proffered two expert witnesses who opine that hormone therapy is not an effective treatment for gender dysphoria, is dangerous, and is never medically necessary for inmates with gender dysphoria. Given that Defendants are contesting the benefits of hormone therapy for patients with gender dysphoria and the harm of discontinuing such treatment—and thus, apparently the medical necessity of such care—Plaintiffs seek discovery from Centurion, the providers of care to inmates, regarding the impact of hormone therapy on Plaintiffs' health and the anticipated harms if treatment were to be withdrawn. **Topic 7** covers this.

**Topics 23 and 24**—which cover Centurion's agreement to cover the cost of hormone therapy in light of the State's ban on paying for it and discussions leading up to that agreement—could show that both Centurion and FDC recognized the importance of hormone therapy for the health of inmates with gender dysphoria and the harm of denying this care. And the continued availability of hormone therapy for inmates depends on Centurion's voluntary provision of the medications, given FDC's unwillingness to pay for medically necessary treatment. Plaintiffs need to

understand the terms of this agreement to assess the likelihood of changes to that agreement and their resultant loss of hormone therapy.

    2.    <u>Discovery Regarding the Origins and Motivations for the Policy Is Relevant to Plaintiffs' Accommodations Claim</u>

Even if the Court had dismissed Plaintiffs' claim with respect to hormone therapy, discovery into the origins of the Policy—including whether it was prompted by Florida's policy against hormone therapy found in the AHCA report, or by SB 254 and politicians, or both—is relevant to pursuing their claim related to accommodations.

As FDC's contracted medical provider, Centurion works closely with FDC's Chief of Medical Services and Chief of Mental Health, who drafted the Policy. Therefore, Plaintiffs wish to question Centurion about its knowledge of the impetus of the Policy. It is impossible to explore the actual rationale for and development of the Policy if Plaintiffs cannot ask about hormone therapy. In addition, Centurion gave significant input to FDC on a draft of the new Policy, supporting maintaining the same access to hormone therapy and accommodations. Plaintiffs seek to question Centurion about its discussions with FDC about its proposed revisions and why FDC rejected them, which is relevant to showing FDC's deliberate indifference to the medical and mental health consequences of discontinuing gender affirming care. Drawing a line between discovery regarding hormone therapy and social transition accommodations is impracticable and would deprive Plaintiffs of evidence regarding

14

key elements of their case. **Topic 9** is likely to lead to the discovery of important information to support Plaintiffs' claim.

### C. Centurion Faces No Meaningful Burden in Producing a Witness to Testify on Topics 7, 9, 13, 14, 15, 20, 23, and 24

Centurion's second basis for seeking a protective order—burden—rings hollow. Fed. R. Civ. P. 45(d)(1) does not protect non-parties from all burden, only from "undue burden." Parties resisting subpoena discovery of documents have a "heavy burden" to show that compliance will cause undue burden. *See, e.g.*, *Hatala v. Sustainable Concepts Dev., LLC*, No. 9:15-CV-81475, 2022 WL 2341234, at *2 (S.D. Fla. Apr. 25, 2022) (holding that non-parties "have not met their heavy burden of demonstrating how the requests are unduly burdensome" by making "conclusory statements in their Motion").

As an initial matter, Centurion casts itself as a disinterested party for which the burden and expense of discovery present an unwarranted intrusion. Nonsense. Centurion provides *all* of the medical and mental healthcare to people in FDC custody. Its existence as an entity is for the sole purpose of providing healthcare to FDC inmates, and it will receive $575 million this year to provide that care, not counting the reimbursable healthcare costs. The total expended by Centurion in complying with third party discovery is but a tuppence when compared to its contract with FDC. Centurion's contract also specifically provides a 10% administrative fee on top of what FDC pays for medical and mental health services, and states that this

15

fee is intended to compensate Centurion for legal expenses arising out of providing its services. (**Ex. 10**, Centurion Contract Excerpt at CENTURION_0000412, ¶ 2).[1] Centurion is anything but disinterested. *See, e.g., Culliver v. Ctr. for Toxicology & Env't Health LLC*, No. 3:21-CV-4942-MCR-GRJ, 2022 WL 475185, at *6 (N.D. Fla. Feb. 16, 2022) (rejecting burden arguments where third-party was "not a typical disinterested party given its intimate involvement in the underlying events that gave rise to the [] lawsuits."); *Handorf v. Milliman, Inc.*, 731 F. Supp. 3d 1077, 1084 (N.D. Iowa 2024) (granting motion to compel and holding that where a third party is "directly involved in the issues before the Court . . . any concern about imposition on a third party is diminished.").

