# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:24-cv-00434-AW-MAF

REIYN KEOHANE, et al.,

    Plaintiffs,

vs.

RICKY D. DIXON, et al.,

    Defendants.
_____/

DEPOSITION OF
DANNY MARTINEZ, M.D.
VOLUME 2 OF 2

DATE:       October 14, 2025
TIME:       11:39 a.m. - 6:24 p.m.
PLACE:      Akerman LLP
            201 East Park Avenue, Suite 300
            Tallahassee, Florida 32301

Examination of the witness taken before:

JEFFREY R. BABCOCK
Stenographer



1  requirements here of section C1?
2      A.  For those individuals who have received the
3  variance, the Gender Dysphoria Variance Team would answer
4  in the affirmative.
5      Q.  Now, you've received a number of variance
6  requests; correct?
7      A.  Yes.
8      Q.  And those variance requests include citations to
9  literature that Centurion has provided; correct?
10     A.  Yes.
11     Q.  And do any of the -- does any of the literature
12 that Centurion has cited, does any of it address whether
13 the treatment is improving clinical outcomes by treating
14 the etiologic basis of gender dysphoria?
15     A.  What they have submitted shows -- again, these
16 are -- some of these are surveys, patients that have been
17 followed over time.  The problem with that research is
18 that you wind up with what's called survivorship bias.
19 Only the people who stay in the survey and continue to
20 respond are what's published.  You're not publishing the
21 folks who dropped out of the survey who may have stopped
22 transitioning, and in fact, de-transitioned; they're lost
23 to the information.  So it's only the survivors of the
24 study that are reporting, and so this can prop up the
25 actual level of satisfaction that the entire group had as



1  a whole because you're losing them by the time you're
2  publishing.  That is a tremendous weakness.
3        Nevertheless, there have been studies of this format
4  that claim that this treatment is able to stabilize these
5  patients from a mental health perspective.  So that's
6  what's out there.  That's what we have -- we have to
7  accept that this is what they've been able to provide and
8  that's what out there.
9        Q.  Do any of the studies cited by Centurion identify
10 the etiologic basis of gender dysphoria?
11       A.  No, but there are a variety that speculate.
12       Q.  And do the studies cited by Centurion demonstrate
13 that the mechanism of action by which clinical outcomes
14 are improved, you know, go to the etiology of gender
15 dysphoria?
16       A.  Again, you've lost me with "mechanism of action."
17 We apply that to medications.  So can you state that
18 another way?
19       Q.  Do any of the studies that Centurion has provided
20 demonstrate that treatment improves clinical outcomes by
21 treating the etiologic basis of gender dysphoria?
22       A.  So you have studies that try to determine the
23 etiology of gender dysphoria, and you have studies that
24 have shown claimed improvements in terms of clinical
25 outcomes.  But that I'm aware, of one study that tries to



1  prove both, no, that hasn't come across my desk, no.
2       Q.  So as of today, you're not aware of Centurion
3  giving any citations to literature that shows that the
4  administration of hormone therapy improves clinical
5  outcomes by treating the etiologic basis of gender
6  dysphoria; correct?
7       A.  I think I answered that question, I think.
8       Q.  And the answer is no; correct?
9       A.  That show both in one study, no?  Some have tried
10 to identify cause, some have tried to demonstrate the
11 clinical outcomes have improved as a result of the
12 treatment, but any one study proving both, I'm not aware.
13      Q.  Now, if FDC was actually enforcing this policy as
14 written, isn't it true that FDC wouldn't have granted any
15 variances --
16           MR. STEELY:  Object --
17           MR. ANSCOMBE:  -- as of today?
18           MR. STEELY:  Object to form.
19           THE WITNESS:  No, I don't come to that
20      conclusion.
21 BY MR. ANSCOMBE:
22      Q.  All right.  Well, one reason to come to the
23 conclusion is that, as you've said, you're not aware of
24 anything in the U.S. Constitution that requires FDC to
25 provide hormone therapy; correct?



```
 1               MR. STEELY:  Object to form.
 2               THE WITNESS:  I said that earlier, yes.
 3   BY MR. ANSCOMBE:
 4       Q.  By the way, were you the one who wrote in the
 5   words, quote, "And (2,) if necessary, to comply with the
 6   U.S. Constitution or court decision"?
 7       A.  It would have been either myself or Dr. Klein.
 8       Q.  And is Dr. Klein a scholar on the U.S.
 9   Constitution?
10       A.  No.  She is a clinical psychologist, and again,
11   she's the Chief of Mental Health Services.  But my
12   recollection is there was not one but two possible cases
13   regarding transgender issues that could have been heard by
14   the court.  I don't know if they decided not to take them
15   up, but at the time, there were -- if memory serves
16   correct, there were at least two that were directly
17   related to transgender care.
18       Q.  FDC has issued 67 variances so far, even though
19   there's nothing in the U.S. Constitution that requires it
20   to provide that care; correct?
21               MR. STEELY:  Object to form.
22               THE WITNESS:  Yes.
23   BY MR. ANSCOMBE:
24       Q.  Okay.  And it's also provided 67 variances, even
25   though Centurion has not provided it with any study that
```

