# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | | |
|---|---|---|
| **REIYN KEOHANE,** *et al.*, | **)** | |
| | **)** | |
| **Plaintiffs,** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 4:24-cv-434-AW-MAF** |
| | **)** | |
| **RICKY D. DIXON,** *et al.*, | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

## THE FDC OFFICIALS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION...........................................................................................1

LEGAL STANDARD ......................................................................................2

PROCEDURAL HISTORY .............................................................................3

STATEMENT OF UNDISPUTED FACTS.......................................................7

    I.    FDC PROVIDES APPROPRIATE TREATMENT FOR INMATES
        DIAGNOSED WITH GENDER DYSPHORIA ...........................................7

    II.    FDC CONTINUES TO PROVIDE EACH PLAINTIFF
        WITH HORMONES ..........................................................................12
        A.    Keohane continues to receive hormones...........................12
        B.    Coleman continues to receive hormones...........................13
        C.    Mendoza continues to receive hormones ..........................13
        D.    Boothe continues to receive hormones ..............................14
        E.    Jackson continues to receive hormones .............................15

    III.    SOCIAL ACCOMMODATIONS............................................................16
        A.    FDC PREVIOUSLY PERMITTED SOCIAL-TRANSITIONING
            ACCOMMODATIONS WITHOUT REGARD TO MEDICAL
            NECESSITY .................................................................16

        B.    FDC'S HSB PERMITS MEDICALLY NECESSARY
            TREATMENT................................................................17

EXPERT TESTIMONY.................................................................................19

    The FDC Officials' Experts ..................................................................19

    Plaintiffs' Advocates..............................................................................21

ARGUMENT................................................................................................22

I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE FDC OFFICIALS ON PLAINTIFFS' INDIVIDUAL HORMONE CLAIMS .......22

    A.    PLAINTIFFS LACK STANDING TO RAISE CLAIMS REGARDING HORMONES ......................................................23

    B.    EVEN IF PLAINTIFFS POSSESSED STANDING, THE FDC OFFICIALS' HORMONE POLICY DOES NOT VIOLATE THE CONSTITUTION.....................................................25

II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE FDC OFFICIALS ON PLAINTIFFS' CLASS CLAIM REGARDING SOCIAL ACCOMMODATIONS ..................................................28

CONCLUSION...............................................................37

CERTIFICATE OF COMPLIANCE ...............................................39

CERTIFICATE OF SERVICE ..................................................40

ii

## **TABLE OF AUTHORITIES**

**Cases**                                                                                   **Page(s)**

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986)................................................................................2

*Bayse v. Ward*
   147 F.4th 1304 (11th Cir. 2025) ............................................31, 32, 33

*Brown v. Beck*
   481 F. Supp. 723 (S.D. Ga. 1980)........................................................25

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)............................................................................2, 3

*Church v. City of Huntsville*
   30 F.3d 1332 (11th Cir. 1994)........................................................24, 25

*City of Los Angeles v. Lyons*
   461 U.S. 95 (1983)................................................................................24

*Clark v. Coats & Clark, Inc.*
   929 F.2d 604 (11th Cir. 1991)...........................................................2, 3

*Clark v. Valletta*
   157 F.4th 201 (2d Cir. 2025)................................................................35

*Eknes-Tucker v. Gov. of Alabama*
   114 F.4th 1241 (11th Cir. 2024) ..........................................................33

*Farmer v. Brennan*
   511 U.S. 825 (1994)........................................................................23, 26

*Gibson v. Collier*
   920 F.3d 212 (5th Cir. 2019)................................................................28

*Harris v. Thigpen*
   941 F.2d 1495 (11th Cir. 1991).......................................................Passim

iii

*Hicklin v. Precynthe*
Case No. 4:16-cv-01357-NCC, 2018 ....................................................... 35, 36
WL 806764 (E.D. Mo. Feb. 9, 2019)

*Keohane v. Fla. Dep't. Corr. Sec'y*
952 F.3d 1257 (11th Cir. 2020)...................................................................Passim

*Keohane v. Inch*
2021 WL 11691024 (N.D. Fla. Aug. 12, 2021).................................................. 4

*Keohane v. Inch*
2021 WL 11691027 (N.D. Fla. Mar. 9, 2021) ................................................... 4

*Keohane v. Jones*
328 F. Supp. 3d 1288 (N.D. Fla. 2018)........................................................ 3, 4

*Kosilek v. Spencer*
774 F.3d 63 (1st Cir. 2014) ........................................................................... 35

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992) ..........................................................................23, 24, 25

*Rogers v. Evans*
792 F.2d 1052 (11th Cir. 1986)...................................................................... 25

*Soneeya v. Spencer*
851 F.Supp.2d 228 (D. Mass. 2012) .............................................................. 36

*U.S. v. Skrmetti*
605 U.S. 495 (2025)....................................................................................... 33

*Wade v. McDade*
106 F.4th 1251 (11th Cir. 2024) .................................................................... 26

## **Statutes**

42 U.S.C. § 1983 ............................................................................................. 4

Florida Statute 286.311.................................................................................. 10

iv

**<u>Rules</u>**

Fed. R. Civ. P. 56 and 56(a)..................................................................2

Fed. R. Civ. P. 56(e)..................................................................3, 24, 25

Defendants Ricky D. Dixon, in his official capacity as Secretary of the Florida Department of Corrections ("FDC"); Clayton Weiss, in his official capacity as FDC's Health Services Director; Gary Hewett, in his official capacity as Warden of Wakulla Correctional Institution; Nan Jeffcoat, in her official capacity as Warden of Florida Women's Reception Center; and Alonzo Horner, in his official capacity as Warden of Homestead Correctional Institution (collectively, the "FDC Officials"), move for summary judgment and state as follows:

## INTRODUCTION

All five Plaintiffs continue to receive cross-sex hormones for their gender dysphoria. Plaintiffs ignore these facts, asking this Court to mandate that FDC indefinitely perpetuate this treatment. Plaintiffs' claim rests upon sheer speculation, not evidence. Additionally, Plaintiffs ask this Court to legally endorse a medical entitlement to hygiene products and opposite-sex clothing, underwear, and grooming standards, which Plaintiffs self-servingly label as "social accommodations."[1] However, these "accommodations" are neither medical nor necessary under the Eighth Amendment's rigorous test. In pursing these claims, Plaintiffs wholly ignore the Eleventh Circuit's prior rejection of Plaintiff Keohane's

---

[1] The FDC Officials use the term "social accommodations" for the Court's convenience, as it reflects a self-serving phrase utilized by Plaintiffs. The FDC Officials object to the use of the word "accommodations" to the extent it suggests Plaintiffs are entitled to accommodations of any kind.

contention that "psychologically pleasing" merchandise rises to the level of necessary medical treatment.  Keohane v. Fla. Dep't. Corr. Sec'y, 952 F.3d 1257, 1279 (11th Cir. 2020) ("Keohane I").

As discussed in greater detail below, Plaintiffs' claims fail for at least three reasons:

(1)     Plaintiffs lack standing to pursue their individual Eighth Amendment claims related to cross-sex hormones;

(2)     Even if Plaintiffs possessed standing to pursue individual hormone-related claims, FDC's hormone policy provides for constitutionally adequate care; and

(3)     Plaintiffs cannot support a class claim for denial of social accommodations because they possess no evidence that social accommodations constitute medically necessary treatment for gender dysphoria.

