## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

REIYN KEOHANE, *et al.*,　　　　　　　:

　　　　　　　　　　　　　　　　　　:

　　　　*Plaintiffs*,　　　　　　　　:

　　　　　　　　　　　　　　　　　　:

v.　　　　　　　　　　　　　　　　　:　　　Case No. 4:24-cv-434-AW-MAF

　　　　　　　　　　　　　　　　　　:

RICKY D. DIXON, in his　　　　　　　:　　　ORAL ARGUMENT REQUESTED

official capacity as Secretary　　　:

of the Florida Department of　　　　:

Corrections; *et al.*,　　　　　　　 :

　　　　　　　　　　　　　　　　　　:

　　　　*Defendants.*　　　　　　　　:

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.  **Summary Judgment Standard**................................................................2

II.  **Statement of Facts**.............................................................................3

  A.  **Gender Dysphoria and its Treatment** ............................................3

  B.  **FDC Policy on the Treatment of Gender Dysphoria** ...................5

    1.  Procedure 403.012 ...................................................................5

    2.  Events Leading to FDC's New Policy ......................................8

    3.  HSB 15.05.23 Does Not Permit Social Transition Accommodations, Regardless of Medical Need. ..........................................................12

  C.  **FDC is Aware That Rescission of Social Transition Accommodations has Exposed Plaintiffs and Other Class Members to Serious Harm.**....................15

III.  **Expert Witnesses**............................................................................19

IV.  **Argument**........................................................................................21

  A.  **Defendants' Motion Regarding Plaintiffs' Accommodations Subclaim Should be Denied.** .................................................................................21

    1.  Gender Dysphoria is an Objectively Serious Medical Need for Purposes of the Eighth Amendment....................................................................24

    2.  Defendants Have Acted With Deliberate Indifference to Serious Medical Needs.........................................................................................24

      a.  The Evidence Shows That Defendants Prohibit Social Transition Accommodations, Regardless of Medical Necessity....................................25

      b.  Substantial Evidence Demonstrates That Social Transition Accommodations are Medically Necessary Care for Plaintiffs and Other Class Members....................................26

      c.  Defendants Misconstrue Keohane I......................................30

  B.  **The Court Should Dismiss the Hormone Therapy Subclaim Without Prejudice.**.......................................................................................34

V.  **Conclusion**.....................................................................................37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amey, Inc. v. Gulf Abstract & Title, Inc.*,
758 F.2d 1486 (11th Cir. 1985) ...............................................................................2

*Bayse v. Ward*,
147 F.4th 1304 (11th Cir. 2025) ............................................................................32

*Bradley v. Puckett*,
157 F.3d 1022 (5th Cir. 1998) ...............................................................................23

*Colwell v. Bannister*,
763 F.3d 1060 (9th Cir. 2014) ...............................................................................21

*Cummings v. Roberts*,
628 F.2d 1065 (8th Cir. 1980) ...............................................................................23

*De'Lonta v. Johnson*,
708 F.3d 520 (4th Cir. 2013) ...........................................................................22, 30

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ...........................................................................24, 34

*Estelle v. Gamble*,
429 U.S. 97 (1976)...................................................................................................21

*Fields v. Smith*,
653 F.3d 550 (7th Cir. 2011) .................................................................................22

*Flack v. Wisc. Dep't of Health Servs.*,
395 F. Supp. 3d 1001 (W.D. Wis. 2019).................................................................34

*Gardner v. Mutz*,
962 F.3d 1329 (11th Cir. 2020) .............................................................................36

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019) ...........................................................................33, 34

*Giraldes v. Roche*,
357 Fed. Appx. 885 (9th Cir. 2009).......................................................................28

*Greason v. Kemp*,
891 F.2d 829 (11th Cir. 1990) ...............................................................21

*Greeno v. Daley*,
414 F.3d 645 (7th Cir. 2005) ...............................................................21

*Hicklin v. Precynthe*,
No. 16-cv-01357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ...............23, 30, 33

*Jorden v. Farrier*,
788 F.2d 1347 (8th Cir. 1986) ...............................................................22

*Keohane v. Fla. Dep't of Corr. Sec'y*,
952 F.3d 1257 (11th Cir. 2020) ...................................................*passim*

*Keohane v. Jones*,
328 F. Supp. 3d 1288 (N.D. Fla. 2018) ...............................................8

*Kosilek v. Spencer*,
774 F.3d 63(1st Cir. 2014)....................................................23, 33, 34

*Miller v. King*,
384 F.3d 1248 (11th Cir. 2004) ...............................................................23

*Moore v. Geico Gen. Ins. Co.*,
633 Fed. Appx. 924 (11th Cir. 2016)....................................................19

*N. Shore Med. Ctr., Inc. v. CIGNA Health*,
68 F.4th 1241 (11th Cir. 2023) ...........................................................2

*Polelle v. Fla. Sec'y of State*,
131 F.4th 1201 (11th Cir. 2025) ...............................................................36

*Roe v. Elyea*,
631 F.3d 843 (7th Cir. 2011) ...............................................................22, 30

*Rosati v. Igbinoso*,
791 F.3d 1037 (9th Cir. 2015) ...............................................................22

*Soneeya v. Spencer*,
851 F. Supp. 2d 228 (D. Mass 2012)....................................................23, 33

*Wade v. McDade*,
106 F.4th 1251 (11th Cir. 2024) (en banc) .......................................................21

**Other Authorities**

Eighth Amendment ....................................................................................*passim*

Florida Medicaid, Generally Accepted Professional Medical
Standards Determination on the Treatment of Gender Dysphoria,
June 22, 2022, at 2, available at
https://ahca.myflorida.com/content/download/4869/file/AHCA_G
APMS_June_2022_Report.pdf?version=1 ........................................................10

https://www.flsenate.gov/Session/Bill/2023/25 (providing effective
date of May 17, 2023)........................................................................................10

Rule 18-14096.................................................................................................32

Rule 33-602.101..............................................................................................13

Defendants have moved for summary judgment on both components of Plaintiffs' Eighth Amendment challenge to the Florida Department of Corrections' ("FDC") policy regarding the treatment of gender dysphoria. With respect to hormone therapy, in light of Defendants' representations to the Court and facts revealed in discovery, Plaintiffs agree that there does not appear to be any "certainly impending" risk of losing their hormone therapy. Thus, this subclaim should be dismissed without prejudice. With respect to FDC's ban on social transition accommodations, this Court should deny Defendants' motion. Substantial evidence supports a judgment in Plaintiffs' favor.

Plaintiffs contest two fundamental facts essential to Defendants' Motion. First, overwhelming evidence contradicts Defendants' assertion that "FDC would provide social accommodations to the extent deemed medically necessary for a particular inmate." **Doc. 155**, "MSJ" or "Motion" at 30. FDC has implemented a blanket ban with no exception for medical necessity. Second, substantial evidence contradicts FDC's assertion that social transition accommodations are not medically necessary care. In addition to testimony from expert witnesses and the Plaintiffs about their medical need for accommodations, FDC's own healthcare providers testified that social transition accommodations significantly alleviated gender dysphoria for some patients, and losing them caused a deterioration of mental health.

