# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:24-cv-00434-AW-MAF

REIYN KEOHANE, et al.,

    Plaintiffs,

vs.

RICKY D. DIXON, et al.,

    Defendants.
_____/

DEPOSITION OF
DANNY MARTINEZ, M.D.
VOLUME 1 OF 2

DATE:            October 14, 2025
TIME:            11:39 a.m. - 6:24 p.m.
PLACE:           Akerman LLP
                 201 East Park Avenue, Suite 300
                 Tallahassee, Florida 32301

Examination of the witness taken before:

JEFFREY R. BABCOCK
Stenographer



many more inmates with those three combination of diagnoses than we have gender dysphoric patients.

BY MR. ANSCOMBE:

Q.  Well, those three conditions are expected attributes of gender dysphoria; correct?

MR. STEELY:  Object to form.

BY MR. ANSCOMBE:

Q.  Well, certainly depression and anxiety?

A.  So, again, if you're talking causation, no.  No. Again, if you look at case studies of this patient population, many of them suffer from depression, I would say almost all of them suffer from anxiety, and many of them also suffer from post-traumatic stress disorder, PTSD.

Q.  Do social or media influences cause gender dysphoria?

A.  So this does not relate to the correctional setting, but in the community setting, we have had what is called -- a phenomenon occur called rapid onset gender dysphoria, okay?  And that is young people communicating to each other over social media that, collectively, all of the sudden, decide they're gender dysphoric and they need to be treated immediately.

Q.  But that doesn't occur in the prison community; correct?





A.  They don't have access to that type of communication.

Q.  Do you agree that the etiologic basis of gender dysphoria is unknown?

A.  Yes.

Q.  Do you agree that gender dysphoria is a serious medical condition?

A.  Yes.

Q.  Is gender dysphoria a serious mental health condition?

A.  I don't see how you could divorce the mental health aspect of gender dysphoria.  Now, there are those who belong to the WPATH community that vociferously argue otherwise.  From everything that I have read, I do not know -- if an individual's born with normal physiology and they're male, but they feel that they identify as female, then in my opinion -- and this is my own opinion, not FDC's opinion, my own opinion -- I do not see how you could remove this condition from the psychiatric realm.

Q.  Well, the condition that I referred to is gender dysphoria, and I guess what I'm trying to find out is whether -- you've agreed that it's a serious medical condition and, you know, some might suggest that it was a mental health condition.  And do you agree that it's also a mental health condition?



A.  I believe it is a mental health condition.

Q.  And do you believe it is a mental health condition that can have serious impacts on patients who have it?

A.  Yes.

Q.  Now, you've overseen -- or actually, I won't say "overseen," but hormone therapy has been delivered to inmates at -- within the Florida Department of Corrections for the whole time that you've been with FDC; correct?

A.  Yes.

Q.  What does -- what is the reason why gender dysphoric patients want hormone therapy?

MR. STEELY:  Object to form.

THE WITNESS:  If it's a male, who we would then refer to as a transgender female, mainly, it would be to acquire attributes of a more feminine figure.

BY MR. ANSCOMBE:

Q.  And what about a female who wants to receive male hormones, why would a female want to receive male hormones?

MR. STEELY:  Object to form.

THE WITNESS:  Which we refer to as a transgender male, same -- the same exact reason:  They would want to assume the body morphology of a more --



similar to a male.

MR. ANSCOMBE:  Okay.

THE WITNESS:  By "body morphology," I mean physical anatomic structure.

BY MR. ANSCOMBE:

Q.  And is it your belief that the reason why a transgender man or a transgender woman would want to receive hormone therapy is to reduce the disparity between their gender identity and the gender or the sex that they were assigned at birth?

MR. STEELY:  Object to form.

THE WITNESS:  I'm not sure I understood that.

BY MR. ANSCOMBE:

Q.  All right.  A male patient -- or let's say a person born female who is gender dysphoric wants to look and feel like a man; correct?

MR. STEELY:  Object to form.

THE WITNESS:  Yes.

BY MR. ANSCOMBE:

Q.  Right.  And hormone therapy is one of the ways that they can accomplish that; correct?

A.  So they are never going to become male.

Q.  I understand that, and I think they understand that.  My question is, is the reason that a female-born gender dysphoric patient would want male hormones is so



management of transgender inmates.

Did I read that correctly?

A.  You have read that correctly.

Q.  Right below that, there is a definition of "gender dysphoria."  And this section says, Refers to discomfort or distress caused by a marked difference between an individual's expressed/experienced gender and the gender that others would assign to him or her.  A DSM-5 diagnosis of gender dysphoria requires the condition be present for at least six-month duration and causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Did I read that correctly?

