# EXHIBIT 2

# REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


REIYN KEOHANE, et al.,

            Plaintiffs,

vs.                                    CASE NO. 4:24-cv-434-AW-MAF

RICKY D. DIXON, in his official
capacity as Secretary of the
Florida Department of Corrections,
et al.,

            Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


                    DEPOSITION OF

              SUZONNE KLINE, PSY.D.


              (VOLUME I  Pages 1-136)


        TAKEN ON BEHALF OF THE PLAINTIFFS

              November 13, 2025

            9:54 a.m. - 12:37 p.m.




      (All parties appeared via Zoom conference)






              Laura Leal, Court Reporter



Sorry, my CVS glasses are not reaching that far.

Q.   Oh.  Let's make sure we can find a way for you to see it.

MS. COOPER:  Is there something we can do to bring the screen closer for Dr. Kline?

MR. STEELY:  Yeah, she just zoomed so that should help.

BY MS. COOPER:

Q.   Okay.  Can you see that, Dr. Kline?

A.   Yes.

Q.   Is that the prior Procedure 403.012?

A.   Correct.

Q.   Okay.  And this was the policy or procedure that was in place prior to the change in September 2024, correct?

A.   Yes.

Q.   Okay.  So you - for the first two years or so of your time as Chief of Mental Health, this was what was in place; is that right?

A.   Correct.

Q.   And under this policy or procedure, it provided that hormone therapy could be provided to patients when deemed medically necessary; is



that correct?

A.   Correct.

Q.   Okay.  And that medical necessity was determined by the Centurion providers; is that correct?

A.   Yes, it was determined by the Centurion providers and then we had a gender dysphoria review team that it would have to come up through for us to review and sign off on.

Q.   Okay.  So they would have to - the gender dysphoria review team would have to approve it; is that correct?

A.   Correct.

Q.   Yeah.  And under this prior policy, 403.012, it provided for gender dysphoria accommodations when recommended by the mental health providers; is that correct?

A.   Correct.

Q.   Yeah.  And they could - the mental health providers from Centurion could recommend gender dysphoria accommodations if they felt those could alleviate gender dysphoria for their patients?

A.   Correct.

Q.   And just to be clear to make sure




we're talking about the same thing, those kinds of accommodations included, say, for transgender women, access to female hair length standards; is that right?

A.    Yes.

Q.    And access to female undergarments?

A.    Correct.

Q.    And alternative canteen items?

A.    Correct.

Q.    That would be things like hygiene items; is that right?

A.    Yes.

Q.    And then similarly for transgender men, accommodations could include male undergarments?

A.    Yes.

Q.    Yeah.  And canteen items that would be available for men?

A.    Correct.

Q.    And those accommodations also have to be reviewed by the gender dysphoria review team; is that right?

A.    Yes.

Q.    Okay.  And so you were a member of the gender dysphoria review team; is that right?

comorbidities; is that right?

A.   Correct, correct.

Q.   And treatment for comorbidities could include psychotherapy; is that correct?

A.   Correct.

Q.   Okay.  And in your experience, were inmates with gender dysphoria often provided psychotherapy for comorbidities?

A.   You know, that's a good question.  I'm not sure I could answer that.  I believe they were, but because we were focused on the gender dysphoria, I was - we were focusing on that particular part under the old policy, if that makes sense.

Q.   Uh-huh.

A.   So I would have to go back to each of their charts, but, you know, that's what we do here is provide psychotherapy and psychological mental health treatment.  So I would - I would say yes, that they would be treated for everything that they presented with.

Q.   And understood that - that you can't speak to what was in the particular charts of particular individuals, but just to be clear, nothing about the prior procedure interfered with



treating things like depression or anxiety or other comorbidities with psychotherapy for individuals with gender dysphoria?

A.    You're correct.

Q.    Okay.  Now, I want to ask you about the conversation you had with Tim Fitzgerald in January of 2023 about FDC gender dysphoria policy.  Do you recall that conversation that you had?

A.    I don't recall the conversation.  I saw the e-mail trial, so there must have been some type of conversation, but to be honest with you, I don't recall a conversation.  And then he sent me an e-mail with I believe it was like - it might have even been like the studies from AHCA that I forwarded them, which I normally do, straight to, you know, my counterparts, but I didn't have any discussion after that with him.

Q.    And just for the record, by AHCA, can you say what that stands for?

A.    Agency - wait, Agency For Health Care Administration.

Q.    Thank you.

A.    Okay.  Sorry, yes.

Q.    Okay.  No problem.  I'd like to post



Exhibit - as an exhibit, FDC - actually, before I do that --

MS. COOPER:  For the court reporter, just to clarify, did you mark the prior exhibit as Exhibit 1?

THE COURT REPORTER: Yes, ma'am.

MS. COOPER:  Okay.  Thank you.  So I'd like to mark as 2 Bates No. FDC 43572. Thanks.  And just for the record, I'm going to describe this as an - the top of the document is an e-mail from Suzonne Kline dated 1/13/23 to Stephanie Crawford.  And then if we scroll down, we'll see there are - it's a chain of e-mails included in here. Okay.

(Exhibit 2 was marked for Identification.)

BY MS. COOPER:

Q.   If we can focus in on the January 13, 2023 e-mail from you to Mr. Fitzgerald.

MS. COOPER:  Thank you, Sam.

Oops.  Yes.  Okay.

BY MS. COOPER:

Q.   Is this - this one is Page FDC OFFICIALS 043572.  Is this an e-mail you wrote to Tim Fitzgerald on January 13, 2023?



items, treatment, medicines, interventions that would be required for a certain specific disorder.

Q.    Uh-huh.

A.    If that makes sense.

Q.    Yeah.  So when you were approving the - for example, approving hormone therapy under the prior policy that required a show of medical necessity, you would make the determination that hormone therapy was medically necessary for those patients, correct?

