# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO.  4:24-cv-434

REIYN KEOHANE, et al.,

        Plaintiffs,

Vs.

RICKY D. DIXON, in his official
capacity as Secretary of the
Florida Department of Corrections,
et al.,

        Defendants.
_____/

REMOTE DEPOSITION OF

KRISTOPHER KALIEBE, M.D.

(Pages 1 - 334)

Monday, December 15, 2025
9:30 a.m. - 5:59 p.m.

Virtually via Zoom

Stenographically Reported by:
Diane B. Guldin, RPR

JOB NO.:  J13826060



couple of things.  There are some things that I would have added to my new C.V.

Q   Okay.  So, the date on this report, if we can scroll back to the date page with the signature on page 69 of the PDF, is October 6th.  October 6th.

I'm going to focus in on the topic of gender dysphoria.  Have you added any publications on gender dysphoria since October, 2020 -- oh, October 6th, 2025?

A   Yes.  I think the most relevant publication was the Department of Health and Human Services, gender dysphoria report, which I was a coauthor on.

Q   Okay.  Anything else?

A   In terms of just publications?

Q   Just publications relating to gender dysphoria or transgender people.

A   I don't know if my Obstacles To Progress article is on that C.V., but I'm guessing that it is.  So, I believe -- I believe that the HHS report would be the only other addition.

Q   Okay.  So, you mentioned you've been a psychiatrist since I think you said 1999; is that right?

A   I graduated in medical school in '99.

Q   Okay.  And when did you say you became a





psychiatrist?

A    Well, I think most people would consider you to be a psychiatrist when you finish your first residency.  So, I would -- I went -- I did general psychiatry for three years, and then I went into child.  So, I went from general to child in 2002.

Q    Okay.

A    And then by some people's measures you're only fully minted in your profession when you're done with your fellowships.  So, I finished my child psychiatry fellowship in 2004, and my forensic psychiatry fellowship in 2005.  So, that was when my training ended.

Q    Okay.  And can you give an estimate of the number of patients that you've seen in your career for anything?

A    Well, that's a good question, and it's difficult to estimate because we usually don't, you know, keep track, but I can -- I know that in my clinic in -- at the St. Charles Community Health Center, we did a chart review just before I left, and I average seeing 14 patients a day, per clinic day when I worked there, and I was at that clinic for 11 years, and I was two days a week for about half a day, and one day a week for half.  So, I



mean, I think those are all individual patients encounters. So, you know, some people -- obviously many of them were seen multiple times. Throughout all of my career I'd probably guess -- I mean, definitely over 10,000 patients.

Q   Okay.

A   It's probably closer to double that, I think would be a rough estimate in my head, but I -- you know, that's probably a rough estimate, 20,000.

Q   Okay.  Thank you.

And can you give a rough estimate of pediatric versus adult patients among the patients you've seen over your career?

A   Yes.  I would probably estimate an 80/20 --

Q   Uh-huh.

A   -- split.  Maybe -- or a quarter, 25/75.  I think maybe more recently I've seen a higher percentage of adults.  So, it may be now 25/75.

Q   Okay.  And I saw from your C.V. you have worked in juvenile correction settings; is that correct?

A   Yes.

Q   Have you worked ever in adult correction settings?

A   Yes.



Q   Where was that?

A   So, during my training I worked at the -- at a correctional center in Louisiana when I was doing my forensic psychiatry fellowship.  As part of correct -- forensic fellowships there's a requirement to train in correctional settings.

Q   Uh-huh.

A   And then I also worked for the Orleans Parish Prison, and during that time I was -- on two -- and really sort of two sort of separate occasions.  First when I was living in Louisiana I did some coverage for -- at some other correctional facilities that they were contracted with.  I remember Hunt was one of them.  I don't know, you know, how this was -- I don't even think this is reflected on my C.V. because I was -- it was just a period of months of, you know, coverage sort of, because they ran out of --

Q   Uh-huh.

A   -- psychiatrists I guess to cover the facility.

And then somewhere again around 2018 or '19 I was contacted -- I was also Orleans Parish -- I was contracted again with Orleans Parish Prison. So, I --



but it has been typically through the places that I was employed with, like LSU Health Science Center or the University of South Florida.  I have had some work outside, but it's usually contract work.  So, I don't have a regular individual private practice.

Q  Uh-huh.

A  And nor have I ever had an individual private practice.

Q  When you say, contract work, what does that mean?  What kind of -- who was contracted?

A  Correction -- some of my correctional work has been contract work.

Q  Okay.

A  So, that is not sort of flowing through. Like when you work at a university, you sometimes are not fully employed with them or you do something outside of the university.

Q  Uh-huh.

A  So, that's what I mean by contract work, that it just was work that I was doing independent of the university that I was also employed with at the time.

Q  Uh-huh.  Okay.  So, now I've been asking you general questions about your work as a psychiatrist.  I want to focus in on the patients



with gender dysphoria at this point.

Okay.  And I've seen some of your past testimony, where you were asked about estimates, and I think the last time you testified was I -- it appears to be the -- I think the Cano case about a year ago; is that right?

A   Yeah.  As far as I recall, that was the last time I've testified in these matters, yeah.

Q   Okay.  So, sitting here today, December 15th, 2025, what -- approximately how many patients with gender dysphoria have you seen in your career?

A   Well, I think, you know, as I mentioned in the Cano case, the number was in the 20s, probably -- maybe it's more like 30 at this point --

Q   Uh-huh.

A   -- because I have -- currently have patients with gender dysphoria.  So, that would -- that would probably be -- I mean, 30 I think would be a fair estimate.

Q   Okay.  And of the patients you've seen approximately 30 patients with gender dysphoria, how many were adults versus pediatric cases?

A   Yeah.  Well, I'd say the majority would be pediatric cases.  I've had some that have aged into adulthood while being seen --



Q    Uh-huh.

A    -- so, you know, they would be -- they would be young adults, and legally they're adults. And then there are patients in my outpatient resident clinic with gender dysphoria.  So, there's probably, you know, a half dozen in that -- in that clinic or that I've seen in the -- in that clinic. So, that's a -- so, maybe there's -- for 18 years and over I'm guessing somewhere it would be like six or eight patients.

Q    Okay.  And of the 30 or so patients you've seen with gender dysphoria, how many have been in carceral settings?

A    I would guess that that's a dozen --

Q    Okay.

A    -- perhaps even -- perhaps more than that, but maybe 15.  Once again, you know, I'm sorry, you don't track things over time.  And, so --

Q    Uh-huh.  So, about -- you think a dozen to 15, nearly half of your 30 or so gender dysphoria patients have been in carceral settings?

A    Yeah, that would be right.

Q    Okay.  And just to help clarify, and I can show you, if you need, at the time of your Cano deposition a year ago, I believe you said you had



five patients with gender dysphoria you treated in a carceral setting. So, does that -- does that still sound about right? Do you think you had about ten more or eight more in the past year?

A   Yeah. I mean, perhaps -- perhaps it is a -- yeah. I mean, my guess right now was more like 12 or 15, I'm thinking, but I have had -- certainly have had at least five patients with gender dysphoria in the last year.

