# EXHIBIT 4

# Clinical Guidelines for Behavioral Health Services:
# The Evaluation and Treatment of Gender Dysphoria in Correctional Settings

The diagnosis and management of gender dysphoria in correctional settings is an important and challenging task for healthcare staff.  The following Clinical Guidelines are intended to assist Centurion clinical administrators and staff in establishing a system for the evaluation and treatment of incarcerated individuals presenting with possible or confirmed gender dysphoria within their contract.

These guidelines are written generically so the basic tenets can be applied to large state correctional systems as well as smaller state or county systems and provide an overview of the clinical and administrative structures necessary to ensure proper evaluation and treatment for this population.

Centurion clinical administrators and clinical staff establish this system in collaboration with client leadership and in accordance with community standards of care.  If elements within this guideline conflict with client policy or expectations, Centurion leaders take collaborative steps to resolve the difference.

## DEFINITIONS

The term _transgender_ and the diagnosis of _gender dysphoria_ are often confused.  _Transgender_ is an umbrella term used to identify individuals whose gender identity or gender expression does not conform to the individual's gender assigned at birth (often referred to as _birth-assigned gender_).  _Cisgender_ denotes individuals whose gender identity or gender expression are congruent with their birth-assigned gender.  Transgender and cisgender identity tends to remain persistent, consistent, and insistent over time, but gender identity can change over the course of the individual's development, including during adulthood.  _Transgender_ is not a psychiatric diagnosis or disorder.

_Gender-nonconforming, gender-diverse, gender variant, gender neutral_, _gender fluid_ and _non-binary_ are additional terms encompassed under the transgender umbrella.  _Trans male_ refers to individuals whose birth-assigned gender is female but whose gender identity or expression is male; _trans female_ refers to individuals whose birth-assigned gender is male but whose gender identity or expression is female.  Transgender individuals may or may not experience distress related to their gender assigned at birth.

Individuals who experience clinically significant distress related to their birth-assigned gender meet clinical criteria for the _DSM-5-TR_ diagnosis of _gender dysphoria_.  While most individuals diagnosed with gender dysphoria would identify as transgender, many individuals who identify as transgender do not meet clinical criteria for gender dysphoria.  These clinical guidelines address the assessment and treatment needs specifically of patients who may meet diagnostic criteria for gender dysphoria.

In the correctional setting, when an incarcerated individual meets the _DSM-5-TR_ criteria for the diagnosis of gender dysphoria, the individual has a constitutionally protected right to adequate care, as delineated by numerous court cases.  Briefly, in the landmark case of _Estelle v. Gamble_ (1976), the U.S. Supreme Court found that when correctional departments are "deliberately indifferent" to a prisoner's serious medical condition, it constitutes cruel and unusual punishment, an 8th Amendment violation.  The following year, in the case of _Bowring v. Godwin_ (1977), the U.S. Supreme Court found psychiatric conditions to have the same protections under the 8th Amendment.  Since that time, numerous Federal Courts of Appeal have identified gender dysphoria as a serious psychiatric condition (e.g., _De'Lonta v. Angelone_

©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037250

# Clinical Guidelines for Behavioral Health Services:
# The Evaluation and Treatment of Gender Dysphoria in Correctional Settings

*et al.*, 2003; *Kosilek v. Maloney*, 2002; *Phillips v. Michigan Department of Corrections*, 1990). Therefore, when an incarcerated individual meets clinical criteria for gender dysphoria, the individual has a constitutionally protected right to adequate treatment.

## LIMITS OF SCOPE AND INTENT

The identification and management of patients with gender dysphoria requires case-by-case evaluation followed by an individualized treatment plan.  These clinical guidelines are designed to provide administrators and clinicians with a guide for establishing these processes but do not account for every case scenario.  As such, these guidelines cannot and should not replace individual clinical judgment based on the patient's presentation and condition.  In these and all cases, clinical judgment, clinical supervision, and multidisciplinary discussion and consultation are necessary.

