# EXHIBIT 5

## REDACTED

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF FLORIDA

Civil Action No. 4:24-cv-00434

REIYN KEOHANE, et al.,

               Plaintiffs,

    v.

RICKY D. DIXON, et al.,

               Defendants.

_____

December 11, 2025

9:35 a.m.

Fort Walton, Florida

REMOTE DEPOSITION OF JOHN PRESTON LAY JR., M.D.
As 30(b)(6) Corporate Representative of
Centurion of Florida, LLC

Taken on behalf of the Plaintiffs before Michael J. D'Amato, RMR, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition in the above cause.

Job # J13675050



level.

So I think the chain of command would be the facility issues would be raised to the psychological services director.  And then if they needed assistance they would bring it to the regional mental health director and then it would come up to Dr. Watkins-Ferrell at that point, if they needed assistance.

Q.   And who are the psychological services directors at the facilities that house transgender inmates?

A.   I don't know them all, specifically.

Q.   Okay.  Can you name some of them?

A.   Again, I think Dr. Gazcon maybe, or she may be the regional mental health director.  But I don't know -- we're not separated from mental health but they all work under Dr. Watkins-Ferrell and really when her and I communicate it's not much specific names.  We have that, but I don't have it available today.

Q.   So in your preparation for today's 30(b)(6) deposition I understand you spoke with some of the regional mental health directors but you didn't speak to directly to any of the psychological services directors, correct?

A.   Again, not unless Dr. Gazcon is a



psychological services director.  I'm not exactly sure of her role.

Q.    And did you ask the regional mental health directors to collect any information from psychological services directors or others before meeting with you?

A.    No.  I just asked them to give me sort of what they had -- they're basically anecdotal evidence or their interpretation or their opinions on some of the topics.

Q.    How much time did you spend meeting with the, Dr. Watkins-Ferrell and the others that were part of that preparation meeting?

A.    I had several phone calls with Dr. Watkins-Ferrell before that just to go over stuff, partly in preparation for the meeting.  But we spent one hour discussing the topics that were more, you know, in their lane, yesterday.

Q.    Is it correct to say that Centurion provides medically necessary care to inmates in FDC custody?

A.    Yes.

Q.    And as Centurion uses that term medically necessary care it can include treatment for mental health conditions?

A.    Yes.

Q.    So is it correct that for some medical



conditions there may be accommodations that an individual needs such as a special diet for diabetes, something like that?

A.   Yes.

Q.   And that would be a medically necessary accommodation, that type of example?

A.   Correct.

Q.   Okay.  Is another accommodation that is sometimes deemed medically necessary a low bunk pass, if somebody has physical limitations?

A.   Yes.  With these accommodations there are FDC guidelines of who qualifies or what the criteria are to meet those guidelines.  But within those guidelines, yes, those are both good examples of accommodations.

Q.   And under the guidelines do they have to be medically necessary to provide those accommodations?

A.   Yes.

Q.   Okay.  So in those kind of examples that I gave, the special diet for diabetes or low bunk pass for physical disability, do the Centurion healthcare professionals have to approve those accommodations passes for those inmates to get those accommodations?

A.   So they have to meet criteria and we have published guidelines for what kind of passes.  There are probably several dozen if -- we call them passes,



not accommodations, for things of that nature.

So we have a lot of published guidelines to make sure we are being consistent across all facilities to make sure everyone is working out of the same playbook, for lack of a better term.  But they have to meet those criteria.

Now, there are some particular passes that require regional medical approval such as some specific diet passes that have to be elevated to the regional medical director for approval.

Q.    Thank you.  But to be approved for these passes one of the requirements is that they're medically necessary for the inmate?

A.    Correct.

Q.    Now, I understand Centurion has its own guidelines regarding the treatment of gender dysphoria, is that right?

A.    Yes.  Centurion did publish guidelines. However, those guidelines are not applicable in Florida.

Q.    Okay.  And where are they applicable?

A.    They're applicable to other contracts.  We have different contracts that we have, have different sort of operating procedures.  Some states rely directly on our, solely on the Centurion guidelines to



Q.    When you say "we" you mean in Florida?

A.    Centurion Florida, correct.

Q.    But Centurion outside of Florida may use this guideline?

A.    They may.  I don't know what each contract does, but yes, it is published for the states that do use our guidelines.

Q.    And you are not aware of an update of this?

A.    No, I'm not.

Q.    Who created this guideline?

A.    That I do not know.

Q.    Okay.

A.    I was not involved in the creation of it and I'm not sure who in Centurion would have drafted this or created it.

Q.    What was the purpose of it?

A.    We do clinical guidelines for many things.  We have clinical guidelines for everything from how to administer influenza vaccines to management of diabetes.

So we have a clinical operations team that develops these.  And again, for states that don't have their own guidelines the provider would defer to these to use.  So that's the purpose.

Q.    So when the state doesn't have its own



guidelines these are the guidelines Centurion clinicians will follow when treating incarcerated people?

