# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

REIYN KEOHANE, et al.          :
                                              :
    *Plaintiffs*,                         :
                                              :
v.                                           :          Case No. 4:24-cv-434-AW-MAF
                                              :
RICKY D. DIXON, et al,        :
                                              :
    *Defendants.*                        :


**EXPERT REBUTTAL REPORT OF DAN H. KARASIC, M.D.**


1.　　　My name is Dan H. Karasic.  I have been retained by counsel for plaintiffs as an expert in connection with the above-captioned litigation.

2.　　　I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and based on my expert opinion.

3.　　　I incorporate as part of this rebuttal report my opinions and qualifications set forth in the expert report I filed in this matter dated August 25, 2025.

4.　　　As with my August 25, 2025, expert report, my opinions contained in this rebuttal report are based on my thirty years of clinical experience as a psychiatrist treating thousands of patients with gender dysphoria and my knowledge of the peer-reviewed research regarding the treatment of gender dysphoria and the relevant clinical practice guidelines.

5.　　　I submit this rebuttal declaration to respond to the expert declarations of Drs. Kristopher Kaliebe and Michael Laidlaw.  In this rebuttal report, I respond to some of the central points made in their reports.  I do not address each and every assertion made in those reports that

I believe are baseless, misleading, or mischaracterizations of the evidence, as there are many. Instead, my aim is to provide an explanation of the erroneous premises upon which their conclusions are based.

## II.    SUMMARY OF EXPERT OPINIONS

6.    Dr. Kaliebe offers a view of gender dysphoria that is at odds with how this condition is understood within the field of psychiatry.

7.    Dr. Kaliebe's description of gender-affirming care for gender dysphoria bears no resemblance to the prevailing treatment protocols.

8.    Defendants' expert witnesses' assertions that hormone therapy for the treatment of gender dysphoria is unproven, harmful and never medically necessary are baseless.

9.    Dr. Kaliebe's assertions that social transition does not alleviate gender dysphoria and is not medically necessary has no basis in evidence.

10.    Defendants' expert witnesses' attempts to discredit the WPATH Standards of Care and the preeminent American medical and mental health professional groups—all of which support gender affirming care for gender dysphoria—are baseless.

11.    Defendants' expert witnesses' claims that psychotherapy is the preferred treatment for gender dysphoria and an effective treatment are baseless.

12.    Dr. Laidlaw's assessments of Plaintiffs cannot be given credence.

## III.    EXPERT OPINIONS

### A.    Dr. Kaliebe offers a view of gender dysphoria that is at odds with how this condition is understood within the field of psychiatry.

13.    Much of the content in Dr. Kaliebe's report reflects a personal idiosyncratic view of gender dysphoria that is at odds with how this condition is understood within the field of psychiatry.

14.    First, Dr. Kaliebe claims that gender dysphoria is a "temporary" disorder and most cases are not long-lasting (par. 39) and that "[r]esolution of gender-related distress is aided when [it] is not affirmed." (par. 41). His claim that gender dysphoria is a transient condition appears to rely on his view of some research regarding prepubertal children that shows that many gender non-conforming children do not grow up to be transgender. Some who oppose gender-affirming medical care for minors have argued that this body of research shows that gender dysphoria in children tends to resolve as they grow up. That is a misreading of that research, which does not actually look at gender dysphoria in children, but rather, gender non-conformity. But even if one accepted that reading, it has no bearing on adults. Dr. Kaliebe cites no evidence that gender incongruence in adults is likely to resolve, and there is no such evidence. To the contrary, it is widely recognized that when gender incongruence persists past childhood and into adolescence and adulthood, it is highly unlikely to desist. (Zucker et al. 2010; van der Loos, et al 2022). Withholding gender affirming care as Dr. Kaliebe suggests does not make gender incongruence go away. It only increases suffering by denying treatment that is known to alleviate the distress of gender dysphoria. While some have raised questions about gender affirming care for minors, there is no debate in the mainstream medical and mental health fields about such treatment for adults.

