# EXHIBIT 20

## REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
CASE NO:  4:24-cv-434-AW-MAF


REIYN KEOHANE, et al.,

     Plaintiffs,

vs.

RICKY D. DIXON, in his office
capacity as Secretary of the
Florida Department of
Corrections, et al.,

     Defendants.




ZOOM DEPOSITION OF:
DANNY MARTINEZ, M.D., MPH

Taken on Behalf of the Plaintiffs



DATE TAKEN:      Thursday, November 6, 2025

TIME:            10:00 a.m. - 6:17 p.m.

PLACE:           via Zoom videoconference

REPORTER:        Lisa Adkins, Court Reporter



that I took the WPATH provider course from August of 2020 to December of 2020, during that course they mentioned it again, and again, and again.  Standards 8 -- Standards of Care 8 were coming, and you can expect major changes.

BY MS. NOWLIN-SOHL:

Q.   Okay.  And at that time, was procedure 40312 relying on WPATH 7?

A.   In part, yes.

Q.   Okay.  You and Dr. Kline first started drafting HSB 15523 in 2023, correct?

A.   Again, the conversation predate her coming to the office of health services at Florida Department of Corrections.

Those conversation, to my mind, began December of 2020, with her predecessor Dr. Dean Aufderheide, and the then associate chief of mental health services Dr. Tammy Lander.

Q.   All right.  Well, my question wasn't actually about the conversation; it was about the drafting.  So let me repeat that.

So you and Dr. Kline started drafting the HSB 15523 in 2003, correct?  Sorry, 2023.

A.   Again, the exact date that -- you know, was it day one or day zero as you're trying to define it, I



assume -- I don't remember.  I don't recall.

Q.   What --

A.   The conversation was way before then.

Q.   Okay.  Well, forget about the drafting.  I'm asking -- that happened in 2023.

I don't need the exact date, but that's the right year?

MR. STEELY:  Object to form.

A.   I don't recall specifically.

BY MS. NOWLIN-SOHL:

Q.   So as you sit here today, you don't know which year you started drafting HSB 15523?

A.   The exact date, no.

Q.   I'm not asking for the exact date.  I'm asking for the year.

A.   Many, many conversation took place regarding how we would change the procedure.  To my memory, those conversation began in December of 2020.  When exactly we put those ideas down on paper when we started that process, I do not recall off the top of my head, no.

Q.   Okay.  So you do not know when the drafting of the HSB started?

MR. STEELY:  Object to form.

A.   Again, I do not recall the exact date.

Q.   And the first drafts of the HSB did not allow



for hormone therapy or accommodations, correct?

A.   To my recollection there was one draft that is consistent with that.

Q.   Do you know roughly when that draft was?

A.   It could have been the summer -- I don't recall exactly.

Q.   Summer of 2023?

A.   I answered this question in my previous testimony on October 14th, and I was presented with a document that had an 8 on it.

Q.   Okay.

A.   So, you know, I think I answered that.

Q.   Okay.  So you said there was at least one draft that did not allow for hormone therapy or accommodations.

Why did that draft not provide for those?

A.   I'm sorry, can you complete that idea -- that question?

Why did that draft not provide for what?

Q.   So you said there was at least one draft that did not provide -- provide for hormone therapy or accommodations.

Why did that draft not provide for hormone therapy or accommodations?

A.   Again, the clinical literature at that time



began to change as to the treatment of gender dysphoria population.

And, again, I can point to Dr. Kaliebe's testimony where he is of the expert medical opinion that the true treatment is cognitive behavioral therapy.

Q.   And so at the time of that draft, you thought the clinical literature showed that hormone therapy and accommodations were never medically necessary?

A.   There was clinical research that suggested that, yes.

Q.   Okay.  And so that was a pretty significant change in policy and that was based on the clinical research at that time?

A.   That is where we were with the draft at that moment, yes.

Q.   Okay.  At that time, did you think that hormone therapy was never medically necessary?

A.   In the summer of '23?

Q.   Yes.

A.   I did not -- I did not think in all cases it was necessary, no.  And, you know, our patient population suggests that because we have some gender dysphoric patients who, you know, have a level of education, and when they are told the long-term side effects of taking processed hormones, they, of their own



Q.   Okay.

A.   Or he was the primary author and secondary author.

Q.   Okay.  And do you know how many peer-reviewed studies on gender -- treatment for gender dysphoria that Dr. Cantor has published?

