# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

CASE NO. 4:24-cv-434-AW-MAF

REIYN KEOHANE, et al.,

      Plaintiff,

vs.

RICKY D. DIXON, in his official capacity as
Secretary of the Florida Department of
Corrections, et al.,

      Defendants.

_____/

DEPOSITION OF

CLAYTON WEISS

VOLUME 1 (Pages 1 - 178)

Tuesday, August 12, 2025

10:33 a.m. - 4:21 p.m.

Florida Department of Corrections
501 South Calhoun Street
Tallahassee, Florida 32399

STENOGRAPHICALLY REPORTED BY:

KIMBERLY S. BARTHOLOMEW
Professional Stenographer

Job No:  J13535535



to be sensitive to that.

But at the same time, we work through a process with a multitude of folks to get to what we think is the best policy for treatment of gender dysphoria.

Q    Are you aware of any communications that any government official involved with the development and implementation of the HSB had with private parties concerning any matter addressed in the HSB?

A    With private parties?

Q    Yes.

A    Can you be more specific?

Q    Sure.  For example, during the campaign around Amendment 4 for the last year concerning abortion protections in the Florida Constitution, the state hired an individual from the Heritage Foundation to be part of a committee to review the financial impact of the amendment.  So they were communicating with a private party, an outside actor, about this thing that was on the ballot.

So my question to you is, are you aware of any government officials that talk to outside folks, private parties, about any aspect of the HSB?

A    No, I'm not.

Q    Are you aware of any communications that



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

anyone at FDC involved with the development and implementation of the HSB had with any other government officials concerning any matter addressed on the HSB?

A    No, I'm not.

Q    Are you aware of any communications that anyone anywhere has had with the governor's office concerning the change in policy for the treatments of inmates with gender dysphoria?

MR. STEELY:  Object to form.

Go ahead.  You can answer.

A    Yes.  You know, this policy did have to be reviewed by the governor's office.

BY MR. TILLEY:

Q    And why is that?

A    Why is that?

Q    Yes.

A    Again, it's a hot button topic.  It garners a lot of attention in the media and the news.  So I suspect that's probably the reason.

Q    And when you suspect, what leads you to suspect that?

A    Kind of circular here because of the nature of the subject.  You know, I mean, I guess I can empathize where if I worked for the governor's office, I would probably want to know what was going on with policies,



you know, that are involving controversial subjects, whether it's gender dysphoria or, you know, the death penalty, for example, or topics, anything that garners that sort of attention.

Q    Well, what would be the point of having the conversation with the governor's office?

MR. STEELY:  Object to form.

A    You know, I don't know.  I haven't had any conversations with the governor's office.  I don't know what those meetings are like.

BY MR. TILLEY:

Q    Who did have the conversations with the governor's office?

A    I don't know all the players.  I think, you know, I worked with legal on aspects of that.  I think legal probably had some conversations with the governor's office.

Q    Anyone other than legal that you're aware of who had conversations with the governor's office about this HSB?

A    About the HSB?  No, I don't think so.  No. There may have been a conversation with the governor's office just to let them know, too, that we were implementing.  That's it, to my knowledge.

Q    Meaning, you were implementing the HSB?



know, that they have at the governor's office.

Q   You largely don't in general or largely don't with respect to this particular HSB?

A   I guess both, you know.  And certainly in general.  I don't have any reason to think that they have many meetings at all talking about the HSB other than, you know, we're ready to implement.

Q   How do you have knowledge about the fact that someone talked to the governor's office about this HSB?

A   In terms of our -- are you referring to the conversation that legal would have had with an individual at the governor's office?

Q   Whoever, that you have knowledge of, communicating with the governor's office?

MR. STEELY:  I'm going to object if you're trying to get into any information he has got from legal, any conversations he has had with legal.  That's going to be protected attorney/client.

Beyond that, if you have any information outside of any conversations you've had with legal, then you're free to answer.

A   Well, I think as we were getting ready to implement, I think they just wanted a brief -- brief out.  Again, they have weekly meetings.  One of the items would have been just to brief them that we were



going to implement.

BY MR. TILLEY:

Q   So there's the roll out, you had mentioned before the roll out conversation.  When did the earlier conversation take place?

A   I'm sorry, what's the earlier conversation you're referring to?

