# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
CASE NO:   4:24-cv-434-AW-MAF

REIYN KEOHANE, et al.,

    Plaintiffs,

vs.

RICKY D. DIXON, in his office
capacity as Secretary of the
Florida Department of
Corrections, et al.,

    Defendants.

ZOOM DEPOSITION OF:
PEGGY WATKINS-FERRELL, Ph.D.

Taken on Behalf of the Plaintiffs

DATE TAKEN:      Tuesday, December 2, 2025

TIME:            9:59 a.m. - 6:07 p.m.

PLACE:           via Zoom videoconference

REPORTER:        Lisa Adkins
                 Court Reporter



policy of permitting access to gender-affirming items, correctional healthcare professionals are obligated to advocate for such access, right?

A.    Yes, in terms of advocating and giving feedback on the proposed HSB.

Q.    And Centurion did, in fact, advocate for gender dysphoria accommodations in the redlines that it made to the proposed HSB, correct?

A.    To the best of my recollection.  You would have to show me the document.

Q.    And if Centurion didn't do that, it wouldn't be following the ethical considerations as set forth in Centurion's clinical guidelines, correct?

A.    Correct.

Q.    The bottom paragraph on this page continues.

If access is denied on a population-wide basis, behavioral health professionals are obligated to support access on a case-by-case patient-specific basis.

Do you see that?

A.    Yes.

Q.    Do you agree with that?

A.    Yes, I think, you know, we can continue to discuss it, but it has been clear that accommodations will not be granted so. . .

Q.    So the HSB --



A.    From the policy and any discussion that that is not --

Q.    Would you agree with me --

A.    -- currently going to occur in Florida.

Q.    You would agree with me that the HSB denies gender dysphoria accommodations to inmates on a population-wide basis, correct?

A.    Yes, that is my understanding.  Yes.

Q.    And Centurion employs behavior health professionals, would you agree with me?

A.    Yes, we do.

Q.    And because of that, the behavioral health professionals at Centurion, according to Centurion's clinical guidelines, are obligated to support access on a case-by-case patient-specific basis, correct?

A.    Yes, that's what it says.

Q.    And Centurion did try to advocate for that in the redlines that it provided to FDC, correct?

A.    Yes.

Q.    But Centurion's recommendations got ignored by the FDC, correct?

A.    I can't recall which ones.  There may have been some changes.  I can't recall what was changed and what wasn't without comparing each document.

Q.    Okay.  Well, does the current HSB support



access to gender dysphoria accommodations on a case-by-case patient-specific basis as currently drafted?

A.   No, it is my understanding that accommodations are not an option.

Q.   So the FDC's policy is incompatible with Centurion's clinical guidelines, correct?

A.   Yes.

Q.   But nevertheless Centurion, under it's contract with the FDC, is forced to follow the HSB as written, correct?

A.   Yes, our -- not just that HSB, but all of the procedures and policies of the department; that is what Centurion is expected to following.  It's in the contract, yes.

Q.   Right.

So you guys have to follow the contract as drafted even if the practices are not ethical under Centurion's clinical guidelines, correct?

A.   I think it's an ethical consideration.  It's thing to consider.  But, yes, we are required to follow the FDC policies, correct.

Q.   Even when those policies conflict with the four cardinal ethical principals that guide healthcare, correct?



A.    Once again, this is the Centurion guideline, and we were required to following the FDC policies; not the Centurion clinical guidelines.

Q.    Understood.

So when there's a conflict between the FDC guidelines and the Centurion guidelines that set forth the ethical consideration and the four cardinal ethical principals that guide healthcare -- if there's a conflict between those two documents, you guys are contractually obligated to do what FDC says, correct?

A.    Yes, we follow the policies.  That would be true on any clinical guidelines.  If there's something that's different in the clinical guidelines and the policies, we follow the policies.  There's a number of clinical guidelines.

Q.    Let's look at the last sentence on this page. It says:  If such placement or such items will alleviate the individual's gender dysphoria, then these and other similar interventions constitute treatment interventions that must be directed by healthcare professionals in collaboration with custody staff.

Do you see that?

A.    Yes.

Q.    And when it's talking about such items, it's talking about the gender dysphoria accommodation items,



heard it's a gender-neutral canteen, for example.

Q.    Well, in many correctional systems access to general-affirming clothing and hygiene items requires the individual to be diagnosed with gender dysphoria, right?

A.    Right.

Q.    And we know that the FDC correctional system is not one of those systems because the FDC correctional system under the HSB doesn't allow for these items with or without a diagnosis of gender dysphoria, right?

A.    Oh, I see what you're saying.  I'm sorry, I was reading it backwards.

Q.    Right.

A.    So, yes.

Q.    Okay.  And what Centurion is strongly recommending -- it says:  It is strongly recommended that access to such items or gender affirming housing or hair length does not require this diagnosis, right?

A.    Yes.  Yes, that's what I see there.  And what I think I was referencing is I believe -- once again, I do not know.  But I have heard that there may be some correctional systems where transgender individuals get certain accommodations and they do not have a diagnosis.

Q.    Correct.

A.    As I mentioned, like, a gender-neutral canteen.



Q.   Okay.  But that's not the FDC system, right?

A.   Right, in FDC if you identify as transgender, classification will ask if you want a shower alone memo.  So that would be. . .

