# EXHIBIT 32

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

_____ )

REIYN KEOHANE, et al.,                    )
                                          )
                                          )
          Plaintiffs,                     )
                                          )          Case No. 4:24-cv-434
     vs.                                  )
                                          )
                                          )
RICKY D. DIXON, in his                    )
official capacity as                      )
Secretary of the Florida                  )
Department of                             )
Corrections, et al.,                      )
                                          )
                                          )
          Defendants.                     )
_____ )

DEPOSITION OF MICHAEL LAIDLAW, M.D.

CONDUCTED REMOTELY

DECEMBER 5, 2025

REPORTED BY KAYLEE G. WOOD, RPR, CRR, CSR NO. 14348



of the sort of common disease conditions you would

expect to find in endocrinology.  For example, diabetes

type one, type two, thyroid disease, adrenal disorders,

osteoporosis and bone metabolism disorders, disorders

of the sex glands, disorder of the pituitary.  I think

that captures a large amount of what I do.

Q.   Do you have any focus areas within

endocrinology?

A.   You know, I've -- or when I was in training

as a fellow I spent quite a bit of time with metabolic

bone disease.  I did some research in that area.  And

also thyroid cancer.  And then as of the last -- since

2017 or so I've spent a lot of times investigating and

researching and writing and publishing on hormone

treatment and other treatments with respect to gender

dysphoria.

Q.   And you mentioned that your primary focus is

adult endocrinology.  Do you also treat youth?

A.   I have, because of the area I live in, which

is not a lot of endocrinologists in general but

particularly pediatric endocrinology I've seen some

patients who are under the age of 18, I'm thinking like

16, 17, 18.  But it would form a small part, probably

less than 5 percent of all the patients I see.

Q.   And when you said 16, 17, 18, that's their



ages, not the number of patients?

A.    The ages, correct.

Q.    Okay.

A.    Maybe 15.  I can't recall.  But in the later teen, mid to late teens.

Q.    Do you treat patients for gender dysphoria?

A.    In the course of my being a physician I have -- well, let me step back a minute.  So gender dysphoria is a psychological condition found in the DSM-5, so it's a psychological-psychiatric condition which I have training in, but that's not my specialty. I have in the course of -- during fellowship have an occasion to see a person who was receiving what was termed at the time cross-sex hormones for what was at the time I recall gender identity disorder who I had evaluated and was receiving estrogen and refilled their estrogen for treatment.  But subsequent to that I have not made -- the hormonal treatment of gender dysphoria has not been a part of my practice.

Q.    Okay.  And so there was just the one patient that you refilled the estrogen for that had what was at the time gender identity disorder?

A.    In terms of that sort of treatment.  Now, I've had other patients who have, you know, in the course of workup described to me symptoms which sounded



like a gender identity condition, and so I've had to
work up at least two times, for example, pituitary
dysfunction for those two patients.  I had another
patient who had osteoporosis.  And so I've encountered
it, but I have not treated that condition with
hormones.

Q.   And so the patient with osteoporosis, they
were -- they had gender dysphoria or were they
transgender or --

A.   Well, you know, I -- I don't know because,
you know, at the time I first saw the patient I was
evaluating for if I recall -- I'm trying to think of
the age, but around the age of, you know, menopausal
osteoporosis, and the person had -- the patient told me
that they at some subsequent visit that they were
working with another physician to receive testosterone.

Q.   Okay.  So you were treating that patient for
osteoporosis, not gender dysphoria?

A.   That's correct.

Q.   Okay.  And then the two patients that you
mentioned that you did a workup of the pituitary
dysfunction, you were treating them for the pituitary
dysfunction, not gender dysphoria?

A.   That's correct.

Q.   Okay.  So sounds like roughly in your



experience you've had four patients who you think may have had gender dysphoria, is that accurate?

A.   Well, I've had others -- you know, I've probably had -- I don't know -- maybe five or six others or, you know, who it's come up in discussions, but nothing that we spent any time talking about. Those are the ones that stand out in my mind.

Q.   Okay.  So of the patients you've had that had gender dysphoria, that was -- they just kind of happened to have gender dysphoria?  That was not what you were seeing them for?

A.   That's correct.

Q.   Okay.  And then I think in your report you mention that -- I mean, let me actually just put it up here.  I've switched screens.  Can you see a report now?

A.   Yes.

Q.   Okay.  So I'm on page 2, and this paragraph that starts with my opinions, you list opinions in your report and what they're based on.  In number two you say, my clinical experience evaluating individuals who have or have had gender incongruence including a detransitioner.

Did I read that correctly?

A.   Yes.



Q.   And roughly how many of those cases deal with adult care versus youth care?

A.   Let's see.  A couple of them encompassed youth and adults, like I believe the Florida Medicaid case.  There was also an Arizona Medicaid case.  And then there's been several prison cases which are primarily adults, Idaho, Indiana, this one for Florida, and Kentucky that I can recall.

