# EXHIBIT 35

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
CASE NO:  4:24-cv-434-AW-MAF

REIYN KEOHANE, et al.,

    Plaintiffs,

vs.

RICKY D. DIXON, in his office
capacity as Secretary of the
Florida Department of
Corrections, et al.

    Defendants.


ZOOM DEPOSITION OF:
ADAM WASSERMAN, Ph.D.

Taken on Behalf of the Plaintiffs


DATE TAKEN:     Tuesday, November 4, 2025

TIME:           10:00 a.m. - 2:20 p.m.

PLACE:          via Zoom videoconference

REPORTER:       Lisa Adkins
                Court Reporter



Is there anything on that template that allows the Centurion providers to request the social accommodations for patients?

A.   Negative.

Q.   Why not?

A.   It's not part of the gender dysphoria variance process.

Q.   What do you mean by that?

A.   It's not on the HSB.

Q.   The HSB doesn't allow for social accommodations?

MR. STEELY:  Object to form.

A.   The HSB doesn't speak to social accommodations.

BY MS. NOWLIN-SOHL:

Q.   And due to its silence that means they're not permitted?

MR. STEELY:  Object to form.

A.   The honest answer I have is, I don't have a role to play in that level of decision-making.

Q.   And that wasn't quite my question.

My question was:  The HSB doesn't speak to social accommodations and, therefore, they are not permitted, correct?

MR. STEELY:  Object to form.

A.   Under the current version of the HSB it's not



permitted.

BY MS. NOWLIN-SOHL:

Q.   Okay.  And so if the MDST recommended social accommodations on the variance request, they couldn't be granted?

MR. STEELY:  Object to form.

A.   That is my understanding.

Q.   Have you had any conversations with Centurion providers about the impacts of the loss of social accommodations on their patients?

A.   I have not.

Q.   Have any providers expressed concerns to you about the loss of social accommodations?

A.   To the best of my knowledge, no.

Q.   Are you aware of any inmates who have had serious distress, or self-harm, or suicidal ideation as a result of the loss of accommodations?

A.   As one element of a causal factor, yes.

Q.   Can you tell me more about that?

A.   The individual we spoke earlier in the morning that took their own life.

Q.   And what is your understanding of how they were impacted by the loss of social accommodations?

A.   That was one of the factors that was identified in the psychological autopsy as perhaps contributed to



the motivation to take her own life.

Q.    What were the other factors that were identified?

A.    Signs of depression.  There were -- in the absence of -- in terms of the cross-sex hormonal therapy.  There were -- there was interpersonal conflict that the inmate had with another inmate immediately prior.  There was intent because the individual had brought items in with them to carry out the suicide.

Q.    All right.  I'm going to show you a document that's been Bates stamped FDC officials 029253.

Are you able to see that?

A.    Yes.

Q.    Okay.  And so it looks like Dr. Klein forwarded you an email on February 20th.  And the forwarded email is a chain between Dr. Martinez and Dr. Lemus at Centurion, correct?

And that's the end of it.

A.    Yeah.  Scroll up all the way up, please, if you would.

Q.    (Complies.)

A.    Okay.

Q.    Have you seen this email before?

A.    I'm on the email chain.

Q.    Do you recall seeing this email before?



A.    Let me see the email from Dr. White.

Q.    (Complies.)

A.    Okay, thank you.  Yes, I do.

Q.    Okay.  What's RMC?

A.    Reception Medical Center.

Q.    Do you know why this email was sent to Dr. Martinez and Kline and Mr. Weiss rather than to you as the point of contact?

A.    No.

Q.    Is this the kind of question that should go to you as the point of contact?

A.    It's the type of question that should go to me as the point of contact.

Q.    Do you know why it was directed to Dr. Martinez?

A.    I mean, I'm speculating.  But Dr. Lemus is the Centurion's chief of -- it's their medical director.  You know, Dr. Lemus knows Dr. Martinez far more than he knows me.

Q.    Do you know why Dr. Klein forwarded you this document?

A.    Point of contact.  Keep me in the loop.

Q.    So to keep you in the loop but not to provide an answer?

A.    Correct.

