**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| REIYN KEOHANE, *et al.*, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Case No. 4:24-cv-434-AW-MAF |
| | : | |
| RICKY D. DIXON, in his | : | |
| official capacity as Secretary | : | |
| of the Florida Department of | : | |
| Corrections; *et al.*, | : | |
| | : | |
| *Defendants.* | : | |

**<u>PLAINTIFFS' TRIAL MEMORANDUM</u>**

# TABLE OF CONTENTS

I.   Statement of the Case ...................................................................................3

II.  Citation of Authorities and Argument on all Disputed Issues of Law..........6

   A.  The Deliberate Indifference Standard.......................................................6

   B.  Denial of Recognized Treatments Based on a Blanket Prohibition, Without Regard for Individual Patient Need, Constitutes Deliberate Indifference.................................................................................................6

   C.  Social Transition Accommodations Can Constitute Medically Necessary Care ...........................................................................................................11

   D.  Defendants are Acting with Deliberate Indifference to a Serious Medical Need by Categorically Prohibiting Social Transition Accommodations 12

      1.  Gender Dysphoria is an Objectively Serious Medical Need .....................12

      2.  Defendants Have Acted With Deliberate Indifference to Serious Medical Needs.................................................................................................13

         a.  Defendants Prohibit Social Transition Accommodations, Regardless of Medical Necessity.................................................................................13

         b.  Social Transition Accommodations are Medically Necessary for Some Patients....................................................................................................15

   E.  None of Defendants' Arguments that Social Accommodations Can Never be Medically Necessary are Supported by Evidence, and Defendants Misconstrue the Relevant Case Law.......................................................18

      1.  Defendants' assertion that social transition accommodations are not treatment .................................................................................................19

      2.  Defendants' assertion that social transition accommodations are merely "helpful," not medically necessary...........................................................19

      3.  Defendants' assertion that social transition is not effective in prison........20

      4.  Defendants' assertion that there is a medical debate about the efficacy of social transition to alleviate gender dysphoria .........................................21

a.   Social transition is a widely recognized treatment for gender dysphoria 21

b.   Defendants misconstrue the relevant caselaw ........................................23

**F.   The Ban on Social Transition Accommodations Violates the Eighth Amendment for the Additional Reason that it was Prompted by Politics, Not Medical Judgment** ..............................................................................27

**G.   The Court Should Grant the Injunction Plaintiffs Seek**.........................29

**III. Conclusion** ..................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ancata v. Prison Health Servs., Inc.*,
769 F. 2d 700 (11th Cir. 1985) ......................................................................25

*Barrett v. Coplan*,
292 F. Supp. 2d 281 (D.N.H. 2003).................................................................8

*Bayse v. Ward*,
147 F.4th 1304 (11th Cir. 2025) ....................................................................26

*Bradley v. Puckett*,
157 F.3d 1022 (5th Cir. 1998) .......................................................................11

*Braggs v. Dunn*,
383 F. Supp. 3d 1218 (M.D. Ala. 2019)..........................................................31

*Brooks v. Berg*,
270 F. Supp. 2d 302 (N.D.N.Y. 2003)..............................................................8

*Colwell v. Bannister*,
763 F.3d 1060 (9th Cir. 2014) .........................................................................6

*Cummings v. Roberts*,
628 F.2d 1065 (8th Cir. 1980) .......................................................................11

*De'lonta v. Angelone*,
330 F.3d 630 (4th Cir. 2003) ...........................................................................8

*De'lonta v. Johnson*,
708 F.3d 520 (4th Cir. 2013) ......................................................................8, 11

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ...............................................................1, 10, 12

*Estelle v. Gamble*,
429 U.S. 97 (1976).........................................................................................6

*Fields v. Smith*,
   653 F.3d 550 (7th Cir. 2011) ...........................................................................8, 31

*Flack v. Wisc. Dep't of Health Servs.*,
   395 F. Supp. 3d 1001 (W.D. Wis. 2019) ............................................................10

*Gibson v. Collier*,
   920 F.3d 212 (5th Cir. 2019) .............................................................9, 10, 26, 27

*Giraldes v. Roche*,
   357 F. App'x 885 (9th Cir. 2009) ........................................................................27

*Greason v. Kemp*,
   891 F.2d 829 (11th Cir. 1990) ..............................................................................6

*Greeno v. Daley*,
   414 F.3d 645 (7th Cir. 2005) ................................................................................6

*Harris v. Thigpen*,
   941 F.2d 1495 (11th Cir. 1992) ..........................................................................25

*Hicklin v. Precynthe*,
   2018 WL 806764 (E.D. Mo. Feb. 9, 2018) .............................................11, 12, 25

*Houston v. Trella*,
   2006 WL 2772748 (D.N.J. Sept. 25, 2006) ..........................................................8

*Johnson v. Wright*,
   412 F.3d 398 (2d Cir. 2005) ..................................................................................7

*Jorden v. Farrier*,
   788 F.2d 1347 (8th Cir. 1986) ..............................................................................7

*Kentucky v. Graham*,
   473 U.S. 159 (1985).............................................................................................31

*Keohane v. Fla. Dep't of Corr. Sec'y*,
   952 F.3d 1257 (11th Cir. 2020) ...................................................................*passim*

*Konitzer v. Frank*,
   711 F. Supp. 2d 874 (E.D. Wis. 2010) ...............................................................12

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014)..................................................................7, 9, 10, 12

*Mahan v. Plymouth Cty. House of Corr.*,
64 F.3d 14 (1st Cir. 1995)........................................................................7

*Miller v. King*,
384 F.3d 1248 (11th Cir. 2004) ...............................................................11

*Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*,
834 F.2d 326 (3d Cir. 1987) .....................................................................7

*Roe v. Elyea*,
631 F.3d 843 (7th Cir. 2011) ...............................................................7, 10

*Rosati v. Igbinoso*,
791 F.3d 1037 (9th Cir. 2015) .................................................................8

*Soneeya v. Spencer*,
851 F. Supp. 2d 228 (D. Mass. 2012)..........................................8, 12, 25

*Thomas v. Bryant*,
614 F.3d 1288 (11th Cir. 2010) .........................................................30, 31

*Wade v. McDade*,
106 F.4th 1251 (11th Cir. 2024) (en banc) ...........................................6, 13

*Ex parte Young*,
209 U.S. 123 (1908)................................................................................31

## Statutes

42 U.S.C. §1983 .......................................................................................3

## Other Authorities

https://www.flsenate.gov/Session/Bill/2023/254 ....................................28

U.S. Const. amend. VIII...................................................................*passim*

The disputed issue of law in this case is whether the Florida Department of Corrections ("FDC") is acting with deliberate indifference to Plaintiffs' and other class members' serious medical need in violation of the Eighth Amendment by categorically prohibiting accommodations to enable social transition ("social transition accommodations") for the treatment of gender dysphoria, without considering individuals' medical need for this intervention.

