**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| **REIYN KEOHANE, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:24-cv-434-AW-MAF** |
| | ) | |
| **RICKY D. DIXON, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THE FDC OFFICIALS' RULE 702 MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' PURPORTED EXPERT DAN KARASIC AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Evidence 702, Defendants Ricky D. Dixon ("Secretary Dixon"), in his official capacity as Secretary of the Florida Department of Corrections ("FDC"), Clayton Weiss, in his official capacity as Health Services Director of the Florida Department of Corrections ("Weiss"), Gary Hewett, in his official capacity as Warden of Wakulla Correctional Institution ("Hewett"), Alonzo Horner, in his official capacity as Warden of Homestead Correctional Institution ("Horner"), and Nan Jeffcoat, in her official capacity a Warden of Florida Women's Reception Center ("Jeffcoat," and together with Secretary Dixon, Weiss, Hewett, and Horner, the "FDC Officials"), hereby respectfully submit this Motion to Exclude Testimony of Plaintiffs' Purported Expert Dan Karasic ("Karasic"). In support of this Motion, the FDC Officials provide as follows:

## INTRODUCTION

Karasic – Plaintiffs' purported psychiatry expert – attempted to opine that access to opposite-sex grooming standards, as well as items such as opposite-sex clothing, shampoo, and deodorant, constitute constitutionally required treatment for gender dysphoria. As confirmed through discovery, Karasic engaged in limited fact gathering and investigation. Karasic failed to examine any Plaintiff or class member, failed to review Plaintiffs' medical records, failed to identify any specific inmate whose need for the items qualified as constitutionally required treatment, and could not say whether any FDC Official intentionally or deliberately denied care. His report offers a one-sided summary of old medical literature and third-party standards, not a Rule 702-compliant application of medical principles to the facts of this case.

Karasic's opinions also rely heavily on guidelines promulgated by the World Professional Association for Transgender Health ("WPATH"). The WPATH standards represent guidelines, not treatment requirements. Moreover, courts increasingly recognize that WPATH functions more as an advocacy group for transgender individuals than as a non-biased entity providing treatment recommendations. Thus, Karasic's reliance on WPATH magnifies rather than cures the defects in his opinions. Karasic's opinions and testimony remain subject to exclusion under Rule 702 for at least the following three reasons:

(1) Karasic's opinions rely on an incorrect legal standard;

(2) Karasic's opinions do not assist the trier of fact because his opinions do not fit the facts of the case; and

(3) Karasic's opinions fail to satisfy Rule 702's reliability requirements.

Accordingly, the FDC Officials respectfully request that the Court exclude Karasic's opinions and testimony.

## KARASIC'S OPINIONS

Karasic purported to provide the following opinions in support of Plaintiffs' claim regarding social transitioning:

- "Gender dysphoria is a serious condition which, if left untreated, can impair a person's ability to function and cause significant depression, anxiety, self-harm and suicidality." (Doc. 154-4, Ex. 4A: Expert Report of Dr. Dan Karasic ("Karasic Report"), ¶ 25);

- "Decades of scientific research and clinical experience have demonstrated that social transition and gender-affirming medical care, including hormone therapy, can significantly relieve the distress of gender dysphoria and are medically necessary for many people with this condition. I have seen first-hand, countless times over decades of practice, the many benefits of social transition and gender-affirming medical care." (Id., ¶ 26);

- "For individuals for whom gender-affirming medical care is indicated, there are no alternative evidence-based treatments for gender dysphoria." (Id., ¶ 27);

- "Social transition and gender-affirming medical care—including hormone therapy—are part of the widely accepted protocols for the treatment of gender dysphoria

supported by every major medical association in the country, including the National Commission on Correctional Health Care." (Id., ¶ 28);

- "Prohibiting people with gender dysphoria from socially transitioning (such as denying incarcerated people accommodations to allow them to do so) and withdrawing or denying hormone therapy to those for whom it is indicated would put them at risk of significant harm to their health or well-being, including heightened risk of self-harm and suicidality." (Id., ¶ 29);

- "When incarcerated people are unable to receive appropriate treatment for their gender dysphoria, some have resorted to self-castration or other self-harm to get relief, or have attempted to end their lives." (Id., ¶ 30);

- "Social transition is an integral part of addressing gender dysphoria for transgender people. Social transition involves changing appearance (e.g. garments, hair, make-up) and social role, with change of signifiers of gender, including names and pronouns, and public presentation in the identified gender." (Id., ¶ 59);