Moreover, Centurion's witnesses will already be deposed on certain topics to which Centurion does not object. Having Centurion's witnesses answer additional questions about hormone therapy—in light of the importance of the issues to Plaintiffs' case, Centurion's direct involvement in the Policy, and the scale of Centurion's business from the FDC—make any claims of undue burden fall flat.

### D. Courts in the Eleventh Circuit Have Concluded that a Motion for a Protective Order is Inappropriate in Cases of Rule 30(b)(6) Depositions

Finally, while different courts within the Eleventh Circuit have taken differing approaches on the issue of whether a party can even seek a protective order prior to

---

[1] This document was produced by Centurion without bates-stamping, so Plaintiffs bates stamped this document after receipt and provided a copy to Defendants.

a Rule 30(b)(6) deposition, many courts have reasoned that this is not the proper approach under Rule 30. As outlined in *Florida v. United States*, 342 F.R.D. 153, 156 (N.D. Fla. 2022):

> [T]he Court notes there are varying opinions on whether a district court should even entertain a pre-deposition motion for a protective order that seeks to limit the topics that can be covered during a Rule 30(b)(6) deposition. Some courts have taken the position that Rule 30(b)(6) is intended to be self-executing and must operate extrajudicially. And these courts have opined that the proper operation of the Rule does not require, ***and indeed does not justify, a process of objection*** and Court intervention prior to the schedule[d] deposition. Doing so would provide a corporate deponent a procedural benefit that no other deponent has, and ***there is nothing in Rule 30(b)(6) that was intended as . . . a special corporate opportunity to challenge the topics that may be raised at a deposition***. These courts have held that the better approach is the one taken with respect to all other depositions—the parties should proceed[] with the deposition and then after the deposition if there were disputes regarding any privilege objections raised during the deposition or objections regarding the scope, the Court could then . . . address[] [them] through a motion to compel or through a motion for protective order with the benefit of the transcript containing questions and answers. Other courts, however, have routinely ruled on protective order motions seeking to limit the topics prior to Rule 30(b)(6) depositions.

(citations and internal quotation marks omitted; emphasis added) (collecting cases); *see also, e.g.*, *FDIC v. Brudnicki*, No. 5:12-cv-00398-RS-GRJ, 2013 WL 5814494, at *1-2 (N.D. Fla. Oct. 29, 2013) (Rule 30(b)(6) "does not limit what can be asked of a designated witness at a deposition . . . Thus, Defendants in this case simply should have proceeded with the deposition and then after the deposition if there were . . . objections regarding the scope, the Court could then have addressed the issues

17

either through a motion to compel or through a motion for protective order with the benefit of the transcript containing questions and answers") (citations omitted); *New World Network, Ltd. v. M/V Norwegian Sea*, No. 05-22916-CIV-JORDAN/TORRES, 2007 WL 1068124, at *4 (S.D. Fla. Apr. 6, 2007) ("the proper operation of the Rule does not require, and indeed does not justify, a process of objection and Court intervention prior to the schedule deposition. That would provide a corporate deponent a procedural benefit that no other deponent has.").

Here, Centurion's Rule 30(b)(6) witnesses will already be present to testify on certain (unobjectionable) topics. Prohibiting Plaintiffs from asking about other topics that they believe to be highly relevant *ex ante* would contravene Rule 30(b)(6) and the case law above.

## IV. Conclusion

For the foregoing reasons, Centurion's Motion for a Protective Order should be denied.

Dated: December 3, 2025

| | |
|---|---|
| /s/    *Samantha J. Past* <br> Samantha J. Past (FBN 1054519) <br> Daniel B. Tilley (FBN 102882) <br> **ACLU Foundation of Florida** <br> 4343 West Flagler Street, Suite 400 <br> Miami, FL 33134 <br> Tel: (786) 363-2714 <br> spast@aclufl.org <br> dtilley@aclufl.org | Li Nowlin-Sohl <br>    (Admitted in Washington only) <br> Leslie Cooper <br> **ACLU Foundation** <br> 125 Broad St. <br> New York, NY 10004 <br> Tel: (212) 549-2584 <br> lnowlin-sohl@aclu.org <br> lcooper@aclu.org |

       Anthony Anscombe (*pro hac vice*)
       George Desh (*pro hac vice*)
       Sadaf Misbah (*pro hac vice*)
       Sarah Norise (*pro hac vice*)
       **Steptoe LLP**
       227 West Monroe Street, Suite 4700
       Chicago, IL 60606
       Tel. (312) 577-1300
       aanscombe@steptoe.com
       gdesh@steptoe.com
       smisbah@steptoe.com
       snorise@steptoe.com

## **CERTIFICATE OF WORD COUNT PURSUANT TO RULE 7.1 (F)**

The undersigned counsel certifies that, pursuant to Local Rule 7.1(F), the total word count in this motion is 4,268 words.