Accordingly, the FDC Officials respectfully request that the Court enter judgment as a matter of law in their favor.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure establishes that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The movant bears the initial burden of identifying evidence showing no genuine issue exists and the absence of evidence to prove a fact necessary to the non-movant's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Clark v. Coats & Clark,

2

Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the FDC Officials meet this initial burden, the burden shifts to Plaintiffs to demonstrate any genuine issues of fact to defeat a motion for summary judgment. Clark, 929 F.2d at 608. The FDC Officials shall be entitled to judgment as a matter of law when Plaintiffs fail to "make a sufficient showing on an essential element of [Plaintiffs'] case with respect to which [Plaintiffs]" bear the burden of proof. Celotex, 477 U.S. at 323. Plaintiffs must produce specific, competent evidence by going "beyond the pleadings and by [Plaintiffs'] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'" to show a genuine factual dispute. Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). Because Plaintiffs cannot produce evidence supporting their claims, the Court should grant summary judgment to the FDC Officials.

## PROCEDURAL HISTORY

Plaintiff Reiyn Keohane filed a lawsuit against certain FDC officials in 2016, challenging (a) FDC's former "freeze-frame" policy, which provided for treatment of inmates with gender dysphoria "only at the level of change that existed at the time they were received by [FDC]," and (b) FDC's denial of social accommodations to Keohane. Keohane v. Jones, 328 F. Supp. 3d 1288, 1299 (N.D. Fla. 2018) (internal quotations omitted). While the case remained pending, FDC replaced the "freeze-frame" policy and provided Keohane with hormones. Id. at 1297-98. Nevertheless, the district court (1) enjoined FDC from reenacting the "freeze-

3

frame" policy and required it to continue Keohane's hormones, and (2) required FDC to provide Keohane with access to FDC's "female clothing and grooming standards." Id. at 1319. On appeal, the Eleventh Circuit found Keohane's hormone-related claims moot. Keohane I, 952 F.3d at 1262. Additionally, "[i]n light of the disagreement among testifying professionals about the medical necessity of social transitioning to Keohane's treatment," the Court rejected the merits of Keohane's claim "that the FDC violated the Eighth Amendment by refusing to accommodate [Keohane's] social-transitioning-related requests." Id. at 1277, 1279. The Eleventh Circuit vacated the district court's order, dismissed the hormone-related claims as moot, and reversed the injunction as to social accommodations. Id. at 1279.[2]

Keohane filed this action on October 25, 2024, asserting a single claim under 42 U.S.C. § 1983 ("section 1983") against Secretary Dixon, Weiss, and Hewett in their official capacities for alleged denial of medical treatment. (Doc. 1, 8-9, ¶¶ 17-19; 21-23, ¶¶ 69-81). Keohane purported to assert this claim on behalf of a class of "all incarcerated persons in custody of the FDC who i) are or will be diagnosed by FDC medical or mental health personnel with gender dysphoria, and ii) are currently being provided—or, absent the new policy announced on September 30, 2024[,]—

---

[2] Keohane filed another lawsuit against FDC in 2020 based on FDC's denial of gender reassignment surgery. Keohane v. Inch, 2021 WL 11691027, at *2 (N.D. Fla. Mar. 9, 2021). The district court dismissed the case for failure to prosecute and comply with a court order. Keohane v. Inch, 2021 WL 11691024, at *1 (N.D. Fla. Aug. 12, 2021).

would be considered for hormone therapy and/or access to clothing and grooming standards that accord with their gender identity." (Id., 5, ¶ 7). Keohane alleged that FDC's Health Services Bulletin 15.05.23 (the "HSB") amounted to "a blanket policy prohibiting treatment" without regard to medical necessity. (Id., 6, ¶ 11).

As part of this renewed action, Keohane filed a Motion for Preliminary Injunction together with the Complaint. (Doc. 4). In denying the preliminary injunction, the Court noted that Keohane asserted a single claim for denial of medical care, but the claim included "two components:" cross-sex hormones and "social accommodations" such as "permission to wear long hair, makeup, and women's undergarments." (Doc. 55, 5-6). The Court acknowledged that these "two components differ in some ways." (Id., 6). Accordingly, the Court addressed hormones and social-accommodations separately. (Id.).

As to hormones, the Court noted that the evidence "demonstrated that [FDC] will individually evaluate every inmate who was receiving hormone[s]" to "determine if continued hormone treatment is medically necessary." (Id., 7). Further, "[i]f [FDC] concludes it *is* medically necessary, the hormone treatment will continue." (Id., 7-8). The Court further noted that the HSB's limitation of hormones "to instances when it is 'necessary to comply with the U.S. Constitution or a court decision' . . . is no obstacle to constitutionally required care." (Id., 9). Instead, the Court concluded that, "to the extent the Department provides what is

5

medically necessary, it has provided what is constitutionally required," and, "[i]ndeed, even medical care falling below what is medically necessary does not necessarily violate the Eighth Amendment." (Id. (citing Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)). The Court also found that Keohane failed to establish a likelihood of success on the merits of the social accommodations claim, because "Keohane presented no evidence showing that denying requested social accommodations is tantamount to providing care so deficient that it constitutes an Eighth Amendment violation." (Id., 17). Accordingly, the Court denied the preliminary injunction. (Id., 23).

On March 13, 2025, Plaintiffs filed an Amended Complaint, adding Plaintiffs George Mendoza, Kelvin Coleman, Candace Jackson, and Natasha Boothe and added Horner and Jeffcoat in their official capacities as defendants. (Doc. 66, 1). The Amended Complaint abandoned Keohane's theory that the HSB imposed a "blanket ban" on hormones, instead alleging that Plaintiffs and putative class members face a "risk" of a denial or withdrawal of hormones as a result of evaluations for variances under the HSB. (Id., 9-10, ¶ 14). As to social accommodations, the Amended Complaint continued to allege, "[i]t is medically necessary for Plaintiffs and members of the proposed class to receive . . . access to clothing and grooming standards that accord with their gender identity." (Id., 34, ¶ 128).

6

This Court entered an Order Granting in Part Motion to Certify a Class (the "Class Certification Order") on October 22, 2025.  (Doc. 125).   The Class Certification Order granted class certification as to the social-accommodations component of Plaintiffs' claim and denied class certification as to the hormone component because Plaintiffs failed to demonstrate "that any Plaintiff has standing to pursue such a claim."   (Id., 3).  The Court defined the social-accommodations class as "all persons who are or will be incarcerated in custody of the FDC who have been diagnosed with gender dysphoria and who, absent the HSB, would be provided social accommodations to treat their gender dysphoria if deemed medically necessary for them." (Id., 13).  Accordingly, this case proceeds on a class basis only as to the social-accommodations claim, while any claims concerning hormones remain individual claims.

## STATEMENT OF UNDISPUTED FACTS

### I.    FDC PROVIDES APPROPRIATE TREATMENT FOR INMATES DIAGNOSED WITH GENDER DYSPHORIA.

FDC maintains twelve HSBs and five procedures dedicated to providing mental-health treatment for inmates. (Doc. 154-1, 4, ¶ 8).  Further, designated FDC facilities provide enhanced mental-health care, including "S3" facilities, which contain additional medical and mental-health staff.  (Id., 4, ¶ 9).  Inmates receive training on how to access mental-health care, and FDC's HSBs and procedures establish timelines for triage and treatment of these needs.  (Id., 3-4, ¶¶ 10-11).