1

Defendants also misread relevant caselaw, including *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020) ("*Keohane I*"). Defendants interpret *Keohane I* to mean that social transition accommodations can never be medically necessary. But the court held that the plaintiff's healthcare providers determined that accommodations were not medically necessary *for her* at that time, *id.* at 1277, and recognized that blanket policies mandating "refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference'[.]" *Id.* at 1266-67. Here, Plaintiffs produced evidence demonstrating the medical necessity of social transition accommodations *for them* and other class members and that FDC's policy prohibits them.

## I.    Summary Judgment Standard

"A court should grant summary judgment only if the movant establishes that there is no genuine dispute as to any material fact." *N. Shore Med. Ctr., Inc. v. CIGNA Health*, 68 F.4th 1241, 1243 (11th Cir. 2023) (citation omitted). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Id.* (citation omitted). "In determining whether the movant has met its burden, the reviewing court must examine the evidence in a light most favorable to the opponent of the motion. All reasonable doubts and inferences should be resolved in favor of the opponent." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985).

2

## II.    Statement of Facts

### A.    Gender Dysphoria and its Treatment

"Gender dysphoria" is a serious medical condition characterized by clinically significant distress resulting from the incongruity between an individual's gender identity and the sex they were designated at birth. *See* Diagnostic and Statistical Manual of Mental Disorders, 5th Ed., American Psychiatric Association; **Doc. 154-4** at Ex. 4A, Expert Report of Dr. Dan Karasic ("Karasic Report") ¶¶ 42 and 43; **Exhibit 1**, FDC Rule 30(b)(6) Deposition ("FDC") 50:6-51:5; **Exhibit 2**, Deposition of Dr. Suzonne Kline ("Kline") 286:25-287-5. Without appropriate treatment, gender dysphoria can cause depression, anxiety, self-harm, and suicidality, and impair everyday functioning. Karasic Report ¶ 45. Treatment of gender dysphoria in accordance with prevailing treatment protocols is highly effective. *Id*. ¶ 44.

Treatment of gender dysphoria seeks to help patients live consistently with their gender identity, thereby reducing distress, by aligning their presentation and body with their gender identity. *Id*. ¶ 58. Treatment includes social transition (where a patient dresses, grooms, and otherwise lives in accordance with their gender identity) and may include hormone therapy to bring their body into alignment with their gender identity. *Id*. ¶¶ 59, 62.[1]

---

[1] Plaintiffs do not address surgical treatments for gender dysphoria because surgery is not at issue in the case.

3

Social transition is a widely accepted part of treatment of gender dysphoria and supported by the National Commission on Correctional Health Care. Karasic Report ¶ 28; **Exhibit 3**, Deposition of Dr. Kristopher Kaliebe ("Kaliebe") 327:4-328:8. FDC's Chief of Mental Health, Dr. Suzonne Kline, acknowledges that outside of prison, social transition is recommended to alleviate gender dysphoria. **Exhibit 2**, Kline 50:15-25. FDC's contracted healthcare provider, Centurion, has clinical guidelines recommending social transitioning for the treatment of gender dysphoria. **Exhibit 4**, FDC_OFFICIALS_037250 at 37252, 37258-9; **Exhibit 5**, Centurion Rule 30(b)(6) Deposition ("Centurion") 24:9-18; 127:4-128:21.

Research and decades of clinical experience have established that social transition can significantly relieve gender dysphoria. Karasic Report ¶¶ 26, 59, 69; *see also* **Exhibit 6**, Deposition of Dr. Aloka Joshi ("Joshi") 29:24-30:2 (psychologist who conducts FDC's gender dysphoria evaluations agrees social transition can alleviate gender dysphoria). Indeed, for some patients, social transition alone can alleviate gender dysphoria. Karasic Report ¶ 62.

Outside of prison, people do not need healthcare providers' involvement to socially transition (although mental health providers often provide support during this process, Karasic Report ¶ 61); they can dress and groom as they choose. But in prisons with gendered dress and grooming standards, inmates must receive accommodations to be exempted from those standards. FDC's mental health

4

providers (who are employed by Centurion) have observed that for some patients, accommodations to permit social transition helped decrease gender dysphoria symptoms and significantly improved their mental health. *See* Section II(C), *infra*.

Prohibiting gender dysphoric people from socially transitioning puts them "at risk of significant harm to their health and well-being, including heightened risk of self-harm and suicidality." Karasic Report ¶¶ 29, 69. FDC's providers have seen some patients experience a deterioration of their mental health when social transition accommodations were withdrawn. *See* Section II(C), *infra*.

While psychotherapy can help with comorbidities, experts on both sides agree that there is no evidence that psychotherapy can alleviate gender dysphoria. **Exhibit 3**, Kaliebe 144:9-145:4, 309:17-22; Karasic Report ¶ 78; **Exhibit 7**, Expert Rebuttal Report of Dr. Dan Karasic ("Karasic Rebuttal") ¶ 34.[2]

### B.   FDC Policy on the Treatment of Gender Dysphoria

#### 1.   Procedure 403.012

FDC Procedure 403.012, implemented in 2017 and updated in 2019, provided for accommodations which allowed gender dysphoric inmates to dress and groom consistently with their gender identity. **Exhibit 8**, 2017 Procedure; **Exhibit 9**,

---

[2] Defendants' expert, Dr. Kaliebe, speculates that social transition accommodations may harm patients by potentially prolonging gender dysphoria and making them reluctant to receive psychotherapy, MSJ at 20, but concedes there is no evidence to support this. **Exhibit 3**, Kaliebe 133:4-11, 136:20-137:4.

FDC_OFFICIALS_023085, 2019 Procedure.[3] Those approved for accommodations received an "accommodations pass." *See* **Exhibit 10**, FDC_OFFICIALS_035780.

The 2017 Procedure allowed individuals with gender dysphoria to use "[p]roperty and apparel" consistent with their gender identity if deemed medically necessary by the Gender Dysphoria Review Team ("GDRT"). **Exhibit 8**, 2017 Procedure, at 5-6. At that time, FDC and the GDRT understood that social transition accommodations could be medically necessary for individuals with gender dysphoria. **Exhibit 1**, FDC 70:8-71:19.

The "Accommodations" section of the 2019 Procedure identified the available clothing and grooming accommodations—alternate canteen, make-up, hair standards, uniforms, and undergarments. **Exhibit 9**, 2019 Procedure, at 6. Accommodations were provided "[t]o assist in transitioning." *Id*. Under this Procedure, accommodations were only provided when recommended by a psychologist after determining that they would likely alleviate the patient's gender dysphoria, and the GDRT unanimously approved them. **Exhibit 2**, Kline 28:14-25; **Exhibit 5**, Centurion 28:11-22, 32:9-24, 34:12-25; **Exhibit 11**,

---

[3] Defendants object to the use of the word "accommodations" and characterize it as "a self-serving phrase utilized by Plaintiffs." MSJ at 1, n.1. This is the exact term that FDC used long before this litigation. *See, e.g.,* **Exhibit 8**, 2017 Procedure, at 6 (section titled "Accommodations").