A.  You have read that correctly.

Q.  And is that consistent with the definition of "gender dysphoria" that you gave me earlier?

A.  For the most part.

Q.  All right.  I'd like you to go here to page 5.

A.  Yes.

Q.  All right.  In the middle of the page, there's a Section 4, and that is entitled, General Treatment Principles.  Did I read that correctly?

A.  Yes.

Q.  All right.  So right below that in Subsection (a,) it states, Inmates diagnosed with gender dysphoria



shall have access to, 1, appropriate mental health treatment that includes, but may not be limited to, ambivalence and/or dysphoria regarding their gender identity and assists in better adjustment to incarceration.

Did I read that correctly?

A.  Yes.

Q.  Number 2, Evaluation for treatment hormone -- or I'm sorry, 2, evaluation for hormone therapy treatment; and 3, other treatment and accommodations, although limited to those determined to be medically necessary by the Gender Dysphoria Review Team.

Did I read that correctly?

A.  Yes.

Q.  All right.  And so isn't this telling you that accommodations can be determined to be medically necessary by the Gender Dysphoria Review Team?

A.  With the knowledge that was available to the then-Gender Dysphoria Review Team -- and again, this would be back in 2017 -- yes.

Q.  If you look at Section (b) below that, there's also a statement, However, treatment and accommodations may be provided within correctional facilities to lessen gender dysphoria.

Did I read that correctly?



ESQUIRE
DEPOSITION SOLUTIONS

A.  Yes.

Q.  And doesn't that tell you that accommodations were part of treatment to lessen gender dysphoria?

MR. STEELY:  Object to form.

THE WITNESS:  Since 2017, referring to item 4(a)3, and 4(b), it has not been proven to be medically necessary to have said accommodations.

BY MR. ANSCOMBE:

Q.  Move to strike the answer as non-responsive.

Dr. Martinez, I'm asking you doesn't that tell you that in 2017, that accommodations were regarded by Florida Department of Corrections as medically necessary as determined by the Gender Dysphoria Review Team?

A.  I believe I couched my answer, within the context of 2017, I earlier replied in the affirmative.

Q.  And so the answer would be affirmative here again?

A.  In 2017, that was the thinking of the Gender Dysphoria Review Team, yes.

Q.  All right.  Thank you.  You can put that one to the side.  All right.  Handing you what's been marked as Exhibit 3.  Dr. Martinez, do you recognize this document?

(Exhibit Number 3 was marked for identification.)

THE WITNESS:  I do.



BY MR. ANSCOMBE:

Q.  What is it?

A.  It is Procedure Number 403.012 issued July 13th, 2017, with effective date November 13th, 2019.

Q.  Do you recognize this as the 2019 revision of the 2017 policy?

A.  I will take your word for it.  I was not -- again, I began with the Department in August of 2020.

Q.  Is this the version of 403.012 that was in effect when you started?

A.  Yes.

Q.  All right.  I'd like to direct your attention to several portions of this.  Do you have an understanding as to who it was that authored this policy?

A.  My understanding is that the major contributors to this policy were both the former Chief of Medical -- Mental Health Services, Dr. Dean Aufderheide, and the former Assistant Chief of Mental Health Services, Dr. Tammy Lander.

Q.  And do you know whether there was input from anybody else?

A.  Again, I -- I cannot.

Q.  All right.  So at the top of page 2, do you see the section entitled Purpose?

A.  Yes.



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:24-cv-00434-AW-MAF

REIYN KEOHANE, et al.,

    Plaintiffs,

vs.

RICKY D.DIXON, et al.,

    Defendants.
_____/

DEPOSITION OF
DANNY MARTINEZ, M.D.
VOLUME 2 OF 2

DATE:              October 14, 2025
TIME:              11:39 a.m. - 6:24 p.m.
PLACE:             Akerman LLP
                   201 East Park Avenue, Suite 300
                   Tallahassee, Florida 32301

    Examination of the witness taken before:

JEFFREY R. BABCOCK
Stenographer



Q. Well, sir --

A. The researcher who was commissioned -- I don't mean to cut you off, I apologize. The researcher who was commissioned by WPATH at -- I believe her name is Dr. Anderson at Johns Hopkins University, published a big part of the -- her disagreement of WPATH's squashing her results.

Q. You've talked about randomized controlled clinical trials; right?

A. I believe I mentioned it once.

Q. Have you ever designed any?

A. Have I ever designed a randomized -- no. No, sir, I've not.

Q. Would it be ethical to do a randomized controlled study where half of the study population is not -- is assigned to receive something other than what is regarded as the standard of care?