A.    Correct.

Q.    Yeah.  And things could be medically necessary that are not medicines, right?  Like psychotherapy could be medically necessary for a patient with a condition; is that correct?

A.    Correct.

Q.    Yeah.  Okay.  And so what is your understanding of why Dr. Martinez felt that accommodations were not medically necessary for individuals with gender dysphoria?

A.    I think he would be a better one to ask about that, but I know that he has, you know - he just doesn't feel that that's something that's - that's needed in order to treat the



condition and that it might be - I don't want to bring up the term, like psychologically pleasing but not medically necessary.

Q.   Okay.

A.   Like --

Q.   Where did you hear that term, "psychologically pleasing?"  Was that from Dr. Levine?

A.   Well, I first heard it there.  I've actually heard it in other places too.

Q.   Okay.  And I guess, is it your understanding that under - that --

MS. COOPER:  Let me scratch that.

BY MS. COOPER:

Q.   It is your understanding that outside of prison for individuals with gender dysphoria, social transition is a recommended process to help alleviate dysphoria?

A.   Yes, outside of prison.

Q.   And just to be clear that we're talking about the same thing in terms of - by the term "social transition," would that mean things like dressing and grooming and identifying yourself consistent with your gender identity?

A.   Correct.



Q.   Yeah.  Okay.  And so that would be recommended for people outside of prison is your understanding?

A.   Correct.  I mean, I guess depending on who the person was going to, but I'm assuming somebody who ascribes to WPATH or any of the other, yes.

Q.   Yeah.  And that's a commonly accepted treatment for gender dysphoria; is that correct?

MR. STEELY:  Object to form.

THE DOCTOR:  It is common.

BY MS. COOPER:

Q.   Yeah.  Okay.

A.   Yeah.

Q.   But you don't think - but it would not benefit individuals in prison to be able to socially transition the way it would benefit individuals outside of prison?

MR. STEELY:  Object to form.

THE DOCTOR:  No, I don't.  I think that the prison population is fundamentally different.  What I have been looking for, and I would love to see are studies done with samples using incarcerated adults so I'd have better evidence.  The issue is



there's lots of evidence, and it's still a young field, and a field of evidence needs to matriculate, just like the sex offender, you know, 25 areas of expertise of sex offender research and it took decades for it to come to fruition, so it's coming.  It's just at the moment all of the stuff that - that people relay on, and whether we're looking at litigation or this case or even when they're talking about it in research literature, are studies that are done on samples that aren't incarcerated.  So it's like they're trying to extrapolate or generalize to a prison population and there's a lot of challenges in that just by nature of the environment.

BY MS. COOPER:

Q.   Well, I understood that there may be questions about the challenges of implementing accommodations.  Let's put those aside for a moment, but just focus sort on the health care needs.  Is there any reason that the fact that somebody is incarcerated would make them any less likely to benefit from socially transitioning than someone who is not incarcerated?



MR. STEELY:  Object to form.

THE DOCTOR:  I think it depends on a case to case basis.  Yeah, we have lifers in here, right?  I mean, and they deserve the same amount of treatment, if not more, and we have to deal with the realistic adjustment in an incarcerated setting.  So I think that providing people social transition items for transgender females in a male prison is problematic.  It might not be helpful in helping them adjust to their new reality, if that makes sense.

BY MS. COOPER:

Q.   But it might still help alleviate their gender dysphoria?

A.   It could.  It could help.

Q.   Okay.

MS. COOPER:  And if we can go put back up of what I think we're marking as Exhibit 3, FDC 43569.

BY MS. COOPER:

Q.   Okay.  This is an e-mail from Tim Fitzgerald to you dated January 12, 2023.

"Subject:  Transgender Hormone Treatment."  And I just want to read where



this - the substantive paragraph:

"I called you to discuss FDC policy on transgender hormone treatment.  I was asked a question on our policy and need to provide an answer.  Please call me on my cell as I am at out of the office."

Does this help trigger your recollection about the conversation you had or when you had it?

A.   No.  I mean, it helps me put it in perspective that somebody had asked him and he was calling me so that's probably why I was talking about it with him.

Q.   Okay.

A.   But it doesn't - to be honest, it doesn't jog my memory about what specifically we spoke about.

Q.   Did he ask you what was FDC policy on treatment of gender dysphoria?

A.   I'm - I'm assuming based on - I don't know if I want to - I mean, I don't want to speculate, but it would be reasonable based on this, which makes it - puts it in a better context that somebody had asked him and he was asking me.  And so I probably told him what our



policy was and then I followed it up with the data he requested.

Q.   And you focused in on he was asked a question.  What question was he asked?

A.   Well, I don't - I don't know.  It says:

"I was asked a question on our policy."

It's coming from him.  I don't --

Q.   He didn't tell you?

A.   I don't recall what the conversation was.

Q.   Okay.

A.   I genuinely do not recall that conversation with him.

Q.   Do you recall who he was asked the question by?

A.   No.

Q.   Do you recall him mentioning anything about a present inquiry about FDC policy that was made to the Governor's office about transgender prison policy?

A.   No, I don't recall that.  We've had present inquiries before, other inquiries about our gender dysphoria policy.

Q.   Okay.  Did he mention that the Governor's press secretary reached out to FDC about their policy?

A.   I do not recall.

Q.   And then just - I'm trying to see if any of this can help jog your memory.  Did he tell you that Governor Kristi Noem, then Governor Kristi Noem, had publically criticized Florida's policy concerning transgender inmates and the Governor was asking about it?

MS. COOPER:  Object to form.  She said she doesn't recall the conversation.

Just go ahead and answer if you can.

THE DOCTOR:  I don't - I honestly don't recall, but I would want to say given this line of questioning that it would be unusual for Mr. Fitzgerald to give me that kind of information and I don't usually ask him who, you know, he's speaking to, if that makes sense.