Q   In the carceral settings?

A   In those settings, yeah.

Q   Okay. And of the dozen or 15 patients with gender dysphoria that you've seen in the carceral setting -- carceral setting, how many were adults versus minors?

A   Well, the vast majority would have been under 18 because I -- since I'm working in juvenile correctional centers, people at those centers do age into -- you can be in a juvenile center up to age 21 really. So, I believe -- there's at least two that aged in or were 18 at the time of treatment.

Q   Okay. Understanding that at least two were -- turned 18 while being treated, of the dozen to 15 patients with gender dysphoria that you've seen in carceral settings, were they all in juvenile

settings or were some of those dozen to 15 in adult settings?

A    Right now I'm only working in juvenile correctional centers, so --

Q    Okay.

A    -- those are in juvenile settings.

Q    So, all 12 to 15 were in juvenile settings?

A    Correct.  I don't remember -- as far as I remember, I don't remember seeing gender dysphoria in adult settings.

Q    In adult carceral settings?

A    Adult corrections, yes.

Q    Okay.  So, I want to now -- I was just focusing on the carceral settings.  Now, I want to focus in on adult care that you've --

A    Uh-huh.

Q    I think you said -- well, actually I'm not sure I asked you this yet.

To save you time, I'm checking my notes.

Oh, I think you testified about six or eight of the -- about 30 patients with gender dysphoria were 18 or over; correct?

A    Yes.

Q    Okay.  So, focusing in on that group of six or eight adults with gender dysphoria you've



treated, can you tell me what settings you saw them in?

A    We just talked about some of them have -- are 18, yet in juvenile corrections.  And then there's an adult general psychiatry clinic that I work at.  And then I work at Tampa General Hospital covering the hospital on the -- on the weekends.

Q    Uh-huh.

A    Right now those are the settings that I'm working in.

Q    So, we're talking about six to eight adults.  Can we break it down, how many you saw at the adult clinic?  And is that the USF Clinic?

A    Yes.

Q    How many do you see there of the six to eight?

A    I'd say the vast majority, so it's probably six or so then.

Q    Okay.  And then how many did you see at Tampa General of the six to eight?

A    I would say that there's been two patient encounters.  That's coverage.  So, this is on-call coverage.

Q    And that's counted in your six to eight patients you've seen who are adults with gender



dysphoria?

A    Yes.

Q    Okay.  And then -- so, that gets you -- if there's about six at the USF Clinic, and about two in your Tampa General on-call coverage, is that -- that's all of them?

A    Yes.

Q    Okay.  And in the on-call coverage, that -- would that just be one visit when you're on-call, and somebody needs to see a psychiatrist, and you see them that one time?

A    Yeah, that's coverage at a major hospital, so it's what's called a consultation liaison service.

Q    Uh-huh.

A    So, you would either be covering someone that's already been seen by the service or it would be a new admission to the emergency room or someone on the floors of the -- of the hospital.

Q    I see.  Would that be a one-time --

A    Yes.  It would be, yes.

Q    Okay.  And at USF -- at the USF Adult Clinic where you said you saw about six adult patients with gender dysphoria, what is the nature of that clinical relationship?  Is that more ongoing



or can you tell me a little about that?

A   Yes.  So, that's a resident clinic where you cover any sort of -- any incoming patients from the community that have just sort of wound up at that clinic by whatever referral system that they got there.  So, it's a general full-service psychiatry clinic run by residents with attending supervision.

Q   And, I'm sorry, did you say resident clinic or residential clinic?

A   It's a resident, resident --

Q   So, run by residents?

A   The trainee -- yes.  The trainees, and I supervise, and the patients are seen by the trainees.

Q   Uh-huh.  So, the six adult patients with gender dysphoria who you've seen at that clinic were being seen by residents who you supervised; is that correct?

A   So, depending -- yes.  The -- correct.

Q   Okay.  And is that ongoing treatment where someone comes in for weekly treatment or how often would they be with the clinic?

A   So, it typically is ongoing treatment.  So, there -- they can be longstanding patients.  Some



people stay in treatment for longer, some people are there for a shorter amount of time, but it could be years, it could be months --

Q   Uh-huh.

A   -- but it is typically not a one-time deal.

Q   And of these six patients, adult patients with gender dysphoria that were at the USF Clinic, were all of them seen by residents or did you -- were some of them your patients?

A   Yes, we -- those are all seen at that clinic, and are seen by residents with my supervision.

Q   And as the supervisor of the residents at that clinic who are providing treatment, do you meet with the patient as well?

A   Yes.  If they're a new admit or they're on -- depending on their insurance, that I would have to have a meeting with them if they're Medicaid or Medicare.  If they have private insurance, then it may be that they're only seen by me during their initial visit.  So, depending on the type of insurance I may see them every single time or they may be just seen by me initially, and then the resident follows up with them --

Q   Uh-huh.



A    -- and presents the case to me, and then I --

Q    Okay.  So, of those six, were you involved in the initial evaluations of all of them or just some of them?

A    It would just -- it would depend.  Just some of them.  It sort of depends, did they show up to the clinic or are they new to the resident at the time --

Q    Uh-huh.

A    -- the year starts or are they already -- have ongoing treatment, and it's just sort of being taken over, it could be either way.

Q    I see.  And of those six adult patients with gender dysphoria at the USF clinic that you referred to, how many did you provide therapy to yourself?

A    Those patients I have not provided direct -- well, when you say, therapy to, I -- you know, at that psychiatry clinic it is sort of a general psychiatry clinic.  So, I don't think therapy would be the ideal sort of description of what it is.

Q    Okay.

A    So, they're seen for, you know, holistic mental health care, and medication management, and



therapy, depending on what's needed.  So, it's a --
it is not a, quote, unquote, therapy clinic, where
therapy is the emphasis of what we provide.  We
provide it, if needed, and -- but maybe -- or maybe
not providing therapy, if not needed, if that's --
if you understand.

Q   So, would treatment be a better word than
treatment --

A   Yes.

Q   -- if I asked that question again?

A   Yes.  Treatment would make more sense, yes.

Q   Okay.  And just to be clear, treatment
could include medication; is that right?

A   Yes.

Q   Yes.  And it could include therapy, if it
was indicated?

A   Yes.

Q   What other treatments?  I just want to make
sure I understand the full range.

A   You know, when you evaluate someone's
mental health needs, there's many different possible
things that you could provide to them.
Psychotherapy is typically seen as an in-depth
exploration of a set of challenges or problems that
a person wants to come in and specifically work on,



fit into psychotherapy and medication management in my type of clinics, and how I train the residents.

So, I just want to be clear that, yes, sometimes the words psychotherapy or medication management don't really, you know, cover everything we do.

Q   Got you.  And, so, at the USF Adult Clinic, is there a particular population or a particular set of issues that the clinic draws?

A   No, it's a general clinic.  So, we would just get whatever range of individuals from the community get to -- get referred to us.

Q   Uh-huh.

A   So, we take all type -- different types of problems.