## RESOURCES AND SOURCES FOR GUIDELINES

The guidelines are written with correctional facilities as a general framework and are consistent with ACA and NCCHC standards as well as the World Professional Association for Transgender Health (WPATH) Standards of Care (SOCs).  The guidelines are also consistent with or informed by the following sources:

- American Academy of Pediatrics (2018).  *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents (Policy Statement).* https://pediatrics.aappublications.org/content/142/4/e20182162
- American Psychological Association (2015).  *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, Guidelines 5 & 10. https://www.apa.org/practice/guidelines/transgender.pdf
- American Psychiatric Association (2022).  *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision*. Washington, DC: American Psychiatric Association, 2013
- Beck, A.J. (2014).  *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12.*  Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates.  Bureau of Justice Statistics.
- *Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977)
- *De'Lonta v. Angelone et al.* 330 F.3d 630 (4th Cir. 2003)
- Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Langstro¨m N, et al. (2011).  Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden. *PLoS ONE 6*(2): e16885. doi:10.1371/journal.pone.0016885
- *Edmo v. Corizon*, Inc., 935 F. 3d 757 (2019)
- *Estelle v. Gamble*, 429 U.S. 97 (1976)
- *Farmer v. Brennan*, 511 U.S. 825 (1994)
- *Gibson v. Collier*, 920 F. 3d 212 (2019)
- Grant, J.M., Mottet, L.A., Tanis, J., Herman, J.L., Harrison, J., & Keisling, M. (2010).  *National Transgender Discrimination Survey Report on Health and Health Care.*  Findings of a Study by the National Center for Transgender Equality and the National Gay and Lesbian Task Force.
- Hembree, W.C., Cohen-Kettenis, P.T., Gooren, L., Hannema, S.E., Meyer, W.J., Murad, M.H., Rosenthal, S.M., Safer, J.D., Trangpricha, V., & T'Sjoen, G.G. (2017).  Endocrine



©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037251

# Clinical Guidelines for Behavioral Health Services:
## The Evaluation and Treatment of Gender Dysphoria in Correctional Settings

Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. *Journal of Endocrinology and Metabolism, 102*(11), 3869-3903. doi: 10.1210/jc.2017-01658

- *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 192 (2002)
- National Commission on Correctional Health Care (2020). *Position Statement on Transgender and Gender Diverse Health Care in Correctional Settings*
- *Norsworthy v. Beard*, 802 F. 3d 1090 (2015)
- *Phillips v. Michigan Department of Corrections et al.*, 731 F. Supp. 792 (WD Mich, 1990)
- *PREA Standards and Policy Development Guidelines for Lesbian, Gay, Bisexual, Transgender and Intersex Inmates.* http://www.wcl.american.edu/endsilence/documents/LGBTIAdultWebinarFINAL.pdf
- *Prison Rape Elimination Act*, 28 C.F.R. §§ 115.15 (e), 115.43 (a)
- Warrier, V, Greenberg, D.M., Weir, E., Buckingham, C., Smith, P., Lai, M.C., Allison, C., & Baron-Cohen, S. (2020).  Elevated rates of autism, other neurodevelopmental and psychiatric diagnoses, and autistic traits in transgender and gender-diverse individuals. *Nature Communications, 11*:3959 | https://doi.org/10.1038/s41467-020-17794-1
- World Professional Association for Transgender Health (2012).  *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7.* [ HYPERLINK "https://www.wpath.org/publications/soc" ]

### ETHICAL CONSIDERATION

A guiding principle of clinical care is to do no harm.  When working with gender dysphoric individuals in corrections, there are multiple instances in which harm can occur including (1) lack of access to necessary interventions and (2) approval of interventions that are not clinically indicated and that may cause harm.  As a result, correctional behavioral health and physical health professionals working with incarcerated individuals must consider all evidence-based options for treatment *and* ensure that interventions that could be harmful are not applied.

*Transgender* identities and diverse gender expressions, though do not represent mental illness, deserve the support of all healthcare professionals.  Correctional healthcare professionals must take particular care to respect human dignity, including the expression of gender identity, as well as support patient autonomy.  The four cardinal ethical principles that guide healthcare – respect for autonomy, beneficence, non-maleficence, and justice – dictate that incarcerated individuals be provided access to gender-affirming items and practices such as clothing items, hygiene products, housing and the ability to maintain hair length as desired.  Access to gender-affirming practices and items should not require a diagnosis of gender dysphoria.