A.    Correct.

Q.    When I say these, I mean not just the gender dysphoria ones but these kinds of guidelines on medical issues as well?

A.    Yes.  Correct.

Q.    So are these guidelines developed based on what the Centurion clinical operations team considers best practices in the field?

A.    I do not know for sure but I would have to assume so.

Q.    Are they, in general, again, not just this one but your clinical guidelines that Centurion has, are they developed to be consistent with accepted treatment protocols in the community?

A.    Yes, when at all possible, yes.

Q.    Okay.  So under these clinical guidelines Centurion views hormone therapy as an appropriate treatment for gender dysphoria?

A.    Yes.

Q.    And Centurion agrees that hormone therapy can alleviate the distress of gender dysphoria?

A.    Based on these guidelines, yes.



Q.   And based on these guidelines, Centurion agrees that providing accommodations such as access to female clothing and grooming standards for individuals with gender dysphoria can help alleviate the distress of gender dysphoria?

A.   Again, based on these guidelines, yes.

Q.   And with respect to that last question, providing accommodations such as access to female clothing and grooming standards for transgender women with gender dysphoria, does Centurion agree that it can help alleviate gender dysphoria because it helps them to socially transition?

A.   I don't know if that's the specific wording here, and I don't know what the reasoning was.  Again, I wasn't part of developing this guideline.

If we can scroll down and see if it says that in here then I would have to say yes, that is their position.

Q.   Just one second.  I may want to show you something.  Give me a second.

MS. COOPER:  Sam, can we put up tab B, Bates stamped FDC 23085.  And I think you can quickly scroll down through this one and mark this for identification, a document called Procedure 403.012 bearing Bates FDC 23085.



education about gender dysphoria, and then discussion of the new, this new revision and how it would be implemented.

That took place, I think, just a couple of weeks before this was published.

Q.    And that was the 2017 or 2019?

A.    No, that was the 2019 version, this version.

Q.    Did that training explain why these provisions were included?

A.    Not to my knowledge.  Again, Dr. Watkins-Ferrell was present and Dr. Tapia, he was our statewide mental health rep at the time.

I was not able to set up a meeting to talk to him just because of our schedules.  But to Dr. Watkins-Ferrell's knowledge it was done by Dr. Freel who was the FDC psychologist at the time; but it was really more of teaching some of the aspects of gender dysphoria and really the process to do the evaluations not anything as to why the procedure was published.

Q.    So Procedure 403.012, both the 2017 and 2019 versions provided for hormone therapy when deemed medically necessary for an inmate, right?

A.    Correct.

Q.    And it also provided for accommodations specifically the ability to wear under garments that



matched an individual's gender identity, hair length standards in accordance with their gender identity, the ability to wear makeup in the housing unit and alternate canteen items, is that correct?

A.    Correct.

Q.    And those, I'm going to use the word accommodations to refer to those, or gender dysphoria accommodations, is that okay and you'll understand what I mean?

A.    Yes, I do.

Q.    Is that gender dysphoria accommodations under the Procedure 403.012 would be provided if the gender dysphoria review team approved an accommodations pass, is that correct?

A.    My understanding was, again, trying to look at the changes between 2017 and 2019, there weren't a lot.

My understanding was really the accommodations, what the 2019 version did was formalize the documentation that was submitted by the psychologist to the gender dysphoria review team.

And my understanding was the accommodations, if recommended, were approved.  They were provided.  It was the hormone therapy that was, that would be approved by the gender dysphoria review team, if medically appropriate.



Q.    I see.  Thanks for that clarification.  So for the accommodation it would just need to be the psychologist who recommended them?

A.    That was my understanding, yes.

Q.    Okay.  And Procedure 403.012 also provided for psychotherapy for individuals with gender dysphoria, is that correct?

A.    Yes.

Q.    What prompted the creation of Procedure 403.012?

A.    Again, I don't know.  That was before I was statewide medical director.  And no one that I spoke to in Centurion was aware of really the reason that it was developed.

Q.    Does Centurion know why the accommodations provisions were included?

A.    No.  Not anyone that I spoke with.

Q.    Procedure 403.012 remained in place until it was rescinded and replaced by Health Services Bulletin 15.05.03 in September of 2024, correct?

A.    Correct.

Q.    So Centurion was operating under Procedure 403.012 for about six, seven years, right?

A.    Right.

Q.    And that policy provided for a Gender



Q.   So we touched on this before, but you mentioned under the Procedure 403.012 for an inmate to be able to get approval for gender dysphoria accommodations they would have to be recommended by a psychologist, correct?

A.   Correct.  Psychologist would do the evaluation.  They would meet with the MDST, multidistrict services team.  The MDST was really responsible for adding the diagnoses into the patient and developing a care plan.

But then the psychologist would recommend the accommodations.  I think really from what I can understand, really the change between 2017 and 2019 was just a format.  2019 formalized the form that we would use to do the recommendations.

So that seemed to be the bigger change in 2019, the development of the DC4-643E was the form we would make the recommendations on.  We would complete the assessment and the recommendations on that form.