15.    Dr. Kaliebe criticizes Dr. Evans for not considering same-sex attraction, sexual abuse, and trauma as causes of gender incongruence in the named Plaintiffs. (par. 170). This reflects a profound lack of understanding of this condition because there is no evidence that trauma or abuse or same-sex attraction are the causes of gender dysphoria, nor that consideration of these is a substitute for treating gender dysphoria. Indeed, in my three decades treating thousands of patients with gender dysphoria, I've had countless patients with gender dysphoria

-3-

who have no history of trauma or abuse.  I've also had many patients with gender dysphoria who were not attracted to people of their birth-assigned sex.  And, of course, the overwhelming majority of individuals who have same-sex attraction are not transgender.

16.     Dr. Kaliebe offers no evidence to support his assertion that inmates would pretend to be transgender and to have gender dysphoria and maintain that ruse for years to get privileges in prison.  (pars. 164, 176).  And he offers no basis to suggest that is the case with the named Plaintiffs, most of whom state in the Complaint that they have experienced gender incongruence from a young age.[1]

**B.     Dr. Kaliebe's description of gender-affirming care bears no resemblance to the prevailing treatment protocols**

17.     Dr. Kaliebe offers a description of gender affirming care for gender dysphoria that bears no resemblance to the widely accepted protocols for treatment.  He refers to the "affirmation model" of care, implying that what he describes is an accepted mode of treatment, but the model he describes is not what is recommended by the WPATH SOC 8 or the Endocrine Society Guideline or any other guidelines for care of gender dysphoria.  Dr. Kaliebe says the "affirmation model" of care "promotes affirmation of the transgender identity immediately and decisively."  (par. 35).  Neither WPATH nor the Endocrine Society suggest such treatment.  As stated in WPATH SOC 7, "Treatment is available to assist people with such distress to explore their gender identity and find a gender role that is comfortable for them (Bockting & Goldberg, 2006).  Treatment is individualized: What helps one person alleviate gender dysphoria might be very different

---

[1] Dr. Laidlaw suggests that I "advocate[] for conflicting viewpoints on gender diagnosis" because I support recognizing both the DSM's gender dysphoria diagnosis and the ICD-11's gender incongruence diagnosis.  (p. 8).  There is no tension between recognizing both of these diagnoses and recognizing that gender dysphoria is a serious mental health condition.  Gender incongruence per se is not a mental health condition, but when there is substantial distress or impairment of function, that is gender dysphoria, which is a serious mental health condition.

from what helps another person.  This process may or may not involve a change in gender expression or body modifications." (Coleman, et al., 2012).  Psychotherapy, therefore, should be respectful of the patient and allow them the space to explore or express their gender identity, without preconceptions imposed by the therapist: "[Mental health providers] working with transgender people should use active listening as a method to encourage exploration in individuals who are uncertain about their gender identity.  Rather than impose their own narratives or preconceptions, MHPs should assist their clients in determining their own path." (Coleman, et al 2022 p.S171). Contrary to Dr. Kaliebe's assertion, "questions about the patients' self-identification" are not "viewed as hostile and potentially harmful to the patient" (par. 37), if these questions are part of a respectful process of helping the patient explore their gender, as opposed to an effort by a therapist to suppress the patient's gender expression or to attempt to change their identity.

18.     Dr. Kaliebe says under the "affirmation model," social transition, hormone therapy and surgeries are provided "without regard, or with minimal regard" to other mental health issues such as trauma and autism.  (par. 36).  Again, this is not how care is provided under the prevailing protocols.  Indeed, the WPATH SOC 8 specifies that for assessing a patient for gender-affirming medical care, the health professional should be "able to identify co-existing mental health or other psychosocial concerns and distinguish these from gender dysphoria, incongruence, and diversity." (Coleman, et al. 2022 S34).  WPATH SOC 8 also provides that in evaluating a patient for medical transition, co-occurring mental health conditions should be evaluated and addressed.  Health professionals must "[i]dentify and exclude other possible causes of apparent gender incongruence prior to the initiation of gender-affirming treatments." (Coleman et al 2022 S36).