A.   Dozens.

Q.   With regard to adults?

A.   Dozens.

Q.   Okay.  And so your testimony is that you relied on the expert testimony of Dr. Kaliebe and Cantor, as well as Dr. Levine, as the basis for adding the language of needing to show that the truth may improve clinical outcomes by treating the ideological basis of the pathology?

MR. STEELY:  Object to form.

A.   This is also consistent with the language that's in the DSM-V Text Revision, which is the textbook which contains all psychiatric diagnoses.

BY MS. NOWLIN-SOHL:

Q.   Okay, but separate from the DSM.  So you're agreeing with the statement that I just made.

And it is also consistent with the DSM, is that what you're saying?

A.   Yes, and that's just one more source that we



look to when we wrote this language.

Q.   Does the DSM-V talk about treatment for gender dysphoria, or diagnosing of gender dysphoria?

A.   It talks about both.

Q.   Okay.  You don't know the ideological basis of gender dysphoria, correct?

A.   There is no-known ideological basis of gender dysphoria.  And, again, that's not from me; that is from the DSM-V Text Revision.

Q.   So how can a treatment treat unknown ideological basis of a pathology?

A.   Again -- so we focus on treating the whole patient.  We try to focus on as much mental health as possible.  This patient population, the majority, if not all of them, have multiple comorbidities.  We try to address them in the light of gender dysphoria.

Q.   Does treating the ideological basis of gender dysphoria mean that the person's gender dysphoria will go away?

A.   That's impossible to determine.  That would be on a case-by-case basis.

Q.   Is that the goal?

A.   The goal is to make the gender dysphoria go away, is that what you're asking me?

Q.   Yes.



A.   So, again, there's no-known cause to gender dysphoria, and there's no-known test.  For gender dysphoria is a clinical diagnosis and it's a diagnosis of exclusion.

So by, you know, most generally accepted psychiatric standards and clinical psychological standards, right, you would address all of the mental health comorbidities in the light of gender dysphoria.

Now, on an individual basis does that improve the gender dysphoria?  Well, it would depend on what your definition of improvement would be.  You know, did there -- you know, has their mood stabilized.  Are they less violent.  Are they more cooperative.  Are they compliant with their treatment.  You'd have to look at all of that to make that determination.

Q.   Is treating the ideological basis of gender dysphoria mean that the person will no longer be transgender?

A.   Again, there is no -- there is no-known test to diagnose someone definitively with gender dysphoria.  And the diagnosis is made as -- it's a diagnosis of exclusion.  You have to eliminate anything else that might be there.  You have to stabilize any other psychiatric condition they might have.  With any combination of pharmacological therapy be that



December he sent you an email.

A.    Uh-huh.

Q.    What happened next in the following months with the policy?

A.    We would have reviewed it but -- I mean, we would have reviewed it.  We would have reviewed whatever was last draft, would have been the immediate next step.

Q.    And what about the next step after that?

A.    I suppose at some point in the future we would have a meeting with Mr. Weiss to give him an update.

Q.    Okay.  I guess I'm trying to understand that this versus -- this email was December 5th.  And then the final policy doesn't go into effect until almost ten months later.  We see almost no more drafts for many months.

I'm curious, what happened to delay the implementation of the policy?

A.    I believe that there were additional court proceeds that were occurring at or around that time. And so the publishing of the policy kept on getting delayed until those rulings were pronounced, is my understanding.

Q.    And how did you reach that understanding?

A.    From meetings that I had with Mr. Weiss.

Q.    Was it just you and Mr. Weiss in those



meetings?

A.   I don't recall if it was just me and Mr. Weiss, or if it was just me, Mr. Weiss, and Dr. Kline.  But it wouldn't surprise me if that were the case.

Q.   Do you know what those legal proceedings were about?

A.   I didn't say legal proceedings.  In terms of my conversation with Mr. Weiss, I -- and, again, I'm not an attorney.  Apparently, there were cases where this topic had come up in terms of treatment, and diagnosis, and services that would be provided were being considered.

Q.   Do you remember the names of those court proceedings?

A.   I do not.

Q.   During the time that HSB 150523 was being developed, was procedure 40312 still in effect?

A.   My understanding is, yes.

Q.   Okay.  But the GDRT stopped meeting in May of 2023?

A.   Yes.

Q.   Why was that?

A.   Because we were in the process of editing the policy, the procedure, and ultimately replacing the procedure with an HSB.

Q.   So 40312 was still in effect but it was



essentially paused because you were updating the policy?