Q   Sure.  I understood from your prior testimony that there was more than one communication with the governor's office about this HSB.  One of them was at the time of the impending roll out of the HSB, and there was another conversation prior to that.

And my question was, if that's accurate, when that prior conversation was?

A   Okay.  Okay.  I don't know.  I think there may have been only the one conversation that was just prior to roll out.  I could be wrong.  Like I said, I haven't been at any of these meetings.  But I think there was only one meeting that leadership had to brief out that we were going to be implementing.

Q   And did the governor's office have any feedback on the HSB?

A   If they would have provided any feedback, I suspect they would have come to legal.

Q   And without asking the contents of any





feedback, are you aware that there was feedback provided?

MR. STEELY:  Object to form.

A     Yes, I believe there was.

BY MR. TILLEY:

Q     Just so I'm clear and lining up everything correctly, your testimony is that there was a conversation between FDC leadership and the governor's office around the time of the roll out of the HSB, and that the governor's office provided some feedback at that time; is that right?

MR. STEELY:  Object to form.

You can answer.

A     No, not at that meeting, to my knowledge.

BY MR. TILLEY:

Q     When did the governor's office provide feedback on the HSB?

A     To my knowledge, that feedback would have been provided with our general counsel's office.

Q     And I'm asking about the timing.

A     That would have occurred probably, you know, within the months when we were working to finalize our HSB.

Q     Okay.  I think I may have been intuiting something incorrect, because when I understood -- or



when I heard you say that there were conversations with the governor's office around the roll out of the HSB, I was in my mind thinking last fall, which would have been when the HSB came into effect.  It sounds like you're talking about a different time; is that right?

A    Correct.  I think there is a two separate meetings.  There's a meeting that our leadership goes to on a weekly basis.  And at, I think, one of those meetings they briefed out that we were ready to implement.

And then there were other meetings that took place with our general counsel, our legal, with another counterpart in the governor's office to discuss our policy that we had been working on.

Q    And when were those meetings?

A    I don't know exactly when those meetings occurred.  To my understanding, those aren't regularly scheduled -- well, I don't know.  I honestly don't know about the timing of those meetings.

Q    Did they occur after the implementation of the HSB?

A    I don't know.  I don't know if they occurred after the implementation.

Q    But your testimony is that at one of those meetings, whenever they were, there was feedback



provided on the HSB from the governor's office?

A    I believe so, yes.

Q    And when you reference a counterpart, you talked about general counsel at FDC communicating with a counterpart in the governor's office, who was that counterpart?

A    I think it would have been someone more on the legal end.

Q    But you're not sure who it is?

A    Correct.

Q    And when you mentioned a routine meeting with the leadership of FDC and someone in the governor's office, when did that routine meeting take place where the HSB was mentioned?

A    Yeah, our leadership meets weekly, typically on Mondays, with leadership -- you know, with staff at the governor's office.  So it would have been -- probably it would have been one of those Monday meetings.  The exact date I don't recall.

Q    Do you know what year it would have been?

A    It would have been shortly -- it would have been fairly quickly before -- or right around the time that we rolled it out, implemented the new policy.

Q    So probably September, August?

A    I have no reason to -- yeah.



Q    I'm sorry, I spoke over you.

A    No, I have no reason to dispute one of those two months.

Q    And I'm not asserting, I'm just asking you.

A    That sounds right, yeah, September or August.

Q    Okay.  Of 2024 we're talking about, right?

A    Correct.

Q    Who is the leadership that you're referring to when you talked about FDC leadership in these meetings, routine meetings with the governor's office?

A    Our leadership would be the folks that typically go to the governor's office, include our secretary usually, to my understanding, our deputy secretary, our chief of staff, and potentially others.

Q    And what others would be potentially there?

A    You know, I think it depends sometimes on the subject.  But, you know, I don't know.  It could vary.

Q    For the routine meeting last year where this HSB was raised with the governor's office, do you know who was at that meeting?

A    I don't.  Specifically, no.

Q    Do you know if anyone was present who was not normally at those meetings?

A    I don't.

Q    How would the individuals who are at those



meetings come into possession of the information that they would present at the meetings to the governor's office?  And I'm asking specifically about the HSB.

A    Yeah.  So at those meetings, at that particular meeting, I don't know that they would have taken any materials.