Q.   Okay.

A.   And I believe the other thing would be -- they'll are if they would like a female pat search.  So there's two things afforded to transgender.

Q.   Okay.  In the FDC system under the HSB, do inmates with gender dysphoria have access to gender affirming clothing?

A.   No.

Q.   Do they have access to hygiene items of their perceived gender?

A.   No.

Q.   Do they have the ability to maintain hair length -- hair at their preferred length?

A.   No, not under the current policy.

Q.   And then on the next page all the way at the end it says -- in the second paragraph from the bottom on page ending in 24968:  As a healthcare professional, if you are not able to work with a transgender or gender dysphoric patient in a supportive and ethical manner, correctional healthcare is not for you.

Do you see that?



A.    Uh-huh.

Q.    Do you agree with that?

A.    Yes, we would want all of our staff to be able to treat any patient with any disorder in a supportive and ethical manner, yes.

Q.    So it's important for Centurion to treat patients in an ethical manner, correct?

A.    Yes, this is the Centurion clinical guideline.

Q.    And it's important for Centurion's employees healthcare providers to be guided by the four cardinal ethical principals that guide healthcare respect for autonomy, beneficences, non-maleficence, and justice, correct?

A.    Yes, that's from the clinical guideline.

Q.    Now, looking at the last page on page 24968, it says:  The use of supportive therapy and antidepressant medications as the sole treatment for this population without providing access to other gender-affirming interventions to alleviate dysphoria such as:  Clothing items, hygiene products, hormones, and surgical intervention, it is inappropriate and unethical.

Do you see that?

A.    Uh-huh.

Q.    So this is saying that just providing supportive therapy and antidepressant medication without



know, that was not --

Q.   Why would --

A.   -- something that --

Q.   Why would you have been concerned about weaning people off hormones?

A.   Because it's one of the standards that is indicated for patients with significant dysphoria and/or serious difficulties in adaptive functioning.  If over time they're not improving, hormonal therapy can be an indicated intervention.  Of course those are prescribed by the medical providers, the M.Ds., and the D.Os. but. . .

Q.   But you were concerned about this?

A.   Yes, concerned that -- yes, I was concerned.

Q.   Were you also concerned that nothing in this draft talked about gender dysphoria accommodations?

A.   I don't recall in terms of that.  I know it was somewhat confusing at a certain point about -- whether those were going to continue or not.  Whether -- would that be in a separate policy somewhere else.  I don't think that might have been clear at this point.

Q.   But sitting here today, you are clear about whether the HSB provides for accommodation, correct?

A.   Yes, the HSB does not, and it's not in other policies.  Except, as I mentioned, there is a shower



alone memos as requested, or female pat searches but, yes, it. . .

Q.   Does that give you concern sitting here today?

A.   Well, as we've discussed, I don't know why the policy was changed.  It's very difficult for me to give an opinion.  I was not aware if there was an issue with the accommodations, but maybe there's things that I'm not aware of that resulted in FDC needing to remove that.  But it would make common sense.  Some of the patients have reported what I've heard third-hand that certain accommodations were helpful to them.  So, in summary, yes, that would be a concern.

Q.   Did you ever communicate any of your concerns to the FDC?

A.   There was feedback given, as I recall, on one of the final drafts.  I mean, it was discussed at meetings but it was not -- once again, we don't -- I don't understand why the changes were made.  We don't know why the change -- I don't know why the changes were made, I should say that.  I don't know why the changes were made to the accommodation.

Q.   So you expressed concern to FDC about the accommodations being removed as part of the redlines you provided to the HSB, correct?

A.   Yes, there were a number of people that worked



on that document.  I don't know who put what in there.
But, yes there was -- before the final draft was
published.

Q.   Uh-huh.

So different Centurion individuals provided
different redlines on the HSB that expressed different
concerns that they had with the HSB, fair to say?

A.   Yes.

Q.   Other than the redlines to the HSB, are you
personally aware of other ways that you or anybody else
at Centurion communicated their concerns to the FDC?
Emails?  Phone calls?  Text messages?  You know, in
person presentations?  Things like that.

A.   No, I'm not.  I'm not aware of any emails or --
there could be, but I'm not aware of any.

Q.   What about the biweekly meetings that the
Centurion leadership team had with FDC's leadership
team.

Did that -- the Centurion concerns come up at
those meetings that you recall?

A.   It may have.  I also seem to recall there was
some other separate meetings just to discuss this.  My
memory is just not that good for all the meetings I go
to to remember what was discussed at what meeting.

Q.   Okay.  Well, tell me what you recall about



either the biweekly meetings or these other separate meetings that you just referenced.

A.   The ones I remember best are before the final HSB was published and discussion about the process that would take place to notified the staff and the patients. That's what I remember.  I remember those meetings the best.

And then there were some documents after that that kind of detailed the operational process.  And that was when we discussed some of the issues, you know, including that, you know, accommodations were no longer going to be provided, and there would be a script that would be read by the chief of security.  You know, the re-evaluation process -- I mean, a lot of those things were discussed in the meeting.  I think that's when we discussed how the patients would be handled who were coming in to the FDC from the county jail already with a prescription for hormones, et cetera.  Those are the meetings that I remember the best.  Those were phone -- I was on those meetings via phone because I was out of state at the time.  Actually, I wasn't out of state, but I was in a summit.  Actually, now that I think about it, I was in Florida, but not in Tallahassee.