Q.   Kentucky adults as well?

A.   Yes.

Q.   How much of your income in the last five years has been from expert work compared to private practice?  So I don't need the raw numbers, just comparatively.

A.   I don't know.  I haven't really done a breakdown of that.  I'm not sure.

Q.   Is it the majority?

A.   I would say no.

Q.   Is it roughly half your income has been from expert work in the last five years?

A.   Probably not, but I have not done the breakdown.

Q.   More than a quarter?

A.   I don't know.

Q.   So other than refilling the estrogen



prescription for the one person with gender dysphoria that you talked about earlier, you've never treated gender dysphoria, correct?

A.   Well, as I was saying earlier, gender dysphoria is a psychological condition so that's not something that I treat.

Q.   So it's accurate to say as an endocrinologist you have not provided treatment to anybody for gender dysphoria other than refilling that one prescription?

A.   Well, it was --

MR. STEELY:  Object to form.

A.   I mean, that -- it was -- yes, the ultimate outcome was to refill the prescription, but it involved an evaluation.  It involved, you know, history, physical, speaking to the patient.  So a patient encounter, you know, follow-up visit, and refill.  But that was -- that would be the extent that I've ever prescribed hormones to treat gender dysphoria.

Q.   And sorry.  The audio just cut out briefly. Did you say it did or did not involve kind of a more in-depth evaluation and history?

A.   It involved a history and physical like the typical type we would do for a follow-up visit as opposed to, say, an initial consult visit which is more in depth.



Q.   Okay.  But that is the only person that you would say that you maybe even marginally treated for gender dysphoria?

MR. STEELY:  Object to form.

A.   I would say that's the only patient with a gender identity condition that I've treated with hormones.

Q.   Have you treated patients with gender identity conditions with any other types of treatment?

A.   Well, that's what I was talking about, the two that I can recall that I've provided treatments for, pituitary -- treatments or evaluation for pituitary dysfunction which involved, you know, sex hormones.  So it's indirect.  I wasn't specifically treating a gender identity disorder.

Q.   Right.  So you've never provided treatment for gender dysphoria to a patient other than the one hormone refill, correct?

MR. STEELY:  Object to form.

A.   Well, that would be a patient with gender identity disorder as defined at the time.

Q.   Okay.  So with gender identity you've never -- let me rephrase this.  You've never treated a patient for gender dysphoria or gender identity disorder except for the one patient?



again, it's not really a scientific term but it's a self-identifying term. I can't dispute with the way someone identifies themselves, but there's no objective way again to qualitatively or quantitatively assess a gender identity by any physical means.

Q. Would you -- would you identify a transgender woman who's socially transitioned, received hormones and surgery as a feminine man?

MR. STEELY: Object to form.

A. I don't think I use that terminology anywhere.

Q. So you're talking about there's not a way to assess if someone's transgender or not or, you know, what their gender identity is, but there is a way to assess gender dysphoria, correct?

A. In the DSM-5 there are criteria for -- yes, psychological criteria for who meets diagnostic criteria for gender dysphoria. Yes, that is true.

Q. Do you think adults whose gender identity does not match their sex assigned at birth or their natal sex should not socially transition and live consistent with their gender identity?

MR. STEELY: Object to form.

A. I've never said that.

Q. So regardless of whether you've said it



before, I'm asking you now your opinion on that.

A.   Just could you repeat that, please?

Q.   Do you think adults whose gender identity does not match their sex assigned at birth should not socially transition and should not live consistently with their gender identity?

MR. STEELY:  Object to form.  This is outside the scope of his opinion in this case.

But you can answer if you can.

A.   Well, here again, social transition does not involve -- I mean, as you've defined it does not involve any hormonal or surgical treatment, so it's outside of the scope of endocrinology.  So I don't have a particular opinion on an adult who chooses to socially transition.

Q.   So social transition is outside of your area of expertise?

MR. STEELY:  Object to form.

A.   I think that to socially transition as it pertains to future hormone use, in other words, for minors, particularly children -- I've written some about this -- that because they don't have a proper understanding of their physical bodies, their physiology, their reproductive capacity because young children in particular are prone to believing in things



which adults may not believe in, that social transition may affect their decision to take hormones in the future.

Q.   Do you think social transition affects adults' decisions to take hormones in the future?

MR. STEELY:  Objection.  Can you let him finish his answers?

A.   Yeah.  So for -- again, going back to minors, I think that that is an important consideration.  As far as adult social transition, I mean, I am of the opinion that an adult has liberty to decide what clothes they want to wear, how they want to style their hair, and so forth.  They're at liberty to do that. Could that potentially lead them to hormones or surgeries?  I think in the past WPATH has recommended so many years of social transition leading up to hormones, maybe a year or something like that, so it was part of the protocol.