It is undisputed that gender dysphoria is a serious medical condition. *See, e.g.*, **Exhibit 2**,[1] Kline 286:25-287:5; *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) ("*Keohane I*"); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (collecting cases). The evidence presented at trial will show that (i) social transition is well-recognized in the medical field as an effective treatment for gender dysphoria; (ii) FDC's health care providers have observed and documented that social transition accommodations have significantly alleviated gender dysphoria and improved the mental health of some class members, and that the withdrawal of this treatment has resulted in some experiencing mental health deterioration; and (iii) FDC nevertheless categorically prohibits social transition accommodations without considering individual patient need. These facts establish that FDC is acting with

---

[1] Throughout this Trial Memorandum, "**Exhibits**" refer to the exhibits submitted with Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Doc. 161).

deliberate indifference to class members' serious medical need and subjecting them to serious harm or a significant risk thereof.

The Eighth Amendment does not permit prisons to categorically deprive patients of a recognized medical treatment for a serious health condition without considering their individual medical need. As the Eleventh Circuit put it, the "refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference,'" *Keohane I*, 952 F.3d at 1266-67.

Defendants have argued that there is no blanket ban on accommodations and that accommodations would be considered if deemed medically necessary, but the evidence overwhelmingly refutes that. Their alternative argument is the assertion that social transition accommodations are never medically necessary, but, again, the evidence shows otherwise, and their arguments rely on a flawed reading of caselaw.

This is not a case in which Plaintiffs are challenging treatment decisions made for them by their prison healthcare providers. Plaintiffs and many class members received social transition accommodations because FDC's psychologists recommended this intervention for each of them after determining that it would likely alleviate their gender dysphoria and improve their mental health. Indeed, for some people, FDC's providers saw that it did just that. But FDC overrode its healthcare providers' treatment decisions by issuing a blanket ban taking these accommodations away. And the impact on some patients was mental health

2

decompensation. Defendants' conduct constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment

## I.    Statement of the Case

Plaintiffs, on behalf of themselves and the certified class, assert claims for the denial of medically necessary treatment under 42 U.S.C. §1983 and challenge FDC's policy—enacted in September 2024—of categorically withdrawing social transition accommodations, such as clothing, grooming standards, and personal items consistent with gender identity, from patients with gender dysphoria regardless of their medical need for them, and prohibiting the provision of such accommodations for anyone going forward. Even though Defendants admit that gender dysphoria is a serious medical condition, and FDC's own healthcare providers have documented the mental health benefits of this treatment for some patients with gender dysphoria, FDC rescinded Procedure 403.012 and replaced it with HSB 15.05.23, and no longer permits healthcare providers to provide this care to their patients regardless of their individual medical need.

For years, FDC permitted social transition accommodations if a psychologist determined after an assessment that this intervention would likely alleviate the patient's gender dysphoria and improve their mental health.[2] For example, a

---

[2] *See, e.g.,* **Exhibit 8**, 2017 Procedure, at 5-6; **Exhibit 1**, FDC 70:8-71:19; **Exhibit 2**, Kline 28:14-24; **Exhibit 5**, Centurion 28:11-22, 32:9-24, 34:12-25; **Exhibit 11**,

psychological evaluation of one Plaintiff in January 2024 stated that she had "depression, anxiety and suicidal ideation, which are likely due to her inability to feminize"; "[i]t is likely that her symptoms will improve if she is approved for accommodations to feminize during her incarceration"; and "[i]f she is not allowed all available accommodations for transgender individuals during her incarceration, her mental health may further decompensate, leading to additional distress and/or mental health symptoms (i.e., depression, anxiety and suicide ideation/attempt)."[3]

FDC's providers observed that social transition accommodations, in fact, significantly improved the mental health of some class members.[4] For some patients,

---

FDC_OFFICIALS_026084 (form used by GDRT to approve specific accommodations).

Defendants previously asserted that under the 2019 version of Procedure 403.012, accommodations were not provided based on medical necessity (as the original 2017 version of Procedure 403.023 expressly required), but this is at odds with this evidence. Even if the 2019 Procedure allowed for accommodations in the absence of medical necessity, that would not mean that they were not medically necessary for *any* of the recipients; it would suggest FDC expanded access to include both to those for whom they were and were not medically necessary.

[3] **Exhibit 12**, FDC_OFFICIALS_036667 at 36677, 36679. *See also* **Exhibit 13**, FDC_OFFICIALS_036657 at 36657 (stating that another Plaintiff's gender dysphoria "will likely improve" with social transition accommodations).

[4] **Exhibit 2**, Kline 246:22-247:1, 247:12-16; **Exhibit 5**, Centurion 39:8-11, 146:19-25; **Exhibit 6**, Joshi 72:3-8 (for some individuals, social transition items can help alleviate symptoms of gender dysphoria); **Exhibit 30**, Martell 28:21-29:3 (social transition accommodations help relieve patient's depression and anxiety); **Exhibit 31**, FDC_OFFICIALS_019703 at 019706 (medical record indicating "inmate mental health has improved substantially following approval for gender-affirming accommodations in FDC.") and **Exhibit 20**, Martinez 215:11-23 (the statements in

providers saw dramatic reductions in psychological emergencies, in-patient admissions, and disciplinary reports.[5] FDC considers such evidence as indicating that treatment is beneficial, and supporting a determination that treatment is medically necessary.[6]

Conversely, FDC's providers observed that the rescission of social transition accommodations led to the deterioration of mental health for some class members.[7] For one inmate who died by suicide, FDC determined that the loss of social transition accommodations contributed to her decision to end her life.[8]

By taking this intervention off the table regardless of medical need, the Defendants have exhibited deliberate indifference to the serious medical needs of Plaintiffs and class members, causing them serious harm.

---

this evaluation were the provider's clinical impressions); **Exhibit 33**, FDC_OFFICIALS_019749 at 19750.

[5] **Exhibit 5**, Centurion 129:5-131:15; **Exhibit 33**, FDC_OFFICIALS_019749 at 19750; **Exhibit 31,** FDC_OFFICIALS_019703 at 019706

[6] **Exhibit 20**, Martinez 162:25-164:20.