- "For individuals in the community, social transition can generally occur independently, without the involvement of mental health providers (although mental health providers often provide support during this process), as people are free to dress and groom as they choose. In the prison context, where there are often gender-based rules and restrictions on how individuals dress and groom, social transition often requires accommodations to permit individuals to dress and groom in accordance with their gender identity." (Id., ¶ 61); and

- "Social transition has been shown to positively affect mental health. . . . Bringing one's presentation into alignment with gender identity can help one see oneself

> and be recognized and treated by others consistent with one's gender identity." (Id., ¶ 68).

When asked at his deposition how he "define[s] the term medical necessity," Karasic stated:

> A. So, medically necessary care is the care that a clinician decides is necessary to treat a particular condition in -- that's also in accordance with -- with the community standards of care and/or practice guidelines that -- that -- so, kind of generally accepted -- a -- a recommendation that falls within generally accepted care for a condition.

(Karasic Dep., attached hereto as **Exhibit A**, 141:15-21). Karasic then confirmed that he used the terms "medically necessary" and "medical necessity" in his report consistent with the definition above:

> Q. That phrase medical necessity or medically necessary also appears in your reports; doesn't it?
>
> A. I believe so.
>
> Q. And so, do you utilize the phrase medically necessary or medical necessity in your reports consistent with the definition you just provided to me?
>
> A. I believe so.

(Karasic Dep. 141:22-142:3). As to his understanding of Plaintiffs' claim, Karasic testified as follows:

> A. My understanding is that -- that incarcerated people are entitled to the medically necessary care that -- that clinicians would be providing to patients in other settings.
>
> And that denying needed care is, you know -- is -- is not allowed as cruel and unusual punishment, essentially.

(Karasic Dep. 143:8-14). Karasic provided the following testimony with respect to the individual Plaintiffs:

> Q. Okay. Your report does not include a list of social accommodations that you believe the plaintiffs should receive; does it?
>
> A. No.
>
> Q. And you don't know currently what social accommodations any of the named plaintiffs are seeking?
>
> A. No.
>
> Q. And have you done anything to evaluate any particular named plaintiff in terms of whether any of their requested social accommodations rise to the level of a medical necessity?
>
> A. No.
>
> Q. If you were asked to evaluate whether a social accommodation was medically necessary for any of the named plaintiffs, what would you have to do?
>
> A. I would have to examine them and see whether that accommodation is necessary as part of the -- the treatment of their gender dysphoria.

(Karasic Dep. 249:9-250:1). Karasic admitted as follows:

> Q. Have you ever visited any prisons in the state of Florida?
>
> A. Not in Florida, no.
>
> Q. Okay. And I may have asked this, and I apologize. Have you ever met with any of the named plaintiffs?
>
> A. No.
>
> Q. Were you ever asked to meet with any of the named plaintiffs?

A. No.

(Karasic Dep. 80:13-22). Additionally, when asked if he knew "if anyone has intentionally or deliberately denied any care to any of the named plaintiffs in this case," Karasic responded,

> A. No, I don't know. I don't know the specifics of the care of the individuals involved.

(Karasic Dep. 145:15-21). Thus, Karasic demonstrated no familiarity with any Named Plaintiff, the accommodations they sought, or the environment within FDC facilities.

Karasic claimed that WPATH's SOC, which he co-authored, "are the internationally accepted guidelines designed to promote the health and welfare of transgender, transsexual, and gender variant persons." (Karasic Report, ¶¶ 7, 13). Karasic also stated that, in preparing his report, he relied upon his "knowledge of the clinical practice guidelines for the treatment of gender dysphoria, including [his] work as a contributing author of the WPATH" SOC. (Karasic Report, ¶ 22). However, Karasic stated the following with respect the use of the WPATH SOC 8:

> Q. Do you recommend that every clinician follow all of the guidance in Standards of Care 8?
>
> . . .
>
> A. No. Standards of Care 8 is a very large document, and so I don't even personally use all of it.