7

FDC recognizes gender dysphoria as a mental-health condition warranting individualized clinical evaluation and treatment. (Doc. 154-5, 4-5 (50:6-51:5); 154-6, 11 (158:5-14)). As of October 10, 2025, approximately 273 FDC inmates carried a permanent or preliminary gender dysphoria diagnosis. (Doc. 154-5, 3 (19:10-13)). FDC, through its medical contractor Centurion of Florida, provides treatment for gender dysphoria pursuant to its written policies. (Doc. 154-1, 11-19; Doc. 154-10, 3 (12:18-21)). FDC implemented Procedure 403.012 (the "2017 Procedure") on July 13, 2017. (Doc. 154-5, 18). The 2017 Procedure provided for mental-health treatment, hormones, and "other treatment and accommodations, although limited to those determined to be medically necessary by the Gender Dysphoria Review Team." (Id., 22).

In 2019, following the district court's ruling in Keohane I, FDC revised Procedure 403.012 (the "2019 Procedure"). (Doc. 154-5, 23-30; Doc. 154-7, 7 (161:7-16)). Diagnosis of gender dysphoria and decision-making pertaining to treatment under the 2019 Procedure encompassed both the inmate's Multidisciplinary Services Team ("MDST")[3] and the Gender Dysphoria Review Team ("GDRT"). (Doc. 154-5, 26-28). MDST made a provisional diagnosis, and

---

[3] MDST is comprised of "staff representing different professions and disciplines, charged with "responsibility for ensuring access to necessary assessment, treatment, continuity of care and services to inmates in accordance with their identified mental-health needs." (Doc. 154-5, 25). MDST creates, reviews, and revises ISPs. (Id.).

inmates with this diagnosis received transfers to facilities designated by GDRT for gender dysphoria evaluations.  (Id.).  The 2019 Procedure provided for mental-health treatment as well as cross-sex hormones when "healthcare staff determine[d] the hormones are medically necessary and not contraindicated for any reason."  (Id., 28).  The 2019 Procedure also allowed for social accommodations for inmates diagnosed with gender dysphoria "[t]o assist in transitioning," not based upon medical necessity.  (Id., 29).

After concerns regarding the treatment provided under the 2019 Procedure and years of research and deliberation, as well as the Eleventh Circuit's reversal of the district court's injunction in Keohane I, FDC replaced the 2019 Procedure with HSB 15.05.23 (the "HSB") on September 30, 2024.  (Doc. 154-1, 11-19; Doc. 154-7, 5-6 (25:10-26:20)).    FDC's HSB recognizes gender dysphoria as "a psychological disorder caused by clinically significant distress or impairment due to the perceived discrepancy between a person's expressed/experienced gender identity and his or her biological sex."   (Doc. 154-1, 12).  According to FDC's HSB, FDC continues "[t]o ensure inmates diagnosed with Gender Dysphoria receive timely, appropriate mental health services and individualized treatment programming as clinically indicated."   (Id.).   FDC's HSB mandates that "[t]reatment interventions shall target psychological distress/dysphoria, as well as

9

any co-occurring mental health disorders, and be tailored to the unique needs of the inmate." (Id.).

Under FDC's HSB, inmates diagnosed with gender dysphoria receive psychotherapy, psychiatric care, crisis intervention, and individualized treatment planning through an Individualized Service Plan ("ISP").[4] (Id., 12-16). FDC's HSB also authorizes the use of hormones through a variance process. (Id., 17-19). As appropriate, an inmate's MDST can recommend hormones to the Gender Dysphoria Variance Team ("GDVT"). (Id., 18).[5] GDVT (the Chief of Medical Services, Dr. Danny Martinez; Chief of Mental Health Services, Dr. Suzonne Kline; and Chief Clinical Advisor, Dr. Kalem Santiago) reviews MDST's recommendations and the inmate's medical and mental-health records and must unanimously approve or deny the usage of hormones. (Id.).[6] Additionally, while

---

[4] HSB 15.05.11 provides guidelines for the development and review of ISPs. (Doc. 154-1 at 86-98).

[5] Treatment of gender dysphoria continues to evolve. FDC's HSB prioritizes psychotherapy because cross-sex hormones may cause extensive side effects, such as "infertility, neurological issues, cardiovascular disease, disfigurement, and other permanent effects." (Doc. 154-1, 17-18; Doc. 154-15, 27-37, ¶¶ 44-85; Doc. 154-14, 52-53, ¶ 114). Some experts conclude cross-sex hormones are not medically necessary to treat gender dysphoria. (See, e.g., Doc. 154-15, 38, ¶ 90).

[6] Florida Statute 286.311 prohibits the use of state funds on cross-sex hormones, and the HSB provides that FDC will comply with state law "unless compliance with the U.S. Constitution or a court decision requires otherwise." (Doc. 154-1, 18; Doc. 154-6, 17-18 (199:22-200:1)). Centurion covers the costs of hormones at no cost to FDC. (Doc. 154-20, 10 (122:5-10); Doc. 154-6, 18 (200:8-10); Doc. 154-18, 6 (113:13-17)).

the 2019 Procedure provided social accommodations without regard to medical necessity, FDC's HSB contains no reference to social accommodations. (Doc. 154-1, 11-19). However, inmates may receive certain accommodations; for example, inmates with sufficient breast development to require physical support continue to receive bra passes since FDC implemented the HSB. (Doc. 57, 22:19-23:10; Doc. 154-1, 8, ¶ 26).

Inmates who received hormones in FDC custody prior to the HSB require re-evaluation for a variance, but they continue to receive hormones while awaiting re-evaluation. (Doc. 154-6, 15 (168:10-21); Doc. 154-1, 19).[7] For inmates arriving in FDC custody on hormones, Centurion reviews and enters the inmate's outside documentation into the electronic medical record; the inmate is placed in the queue for evaluation; and hormones continue while awaiting evaluation. (Doc. 154-7, 9-10 (169:14-170:5); Doc. 154-18, 7-8 (197:23-198:8)). An inmate already in FDC custody but not diagnosed with gender dysphoria may request an evaluation for gender dysphoria through a sick call form or discussing the matter with a mental-health provider. (Doc. 154-1, 6, ¶ 16).[8]

---

[7] HSB 15.05.17 establishes the guidelines for mental-health screening of newly arrived inmates at reception centers. (Doc. 154-1, 99-108).

[8] Inmates not receiving hormones prior to the HSB may undergo a year of mental-health treatment before receiving a variance, evaluated on a case-by-case basis. (Doc. 154-1, 16). In some instances, an inmate may qualify for hormones or GDVT

As of January 1, 2026, of the 273 identified gender dysphoric inmates in FDC custody, approximately 150 received hormones.  (Doc. 154-1, 6, ¶ 18).  Between implementation of the HSB and January 1, 2026, GDVT approved variances for 73 inmates under the HSB.  (Id.).  GDVT denied six variance requests based on failure to comply with medication dosages and behavioral concerns.  (Id.).