FDC_OFFICIALS_026084 (form used by GDRT to approve specific accommodations).[4]

---

[4]  Defendants assert that under the 2019 Procedure, accommodations were not provided based on medical necessity, MSJ at 16, but this is at odds with this evidence. Even if the 2019 Procedure allowed for accommodations in the absence of medical necessity, that would not mean that they were not medically necessary for any of the recipients; it would suggest FDC expanded access to include both to those for whom they were and were not medically necessary.

7

2.      Events Leading to FDC's New Policy

On September 30, 2024, FDC rescinded Procedure 403.012 and replaced it with HSB 15.05.23 (the "HSB," **Doc. 154-1** at Ex. 1A). The HSB does not permit social transition accommodations.

Defendants assert that the policy change was prompted by "concerns regarding the treatment provided under the 2019 Procedure and years of research and deliberation." MSJ at 9.[5] They cite testimony by Dr. Danny Martinez, FDC Chief of Medical Services, that there were "conversations" about changing the policy starting in December 2020. *Id.* But neither he nor Dr. Kline, the two drafters of HSB 15.05.23, took any steps to change the policy until 2023. Indeed, in August 2022, Dr. Martinez had "no edits or recommended changes" to Procedure 403.012 when it came up for annual re-evaluation. **Exhibit 14**, FDC_OFFICIALS_023302.[6]

---

[5] They also point to "the Eleventh Circuit's reversal of the district court's injunction in *Keohane I*" as something that triggered the policy change. MSJ at 9. But Procedure 403.012 was enacted in 2017, before the district court's injunction in August 2018, *Keohane v. Jones*, 328 F. Supp. 3d 1288 (N.D. Fla. 2018), and it remained in effect until September 30, 2024, several years after the Eleventh Circuit's decision in 2020.

[6] Dr. Martinez tries to explain this by saying he was waiting for the new edition of the WPATH Standards of Care (SOC 8), which was released in September 2022, but this is a red herring: he had no reason to expect that WPATH would disavow social transitioning. He asserts that medical professional groups dropped their support for gender-affirming care after SOC 8, but Defendants' expert, Dr. Kaliebe, refuted that. **Exhibit 3**, Kaliebe 327:4-328:8.

In early 2023, two significant political influences led FDC to change its policy and ban social transition accommodations.

First, in January 2023, the Office of the Governor prompted FDC to align its policies with the administration's policy against gender-affirming care. On January 10, 2023, Governor DeSantis's office received a press inquiry from a reporter, asking for comments about statements by Governor Kristi Noem regarding Florida's policies concerning transgender inmates. Governor DeSantis's office responded that "conservative governors need to work together to enact conservative policies." Two days later, the Governor's office sent this email interchange to FDC Chief of Staff Tim Fitzgerald. **Exhibit 15**, FDC_OFFICIALS_024865. As Chief of Staff, Mr. Fitzgerald's job responsibilities included facilitating policy alignment between FDC and the Governor's Office. **Exhibit 16**, Deposition of Tim Fitzgerald ("Fitzgerald") 76:3-15. Mr. Fitzgerald, in turn, reached out to Dr. Kline on January 12, 2023, asking her to call to discuss FDC policy on "transgender hormone treatment" because he had been "asked a question" about it. **Exhibit 17**, FDC_OFFICIALS_043569.

A few days later, on January 18, 2023, Mr. Fitzgerald forwarded to Dr. Kline a report from the Florida Agency for Health Care Administration ("AHCA") that concluded that hormone therapy for the treatment of gender dysphoria is not

9

"consistent with generally accepted professional medical standards,"[7] a requirement for Medicaid coverage. He recommended to Dr. Kline that FDC "should work with" AHCA "as we update our policy in this area." **Exhibit 18**, FDC_OFFICIALS_045490. Dr. Kline understood him to be suggesting that FDC should make its policy on gender dysphoria consistent with AHCA's. **Exhibit 2**, Kline 77:13-78:7. Dr. Kline and Mr. Fitzgerald testified that they recall nothing about their conversations in January 2023, **Exhibit 2**, Kline 32:5-10, 53:22-55:18, 62:25-63:4; **Exhibit 16**, Fitzgerald 63:2-64:14, 73:24-76:19, but numerous communications occurred between them regarding FDC's "gender dysphoria program" that month. **Exhibit 19**, FDC Privilege Log, at 1.

The second political influence leading to revision of the policy occurred in March 2023, when the Florida legislature introduced SB 254, a bill banning the use of state funds for gender-affirming medical care. That same month, Drs. Martinez and Kline began work on the new policy, and they received approval to begin drafting in May 2023, the month SB 254 became law.[8] **Doc. 38-1**, ¶ 8. Drs. Martinez

---

[7] *See* Florida Medicaid, Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria, June 22, 2022, at 2, available at https://ahca.myflorida.com/content/download/4869/file/AHCA_GAPMS_June_2022_Report.pdf?version=1.

[8] *See* https://www.flsenate.gov/Session/Bill/2023/25 (providing effective date of May 17, 2023).

and Kline testified that they needed to come up with a new policy because FDC's existing gender dysphoria policy did not comply with S.B. 254. **Exhibit 2**, Kline 117:5-12; **Exhibit 20**, Martinez 143:24-144:8. A draft statement to inmates regarding the policy change stated: "Due to recent laws enacted by the Florida Legislature, [FDC] is required to change some of its policies regarding treatment of gender dysphoria." **Exhibit 21**, FDC_OFFICIALS_036260.

Consistent with S.B. 254's ban on the use of state funds to pay for hormone therapy, initial drafts of the HSB did not make any provision for hormone therapy;[9] nor did they provide for social transition accommodations. **Exhibit 2**, Kline 170:5-171:7; **Exhibit 20**, Martinez 26:25-27:3. The policy was drafted by Drs. Martinez and Kline with political oversight; the Governor's office provided input on the draft policy because it was a "hot button topic." **Exhibit 22**, Deposition of Clayton Weiss ("Weiss") 108:5-19, 112:21-116:14.

While the HSB was being developed, Centurion resisted FDC's plans to abolish social transition accommodations. In providing feedback on a draft, Centurion expressed concern about the removal of accommodations and tried to get them reinstated. **Exhibit 23**, Deposition of Peggy Watkins-Ferrell ("Watkins-Ferrell") 122:13-123:3, 126:19-127:8, 134:18-22, 142:13-143:3, 144:8-15; **Exhibit**

---

[9] The HSB was subsequently amended to allow "variances" for hormone therapy. *See generally* HSB.