        MR. STEELY: Object to form.

        THE WITNESS: When it comes to human experimentation, it would be unethical.

BY MR. ANSCOMBE:

Q. Thank you. All right. Let's --

A. Again, that would not be how you would do it in this case. You would do -- you would repeat the Cass Report and you would repeat the longitudinal study that



was done in Sweden starting today, and then taking a look at it at whatever end point you want:  Ten years from now, eight years from now, whatever the case.  You'd repeat either or both of those studies to get a definitive answer, and those studies simply have not been done. Unfortunately, the Swedish study was from -- followed patients from two thousand -- I'm sorry, 1973 to 2003.

Q.  Did you show drafts of forty -- I'm sorry, did you show drafts of HSB 15.05.23 to anybody other than Dr. Klein?

A.  Not to my knowledge.

Q.  Did you ever share that policy with Centurion?

A.  No.

Q.  Did you consult Centurion in any way over the creation of that policy?

A.  Only the specific examples that I gave you where I asked Dr. Klein to find studies for autism -- screen and a confirmatory study -- and to find studies for malingering, which were the MFAST and the MMPI.

Q.  And if Centurion provided any comments on your policy, you never received those; is that correct?

A.  They were never part of the process other than the two examples that I just told you now.

Q.  Did you ever see any suggested revisions from Centurion?



A.  That's not their -- that's not their role or their policy.

Q.  And that wasn't my question.  My question was did you ever see any suggested revisions from Centurion?

A.  And I answered the question and I'll repeat my answer:  That's not the procedure or the policy of Florida Department of Corrections.  They do not edit any of our HSBs or policies.  By contractual agreement, they must comply with all of our procedures and HSBs, and they do not edit any of them.

Q.  Sir, did you ever see a version of your policy that was edited by Centurion?

A.  No.

Q.  And is that information that you didn't want to have just from the standpoint of people who practice in the medical field?

MR. STEELY:  Object to form.

THE WITNESS:  Is that something --

BY MR. ANSCOMBE:

Q.  Well, in other words, if Centurion had suggestions on your policy, would their comments or their input matter to you in any way?

A.  No.  And the same would be true for any other procedure or HSB that we have.

MR. ANSCOMBE:  All right.  Could we pause



long enough for a quick time check?

(Brief pause.)

MR. ANSCOMBE:  All right.  Back on the record.

MR. STEELY:  Can I get a copy?

MR. ANSCOMBE:  Oh, yeah, sorry.

THE WITNESS:  Should this be 10?

MR. STEELY:  Yeah, it should be 10.

MR. ANSCOMBE:  All right.  I'm confused here. Let me put 10 over that.

(Exhibit Number 10 was marked for identification.)

BY MR. ANSCOMBE:

Q.  Dr. Martinez, if you could put that on top?

A.  Oh, okay.

Q.  All right.  Dr. Martinez, do you recognize this document?

A.  I do.

Q.  What is it?

A.  It is HSB 15.05.23.

Q.  And is this the final version?

A.  I'm just reviewing my -- the annotations that I wanted on the final product.  Yes, I believe this is -- this is the final product.

Q.  All right.  Dr. Martinez, the purpose of this



a whole because you're losing them by the time you're publishing.  That is a tremendous weakness.

Nevertheless, there have been studies of this format that claim that this treatment is able to stabilize these patients from a mental health perspective.  So that's what's out there.  That's what we have -- we have to accept that this is what they've been able to provide and that's what out there.

Q.  Do any of the studies cited by Centurion identify the etiologic basis of gender dysphoria?

A.  No, but there are a variety that speculate.

Q.  And do the studies cited by Centurion demonstrate that the mechanism of action by which clinical outcomes are improved, you know, go to the etiology of gender dysphoria?

A.  Again, you've lost me with "mechanism of action." We apply that to medications.  So can you state that another way?

Q.  Do any of the studies that Centurion has provided demonstrate that treatment improves clinical outcomes by treating the etiologic basis of gender dysphoria?

A.  So you have studies that try to determine the etiology of gender dysphoria, and you have studies that have shown claimed improvements in terms of clinical outcomes.  But that I'm aware, of one study that tries to



prove both, no, that hasn't come across my desk, no.

Q.  So as of today, you're not aware of Centurion giving any citations to literature that shows that the administration of hormone therapy improves clinical outcomes by treating the etiologic basis of gender dysphoria; correct?