BY MS. COOPER:

Q.   Okay.

A.   But I have no direct recollection of this conversation.

Q.   Okay.



A.    I don't believe so.  That's - that's very new information to me.

Q.    Okay.  Okay.  Fine.

A.    He definitely didn't forward that.

Q.    Sorry?

A.    He definitely didn't forward that change to me.  I've never seen that before.

Q.    Understood.  Does that help you remember if he - if he talked to you about this inquiry from the Governor's press office?

A.    Yeah.  I still can't remember the conversation.  I mean, I genuinely can't.  Again, whether it would be - it would be unusual for him to bring me into that kind of politics, if that makes sense.

Q.    So he didn't mention to you any conversations with people with the Governor's office?

A.    No.

Q.    All right.  This is a good - a good moment to take a break.  How much time would you like?  You want a short like restroom break, five minutes or --

A.    Can we do 10?  Would 10 be okay?

Q.    10 is fine, sure.

A.    Okay.  Perfect.

Q.    Okay.  Let's be back at back at, just say for ease, at 11:10.  Okay?

A.    Thank you.

(Recess from 10:59 a.m. - 11:11 a.m.)

BY MS. COOPER:

Q.    So I just want to ask you a few more questions to see if they, you know, help jog your memory about your conversation with Mr. Fitzgerald.  When you talked to him back in January of 2023, did he mention anyone from the Florida Agency For Health Care Administration, or AHCA?

A.    I don't know if he mentioned it in the conversation.  I think he forwarded me something from them that would have been in there.  I don't know if we talked specifically about AHCA.

Q.    Okay.  Did he say anything about state policies prohibiting paying for hormone therapy?

A.    No, I don't believe so, not at that time.

Q.    At some later time did he?

A.    No, I don't believe that was in that discussion at all.

Q.    Okay.  Did he mention anything about

pending legislation to prohibit funding for hormone therapy for gender dysphoria?

A.   Again, I can't recall a conversation, but that doesn't jog my memory at all.

Q.   Did you ever become aware at any point that there was legislation prohibiting state funding of hormone therapy for gender dysphoria?

A.   I became aware of it.  I'm not sure exactly when.

Q.   Okay.  Did you become aware of it before it actually was signed in to law?

A.   Yes.

Q.   How did you learn about it?

A.   I can't remember if it was a discussion conflict that came up or I honestly can't recall how I became aware of it.

Q.   Is that something was discussed between you and Dr. Martinez?

A.   It could have been.

Q.   Yeah.

A.   Or it could have been with Tom Reimers, might have brought it to my attention.

Q.   Yeah.  And Tom Reimers was the predecessor to Mr. Weiss?

A.   Correct.



Q.   Do you remember anything about that conversation?

A.   No.

Q.   Yeah.  Do you remember when it was?

A.   No.  Yeah, I don't want to speculate. I don't remember when that was.

Q.   Do you remember if you -- well, scratch that.  I'll come back to it.

Did Mr. Fitzgerald ask you to make changes in the policy concerning gender dysphoria?

A.   No.

Q.   And did he at any point ever ask you to make changes to the policy concerning gender dysphoria?

A.   No.

Q.   Okay.  Did he ever suggest you might want to make changes in the policy?

A.   No, he never even suggested something like that.  I've never had a conversation with him about changing the policy.

Q.   Okay.  When we were looking at an e-mail between you, an e-mail chain between you and Mr. Fitzgerald earlier, we talked about a portion that discussed you doing legal research,

(Exhibit 7 was marked for Identification.)

BY MS. COOPER:

Q.    And this is a document titled "Florida Medicaid, Generally Accepted Professional Medical Standards determination on the Treatment of Gender Dysphoria, June 2022."  Is this the AHCA report he forwarded to you?

A.    Correct.

Q.    Okay.  And if you go to Page --

MS. COOPER:  Can we scroll to Page 2?

Well, I think that's - the one that's - no, scroll back up.

Thank you, right there.

BY MS. COOPER:

Q.    It references in the middle of the page various attachments, Attachment C, D, E, F, G.  Do you see that?

A.    Yes.

Q.    Yeah.  Are these the expert reports that Mr. Fitzgerald was referring to that are part of this report?

A.    Actually, I don't know what he was referring to.  I just took the report, you know, and read it in its entirety and including the reference section.



MR. STEELY:  And if you can let her scroll all the way down.

MS. COOPER:  Okay.

BY MS. COOPER.

Q.   But these are the attachments to the report that are expert assessments; is that correct?

A.   Correct.

Q.   And you read those as well?

A.   Yeah, I'm trying to - I know I read everything, so I just don't recall.  It's been a while.

Q.   Understood.  Understood.  So in the e-mail when he sent you this, he was - Mr. Fitzgerald was asking you to work with AHCA and their expert in updating FDC policy on trans care, right?

MR. STEELY:  Object to form.

THE DOCTOR:  Correct.

BY MS. COOPER:

Q.   Did you do that?

A.   No.

Q.   Why not?

A.   Because I felt like the information he had given me was sufficient.  I didn't need to



consult with anybody.  And it gave me a list of references that I could start with, again, in reading the research literature.

Q.   And did you understand him to be suggesting that the FDC guidelines should be consistent with the AHCA guidelines?

A.   I think that's fair to say.

Q.   And did you - did you endeavor to make them consistent?

A.   No.

Q.   Why not?

A.   I - I'm always - I always look at the evidence and evidence-based practice.  So I just go where the evidence takes me, if that makes sense.

Q.   Sure.  So you never connected with Acting General Counsel Andrew Sharen about the FDC policy?

A.   No.

Q.   Okay.  Did you talk to any of the AHCA experts when you were - or at any point, I should just ask.

A.   No.

Q.   No?  Okay.  So you - you recognize that Dr. - not doctor, sorry, Mr. Fitzgerald was



suggesting that the FDC policy align with the AHCA policy, but you did not do that because you follow the research.  Just to understand that better, are you saying you disagreed with the conclusions of the AHCA report?