Q   Okay.  And, so, going back to the six adult patients with gender dysphoria you referenced at the clinic, at USF, did you directly provide treatment of any kind to any of those six adults?

A   Yes, in that I directly assessed or have seen them in person, and with the resident and, you know, came up with the treatment plan, so --

Q   How many of them?

A   Probably -- say probably two-thirds were seen, at least seen individually by me at either the



first time that I saw them, and then they were followed up or were -- their -- depending on their insurance they may need to be followed every time.

Q   Uh-huh.  So, were any of these six people you provided therapy to, psychotherapy?

A   No, I would not be the psychotherapy provider in that case.

Q   Okay.  Would that be a resident?

A   Yes.  If that -- if a patient requires psychotherapy in the clinic, it would come through the resident.

Q   Did any of those six patients require psychotherapy in the clinic?

A   None of those six patients were coming to the clinic for psychotherapy or following up officially for psychotherapy.  So, we were providing psychosocial supports and other types of assistance, but not what I would say traditional psychotherapy.

Q   Uh-huh.  For any of the six?

A   Correct.

Q   Correct.  Okay.  Did you see any of the -- strike that.

You said you were involved in the assessment and treatment planning for about two-thirds of that group of six.  Did you see any



one of the group of six more than once?

A    Yes.  So, many of them are ongoing patients that we're seeing month to month or -- or sometimes less often, it really depends on the acuity of the patient, what's going on, how often the resident or I feel they need to follow up with us, and how stable they are.

Q    Uh-huh.

A    So, yeah, they're ongoing -- that group is mostly ongoing treatment cases.

Q    And -- but -- and maybe my question wasn't clear.

Were they seen more than once by you, Dr. Kaliebe, or as opposed to by residents and others?

A    Yeah, I would say half of them would be ones that I see because of insurance reasons or, you know -- so, they have to follow up with me --

Q    Okay.

A    -- in addition to the resident.

Q    Uh-huh.  All right.  Since this is a pretty small number of people, we can probably get a little more granular.

Of the six, were any of them coming to treatment for gender dysphoria?

A    Well, how do you mean?  How do you mean?



Q    Well, so, maybe there's a different language you use in your field.

Do you talk about presenting conditions, is that an appropriate term?

A    Yeah, I mean, I think if we're asking about what is -- what are their present -- I guess you could say presenting conditions or what are the, you know, problems or challenges that we're treating them for.  If they're diagnosed with gender dysphoria, that's part of their overall picture, and would be part of our, you know, biopsychosocial assessment and treatment approach.

Q    Uh-huh.  And can you say what kind of presenting conditions these six adults came with?

A    What other -- are you asking -- could you -- I'm not sure what you're asking.

Q    Sure.  So, of the six adults who have gender dysphoria that you referred to seeing at the USF Clinic, what kinds of presenting conditions did they come with?

MR. STEELY:  Object.

A    Presenting -- well, I mean, gender dysphoria would be a presenting condition.

BY MS. COOPER:

Q    Uh-huh.



A   Are you saying, what, in addition to gender dysphoria?  I mean, I guess --

Q   Yeah.

A   -- we've already established that they have gender dysphoria.

Q   Yes.

A   So, that's one treatment.

You're saying what in addition to the gender dysphoria --

Q   Yes.

A   -- presenting treatment?  Well, co-morbidities would include autism, psychosis, anxiety disorders, depressive disorders, personality disorders.  I think within those that -- that range would be the ones that I have seen.

Q   Uh-huh.  But you mentioned none of those people are coming for psychotherapy at the clinic?

A   They -- none of them were engaged in psychotherapy with us at the clinic.  Some of them have therapists, but they may go to an individual therapist outside of the clinic.

Q   Uh-huh.  Okay.  Of the six adult patients, you mentioned that about half because of their insurance you would see more often than just the one evaluation; correct?



A   Correct.

Q   Yeah.  So, the other half you would just do the evaluation, and the treatment planning, but then the resident would be the one seeing them going forward?

A   Yes.

Q   Okay.  So, for the half that you -- so, that would be about three that you saw more often. How long did you see those patients?

A   Well, it would -- are you asking how many visits have you seen or are you asking how long have you spent per visit or -- I'm not sure what you're asking.

Q   Sure.  Well, let's start with how many visits.

A   Uh-huh.  Well, some patients would be ongoing.  So, there may be a patient that -- you know, so some maybe I've seen three or four times, and they're in the process of continuing follow up. So, in terms of the ongoing -- and some have come to the clinic, and now, you know, I'm not sure -- you never really know in our business if they're coming back to the clinic.  So, you've seen people, they're scheduled, you know, I haven't really scheduled. There's lots of residents.  I don't know, you know,



are people really going to be seen again?  Are they going to continue to follow up?

And then year to year if you are the supervisor for a case, they don't necessarily come back to your clinic.  So, you may be someone's treatment provider for a year, and then they move on to a different, you know, attending supervisor because they get a new resident.  You know, some residents keep patients for two years, that would probably be the -- be the maximum in our clinic.

So, some patients may have come and gone, and I saw them on -- you know, depending on how much they're following up, four occasions during the year.  Some that would probably be the typical number, but maybe it would be more, six, if they're coming every two months.  It would be 12 if they come every month, but I would say most of our patients are more like one to two months.  So, I would say it's like six times a year would be a more -- depending on their acuity level, some are -- come more frequently than that.  And then some are relatively stable, and are only seen every three months, so that would be four times.

Q    So, understanding that every patient has a different routine based on their needs.  For the --



I want to focus in on the patients with gender dysphoria.

So, you said there were about six, and half -- about half or three or so you've seen more than just at the evaluation time.  Can you tell me how many times you've seen each of those three patients?

A    I'm trying to -- you know.  So, I would guess something about five times -- you know, three times for two of them, five times for one would be my -- would be my guess, something like that.

Q    So, would -- so, just to put that together. For the three, somewhere between three and five times each?

A    Yeah.  And we're speaking only of the ones that need to follow up with me or that I've seen.

Q    Yes.

A    Okay.  Yeah.  Uh-huh.

Q    Yes.  Got you.  And you anticipated my next question.

Of the other three or so who were seen by residents, how long are they being seen or how many visits have they had?

A    I mean, there's -- there's some that have been -- had had more visits, and have been ongoing. So, some have been a higher number than that.  I



would say maybe one that was more like eight or ten visits, and then two that were more like four, five visits.

Q    Okay.  And none of these six, though -- just I want to make sure I didn't get confused.

None of these six were receiving psychotherapy from you or the residents at the clinic at USF; right?

A    No, I would say that's not right.  I think that there were of the -- of the patients who are -- have been seen by the residents, that there are patients who did receive some psychotherapy from the residents.  So, I do have some residents -- supervision of residents who were seeing patients for psychotherapy.

Q    Okay.  So, of the group of six adults with gender dysphoria seen by the clinic, of the three that were seen by residents, some of those folks were receiving psychotherapy by the residents?

A    These two patients that I remember did -- were receiving psychotherapy from the resident.