When correctional departments do not adopt a policy of permitting access to gender-affirming items and practices to incarcerated individuals, correctional healthcare professionals are obligated to advocate for such access.  If access is denied on a population-wide basis, behavioral health professionals are obligated to support access on a case-by-case, patient-specific basis.  In these cases, these items and practices represent *interventions* that require evaluation of the patient and approval of the item or practice by behavioral health staff. Interventions such as housing, undergarments or hygiene items may not appear to be within the purview of behavioral health and physical health staff.  However, if such placement or such items will alleviate the individual's gender dysphoria, then these and other similar interventions constitute treatment interventions and must be directed by healthcare professionals in collaboration with custody staff.

©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037252

# Clinical Guidelines for Behavioral Health Services:
# The Evaluation and Treatment of Gender Dysphoria in Correctional Settings

## PROCEDURE

Each Centurion contract should ensure that individuals who meet *DSM-5-TR* criteria for gender dysphoria have access to appropriate services.  At a minimum, access to appropriate services requires that the program establish methods for:

1. Determining the initial diagnosis of gender dysphoria;
2. Evaluating whether hormonal treatments are necessary to alleviate the dysphoria;
3. Evaluating whether surgical interventions are necessary to alleviate the dysphoria; and
4. Evaluating whether identified interventions are medically indicated and appropriate for a particular individual based on the individual's unique medical presentation.

Consistent with national and international guidelines, each step in the process requires multidisciplinary cooperation.  The initial determination of whether the individual meets criteria for gender dysphoria or whether a certain type of intervention (i.e., gender-affirming hormones or surgeries) would alleviate the individual's dysphoria is made by a qualified, independently licensed behavioral health professional.  The behavioral health determination that specific interventions are likely to alleviate the individual's dysphoria is not a determination that the interventions are medically appropriate for a particular patient.  Once behavioral health professionals determine that a certain intervention is likely to alleviate dysphoria, medical physicians (endocrinologists, for example) conduct a medical evaluation to determine medical appropriateness.  The medical provider then prescribes treatment as medically indicated for the particular patient.  This sequence is consistent with WPATH SOCs and community standards.

**Establishing the diagnosis:**  Correctional behavioral health services have implemented different methods for establishing a diagnosis of gender dysphoria.  Most correctional systems establish a gender dysphoria treatment committee or gender dysphoria treatment panel comprised of the psychiatric director, medical director and clinical director (typically a licensed clinical psychologist, a licensed clinical social worker, or other independently licensed behavioral health professional).

Upon admission to the correctional system, or at any other time during an individual's incarceration, if the incarcerated individual either self-identifies as meeting criteria for gender dysphoria or is referred secondary to possible gender dysphoria, a facility-based qualified behavioral health professional is assigned to conduct the evaluation.  Such individuals shall have received training on gender dysphoria and transgender health and have been identified by the treatment committee as competent to conduct such evaluations.  At minimum, this assessment requires a face-to-face evaluation, review of medical and behavioral health history, discussion with collateral contacts, and any other method the behavioral health professional deems appropriate to gain information necessary to make the diagnosis.  During this time, the behavioral health professional works with the incarcerated individual to have all appropriate releases of information signed so access can be gained to outside medical and mental health records.

The behavioral health professional then prepares a report of the evaluation and provides a provisional diagnosis.  In most systems, an additional evaluation is conducted by a behavioral health professional with more experience with this population to confirm the diagnosis.  In larger systems, these reports are then reviewed by a treatment committee for final approval.  In smaller systems when a committee review is not possible, the second evaluation serves to



©2022 Centurion, LLC. All rights reserved.

confirm the diagnosis.  These evaluations should be completed timely and at least within 30 days of the date when the determination was made that such an evaluation is necessary. Additional time may be required by the treatment committee to review the diagnosis, but this process should be expedited and take no more than one week or as expeditiously as possible after receiving the second evaluation.