Q.   Just for the record, MDST stands for?

A.    Multi-disciplinary services team.

Q.   And that's at the facility?

A.   That's at the facility.

Q.   So the psychologist would do the evaluation, right -- write up the evaluation, make recommendations



and they would meet with the MDST.  Would the MDST have to approve the recommendations of the psychologist?

A.    No, before the HSB, when this procedure was in effect the psychologist's recommendations were the only thing that was required.

The MDST was involved in just developing the overall treatment plan, which involved all aspects of treatment, not just the accommodations.

Q.    But if the psychologist recommended accommodations the MDST would automatically include accommodations as part of the treatment plan, is that correct?

A.    They could not be included until the GDRT approved them.  So the 643, which that form included the four accommodations we mentioned, they would be submitted by the psychologist with recommendations for or against those accommodations.  But until the GDRT approved them they could not be implemented.

Q.    So again, just to be clear on the process for approval of gender dysphoria accommodations or pass for those accommodations, the psychologist would have to recommend them, that would then go to the GDRT, that would have to approve it?

A.    Correct.

Q.    And one of those accommodations would be



hormone therapy as well.

Understood.  So when I was using the term accommodation also I was just referring to the grooming, the canteen items, the hair, undergarments; but you are saying hormone therapy was also considered an accommodation that would have to be approved by the GDRT?

A.    Correct.

Q.    And that would also have to be recommended by the psychologist?

A.    Correct.

Q.    Understood.  Under what circumstances would the Centurion psychologist recommend gender dysphoria accommodations under the Procedure 403.012 when that was still in effect?

A.    To my understanding 403.012 did not specifically outline what had to be met.  There was, I think as it developed and with the revision there was basically some guidelines on type of evaluation to be done as far as testing.

But really there was, the purpose of the psychologist's evaluation was to determine does the patient actually have gender dysphoria, truly have a diagnosis and would those accommodations be helpful for that patient.



But I don't think there was any clear published guidelines other than, you know, again, maybe some of the training that was put out before it was released that I don't have knowledge of.

But I think the purpose of that training right before this was released in 2019 was to sort of go over and educate the providers about gender dysphoria and probably, I'm sure there was some discussions on the different treatment alternatives and accommodations during that presentation.  I just don't have an agenda from it.

Q.   But the way it worked under the -- during the period of time that that procedure was in place was the psychologist would evaluate the inmate and if they determined that a patient had gender dysphoria they would then consider whether the accommodation such as hair standards, grooming standards, canteen and under garments they would consider whether those would be helpful to alleviate gender dysphoria for the patient, is that correct?

A.   Correct.

Q.   Okay.  And if they determined that it would be helpful to alleviate the gender dysphoria having those accommodations they would recommend them?

A.   Correct.



Q.  So during the several years that Procedure 403.012 was in effect did Centurion have any concerns about the policy?

A.  Not to my knowledge.  I mean, we were -- it seemed like the vast majority of the recommendations were approved.  There didn't seem to be any trend they weren't.

As far as hormone therapy, which is more my line as the medical director, there was quite a few patients.  I think the majority of our patients had come into FDC on hormone therapy and Procedure 403.012 allowed us to continue treatment until the recommendations were done.

So I think, you know, the vast majority of patients on recommended hormone therapy were approved to continue hormone therapy.  And I think most of the ones that discontinued was because of the patient's request to discontinue it, actually.

So we really didn't have -- I personally and talking to Dr. Watkins-Ferrell didn't have my concerns. Because it seemed that the feedback we got we were recommending things and they were being approved, so there was really no impact on the treatment.

Q.  Did you feel that the policy which allowed for hormone therapy and these, I'll use the shorthand



hormones.  That's separate.

Q.   Okay.  I'll ask it differently so that we are clear.  Focusing just on those clothing and grooming-type accommodations, what was the experience from the Centurion mental healthcare providers in terms of the impact of those accommodations on the mental health of patients with gender dysphoria?

A.   I think initially they felt they were -- well, the feedback I actually got from them because we did talk about this, the feedback I got from them was that initially the accommodations seemed to be more helpful than hormones.

But they also, and they particularly mentioned that between the 2018 and 2019 time frame, that they seemed to be more benefited or more positive response from the accommodations.

And then later on they seemed to mention that the patients tended to shy away from talking -- not shy away but talked less about their accommodation benefits and more about the hormone therapy benefits they were receiving.

Q.   In terms of the impressions of the mental health providers themselves, did they see benefits from both aspects of care, both the accommodations, gender dysphoria accommodations and the hormone therapy?

A.    Yes, they did.  And it was interesting that it seemed to transition from primarily accommodations to primarily hormones over the 2018 to 2019 time frame.

Q.    When you say transition meaning the emphasis of what they were hearing from inmates in terms of what was providing the most benefit to their health?

A.    Correct.

Q.    But the providers themselves observed both the accommodations and the hormone therapy helped improve mental health for inmates with gender dysphoria?