19.     Far from ignoring autism spectrum disorder as Dr. Kaliebe asserts, WPATH SOC 8 recognizes higher rates of this condition among transgender adolescents compared to their

peers and provides specific guidance regarding the evaluation process for such patients. (Coleman, et al. 2022, S62-63).

20.     Therefore, the claim that the prevailing protocols for the treatment of gender dysphoria direct a single-minded focus on gender dysphoria to the exclusion of other conditions has no basis in reality.

21.     In sum, Dr. Kaliebe creates a straw man by providing a false description of care under the prevailing protocols and then attacking it.  He either misunderstands the prevailing protocols or assumes, without basis, that clinicians providing care to patients with gender dysphoria disregard them.

> **C.     Defendants' expert witnesses' assertions that hormone therapy for the treatment of gender dysphoria is unproven, harmful, and never medically necessary are baseless.**

22.     As discussed in my opening report, it is widely recognized in the medical and mental health fields that hormone therapy is an effective treatment for gender dysphoria that can be medically necessary for some people with this condition.

23.     While there are some who have raised questions about the appropriateness of hormone therapy for minors with gender dysphoria, there is no serious dispute in the medical and mental health fields about whether it is effective in alleviating gender dysphoria and can be medically necessary for adults.  This is recognized by every major medical association as both research and decades of clinical experience have demonstrated the efficacy of this treatment. There are no voices among those with significant experience with this patient population who agree with Drs. Kaliebe and Laidlaw that hormone therapy is unproven or harmful and, thus, should not be provided to adults with gender dysphoria.

24.     In addition to quarreling with the methodology or validity of some individual studies, Drs. Kaliebe and Laidlaw attempt to discredit the entire body of research demonstrating

the efficacy of this care on the basis that it is "low quality" evidence.  This is a term of art in science typically meant to describe research methods other than randomized controlled trials, which are generally considered the highest quality evidence and offer the most certainty.  "Low quality" evidence includes cohort studies based on convenience samples (as opposed to randomized population-based samples) that evaluate a group receiving treatment over time and/or compare the subjects to an untreated group.  This type of evidence describes much of the evidence relied on across medicine, as it is often not feasible due to cost or ethical constraints to conduct randomized controlled trials.  Indeed, authors of the North American systematic reviews of research on gender affirming medical care for minors that discussed the low quality/low certainty evidence in this area—Guyatt et al—recently put out a statement expressing their concern about that being used as a basis to ban care, stating:

> It is profoundly misguided to cast health care based on low-certainty evidence as bad care or as care driven by ideology, and low-certainty evidence as bad science. Many of the interventions we offer are based on low certainty evidence, and enlightened individuals often legitimately and wisely choose such interventions. Thus, forbidding delivery of gender-affirming care and limiting medical management options on the basis of low certainty evidence is a clear violation of the principles of evidence-based shared decision-making and is unconscionable.

(Guyatt, et al. 2025).[2]

25.     Drs. Kaliebe and Laidlaw's suggestion that studies show that hormone therapy

---

[2] Whether intentionally or not, Dr. Kaliebe misleadingly cites Miroshneychenko 2025, saying "[t]he best available evidence reporting on the effects of GAHT [cross sex hormones] in individuals with GD ranged from moderate to high certainty for cardiovascular events and low to very low certainty for the outcomes of GD, global function, depression, sexual dysfunction, BMD [bone mineral density] and death by suicide."  (par 114).  The studies referenced found that the risk of cardiovascular events was exceedingly low (.04%) and that various mental health measures improved with treatment.  The certainty of findings regarding the low-risk of cardiovascular events was greater than the certainty of the findings regarding the mental health benefits of treatment given the quality of the evidence.  But as I explained, low quality evidence is widely relied on in medicine.