MR. STEELY:  Object to form.

A.   No.

BY MS. NOWLIN-SOHL:

Q.   The GDRT did not approve anyone for hormone therapy after May of 2023, correct?

A.   My understanding is, yes.

Q.   Your understanding is that is correct; that no one was approved?

A.   Yes.

Q.   Okay.  Was the delay in the HSB as a result of Centurion's feedback or concerns at all?

A.   No.

Q.   So you testified earlier that Mr. Weiss' signature on the HSB and the effective date is what makes it official and final and going into effect, correct?

A.   Director of the office of health services Mr. Clayton Weiss has the final says on all of our HSBs and all of our procedures.  His signature must appear on the final version.

Q.   And once he's --

A.   That's --

Q.   And once he's signed it, that's what makes it final?



800.211.DEPO (3376)
EsquireSolutions.com

A.    Yes.

And let me just repeat here.  All of the drafts that we've gone over today were not the final product because none of them have his signature.

Q.    Lets mark as Exhibit 15 HSB officials 030474.

(Plaintiffs' Exhibit No. 15 is marked for identification.)

BY MS. NOWLIN-SOHL:

Q.    Okay.  So this is -- we can start at the bottom, actually.  Well, the second page is empty.

This is an email from Jennifer Bridges to Mr. Weiss.  The subject is HSB 150523, parentheses, new.

And it says:  I have prepared this for your signature.

Do you see that?

A.    I do.

Q.    Okay.  And then Mr. Weiss responds, Please find attached.

Do you see that?

A.    I do.

Q.    All right.  So Exhibit 16 is going to be the second attachment to this email; it is FDC officials 030485.

(Plaintiffs' Exhibit No. 16 is marked for identification.)



A.   I don't know.

Q.   Who suggested that change?

A.   I don't recall.

Q.   Had the change in medical consensus occurred since July of 2023?

A.   Since July of 2023.  There was a lot of -- that summer, there were a lot of publications and literature, again, that were in contradiction with WPATH's Standards of Care 8, to my recollection.

Q.   Didn't this HSB start developing because of the change in law?

        MR. STEELY:  Object to form.

A.   Again, the procedure -- the conversation for editing and changing the procedure began in December of 2020.  You know, again, which, you know, next month will make five years.  Five years that -- from these events.

BY MS. NOWLIN-SOHL:

Q.   Dr. Martinez, when I ask about the drafting, I'm talking about the writing of the document; not the conversation, but I think we've established that.

        So did the drafting of this HSB and the actual writing of a policy occur because of the change in law?

        MR. STEELY:  Object to form.

A.   What's you're showing me here is neither the policy, or the HSB, or the procedure.



This was in anticipation of rolling out the new HSB how we were going to inform the -- our transgender population of the change.

BY MS. NOWLIN-SOHL:

Q.   That doesn't answer my question, Dr. Martinez.

A.   I'm sorry, I'm lost.  What is your question?

Q.   Okay.  So didn't the drafting of the writing of this HSB start because of the change in law?

MR. STEELY:  Object to form.  Asked and answered.

He's -- you're trying to break the place from where he said he started this progress to the actual writing.  He's gone over that over and over all day today.  But if you want to go ahead and answer, go ahead.

A.   The conversations about editing this procedure began in December of 2020 well before the passing of law.

BY MS. NOWLIN-SOHL:

Q.   Dr. Martinez, you understand the distinction between drafting a policy and having conversation about a policy?

A.   You made it abundantly clear, yes.

Q.   Okay.  So I'm going to ask the question again about the drafting of the policy.



Didn't the drafting of the policy start developing because of the change in Florida law?

MR. STEELY:  Same objection.  You can answer

A.    Did I actually put pen to paper at that moment, if you will, yes.

Q.    Okay.

A.    Our old procedure was not in compliance with Florida law.  We were required to change it, yes.

Q.    Did Centurion ever provide edits to this script?

A.    I don't recall.  It's possible.  Again, at the end of the day it was a Centurion employee from mental health and an FDC employee from security that ultimately delivered the message to all of the gender dysphoria patients on the same day.

Q.    Do you know whether it was a Centurion employee that ultimately ended up reading this script to the patients?

A.    Do I have documented video evidence that it was a Centurion employee reading this to the gender dysphoria population, no, I do not.

My understanding is that either a Centurion employee or the FDC security employee would have read either or.  Those were our instructions.

Again, this was not the final work product.