Q    Sure.  So my question is, if they're saying something about the HSB to the governor's office, the person who is saying that thing would have had to have learned the information that they're saying.

And so my question is, how would that person have come to having that information that they're then expressing at the meeting?

MR. STEELY:  Object to form.

A    Sure.  You know, as a group, as we worked through this whole process, you know, beginning again -- I mean, certainly before I was here and while I was here we worked as a group, and we would have briefed out our leadership, you know, to let them know here is where we are, and we're ready to implement this on such and such a date or within the next few weeks, or whatever.  And so brief them out and then let them determine any next steps that they need to do as well.

Q    And are you aware of any particular conversations that went into the briefing for the



experiencing deterioration of mental health due to the loss of accommodations related to clothing and grooming standards or the alternate canteen items?

A    No, I have not.

Q    What about with respect to Reiyn Keohane, who is in in-patient mental health custody after her bras were taken away?

A    No, I have not.

Q    Do you think it's important to solicit feedback from those who deal with inmates directly to hear how FDC policies are being implemented?

A    Yeah, I have no reason to have any issue with that.  I can see where it can be helpful.

Q    Is there a way it would be unhelpful?

A    I think any time, you know, you're seeking data, you have to probably have an idea of how you're going to -- you know, what your plan of action would be.

But we don't -- you know, we don't typically do that with, you know, much of our other health services bulletins.  You know, I think we try to orient them to:  A, we want to produce something that meets the standard of care that's acceptable; and, B, we want to produce a policy that's achievable and clear for the vendor.

So most of our conversations are oriented



towards the vendor and what we can do to improve their life.  And certainly they are the ones that interact on a daily basis with the inmates.  So I would imagine that when they're thinking how we can improve their life, they are pretty patient centered as a group, Centurion.  During that I would hope that they're using that feedback that they're receiving, and seeing with inmates that they're using that to help inform us of, you know, things we can do better.

Q    Is anyone in FDC custody receiving access to accommodations related to clothing and grooming standards as they were under the prior procedure?

A    Not that I'm aware of.

Q    Is that even on the table for anyone ever to be able to receive such accommodations?

A    Not that I'm aware of.

Q    Why not?

A    We have changed our -- I mean, not that I'm aware of.  We have changed our policy, and we've rescinded the previous procedure.  And we've implemented the new health services bulletin, and it appears to be working smoothly.  And I haven't heard any reason to divert.

Q    If someone at Centurion believed that it was medically necessary for an inmate with gender dysphoria



in a male facility to be able to access the female clothing and grooming standards, would that accommodation be provided?

    A    No.

    Q    Why not?

    A    Our position at the Department is that those -- those treatments, if you will, those items are not medically necessary.  That's the position that, you know, Dr. Martinez and Dr. Kline have taken.  And that's what the Department is going with.

    Q    So there is no variance available for clothing and grooming accommodations on a case-by-case basis?

        MR. STEELY:  Object to form.

    A    That's correct.

BY MR. TILLEY:

    Q    And there could be no individualized assessment that could permit that?

        MR. STEELY:  Object to form.

    A    That's correct.

BY MR. TILLEY:

    Q    How is the current policy relating to clothing and grooming standards being enforced?

    A    I think you'd have to ask someone from security operations that.

    Q    Okay.  The same answer for how an officer



Reference No.: 13535535

Case:   KEOHANE vs DIXON

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_____

Clayton Weiss

NOTARIZATION OF CHANGES

(If Required)

Subscribed and sworn to on the __30th__ day of

__October_____, 20_25_ before me,

(Notary Sign)_____

PATRICIA TURNAGE
Notary Public
(Print Name)   State of Florida      Notary Public,
Comm# HH643383
Expires 6/11/2029

in and for the State of __FLORIDA_____



Reference No.: 13535535
Case:   KEOHANE vs DIXON

Page No. *12* Line No. *8* Change to: *called the Bureau of Tuberculosis and Refugee Health, as the*
Reason for change: *Correction*

Page No. *27* Line No. *2* Change to: *Comments from CMA and Centurion.*
Reason for change: *Should be CMA*

Page No. *152* Line No. *4* Change to: *greater progress today than they were, you know, quite a*
Reason for change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____

SIGNATURE: _____ DATE: _____
Clayton Weiss



Reference No.: 13535535
Case:   KEOHANE vs DIXON

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____
Clayton Weiss