Q.   Okay. What summit were you at?

A.   Oh, it was a behavioral health summit for



leadership in Centurion -- mental health leadership within Centurion from around the country.

Q.    And do you remember what year or month that was?

A.    That would have been shortly before the HSB was published.  It probably would have been August or September.  I think it was published in September.  So it was before the publication of the HSB.

Q.    The final HSB was published in September 2024, correct?

A.    Yes, that sounds correct.  So, yes, it would have been shortly before that publication.  I can't remember whether it was August or September.

Q.    And in any of those meetings or phone calls that we just talked about, did the Centurion folks ever tell the FDC focus, you know, Hey, guys.  We don't think you should be taking gender accommodations away under this new HSB?

Do you recall conversations like that happening?

A.    Yeah, I can recall.  Just concerns about wanting to do everything we could do to support the patients.  You know, to ensure that there wasn't a significant increase in symptoms and just how would that process take place.



Q.   Because with the removal of gender dysphoria accommodations, Centurion was concerned that there would be an increase in symptoms, correct?

A.   That there possibly could be.  You know, any time you have a change -- none of us take change well.  Usually, most people don't.

So we wanted to make sure that we had a clear process and how that was all going to happen given that was the decision that the department had made.  To do our best to support the patient as they were told in the intervening months.

Q.   Right.

So setting aside the process details, though, I believe you testified that you guys just did generally express concern for the idea that gender dysphoria accommodations were going to be taken away, correct?

A.   Yes, I can't recall specifically, but I'm sure that was discussed at some of the meetings, yes.

Q.   Okay.  And what did FDC tell you when Centurion expressed those concerns?

A.   It was, once again, my understanding that that was something that -- a decision they were making.  I don't recall any reason being given for why that change was occurring.

Q.   So, essentially, you guys told them, We don't



think you should do this.

And they said, We don't care. We're going to do it anyways?

A.   I don't think it was said exactly like that.

But, yes, it was clear that, you know, obviously, this would be true on any procedure HSB. We can give feedback, but ultimately the department makes the final decision on the policies and procedures.

Q.   Even in cases where Centurion disagrees with the wisdom of the FDC's decision, right?

A.   Can -- I'm sorry, can you repeat the question? I'm not --

Q.   Yeah.

A.   -- sure what you're asking.

Q.   So it's the FDC's call. Even if Centurion thinks the FDC is wrong, the FDC makes the final call, right?

A.   Yes.

Q.   Okay. And in this case, FDC made the final call on what the HSB would say, right?

A.   Yes.

Q.   Even though Centurion disagreed with the final version of the HSB, correct?

A.   Yes, we had made recommendations and feedback that were different than the way the final HSB was



published.

Q.    Okay.  So turning back to this exhibit that we were looking at, which is Exhibit 7.

This email is from August of 2023, right?

A.    Yes, I see that.

Q.    Okay.  So I'm going to put away this exhibit, and I'm going to show you another exhibit, which is going to be Exhibit 8.

(Plaintiffs' Exhibit No. 8 is marked for
identification.)

BY MR. DESH:

Q.    Can you see that?

A.    Yes.

Q.    Does this appear to be an email dated October 30th, 2023 from Clayton Weiss to people at Centurion including you?

A.    Yes.

Q.    And, I'm sorry, maybe I should have asked you this before.  Who is Vicki Love?

A.    She's in corporate.  I think her title is COO. Once again, I'm not good with titles.  But she works in corporate.

Q.    Got it, okay.

So here we have Mr. Weiss at the FDC sending you guys another draft of HSB 150523 for review,



Lay to Clayton Weiss copying a number of Centurion people including yourself, correct?

A.    Okay.

Q.    And Dr. Lay is saying, Clayton, good morning. Please see attached markups for HSB 1505.23 draft.  Let me know if you would like to have a call to discuss.

Do you see that?

A.    Yes.

Q.    After Dr. Lay sent these redlines copying you and a few other Centurion people, do you know if Clayton ever took him up on his offer to have a call to discuss?

A.    I don't recall.  I just can't recall.

Q.    Okay.  Do you recall being on any phone calls with Clayton Weiss or anybody at the FDC to discuss this document after it was sent to the FDC?

A.    I don't recall.  There's one other meeting I recall that we had in person, but I don't remember when that was.  It -- I have no idea if it was in response to this email.  I just don't recall.

Q.    What do you recall -- what do you recall about that meeting?

A.    I know it was just a meeting where we were discussing different drafts of this HSB.  It was held in Tallahassee at FDC.

Q.    Who was at that meeting?



A. It was statewide leadership from OHS and from Centurion. I can't recall everybody that was at the meeting.

Q. Were you there?

A. Yes, I was at the meeting.

Q. Was Dr. Kline there?

A. I believe she joined by phone, if I can recall correctly. It's just very hard to remember.

Q. Sure.

Was Dr. Martinez there?

A. I think so.

Q. Was Dr. Lay there?

A. I don't believe so. I think he -- I don't remember. I think one of the regional medical directors came. He must have had some other commitment or been on PTO. I don't recall. I don't remember him being in the room.