So part of the question is, is it part of a protocol that will lead to hormones and surgeries.  If it's part of that encompassing protocol, then I would say that there could be dangers for that person if they will eventually take hormones or have surgeries, danger to their physical body.  But as far as danger to their physical body for changing their hairstyle or clothes,



I cannot see any from the point of view of an endocrinologist.

Q.    Okay.  So I guess I'm trying to understand the scope of your expert opinion here, and Mr. Steely objected that my questions about social transition were beyond the scope and you started to say that but then kind of said that you had opinions about social transition as it may relate to hormones in the future. So it sounds like you do have concerns potentially around social transition in the sense of they can impact future treatments.  And so I'm trying to understand, do you think social transition is harmful and that health care professionals should not -- should recommend against it --

MR. STEELY:  Objection.

Q.    -- for adults -- for adults?

MR. STEELY:  Objection.

A.    Honestly I would have to look into that some more.

Q.    So you're not providing an expert opinion at this time on social transition, the benefits or the harms?

A.    With respect to adults, yes, that's correct.

Q.    With respect to adults.  Okay.  And you're an adult endocrinologist, correct?



A.   Yes.

Q.   Dr. Laidlaw, do you have any religious beliefs about what it means to be a man or a woman?

MR. STEELY:  Object to form.

A.   What are -- I don't know.  What do you mean by that exactly?

Q.   Is there a part in particular that's not making sense?

MR. STEELY:  Objection if that was a question.

A.   I mean, what -- to my knowledge, I don't have anything about my religious beliefs in my expert report or in my -- anything I've written, so I'm not sure why it's relevant.

Q.   I'm asking do you have any religious beliefs about what it means to be a man or a woman?

MR. STEELY:  Objection.  Outside the scope of what his opinion is, and you're -- I don't know.

If you have any sort of response to that, you can respond.  If this is out -- this is kind of outside the bounds of what we're doing here.

A.   I mean, I'll say that I am a Christian, nondenominational.  I find it interesting that if we talk about this topic that again all of my arguments are scientific and my discussion about biology is



MR. STEELY:  Object to form.

A.   Well, I mean, it's like, for example, bipolar disorder.  There's no objective physical way of measuring it.  That doesn't mean it can't be treated by psychological means or psychotropic medication.  So it falls in the same category of illness, mental illness.

Q.   So many mental health conditions, there's no physical or objective way of proving them?

MR. STEELY:  Object to form.

A.   I -- for many mental health conditions there will be no objective marker.  I mean, some can be caused, like I said, by hormones or, say, a brain tumor, something like that.  So sometimes you may have some physical reason to form the basis of why you believe a person has a mental disorder.  But for many of them they're not.  That's why psychologists, for example, don't even prescribe medication.  It's all talk therapy and diagnosis through, you know, conversation and interacting and asking questions.

Q.   But psychiatrists prescribe medication?

A.   Yes.

Q.   And you're aware that pharmacological medications are prescribed for a number of mental health conditions?

A.   Yes, that is true.



Q. So it is not your opinion that pharmacological treatment can never be necessary for mental health conditions?

A. Could you repeat that?

Q. So it's not your opinion that pharmacological treatment can never be necessary for mental health conditions?

A. I guess the way I would phrase it --

MR. STEELY: Object.

A. The way I would phrase it is that pharmacologic treatment is sometimes necessary for psychiatric conditions.

Q. And so earlier we were talking at some length about kind of your treatment of people with gender dysphoria and you kind of kept specifically referring to hormones. Are there any other treatments that you provide to people for gender dysphoria other than hormones?

A. I don't provide any treatment for gender dysphoria.

Q. I think we've been going -- and you never have provided treatment for gender dysphoria besides that one person?

MR. STEELY: Object to form. Asked and answered.



A.   Yeah.  I think we went over there before, but as I was saying there was one case where cross-sex hormones were provided and there's been no case where I've ever provided psychotherapy or any other treatment for gender dysphoria.

MS. NOWLIN-SOHL:  Okay.  We've been going about an hour and I'm kind of at a transition point in my outline.  Does it make sense to take a five-minute break?

THE WITNESS:  Sounds fine to me.

MS. NOWLIN-SOHL:  Okay.  Let's go off the record.

MR. STEELY:  Can we take just a little longer?  Because it's lunchtime here in Alabama, and I just want to eat my lunch.

COURT REPORTER:  Off the record, Counsel?

MS. NOWLIN-SOHL:  Yeah.  Let's go off the record.

(Whereupon, a recess was taken.)

BY MS. NOWLIN-SOHL:

Q.   Dr. Laidlaw, during the break did you speak with counsel about your testimony at all?

A.   What time are you referring -- we met yesterday.

Q.   This ten-minute break that we just had.