[7] **Exhibit 5**, Centurion 44:11-14, 152:15-19; **Exhibit 6**, Joshi 171:22-172:13, 184:4-16; **Exhibit 30**, Martell 49:12-24; *see also* **Exhibit 34**, FDC_OFFICIALS_019676 at 019678 (medical record noting patient's suicidal ideation after policy change).

[8] **Exhibit 2**, Kline 272:1-23; **Exhibit 35**, Wasserman 112:15-113:1.

## II.     Citation of Authorities and Argument on all Disputed Issues of Law

### A.     The Deliberate Indifference Standard

Corrections officials violate the Eighth Amendment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference is established by showing that plaintiff has an "objectively serious" medical need, *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc), and that defendants were "subjectively aware" that their "conduct—[their] actions or inactions—put the plaintiff at substantial risk of serious harm." *Id.* at 1258.[9] Medically necessary care includes care for mental health conditions. *See, e.g.*, *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990).

### B.     Denial of Recognized Treatments Based on a Blanket Prohibition, Without Regard for Individual Patient Need, Constitutes Deliberate Indifference

Cases are legion in holding that a denial of medically necessary care based on a blanket policy, and without consideration of an individual's medical need, constitutes deliberate indifference. *See, e.g.*:

- *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) (the "blanket, categorical denial of medically indicated surgery solely on the basis of an

---

[9] "This is not to say that a prisoner must establish that officials intended or desired the harm that transpired." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). It is enough that defendants knew of the substantial risk of harm of denying the care and denied it despite the risk. *Id.*

administrative policy . . . is the paradigm of deliberate indifference" (quotation omitted));

- *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011) (deliberate indifference to bar particular treatment for hepatitis C based on blanket policy without considering patient's individual medical need);

- *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (denial of hepatitis C treatment to a prisoner based on a policy that a particular drug could not be administered to inmates with recent history of substance abuse could constitute deliberate indifference if relied upon without consideration of individual medical need);

- *Mahan v. Plymouth Cty. House of Corr.*, 64 F.3d 14, 18 & n.6 (1st Cir. 1995) (suggesting that "inflexible" application of prescription policy may violate Eighth Amendment);

- *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 & n.32 (3d Cir. 1987) (by virtue of a blanket policy, "the County denies to a class of inmates the type of individualized treatment normally associated with the provision of adequate medical care");

- *Jorden v. Farrier*, 788 F.2d 1347, 1349 (8th Cir. 1986) (denial of particular medication based on blanket exclusion of the medication could violate Eighth Amendment if plaintiff can show alternative drugs provided are not effective for him).

For that reason, courts routinely find that prison policies violate the Eighth Amendment when they categorically exclude recognized treatments for gender dysphoria. *See, e.g.,*

- *Keohane I*, 952 F3d at 1266-67 (discussing earlier policy categorically prohibiting hormone therapy, noting that "a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'");

- *Kosilek v. Spencer*, 774 F.3d 63, 90-91 (1st Cir. 2014) ("blanket policy" banning gender-affirming surgery "would conflict with the requirement that

medical care be individualized based on a particular prisoner's serious medical needs");

- *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (alleged denial of gender-affirming surgery based on blanket policy stated an Eighth Amendment claim);

- *De'lonta v. Johnson*, 708 F.3d 520, 525-26 (4th Cir. 2013) ("*De'lonta II*") (prisoner with gender dysphoria stated a claim for deliberate indifference where prison would not even evaluate her need for surgery);

- *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (statute banning hormone therapy for gender dysphoria violated the Eighth Amendment);

- *De'lonta v. Angelone* ("*De'lonta I*"), 330 F.3d 630, 634-35 (4th Cir. 2003) (prisoner with gender identity disorder stated a claim for deliberate indifference where the Department of Corrections withheld hormone therapy pursuant to a categorical policy against providing such treatment rather than based on individualized medical judgment);

- *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 249, 253 (D. Mass. 2012) (holding that a prison policy that "removes the decision of whether sex reassignment surgery is medically indicated for any individual inmate from the considered judgment of that inmate's medical providers" violated Eighth Amendment);

- *Houston v. Trella*, 2006 WL 2772748, at *8 (D.N.J. Sept. 25, 2006) (claim that prison doctor's decision not to provide hormone therapy to prisoner with gender identity disorder based not on medical reason but policy restricting provision of hormones stated viable Eighth Amendment claim);

- *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) ("A blanket policy that prohibits a prison's medical staff from making a medical determination of an individual inmate's medical needs and prescribing and providing adequate care to treat those needs violates the Eighth Amendment.");

- *Brooks v. Berg*, 270 F. Supp. 2d 302, 312 (N.D.N.Y. 2003) (prison officials cannot deny inmates medical treatment for gender identity disorder based on a policy of limiting such treatments to inmates who were diagnosed prior to incarceration), *vacated in part on other grounds*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003).

This does not mean that the Eighth Amendment entitles patients to purported treatments for which there is no evidence of efficacy or support within the medical community. But when a treatment is recognized within the medical community as an appropriate treatment for a particular condition, the Eighth Amendment does not permit a prison to categorically deny it to patients.

FDC has relied heavily on *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019), an outlier decision in which the Fifth Circuit has charted a different rule than the Eleventh Circuit and the other Courts of Appeals. In *Gibson*, 920 F.3d at 224, the court held that prisons can categorically ban a treatment if it is not "universally accepted" in the medical field regardless of "evidence of [plaintiff's] personal medical need" for the treatment. *See also id.* at 225 (disagreeing that "the Eighth Amendment requires individualized assessments"). As noted in the dissenting opinion, such a standard is not supported by any precedent and is an "unfounded qualification to the well-known deliberate indifference standard." *Id.* at 229, 235 (Barksdale, J., dissenting). *Gibson* relies on a mischaracterization of *Kosilek*, 774 F.3d 63, suggesting that the First Circuit's decision agreed that the Eighth Amendment tolerates categorical bans on treatment if there is a lack of consensus in the medical community about the appropriateness of the treatment. But *Kosilek* said no such thing. Rather, the denial of surgery rested on evaluations of the individual plaintiff. The *Kosilek* court explicitly noted that the decision was not "a *de facto* ban

9

against [sex reassignment surgery] as a medical treatment for any incarcerated individual," noting that as any such "blanket policy" "would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs." *Kosilek*, 774 F.3d at 90-91; *see also Edmo*, 935 F.3d at 797 (noting that *Gibson* "contradicts and misconstrues the precedent it purports to follow: *Kosilek*" and "disregarded [*Kosilek*'s] words of warning" against reading the case as supporting blanket bans on treatment); *Flack v. Wisc. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1017 (W.D. Wis. 2019) (similar critique of *Gibson*).