(Karasic Dep. 164:21-165:1). In his Report, Karasic claimed WPATH's "SOC 8 utilized a rigorous evidence-based approach to developing the guidelines." (Karasic Report, ¶ 48). However, at his deposition, Karasic admitted WPATH's SOC "rel[ied] on low quality or low certainty of evidence studies." (Karasic Dep. 273:15-17). As discussed below, Plaintiffs cannot demonstrate the admissibility of Karasic's purported opinions.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 permits a qualified expert to offer opinion testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702. The party offering the purported expert testimony must demonstrate the admissibility of the testimony by a preponderance of the evidence. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1107 (11th Cir. 2005). In applying Rule 702:

> [Courts] must conduct "a rigorous three-part inquiry," considering whether "(1) the expert is qualified to testify

> competently regarding the matters [s]he intends to address; (2) the methodology by which the expert reaches [her] conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

Id. (quoting U.S. v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (*en banc*) (some citations and quotation marks omitted)). Plaintiffs cannot meet Rule 702's requirements as to Karasic's opinions.

## ARGUMENT

### I. KARASIC RELIED UPON AN INCORRECT LEGAL STANDARD FOR CLAIMS UNDER THE EIGHTH AMENDMENT FOR THE ALLEGED DENIAL OF ADEQUATE MEDICAL CARE.

To establish liability on a deliberate indifference claim under the Eighth Amendment, the plaintiff must "demonstrate, as a threshold matter, that he suffered a deprivation that was, 'objectively, sufficiently serious.'" Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024) (*en banc*) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Then, the plaintiff must show "that the defendant acted with 'subjective recklessness as used in the criminal law,'" which requires showing "the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." Id. (quoting Farmer, 511 U.S. at 839). However, a prison official cannot be liable under the Eighth Amendment when he

"'responded reasonably to the risk.'" Id. (quoting Farmer, 511 U.S. at 844). This well-established standard governs Plaintiffs' claim.

Moreover, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). Instead, "to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. Under the Eighth Amendment, prison officials must provide inmates with "minimally adequate" mental-health care, but, "as with all medical care provided to prisoners, it is not constitutionally required that mental health care be 'perfect, the best obtainable, or even very good.'" Harris v. Thigpen, 941 F.2d 1495, 1504, 1510 (11th Cir. 1991) (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980)). Accordingly, "[m]edical treatment violates the [E]ighth [A]mendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Harris, 941 F.2d at 1505 (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)); Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1272 (11th Cir. 2020) (holding that "[t]he question here . . . isn't whether, in the best of all possible worlds," plaintiffs would receive the treatment they seek, or "even whether, if we were sitting as a common-law court, we might conclude that ordinary prudence requires" the treatment; instead, under "the Eighth Amendment, the sole question before us is

whether [the treatment the inmates received] is so reckless—so conscience-shocking—that it violates the Constitution"). Thus, an inmate's desire for a treatment does not dictate whether the Eighth Amendment requires prison officials to provide that treatment.

The Eleventh Circuit applied these long-standing precedents in Keohane I to conclude that nothing in the Constitution requires prison officials to provide social accommodations to an inmate with gender dysphoria merely because the accommodations may prove "psychologically pleasing" to the inmate. Keohane v. Fla. Dep't of Corr., Sec'y, 952 F.3d 1257, 1274 (11th Cir. 2020) ("Keohane I"). Instead, the Court confirmed that "it's well established that 'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [cannot] support a claim of cruel and unusual punishment.'" Id. (quoting Harris, 941 F.2d at 1505); see also Hoffer, 973 F.3d at 1273 ("Because the plaintiffs here are receiving medical care—and because the adequacy of that care is the subject of genuine, good-faith disagreement between healthcare professionals—we are hard-pressed to find that the Secretary has acted in so reckless and conscience-shocking a manner as to have violated the Constitution.").[1] Thus, in Keohane I, the Court concluded that "implementing the

[1] The Eleventh Circuit and district courts within the Eleventh Circuit routinely apply these principles in cases involving inmates who seek different treatment than the treatment prison officials already provide for them. For example, in Ross v. Corizon

course of treatment recommended by Keohane's FDC medical team, and seconded by a number of other medical professionals, isn't 'so unconscionable as to fall below society's minimum standards of decency'—and thus violative of the Eighth Amendment—merely because it conflicts with the opinion of Keohane's retained expert." 952 F.3d at 1275. Karasic's opinions ignore this black-letter law.