## II.   FDC CONTINUES TO PROVIDE EACH PLAINTIFF WITH HORMONES.

### A.   Keohane continues to receive hormones.

Keohane entered FDC custody in July 2014 after pleading no contest to attempted second degree murder.  (Doc. 154-19, 10-11 (117:13-15, 118:22-25)).  Keohane received a gender dysphoria diagnosis in 2008 and began taking the hormones estradiol and spironolactone in 2013, prior to incarceration.  (Id., 6-8 (29:5-18, 59:15-24, 77:16-17)).  FDC currently provides Keohane with estradiol, spironolactone, medroxyprogesterone, and finasteride.  (Id., 5 (16:7-22); Ex. 154-1, 25-26).

Following adoption of FDC's HSB, Dr. Aloka Joshi with Centurion re-evaluated Keohane for the MDST to consider a variance.  (Doc. 154-19, 16 (269:1-8); Doc. 154-1, 29-35).  Keohane's MDST recommended the variance; GDVT granted it on February 20, 2025; and Keohane now receives hormones under the variance.  (Doc. 154-19, 12 (238:4-17); Doc. 154-1, 21).  The variance contains no

---

may waive this provision based on treatment outside FDC custody.  (Doc. 154-7, 12-23 (179:14-24-180:11)).

expiration date, and Keohane agrees that it gives greater assurance that Keohane will continue receiving hormones. (Doc. 154-1, 21; Doc. 154-19, 13 (240:11-25)). Keohane also receives weekly counseling and treatment for other mental-health diagnoses. (Doc. 154-19, 14-15 (248:2-249:6); Ex. 154-1, 22-28).

### B.    Coleman continues to receive hormones.

Coleman entered FDC custody after a murder conviction and serves a life sentence without the possibility of parole. (Doc. 154-13, 4-5 (68:8-69:18)). After entering FDC custody, Coleman received a provisional gender dysphoria diagnosis in 2023 under the 2019 Procedure. (Id., 6 (140:1-24); Doc. 154-1, 38-40). FDC transferred Coleman to Wakulla Correctional Institution ("Wakulla"), where Coleman received an evaluation and a formal gender dysphoria diagnosis in January 2024. (Doc. 154-13, 7-9 (141:2-143:11)). The GDVT granted Coleman a variance on June 25, 2025, and Coleman continues to receive hormones under this variance. (Doc. 154-13, 13-15 (170:17-172:15); Doc. 154-1, 37). Coleman also receives counseling, psychiatric follow-ups, and other mental-health treatment. (Doc. 154-13, 12 (165:9-20); Doc. 154-1, 41-45).

### C.    Mendoza continues to receive hormones.

Mendoza entered FDC custody in September 1985 with a sentence of life with the possibility of parole after convictions for first-degree murder, second-degree murder, armed burglary, and possession of a machine gun. (Doc. 154-8, 6 (43:20-44:4, 44:14-25)). Mendoza first identified as transgender to FDC in 2019

13

or 2020 and transferred from Martin Correctional Institution to Wakulla for a gender dysphoria evaluation under the 2019 Procedure. (Id., 7-9 (66:4-7, 67:4-68:3)). At Wakulla, Mendoza received a diagnosis of gender dysphoria, as well as other mental-health diagnoses. (Id., 10 (76:14-19); Doc. 154-1, 48-55). The evaluation under the 2019 Procedure required Mendoza's participation in therapy for at least one year before MDST re-evaluation. (Doc. 154-8, 11-12 (77:24-78:13); Doc. 154-1, 55. Mendoza then transferred to Florida State Prison and received group and individual counseling for two years before MDST recommended and GDRT approved hormones. (Doc. 154-8, 12-13 (78:22-79:19); Doc. 154-1, 56). Mendoza received a re-evaluation under the HSB, and GDVT approved Mendoza's variance on September 15, 2025. (Doc. 154-1, 47). Mendoza continues to receive hormones. (Doc. 154-8, 14 (112:7-25), 20-21 (191:20-192:1)). Mendoza's ISP addresses all of Mendoza's mental-health diagnoses and provides for counseling and psychiatric follow-ups. (Id., 22-25 (193:11-194:5, 196:13-197:9); Doc. 154-1, 57-62). Mendoza testified that FDC has not disciplined Mendoza for expressing Mendoza's gender identity. (Doc. 154-8, 15 (116:9-17)). Mendoza holds a bra pass based on physical need. (Doc. 154-1, 8-9, ¶ 26; Doc. 154-8, 29 (261:9-13)).

### D.    Boothe continues to receive hormones.

Boothe entered FDC custody after pleading guilty to manslaughter with a deadly weapon. (Doc. 154-16, 3-4 (67:2-68:7)). Boothe began taking hormones

before incarceration and continued after entering county jail in September 2019. (Id., 5-6, 17-18 (90:23-91:3, 308:10-309:1)).  FDC began providing Boothe with hormones one month after Boothe entered FDC custody, and Boothe continues to receive testosterone while awaiting an evaluation for a variance under the HSB. (Id., 10, 16 (163:19-22, 295:15-17); Doc. 154-1, 9, ¶ 27).  Boothe's ISP addresses all of Boothe's mental-health diagnoses, including gender dysphoria.  (Doc. 154-16, 11-13 (231:7-233:2; Doc. 154-1, 64-68).  FDC offers Boothe counseling sessions, and Boothe accesses mental-health care as needed by submitting a mental-health sick call.  (Doc. 154-16, 7-9 (132:12-134:3)).

### E.    Jackson continues to receive hormones.

Jackson entered FDC custody in 2014 after convictions for second-degree murder, attempted second-degree murder, and aggravated battery.  (Doc. 154-2, 4-5 (36:6, 51:13-17)). Prior to entering FDC custody, Jackson did not take hormones, carry a diagnosis of gender dysphoria, or identify as transgender.  (Id., 6, 9 (58:14-19, 148:17-19)).  Jackson began receiving testosterone in January 2023 under the 2019 Procedure after receiving an evaluation for and diagnosis of gender dysphoria. (Id., 10 (162:14-19); Doc. 154-1, 75-80).  Jackson transferred to Homestead Correctional Institution ("Homestead") for unrelated medical reasons but continues to receive counseling and hormones while awaiting re-evaluation for a variance. (Doc. 154-2, 3, 12 (32:6-12, 277:12-19)).

15

III.   **SOCIAL ACCOMMODATIONS.**

A.   **FDC PREVIOUSLY PERMITTED SOCIAL-TRANSITIONING ACCOMMODATIONS WITHOUT REGARD TO MEDICAL NECESSITY.**

The 2019 Procedure provided guidelines for medical appraisal, mental-health screening, evaluation, and treatment of inmates regarding gender dysphoria. (Doc. 154-5, 23-30). Treatment under the 2019 Procedure focused on "ambivalence and/or dysphoria regarding gender identity, social transitioning, assisting with adjustment to incarceration, and community reentry." (Id., 28). The 2019 Procedure permitted inmates to grow and style their hair in accordance with female hair standards and receive state-issued opposite-sex uniforms and undergarments. (Id., 29). The 2019 Procedure also provided access to opposite-sex canteen lists, including items such as hairbrushes, makeup, deodorants, shampoos, and undergarments (separate from the state-issued undergarments) that inmates could purchase with their own funds. (Doc. 154-5, 6 (59:2-17); Doc. 154-20, 3 (29:1-19); Doc. 154-8, 4 (14:6-8)). FDC allowed these social accommodations under the 2019 Procedure without requiring a medical necessity determination. (Doc. 154-5, 29; Doc. 154-12, 8 (145:1-19) (testifying that the 2019 Procedure permitted social accommodations "[n]ot as part of the treatment, but to assist them [with] the transition"), 10 (179:20-23)).