**24**, FDC_OFFICIALS_045110 (Centurion HSB redline). Centurion's clinical guidelines on gender dysphoria state that "cardinal ethical principles" dictate that such accommodations be provided and that healthcare professionals should support access for patients. **Exhibit 4**, FDC_OFFICIALS_037250 at 37252. Centurion's views did not matter to FDC; as a contractor, Centurion was obligated to follow FDC's directives. **Exhibit 1**, FDC 155:8-156:24.

Although the HSB was not implemented until September 30, 2024, when S.B. 254 took effect in May 2023, the GDRT stopped meeting and FDC stopped approving anyone to begin hormone therapy or receive new accommodations passes. **Exhibit 2**, Kline 107:5-13; **Exhibit 20**, Martinez 124:15-125:10, 151:19-152:20; **Exhibit 23**, Watkins-Ferrell 151:18-152:20.

       3.     <u>HSB 15.05.23 Does Not Permit Social Transition Accommodations, Regardless of Medical Need.</u>

FDC contends that it would still provide social transition accommodations if a treating mental health provider deemed them medically necessary for a patient. This is nonsense, not least because Defendants expressly stipulated that following the HSB, accommodations are not available. **Doc. 57** at 59:8-12. Nothing in the HSB permits social transition accommodations. *See generally* HSB. And FDC Security Chief Harrell testified that accommodations would have to be included in the HSB in order to be permitted. **Exhibit 25**, Deposition of Michael Harrell ("Harrell") 79:22-80:20. All accommodations passes were rescinded as a result of the HSB,

without any individualized determinations that patients no longer needed them. **Exhibit 2**, Kline 226:10-227:1.

Multiple FDC documents confirm that the new policy did not permit social transition accommodations, regardless of medical need. The "HSB 15.05.23 Action Plan" for the rollout of the policy states that inmates "will be advised that the alternate canteen and quarterly order menus will be rescinded, and they will have to comply with the grooming standard in accordance with their biological sex." **Exhibit 26**, FDC_OFFICIALS_003768; *see also* **Exhibit 27**, FDC_OFFICIALS_027662 (FAQs for staff explaining that accommodations—alternate canteen, clothing and grooming standards consistent with gender identity, and bra passes[10]—will no longer be available). The "Script Regarding Undergarment, Hair, and Alternate Canteen Items," given to inmates on September 30, 2024, mandated that they exchange their undergarments for those authorized at their institution, bring their hair into compliance with the requirements of Rule 33-602.101, F.A.C., Care of Inmates paragraph (4), and consume or mail home alternate canteen items within 30 days or face discipline. **Exhibit 29**, FDC_OFFICIALS_043881. Moreover, the gender dysphoria evaluation template no longer has a section in which providers can

---

[10] FDC allows for bras for those with breast development requiring physical support, but not as social transition accommodations. *See* **Exhibit 27**, FDC_OFFICIALS_027662; *see also* **Exhibit 28**, CENT PROD 001742 at 2, 4; **Exhibit 20**, Martinez 206:22-208:6.

recommend accommodations. **Exhibit 20**, Martinez 159:8-21. And Form DC4-634G—the accommodations pass—no longer exists. **Exhibit 20**, Martinez 204:6-19.

FDC mental health personnel understand that the new policy does not permit social transition accommodations, regardless of medical need. Dr. Kline testified that after the HSB issued, mental health staff were informed that accommodations were no longer permitted. **Exhibit 2**, Kline 224:19-225:2. FDC never informed Centurion's providers that despite the documents stating accommodations are no longer permitted, they could still recommend them if they believed them to be medically necessary for a patient. *Id.* 234:6-24; **Exhibit 20**, Martinez 216:21-217:8. Clayton Weiss, FDC's Director of Health Services, testified that accommodations are not "even on the table" under the HSB. **Exhibit 22**, Weiss 143:10-23.

Centurion likewise understood the HSB to be a ban on accommodations even if mental health providers believe they are necessary for the health of the patient. **Exhibit 5**, Centurion 125:13-126:6; **Exhibit 23**, Watkins-Ferrell 98:5-8, 98:25-99:5, 108:9-18, 177:15-21. Thus, mental health providers no longer assess whether inmates have a need for accommodations. *See* **Exhibit 23**, Watkins-Ferrell 229:3-231:17. Dr. Joshi, a psychologist who conducted many of the gender dysphoria re-evaluations mandated by the HSB, said she would continue to recommend social

14

transition accommodations for patients when indicated, but cannot because they are no longer available. **Exhibit 6**, Joshi 35:15-20, 180:20-14.

### C.   FDC is Aware That Rescission of Social Transition Accommodations has Exposed Plaintiffs and Other Class Members to Serious Harm.

FDC's Chief of Mental Health acknowledged that social transition accommodations have alleviated gender dysphoria and improved the mental health of some inmates. **Exhibit 2**, Kline 246:22-247:1, 247:12-16. FDC's mental health providers have observed that accommodations helped improve some patients' mental health by decreasing gender dysphoria symptoms. **Exhibit 5**, Centurion 39:8-11, 146:19-25; **Exhibit 6**, Joshi 72:3-8 (for some individuals, social transition items can help alleviate symptoms of gender dysphoria); **Exhibit 30**, Deposition of Jillian Martell ("Martell") 28:21-29:3 (social transition accommodations help relieve patient's depression and anxiety); **Exhibit 31**, FDC_OFFICIALS_019703 at 019706 (medical record indicating "inmate mental health had improved substantially following approval for gender affirming accommodations in FDC.");[11] **Exhibit 33**, FDC_OFFICIALS_019749.

For some patients, providers saw dramatic reductions in psychological emergencies, in-patient admissions, and disciplinary reports, **Exhibit 5**, Centurion

---

[11] **Exhibit 20**, Martinez 215:11-23 (the statements in this evaluation were the provider's clinical impressions).

129:5-131:15; **Exhibit 33**, FDC_OFFICIALS_019749 at 19750; **Exhibit 31,** FDC_OFFICIALS_019703 at 019706, which FDC considers evidence indicating treatment is benefitting a patient and that would support a determination that continued treatment is medically necessary. **Exhibit 20**, Martinez 162:25-164:20.

After the HSB took effect, FDC's providers observed some patients experience a deterioration in their mental health due to the loss of accommodations. **Exhibit 5**, Centurion 44:11-14, 152:15-19; **Exhibit 6**, Joshi 171:22-172:13 (psychologist opined that loss of accommodations caused mental health decompensation for inmate who experienced suicidal ideation after accommodations rescinded); Joshi 184:4-16 (some patients experienced increased depression, anxiety and dysphoria after the accommodations were removed); **Exhibit 30**, Martell 49:12-24 (some patients experienced distress from lack of accommodations and increased depression and anxiety); *see also* **Exhibit 34**, FDC_OFFICIALS_019676 at 019678 (medical record noting patient's suicidal ideation after policy change).

FDC knows the impact of accommodations on patient health as Centurion provided all of these evaluations to FDC. **Exhibit 5**, Centurion 147:12-17.