A.  I think I answered that question, I think.

Q.  And the answer is no; correct?

A.  That show both in one study, no?  Some have tried to identify cause, some have tried to demonstrate the clinical outcomes have improved as a result of the treatment, but any one study proving both, I'm not aware.

Q.  Now, if FDC was actually enforcing this policy as written, isn't it true that FDC wouldn't have granted any variances --

MR. STEELY:  Object --

MR. ANSCOMBE:  -- as of today?

MR. STEELY:  Object to form.

THE WITNESS:  No, I don't come to that conclusion.

BY MR. ANSCOMBE:

Q.  All right.  Well, one reason to come to the conclusion is that, as you've said, you're not aware of anything in the U.S. Constitution that requires FDC to provide hormone therapy; correct?



MR. STEELY:  Object to form.

THE WITNESS:  I said that earlier, yes.

BY MR. ANSCOMBE:

Q.  By the way, were you the one who wrote in the words, quote, "And (2,) if necessary, to comply with the U.S. Constitution or court decision"?

A.  It would have been either myself or Dr. Klein.

Q.  And is Dr. Klein a scholar on the U.S. Constitution?

A.  No.  She is a clinical psychologist, and again, she's the Chief of Mental Health Services.  But my recollection is there was not one but two possible cases regarding transgender issues that could have been heard by the court.  I don't know if they decided not to take them up, but at the time, there were -- if memory serves correct, there were at least two that were directly related to transgender care.

Q.  FDC has issued 67 variances so far, even though there's nothing in the U.S. Constitution that requires it to provide that care; correct?

MR. STEELY:  Object to form.

THE WITNESS:  Yes.

BY MR. ANSCOMBE:

Q.  Okay.  And it's also provided 67 variances, even though Centurion has not provided it with any study that



demonstrates an improvement in clinical outcomes as a result of treating the etiologic basis of gender dysphoria; correct?

MR. STEELY:  Object to form.

THE WITNESS:  They have scoured the literature, and what they have been able to produce are studies of not great quality demonstrating improvement in outcomes, and other studies pointing at possible causes.

BY MR. ANSCOMBE:

Q.  So those studies don't meet the standard as written here; correct?

MR. STEELY:  Object to form.

THE WITNESS:  They are providing us with what is available in the clinical literature.

BY MR. ANSCOMBE:

Q.  And what they have provided does not, in fact, meet the standard of demonstrating that it improves clinical outcomes by treating the etiologic basis of gender dysphoria --

MR. STEELY:  Object to form.

BY MR. ANSCOMBE:

Q.  Correct?

A.  Again, what they have provided are clinical studies that show benefit in terms of health outcomes from



the treatment, and they have provided other studies that point towards possible causes of gender dysphoria; but no single study that would answer the question both.  And you've asked me the same question now I think three times, and I can't imagine that any one study would prove both.

Q.  Okay.

A.  So they have given us what is available, and again, on a case-by-case basis, we have reviewed these gender dysphoric patients' medical record and come to those determinations.

MR. ANSCOMBE:  I'd like to take a break.

(Brief recess.)

THE WITNESS:  I need to submit a correction.

MR. ANSCOMBE:  All right.  Let's just wait one minute here before we go back on the record.

(Brief Pause.)

BY MR. ANSCOMBE:

Q.  All right.  We're back on record.  Dr. Martinez, do you wish to change your testimony?

A.  Yes, I do.  I had mentioned three experts in the field -- Steven Levine, James Cantor -- and I misspoke when I mentioned Karisich.  It's not Karisich.  It's Kaliebe -- that's K-a-l-i-e-b-e -- as the psychiatrist who recommends specifically cognitive behavioral therapy as the main treatment for gender dysphoria.



Q.  Would you agree that Dr. Karisich is a physician of staggering genius?

MR. STEELY:  Object to form.

THE WITNESS:  That's -- you know, everyone has their own opinion.

MR. ANSCOMBE:  All right.

THE WITNESS:  I'll leave it at that.

BY MR. ANSCOMBE:

Q.  All right.  People who come in to FDC under the new policy, without being on hormone therapy, have to undergo a year's worth of psychotherapy before they can be eligible for a variance; correct?

A.  That is correct.  And again, this is something that we adopted from Washington state's department of corrections.  They appear to have been able to reduce the number of inmates that were malingering by doing that and some other psychological testing.

Q.  How do you know that?

A.  They spoke at the National Commission of Correctional Health Care in 2022.

Q.  Do you recall the name of whoever gave that presentation?

A.  I do not, but I believe it was the equivalent -- this individual had the equivalent position as Dr. Klein in our organization.  He was the chief mental health