          MR. STEELY:  Object to form, mischaracterization.

          You can answer.

          THE DOCTOR:  No, what I'm trying to say is at no time has Mr. Fitzgerald or anybody in leadership told me what to do with a policy, which I appreciate, because I'd hope that they appointed me to this position because one of my fortes is evidence-based practice in making sure I'm keeping up with the literature, and this is an important topic.  So once he provided this to me, I felt I had all the information I needed.  There was no need for me to consult --

BY MS. COOPER:

     Q.   Yeah.

     A.   I like to be --

     Q.   I'm sorry, can you repeat the last part, I'm sorry, I spoke over you.



Q. Okay. Now, I understand that the gender dysphoria review team stopped meeting in May of 2023; is that right?

A. Correct.

Q. And that was because of the law that took effect as B254?

A. No, actually that was because, I mean, it might have kind of happened together. I didn't feel right - we need to focus our efforts on the new HSB, the new policy that we've been talking about, and I knew that accommodations were probably coming out of that new HSB and I didn't feel that we should continue having these meetings and approving something for somebody that might get taken away --

Q. Okay.

A. 00 you know, within a very short period of time. So we were still operating under the old procedure, but our GDRT meetings were focused where Danny, myself, you know, Dr. Martinez and myself focused more on, again, reviewing as much literature as we could and starting to put pen to paper for the new HSB.

Q. But I understand that the meetings stopped, the GDRT stopped meeting. Is that not



right?

A.   Yes, so that Dr. Martinez and myself could start meeting and - and focusing our energy on - on the new HSB.

Q.   And once the GDRT stopped meeting in May of 2023, initiation of hormones was not approved for any other inmates up until after the HSB was passed in September of '24, correct?

A.   Correct.

Q.   Okay.  So about a year-and-a-half they did not approve - nobody was approved for initiation of hormone therapy?

A.   Correct.

Q.   And that was not because of the statute that prohibited paying for hormone therapy?

A.   No, because we --

MR. STEELY:  Object to form.

THE DOCTOR:  -- we had a bunch that was still taking the hormones, so it never got, you know, interrupted.  They continued to received their hormones.

BY MS. COOPER:

Q.   What was the reason for halting approval for new patients for that



year-and-a-half period?

A.   Because our focus needed to be on the new policy, like I said, and that took a lot of time.  I mean, it was hundreds of hours' worth of work and research and development.  So - and between Dr. Martinez and myself, you know, I have a lot of competing priorities, so I needed to make sure I had enough time focused on this task.  So I could not do both simultaneously, at least not both well.

Q.   Did you stop approving patients for other mental health treatments for other conditions because you were busy with this policy?

A.   No.

Q.   Okay.  Now, so is it because initiation of hormone therapy was halted from May 2023 until the new HSB September 30, 2024, is that the reason Plaintiff Sheila Diamond, legal name Kevin Coleman, had to wait more than a year-and-a-half after her approval to actually start hormone therapy?

MR. STEELY:  Object to form.

THE DOCTOR:  I haven't reviewed her case, so it's possible.



mental health and it's a mental health HSB, so I'm sure a lot of people think probably that I would be the responsible authority.

Q.   Yeah.  Is that unusual to not have a responsible authority for any policy?

A.   I've never created a new policy here, so I'm not sure how that part of it works.

Q.   Okay.  Dr. Martinez mentioned that the medical and mental health leadership began working on changing the gender dysphoria policies in March of 2023.  Is that consistent with your recollection?

MR. STEELY:  Object to form.

THE DOCTOR:  Yes, and I would even say it dates back further.

BY MS. COOPER:

Q.   Okay.

A.   If you're talking about while I've been here or before they were having conversations before I even arrived?

Q.   And in Dr. Martinez's declaration, he said that the medical and mental health teams received approvals to begin drafting the revised policy in May of 2023; is that right?

A.   Correct.



Q.   Yeah.  Who was the approval from?

A.   I think it would have been Mr. Reimers saying that we can go ahead and start drafting it.

Q.   And that was after the HSB 254, the law concerning hormone therapy, went in to effect?

A.   I think they're all - I - I don't know which came first to be honest with, but I feel like they're related just because once that became state law, our prior policy was no longer compliant.  So there might have been, you know, we need to start actually putting words on paper and starting to do - come with a new policy.

Q.   And you say the prior policy was not compliant once the Statute SB 254 took effect, is that actually true or is that just what you thought at the time?

MR. STEELY:  Object to form.

THE DOCTOR:  Well, that's what I thought and still think.

BY MS. COOPER:

Q.   And the reason I'm asking is I understand the initial draft you wrote making no provision for hormone therapy understanding that

that was required by the law, but then you subsequently or ultimately issued a policy that did make provision for hormone therapy in some cases.  So I'm wondering, you know, if that is allowed, why wouldn't the prior policy be compliant too?

A.   Because the prior policy didn't specify out like who's paying for it, that became like the issue, if that makes sense.  So I thought we were no longer allowed to give hormones in general, but it was - you know, and then of course I was informed that it was just about state expenditures, so we didn't have that provision in our old policy.

Q.   But the new policy doesn't specify about who's paying for it, does it, the HSB?

A.   Well, specifies that we're not paying for it, I guess.

Q.   In the policy itself?  I mean, I understand that you're not paying for it, but does - I haven't seen any language if we look at the policy together, because --

MS. COOPER:  Can we put that up?  It's Exhibit - somebody is going to find it before I do.  Li, I'm going to ask if you



**In the Matter Of:**

REIYN KEOHANE vs RICKY D. DIXON

4:24-cv-434-AW-MAF

**SUZONNE KLINE, PSY.D.**

*November 13, 2025*

*Vol. II*



800.211.DEPO (3376)
*EsquireSolutions.com*

and that's why you were able to do it?