Q    Okay.  And that would be -- do you recall -- well, you said of the three seen by residents, you estimated one of those patients was seen maybe eight to ten visits, and the other two about four to



five.

Do you recall whether the patients receiving psychotherapy were receiving it for four to five visits or eight to ten visits?

A    Yes, sometimes the cases that you're -- you take over a resident, and they've already seen the patient, and, so, like at least one of the cases that I'm thinking of, the resident had a different supervisor the year before, and then I took over as a supervisor, and they continued with me, you know. So, they had already seen the patient a number of times --

Q    Uh-huh.

A    -- for psychotherapy, and medication management, and all of that, and then continued with me.  So, I don't want to give the impression that the patient was only seen less times overall than they were seen, but in my supervisory capacity those were the numbers that I was giving you, if you -- if that makes sense.

Q    It does.

Thank you for clarifying.

Okay.  So, of these six adults with gender dysphoria that you referenced seen by the -- at the USF clinic, you have not provided psychotherapy to



any of those individuals; correct?

I didn't hear.

A   I said, correct.  You said to me directly provided psychotherapy --

Q   Yes.

A   -- yes, correct.

Q   Okay.  Got you.  And then the other adult with gender dysphoria you mentioned were two people who you saw on-call at Tampa General; right?

A   Correct.

Q   But that was one visit --

A   Correct.

Q   -- for each?

A   Yes.

Q   Okay.  So, switching gears from your adult patients, and focusing in on the pediatric patients or minors.  By my math, you saw about 30 patients with gender dysphoria, and you said about six or eight were over 18, that would be 32 -- sorry, 22 or 24 were minors; does that sound about right?

A   Yes.  Yeah.  I mean, I'm getting a little confused with these numbers, so --

Q   Yeah.

A   Sorry, you know, I'm having trouble.

Q   Yeah.  Let me ask again.



A   I --

Q   Let's make sure we're clear.

So, we have about -- you mentioned about 30 patients that you've seen with gender dysphoria, and I believe you said about six or eight were 18 or older, and the rest were pediatric; does that -- did I get that right?

A   Yeah.  I'm kind of -- so, we're -- well, we would add the ones that we saw that we just discussed who were seen in the adult clinic, and then we would add the ones who were 18 at the time in the child -- seen in juvenile corrections, but were over 18.  So, there's at least a couple in that -- in that category.

Q   All right.  And I want to make sure I'm clear.  So, the total number, whether you -- when you don't try to tease out ages, it's about 30 is what you said; right?

A   Uh-huh.

Q   And then I get that somebody might be in a pediatric setting, but could be 18 or 19; right?

A   Yeah.

Q   Okay.  So, when you were giving me the number of six to eight were adults, the ones you saw at the USF -- the six or so you saw at the USF



on the record is, yeah, I had a colleague ask me about, you know, the ability to consent for a young person, you know, considering puberty blockers.

Q   Uh-huh.

A   So, that -- I think I previously have testified regarding that.  So, I also had that.  But it was not a psychotherapy question, it was just a different question about care of a youth who would potentially, you know, go on to some medical therapies.

Q   Uh-huh.  Okay.  But those -- that was the -- those three would be the examples of formal consults you had?

A   Correct.  Yes.

Q   Okay.  So, of the patients with gender dysphoria you saw at the juvenile corrections facilities or the USF Pediatric Clinic, were you providing psychotherapy to any of those youths?

A   Yes.  So, in juvenile corrections, depending on the setting, sometimes I'm in places where I, you know, spend more hours, and I'm able to do psychotherapy with certain patients.  So, there were a number of patients who I've worked on in psychotherapy with gender-related distress or gender dysphoria diagnosis.





800.211.DEPO (3376)
EsquireSolutions.com

Q    Uh-huh.  And of those I think we said roughly 22 to 24 youths who -- with gender dysphoria that you've seen, approximately how many did you provide psychotherapy to?

A    Well, to broadly speak I would say at least -- I would say a half dozen of the -- of the youth in corrections that I would -- that I provided psychotherapy for.

Q    Uh-huh.  And at USF, at the gender -- yeah, at the -- sorry, the pediatric clinic there?

A    No, this is -- yeah, that's all in juvenile corrections, what I just said.  And then I have one, you know, juvenile patient at USF that I had ongoing psychotherapy with.

Q    Okay.  So, just to be clear.  When I asked how many of the juvenile patients with gender dysphoria you provided psychotherapy to, it was about a half dozen of youth and corrections, and one patients at USF Pediatric Clinic?

A    Yeah.

Q    Okay.

A    Yes.

Q    Thank you.

And what's the longest that you've spent -- let me ask it differently.



What was sort of the longest psychotherapeutic relationship you've had with any of these seven or so youths with gender dysphoria?

A    The facility, Tampa Residential, which was where I'm spending the most clinical hours up until about two years ago, maybe a year and a half ago, maybe it was a year or so, they changed from a -- they changed the level of facility.  So, up until this change they were what in Florida would call a level eight facility, which was a minimum nine month stay.  And then if things went not ideally, you could end up staying longer.  So, you know, we were hoping to get the kids in and out by nine months, but if they don't do their work or get in trouble or whatever it could be longer.

So, I know in those patients in that facility, the nine months would be sort of your expected amount of time that they would be under my care, and that I'd be working with them.  And, so, that would be the -- that would be some of them were in that facility.

Q    So, the half dozen or so youths with gender dysphoria you provided psychotherapy to in juvenile corrections, it would be nine months?

A    Nine months for some, six months for some.



you know, all sorts of other problems, trauma reactions.  So, you know, like I said, it's difficult to disentangle what would be the primary treatment, so, the primary treatment target.

Q   Okay.  Let's take a break now.  We've been going a little -- about an hour.

Is five minutes okay or do you need a little bit more?

A   Five is fine with me.

Q   All right.  See you back at -- in five minutes.

Thank you.

(Thereupon, a recess was had at 10:38 a.m.; whereupon, we reconvened at 10:43 a.m.)

MS. COOPER:  All right.  We can go back on.

BY MS. COOPER:

Q   One thing about your pediatric patients that I think I forgot to ask.

You had mentioned that of the 30 patients, I think we did the math, that about 22 to 24 were minors; correct?

A   (No verbal response.  The deponent nods his head up and down.)

Q   Correct?  Can you answer out loud?

A   Yes.



Q   You've been doing great.  One nod there.

And then of those minors, you said about a dozen to 15 were in the juvenile corrections context; right?

A   Yes.

Q   Yes.  Okay.  And, so, that would mean about -- you know, the remainder eight, nine, somewhere in there would have been at Silver, the Silver Clinic at USF?

A   Yes, although I'm not totally sure that that may not be a slight underestimate, I don't want to be -- so, if -- as we break down those numbers, the amounts seen at Silver, maybe that's a little -- but it's in the ballpark, yes.

Q   Okay.  Great.

MS. COOPER:  Sarah, if we can put up tab three, please, at page -- well, let's start at the cover page.

I'm going to -- we will be marking this as Exhibit 2, which -- I will be identifying it I should say as Exhibit 2, not marking.