**Psychological testing:**  There is no psychological test that can rule in or rule out a diagnosis of gender dysphoria.  Current standards for diagnostic assessment include a patient interview, review of clinical history, and obtaining information from collateral contacts in the community (e.g., family members and/or treatment providers).  Taken together, these sources are usually sufficient to make the diagnosis.  Formal psychological testing may be indicated to determine whether other clinically significant issues that require treatment are present or to rule out other conditions.  As with all diagnostic testing, specific tests to be conducted are determined by a licensed psychologist, and may not be dictated by policy.  Unsupported and lengthy diagnostic processes, such as requiring a pre-determined battery of psychological tests, are often viewed as an intentional delay in treatment for patients in need of care.

**Other considerations for qualified behavioral health professionals when conducting diagnostic assessment:**  Although transgender status is not a mental illness, many individuals who identify as transgender, including individuals who may be suffering from gender dysphoria, have been victims of maltreatment, marginalization, stigmatization, discrimination, gender victimization, abuse, and other forms of interpersonal trauma.  Behavioral health professionals conducting the evaluation must take a trauma-informed approach to the evaluation and be sensitive to the risk of inadvertently re-traumatizing the patient during the assessment process.

The prevalence of suicidal spectrum ideation and behavior in this population is very high. Studies reflect rates of suicidal spectrum behaviors ranging from 30% to 80%.  Coexisting anxiety and depressive disorders are common as a result of social and cultural ostracism, as are substance use disorders that may arise as a result of self-medication.  The assessment of gender dysphoria requires behavioral health professionals to adopt a posture of heightened alertness for the risk of suicide and sensitivity to the potential for trauma-related and other disorders.

A special consideration in the context of incarceration arises from recent empirical work confirming an overrepresentation of autism spectrum traits among individuals with gender dysphoria as well as an elevated risk for gender dysphoria among patients with autism spectrum disorder.  Patients with autism spectrum disorder may exhibit concrete and rigid thinking about gender roles, have difficulty understanding social roles, or simply be less bound by fixed or "traditional" gender roles.  These considerations can complicate both the assessment and treatment recommendations, creating a unique challenge. Because individuals with autism spectrum are also at risk for social rejection and suicidal spectrum behaviors, a finding that a patient meets criteria for both autism spectrum and gender dysphoria raises the level of behavioral health care the patient is likely to require.

It is possible to suffer from both gender dysphoria and a psychotic disorder.  Gender-themed delusions are relatively common among patients with schizophrenia, occurring in up to a fifth of these patients at some point.  However, in the absence of a psychotic disorder, a transgender individual's insistence that they are another gender is not a delusion.  Distinguishing between gender-themed delusions and gender dysphoria can typically be accomplished through consideration of the patient's psychotic symptoms (including the presence of bizarre mentation

©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037254

# Clinical Guidelines for Behavioral Health Services:
# The Evaluation and Treatment of Gender Dysphoria in Correctional Settings

in schizophrenia that is absent in gender dysphoria) and the waxing and waning of gender-themed delusions with changes in psychosis. Among individuals with gender dysphoria, their gender identity and expression is typically much more consistent and persistent over time.

A small percentage of individuals in correctional settings feign symptoms of gender dysphoria in pursuit of some other goal. Although such instances are rare, additional considerations should be made within correctional settings to rule out this possibility. It is the responsibility of the qualified behavioral health professional to ensure that patients receive proper treatment and that no harm comes to the patient. If a patient feigns symptoms of gender dysphoria, there is the possibility of creating harm as many of the interventions are intrusive and/or non-reversible, including the effects of hormone treatment and surgeries. Reasons individuals have feigned symptoms to receive a diagnosis of gender dysphoria include:

- **Housing/placement:** In some instances incarcerated individuals have reported symptoms of gender dysphoria to effect housing changes such as moving to another area or being assigned to a single cell. Reasons identified for individuals seeking such housing transfers include, but .are not limited to:
    - To avoid placement in a non-preferred facility or area due to fear of other incarcerated individuals
    - To be placed with transgender and gender non-conforming individuals in order to take advantage of this population sexually or otherwise
    - To be housed at identified facility or facilities when correctional departments limit evaluation services to specific facilities
- **Affect appeal process/parole:** In natal males, there have been cases in which an incarcerated individual reports the desire to be diagnosed with gender dysphoria for the purpose of presenting as a woman to the parole board or while appealing a criminal case. In these rare cases, individuals have reported the belief that presenting as a woman will improve their chances of receiving parole or their success in the appeal process.
- **Overturn civil commitment in sexually dangerous person hearing:** Some states have civil commitment laws that detain an individual indefinitely due to sexual dangerousness. During periods of incarceration, there have been some cases of natal males deemed sexually dangerous who have feigned symptoms of gender dysphoria in order to present to the Court or jury as a woman rather than the man who committed the sex offenses.
- **Sexual gratification:** Transvestic disorder should be ruled out to ensure that the individual's desire to access undergarments or products is not strictly based to use these items sexually, but rather to alleviate dysphoria. Transvestic disorder and gender dysphoria are not mutually exclusive. Transvestic disorder with fetishism decreases the likelihood of gender dysphoria in natal men, but transvestic disorder with autogynephilia (arousal by thoughts or images of self as female) raises the likelihood of gender dysphoria. In cases that the sole reason the individual desires undergarments or other products is for sexual gratification, a diagnosis of gender dysphoria should not be given.
- **Increase sexual desirability:** An assessment of whether the person experiences genuine dysphoria due to natal gender versus the individual's desire to be sexually desirable to other incarcerated individuals within the prison system should be conducted. As with all comorbid conditions, the intent to become more sexually desirable to others



©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037255

does not rule out gender dysphoria, but if this is the sole reason to desire clothing or other products, a diagnosis of gender dysphoria should not be given.

**Evaluation for hormonal interventions:**  The evaluation for hormonal interventions requires a step-wise, multidisciplinary approach as follows:

1. Evaluation by a qualified independently licensed behavioral health professional to determine whether the individual's dysphoria will likely benefit from such intervention.

2. Evaluation by a licensed medical physician to determine whether such interventions are medically appropriate based on the individual's unique medical presentation.

   **Evaluation by independently licensed behavioral health professional:**  The main question the qualified independently licensed behavioral health professional asks when conducting this evaluation is as follows: *Does this individual have significant dysphoria related to their current gender expression that hormonal interventions will likely help to alleviate?*  Beyond the training the behavioral health professional needs to be qualified to conduct gender dysphoria evaluations, when evaluating whether hormones are likely to alleviate significant dysphoria, the individual must have an understanding of how the physical changes made by hormones will address dysphoria, as well as a basic understanding of the risks and benefits of utilizing hormones.  Centurion's gender-affirming hormone consent forms can be used as a reference.  If determined that such intervention would alleviate dysphoria, the patient is referred to an identified medical professional (typically an endocrinologist) for medical evaluation.  This process mirrors the WPATH SOCs, which require an independently licensed behavioral health professional to conduct the initial evaluation and provide documentation to the patient to provide to a medical professional.

   **Evaluation by licensed medical physician:**  The licensed physician then conducts a physical health evaluation of the patient to determine the appropriate course of treatment or whether other medical issues result in hormonal treatment being contraindicated.  The licensed physician is often an endocrinologist used as a consultant, and the prescribing is then then done by the on-site medical provider based on the consultation.  When an outside consultant or internal specialist is not available, specialty consultation through RubiconMD is obtained.  The Centurion on-site medical provider then prescribes or not based on the consultation.  When the on-site medical provider meets with the patient, the Centurion gender-affirming hormone consent forms and patient education handouts are used.

Patients newly received into the system who were prescribed hormones in the community should receive a bridge order to ensure no disruption in treatment when the medications are confirmed.  This process should be identical to the bridge order process for all other medications.  Additionally, patients who report taking such hormones 'illicitly' (i.e., purchasing on the street), should be evaluated as to the veracity of these claims.  If laboratory tests or physical appearance is consistent with the patient's report, and there are no behavioral health or medical contraindications, these hormones should be started as soon as possible.

**Evaluation for surgical interventions:**  Similar to the evaluation for hormonal interventions, evaluation for surgical interventions requires a step-wise, multidisciplinary approach as follows:



©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037256

# Clinical Guidelines for Behavioral Health Services:
# The Evaluation and Treatment of Gender Dysphoria in Correctional Settings

1. Evaluation by a qualified independently licensed behavioral health professional to determine whether the individual's dysphoria requires such intervention.