A.    Yes.

Q.    What sorts of improvements did they see?

A.    Well, just the -- I mean, they really looked for was the resolution of the dysphoria symptoms.

So if the dysphoria decreased that was considered an improvement in their gender dysphoria symptoms.

Q.    Did they see, in addition to the dysphoria itself did they see improvement in terms of reduction in depression?

A.    We did not specifically discuss that.  I know later on in the evaluations that we did with the HSB there were specific topics they addressed as improvement in those kind of symptoms, behavior improvements.



Those things were really addressed in the new format from -- based on the HSB.  But I didn't actually ask them if they particularly saw that symptom decrease.

Q.   What about self-harm, did they see improvements in the area of self-harm?

A.   We discussed self-harm.  They really -- there seemed to be a very low rate of self-harm with or without accommodations.  So they really couldn't make a comment.  They really didn't feel like they have enough evidence to say there was a benefit either way for self-harm.

Q.   What about suicidality, did they see an impact on suicidality?

A.   Same as the self-harm, they really didn't.  We sort of put those into one category and they said they really didn't see, couldn't see any change in that.

We specifically talked more about when the accommodations were taken away did they see an increase in that and they said no.

Q.   When the accommodations were taken away did they see an increase in the dysphoria symptoms?

A.   They actually reported less than they expected.  Some but less than they expected.

Q.   So they expected to see much more of a rise in



Q.   Is it fair to say, it's accurate that for some inmates the loss of accommodations had a significant negative impact on their mental health, right?

A.   They didn't mention they had significant. They mentioned there were some that some impact, but the less, the level of impact was less and the number was less than we expected.

Q.   And when they said they had some impact what kind of impact did they describe for those for whom the loss of accommodations had an impact?

A.   Just increased in their dysphoria symptoms, really.  They said they had some inmates, again, they're on the ground, they're dealing with direct patient care, they had some that they checked in on a little more often for the first couple of weeks and see how they were doing.

But there was not a lot of crisis intervention that we thought we were going to have, which was good news, but still surprising to us.

Q.   Yeah.  Was there crisis intervention necessary for any inmates as a result of loss of accommodations?

A.   Not that I'm aware of.

Q.   Did you ask about that when you prepared for the deposition?

A.   I didn't ask for specific, was there specific



examples.  Again, I wasn't talking to all the mental health directors.  The only way I would be able to have an answer to that question was to ask every mental health provider in the state.

Q.   So sitting here now it's possible there could have been crisis intervention that was necessary for some inmates with gender dysphoria who lost accommodations, but you don't know because you haven't checked in with all of the mental health directors?

A.   Correct.

Q.   But what you do know is for some individuals they had an increase in their gender dysphoria symptoms when they lost their accommodations?

A.   Yes.

Q.   So you described planning for mental health crises and having security around.  Why did Centurion anticipate there would be mental health crises?

A.   We just didn't know.  So we knew this was going to be a, this, the delivery or the discussion or the education about the new HSB was going to happen across all facilities at the same time.  That was put out to try to prevent rumor mills and make sure everybody was educated at the same time.  We just didn't know.

So we always prepare for the worse and hope



for the best.  And again, the overall response was the inmates seemed to be much more -- the actual -- what they said they felt like was that they focused on what they knew they could do, which was seek litigation, seek, seek grievances, seek the appeals.

So they seemed to be focused more on doing that than having, you know decompensating right there when they were given the message.

Q.   So was that a coping mechanism that inmates had that they could be pursuing litigation to try to get their accommodations restored?

A.   I'm not a mental health provider so I really couldn't tell if that was a coping mechanism or not.

Q.   You mentioned that they, the inmates were focused on pursuing litigation.

Is that something that the regional mental health directors reported that when they received word of the loss of accommodations that that was something they were discussing, the inmates?

A.   During their initial, during their individual encounters, yes.

Q.   Okay.

A.   Again, after the message went out to the group they did hold individual meetings with every patient and that was the feedback they got from that.  Again,



with an HSB?

A.   Correct.

Q.   Okay.  And at any point was it -- did Centurion -- strike that.

At any time was there concern that Procedure 403.012 would not be in compliance with the new law?

A.   Up until the time that we actually had seen 254 I don't know that that was a concern on Centurion's part.  I can't speak for FDC.

I know there was either Procedure 403.012 or the HSB, and I don't know which one, directed that gender dysphoria treatment would be direct therapy and that's something we did have to change as soon as 254 was released because of a violation.

Q.   Can you ask me to repeat that because I think I maybe didn't hear a word?

A.   Sure, either 403.012 or the HSB, I don't remember which, or maybe both directed that medication, that hormone therapy would be direct and therapy.

Q.   That's the part?

A.   Direct observed therapy, it means it has to be administered directly by a nurse to the patient and the nurse has to observe them taking it.  When 254 came out that was a violation of that and that's why we made that sudden or rapid change to keep on person



medication so we would be compliant with it.