actually worsens mental health is baseless.  (Kaliebe par. 112 [discussing Glintborg 2023]; Laidlaw pars. 148-58 [discussing Dhejne 2011 and Chen 2023]).  The studies they cite show nothing of the kind.  Glintborg explains that because a psychological assessment was required to initiate hormone treatment, the engagement with mental health professionals resulted in greater mental health diagnoses and treatment of transgender people recorded in this Danish registry study.  It did not suggest that hormone therapy worsens mental health.  Dhejne's study found 10 suicides in transgender people in Sweden from 1973-2003, compared to 5 in its general population matched controls, but no statistically significant difference in suicidality in those who transitioned in the second 15 years of the 30-year period.  The paper did not compare transgender people who received gender-affirming medical treatment to those who had not, only recording higher suicidality compared to the general population, especially for those transitioning in the 1970's and 1980's.  Chen's study did include two youths who died by suicide, in a population with high suicidal ideation, but did not demonstrate that hormones worsened mental health outcomes; in fact, mental health outcomes improved overall in the youth receiving treatment. Systematic reviews of studies of hormone treatment for transgender people have shown improved mental health.  (Baker, et al 2021, Taylor et al. 2024).

26.    Dr. Laidlaw appears to be saying that hormone therapy cannot be medically necessary for the treatment of gender dysphoria because gender dysphoria is not an endocrine disorder and treatment comes with risks.  The fact that the treatment at issue is needed for a psychiatric condition rather than a physiological condition does not mean it is not medically necessary.  Psychiatric treatment needs are also recognized as medically necessary.  And the fact that there are potential risks of treatment does not mean treatment is inappropriate or not medically necessary.  Risks are part of medicine and, as with all medical decisions, potential

risks must be weighed against potential benefits. Dr. Laidlaw fails to consider the known benefits of hormone therapy for patients with gender dysphoria in concluding that this treatment is not medically necessary.

**D.     Dr. Kaliebe's assertions that social transition does not alleviate gender dysphoria and is not medically necessary are baseless.**

27.     As I discussed in my opening report, it is widely recognized that social transition is a critical component of alleviating the distress of gender dysphoria. Until the most recent iteration of the Standards of Care, Version 8, social transition was a requirement before medical and/or surgical interventions. The sequential series of social transition, then medical interventions, then surgical interventions has been recommended for decades. More recent recognition of different pathways has led to the removal of social transition as a pre-requisite for medical or surgical interventions, but social transition remains integral to addressing gender dysphoria and is discussed extensively in Standards of Care Version 8. Standards of Care 8 notes that "[r]esearch indicates social transition and congruent gender expression have a significant beneficial effect on the mental health of [transgender] people," reducing gender dysphoria, depression, anxiety, and self-harm and suicide ideation and attempts. (Coleman, 2022, S107). It is for this reason that Standards of Care 8 recommends that incarcerated individuals be permitted to dress and groom in accordance with their gender identity. *Id.*

28.     Some examples of the research showing the benefits of social transition (in addition to the Hughto 2020 study that I cited in my opening report) are James et al 2024 (finding that transgender adults who reported social transition more often reported they were "very to pretty happy" (71% vs. 52%), "thriving" (36% vs. 18%), and satisfied with their lives (43% vs. 24%) compared to those who have not socially transitioned), and Russell, et al 2018 (finding that transgender youth who were able to use their chosen names reported fewer

depressive symptoms and less suicidal ideation and behavior). An article cited by Dr. Kaliebe noting limitations in the body of research on social transition in the context of youth does not undermine the well-established benefits of social transition for adults.

29.     Dr. Kaliebe says "social transition is not medically necessary because it is not "related to healing medical illness or disease." (par. 146). Dr. Kaliebe—like Dr. Laidlaw— seems to be suggesting that when treatment is for a mental health condition, it can never be medically necessary. But as discussed above, there are medically necessary interventions for many mental health conditions. And medically necessary interventions—whether for physiological or mental health conditions—can include medications as well as other interventions such as prosthetic devices, psychotherapy, and behavioral interventions. For example, medically necessary treatment for eating disorders may include lifestyle/behavioral interventions focused on changing how one eats. The fact that there is no medication prescription does not make an intervention any less medically necessary.