DEPOSITION SOLUTIONS

This is not what was read.

Q.   Were you aware that Centurion's counsel asked FDC's counsels to remove the words "recent changes from the medical consensus" from the script?

A.   I have no recollection.

Q.   So you've never heard that before?

A.   I have no recollection.

Q.   All right.  Lets mark as Exhibit 18 Centurion production 00082.

(Plaintiffs' Exhibit No. 18 is marked for identification.)

BY MS. NOWLIN-SOHL:

Q.   So this an email chain.  We can start -- the second page is mostly blank.

The first email is from Deana Johnson to -- at Centurion to Dan Johnson at FDC on September 20th, 2024.  And then there are additional forwards.

So in the middle of this paragraph Deana Johnson says:  I am writing to ask your consideration of removal of the words, both recent changes in medical consensus, end quote.

If FDC decides to provide a reason for this policy change in the announcement, Centurion requests either the removal of the concept that medical consensus has changed, or alternatively that FDC delivered this



charge of the annual review of all the HSBs and procedures that have to be sent out to each of the chiefs for review and editing.  They send it back to this individual.  This individual then forwards it to the next person on the chain for review of the HSB procedure.

Q.   And this email says that procedure 40312 is under litigation decisions and may possibly be rescind.

What does it mean for the procedure to be under litigation decisions?

A.   What I mentioned earlier that there were court cases outside of the state of Florida regarding the treatment and care of patients with gender dysphoria.

Rescinded means that it would be, you know, retired, and it would be replaced by something else. Ultimately, it was replaced by the HSB 1505.23.

Q.   So earlier I thought you said that the HSB publication was kind of delayed for the court decision.

So are you saying that those court decisions also were impacting 40312?

A.   So we're not -- you know, we delayed the rescinding of the procedure until we were sure of when we're going to publish the HSB 1505.23.  Because we had not published 1504.23, we did not rescind the procedure.

Q.   Well, this is July of 2023.



So this is still somewhat early in the drafting process of the HSB, right?

MR. STEELY:  Object to form.

A.    It's consistent with the timeline that we've been talking about from the date the director signed on June 3rd of 2023.  But I'm not sure what year asking me.

BY MS. NOWLIN-SOHL:

Q.    I believe the document we showed with the director signing it was June 3rd of 2024.

And so my question is:  The first drafts we looked at of the HSB are in June of 2023.

So you're still a ways off from a mere final draft of the HSB, right?

A.    Again, we have to review all our policies and procedures on an annual basis.  The conversation for changing or rescinding procedure 403.012 began in December of 2020.  This is an snapshot of where we were at the end of July of 2023.

Q.    Okay.  And you said earlier that the GDRT stopped meeting in May of 2023, correct?

A.    That's accurate.

Q.    And that's because SB 254 was passed in May of 2023?

A.    Again, we were in noncompliance with the law.  Yes.



Q.   So no one was approved for hormone therapy by the GDRT between May of 2023 and the release of the new HSB on September 30th of 2024?

A.   So, no, there were approvals, just not through the GDRT.

Q.   Who made those approvals?

A.   So, for example, if we received inmates from the outside community that had the diagnosis and were receiving hormone therapy, we continued them on hormone treatment.

Q.   For the entirety of that time period?

A.   Yes.

Q.   But for patients who are already within an FDC custody, nobody was approved to start hormone therapy during that time?

A.   To my knowledge, no.

Q.   And as a member of the GDRT, you would have known had somebody been approved to initiate hormone therapy?

A.   Yes.

Q.   When the HSB -- the final version came out, did anyone from FDC medical or mental health personnel express concerns about the new policies removal of accommodations?

A.   Not that I'm aware of.



Q.   Did any Centurion medical or mental health personnel express concerns about the new policies removal of accommodations?

A.   Not that I'm aware.

Q.   Did anyone raise concerns about the impact of the loss of accommodations on inmate patients?

A.   I previously answered that question.

Dr. Kline and I had conversations as to -- and I answered this with Mr. Anscombe as well.  We talked about, you prepare for the worst.  You hope for the best.

So on the day that the message was released, we made sure that there was additional security and mental health providers available at all of the facilities that housed gender dysphoria inmates in case there would be a psychological emergency; in case there would be a decompensation in their mental health; in case they needed to be sent out to an outside hospital for psychiatric treatment.

Q.   What about the ongoing impacts of not being provided accommodations?

MR. STEELY:  Object to form.  Go ahead.