Q. And in that meeting you expressed to FDC that Centurion had concerns about the draft of the HSB, correct?

A. Yes, we discussed the concerns that Centurion had, yes.

Q. Okay. Now, turning to this document that we're looking at that's Exhibit 9.

You see Dr. Lay attaches a document called HSB



1505.23 sent edit at November 10, 2023, correct?

A.   Uh-huh.

Q.   And then if we scroll through these, there appears to be some redlines that Centurion is making to the draft of the HSB, correct?

A.   Yes, that's what it appears to be.

Q.   Would it be fair scrolling through this document to describe Centurion's edits as extensive?

A.   I think that's partly because if I -- it looks like a lot of it may be moving things around.  I'm not sure how much words were changed versus a lot of moving sections.

Q.   So my understanding of redlines -- and correct me if you understand it differently.  When you move something in a Word document, it appears in green text, like we're seeing here.  And when you add or delete something, it appears in a redline.

A.   Okay.  You could be correct with that.

Q.   Okay, but you don't know -- you don't know either way?  Or you think I am right?

A.   I thought sometimes when we line through that -- I don't know.  I'm not an expert in that area either.  But, yes, that looks like something that was sent that I recall seeing, yes.

Q.   Okay.  So whether things were moved, or crossed



or higher.

Q.   You don't think that all patients with gender dysphoria should be designated as S-33, do you?

A.   Not, I don't.

Q.   So here on page 8 of 9, I'll represent to you, that you also made this deletion number 167.  Deleting this footnote that says:  In the scientific research literature there's been a gradual shift from definitive gender affirmative care, which prioritizes access to medical interventions as a sole treatment back to a more conservative approach that address psychiatric comorbidities and psychotherapeutically explores the developmental ideology of transgender identity.

And you proposed deleting that.  Why?

A.   Can you show me that I proposed deleting it?

Q.   Yeah.

A.   Okay, I don't -- I don't recall.  We may have deleted any of those footnotes.  Typically, in an HSB procedure there's not those kinds of footnotes so. . .

Q.   Did you propose adding this language back somewhere in the body of the document, to the best of your recollection?

A.   Not to the best of my recollection.

Q.   Okay.  Do you agree with what it states in this footnote?



A.   I'm not an expert in the area, but I don't -- I don't recall that any of the associations that publish standards had recently changed any of their standards.

Q.   So there was no gradual shift, correct?

A.   Not that I'm aware of.

Q.   Let's look at change 150 on this same page. And I'll represent to you that you also made this proposed addition.

And it says:  The evaluation testing results, if applicable, diagnosis and recommendations for accommodations and/or hormone therapy.

And I'm focusing on the word "accommodations."

Why did you propose adding accommodations into the HSB?

A.   This would have been keeping it consistent with the process that we had been using.  Even though the procedure indicated any patient with a diagnosis of gender dysphoria would have access to accommodations there was still a section on the psychological evaluation where we could make those recommendations. So it was really just making it consistent with what we had been doing.

Q.   Right.

Because the procedure for provided for accommodations and the procedure was working well,



right?

A.   Yes, it wasn't perfect but, yeah, overall it was -- it was working, in my opinion.

Q.   Right.

And it was working better than the HSB is working?

A.   That's hard -- that's hard to compare.  I think, once again, the patients had reported feeling like they had lost benefits from some of the accommodations they were receiving.

We are also doing a lot of re-evaluations to document the benefits patients are receiving from hormonal treatment so they can continue, and that is working.  But it is extra work on our team, but we're more than, you know, willing to do that, to do those re-evaluations.

Q.   And maybe I misheard or misunderstood part of your answer.

Did you say that some patients reported benefits from loss of accommodations?

A.   Oh, maybe I said the -- that some patients, you know, have reported that they were benefitting from the accommodation, and they wished that the policy had not changed.  I probably misspoke.  That is what I meant to say.  That is what I hear from the regional mental



health directors; that the patients -- some of them. Some of them, perhaps, are not reporting that they felt like they were receiving significant benefits from the accommodation.  Some feel like it was more significant for them, and so it was a greater loss for them.  And as I said before, it might have depended on the particular accommodation.

Q.    And for all those reasons, you proposed adding for the possibility of accommodation into your suggestive changes to the HSB, yes?

A.    Yes, this was before all this -- this was before it was published.  So, yes, knowing that it wasn't going to be in another policy or another avenue for them to get accommodations to keep it as a part of the evaluation process where those could be recommended.

Q.    So if we look at page 9 of 9.  When we first look to the footnote 5, a change 172.  I'll also represent to you that you made this deletion.

Can you tell me why?

A.    As I mentioned before, I believe I was deleting any of the footnotes.

Q.    Do you agree with what is written in this footnote?

(Sarah Norise enters the Zoom videoconference.)

A.    Some parts of it I could agree with.



BY MR. DESH:

Q. Okay. What parts do you agree with?

A. Well, you would need medical justification. It can't have side effects. Once again, I'm not an expert in this area. The hormones are prescribed by the M.D. and the D.O.

Q. Okay. So you're not, sort of, an expert either way on the hormone therapy part of it, right?

A. That's correct.

Q. Okay. Then I see above this footnote -- and I couldn't really tell this.

So remember that language we looked at before about, like, improving clinical outcomes by treating the ideological basis of the pathology; that was in one of the drafts.

Do you remember seeing that?