As discussed below, even if *Gibson* were the applicable legal standard here (which it is not), the challenged policy would still fail because even under *Gibson*, "universally accepted" does not mean the absence of any dissenting views; rather, the court said that where "there is robust and substantial good faith disagreement dividing respected members of the expert medical community, there can be no claim under the Eighth Amendment." *Gibson*, 920 F.3d at 220. The evidence will show that the efficacy of social transition is not an issue about which the expert medical community is divided.

Defendants may suggest that because they are providing other treatment for gender dysphoria, they can categorically ban a different treatment without violating the Eighth Amendment. That is not the law. *See, e.g. Roe*, 631 F.3d at 857–58 ("a defendant's showing that a plaintiff received *'some'* treatment does not resolve the

10

issue"). If a patient has a serious condition that *cannot* be adequately addressed without a particular treatment, a prison cannot deny that necessary care simply by providing some other treatment. *See, e.g. De'Lonta II*, 708 F.3d at 526 (that defendants "have provided De'lonta with some measure of treatment to alleviate her GID symptoms" does not mean they necessarily provided her with "constitutionally adequate treatment"); *Hicklin v. Precynthe*, 2018 WL 806764, at *12 (E.D. Mo. Feb. 9, 2018) (the fact that "some treatment" was provided does not end the inquiry; the "treatment must . . . be adequate to address the prisoner's serious medical need."). As discussed below, the evidence here will show that Plaintiffs and other class members are not being adequately treated, as their mental health deteriorated when accommodations were withdrawn.

## C.    Social Transition Accommodations Can Constitute Medically Necessary Care

Social transition accommodations can constitute medically necessary care. Medically necessary care under the Eighth Amendment is not limited to treatment that requires a prescription or surgery; it also can include medically necessary supplies and devices. *See, e.g.*, *Miller v. King*, 384 F.3d 1248, 1261-62 (11th Cir. 2004) (orthopedic shoes), *vacated and superseded on other grounds*, 449 F.3d 1149 (11th Cir. 2006); *Bradley v. Puckett*, 157 F.3d 1022, 1025-26 (5th Cir. 1998) (shower chair); *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980) (personal hygiene products for individual confined to a hospital bed).

11

Courts have recognized that social transition accommodations can be medically necessary treatment for inmates with gender dysphoria. *See Hicklin*, 2018 WL 806764, at *12; *Soneeya*, 851 F. Supp. 2d at 246-250; *Konitzer v. Frank*, 711 F. Supp. 2d 874, 908 (E.D. Wis. 2010) (denying defendant prison's motion for summary judgment, holding that "a reasonable jury could find that the defendants were deliberately indifferent to [transgender inmate's] serious medical need when they failed to provide . . . the real-life experience"[10]); *see also Kosilek*, 774 F.3d at 69-70, 90 (noting that the "treatment" plaintiff was receiving to address gender dysphoria included "[being] provided female, gender-appropriate clothing and personal effects").

**D.    Defendants are Acting with Deliberate Indifference to a Serious Medical Need by Categorically Prohibiting Social Transition Accommodations**

1.    Gender Dysphoria is an Objectively Serious Medical Need

Defendants do not dispute that gender dysphoria is an objectively serious medical need for purposes of the Eighth Amendment. Indeed, FDC officials admitted this in *Keohane I. Keohane I*, 952 F.3d at 1266. Circuit courts have consistently recognized this. *See, e.g.*, *Edmo*, 935 F.3d at 785 (collecting cases). Dr. Kline testified that gender dysphoria is a serious mental health condition that can cause

---

[10] "Real-life experience" refers to socially transitioning and accommodations to be able to do so.

serious distress, and that self-castration attempts due to gender dysphoria have "happened several times." (**Exhibit 2**, Kline 286:25-287:23).

> 2. Defendants Have Acted With Deliberate Indifference to Serious Medical Needs

Plaintiffs will demonstrate at trial that Defendants have acted with deliberate indifference, that is a "subjective awareness" that their "conduct—[their] actions or inactions—put the plaintiff at substantial risk of serious harm," *Wade*, 106 F.4th at 1258, and a disregard of that risk, by imposing a blanket policy that prohibits social transition accommodations regardless of patient medical need.

Defendants have argued there is no denial of medically necessary care because: (i) social transition accommodations would be provided if deemed medically necessary for a patient, and (ii) such accommodations are not medically necessary. The evidence flatly contradicts both assertions.

> a. *Defendants Prohibit Social Transition Accommodations, Regardless of Medical Necessity*

Defendants contend that FDC does not have a blanket ban on social transition accommodations and would provide them if they were ever deemed medically necessary for a patient. This is nonsense. There is overwhelming evidence to the contrary:

- FDC documents given to staff and inmates during the roll-out of the HSB made clear that accommodations would no longer be permitted. (**Exhibit 26**, FDC_OFFICIALS_003768; **Exhibit 27**, FDC_OFFICIALS_027662; **Exhibit 29**, FDC_OFFICIALS_043881);

13

- After the effective date of HSB 15.05.23, FDC revoked all passes for social transition accommodations, with no individualized assessment of need. (**Exhibit 2**, Kline 226:10-227:1);

- FDC officials, including FDC's Chief of Mental Health Services (Dr. Kline) and the Chief of Security (Mr. Harrell), have said that social transition accommodations were no longer permitted after the September 2024 policy change. (**Exhibit 2**, Kline 226:10-227:1; **Exhibit 25**, Harrell 79:14-80:20);

- FDC's gender dysphoria evaluation template no longer contains a section where providers can recommend social transition accommodations. (**Exhibit 20**, Martinez 159:8-21);

- The form that was the accommodations pass was rescinded and no longer exists. (**Exhibit 20**, Martinez 159:8-21, 203:18-204:19);

- FDC's Director of Health Services (Mr. Weiss) has said that he was not aware of accommodations being "on the table" under the HSB. (**Exhibit 22,** Weiss 143:10-23);

- Dr. Kline has said that mental health providers were informed that social transition accommodations were no longer available; no one told them they could still recommend them if they deemed them medically necessary. (**Exhibit 2**, Kline 224:19-225:2);

- FDC's healthcare providers have said they no longer assess patients' need for social transition accommodations because they know they cannot recommend them, but would if they were available. (**Exhibit 5**, Centurion 125:13-126:6; **Exhibit 23**, Watkins-Ferrell 98:5-8, 98:25-99:5, 108:9-18, 177:15-21, 229:3-231:17; **Exhibit 6**, Joshi 35:15-20, 180:20-181:18);

- FDC's former policy, 403.012, expressly provided for social transition "accommodations," (**Exhibit 9**, FDC_OFFICIALS_023085, 2019 Procedure, at 6). HSB 15.05.23 contains no such provision.