---

Medical Services, an inmate with numerous infirmities filed claims for deliberate indifference after doctors changed his pain medications and denied additional specialized care. 700 F. App'x 914, 915 (11th Cir. 2017). The Eleventh Circuit affirmed the district court's grant of summary judgment in favor of the defendants, finding the defendants did not act with deliberate indifference because there was no evidence the inmate "was denied treatment or medication, just that he did not agree with the medical treatment provided." Id. at 917-18; see also Carter v. Broward Cnty. Sheriff's Dept. Med. Dept., 558 F. App'x 919, 922 (11th Cir. 2014) (finding the district court did not err in granting summary judgment in favor of defendant when the defendant used her medical judgment and discontinued an inmate's high-calorie/high-protein diet, but the inmate believed the diet was constitutionally required for his HIV); Smith v. Fla. Dept. of Corr., 375 F. App'x 905, 910 (11th Cir. 2010) (affirming the district court's dismissal of inmate's Eighth Amendment claim because the inmate's "difference of opinion with the prison medical staff over the course of" treatment for a broken pelvis did not rise to the level of a constitutional violation); Culver v. Sanders, 608 F. Supp.3d 1171, 1180 (N.D. Fla. June 23, 2022) (dismissing inmate's claim as a classic disagreement with medical judgment after defendants repeatedly evaluated the inmate and believed that providing a two-wheeled walker instead of a four-wheeled rollator the inmate wanted and previously used was appropriate for the inmate's back, leg, and foot pain); Abel v. Lappin, 661 F. Supp.2d 1361, 1379 (S.D. Ga. Sept. 24, 2009) (granting defendants summary judgment after finding the inmate received care and treatment for Hepatitis C, "even if that care was not what [the inmate] deemed to be the proper course of care and treatment"); Loadholt v. Moore, 844 F. Supp. 2d 1274, 1282 (S.D. Ga. Jan. 25, 2012) (explaining that "[t]he United States Constitution does not entitle inmates to medical care tailored to their preferences," and, "[i]ndeed, the Eighth Amendment does not even dictate that inmates receive professionally competent care").

In opining that "social transition and gender-affirming medical care . . . can significantly relieve the distress of gender dysphoria and are medically necessary for many people with this condition[,]" (Karasic Report, ¶ 26), Karasic failed to apply the Eighth Amendment standard. Instead, Karasic self-defined "medically necessary care" as "care that a clinician decides is necessary to treat a particular condition" and that falls within "community standards of care and/or practice guidelines[.]" (Karasic Dep. 141:15-21). He then confirmed that he used the terms "medically necessary" and "medical necessity" in his reports consistent with that definition. (Karasic Dep. 141:22-142:3). He also testified that his understanding of Plaintiffs' claims is "that incarcerated people are entitled to the medically necessary care that . . . clinicians would be providing to patients in other settings[,]" and that "denying needed care" is "not allowed as cruel and unusual punishment[.]" (Karasic Dep. 143:8-14). That invented standard directly conflicts with the constitutional standard.

As set forth above, nothing in the Eighth Amendment requires prison officials to provide whatever care a clinician might decide is appropriate in private practice, whatever care may fall within professional guidelines, or whatever care clinicians may provide to patients "in other settings." Rather, the constitutional inquiry is narrower: whether prison officials provided minimally adequate care and whether the challenged course of care was so inadequate, reckless, and conscience-shocking that it violated the Eighth Amendment. Harris, 941 F.2d at 1504-05, 1510; Hoffer,

973 F.3d at 1271-73. Karasic's definition improperly substitutes Karasic's own clinical-practice standard for the controlling Eighth Amendment standard.

Karasic's definition of required care eliminates the distinction drawn by Estelle, Harris, Hoffer, and Keohane I. Under his view, if a clinician would provide social transition accommodations in another setting or if those accommodations fall within professional guidelines, then withholding them in prison becomes a denial of required care. But, the Eighth Amendment does not constitutionalize the standard of care available in the free world, nor does it transform every good-faith disagreement over treatment into cruel and unusual punishment. See Keohane I, 952 F.3d at 1274; Hoffer 973 F.3d at 1273. Hoffer emphasized "the stringency of the deliberate-indifference standard":

> Confronted with an inmate who has a serious medical condition, a reviewing court hears from experts about measures that (in their view) would provide the most effective treatment. When the court then sees evidence that prison authorities aren't taking those measures—that perhaps they could be doing more, doing better—it concludes that liability must presumably follow. Intuitive as that line of thinking may be—especially for lawyers and judges educated and trained in the common-law tradition—it does not reflect the *constitutional* standard.