16

Under the 2019 Procedure, MDST recommended treatment for gender-dysphoric inmates, and GDRT approved or denied the recommendations. (Doc. 154-5, 26-27). GDRT approved "social-transitioning" accommodations for gender-dysphoric inmates without regard to medical necessity. (Doc. 154-5, 29-30; Doc. 154-6, 4 (89:10-19); Doc. 154-12, 3-4, 8 (55:8-56:9, 145:1-19)). Mental-health providers recommended such accommodations to assist gender-dysphoric inmates in transitioning, not as medical treatment. (Doc. 154-12, 3 (55:12-16), 8 (145:1-9), 10 (179:20-23) (testifying that social accommodations were "not medically necessary" but were available under the 2019 Procedure "to assist them on the transition process, not because it was medically necessary"), 11 (191:9-11); Doc. 154-5, 29).

## B.    FDC's HSB PERMITS MEDICALLY NECESSARY TREATMENT.

FDC revised its gender dysphoria policy after the Eleventh Circuit's reversal of the district court's injunction in Keohane I and after providers determined prior references to "transitioning" lacked clarity and social-transitioning accommodations lacked support as medically necessary. (Doc. 154-6, 5-6, 13 (101:19–102:9, 164:8-10); Doc. 154-20, 5-7 (91:23-92:15, 93:8-11)). Accordingly, FDC's HSB contains no reference to social accommodations. (Doc. 154-1, 11-19).

Under the HSB, unlike the 2019 Procedure, social-transitioning accommodations do not simply become "available if [a mental health provider] just

17

request[s] them." (Doc. 154-21, 5-6 (233:18-234:4)). Instead, "[t]hey have to show a medical basis." (Id.). As of January 1, 2026, no MDST recommended these types of accommodations to GDVT for any inmate under the HSB. (Doc. 154-1, 7, ¶ 19). If MDST requested social-transitioning accommodations and could demonstrate they were medically necessary for a particular inmate, GDVT would consider those requests "because the HSB is based on medical necessity." (Doc. 154-7, 15 (203:6-17); Doc. 57, 59:3-6, 99:20-25).

FDC providers distinguished between "helpful" or "psychologically pleasing" interventions and medically necessary interventions, concluding that "social-transitioning" accommodations do not qualify as medically necessary treatment for gender dysphoria, even if the accommodations may provide short-term comfort. (Doc. 154-20, 8-9 (96:22-97:3); Doc. 154-21, 7, 9-10 (256:10-25, 267:19-268:4)). Centurion indicated that, while such accommodations could provide some benefits to gender-dysphoric inmates, they remain unaware of any research indicating such accommodations constitute a medical necessity for treating gender dysphoria. (Doc. 154-18, 5 (46:9-14)). FDC providers remain unaware of any evidence of long-term mental-health benefits of social-transitioning accommodations. (Doc. 154-21, 7 (256:5-25)). Additionally, Centurion agrees that the HSB does not require denial of medically necessary care. (Doc. 154-10, 4-5 (19:18-24, 195:21-24); Doc. 154-22, 4, ¶ 8). After approximately one year without

18

social accommodations, providers described gender-dysphoric inmates as "doing very well" and "adjusted."  (Doc. 154-21, 8 (260:1-12)).

## EXPERT TESTIMONY

## The FDC Officials' Experts

The FDC Officials retained Dr. Kristopher Kaliebe, a physician, psychiatrist, and professor, to provide his opinions in this matter.  (Doc. 154-14, 13, ¶ 1).  Dr. Kaliebe maintains board certifications in Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry and evaluates and treats juvenile and adult patients with gender dysphoria.  (Id., 13-15, ¶¶ 3, 9-11).

In this case, Dr. Kaliebe reached the following conclusions:

1.  "Hormone therapy is unproven and experimental treatment for Gender Dysphoria that generally should not be available to those in the custody of the [FDC].  In a limited set of circumstances, a variance may be appropriate for inmates already being treated with hormones, but only after an individual assessment."  (Id., 19, ¶ 20);

2.  "Social accommodation is not medically necessary in the correctional setting."  (Id., 19, ¶ 21);

3.  "The FDC's Health Services Bulletin 15.05.23 establishes a reasonable, clinically sound approach to the treatment of inmates with Gender Dysphoria.  [HSB] 15.05.23 emphasizes psychotherapy as the primary and best mental health approach with this vulnerable population of incarcerated individuals with Gender Dysphoria, with some exceptions made for hormone therapy on a case-by-case basis."  (Id., 19, ¶ 22); and

4.  "FDC provides the named Plaintiffs in this case . . . with appropriate treatment for their Gender Dysphoria."  (Id., 20, ¶ 23).

19

Dr. Kaliebe opined that "social transition is not medically necessary in correctional facilities" and is not "related to healing medical illness or disease." (Id., 63, ¶ 146).  In Dr. Kaliebe's view, social accommodations may harm patients by "potentially prolonging and intensifying gender dysphoria" by "entrenching, and making worse their own . . . distress about themselves."  (Id., 6 (118:2-10)).  He noted that psychotherapy remains the preferred treatment approach for gender dysphoria within correctional environments.  (Id., 27-34, ¶¶ 49-69).

Dr. Kaliebe explained that "limited evidence suggest[s] that" social accommodations "would improve or resolve symptoms associated with Gender Dysphoria."  (Id., 64, ¶ 150).  However, "[t]he fact that some social-transitioning items are pleasing to inmates with Gender Dysphoria does not mean that such interventions are medically necessary."  (Id., 64-65, ¶ 150).  In fact, Dr. Kaliebe concluded that, "[i]n the correctional context, making social transition items available can work against the patients' overall mental health because having such items likely will prolong the symptoms of Gender Dysphoria for the already vulnerable inmate-patient population with significant co-morbidities, and because they may enhance the patients' reluctance to receive psychotherapy, when such treatment could have long-lasting benefits."  (Id., 65, ¶ 151).

Dr. Kaliebe reviewed FDC's HSB and concluded that it "lays out an improved treatment approach for Gender Dysphoria, emphasizing psychotherapy

20

as the best mental health approach within this vulnerable population, with some exceptions made for hormone therapy on a case-by-case basis." (Id., 70, ¶ 167). Dr. Kaliebe "reviewed the treatment provided to the named Plaintiffs" and concluded that they each "receive reasonable, clinically appropriate treatment for their Gender Dysphoria." (Id., 70, ¶ 168).

The FDC Officials retained Dr. Michael Laidlaw, who maintains a board certification in endocrinology. (Doc. 154-15, 17). Dr. Laidlaw completed a residency in internal medicine and a fellowship in endocrinology, diabetes, and metabolism and maintains a clinical endocrinology practice. (Id.).