After one class member tragically died by suicide, FDC's psychological autopsy concluded that distress from the loss of accommodations due to the HSB was one of the factors that contributed to her decision to end her life. **Exhibit 2**, Kline 272:1-23; **Exhibit 35**, Deposition of Dr. Adam Wasserman 112:15-113:1; *see*

16

*also* **Exhibit 6**, Joshi 183:20-184:11 (not surprised to learn that denial of accommodations was a factor in the suicide, given that some patients were experiencing increased depression, anxiety and dysphoria after the rescission of accommodations). Dr. Joshi, asked if she is worried that other suicides may occur as the result of loss of accommodations, testified: "as a mental health provider and as a human being, yes, that is concerning." **Exhibit 6**, Joshi 183:20-184:16. *See also* Joshi 93:3-16 (expressing concern about patients developing or re-exhibiting symptoms because of accommodations being rescinded).

Plaintiffs' expert, Dr. Jennifer Evans, evaluated each Plaintiff, conducting extensive clinical interviews and reviewing their medical records. **Exhibit 36**, Dr. Jennifer Evans' Psychological Report of Reiyn Keohane ("Evans Keohane Report"); **Exhibit 37**, Sasha Mendoza ("Evans Mendoza Report"); **Exhibit 38**, Sheila Diamond ("Evans Diamond Report"); **Exhibit 39**, Nelson Boothe ("Evans Boothe Report"); **Exhibit 40**, Karter Jackson ("Evans Jackson Report") (collectively, "Evans Reports"); **Exhibit 41**, Evans Declaration. Dr. Evans' reports describe how social transition accommodations provided significant relief from gender dysphoria for Plaintiffs and how each suffered following the loss of accommodations. For example, she says of Sheila Diamond:

17



**Exhibit 38**, Evans Diamond Report at 18.[12]

Plaintiffs themselves have also articulated how the loss of social transition accommodations has harmed their mental health. *See, e.g.* **Exhibit 42**, Deposition of Reiyn Keohane at 103:22-104:21, 155:23-156:17 (████████████ ████████████████████████████████ ); **Exhibit 43**, FDC_OFFICIALS_037826-29 (████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████ ); **Doc. 78-4**, Declaration of Sasha Mendoza; **Doc. 78-6**, Declaration of Karter Jackson; **Doc. 78-7**, Declaration of Nelson Boothe.

Defendants' expert, Dr. Kaliebe, agrees that some of the Plaintiffs' mental health decompensated after losing their accommodations. **Exhibit 3**, Kaliebe 306:10-25.

---

[12] Defendants' suggestion that Dr. Evans' opinions that social accommodations are medically necessary for Plaintiffs are based "largely on the request of the inmate," MSJ at 34, is baseless. Her reports make clear that her opinions are based on her clinical interviews and reviews of Plaintiffs' medical records.

Defendants ignore this evidence and proclaim "[a]fter approximately one year without social accommodations, providers described gender-dysphoric inmates as 'doing very well' and 'adjusted.'" MSJ at 18-19. To support this claim, they cite Dr. Kline, who merely testified that "we have people doing very well"; she did not claim that *everyone* is doing well and acknowledged she has only seen information for inmates who have gone through the variance process (about one quarter of the class). **Exhibit 2**, Kline 259:25-260:12.

## III.    Expert Witnesses

In support of their Motion, Defendants have proffered the expert opinions of Drs. Kristopher Kaliebe and Michael Laidlaw. Plaintiffs and their experts refute their opinions that social transition accommodations are not medically necessary and that FDC's care of gender dysphoric inmates is adequate.

Defendants disparage Plaintiffs' experts as "advocates" who provided "purported expert testimony." MSJ at 21. Expert credibility determinations are not permissible at the summary judgment stage, *see, e.g. Moore v. Geico Gen. Ins. Co.*, 633 Fed. Appx. 924, 930-31 (11th Cir. 2016), but Plaintiffs feel compelled to respond to Defendants' characterization. Drs. Karasic and Evans have extensive experience treating patients with gender dysphoria.[13] Dr. Karasic, a psychiatrist, has seen

---

[13] While Defendants also disrespect Plaintiffs' expert Dr. Ole-Petter Hamnvik, as an endocrinologist, his expert opinions are not relevant to Plaintiffs' response to the Motion.

19

thousands of patients with gender dysphoria over his lengthy career, and has published numerous books and peer-reviewed articles on gender dysphoria. Karasic Report ¶¶ 6, 9, and Ex. A at 16-17. Dr. Evans, a psychologist, has seen hundreds of transgender patients and has trained healthcare providers in Florida on the treatment of transgender patients. **Exhibit 36**, Evans Keohane Report at 1-2.

In contrast, neither of Defendants' experts has meaningful experience treating patients with gender dysphoria. Dr. Laidlaw has none whatsoever, except that he once refilled a prescription for a patient during his fellowship. **Exhibit 32**, Deposition of Dr. Michael Laidlaw 18:6-19, 37:4-6, 87:19-20. As an endocrinologist, Dr. Laidlaw admits he does not have opinions on the benefits or harms of socially transitioning for adults with gender dysphoria because it is outside of the scope of endocrinology. *Id.* 67:3-15, 69:20-23.

As for Dr. Kaliebe, of the roughly 20,000 patients he has seen in his career, only about 30 had gender dysphoria, and all but about 6 to 8 of them were pediatric patients. **Exhibit 3**, Kaliebe 15:14-16:10, 20:9-21:10. His experience with those patients was extremely limited, consisting mostly of one-time evaluations of patients seen by residents at a psychiatric clinic. *Id.* 24:11-25:21, 41:7-14, 26:16-20, 27:6-12, 28:3-22, 32:4-18, 35:22-36:6, 38:3-40:1, 48:1-21, 53:1-9.[14]

---

[14] Dr. Kaliebe's publications regarding gender dysphoria are—with the exception of one article on pediatric treatment—letters to the editor of journals and other opinion pieces. *Id.* 72:10-73:4, 74:8-19.

Defendants' experts' opinions, thus, should not be given credence at trial.

## IV.   Argument

### A.   Defendants' Motion Regarding Plaintiffs' Accommodations Subclaim Should be Denied.

Corrections officials violate the Eighth Amendment's bar on cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference is established by showing that plaintiff has an "objectively serious" medical need, *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc), and that defendants were "subjectively aware" that their "conduct—[their] actions or inactions—put the plaintiff at substantial risk of serious harm." *Id.* at 1258.[15] Medically necessary care for purposes of the Eighth Amendment includes care for mental health conditions. *See, e.g.*, *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990).