A.   I was aware that they were - I wasn't privy to any of that - how that happened, but I believe I became aware of it and was trying to work it back in the policy, yes.

Q.   Do you remember when you became aware that Centurion was willing to pay for hormones?

A.   I don't know when.  I know that Mr. Reimers had a call with Ruth Feltner or it might have been Vicki, and that's all I know, and that he informed me that they're willing to pay.

Q.   How did you react when you heard that?

A.   Well, I was thankful.

Q.   Okay.  So let's make sure I understand how this all unfolded.  I understand from Dr. Martinez's testimony that - that you and he both felt that the research showed hormone therapy could be medically necessary for some patients with gender dysphoria and wanted to be able to continue providing that, but that the statute was a barrier, but when Centurion agreed to pay, that made it possible for you all to continue to provide hormone therapy; is that fair?

MR. STEELY:  Object to form.

THE DOCTOR:  Can you restate the



question and make sure I understand it correctly?

BY MS. COOPER:

Q.   Sure.  I'll break it up.

I understood from Dr. Martinez's testimony, as well as some of your earlier testimony, that the two of you both felt hormone therapy could be medically necessary for some individuals with gender dysphoria, correct?

A.   Correct.

Q.   But you both understood that SB254 was a barrier to continuing to provide that treatment, correct?

A.   It was a challenge, yes.

Q.   And that's why you drafted a policy initially that did not allow for hormone therapy?

A.   Yes, that was us taking it on our initiative, though.  I want to make sure I'm clear that it wasn't like, you know, I sought counsel or something to make that determination. I was trying to come up with something in the parameters that I thought, but, obviously, I - I was misreading --

Q.   Right.

A.   -- the statute from the beginning, so

--

Q.    And but those drafts that did not allow for hormones, they were drafted that way because at that time you understood the statute to prohibit the provision of hormone therapy, correct?

A.    Correct.

Q.    Okay.  But then once you learned that it only provided for --

Sorry, scratch that.

Once you learned that the statute only prohibited payment for hormone therapy and Centurion was willing to pay, you understood that you could continue to provide hormone therapy to inmates, correct?

A.    Correct.

Q.    Okay.  And did FDC ask Centurion to pay for hormone therapy?

A.    I was not privy to that phone call or how - who asked who, so I don't know.

Q.    But your understanding it was a discussion between Mr. Reimers and people at Centurion?

A.    Correct.

Q.    Okay.  Had you discussed what would



have happened if they hadn't agreed to pay?

A.   I don't think we discussed it much.  I was hopping that they would agree to pay and - and was - I don't want to say confident, but fairly confident given that how much hormones cost that they would be willing to do that.

Q.   Because they're not very expensive, you mean?

A.   Correct.

Q.   Going forward, if Centurion decides its no longer willing to pay, would you need to discontinue hormone therapy?

MR. STEELY:  Object to form.

THE DOCTOR:  I wouldn't - I would try and find an alternate solution first.  My first line of defense would not be to just discontinue hormones, no.

BY MS. COOPER:

Q.   You would try to find someone else who could pay for it; is that right?

MR. STEELY:  Objection.

THE DOCTOR:  I would probably seek advice from counsel on how we could try and make this work.

BY MS. COOPER:



gender dysphoria.

Q.   Oh, and I understand how that definitely explains the first sentence, right, the variance should be only considered after the complete of the treatment protocol.  I wasn't clear.  I meant to focus in on the part that says:

"An inmate may be assessed for cross-sex hormone therapy if the treating physician can demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the etiological basis of the pathology."

Each doctor needs to demonstrate that there's a body of research showing that treatment will improve clinical outcomes by treating the etiological basis of gender dysphoria?

MR. STEELY:  Object to form.

THE DOCTOR:  So I --

MR. STEELY:  Go ahead.

THE DOCTOR:  I think the intent was, and the more we go through this I think of tweaking wording so it is more clear, there is obviously a body of research literature, it is what it is, but we individualize all



of our assessments.  So, in other words, what research and research body of different studies apply to this individual that would support use of hormones for their gender dysphoria, if that makes sense.

BY MS. COOPER:

Q.   Okay.  I'm focusing a little bit on - I'm curious out the etiological basis language. Because I understand from testimony of some other FDC folks that folks all recognize that the etiological basis of gender dysphoria is not known.  Would you agree with that?

A.   Yes.

Q.   And so why is this language in here saying that there's a requirement of showing evidence that treatment will improve the clinical outcomes by treating the etiological basis of gender dysphoria when it's not known?

A.   Well, I think that that is kind of two separate issues.  So just because we're not aware of the etiology doesn't mean it doesn't exist. There's like multiple pathways.  So more one individual it would be one pathway, another individual could be a different pathway.  So the provider would have to say this is the pathway we



think they're on, you know, all of the other comorbid disorders are well-controlled or treated so we think this is going to help this particular individual.  I don't know how else to state that.

Q.   Was there any discussion among, you know, you and Dr. Martinez and others or with folks at Centurion raising questions about what this means, this etiological basis language?

MR. STEELY:  Object to form.

THE DOCTOR:  I mean, I didn't have any discussions with Centurion about that.  Dr. Martinez and I have discussed it.

BY MS. COOPER:

Q.   Did you raise questions about it?

A.   Well, I thought I understood it and I still feel like I do.  I just - it's - I think that people sometimes get stuck on semantics and I don't understand it to mean that there's only one etiological basis, you know, that we're treating or that - that - that because it's unknown that it doesn't exist.

Q.   Okay.  Right.  But it sounds like you all are accepting evidence from providers showing that hormone therapy can improve clinical outcomes of gender dysphoria, period, right?  If



they can show that and meet the other requirements, they can get a variance; is that correct?

MR. STEELY:  Object to form.

THE DOCTOR:  Correct.  The evidence is still weak, right?  It's not as strong as we'd like it to be.  I think that's a consensus in the research literature about low quality evidence, not peer reviewed, not long - you know, not long enough studied for a long term, but, again, with fields of study, there's a period of time for matriculation.  It takes time to get to that point.