(Plaintiffs' Exhibit Number 2 was identified and will be marked after the deposition is completed and/or received.)

BY MS. COOPER:



Q   This is going to be a transcript of your deposition in the Dekker case.

And I'll ask you a few questions as soon as we have that up.

Okay.  Can you see that or do we need to make it a little bigger?

A   I can see it.

Q   Okay.  Let's see the date.

Does this look like your --

MS. COOPER:  Scroll down a little bit just to see it.

MS. COOPER:

Q   -- the deposition that you gave in the Dekker case?

A   Yes.

Q   Okay.

MS. COOPER:  And scrolling back up to the top page.  This was -- scroll down a little bit.

BY MS. COOPER:

Q   We see the date there, March 20th, 2023; correct?

A   Yes.

Q   Okay.  And just for the purpose -- for the court reporter, I think when you say, yes, sometimes you're saying it very softly.



A    It would depend on the context.  I think there's some context where I'd feel it would be more appropriate to avoid just using -- I mean, you don't have to address someone by their, you know, name if they're in a -- but there -- there are times when I feel like it would be appropriate, and, yes, I would use the -- the name that they prefer, and the pronoun they prefer, but I think that's a clinical decision based on a patient in front of you.

Q    Okay.

MS. COOPER:  If we can put up what we've identified as Exhibit 1 again, the expert report of Dr. Kaliebe.  And I'd like to look at page 6.

BY MS. COOPER:

Q    Okay.  There's -- paragraph 19 says, my recent publications related to gender dysphoria include.

MS. COOPER:  And if you could scroll down slowly so Dr. Kaliebe can just -- oh, actually we can see them all; right?  Almost.

BY MS. COOPER:

Q    So, these are all publications you've written about gender dysphoria; correct?

A    Correct.

Q    And you say recent ones, you had previous


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

publications on gender dysphoria as well?

A   No, those are the -- those are the -- in medical journals, those are the only ones.

Q   Okay.  And the only thing since is the HHS report -- and I understand that's not a medical journal, but that's a publication that came out since this report; correct?

A   Correct.  Yeah.  The finalized peer review article -- version is published.

Q   Okay.  And looking at the first one, Adolescent Onset Gender Dysphoria, Our Perspective, AACAP News, that's the American Academy of Child and Adolescent Psychiatry News --

A   Correct.

Q   -- is that right?

A   Yes.

Q   And this -- this was an opinion piece that you provided?

A   Correct.

Q   Okay.  The next one, A Reply to Legal, Mental Health, and Societal Considerations Related to Gender Identity and Transexualism, Letter to the Editor, Journal of the American Academy of Psychiatry and the Law.  That is a letter to the editor that you wrote?



A    Correct.

Q    Okay.  And the following one is also a letter to the editor?

A    Correct.

Q    Okay.  The question about the last one, Kozlowska, et al., including you, Obstacles To Progress and Pediatric Gender Medicine, European Journal of Developmental Psychiatry, was that a peer reviewed article?

A    Yes.

Q    And the -- this was a reviewed article that you wrote?

A    Correct.  I was a co-author on it.

Q    Uh-huh.

A    But, yes, I believe -- the journals title articles under different things for different journals.  So, I'm not sure exactly what the official type of -- or category that the journal put it in, but I think a reviewed article would be --

Q    Uh-huh.

A    -- that probably would, you know, fairly suffice to describe it.

Q    Okay.  So, is this your only peer reviewed publication on gender dysphoria that's published in a scientific journal?



A    The letters to the editor of the Journal of the American Academy of Psychiatry and Law are peer reviewed, they don't just publish a letter to an editor.  You have --

Q    Okay.

A    -- to be reviewed to get into those.  So, those are also considered peer reviewed articles.

Q    Okay.  So, let me ask it differently then. The Kozlowska, et. al., is that the only peer reviewed study or review that you've published in a peer reviewed journal?

A    Yes.

Q    Yes.  Okay.  And Kozlowska is about pediatric general medicine, as the title indicates; is that correct?

A    It does.  It covers a lot of issues that are important with -- for adult gender medicine also, but it is focused on pediatric gender medicine.

Q    Uh-huh.  Okay.  So, have you -- oh, strike that.

Have you conducted any original research on gender dysphoria or transgender people?

A    No.

Q    Okay.



MS. COOPER:  We can take down that, the exhibit for now.

BY MS. COOPER:

Q   When did you first begin reading the literature, the scientific literature on gender dysphoria?

A   Well, I think that to describe my evolution of knowledge regarding what we're currently calling gender dysphoria, you have to go back to my education, you know, even in medical school, and in residency which, you know, included different names for similar or if not exactly the same presentations.  So, there was gender identity disorder.  And during residency and adult psychiatry, and then in child psychiatry, and in forensic psychiatry you cover disorders of sexuality or sexual-related disorders or -- you know.  So, depending on what the different organization or, you know, ICD versus DMS --

Q   We're breaking up a little bit.

Is that -- is that --

A   Am I back?  Can you hear me okay?

MR. STEELY:  I can hear you just fine.

MS. COOPER:  Oops.

A   Okay.  Well, I'll keep talking if people



medically necessary outside of the prison context?

MR. STEELY:  Object to form.

A    I don't think it would meet the standard of medical necessity.  It could be a choice that a patient would make, but I don't think it would be medically necessary.

BY MS. COOPER:

Q    And why?

A    Well, to be -- it is a --  first, it's a, you know, patient's own will to do -- to dress themselves as they want when they're out in the world, and present themselves as they want.  They can call themselves what they want.  I mean, all of those things are choices that have, you know, many complex tradeoffs, and I think we're not usually in the business of getting -- of micromanaging these tradeoffs in outpatient settings.

And when someone enters into a correctional setting, you know, things are very different.  But, yeah, in an outpatient setting it wouldn't need to be medically necessary because it would be really patient autonomy, but they would decide.

Q    Well, I understand it wouldn't need to be medically necessary for the person to access that, but could it be necessary -- medically necessary for


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

somebody's mental health to dress and groom consistently with their gender identity?

A    No, I don't think it meets the standard of medical necessity.

Q    And is that because you don't think it helps or for some other reason?

A    Well, it's a complex tradeoff that a -- that they could choose to enter into if they -- if they want to, and some patients may choose to present one way in certain situations, and another way in another situation, and -- and --

Q    Is it -- so, go ahead.

A    Yeah.  So, they have the autonomy to choose these things, you know, as outpatients, but -- and -- you know, but it is -- but it wouldn't be medically necessary.  I don't think it's -- it's just not part of what we're -- we have to sort of like put within the realm of what we can -- of what we control as, you know, mental health providers. It's sort of beyond what we're sort of working with, with these patients.

Q    Right.  But, I mean, I think you'd agree that certain accommodations that people need in life outside of prison can be medically necessary even if you don't need a doctor to get a low bed or



orthopedic shoes?

A    Right.

Q    So, I'm just trying to understand.  Is it something about the nature of the, you know, clothing and grooming standards that leads you to say that can never be medically necessary or, you know, is that the -- is that what it is?  It's something about the nature of the --

A    Yeah.  It's --

MR. STEELY:  Object to form.