2. Evaluation by a licensed medical physician to determine whether such interventions are medically appropriate based on the individual's unique medical presentation.

- **Evaluation by two independently licensed behavioral health professionals:** The main question the qualified independently licensed behavioral health professionals ask when conducting this evaluation is as follows: *Does this individual have significant dysphoria related to their current gender expression that surgical interventions will likely help to alleviate?* The *DSM-5-TR* diagnostic criteria for gender dysphoria require that the individual meet two of six specified criteria. Two of these criteria include the following: (1) A strong desire for the sexual characteristics of a gender other than one's assigned gender and (2) A strong desire to be rid of one's sexual characteristics due to incongruence with one's experienced or expressed gender. It is expected that, to be found in need of surgical interventions, the patient will meet at least one of these criteria, and most often both – as well as other criteria.

  Behavioral health professionals need specific training to be qualified to conduct gender dysphoria evaluations. Additionally, when evaluating whether surgery is likely to alleviate significant dysphoria, behavioral health professionals must have an understanding of (1) the patient's desired expectations, and (2) whether the patient's desired expectations are realistic in light of available surgical procedures. This process mirrors the WPATH SOCs, which require two independently licensed behavioral health professionals to conduct the initial evaluation and provide documentation to a medical professional that surgery will alleviate the individual's dysphoria.

- **Evaluation by a licensed medical physician:** The licensed medical physician then conducts a physical health evaluation of the patient to determine the appropriate course of treatment or whether other medical issues result in surgery being contraindicated. The licensed medical professional is typically a surgeon used as a consultant. It is important that the surgical consultant perform a comprehensive risks-benefits analysis with the patient as well as informed consent. If the consultant surgeon determines that surgery is able to be performed and there are no medical contraindications, a surgical appointment is made. In many cases, the surgical consultant is asked to perform the surgery. If not, another surgeon must be identified to perform the surgery.

**Housing considerations and searches:** Despite well-established advancements in the standards of care, it is possible to encounter correctional departments that still determine housing placement for an incarcerated individual based on primary sex characteristics (i.e., penis or vagina). Prison Rape Elimination Act (PREA) standards prohibit facility staff from searching or physically examining a transgender or intersex resident for the sole purpose of determining the resident's genital status. Healthcare staff should never determine an individual's gender identity by examining the individual's genitals. It is unethical for medical professionals to examine someone's genitalia in order for custody to determine housing placement. When healthcare professionals identify this practice, they are expected to escalate the issue through the appropriate chain of supervision so to achieve resolution and compliance with current standards and PREA.

Centurion: BH Clinical Guidelines: Gender Dysphoria
Reviewed: 6.13.2022



©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037257

## Clinical Guidelines for Behavioral Health Services:
## The Evaluation and Treatment of Gender Dysphoria in Correctional Settings

The evaluation of an individual's gender identity needs to be based on the individual's experience. In cases when the individual has had prior genital surgery resulting in complications or in cases that would otherwise require a healthcare staff to examine the individual's genitals, the decision to conduct the evaluation is based solely on clinically considerations that address the individual's medical needs. Such an examination is clinically appropriate. The results of such evaluation or intervention are not provided to custody staff in order to determine housing.

In contrast to the practice of assigning housing based on primary sex characteristics, PREA requires housing decisions to be made on a case-by-case basis rather than a "one-size-fits-all" approach. PREA standard 115.42(c) states: "In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."

In addition, PREA requires the correctional agency to train security staff to conduct cross-gender pat-down searches and searches of transgender and intersex residents in a professional and respectful manner, and in the least intrusive manner possible. The following website provides useful information on conducting searches, including video examples: [ HYPERLINK "https://www.prearesourcecenter.org/file/3328/guidance-cross-gender-and-transgender-pat-searches" ].

**Treatment and other recommended accommodations**: The following general recommendations endeavor to (1) ensure proper care; (2) guarantee access to care; and (3) help correctional departments avoid negative outcomes through proactive policy, procedure and treatment improvements.