Q.   Okay.  And so if -- so I represented in May of 2023 was when SB 254 took effect.

At that time the law took effect Centurion understood that FDC could no longer pay for hormone therapy for gender dysphoria treatment, correct?

A.   Correct.  So the two impacts that 254 had directly on us was the FDC cannot pay for the medication and that it had to be administered by a physician.

And at the time we knew almost immediately that FDC had enough medication in stock to buy us some time to develop a process to address that.  But they did not have to purchase any more medication.  They had it already in stock in the FDC pharmacy system.  The other aspect was the physician administering the medication.

And so we, I think the same day or if not the next day, we took steps to change the way we administered medication to make sure we were in compliance with that.

And then Centurion working with FDC decided that to meet the other stipulation of 254, that Centurion would just pay for the medication and not be reimbursed so that the state was not paying for it.



Q.   Okay.  Who did Centurion understand made the decision to change the gender dysphoria treatment policy from Procedure 403.012 to the HSB?

A.   We were never told a specific person that decided to do that.

Q.   Was Centurion ever told if it was directed from outside of the Office of Health Services?

A.   No not to my knowledge.

Q.   So Centurion does not know who drove that decision?

A.   No.

Q.   Did Centurion ever ask?

A.   No.  I mean, in our opinion it made sense to go from a procedure to an HSB as we mentioned before. We were shifting more -- you know, the procedure itself addressed a lot of housing, you know, gender assignments as far as the housing, things of that nature that were really on the security side.

With the HSB we shifted to more of a, Here's how we are going to medically evaluate and treat and recommend hormones and approve hormones.  So because of that shift from primarily a security-focus directive to medical it made sense to switch to an HSB.

So we didn't think, we had no reason to question why it was being done because it made sense to



"such evidence must be based on sound scientific methods and research subject to the formal review process."  That was the part that I had concerns about.

Just because understanding how medical studies are performed, it's very difficult if not impossible to do a true -- you know, the gold standard is double blind placebo-controlled study.  You can't do that for this type of population.  It's impossible.

So my concern was, you know, how specific would the GD team be meeting that requirement?  If they really held us specifically to that exact wording we probably would not have any evidence to support.

With that, my decision was to go ahead and gather as much information as I could.  Because, again, keeping in mind that we were given a short period of time to do 200-plus evaluations.

I wanted to give my providers as much, as many supporting documents with citations as possible.  So I worked with Dr. Seaaira Reedy and identified a group of these studies that in my opinion met that requirement. Now, would they meet that by the variance teams?  I didn't know.

But I went ahead and published those -- not published but consolidated so they would have the supporting studies to submit with it.



Q.    So I saw the correspondence with Dr. Reedy where she collected some of the studies --

A.    Yes.

Q.    -- that you shared with the providers.

And she mentioned that the etiological basis of gender dysphoria is not known, right?

A.    Right.

Q.    Given that language this, the HSB, I mean is there a concern that a literal reading of that provision would mean it's an impossible standard because there is no evidence that shows that hormone therapy may improve clinical outcomes by treating the etiological basis of gender dysphoria?

A.    I think you could make that interpretation if that's how you want to read it.  Again, you know, I looked at it as this is a high bar, but I'm going to try to achieve it.  And then I'm going to see what happens.

And if my providers felt it was necessary to continue treatment I was going to give them what they needed to request a variance and see what the outcome was.

At this point when this first came out I did not know how that would play out.

Q.    So you didn't know if you could meet the



standard with the evidence that you had?

A.   Correct.  I thought I could make a reasonable argument.  Would the variance team accept it?  I didn't know.

Q.   So currently the variance team, which is Dr. Martinez, Dr. Kline and Dr. Santiago, right --

A.   Correct.

Q.   Currently they are accepting the kind of research you were able to collect, correct?

A.   Yes.

Q.   But do you have any concerns if different personnel came in they may read it differently and not accept the research that you are submitting?

A.   I think they could.  I mean, if you wanted to strictly apply this I think, yeah, you could say none of my documentation meets the requirement.  But so far other than I think in about 65 out of 70 or so cases they've accepted it.

Q.   And do you think someone who was strictly reading the language could conclude that the evidence isn't sufficient because it doesn't show that hormone therapy treats the etiological basis of gender dysphoria?

A.   They could.  Again, I don't understand what they mean by etiological basis.  So I just decided I



would just honestly skip past that point and submit my documentation.

You know, at this point this was a published policy; I had to follow it.

Q.  Did anyone at Centurion talk to FDC about what that meant?

A.  I did not, no.  That would apply to me and I did not.

Q.  Did anybody else?

A.  Not to my knowledge, no.

Q.  So you mentioned the concern about what I'm calling in shorthand the research requirement that we see in the HSB Section 9C1 that you weren't sure if you would be able to meet that standard with the research you collected.

Did you have -- first of all, did I describe that correctly?

A.  Yes.

Q.  Okay.  Did you have any other concerns about any other aspect of the HSB that may make it difficult to get hormone therapy for patients for treating gender dysphoria?