30.     Dr. Kaliebe trivializes the impact of denying gender dysphoric inmates accommodations to allow them to socially transition. He calls such accommodations "unnecessary entitlements" and scoffs at the notion that "inmates with Gender Dysphoria cannot cope" without them. (pars. 154-55). Thus, he argues that denying such accommodations does not constitute sufficient harm to make them medically necessary. *Id.* His failure to understand the impact on gender dysphoric transgender women of being forced to outwardly present as men, and of gender dysphoric transgender men of being forced to outwardly present as women suggests a lack of any meaningful experience with this patient population and the painful distress this can cause. In my experience, I've seen incarcerated people who, in fact, could not cope when effectively forced to socially detransition by being denied gender dysphoria

accommodations, experiencing severe psychological distress and suicidal ideation.  Given what we know about the powerful salutary effect of social transition for many people with gender dysphoria, it is shocking to read Dr. Kaliebe's comments.

31.    Dr. Kaliebe claims that social transition is harmful because it can prolong an individual's transgender identification.  (pars. 151, 153).  Again, this reflects Dr. Kaliebe's lack of understanding of gender dysphoria.  Some who advocate against social transition for children have speculated that data showing that most children who socially transition continue to have a transgender identity as adolescents means that social transition causes the gender incongruence to continue.  The research does not support this conclusion, but rather that social transition in prepubertal youth is a response in youth to strong gender dysphoria.  The Dutch study noted that youth with more intense gender dysphoria were more likely to socially transition.  (Steensma, et al 2013).  In the Olson cohort of gender diverse youth, transgender identity preceded social transition, not the other way around.  (Rae, et al 2019).  Regardless, there has been no evidence suggesting that withholding social transition or other gender affirmation from adults with gender dysphoria promotes desistance of their gender incongruence.  All it does is deny patients relief from gender dysphoria.

32.    Dr. Kaliebe speculates that making social transition available to inmates with gender dysphoria undermines patient mental health because it "may enhance the patients' reluctance to receive psychotherapy."  (par. 151).  As discussed above, no psychotherapy protocol resolves gender dysphoria but therapy can be important for comorbidities.  It is illogical to speculate that people who would otherwise seek psychotherapy to treat depression, anxiety or other comorbidities would not do so if permitted to socially transition.

**E.    Defendants' expert witnesses' claims that psychotherapy is the preferred and an effective treatment for gender dysphoria are baseless.**

33.    Defendants' expert witnesses disapprove of existing protocols for treating gender dysphoria, including hormone therapy and social transition, but the alternative treatments they propose are not supported by the rigorous evidentiary standards to which they hold existing protocols and, in fact, lack any evidence of effectiveness at all.

34.    Dr. Kaliebe asserts that psychotherapy is the "preferred treatment" for gender dysphoria but offers no support for such a claim.[3]  Nor could he.  As I discussed in my opening report, there is no evidence that psychotherapy is an effective treatment to resolve gender dysphoria and there are no psychotherapeutic protocols that have been found to alleviate gender dysphoria.

35.    Dr. Kaliebe offers nothing more than hypotheses that psychotherapeutic treatments that are helpful for other conditions might help address gender dysphoria.  For example, he says cognitive behavioral therapy is an effective treatment for Body Dysmorphic Disorder, eating disorders, and Borderline Personality Disorder and, because he says these conditions "share features" with gender dysphoria, he argues that this would also be an effective treatment for this condition.  (pars. 56-58, 62).  Psychotherapy was used for decades in attempts to treat gender dysphoria but these practices resulted in no evidence of such interventions being effective.  It has been widely known since the 1950's that psychotherapy does not alleviate gender dysphoria and that the distress of this condition can only be alleviated by social and/or medical transition.  (Brown, 1960; Cornell University What We Know, 2017).

36.    Finally, Dr. Kaliebe's comparison of gender affirming medical care to treating

---

[3] The article he cites discussing a "resurgence of psychotherapy" (par. 184) was not about treatment of gender dysphoria.

anorexia nervosa with strict diet and liposuction (par. 58) shows his lack of understanding of gender dysphoria.  There is no evidence that strict diet and liposuction effectively treat anorexia nervosa, but decades of evidence and clinical experience that gender dysphoria lessens with hormone therapy.  (Pfäfflin et al, 1998, Cornell University What We Know, 2017).