A.   What is the question?

Q.   Did anyone raise concerns with you about the ongoing impacts of patients not being able to access



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.    (Complies.)

A.    Thank you.  Sorry, can you scroll up?

Q.    (Complies.)

A.    Little bit more.

Q.    (Complies.)

A.    Yes.

Q.    Okay.  And it's dated May 8th, 2025.  Sorry, I moved too quickly, but it's right here.

Is that correct?

A.    That's what it says.

Q.    And you have no reason to believe that's not accurate?

A.    I do not.

Q.    Okay.  And so here on page 5 in the second paragraph of Section 9 it says:  Since the removal of GD accommodations, inmate patient has struggled with adapting the demands of prison.  For example, inmate patient describes that going through the experience of having grown hair shaved involuntarily triggered an adverse reaction subsequently resulting in the TCU transfer ambition.

What is TCU?

A.    Therapeutic care unit.  It's a level of what's called the residential continued unit care.

Q.    Okay.  And so this form is saying that this


ESQUIRE
DEPOSITION SOLUTIONS

patient has struggled with the loss of accommodations, correct?

A.   The clinical psychologist is providing a summary, again, of the self-reported answers that the patient gave indicating that they required a higher level of mental healthcare as a result of their adverse reaction, yes.

Q.   Okay.  Is there a section on this form for the clinical psychologist to recommend accommodations?

A.   No.

Q.   Why not?

A.   We rescinded the alternative canteen, which was part of the old procedure.

Q.   And you also rescinded the accommodation for hair length for transgender women?

A.   Yes.

Q.   And rescinded the accomodation for certain undergarment accommodations, correct?

A.   There were set items available in the alternative canteen.  The alternative canteen was eliminated with the rescinding of the old procedure.

Q.   Were the items also available through laundry?

A.   No.

Q.   So the gender dysphoria variance team is referred to as the GDVT, yes?



A.    Yes.

Q.    And that includes the chief medical officer, the chief mental health officer, and the chief clinical advisor?

A.    Yes.

Q.    Anybody else?

A.    No.

Q.    The chief clinical advisor was not a member of the GDRT, correct?

A.    So when I assumed my position in August of 2020, Dr. Santiago was no longer in that position.  And it was not until the gender dysphoria variance team was created in September of 2024 that she has been reincorporated into this process.

Q.    Was there ever a time that the chief clinical advisor was on the GDR team?

A.    To my knowledge, no.  But what happened was is that the chief clinical advisor, before Dr. Santiago left -- Dr. Santiago assumed the position of chief clinical advisor but there was not -- and she had my old position.  She had -- my current position was her old position, chief of medical services.

So, in fact, for a period of a year, she was performing both duties until I was hired in.

Q.    And why was she added to the GDVT?



A.   It was felt that another -- three would be better than two.  Three could, you know, resolve a deadlock.

Q.   And the chief of security and pre-coordinator had been part of the GDRT.

Why were they not included on the GDVT?

A.   Because, again, originally, when the old procedure was written, it was the result of litigation.  And so it was written way back in 2017, prior to my arriving at FDC.

But my understanding is that it was heavily edited and rewritten multiple times over until the judge in that case was satisfied that it would provide treatment for this patient population.  And the pre-coordinator and a member of security and ops were added to the group.

In effect, when this group met -- when the GDRT met, the previous group met, they really had a secondary role.  The role was, number one, did this inmate patient evaluated for gender dysphoria, did they have a prehistory, okay, number one.

Number two.  Were they evaluated by the pre-coordinator and/or her assistant to determine whether this individual had a high potential to be a victim of a pre-act.



Should the person be -- as a result of the team meeting, should the individual be deemed to have the diagnosis of gender dysphoria -- that's the reason why operations and security were there, right.  What is the proper place to house the gender dysphoria patient.  What's the proper level of security for this gender dysphoric patient.  Given all the externalities.  Their past history.  Their past crimes.  Their past behavior in past institutions.  It was a way of keeping all three in the loop.  It was an administrative task for them.  They did not make any of the clinical decisions.

Q.   Was there no need for the chief of security on the team now that accommodations were no longer provided?

A.   To be present in the actual meetings, no.  They received a report.  They have a list of all transgender patients.  They know exactly who they are, where they're housed.

And, again, the pre-coordinator receives any new intakes that we have.  So she's aware of their past history to alert security of -- any additional security needed that might be required.  Like, sitting in those meetings like they did in the past it was deemed unnecessary.