A. Yes.

Q. And we talked about how we don't know the ideological basis of gender dysphoria.

Do you recall that?

A. Yes.

Q. Okay. And I just couldn't tell from this document -- like, a lot of these deletions are in red and the editions are in red, which makes sense. But these are in black lined.

 ESQUIRE
DEPOSITION SOLUTIONS

Q.   I'm sorry, you don't recall whether any changes --

A.   I can't recall from that final one.  I'm assuming that's the final one you're showing me.  There could be another one.  I just can't remember.  But I don't recall substantial changes being made.  I don't recall that.

I mean, they may have taken some of the recommendations, but I don't there was -- the majority were changed -- or incorporated into the final HSB.

Q.   Okay, got it.

So Centurion -- I'm sorry, FDC did not incorporate the majority of Centurion's proposed changes, correct?

A.   Yes, that's what I recall.

Q.   FDC disregarded the majority of the proposed changes, correct?

A.   They did not incorporate most of the changes that we made in the draft document.

Q.   Do you know why?

A.   No, I do not.

Q.   Did anybody at FDC tell you why?

A.   No.

Q.   Did you ever ask?

A.   Did I ever ask.  Not specifically to say, like,



why did you not accept these, you know, or. . .

Q.   Did you ask generally?

A.   No.

Q.   Is it common based on other FDC policies or HSBs that you guys at Centurion have edits for the FDC to reject most of them as they did here?

A.   Typically, when we're providing feedback, it's on an established procedure or HSB.  So, usually, we're not providing that many recommended changes.  This one perhaps, because it was a new HSB, had more -- and when we make -- you know, when we make proposed changes, you know, they may concur and make a change, they may not. That's consistent.

Q.   Do you recall any other document where FDC rejected as many of Centurion's proposed changes as they did in this instance with the HSB?

A.   I don't recall that.

Q.   Now, between the time that Centurion provided these edits in November 2023, and when the HSB went into effective in September of 2024, was the old procedure, the 403.12, still in place?

A.   Yes.

Q.   Do you know if parts of the old procedure were put on hold during this time period?

A.   Yes, at some point the gender dysphoria review



team were not having meetings.  That's the only thing I can recall.

Q.   Okay.  Why did the GDRT stop meeting?

Did you hear my question?

A.   No, I think my Internet connection is unstable, so could please repeat that?  Hopefully, it will --

Q.   Sure.

Why did the GDRT stop meeting?

A.   I don't know.

Q.   When did the GDRT stop meeting?

A.   I can't recall.

Q.   When the GDRT stopped meeting, does that mean that they couldn't sign-off on the recommendations from the MDST for hormone therapy, for example?

A.   Yes, that's correct.  They weren't meeting to review and make recommendations on the disposition form.

Q.   And, similarly, that was true with the gender dysphoria accommodations; they couldn't approve that if they weren't meeting?

A.   Correct.

MR. HANSON:  Mr. Desh, I don't want to interrupt your flow.  But I did want to make an objection to statements you have made in looking at Exhibit 9 to HSB redlines.

I was able to pull those up during this



subsequent line of questioning, and I think that your representation that Dr. Watkins-Ferrell was deleting individual footnotes may have been inaccurate.  I believe that the footnotes may have been included in texts above the line that was deleted, and then the footnotes were deleted because the text had been deleted based on the documents I'm looking at.  So I just wanted to make that objection to your representation now.  Apologies if that threw off your flow.

MR. DESH:  That's okay.  So let me just, then, make sure I understand.

So then looking back at Exhibit 9, for example, here, I see footnote 5 being deleted and the change indicator here is 172.

Mr. Hanson, what do you think I should be looking at based on your reading of this document?

MR. HANSON:  Where footnote 5 falls above the line that entire section was deleted, and I believe that deletion above the line is what resulted in the deletion of the footnote.

MR. DESH:  Okay, so what -- I guess I'll address this to the witness -- or Mr. Hanson.  So what does change 172 represent?

MR. HANSON:  If you're asking me, I don't know.



Q.   And that policy also provided for gender dysphoria accommodations to prisoners, correct?

A.   Yes, they did it -- those policies did at that time.  I do not know what the current policies indicate. But, yes, the ones you showed me from several years ago, yes.

Q.   And we looked at Centurion's own clinical guidelines, correct?

A.   Correct.

Q.   And those guidelines provided that, you know, not only should gender dysphoria accommodations be allowed, healthcare providers should, in fact, advocate for them when they're prohibited across the entire prison population.

Do you recall that?

A.   Yes, that's the guideline, yes.

Q.   But even in lighted of the prison policies of other correctional institutions and Centurion's own clinical guidelines that we looked at, you don't know whether a blanket prohibition on gender dysphoria accommodation reflects the current medical consensus?

A.   There -- once again, there hasn't been any changes in the standards that I'm aware of.  So it -- whatever the standard indicates with respect to social transitioning there has not been a change.



Q.   What are the --

A.   I would defer to the experts, yes.

Q.   What are these standards that you're referencing?

I just want to make sure I understand.  When you say standards what do you mean?

A.   WPATH standards.  APA.  I think the American Psychiatric Association, American Medical Association reference the WPATH standards.

Q.   Got it.

So no recent changes in any of those standards, correct?