This evidence and more will show that FDC categorically bans social transition accommodations.

>    b.    *Social Transition Accommodations are Medically Necessary for Some Patients*

Defendants contend that social transition accommodations are never medically necessary treatment for gender dysphoria. But voluminous evidence, including evidence from FDC officials and its health care providers, shows otherwise:

- FDC's Chief of Mental Health, Dr. Kline, has acknowledged that outside of prison, social transition is recommended to alleviate gender dysphoria. (**Exhibit 2**, Kline 50:15-25);

- Dr. Kline recognizes that inside of prison, social transition could help alleviate gender dysphoria (*id*. 52:18-53:16);

- Guidelines of Centurion, the parent company of Centurion of Florida, which provides healthcare to patients in FDC custody, recommend social transition accommodations as treatment for gender dysphoria. (**Exhibit 4**, FDC_OFFICIALS_037250 at 37252, 37258-9; **Exhibit 5**, Centurion 24:9-18; 126:25-128:21);

- FDC's own healthcare providers agree that social transition can alleviate gender dysphoria. (**Exhibit 6**, Joshi 29:24-30:2);

- FDC healthcare officials and its healthcare providers testified that accommodations were provided under the prior policy when recommended by a psychologist after determining that accommodations would likely alleviate the patient's gender dysphoria and improve their mental health. (**Exhibit 2**, Kline 28:14-24; **Exhibit 5**, Centurion 28:11-25, 32:9-24, 34:12-25; **Exhibit 11**, FDC_OFFICIALS_026084 (form used by GDRT to approve specific accommodations). This is also documented in FDC medical records. *See, e.g.*, **Exhibit 12**, FDC_OFFICIALS_036667 at 36677, 36679 ("[i]f [Plaintiff] is not allowed all available accommodations for transgender individuals during her incarceration, her mental health may further decompensate, leading to additional distress and/or mental health symptoms (i.e., depression, anxiety and suicide ideation/attempt)."); **Exhibit 13**, FDC_OFFICIALS_036657 at 36657 (stating another

15

Plaintiff's gender dysphoria "will likely improve" with social transition accommodations)).

- Dr. Kline, FDC's mental health providers, and FDC medical records show that accommodations significantly alleviated gender dysphoria and improved mental health for some patients. (**Exhibit 2**, Kline 246:22-247:1, 247:12-16; **Exhibit 5**, Centurion 39:8-11, 129:5-131:15, 146:19-25; **Exhibit 6**, Joshi 72:3-8; **Exhibit 30**, Martell 28:21-29:3; **Exhibit 31**, FDC_OFFICIALS_019703 at 019706 (medical record indicating "inmate mental health had improved substantially following approval for gender affirming accommodations in FDC."); **Exhibit 33**, FDC_OFFICIALS_019749 at 19750). For some patients, providers saw dramatic reductions in psychological emergencies, in-patient admissions, and disciplinary reports (**Exhibit 5**, Centurion 129:5-131:15; **Exhibit 33**, FDC_OFFICIALS_019749 at 19750; **Exhibit 31,** FDC_OFFICIALS_019703 at 019706), which FDC considers evidence indicating treatment is benefitting a patient and that would support a determination that continued treatment is medically necessary. (**Exhibit 20**, Martinez 162:25-164:20);

- FDC's mental health providers and medical records show that some patients experienced decompensation of their mental health as a result of losing accommodations. (**Exhibit 5**, Centurion 44:11-14, 152:15-19; **Exhibit 6**, Joshi 171:22-172:13 (psychologist opined that loss of accommodations caused mental health decompensation for inmate who experienced suicidal ideation after accommodations rescinded); *id.* at 184:4-16 (some patients experienced increased depression, anxiety and dysphoria after the accommodations were removed); *id.* at 183:20-184:16, 93:3-16 (expressing concern about patients developing or re-exhibiting symptoms because of accommodations being rescinded); **Exhibit 30**, Martell 49:12-24; **Exhibit 34**, FDC_OFFICIALS_019676 at 019678 (medical record noting patient's suicidal ideation after policy change));[11]

---

[11] Any argument by Defendants that no "treating provider found social accommodations medically necessary for any class member at any time since implementation of the HSB" (Doc. 155, at 39-40) is preposterous given that FDC has told its healthcare providers that they can no longer provide social transition accommodations and, thus, the providers no longer assess patients for the need for accommodations. *See supra* at 13-14.

- FDC knows about the impact of the loss of accommodations on patient health as it received all of these evaluations. (**Exhibit 5**, Centurion 147:12-17);

- FDC's expert, Dr. Kaliebe has admitted that some Plaintiffs experienced mental health decompensation after loss of social transition accommodations. (**Exhibit 3**, Kaliebe 306:10-25);

- An FDC official and FDC records indicated that after a transgender woman died by suicide, FDC's psychological autopsy indicated that distress from the loss of social transition accommodations was a factor that contributed to her decision to end her life. (**Exhibit 2**, Kline 272:1-23; **Exhibit 35**, Wasserman 112:15-113:1);

- The psychologist who conducted many of the evaluations of gender dysphoric patients has expressed concern that other suicides may occur as a result of the loss of accommodations. (**Exhibit 6**, Joshi 182:19-184:16);

- Plaintiffs' expert, Dr. Evans, who conducted psychological evaluations of Plaintiffs, found that social transition accommodations alleviated their gender dysphoria and improved their mental health and their loss has exacerbated their gender dysphoria and other mental health symptoms. (*See* **Exhibits 36-40**, Evans Reports). For some Plaintiffs, the denial of accommodations caused suicidal ideation and thoughts of self-surgery. (*See* **Exhibit 40**, Evans Report, at 7, 19; **Exhibit 38**, Evans Report, at 18).

- Plaintiffs will articulate how the loss of social transition accommodations has harmed their mental health.

- Finally, Plaintiffs' expert, Dr. Karasic—who has treated thousands of patients with gender dysphoria and published books and peer reviewed articles on this condition—will testify that research and decades of clinical experience demonstrate that social transition can significantly relieve gender dysphoria, and that this is a widely accepted part of treatment and supported by every major medical professional association in the United States, including the National Commission on Correctional Health Care (*See* Doc. 154-4 at Ex. 4A, Karasic Report ¶¶ ¶¶ 26, 28, 68-69; **Exhibit 7**, Karasic Rebuttal ¶¶ 27-28). He will also discuss the serious negative impact it can have on inmates with gender dysphoria when they cannot dress and groom consistently with their gender identity, including suicidality and self-harm. (*See* Karasic Report ¶¶ 80-82.)