973 F.3d at 1271. Keohane I also squarely rejected the premise that social transition items become constitutionally required because they may be "psychologically pleasing." 952 F.3d at 1274 n.9. Thus, even assuming "there are no alternative evidence-based treatments for gender dysphoria" (a proposition the FDC Officials

hotly dispute) or social accommodations "can significantly relieve the distress of gender dysphoria," that would not render them constitutionally required. Karasic's standard therefore would require the Court to answer the wrong questions – whether social transition is supported by community practice, WPATH, or the clinical judgment of providers outside prison. The Eighth Amendment, on the other hand, asks whether FDC applies a constitutionally deficient treatment approach—one that "is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Keohane I, 952 F.3d at 1275 (quoting Harris, 941 F.2d at 1505). Because Karasic improperly substituted a community-practice standard for the constitutional standard, his opinions rest on an incorrect legal standard and should be excluded under Rule 702.

## II. KARASIC'S OPINIONS WILL NOT ASSIST THE TRIER OF FACT.

Under Rule 702(a), an expert's testimony must "help the trier of fact . . . determine a fact in issue." Expert testimony that relies upon an incorrect legal standard cannot assist the trier of fact. Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1323 (11th Cir. 2003) (affirming district court's exclusion of testimony that failed to "differentiate between legal and illegal pricing behavior" because the testimony "would not have assisted a factfinder in determining whether [the defendants] engaged in lawful conscious parallel behavior or collusive price fixing"); Boca Raton Cmty. Hosp., Inc. v. Tenet Health Corp., 582 F.3d 1227, 1233

(11th Cir. 2009) (affirming district court's exclusion of expert opinion that "fail[ed] to recognize . . . the range of behavior between clearly unlawful and perfectly lawful"). In Boca Raton Community Hospital, the Court noted that the opinion lacked a "fit" with the plaintiff's liability theory, which appropriately distinguished between "lawful overcharging" and "unlawful overcharging." 582 F.3d at 1233. Karasic's medical-necessity opinions likewise lack a fit with the Eighth Amendment issues governing trial.

Karasic opined that "[s]ocial transition has been shown to positively affect mental health" and that "[b]ringing one's presentation into alignment with gender identify can help one see oneself and be recognized and treated by others consistent with one's gender identity." (Karasic Report ¶ 68). However, the relevant Eighth Amendment issue does not turn on whether a practice may "positively affect" some patients. Rather, the issue remains whether the FDC Officials provided treatment in a manner "so reckless—so conscience-shocking—that it violates the Constitution. Hoffer, 973 F.3d at 1273. Karasic's own description of social transition accommodations confirmed the disconnect between his opinions and the relevant legal standard. Karasic defined social transition broadly: "[s]ocial transition involves changing appearance (e.g. garments, hair, make-up) and social role, with change of signifiers of gender, including names and pronouns, and public presentation in the identified gender." (Karasic Report ¶ 59). But, this case does

not concern social transitioning in the abstract. It concerns discrete prison items and exemptions—opposite-sex undergarments, hair-length standards, makeup, scented grooming products, and canteen items—within FDC's adult correctional system.

Karasic failed to provide a reliable, facts-based analysis showing how these specific items qualify as constitutionally required for any Plaintiff or class member, all of whom reside in a correctional setting under FDC custody. Karasic admitted he never even met (much less examined) any named Plaintiff or class member, never reviewed their medical records, never visited any Florida prison, and does not know whether anyone intentionally or deliberately denied care to any named Plaintiff because he does not know "the specifics of the care of the individuals involved." (Karasic Dep. 80:13-22; 145:15-21). Indeed, Karasic admitted to not even knowing what particular accommodations Plaintiffs seek. (Karasic Dep. 249:9-250:1). Instead, Karasic opined in the abstract that "social transition has been a critical step towards improved mental health" for his patients—none of whom are members of the class here. (Karasic Report ¶ 69). As Karasic acknowledged, outside prison, social transitioning may occur through the patient's exercise of personal choices. (Karasic Report ¶ 61). In contrast, in FDC custody, Plaintiffs seek compelled exemptions to rules that apply to incarcerated individuals. Karasic failed to tie his opinions to the correctional setting or the incarcerated individuals who make up the

class. The gap between Karasic's opinions and the specifics of this case renders his opinions unhelpful to the trier of fact.