In his opinion, Dr. Laidlaw concluded as follows:

> FDC's HSB 15.05.23's requirements for individual evaluations, focus on identifying and addressing co-occurring mental illnesses, and providing psychotherapy present a reasonable approach to the treatment of Gender Dysphoria. Therefore, I believe that FDC's HSB 15.05.23 is a reasonable policy for the protection of human persons from medical harms.

(Id., 75, ¶ 261).

### Plaintiffs' Advocates

Plaintiffs retained three advocates to provide purported expert testimony: Dan Karasic, Ole-Petter Hamnvik, and Jennifer Evans. (Doc. 154-4, 6 (49:11-13); Doc. 154-17, 4 (148:16-20); Doc. 154-9, 4 (167:10-18)).

Karasic did not examine Plaintiffs or their medical records.  (Doc. 154-4, 3-5 (18:4-20:6)).  Karasic could not state whether anyone intentionally or deliberately denied care to Plaintiffs, nor did he know whether FDC denied a variance to any Plaintiff.  (Id., 14-15 (145:15-23, 270:16-18)).  Hamnvik also did not review the care provided to Plaintiffs or any other inmate.  (Doc. 154-17, 8 (166:2-9)).  Hamnvik did not review any FDC policies or procedures and did not know FDC's current policies regarding care for gender dysphoria.  (Id., 6 (164:2-9)).  Hamnvik does not know whether FDC denied any of the Plaintiffs necessary medical care and could not provide an opinion on the specific care options offered by FDC.  (Id., 7-8 (165:4-166:1)).  Evans admitted she does not practice as an endocrinologist or a medical doctor and lacks the qualifications to prescribe hormones and the experience to provide medical treatments for gender dysphoria.  (Doc. 154-9, 3, 5-6 (95:12-16, 174:12-22, 175:4-14)).

## ARGUMENT

I.   **THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE FDC OFFICIALS ON PLAINTIFFS' INDIVIDUAL HORMONE CLAIMS.**

An inmate seeking injunctive relief for an alleged constitutional violation:

> must adequately plead such a violation; to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish

22

eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

Farmer v. Brennan, 511 U.S. 825, 845-46 (1994).  The undisputed facts show Plaintiffs cannot meet this burden to the extent they raise hormone-related claims. First, Plaintiffs lack standing to raise these claims.  Second, even if Plaintiffs possess standing, they cannot demonstrate that the FDC Officials act with deliberate indifference regarding hormones.

### A.    PLAINTIFFS LACK STANDING TO RAISE CLAIMS REGARDING HORMONES.

"[T]he irreducible constitutional minimum of standing contains three elements": (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted).  "The party invoking federal jurisdiction bears the burden of establishing these elements[,]" which "are not mere pleading requirements but rather an indispensable part of the plaintiff's case."  Id. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of

23

evidence required at the successive stages of the litigation." Id.  At the summary-judgment stage, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" supporting standing.  Id. (quoting Fed. R. Civ. P. 56(e)).  Moreover, "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)).  Plaintiffs failed to provide facts establishing standing as to hormones at the class certification stage, and they still cannot do so.

The Court denied class certification as to hormones "because [Plaintiffs] have not shown that any Plaintiff has standing to pursue such a claim."  (Doc. 125, 3). The Court found that it was "undisputed that all Plaintiffs but one (Diamond[/Coleman]) are receiving hormone treatment and have been for some time."  (Id., 4).[9]  According to the Court, "Plaintiffs have not proven that at the case's outset—or at any time since—any of them faced an imminent threat of injury."  (Id., 6).  Although it held that Plaintiffs lacked standing to pursue class claims regarding hormones, the Court recently stated that "the individual claims

---

[9] Coleman received a variance in June 2025 and currently receives hormones. (Supra, 13).

related to hormone treatment remain pending." (Doc. 139, 4; Doc. 142, 2). However, it remains true that no Plaintiff can provide "'specific facts'" supporting standing. Lujan, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)). To the contrary, the summary-judgment record reflects that the FDC Officials provide each Plaintiff with hormones and intend to continue providing hormones as long as they remain medically necessary and not contraindicated. (Supra, 12-15). Plaintiffs therefore cannot demonstrate a "real and immediate" threat of injury. Church, 30 F.3d at 1337. Accordingly, Plaintiffs cannot meet their burden of demonstrating standing to pursue individual hormone-related claims.

**B.     EVEN IF PLAINTIFFS POSSESSED STANDING, THE FDC OFFICIALS' HORMONE POLICY DOES NOT VIOLATE THE CONSTITUTION.**

The Eighth Amendment requires prison officials to provide inmates with "minimally adequate" mental-health care, but, "as with all medical care provided to prisoners, it is not constitutionally required that mental health care be 'perfect, the best obtainable, or even very good.'" Harris v. Thigpen, 941 F.2d 1495, 1504, 1510 (11th Cir. 1991) (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980)). "Medical treatment violates the [E]ighth [A]mendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Id. at 1505 (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)). Moreover, to establish liability on a deliberate-indifference

claim under the Eighth Amendment, the plaintiff must first "demonstrate, as a threshold matter, that he suffered a deprivation that was, 'objectively, sufficiently serious.'" Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024) (*en banc*) (quoting Farmer, 511 U.S. at 834). The plaintiff must next "demonstrate that the defendant acted with 'subjective recklessness as used in the criminal law,'" which requires showing that the defendant "was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." Id. (quoting Farmer, 511 U.S. at 839). Finally, a prison official cannot be liable under the Eighth Amendment if he "'responded reasonably to the risk.'" Id. (quoting Farmer, 511 U.S. at 844).

Even if Plaintiffs possessed standing to assert a hormone claim, Plaintiffs lack any evidence that the FDC Officials' hormone policy violates the Constitution. Plaintiffs' claims effectively would require the Court to conclude that a policy emphasizing psychotherapy and implementing a review process before authorizing cross-sex hormones is "so grossly incompetent [or] inadequate . . . as to shock the conscience or to be intolerable to fundamental fairness." Harris, 941 F.2d at 1505. Indeed, the Court would have to find that the hormone policy reflects "criminal recklessness." Wade, 106 F.4th at 1255. Plaintiffs do not come close to making such a showing, nor can they in light of the disagreement among medical professionals. (See, e.g., Doc. 154-15, 27-38, ¶¶ 44-85, 90; Doc. 154-14, 52-53,

26

¶ 114); Keohane I, 952 F.3d at 1275 ("Put simply, when the medical community can't agree on the appropriate course of care, there is simply no legal basis for concluding that the treatment provided" falls short of constitutional requirements.).

In the Amended Complaint, Plaintiffs point to the HSB's provision that Florida law "'prohibits the Department from expending any funds to purchase cross sex hormones for the treatment of gender dysphoria.'" (Doc. 66, 16, ¶ 37 (quoting HSB, 7)). However, Plaintiffs acknowledge that the very next sentence of the HSB states, "the 'Department shall comply with this statutory requirement unless compliance with the U.S. Constitution or a court decision requires otherwise.'" (Id. (quoting HSB, 7)). As this Court already concluded, that provision of the HSB "is no obstacle to constitutionally required care." (Doc. 55, 9). Instead, the Court noted that, "to the extent the Department provides what is medically necessary, it has provided what is constitutionally required." (Id.).[10] The record establishes that the FDC Officials provide hormones to inmates with gender dysphoria, including Plaintiffs, where medically necessary. (Supra, 7-15).