Denying medically necessary care based on a blanket policy prohibiting such care constitutes deliberate indifference. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) (the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy . . . is the paradigm of

---

[15] "This is not to say that a prisoner must establish that officials intended or desired the harm that transpired." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). It is enough that defendants knew of the substantial risk of harm of denying the care and denied it despite the risk. *Id.*

deliberate indifference" (quotation omitted)); *Jorden v. Farrier*, 788 F.2d 1347, 1349 (8th Cir. 1986) (denial of particular medication based on blanket exclusion of the medication could violate Eighth Amendment if plaintiff can show alternative drugs provided are not effective for him); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011) (deliberate indifference to bar particular treatment for hepatitis C based on blanket policy without considering patient's individual medical need).

Of course, this does not mean that a categorical prohibition on a purported medical treatment would violate the Constitution absent a showing that the treatment could *ever* be medically necessary. But when a treatment is one that has been shown can be an effective treatment for a serious medical condition, a blanket prohibition against providing such care without regard to a patient's medical need for it constitutes deliberate indifference.

Courts have routinely held that prison policies violate the Eighth Amendment when they categorically exclude recognized treatments for gender dysphoria regardless of the individual's medical need for them. *See, e.g., Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (statute banning hormone therapy violated the Eighth Amendment); *De'Lonta v. Johnson*, 708 F.3d 520, 525-26 (4th Cir. 2013) (prisoner with gender dysphoria stated a claim for deliberate indifference where prison would not even evaluate her need for surgery); *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (alleged denial of gender confirmation surgery based on blanket policy

stated an Eighth Amendment claim); *see also Kosilek v. Spencer*, 774 F.3d 63, 90-91(1st Cir. 2014) ("blanket policy" banning gender-affirming surgery "would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs"). As the Eleventh Circuit observed when discussing a categorical ban on hormone therapy, the "refusal to even consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'" *Keohane I*, 952 F3d at 1266-67.

In addition to medications and surgeries, the Eighth Amendment requires prison officials to provide inmates with serious healthcare needs medically necessary supplies and devices. *See, e.g.*, *Miller v. King*, 384 F.3d 1248, 1261-62 (11th Cir. 2004) (orthopedic shoes), *vacated and superseded on other grounds*, 449 F.3d 1149 (11th Cir. 2006); *Bradley v. Puckett*, 157 F.3d 1022, 1025-26 (5th Cir. 1998) (shower chair); *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980) (personal hygiene products for individual confined to a hospital bed).

Courts have specifically recognized that social transition accommodations can be medically necessary treatment for inmates with gender dysphoria. *See Hicklin v. Precynthe*, No. 16-cv-01357, 2018 WL 806764, at *12 (E.D. Mo. Feb. 9, 2018); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 246, 250 (D. Mass 2012); *see also Kosilek*, 774 F.3d at 69-70, 90 (noting that the "treatment" plaintiff was receiving to address

23

gender dysphoria included "[being] provided female, gender-appropriate clothing and personal effects").

Plaintiffs here have presented substantial evidence that Defendants are subjectively aware that social transition accommodations are medically necessary for them and other class members to alleviate their gender dysphoria and that denying them accommodations based on the HSB (which permits no exception based on medical necessity) is causing substantial harm to their mental health. These facts constitute deliberate indifference to a serious medical need in violation of the Eighth Amendment.

1.     Gender Dysphoria is an Objectively Serious Medical Need for Purposes of the Eighth Amendment.

Defendants do not dispute that gender dysphoria is an objectively serious medical need for purposes of the Eighth Amendment. Indeed, FDC officials judicially admitted this in *Keohane I. Keohane I*, 952 F.3d at 1266. Circuit courts have consistently recognized this. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (collecting cases).

2.     Defendants Have Acted With Deliberate Indifference to Serious Medical Needs.

Defendants argue there is no denial of medically necessary care because, they assert: (i) accommodations would be provided to a patient if deemed medically necessary for them, and (ii) there is no evidence that accommodations are medically

24

necessary care and patients with gender dysphoria are doing well without accommodations. The evidence described above contradicts these assertions. Defendants also misread *Keohane I* as governing the outcome of this case.

> a.   *The Evidence Shows That Defendants Prohibit Social Transition Accommodations, Regardless of Medical Necessity.*

Defendants claim that FDC does not have a blanket ban on social transition accommodations, asserting that they would be provided if a provider deemed them medically necessary for a patient. MSJ at 17.[16] But Plaintiffs have presented overwhelming evidence to the contrary, including:

- FDC documents given to staff and inmates during the roll-out of the new policy made clear that accommodations are no longer permitted.

- FDC officials, including the Chief of Health Services and the Chief of Security, testified that accommodations were not permitted after the policy change.

- Dr. Kline testified that mental health providers were informed accommodations are no longer available and no one told them they could, nevertheless, still recommend them if they deemed them medically necessary.

- FDC healthcare providers testified that they no longer assess patients' need for accommodations because they know they cannot recommend them (but would if they were available).

- The accommodations pass form no longer exists.

---

[16] They simultaneously argue that accommodations "do not qualify as medically necessary treatment for gender dysphoria," MSJ at 18, which is addressed in IV(A)(2)(b), *infra.*

25

*See* II(B)(3), *supra*.

        b.      *Substantial Evidence Demonstrates That Social Transition Accommodations are Medically Necessary Care for Plaintiffs and Other Class Members.*

Defendants assert that plaintiffs "possess no evidence that social accommodations constitute medically necessary treatment for gender dysphoria," MSJ at 2. This is pure fiction.

Dr. Karasic's expert reports discuss the research and decades of clinical experience demonstrating that social transition can significantly relieve gender dysphoria, and the fact that social transition is a widely accepted part of treatment. Karasic Report ¶¶ 26, 28, 68-69; **Exhibit 7**, Karasic Rebuttal ¶¶ 27-28. Dr. Karasic also describes the serious negative impact it can have on prisoners with gender dysphoria when they cannot dress and groom consistently with their gender identity, including suicidality and self-harm. Karasic Report ¶¶ 80-82.

Dr. Evans' psychological evaluations of the Plaintiffs concluded that social transition accommodations are medically necessary for them, noting that the withdrawal of accommodations has exacerbated their gender dysphoria and worsened their other mental health symptoms. **Exhibits 36-40**, Evans Reports. ████

████████████████████████████████████

██████████████████████ **Exhibit 40**, Evans Jackson Report, at 7, 19; **Exhibit 38**, Evans Diamond Report, at 18.

This evidence alone would be sufficient to deny summary judgment, but contrary to Defendants' suggestion, Plaintiffs have provided a great deal of evidence beyond the opinions of their experts supporting the medical necessity of accommodations for plaintiffs and other class members, including:

- Dr. Kline acknowledged that outside of prison, social transition is recommended to alleviate gender dysphoria.

- Centurion's guidelines recommend social transition accommodations as gender dysphoria treatment.

- FDC and Centurion officials testified that accommodations were only provided under the prior policy when recommended by a psychologist after determining that accommodations would likely alleviate the patient's gender dysphoria.

- Dr. Kline and mental health providers testified—and medical records showed—that accommodations did, in fact, alleviate gender dysphoria and improve mental health for some patients.