BY MS. COOPER:

Q.   But you're accepting the research that the Centurion providers are giving showing that hormone therapy can improve clinical outcomes in granting variances, correct?

A.   On individuals - yes, looking on individual cases.

Q.   For a number of patients, correct?

A.   Correct.

Q.   I understand under the new policy anybody who is in the gender dysphoria program



gets an S3 destination; is that correct?

A.    Correct.

Q.    And prior to that, it was S2?

A.    Correct.

Q.    Yeah.  Who decided on that change or proposed that change?

A.    I think it was a joint decision, but I would say more me because I wanted to make sure that wherever they were housed that they had a full mental house staff there available to them.

Q.    And being S3 means that you - an individual may have access to programs, correct?

A.    It could.  It depends.  People are allowed access to programs as an S3, but the important thing to remember is that at S2 camps we don't have the same kind of mental health staff that we have at S3 camps.  And I felt that making sure that we have enough sufficient mental health staff following them was most important.

Q.    Did the folks at Centurion raise a concern about that change?

A.    They might have raised a concern.  I'm trying to think, because people were comfortable at some of the S2 camps, but it wasn't because of like programming or anything.  They just didn't



demonstrate the efficacy of psychotherapy to
address gender dysphoria?

A.    Yes.

Q.    So there's more --

A.    There is sufficient - there is
sufficient - there is evidence out there, but
I've - probably four or five studies and one
system particular review, I'm still looking for
others.

Q.    Yeah.

A.    But also know that psychotherapy is
very - traditionally has a very good solid
research base for treating these types of issues.

Q.    So if you were able to look at a body
of research showing that effectiveness of
psychotherapy to address gender dysphoria and a
body of research examining the efficacy a form of
therapy to treat gender dysphoria, is it your
view that there's a more robust body of research
supporting the psychotherapy than the hormone
therapy?

A.    No.  I think that there's insufficient
- I don't think there's sufficient to say that
hormone therapy is the therapy of choice.  It's
the one that we have to go with.  It's the



primary.  Not that it can't be helpful and, obviously, it's medically necessary in certain cases, that's what I'm trying to say.

Q.   I mentioned talking with Dr. Watkins-Ferrell about the new policy.  Was Dr. Crawford involved in any discussions that you participated in with Dr. Watkins-Ferrell?

A.   I don't - not that I recall.

Q.   Okay.

A.   I mean, I guess it's possible, but not that I recall.

Q.   Did Dr. Crawford express any concerns with you about any of the changes in the GD policy?

A.   Not to me.

Q.   To anybody else?

A.   I mean, that would be unlikely, but I just don't discuss it with her.

Q.   Okay.  So since the HSB took effect nine - September 30, 2024, gender dysphoria accommodations are no longer permitted, correct?

A.   Under the new policy, correct.

Q.   Yeah.  Okay.  And that medical and mental health staff were informed when the HSB was implemented that gender dysphoria



accommodations are no longer permitted?

A.    Correct.

Q.    So medical and mental health staff could not obtain accommodations for their patients even it they believed that those accommodations were medically necessary for their patients?

A.    Well, they've never come to me with that.  So we do things based on medical necessity.  For example, some of the individuals would have breasts, have bra passes because there's a medical necessity for that.

Q.    Right, if a mental health provider felt there was a medical necessity for, say, women's undergarments and a hair length standards because of the psychiatric harm of or psychological harm of denying it and brought that to your attention, could you approve accommodations for that patient under the current policy?

A.    So the current policy doesn't provide for it, but it doesn't mean that people can't come to me if they think that there's a medical necessity and that we can look at things on an individual basis.



Q.   Do they know that?

MR. STEELY:  Object to form.

THE DOCTOR:  They come to me when they have other --

BY MS. COOPER:

Q.   Right.

A.   -- questions or whenever they think there's anything that is off script or not in the policy, so I don't see why they wouldn't here.

Q.   Well, there were - let's move on, then.  When the HSB was implemented, all of the inmates who had GD accommodations passes have been rescinded, correct?

A.   Correct.

Q.   And the only reason was because of the new policy, correct?

MR. STEELY:  Object to form.

THE DOCTOR:  Well, the new policy that's based on medical necessity and the research literature, yes.

BY MS. COOPER:

Q.   It was not an individual evaluation of each inmate and a determination made that they no longer need the accommodations, it was based on the policy change?



A.    Correct.

Q.    Okay.  And when the policy was announced on September 30, 2024, all the inmates with gender dysphoria were told they had one month to get rid of all their accommodations and come in to compliance or they would face discipline, correct?

A.    I don't remember.  That would have been the security script, but I believe they could have it sent home and we would pay for it. They were given option of what they could do with it, but I believe they would have to come in to compliance within 30 days.

Q.    Okay.  Are you familiar with a document called an Action Plan for the rollout of HSB 15.05.23?

A.    Is that the implementation plan or is that different?

Q.    Well, yeah.

MS. COOPER:  Let's post that.  It's FDC 3768.

MR. STEELY:  Are you going to mark this as an exhibit?

MS. COOPER:  Yes, we are going to mark it as the Exhibit 22.



(Exhibit 22 was marked for Identification.)

BY MS. COOPER:

Q.   You are familiar with this document called FDC 15.05.23 Action Plan?

A.   Yes.

Q.   Okay.  Did you have a role in drafting it?

A.   I believe this was drafted by Mr. Weiss.

Q.   Okay.  Did you have to approve it?

A.   I don't know if approve it is the right word.

Q.   Did you review it?  Do you need me to make it bigger?

A.   We had it up on the screen when we were going through who had to have various items. I remember that.

Q.   So you saw it before it was put in to action?

A.   Correct.

Q.   Okay.  If you look in the middle of the page, it says:

"Conduct group meetings with inmates on treatment for gender dysphoria.  Inmate will be advised the alternate canteen and



care staff.  So that's other people who work in the - in the prisons; is that right?