A    It seems -- it seems quite foreign.  It would be like writing a prescription for a wig, right.

BY MS. COOPER:

Q    For what?

A    For a wig or for women's clothing, right. I mean, it does not -- it doesn't seem like it's within the purview of what would be medically necessary, and what would we be providing in saying, must be or sort of is emphatically we're supporting them.  I mean, these are choices that people make in the outpatient world, and it is their choice how they present themselves.  But it doesn't make it medically necessary, and patients frequently are changing how they present themselves, and they have



the autonomy to do so.

Q   So, you disagree with insurance companies that provide coverage for wigs for cancer patients after chemo as medically necessary?

MR. STEELY:  Object to form.

A   That would not be an issue that I have looked into.  So, I don't know what all of the ins and outs are with wigs for chemotherapy.

BY MS. COOPER:

Q   Correct.  But given what you're describing, it sounds like you would say that's not medically necessary in your view, wigs after chemotherapy?

MR. STEELY:  Object to form.

A   Well --

MR. STEELY:  Object to form.

A   -- it may be different.  Maybe they do actually write a prescription for a wig.  I'm not -- I'm not -- I don't -- I don't know enough about it.

BY MS. COOPER:

Q   Let's assume they --

A   So, it may have changed somewhat.  So, yeah, I mean, maybe if the -- if the loss of hair is due to the chemotherapy that the doctor is using to cure the disease of the cancer, and, therefore, the loss of hair is related to a medicine, then that



does change the dynamic because it's related to the, you know, medicine that someone has provided for the treatment of the disease.

Q    Okay.

A    So, they would then potentially be working, helping to ameliorate a side effect that they caused by giving chemotherapy.  So, it seems like it's a different situation.

Q    Well, you started talking about doctors writing prescriptions, but I think you agreed before it doesn't have to require a doctor's prescription for something to be medically necessary for somebody; right?  Like a low bunk or a diet or something; right?

A    Correct.  Although I think within correctional environments things are very much prescribed in -- in -- and are regimented in its very official who -- you know, what is provided, and what is not provided.

Q    Right.  So, certain things in prison you don't get to choose, so you need a doctor's approval to get the low bunk pass or the diet; right?

A    Correct, that's what I'm saying.

Q    But outside of prison you wouldn't need a prescription for a doctor to get either of those



things; correct?

A   That's correct.  Yes.

Q   Yeah.  Okay.  So -- hold on.

So, if the research showed that social transition improves the mental health of people with gender dysphoria, and alleviates their gender dysphoria, and assume with me this is research that you find to be credible research, would you still think that ability to socially transition would never be medically necessary?

MR. STEELY:  Object to form.

A   I think it would depend on the -- it would be -- could be situational, and it could depend on exactly what the research is showing.  I mean, the ability to social transition -- socially transition, and I assume this question is posed in the outside world, you know, not in corrections.

BY MS. COOPER:

Q   Right.

A   And is the -- is the positive effect of the social transition profound enough, you know, to raise to the level of -- with enough research, and in the right situation could I agree potentially that they -- that it would in certain situations be medically necessary?  I think I could be convinced



population.  I don't think it's, you know, necessary for those patients, and I think they would probably be more helped in the long run by not having the social transition.

Q   So, I understand that you're drawing some conclusions based on the rise in numbers of people with gender dysphoria, but are you aware of studies that shows that adults with gender dysphoria are likely to -- are more likely to desist in their gender incongruence if they are not able to socially transition?

A   Well, so, when you say, gender incongruence, so this raises a whole number of different questions.  So, I think -- or, you know, I would agree that adults are unlikely to overcome gender non-conformity, you know, which we would say broadly would exist -- would say, you know, not being stereotypes, being, you know, same types attracted, any of those type of things, you know, are unlikely to, you know, significantly change. So, that doesn't -- those are sort of properties that, you know, tend to be more enduring.

Whether they have distress about their body, I think is something that they could overcome, you know, if -- with proper treatment for most


ESQUIRE
DEPOSITION SOLUTIONS

patients most of the time.

Q   Okay.  Let me -- let me -- thank you for that breakdown.

So, are you aware of any studies or evidence showing that adults with gender dysphoria are likely to overcome their gender dysphoria, more likely to overcome it if they are not able to socially transition?

A   I didn't think that the matter has been studied.  So, yeah, I don't think we have data one way or another on that.

Q   Okay.  And when you say that providing accommodations for social transition may enhance a patient's reluctance to receive psychotherapy, do you have -- is there evidence showing that people are unlikely to receive psychotherapy if they're able to socially transition?

MR. STEELY:  Objection.

A   Well, I think that all of this -- that question comes down to this really interesting dilemma that we have.  If you have institutional support for the idea that mostly we should be going along with, and accommodating your, you know, cross sex ideas, then that will be helpful to you versus if an institution says, well, I think it's better



for us just to, you know, compassionately understand that there are biological sexes, and you've come in in this biological sex, and we're going to give you the clothing and, you know, sort of -- you're going to be socialized with those of your biological sex, that that can help patients, and that that we -- by -- we should probably -- that we have to be very careful when institutions, especially a correctional environment endorse a certain approach to something that seems to be going along with it.

So, yes, I am saying that -- that I think that it would be -- when we are giving things like social transition, we are sort of saying, we're going to go along with as an institution this idea that you, you know, have a need to present as the other sex, whereas we -- which we would then endorse perhaps the idea that this is really a thing that solved my gender-related distress, and my emotional-related problems, would be solved through things like social accommodation, hormones, you know, surgical treatments down the road rather than an institution that's like our main focus is to compassionately provide psychotherapy for people with gender-related distress, and we don't really mean to do the transition.



So, I do think that they -- that the not -- you know, showing that we're -- we're comfortable with not going along with the social transition helps sort of solidify the interest in psychotherapy as the main treatment.

BY MS. COOPER:

Q   Is it your understanding that prior to the change in policy and the removal of social accommodations that inmates with gender dysphoria were not also getting psychotherapy?

A   No, I think --

MR. STEELY:  Object.

A   -- they were -- psychotherapy was available.

BY MS. COOPER:

Q   Okay.  So -- but this idea that people would be reluctant to engage in psychotherapy if they're also able to get social transition, is there evidence showing that that happens, that people are less likely to pursue therapy if they're able to socially transition?

A   Well, I think, you know, just from being in the therapeutic community that works with gender distressed individuals, that it is a talked about and well phenomenon that the more affirmative



environments people are in, the -- you know, it becomes then sort of frowned upon, and perhaps going against how people feel they should be treated to then, you know, engage in psychotherapy, right.  So, there is a lot of stigmatization of psychotherapy within the professional community that -- like those -- like WPATH, and within those who follow that type of approach.

And, so, I think it happens, and I think it can make -- that it does make a difference with regard to engagement, what sort of stance, you know, institutions and mental health providers take regarding these things.