- *Treatment committee.* A gender dysphoria treatment committee, comprised of behavioral health professionals who provide ongoing behavioral health treatment for individuals diagnosed with gender dysphoria, is recommended. This group can meet either monthly or quarterly via teleconference or in person. This allows the treatment committee members (behavioral health director, psychiatric director and medical director) to receive regular updates on each patient diagnosed with gender dysphoria. This group of behavioral health professionals can process patient requests with the entire group. Based on these discussions, referrals for additional interventions, such as hormonal treatment or surgery, can be made when deemed necessary to address significant dysphoria (as discussed at length earlier in these guidelines).

- *Gender-affirming items and practices.* In many correctional systems, access to gender-affirming clothing, hygiene items, housing, ability to maintain hair at the preferred length, etc., requires the individual to be diagnosed with gender dysphoria. It is strongly recommended that access to such items or gender-affirming housing or hair length does not require this diagnosis. Many individuals who identify as transgender benefit from accessing such items, but do not meet criteria for gender dysphoria. In fact, many enter the prison system feeling completely at ease with their identified gender and do not want invasive interventions such as hormones or surgeries, as access to these simple items have allowed them to live comfortably as their identified gender for an extended period of time. If such items are taken away upon admission to the correctional department, after a period of time the individual may begin to experience extreme discomfort to the

©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037258

## Clinical Guidelines for Behavioral Health Services:
## The Evaluation and Treatment of Gender Dysphoria in Correctional Settings

point they meet criteria for gender dysphoria. To alleviate this issue, Centurion behavioral health and physical health clinicians and administrators are encouraged to work with correctional colleagues to advocate for policies that allow access to such items without requiring a diagnosis of gender dysphoria. A gender neutral canteen or commissary menu, preferred undergarments, and ability to maintain hairstyle at the preferred length are strongly encouraged for all correctional departments.

- *Pronouns and names.* It is recommended that all staff refer to the individual as she or he requests, such as with pronouns the individual prefers. Many individuals with gender non-conforming lifestyles have legally changed their name to be more consistent with their gender identity. When this is the case, it is never appropriate for staff to refer to an incarcerated individual by their previous name.
- All direct care staff (medical staff, behavioral health staff, correctional officers, program staff, education staff, etc.) should receive training on working with transgender and gender dysphoric individuals.
- It is recommended that correctional administrators, healthcare and behavioral health professionals involved in the care or custody of gender non-conforming individuals be familiar with the WPATH SOCs, which can be found here: [ HYPERLINK "https://www.wpath.org/publications/soc" ]. The current version of the SOCs includes a section titled "Applicability of the Standards of Care to People Living in Institutional Environments", which calls for the treatment of patients with gender dysphoria institutional environments (such as prisons and jails) to mirror that which they would receive in the community.

**Interventions that are contraindicated and/or unethical:**  Research is beginning to identify a biological basis for gender dysphoria. The use of interventions designed to "talk someone out" of having gender dysphoria, such as some iteration of "Conversion Therapy" or "Reparative Therapy" should never be employed and are considered unethical.

In corrections, we have a constitutional obligation to provide adequate care and custody for all individuals in our institutions. As a healthcare professional, if you are not able to work with a transgender or gender dysphoric patient in a supportive and ethical manner, correctional health care is not for you. The same is true for correctional administrators and staff. If you are not able to provide safety and security to all incarcerated individuals in a manner that supports each individual's dignity no matter their gender identity, corrections is not for you.

The use of "supportive therapy" and antidepressant medication as *the sole treatment* for this population without providing access to other gender-affirming interventions to alleviate dysphoria (such as clothing items, hygiene products, hormonal and surgical interventions) is inappropriate and unethical. That being said, *supportive therapy in addition to* gender-affirming interventions is clinically indicated. Such treatment can be provided individually, in a group setting, or both. The focus of therapy should focus on the individual's quality of life related to their gender expression. Therapy is a safe place for the individual to explore thoughts, feelings and experiences related to their gender identity as well as other aspects of their life. A psychoeducation support group and patient education handouts for this population are available on Centurion Central.



©2022 Centurion, LLC. All rights reserved.

FDC_OFFICIALS_037259