A.  Not specifically.  I think that was really what I focused on, was that.  Because, again, that was my role in this was going to be to make sure that my



providers knew how to submit the variances they needed.

Later on when we got to the process of the evaluation, it became much more intensive, so I played a role working with Dr. Watkins-Ferrell making sure we could meet all the requirements of the form we had to submit.

At this point, when this just came out, that was my focus on how am I going to get this evidence and will I be able to meet it.

Q.   Looking at the beginning of Section C it says, "In rare instances deemed medically necessary, a variance may be approved to permit the use of cross-sex hormones to treat an inmate's gender dysphoria."

Did you have any concerns that that language suggests that approvals would not be likely?

A.   Honestly, when I first read this I didn't pay attention to that to be honest with you.  I was focusing on what I had to do thinking from how am I going to approach this.

Later on when I read it that did catch my attention, am I -- I guess my thought then became:  If they're saying it is a rare instance is that going to elevate the standards for that supporting documentation to then we're not going to get many of these approved? I just didn't know.



Q.   I'm sorry.  I didn't hear the last word.

A.   I think it was more of a surprise on our part that when the accommodations were removed that there was not a bigger decline or worsening of dysphoria symptoms to the extent we thought there would be.

Q.   You mean it wasn't as crises level like you anticipated?

A.   Correct.  Or even, even less than that.  There just didn't seem to be -- you know, I guess crisis is sort of a relative term.  Are they declaring a mental health emergency threatening to self-harm is one level crisis versus somebody who is decompensating and needs more care is more the other end of that spectrum.

But I think overall the consensus from the mental health providers is we didn't see the decompensation that we thought we could see.  And we don't really know why.

When I talked to Dr. Reedy, because I mentioned that with her, they've sort of seen that same trend with other contracts when they had to do these same changes and we don't know why.

Q.   When you say they didn't see the decompensation they expected, I understood earlier you said they saw decompensation for some people and no decompensation for other people, and you couldn't sort



of quantify it, how many were in each bucket; is that correct?

A.   We can't.  We expected to have a lot of emergency emergencies.  We had teams on standby.  Made sure all the regional mental health directors were in facilities.  We took steps to address what we thought could be a significant decompensation immediately.  We didn't see it.

As a matter of fact, the feedback we were getting that day that this was announced was coming from across all the facilities saying not as bad as we thought it was going to be.  We didn't know.

And then even following that, there didn't seem to be -- what I got from the directors yesterday was that there were some patients that we increased the frequency of their follow-ups a little bit but not as much as we thought they would have to.

So I think it was both not the initial but also some less patients involved and for those that were involved it was less severe than expected.

Q.   So you are not saying that -- well.  Let me rephrase this.

So I understand your testimony to be that for some patients there was mental health decompensation from the loss of accommodations, for other patients



there was none, and the severity of what you all anticipated did not turn out to be as bad as you thought?

A.   Correct.

Q.   Okay.  If we could go back to tab A -- sorry, Exhibit 1, the Centurion -- sorry, it is 2.  Thank you.

If you can look at the third paragraph with me it says, "Centurion clinical administrators and clinical staff established this system in collaboration with client leadership and in accordance with community standards of care.  If elements within this guideline conflict with client policy or expectations, Centurion leaders take collaborative steps to resolve the difference."

Did I read that correctly?

A.   Yes.

Q.   Okay.  And is it fair to say that there were elements of the HSB that were in conflict with the Centurion guidelines, correct?

A.   Yes.

Q.   And that would be the removal of accommodations?

A.   Yes.

Q.   Anything with respect to the hormone therapy policy?

A.    Again, no.  We had a process to request it. And so until I -- if I would have discovered that they were all being disapproved then I think it would be in conflict with this.  But at the time and currently I don't think it is.

They're approving our requests, so hormone therapy is consistent with this guideline.

Q.    And did Centurion leaders take collaborative steps to try to resolve the difference between the HSB and the clinical guidelines with respect to the accommodations issue?

A.    I mean I think we did in the form of the HSB revisions we recommended changes to.  And that is typically how we -- that's how we discuss these things. If there's any policy that's being changed and we don't agree with parts of it, then we submit our recommended changes back.

Q.    Maybe we touched on this before and I just don't recall if I asked it this way.

Did Centurion ever ask anyone at FDC why are we getting rid of accommodations?

A.    Not to my knowledge, no.

Q.    Obviously that was a major shift in care of inmates with gender dysphoria, right?

A.    Well, it is.  I think we did, we did have



the cost of hormone therapy for gender dysphoria patients?

A.   Not by contract, no.

Q.   So Centurion could stop tomorrow if it wanted to?

A.   Correct.

Q.   Who at Centurion has to authorize this agreement or did authorize this agreement?

A.   I believe it was, at the time it was Keith Luken, the CEO.

Q.   And whose approval is necessary to continue this arrangement?

A.   I don't think there has to be a revolving or annual approval.  But I think if it would it would be Tim Harlin the current CEO.