      **F.**      **Defendants' expert witnesses' attempts to discredit the WPATH Standards of Care and all of the major medical and mental health professional groups are baseless.**

37.      Defendants' expert witnesses attempt to discredit the WPATH SOC 8 as ideologically driven as opposed to based on science.  They primarily rely on select excerpts of documents from a voluminous document production in a lawsuit in Alabama to make all sorts of unsupported statements about WPATH and SOC 8.  (Kaliebe pars. 70-73; Laidlaw pars. 116-18).  They cite their own reports in the Alabama case where they made such claims, and an article co-authored by Dr. Kaliebe, and appear to try to bolster their assertions by citing other people making the same claims but those citations were to opinion writers and commentators in non-scientific publications such as the New York Sun and the Economist.  (Kaliebe, par. 72).

38.      I also was an expert witness in the same Alabama case and had access to the same document production and it contained thousands of pages of documents.  For most of the documents, the authors' names were redacted and it was unclear whether they were involved in the WPATH SOC 8.  For some documents, it was clear they were not authored by individuals involved in SOC8.  Defendants' experts cherry picked select excerpts from thousands of pages.  These out-of-context statements by unknown individuals do not permit any of the conclusions drawn by Drs. Kaliebe or Laidlaw about WPATH or SOC 8.

39.      Dr. Kaliebe also relies on a publication called "the WPATH Files" (pars. 74-75), which similarly is a collection of out of context excerpts of statements made by unknown individuals on a clinical discussion board available to WPATH members.  The author of this

publication is an anti-trans advocate who shared her own narrative cobbled together from those select excerpts in an advocacy publication.

40.    As discussed in my opening report, WPATH followed a rigorous process in assessing the evidence and making treatment recommendations for gender dysphoria.  The attempt to taint the WPATH SOC 8 through this tactic is baseless.

41.    Dr. Kaliebe points to an assessment by Dahlen, et al. concluding that the predecessor to SOC 8—WPATH SOC 7—is not the gold standard for a clinical practice guideline. (par. 78).  WPATH SOC 7, which was developed from 2009 through 2011, was written before current standards for clinical practice guidelines in medicine.  The Institute of Medicine published their recommendations for developing clinical practice guidelines in 2011. SOC 8 followed those recommendations.

42.    Drs. Kaliebe and Laidlaw also claim that WPATH silences dissenting views about gender affirming care.  I have attended many WPATH conferences over the years and have been a member of the Scientific Committees that have reviewed abstract submissions for the conferences, and the diversity of views presented and discussed has always been notable. For example, as chair of the Scientific Committee for the 2017 USPATH conference, I helped organize a panel of therapists and trainees who had themselves detransitioned, and the presentations and discussion were well-received by attendees.  Dr. Kaliebe's assertion that WPATH censored the views of Dr. Ken Zucker (par. 73) is belied by the fact that he presented at the next WPATH conference, 2017 EPATH, after the event mentioned by Kaliebe, where security issues related to protests caused one of his two sessions to be cancelled.

43.    According to Defendants' experts, it is not just WPATH, but also the American Medical Association, the American Psychological Association, the American Psychiatric

Association, and the Endocrine Society, that act based on political ideology rather than evidence-based scientific methodologies. The claim that all of the major American medical groups are sacrificing patient health to promote a particular ideology is staggering.

44.     Defendants' experts' suggestion that medical organizations and health care providers across specialties are being duped by WPATH is without basis. The agreement among the medical organizations is not coming top down from WPATH; rather, the care being recommended by WPATH is the care that experts across disciplines recognize is beneficial to this patient population.

45.     Defendants' experts also suggest that the medical community is being bullied by transgender activists to promote harmful medical care. For example, Kaliebe's assertion that Guyatt, et al at McMasters, discussed above, "capitulat[ed]" on gender affirming medical care because of left-wing cancel culture (par. 99, 101), was based on nothing more than the assertions in an on-line publication of an independent journalist opposed to such care.

46.     Defendants' experts are essentially asking this Court to accept an extraordinary conspiracy theory that every professional medical group in the United States has been coopted to support ineffective and harmful treatments in furtherance of a political agenda.