Q.   So under the final HSB a variance is only



approved if it's deemed medically -- if hormone therapy is deemed medically necessary, correct?

A.    That medical necessity is at the heart of the new HSB, yes.

Q.    And so if somebody is approved, it's been deemed medically necessary for them?

A.    On a case-by-case basis, as the recommendations come from the MDST, if we approve it, yes.

Q.    And an approval for variance requires a new unanimous vote of the GDVT?

A.    Yes.

Q.    So anyone approved for hormone therapy reflects your determination that hormone therapy was medically necessary for them?

A.    My determination, the chief of medical -- chief of medical services, and myself, and the chief clinical advisor, and the chief of mental health services all have to be in unanimous agreement.

The evidence provided by the MDST demonstrates that this individual would benefit from initiation or from continuation of cross-sex hormone therapy.

Q.    How does it benefit people?

A.    So, again, this is examined on a case-by-case basis.  We have meticulously constructed our evaluations.  We have a long battery of psychological



tests at our disposal, again, to determine, does this patient's past medical history coincide with the requirements of the diagnosis as elaborated in the DSM-V Text Revision.  And does this individual with their comorbidities -- again, most of them have other psychiatric diagnoses -- are those well controlled.  Is this individual stable on their psychotropic medication, if they're taking it.  Are they compliant with their psychotropic medication.  Are they going to see their mental health provider, whether in group or individual one-on-one sessions.  We also look at what's called DRs. DRs are disciplinary reports.

So I have seen cases where prior to hormone treatment, the individual had 30-plus disciplinary reports attacking correctional officers.  Arguing or attacking other inmates, or other types of disciplinary reports.  And, you know, we go -- we approve them for hormones.  We revisit the case and six months later, they've had one disciplinary report since starting hormones.  That's just one example.

Again, we try to look at each individual holistically.

Q.   Okay.  Once the determination has been made to grant somebody a variance, they're either continuing or initiating hormones, does it help treat their gender



dysphoria because it brings their body more into alignment with their gender identity?

A.   Certainly -- you know, we can probably find other reports where the patient would self-report that they feel more feminine, that they look more feminine, and that that is psychologically pleasing to them.  But whether or not that is treating their gender dysphoria, you know, I can't say.  I can't say.

I can point to things, like -- again, is there mood stabilized, all right.  Are they less depressed. Are they less anxious.  Are they -- you know, if they're in any type of program, are they sticking with their program.  Are they getting their GED.  Have they completed it.  You know, any positive milestones that they're achieving after initiating the therapy, versus their behavior, their general mood, their level of anxiety, their level of depression prior to initiating therapy are the types of things that we look at.

Q.   Did you, Dr. Kline, and Dr. Santiago meet in person to discuss the GDVTs or the variance determinations; is that correct?

A.   Mostly, yes.

Q.   Sometimes is it remote?

A.   It can be on occasion.

Q.   Is it ever decided over email?



Q.   Under the new policy, yes.

A.   They would not be able to do that under the new policy.  The current policy states that a born male must follow male grooming standards.  A born female must follow female grooming standards in FDC.

Q.   And that's true regardless of medical necessity?

MR. STEELY:  Object to form.

A.   Again, we look at each individual patient holistically.  If the MDST can prove that these items are medically necessary, we have to take it into consideration.

BY MS. NOWLIN-SOHL:

Q.   Even though the policy doesn't permit it?

A.   We would have to take it into consideration if they prove medical necessity because the HSB is based on medical necessity.

Q.   And there's nowhere in the variance template for somebody to recommend accommodations, correct?

A.   Yes.

Q.   And that's because the accommodations are not permitted under the HSB?

A.   The alternative canteen that was available under the old procedure has been eliminated.

Q.   And I think we established earlier when I was



talking about accommodations, I'm referring to more than just alternate canteen, right?

A.   So we mentioned, I think, hair growth, I think you mentioned.  Is that what you're getting at?

Q.   Yes.

A.   Yes, that -- under the old evaluation -- again, those accommodations would have been granted through a pass system.  So that if the individual had those items on them, security would know that they have a pass that they were allowed have those items.  Security would know that they had a pass to grow out their hair, yes.

Q.   And those passes were rescinded as part of the new HSB?

A.   They were rescinded because they were part of the old procedure, which was rescinded, yes.

Q.   So those passes don't even exist anymore?

A.   For access to an alternative canteen, no.  For being allowed to grow hair to female standards for transgender female, no.