A.   With respect to the, you know, assessment and treatment of gender dysphoria, not that I'm aware of.

Q.   Okay.  But there has been a change in the FDC policy, correct?

A.   Yes.

Q.   And that change is that gender dysphoria accommodations are totally prohibited from the entire prison population at FDC, correct?

A.   Yes.

Q.   Do you know if Billy Sullivan, one of the owners of Centurion, asked Deana to write this email to FDC?

A.   I do not know.



Q.   Okay.  But it seems like he's pleased with her for delivering this message, right?

A.   Well done, Deana.  Thank you.

Q.   Yeah.

Okay.  I'm going to show you what we're going to mark as Exhibit 13.

(Plaintiffs' Exhibit No. 13 is marked for identification.)

BY MR. DESH:

Q.   And this bottom email is from Ruth Feltner to some people at Centurion including you, correct?

A.   Yes.

Q.   And this, I'll represent to you, is a week after the email that we just looked at from Deana Johnson, okay?

A.   Okay.  Can you make this a little bit larger?

Q.   (Complies.)

A.   Okay.

Q.   And in the last email that we looked at, Ms. Johnson is saying that Centurion people don't want to read this script that has the word "recent changes in medical consensus."

Do you remember that?

A.   Yes.

Q.   Okay.  And here Ruth Feltner is emailing



Constitution?

A.    No.

Q.    How do you determine if something is necessary to comply with the U.S. Constitution?

A.    I don't know.

Q.    Okay.  And then C1.  This has the language we looked at a few times about treating the ideological basis of pathology.

Do you see that?

A.    Yes.

Q.    And as we talked about before, the ideological basis of gender dysphoria is unknown.

Would you agree?

A.    Yes, I'm not an expert.  But as far as I know, it's from them.

Q.    Were you concerned that this would be a difficult standard to meet for a variance?

A.    Yes, when you read it because it says in rare instances.  So it would give you pause to, you know, wonder.

Q.    So when you read the HSB as drafted, you were concerned that this would be a difficult standard to meet, is that fair to say?

A.    Yes, but I also think if the patient is presenting with, you know, significant and sustained



symptoms, you know, daily impacts on functioning, then the standard would be met.

Q.   Do you think in that case the clinical outcomes would be improved by treating the ideological basis of pathology?

A.   I'm not saying that.  In terms of the variance request being approved.

Q.   Right.

So you're saying -- you're saying if, you know, we kind of close one eye and don't look at this language, we can still approved variances.

And that has happened on occasion, is that kind of what you're saying?

MR. HANSON:  Objection.  You may answer.

A.   Yes, I personally am not -- I don't get caught up in the words.  I'm caught up in the presentation of the patient, the level of symptomatology, and what the MDST is documenting.

BY MR. DESH:

Q.   Understood.

But if I were a person who is really caught up on the words and I was, you know, following this HSB to the letter as written, would you agree that, as written, this presents an impossible standard to meet regarding the ideological basis of the pathology?



A.   Yes, it would be a high bar since we -- once again, my understanding from the -- we don't know the ideological basis.

Q.   Not just a high bar, an impossible bar.  If I was just reading the words and following the HSB as written, would you agree?

A.   I'm reading it again.  Yes, I could agree with that.

Q.   If we look at the final paragraph in here, this talks about how every inmate who receives hormones for gender dysphoria will be evaluated by the MDST to determine if the diagnosis is still warranted for those inmates whose diagnosis is no longer warranted, titration and discontinuation of cross-sex hormone therapy should be initiated over a period of nine weeks.

Do you see that?

A.   Yes.

Q.   And I believe you testified earlier that this was another provision that gave you concerns about titrating patients off cross-sex hormones, correct?

A.   Yes.  I mean, if they didn't meet criteria for the diagnosis, it would make sense.  The prior one suggested everybody would be titrated off, if I recall correctly, whether they met criteria or not.  I would have to see the other document.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   How often are people getting evaluated to see if the diagnosis is still warranted, or have you guys not gotten to that stage yet?

A.   So the MDSTs have been working on re-evaluation for the patients that are on hormonal therapy and submitting them up to the gender dysphoria variance team.  We have not finished the process yet, but we have a significant number.

Q.   What -- how many have you gone through, approximately?

A.   Well, I can't -- I don't know.

Q.   Would you say you're, like, 50 percent of the way down?  75 percent of the way done?  90 percent of the way done?

A.   I would say we're over 50 percent.

Q.   Over 50 percent?

A.   Yes, yes.

Q.   And how do you decide, like, who to start with?  Who goes first?  Who goes last?

A.   The sites are making that determination.  So if -- particularly, when we first started if we felt like there was a patient who was particularly anxious about the outcome of her re-evaluation, you know, maybe was obsessing over that, that kind of thing, they may have been re-evaluated, you know, prior to other



So I think what we were communicating there is maybe it wasn't a good idea to come up with, yet, another template or form, and we would stick with our format for the psychological evaluation, and then the format that was provided for the re-evaluations and the one for the initiations, I think that's what I was referencing.

Q.   Okay.  And I think this will be the last document that I'm going to pull up here in a second.

All right, this will be Exhibit 21.

(Plaintiffs' Exhibit No. 21 is marked for identification.)

BY MR. DESH:

Q.   And this is also from June of 2025.

So you say -- you're emailing Dr. Joshi and Dr. Zuniga, who we talked about, and you're coping Dr. Schmidt, who we talked be about.  And is Gaston Lazara that's one of the other RDs or regional directors?