17

In sum, abundant evidence will demonstrate that social transition accommodations can constitute medically necessary treatment for gender dysphoria.

### E. None of Defendants' Arguments that Social Accommodations Can Never be Medically Necessary are Supported by Evidence, and Defendants Misconstrue the Relevant Case Law

Defendants have argued that social transition accommodations can never be medically necessary for anyone. As an initial matter, it is curious that Defendants recognize that hormone therapy can be medically necessary for some class members with gender dysphoria and, thus, approved such care for many people, see HSB at 7 (variance for hormone therapy may be approved when "deemed medically necessary"), but prohibit accommodations to enable social transition. And they take this position even though the goal of both medical and social transition is to alleviate gender dysphoria by helping a patient live consistently with their gender identity. *See* Karasic Report ¶ 58 (the "goal of treatment is to eliminate the distress of gender dysphoria by helping the patient live consistently with their gender identity by aligning their presentation and body with their gender identity"). It is illogical that Defendants recognize the medical necessity of feminizing or masculinizing one's body to live consistently with their gender identity and provide treatment for that purpose, but at the same time require patients to present inconsistently with their gender identity, undermining the purpose of medical transition.

18

In any case, evidence refutes all of their assertions about why social transition accommodations are never medically necessary.

### 1. Defendants' assertion that social transition accommodations are not treatment

Defendants have argued that regardless of the impact of social transition accommodations on patient health, they are not "treatment" because, outside prison, an individual can dress and groom however they want, without a doctor's order. There is no legal support for this proposition. Even Defendants' expert recognizes the medical necessity of healthcare accommodations that do not require a doctor's prescription, such as orthopedic shoes, a low bunk for people with physical limitations, or a special diet for diabetes. (**Exhibit 3**, Kaliebe 112:22-113:2, 115:9-15; **Exhibit 5**, Centurion 19:25-20:14). And Centurion recognizes that providing social transition accommodations is a "treatment intervention." (**Exhibit 4**, FDC_OFFICIALS_037250 at 37252).

### 2. Defendants' assertion that social transition accommodations are merely "helpful," not medically necessary

Defendants have tried to argue that social transition accommodations are "helpful" or "psychologically pleasing," but not "medically necessary treatment." This is sophistry. The evidence will show that FDC's providers observed that this intervention significantly improved some inmates' mental health and that taking accommodations away resulted in mental health decompensation. For one inmate,

they determined that loss of accommodations contributed to her suicide. That the term "medically necessary" was not in their patient evaluations does not mean they were not describing medically necessary care. (*See* **Exhibit 20,** Martinez 162:25-163:21 (explaining that treatment is deemed "medically necessary" where evidence "demonstrates that [the] individual would benefit from initiation or continuation of" the treatment)).

### 3. Defendants' assertion that social transition is not effective in prison

Defendants may argue that while social transition might be medically necessary in the community it cannot be in prison. This is nonsense. Gender dysphoria is the same diagnosis in prison as in the outside world. An intervention that is medically necessary to alleviate a condition does not become unnecessary simply because a patient is incarcerated. While the prison setting might impact the way a treatment is provided, and the range of social transition accommodations available, it does not affect a person's medical need for treatment. Moreover, the evidence will show that social transition accommodations have, in fact, alleviated gender dysphoria for some patients in FDC custody. *See supra* at 15-16.[12]

---

[12] Defendants may also put forward Dr. Kaliebe's opinion that social transition can prolong gender dysphoria for incarcerated people and undermine their participation in psychotherapy, but he acknowledges that he has no evidence supporting these opinions. (**Exhibit 3**, Kaliebe 133:4-11, 136:20-137:4).

4. <u>Defendants' assertion that there is a medical debate about the efficacy of social transition to alleviate gender dysphoria</u>

Defendants have asserted that there is a debate in the medical field about whether social transition is ever medically necessary for individuals with gender dysphoria. They contend that this purported debate means that FDC can categorically prohibit social transition accommodations without violating the Eighth Amendment. Defendants are wrong on the facts and wrong on the law.

a. *Social transition is a widely recognized treatment for gender dysphoria*

Social transition is a well-recognized treatment for gender dysphoria, as FDC's Chief of Mental Health agrees. (**Exhibit 2**, Kline 50:15-25), and is supported by every major medical professional association in the country. (Doc. 154-4 at Ex. 4A, Karasic Report ¶ 28; **Exhibit 3**, Kaliebe 327:4-328:8).

Defendants claim there is a debate in the medical field about the appropriateness of social transition to address gender dysphoria but have not offered evidence to support that. They point to the view of their expert witness, Dr. Kaliebe, who has only minimal experience treating patients with gender dysphoria (**Exhibit 3**, Kaliebe 20:9-21:10, 24:11-25:21, 41:7-14, 26:16-20, 27:6-12, 28:3-22, 32:4-18, 35:22-36:6, 38:3-39:21, 48:1-20, 53:1-14).[13] Dr. Kaliebe opposes social transition

---

[13] As of his deposition, Dr. Kaliebe's publications regarding gender dysphoria were—with the exception of one article on pediatric treatment—letters to the editor of journals and other opinion pieces. (**Exhibit 3**, Kaliebe 72:10-73:4, 74:8-19).

21

for people in prison and believes—in conflict with FDC's practice—that hormone therapy "generally should not be available" to them (see Doc. 155, at 19), and asserts that psychotherapy is the preferred treatment approach for gender dysphoria.

That some individuals disagree with the wisdom of prevailing medical protocols does not establish the existence of meaningful debate in the medical field. And if the alleged debate is whether gender-affirming care or psychotherapy is the better approach for the treatment of gender dysphoria, on one side, decades of research and clinical experience (including FDC's own experience) demonstrate the efficacy of gender-affirming care, including social transition, (*see* Karasic Report ¶¶ 68-76; *supra* at 15-16 (discussing patients benefitting from accommodations)). On the other side, as Dr. Kaliebe himself admits, there is *no* evidence that psychotherapy is an effective treatment for gender dysphoria. (**Exhibit 3**, Kaliebe 144:9-145:4, 309:17-22; *see also* **Exhibit 7**, Karasic Rebuttal Report ¶ 35 ("It has been widely known since the 1950's that psychotherapy does not alleviate gender dysphoria and that the distress of this condition can only be alleviated by social and/or medical transition.")). This is not a debate.