Accordingly, Karasic's testimony does not help the Court decide the facts in issue. This case concerns whether particular social accommodations qualify as constitutionally required medical treatment for particular inmates in FDC custody despite prison-specific restrictions, security concerns, and treatment alternatives. Moreover, "psychologically pleasing" items fail to qualify as constitutionally required care under the Eighth Amendment. Keohane I, 952 F.3d at 1274. Like the experts in Williamson Oil Co. and Boca Raton, Karasic's opinions lack a fit with this case because they fail to distinguish between legal conduct (denying "psychologically pleasing" items to inmates) and illegal conduct (denying constitutionally required medical care). Williamson Oil Co., 346 F.3d at 1323; Boca Raton Cmty. Hosp., Inc, 582 F.3d at 1232. The Court should exclude Karasic's opinions because they will not assist the trier of fact.

## III. KARASIC'S OPINIONS FAIL TO MEET RULE 702'S RELIABILITY REQUIREMENTS.

In his Report, Karasic claimed the WPATH SOC, which he co-authored, represent "the internationally accepted guidelines designed to promote the health and welfare of transgender, transsexual, and gender variant persons." (Karasic Report, ¶¶ 7, 13). Karasic stated that, in rendering his opinions, he "relied on [his] knowledge of the clinical practice guidelines for the treatment of gender dysphoria,

including [his] work as a contributing author of the WPATH" SOC. (Karasic Report, ¶ 22). The WPATH SOC fail to provide a reliable basis for Karasic's opinions for at least three reasons.

First, contrary to Karasic's suggestion that WPATH's SOC represent "internationally accepted guidelines," multiple courts rejected the premise that WPATH's SOC represent a settled medical consensus. For example, the Fifth Circuit noted that WPATH's Standards "reflect not consensus, but merely one side in a sharply contested medical debate[.]" Gibson v. Collier, 920 F.3d 212, 221 (5th Cir. 2019). The First Circuit quoted a court-appointed expert as concluding that the SOC "is not a politically neutral document[,]" and "WPATH aspires to be both a scientific organization and an advocacy group for the transgendered." Kosilek v. Spencer, 774 F.3d 63, 78 (1st Cir. 2014) (*en banc*). Justice Thomas recently wrote that "[r]ecent revelations suggest that WPATH . . . bases its guidance on insufficient evidence and allows politics to influence its medical conclusions." U.S. v. Skrmetti, 605 U.S. 495, 543 (2025) (Thomas, J., concurring); see also id. at 545 (noting that "newly released documents suggest that WPATH tailored its Standards of Care in part to achieve legal and political objectives") (Thomas, J., concurring); id. at 546 ("[R]ecent reporting has exposed that WPATH changed its medical guidance to accommodate external political pressure.") (Thomas, J., concurring); see also Eknes-Tucker v. Governor of Ala., 114 F.4th 1241, 1261 (11th Cir. 2024) ("[R]ecent

revelations indicate that WPATH's lodestar is ideology, not science.") (Lagoa, J., concurring in denial of rehearing *en banc*). Thus, far from representing a medical consensus, WPATH's SOC represent the views of advocates for transgendered individuals, not unbiased medical professionals.

Second, even Karasic recognized that WPATH's SOC represent "guidelines," not requirements. (Karasic Report, ¶ 7). In his deposition, Karasic testified that he does not "recommend that every clinician follow all of the guidance in" the SOC, and, in fact, he does not "even personally use all of it." (Karasic Dep. at 164:21-165:1). The Eleventh Circuit recently recognized that, as "[g]uidelines," the SOC do not constitute strict constitutional requirements. Bayse v. Ward, 147 F.4th 1304, 1313 (11th Cir. 2025). In Bayse, an inmate relied on WPATH's SOC in arguing that social accommodations qualified as constitutionally required treatment. Id. at 1309. The Eleventh Circuit rejected the argument, holding that WPATH's SOC, "by their own terms," constitute only "'[f]lexible [c]linical [g]uidelines' that list '[c]hanges in gender expression' as a mere 'option[]' for treatment." Id. at 1313. Accordingly, the Court held that the SOC "are far too equivocal to be evidence that social transitioning accommodations were" constitutionally required for the inmate. Id. Thus, these "guidelines" cannot serve as a reliable basis for Karasic's opinion that social accommodations qualify as constitutionally required medical treatment.