The Amended Complaint next alleges that obtaining a variance under the Policy "appears to be an impossible standard to meet." (Doc. 66, 16-17 ¶ 39). The evidence demonstrates the falsity of this allegation. As set forth above, FDC

---

[10] Indeed, the Court noted, "even medical care failing below what is medically necessary does not necessarily violate the Eighth Amendment." (Id.) (citing Harris, 941 F.2d at 1505).

already granted variances to 73 inmates, including Keohane, Coleman, and Mendoza, and FDC denied variances to only 6 inmates. (Supra, 12-14). Boothe and Jackson continue to receive hormones while awaiting evaluations for variances under the HSB. (Supra, 14-15). Thus, Plaintiffs possess no evidence supporting their speculative allegation that obtaining a variance under the HSB is "impossible." To the contrary, the evidence demonstrates that FDC granted variances to over 90% of the inmates evaluated since FDC implemented the HSB. (Supra, 12). Accordingly, even if Plaintiffs possessed standing to pursue hormone-related claims, the FDC Officials would remain entitled to summary judgment.

## II. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE FDC OFFICIALS ON PLAINTIFFS' CLASS CLAIM REGARDING SOCIAL ACCOMMODATIONS.

"[P]risoners aren't constitutionally entitled to their preferred treatment plan or to medical care that is great, 'or even very good.'" Keohane I, 952 F.3d at 1277 (quoting Harris, 941 F.2d at 1504). Moreover, "'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment.'" Id. at 1266 (quoting Harris, 941 F.2d at 1505). "Put simply, when the medical community can't agree on the appropriate course of care, there is simply no legal basis for concluding that the treatment provided is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to

28

fundamental fairness.'" Id. at 1275 (quoting Harris, 941 F.2d at 1505); Gibson v. Collier, 920 F.3d 212, 220 (5th Cir. 2019) ("There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care."). At most, Plaintiffs' claims regarding social accommodations amount to disagreements about the care provided by the FDC Officials; accordingly, the FDC Officials remain entitled to summary judgment.

The undisputed evidence demonstrates that Plaintiffs and class members receive extensive treatment for their gender dysphoria. Under the HSB, FDC provides "[a]ssessment and consultation services . . . in response to referrals by staff, inmate requests, or situational factors;" "[o]ngoing mental health care . . . to alleviate symptoms of mental illness that result in the impairment of an inmate's ability to adapt and function in the prison environment;" and "[c]risis intervention services . . . [for] inmates who may be experiencing acute distress or acute symptoms of mental illness to prevent suicide and self-injury . . . or to provide relief from symptoms of mental illness and prevent further decompensation." (Doc. 154-1, 13). Inmates receive "individual or group clinical psychotherapy weekly and case management at least every 60 days." (Id., 16). Inmates also receive psychotropic medication if appropriate. (Id.). Finally, the HSB provides for inmates to receive cross-sex hormones if "deemed medically necessary." (Id., 18). As set forth above, FDC and Centurion implemented an ISP for each Plaintiff, and

29

they each receive hormones and mental-health treatment to treat their gender dysphoria. (Supra, 12-15). Indeed, in denying a preliminary injunction to Keohane, this Court found that "[t]he record indicates Keohane receives extensive medical treatment relating to gender dysphoria." (Doc. 55, 20). Thus, the record establishes that the FDC Officials provide class members with extensive treatment for their gender dysphoria.

Plaintiffs nevertheless challenge FDC's HSB because it "does not have a provision for clothing and grooming accommodations, thereby prohibiting inmates from abiding by FDC's clothing and grooming policies consistent with their gender identity, regardless of the impact on their health." (Doc. 66, 4). Plaintiffs allege that, under FDC's "former policy, they were permitted to follow clothing and grooming standards that accord with their gender identity." (Id.). Plaintiffs claim the HSB "establishes a blanket prohibition that denies clothing and grooming accommodations to Plaintiffs and members of the proposed class without consideration of any medical judgment formed by healthcare providers . . . ." (Id., 35, ¶ 132). It does not. Instead, the undisputed evidence establishes that (1) no provider deemed social accommodations medically necessary for any Plaintiff or any other class member; and (2) FDC would provide social accommodations to the extent deemed medically necessary for a particular inmate. This undisputed

30

evidence entitles the FDC Officials to summary judgment on Plaintiffs' class claim regarding social accommodations.

As a preliminary matter, social accommodations do not constitute "treatment" at all, much less medically necessary treatment. Outside the prison context, an individual could simply adopt the clothing and grooming styles of his or her choice. (See Doc. 154-6, 7-8 (104:15-105:6)). Even within prison, the alternate canteen list provided under the 2019 Procedure merely permitted inmates to purchase items with their own funds; it did not provide those items as medical treatment. (Supra, 16). If an inmate lacked the funds to purchase the items, the inmate would not receive them. Plaintiffs' attempt to portray social accommodations as "medical treatment" stretches that term far beyond its ordinary meaning.

Even assuming social accommodations could qualify as medical treatment in some circumstances, Plaintiffs bear the burden of establishing their medical necessity. Bayse v. Ward, 147 F.4th 1304, 1312 (11th Cir. 2025). In Bayse, the plaintiff-inmate asserted individual-capacity damages claims against prison officials who denied the inmate's "request to grow long hair and wear makeup, earrings, and nail polish." Id. at 1307. The inmate's treatment plan at one prison allowed the inmate these accommodations, but, after a transfer, "no medical professional at [the new prison] ever prescribed the social transitioning

31

accommodations to allow [the inmate] to follow female grooming and cosmetic standards," and officials told the inmate the "accommodations violated Department of Corrections policy." Id. at 1307-08. In addition to the previous treatment plan, the Bayse plaintiff relied on "standards of care promulgated by the World Professional Association for Transgender Health" in arguing that the social accommodations were medically necessary. Id. at 1313. Like Plaintiffs and class members here, the inmate continued to receive hormones and counseling. Id. at 1308.

In reversing the district court's denial of summary judgment to the officials, the Eleventh Circuit observed that the inmate "offer[ed] no evidence that considerations of medical necessity motivated" the accommodations provided under the previous treatment plan, so it "lack[ed] probative value." Id. at 1313. The Court cited Keohane I for the proposition that "social transitioning accommodations can be 'psychologically pleasing' without being 'strictly medically necessary.'" Id. (quoting Keohane I, 952 F.3d at 1274). The Court further noted that the WPATH standards are "'[f]lexible [c]linical [g]uidelines' that list '[c]hanges in gender expression' as a mere 'option[]' for treatment. These *general* standards are far too equivocal to be evidence that social transitioning accommodations were medically necessary *for*" the inmate. Id.; see also Doc. 55 at 18 (this Court, in denying Keohane's motion for preliminary injunction, observing that the "WPATH

32

recommendations do not show the social accommodations are medically necessary"). Thus, the Bayse plaintiff's reliance on the previous treatment plan and the WPATH standards were "insufficient to satisfy [the inmate's] burden—even as the nonmovant on summary judgment." Id. Here, Plaintiffs similarly fail to provide any evidence of medical necessity as to social accommodations. As to WPATH, it (and its purported standards) has been thoroughly discredited since Keohane I was decided. See, e.g., Eknes-Tucker v. Gov. of Alabama, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring in denial of rehearing *en banc*) ("[R]ecent revelations indicate that WPATH's lodestar is ideology, not science."); U.S. v. Skrmetti, 605 U.S. 495, 543-46 (2025) (Thomas, J., concurring) ("Recent revelations suggest that WPATH . . . bases its guidance on insufficient evidence and allows politics to influence its medical conclusions."). WPATH's purported standards are of no use in determining whether the Eighth Amendment requires any particular treatment for gender dysphoria.