- Centurion and mental health providers testified—and medical records confirm—that some patients experienced decompensation of their mental health as a result of losing accommodations.

- Dr. Kaliebe admitted that some Plaintiffs experienced mental health decompensation after loss of accommodations.

- FDC officials testified that after a transgender woman died by suicide, the psychological autopsy indicated that distress from the loss of accommodations was a factor that contributed to her decision to end her life.

*See* II(C), *supra*.[17]

---

[17] Defendants assert that WPATH and its Standards of Care for the treatment of gender dysphoria have been discredited. MSJ at 33. That assertion is disputed, Karasic Report ¶¶ 47-52; **Exhibit 7**, Karasic Rebuttal ¶¶ 37-46, but also irrelevant

While Defendants assert that gender dysphoric inmates are "doing very well" since accommodations were withdrawn, MSJ 18-19, plenty of evidence set forth above says otherwise.[18]

Defendants attempt to sidestep the evidence by arguing that regardless of the impact of social transition accommodations and lack thereof on patient health, they are not "treatment" because "[o]utside the prison context, an individual could simply adopt the clothing and grooming styles of his or her choice." MSJ at 31 (citing Doc. 154-6, at 104:15-106:6, Dr. Martinez's testimony that "you don't need a prescription to wear a dress"). This is legally incorrect, as shown above. *See supra* at 26-27.[19] Even Defendants' expert recognized that other healthcare accommodations that do not require a doctor's prescription outside of prison, such as orthopedic shoes, a low bunk for people with physical limitations, or a special diet for diabetes, can be medically necessary. **Exhibit 3**, Kaliebe 112:22-113:2, 115:9-15; **Exhibit 5**,

---

as Plaintiffs have presented many sources of evidence showing the medical necessity of social transition and accommodations to allow for social transition in prison.

[18] Plaintiffs have also presented evidence of the circumstances surrounding the change of policy indicating that it was prompted by politics. *See* II(B)(2), *supra*. Plaintiffs need not show that it was politics that prompted the policy change to prevail on their claim, but showing that "a treatment decision was motivated by something other than medical judgment" can support a deliberate indifference claim. *Giraldes v. Roche*, 357 Fed. Appx. 885, 886 (9th Cir. 2009).

[19] Defendants' attempt to distinguish these cases by saying "no treating provider found social accommodations medically necessary for any class member," MSJ at 36, is preposterous given that healthcare providers have been told accommodations are not available. *See supra* at 14.

Centurion 19:25-20:14. Centurion recognizes that providing social transition accommodations is a "treatment intervention." **Exhibit 4**, FDC_OFFICIALS_037250 at 37252.

Defendants further try to dismiss the evidence by stating that "FDC providers" consider social transition accommodations "helpful" or "psychologically pleasing," but they "do not qualify as medically necessary treatment for gender dysphoria." MSJ at 18. This is sophistry. Providers observed that this intervention significantly improved some inmates' mental health and that taking accommodations away resulted in mental health decompensation; for one inmate, it contributed to her suicide. The term "medically necessary" was not in their parlance in patient evaluations, but they were describing medically necessary care. *See* **Exhibit 20,** Martinez 162:25-163:21 (explaining that treatment is deemed "medically necessary" where evidence "demonstrates that [the] individual would benefit from initiation or continuation of" the treatment). The distinction Defendants are making is a word game that trivializes the seriousness of the harm they are causing.

Defendants also appear to argue that while social transition might be medically necessary in the community, it cannot be in prison. MSJ at 20. This is illogical. An intervention that is medically necessary to alleviate a condition does not become unnecessary simply because a patient is incarcerated. While the prison

29

setting might impact the way a treatment is provided, it does not affect a person's medical need for it.

Finally, Defendants appear to suggest that because they are providing other treatment for gender dysphoria, they have satisfied the requirements of the Eighth Amendment. MSJ 30. That is not the law. *See, e.g. Roe*, 631 F.3d at 857–58 ("a defendant's showing that a plaintiff received *'some'* treatment does not resolve the issue"). If a patient has a serious condition that *cannot* be adequately addressed without a particular treatment, the fact that other treatments may also be provided does not mean a prison can deny the alternative or additional treatment they need. *See, e.g. De'Lonta*, 708 F3d at 526 (that defendants "have provided De'lonta with some measure of treatment to alleviate her GID symptoms" does not mean they necessarily provided her with "constitutionally adequate treatment"); *Hicklin*, 2018 WL 806764, at *12 (the fact that "some treatment" was provided does not end the inquiry; the "treatment must . . . be adequate to address the prisoner's serious medical need."). The evidence here shows that Plaintiffs and other class members are not being adequately treated, as their mental health significantly deteriorated when accommodations were withdrawn. *See* II(C), *supra*.

> c.      *Defendants Misconstrue Keohane I.*

Defendants suggest that the Court of Appeals' decision in *Keohane I* supports summary judgment in their favor. It does not.

In *Keohane I*, the plaintiff brought an individual claim in 2016 that included a challenge to the FDC's refusal to provide her social transition accommodations, which she claimed were medically necessary to address her gender dysphoria. The court pointed to testimony from an FDC psychologist who evaluated her and concluded that she did not have a medical need for accommodations. The court, citing disagreement between FDC's treatment team and Plaintiff's expert "as to the proper course of treatment for Keohane's gender dysphoria," *Keohane I*, 952 F.3d at 1274, noted that it's well-established that a "difference in medical opinion between the prison's medical staff and the inmate as to the latter's . . . course of treatment" does not support an Eighth Amendment claim. *Id.*

Here, Plaintiffs challenge a blanket policy that precludes social transition accommodations regardless of an individual's medical need. They and other class members previously received accommodations because a psychologist recommended them after determining they would likely help alleviate their gender dysphoria. *See supra* at 6-7. FDC withdrew the accommodations *en masse* pursuant to the HSB, without assessing the needs of any individual inmate. *See supra* at 14-15. Those accommodations had, in fact, alleviated gender dysphoria and significantly improved mental health, and their loss has caused a worsening of their mental health. *See* II(C), *supra*.

31

Here, unlike in *Keohane I*, there is no disagreement between class members and their healthcare providers about the appropriate course of treatment for them; their healthcare providers agreed that accommodations were indicated, but have been precluded from providing them. *See supra* at 14-15.

*Keohane I* did not hold that social transition accommodations are *never* medically necessary,[20] and did not endorse a blanket ban on them. It merely held that plaintiff's medical providers determined that they were not medically necessary *for her* at that time and "her current regimen is sufficient to treat her gender dysphoria." *Keohane I*, 952 F.3d at 1274, 1277.[21] Indeed, it made clear, in discussing an earlier FDC policy prohibiting the initiation of hormone therapy, that "a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of "deliberate indifference." *Keohane I*, 952 F.3d at 1266-67. The Court added that it was "unsurprising[]" that "other courts considering similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment." *Id.* at 1267.