A.    Correct.

MS. COOPER:  We can take this down.

BY MS. COOPER:

Q.    So all these documents that were written articulating that gender dysphoria accommodations are no longer permissible and that inmates need to comply with the clothing and grooming requirements of their biological sex, all of that information was made known to the inmates and the mental health staff.  How would a psychologist or mental health provider know that despite this language saying that these are no longer available, they are, nevertheless, still available if they ask for them?

MR. STEELY:  Object to form.

THE DOCTOR:  It's not like they're available if they just request them.  They have to show a medical basis.  So - and it's never stopped before when they've had, you know, an unusual circumstance asking for clarification.  We, you know, look at everything on an individual basis, but it's not provided and it would have to show



compelling evidence as to why for that particular patient that that thing was, you know, whatever it was they were requesting was medically necessary.

BY MS. COOPER:

Q.   So after all this information was provided to inmates and staff, were the mental health providers or doctors ever informed that despite the very clear rule that gender dysphoria accommodations are no longer permissible and everybody's passes are rescinded, that you could, nevertheless, go and request those accommodations if you believe it's medically necessary?  Did anybody ever communicate that to doctors or mental health staff?

MS. COOPER:  Object to form, mischaracterization.

You can answer.

THE DOCTOR:  Yeah, no, not in that way.

BY MS. COOPER:

Q.   Well, in any way.

A.   No, but we haven't done that with anything else with HSB procedures.  They come to us when they come to us with questions with



experimental treatments or something else that they want to look at and we're happy to review it.  Doesn't mean we're going to agree with them.

Q.   Will they come to you when there's a clear statement saying it's not available to say can I have it anyway for my patient?

MR. STEELY:  Object to form, mischaracterization.

BY MS. COOPER:

Q.   I understand if there's areas of you uncertainty and acuity, but here in this policy it's pretty clear it's not permitted.  How would a doctor know I can ask Dr. Kline for an exception if I can demonstrate medical necessity?

MS. COOPER:  Form objection.

Answer if you can.

THE DOCTOR:  Yeah, I'm not sure if I can answer that question, because I feel like they come to us, you know, just last week or two weeks ago, for example, Dr. Lay shared with me something, a new treatment, and something that was not in our policy on treating any of our substance abuse, but that one of their medications might be helpful in treating our self-injury and



request for patients?

MR. STEELY:  Object to form.

THE DOCTOR:  Correct, it's not something that's currently available in the current version of the policy.

BY MS. COOPER:



BY MS. COOPER:

    Q.   But it's the professional opinion of the mental health provider that her mental health has approved following approval for gender-affirming accommodations?



A.    Correct.

Q.    And, yeah, does information like that has any of that information made its way to you that any of the mental health providers have seen these benefits from accommodations for their patients?

MR. STEELY:  Object to form.

THE DOCTOR:  Since not - no, not from the new policy, I haven't seen any of this language.

BY MS. COOPER:

Q.    NO, no, but, in general, in your time at FDC, were you ever made aware that the accommodations have improved the mental health of some of the patients with gender dysphoria?

A.    That - that they can help, yes.

Q.    Yeah.  Okay.  And you were aware that Centurion psychologists who conducted the evaluations of inmates with gender dysphoria --

MS. COOPER:  Actually, scratch that.

BY MS. COOPER:

Q.    This was one example of one report, but are you aware that there are other psychologists who have conducted evaluations of inmates with gender dysphoria and recognized the



positive benefits of gender dysphoria accommodations on the mental health of their patients with gender dysphoria?

A.    Well, it would make sense given our old policy that they would make statements to that effect so they can continue them.  I think that - I think that in and of itself --

Q.    But --

Go ahead.

A.    I don't think that they would just write this in and of itself.  They write it in response to our policy and their transgender or gender dysphoric patient, right, so that was written whenever their first or initial or however they were doing then.  They write just the same type of stuff with the reports we've seen recently that they're doing better on the hormones, you know, which they can have accommodations, but they've been okay with not having - with, you know, they're adjusting, that kind of thing.

Q.    So but my question is these are - you're aware that it's not just Dr. Joshi in this one, I'm sorry, not Dr. Joshi, Ms. Akin in this one report observing the mental health benefits



Q.   But if accommodations allowing social transition improves an individual's mental health, I am not sure why - what the distinction between helpful and medically necessary is in that context.

A.   I guess in looking at the research, my concern would be that it might be temporarily pleasing, like they might report it being helpful, but it's not actually changing their condition, right?  It's not changing their dysphoria.

Q.   That's true of hormone --

A.   Like any --

Hum.

Q.   Isn't that true of hormone therapy as well?

A.   Well, you could make that argument, but I'm trying to be - you know, I feel like we have a better argument with the hormones definitely than we do social transition items.

Q.   Okay.

A.   And I feel that we don't know the long-term benefits of that.

Q.   Of the accommodations?

A.   Right.  Or any, really, but even



accommodations.

Q.    So this is what I'm trying to get at, because you mentioned there was insufficient evidence or lack of evidence on hormone therapy benefits as well, so I'm wondering why do you all agree and - and sign variances supporting the medical necessity of hormone therapy for some of the patients with gender dysphoria, but I think you are saying it's never medically necessary to have accommodations to allow social transition to help alleviate gender dysphoria.

A.    Because there's more - much more research on hormones, and this is a longer period of time from which you draw the research showing that it can be helpful and in community populations especially.  Again, it's difficult applying these in a prison setting, so I would never want to say that just because the evidence isn't overwhelming that it doesn't mean - there is evidence of it, so - and that's - and we've been using it here.  The accommodations case, I haven't seen any evidence to show that it's medically necessary.