So, no, we don't have a lot of data on it, but I think it is reasonable to think that the -- the willingness of an engagement for those with gender dysphoria, which is often difficult to get this special population to engage in substantial, you know, psychotherapy treatment can be underlined.

Q   We don't have any data; right?  It's not just that we don't have a lot of data --

A   Uh-huh.

Q   -- we don't have any data showing that --

A   Uh-huh.

Q   -- social transition makes people less



800.211.DEPO (3376)
EsquireSolutions.com

likely to pursue psychotherapy; is that correct?

A    Yes, it hasn't -- it hasn't been adequately studied, but I would say in my -- in my experience --

Q    Okay.

A    -- this -- this is a patient population that generally is reluctant to engage in psychotherapy.

Q    And your understanding is that people who follow the WPATH standards are reluctant to provide therapy to their patients, and suggestions?

A    Yeah, they're reluctant to provide what I would call, you know, high quality psychotherapy because there's a tension between saying that hormones and surgeries are the solution to your gender-related distress, and psychotherapy is the solution to your gender-related distress.

Q    Uh-huh.

A    So, those who are sort of more enthusiastically advocating for hormones and surgeries tend to be downplaying psychotherapy.

Q    But you don't know how most providers are providing care, those who you would call affirming providers; right?

A    I do know that I've been following the



field quite a bit, and I do know what they put in their standards of care, and how they frame things. And, so, I think you can judge them by their own standards of care.

Q   Which recommends psychotherapy; correct?

A   It recommends affirming psych -- for one, which then makes a question of whether it is psychotherapy at all, but it downplays in adults the need for psychotherapy prior to transition.

Q   Uh-huh.

A   So, it's not a psychotherapy emphasis, it is -- it is one sort of, they would say supportive kind of measure along with the medical transitions that they're recommending.

Q   Okay.  Just doing a check on hunger.  Are you able to go a little bit longer or do you need a break?

A   I'll do -- you know, I wouldn't mind a break.

Q   Do we want to do a lunch break now?  And if others -- or do a short break, and do lunch a little later?

MR. STEELY:  I'm good either way.  I'm an hour behind the good doctor, so I'm good at lunch now or later, doesn't matter to me.



dysphoria?

A    Not that I -- not that I'm not aware of.

Q    Okay.  And I want to make sure I understand your view.  Are you saying psychotherapy ought to be the exclusive treatment?  I understand you -- well, let me -- let me rephrase.

I understand you say it should be the primary treatment.  Is it your view it should be the exclusive treatment as well for gender dysphoria?

MR. STEELY:  Object to form.

A    Are you asking me about in correctional environments or --

BY MS. COOPER:

Q    I'm asking in --

A    -- in general?

Q    Let me ask generally in the community.

A    I do believe it should be the first line approach, and the primary approach.  I don't --

Q    Uh-huh.

A    So, that's what I'm saying, it should be the first approach, and the primary approach.

Q    But it should not necessarily be the exclusive approach in the community, psychotherapy?

A    Correct.

Q    Okay.  But in the correctional environment



you believe psychotherapy should be the exclusive approach to gender dysphoria?

A   Well, I believe as I've detailed in my report that I'm a -- I am -- I think that we can accept that certain exceptions are made to psychotherapy only, you know, especially under circumstances where someone has already presented in treatment.

Q   Okay.  And there are no studies, right, that demonstrate the effectiveness of psychotherapy alone to treat gender dysphoria; right?

A   There are no studies demonstrating the -- basically no studies demonstrate the effectiveness or ineffectiveness.  It's not been studied.

Q   Okay.  So, is it your view that psychotherapy is effective at treating other mental health conditions, you believe they can be effective to alleviate gender dysphoria?

A   Yes, I mean, in part I think the proven track record of helping individuals with all sorts of distress would include a very high likelihood that it would help individuals with gender-related distress.  I don't see any reason why gender-related distress should be exceptionalized.

Q   Uh-huh.  Uh-huh.  But there -- at this



point there's not evidence looking at that; is that correct?

A   Basically one way or another there's not evidence, yes.

Q   Uh-huh.  Okay.  And you cite an article by Hakeem about psychotherapy; right?

A   Correct.

Q   Yeah.  Now, Hakeem is not suggesting that psychotherapy should be the exclusive treatment for gender dysphoria; right?

A   Well, I would think -- I guess you would have to ask Dr. Hakeem about that.  I don't believe, but I'm not a hundred percent sure what he recommends.

Q   Well, in the article they recognize that homotherapy and gender conforming surgeries can be helpful for gender dysphoria; right?

A   The article -- yeah, I'm not sure if his viewpoint has evolved since that time, but --

Q   Uh-huh.

A   -- yeah.

Q   But in that article that's what he said?

A   Yes.

Q   Okay.  Of your -- I think we said -- you said six to eight adult patients who you've treated



or had residents treat who have gender dysphoria, did any of those patients of their gender dysphoria resolve through psychotherapy?

A   Well, I'm not aware of the outcome of some of the patients if they're no longer in the clinic. So, I don't know.  And some already have ongoing treatment, and I would -- some have been medically treated already.  So, none -- none have exclusively used psychotherapy as an approach.  So, I -- so, no, I don't think that that's the case.

Q   You say none of the six to eight patient --- adult patients with gender dysphoria that you or your residents have seen use psychotherapy as the exclusive approach?

A   You asked about the adult patients?

Q   Yes.  Yes.

A   Oh.

Q   Is that correct?

A   Correct.  Correct.

Q   Okay.  Now, in your reports you offer various assertions about WPATH and WPATH's Standards of Care 8 based on documents from a WPATH production in a lawsuit in Alabama called Boe V. Marshall; right?

A   Yeah, I mean, there's many lines of



800.211.DEPO (3376)
EsquireSolutions.com

that has been functionally, you know, socially transitioned in a correctional environment would be upset, and be disappointed by such a change.

But I'd also reflect that individuals with gender dysphoria, whether they're incarcerated or not, you know, are aware that not everyone believes that it's a good idea to go along with social transition, and to indulge social transition in any number of settings, not just in incarceration.

So, I don't think that anyone in an incarcerated setting would have been all that surprised that that previous mode was -- would change.  They might have been disappointed, but I would imagine they knew that at some point that could change, just like someone who embarks on hormone treatment could at some point have a side effect or problem with it, and they just have to stop because they now have a problem related to the treatment.

So, sometimes you begin a treatment, and you can't always finish it for a number of reasons. And, so, this I think would be a disappointment to them.  But if you're -- you're trying to weigh, you know, what is best for the individuals, and best for the system, and if you have to make a transition



from one policy to another, there's always going to be some disruption.

BY MS. COOPER:

Q    And you said it would be disappointing. Would you not expect mental health decompensation for any people who have been able to dress and groom consistent with their gender identity for years, and have that taken away?

A    There might be, that may occur.

Q    Uh-huh.  And -- sorry.  And do you know whether people who are incarcerated in the Florida Department of Corrections who have had these accommodations taken away, whether any of them have experienced severe decompensation as a result?

A    Well, I think the plaintiffs in this case have voiced that that was their feeling with the change in policy.