Q.   What is the last name?

A.   Tim Harlin, H-A-R-L-I-N.  Tim.

Q.   So if Tim Harlin was not on board with this he could end this if he wanted to?

A.   Correct.

Q.   And if you got a new CEO tomorrow they could do the same?

A.   Yes.

Q.   Is there any reason inmates should feel secure that their hormone therapy will always be provided if



deemed medically necessary in FDC custody?

A.    I mean, based on the current agreement, I can't speak to what will happen in the future.  Based on the current agreement and the approvals we received back I think, no, I think they're safe in assuming if we recommend it they're going to be able to continue.

Q.    As long as Centurion is the provider?

A.    Correct.

Q.    Okay.  Has Centurion had any discussions internally or with FDC about what would happen if Centurion wasn't paying for the care?

A.    No, not to my knowledge.

Q.    So switching gears a little bit, I think we talked about this some, that with the rescission of 403.012 and the implementation of the HSB accommodations for gender dysphoria are no longer available for patients with gender dysphoria, correct?

A.    Correct.

Q.    And that was based on the change of policy, not an assessment of individual's needs for accommodations, correct?

A.    Correct.

Q.    And under the new policy accommodations are no longer permitted even if mental health providers believe they are necessary for the health of the



patient?

A.    Correct, we don't have a process to recommend or request accommodations any longer.

Q.    And under the current policy they couldn't be approved?

A.    Correct.

Q.    Has Centurion ever been informed by anyone at FDC that if mental health providers could demonstrate a medical need/medical necessity for accommodation that they could pursue that?

A.    Other than the bra accommodation?  No, I'm not aware of any other message like that.

Q.    And by the "bra accommodation" are you referring to the medical pass for a bra if there's breast growth that requires it?

A.    Correct.

Q.    So it's clear to all the mental health staff that gender dysphoria accommodations are rescinded and no longer available?

A.    Yes.

Q.    And they were not told there could be exceptions made for any reason other than the bra pass if there's breast work?

A.    Correct.

Q.    Can we go back to Exhibit 2, the clinical



guidelines.  If we can go to the page marked FDC Official 037252.  The heading is "Ethical Consideration."

Dr. Lay, I would like you to look with me at the bottom paragraph of the guideline on that page, 37252.  I'm just going to read it for the record.

"When correctional departments do not adopt a policy of permitting access to gender-affirming items and practices to incarcerated individuals, correctional healthcare professionals are obligated to advocate for such access.  If access is denied on a population-wide basis, behavioral health professionals are obligated to support access on a case-by-case, patient-specific basis.  In these cases, these items and practices represent interventions" italicized, "that require evaluation of the patient and approval of the item or practice by behavioral health staff.  Interventions such as housing, undergarments or hygiene items may not appear to be within the purview of behavioral health and physical health staff.  However, if such placement or such items will alleviate the individual's gender dysphoria, then these and other similar interventions constitute treatment interventions and must be directed by healthcare professionals in collaboration with custody staff."  Did I read that correctly?



A.   Yes.

Q.   So this is what the Centurion clinical guideline for gender dysphoria have to say about gender-affirming accommodations, correct?

A.   Correct.

Q.   And so this is, this is Centurion's policy, essentially?

A.   I'm sorry?

Q.   This is Centurion's policy -- let me ask differently.  This is what Centurion considers best practices for treatment of gender dysphoria?

A.   Correct, yes.

Q.   Okay.  So Centurion agrees that accommodations such as clothing and grooming standards are a treatment of intervention for gender dysphoria?

A.   Based on this policy, correct.

Q.   And based on this policy they, Centurion, agrees that accommodations such as clothing and grooming standards can alleviate gender dysphoria for some people?

A.   Based on this guideline, correct.

MS. COOPER:  Sam, if we can do tab C, Bates FDC 019703 and mark that as Exhibit 8.

(Exhibit 8 marked for identification)

Q.   Dr. Lay, this is a document entitled



Q.   And were you and Dr. Watkins-Ferrell aware that Centurion psychologists were opining that for inmates who were not receiving accommodations, that such accommodations would likely improve their mental health?

A.   I didn't know that specifically, but it makes sense to me clinically.

Q.   Okay.  And we looked at some examples where the Centurion providers offered that professional opinion --

A.   Correct, yes.

Q.   Okay.  And did Centurion make this information known to FDC that in their professional opinion the accommodations were improving patient mental health?

A.   All those recommendations that you showed me were all sent to FDC, so for every case that was reported to FDC based on our evaluation.

Q.   Were there any mental health providers at Centurion who had been at FDC before the old policy 403.012 took effect or was that -- just trying to get the timing separate for when you all began?

A.   You mean our employees that previously worked for FDC?

Q.   Let me ask it differently.  That was a terrible question.  I think you said it was 2016,



right, that the contract began at FDC?

A.    Correct.

Q.    And the policy or Procedure 403.012 first took effect in 2017, right?

A.    Correct.

Q.    So I'm wondering were there any Centurion employees who were operating under the time prior to Procedure 403.012?

A.    So to clarify, so when FDC privatized a called Corizon won a contract.  Most of their employees were previously FDC employees, especially at the site level that they hired in, the nurses, providers.