**G.      Dr. Laidlaw's assessments of Plaintiffs cannot be given credence.**

47.     Dr. Laidlaw purports to offer an assessment of the appropriateness of hormone therapy for the named Plaintiffs based on their medical records and concludes that the risks of hormone therapy outweigh "any potential benefits" to each of the plaintiffs. This conclusion turns on his starting premise that it's inappropriate to use hormone therapy to treat gender dysphoria <u>ever</u>, regardless of the benefits in alleviating the condition, and he offers no assessment of how hormone therapy has affected Plaintiffs' mental health. Without assessing the benefits of treatment, he has no basis to conclude that the risks outweigh the benefits.

I declare under penalty of perjury of laws of the United States that the foregoing is true and correct.

Executed this 29th day of October, 2025

_____

Dan H. Karasic

-16-

**BIBLIOGRAPHY**

Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society*, 5(4), 1-16.

Brown, D., Psychosexual Disturbances: Transvestism and Sex-Role. Source: Marriage and Family Living, Vol. 22, No. 3 (Aug., 1960), pp. 218-227. Published by: National Council on Family Relations. Stable URL: http://www.jstor.org/stable/347641.

Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., ... & OlsonKennedy, J. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. New England Journal of Medicine, 388(3), 240-250.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., ... & Zucker, K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism*, 13(4), 165-232.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, *23*(Suppl 1), S1–S259.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A.L., Långström, N., Landén, M. Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PLoS One. 2011;6(2):e16885.

Glintborg, D., Møller, J. J. K., Rubin, K. H., Lidegaard, Ø., T'Sjoen, G., Larsen, M. L. J. Ø., ... & Andersen, M. S. (2023). Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study. European journal of endocrinology, 189(3), 336-345.

Guyatt et al, 2025. Systematic reviews related to gender-affirming care. Retrieved from https://hei.healthsci.mcmaster.ca/systematic-reviews-related-to-gender-affirming-care/ on 10/28/25.

James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). Early Insights: A Report of the 2022 U.S. Transgender Survey. National Center for Transgender Equality, Washington, DC.

Miroshnychenko, A., et al (2025). Gender affirming hormone therapy for individuals with gender dysphoria aged < 26: a systematic review and meta-analysis. Archives of Disease in Childhood, 110(6), 437-445.

Pfäfflin, Friedemann & Junge,. (1998). Sex Reassignment. Thirty Years of International Follow-up Studies after Sex Reassignment Surgery. A Comprehensive Review, 1961-1991.

1

Rae, J. R., Gülgöz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting Early-Childhood Gender Transitions. Psychological Science, 30(5), 669-681. https://doi.org/10.1177/0956797619830649 (Original work published 2019)

Russell, S.T., Pollitt, A.M., Li, G., Grossman, A.H. Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth. J Adolesc Health. 2018 Oct;63(4):503-505.

Steensma, T., McGuire, J., Kreukels, B., Beekman, A., Cohen-Kettenis, P. Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study, Journal of the American Academy of Child & Adolescent Psychiatry, Volume 52, Issue 6, 2013, Pages 582-590, ISSN 0890-8567, https://doi.org/10.1016/j.jaac.2013.03.016.

Taylor, J., Mitchell, A., Hall, R., Langton, T., Fraser, L., Hewitt, C.E. Masculinising and feminising hormone interventions for adolescents experiencing gender dysphoria or incongruence: a systematic review. Arch Dis Child. 2024 Oct 30;109(Suppl 2):s48-s56. doi: 10.1136/archdischild-2023-326670. PMID: 38594053.

van der Loos, M. A. T. C., Hannema, S. E., Klink, D. T., den Heijer, M., & Wiepjes, C. M. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. *The Lancet. Child & adolescent health*, *6*(12), 869–875.

What We Know Project, Ctr. for the Study of Inequality, Cornell Univ. (2018). What does the scholarly research say about the effect of gender transition on transgender well-being? (online literature review), *available at* https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/.

Zucker, K., et al (2010) Puberty-Blocking Hormonal Therapy for Adolescents with Gender Identity Disorder: A Descriptive Clinical Study, *Journal of Gay & Lesbian Mental Health*, 15:1, 58-82.