Q.   Okay.  So even if you determined that these accommodations are medically necessary, they're no longer exists the pass to provide to somebody to be able to receive those accommodations, correct?

A.   Currently, yes.

Q.   I'm going to Mark as Exhibit 23, FDC officials



003768.

         (Plaintiffs' Exhibit No. 23 is marked for

                   identification.)

BY MS. NOWLIN-SOHL:

    Q.    This is the HSB 150523 action plan, correct?

    A.    That's what it says, yes.

    Q.    Have you seen this document before?

    A.    I don't recall, but it's possible.

    Q.    Were you involved in implementing HSB 150523?

    A.    So insofar as the second part saying approved
inmate script, Centurion.  Again I was the principal
author of that script.

    Q.    Okay.  In the middle of this action plan
there's an entry that says:  Conduct group meetings.

          And let me zoom in.

          Do you see that?

    A.    I do.

    Q.    It says:  Inmate will be advised that the
alternative canteen and quarterly order menus will be
rescinded, and they will have to comply with the
grooming standard in accordance with their biological
sex.

          Do you see that?

    A.    Yes.

    Q.    Okay.  So this is indicating that alternate



canteen and grooming accommodations are no longer available under the HSB?

A.   Yes, but the actual date that this occurred was a week later on October 31st of 2024.

Q.   Okay.

A.   And didn't actually occur on the 24th; it occurred a week later.

Q.   And inmate patients have 30 days to come into compliance with the grooming standards and to consume, dispose, or mail of their alternate canteen items, correct?

A.   They had the option to mail those items home at -- with Florida Department of Corrections paying for the cost of doing so.

Q.   But they had 30 days to come into compliance?

A.   That is correct.

Q.   Were any individualized assessments of medical necessity conducted during that 30-day period?

MR. STEELY:  Object to form.

BY MS. NOWLIN-SOHL:

Q.   Let me rephrase it.

Were any individualized assessments of medical necessity for the alternate canteen items and the grooming accommodations conducted during that period?

A.   Yes.



Q.   How so?

A.   So specifically when it came to a bra pass, which you had not mention, that was another accommodation that had been provided by the old procedure.

I think I mentioned this before.  But one of the medications that some of the transgender -- I'm sorry, the gender dysphoric population is on is a diuretic.  A potassium-sparing diuretic called spironolactone, which has a side effect of growing breast tissue.  We call it gynecomastia.  There are some individuals who've been on that medication for a number of years.  They would have -- they could have developed considerable breast tissue.

Q.   Separate -- separate from the bra pass, which I think we've established were only provided for medical purposes.

Were there any evaluations -- individualized evaluations done for accommodations such as alternate canteen and hair length for gender dysphoria?

MR. STEELY:  Object to form.

A.   Again, they were all evaluated for the need for a medical bra.

BY MS. NOWLIN-SOHL:

Q.   But not for alternate canteen, or hair length,



or for a nonmedical bra for gender dysphoria?

A.   Again, the bra is offered to other individuals who were taking said medication for other health reasons that have nothing to do with gender dysphoria.

But, specifically, all the gender dysphoria patients were evaluated for the need for a medical bra.

Q.   So setting aside the bra.

Were any of the patients with gender dysphoria evaluated for a need for alternate canteen items?

A.   No.

Q.   Were any of the patients with gender dysphoria evaluated for the need for alternate hair length?

A.   No.

Q.   All right, lets mark as Exhibit 24, FDC 003769.

(Plaintiffs' Exhibit No. 24 is marked for identification.)

BY MS. NOWLIN-SOHL:

Q.   Dr. Martinez, is this a frequently asked questions document that was prepared in relation to the implementation of the new HSB?

A.   Yes, I wrote this.

Q.   Okay.  And so here, roughly in the middle, you wrote that there would be no longer alternate canteen menus; is that correct?

A.   Yes.  And then you can see the corrected date



of September 30th.  This was the actual script.

Q.   Okay.  And you wrote that:  Any items retained after the 30-day deadline would be considered contraband?

A.   That was after a lengthy conversations with security.  That was the determination that was made, yes.

Q.   What do you mean lengthy conversation with security?

What were those conversation?

A.   What would be the consequences if they decided to keep the alternative canteen items.

Q.   Okay.

A.   So they could dispose of them, give them away, mail them back home.  If they happen to have them after that date, the consequence would be that the inmate would receive a disciplinary report that they were in possession of contraband.