A.   Yes, she's the regional mental health director, yes, in Region 4.  So the second Region 4, including Dade.

Q.   Okay.  So Ana Zuniga would be reporting to Dr. Gascon?

A.   Yes, there's also a psychological services



director at Dade.  But for the most part, around these evaluations she's communicating with Dr. Gascon.

Q.    Okay.  And you say:  Dr. Wasserman has indicated that Centurion can propose a revised template. For example, are there any headers that we would recommend removing, or any that we would like to add, et cetera, and you're asking for their feedback.

So what template is this discussing here?

A.    That's discussing the psychological evaluation for gender dysphoria.  But that's the document that we do to determine whether the patient meets the criteria for gender dysphoria.

Q.    Dr. Joshi responds:  We're already not including the accommodations portion and the recommendations section with checkboxes.  I'm not sure how the inmates request pertinent to gender dysphoria header is since no there are no social transitioning accommodations at this time.  I have been including accommodations they believe would be helpful for them, even though they won't receive them, but I'm not sure how helpful that information is to include these.

Do you see that?

A.    Yes.

Q.    What did you understand Dr. Joshi to be saying here?



A.   She was giving feedback on potentially what section could be removed from the evaluation.

Q.   And what she's saying here is she's not sure if the inmates request pertinent to gender dysphoria should be included because there are no social transitioning accommodations, right.  She's been including them, but patients aren't going to get they any ways.

So what's the point of including them?

A.   Yes, I don't want to speak for Dr. Joshi so -- that's what she's writing there.

Q.   Okay.  I mean, do you understand her to be saying, you know, we can include this section; we cannot include this section.  Either way, patients aren't going to get accommodations either way?

A.   Yes, that was made clear by the department that they would not.

Q.   Doesn't matter if Centurion treaters recommend social transition accommodations, either way patients aren't going to get them, fair?

A.   Yes.

Q.   And, in fact, after Dr. Joshi wrote this, Dr. Zuniga says:  I support the removal of all three sections.  They're still a little long, so condensing is fine.

And then Dr. Joshi said:  I also support



ESQUIRE
DEPOSITION SOLUTIONS

removing all three sections.

And then Dr. Schmidt said:  Yes, and shortening the summary.

So was it ultimately decided to remove the sections where people could, you know, indicate there were requests for accommodations from this template?

A.   Yes, I believe so.  Didn't -- I think we said if you look up, it could be included elsewhere in other sections of the report.

Q.   Where does it say that?

A.   The information could be incorporated in other sections.  So there's other sections of the report where the patient is talking about their history.  There's a lot of -- it's a very long report.

Q.   Okay.  But either way, as you testified before, they weren't going to get accommodations, correct?

A.   Correct.

Q.   Okay, just some last questions here.

Is the re-evaluation for someone's gender dysphoria diagnosis separate from the evaluation of whether they should receive a variance under the new HSB?

A.   I'm not sure I understand your question.

Q.   Under the HSB would somebody need to be re-evaluated for gender dysphoria?



A.   Okay, so, yes, they're -- they're re-evaluated and we submit the report requesting the variance request to continue their hormonal treatment.  We don't -- I don't recall a patient that's been on hormones where we haven't been, you know, doing those re-evaluations and submitting the request.  We're not finished with all of them yet, but we're over 50 percent done, for sure.

Q.   And are your standards for that evaluation under the HSB the same or different that they were under the procedure that was in place in 2019?

A.   The standards in the prior procedure was more -- because it was typically initiation of hormones.  Unless, of course, if it was a patient who came in already prescribed hormones.

These re-evaluations are a little bit different because what we're really talking about in the report is:  Number one.  Yes, they have the diagnosis.  They're also receiving treatment, if they have any other disorders.  And then both looking at their functioning.  What was their functioning prior to starting hormonal treatment, and what has their functioning been subsequent to that.  As well as talking with the patient in a clinical interview to ask them, and get information from them, about any reduction in terms of symptoms that they've seen.  What differences do they see with respect

DEPOSITION ERRATA SHEET

Assignment No:     J13674934

Case Caption:      REIYN KEOHANE

                   vs.

                   RICKY D. DIXON

DECLARATION UNDER PENALTY OF PERJURY

I declare that under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 23rd day of December, 2025

*Peggy Watkins-Ferrell*
*(signed electronically)*

Peggy Watkins-Ferrell, Ph.D.
REIYN KEOHANE vs. RICKY D. DIXON                December 02, 2025

DEPOSITION ERRATA SHEET CONTINUED

Page No. 10    Line No. 15   Change To: Change records to record
Reason For Change: wrong word

_____

Page No. 16    Line No. 18   Change To: Change DePual to DePaul
Reason For Change: misspelling

_____

Page No. 19    Line No. 9   Change To: Change answers to standards
Reason For Change: wrong word

_____

Page No. 21    Line No. 9   Change To: Change Freidl to Friedle
Reason For Change: misspelling

_____

Page No. 26    Line No. 9   Change To: Change directors to director
Reason For Change: wrong word

_____

Page No. 27    Line No. 9   Change To: Change Freidl to Friedle
Reason For Change: misspelling

_____

Page No. 29    Line No. 4   Change To: Change Corison to Corizon
Reason For Change: misspelling