Defendants assert that WPATH has been discredited. Even if that assertion had a basis in fact (which it does not, as the evidence will show), it would not change the fact that social transition is a widely accepted treatment for gender dysphoria. This acceptance in the medical community does not turn on WPATH; it is based on

22

decades of research and clinical experience showing its effectiveness. FDC's healthcare providers have seen it to be true. Defendants' attack on WPATH is a straw man.

### b.      Defendants misconstrue the relevant caselaw

Defendants have asserted that a debate in the field about a particular treatment means the Eighth Amendment permits prisons to categorically prohibit it. This is erroneous.

Defendants misplace their reliance on *Keohane I.* In that case, the plaintiff brought an individual claim in 2016 that included a challenge to the FDC's refusal to provide her social transition accommodations, which she claimed were medically necessary to address her gender dysphoria. The court pointed to testimony from an FDC psychologist who evaluated her and concluded that she did not have a medical need for accommodations. The court, citing disagreement between FDC's treatment team and Plaintiff's expert "as to the proper course of treatment for Keohane's gender dysphoria," *Keohane I*, 952 F.3d at 1274, noted that it is well-established that a "simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's . . . course of treatment" does not support an Eighth Amendment claim. *Id.*

This case does not involve a disagreement between Plaintiffs and their FDC healthcare providers; the providers recommended social transition accommodations

23

for each of them. Plaintiffs are not challenging individual treatment determinations made by FDC's providers but, rather, a blanket policy that precludes social transition accommodations, without regard to an individual's medical need, and overrides FDC's healthcare providers' judgment about their need for this treatment.

*Keohane I* does not support the proposition that disagreement or debate *within the medical profession* about the appropriateness of a particular treatment *in general*—as opposed to an inmate's disagreement with prison medical staff regarding the course of treatment *for her*—supports banning the treatment for all inmates regardless of an individual's medical need. The distinction between denying a treatment to a patient based on an assessment of their individual need for it and a blanket policy taking that treatment off the table for everyone without assessing their individual need for it, is a critical distinction. When there is a recognized medical treatment, a blanket policy prohibiting that care means some people who might need that care will be denied it.

It is certainly true that an individual assessment does not guarantee the provision of all medically necessary care. There could be an individual prison healthcare provider who personally believes a certain treatment is never medically necessary for anyone—whether that treatment be social transition for gender dysphoria, anti-depressant medications for depression, or chemotherapy for cancer—that could result in the same denial of care. In such a case, other Eighth

24

Amendment arguments might be available to challenge those treatment decisions. *See, e.g. Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1992) (Eighth Amendment violation "could well be present if the care received by the prisoners, when measured against general professional standards, rose to such a level of gross incompetence that it manifested deliberate indifference"); *Ancata v. Prison Health Servs., Inc.*, 769 F. 2d 700, 704 (11th Cir. 1985) (Eighth Amendment claim where inmate was "denied access to medical personnel capable of evaluating the need for treatment.").

*Keohane I* did not endorse a blanket ban on social transition accommodations.[14] To the contrary, the court said that a "refusal even to consider whether a particular course of treatment is appropriate is the very definition of "deliberate indifference." *Keohane I*, 952 F.3d at 1266-67. It added that it was "unsurprising[]" that "other courts considering similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment." *Id.* at 1267. Indeed, two of the cases cited by the Court— *Hicklin* and *Soneeya*—addressed social transition accommodations.

---

[14] And *Keohane I* did not hold that social transition accommodations are *never* medically necessary. FDC had argued for such a rule, *see, e.g.*, *Keohane I*, No. 18-14096, FDC Brief (11/19/18) at 19, which the Eleventh Circuit declined to endorse.

In sum, *Keohane I* offers no support for Defendants' position that the existence of debate in the medical field about the appropriateness of a treatment can justify a blanket ban on that treatment for people in prison.[15]

As noted above, Defendants rely on the Fifth Circuit's decision in *Gibson* to support that position. Even if *Gibson* were the law in this circuit, the evidence would not support a blanket ban on social accommodations even under the standard articulated in that case. The *Gibson* court made clear that it was not suggesting the existence of dissenting views about a treatment would be enough to justify banning a treatment. *Gibson*, 920 F.3d at 220 ("'Universal acceptance' does not necessarily require unanimity."). Rather, it explained, where "there is robust and substantial good faith disagreement dividing respected members of the expert medical community, there can be no claim under the Eighth Amendment." *Id.* Here, the evidence will show there is no such divide in the medical community as to whether social transition is an effective intervention for gender dysphoria. At most, Defendants have shown that, as in all areas of medicine, there are some individuals

---

[15] Defendants' reliance on *Bayse v. Ward*, 147 F.4th 1304 (11th Cir. 2025) is similarly misplaced. There, the court rejected plaintiff's deliberate indifference claim because the pro se plaintiff presented no evidence that social accommodations were medically necessary for her. *Id.* at 1313. The court said simply citing clinical practice guidelines like the WPATH standards of care were not evidence of the individual *plaintiff's* medical need for social accommodations.

who disagree with the prevailing protocols. That is not a sufficient basis to withhold a particular medical treatment from all incarcerated people even under *Gibson*.

> **F.    The Ban on Social Transition Accommodations Violates the Eighth Amendment for the Additional Reason that it was Prompted by Politics, Not Medical Judgment**

The blanket ban on social transition accommodations for individuals with gender dysphoria violates the Eighth Amendment for the additional independent reason that it was not the result of medical judgment but, rather, political influence. That a "treatment decision was motivated by something other than medical judgment" can support a deliberate indifference claim. *Giraldes v. Roche*, 357 F. App'x 885, 886 (9th Cir. 2009).

Defendants claim that the policy change was prompted by concern on the part of FDC's Chief of Medical Services, Dr. Martinez, about the prior gender dysphoria policy and years of research and deliberation going back to 2020. But no steps were taken to change the policy until 2023. Indeed, in August 2022, Dr. Martinez had "no edits or recommended changes" to Procedure 403.012 when it came up for annual reevaluation. (**Exhibit 14**, FDC_OFFICIALS_023302). Two developments in early 2023 prompted FDC to change its gender dysphoria policy.

First, in January 2023, the Governor's Office prompted FDC to align its policy with the administration's policy against gender affirming care. It reached out to FDC's Chief of Staff, whose responsibilities include facilitating policy alignment

27

between FDC and the Governor's office, who in turn reached out to Dr. Kline, who understood him to be suggesting that FDC should align its gender dysphoria policy with other state agency policy opposing gender affirming care. (*See* **Exhibit 15**, FDC_OFFICIALS_024865; **Exhibit 16**, Fitzgerald 76:3-6; **Exhibit 17**, FDC_OFFICIALS_043569; **Exhibit 18**, FDC_OFFICIALS_045490; **Exhibit 2**, Kline 77:13-78:7).