Third, despite his statement in his Report that the WPATH SOC "utilized a rigorous evidence-based approach to developing the guidelines[,]" (Karasic Report ¶ 48), Karasic admitted at his deposition that the SOC relied on "low quality or low certainty of evidence studies[.]" (Karasic Dep. at 273:15-17). Numerous courts also recognized the questionable validity of the evidence relied on by WPATH. For example, in his concurrence in Skrmetti, Justice Thomas wrote that "WPATH publicly represents that '[g]ender-affirming interventions are based on decades of clinical experience and research,' and are 'safe and effective' treatments," but "WPATH appears to rest this conclusion on self-referencing consensus rather than evidence-based research, which may help explain the group's confidence in the face of concededly inadequate evidence." 605 U.S. at 544; Eknes-Tucker, 114 F.4th at 1249 (noting that "a whistleblower leaked documents and recordings impugning the credibility of" WPATH, and those "documents suggest that WPATH officials are aware of the risks of cross-sex hormones and other procedures yet are mischaracterizing and ignoring information about those risks") (Lagoa, J., concurring in denial of rehearing *en banc*); id. at 1267 (citing document that "provided multiple reasons to question the reliability of WPATH and concluded that the most recent iteration of the [SOC] 'overstates the strength of the evidence' supporting its recommendations") (quoting *The Cass Review, Independent review of gender identity services for children and young people* (2024),

https://cass.independent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf [https://perma.cc/9F73-D7BW]) (Lagoa, J., concurring in denial of rehearing *en banc*); Kosilek v. Spencer, 774 F.3d 63, 78 (1st Cir. 2014) (*en banc*) (court-appointed expert noted that the SOC faced additional "limitations" because of "the lack of rigorous research in the field"). These deficiencies render WPATH's SOC an unreliable source for Karasic's opinions.

## CONCLUSION

For the foregoing reasons, the FDC Officials respectfully request the Court exclude the testimony and opinions of Plaintiffs' purported expert Dan Karasic under Federal Rule of Evidence 702.

Dated: June 9, 2026

*/s/ William R. Lunsford*
William R. Lunsford
*One of the Attorneys for the FDC Officials*

William R. Lunsford (*Pro Hac Vice*)
Megan N. McNab (*Pro Hac Vice*)
Macey Rae Jones (*Pro Hac Vice*)
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
megan.everett@butlersnow.com
macey.jones@butlersnow.com

George A. Wright (*Pro Hac Vice*)
**BUTLER SNOW LLP**
445 North Blvd.
Suite 300
Baton Rouge, LA 70802
Telephone: (225) 325-8700
Facsimile: (225) 325-8800
george.wright@butlersnow.com

Daniel A. Johnson (Florida Bar No. 91175)
**FLORIDA DEPARTMENT OF CORRECTIONS**
501 South Calhoun Street
Tallahassee, FL 32399-2500
Telephone: (850) 717-3605
dan.johnson@fdc.myflorida.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Rule 702 Motion and Incorporated Memorandum of Law contains 4,903 words and does not exceed 8,000 words as required by Local Rule 7.1(F).

*/s/ William R. Lunsford*
*One of the Attorneys for the FDC Officials*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all parties in this matter, including without limitation the following, by the Court's CM/ECF system on this 9th day of June, 2026:

Daniel B. Tilley
(Florida Bar No. 102882)
Samantha J. Past
(Florida Bar No. 1054519)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
spast@aclufl.org
*Attorneys for Plaintiffs*

Li Nowlin-Sohl (*Pro Hac Vice*)
Leslie Cooper
Sruti J. Swaminathan (*Pro Hac Vice*)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street
New York, NY 10004
Tel: (212) 549-25800
lnowlin-sohl@aclu.org
lcooper@aclu.org
sswaminathan@aclu.org
*Attorneys for Plaintiffs*

Anthony J. Anscombe (*Pro Hac Vice*)
Sarah E. Norise (*Pro Hac Vice*)
George V. Desh (*Pro Hac Vice*)
Sadaf Misbah (*Pro Hac Vice*)
**STEPTOE LLP**
227 West Monroe, Suite 4700
Chicago, IL 60606
Tel: (312) 577-1300
aanscombe@steptoe.com
snorise@steptoe.com
gdesh@steptoe.com
smisbah@steptoe.com
*Attorneys for Plaintiffs*

*/s/* William R. Lunsford
Of Counsel