As in Bayse, FDC previously provided some class members with social accommodations, but Plaintiffs provided "no evidence that considerations of medical necessity motivated" those accommodations. Id. Indeed, the record establishes that FDC provided the accommodations without regard to medical necessity. (Supra, 16-17). Moreover, Plaintiffs provided no evidence that any treating provider found social accommodations medically necessary for any class

member at any time since implementation of the HSB.  Instead, Plaintiffs provided only the opinions of their Advocates.  Karasic opined that social transitioning can "positively affect mental health" of gender dysphoric individuals, and patients who "socially detransition" may experience negative mental-health impacts.  (Doc. 154-4, 32, ¶¶ 68, 69).  Karasic did not examine any Plaintiff or class member, nor did he identify any inmate for whom he believed social accommodations were medically necessary.  (See supra, 21-22).  Neither Karasic nor Ole-Hamnvik ever worked inside prisons or jails.  (Doc. 154-4, 11-13 (80:23-82:4); Doc. 154-17, 3 (45:10-12)). These Advocates' general statements that social accommodations can be helpful for some individuals with gender dysphoria cannot establish that the accommodations are medically necessary for any Plaintiff or class member.  While Evans opined that social accommodations would alleviate each Plaintiff's symptoms of gender dysphoria, she lacks the experience to provide medical treatments for gender dysphoria.  (Doc. 154-9, 6 (175:4-14)).  Moreover, Evans was unable to "think of examples" of circumstances in which she would not find social accommodations necessary for any individual who requested them.  (Id., 7 (218:18-23)).  This testimony suggests that Evans bases her opinions largely on the request of the inmate rather than on any independent evaluation of medical necessity.

In any event, just as in Keohane I, "[a]t worst . . . , this is a situation where medical professionals disagree as to the proper course of treatment for [class

34

members'] gender dysphoria, and it's well established that 'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [cannot] support a claim of cruel and unusual punishment.'" 952 F.3d at 1274 (quoting Harris, 941 F.2d at 1505).  FDC's chosen course of treatment "isn't 'so unconscionable as to fall below society's minimum standards of decency'—and thus violat[e] the Eighth Amendment—merely because it conflicts with the opinion of [Plaintiffs'] retained expert." Id. at 1275 (quoting Kosilek v. Spencer, 774 F.3d 63, 96 (1st Cir. 2014) (*en banc*)); see also Clark v. Valletta, 157 F.4th 201, 206 (2d Cir. 2025) (holding that "how to treat [gender dysphoria] is not settled in the scientific and medical community").  Moreover, the undisputed testimony from the FDC Officials establishes that they would provide these accommodations if deemed medically necessary for a particular inmate. (Supra, 17-18).  Plaintiffs' inability to demonstrate that the FDC Officials' denial of social accommodations amounts to the denial of medically necessary care entitles the FDC Officials to summary judgment.

In the few (nonbinding and erroneously decided) cases in which courts found denial of social accommodations amounted to constitutional violations, the defendants denied accommodations that the plaintiffs' treating providers found medically necessary.  For example, in Hicklin v. Precynthe, Case No. 4:16-cv-01357-NCC, 2018 WL 806764 (E.D. Mo. Feb. 9, 2019), the court found the plaintiff

35

likely to succeed on the merits of a claim for "access to 'gender-affirming' canteen items and permanent hair removal" where the plaintiff's treating provider recommended them as part of medical treatment. Id. at *12; see also Soneeya v. Spencer, 851 F.Supp.2d 228, 237-38 (D. Mass. 2012) (prison officials refused to provide "feminizing items" despite "a formal clinical recommendation in writing" from inmate's treating providers). Putting aside that an individual physician does not determine constitutional requirements, it remains undisputed that no treating provider found social accommodations medically necessary for any class member and that the State will provide social accommodations to the extent deemed medically necessary by FDC and its providers for any inmate. (Supra, 17-18). Indeed, the FDC Officials already provide bra passes for inmates with sufficient breast development to require physical support, including Plaintiff Mendoza. (Supra, 14). Thus, no evidence supports a finding that the FDC Officials denied medically necessary care to any class member, and the FDC Officials remain entitled to summary judgment.

36

## CONCLUSION

For the foregoing reasons, the FDC Officials respectfully request that the Court grant summary judgment in their favor on Plaintiffs' claims against them.

Dated: February 9, 2026

Respectfully submitted,

/s/ *Kenneth S. Steely*
Kenneth S. Steely
*One of the Attorneys for the FDC Officials*

William R. Lunsford (*Pro Hac Vice*)
Kenneth S. Steely (Florida Bar #84714)
Megan N. McNab (*Pro Hac Vice*)
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
kenneth.steely@butlersnow.com
megan.everett@butlersnow.com

George A. Wright (*Pro Hac Vice*)
**BUTLER SNOW LLP**
445 North Blvd.
Suite 300
Baton Rouge, LA 70802
Telephone: (225) 325-8700
Facsimile: (225) 325-8800
george.wright@butlersnow.com

Daniel A. Johnson (Florida Bar No. 91175)
**FLORIDA DEPARTMENT OF CORRECTIONS**
501 South Calhoun Street
Tallahassee, FL 32399-2500

Telephone: (850) 717-3605
dan.johnson@fdc.myflorida.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this Motion for Summary Judgment and Incorporated Memorandum of Law contains 7,977 words and does not exceed 8,000 words as required by Local Rule 7.12(F).

*/s/ Kenneth S. Steely*
*One of the Attorneys for the FDC Officials*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all parties in this matter, including without limitation the following, by the Court's CM/ECF system on this 9th day of February, 2026:

Daniel B. Tilley
(Florida Bar No. 102882)
Samantha J. Past
(Florida Bar No. 1054519)
**AMERICAN CIVIL LIBERTIES**
  **UNION FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org

*Attorneys for Plaintiffs*

Li Nowlin-Sohl (*Pro Hac Vice*)
Leslie Cooper
**AMERICAN CIVIL LIBERTIES**
  **UNION FOUNDATION**
125 Broad Street
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org

*Attorneys for Plaintiffs*

Anthony J. Anscombe (*Pro Hac Vice*)
Sarah E. Norise (*Pro Hac Vice*)
George V. Desh (*Pro Hac Vice*)
Sadaf Misbah (*Pro Hac Vice*)
**STEPTOE LLP**
227 West Monroe, Suite 4700
Chicago, IL 60606
Tel: (312) 577-1300
aanscombe@steptoe.com
snorise@steptoe.com
gdesh@steptoe.com
smisbah@steptoe.com

*Attorneys for Plaintiffs*

/s/ *Kenneth S. Steely*
Of Counsel

40