---

[20] Notably, FDC had argued for such a rule, *see, e.g.*, *Keohane I*, No. 18-14096, FDC Brief (11/19/18) at 19, which the Eleventh Circuit declined to endorse.

[21] Defendants' reliance on *Bayse v. Ward*, 147 F.4th 1304 (11th Cir. 2025), is similarly misplaced. There, the court rejected plaintiff's deliberate indifference claim because the plaintiff presented no evidence that social accommodations were medically necessary for her. *Id.* at 1313.

32

Notably, two of the cases cited by the Court—*Hicklin* and *Soneeya*—addressed social transition accommodations.

Defendants misconstrue *Keohane I* to mean that disagreement or debate *within the medical profession* about the appropriateness of a particular treatment *in general*—as opposed to disagreement about the appropriate treatment for *a particular inmate*—supports banning the treatment in prisons regardless of an individual's medical need. It does not. The "difference in medical opinion" at issue in *Keohane I* was between the prison's medical staff and the inmate. *Keohane I*, 952 F.3d at 1274.

*Gibson v. Collier*, 920 F.3d 212, 224 (5th Cir. 2019), cited by Defendants, is an outlier in suggesting that if a treatment is not "universally accepted" in the medical field, that precludes a deliberate indifference claim regardless of "evidence of [plaintiff's] personal medical need" for the treatment. *See also id.* at 225 (disagreeing that "the Eighth Amendment requires individualized assessments"). As noted in the dissenting opinion, such a standard is not supported by any precedent and is "an unfounded qualification to the well-known deliberate indifference standard." *Id.* at 229, 235 (Barksdale, J., dissenting). Notably, *Gibson* relied on a mischaracterization of *Kosilek*, 774 F.3d 63, suggesting that the First Circuit agreed that the Eighth Amendment tolerates categorical bans on treatment without regard to individual need if there is a lack of consensus in the medical community about the

33

appropriateness of the treatment. *Kosilek* said no such thing. In that case, the denial of surgery was based on evaluations of the plaintiff and the court was explicit that the decision was not "a de facto ban against [sex reassignment surgery] as a medical treatment for any incarcerated individual," as any such "blanket policy" "would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs." *Kosilek*, 774 F.3d at 90-91; *see also Edmo*, 935 F.3d at 797 (noting that *Gibson* "contradicts and misconstrues the precedent it purports to follow: *Kosilek*" and "disregarded [*Kosilek*'s] words of warning" against reading the case as supporting blanket bans on treatment); *Flack v. Wisc. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1017 (W.D. Wis. 2019) (similar critique of *Gibson*).

In any case, even if debate or differing views within the medical profession about the appropriateness of a particular treatment could justify categorically denying the treatment from prisoners regardless of individual medical need, which it cannot, Plaintiffs presented substantial evidence that social transition is widely accepted as part of treatment for gender dysphoria. Karasic Report ¶ 28; **Exhibit 2**, Kline 50:15-25.

### B. The Court Should Dismiss the Hormone Therapy Subclaim Without Prejudice.

The second part of Plaintiffs' challenge to the HSB related to hormone therapy. As written, the HSB makes access to hormone therapy an impossibility. One

34

insurmountable barrier was the HSB's provision that "[i]n rare instances deemed medically necessary," a variance to receive hormone therapy may be approved, but only if "[t]he treating physician can demonstrate with *documented evidence* that such treatment may improve clinical outcomes by *treating the etiological basis of the pathology*." *See* HSB at §IX.C.1 (emphasis added). "Pathology" here refers to gender dysphoria, and because the "etiological basis" of gender dysphoria is unknown, **Exhibit 20**, Martinez 100:5-9; **Exhibit 1**, FDC 50:3-5; **Exhibit 2**, Kline 206:7-13, no such "documented evidence" exists, **Exhibit 1**, FDC at 181:2-12, making this an impossible standard to meet. Centurion's Statewide Director of Mental Health also read this language as an "impossible bar." **Exhibit 23**, Watkins-Ferrell 205:21-206:8.

However, discovery (largely completed following the Court's ruling on class certification) has shown that neither FDC nor Centurion is enforcing the HSB as written with respect to hormone therapy. **Exhibit 1**, FDC at 182:18-184:10; **Exhibit 2**, Kline 206:7-208:23; **Exhibit 5**, Centurion 75:1-77:4; **Exhibit 23**, Watkins-Ferrell 204:21-205:18. And Centurion has agreed to pay for hormone therapy, which established a work-around to the state funding restriction. **Exhibit 5**, Centurion 58:2-25. Moreover, FDC has approved 73 of the 79 variance requests that it considered so far. MSJ at 12.

Defendants have also represented to the Court in their Motion that they "intend to continue providing hormones as long as they remain medically necessary and not contraindicated." *Id.* at 25. As to Plaintiffs themselves, three have received variances while the other two continue to receive hormones while awaiting their variance determinations. *Id.* at 12-15.

In light of these circumstances, Plaintiffs agree that there does not appear to be any "certainly impending" risk of losing their hormone therapy, *see* **Doc. 125** at 4 (citing *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 409-410 (2013)), constituting a "concrete and particularized injury." *Id.* at 6. The appropriate course therefore is for the Court to dismiss this subclaim without prejudice for lack of subject matter jurisdiction, and the Court need not address its merits. *See, e.g.*, *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1229 (11th Cir. 2025) ("Typically, where standing is lacking, a court must dismiss the plaintiff's claim without prejudice.") (citation omitted); *Gardner v. Mutz*, 962 F.3d 1329, 1339 (11th Cir. 2020) ("because standing to sue implicates jurisdiction, a court *must* satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim") (citation omitted; emphasis in original).

Plaintiffs do not respond to—and it would be inappropriate for the Court to address—the merits of Defendants' contentions regarding hormone therapy raised in Argument Section I.B of their Motion. Plaintiffs reserve their right to address the

36

merits of their individual claims related to hormone therapy should FDC change its position.

## V.    Conclusion

For the foregoing reasons, the Court should deny summary judgment on the social accommodations subclaim and dismiss the hormone therapy subclaim without prejudice.


Dated: March 16, 2026

_____/s/ Daniel B. Tilley_____
Samantha J. Past (FBN 1054519)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
spast@aclufl.org
dtilley@aclufl.org

Li Nowlin-Sohl (*pro hac vice*)
Leslie Cooper
**ACLU Foundation**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org

Anthony Anscombe (*pro hac vice*)
George Desh (*pro hac vice*)
Sadaf Misbah (*pro hac vice*)
Sarah Norise (*pro hac vice*)
**Steptoe LLP**
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Tel. (312) 577-1300
aanscombe@steptoe.com
gdesh@steptoe.com
smisbah@steptoe.com
snorise@steptoe.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 56.1 and 7.1(F), the undersigned hereby certifies that this Memorandum in Opposition to Defendants' Motion for Summary Judgment contains 7,959 words and does not exceed 8,000 words.

<u>        /s/ Daniel B. Tilley        </u>