Q.    Have you --

A.    Being helpful is different than



medically necessary.  Them thinking it's pleasing is different than they absolutely need this or their gender dysphoria is going to implode or it's never going to get better, and that's not the case because they've been without accommodations now for a year and we have people doing very well, like that come through - I mean, just the ones I haven't seen, there's like 275, I think 70 have come through our variance.  So I'm just trying to explain to you that, you know, so they have adjusted and they're still - and they're doing well.

Q.   Well, you could take the hormones away and you might find the same thing, but it doesn't mean it's not medically necessary, right?  Or is it like if you take it away and they're not sort of suicidal, it's not medically necessary?  I'm trying to understand the line.

A.   I would think, no, that is a clear line.  I mean, if we took it away and they didn't show any difference, then I would argue it's not medically necessary.

Q.   Okay.

MS. COOPER:  Why don't we take a break.  This is a good breaking point.  You



were looking for a break.  Do you need like

a ten-minute break at this point?

THE DOCTOR:  Good.

MS. COOPER:  Let go off the record.

Thanks.

(Recess from 3:54 p.m. - 4:06 p.m.)

MS. COOPER:  I'd like to mark as the

next exhibit --

I'm sorry, give me one second.  We can

talk about this during the next break, but

at our count, we're only at five hours and

four minutes, so maybe we have a math error.

We'll figure that out during break.

But the next Exhibit is 27.  And it is

FDC 36667.  It's a document entitled:

"Florida Department of Corrections

Psychological Evaluation for Gender

Dysphoria."

And it says here testing dates 9/29/23

and 11/27/23.

(Exhibit 27 was marked for Identification.)

BY MS. COOPER:

Q.   Do you see that at the top?

A.   Yes.

Q.   Okay.  So this is an evaluation form



much mental health issues after transition as there were before.

Q.   So if your sense is there's just not research establishing the efficacy of again gender dysphoria accommodations or social transition to alleviate gender dysphoria, doesn't it follow that no matter what a doctor might, you know, argue about their patients, you're not going to approve accommodations as medically necessary because you don't believe they can be medically necessary; isn't that right?

A.   No, I wouldn't agree with that.  I'm a very reasonable person, so if somebody brought to me, but they have to have evidence.  It wouldn't just be "I think this because I'm subscribing to this ideology or that ideology."  It's all about the evidence.  So if he can show me with evidence on any individual patient why this in particular is so medically necessary for their psychological well-being, then we're happy to review it.

Q.   Okay.

A.   But, again, I just want to clarify it, reviewing it doesn't always mean we are going to agree with it, and sometimes we have to agree to disagree.



Q.  Okay.  Did you discuss this at the time with other folks within FDC or Centurion?



A.    Did I have a conversation with Peggy? No, I reviewed what they had - we have what is called a psych autopsy and then we have the closure summary, which is with Dr. Watkins-Ferrell and myself, so I don't know if I had a conversation directly with her about it.

Q.    Did you talk to anybody about this - this situation?

A.    I talked to Dr. Wasserman about it, but, you know, again, we're talking about policy and there were a lot of issues in that case, you know.  They were prescribed what they were supposed to be prescribed, but, yet, there was a gap in receiving medication, so there were a lot of contributing factors, recent altercation with a, you know, partner, and just I feel like there were other signs there.

Q.    And the person that conducted the psychological autopsy, what is their role within FDC?

A.    So they are the regional - it will be assigned to one of the Regional Medical Health Directors from Centurion.

Q.    So that person who wrote that psychological autopsy after, I guess,



assessment that they do on the inpatient unit. Like when you use an HDR - HDR 20, but then there is also something called the BRA, the Behavior Risk Assessment.  There's lots of -- I can't even speak this afternoon -- acronyms in DOC that I'm learning.  So they're two separate things, but they do assess risk for violence.

Q.   Okay.  And have there ever been inmates with gender dysphoria for whom this kind of risk assessment was done since the change in policy?

A.   So I'm not specific on what - when you're referring to.  If you --

Q.   Any time.

A.   Anybody that goes in to inpatient would have this done, that's a requirement of being an inpatient.

Q.   I see.  But for people, there's not a risk assessment done for people in the general population?

A.   No, this would be if you're inpatient or you're in the residential continuum of care, like our vulnerable population, so it's a risk, you know, yes.

Q.   Would you agree that gender dysphoria



is a serious mental health conditions?

A.    Yes.

Q.    And would you agree gender dysphoria can cause serious distress?

A.    Yes.

Q.    Would you agree that some individuals with gender dysphoria attempt self-castration as a result of that distress?

A.    Yes, I mean, there have been reports of people attempting to harm themselves.  The one caveat I have is it's sometimes difficult, especially with people who self-injure, because they usually have such a traumatic history that's it's hard to tease apart - even though they are saying it's this way, there could be a lot of comorbidities going on, if that makes sense, so, but, yes.

Q.    But when it's self-castration, is that generally attributed to the gender dysphoria?

A.    If they're not psychotic.

Q.    Yeah.

A.    That's happened several times, actually.

Q.    Okay.

MS. COOPER:  Can we show as - I think



we're on Exhibit 29, FDC 30769.

(Exhibit 29 was marked for Identification.)

BY MS. COOPER:

Q.   Okay.  This is an e-mail from Lisa Peterson dated May 9, 2024 to Suzonne Kline and Stephanie Crawford.  Have you seen this e-mail before?

A.   My name is on it, but I don't recall it right off the top of my head.

Q.   I'll just read it, maybe it will refresh this recollection.

"Good evening, we have a patient at Graceville whom I would like to staff with you if either of you have time tomorrow.  We are considering a referral back to a higher level of care, but the individual was discharged from a CSU in February.  There are gender dysphoria concerns and also continued self-hard relating to cutting on the testicles.  Let me know when you're available."

I can stop there, I think.  Do you recall hearing about this inmate?

A.   I don't specifically recall, but I want to say this was the one that we did transfer