Q    Uh-huh.  And do you know whether their mental health providers have agreed?

A    Well, I think that they -- that there clearly is and was a disruption that was impactful to them with the change.

Q    And did their mental health decompensate in some cases?

A    I believe, yes.  In some cases, yes.



Q    Uh-huh.  And, so, given that -- I mean, if you were advising a prison system, if they hired you to help consult on their gender dysphoria policy, they already have -- their current policy has accommodations, and they've had people receiving these for years, would you advise them it's a good idea to take that away?

MR. STEELY:  Object to form.

A    Well, I don't know that I have enough information to decide on the totality of how a system would handle such a -- you know, these difficult decisions because if you're correctly identifying -- in my opinion correctly identifying that the -- the over reliance on medications and social transitions for inmates expressing gender dysphoria has caused a problem, turning that around I think no matter how you, you know, change the system to a more psychotherapy oriented system is going to cause disruption and problems.  And, so, I don't know that I can comment on exactly or that I have a well thought out idea about how exactly to make that change to a more appropriate system, but I understand that it would be impactful, and cause significant disruption.

BY MS. COOPER:



Q   Uh-huh.  And significant psychological distress for some inmates?

A   Yes, I think especially in the short-term when they're -- when policies are changed, and someone is used to a certain policy.  I think that's true with, you know, commentary policies much less something more, you know, impactful to inmates.

Q   So, you don't disagree, I take it then that for someone with gender dysphoria the inability to socially transition and present to the world consistent with their gender identity, that that can help for some people improve their mental health?

MR. STEELY:  Object to form.

A   Well, I think it's a complex tradeoff that we're -- that we're contemplating individuals with gender dysphoria because the social transition I think for a large group of them would serve them to feel pleased and better, you know, in the short run, but may not help them in the long run, right.  So, I mean, obviously this is an area that we need more study of how to get people to, you know, come to peace with their bodies that they have, but you can see that that would be a positive if someone was not upset about the body that they have, and exactly what institutional policies and other approaches



lead to someone, you know, having less distress is a -- you know, a question that obviously we've been talking about it's a plus.

BY MS. COOPER:

Q   So, in your view the goal for treatment of gender dysphoria is -- still should be helping people come to peace with the body they have?

A   Well, I think, as we mentioned, there's a number of potential psychotherapeutic or other goals that you could, you know, reach with a patient, but I do think that at least some component of treatment would be to reduce gender dysphoria, that's a psychiatric disorder.

Q   Uh-huh.

A   So, if we can reduce that, that would be good.

Q   Yeah.  But at the moment we don't know if there's -- there's no evidence indicating whether psychotherapy can help reduce that dysphoria; correct?

A   Uh-huh.  Yes.  But there's also very limited evidence on social transition.

Q   Uh-huh.

A   So, yes, there's a number and -- and the potential that there's some tradeoff that's high



iatrogenic or, you know, induced harm from continuing with the -- you know, with the social transition rather than working to accept the body that they have.

Q   Even though we don't have any evidence that psychotherapy can help people come to accept the body that they have?

A   Well, we have --

MR. STEELY:  Object to form.

A   We do have good evidence that in other disorders that they can.  So, the evidence for something like a body dysmorphic disorder, CPT protocols are very effective.  So, we -- and sebopsoriasis actually help also in that case.  So, there's a number of other disorders where we do work with people to help accept their body, and work with the body, and get over body-related distress.

So, I think there is a good amount of evidence.  And when you're talking about evidence-based medicine, especially in situations where the -- there's a lack of study in the particular disorder or problem that you're facing, then you look at all evidence, right.  So, there's uncertain evidence regarding gender dysphoria of how to approach it, I think it's perfectly reasonable to



clinical populations.  So, the -- an adolescent with gender dysphoria is also in the middle of a phase of life where their identity would be changing more rapidly, and gender dysphoria might be related to adolescent issues that come up.

Q   So, would you use different diagnostic tools or treatment, I guess modalities for a better word in treating adolescents versus adults?

A   Well, I think that there's two different things.  So, for diagnosis, I mean, you're still using the same -- pretty much the adolescent criteria in an adult or similar.  So, you're sort of getting either -- the diagnosis would be the same. I think everyone is treated differently based on their stage of life, and how long that they've had the problem, and -- and what's the context of the problem that they have, irregardless of gender dysphoria or other treatments.

So, yes, I think that there's some differences, although there's some things that are obviously the same because you're dealing with criteria for a disorder that's very similar.

Q   I think that's all of my questions.

Thank you.

MS. COOPER:  I just have one short follow



KRISTOPHER KALIEBE M.D.                      December 15, 2025
KEOHANE vs DIXON                                          327

up.

                    REDIRECT EXAMINATION

     BY MS. COOPER:

     Q   So, the mental health as well as
associations views or support for certain
treatments, and -- do I understand correctly that --
would you agree that many of the national medical
and mental health professional groups in the United
States have supported gender affirming care for
gender dysphoria for some time?

     A   Yes.

          MR. STEELY:  Object to form.

     A   Yes, I would agree that major medical
associations have been advocating for gender
affirming care for a while, correct.

     BY MS. COOPER:

     Q   And that would be before, you know --
excuse me, it's getting late in the day.

          And that support for advocacy for, as you
characterized it, gender affirming care, has that
continued after the publication of WPATH's SOC 8?

     A   Yes, it does seem that professional
organizations have for the most part.  The plastic
surgeons have not taken a position on youth gender
medicine, but the other ones, none of them have



walked back their official support for gender affirming care.  So, yes, they're still supporting.

Q   Uh-huh.  And just to be clear, I wasn't talking specifically about youth, I was talking in general, and including for adults --

A   Yes.

Q   -- and would your answer still be the same?

A   Yes.

Q   Yes.  That's it.

MR. STEELY:  All right.  My turn one more time.

RECROSS EXAMINATION

BY MR. STEELY:

Q   All right.  So, when you said earlier, we were talking about the APA, and the committees, and how the leadership was driving the treatment or, sorry, driving the advocacy.

So, is it your understanding that this -- from what you've read, and what you've evaluated, that the major medical groups that you just referenced that are supporting gender affirming care are operating in a similar manner, whereas the leadership and these committees that are driving the advocacy as opposed to the actual membership of the group?



A    Yes.  I think there's two things that are going on.  I think that's true, but I also think that the advocacy groups have also, you know -- so, I would say hijacked the apparatus of the organization to sort of promote these treatments rather than to debate, you know, what should be the right treatment, and all of that.

So, there's been a whole bunch of educational materials, and other things that these organizations put out, which is then in theory to be training physicians to handle these problems.  And I would say I think over the last decade or so we've systematically misinformed residents and trainees regarding treatments for gender dysphoria by once again sort of overstating the benefits, and making it into a rights issue, and not talking enough about risks.

So, I think the professional organizations have two problems, one is that this is -- that their leadership has gone down a road which was putting advocacy before science.

And, secondly, their apparatus is now built in order to promote affirmative treatments rather than to discuss what is really the best treatment, and have an honest dialogue and debate, which is