So yeah, they were FDC staff or FDC prior to Corizon.  When we took over we did the same thing, transferred all the Corizon employees to us.

Once we prioritized, after that there was -- there's pretty strict state statutes or state policies or regulations, probably not statutes but policy regulations on a FDC employee coming to work for us and there has to be a period of time that they cannot come.

So they can't leave FDC and come to work directly for us.  I don't know, I guess that's a conflict at some level.  So I do know that at one point, I'm not a hundred percent sure, but I'm fairly confident Dr. Watkins-Ferrell worked for FDC.



Q.  Okay.

A.  Now, when that happened I don't know.  I know she went to work for our corporate, clinical operations before she came to work for us and I believe that was to get that time period in there before she would come back and work specifically for Centurion Florida.

Q.  Thank you.  So some of the mental health providers who were employed by Centurion now were providing mental health care in FDC prior to Procedure 403.012 taking effect?

A.  Again, I can't say a hundred percent because I wasn't with Centurion then.  I came in the fall of 2016.  But I would have no reason to think they weren't.  I mean, the vast majority of our staff came from FDC to Corizon to Centurion.

Q.  And in your preparation for the 30(b)(6) deposition did you learn of the experiences of these providers when they were operating under the prior policy, whatever it was, prior to 403.012?

A.  No, I didn't go back that far.

Q.  So a few minutes ago we were talking about the fact that Centurion psychologists were opining that accommodations would improve the mental health of some patients with gender dysphoria.  Do you remember that?

A.  Correct.



Q.    And when the previous policy was in effect, 403.012, Centurion psychologists recommended accommodations, again grooming and clothing accommodations, for a number of inmates with gender dysphoria, correct?

A.    Correct.

Q.    And they had to -- and they did that if they thought it would improve their mental health?

A.    Correct.

Q.    And when they made those recommendations were they determining that it was medically necessary for patients to have those accommodations?

A.    I can't say what their exact thought process was, but based on the accommodations they felt that it would improve their symptoms.

Q.    And you mentioned that for at least some subset of inmates with gender dysphoria who had accommodations rescinded there was some deterioration or worsening of their mental health as a result, correct?

A.    Correct, yes.

Q.    So does Centurion agree that prohibiting accommodations denies some inmates with gender dysphoria medically necessary care?

A.    Again, I think we would have to refer back to



the clinical guidelines, which I think it does state that.  I don't think personally I can state if it's medically necessary or not.  I think it's been official, but I don't know if I would use the term "medically necessary."

Q.   We talked about the term medically necessary a few hours ago.

A.   Right.

Q.   And I understood you to be testifying that things like accommodations could be medically necessary for certain conditions, correct?

Just to clarify, the fact that something is an accommodation than rather than a prescription drug doesn't mean it can't be medically necessary, is that correct?

A.   It would be, that's correct.

Q.   I guess the question is what is Centurion's understanding of the term medically necessary or medical necessity?

A.   I actually don't know if Centurion has a defined definition.  I know I don't.  I mean, you know, personally or professionally to me something medically necessary would be something along the lines of there would be a significant harm of not having it.  Now define significant?  That's tough to do.



So someone who's having some gender dysphoria symptoms, if their symptoms would decrease, if they have the accommodations, is that truly necessary?  I don't know.  Is it beneficial?  I would say yes.

So I think it's almost trying to define the term necessary, which to me is a difficult thing to do.

Q.   Okay.  So taking out the term medically necessary which I understand you don't have a definition or you are not sure Centurion has a definition, does Centurion agree that prohibiting accommodations denies some inmates treatment that would improve their mental health?

A.   I think we agreed could potentially improve their mental health, yes.

Q.   Does Centurion agree that taking away accommodations has resulted in some cases of inmates having a deterioration of mental health?

A.   I think in some cases, yes, that is a fair statement.

Q.   Okay.  Would Centurion psychologists still be including recommendations for accommodations in some of their evaluations for gender dysphoria patients if the HSB did not prohibit it?

A.   I haven't asked them personally but I don't see why they would not.



Q.   Now, I understand that Centurion has recommended chest binders to alleviate gender dysphoria for some trans male inmates at FDC, is that right?

A.   I'm actually not familiar with that.

Q.   Okay.

A.   I've heard the term used before but I don't know if we have actually recommended those.

Q.   Do you know what a chest binder is?

A.   Yes, it's just like a compressive-type garment.

Q.   And that's for purposes of making a more masculine-looking chest?

A.   Right.

Q.   Let me see if I can refresh your recollection.

     MS. COOPER:  Let's mark as Exhibit 13 tab S, Bates CENT Production 2050.

     (Exhibit 13 marked for identification)

Q.   Can you see this document?

A.   Yes.

Q.   And this is an email from you to K. Cook and some other people?

A.   Yes.

Q.   Dated 4/17/2024, subject GD concerns at FWRC, is that correct?

A.   Correct.