Q.   All right.  An then down here under 8 it says that:  All inmates will be held to the Department's property requirement in possession limits in accordance with his or her biological sex.  Correct?

A.   Yes.

Q.   And then here it talks about the state -- number 9.  State issued clothing not in accordance with



correction officers?

A.   That's what nonhealthcare staff implies, yes.

Q.   Okay.

All right, lets mark as Exhibit 25, FDC official 019703.

(Plaintiffs' Exhibit No. 25 is marked for identification.)

BY MS. NOWLIN-SOHL:

Q.   This document is titled diagnostic review and treatment recommendations.  I'm just going to go the bottom of it to find the date.  It's dated January 9th, 2025.

And are you able to tell from the format of this document that this was a variance application but one that was prior to the current template that is used by the GDVT?

A.   Yes, it went through several iterations.

Several of the clinical psychologists did their own thing, and were produced very bad reports that we sent back.  So, eventually, we -- the GDVT came together and we kind of hammered out what we wanted to see in the initial evaluations, but also the reevaluations.  Certain information that we wanted to see.

The format is very different from what you see here, yes.



Q.   Okay.  And as a member of the GDVT, you would have reviewed this document?

A.   Yes, in all probability.

Q.   Okay.  This is signed by a number of people. One of them is Amber Akins, a mental health provider.

Do you see that as the second signature?

And I can zoom in a little bit.

A.   That's what it says, yes.

Q.   Okay.  Sorry, I lost my spot.  I'm on the wrong page.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████
███████████████████████████
██████████████████████.

Q.   Okay.  And that's Ms. Akins communicating her clinical impressions of the patient's mental health?

A.   It would appear so, yes.

Q.   And her clinical impression is that the patient's mental health has improved substantially following approval for gender affirming accommodations?

A.   That's what it says, yes.

Q.   And then at the top of that paragraph it says: Since her previous evaluation approval for gender



affirming accommodation, she's self-report and records indicate a decrease in psychological emergencies and staff referrals.

You also see that?

A.  I do.

Q.  Okay.  And does that suggests to you that the social accommodations were beneficial in treating this patient?

A.  I would suggest that from the self-reporting that is the impression that Ms. Akins had, given the self-report from the inmate patient, yes.

Q.  And based on her clinical impressions?

A.  To the extent that she described it there, yes.

Q.  Okay.

A.  It's not a clinical impression.  She is writing the answers that the inmate gave to the question.

Q.  Well, Dr. Martinez, I believe you just testified that this was her clinical impression.

A.  Yes, you are correct.

Q.  So at the time bottom of page 3 in the second to the last paragraph it says:  The provision of social transition accommodations was eliminated in the September 30th, 2024 updates to the Florida Department of Corrections health services bulletin 150323.  Mental health treatment of inmates with gender dysphoria.



Is that statement accurate?

A.   That it is what it says there in the document.

Q.   Is it an accurate statement?

A.   Yes.

Q.   And at any point have you told the providers that they are permitted to request social transition accommodations under the new policy?

A.   Specifically, no.

Q.   You said specifically no.

Have there been other communications that have implied that?

A.   The implication would be the elimination of the alternative canteen where most of these accommodations came from.

Q.   And the elimination of the hair length passes?

A.   Correct.

Q.   And all of the accommodation passes that were available under the prior procedure?

MR. STEELY:  Object to form.

A.   Not including bra passes.

BY MS. NOWLIN-SOHL:

Q.   The medical bra pass?

A.   We just call it a bra pass.

Q.   There's not a separate and new pass for the medical bra pass?



A.    Again, as I explained before, there are people who are taking spironolactone, a potassium-sparing diuretic, for other --

Q.    I'm aware that people have the pass.

I guess I'm talking about the actual document itself.  To the extent that people were given a document --

A.    A new pass was not created.  It's the same old bra pass.  If you have an X -- if you were born male and you now have an excess of breast tissue -- depending on the size of the breasts -- and that's determined by the clinical provider -- they will provide the patient with a bra pass.

Q.    Well, I thought we established the pass had actually been -- a physical pass had been rescinded?

A.    No.  The bra pass was not rescinded, no.  And it was not part of the alternative canteen from the old procedure.

That is to say that prior to the change from the procedure of the HSB there were other patients for other medical reasons that required a bra pass, again, due to excessive breast tissue.

Q.    Just to clarify.

At no point have medical or mental health providers been told that they can request accommodations