_____

Page No. 31    Line No. 3   Change To: Change according to accordance
Reason For Change: wrong word

_____

Page No. 31    Line No. 16   Change To: Change added in patient to at an inpatient
Reason For Change: wrong words

_____

        *Peggy Watkins-Ferrell*
        *(signed electronically)*
        *Date: 12/22/2025 17:16:39 PST*

Image not found or type unknown

Peggy Watkins-Ferrell, Ph.D.
REIYN KEOHANE vs. RICKY D. DIXON                          December 02, 2025

```
                  DEPOSITION ERRATA SHEET CONTINUED
Page No. 35    Line No. 10    Change To: Change grants to
grant
Reason For Change: wrong word
     _____

Page No. 49    Line No. 15    Change To: Change continued to
continuing
Reason For Change: wrong word
     _____

Page No. 51    Line No. 1    Change To: Change interact to in
track
Reason For Change: wrong word
     _____

Page No. 54    Line No. 10    Change To: Change doesn't to
hasn't
Reason For Change: wrong word
     _____

Page No. 55    Line No. 10    Change To: Change if to in
Reason For Change: wrong word
     _____

Page No. 59    Line No. 15    Change To: Change information to
information from
Reason For Change: missing word
     _____

Page No. 67    Line No. 16    Change To: Change But - But to
Reason For Change: missing word
     _____

Page No. 85    Line No. 6    Change To: Change patient to
patients
Reason For Change: wrong word
     _____

Page No. 91    Line No. 13    Change To: Change of to on
Reason For Change: wrong word
     _____



        Peggy Watkins-Ferrell
        (signed electronically)
        Date: 12/22/2025 17:16:39 PST
```

Peggy Watkins-Ferrell, Ph.D.
REIYN KEOHANE vs. RICKY D. DIXON                    December 02, 2025

DEPOSITION ERRATA SHEET CONTINUED

Page No. 92    Line No. 17    Change To: Change neurological to psychological
Reason For Change: wrong word

Page No. 92    Line No. 18    Change To: Change Medicine to Medical
Reason For Change: wrong word

Page No. 99    Line No. 14    Change To: Change following to follow
Reason For Change: wrong word

Page No. 99    Line No. 21    Change To: Change thing to something
Reason For Change: wrong word

Page No. 108    Line No. 7    Change To: Change are to ask
Reason For Change: wrong word

Page No. 112    Line No. 25    Change To: Change The best - To the best
Reason For Change: missing word

Page No. 113    Line No. 14    Change To: Change expect to except
Reason For Change: wrong word

Page No. 114    Line No. 29    Change To: Change The best - To the best
Reason For Change: missing word

Page No. 124    Line No. 5    Change To: Change notified to notify
Reason For Change: wrong word

*Peggy Watkins-Ferrell*
*(signed electronically)*
*Date: 12/22/2025 17:16:39 PST*

Peggy Watkins-Ferrell, Ph.D.
REIYN KEOHANE vs. RICKY D. DIXON                          December 02, 2025

DEPOSITION ERRATA SHEET CONTINUED

Page No. 131    Line No. 19    Change To: Change ideological
to etiological
Reason For Change: wrong word

_____

Page No. 134    Line No. 16    Change To: Change PTO to PDO
Reason For Change: wrong word

_____

Page No. 136    Line No. 3    Change To: Change suggestive to
suggested
Reason For Change: wrong word

_____

Page No. 139    Line No. 17    Change To: Change speak to -
speak for
Reason For Change: wrong word

_____

Page No. 158    Line No. 21    Change To: Change time to mind
Reason For Change: wrong word

_____

Page No. 159    Line No. 24    Change To: Change it MHP to MHP
Reason For Change: Extra word

_____

Page No. 180    Line No. 16    Change To: Change psych to site
Reason For Change: wrong word

_____

Page No. 191    Line No. 8    Change To: Change places to
placed
Reason For Change: wrong word

_____

Page No. 192    Line No. 12    Change To: Change larger to
large
Reason For Change: wrong word

_____

              *Peggy Watkins-Ferrell*
              *(signed electronically)*
              *Date: 12/22/2025 17:16:39 PST*

Peggy Watkins-Ferrell, Ph.D.
REIYN KEOHANE vs. RICKY D. DIXON                    December 02, 2025

DEPOSITION ERRATA SHEET CONTINUED

Page No. 198     Line No. 12    Change To: Change consideration to considering
Reason For Change: wrong word

_____

Page No. 199     Line No. 24    Change To: Change pretitrated to period of
Reason For Change: wrong word

_____

Page No. 206     Line No. 3    Change To: Change ideological to etiological
Reason For Change: wrong word

_____

Page No. 217     Line No. 19    Change To: Change suicidality to suicide
Reason For Change: wrong word

_____

Page No. 222     Line No. 7    Change To: Change ones to once
Reason For Change: wrong word

_____

Page No. 227     Line No. 25    Change To: Change templates to template
Reason For Change: wrong word

_____

Page No. 236     Line No. 13    Change To: Change them me to them
Reason For Change: extra word

_____

Page No. 240     Line No. 7    Change To: Change of to if
Reason For Change: wrong word

_____

*Peggy Watkins-Ferrell*
*(signed electronically)*
*Date: 12/22/2025 17:16:39 PST*