Second, the Florida legislature introduced a bill in March 2023 banning the use of state funds for gender-affirming care. *See* https://www.flsenate.gov/Session/Bill/2023/254. That same month, Drs. Martinez and Kline began work on the new policy and received approval to begin drafting in May 2023, the month the bill became law. *Id.*; Doc. 38-1, ¶ 8. Drs. Martinez and Kline testified that they needed to come up with a new policy because the existing gender dysphoria policy did not comply with the new law. (**Exhibit 2**, Kline 117:5-21; **Exhibit 20**, Martinez 143:24-144:8). The initial drafts of the policy did not make any provision for hormone therapy, (**Exhibit 2**, Kline 170:5-171:7), but after Centurion agreed to pay for this treatment, (**Exhibit 5**, Centurion 58:2-25), it was amended to allow "variances" for hormone therapy. (**Exhibit 2**, Kline 171:11-16).

The new policy was drafted by Drs. Martinez and Kline with political oversight: the Governor's office provided input on the draft policy because it was a "hot button topic." (**Exhibit 22**, Weiss 108:5-19, 112:21-116:14).

While the Court need not find that the policy change was prompted by political rather than medical reasons to hold that it violates the Eighth Amendment, this is an additional basis for such a holding.

### G.   The Court Should Grant the Injunction Plaintiffs Seek

As this Court noted when it certified the class in this case: "Rule 23(b)(2) classes are permitted when 'a single injunction or declaratory judgment would provide relief to each member of the class.' . . . Here, a single injunction enjoining the Department's policy categorically precluding social accommodations would provide the relief sought by each class member." (Doc. 125 at 12 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011))).

The Court defined the class as follows: "all persons who are or will be incarcerated in the custody of the FDC who have been diagnosed with gender dysphoria and who, absent HSB 15.05.23, would be provided social accommodations to treat their gender dysphoria if deemed medically necessary for them." *Id.* at 13.

The Court need simply issue this injunction, "enjoining the [FDC's] policy precluding social accommodations" for "all persons who are or will be incarcerated in the custody of the FDC who have been diagnosed with gender dysphoria and who, absent [the HSB], would be provided social accommodations to treat their gender dysphoria if deemed medically necessary for them." (Doc. 125 at 12-13).

29

Normally, "[t]o obtain a permanent injunction, a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest." *Thomas v. Bryant*, 614 F.3d 1288, 1317 (11th Cir. 2010). "In addition to ensuring that injunctive relief was necessary under this standard, [a court] must also ensure that the scope of the awarded relief does not exceed the identified harm." *Id.* at 1317.

In the context of prison litigation, a court "must also consider the requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626 ('PLRA')," whereby "injunctive relief is only appropriate where it is 'narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" *Id.* at 1318 (citing 18 U.S.C. § 3626(a)(1)(A)).

These requirements above can be easily satisfied, as Plaintiffs are merely asking for individualized medical care, which allows their health care providers to exercise their clinical judgment about the need for social transition accommodations. Defendants have not raised any particular arguments challenging any of the prongs above, and courts have found them satisfied in similar circumstances. *See, e.g., Thomas*, 614 F.3d at 1326 (affirming permanent injunction in a prisoner case);

*Keohane I*, 952 F.3d at 1265 n.3 ("We can dispense at the outset with the FDC's contention that the district court's injunction violates the Prison Litigation Reform Act"); *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1227 (M.D. Ala. 2019) (ordering class-wide injunctive relief); *Fields*, 653 F.3d at 550 (affirming injunction in transgender prisoner case, finding injunction did not violate PLRA).[16]

In any event, to the extent any particular provisions regarding the injunction are required, or to the extent the Court needs to make specific findings under the PLRA, *see Thomas*, 614 F.3d at 1323, n. 33 (discussing particularized findings regarding PLRA's requirements), Plaintiffs believe that such analysis is more appropriate for post-trial briefing, or conferrals with Defendants if Plaintiffs prevail on the merits at trial.[17]

---

[16] Based on Defendants' submissions in the pretrial stipulation, it appears they will contend that Defendants are improper defendants because they have not personally taken actions in violation of the rights of Plaintiffs, and they are not the individuals who would be implementing any injunctive relief ordered by the Court. But the law is clear that, under *Ex parte Young*, 209 U.S. 123 (1908), to challenge actions of a state agency in federal court, the lawsuit must be brought against named officials in their official capacity, not the agency itself, but the agency is the real party in interest and any injunctive relief awarded binds the agency. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.") (internal citation omitted). That is what Plaintiffs have done here.

[17] *See Thomas,* 614 F.3d at 1317 (noting district court found Eighth Amendment violation, concluded that plaintiffs "were entitled to injunctive relief," and "invited

31

## III.   Conclusion

For the foregoing reasons, judgment should be entered in Plaintiffs' favor following trial.

Respectfully submitted,

Dated: June 8, 2026                                        /s/ Anthony J. Anscombe

Samantha J. Past (FBN 1054519)        Li Nowlin-Sohl (*pro hac vice*)
Daniel B. Tilley (FBN 102882)            Leslie Cooper
**ACLU Foundation of Florida**           Sruti Swaminathan (*pro hac vice*)
4343 West Flagler Street, Suite 400      **ACLU Foundation**
Miami, FL 33134                          125 Broad St.
Tel: (786) 363-2714                      New York, NY 10004
spast@aclufl.org                         Tel: (212) 549-2584
dtilley@aclufl.org                       lnowlin-sohl@aclu.org
                                         lcooper@aclu.org
                                         sswaminathan@aclu.org

                                         Anthony J. Anscombe (*pro hac vice*)
                                         George Desh (*pro hac vice*)
                                         Sadaf Misbah (*pro hac vice*)
                                         Sarah Norise (*pro hac vice*)
                                         **Steptoe LLP**
                                         227 West Monroe Street, Suite 4700
                                         Chicago, IL 60606
                                         Tel. (312) 577-1300
                                         aanscombe@steptoe.com
                                         gdesh@steptoe.com
                                         smisbah@steptoe.com
                                         snorise@steptoe.com

---

the defendants to confer with the plaintiffs to reach an agreement on the injunction's proposed terms and/or to submit their own proposal for an injunction.")

32

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(F), the undersigned hereby certifies that this Plaintiffs' Trial Memorandum contains 7,611 words and does not exceed 8,000 words.

*/s/ Anthony J. Anscombe*