# Exhibit A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

_____

REIYN KEOHANE; KELVIN COLEMAN;

CANDACE JACKSON; NATASHA BOOTHE;

and GEORGE MENDOZA,

Plaintiffs,

v.                                    Case No.

RICKY D. DIXON; CLAYTON WEISS;        4:24-cv-00434-AW-MAF

GARY HEWETT; ALONZO HORNER; and

NAN JEFFCOAT,

Defendants.

_____

VIDEOTAPED DEPOSITION OF DAN H. KARASIC, M.D.

DATE:          Tuesday, December 16, 2025

TIME:          9:02 a.m.

LOCATION:      Hanna Brophy MacLean McAleer & Jensen,

               LLP

               101 D Street

               Santa Rosa, CA 95404

OFFICIATED BY: Ariana Beaumont

JOB NO.:       7772169


PAGE 62 IS CONFIDENTIAL

Page 2

APPEARANCES

ON BEHALF OF PLAINTIFFS REIYN KEOHANE, KELVIN COLEMAN, CANDACE JACKSON, NATASHA BOOTHE, AND GEORGE MENDOZA:

LI NOWLIN-SOHL, ESQUIRE
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
lnowlin-sohl@aclu.org
(212) 549-2584

ON BEHALF OF DEFENDANTS RICKY D. DIXON, CLAYTON WEISS, GARY HEWETT, ALONZO HORNER, AND NAN JEFFCOAT:

WILLIAM LUNSFORD, ESQUIRE
MEGAN MCNAB, ESQUIRE
Butler Snow, LLP
200 West Side Square, Suite 100
Huntsville, AL 35801
kenneth.steely@butlersnow.com
megan.everett@butlersnow.com
(256) 936-5619

Page 3

APPEARANCES (Cont'd)

ON BEHALF OF DEFENDANTS RICKY D. DIXON, CLAYTON WEISS, GARY HEWETT, ALONZO HORNER, AND NAN JEFFCOAT:

GEORGE WRIGHT, ESQUIRE (by videoconference)
Butler Snow, LLP
445 North Boulevard, Suite 300
Baton Rouge, LA 70802
george.wright@butlersnow.com
(225) 325-8700

WILLIAM GWALTNEY, ESQUIRE (by videoconference)
Office of the General Counsel - Florida Department of Corrections
501 South Calhoun Street
Tallahassee, FL 32399
william.gwaltney@fdc.myflorida.com
(850) 717-3916

ALSO PRESENT:
David Nahman, Videographer
Samuel Storey, Law Clerk, Florida Department of Corrections (by videoconference)

Page 4

INDEX

EXAMINATION:                    PAGE
  By Mr. Lunsford              7
  By Ms. Nowlin-Sohl          276

EXHIBITS
NO.         DESCRIPTION                PAGE
Defendant:
Exhibit 1    Expert Report of Dan H. Karasic, M.D.          113
Exhibit 2    Expert Rebuttal Report of Dan H. Karasic, M.D.   115
Exhibit 3    Notice of Deposition to Dan H. Karasic, M.D.    138
Exhibit 4    WPATH SOC8 Contributors     178
Exhibit 5    Health Services Bulletin 15.05.23  219

Page 5

PROCEEDINGS

THE OFFICER:  Good morning.  My name is Ariana Beaumont.  I'm the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 9:02 a.m.

This is the deposition of Dr. Dan Karasic taken in the matter of Reiyn Keohane et al. vs. Ricky D. Dixon, et al., on Tuesday, December 16, 2025, at Santa Rosa, California 95404.

I am a notary authorized to take acknowledgments and administer oaths in California.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recordings of this proceeding:
       - is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
       - shall constitute written stipulation of such.

This proceeding will be recorded via video technology by David Nahman.  At this time, will

Veritext Legal Solutions
877-373-3660                     800.808.4958

Page 6

everyone in attendance please identify yourself for the record, beginning from my left.

MR. LUNSFORD: Good morning. My name's Bill Lunsford. I, along with Megan McNab, and Bill Gwaltney, and George Wright, who are listening in via Zoom, represent Secretary Ricky Dixon of the Florida Department of Corrections and all the other named FDC officials.

MS. NOWLIN-SOHL: Li Nowlin-Sohl with the ACLU, representing the plaintiffs.

DR. KARASIC: And I'm Dan Karasic.

THE OFFICER: And I believe we were joined by two other people on Zoom. We have a William Gwaltney and a Samuel Storey, both with FDC, joining remotely.

MR. GWALTNEY: Yes, ma'am. William Gwaltney, deputy general counsel of FDC. Mr. Lunsford mentioned me as Bill Gwaltney. Same thing. And then Sam Storey is our law clerk.

THE OFFICER: Thank you very much. Hearing no objection, I'll now swear in the witness.

Please raise your right hand.

//
//
//

Page 7

WHEREUPON,

DAN H. KARASIC, M.D.,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE OFFICER: Thank you.

You may proceed.

EXAMINATION

BY MR. LUNSFORD:

Q Good morning, Dr. Karasic.

A Good morning.

Q We met just before your deposition started, but I always like to start a deposition with a little bit of introductions. This is not your first time sitting for a deposition; is it?

A No.

Q How many times previously have you set for a deposition?

A I would say at least a dozen times.

Q Of those dozen depositions or more that you've sat for, how many of those were you testifying as a person who's been called by one side or the other as an expert witness?

A That is -- all of them have been as an expert.

Q Okay. Well, you've done this before, but I'm

Page 8

going to still cover some ground rules just so you and I are on the same page.

Obviously, today's deposition is being video recorded and transmitted via Zoom. Also, the individual to your left, my right, is our court reporter, and she will be transcribing everything that you say, and I say throughout today's deposition.

In order to make sure that the written record of today's deposition is accurate, a couple of different things on that.

Number one is it's typical in our everyday communications to nod our head or shake our head in answering yes or no or use what we call nonverbal responses such as "uh-huh" or "uh-uh."

And I would ask you, just for clarity of the record, that if your response is a yes or no, that you say that; okay?

A Yes.

Q Okay. Also, there may be occasions when you may think that I've taken a break. I'll try not to do that. I'll invariably do that on occasions, or you may think you know the full question before the answer begins or before I complete my question.

That results in a broken question that I'll have to go back and restate again and just kind of draws

Page 9

out the process. So, if you could wait till the end of my question before you answer, it'll make sure that your question is responsive to -- your answer is responsive to the question I ask; okay?

A Yes.

Q Okay. If I ask you a question and you're confused by any of the words or phrases that I use in the question, or any terminology I use, or don't understand the question itself, will you let me know?

A Yes.

Q If I ask you a question and you answer it without indicating any confusion about any of that, I will assume that you understood the question itself as well as all the words and phrases I used; okay?

A Yes.

Q Okay. I'll also be providing you with a series of documents throughout today's deposition to review. I want you to take whatever time you believe is necessary in order to review those documents and answer the question accurately and truthfully. So, if you need additional time, will you please let me know?

A Yes.

Q There will be occasions when you may need additional time, but if I give you that time and then you answer my questions, I'll assume that you had

3 (Pages 6 - 9)

Page 10

sufficient time to review the documents and answer my question; okay?

A    Yes.

Q    Okay.  Counsel for ACLU in this case may at times say objection to the form, and so if you can allow time for counsel to raise those objections.  But if there's an objection of the form, you can proceed to answer the question; okay?

A    Yes.

Q    At any point in time during today's deposition, you can take a break.  I just would ask that you let me know.  We'll definitely take a break -- an extended break for lunch, but the one kind of stipulation on that I'd ask is that you answer any pending question before we break; okay?

A    Yes.

Q    Okay.  Before we get into the meats of your various reports that you've provided to us in this case, let me first ask you, what did you do to prepare for today's deposition?

A    I reviewed my declaration, the -- my rebuttal declaration, and the complaint.

Q    Obviously, you wrote what you referred to as your declaration and the rebuttal declaration; correct?

A    Yes.

Page 11

Q    Okay.  We're going to talk some later about that, but you reviewed the complaint in this case?

A    Yes.

Q    Had you previously reviewed the complaint in this case?

A    Prior -- prior to when?

Q    Prior to preparing for this deposition?

A    Yes.

Q    Do you remember the first time you reviewed the complaint?

A    No.

Q    Did you review the complaint in detail?

A    I read it.

Q    Did you notice anything in the complaint that was not accurate?

A    When I read it initially?

Q    Yes.  Or at any time.

A    What do you mean by not accurate to what?

Q    False.  Did you notice anything in the complaint that you knew to be false?

A    No.

Q    After you first received -- well, let me first ask, when did you first receive the complaint?

A    I don't recall.

Q    Did you do anything to investigate all of the

Page 12

facts in the complaint?

A    No.

Q    Did you do anything to verify the accuracy of the complaint?

A    No.

Q    Did you ever speak with any of the named plaintiffs about the complaint?

A    No.

Q    Have you reviewed any orders entered by the court in this case?

A    I don't believe so.

Q    And you understand when I'm referring to this case, I'm referring to the case filed by an individual with the last name Keohane versus Secretary Ricky Dixon and other FDC officials?

A    Yes.

Q    Okay.  Did you read any other depositions in this case?

A    No.

Q    Did you ever receive the plaintiff's depositions?

A    No.

Q    Did you ever review any of the depositions of any FDC officials?

A    No.

Page 13

Q    Did you review the depositions of any individual providing medical care to any of the named plaintiffs?

A    No.

Q    And you understand that when I refer to the named plaintiffs, I'm referring to the incarcerated individuals who filed this lawsuit?

A    Yes.

Q    Do you know how many individuals who are incarcerated filed this lawsuit?

A    Five.

Q    Have you ever met those individuals?

A    No.

Q    Have you ever spoken with those individuals?

A    No.

Q    I'm going to refer to those five individuals as the named plaintiffs; okay?

A    Okay.

Q    Have you reviewed any mental healthcare records of the named plaintiffs?

A    No.

Q    You're familiar with the phrase telepsychiatry, I know; right?

A    Yes.

Q    And what is telepsychiatry?

4 (Pages 10 - 13)

Page 14

A   Telepsychiatry is the practice of psychiatry via Zoom or other two-way transmission -- electronic transmission.

Q   Usually telepsychiatry involves, in layman's terms, a psychiatric appointment that's conducted via video conference; correct?

A   Yes.

Q   In your experience using telepsychiatry, have you used equipment that also has supplemental equipment attached to it, such as a blood pressure sensor, or a temperature sensor, or a respiration rate sensor of any kind?

A   Personally, I don't use one that has that equipment.

Q   When you have conducted telepsychiatry appointments, has anyone been present with you on your end of the communications, typically?

A   Typically, no.

Q   Okay.  And in those instances when you have used telepsychiatry in your practice, has anyone been present with the patient?

A   Only when I do telepsychiatry with minors, very often the parents are present.  With -- with an adult individual patient, it's just the -- the patient.

Q   How many telepsychiatry appointments would you

Page 15

estimate you've participated in in your professional career?

A   Hundreds in certainly my practice.  I did very little telepsychiatry until March of 2020 and -- but since March of 2020, the vast majority of my practice has been telepsychiatry.

Q   Are there benefits, in your view, with telepsychiatry?

A   Yes.

Q   What are they?

A   So, it is more accessible and more convenient for the patient.  Over the years, seeing people in person in my San Francisco office, patients would have to come in from the East Bay, Marin, Silicon Valley. Could be an hour drive, and have to park in San Francisco, which is not always easy.

And this allows people to -- to just be present for the time of the -- of the appointment to fit it into their work schedule during a half hour break, for example, for a follow-up visit.  And so, that's -- it's a -- a great convenience that patients tend to prefer.

Q   Do you typically require an in-person consultation before --

THE OFFICER:  Sorry.  Can you repeat

Page 16

that?

BY MR. LUNSFORD:

Q   Do you typically require an in-person consultation before you will see a patient via telepsychiatry?

A   No.  I have -- I did see in person patients who were being started on a psychostimulant, but now it's kind of unclear whether the -- those roles are going to be instituted again.

And so, most of my patients are just seen remotely without an in-person visit.

Q   Based on your current schedule, what percentage of your patients are you seeing via telepsychiatry?

A   Currently, all of the patients I see are via telepsychiatry.  As I said, there have been periodic times where I've seen people for one visit for -- who are being prescribed schedule two medications, but that's not required now.

And so, typically all of the care is -- is done via telepsychiatry.

Q   When is the last time you had routine in-person clinical hours?

A   The last time I had routine in-person clinical hours was March of 2020.  I -- I have had

Page 17

intermittent -- intermittent in-person visits and -- but it's probably been -- it may have been a year since I've seen someone in person.

Q   Okay.  As a licensed psychiatrist in the state of California, do you believe you can meet the standard of care in terms of the community practice of psychiatry by providing services via telepsychiatry?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  Yes.

BY MR. LUNSFORD:

Q   When I say the community standard of care, do you know what I'm referring to?

A   Yes.

Q   What am I -- what -- how do you define that phrase?

A   So, that -- a community standard of care is the generally accepted practice that is in accordance both with others in the profession and with the knowledge base that we have.

Q   Okay.  Would you agree that one commonly referenced definition of the community standard of care is how a reasonable physician would act in the same or similar circumstances?

A   Yes.

Q   Okay.  We'll come back to issues around the

5 (Pages 14 - 17)

Page 18

standard of care. But going back to -- I'm going to go back a little bit further to the complaint, and I want to talk about the named plaintiffs.

I think I may have asked you this question, but I want to make sure. Did you review any of the medical or mental health records for the named plaintiffs?

A   No.

Q   Do you know anything about the medical histories of the named plaintiffs?

A   Very little. I just -- I only reviewed the -- the complaint. I have not reviewed any of the records of any of the named plaintiffs.

Q   Okay. And you've not physically examined any of the named plaintiffs?

A   No.

Q   Have you reviewed any of the medications prescribed to the named plaintiffs?

A   No.

Q   Do you know what medications the named plaintiffs are currently receiving?

A   No.

Q   Do you know if any of the named plaintiffs are currently receiving some form of hormone therapy?

A   I don't know the current status of the medical

Page 19

treatment of the named plaintiffs.

Q   What about the mental health treatment of the named plaintiffs?

A   Or -- or the current mental health status of the individual patients -- the individual plaintiffs. I'm sorry.

THE OFFICER: Sorry. What was that?

THE WITNESS: The individual plaintiffs, I meant.

BY MR. LUNSFORD:

Q   Do you know the names of any of the medical professionals providing medical care currently to the named plaintiffs?

A   I do not.

Q   What about the names of any medical professionals who provided care to the named plaintiffs during their incarceration in the Florida Department of Corrections?

A   I do not.

Q   Do you know anything about the qualifications, expertise, or background of the medical professionals who've seen or treated Plaintiffs during their incarceration?

A   No.

Q   Switching gears. Do you know if any of the

Page 20

named plaintiffs are currently receiving mental healthcare while incarcerated in Florida?

A   I don't know what treatment, aside from having read the -- the protocol that -- for people to receive treatment, but I don't know the -- what people are actually receiving.

Q   Are you referring to the document that I'll refer, and I'll actually show you the health services bulletin that was adopted by the Florida Department of Corrections?

A   Yes.

Q   Okay. We're going to come back to that particular document. Do you know anything about the training, education, or experience of the mental health professionals who have treated the named plaintiffs during their incarceration in Florida?

A   I do not.

Q   Did you undertake any effort to attempt to validate or confirm any of the medical or mental health diagnoses provided to any of the named plaintiffs during their incarceration?

A   No.

Q   Did you do anything to evaluate the medical or mental healthcare currently being provided to any of the named plaintiffs in Florida?

Page 21

A   No.

Q   Do you know the extent of medical or mental healthcare provided to any of the named plaintiffs during their incarceration in Florida?

MS. NOWLIN-SOHL: Object to form. Asked and answered.

THE WITNESS: No.

BY MR. LUNSFORD:

Q   Okay. Do you know if -- well, you use a phrase, and there's been a phrase thrown around in this case called social accommodations. Are you aware of that phrase?

A   Yes.

Q   How do you define that phrase?

A   So, social accommodations are the provision of access to -- or the provision of clothing, makeup that -- braziers, undergarments that may be utilized as part of the social transition of the individual incarcerated person.

Q   You used a phrase I want to make sure we have defined. What is social transition or social transitioning?

A   So, part of process addressing gender dysphoria in a transgender person is to -- to have their appearance or the clothes they wear be more in

6 (Pages 18 - 21)

Page 22

accordance with their identity. And clothing, hair, also hair length, makeup, et cetera.

Q   Do you know what items that would fall into your definition of social accommodations are available to any of the named plaintiffs?

A   So, I just know in -- in reading the complaint that -- that the named plaintiffs were -- were told that they were going to lose access to -- to those accommodations.

And I don't know what has been actuated in terms of, you know, haircuts, or not being able to wear undergarments, or other -- other aspects of those accommodations.

Q   So, you don't know what social accommodations are currently available to named Plaintiffs? Is that accurate?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: I don't know what's actually being provided. I just know what they were told in -- in accordance with Florida policy -- what they were told was Florida policy.

BY MR. LUNSFORD:

Q   Did you assume that the allegations in the complaint were accurate?

MS. NOWLIN-SOHL: Object to form.

Page 23

THE WITNESS: So, you -- I -- of course, I can't assured that everything in the complaint is accurate, but I assumed that people were not going through this legal process, you know, if they did not believe that -- that they were going to lose social accommodations or access to hormones.

MR. LUNSFORD: Okay. I just want to make sure I didn't ask a bad question. What was the form issue with that question? I asked did he --

MS. NOWLIN-SOHL: Can you repeat the question?

MR. LUNSFORD: No, it's fine. Did he -- I asked, did he assume that the allegations in the complaint were accurate?

MS. NOWLIN-SOHL: Well, I think to the extent that that might call for legal conclusions or, you know, it was kind of a little bit vague, so.

MR. LUNSFORD: What was vague about it?

MS. NOWLIN-SOHL: I mean --

MR. LUNSFORD: I mean, the allegations in the complaint are, it's a written document. I'm just saying, did you assume they're accurate?

MS. NOWLIN-SOHL: Okay. Well, if we need to debate whether the objection's correct later or not, we can.

Page 24

MR. LUNSFORD: I just want to make sure I ask a fair question. I'm trying to be fair with Dr. Karasic about my question.

BY MR. LUNSFORD:

Q   We'll come back to this issue of social accommodations. Let me back up for just a minute and go back to one other thing we discussed, which was we were talking about your preparation for the deposition.

Are you aware that there is another individual who's been proposed by Plaintiffs as an expert witness in this case; Dr. Hamnvik?

A   Oh, I -- I am aware that they were also using a -- I believe, an endocrinologist, I think Dr. Hamnvik, as an expert witness.

Q   Do you know the other individual who's been identified by Plaintiffs or proposed as an expert witness?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: I don't -- I -- I know of him, but I don't know him personally.

BY MR. LUNSFORD:

Q   How do you know of him?

A   Because he is -- I -- I'm -- I mean, he's in the field. I believe that he had some contributions to the educational program of WPATH. So, I, you know --

Page 25

I'm aware of other people in -- in the field, but it -- it's not somebody that I can recall meeting.

Q   Have you ever spoken with Dr. Hamnvik?

A   No.

Q   Did you ever read Dr. Hamnvik's report in this case?

A   No.

Q   Did you recommend Dr. Hamnvik to Plaintiff's counsel?

A   I may have -- I may have made that recommendation. I -- I think counsel had asked me about endocrinologists in the field, and he was someone I was aware of, and so, I think I -- he may have been one of the people that I said, you know, is an endocrinologist in the field.

Q   Just for clarity's sake, you're not an endocrinologist; are you?

A   I'm not, no.

Q   Do you consider yourself an expert in endocrinology?

A   I'm not an expert in -- in the broader field of endocrinology.

I do have -- as a physician who's been working in transgender health for over 30 years, I have expertise in endocrinology relating to transgender

7 (Pages 22 - 25)

Page 26

patients just because I, you know, have kind of worked in that field and -- and have needed to have knowledge that was pertinent to my work.

Q   Okay.  Do you currently prescribe hormone therapy for your patients?

A   I -- I do not.

Q   Do you currently manage prescriptions for hormone therapy for your patients?

A   I do not.

Q   Who does that for your patients?

A   For my patients, it is typically their primary care provider.

Q   You said, when you were talking about Dr. Hamnvik, that he was, quote, in the field.  What field are you referring to?

A   I mean, the healthcare providers who are providing care for transgender patients.

Q   Is there a particular board certification or qualification that is necessary in order to, in your words, be in the field?

A   No.  It -- there is a WPATH certification process, but it's not a necessary thing to -- to be in the field.  It just is something that exists.  And especially a lot of mental health therapists who work with transgender people have that certification.

Page 27

THE OFFICER:  Did you say mental health -- mental health?

THE WITNESS:  Mental -- mental health, yes.

BY MR. LUNSFORD:

Q   So, just to be clear, there's currently no board certification in order to provide medical or mental healthcare to an individual who identifies as transgender?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  The -- there is board certification for the -- the discipline that the person works in.  So, for a psychiatrist, there's board certification for -- in psychiatry.

And, you know, of course there's board certification in endocrinology, but it's not board certification that is specific to being a psychiatrist working with transgender patients or being an endocrinologist working with transgender patients.

BY MR. LUNSFORD:

Q   And you've referenced several times WPATH?

A   Yes.

Q   What does WPATH stand for?

A   That's the World Professional Association for Transgender Health.

Page 28

Q   And WPATH is a nonprofit association; is that correct?

A   Yes.

Q   Okay.  We're going to come back to WPATH.  Let's go back to the named plaintiffs first though.  So, did you undertake any review of any diagnosis that had been made with respect to any of the named plaintiffs in terms of their medical or mental health?

A   No.

Q   Did you undertake any detailed review of whether the care those named plaintiffs had received while incarcerated in Florida was adequate in your opinion?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   So, just so we're clear, your role in this particular case, you didn't review the adequacy of care provided to any of the named plaintiffs?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I reviewed how the -- the protocol put in place by -- by the new policy, how that could impact people receiving proper care.

BY MR. LUNSFORD:

Q   Okay.  Did you review the health services

Page 29

bulletin adopted by the Florida Department of Corrections itself?

A   Yes.  The -- yeah.  Yes.

Q   Do you understand how the health services bulletin revisions that you reviewed -- how they originated or where they began?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I -- I believe it -- it was to be in accordance with Florida -- a more general Florida state policy, but I don't know the details of how -- how that bulletin came about.

BY MR. LUNSFORD:

Q   You said you believe that, which is an interesting phrase.  Why do you say I believe that the HSB was somehow tied to Florida law?

A   I don't recall the details of the process that led to the bulletin being created.

Q   Do you know who, within the Florida Department of Corrections, initiated the process of revising the health services bulletin?

A   No.

Q   Do you know who wrote the health services bulletin?

A   No.

Q   Do you know what experts or sources were

8 (Pages 26 - 29)

Page 30

relied upon in order to develop the health services bulletin?

A   No.

Q   Do you know when the health services bulletin went into effect?

A   I don't recall.  I read the bulletin, but I don't recall if it had a -- a start date.

Q   Do you know who oversaw implementation of the bulletin?

A   The Florida Department of Corrections, but I don't know individually who -- who that was.

Q   Well, that kind of goes without saying.  If the Florida Department of Corrections adopts a policy, it kind of is, you know, axiomatic that the Florida Department of Corrections would institute that policy; right?

A   Yes.

Q   Okay.

THE OFFICER:  Wait.  I'm sorry.  Sorry. Can you repeat that?

BY MR. LUNSFORD:

Q   It's axiomatic that if the Florida Department of Corrections adopted a policy that the Florida Department of Corrections would implement that policy; right?

Page 31

A   Yes.

Q   Okay.  So, do you know what FDC official was charged with implementation of the policy?

A   I don't know the details of that -- of who within the Florida Department of Corrections was in charge of implementing the policy.

Q   Do you know if training was provided to medical or mental health staff on the health services bulletin?

A   I -- I don't know.  Yeah, I don't know.

Q   Do you know if any portion of the health services bulletin has yet to be implemented?

A   I don't know.

Q   Do you know if any of the health services bulletin has been implemented?

A   I don't know.

Q   Do you know the education, training, or experience of any of the individuals who have been charged with responsibility for carrying out the requirements of the health services bulletin?

A   No.

Q   Do you know whether any of the named plaintiffs have gone without any prescribed medical or mental healthcare as a result of the health services bulletin?

Page 32

A   No.

Q   Do you know if the implementation or carrying out of the health services bulletin itself has resulted in any of the named plaintiff's not receiving any prescribed treatment?

A   No.

Q   Do you know if any named plaintiff has gone without hormone therapy since the adoption of the health services bulletin?

A   No.

Q   Do you know if any of the named plaintiffs have gone without any social accommodations since the implementation of the health services bulletin?

A   No.

Q   Do you know if any named plaintiff has complained to FDC about not receiving any type of prescribed treatment or necessary treatment in their -- in the plaintiff's view since implementation of the health services policy or bulletin?

A   No.

Q   Do you know if any of the named plaintiffs currently have any form of mental health diagnosis?

A   The named plaintiffs have diagnoses of gender dysphoria to have been started on hormones in the first place.

Page 33

Q   Do you know if all of the named plaintiffs have received a diagnosis of gender dysphoria?

A   No.

Q   How do you know that any named plaintiff has received a diagnosis of gender dysphoria?

A   I haven't reviewed the records, so I don't know in that regard.

But even in terms of prior policy and in terms of usual medical practice that if they're -- they were being prescribed some -- the plaintiffs were being prescribed while in Florida prisons, hormones, that the doctors prescribing them had made a diagnosis of gender dysphoria in order to -- to treat that with -- with hormones.

Q   How do you know that any of the named plaintiffs had previously received hormone therapy while incarcerated?

A   That was in a complaint that they -- they had been receiving hormones while incarcerated.

Q   And did you assume that statement was true?

A   Yes.

Q   Did you do anything to confirm the accuracy of that statement regarding hormone therapy in the complaint?

A   No.

9 (Pages 30 - 33)

Page 34

Q   You said, I believe, and I don't want to put words in your mouth, so feel free to just say that's not accurate.

I don't want to mischaracterize your words, and you come back later and say, I didn't -- I said something incorrectly.  So, I want to make sure I get your testimony right.

A   Sure.

Q   Did you assume that the named plaintiffs had, at some point in the past, prior to the filing of this lawsuit, been diagnosed with gender dysphoria?

A   Yes.

Q   Okay.  While we're on the term, what is gender dysphoria?

A   So, gender dysphoria is defined in the DSM-5 as a marked incongruence between one's identified or experienced -- experienced or expressed gender and -- and one's assigned gender.  Often that's also referred to as the sex assigned at birth.

And they have to have two out of six examples of that, which can include incongruence between one's primary sexual -- primary or secondary sexual characteristics and -- and their gender identity, or wanting to be of the other gender, or treated as the other gender.

Page 35

So, there's a -- a set of kind of examples of ways of -- of experiencing that incongruence and -- and then there has to be -- they have to be experiencing clinically significant distress, or social, or occupational impairment as a result.

Q   You used the word incongruence.  What does that mean?

A   So a -- an incongruence is -- is a -- a difference.

Q   Okay.  One definition I found, and this is from the Cambridge Dictionary, is the state of not being suitable or not fitting well with something else.  Would you agree with that definition?

A   Yes.

Q   Would you agree that sometimes the word incompatibility has been used interchangeably with incongruence?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  Maybe in other context it -- incongruence particularly has been used in referring to the difference between one's identity or experience of gender and one's assigned gender.

And so, it -- it particularly does refer to that difference in -- in people with -- with gender dysphoria.  It's used in that context as where --

Page 36

whereas incompatibility is maybe used in a similar way in other contexts.

BY MR. LUNSFORD:

Q   Well, let's talk about context.  I've heard this word incongruence used in the definition of gender dysphoria, but in the field of psychiatry, can you think of another context in which incongruence is used as a factor to consider in terms of diagnosis?

A   Not that I -- not off the top of my head.

Q   Okay.  Assume with me for a minute that you were asked in this case to evaluate the named plaintiffs in terms of their diagnosis of gender dysphoria, assuming they've all been diagnosed that way as you've done.

What would you do as a psychiatrist to confirm that diagnosis?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, as a -- as a psychiatrist, I would take a psychiatric and medical history including developmental history and a history of present illness of what symptoms they're currently experiencing, what kind of -- what they have done in response.

So, that could be -- include social transition.  That could be medical interventions, and

Page 37

how having that -- having that dysphoria, how it's impacting their life.

BY MR. LUNSFORD:

Q   Is there a spectrum of symptoms that individuals who experience gender dysphoria may experience?

A   Yes.

Q   And is there a spectrum of severity of those symptoms?

A   Yes.

Q   What are the symptoms that you've seen with patients with gender dysphoria?

A   So, similar to -- in the diagnosis, they recognize a -- a difference between their experience of gender and that of their peers that's very often gone on for an extended period of time.

At some point, they may have increasing distress related to that, and that ends up impacting their -- their life in different ways.  And then there's a process in which they may share that experience with family, or partners, or others.

And -- and then there may be a process of -- of social transition in which they are living more in the role of the gender they identify.  And then there may be a seeking of mental healthcare and medical care

10 (Pages 34 - 37)

Veritext Legal Solutions

877-373-3660                                                        800.808.4958

Page 38

as part of that process of transition.

Q   In terms of the diagnosis process for gender dysphoria, are there lab tests that can be run in order to evaluate an individual for gender dysphoria?

A   So, the diagnosis of gender dysphoria is not made by -- by a lab test.

Q   Okay.  So, the answer is no?

A   So, the -- the answer is -- is no, there's not a -- a lab test you can run that would give you that diagnosis.

Q   These may sound sort of --

THE OFFICER:  I -- I'm sorry.  I didn't catch the end of the answer.

THE WITNESS:  There's not a lab test that you -- that -- that could be done to give you the diagnosis of gender dysphoria.

BY MR. LUNSFORD:

Q   Let me run through a couple of examples just to confirm.  Are there any imaging studies that you could do in order to evaluate whether someone should be diagnosed with gender dysphoria?

A   No.  Imaging has been used in research purposes, but there's no clinical purpose for imaging.

Q   When you go through the diagnosis process for gender dysphoria, do you use any type of form or EMR

Page 39

checkbox where you go through a listing of factors?

A   No.  My diagnosis is similar to that of the diagnoses I make on other patients and other disorders like somebody presenting with major depressive disorder or someone with schizophrenia where I'm taking a history.

I'm also observing the person, and there are times where I also get history from collateral sources, which happens particularly when parents or caregivers are involved in the care of the -- of the patient.

And then often I'll review medical or mental health records if they're coming from other care.

Q   Is there any type of clinical scale that you use to -- as a measurement of the severity of gender -- sorry, gender dysphoria?

A   I do not.

Q   Do other clinicians use any type of scale, as far as you know?

A   I have seen that only in clinics that are doing research where they are -- are trying to -- trying to measure gender dysphoria or co-occurring mental health symptoms using scales that, you know -- to see if there is an effect with -- with treatment.

Q   Would it be accurate to say that a diagnosis of gender dysphoria is typically reached solely based on

Page 40

conversations with the patient?

A   No, I wouldn't describe it that way.  I would say it's an examination of the patient as -- as psychiatrists we're not just having conversations with someone in the same way one might have at a cocktail party.

We are doing a -- a clinical examination -- a mental health clinical examination that includes the factors that I had just discussed.

Q   In reaching a diagnosis for gender dysphoria, other than physical appearance and information received either directly from the patient or from the patient's prior medical or mental health records, do you typically rely on anything else?

And I would include in that statements from minor patients, parents, or immediate family members.

THE OFFICER:  Did you say statements from minor patients?

MR. LUNSFORD:  Yes.

THE WITNESS:  I -- I believe you're asking do I -- aside from examining the patient, speaking with collaterals when appropriate, including parents or caregivers, reviewing records, or speaking with other clinicians, is that the totality of a typical evaluation?  And to that, I would say yes.

Page 41

BY MR. LUNSFORD:

Q   Okay.  Do the symptoms that you're investigating of gender dysphoria have to persist for a period of time before you're comfortable diagnosing a patient with gender dysphoria?

A   So, the DSM length of time is -- for the diagnosis is six months of symptoms.

But typically, people describe longer periods starting with an awareness of difference and at -- at some point, reaching a level of -- of symptoms that is causing clinical distress or impairing their functioning.

Q   So, do I understand your answer to mean that you're saying you typically see patients who have been experiencing symptoms for longer than six months?

A   Yes.

Q   Have you ever diagnosed a patient with gender dysphoria who had experienced those symptoms for less than six months?

A   I wouldn't give them a gender dysphoria diagnosis because there -- there's a requirement of having six months of symptoms.

And so, you know, that being said, I, you know, may well give someone a diagnosis the first time I see them based on their, you know, report of having

11 (Pages 38 - 41)

Page 42

symptoms going back for longer periods of time.

Q   So, if I hear you correctly, you don't require observing symptoms for six months before diagnosing someone with gender dysphoria if the patient reports symptoms for longer than six months?

A   Yes.

Q   Do you typically require some kind of waiting period after you provide an initial diagnosis of gender dysphoria before referring someone for consideration for hormone therapy?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, that is quite individual.  So, I do see people who are still working on how to address the experiences that they're having.

So -- so it's, you know -- and I -- I certainly see many people who have already gone to a primary care provider who's made that diagnosis or an endocrinologist who's made the diagnosis and already been started on hormones before I see them.  So, it's -- it -- it really depends on the individual circumstance.

BY MR. LUNSFORD:

Q   Are there certain occasions when you will wait, or certain warning signs, or other circumstances that you would recommend a patient wait for hormone therapy?

Page 43

A   If a patient, for example, was having an acute manic episode or was having psychosis of some sort that would impair their ability to give informed consent, I would certainly wait while that was being addressed.

And so -- and then there are people who, for example, are in a marriage, or living with their parents, or having social circumstances where they might need to wait in order to get medical care of some sort.

So, there are individual circumstances where they would not get care right away.

Q   Are you currently providing inpatient psychiatric care?

A   No.

Q   And just so the Court understands what we mean by inpatient, what do you understand that to mean?

A   So, that means in a hospital, medical institutional type setting.

Q   Do you know if FDC provides inpatient psychiatric services?

A   I -- yes.  I mean, I -- I believe that -- that inpatient -- whether or not it's provided by the -- by a prison or -- or they are sent to a contracted facility, that that's part of -- of care that -- that needs to be provided to people incarcerated or not if -- if clinically warranted.

Page 44

Q   I mean, I appreciate your answer, but I asked a different question.  My question was, do you know whether FDC currently provides inpatient psychiatric services to its incarcerated population?

MS. NOWLIN-SOHL:  Objection.  Asked and answered.

THE WITNESS:  I guess the -- the question is the meaning of provides, meaning is that inpatient facility part of the prison system, or is it contracted out to a -- to a medical facility?

I -- I can -- could only, you know, hazard guess that it is provided through facilities that are from the Department of Corrections itself, but there are people who are -- or systems that contract out there -- even prisons that are contracted out to, you know, to other providers.

BY MR. LUNSFORD:

Q   So, let's just make sure we're clear on terminology.  When I ask you if you know something, I want to know if you have knowledge that something is a fact.  When I want you to guess something, I'm going to say, well, what's your estimate, or what's your guess; okay?

I didn't ask you whether your estimate or guess.  I said, do you know for a fact whether FDC,

Page 45

let's use a different word, makes available to its incarcerated population or has access to inpatient psychiatric services?

A   So, I -- I don't mean to split hairs, but I, you know -- I know that prisons do provide that, and so I know it in that sense.  I do not know the -- the details of -- of how Florida provides inpatient care for those who need it.

Q   Do you know how many beds for inpatient psychiatric services are available to the FDC incarcerated population?

A   No.

Q   Do you know where those beds are located?

A   No.

Q   Do you know if any of the named patients -- named plaintiffs have ever received inpatient psychiatric services?

A   No.

Q   You've heard the phrase or term comorbidities; correct?

A   Yes.

Q   What's a comorbidity?

A   A comorbidity is a -- another illness that may need to be addressed along with the -- the focused -- the focus may be the primary focus of care that -- that

12 (Pages 42 - 45)

Page 46

patients often have other conditions that should be taken into consideration.

Q    Are there comorbidities that commonly occur with gender dysphoria?

A    Yes.

Q    Such as?

A    Such as depression, anxiety, suicidal ideation are kind of other -- so, that -- that could be -- so, the conditions that could -- that the person could have in addition might be a major depressive episode, for example.

And which occurs more -- more commonly in a transgender person than in the general population.

Q    Is it known what percentage of the patient population who's been diagnosed with gender dysphoria experiences a comorbid condition as well?

A    The -- the estimates are -- are really variable.  There -- there have been reports of very high rates of comorbid conditions, but I -- I think that -- that those estimates probably depend on the -- the particular study and the population that one -- one is looking at.

Q    Can you give us a flavor of the range of estimates that you've seen?

A    I've seen 20 to 60%.  And -- and then it's

Page 47

also how -- how you're defining comorbidity, if you're defining it as a symptoms of -- increased symptoms of depression or anxiety versus if you're defining it as that they've been diagnosed with a second disorder besides gender dysphoria.

Q    In your current patient population, what percentage have a comorbid diagnosis or condition?

A    So, I see a very particular patient population.  Because I'm a psychiatrist, I most often see people with comorbid conditions.  So, if somebody has gender dysphoria and they are not depressed or anxious, they're much less likely to see me and more likely to see a non-MD provider.

So, the overwhelming share of the patients that I see have a comorbid condition like, you know, that could be in remission but have been diagnosed with major depressive disorder, or panic disorder, or OCD, or another condition where not only is some understanding of gender dysphoria important, but also the ability to treat major depressive disorder, or PTSD, or, you know, that second condition.

Q    Do you know whether any of the named plaintiffs carry any type of comorbidity in terms of diagnosis or condition?

A    I don't.

Page 48

Q    Okay.  When you said you see a very particular patient population, are you simply saying that most of your patients experience some type of comorbid condition?

A    Yes.  So, I -- I -- in addition to seeing patients who contact me directly who may or may not have another condition, I often will see a patient who is already seeing a psychotherapist, but the psychotherapist suspects that they might benefit from an evaluation for medication to treat the comorbid condition.

So, that's part of my practice as well.  And so, somebody may already be seeing a therapist for gender dysphoria, and beyond hormones, and -- but I would see -- might see them to evaluate for a mood disorder, or an anxiety disorder, or some other psychiatric condition.

Q    Okay.  I don't want to know the content of any discussions, but did you meet with Plaintiff's counsel before today's deposition?

A    Yes.

Q    How many times?

A    I met to -- I think we had three relatively brief conversations about the deposition specifically.  And -- and then in -- in the past we had had a couple of

Page 49

meetings just talking about the case from the very start, agreeing to be an expert, and -- and then about the desire for declaration.  And then I guess again for -- for the rebuttal.

Q    Particularly as it relates to the deposition, you said you met with Plaintiff's counsel three times, I believe?

A    Yes.

Q    How long were those meetings?

A    They were a half hour to an hour.

Q    And you've been retained in this case by the ACLU; correct?

A    Yes.

Q    Have you previously been retained by ACLU to serve as an expert witness?

A    Yes.

Q    How many times?

A    I have -- I would say about a half dozen, maybe -- maybe more because there are cases that proceeded, you know, to different degrees, but could be six to eight.

Q    Have you worked with the attorneys in this case previously?

A    Yes.

Q    In which cases?

13 (Pages 46 - 49)

Page 50

A    So, I worked with Leslie Cooper and Brandt in -- in Arkansas. I -- I have worked with ACLU on Kingdom vs. Trump with Board of Prisons -- Federal Board of Prisons. I've worked with ACLU on PFLAG vs. Trump. I worked with ACLU briefly on a case in Kentucky.

I -- let's see. I've worked with them on -- with ACLU but not with these lawyers in one or two other cases that I can think of in Indiana. The state ban on gender affirming care in Indiana was with other lawyers from ACLU.

Q    Has your hourly rate been the same for all these cases?

A    For all the ACLU cases, yes.

Q    And what is your hourly rate for ACLU?

A    $400.

Q    Have you worked for other advocacy organizations other than ACLU?

A    Yes.

Q    What other organizations?

A    I have worked for Lambda Legal, for NCLR, for Transgender Law Center, and Disability Rights Washington.

Q    Is that Washington State?

A    Yes.

Q    We're going to come back to the specific

Page 51

cases, but for the other expert retentions for your other -- these other advocacy organizations, what's your hourly rate been?

A    So, it had -- it's been $400 for those.

Q    When was your first case for one of these advocacy organizations? What year?

A    So, I have to think about that. I did some work, but it was with Department of State Hospitals, but it was kind of under agreement between them and Transgender Law Center, in 2008.

Disability Rights Washington and ACLU of Washington were 2019, I believe, at least. Yeah, it may have -- those cases may have started before then. And then -- and then Lambda Legal was 2020 or 2021.

And then somewhere around 2021 was maybe ACLU and Brandt. And so -- so the -- the first ACLU case may have been ACLU -- ACLU of Washington, in 2019.

Q    Has there been a period of time since 2019 when you have not been under an expert retention with some type of advocacy organization?

A    I was not doing that much of the work -- of that work until around 2020 just 'cause in June of 2020, I retired from UCSF, so I had a little bit more time to do it that these cases are -- can be disruptive essentially if one already has an extremely busy

Page 52

schedule.

And so, starting in 2020, I started having more flexibility with my schedule to accommodate being able to do some of these cases.

Q    So, since 2020, do you have any estimate of how many hours you've spent doing expert testimony work year to year?

A    I -- I really can't give an -- I -- I don't know. I don't have an estimate.

Q    Do you have any judgment as to the most number of hours you've devoted in a single year to expert testimony?

A    No.

Q    Would it be more than 400 in a given year?

A    No.

Q    Would it be more than 300?

A    Let's see. I might estimate 200 in a given year, but it -- I -- I haven't really kind of thought about that.

Q    Do you know how many hours you've devoted to this case?

A    I haven't billed yet, but it might be 20.

Q    Have you invoiced the ACLU for all of the hours that you've worked on their cases?

A    No.

Page 53

Q    Why not?

A    I got a little behind. I had a life- threatening illness and was hospitalized a couple times.

Q    Sorry to hear that.

A    And so, I have to catch up with that. And I have -- yeah, I have billing. I've prioritized, you know, continuing to take care of my patients, but I have some billing I need to catch up with.

Q    Do you apply any type of discount to your invoices for the ACLU?

A    I do have a -- a lower rate -- kind of nonprofit rate of $400, and I charge 600 for -- for other -- for other cases. And so, but I -- I've been charging $400, I think, as far back as I can recall for ACLU and -- and other non-profit public interests.

THE OFFICER: Did you say republic interests?

THE WITNESS: Non -- nonprofit or public interest law groups.

BY MR. LUNSFORD:

Q    Who have you charged $600 an hour for expert testimony?

A    I have charged $600 for -- for cases that are malpractice defense and for cases that are -- mostly been for malpractice cases and -- and cases where

14 (Pages 50 - 53)

Page 54

someone is -- have privately contracted suits for damages.

It's only been a small amount of work that I've done on those, but I have done several malpractice cases, charging 600 an hour.

Q   Do you currently have any malpractice cases in which you're -- you've been proposed as an expert witness?

A   Yes.

Q   How many?

A   So, in terms of the ones that are active now, they're -- right now I have -- I have two active cases. I have -- there were at least a couple that were dismissed.

And there are some that have -- that have contacted me, but presumably have been dismissed because then I have not heard, you know -- they would contact me if it were proceeding.

Q   On the malpractice cases that you've been retained, have you been retained by the defense or the plaintiffs?

A   So, those have been by the -- by the defense.

Q   And you said you currently have two active cases in the malpractice area?

A   Yes, two.  Two that are -- are active.

Page 55

Q   How many malpractice defense cases have you taken on in the last five years?

A   I have probably agreed to do eight or ten cases.

Q   Of those eight to ten cases, do any of those involve patients who've been diagnosed with gender dysphoria?

A   Yes.

Q   And do the allegations of malpractice fall into a particular category where a particular type of injury occurred, whether it be a suicide, or self-harm, or some other type of injury?

A   The most -- the typical scenario has been somebody who detransitioned and then we're suing all of their doctors, medical and mental health providers for letting them transition in the first place.

Q   Of the eight to ten cases you're referencing with individuals who've detransitioned, how many of those individuals were juveniles?

A   So, I haven't -- I was answering in terms of how many cases I've agreed to do.  There were some that I agreed to do that haven't gone forward.

In terms of the cases that I have been actively involved with, there were at least three that were juveniles when they started care.  One young adult

Page 56

that I can think of.

Q   When you say young adult, can you give us some kind of perspective on age of that individual?

A   Maybe 19.

Q   And so, would it be fair to say that all of your medical malpractice cases involved you offering expert testimony on behalf of a physician who's prescribed some type of treatment for transgender individuals?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  For a physician or a therapist who has seen somebody who went on to get medical care.

BY MR. LUNSFORD:

Q   Have you ever served as a defense witness in a case in which a -- a physician or provider of some kind refused some form of treatment for an individual who identifies as transgender?

A   Can you repeat the question?

Q   Have you ever defended a physician or other provider of some kind who is being sued because they refused to provide some type of care for a transgender individual?

MS. NOWLIN-SOHL:  Object to form?

THE WITNESS:  I have -- I've never been

Page 57

a -- an expert in a malpractice case where care -- that was associated with care being refused.

BY MR. LUNSFORD:

Q   You also offered another category of cases in which you've served as an expert charging $600 an hour, and that's in damages cases?

A   So, there have been a couple of cases I agreed to do, which people have been -- so, a couple cases of employment discrimination and a couple cases where -- involving a transgender person who's been injured while incarcerated.

And so, talking about all cases that where I've had involvement, whether or not they've proceeded to deposition or to -- to trial.

Q   What jurisdiction was involved for the transgender individual who was injured while incarcerated?

A   So, one case was in New York State, and one case was in Maryland.

Q   You know the names of those cases?

A   I can't think of it off the top of my head.

Q   How was the incarcerated person in New York State injured?

A   So, they were physically beaten by a corrections officer and suffered physical injuries as a

15 (Pages 54 - 57)

Page 58

result.

Q   Okay.  Is that case still pending?

A   No.

Q   And you testified for the incarcerated individual?

A   It never -- it didn't go to trial.  It was settled.

Q   Did you issue a report in the New York State case?

A   Yes, I believe so.  I'm trying to think.  I think so.

Q   Do you know what year that case was pending?

A   That would've been at least a couple years ago.

Q   Okay.  What were the facts under the Maryland case?

A   The Maryland case -- I'm trying to remember also.  Also, a case that was settled.  I can't remember if I did a declaration, but it was also -- I -- I -- as I recall -- I was trying to remember -- someone who was injured -- a transgender person who was injured by -- by prison or jail personnel.

Q   So, in -- in the Maryland case, did that involve an injury sustained by an incarcerated person that was undertaken by a member of the prison staff?

Page 59

A   As I recall, the New York case did.  I'm -- I'm -- I have to jog my memory on -- on how the injury happened in the Maryland case.

Q   Do you remember the name of the Maryland case?

A   No.

Q   And when was the Maryland case?

A   That was also -- it was also at least a couple years ago.

Q   What was your opinion in summary in the Maryland case?

A   I don't -- I don't think in that case I had to provide an opinion.  I don't think it went that far.  I think it was settled, and at least that's my recollection.

I think I -- I may have met remotely with the incarcerated person and -- and then the case was -- was settled before, you know, it proceeded.

Q   Let's just talk about this year since we're at the end of 2025.  Do you have any judgment as to the percentage of your personal income derived from expert testimony?

A   I would say 20%.

Q   Okay.  And do you have an estimate as to the amount of money that is?

A   And that might be -- well, that would be, at

Page 60

most, I would say 20%, which would be about $80,000.  That would be probably in the year where I've done the most.

Q   What about 2024?  What percentage of your income came from expert services?

A   2024?  It -- I don't think it was more -- I think it was less than 80,000, but I -- I don't -- I can't say exactly how much that was.

Q   So, would the 80 -- other 80% of your income be primarily derived from your psychiatric practice or retirement savings?

A   So, it would be -- yeah, my other income is my private practice and my pension.

Q   Okay.  I'm not worried about the pension.  Let's talk about your private practice.  What percentage of your patients carry a diagnosis of gender dysphoria?

A   I would say two thirds.

Q   Okay.  And so, roughly -- I'm trying to do the math.  What percentage -- that two thirds of care that if we take your overall income off of your private practice related to care for transgender individuals or individuals with a diagnosis of gender dysphoria, what percentage of your overall annual income would that be on average for the last five years?

MS. NOWLIN-SOHL:  Object to form.

Page 61

THE WITNESS:  Can you repeat the question?

BY MR. LUNSFORD:

Q   Well, what I'm trying to get to is, you've testified that part of your income is derived from your psychiatric practice.

A   Yes.

Q   Two thirds of that practice is devoted to care for individuals with gender dysphoria.  Am I right so far?

A   Yes.

Q   And so, my question is, if we carved out that two thirds of your practice, what percentage of your income on an annual basis is that?

A   If you were saying what percentage of my income are patients who are not transgender, or as a percentage of my total clinical practice?

(Nonconfidential portion of transcript ends.)

//
//
//
//
//
//
//

Veritext Legal Solutions

877-373-3660                                                                                    800.808.4958

Page 62

(Confidential portion of transcript begins.)



(Confidential portion of transcript ends.)

//
//
//
//
//
//
//

Page 63

(Nonconfidential portion of transcript begins.)

BY MR. LUNSFORD:

Q   Okay.  And so, about two thirds of that income would you say is related to the care you've provided to transgender individuals?

A   I -- I -- again, just a -- a guess.  I don't really distinguish.  I do very similar care for people, whether they're cisgender or transgender people, you know, are coming for treatment for a psychiatric condition and -- and -- but -- but a large share of my patients are -- are transgender.

And so, I -- I could estimate that that could be two thirds of my patients.

Q   Before you retired, what percentage of your patients were transgender?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I would say it was probably close to half and half.  So, I was also doing -- I -- I was providing care in the HIV clinic at San Francisco General for many, many years.  And so, that was a good chunk.

And so, I -- I had -- I was psychiatrist for two transgender clinics; one for youth, one for adults.  And then I had a faculty practice, which was

Page 64

kind of like a private practice that had a mix, but mostly trans people.

BY MR. LUNSFORD:

Q   Okay.  So, it'd be fair to say while you were in your prior full-time position with the university, about 50% of your patients were transgender?

A   Yeah, I would say that it -- by the end of that time in the, you know -- I was there for 29 years.  So, in the earlier part it was a smaller percentage than that because I was doing more for several years.  I was not only doing the HIV clinic, but I was doing consultation liaison, psychiatry --

THE OFFICER:  Sorry.  Consultation liason?

THE WITNESS:  Consultation liaison, psychiatry was -- which was in -- in a medical hospital, consulting on psychiatric illness.  And then I stopped doing the consultation liaison, had a research grant, was doing some research into depression treatment.

And -- and then -- and then I had increasing amounts over that time of -- of transgender patients from especially -- well, I saw trans patients since the start of my work for UCSF in the 1990s.  But 2003 became psychiatrist for the Dimensions Clinic.

THE OFFICER:  For the Dimensions Clinic?

Page 65

THE WITNESS:  Dimensions Clinic, which was a -- a clinic for transgender youth.  So, gradually there were things added -- added on.  And then for a program for transgender care of adults at UCSF.  So, the percentage varied over the course of my career.

MS. NOWLIN-SOHL:  When we're done with this line of questioning, does it make sense to take a break?

MR. LUNSFORD:  It does.  It makes very much good sense, so I appreciate that.  Let me just cover a couple things.

BY MR. LUNSFORD:

Q   Are you certified by WPATH?

A   I don't think I'm officially certified by WPATH, but I -- I was the primary author of the certification exam, and I helped create the certification program.

And so, with that, I was kind of, I guess, could -- could have been certified or eligible to be certified, but I never went through and whatever, you know.  I don't call myself a certified person.

I was active in the creation of that between 2014 and 2018.  But I left the -- I finished my time on the WPATH board in 2018, and at that time I left any involvement with the Global Education Initiative that

17 (Pages 62 - 65)

Case 4:24-cv-00434-AW-MAF   Document 186-1   Filed 06/09/26   Page 19 of 151

Page 66

did certification.

Q  So, just to be clear, you've never sat for the WPATH certification exam; have you?

A  No.  I mean, it -- it would've been easy because I wrote it, but --

Q  I mean, I just -- I'm trying to move on if the answer is no; right?

A  Well, it's a little complicated because I was assured that I was -- that I didn't have to take the exam, that I was certified.  But then there's maintenance of certification, which I've never done.

So, I would say the answer of am I WPATH certified, no, I guess.  But have I ever been certified?  I was kind of assured that I was without needing to kind of being grandfathered out of having to do the mentoring, without having to take the exam because I was kind of the primary author of it and it would've been a little superfluous.

And then it never really mattered to me to be WPATH certified to be able to, like, maintain it, which you have to do with the organization by, you know, documenting that you're continuing to go to -- to sessions.

So, if I -- if I wanted to be certified, I could, but I have not.  That's not something that has

Page 67

mattered to me.

Q  Is there one WPATH certification exam?

A  So, there -- back -- I have not been involved with it since 2018, but we had one for -- I believe we had one for mental health and one for medical.  Back then there -- there was kind of a separate certification -- kind of a parallel certification for medical providers and for mental health providers.

Q  Did an individual have to be licensed in a jurisdiction to sit for the exam?

A  Yes.

Q  And what was -- was there a passage rate assigned to the exam in order to receive a certification?

A  You had to pass the exam.  There was a set of criteria for certification.  You had to pass the exam.  You had to attend a certain amount of continuing education credits in -- in kind of a breadth of -- of topics.

And then there was a mentoring program where you met with kind of like a supervisor, but they weren't directly supervising your clinical cases.  So, they were called mentors.  Or you met with a mentor, discussed your caseload, and got supervision about your caseload.

And then that mentor would have to, I think,

Page 68

you know, approve that you -- that you could be certified.

Q  What's the passage rate for the exam, or percentage?

A  I -- I don't know.

Q  And can a licensed physician provide care to a transgender individual without being certified by WPATH?

A  Yes.

Q  Did any government organization sanction the certification process?

A  No.

Q  Did any government or licensing authority ask WPATH to develop standards that would be required to -- for anyone practicing in that area?

A  It wasn't a direct request, I think, of any governmental organization.  There was some demand for somebody to do it, and I think WPATH decided to step into that space.

But, you know, other organizations could offer certification as they do in, you know, the -- the Sexology Association has a certification.  You know, there are other, you know -- obviously, medical specialties have certification.

But people in those medical specialties often practice without those certifications.  So, it's -- it's

Page 69

kind of an -- an added qualification, but it's typically not a requirement to do the work beyond the basic licensing that you have to have in your -- in your discipline.

Q  Are you aware of any studies that have demonstrated that a practitioner who receives WPATH certification, that that certification has any positive or negative impact on their practice or services provided?

A  No.

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q  Are you aware that there's been a decline in the individuals seeking certification?

A  I'm not aware of -- I haven't been really involved in the WPATH leadership since 2018, so I'm not aware of WPATH numbers.

Q  Okay.  Last question then we'll take a break.  Are you aware that there has been a decline in WPATH membership between January of '23 and January of '24?

A  I'm -- I'm not aware of the WPATH membership numbers since, you know, years ago.

Q  Well, do you know of any reason why there would be a 60% decline in global membership in WPATH

18 (Pages 66 - 69)

Veritext Legal Solutions

877-373-3660                                           800.808.4958

Page 70

between January of '23 and January of '24?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: Well, from when I was involved with WPATH, there was substantial fluctuation in membership. People would join before going to a conference or before taking training courses.

Because like with any organization, there are discounted rates for members, and so there would be -- there could be often large bumps in membership. And then the January numbers are always a little tricky because everyone who hasn't renewed -- and this is from years ago when I was on the board.

Anyone who hadn't renewed as of January 1st was dropped from membership. But then some of those people would rejoin over the course of the year, especially --

THE OFFICER: Did you say would or wouldn't?

THE WITNESS: Would, yeah. So, people would be dropped from membership, and then they would rejoin before going to a conference or before taking some training courses.

And so, there -- there would be these large fluctuations in -- in membership because people were, you know, using the organization for services

Page 71

really that were being provided.

THE OFFICER: I'm sorry. I can't hear when the microphones are being touched.

THE WITNESS: Oh, I'm sorry. So, people were -- people use the organization. It's a voluntary organization that people join often because they want to attend the conference or they want to attend trainings that provide continuing education, which is required in these professional fields.

And so, WPATH, like all other medical and health profession organizations, provide continuing education programs. And people would join the organization in order to take advantage of those programs because often there was a discounted rate.

And so, that's when people would join. And then -- and then membership would -- would tail off. And so -- so, I can't -- I can't speak to the current numbers.

But -- but there -- there would be these very big fluctuations that often could be explained by what -- what programs people were accessing and what time of year those were being given.

MR. LUNSFORD: Let's take a break now.

THE VIDEOGRAPHER: 10:48 a.m., we're off the record.

Page 72

(Off the record.)

THE VIDEOGRAPHER: Time is 10:58 a.m. We're back on the record.

BY MR. LUNSFORD:

Q   We were talking about WPATH membership when we went off the record. And I wanted to ask you, do you know how large WPATH's membership is currently?

A   I remember at some point it had -- was approaching 3,000, but I don't know what it -- what it is currently.

Q   Do you know of the 3,000, how many of those individuals are members that reside in the United States?

THE OFFICER: Sorry. And are you saying three or 30,000?

MR. LUNSFORD: Three thousand.

THE WITNESS: When -- when I was on the board, the majority of WPATH members were in the United States.

BY MR. LUNSFORD:

Q   Of the American membership of WPATH, do you know what percentage of those are licensed clinicians?

A   From -- at least from -- from my time on the board, the vast majority of WPATH members were -- were licensed clinicians, but certainly a smaller percentage

Page 73

were physicians. There were many psychotherapists, psychologists, LCSWs, LMFTs, who were WPATH members.

Q   What's an LMFT?

A   Licensed Marriage and Family Therapist.

Q   Okay. What were the other acronyms you provided?

A   Oh, LCSW is licensed clinical social worker. And of course there are RNs and nurse practitioners who are non-physician members. And then the physicians who I think were -- are a minority of WPATH members.

Q   Can anyone be a member of WPATH?

A   To be -- again, this is going back to my time on the board. There were -- was a full membership and then there was an associate membership or a supporting membership of some sort where -- that anyone could be a supporting or associate member.

But to be a full member, you would have to be a health practitioner or -- or academic in -- in transgender health. And -- and then there -- there were student members also.

And so, I -- I can recall because there was a time when I was on the board when I believe student members could only vote for a student representative. And that may have changed.

Q   Do you know where WPATH receives its funding

19 (Pages 70 - 73)

Page 74

from?

A   The vast -- again, from when I was on the board, the overwhelming funding from WPATH is member dues and from people paying to go to conferences and trainings.

Q   Does WPATH receive contributions from private corporations or private individuals separate from memberships?

A   Yes.  When I was on the board, that was a very small portion.  Sometimes there was money that would be -- that -- that they could get a donation for a specific project.

For example, translating the WPATH standards of care into another language; sometimes that would be funded by someone.  But the vast majority was from -- was from membership dues.

I -- I know when WPATH hired Johns Hopkins to do systematic reviews and provide assistance on the development of the practice guidelines of Standards of Care 8 --

THE OFFICER:  Sorry.  Practice guidelines on what?

THE WITNESS:  Of WPATH Standards of Care 8.  When that happened, that -- the reason I can remember from back then was that was -- what the payment

Page 75

for that was most of the membership dues for -- for a year.

So, it was not a wealthy organization. It was an organization that was funded by its individual members and -- and what people paid for for trainings in symposia.  And -- and there -- there was very little that came from corporations or outside donors.

BY MR. LUNSFORD:

Q   Has the ACLU contributed to WPATH?

A   Not as far as I'm aware.

Q   Have you contributed to the ACLU?

A   I have not -- not -- never given money to the ACLU.

Q   Okay.  Were you ever paid by WPATH?

A   No.  There was one training I did in GI where there was an organization -- a hospital group or medical group that gave some honoraria, small, you know -- it may have been a few hundred dollars.  I think that may have happened once.

The -- otherwise when I was training clinicians for WPATH, WPATH would reimburse travel expenses, but that was it.

All of the time that we spent for WPATH was donated time, including when I was on the board, my board work, and for standards of care.  That was all

Page 76

donated time.

Q   Do you know or have an estimate of how many hours you've donated to WPATH of your personal time?

A   A lot.  Not so much in -- since 2018, but let's say from the 2000s to 2018, you know, hundreds and hundreds and hundreds of hours donated to WPATH with -- without compensation.

Q   Would WPATH reimburse you for travel expenses?

A   For -- for travel expenses to -- when we would do the trainings, but we would pay even as board members.  We, you know -- we paid to go to the conferences and things like that.

The only expenses that I can recall being paid were when we were trainers at trainings that they were charging money for, that they would pay for our hotel and -- and airfare.

Q   Okay.  Any judgment as to how many thousands of dollars you've been reimbursed for travel or lodging expenses by WPATH?

A   Hard to say.  I mean, it would be a few hundred dollars at a time.  Basically, an airfare, and sometimes WPATH would just be directly paying for a block of rooms.  And sometimes we'd book the hotel and they would reimburse.

But all of that was between 2014 and 2018, so

Page 77

it was a long time ago.

Q   Where was the last training you occurred in terms of location?

A   The last -- I think the last two trainings were Portland and Palm Springs, in 2018.  Yeah, the last two Global Education Initiative trainings I did were in 2018 and -- and those were the two places I went for -- for those.

Q   Did the guideline committee that was in charge of the Standards of Care 8 ever meet in person?

A   We met in person in -- at the 2018 WPATH meeting in Buenos Aires and which I was not compensated for.  I paid for my trip to Buenos Aires and to attend the conference.

But during the conference, we met.  We were supposed to meet again in 2020 'cause originally the Standards of Care 8 was supposed to come out in 2020 with, as I recall, the original kind of timeline.

And so, we were supposed to meet in Hong Kong in 2020, and for obvious reasons that meeting didn't happen.  And that was probably like -- I don't know if that was like June of 2020 or something, and --

Q   So, there was only one in-person meeting as well?

A   There was only one in-person meeting and --

20 (Pages 74 - 77)

Page 78

right.  And then that second one didn't happen, and then the release of standards of care was pushed back with -- with the pandemic.

And then by the time we met again as an organization, 'cause WPATH as a whole met only every two years, it was right at the time that Standards of Care 8 was released in 2022.

Q   What month was the Standards of Care 8 released?

A   The conference was, I believe, September of 2022.

Q   Okay.  Would your university reimburse you for traveling to WPATH meetings?

A   No.  I did -- my university, I had -- money from my faculty practice went into a fund where I could designate a portion of that fund for educational expenses.

And so, for my continuing medical education expenses, which could be at American Psychiatric Association or could be at WPATH -- I could get reimbursed from money I made essentially, but it would be pre-tax money because it was out of this educational fund.

Q   So, do you have any judgment about how much money you've spent out of your own pocket to go to WPATH

Page 79

conferences or meetings?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  Well, quite a bit because the -- well, the first time I went to a WPATH meeting was 2001.  And then 2009 was Oslo.  And 2011 was Atlanta.  2014 was Bangkok.  2016 was Amsterdam.  2018 was Buenos Aires.

And so, you know, the -- there was hotel and airfare to each of those that I would pay out of my -- typically out of educational money that had been money that I had earned, but had put in -- into a university education fund to pay for CME.

BY MR. LUNSFORD:

Q   So, roughly thousands of dollars of travel?

A   Yes.

Q   Do you know the original name of WPATH?

A   Yes.

Q   What is it?

A   The Harry Benjamin International Gender Dysphoria Association.

Q   Do you know who Harry Benjamin was?

A   Yes.

Q   Who was Harry Benjamin?

A   He was a physician who did transgender care in the 1940s to 60s.  And -- and originally the

Page 80

organization was named after him and -- and then later the organization decided to -- to change its name to WPATH.

Q   Do you know how much money was given by the original founders of what is now WPATH?

A   No.

Q   Okay.  Did you ever visit New York State Prison while you were retained on those -- that damages case?

A   No.

Q   Did you ever visit a Maryland State prison?

A   No.

Q   Have you ever visited any prisons in the state of Florida?

A   Not in Florida, no.

Q   Okay.  And I may have asked this, and I apologize.  Have you ever met with any of the named plaintiffs?

A   No.

Q   Were you ever asked to meet with any of the named plaintiffs?

A   No.

Q   Have you ever worked in any prison or jail?

A   I have worked as a consultant to -- to Department of State Hospitals, which is -- which are

Page 81

state forensic hospitals for people found not guilty by reason of insanity.

I have consulted with the California Department of Corrections and Rehabilitation, the California state prisons.  I've consulted -- I'm still a consultant for the Alameda -- Alameda County jail system.

And I have -- over the years working for UCSF, I have, in the course of my work, spent time with patients in consultation at -- at -- in the San Francisco jails.

Q   Okay.  Do you know the difference between a jail and a prison?

A   Yes.

Q   What's the difference?

A   So, in my understanding, you have county jails, which are mostly for shorter term incarceration like people awaiting trial or people just have to arrest.  And then you have state prisons where people, once convicted, might go to serve their time.

Q   Do you know if that's true in Florida?

A   I don't know how Florida works.

Q   Do you know if FDC runs any jails?

A   I -- I don't know.

Q   Okay.  Have you actually been inside any of

21 (Pages 78 - 81)

Veritext Legal Solutions
877-373-3660                                          800.808.4958

Page 82

the California Department of Corrections and Rehabilitation facilities?

A   I -- no. It's all been remote. Just remote. I'm sorry.

THE OFFICER: I'm sorry. Can you repeat the answer?

THE WITNESS: Oh, just I've only -- all of my work with them has been remote.

BY MR. LUNSFORD:

Q   So, the answer is no, you've never been --

A   No. Inside one, no.

Q   Okay. Have you ever been inside the Alameda County Jail?

A   No.

Q   Have you ever been inside the San Francisco jail?

A   Yes.

Q   When was the last time?

A   Several years ago.

Q   Can you give me an estimate?

A   2015.

Q   Okay. Do you know the reasons why any of the named plaintiffs are incarcerated?

A   No.

Q   Do you know the length of sentence that any of

Page 83

the named plaintiffs are holding?

A   No.

Q   Do you know -- well, you've never worked as a corrections officer; have you?

A   No.

Q   You've never worked as a supervisor inside of a prison; have you?

A   No.

Q   Have you reviewed any of the security protocols enacted by the Florida Department of Corrections?

A   No.

Q   You're not an expert in management of a prison population; are you?

A   I'm not. I mean, I have been an expert on the management of -- of gender dysphoria in incarcerated people, you know. I certainly have been, you know, hired as such, but not in general -- not in the general terms outside of the care of -- of transgender inmates.

Q   Okay. Well, I mean, let me just run through some things. Are you familiar with use of force standards inside of a prison?

THE OFFICER: Sorry. With what?

MR. LUNSFORD: Use of force standards inside of prison.

Page 84

THE OFFICER: Sorry. Force?

BY MR. LUNSFORD:

Q   Use of force standards inside of prison?

A   No.

Q   Have you ever trained any correctional officers on use of force?

A   No.

Q   Are you offering an opinion in this case that use of force standards for transgender individuals should be different than non -- than cisgender individuals?

A   No.

Q   Have you ever reviewed contraband policies for any system?

A   No.

Q   Do you know what contraband is?

A   I have an understanding of contraband as possession of items that are not -- that an inmate's not allowed to -- to possess.

Q   Do you know what's defined as contraband inside the Florida Department of Corrections?

A   No.

Q   Do you think that the definitions of contraband for transgender versus non-transgender individuals should be the same?

Page 85

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: Well, I -- I think that you can have items that are accommodations for a transgender patient that might otherwise not be permitted except as an accommodation to a transgender patient.

BY MR. LUNSFORD:

Q   Such as?

A   For example -- I mean, not patient. Inmate. A transgender inmate might have an accommodation of a chest binder, for example, for --

THE OFFICER: Chest binder?

THE WITNESS: Chest binder, and an accommodation because that's a treatment for gender dysphoria. But other people might not be allowed to have that because of safety concerns or other concerns.

And so, there might be items that are only allowed, you know, because the prison is making an accommodation because they're part of the treatment of that person's gender dysphoria.

BY MR. LUNSFORD:

Q   Do you know the security threats inside a prison if an inmate had possession of a nail file?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: No.

//

22 (Pages 82 - 85)

Page 86

BY MR. LUNSFORD:

Q   Should an inmate receive a nail file as an accommodation even if it poses a security threat, in your view?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I think that there would need to be an effort to -- to make the accommodations also taking into account, you know, the safety of the, you know -- the -- the population -- the prison population.

BY MR. LUNSFORD:

Q   What do you mean there ought to be consideration?  I'm not following you.

MS. NOWLIN-SOHL:  Same objection.

THE WITNESS:  I'm not saying that -- that -- for example, if there was a nail file that also could be used in some other manner that was posing a threat, then -- but it was determined that -- that the person would benefit from use of that item, that they might find an -- an accommodation that does not pose that threat.

And I -- I don't know if I can come up with what the detail of that would be, but the point is that I understand that there, you know -- there are safety concerns that -- that might need to be addressed.

Page 87

BY MR. LUNSFORD:

Q   Have you ever been asked to evaluate the security threats posed by social accommodations that might be provided to a transgender individual?

A   No.

Q   Are you qualified to evaluate security threats that might be posed by social accommodations?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I'm -- I'm qualified to -- to talk about the -- or to consult on accommodations that -- that should be provided for the treatment of someone's gender dysphoria, but also recognition that there, you know -- there -- there may need to be discussion about -- about providing -- safely providing accommodations for people.

BY MR. LUNSFORD:

Q   You would agree that most of the social accommodations that transgender individuals seek are intended to change the individual's appearance?

A   Yes.

Q   What are the security risks inside of a prison if an inmate has the ability to change their appearance?

MS. NOWLIN-SOHL:  Objection.

THE WITNESS:  So, transgender people are at increased risk in prison settings, but I think that

Page 88

that risk is not something that can be eliminated by -- by not providing an -- an accommodation for -- for that person.

For example, a -- a feminine inmate assigned male at birth who is not transgender and is not getting any accommodations might be at increased risk for sexual assault.

That -- that there could be an increased risk of assault, whether from other inmates or from staff for people who are gender nonconforming as well as transgender people.

So -- so, while it is true that it may be easier to identify someone's difference with the accommodations, it doesn't seem to me to be a reason not to provide those accommodations.

I think the underlying principle is that all incarcerated people should -- that their safety should be provided for.

And if there needs to be a means to -- of whether it's better security, or training, or whatever the -- the identified issue is, that should, you know -- that needs to be done as opposed to saying that -- that transgender people must hide that they're transgender through their period of incarceration for their own safety.

Page 89

BY MR. LUNSFORD:

Q   Let's go back to several different statements in there.  First of all, you said that transgender individuals are at an increased risk of violence.

A   Yes.

Q   Are there other -- other than violence, are there other risks that are posed to transgender individuals simply because they're incarcerated, other than simply violence?  And that would include physical violence and sexual violence in that.

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, right, they're at risk for violence.  They may have increased suicide risk because just transgender folks as a whole have higher suicide risks in the general population.

There -- so, it -- it's not -- I wouldn't say violence is the only risk, but I would say that's the -- the most pressing risk, physical and sexual violence.  That is increased for a transgender inmate versus a cisgender one.

BY MR. LUNSFORD:

Q   So, I've got two risks.  You mentioned violence and you mentioned suicide.  I assume you would also include self-harm in suicide.

A   Self harm, yes.

23 (Pages 86 - 89)

Page 90

THE OFFICER: I'm sorry. There's some crosstalk. Can you repeat the question and then the answer?

BY MR. LUNSFORD:

Q So, I've got two things. I've got violence and suicide risk as risks you've mentioned; correct?

MS. NOWLIN-SOHL: Object.

BY MR. LUNSFORD:

Q You have to answer out loud.

A Yes.

Q Okay. I assume you would also include an increased risk of self-harm?

A Yes.

Q Are there any other risks that you've identified that transgender individuals experience in an incarcerated setting?

A They may have -- they may have more risk, just because they do generally, of mood and anxiety disorders, symptoms related to PTSD or past trauma. So, the -- a set of psychiatric symptoms that transgender people generally have in greater share than the general population.

Q Any other risks that you claim disproportionately affect transgender individuals in an incarcerated setting?

Page 91

A Not that I can think of.

Q Okay. Are you aware of any studies or data that shows that transgender individuals are at an increased risk of either physical violence or sexual violence inside a prison?

A I have seen publications showing higher rates of physical and sexual violence for transgender people.

Q Can you name one?

A I can't name the authors of them.

Q Did you cite those in your report?

A I don't believe I did.

Q Okay. Are you aware of any data or studies that confirmed an increased risk in suicidality or self-harm among transgender incarcerated individuals versus non-transgender individuals?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: I -- I can't -- I can't name a -- a study for that.

BY MR. LUNSFORD:

Q Are you aware of any studies or data that has shown an increased risk among the transgender incarcerated population for mood, or anxiety symptoms, or other related distress increases?

A No. My assertion of that was based on the data for the general population.

Page 92

Q What do you mean?

A So, for example, there are large health surveys, for example, from -- one done by the state of California where they do ask gender identity, and they -- they ask in these health surveys, among other questions, about mental health measures.

And they have found substantially higher rates of depression, anxiety, and suicide -- suicidality in transgender people compared to the general population.

Q So, you're assuming that that just translates into the incarcerated population as well?

A Yes.

Q Okay. First of all, do you know anything about the rates of physical violence inside the Florida prison system?

A No.

Q Do you know anything about the rates of sexual violence inside the Florida prison system?

A No.

Q Do you know anything about the rates of suicidality within the Florida prison system?

A No.

Q Do you know anything about the rates of self-harm within the Florida prison system?

A No.

Page 93

Q Do you know anything about the rate or frequency of mood or anxiety increases for those incarcerated in Florida?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: No.

BY MR. LUNSFORD:

Q Do you know if any of the named plaintiffs have experienced physical violence at the hands of either prison staff or other incarcerated individuals in Florida?

A No.

Q Do you know if any of the named plaintiffs have had any experience of sexual abuse or sexual violence while they've been incarcerated?

A No.

Q Do you know if any of the named plaintiffs have expressed any symptoms of suicidality while they've been incarcerated?

A No.

Q Do you know if any of the named plaintiffs have had a decrease in suicidality since they've been incarcerated?

A No.

Q Do you know if any of the named plaintiffs experienced self-harm before their incarceration?

24 (Pages 90 - 93)

Page 94

A   No.

Q   Do you know if any of the named plaintiffs have engaged in self-harm while they've been incarcerated?

A   No.

Q   Do you know if any of the named plaintiffs have reported an increase in their depression or -- or a decrease in their overall mood or anxiety since their incarceration?

A   No.

Q   Does simply the fact that an individual is --

THE OFFICER:  Sorry.  Can you repeat?

BY MR. LUNSFORD:

Q   Does simply the fact that an individual is incarcerated cause anxiety?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  It -- it can.

BY MR. LUNSFORD:

Q   Do you know if there have been any studies that have attempted to apportion the amount of anxiety caused by the sheer fact of incarceration versus one's gender dysphoria diagnosis?

A   No.

Q   Do you know of any studies that indicate whether incarceration exacerbates one's gender

Page 95

dysphoria?

A   No.

Q   So, we've talked about social accommodations, and let me ask this.  Do you know what measures the Florida prison system takes when it receives a new inmate to document that individual's appearance?

A   No.

Q   Were you aware that -- do you know why the Florida Department of Corrections take such efforts to document an individual's appearance at the time of intake?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   Do you understand why changing one's appearance poses a security threat in terms of escapes?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  Are you saying that, do I know whether any Florida inmates have used posing as a different gender as way of escaping prison?

BY MR. LUNSFORD:

Q   I'm saying, do you know why a change in appearance poses an escape risk to a prison?

MS. NOWLIN-SOHL:  Same objection.

THE WITNESS:  No.

Page 96

BY MR. LUNSFORD:

Q   Do you know that the Florida Department of Corrections has standards for appearance of all inmates?

A   I would assume it does and that prison systems do have standards of appearance for -- for inmates, and that the plaintiff's report in the complaint being told that they would have to change their appearance because of the new policy.

Q   So, let me ask this.  Have you evaluated, from a security perspective, any of the risk posed by the social accommodations requested by Plaintiffs?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  It has not -- that has not been part of my evaluation.

BY MR. LUNSFORD:

Q   Would you be qualified -- if Plaintiff's counsel had asked you to look through the scope of social accommodations requested by the plaintiffs in this case, would you be qualified to evaluate that list and determine which items do or do not pose a security risk in a prison setting?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, I would just say that those accommodations for -- for appearance, you know, have been provided by other prison systems that -- that

Page 97

manage the escape and safety risk for all of their prisoners.

So, I -- I -- it has not been part of my judgment in terms of how to manage gender dysphoria as to whether or not that might help, you know -- whether that might increase flight risk, for example, by -- by a prisoner.

BY MR. LUNSFORD:

Q   Do you know if -- is there -- do you know of any data that has evaluated whether transgender individuals who receive social accommodations are at a higher risk for violence?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, there are -- there are studies that have shown that transgender inmates are at higher risk for -- for violence, not attributing that specifically to the social accommodations.

It seems to me there would be an assumption there that without the social accommodations, people wouldn't know that the person is transgender, and they could, you know, suppress that.

And -- and very often that isn't possible or -- or reasonable to expect of a, you know -- of a prisoner during their incarceration.

//

25 (Pages 94 - 97)

Page 98

BY MR. LUNSFORD:

Q   My question's different, and please listen carefully to my question because it's very different.

Are you aware of any study that has demonstrated that the provision of social accommodations to a transgender inmate reduces the likelihood that they are the victim of physical violence?

A   No.

Q   Are you aware of any study that demonstrates that individuals who are transgender who receive social accommodations are at a decreased risk for sexual violence?

A   No.

Q   Are you aware of any study that demonstrates that individuals who are transgender that receive social accommodations are at a higher risk of violence, whether that be physical violence or sexual violence?

A   No.  You mean like as -- if you're saying, has anyone studied where you have a transgender person and they, in that study, are either assigned to get social accommodations or not, and then comparing the rate of violence to the two groups?

Q   Yes.  Yes.

A   I'm not -- I'm not aware of such a study.

Q   Could you ever opine that the provision of

Page 99

social accommodations to a transgender inmate reduces the likelihood of victimization from physical or sexual violence?

A   No.

Q   Do you know the security threats posed by long hair among the inmate population?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I know that if there is an increased risk that it is managed by prison systems across the country.

THE OFFICER:  I'm sorry.  Can you hold on one second?  Let me plug this back in.

THE WITNESS:  And presumably managed by Florida -- sorry.

THE OFFICER:  Okay, thank you.  Go ahead.

THE WITNESS:  I am aware that that accommodation of longer hair is managed by other prison systems and was managed by Florida before the change in policy.  And so, there -- there may be a risk that can be and has been managed by -- by many prison systems.

BY MR. LUNSFORD:

Q   You've mentioned other prison systems, and let me just back up for a minute.  In your report, do you cite to any policy or procedure from any other state prison system?

Page 100

A   No.

Q   In your work in this case, did you research any policies or procedures of any other state prison system as it relates to social accommodations?

A   I have in the past in work in other prison systems.  I guess that's my answer.

Q   But did you do any research as part of your work in this case to consider the policies of other prison systems as it relates to the provision of social accommodations?

MS. NOWLIN-SOHL:  Objection.  Asked and answered.

THE WITNESS:  You're saying as part of my work in this case, have I looked at the policies of other systems, and I would say it was not as part of the work of my case -- this case.  It's just as part of my work with other prison systems.

BY MR. LUNSFORD:

Q   In this case, are you asking the Florida Department of Corrections or recommending that they adopt any other prison system's policies of any kind?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I think that there -- as part of the complaint, there is an effort to keep Florida from changing its policy from -- from before --

Page 101

from -- from what the -- its previous policy had been because patients or inmates, I mean, were receiving accommodations under a -- I believe it was a 2017 policy -- under a previous policy.

And part of the complaint is that those accommodations and as well as medical treatment be maintained.

BY MR. LUNSFORD:

Q   So, your opinion is that Florida should return to the 2017 policy?

MS. NOWLIN-SOHL:  Objection.  Mischaracterizes testimony.

BY MR. LUNSFORD:

Q   Does that mischaracterize it?

A   I think that I'm not necessarily endorsing every aspect of the 2017 policy as part of that statement, but that I don't think that Florida should be changing its policy to be more restrictive of the ability of transgender people to have social accommodations and needed medical care.

Q   Okay.  We'll go at this a different way.  When is the last time that you reviewed a state prison policy as it relates to transgender healthcare?

A   I have reviewed that for -- in three states.  In California, because we were -- I was consulting --

26 (Pages 98 - 101)

Page 102

Q   Can I just interrupt?  My question's really simple.  And I know you want to answer something else, but here's my question, okay.  I don't think it requires a medical degree to pick up on the first word of this.

My question was when -- when was the last time?  Not the three times.  Not which system.  I meant when, date, time, place.  I mean, when was the last time you reviewed a state prison policy as it relates to transgender healthcare?

MS. NOWLIN-SOHL:  Object to form.  Harassing the witness.

THE WITNESS:  I would say -- I'm trying to think which month.  Maybe -- may have been March of 2025.

BY MR. LUNSFORD:

Q   Okay.  Which policy was that?

A   And that was policies CDC -- CDCR policies where there was -- there were concerns from a -- a legal organization that --

Q   I don't want to --

A   Okay.

Q   So, the last you reviewed was CDCR's?

A   CDCR, yeah.

Q   Okay.  And have you reviewed any other statewide policies as it relates to transgender

Page 103

healthcare since 2020?

A   Yes.

Q   Which other systems?

A   Colorado.  And as part of -- there was a class action suit that was settled there, and then Washington State.  I went up to Washington in 2019, but then the case kind of came back around a few years later, so --

Q   Any other jurisdictions?

MS. NOWLIN-SOHL:  He gets to finish his answer.

MR. LUNSFORD:  If he'll answer the question, I will not interrupt.  But this business of going off on rabbit trails -- if I could just get an answer to my simple question, I would appreciate it, and it will move things along.

MS. NOWLIN-SOHL:  He's answering the question, and you have to let him finish the answer.

BY MR. LUNSFORD:

Q   Which other systems?  And I'm asking --

A   Which other state prison systems?

Q   Yes.

A   The only policies I reviewed were Washington State, Colorado, and California.

Q   Okay.  And other than California, have you reviewed any other state policies outside of California

Page 104

and Florida in the last two years?

A   Colorado and Washington.  There were aspects in each of those states that were -- that may have ended two years ago.  I don't recall the exact date.

So, yeah -- so, that may have been -- that could have been -- I don't know whether it was 2023 or 2024 for Colorado and Washington State cases.

Q   Do you know what a classification system is in a prison context?

A   I'm not familiar with that, no.

Q   Okay.  Do you know what a staffing analysis is for a prison system?

A   No.

Q   Have you ever done any work with the National Institute of Corrections?

A   No.

Q   Have you ever done any work with the American Correctional Association?

A   No.

Q   Have you ever been involved in an ACA audit of facility?

A   No.

Q   Are you aware that Florida is -- their facilities are ACA accredited?

A   No.

Page 105

Q   Do you know what that means that Florida's facilities are ACA accredited?

A   No.

Q   Do you know whether transgender issues are -- were considered as part of ACA's audit of the Florida prison system?

A   No.

Q   Do you know what a security threat group is?

A   No.

Q   Do you know if any of the named plaintiffs are part of a security threat group?

A   No.

Q   Do you know if a tattoo can cause an increased risk of violence in a prison system?

A   Yes.

Q   Do you know what types of tattoos cause increased risk of violence?

A   Tattoos that identify someone as part of -- of one group or another that -- that might attract the attention of a -- a group that they're in conflict with.

Q   Do you know if any of the named plaintiffs have tattoos?

A   No.

Q   Do you know if any of the named plaintiffs are gang members?

27 (Pages 102 - 105)

Page 106

A   No.

Q   Do you know if a gang membership and security threat groups are the same thing?

A   No.

Q   Do you know of any -- in your work in other prison systems, do you know of any prison system in the world that has prevented or guaranteed safety for inmates from physical violence?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I think -- you mean any prison system in the world that has eliminated all physical violence?

MR. LUNSFORD:  Yes.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   Do you know if any prison system in the world has eliminated the risk of sexual violence amongst its incarcerated population?

A   No.

Q   Do you know of any prison system in the world that has eliminated suicides among the incarcerated population?

A   No.

Q   Do you know of any prison system in the world that has eliminated self-harm among its incarcerated

Page 107

population?

A   No.

Q   Do you know of any prison system in the world that has reduced any type of mood or anxiety disorder or eliminated it within its incarcerated population?

A   No.

Q   Do you know whether any of the named plaintiffs were receiving medical care or mental healthcare before they were incarcerated?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   Do you know whether any of the named plaintiffs saw an increase in mental healthcare since they've been incarcerated?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   Do you know if any of the named plaintiffs have been diagnosed with any comorbidities while they've been incarcerated?

A   No.

Q   Do you know whether the level of -- levels of distress by the named plaintiffs has changed at all since they've been incarcerated in Florida?

Page 108

A   No.

Q   Do you know whether any of the named plaintiffs have reported to their treating physicians and clinicians an increase in distress since the implementation of FDC's most recent HSB?

A   No.

Q   Would you just describe for me the first time you learned about this case?

A   I was --

MS. NOWLIN-SOHL:  Just going to real quick object to the extent it calls for protective communications with counsel.  But go ahead.

THE WITNESS:  Okay.  Yeah, I was contacted about it by one of the ACLU attorneys and -- who asked -- who told me what the case was about, and asked me if I would be willing to be an expert in the case.

BY MR. LUNSFORD:

Q   Did you agree to serve as an expert during that initial call?

A   Yes.

Q   Had you received the complaint before the phone call?

A   Don't recall.

Q   You don't have a written retention agreement

Page 109

in this case; do you?

A   No.

Q   Do you know why not?

A   I think it just fell through the cracks.  I had -- I think I had one for another ACLU case I was doing at the same time.

Q   So, what documents did you gather in preparing your report?

A   So, I -- I saw the complaint, the old Florida policy for transgender inmates, the new policy, and I guess those were the Florida specific documents, you know.  And then of course there -- there's just the, you know, general literature that I'm familiar with.

Q   Did you conduct any research into the Florida Department of Corrections other than reviewing the documents you've already mentioned to me?

A   No.

Q   And you didn't review any depositions?

A   No.

Q   Were you provided any specific statements or any kind of structure in terms of how to outline your report?

A   No.  Certainly, I had, you know -- I've done other reports with -- with the ACLU, and so, you know, I had -- and other -- and other legal organizations, so I

28 (Pages 106 - 109)

Page 110

had an idea of, you know, how to structure it.

Q   Okay.  Did you have any outside assistance in preparing your report?

A   No.  I -- I had -- I did provide a declaration, and had proposed edits from lawyers, and responded to those.

Q   You understood, at the time you were drafting your report, that it was important that you include all of your opinions in this case?  And I'm talking about the collection of both reports.

A   Yeah.  I think that -- I think I say in my declarations that my opinions are not necessarily limited if new information comes up, you know, that -- so, not necessarily that I can't opine on something that if it comes up in the course of the litigation that I haven't stated in those declarations.

Q   No, I understand new information.  But you were supposed to come up with all the opinions you had based on the information available to you; correct?

A   Yes.

Q   And you didn't exclude any opinions that you formed based on the information that was available to you at that time; did you?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I'm sorry.  Can you repeat

Page 111

the question?

BY MR. LUNSFORD:

Q   Did you exclude any opinions that you formed as part of your work in this case based on the information that was available to you at the time you signed your reports?

A   No.

Q   As of today, based on the information available to you, do you intend to offer any additional opinions not included in your reports?

A   I would say only if it, you know, comes up in the course of the litigation.  If you ask me something that's not in my report, you know, I'll answer.

Q   Well, let me ask this differently.  As you sit here today, do you have any additional opinions in this case that are not set forth in your report?

A   No.

Q   You understand that it's important, given your experience as an expert witness, to be accurate in reciting facts in your report; correct?

A   Yes.

Q   You understand that it's important for you to identify the information that you relied upon in reaching your conclusions; correct?

A   Yes.

Page 112

Q   You understand that it's important to identify the scholarly literature, peer reviewed journals, whatever other authorities you might be relying on in order to support your opinions; correct?

A   Yes.

Q   And you did that; correct?

A   Yes.

Q   You understand that if you're relying on something that's not in the report, that that gives us no ability to evaluate your opinions; right?

A   Yes.

Q   Since you've authored your report, you said you reviewed those in preparation for today's deposition; is that correct?

A   Yes.

Q   Did you identify any errors or omissions in your report when you reviewed it in preparation for the deposition?

A   No.

MR. LUNSFORD:  Do you have exhibit stickers?

THE OFFICER:  I do.

BY MR. LUNSFORD:

Q   Let me hand you what I'm going to mark as Exhibit 1.  She's going to mark it.

Page 113

(Defendant Exhibit 1 was marked for identification.)

A   She's going to mark it, okay.

Q   Do you recognize Exhibit 1?

A   Yes.

Q   What is Defendant's Exhibit 1?

A   That's the expert report of Dan H. Karasic, M.D.

Q   And if you just flip through that, I believe on page 26 is your signature page, if you could look at that?

A   Yes.

Q   And then after your signature page, is that a true and correct copy of your professional CV as of the date of your report?

A   Yes.

Q   And does that Exhibit A, your professional CV, accurately indicate your professional employment experience?

A   Yes.

Q   Does it accurately reflect your employment experience?

A   Yes.

Q   And does it accurately reflect the cases in which you've been retained in the last five years to

29 (Pages 110 - 113)

Page 114

offer expert testimony?

A    There -- I think I just list cases that proceeded to deposition or resolution in some way. I -- I have been retained in cases where -- where the case either gets dismissed or doesn't, you know, proceed in some ways. So, it doesn't -- it's not necessarily comprehensive of all cases.

Q    Does it include all of the other cases in which you testified as an expert at trial or by deposition in the last four years?

A    That may not be in the CV. That would be in the -- in my declaration I list those.

Q    Okay. And when you say declaration, you're referring to Exhibit 1; correct?

A    To Exhibit 1, yeah.

Q    I'm going to refer to that as your expert report; okay?

A    Okay.

Q    Did you include all of the publications that you've authored in the last ten years?

A    I don't know. The -- since this was kind of based off of my academic CV, and since I retired, I am not really that active in updating it. And so, it -- I wouldn't say the CV is comprehensive to -- to everything that I've done.

Page 115

Q    So, it doesn't include all publications authored in the previous ten years?

A    I can't say for sure.

Q    Okay. Does it include a complete statement of all opinions that you will express and the basis for those opinions?

A    The -- my expert report and my rebuttal report?

Q    Yes.

A    They are the -- the set of expert opinions that I'm offering and I said with the proviso that, you know, if -- if more comes up in the process of -- whether it's new information or whether I'm asked about something, you know, I'll provide information on that as well.

Q    Okay. I'm handing you also what's been marked as --

THE OFFICER: Exhibit 2.

BY MR. LUNSFORD:

Q    Exhibit 2, which is your rebuttal report.

(Defendant Exhibit 2 was marked for identification.)

Is Exhibit 2 a true and correct copy of your expert rebuttal report?

A    Yes.

Page 116

Q    And does your signature appear on the final page of that report?

A    Yes.

Q    Okay. Of the cases in which you have been called to testify as an expert witness, have you ever testified in court or been offered as an expert about the adequacy of psychiatric services in terms of the actual provision of care?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: The -- so, I would say yes.

BY MR. LUNSFORD:

Q    Okay. And which cases were those?

A    Let me just look at the list. Okay. So, Lovedhal vs. Kaiser Foundation Hospitals. There was -- there was question about the adequacy of -- of mental health treatment provided to the plaintiff.

Q    And particularly what aspects of care did you testify about?

A    So, I -- in that case, I reviewed the records, and I testified about whether the person had an adequate evaluation for gender dysphoria, and then I testified about their treatment for co-occurring mental health conditions.

Q    Have you ever testified in a case in which the subject plaintiff, or plaintiff's, or patient --

Page 117

applicable patient population was suffering from something other than gender dysphoria?

A    Yes.

Q    In which cases?

A    So, in -- in Lovedhal, in -- so, in -- in cases where I have evaluated the -- have done some sort of evaluation with the patient, either an exam or a review of records, very often there have been co-occurring mood or anxiety disorders.

Q    I'm asking a different question.

A    Okay.

Q    I'm asking, have you testified in any case where gender dysphoria was never discussed?

A    I have not testified in a case, and I'm just trying to think to go back. Certainly not in recent years, I have not testified in a case that did not involve gender dysphoria.

Q    I mean, would it be accurate to say that every single expert retention you've ever had related in some way to a patient or a patient population related to gender dysphoria?

A    I -- I'm trying to think. Maybe I was a fact witness in a case, somebody who was not transgender.

Q    I didn't ask as a fact witness. I said I --

A    No, that's why I'm trying to think of -- I'm

Page 118

going back 30 plus years.  If I'm going back that far, I'm just thinking of other times I've testified as an expert.

And -- but in all of these cases, and certainly all of my recent cases have involved gender dysphoria or a person who had been diagnosed with gender dysphoria.

Q   How many times have you been retained as an expert witness in which the underlying dispute related to a state law or state policy?

A   So, that would be -- just going through the list; 1, 2, 3, 4, 5, 6, 7, 8, 9.  So, nine times have been a deposition or trial aside from -- from this case have been related to state policies.

Q   And you said nine times?

A   Yes.

Q   On each of those nine occasions, were you engaged by Plaintiffs?

A   In each of those having to do with state policies, I was engaged by Plaintiffs.

Q   And did all of those cases involve some statutory or policy limit on care for individuals with gender dysphoria?

A   Yes.

Q   And how many of those cases proceeded to

Page 119

trial, of the nine?

A   Of the nine, three proceeded to trial.

Q   Which three were those?

A   The two Florida cases, Dekker vs. Wieda, and Doe vs. Ladapo, and then the Arkansas case, which was Brandt.

Q   What was the result of the Brandt case?

A   The Brandt case, the district court ruled in favor of Brandt and the -- Brandt and the other plaintiffs in -- in terms of enjoining the implementation of the ban on gender affirming care for minors.

Q   Did that decision stand?

A   I believe it was recently reversed after Skrmetti.

Q   Okay.  Have you read the Skrmetti opinion?

A   Yes.

Q   Have you read the briefing on the Skrmetti decision?

A   I don't recall how much I've read beyond the decision and some of the amicus briefs.

Q   Do you know how many states filed amicus briefs in the Skrmetti case?

A   I think that -- that it must have been about half -- about half the states.

Page 120

Q   Okay.  About half the states filed amicus briefs on which side of the case?

A   Oh, I'm sorry.  So, on the -- those -- there were those states who had -- whose legislatures had passed laws banning gender affirming care for minors.

Q   And what was the -- your understanding of the outcome of the Skrmetti case?

MS. NOWLIN-SOHL:  Object to the extent it calls for a legal conclusion.

MR. LUNSFORD:  That's why I asked for his understanding.

THE WITNESS:  Oh, okay.  So, my understanding is that -- that in Skrmetti that the state could make determinations based on -- on diagnosis and that kind of determination was not necessarily discriminatory when a particular treatment was allowed for a cisgender person and not for a transgender person.

BY MR. LUNSFORD:

Q   You were an expert for the plaintiffs in at least one of the cases that led to the Skrmetti decision; correct?

A   I was an expert -- Skrmetti decision included Kentucky, and I was an expert for Kentucky.

Q   Only Kentucky?

A   The -- well, it was Kentucky and Tennessee I

Page 121

believe were the -- the cases that were appealed to the Supreme Court.  And I was not an expert in Skrmetti in Tennessee.

Q   Okay.  Did you consider Skrmetti at all in your opinions in this case?

A   No.

Q   Why not?

A   I -- my expertise was focusing on the provision of proper healthcare and social accommodations to Florida inmates, and not what would seem to me a legal question of the applicability of Skrmetti to this circumstance.

Q   You're aware that the Skrmetti decision discussed the standards of Care 8; correct?

A   Yes.

Q   Did you read Justice Thomas's concurrence?

A   I -- I believe I did.  I don't recall that much of the -- the text of it, but I either read all of it or a -- a quoted portion of it.

Q   As part of the Skrmetti case, there were communications among certain WPATH officials or leaders disclosed; right?

A   Yes.

Q   And in your -- from your perspective, did the Skrmetti decision have any impact upon the public

31 (Pages 118 - 121)

Page 122

perception of the WPATH standards?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: That's hard for me to say. I think that there's been a broader campaign that's included misinformation about WPATH and -- and those of us involved in WPATH standards of care. And that is much broader than the Skrmetti decision.

BY MR. LUNSFORD:

Q   Do you think the Skrmetti decision cast the WPATH standards in a positive light?

A   I didn't really think of it that way.

Q   You don't think that the Skrmetti decision casts the WPATH standards in a negative light?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: I -- I think that there was -- you're referring to the -- the majority decision in Skrmetti and what it -- how it referred to WPATH?

BY MR. LUNSFORD:

Q   I'm referring to the whole document.

A   I don't know if I have an opinion on that.

Q   Okay. Have you ever testified on behalf of a Department of Corrections?

A   I have not testified on behalf of the Department of Corrections. I -- I have -- I've -- I've been a consultant to them, so where, you know, that's

Page 123

been funded by Department of Corrections, but I have not testified in court for them.

Q   Okay. Have you ever testified in favor of a state policy that limits access to either social accommodations or hormone therapy?

A   No.

Q   Let's go back for a minute. I want to talk about your diagnosis and treatment process. As we go through and look at your patients -- I just want to cover this relatively quickly, and then we'll take a break for lunch.

You said approximately 50% and -- or two thirds of your current patient population has a diagnosis of gender dysphoria; is that correct?

A   Yes.

Q   Okay.

THE OFFICER: Did you say 50 or 15?

MR. LUNSFORD: Thirty. Well, I said 50 originally, and then I corrected it to two thirds.

THE WITNESS: Yes.

BY MR. LUNSFORD:

Q   Okay. Of those two thirds of the patients you see, how many have received hormone therapy of some kind?

A   I would say of those two thirds -- I would say

Page 124

probably 80% of the two thirds. I don't know what that math would be, but most -- certainly, most of my transgender patients are on hormones.

I have some who -- who are not, and I've certainly provided care for people who are -- who are not, but most are.

Q   What is the distinguishing factor between the 20% of your gender dysphoric patients that are not receiving hormones versus the 80% who are?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: So, the most common reason for not being on hormones is that the patient is a person with a non-binary identity where -- where maintaining on hormones might cause bodily changes that are not relieving of gender dysphoria for them.

So, I've had some who've been on hormones for short periods of time and had some response and then that was enough. For example, someone with voice dysphoria, assigned female at birth, who had some lowering of voice, and that was kind of all that they needed. So, there's that.

I've had -- I had a patient that I took care of for 20 years with severe mental illness and strong religious beliefs who -- who did not receive hormones while under my care. So, there've been

Page 125

occasional circumstances.

I've had an occasional patient who has put off being on hormones for -- for other reasons, and then later went on hormones for -- because of a partner or family. They were not on hormones and later went on hormones.

I had one patient who was a -- a competitive athlete who -- who transitioned later, and this was male to female, and hormones lessened muscle strength. And so, they -- they were reluctant initially, but then later did go on hormones in transition.

So, there've been circumstances that have been temporary. There have been some people for whom it's not indicated because of non-binary identification, although some of those patients later do go on to get some sort of medical intervention.

BY MR. LUNSFORD:

Q   Have you ever offered an opinion in court that every gender dysphoric patient should receive hormone therapy?

A   No.

Q   Would you agree that the evaluation of a patient with gender dysphoria for hormone therapy is individualized?

32 (Pages 122 - 125)

Page 126

A   Yes.

Q   As part of your practice, do you prescribe social accommodations for your patients?

A   So, outside of a carceral setting, people just go ahead and socially transition. They -- they may discuss it with mental health professionals, especially as it may impact relationships with family or their job.

So, they may discuss the -- the consequences -- the potential consequences, but -- but people have the freedom to go ahead and socially transition. And most commonly people do that before -- before they see me.

Q   I guess my question though is, have you ever prescribed social accommodations for a patient?

MS. NOWLIN-SOHL:  Objection. Asked and answered.

THE WITNESS:  So, you're saying for someone -- someone, while they're in my private practice, it -- it doesn't require a prescription and -- and so, I've had discussions with patients about the timing or how to, you know, go about it.

But it's not a -- not formally prescribing social accommodations.

BY MR. LUNSFORD:

Q   Okay. Have you ever held a position where you

Page 127

were required to evaluate what types of social accommodations would be medically appropriate for a gender dysphoric patient?

A   Can you give me an example of what you mean?

Q   Have you ever said, you know, "Let's talk through your social accommodations," with a patient and said, you know, "I think you should use these and not these?"

A   There -- I have had patients where there were discussions about binder use, for example.

So, you know, if -- if we're talking about that, and there have been discussions certainly with patients about -- about coming out as transgender at work, or in other settings, or to their spouse, but I'm not sure if that's what you mean.

Q   Let me ask a little bit different question. Well, do you prescribe hormone therapy for any of your patients?

A   No, I don't write the prescriptions myself.

Q   Do you monitor hormone levels for any of your patients?

A   No. It's their primary care provider that does that.

Q   So, for example, if we went through your patient records, would we see orders for routine labs

Page 128

once someone went on hormone therapy?

A   No. That -- that is done by their primary care provider.

Q   Are all of your patients with gender dysphoria using something that you would call some kind of social accommodation or something that falls in that category?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I think that it looks different outside of prisons. And in prisons, there is a formal structure of people needing permission for things. One doesn't need an evaluation or an order to -- in -- in how you style your hair, or what clothes you purchase, or braziers, or binders.

Those are all things that people can go out and do without a doctor's order. And so, there are -- there can be discussion of those things in so far as they impact the person's life, but it's a little bit different from a prison system and the accommodations that are made in a system where those things are -- are more regimented.

BY MR. LUNSFORD:

Q   Is there a cure for gender dysphoria?

A   There -- there is treatment for gender dysphoria that can be quite effective, but it is often ongoing treatment. People, for example, on hormones

Page 129

needing to stay on hormones indefinitely.

Q   But for example, your patients that are receiving hormones with gender dysphoria, would you ever say that those patients have been cured of gender dysphoria?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I have patients who -- I -- I have many patients who are not suffering from symptoms at, you know -- after treatment for gender dysphoria because of hormones and perhaps surgeries as well. They will say that they are not experiencing gender dysphoria.

The DSM has a post-transition specifier. People are still billed for -- their insurance is still billed, for example, for ongoing hormones, even when they're not experiencing gender dysphoria because that's necessary for kind of the maintenance of the condition.

BY MR. LUNSFORD:

Q   But you also have patients that are receiving hormone therapy that continue to experience symptoms of gender dysphoria; is that correct?

A   Yes.

Q   Have you done any analysis of the number of your patients that you've seen in any setting, whether it be academic setting or your current private practice,

33 (Pages 126 - 129)

Page 130

who elect to use some type of social accommodations like we've discussed?

Have you done any analysis as to the percentage of those in terms of their level of distress afterwards -- after they begin social transitioning?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: So, first of all, I think it is important to -- to look at the -- an intervention that can have -- simultaneously have multiple parts.

And so, people are socially transitioning, and so changing their attire, changing makeup, bras, binders, doing all those things at the same time that they are getting medical intervention and -- and often mental health intervention as well.

And all of those things can, you know -- can be happening. So, it's not always a sequential process, although there are people who present to a mental health provider having already, you know, changed their appearance, you know, on their own.

BY MR. LUNSFORD:

Q   Is there a way to objectively measure the level of distress among a gender dysphoric patient?

A   There -- there are scales. So, there have been studies with body -- body congruence scales, and we're -- like in the -- the multicenter NIH study of

Page 131

youth, they -- they measured body congruence.

Other ones -- Cooper also did. So, there are measures of body congruence. There are a little bit downstream measures of mental health, depression, anxiety, suicidality, just quality of life to see if there are impact -- impacts on those that may be a consequence of the person feeling more body congruence, feeling like their body better matches their -- their identity.

Q   But the goal of hormone therapy is to improve body congruence; correct?

A   Is to improve body congruence so as to lessen gender dysphoria, yeah.

Q   Well, and as Dr. Hamnvik said, it's to lower the level of distress the patient's experiencing?

A   Yeah, to lower distress, which is the distress of gender dysphoria.

Q   Are you aware of any study, given what you've said, where patients are receiving all these different interventions, whether it be hormone therapy, psychotherapy, mental health services, and social transitioning?

Are you aware of any study that have tried to parse out the overall effectiveness of those three components together at the same time in terms of

Page 132

outcomes?

MS. NOWLIN-SOHL: Object to form.

BY MR. LUNSFORD:

Q   Let me -- I'm trying to -- this is a little bit. But you described a scenario where a patient's receiving a lot of different interventions. And my question is, is there a way to parse out what of those interventions has the most impact on a patient's gender dysphoria?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: Yeah. So, it is challenging to do that research. There have been a few papers that I believe that I cited that were about specific aspects that might be related to social transition.

You know, like the Russell paper that people -- that there was an association of being -- of -- of other people using one's chosen name and pronouns, and that having positive mental health effects.

So, and there are surveys of mental health in people who have socially transitioned and those who have not. But it is very difficult research to do because in -- in clinical settings that -- where people are being studied, they're often having multiple

Page 133

things going on at the same time.

BY MR. LUNSFORD:

Q   So, you would agree that trying to evaluate the level of distress among a gender dysphoric patient is difficult because of the numerous different factors that can impact that person's level of distress?

A   I would say that I -- fully identifying which part of transition and separating that out, the impact of each part on their distress, can be difficult because the different interventions overlap.

Q   And when you say the different interventions, what are you referring to?

A   So, the -- the interventions of social transition, of -- and of hormones and -- and surgery. And so, that those -- if somebody is -- is under care there -- there was, in prior iterations of the standards of care, a requirement of social transition before hormones would be approved.

The real-life test as it was referred to or real-life experience, and where a person wanting to transition would first have to socially transition before doctors would give them medication.

And over the years that protocol has -- has changed. And so, somebody -- so, there's not a requirement of social transition first before -- before

Page 134

receiving hormones and -- and that's, I think, when you are looking at people before transitioning and after transitioning.

One could do surveys or one could ask about specific aspects of social transition, but it can be difficult to tease out the various impacts of the -- the various parts of transition that people experience.

Q   And additionally, there can be external factors that impact one's experience with transitioning; correct?

A   Yes.

Q   What are some of those, in your experience, of external factors that can impact levels of distress?

A   So, sometimes when someone transitions, they could face rejection from family, or loss of job, and -- or -- or face more discrimination because they're identified as someone who's transgender.

So, those things can happen. And the -- the part that's kind of labeled minority stress, there's -- there's that internal stress but also becoming visible as a transgender person can be -- can have -- can, you know -- can contribute to stress.

Q   Well, and things that have nothing to do with being transgender or gender dysphoric can contribute to distress; correct?

Page 135

A   Yes. Yeah, I see that other one third of my patients who are cisgender, and they can be just as miserable.

Q   Have you had patients, after social transitioning and after hormone therapy, continue to experience levels of distress?

A   I'm sorry. Did you say, have -- can you repeat the question?

Q   Have you had patients who've received hormone therapy and have socially transitioned who continue to experience symptoms related to their gender dysphoria?

A   Yes.

Q   Have you had patients where those symptoms have on occasion increased?

A   There have been times where there have been transient increases in distress around the distress of a particular intervention and somebody having surgery, for example, and that can be stressful.

Or consequences like divorce that can happen when someone transitions sometimes. That can be stressful. So, there can -- there can be circumstances that, you know -- that add to distress.

Q   Have you had patients detransition?

A   I have never had someone who transitioned in a binary way with hormones and surgery then detransition.

Page 136

I've had people -- young people who've been on hormones for a while and decided it's not for them, and not because of a change in their gender identity per se, but most frequently because of a non-binary identity and trying to figure out what intervention is helpful for them.

Q   What percentage of your two thirds patients that are gender dysphoric have undergone some type of gender affirming surgery or procedure?

A   A surgical procedure?

Q   Yes.

A   I would say of my two thirds of patients -- might have to break it down. Certainly the -- of the minor patients, it's pretty rare except for chest surgery that they've had surgery. For my adult patients, a majority have had at least one surgery.

THE OFFICER:  Counsel, sorry to interrupt, but we've been going for about an hour and 45 minutes, so whenever it's a good time.

MR. LUNSFORD:  Yep.  I got just a couple more and then I'm -- I'm not going to say one more 'cause I might have more than one.  So, I'm trying to be honest here.

BY MR. LUNSFORD:

Q   You're aware that hormone therapy can result

Page 137

in physical changes that don't reverse or completely dissipate after the cessation of hormones?

A   Yes.

Q   Can you give me some examples?

A   Yes. So, for someone assigned female at birth, the voice lowering doesn't fully reverse. Hair growth might not fully reverse. If -- if they're on hormones at -- at a younger age particularly, there's -- there may be even like a masculinization of bones and less common.

But -- and then in terms of fertility, there can be a risk of loss of fertility, particularly with people assigned male at birth who start on estrogen.

MR. LUNSFORD:  Let's break there.

THE VIDEOGRAPHER:  The time is 12:44 p.m. We're off the record.

(Off the record.)

THE VIDEOGRAPHER:  The time is 1:53 p.m., and we are back on the record.

BY MR. LUNSFORD:

Q   Okay.  Dr. Karasic, you understand that you're still under oath; is that correct?

A   Yes.

Q   I'd like to ask you about a document before we move into another topic, and I'll hand you that, and our

35 (Pages 134 - 137)

Page 138

court reporter's going to mark that as -- I believe that's Defendant's Exhibit 3.

A   Yes.

Q   Do you --

THE OFFICER:  Let me just mark it.  I'm sorry.

(Defendant Exhibit 3 was marked for identification.)

BY MR. LUNSFORD:

Q   Do you recognize that particular document?

A   Yes.

Q   And this is a notice of deposition for you today, December 16, 2025; is that correct?

A   Yes.

Q   Okay.  Have you seen this document before today?

A   Yes.

Q   And if you'll turn to, I believe, page 8, there's a series of document requests that are set forth on page 8.  Do you see those document requests?

A   Yes.

Q   Did you review these document requests when we submitted them to counsel?

A   Yes.  I had reviewed them with ACLU counsel.

Q   Okay.  So, did you have to do anything to

Page 139

search for documents that were requested here?

MS. NOWLIN-SOHL:  So, objection.  My understanding, Bill, is that we've actually narrowed the scope of this request.

MR. LUNSFORD:  I understand that.  Yeah.  I'm just asking, did he search for documents?

MS. NOWLIN-SOHL:  Within the scope of this request or the narrowed request?

MR. LUNSFORD:  Just did he search for documents?

MS. NOWLIN-SOHL:  Okay.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   Okay.  What documents did you provide in response to these requests?

A   I have not provided documents.  I just was told by counsel that they were negotiating.

Q   Okay.  So, you've not yet provided any documents to counsel?

A   Yes.

Q   Okay.  Let me just ask this.  Do you have any written communications at all with the named plaintiffs?

A   No.

Q   Okay.  Do you have any notes of any kind pertaining to your work in this case?

Page 140

A   No.

Q   And you've not yet received payment in this case; have you?

A   I have not.

Q   Okay.  Of the 20 hours that you say you've devoted to this case, how many of those hours were devoted to writing your reports?

A   Yeah, I don't even know if it was 20 hours.  That was just a guess.  So, but most of the work that I've done has been just writing the reports.

Q   Okay.  While drafting your reports, did you reference -- I thought that was at a rest from that.  Sorry.  Did you refer to the WPATH standards of care at all?

A   Yes, I -- I believe in my reports I referred to the standards of care.  You mean --

Q   That was a bad question.  Did you actually pull the standards up and read any of them?

A   I don't recall.

Q   Okay.  Do you have occasions during your clinical practice to pull up the standards of care and review them on any particular topics?

A   Yes.

Q   What topics do you most commonly refer to?

A   So, I will refer to the adolescent chapter.

Page 141

Sometimes I will -- I'll have reviewed the mental health chapter that I'm, you know, quite familiar with because I was the chapter lead of that one.

And those are probably the two chapters that I would -- might pull up the most often.  Occasionally, I do reviews of medical necessity for the State of California's Department of Insurance and Department of Mental Healthcare.

And so, sometimes that involves pulling up standards of care, either that section on medical necessity or the surgical section related to deciding on medical necessity.

Q   Okay.  You used the phrase medical necessity.  How do you define the term medical necessity?

A   So, medically necessary care is the care that a clinician decides is necessary to treat a particular condition in -- that's also in accordance with -- with the community standards of care and/or practice guidelines that -- that -- so, kind of generally accepted -- a -- a recommendation that falls within generally accepted care for a condition

Q   That phrase medical necessity or medically necessary also appears in your reports; doesn't it?

A   I believe so.

Q   And so, did you utilize the phrase medically

36 (Pages 138 - 141)

Page 142

necessary or medical necessity in your reports consistent with the definition you just provided to me?

A   I believe so.

Q   Okay.  Is it your understanding that -- and so, it -- would it be accurate to say -- and again, I don't want to put words in your mouth, but I just want you to tell me if you agree with it, that one of the points of your reports in this case was to discuss your opinion that you believe hormone therapy and social accommodations are medically necessary?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  They can be medically necessary.  You know, medical necessity does involve the determination of -- of a clinician.  And so, a clinician can determine that those are -- are medically necessary for that patient based on their evaluation of that patient.

BY MR. LUNSFORD:

Q   And that's the standard you incorporate into your report?

A   Yes.

Q   Okay.  Do you know -- and again, I'm not asking for a legal opinion here.  I'm asking for your understanding as an expert retained witness in this case.

Page 143

A   Yeah.

Q   Do you know what claims the plaintiffs are legally asserting in this case against the Florida Department of Corrections secretary and other officials?

A   The -- the, like, legal statutes that are being violated?

Q   Or the legal claim that is being asserted?

A   My understanding is that -- that incarcerated people are entitled to the medically necessary care that -- that clinicians would be providing to patients in other settings.

And that denying needed care is, you know -- is -- is not allowed as cruel and unusual punishment, essentially.

Q   Okay.  You mentioned a phrase there, cruel and unusual punishment.

A   Yes.

Q   Do you know where that comes from?

A   That comes from the Bill of Rights.

Q   Do you know which amendment?

A   Eighth.

Q   Okay.  It is from the Eighth Amendment.  Have you done anything to research the standards under the Eighth Amendment, or any court decisions surrounding the Eighth Amendment?

Page 144

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I have read decisions in the distant past related to the Eighth Amendment, but I am -- it's not an area that I'm that familiar with.

BY MR. LUNSFORD:

Q   But you understand the Eighth Amendment prohibits punishment; correct?

A   Yes.

Q   Do you know how courts have defined punishment in the context of a prison?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I'm not quite sure how to answer that question.

BY MR. LUNSFORD:

Q   Okay.  Have you ever heard the phrase deliberate indifference?

A   Yes.

Q   And do you know what that means according to the courts that oversee this case?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  That -- I -- I mean, I believe it means denying, you know -- intentional denying or -- I don't even know if you need to have that qualifier, but denying care that -- that needs to be provided or would be provided, maintaining the health

Page 145

of -- of an inmate -- of an inmate.

BY MR. LUNSFORD:

Q   Okay.  The word deliberate does -- I mean just in everyday parlance, does indicate some level of subjective judgment; right?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  Yes.

BY MR. LUNSFORD:

Q   Okay.  And indifference; do you know if that's different than the malpractice standard?

A   I don't know.

Q   Okay.  But in your report, you don't reference the phrase deliberate indifference; do you?

A   No.

Q   And you don't know if anyone has intentionally or deliberately denied any care to any of the named plaintiffs in this case; do you?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No, I don't know.  I don't know the specifics of the care of the individuals involved.  I just know what I had read in the -- in the complaint and also in the -- what was planned for the inmates in the new policy.

BY MR. LUNSFORD:

Q   Okay.  We'll get to that eventually.  You've

37 (Pages 142 - 145)

Page 146

served on a number of different boards and leadership positions at various associations. I want to just talk to you about that. You were on the board of directors of the gay and lesbian psychiatrists; is that correct?

A    The Association of Gay and Lesbian Psychiatrists, yes.

Q    Are you still a member of that organization?

A    No.

Q    Why not?

A    I just haven't been active in it for a long time, so I've -- I've let my membership lapse in it.

Q    Are you a member of the American Psychiatric Association?

A    Yes.

Q    And you're a member of the Northern California Psychiatric Society; correct?

A    Yes.

Q    Have you served on any committees with that association or society?

A    Yes. I was on the LGBT -- LGBT Issues Committee of the Northern California Psychiatric Society back years ago.

Q    And what was your role on that committee?

A    We addressed issues in both for the care of LGBT patients, psychiatric patients in Northern

Page 147

California, and also issues concerning LGBT psychiatrists who, you know -- who may be members of APA and -- and thus also of Northern California Psychiatric Society.

Q    Would you say that part of the role on that committee was to advocate for certain policy decisions that could affect LGBT patients or physicians?

A    Yes.

Q    Okay. What positions have you held with WPATH?

A    So, I was a -- so, I was on a committee -- I was on some committees with WPATH on WPATH's input to the American Psychiatric Association on the change from gender identity disorder of DSM-4 to gender dysphoria in DSM-5, and then consultation of WPATH to the World Health Organization on ICD-11, the International Classification of Diseases 11.

And then I was -- I was elected a board member of WPATH, served on the GEI committee, the Global Education Initiative Committee that I talked about earlier. And then I was chapter lead for the mental health chapter of -- of -- I was on the Standards of Care 7 committee as --

THE OFFICER: On the what committee?

THE WITNESS: I'm sorry. The WPATH

Page 148

Standards of Care 7 committee as a co-author, and then I was chapter lead of the Standards of Care 8 mental health chapter.

BY MR. LUNSFORD:

Q    Okay. How many years did you serve on the board of WPATH?

A    Four.

Q    How large was the board while you were serving on WPATH's board?

A    WPATH's board was -- it may be 11 members.

Q    Was there anyone on the board of WPATH, while you served on it, from Florida?

A    No.

Q    Of the 12 members -- I'm sorry, you said --

A    Eleven.

Q    Eleven members of the WPATH board when you served, how many of those individuals worked internationally?

A    So, there -- there were -- there were elections and so different -- I guess two different boards, essentially that I was on that they -- as a board member, it was a four-year term, but half of the board was elected every two years or four were elected.

Four of the general board members were elected in one -- one two-year period for four years. And then

Page 149

two years later, the other three were, and -- and then there was a executive committee of four board members.

And -- and typically, several of the board members were from other parts of the world. So, there was a board member who was originally in Hong Kong, and then later in Australia. There was a Canadian board member, a board member from United Kingdom, a board member from Belgium.

So, there were, you know -- up to half of the board were people from outside the United States.

Q    So, you were on the guideline committee for the Standards of Care 7; is that correct?

A    I was -- we didn't call it a -- a guideline committee, but I was -- I was on the Standards of Care 8 -- the larger Standards of Care 8 committee, and then chapter lead of the mental health chapter of one of the 18 chapters.

Q    So, what was the name of the body that promulgated the Standards of Care 7 for WPATH?

A    Standards of Care 7 or 8?

Q    Seven.

A    Oh, seven. We just called it the Standards of Care 7 committee, I think.

Q    Okay. How many people were on the committee?

A    Thirty-four. So, there were 34 authors, and

38 (Pages 146 - 149)

Page 150

it was -- yeah, it was not as segregated, and it was a much smaller group than Standards of Care 8 in which there was a separate committee for each chapter.

Q    And so, did WPATH receive any specific funding to develop Standards of Care 7, from an external body?

A    There -- there was some funding. I know some of it went to translation.

Q    I'm not talking about translation. I'm talking about --

A    But the actual --

THE OFFICER: I'm sorry. I didn't hear the -- I didn't hear what you said, Mr. Lunsford.

BY MR. LUNSFORD:

Q    I'm not talking about translation. I'm talking about coming up with the initial set of guidance.

A    Yeah. I wasn't on the board when Standards of Care 7 was developed. That was 2011 -- came out in 2011, published 2012. So, I don't know the details of the financing of Standards of Care 7.

I have more knowledge of Standards of Care 8 because I was on the board at that time as well as then, you know, becoming a -- an author again.

Q    So, for the Standards of Care 7, was there a process for approval of those standards within the

Page 151

committee?

A    Yes. So, Standards of Care 7 was a -- the -- there was a consensus process where the entire committee of 34 had to agree on each section. And if they didn't offer amendments to it until it was agreeable to everyone, it was, you know, less formal than in Standards of Care 8 where there was the Delphi process.

THE OFFICER: The what process?

THE WITNESS: Oh, Delphi. D-E-L-P-H-I.

BY MR. LUNSFORD:

Q    So, again, going back to Standards of Care 7.

A    Yes.

Q    I know you want to talk about eight, but on seven -- I'm still confused as to who -- if we went and pulled an individual standard on -- from the Standards of Care 7, who would've written that standard under the Standards of Care 7?

A    So, under standards of -- Standards of Care 7, there were groupings of people with expertise who wrote on uncertain sections like mental health people on mental health and child and adolescent on child adolescent.

And that was put on a Google document. I believe it was on a document that anyone could access and propose edits to. And -- and then there was a whole

Page 152

series of conference calls to discuss those edits.

And -- and then there was a writing committee that met in person and, you know -- and took all of that into Standards of Care 7 that then needed to be approved by the group as a whole again.

Q    Were you on the writing committee?

A    No.

Q    So, this Google doc that you all created, it eventually went forward to the entire committee of 34 for Standards of Care 7?

A    The whole time it was accessible to the whole committee.

Q    I know that, but it went forward to the whole committee of 34 for approval?

A    Yes.

Q    What vote was needed to approve Standards of Care 7 among the 34?

A    It was unanimous. Every person had to agree to the -- the document as a whole or propose a -- propose an alternative if there was an objection to -- to some part of it.

Q    Do you know how many provisions of Standards of Care 7 were modified because you couldn't get unanimous support for the original document?

MS. NOWLIN-SOHL: Object to form.

Page 153

THE WITNESS: No. It was -- it was -- each part was not put up to a -- a formal vote. It was -- the different parts were -- were put onto this group document, and then edits were proposed.

And then there were lots of conference calls in which the changes or areas where there was dispute or question could be discussed to find agreement.

BY MR. LUNSFORD:

Q    How many members of the committee for Standards of Care 7 were not from the United States?

A    I would say -- I'd have to look at the author list, but -- but there were -- there were a large share that were either European or Canadian.

Q    I mean, over a third were international participants?

A    Yes.

Q    Okay. So, let's just focus on the 20 or slightly higher number of Americans on WPATH's standards of 7 committee.

A    Yes.

Q    How many of those individuals were psychiatrists?

A    On Standards of Care 7, there was me, and there was a psychiatrist from Belgium. Trying to think.

Page 154

Other psychiatrists were on that committee. There were at least two that I can think of, including myself, who were psychiatrists.

There were others who were psychologists -- several psychologists who were on that committee. And -- but trying to think of if there were other. I think I was the only American psychiatrist on Standards of Care 7.

The rest of the mental health folks were psychologists. And there was one therapist who was a master's level therapist who was on --

Q   Do you know, of the 34, how many individuals had some kind of mental health licensure?

A   There -- there were -- in -- you're talking about Standards of Care 7?

Q   Yes. I'm only on seven right now.

A   On seven, yeah. I would -- I would say the vast majority of the people who were authors were licensed clinicians.

Q   Was anyone on the committee who did not have any type of medical or mental health licensure?

A   Yeah. Yes, I think -- I think Jamison Green was who had a -- he ended up getting a law doctorate in the UK and -- but was never a clinician.

Q   So, you're saying there was a British lawyer?

Page 155

A   I can think of one.

THE OFFICER: Hold on.

BY MR. LUNSFORD:

Q   So, are you saying there was a British lawyer?

A   There was an American who had a British law degree. Was not a practicing lawyer either. Was -- was kind of an academic law degree like a doctorate in law or something to that effect, that was not, like, practicing JD, sit for the bar kind of lawyer.

Q   Were there any other non-clinicians on the standards of 7 committee -- standards 7 committee?

A   Not that I can -- not that I can recall. The -- certainly the -- overwhelmingly they were people who were licensed clinicians.

Q   You said overwhelmingly?

A   I know Jamison wasn't, so that's one.

Q   Okay. Were there others?

A   I would probably have to look at the -- I could look at Standards of Care 7 and look through the names and see, but it -- it was, you know, 14 years ago. So, I don't -- I don't -- I can't think of who of all 34 names off the top of my head.

Q   Were the standards sent to anyone else before they were approved as Standards of Care 7?

A   Yes. There was a -- in -- there were some,

Page 156

like, international consultation groups that both other folks like organizations interested in trans health and -- and then committee of -- that included trans people who were not clinicians, but who were active in trans health could review it.

Part of -- even though Standards of Care 7 didn't utilize the more modern Institute of Medicine process that Standards of Care 8 --

THE OFFICER: Say that -- more modern what?

THE WITNESS: Institute -- Institute of Medicine process that Standard of Care 8 did. There was a part of practice guidelines, which includes a dissemination of practice guidelines to get feedback from affected groups.

And so, there was a part of the Standards of Care 7 process in -- in which that -- in which that feedback was solicited.

BY MR. LUNSFORD:

Q   What scientific process are you referring to? Does it go by name?

A   The -- oh, I was talking about the Institute of Medicine practice -- process for practice guidelines that, you know, have influenced -- like, American Psychiatric Association uses it. WPATH uses it for

Page 157

Standards of Care 8.

That -- that is the process that includes the Delphi process and includes getting feedback from affected communities and -- and then in -- for Standards of Care 8, systematic reviews.

So, there -- there's -- there's a set of recommendations from the Institute of Medicine that they came out with in 2011 that impacted future practice guidelines --

THE OFFICER: I'm sorry. What'd you say after --

THE WITNESS: In 2011, they came out with recommendations for developing practice guidelines that many organizations adopted in order to put out practice guidelines.

BY MR. LUNSFORD:

Q   Why weren't those standards used for Standards of Care 7?

A   Because they hadn't been published yet when Standards of Care 7 was developed.

Q   When were the Standards of Care 7 published?

A   2011, which was the same year that the Institute of Medicine paper came out.

Q   So, let's go back for a minute. WPATH, again, is a nonprofit association; correct?

Veritext Legal Solutions

877-373-3660                                                       800.808.4958

Page 158

A    Yes.

Q    And so, it doesn't receive any government funding of any kind; does it?

A    No.

Q    Who decides who is eligible for a member of WPATH?

A    The board.  And then there are bylaws of the organization.  So, the bylaws, I think, spell out who's eligible to be a member.

Q    Who decides the membership of WPATH's board?

A    That's elected by full -- full members of the organization.

Q    Okay.  So, you would agree that most of WPATH's membership are people who are actively providing medical or mental healthcare to transgender individuals?

A    Yes.

Q    Are you aware of anyone who's a member of WPATH who opposes certain aspects of care that has been given to transgender individuals?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  Well, you know, within any organization there can be varying views on how -- how care can be given, but I'm not aware of WPATH members who believe that -- that transgender people should be denied care.

Page 159

Generally, there could be opinions on how that care is delivered, you know, as there would be in any group of people can have different opinions.

That's why it's important to have, you know, in the standards of care to try to bring a group of people together to try to have some consensus, not on every decision that's made on care, but on the things that people can agree on.

BY MR. LUNSFORD:

Q    Would you agree that WPATH is an advocacy organization in part?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  WPATH has tended to shy away from advocacy, but every professional organization, including, like, the American Psychiatric Association, does have a -- a degree of advocacy for their patient population to receive optimal care.

So, WPATH does make statements that are related to the improvement of care of transgender people.

BY MR. LUNSFORD:

Q    Has WPATH retained the services of a lobbyist?

A    They did not during the time I was on the board.

Q    Oh, I'm asking in general.  Do you know if

Page 160

they've -- WPATH has ever retained the services of a lobbyist?

A    I'm not aware that they have.  I don't -- at least when I was on the board.  I'm not -- I haven't been on the board for seven years, but when I was on the board, we didn't have a budget for that.

Q    Does WPATH have any regulatory authority?

A    No.

Q    Does WPATH have any licensing authority?

A    No.

Q    Has WPATH been granted any oversight of any public institution?

A    Not -- no.  I mean, there are institutions that rely on the advice of WPATH for -- for care of patients, but they do not regulate or run any public institutions.

Q    Does WPATH have the authority to sanction its members?

A    WPATH does have the authority to sanction its members.  I'm not aware of that having happened, but they do have the -- the right to do it.

Q    Does WPATH have the authority to sanction clinicians who don't follow their standards of care?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  They -- they have the right

Page 161

to -- they do have the right to -- to do it if -- if there's a -- if there are members who are practicing in ways that are, you know -- that are out of line with WPATH's standards of care.  They do have that right.  I'm not aware that they have exercised that right.

BY MR. LUNSFORD:

Q    What about for non-members?  Does WPATH have the authority to sanction non-members for not following WPATH's standards of care?

A    No.  It's a voluntary organization.  And so, you know, the only sanction for, you know, a member would be expulsion from the organization.  And I'm not aware that they've done that.

Q    Has WPATH ever considered expelling a member?

A    I don't know the answer to that.

Q    Has anyone -- member of WPATH ever spoken out against WPATH's standards of care publicly?

MS. NOWLIN-SOHL:  Object to form.

THE OFFICER:  I'm sorry.  Was that publicly?

MR. LUNSFORD:  Yes.

MS. NOWLIN-SOHL:  Same objection.

THE WITNESS:  So, there -- there have been disagreements or, you know, ranges of views of WPATH members as one would expect in any organization,

41 (Pages 158 - 161)

Page 162

and you're not required to believe all the same things.

So, you know, I -- I've certainly heard a -- a range of views in terms of, you know, beliefs or philosophies related to -- to aspects of care.

BY MR. LUNSFORD:

Q   What do you mean a range of views?

A   So, there -- there are -- with each change in standards of care, there have -- there have been people who, you know, have agreement or disagreement with -- with aspects. I -- I'm not sure if I can say a specific.

But there is a, you know -- not everyone is in lock stop -- lockstep, you know, with -- in -- in terms of all their opinions and views. But I do think that people generally -- WPATH members generally are practicing within the general principles of -- of the standards of care.

I -- but, you know, I -- I wouldn't -- I would -- would say that there, you know -- the people do have differing philosophies in terms of in, you know -- in terms of aspects of -- of care within the organization.

Q   In order to become a member of WPATH, if you're licensed as a clinician, do you have to agree to adhere to the WPATH standards of care?

Page 163

A   Yes. I believe that part of the membership is asking people to adhere to the WPATH standards of care.

Q   So, it would be fair to say that if you disagree with any aspect and won't abide by the standards of care then you can't be a member of WPATH?

MS. NOWLIN-SOHL:  Object to form.

BY MR. LUNSFORD:

Q   Is that accurate?

A   I don't know if it's ever been interpreted that way of like that every aspect of, you know, every -- that you have to agree with every sentence. Even within the Delphi process, there was only a requirement of 75% agreement with any one statement.

If -- if someone was in WPATH and they disagreed in a -- in a really substantial way, I could see why they might be reluctant to be a member.

But -- but in practice, there's no enforcement that everyone has to agree with -- with everything and -- and certainly an expectation that there, you know, can be aspects of differing opinions as it would be in any group of professionals.

Q   As a member of WPATH, is there a process for you as a member to report another member who's not adhering to the WPATH standards of care?

A   There is an ethics committee.  So, I think

Page 164

that would probably be the -- there'd be -- probably be a process if someone was engaged in behavior that was considered not ethical.

But in fact, I don't know of anyone who's been kicked out of WPATH for not following the standards of care and not believing in the standards of care.  I think there can be some self-selection, you know, if somebody were -- were opposed.

And there have been -- I've occasionally seen on the membership lists people who've joined WPATH who, you know, had some major objections to -- I think to the standards of care.

And I'm not sure whether -- in what capacity or why they were joining.  But that is a quite small number of -- of people.

Q   Have you looked at WPATH's website?

A   I have looked at WPATH's website, yes.

Q   And are you aware that WPATH issue statements condemning the policies enacted by certain governments?

A   Yes.

Q   Okay.  Do you recommend that every clinician follow all of the guidance in Standards of Care 8?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.  Standards of Care 8 is a very large document, and so I don't even personally

Page 165

use all of it.

I -- I would say that people should follow the philosophy of care of Standards of Care 8 and that certain chapters, the adolescent chapter, the child chapter, the assessment chapter for adults -- mental health chapter for adults are chapters that kind of get to the core of clinical practice.

And I think that people should -- I would recommend people follow those chapters, for example, in doing an assessment for someone receiving medical care.

BY MR. LUNSFORD:

Q   Who approves applications for membership to WPATH?

A   There is a membership committee that reviews the member -- the -- the applications and, I think, along with a staff person, you know, does the approvals.

Q   Do you know what criteria are applied in order to become a member of WPATH?

A   I think to be a full member, you have to be a -- either a licensed clinician or an academic in transgender health.

And -- and then there's also student members and associate members that are, you know, open either to students or to others who are not health professionals or academics.

Page 166

Q   With regard to Standards of Care 8, there was a -- there was a process for selection of the committee; correct?

A   Yes.

Q   And there was a conflict-of-interest statement that had to be completed; correct?

A   Yes.

Q   Do you know if all the members completed the statement -- the conflict-of-interest statement?

A   I would -- I would assume so.

Q   Again, I asked, did you know, not did you assume.

A   But I -- but I don't.  I mean, I -- I certainly had to.  I know it was given -- conflict of interest statements were given to members.  I don't know who was responsible for making sure that all of those were signed.

So -- so, I don't know whether -- whether everyone signed the conflict-of-interest statement.

Q   How many individuals sat on the committee for Standards of Care 8?

A   For Standards of Care 8, it was maybe 120.  It was over a hundred.

Q   What was your role on the committee?

A   So, I had had two roles.  At the start of the

Page 167

process, I was on the board.  And so, as a board member, we selected a -- an editor and two co-editors.  And then the editors and co-editors had a process where they took applications and CVs.

And with that, the editor and co-editors appointed chapter leads for each of the 18 chapters.  If you were a chapter lead, you could only be involved in that chapter.  Otherwise, people could be an -- an author on more than one chapter.

So, the way the rest of the members of each committee were appointed were that the chapter lead and the editors met and reviewed the applications for that chapter and picked the people they felt were most qualified to -- to be on that committee.

Q   Beyond what you've told me, were there any published guidance about what types of individuals would be qualified?

A   Well, broadly, I think they were following the Institute of Medicine guidelines in terms of --

Q   I'm not -- wait.  I want to make sure I'm clear.  You just said, "I think."  I don't want you to speculate.

A   Okay.

Q   I'm asking, do you know if there were any standards that were provided to the chapter leads on how

Page 168

to select members?

A   Yes.  We were -- we were told to select members based on their -- looking at their contributions to the field, to geographic diversity, that we were picking people with expertise in care delivered not only in the United States, but in -- in other parts of the world.

So, our committee -- our mental health committee had a psychiatrist from Turkey, a psychiatrist from Belgium, and one from Sweden among the, I guess, seven members.

And -- but each of those also were people who had published quite a bit on -- there were psychiatrists who had published quite a bit on mental health.  And our chapter's focus was really people who had co-occurring mental health conditions as well as being trans.

And so, people with experience in that and with publications in that.  And then we selected a -- another psychiatrist from the US and -- for our committee, and then a psychologist from the US.

And then in addition to -- once we had our committee, the editors had had an application for -- for community representatives, which included clinicians who were in practice, but they were not necessarily people with academic backgrounds.

Page 169

And so, we had -- and -- and so, we had a psychotherapist who was transgender who was kind of the community representative on our committee in addition to the -- the committee that had been formed.

Q   Of the seven individuals on the chapter 18 committee?

A   Yeah, chapter 18.

Q   How many were from the United States?

A   So, there -- there were -- trying to think who is the fourth, so -- oh, and then the community.  So, there were -- there were four Americans on the committee.

Q   Where were they from?

A   So, there was a -- a psychiatrist from Chicago, a psychologist from Washington, D.C., a -- there was the community representative was a psychotherapist in San Jose.  And -- and then there was me from San Francisco.

Q   Does the chapter 18 address hormone therapy?

A   It doesn't -- can you maybe clarify what you're asking?

Q   Was there a separate chapter that addressed hormone therapy?

A   Oh, okay.  Yeah.  So, we -- we were -- that chapter 18 was the mental health chapter.  There was a

43 (Pages 166 - 169)

Page 170

separate chapter that addressed hormone therapy.

Q   Did chapter 18 at all address hormone therapy?

A   Only as it intersected with people with co-occurring mental health conditions.

Q   Does chapter 18 at all address social accommodations or social transitioning?

A   It does -- does not have a statement.  Chapter 18 does not have a statement that is specifically about social transition or -- or social accommodations.

Q   The idea of social transitioning or social accommodations appears in other portions of the standards; correct?

A   Yes.

Q   Okay.  So, you sat down with this -- these, what, three psychiatrists from America and four others from across the world, and you all developed the initial draft of chapter 18?  Is that what occurred?

A   Yes.  Yes.  So, well, what we did was we -- we had a task to come up with consensus recommendations based on the literature and clinical experience that would be consensus recommendations as practice guidelines for care of specifically transgender people with co-occurring mental health conditions.

And then the -- we had a call with the editors, and there were -- they were -- kind of helped

Page 171

us pair -- pair those down to ten statements.  I think we may have started with 20.  And -- and they were all supposed to be actionable statements, advice essentially that could guide a particular aspect of care.

Q   So, after the initial draft is prepared, what occurred next in the process?

A   So, we -- we had our ten statements.  We reviewed those in person in Buenos Aires, in 2018.  There's -- and I think we were the first group to go for Delphi -- to the Delphi process where our ten statements were -- the ten recommendations were sent out to the membership.

And they could vote on their level of agreement on a one to ten scale.  And with each vote, there was also supposed to be comments on the statement made by each of the hundred plus people voting.

And then if a particular statement got 75% or more, it was approved, although we were still supposed to take into account recommendations for improving the statement.

If it got less than 75%, then that statement would either be removed or altered, and it could go back to a later stage of the Delphi process.  With our -- with our group of ten statements, all of them received over 75% and were accepted.

Page 172

Q   So, 25% of the participants on the committee could have disagreed with chapter 18?

A   Yes.

Q   And it still would've met approval?

A   And it still would've been approved.  But we were -- we also were obligated to take into account the feedback that we received from the people, whether they agreed or disagreed.

And so, there were iterations of those statements to try to take into account -- into account feedback.  If the statement were changed really materially in character enough, the editors could make the decision of whether the statement should go back for another round of -- of Delphi statement.

And then there was a next part of the process where we wrote explanatory texts for each of the statements.

So, we -- our group, as a committee, wrote -- after each statement, wrote a paragraph essentially on -- about that recommendation with some literature supporting it and some explanation on, you know -- about that statement.

Q   Were non-members of WPATH eligible for participation on the committee?

A   No.

Page 173

Q   Did WPATH seek comment from the general public before publishing its standards?

A   Yes.

Q   Is that part of the Delphi process?

A   Yeah, that's part of the Institute of Medicine process.  That includes the Delphi process for a agreement on the statement.

And then there's another part where the statements are supposed to be -- not only the statements, the whole text is supposed to be widely disseminated, and they're supposed to seek feedback from the general public as well as from other people who are outside WPATH, but involved with transgender health, that they would have the opportunity to -- to weigh in.

And so, we -- when that happened, and that was the first time I saw the other chapters of the standards of care, was when the public did, but also we got, from the editors, back a summary or a listing of all the comments that they had received on our chapter.

And we -- it was requested that we try to incorporate feedback of the broader community of people in transgender health.  And if that involved substantial change, that it would go back to Delphi.  But it -- that wasn't necessary in our process.

Q   Did you comment on any other sections other

44 (Pages 170 - 173)

Page 174

than chapter 18?

A    I -- in the Delphi process, I would comment, as we all were supposed to, on -- so, for -- that would've been probably 17 other chapters if -- if all those chapters had statements going to Delphi.

So, you know, I -- I voted, and I put comments the way we were supposed to -- we were all supposed to do.

Q    Did you vote against any particular chapter?

A    I voted against -- I voted against some Delphi statements -- or it's not even voting against.  It's a one to ten, so it's a level of agreement.  Less than a seven, I think, was considered a disagreement.

So, and there were statements that I voted, you know, lower than that.  And I think that eventually, you know, with each of those statements that did not get approved, that, you know, they came back having modified, you know -- modified that statement back to Delphi with a revised statement.

And -- and so, there were statements, I know, that I had not approved of, but after changes were made, I did vote in the -- in the score that would indicate approval.

Q    Were there any parts of the approval process that was used for the Standards of Care 8 that you

Page 175

disagreed with?

A    By approval process, you mean the -- the Delphi process?

Q    I'm saying the overall process for approving the Standards of Care 8.  Were there any things that transpired as part of the approval or modification process before being finalized?

THE OFFICER:  I'm sorry.  As part of the approval, and then what else?

BY MR. LUNSFORD:

Q    Or modification process that you disagreed with?

A    Yeah.  Oh, I've been asked before in deposition and answered.  I was asked about the eunuch chapter.  My belief --

THE OFFICER:  The what chapter?

THE WITNESS:  Eunuch, E-U-N-U-C-H.  I believe that that should have been part of the non-binary chapter as opposed to a separate chapter.  So, that was, you know, a disagreement in the structure, I suppose.

But in general, I kind of accepted the process.  We were told the process and we, you know, were sent the Institute of Medicine --

THE OFFICER:  Sent the what?

Page 176

THE WITNESS:  The Institute of Medicine paper on practice guidelines.  And so, I was, you know, in agreement with, you know -- with the process, if not with every single statement, but with the process to do it.

BY MR. LUNSFORD:

Q    Okay.  Were you aware that outside advocacy organizations were consulted on some of the standards?

A    Yes, that was -- it was supposed to be part of the process all along to actually have wide consultation that we weren't just surprising people with standards of care from an insular group, but that we were trying to solicit feedback from the larger community of people affected by transgender care.

Q    Was there any consultation with any Department of Corrections?

A    I don't -- I was not on that -- there was an institutional care chapter that talked about corrections, and I was not on that chapter, so --

Q    Not my question at all.  My question's really simple, okay.  It's not hard.  My question is, was any Department of Corrections consulted on Standards of Care 8?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, I can't answer that

Page 177

because I was not the person who solicited comments.

BY MR. LUNSFORD:

Q    Was anyone with any corrections experience consulted with regard to Standards of Care 8?

A    I don't know.  I know that we were in communication because with the Global Education Initiative, we did trainings with people from Department of Corrections, and we had one in -- I think it was Arlington, Virginia.

And so, we -- and -- and there was another one that we did in Missouri where we had people from Department of Corrections.  So, I know that we were in communication with them, but I was not part of the process of soliciting feedback.

So, I don't know who -- who those -- and I was on the board at the time, so I don't know the process or who, you know -- how they went about soliciting feedback.

I only know the -- the feedback that was presented to me on my chapter, and that was anonymous.  The -- the comments were -- had been stripped away from who made the comments.

Q    If we look at the committee -- have you ever looked at the list of contributors?

A    I did back at some point, yes.

45 (Pages 174 - 177)

Page 178

Q   Okay.  Let me hand you what I've marked as Defendant's Exhibit 4, which is a print off from WPATH's website.  Does this look familiar?

A   Yes.

MS. NOWLIN-SOHL:  Can I have a copy?

MR. LUNSFORD:  Yes, you may.

THE OFFICER:  And then let me just mark it really quick.

(Defendant Exhibit 4 was marked for identification.)

THE WITNESS:  Sure.

MR. LUNSFORD:  Oh, maybe I just missed it.  I missed it.  My fault.

BY MR. LUNSFORD:

Q   So, just so we're clear, you would agree that Exhibit 4 appears to be a print off of the list of contributors to the WPATH Standards of Care 8; correct?

A   Yes.

Q   Okay.  So, how long have those standards of care been out?

A   They came out in 2022.

Q   And so, if we look through this list, even though these standards have been out for over three years, there are a number of members who only appear by name and provide no biographical information?

Page 179

A   Yes.  I mean, there's some that I see like Jiska Ristori and Thomas Steensma that --

THE OFFICER:  Sorry.  Can you repeat those names?

THE WITNESS:  Oh, it -- here it is.  These are the two names I -- easier to show because they're in other languages.

THE OFFICER:  And what -- what was the other one?

THE WITNESS:  I'm sorry?

THE OFFICER:  Sorry.  You said Jiska Ristori and --

THE WITNESS:  And Thomas Steensma.

THE OFFICER:  Thank you.

THE WITNESS:  There are people who apparently never responded, but one could Google their names and, you know, see who they are if one wanted to, because they're both people who are, you know, well-known researchers in -- in transgender health.

But not everyone -- for some reason Thomas Steensma is here without his photo and bio twice.  There are people who just never sent in pictures.  There's some without pictures that are the pictures on the next page.

//

Page 180

BY MR. LUNSFORD:

Q   I mean, there's over 20 members of the committee who provided no biographical information or photo; right?

MS. NOWLIN-SOHL:  Objection

THE WITNESS:  That are here.  They did -- everyone, to be on the committee, had to provide a bio and a CV to be selected.

But then there was a separate process closer to publication where they sent out an email asking each contributor to send a photo and a bio.  And not everyone did.

BY MR. LUNSFORD:

Q   Well, let's just -- well, let me ask you this.  Do you know how many contributors to Standards of Care 7 were from the state of Florida?

MS. NOWLIN-SOHL:  Objection.

THE WITNESS:  I do not.

BY MR. LUNSFORD:

Q   Okay.  So, if I told you there was only one, would you have any reason to disagree with that?

MS. NOWLIN-SOHL:  To clarify, you said seven.  Are you talking about seven or eight?

MR. LUNSFORD:  Eight.

MS. NOWLIN-SOHL:  Okay.

Page 181

THE WITNESS:  Yeah, I -- I have no reason to disagree with you on that.

BY MR. LUNSFORD:

Q   In fact, do you have any judgment as to how many states were actually represented on the committee?

A   I do not.

Q   Let me ask this.  Were there more people who practice and work in the United States, or more people internationally on this committee?

A   I don't know the -- the breakdown, but yeah, I don't know the exact number of how -- or the breakdown of how many were Americans, Canadians, Europeans, or from somewhere else.

Q   Where was the highest concentration of committee members from?

A   From the United States.

Q   Yeah, but where in the United States?

A   I would -- I would guess that the Bay Area, the New York area, Boston, Chicago, that there are places that -- that have more people working in transgender health and that those would be places that would have disproportionate representation.

Q   Was there an effort to retain a -- a committee member from every state?

A   There was.  We were -- geographic diversity

46 (Pages 178 - 181)

Page 182

was one of the things that we were asked to do. But in -- I mean, just thinking about my chapter.

When you have maybe seven people on a chapter, you're not going to represent all 50 states, especially, you know, when some of them are from Europe or Asia.

So, I don't think it was -- I don't think that there was any area that was systematically excluded, but -- but the process was 18 different committees being formed, basically. And within each of those 18, there may have been five to eight members.

And -- and within that handful of members there -- there was diversity. But then when you collectively add it up, you, you know -- it -- it certainly wouldn't assure equal numbers of people from -- from every state.

We had -- our community representative was also from California. So, even on our small committee, there were two Californians, but that wasn't part of the initial process that had -- that did have someone from California, and someone from the Midwest, and someone from the East Coast among the Americans.

Oh, and then there was somebody from New York. There was a fourth American before the community member was added.

But it wouldn't surprise me that there are

Page 183

states that are, you know -- did not have anyone represented there. There are states that have not had many people working in -- in trans health or academic centers that had done work in -- in trans health.

Q   So, let's just go through some of these. Well, you would agree that the largest portion of Americans on the standards of committee -- standards of care committee for the version 8 standards were from California; correct?

MS. NOWLIN-SOHL:  Objection.

THE WITNESS:  I -- that would not surprise me that the largest number are from California, but I've never done a count.

BY MR. LUNSFORD:

Q   Okay. Let me ask you, do you know Alexus D'Marco?

A   No.

Q   You're not aware that -- do you know if she's a clinician?

A   I don't know Alexus D'Marco.

Q   Okay. Are you aware that she works for an advocacy organization in the Bahamas?

MS. NOWLIN-SOHL:  Objection.

THE WITNESS:  I don't know who -- who that is.

Page 184

BY MR. LUNSFORD:

Q   Okay. What about -- I'm looking on page 2, the bottom. There's a Joshua Sehoole, I believe, who's with MLaw. Do you see that?

A   What -- what

MS. NOWLIN-SOHL:  On page 2?

MR. LUNSFORD:  Page 2 of Defendant's Exhibit 4.

MS. NOWLIN-SOHL:  I'm not seeing that on page 2.

MR. LUNSFORD:  It's on page 2. I'm reading it. It's three lines down.

THE WITNESS:  Oh, you -- so, you're --

MS. NOWLIN-SOHL:  So, not at the bottom. At the top.

MR. LUNSFORD:  It's on page 2. You need me to --

MS. NOWLIN-SOHL:  It's at the top. He said the bottom, but he means the top.

THE WITNESS:  Okay. So, you're looking at specifically --

MR. LUNSFORD:  I said two lines down.

THE WITNESS:  You're looking specifically at the global applicability of the standards of care chapter. That goes from Sam Winter all the way to

Page 185

Alexus D'Marco.

So, all of those people, except -- it looks like just Shane Morrison was the one American on that global committee. All these other people -- like, I know Alicia Kruger is from Brazil.

BY MR. LUNSFORD:

Q   I'm asking a very simple question again. Let's not go off on one of your rabbit trails; okay? My question is, Alexus D'Marco is listed there as well. Do you see her name?

A   Yes.

MS. NOWLIN-SOHL:  Objection.

BY MR. LUNSFORD:

Q   Did Alexus D'Marco have a vote on the committee through this Delphi process?

MS. NOWLIN-SOHL:  Objection.

THE WITNESS:  If -- if she was on the committee, I would assume that she -- that she did. And if she's not a health professional, it's possible -- as I said, each committee did have one community representative.

BY MR. LUNSFORD:

Q   Well, what about the individual right above that who's with MLaw?

A   Is that a master's of law as the degree?

47 (Pages 182 - 185)

Page 186

Q   I don't know.

A   That's my guess.

Q   I wasn't a member of the committee.  You were.

A   I was not a member of the Global Applicability Committee, which was the Global Health Committee.  And so, I was not involved in that chapter.  I -- if you want to turn to the mental health chapter, I can go through that because I was involved in that one.  And the other chapters, my only involvement was --

Q   Let's stay focused on this individual --

MS. NOWLIN-SOHL:  Let him finish his answer.

MR. LUNSFORD:  No, I'm not going to allow us to waste more time on these rabbit trails.

BY MR. LUNSFORD:

Q   But let me go back to the -- I'm -- I'm just asking about this Sehoole individual.  That's the only thing I want to talk about; okay?  Was Mr. Sehoole granted a vote on approving Standards of Care 8?

A   I -- I have -- I don't know.

Q   Okay.  And I'm just -- I mean, have you done any research on who that individual is?

A   On -- on Mr. Sehoole, no.  Especially that global applicability, those were people involved in global health, and it was supposed to be for a global

Page 187

health chapter.  I was not involved in that chapter.  And, you know -- and -- and so, I would not have been involved in the selection of those people, or reading their CVs, or anything like that.

Q   So, I'm reading from Mr. Sehoole's LinkedIn bio.  Let me just ask you if you have any reason to disagree with his own description of himself, which is a social justice activist focusing on advancing the rights of people on the margins of society.

MS. NOWLIN-SOHL:  Objection.

BY MR. LUNSFORD:

Q   Do you have any reason to disagree with that statement?

MS. NOWLIN-SOHL:  Objection.

THE WITNESS:  Again, I know nothing about that person.  That person was part -- the chapter that you're referring to is the global applicability chapter, which was not about the general standards of care for our evaluation of patients.

It was about -- the Standards of Care 8 had these other topics that were part of the document, and one of them was talking about global health.  And this was a chapter talking about global health.

And so, my only involvement was on the mental health chapter.  I didn't have anything to do

Page 188

with this.  And so, I -- I don't know anything about the folks in that global health section.

BY MR. LUNSFORD:

Q   And you don't know if any of these global health individuals had a vote on the standards of care?

A   I would assume that each member did have a vote.

Q   I mean, would you think that -- let's just assume for a minute that these individuals have no mental health background at all.  Do they have the qualifications to review chapter 18 to determine whether it's appropriate or not?

MS. NOWLIN-SOHL:  Objection.

THE WITNESS:  Well, you know, it is a legitimate issue of a -- a Delphi process where all of the members developing these practice guidelines can vote.  But that's -- that was the decision of how -- how to set it up.

I don't believe that the presence or absence of those folks had impact on the chapter that I was chapter lead of.

BY MR. LUNSFORD:

Q   I'm sorry.  You said you don't know if that had an impact?

A   I said I don't believe that they had an

Page 189

impact.  That the -- yeah, that they had an impact on the mental health chapter.

They may well have had a vote, but, you know, all of our -- our ten statements were all voted in, and I would guess would've been voted in regardless of how, you know, two or three out of the hundred and -- hundred plus people voted, so I --

Q   But you don't know the vote count, do you, for your provisions?

A   Yeah.

Q   You know exactly how many people voted against it?

A   Yes.

Q   And how many people voted against your section?

A   Well, it was each of the ten statements.

Q   Right.

A   And -- but I don't remember how many voted.  But we got the statistics of -- it wasn't a vote for or against.  It was a number.

Q   Right.  I'm just saying, how many people --

A   So, we got a little graph or something of how many people voted; 10, 9, 8, 7, 6, 5, 4, 3, 2, 1, or however it was done.  Something like that.  And so, we could see how many people voted at each level.

48 (Pages 186 - 189)

Page 190

And then we got a number of how many had voted, I think, seven or higher, which counted as a yes. And -- and then we got the comments, you know -- a list of comments from -- from each statement. So, those are the -- that's the information that we had.

Q   Do you still have this information?

A   I don't think so. I mean, I'm trying to think how many laptops I've gone through since 2018. But it could be on an email. I -- or, you know, I don't know whether it was a Google document.

It's a long time ago, so I don't -- I don't remember how we accessed it, but I do remember seeing the feedback on each. We got the feedback from each vote and --

Q   Did any of your sections receive, across the board, all tens?

A   No, but they -- they all got enough, you know -- enough to -- that all of them passed by an easy margin.

Q   Let's turn to page 3. Do you see on page 3 there's a long bio for Mr. Sabir, S-A-B-I-R?

A   Yes. Yes.

Q   Now again, he -- no mental health training of any kind?

A   Yes.

Page 191

MS. NOWLIN-SOHL: Objection.

BY MR. LUNSFORD:

Q   And as far as you know, you could have received comments from Mr. Sabir to your section?

A   Yes.

Q   But you wouldn't have known that you got comments from a non-licensed person in reference to your section; would you?

A   Well, that -- that's true. But if it had come from Dr. -- or from Mr. Sabir, I would have listened to it because I have met -- I've met him, and he was really a leader in people getting -- trans people getting health -- healthcare in Russia before the, you know -- the Russia, you know, kind of eliminated rights for LGBT people.

So, I have actually met at conferences, Kirill -- Kirill Sabir. And he was a -- a real expert. Again, if we're talking about -- in this case, it was terminology, and I think they wanted international people and people with a lot of experience in other countries so that the terminology would be something that would be understandable to people across cultures.

And so, I do believe he was qualified to do that. I would not have approved him to be on our mental health chapter 'cause I didn't think he had the

Page 192

qualifications for that.

But there were many missions for this -- the different sections of -- of Standards of Care 8. And I -- I think for terminology, to have somebody from Russia or Eastern Europe, you know, might make sense 'cause they would have knowledge about the terminology that was used in transgender health in that part of the world.

Q   But according to his own bio here, he's an activist for transgender rights; correct?

A   Well, he was. If he still were, he would go to prison. So, I don't think he's an activist, you know, because Russia has made it illegal to be an activist for transgender rights in Russia.

Q   You do see he wrote an essay entitled, quote, "How it Feels to be a Trans Activist in Russia?"

A   Is that on the bio?

Q   Yes. It's at the end of the second full paragraph.

A   Oh, yeah, yeah, yeah. Yeah. No, he -- I mean, he is a trans activist in Russia, self-described, but he also has expertise on the healthcare delivery in Russia as somebody who is a leader in organizations of -- of people accessing transgender health and working for non-governmental organizations in -- while he was in

Page 193

Russia, while that was still legal in Russia. So, I, you know --

Q   It was just a question of, he authored that essay; didn't he?

A   Yes.

Q   Okay, let's turn to page 5.

THE OFFICER: I'm sorry. I didn't hear the answer.

MR. LUNSFORD: Yes.

BY MR. LUNSFORD:

Q   The answer was yes; wasn't it?

A   Yes.

Q   Let's turn to the fifth page. Tamara Adrian, right above the heading, "The role of primary care in gender health." Do you see that?

A   The -- the next page after --

MS. NOWLIN-SOHL: One more.

THE WITNESS: One more after that, okay.

BY MR. LUNSFORD:

Q   So, Tamara Adrian, who has JD by her name, appears under the heading, "Overview of therapeutic approaches." Correct?

A   Yes.

Q   And so, we're talking about therapeutic interventions for individuals who identify as

49 (Pages 190 - 193)

Page 194

transcender; correct?

A   Yes.  So, she may have been the community representative, or it may be because she is a -- a lawyer and human rights activist in Venezuela, that she may have been providing knowledge of -- of how care is delivered in Venezuela and in South America.

Q   She's a politician; isn't she?

A   She is.  She was elected to the Venezuelan legislature, but she wasn't -- I think Maduro did not allow her -- I think he disbanded the -- the legislature after she was elected.

So, I think she served for a while, and then they -- I think it was disbanded, and they created a new body.

Q   But again, as far as we know, she had a vote on the standards; didn't she?

A   I would assume so, yeah.  And within each chapter there would be one -- should be one person who -- who might -- may well be a -- a non-clinician who -- and as far as I knew -- know, they could vote as well.

Q   Now I'm on -- I am on the section -- if you turn on back, under the role of primary care and gender health.

A   Yes.

Page 195

Q   You said I could Google these people, so I did, and I've looked on this page.  Do you see the name John Dean under Trevor Corneil, in that section on Defendant's Exhibit 4, under the role of primary care in gender health?

A   Yes.

Q   Who's John Dean?

A   I only know the one involved in Watergate.

Q   Okay.  No indication John Dean has any type of medical --

A   I -- yeah, I have no idea who that -- who that person is.

Q   Do you know how many of the contributors to the Standards of Care 8 had never ever treated a transgender individual?

A   So, within each chapter, there was one community representative.  And so, that -- there could be, you know -- with 18 chapters, there could be 18 people.  Although the community representative on our chapter actually also was a psychotherapist working with trans people.

She just wasn't an academic.  She was a master's level psychotherapist.  But other chapters there are -- the community representative is somebody who works in trans health, but not as a clinician.

Page 196

Q   Typically, the community representatives were activists; weren't they?

A   They -- they -- right, they could be activists, but they're -- very often they have knowledge of transgender health.  I was just looking at the -- this page where -- where there was someone named Susie Green who -- who led a charity in the UK that worked on transgender health.

And so -- so, there were -- there -- there were people who had involvement in transgender health, and -- and that could be as an activist.  As I said, in -- in our chapter, the person was not an activist.  They were -- they were a trans person who was a therapist.

And so, I think there was a variety of kinds of involvement, but they were wanting not everyone to be a professor who was on these committees to have some input into people with knowledge of care in the community from a different perspective, and for that to be part of each chapter.

MS. NOWLIN-SOHL:  When you're done with this line of questioning, we've been going for an hour and a half, so it might make sense to take a break.

BY MR. LUNSFORD:

Q   Were you aware that over 25 states were not

Page 197

represented on the standards of care committee?

A   It would -- it -- it wouldn't surprise me if many states were not represented.  As I said, any kind of geographical diversity, I think, was just by chapter, not -- there was no -- I don't think there was a global effort across the entire document to have people representing each state.

Q   How many trans -- people identifying as transgender were on the Standards of Care 8 committee?

A   I think they may have said that somewhere.  I don't know the exact number.  But there -- there were -- there were quite a number of transgender people who were also clinicians who were -- were part of the Standards of Care 8 -- clinicians or academicians who were part of the Standards of Care 8 committee.

Q   Let's try this again.

A   Yeah.

Q   How many transgender individuals were there on the committee for WPATH's Standards of Care 8?

A   I don't know.

Q   Was it more than ten?

A   Yes.

Q   Was it more than 20?

A   Yes.

Q   Was it more than 30?

50 (Pages 194 - 197)

Page 198

A   I don't know the exact number, but there were quite a few transgender people who were -- who -- among the 120, 140, however many people, were on the -- on the committee as a whole.

Q   Would you agree that individuals who are transgender are generally predisposed to support the expansion of services and accommodations to transgender individuals?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I think that people who are transgender are -- tend to be supportive of receiving transgender care, but there are -- also are transgender people who have been critics of -- of expansion of care. So, I -- I don't want to generalize to everyone.

BY MR. LUNSFORD:

Q   Was there a single person on the standards of care committee who had detransitioned?

A   I -- I don't know the answer to that.

Q   Okay.  Let's take a break there.

THE VIDEOGRAPHER:  The time is 3:32 p.m. We're off the record.

(Off the record.)

THE VIDEOGRAPHER:  The time is 3:44 p.m. We're back on the record.

//

Page 199

BY MR. LUNSFORD:

Q   Dr. Karasic, you do understand that you're still under oath?

A   Yes.

Q   Okay.  Just a couple different questions. Between Standards of Care 7 and Standards of Care 8, did Standards of Care 8 reduce or otherwise impose new limitations on any aspect of care for transgender individuals in comparison to Standards of Care 7?

A   I think there were some -- a few changes. There was a requirement of just one evaluation or letter for genital surgery in Standards of Care 8 as opposed to two letters in Standards of Care 7 for genital surgery.

And so, that's one difference.  The Standards of Care 7 recommendation for vaginoplasty was 18.  The age recommendations were not in the final Standards of Care 8.

Q   I'm sorry, but I just want to save our time. You're talking about areas where care was expanded or made more available to individuals.

I'm saying, were there areas -- any areas within Standards of Care 8 versus Standards of Care 7 where the amount of care services or accommodations provided were reduced?

MS. NOWLIN-SOHL:  Object to form.  And

Page 200

I'm going to turn the video real quick here.

THE WITNESS:  Oh, I see.  I thought -- yeah, that wasn't my understanding.  So, any place where access to care was reduced?  Not that I am aware of.

BY MR. LUNSFORD:

Q   Were you aware that certain authors of the WPATH Standards of Care 8 complained that changes were made, quote, based on current US politics?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I'm not aware of that.  I think that there were over a hundred people on the standards of care committee, and people could have had different opinions, but I'm not aware of that.

BY MR. LUNSFORD:

Q   I'm reading that statement from the brief filed by the Solicitor General for the State of Alabama. And my question is, do you have any evidence that that statement's not true?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, I do have a particular perspective on Alabama in that I reviewed the -- the emails, and as an expert in that case, and Alabama relied on their expert, Dr. Cantor, for -- for interpretations of those emails.

And sometimes emails were misattributed

Page 201

and -- and then there was no attempt to correct that, even when I was asked about that in Alabama.

BY MR. LUNSFORD:

Q   Well, I'm referring --

A   So, I -- so, I don't know.  In other words, those emails did not have -- most of the emails did not have the names of the people who wrote or received them on there.  And -- and sometimes that was misattributed in Alabama.  So, I -- I don't know.

Q   So, you're saying just -- are you saying that the Solicitor General for the State of Alabama made a misrepresentation to the Supreme Court of the United States?

MS. NOWLIN-SOHL:  Object to form.  Can we see the document that you're --

BY MR. LUNSFORD:

Q   Is that what you're saying?

A   I would say that there -- there -- yes, that there were misrepresentations that were made.  I don't -- they may not have been intentional misrepresentations.

But they were because there were misrepresentations in the Alabama case that -- that continued to be kind of promulgated without -- even ones that I had said in my deposition were a

51 (Pages 198 - 201)

Page 202

misinterpretation because they misattributed who -- who made the statement.

Q   Did WPATH contributors, in developing Standards of Care 8, act on the advice of, quote, social justice lawyers we spoke with, close quote?

MS. NOWLIN-SOHL:  Object to form.  Can we see the document that you're quoting from?

MR. LUNSFORD:  No.  This is why I take the deposition and you don't, 'cause I get to decide whether he sees the document or not.  He's already said he reviewed the appellate record, so.

MS. NOWLIN-SOHL:  The appellate record of what case?

MR. LUNSFORD:  Skrmetti.

THE WITNESS:  So --

BY MR. LUNSFORD:

Q   My question's very simple, okay.  Let's don't have one of these non-answers.  Let's focus on the question.

A   Yeah.

Q   Are you aware that certain WPATH authors said that they acted on the advice of, quote, social justice lawyers we spoke with?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.

Page 203

BY MR. LUNSFORD:

Q   Okay.  Are you aware that all of the studies sanctioned by WPATH with Johns Hopkins were not released?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, I -- I don't know how far those went.  I know -- so, I would say no.  I don't really know the details outside of my own chapter.

BY MR. LUNSFORD:

Q   Were you aware the United States Surgeon General insisted upon changes to Standards of Care 8?

A   So, my understanding is that Standards of Care 8 editors solicited and received feedback from quite a number of people.

Q   I'm not asking about a quite number.

MS. NOWLIN-SOHL:  Let him answer the question.

MR. LUNSFORD:  No, he's -- again, it's very simple, okay.  And I don't think it requires a PhD, an M.D., or a board certification to understand my -- and answer my question which is simply this.

MS. NOWLIN-SOHL:  Objection.  Harassing the witness.

BY MR. LUNSFORD:

Q   Were you aware that the United States Surgeon

Page 204

General insisted upon changes to Standards of Care 8?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  The -- the attorney -- the Assistant Surgeon General of the United States did not have the power to change Standards of Care 8, only to give feedback to Standards of Care 8.  There was no authority structure for a government official to change Standards of Care 8.

They could give feedback that could be accepted or rejected by the editor.

BY MR. LUNSFORD:

Q   Did the Standard of Care 8 include changes made at the request of the Surgeon General?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, my understanding is that there was objection from the Surgeon General and others to the -- the specific ages being listed.

Those specific ages were suggested ages that also said that they were suggested, unless there were good clinical reasons to do otherwise.  That was in the original text.

When the final text came out, that part -- what the age and -- and that part was no longer in there.  And my understanding, not from direct involvement in Standards of Care 8, but broader

Page 205

involvement, you know.

In my understanding of what happened is that they had negative feedback from the -- from the Assistant Surgeon General and from others when they solicited the outside feedback and a decision was made to remove those specific ages.

BY MR. LUNSFORD:

Q   So, when WPATH circulated these draft standards, did these external reviewers use the Delphi scoring system you've identified for me earlier?

A   No.  So, that last change was not brought back to -- to Delphi, which I, you know, think it should have been.  I think that they -- they made that decision and -- and the whole document was very delayed.

And they just, you know, went ahead without another round of Delphi and there -- there should have been another round of Delphi on that -- on that change.

So, you know, I think that -- that -- unlike other changes, that one just, you know, happened after the main part of the process had -- had transpired.

Q   All right.  My question is were -- was there any consideration of changing any standards, particularly the age requirements, before the Assistant Secretary of Health of the United States was consulted?

A   I don't know.

52 (Pages 202 - 205)

Page 206

Q   And you would agree that, at the time, the Assistant Secretary of Health for the United States was a transgender individual?

A   Yes.

Q   Do you know of other areas in which outside contributors did not follow the Delphi process?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, outside contributors were not part of the Delphi process.  The Delphi process was an internal process of votes, but that statement was the only statement I'm aware of that where a change like that was made without it going back to Delphi.

BY MR. LUNSFORD:

Q   Was that appropriate, in your opinion?

A   I just commented a minute ago that I didn't -- I didn't agree with that, but I wasn't part of that process.

Q   You're aware that in the last five years various states have adopted laws that restrict access to certain aspects of care that you would call transgender care?

A   Yes.

Q   Do you know how many?

A   Maybe 26.

Q   Okay.  Have you ever counseled a physician to

Page 207

violate state law in favor of the WPATH standards?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   Would you ever do that?

MS. NOWLIN-SOHL:  Same objection.

THE WITNESS:  That's kind of speculation.

BY MR. LUNSFORD:

Q   So, you envision a potential circumstance where you could tell a physician to violate state law?

A   No.

MS. NOWLIN-SOHL:  Object to form.  Mischaracterization of testimony.

THE WITNESS:  No.  You're asking me to speculate on, you know, if -- on theoreticals, but I don't -- I never counsel people to -- to break state law and that's just not, you know -- that's not part of my work.

But -- but I'm saying it's kind of, you know -- if you're introducing hypotheticals, I would have to think about it for a minute.

BY MR. LUNSFORD:

Q   You're aware that Florida passed a statute restricting the use of state funds as it relates to transgender care; correct?

Page 208

A   Yes.

Q   Have you read the statute?

A   The -- I -- I had read materials related to -- to minors and to Medicaid in Dekker and Doe vs. Ladapo.  I don't think I've read any of Florida's laws that they've passed after that.

Q   Do you know of how many states have passed laws substantially similar to or identical to Florida's statute that restricts the use of state funds for transgender care?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I -- I do not.

BY MR. LUNSFORD:

Q   Do you know what information the legislature relied upon in reaching the conclusion that it would legislatively mandate those restrictions?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   You do agree that a state legislature has the right to adopt laws that it believes are necessary and appropriate?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  And I -- I believe that those laws can be challenged as they have been.

Page 209

BY MR. LUNSFORD:

Q   Okay.  Do you know whether the Florida statute in question that restricted access to transgender care of using state funds had any impact on the named plaintiffs?

A   I don't know.

Q   Do you know whether the services available to the named plaintiffs changed in any way after Florida passed its restrictions on transgender care?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I don't know.

BY MR. LUNSFORD:

Q   Were you aware that the American Academy of Pediatrics also provided input on Standards of Care 8?

A   Yes.

Q   Okay.  Let me ask this as it relates to these outside associations.  For example, do you know the process that AMA utilized to review the Standards of Care 8?

A   No.

Q   Do you know whether there was a vote among the AMA membership regarding any endorsement or approval of the Standards of Care 8?

A   I don't know.

Q   Do you know the process that AMA used to seek

53 (Pages 206 - 209)

Page 210

approval to at least indicate some support for the Standards of Care 8?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: The way the AMA works is they have a board vote, but I'm not aware of the specifics of the process in this case.

BY MR. LUNSFORD:

Q Do you know if the AMA board had any conflicts of interest at the time it voted?

A I -- what do you mean by conflict of interest?

Q You know what a conflict of interest is; right?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: Yes.

BY MR. LUNSFORD:

Q Do you know if any of the board members of the AMA had a conflict of interest at the time they voted on the Standards of Care 8?

A No.

Q Have you ever seen the resolution that was proposed by the AMA?

A I may have.

Q Did WPATH seek the endorsement or stamp of approval from these other organizations?

A I don't know. I wasn't on the board at that

Page 211

time.

Q Did the American Psychiatric Association independently assess the evidence cited in the Standards of Care 8 regarding transgender healthcare?

A The APA had -- they had a committee that assessed it -- the -- the evidence with Standards of Care 7, but I don't know if they've done that with Standards of Care 8.

Q Okay. Are you familiar with the phrase, policy consensus?

A I am not sure I understand the question.

Q Have you ever heard that phrase, policy --

A Policy consensus?

Q Yeah. Do you know what that is?

A I'm not sure.

Q Do you know what -- well, do you know if WPATH provided either the AMA or the APA with all of the reference materials and evidence cited in Standards of Care 8?

A It's right there in Standards of Care 8. All the references are listed.

Q Do you know whether the AMA or the APA reviewed all of those authorities or studies that were cited?

A I don't know what their process was.

Page 212

Q Okay. Do you know how many individuals were required to vote with respect to APA's decision on Standards of Care 8?

A If it was a board of trustees approval, it would require a majority vote of the board of trustees.

Q Which would be how many people?

A I don't recall how many people are on the APA board of trustees.

Q Do you know if the Standards of Care 8 was ever presented to the entire membership of the AMA or the American Psychiatric Association?

A Well, it's freely available on the web, so --

Q I'm talking about for a vote.

A Oh, for a vote? No. I'm not aware that there was a vote of the membership that -- the last time I can recall a vote of -- as an APA member was, I think -- on any kind of issue like that was before I became a member, on whether or not homosexuality should be removed from the DSM. And that was 1973, I think.

So, it's not something that is commonly -- policy issues aren't commonly put to a vote of the membership.

Q Do you know if individuals have left the AMA or American Psychiatric Association over their approval, for lack of a better word, or vote of support for the

Page 213

Standards of Care 8?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: I have -- I do not know.

BY MR. LUNSFORD:

Q I guess, let me go back to the studies question. I know you say they're referenced in the report, but do you know if there was any effort by WPATH to actually provide the American Medical Association or American Psychiatric Association with those studies themselves?

A Well, when there's a reference, one can look them up if you have institutional library access.

Q Again, that's not my question.

A So, I'm not quite -- I'm not quite sure what --

Q Do you know if the -- if WPATH delivered the handwritten studies to the AMA or the APA?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: I don't think studies are handwritten anymore. They're electronic.

BY MR. LUNSFORD:

Q You can print them; right?

A You can -- you can print them, but even we don't read them printed anymore. We --

Q Fair enough.

54 (Pages 210 - 213)

Page 214

A    Electronic --

THE OFFICER:  Hold on.  There's too much crosstalk.

THE WITNESS:  Sorry.

BY MR. LUNSFORD:

Q    Let me ask the question much more simply.

A    Yeah.

Q    Did WPATH print, mail, email, send via messenger, text message, FedEx, deliver, or otherwise provide anyone in the AMA or the APA with the studies cited in Standards of Care 8 before they were submitted for any kind of vote in those organizations?

A    I would highly doubt it.

Q    Do the Standards of Care 8 include any type of system that identifies the strength of the recommendation in terms of whether it's strongly recommended or if it's just an advisory recommendation?

A    Yes.  Yes.  Each statement was the -- the word used was recommend or suggest.

Q    And that's the only designations that were used?

A    Yes.

Q    So, what's the difference between recommended and suggest?

A    So, recommend is something that has either

Page 215

strong evidence from studies or an overwhelming consensus in clinical practice where there is not a -- not much of a doubt essentially.

And suggest is when there -- there may be -- it's a less strong recommendation because there's more -- maybe more room for -- for accepting or rejecting it based on kind of the level of consensus on the matter or the strength of the literature.

THE OFFICER:  Or the strength of the literature?

THE WITNESS:  Yes.

BY MR. LUNSFORD:

Q    Have you heard of the phrase or phrases, low certainty of evidence or low quality of evidence?

A    Yes.

Q    I mean, we all know what the word low means; right?  And so, my question is, what is more reliable?  A high quality of evidence or a low quality of evidence?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, it's referring to high certainty and low certainty.  And clearly, you can make a stronger recommendation on a systematic review if there's high certainty in the grade -- on the grade score.

But at the same time, most clinical

Page 216

practice -- most interventions that have had systematic reviews that are in common practice get low or very low grade scores.  So, high quality grade scores are less than 10% in most -- most studies of common -- common medical practice.

So, high quality is great, but it's also quite uncommon in the interventions that we do every day.

BY MR. LUNSFORD:

Q    Can you give me a particular type of treatment which rests on a high quality of evidence?

A    Not in mental health but, for example, if one is looking at whether puberty blockers stop puberty, for example, in somebody with precocious puberty where you're only looking at the physical aspects of it, a systematic review, I believe, has high certainty in that regard.

On the other hand, if you're looking at do puberty blockers, even in precocious puberty, help people in terms of mental health or quality of life, you don't.  And so, it -- it -- so, there are -- there's high quality of evidence for Ozempic that it causes weight loss, but there's not high quality of evidence that it improves quality of life.

So, you have the -- you can have high grade

Page 217

scores for very specific things, but most of what we use in medical interventions do not have high grade scores.

Q    Do you have any data that demonstrates or reflects the number of physicians in the United States who are adhering to the WPATH standards?

A    No.

Q    Do you have any opinion as to the number of physicians in the United States that are adhering to the WPATH standards?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, I think that most of what's in the WPATH standards of care, it's not controversial.  Even the recent controversies have mainly been around use of puberty blockers in young people.

I think overwhelmingly in the United States, a transgender person who has a diagnosis of gender dysphoria, who is seeking hormones, for example, you know, can receive those after they've been evaluated.

And that is, you know, the -- probably the most common intervention that follows the standards of care.  So, there are aspects of the standards of care that are, I think, very highly adhered to in American healthcare.

55 (Pages 214 - 217)

Page 218

BY MR. LUNSFORD:

Q   Are you familiar with the types of services available to citizens in the state of Florida?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I would say maybe not as much currently and that there have been more laws, since the last time I was there, addressing general care.  You know, in Doe vs. Ladapo, there was an attempt to restrict telehealth, and nurse practitioners, and master's level therapists from aspects of care.

So, Florida policies, you know, have -- keep on changing.  And so, I -- I don't think I can tell you exactly how practice is -- is done in Florida today.

BY MR. LUNSFORD:

Q   Did you consult with any physicians in Florida as part of your work in this case?

A   No.

Q   Have you heard of the theory spiral of silence?

A   No.

Q   Never heard of that?

A   No.

Q   Do you know anything about it?

A   No.

Q   Okay.  Have you done any research about the

Page 219

theory spiral of silence?

MS. NOWLIN-SOHL:  Objection.  Asked and answered.

THE OFFICER:  And what was the answer?

THE WITNESS:  No.

BY MR. LUNSFORD:

Q   Let me hand you next what I've marked as Defendant's Exhibit 5.

(Defendant Exhibit 5 was marked for identification.)

And I guess the first thing, Dr. Karasic, is Defendant's Exhibit 5 is a true and correct copy of health services bulletin number 15.05.23 from the Florida Department of Corrections; is that correct?

A   Yes.

Q   And this is one of the documents you reviewed as part of preparing your report; correct?

A   Yes.  Yes.

Q   You understand that this policy has been in effect for over a year; correct?

A   Yes.

Q   I could go paragraph by paragraph, but I'd rather you identify for me, are there portions of this policy that you disagree with?

A   Yes.

Page 220

Q   Well, let me just ask, for example, in the purpose in policy sections, do you disagree with those provisions?

MS. NOWLIN-SOHL:  Object to form.

BY MR. LUNSFORD:

Q   Okay.  Let's just go -- do you disagree with the statement -- the purpose statement in Roman numeral 1?

A   I do not disagree with that.

Q   Okay.  Do you disagree with the policy statement in paragraph Roman numeral 2?

A   I do not disagree with number 2.

Q   Okay.  Are there any of the definitions in section Roman numeral 3 that you disagree with?

A   I -- oh, let me look at the last one.  Yeah, I do not disagree with the definitions.

Q   Do you have an objection to utilizing a multidisciplinary team in order to evaluate care for a transgender individual?

MS. NOWLIN-SOHL:  Objection.  Foundation.

THE WITNESS:  I do not disagree with that.

BY MR. LUNSFORD:

Q   Okay.  In fact, the concept of a multidisciplinary team is used in various different

Page 221

aspects of mental healthcare; isn't it?

A   Yes.

Q   Okay.  That's why we have -- for example, one of the common things in mental healthcare is a treatment team meeting; correct?

A   Yes.  Yes.  And then there are gender teams that do that in -- in gender health as well.

Q   And I'm trying to cut to the chase, but when we look at section 4, do you have any concerns about section 4 regarding gender dysphoria care?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, on number 4, I -- I do disagree with aspects of section A.  So, one is therapy will focus on alleviating the distress associated with gender dysphoria.  There -- there is no evidence of a therapy to alleviate the distress of gender dysphoria.

And in fact, there is a very long history going back many decades of showing the futility of psychotherapy to relieve gender dysphoria.

BY MR. LUNSFORD:

Q   So, are you saying that individuals diagnosed with gender dysphoria should not receive psychotherapy?

MS. NOWLIN-SOHL:  Object to form. Mischaracterizes prior testimony.

THE WITNESS:  Yes.  So, many people with

56 (Pages 218 - 221)

Page 222

gender dysphoria benefit from therapy, but it doesn't -- the therapy doesn't relieve the gender dysphoria.

It can -- if somebody has gender dysphoria and they are having self-harm, they could benefit from dialectical behavioral therapy, for example, to reduce self-harm. But that is not relieving the gender dysphoria itself.

BY MR. LUNSFORD:

Q So, what's the purpose of psychotherapy for a person with gender dysphoria?

MS. NOWLIN-SOHL: Object to form.

MR. LUNSFORD: What's the form?

MS. NOWLIN-SOHL: It's a vague question.

BY MR. LUNSFORD:

Q All right. In your opinion, what is the benefit to a patient of receiving psychotherapy if they have gender dysphoria?

A So, just like a patient without gender dysphoria, many people benefit from psychotherapy in terms of coping with strong emotions, in terms of better coping generally, in terms of being able to tolerate anxiety states, in terms of being able to recognize cognitive distortions of depression.

So, there are aspects that people, cisgender or transgender, benefit from. People who are assaulted,

Page 223

post-traumatic symptoms can benefit from psychotherapy. But gender -- gender dysphoria itself is -- is not relieved by gender -- by psychotherapy.

And there have been decades and decades of -- of study of this, and -- and so, psychotherapy is helpful, but it is not a -- a treatment that's been demonstrated effective to relieve gender dysphoria.

Q Okay. Let me ask the question. Have you ever testified or would you ever testify that psychotherapy is not an appropriate treatment for gender dysphoria?

A So, psychotherapy is -- can be appropriate in many people who have gender dysphoria. You know, I work with people who have gender dysphoria and have depression, anxiety, suicidality that benefit from psychotherapy, but they continue to have gender dysphoria.

And I have had patients who have had very intensive psychotherapy. I had one patient I consulted on in a state hospital who had 20 years of psychotherapy four times a day, and it did not provide any relief for their gender dysphoria.

And it was only the prison system changing its policy to provide that surgery that finally gave them relief from gender dysphoria. So -- so, it's not like you can give someone hormones or you can substitute

Page 224

psychotherapy for hormones. It's not a substitute.

Q The HSB in this section doesn't say that these individuals will only receive psychotherapy; does it?

A Somewhere on here it makes -- it appears that people have to -- may have to have psychotherapy for a year before, in exceptional cases, they could be considered for hormones.

Q I'm talking about section A. I'm talking about the one sentence you identified.

A Yeah. And so, in that sentence, I think that it's misleading to say that the therapy -- that therapy has been provided that will alleviate the distress associated with gender dysphoria because --

Q It actually doesn't say that though; does it? It doesn't say the therapy will alleviate the distress; does it?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: It says, "Therapy will focus on alleviating the distress associated with gender dysphoria." And I am saying that there's no evidence that therapy works for that.

And when you have all of the evidence of other interventions working being dismissed by low grade scores, and then -- but then you're putting in a intervention that has absolutely no evidence, I think

Page 225

it's --

BY MR. LUNSFORD:

Q There's no --

MS. NOWLIN-SOHL: Let him finish.

THE OFFICER: I'm sorry. I didn't hear the end of your answer.

THE WITNESS: So -- so, when you're -- you're putting in an intervention that yes, it can -- psychotherapy can be helpful for people who have gender dysphoria, but it's not been demonstrated effective in alleviating the distress of gender dysphoria. That -- I think that that is problematic.

BY MR. LUNSFORD:

Q Does psychotherapy reduce the distress associated with gender dysphoria?

A There is -- there -- there really is not evidence of psychotherapy relieving itself the distress of gender dysphoria -- gender -- gender dysphoria.

You know, while psychotherapy can be quite beneficial for people in -- in relieving anxiety and depression, and people with gender dysphoria may have anxiety and depression that responds to psychotherapy, the gender dysphoria itself persists.

And that has been my experience in my 30 plus years of practice. I take care of people who have both

57 (Pages 222 - 225)

Page 226

gender dysphoria and also have co-occurring mental health conditions. We treat those co-occurring mental health conditions.

They become less -- they may become less depressed and less anxious. They may have less suicidality. They may be able to cope better. They may have fewer panic attacks, but their gender dysphoria does not go away. They're still distressed by their gender dysphoria.

Q   And those are for individuals who are receiving hormone therapy; correct?

A   And even in some people who receive hormone therapy, but I can think of particularly in people who haven't had access to hormone therapy, either incarcerated people or I, you know -- I mentioned the patient who -- because both his mental illness and strong religious beliefs, couldn't access transgender care, tried to never transition, tried to live with it for many, many years.

Eventually self-castrated because of the degree of the -- the distress and the kind of box he had put himself in. So, I -- I have had a lot of experience with people who -- where despite all kinds of attempts to improve their mental health, still have gender dysphoria, and the gender dysphoria doesn't resolve.

Page 227

And so, that -- that is my concern about putting -- putting that and then following it with a sentence that no psychotherapeutic medical or surgical therapy can permanently eradicate all psychological and physical vestiges of one's biological sex.

I think that people know that psychotherapy or hormones is -- are not going to change their chromosomes. But I think that you're -- you're putting in a role of -- in this mental health section that for -- for psychotherapy that is not how it ought to be described in terms of what it does.

Q   Let me ask this question. Agree or disagree with this statement? Psychotherapy can be beneficial with patients diagnosed with gender dysphoria.

A   Yes, I agree with that.

Q   Agree or disagree with this statement? Psychotherapy can assist in patients in reducing the symptoms associated with their gender dysphoria.

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: So, I don't agree with that sentence, but with the proviso that there are symptoms that people can have distress from gender dysphoria, but can also have anxiety or depression that get relief that -- that does improve the way they feel, but it doesn't remove the distress of gender dysphoria.

Page 228

BY MR. LUNSFORD:

Q   I didn't say it removed it. I simply said that -- let me say it again.

A   Yeah.

Q   Psychotherapy can help patients with gender dysphoria reduce the overall symptoms caused by their gender dysphoria?

MS. NOWLIN-SOHL: Object to form. Asked and answered.

THE WITNESS: Yeah, I think that there are -- people's mental health can improve, but the gender dysphoria itself persists.

BY MR. LUNSFORD:

Q   There's no debate among us that gender dysphoria is going to persist. I mean, nothing in here suggests that gender dysphoria is going away; right?

A   Okay. Well, it says, "Alleviate the distress associated with gender dysphoria." Part of gender dysphoria is having distress about it. It's a requirement for the diagnosis of gender dysphoria that you have clinically significant distress or social or occupational impairment, right.

So, if you're alleviating the distress of gender dysphoria, you are presumably taking away the gender dysphoria.

Page 229

Q   Well, let me ask this. If you were training a bunch of individuals who are going to be conducting psychotherapy on individuals with gender dysphoria, would you ever tell them, "Don't worry about your patient's level of distress?" Would you ever tell them, "Don't worry about it?"

A   No. No.

Q   Would you ever tell them of, "You shouldn't focus on the specific distress that this individual gender dysphoric patient is experiencing?" "You shouldn't focus on that."

A   I'm not quite sure what you mean.

Q   Would you tell them, again, "Don't focus on an individual's specific distress associated with their gender dysphoria in conducting psychotherapy sessions?" Would you ever tell someone that?

A   No.

Q   And would you ever encourage clinicians conducting psychotherapy discussions to focus on an individual patient's distress associated with their gender dysphoria?

A   Would I ever tell someone to focus on it? I think that certainly in psychotherapy, one can -- can focus on -- on someone's gender dysphoria, but one is not taking, as I said -- not taking away the distress of

58 (Pages 226 - 229)

Page 230

gender dysphoria.

The distress of gender dysphoria is -- is still there. They may in other aspects function better with psychotherapy.

Q    Would you agree that distress is the number one symptom of -- associated with gender dysphoria?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I think that distress is -- it's a kind of necessary part of the diagnosis, that someone with gender dysphoria who, for example, gets hormones and surgery and no longer has distress is, you know -- arguably doesn't have gender dysphoria because, you know -- it's only because the APA put in this post-transition qualifier that one might say they still do for the purposes of their continuing to get hormones.

But -- but I do think that it's a -- a misstatement to -- to try to say that -- that therapy will alleviate the distress of -- of gender dysphoria.

So, I guess, you know, it's conditioned by we'll focus on alleviating the distress and, you know, maybe that's less of an assertion that it actually will alleviate the distress of gender dysphoria.

BY MR. LUNSFORD:

Q    Is there any psychotherapeutic medical or surgical intervention that will permanently eradicate

Page 231

all psychological and physical vestiges of one's biological sex?

A    No, and that's not the goal.

Q    I'm just asking, is that a true statement?

A    That is a true statement, yes.

Q    Okay. Okay. Again, after A, you know, again, looking at B, we'll go through this individually. Do you have any objection to inmates being offered acute crisis intervention services?

A    No.

Q    Okay. C; do you have any concerns about assessment or consultation services being provided in response to referrals by staff or other -- or inmates themselves, or other things that happen during incarceration?

A    No.

Q    Let me ask this. Do you know what this refers to as -- it says, "Situational factors," in section C, on page 2 of the HSB. It refers to special housing placement. Do you know what that's referring to?

A    Is that referring to either isolation or -- or another kind of special unit that the inmate might -- where that -- where -- where that may -- that person might be placed, like --

Q    Dr. Karasic, I'm just wondering, do you

Page 232

remember what my question was?

A    You were -- you were saying that the -- the -- asking what situational factors are, such as the placement of the inmate in special housing and --

Q    It was really simple. Let's try it again; okay?

A    Okay.

Q    What is special housing inside the Florida Department of Corrections?

A    I cannot tell you specifically.

Q    Did you ever visit any special housing in Florida?

A    No.

Q    Do you know if any of the plaintiffs have ever been placed in special housing?

A    No.

Q    Do you have any problem, again, to a referral process where an inmate can self-refer or be referred by a staff for mental health services?

A    Yeah, no, I have no objection to that.

Q    Okay. Do you have any problem with D in terms of the provision of outpatient services?

A    No objection.

Q    Okay. Do you have any problem with a psychologist consulting with a multidisciplinary team on

Page 233

a diagnosis of gender dysphoria?

MS. NOWLIN-SOHL:  Where are you?

MR. LUNSFORD:  I'm on page 3.

MS. NOWLIN-SOHL:  5C?

MR. LUNSFORD:  I'm on page 3, yeah.

THE WITNESS:  Are you -- I'm sorry. Are you talking about the whole section 5?

BY MR. LUNSFORD:

Q    If you want to talk about section 5, are there any concerns you have about section 5?

MS. NOWLIN-SOHL:  Object to form.

BY MR. LUNSFORD:

Q    Are there any concerns you have about Section 5A?

A    Okay. No.

Q    5B?

MS. NOWLIN-SOHL:  Object to form.

MR. LUNSFORD:  What's wrong with the form?

MS. NOWLIN-SOHL:  He doesn't understand what the forms are that are referred to, and he doesn't have the foundation to answer it.

MR. LUNSFORD:  Oh my God. Nice. Well done. That was great coaching.

//

59 (Pages 230 - 233)

Page 234

BY MR. LUNSFORD:

Q   Have you reviewed any of the forms in 5B?

A   No.

Q   Why not?

A   Why haven't I reviewed those forms?

Q   Yes.

A   I haven't.

Q   So, let me ask that.  You were asked by Plaintiff's counsel to review and opine on this policy that's in front of you as Defendant's Exhibit 5; correct?

A   Yes.

Q   And there are forms referenced in this policy; correct?

A   Yes.

Q   Did you notice that there were forms referenced in this policy when you reviewed it?

A   Yes.

Q   And do you know what's in any of those forms?

MS. NOWLIN-SOHL:  Object to form.

BY MR. LUNSFORD:

Q   Do you know?

A   Well, I -- for example, in B, the form is entitled, "Consent and authorization for use of disclosure inspection release of confidential

Page 235

information."  So, I assume that that's what that form is, is a consent for release of information.

Q   Did you review the form?

A   No.

Q   Why not?

A   I didn't have the form.

Q   Did you ask for it?

A   No.

Q   Do you know if Plaintiff's counsel has it?

A   I do not know.

Q   Why would they not provide it to you?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I don't know.

BY MR. LUNSFORD:

Q   Was there a reason, as far as you know?

A   No.

Q   Did you tell them not to provide you with any forms referenced in this policy?

A   No.

Q   So, you have no opinion on the form that's referenced in paragraph B?

A   No.

Q   Do you have a problem with FDC obtaining prior records of treatment prior to an individual's incarceration?

Page 236

A   No.

Q   In fact, that's very similar to what you do?

A   Yes.

Q   Do you think that's a wise practice to obtain a patient's prior medical records or mental health records?

A   Yes.  Yes.

Q   Would you agree that a patient should consent to a provider obtaining their prior medical or mental health records?

A   Yes.

Q   Okay.  Glad we went through and wasted all that time.  Section 5C; do you have any concerns with that?

MS. NOWLIN-SOHL:  Object to form. Foundation.

BY MR. LUNSFORD:

Q   Do you have any concerns with Section 5C?

MS. NOWLIN-SOHL:  Same objection.

MR. LUNSFORD:  What's the objection?

MS. NOWLIN-SOHL:  You haven't established foundation for all the pieces in that, including the mental health classifications.

BY MR. LUNSFORD:

Q   Okay.  You can answer.

Page 237

A   Okay.  I don't -- I don't have an objection. I am -- I -- I'm not familiar with -- with every term there like -- and maintained in -- as S3.

Q   What's S3 mean?

A   I don't know.

Q   Did you ask anyone?

A   No.

Q   Did you ask for any information as to what that meant?

A   No.

Q   Okay.  Does it make it difficult to opine about a policy if you don't know all the terminology referenced in it?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I -- I wasn't objecting to the release of information or the diagnosis of gender dysphoria.  And so, which form or, you know, is -- is on there was not central to my objection because this was not the part -- a part that I objected to.

BY MR. LUNSFORD:

Q   Okay.  I presume you didn't refer to the form referenced in paragraph D either?

A   No, but I -- it's -- the -- the description seems reasonable.

Q   Okay.  In terms of the evaluation of

Veritext Legal Solutions
877-373-3660                                                        800.808.4958

Page 238

individuals with gender dysphoria listed in section 6, again it references several forms in section 6. You didn't review any of those forms.

A   I need a little bit of time to read section 6.

THE OFFICER:  Also, if there's a good time for a break coming up.

MR. LUNSFORD:  Sure.

THE WITNESS:  Okay.  So, I'm on -- now I'm on section C, which has the list of forms.

BY MR. LUNSFORD:

Q   I'm just saying, you haven't referred or reviewed any of the forms listed in section 4 of Defendant's Exhibit 5; have you?

MS. NOWLIN-SOHL:  You mean section 6?

MR. LUNSFORD:  Six, sorry.  Six.

THE WITNESS:  Some of those forms I have reviewed in other, or even utilized in other contexts. The Wechsler Adult Intelligence Scale revised, the Montreal Cognitive Assessment, I've used.  There's a post-traumatic stress disorder checklist for DSM-5.  So, these are commonly used forms.

Yeah.  So, the -- these list some commonly used forms.  And as long as they're being used as applicable, you know, if the clinician feels that any of these forms will, you know, contribute to the care of

Page 239

the patient, I don't object to their use under that circumstance.

BY MR. LUNSFORD:

Q   Just to cut to the chase, Dr. Karasic, and our court reporter has asked for a break, and so I want to try to be respectful of everybody's time.  But can you identify for me what portions of this policy you have concerns with?

A   Sure.  So -- okay, so in the next section under treatment, it says -- under 1, it says, "All identified medical and psychiatric comorbidities must first be addressed --"

THE OFFICER:  Can you read it just a little --

THE WITNESS:  Oh, I'm sorry.  "All identified medical and psychiatric comorbidities must first be addressed.  It is appropriate to address psychiatric comorbidities and medical comorbidities."

And then it says, "As appropriate, psychiatric comorbidities should be addressed through psychotherapy, psychotropic medication, and other appropriate medical accepted interventions."

That part is fine.  But then it says, "Once these medical and psychiatric comorbidities are resolved and ruled out as a potential cause of the

Page 240

gender dysphoria, further treatment of gender dysphoria may proceed."

So, there, first of all, people have medical and psychiatric comorbidities that can continue to be treated while people are also being treated for gender dysphoria.  So, the fact that somebody has hypertension, a medical comorbidity, doesn't mean that they can't get treated for gender dysphoria.

The fact that somebody has major depressive disorder, it should be being treated, but that -- it shouldn't prevent somebody from getting gender dysphoria treatment as well.

So, you know, bipolar people -- people with personality disorders can benefit from having their gender dysphoria treated even as those comorbidities have not been resolved.

And then the second part is ruled out as a potential cause of gender dysphoria.  It's exceedingly rare that one would confuse these other comorbidities for gender dysphoria.  And they're not the cause of gender dysphoria.

We don't know the cause of gender dysphoria.  So, that last sentence has a number of aspects that are problematic and, in particular, seem to rule out further treatment of gender dysphoria because

Page 241

we -- we don't know the potential cause of -- of gender dysphoria.

BY MR. LUNSFORD:

Q   Do you know if this sentence has prevented any named plaintiff from receiving treatment for gender dysphoria?

A   I don't know that.

Q   Okay.  Would you agree with the statement that all of the treatment currently available for gender dysphoria is aimed at reducing the distress associated with gender dysphoria?

A   All of the treatment of gender dysphoria is associated with -- yes, with reducing the distress of gender dysphoria.

Q   That's the goal; correct?

A   Yes.

Q   And we have yet to determine which of the degree to which each of those treatment modalities has the greatest impact on gender dysphoria?

A   No.  We know that medical treatment of gender dysphoria is more effective for -- for treating it, and we've known that for decades.

That's why you have the -- for example, at UCLA where I trained, the professor who -- and clinician who coined the term gender identity, Bob Stoller, he was

61 (Pages 238 - 241)

Page 242

a psychoanalyst, and his propensity was to treat everything with therapy.

But he determined, back in the 1950s, that -- that for many transgender people, they needed hormones and surgery, and that psychotherapy was ineffective.

You look at, as I cited on my declaration, Daniel Brown, military psychiatrist who published in 1960, that psychotherapy to relieve gender dysphoria or to resolve what he called sex role inversion has never been determined to be effective.

And then you look at Phafflin's review of -- really a systematic review of studies from the beginning of the 1960s up till 1990 or so -- something -- it was '61 to '91, you know, looking at decades of -- of care.

Psychotherapy without access to hormones or surgery is not the accepted treatment for gender dysphoria. It doesn't mean that people can't benefit from psychotherapy as well, but it -- it isn't, you know, an exchangeable treatment.

Q   You said the words medical treatment for gender dysphoria. What do you include in the phrase medical treatment? Hormone therapy?

A   Hormone therapy and then surgery or you -- you know, you might refer to that separately.

Q   And you understand, because you said it in

Page 243

your report, that gender affirming surgery is not part of this case?

A   Yes.

Q   Okay. Anything else you include in the definition of medical treatment other than hormone therapy and gender affirming surgery?

A   So, that has been the -- that and, you know, in this case as well because in prison systems people need social accommodations. There is the triad that has been part -- was part of WPATH's standards of care until more recent iterations, the triad of social transition hormones and -- and surgery.

And -- and each of those contribute to relief from gender dysphoria. And that's been part of kind of a protocol of care now for over half a century.

Q   So, you're saying social transitioning is now part of medical treatment?

A   Social transition is part of the -- a protocol that historically has preceded medical treatment, but it -- it is part of that triad of -- of care that has been used to address gender dysphoria now for many, many decades.

Q   But again, are you aware of any clinician who has ever prescribed any social accommodation for a gender dysphoric patient?

Page 244

A   In -- in prison systems. Outside of prisons or in psychiatric hospitals, but outside of institutional settings does not require a prescription. You can go to a clothing store. You can go to a barber. You can do those things without a doctor's prescription.

Q   Yeah. Are there any clinical guidelines that you can point to that a clinician can rely upon in determining what social accommodations a gender dysphoric patient should receive?

A   So, some prison systems have come up with documents in terms of what accommodations people should receive and -- and make those accessible.

Q   Not my question at all.

A   Okay. What's your question?

Q   Are you aware of any clinical guidelines for clinicians to determine, as part of medical treatment, which social accommodations a patient could receive?

A   So, clinical guidelines do refer to non-medical interventions like chest binding and -- and refer to assisting patients with social transition. It's not a prescription though. Outside of a institutional setting, people don't need a prescription for it.

Q   Okay. But you don't refer to any of these clinical guidelines or other prison policies or

Page 245

standards in your report about the provision of social accommodations; do you?

A   I don't refer to any clinical guidelines about providing social accommodation?

Q   Yes. In your report?

A   In my report, I -- when I'm -- when I'm referring to medical intervention, I'm -- I am referring to -- to medical intervention. But I do, in my report, talk about, you know, that social accommodation is -- is part of transition care that people receive.

Q   In any of your expert reports, do you refer to the policies of any other correctional systems?

THE OFFICER: In any other correctional systems?

MR. LUNSFORD: Systems.

THE WITNESS: No.

BY MR. LUNSFORD:

Q   As part of your report, do you include the provision of social accommodations in any other prison system?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: Oh, do I make a reference?

THE OFFICER: Hold on.

MR. LUNSFORD: Yes.

THE WITNESS: Do I make a --

62 (Pages 242 - 245)

Page 246

THE OFFICER: Hold on. Was there an objection?

MS. NOWLIN-SOHL: Yes. Object to form.

THE WITNESS: I don't make any reference to other prison systems.

BY MR. LUNSFORD:

Q   Have you done any survey of prison systems in terms of what social accommodations are available to gender dysphoric patients?

A   I have -- I've only been informed of them when I've been consulting in California State systems or when I've been part of legal actions in -- in other states in terms of access to -- access to social accommodations.

Q   Because inmates in Florida are housed by their -- their sex assigned at birth, do you think that gender dysphoric patients should be able to choose what type of housing unit they're assigned to in terms of the other occupants of the housing unit?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: I'm not quite sure what you're asking.

BY MR. LUNSFORD:

Q   Should a transgender female with gender dysphoria, in your view, be accommodated by being able to choose whether she is housed in a cisgender male or

Page 247

cisgender female housing unit?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: So, I -- I believe that -- that when -- when possible, a transgender female should be able to be housed in a -- in a -- in a women's prison.

I also recognize that there are cases and that there has to be an individual evaluation in terms of safety, you know, all around.

BY MR. LUNSFORD:

Q   I mean, do you believe that the named plaintiffs in this case should be able to choose what is the overall makeup of the gender of the people they share a housing unit with?

MS. NOWLIN-SOHL: Object to form. Beyond the scope of his report.

THE WITNESS: Yeah, so it -- I -- I do have from -- again, I didn't -- I did not evaluate the plaintiffs in this case, but having evaluated plaintiffs in other cases, there are -- there certainly are transgender female inmates who could safely be housed in women's prisons and be under less danger themselves.

And so, I think that -- that it can be appropriate to house transgender female prisoners in other units and that that should be a case-by-case

Page 248

evaluation.

BY MR. LUNSFORD:

Q   Were you aware that CDCR was sued by its female correctional officers?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: No.

BY MR. LUNSFORD:

Q   Were you aware that CDCR was sued by female correctional officers who had been sexually assaulted by transgender females who were moved to female housing units?

A   No.

Q   Do you know how many occasions transgender females sexually assaulted female officers overseeing female housing units in California?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: No.

BY MR. LUNSFORD:

Q   Do you know whether there's any data or statistics that show that transgender females are more likely to engage in sexual assaults once moved to a female housing unit?

A   No.

MR. LUNSFORD: Let's take a break there.

THE VIDEOGRAPHER: 4:56 p.m. We're off

Page 249

the record.

(Off the record.)

THE VIDEOGRAPHER: Time is 5:03 p.m. We're on the record.

BY MR. LUNSFORD:

Q   Dr. Karasic, do you understand that you're still under oath?

A   Yes.

Q   Okay. Your report does not include a list of social accommodations that you believe the plaintiffs should receive; does it?

A   No.

Q   And you don't know currently what social accommodations any of the named plaintiffs are seeking?

A   No.

Q   And have you done anything to evaluate any particular named plaintiff in terms of whether any of their requested social accommodations rise to the level of a medical necessity?

A   No.

Q   If you were asked to evaluate whether a social accommodation was necessary medically for any of the named plaintiffs, what would you have to do?

A   I would have to examine them and -- and see whether that accommodation is necessary as part of

63 (Pages 246 - 249)

Page 250

the -- the treatment of their gender dysphoria.

Q   Okay.  Let's say there was a transgender female with gender dysphoria and they said, "I just don't feel very empowered.  I need something that feels me empowered.  And so, as a social accommodation, I need an unloaded gun to feel empowered as a person."

Would that be medically necessary in your view?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  No, because I don't think that there is any broader evidence that being armed, even when unload -- in an unloaded gun, that that impacts gender dysphoria.

BY MR. LUNSFORD:

Q   Okay.  What if the patient said, "I would rather use a lady's razor that's pink rather than a royal blue laser -- razor that's distributed to the male inmates?

MS. NOWLIN-SOHL:  Object to form.

BY MR. LUNSFORD:

Q   In your view, would that be medically necessary?

MS. NOWLIN-SOHL:  Same objection.

THE WITNESS:  I -- I think in that case, it -- it may well be that the blue razor blade is

Page 251

adequate to provide the intervention, and I might talk to the person about, you know -- about that.

So, that would involve a conversation as part of the evaluation with the -- with the patient. But my -- my guess is that the color of the razor blade is not impactful because it doesn't change, you know, what the razor does.

BY MR. LUNSFORD:

Q   Well, let's use a different example.  What about lotion?  Do you know what type of lotion is available to cisgender men in Florida?

A   What kind of lotion to cisgender male inmate -- inmates?

Q   Yes.

A   No.

Q   Do you know what lotion is available to cisgender females?

A   No.

Q   Do you know if they're chemically any different?

A   No.

Q   Do you know if they smell any different?

A   No.

Q   If a transgender female said to you, "I really want this lotion in a pink bottle, as opposed to the

Page 252

white bottle that it comes in for men, would that be medically necessary in your opinion?

A   No.  If it -- if it were serving the same purpose.  I think that any of the requested interventions, you know, are subject to individual discussion.  And that would include which lotion is, you know -- is needed for the desired effect.

Q   So, as a clinician evaluates whether to provide a transgender female with lotion in a white bottle or a pink bottle, how do you determine whether that's medically necessary?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, I don't know whether either lotion would be medical -- medically necessary, but when -- if there are particular interventions like the availability of a razor to remove hair, that's where the necessity can become clear, because hair removal is something that's been demonstrated to provide relief from gender dysphoria in people assigned male at birth.

BY MR. LUNSFORD:

Q   Have you reviewed the commissary list for any FDC prison?

A   No.

Q   Would you agree that if a transgender female, for example, misused press-on nails and sharpened them

Page 253

to a point where they could cut someone, that they would not be medically necessary?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I would say that certainly any accommodation has to be evaluated for the safety, both of the inmate, and of -- and of others.

BY MR. LUNSFORD:

Q   Okay.  Going back to the health services bulletin, are there any other provisions -- we were talking about provisions earlier that you disagree with. Any other provisions that you disagreed?

A   So, I agree -- I disagree with some aspects of the -- with the variances overall --

Q   Which paragraph are you referring to?

A   Paragraph A.

Q   And you're on paragraph A of --

A   Of page 6, section 9.

Q   What parts of that do you disagree with?

A   So -- so, there -- so, I -- even though -- so, the -- this part about persons experiencing short-term delusions or beliefs which may later be changed or reversed, and that the decision to undergo hormone therapy was in fact regretted, and the final resolve, such therapy proved to be psychologically and physically debilitating to the patients.

64 (Pages 250 - 253)

Page 254

So, it is true that there are a small number of people who have regret for hormone therapy, but it actually is extremely uncommon, and particularly in people assigned male at birth who undergo treatment with estradiol.

THE OFFICER: Did you say treatment with estradiol?

THE WITNESS: Estradiol. That this is not really reflective of the reality of -- of care that people having short term delusions related to gender identity is rare, and that -- and trans women getting hormones and thus being psychologically and physically debilitating -- debilitated by those hormones.

I think that's not at all typical. I think that would be -- that's quite rare. It is true that cross-sex hormones may result in infertility, though that may not be an issue while they're incarcerated.

Very uncommon that it would result in neurologic issues. Cardiovascular disease is uncommon. Disfigurement. I guess if you are saying that they have breast growth and call that disfigurement, I think generally they don't -- the person does not consider that disfigurement, and other permanent effects.

And so -- and the reference for that is

Page 255

Florida's agency for Health Care Administration. So, and then --

BY MR. LUNSFORD:

Q    Can I ask you a question?

A    Yes.

Q    And then we'll come back to this.

A    Yeah.

Q    The section you just referenced, bottom of page 6, where it says, "The use of cross-sex hormones may result in," and it lists out several things.

A    Yes.

Q    As part of the informed consent, are patients notified, or should patients be notified that these matters listed here are a potential risk of hormone therapy?

A    I -- I don't think this -- that this is an adequate description of the risks and benefits of hormone --

Q    I didn't say benefits, but is this -- let me just go through them individually.

A    Yeah.

Q    Is there a risk associated with hormone therapy of infertility?

A    Yes.

Q    Is there a risk of neurological issues?

Page 256

A    Which neurologic issues are you relating to?

Q    Any?

A    I'm -- it's not something that has -- yeah, I don't know what they're referring to in terms of neurologic issues.

Q    What about cardiovascular disease?

A    So, there is -- can be a very small risk of cardiovascular disease, but it's -- it's very uncommon.

Q    Would you notify a patient of cardiovascular risk if they were consenting to hormone therapy?

MS. NOWLIN-SOHL: Objection.

THE WITNESS: So, I might talk about an increased risk of deep vein thrombosis, and so --

THE OFFICER: Of what?

THE WITNESS: Deep vein thrombosis, DVTs, from hormones because that is a risk.

BY MR. LUNSFORD:

Q    Is there a risk associated with hormone therapy of enlarged breasts?

A    Yes.

Q    Is there a risk of an --

A    But that's -- that's -- I wouldn't label that as disfigurement.

Q    Okay. I understand you disagree with the wording, but is there a risk of changes to male or

Page 257

female genitalia associated with hormone therapy?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: In an adult, you can increase the risk of infertility with -- with estradiol --

THE OFFICER: Sorry. With -- with --

THE WITNESS: Estradiol use. I'm sorry.

BY MR. LUNSFORD:

Q    If Dr. Hamnvik testified that his patients had experienced changes to their genitalia as a result of his prescribing hormone therapy to them, would you disagree with him?

A    So, people can have a decrease in testicular volume in terms of -- if you're talking about adults who are --

Q    I'm not talking about juveniles. This case isn't about that.

A    Right. So, in adults, it is possible to have a reduction in testicular size with -- with estradiol.

Q    Is there a change to the vagina or clitoris as a result of hormone therapy?

A    For -- for people assigned female at birth, you can have clitoral enlargement, yes.

Q    Can some of the effects of hormone therapy be permanent?

65 (Pages 254 - 257)

Page 258

A    And some of those effects are not fully reversed, yeah.

Q    Okay.  Anything else in the HSB that you disagree with?

A    So, then it says, "Studies presenting the benefits to mental health, including those claiming that the services prevent suicide are either of low or very low quality, or rely on unreliable methods."

And so, again, that's referring to the Agency for Health Care Administration.  I think you're introducing without an explanation of grade scores and that most of the care that they receive have low or very low quality on systematic reviews that -- and then rely on unreliable methods.

The methods that -- that studies that prevent benefits to mental health are some of the same methods that are used to demonstrate benefits to mental health of other interventions.

So, that -- I -- I don't -- even though the antidepressants don't do very well on systematic reviews, that when you're -- when people are signing a consent for an antidepressant, I don't think it's worded that way.

Q    Let me ask this.  Footnote A, I think, is what you're saying refers to the Florida Agency for Health

Page 259

Care Administration?

A    Yes.

Q    Is that correct?

A    Yes.

Q    Did you review that particular publication?

A    I -- I did, I think, in prior litigation.

Q    But not for purposes of this litigation?

A    Right.

Q    And in your report, you don't respond to any of the studies cited in that agency publication; do you?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  I don't recall what -- what studies they cited, but I did -- I do respond to this assertion of the low or very low quality, in other words, of grade scores and -- and how that reflects clinical guidelines for care.

And so, you know, I do have disagreement with -- with the -- with that 2022 document's description of -- of care for transgender people.

BY MR. LUNSFORD:

Q    Does the June '22 agency publication reference scientific studies?

A    I don't remember the text of that, but this -- this reference references that.  So, I assume that this sentence says, "Studies presenting the benefits to

Page 260

mental health, including claiming --"

THE OFFICER:  Sorry.  Including --

THE WITNESS:  Oh, it's this last sentence.  This last -- this of section A here.  "Studies presenting the benefits to mental health, including those claiming that the services prevent suicide are either low or very low quality and rely on unreliable methods."

And the reference to that is to that Florida Agency for Health Care Administration document.  So, this statement is referring to that document to back up its assertions of characterizing the -- the evidence behind mental healthcare.

BY MR. LUNSFORD:

Q    I mean, you're reading to me the document.  I get that, but that doesn't answer my question.  Did you pull the studies referenced in the Florida Agency publication from June of 2022?

A    For this --

Q    For this, yes.

A    For this lawsuit, no.

Q    And can you testify under oath that any of the studies cited by the Agency for Health Care Administration in June of 2022, in their publication, were unreliable?

Page 261

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, I disagree with that assertion that --

BY MR. LUNSFORD:

Q    No, I'm not asking about the assertion.  I'm asking about the studies.

MS. NOWLIN-SOHL:  Let him answer the question.

THE WITNESS:  That's what I'm saying.  The assertions --

THE OFFICER:  Hold on.

THE WITNESS:  I disagree with the assertion that the studies rely on unreliable methods.  They rely on methods that are used to provide evidence for all kinds of treatment decisions.

BY MR. LUNSFORD:

Q    Name for me one study cited by Florida's Agency for Health Care Administration that relied upon a reliable method?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, again, I'm referring to the -- that this sentence itself references the -- the -- this previous statement from the State of Florida.  It's not referencing an academic article, for example.

66 (Pages 258 - 261)

Page 262

BY MR. LUNSFORD:

Q   Does the Florida Agency for Health Care Administration refer to any academic or scholarly journal articles?

A   It -- when it does --

Q   No. I'm asking, does it?  Does the Agency for Health Care Administration's publication in June of 2022, refer to any scientific articles or journal articles?

A   It does have references.  I can't tell you what those references are because I have not reviewed that recently.

Q   Can you testify under oath today that any of the studies cited in this agency publication from June of 2022, are in fact reliable?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  So, that's not what my assertion is.  My assertion is when it -- that this -- this statement is -- is misleading because it is dismissing studies preventing benefits to mental health when in fact there are reliable studies that show improved mental health.

For example -- and I can give you examples of those.  The systematic review --
//

Page 263

BY MR. LUNSFORD:

Q   Please don't.  Please don't.

A   Systematic review of hormones.  So, I -- I do not believe --

THE OFFICER:  Did you -- sorry.  Did you say systematic review of hormones?

THE WITNESS:  Yeah.  So, systematic review of the effects of hormones that use reliable methods, that use standard methods for systematic review.  And -- and so, I disagree that -- that studies presenting benefits to mental health rely on unreliable methods.

BY MR. LUNSFORD:

Q   Are there any studies related to the benefits to mental health that rely upon low certainty or low quality of evidence?

A   Are there any studies -- you're saying, are there any studies that in systematic review showed low --

Q   Low quality of evidence?

A   Low quality, yes.

Q   Okay.  Are there studies in this area related to mental health, including studies regarding services to prevent suicide, that use unreliable methods?

MS. NOWLIN-SOHL:  Object to form.

Page 264

THE WITNESS:  Are -- you mean in all of literature, has ever -- has there ever been a study that used unreliable methods?

BY MR. LUNSFORD:

Q   Related to these issues as referenced here.

A   But that's not what the -- it's not what this sentence is saying.  It's saying that the studies that present the benefits of mental health rely on unreliable methods.  And there are studies that use reliable methods that show benefits.

Q   Are there studies that rely on unreliable methods that show benefits?

A   I don't even know what they're referring to in terms of unreliable methods.

Q   Okay.  And you didn't go look at the generally accepted professional medical standards' determination on the treatment of gender dysphoria?

THE OFFICER:  I'm sorry.  Standards -- what -- what came after standards?

BY MR. LUNSFORD:

Q   Determination on the treatment of gender dysphoria to see what studies were referenced in that document?

A   I have reviewed it in the past, and I've seen --

Page 265

Q   I didn't ask that, okay.

A   No, I did not -- for this lawsuit, I did not go back to re-review the Agency for Health Care Administration document.  I just objected to this -- that sentence that the studies prevent -- presenting benefits to mental health rely on unreliable methods.

Q   And you have -- as you've said, you have no idea what studies are being referenced in that sentence; do you?

A   It doesn't say some studies.  It says studies presenting benefits to mental health and -- and so the implication there is the body of evidence as a whole of benefits to mental health from hormones are unreliable or use unreliable methods.  And I disagree with that.

Q   But that requires you to insert your own language of body of evidence; correct?

MS. NOWLIN-SOHL:  Object to form.

BY MR. LUNSFORD:

Q   Let me just be very clear.  Agree or disagree?  The sentence that you're objecting to on page 7 of the HSB, marked as Defendant's Exhibit 5, doesn't say the phrase all studies; does it?

A   It's -- no, it says studies.

Q   Okay.  It's a test of your reading comprehension.  Consider it that way, Dr. Karasic.

67 (Pages 262 - 265)

Page 266

A   Okay.

Q   Does it refer in this -- in this HSB, does it individually name which studies are being referenced here as relying on unreliable methods?

A   It just says studies presenting the benefits and --

Q   Nope, that's not my question.

A   Yes.

Q   Does it identify specifically which studies are being referenced here?

A   No.

Q   The only citation is to the Agency for Health Care Administration's June 2022, publication; correct?

A   Yes.

Q   And you didn't look at that to see if any studies were identified in that publication as unreliable; did you?

MS. NOWLIN-SOHL:  Object to form. Mischaracterizes prior testimony.

THE WITNESS:  Yeah.

BY MR. LUNSFORD:

Q   When you received the HSB --

THE OFFICER:  Wait.  I'm sorry.  I wasn't sure if that was an answer that you gave.

MR. LUNSFORD:  I'm reframing the

Page 267

question.

THE OFFICER:  Okay.

BY MR. LUNSFORD:

Q   When you got the HSB that's in front of you, marked as Defendant's Exhibit 5, and you read this statement, did you research whether the Agency for Health Care Administration's publication from June of 2022, regarding the treatment of gender dysphoria, referenced any unreliable studies?

A   So, that is -- was not the point of the --

Q   No --

MS. NOWLIN-SOHL:  Let him answer the question.

THE OFFICER:  Hold on.  There's too much crosstalk.

MR. LUNSFORD:  If he's answering the question, I will allow him.

BY MR. LUNSFORD:

Q   My question is did you -- yes or no?  Did you go research any studies listed in the Agency for Health Care Administration's June 2022, publication, which it identified as unreliable?

A   No.

Q   Okay.

THE OFFICER:  And we have about nine

Page 268

minutes left.

BY MR. LUNSFORD:

Q   Any other sections of the HSB that you disagree with?

A   So, the -- in section C, it says, "In rare instances deemed medically necessary, a variance may be approved to permit the use of cross-sex hormones to treat an inmate's gender dysphoria."

And so, I object that when somebody has gender dysphoria and that it -- it's only rare instances that hormones are medically necessary.

So, I -- I think the intent here is to try to restrict people who might benefit from hormones from getting it by saying it's only in rare instances that this can be deemed medically necessary.

This is implying that these folks who it sounds like have gone through a year of psychotherapy and are still presenting with gender dysphoria, that only in rare circumstances might they get a variance for cross-sex hormones.  And I don't think that is proper care.

Q   But real quickly, you don't know which named plaintiffs are receiving hormone therapy; do you?

A   No.

Q   And do you promote the provision of hormone

Page 269

therapy for patients for whom it's not medically necessary?

A   No.

Q   Would you agree that the provision of hormone therapy among the general patient population is limited? I'm talking about of all patients receiving medication, would you agree that a very small number of patients are actually receiving hormone therapy?

MS. NOWLIN-SOHL:  Object to form.

THE WITNESS:  You're saying of all --

BY MR. LUNSFORD:

Q   Individuals who are seeking or receiving --

A   All Americans, like the American population?

Q   Yes.

A   So, I would agree that only a small percentage of the American population is receiving -- receiving hormones.

Q   Would you say it's rare for an American citizen to be receiving hormone therapy?

MS. NOWLIN-SOHL:  Object to form. Foundation.

THE WITNESS:  I would not say it's rare. I -- and in particular, in the same way, I wouldn't say it's rare for someone to receive treatment for strep throat.  If you have strep throat, you receive treatment

68 (Pages 266 - 269)

Page 270

for it. If you have gender dysphoria, you receive treatment for it.

BY MR. LUNSFORD:

Q   What's more common? Strep throat or --

A   Strep throat is more common.

THE OFFICER: Hold on. Okay. We're talking over each other a bit too much.

BY MR. LUNSFORD:

Q   What's more common? Strep throat or gender dysphoria?

A   Strep throat.

Q   Okay. Do you have any estimate as to how many more cases of strep throat there are in a given year versus gender dysphoria?

A   No.

Q   Okay. Do you know if any plaintiff has been denied a variance?

A   No.

Q   Let's turn to your report quickly. I want to refer to you first --

THE OFFICER: Oh, sorry. Can you repeat that? There was some audio disturbance.

BY MR. LUNSFORD:

Q   I want to refer you to your expert report, which is, I believe, marked as Defendant's Exhibit

Page 271

number 1.

Paragraph 30, you refer to incarcerated people being unable to receive appropriate treatment for gender dysphoria. Do you see that? And then you talk about several potential risks. I'm at the top of page 7, paragraph 30.

A   Yes.

Q   And do you know if any of the named plaintiffs have engaged in self-castration, other self-harm, or have attempted to end their lives?

A   No.

Q   You referenced several studies on this page, page 7, and throughout your report. And I just want to ask you, do you cite any study in your report that is based on a high quality of evidence?

MS. NOWLIN-SOHL: Object to form.

THE WITNESS: So -- so, maybe you can -- do you want to be more specific?

BY MR. LUNSFORD:

Q   No. There are studies you cited, and I'm just --

A   You're saying just all of the studies that are cited in my report?

Q   Yes.

A   Are -- so, the individual -- it's not the

Page 272

individual study that's a high -- so, one does systematic reviews to find evidence for something and -- and then one creates the quality of the evidence as part of that systematic review.

And so, the systematic reviews of transgender care are -- have typically labeled most -- most studies as moderate, low, or very low quality. And -- but, for example, the Taylor systematic review used in the Cass report --

THE OFFICER: Sorry. The Taylor --

THE WITNESS: The Taylor systematic review used in the Cass report said there was a --

THE OFFICER: The -- sorry. The what report?

THE WITNESS: Cass, C-A-S-S, said that the level of -- on their systematic review of hormones, the -- that there was a moderate quality of evidence. And a moderate quality of evidence is a higher quality of evidence than -- than that which supports most care and certainly most care in -- in mental health.

The quality of -- on systematic review of all of the different psychotherapeutic interventions in young people for depression, all of those are -- are low quality.

And so -- so, in -- in some cases, the

Page 273

quality or the -- or the certainty listed for gender affirming care is higher than -- than treatments that are just very commonly given and accepted as treatment for -- for cisgender people.

BY MR. LUNSFORD:

Q   Let me be more specific. Paragraph 48 of your report, on page 10.

A   Yes.

Q   You refer to the Coleman 2022, study; correct?

A   Yes.

Q   Did it rely upon a low certainty or low quality of evidence?

A   So, Coleman is -- that references the Standards of Care 8.

Q   Okay. Did the Standards of Care 8 rely on low quality or low certainty of evidence studies?

A   Yes.

Q   Okay. Let's turn the page.

THE OFFICER: We are now at seven minutes -- at seven hours.

MR. LUNSFORD: Okay.

THE WITNESS: Oh, we're done?

BY MR. LUNSFORD:

Q   Let me ask this. Paragraph -- page 11; you reference more studies there. Shang 2023. There's a

69 (Pages 270 - 273)

Page 274

Barrett Healy article from 2020. Are those low certainty of evidence studies?

A Those are not studies about transgender care. Those are references describing the Delphi process of reaching an opinion on an issue for the purpose of practice guidelines.

MS. NOWLIN-SOHL: I think we're at time.

BY MR. LUNSFORD:

Q Is there -- I always like to wrap up with these questions. Dr. Karasic, they're mostly for your benefit.

Is there anything that you feel like you've not had the opportunity to say during today's deposition that you would like to say to explain your opinions?

A No, I -- not that I can think of.

Q Is there any portion of your report that you would like to change or correct?

A No.

Q Is there any information that you didn't review or receive prior to today's deposition that you wish you had gone back and reviewed before today's deposition?

A There are always more things one can review, but I am satisfied with what I did.

Q In your report, you, on occasions, refer to a

Page 275

phrase you say, which is many studies. Was there a reason why when you referenced many studies or several studies, why you don't identify any specific study?

MS. NOWLIN-SOHL: Object to form and to the extent that we're over time.

THE WITNESS: I don't know -- I don't know what you're referring to.

BY MR. LUNSFORD:

Q Okay. You're not aware that your report -- let me ask this. If there was a study to support the statements you made, did you use your best efforts to identify and cite to that study?

MS. NOWLIN-SOHL: Objection to the extent that we're over time.

THE WITNESS: Yeah, I would hope so.

BY MR. LUNSFORD:

Q You would hope so? You would hope so that you did cite to those studies or --

A I -- maybe I didn't understand the question. Do you want to rephrase it?

Q To the extent that you were aware of scientific studies that supported the propositions you cited here, did you attempt to identify specifically by citation, each of those studies?

MS. NOWLIN-SOHL: Same objection.

Page 276

THE WITNESS: I'm -- I -- I think I would have to know what you're referring to.

MR. LUNSFORD: Okay.

MS. NOWLIN-SOHL: All right. I think it's my turn.

MR. LUNSFORD: Are you calling time?

MS. NOWLIN-SOHL: I mean, I think she did a few minutes ago actually.

MR. LUNSFORD: Well, I mean, the seven hours -- I mean, I could make all kinds of comments about the last -- I was going to give him the benefit of pointing out the study question. Do you have questions?

MS. NOWLIN-SOHL: I think I just have one or two.

MR. LUNSFORD: Go ahead.

MS. NOWLIN-SOHL: Okay.

EXAMINATION

BY MS. NOWLIN-SOHL:

Q Dr. Karasic, can you look at Exhibit 1, which is your expert report, and go to page 19?

A Yes.

Q Do you see section H where it says, "Some observations regarding health services bulletin 15.05.23?"

A Yes.

Page 277

Q And over the next roughly five pages, you provide opinions on the health services bulletin?

A Yes.

Q Do you stand by those opinions today?

A Yes.

Q And so, when Mr. Lunsford was asking about your thoughts on the policy earlier, you also are incorporating everything that's in your expert report?

A Yes.

MS. NOWLIN-SOHL: Okay. I have no further questions.

THE WITNESS: Okay.

THE VIDEOGRAPHER: This will conclude today's deposition of Dr. Dan Karasic. Our reporter will now request transcript orders. I will follow with video orders, and then I will officially take us off the record.

THE OFFICER: So, Ms. Nowlin-Sohl, would you like to order a copy of this transcript?

MS. NOWLIN-SOHL: Yeah, we'll read it and sign.

THE OFFICER: Okay. And the read and sign will be sent to you?

MS. NOWLIN-SOHL: Yes, please.

THE OFFICER: Okay. And -- but would you

70 (Pages 274 - 277)

Page 278

like to order a copy also?

MS. NOWLIN-SOHL: Yes.

THE OFFICER: Okay. Thank you.

And then, Mr. Lunsford, you automatically get a copy?

MR. LUNSFORD: Please, yes.

THE VIDEOGRAPHER: And videos?

MR. LUNSFORD: Yes.

MS. NOWLIN-SOHL: No, thank you.

THE VIDEOGRAPHER: Today is December 16, 2025, and we are off the record at 5:42 p.m.

(Signature reserved.)

(Whereupon, at 5:42 p.m., the proceeding was concluded.)

Page 279

CERTIFICATE OF DEPOSITION OFFICER

I, ARIANA BEAUMONT, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Ariana Crisafulli*

ARIANA BEAUMONT
Notary Public in and for the
State of California

[X] Review of the transcript was requested.

Page 280

CERTIFICATE OF TRANSCRIBER

I, ERIC BAKER, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Eric Baker*

ERIC BAKER

Page 281

LI NOWLIN-SOHL, ESQ.

lnowlin-sohl@aclu.org

December 31, 2025

RE: Keohane, Reiyn, et al. v. Dixon, Ricky D., et al.

12/16/2025, Dan H. Karasic, M.D. (#7772169)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at errata-tx@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

71 (Pages 278 - 281)

Page 282

Keohane, Reiyn, et al. v. Dixon, Ricky D., et al.

Dan H. Karasic, M.D. (#7772169)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Dan H. Karasic, M.D.          Date

Page 283

Keohane, Reiyn, et al. v. Dixon, Ricky D., et al.

Dan H. Karasic, M.D. (#7772169)

ACKNOWLEDGEMENT OF DEPONENT

I, Dan H. Karasic, M.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Dan H. Karasic, M.D.          Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

72 (Pages 282 - 283)

**[& - 3]**                                                                      Page 284

| & | | | |
|---|---|---|---|
| **&**  1:18 | **140**  198:3 | **20**  46:25 52:22 | 77:16,17,20,22 |

**&**  1:18

**0**

**00434**  1:10

**1**

**1**  4:9 112:25 113:1,4,6 114:14,15 118:12 189:23 220:8 239:10 271:1 276:19
**10**  189:23 216:4 273:7
**100**  2:16
**10004**  2:7
**101**  1:20
**10:48**  71:24
**10:58**  72:2
**11**  147:16,17 148:10 273:24
**113**  4:10
**115**  4:12
**12**  148:14
**12/16/2025**  281:5
**120**  166:22 198:3
**125**  2:6
**12:44**  137:15
**138**  4:14
**14**  155:20

**140**  198:3
**15**  123:17
**15.05.23**  4:16 219:13 276:24
**16**  1:16 5:8 138:13 278:10
**17**  174:4
**178**  4:15
**18**  149:17 167:6 169:5,7,19,25 170:2,5,8,17 172:2 174:1 182:8,9 188:11 195:18,18 199:15
**19**  56:4 276:20
**1940s**  79:25
**1950s**  242:3
**1960**  242:8
**1960s**  242:13
**1973**  212:19
**1990**  242:13
**1990s**  64:23
**1:53**  137:18
**1st**  70:14

**2**

**2**  4:11 115:18,20 115:21,23 118:12 184:2,6 184:7,10,11,16 189:23 220:11 220:12 231:19

**20**  46:25 52:22 59:22 60:1 124:8,23 140:5 140:8 153:18 171:2 180:2 197:23 223:19 283:15
**200**  2:16 52:17
**200,000**  62:16
**2000s**  76:5
**2001**  79:5
**2003**  64:24
**2008**  51:10
**2009**  79:5
**2011**  79:5 150:18,19 157:8 157:12,22
**2012**  150:19
**2014**  65:23 76:25 79:6
**2015**  82:21
**2016**  79:6
**2017**  101:3,10 101:16
**2018**  65:23,24 67:4 69:17 76:4 76:5,25 77:5,7 77:11 79:6 171:8 190:8
**2019**  51:12,17 51:18 103:6
**2020**  15:4,5 16:25 51:14,22 51:22 52:2,5

77:16,17,20,22 103:1 274:1
**2021**  51:14,15
**2022**  78:7,11 178:21 259:18 260:18,24 262:8 262:15 266:13 267:8,21 273:9
**2023**  104:6 273:25
**2024**  60:4,6 62:10,12 104:7
**2025**  1:16 5:8 59:19 102:14 138:13 278:11 281:3
**212**  2:9
**219**  4:16
**22**  259:21
**225**  3:9
**23**  69:21 70:1
**24**  69:21 70:1
**25**  172:1 196:25
**256**  2:20
**26**  113:10 206:24
**276**  4:4
**29**  64:8

**3**

**3**  4:13 118:12 138:2,7 189:23 190:20,20 220:14 233:3,5

**[3,000 - ability]**                                    Page 285

**3,000**  72:9,11
**30**  25:24 118:1
  197:25 225:24
  271:2,6 281:16
**30,000**  72:15
**300**  3:6 52:16
**31**  281:3
**31894**  279:16
**32399**  3:15
**325-8700**  3:9
**34**  149:25 151:4
  152:9,14,17
  154:12 155:21
**35442**  280:14
**35801**  2:17
**3:32**  198:20
**3:44**  198:23

**4**

**4**  4:15 118:12
  147:14 178:2,9
  178:16 184:8
  189:23 195:4
  221:9,10,12
  238:12
**400**  50:15 51:4
  52:14 53:12,14
**445**  3:6
**45**  136:18
**48**  273:6
**4:24**  1:10
**4:56**  248:25

**5**

**5**  4:16 34:15
  118:12 147:15
  189:23 193:6
  219:8,9,12
  233:7,9,10
  234:10 238:13
  238:20 265:21
  267:5
**50**  64:6 123:12
  123:17,18 182:4
**501**  3:14
**549-2584**  2:9
**5:03**  249:3
**5:42**  278:11,13
**5a**  233:14
**5b**  233:16 234:2
**5c**  233:4 236:13
  236:18

**6**

**6**  118:12 189:23
  238:1,2,4,14
  253:17 255:9
**60**  46:25 69:25
**600**  53:12,21,23
  54:5 57:5
**60s**  79:25
**61**  242:14
**62**  1:25

**7**

**7**  4:3 118:12
  147:23 148:1

149:12,19,20,23
150:5,18,20,24
151:2,11,16,17
151:18 152:4,10
152:17,23
153:11,20,24
154:8,15 155:11
155:11,19,24
156:6,17 157:18
157:20,21
180:15 189:23
199:6,9,13,15
199:22 211:7
265:20 271:5,13
**70802**  3:7
**717-3916**  3:17
**75**  163:13
  171:17,21,25
**7772169**  1:23
  281:5 282:2
  283:2

**8**

**8**  74:20,24 77:10
  77:17 78:6,8
  118:12 121:14
  138:18,20 148:2
  149:15,15,20
  150:2,21 151:7
  156:8,12 157:1
  157:5 164:22,24
  165:3 166:1,21
  166:22 174:25
  175:5 176:23

177:4 178:17
183:8 186:19
187:20 189:23
192:3 195:14
197:9,14,15,19
199:6,7,12,17
199:22 200:7
202:4 203:11,13
204:1,5,6,8,12
204:25 209:14
209:19,23 210:2
210:18 211:4,8
211:19,20 212:3
212:9 213:1
214:11,14
273:14,15
**80**  60:9,9 124:1
  124:9
**80,000**  60:1,7
**850**  3:17

**9**

**9**  118:12 189:23
  253:17
**91**  242:14
**936-5619**  2:20
**95404**  1:21 5:9
**9:02**  1:17 5:5

**a**

**a.m.**  1:17 5:5
  71:24 72:2
**abide**  163:4
**ability**  43:3
  47:19 87:22

101:19 112:10 279:10 280:6

**able** 22:11 52:4 66:20 222:21,22 226:6 246:16,24 247:5,12

**above** 185:23 193:14 281:6 283:7

**absence** 188:20

**absent** 5:12

**absolutely** 224:25

**abuse** 93:13

**aca** 104:20,24 105:2

**aca's** 105:5

**academic** 73:18 114:22 129:25 155:7 165:20 168:25 183:3 195:22 261:24 262:3

**academicians** 197:14

**academics** 165:25

**academy** 209:13

**accepted** 17:17 141:20,21 171:25 175:22 204:10 239:22 242:16 264:16 273:3

**accepting** 215:6

**access** 21:16 22:8 23:6 45:2 123:4 151:24 200:4 206:19 209:3 213:12 226:14,17 242:15 246:13 246:13

**accessed** 190:12

**accessible** 15:11 152:11 244:12

**accessing** 71:21 192:24

**accommodate** 52:3

**accommodated** 246:24

**accommodation** 85:5,9,13,18 86:3,20 88:2 99:17 128:6 243:24 245:4,9 249:22,25 250:5 253:5

**accommodati...** 21:11,15 22:4,9 22:13,14 23:6 24:6 32:12 85:3 86:7 87:3,7,10 87:15,18 88:6 88:14,15 95:3 96:11,18,24 97:11,17,19

98:5,11,16,21 99:1 100:4,10 101:3,6,20 121:9 123:5 126:3,14,23 127:2,6 128:18 130:1 142:10 170:6,9,11 198:7 199:23 243:9 244:8,11 244:17 245:2,19 246:8,13 249:10 249:14,18

**accordance** 17:17 22:1,20 29:9 141:17

**account** 86:8 171:19 172:6,10 172:10

**accredited** 104:24 105:2

**accuracy** 12:3 33:22 281:9

**accurate** 8:9 11:15,18 22:16 22:24 23:3,14 23:22 34:3 39:24 111:19 117:18 142:5 163:8 279:9 280:5

**accurately** 9:20 113:18,21,24

**acknowledge...** 283:3

**acknowledgm...** 281:12

**acknowledgm...** 5:11

**aclu** 6:10 10:4 49:12,14 50:2,4 50:5,7,10,13,14 50:17 51:11,15 51:16,17,17 52:23 53:10,15 75:9,11,13 108:14 109:5,24 138:24

**aclu.org** 2:8 281:2

**acronyms** 73:5

**act** 17:22 202:4

**acted** 202:22

**action** 103:5 279:11,15 280:8 280:12

**actionable** 171:3

**actions** 246:12

**active** 54:11,12 54:23,25 65:22 114:23 146:10 156:4

**actively** 55:24 158:14

**activist** 187:8 192:10,12,14,16

**[activist - agreement]** Page 287

192:21 194:4 196:11,12
**activists** 196:2,4
**actual** 116:8 150:10
**actually** 20:6,8 22:19 81:25 139:3 140:17 176:10 181:5 191:16 195:20 213:8 224:14 230:21 254:3 269:8 276:8
**actuated** 22:10
**acute** 43:1 231:8
**add** 135:22 182:13
**added** 65:3,3 69:1 182:24
**addition** 46:10 48:5 168:21 169:3
**additional** 9:21 9:24 111:9,15
**additionally** 5:12 134:8
**additions** 283:6
**address** 42:14 169:19 170:2,5 239:17 243:21
**addressed** 43:4 45:24 86:25 146:24 169:22 170:1 239:12,17

239:20
**addressing** 21:23 218:7
**adequacy** 28:18 116:7,15
**adequate** 28:12 116:20 251:1 255:17
**adhere** 162:25 163:2
**adhered** 217:24
**adhering** 163:24 217:5,8
**administer** 5:11
**administration** 255:1 258:10 259:1 260:10,24 261:18 262:3 265:4
**administration's** 262:7 266:13 267:7,21
**adolescent** 140:25 151:21 151:22 165:4
**adopt** 100:21 208:21
**adopted** 20:9 29:1 30:23 157:14 206:19
**adoption** 32:8
**adopts** 30:13
**adrian** 193:13 193:20

**adult** 14:24 55:25 56:2 136:15 238:18 257:3
**adults** 63:25 65:4 165:5,6 257:14,18
**advancing** 187:8
**advantage** 71:13
**advice** 160:14 171:3 202:4,22
**advisory** 214:17
**advocacy** 50:16 51:2,6,20 159:10,14,16 176:7 183:22
**advocate** 147:6
**affect** 90:24 147:7
**affected** 156:15 157:4 176:14
**affirming** 50:9 119:11 120:5 136:9 243:1,6 273:2
**age** 56:3 137:8 199:16 204:23 205:23
**agency** 255:1 258:9,25 259:10 259:21 260:10 260:17,23

261:18 262:2,6 262:14 265:3 266:12 267:6,20
**ages** 204:17,18 204:18 205:6
**ago** 58:14 59:8 69:23 70:12 77:1 82:19 104:4 146:22 155:20 190:11 206:15 276:8
**agree** 5:14 17:20 35:13,15 87:17 108:19 125:23 133:3 142:7 151:4 152:18 158:13 159:8,10 162:24 163:11,18 178:15 183:6 198:5 206:1,16 208:20 227:12 227:15,16,20 230:5 236:8 241:8 252:24 253:12 265:19 269:4,7,15
**agreeable** 151:5
**agreed** 55:3,21 55:22 57:7 172:8
**agreeing** 49:2
**agreement** 51:9 108:25 153:8

162:9 163:13 171:14 173:7 174:12 176:3

**ahead** 99:15 108:12 126:5,10 205:15 276:15

**aimed** 241:10

**aires** 77:12,13 79:7 171:8

**airfare** 76:16,21 79:9

**al** 2:17 5:7,8 281:4,4 282:1,1 283:1,1

**alabama** 200:16 200:21,22 201:2 201:9,11,23

**alameda** 81:6,6 82:12

**alexus** 183:15 183:20 185:1,9 185:14

**alicia** 185:5

**allegations** 22:23 23:13,20 55:9

**alleviate** 221:16 224:12,15 228:17 230:18 230:22

**alleviating** 221:14 224:19 225:11 228:23 230:20

**allotted** 281:19

**allow** 10:5 186:13 194:10 267:17

**allowed** 84:19 85:14,17 120:16 143:13

**allows** 15:17

**alonzo** 1:11 2:12 3:3

**altered** 171:22

**alternative** 152:20

**ama** 209:18,22 209:25 210:4,8 210:17,21 211:17,22 212:10,23 213:17 214:10

**amendment** 143:20,22,24,25 144:3,6

**amendments** 151:5

**america** 170:15 194:6

**american** 2:5 72:21 78:19 104:17 146:12 147:13 154:7 155:5 156:24 159:15 182:23 185:3 209:13 211:2 212:11,24

213:8,9 217:24 269:13,16,18

**americans** 153:19 169:11 181:12 182:21 183:7 269:13

**amicus** 119:21 119:22 120:1

**amount** 54:3 59:24 67:17 94:20 199:23

**amounts** 64:21

**amsterdam** 79:6

**analysis** 104:11 129:23 130:3

**annual** 60:23 61:14

**anonymous** 177:20

**answer** 8:22 9:2 9:3,11,19,25 10:1,8,14 38:7,8 38:13 41:13 44:1 66:7,12 82:6,10 90:3,9 100:6 102:2 103:10,11,14,17 111:13 144:13 161:15 176:25 186:12 193:8,11 198:18 203:16 203:21 219:4 225:6 233:22 236:25 260:16

261:7 266:24 267:12

**answered** 21:6 44:6 100:12 126:16 175:14 219:3 228:9

**answering** 8:13 55:20 103:16 267:16

**answers** 202:18

**antidepressant** 258:22

**antidepressants** 258:20

**anxiety** 46:7 47:3 48:16 90:18 91:22 92:8 93:2 94:8 94:15,20 107:4 117:9 131:5 222:22 223:14 225:20,22 227:23

**anxious** 47:12 226:5

**anymore** 213:20 213:24

**apa** 147:2 211:5 211:17,22 212:7 212:16 213:17 214:10 230:13

**apa's** 212:2

**apologize** 80:17

**apparently** 179:16

**appealed** 121:1

**appear** 116:1 178:24

**appearance** 21:25 40:11 87:19,22 95:6 95:10,16,23 96:3,5,7,24 130:19

**appears** 141:23 170:11 178:16 193:21 224:4

**appellate** 202:11,12

**appended** 283:7

**applicability** 121:11 184:24 186:4,24 187:17

**applicable** 5:18 117:1 238:24 281:8

**application** 168:22

**applications** 165:12,15 167:4 167:12

**applied** 165:17

**apply** 53:9

**appointed** 167:6 167:11

**appointment** 14:5 15:18

**appointments** 14:16,25

**apportion** 94:20

**appreciate** 44:1 65:10 103:14

**approaches** 193:22

**approaching** 72:9

**appropriate** 40:22 127:2 188:12 206:14 208:22 223:10 223:11 239:17 239:19,22 247:24 271:3

**approval** 150:25 152:14 172:4 174:23,24 175:2,6,9 209:22 210:1,24 212:4,24

**approvals** 165:16

**approve** 68:1 152:16

**approved** 133:18 152:4 155:24 171:18 172:5 174:17,21 191:24 268:7

**approves** 165:12

**approving** 175:4 186:19

**approximately** 123:12

**area** 54:24 68:14 144:4 181:18,19 182:7 263:22

**areas** 153:6 199:19,21,21 206:5

**arguably** 230:12

**ariana** 1:22 5:3 279:2,17

**arkansas** 50:2 119:5

**arlington** 177:9

**armed** 250:11

**arrest** 81:19

**article** 261:24 274:1

**articles** 262:4,8 262:9

**asia** 182:5

**aside** 20:3 40:21 118:13

**asked** 18:4 21:5 23:9,13 25:11 36:11 44:1,5 80:16,20 87:2 96:17 100:11 108:15,16 115:13 120:10

126:15 166:11 175:13,14 182:1 201:2 219:2 228:8 234:8 239:5 249:21

**asking** 40:21 100:19 103:19 117:10,12 139:6 142:23,23 159:25 163:2 167:24 169:21 180:11 185:7 186:17 203:15 207:14 231:4 232:3 246:21 261:5,6 262:6 277:6

**aspect** 101:16 163:4,10 171:4 199:8

**aspects** 22:12 104:2 116:17 132:14 134:5 158:18 162:4,10 162:21 163:20 206:20 216:15 217:23 218:10 221:1,13 222:24 230:3 240:24 253:12

**assault** 88:7,9

**assaulted** 222:25 248:9,14

assaults 248:21
asserted 143:7
asserting 143:3
assertion 91:24
230:21 259:14
261:3,5,13
262:18,18
assertions
260:12 261:10
assess 211:3
assessed 211:6
assessment
165:5,10 231:12
238:19
assigned 5:3
34:18,19 35:22
67:13 88:5
98:20 124:19
137:5,13 246:15
246:17 252:19
254:4 257:22
assist 227:17
assistance 74:18
110:2
assistant 204:4
205:4,23 206:2
assisting 244:20
associate 73:14
73:16 165:23
associated 57:2
221:14 224:13
224:19 225:15
227:18 228:18
229:14,20 230:6

241:10,13
255:22 256:18
257:1
association
27:24 28:1
68:21 78:20
79:20 104:18
132:17 146:5,13
146:19 147:13
156:25 157:25
159:15 211:2
212:11,24 213:8
213:9
associations
146:2 209:17
assume 9:13,25
22:23 23:13,22
33:20 34:9
36:10 89:23
90:11 96:4
166:10,12
185:18 188:6,9
194:17 235:1
259:24
assumed 23:3
assuming 36:13
92:10
assumption
97:19
assure 182:14
assured 23:2
66:9,14
athlete 125:8

atlanta 79:6
attached 14:10
281:11
attacks 226:7
attempt 20:18
201:1 218:8
275:23
attempted 94:20
271:10
attempts 226:23
attend 67:17
71:7,7 77:13
attendance 6:1
attention
105:20
attire 130:11
attorney 204:3
279:13 280:10
281:13
attorneys 49:22
108:14
attract 105:19
attributing
97:16
audio 270:22
279:8 280:3
audit 104:20
105:5
australia 149:6
author 65:15
66:17 148:1
150:23 153:12
167:9

authored
112:12 114:20
115:2 193:3
authorities
112:3 211:23
authority 68:12
160:7,9,17,19
160:22 161:8
204:7
authorization
234:24
authorized 5:10
authors 91:9
149:25 154:18
200:6 202:21
automatically
278:4
availability
252:16
available 22:4
22:15 45:1,10
110:19,22 111:5
111:9 199:20
209:7 212:12
218:3 241:9
246:8 251:11,16
281:6
average 60:24
aw 1:10
awaiting 81:18
aware 21:11
24:9,12 25:1,13
69:5,14,16,18
69:20,22 75:10

**[aware - benefit]**

91:2,12,20 95:8
98:4,9,14,24
99:16 104:23
121:13 131:18
131:23 136:25
158:17,23 160:3
160:20 161:5,13
164:18 176:7
183:18,21
196:25 200:4,6
200:10,13
202:21 203:2,10
203:25 206:11
206:18 207:23
209:13 210:5
212:14 243:23
244:15 248:3,8
275:9,21
**awareness** 41:9
**axiomatic** 30:14
30:22

**b**

**b** 4:6 190:21
231:7 234:23
235:21
**back** 8:25 17:25
18:1,2 20:12
24:5,6,7 28:4,5
34:5 42:1 50:25
53:14 67:3,5
72:3 73:12
74:25 78:2 89:2
99:12,23 103:7

117:15 118:1,1
123:7 137:19
146:22 151:11
157:24 171:22
172:13 173:18
173:23 174:17
174:18 177:25
186:16 194:23
198:24 205:11
206:12 213:5
221:18 242:3
253:8 255:6
260:11 265:3
274:21
**background**
19:21 188:10
**backgrounds**
168:25
**bad** 23:8 140:17
**bahamas**
183:22
**baker** 280:2,15
**ballpark** 62:11
62:13
**ban** 50:8 119:11
**bangkok** 79:6
**banning** 120:5
**bar** 155:9
**barber** 244:4
**barrett** 274:1
**base** 17:19
**based** 16:12
39:25 41:25
91:24 110:19,22

111:4,8 114:22
120:14 142:16
168:3 170:20
200:8 215:7
271:15
**basic** 69:2
**basically** 76:21
182:9
**basis** 61:14
115:5
**baton** 3:7
**bay** 15:14
181:18
**beaten** 57:24
**beaumont** 1:22
5:3 279:2,17
**becoming**
134:20 150:23
**beds** 45:9,13
**began** 29:6
**beginning** 6:2
242:12
**begins** 8:23 62:2
63:2
**behalf** 2:2,11
3:2 56:7 122:21
122:23
**behavior** 164:2
**behavioral**
222:5
**belgium** 149:8
153:25 168:10
**belief** 175:15

**beliefs** 124:24
162:3 226:17
253:21
**believe** 6:12
9:18 12:11 17:5
23:5 24:13,24
29:8,13,14 34:1
40:20 43:20
49:7 51:12
58:10 67:4
73:22 78:10
91:11 101:3
113:9 119:14
121:1,17 132:13
138:1,18 140:15
141:24 142:3,9
144:22 151:24
158:24 162:1
163:1 175:18
184:3 188:19,25
191:23 208:24
216:16 247:3,11
249:10 263:4
270:25
**believes** 208:21
**believing** 164:6
**beneficial**
225:20 227:13
**benefit** 48:9
86:19 222:1,5
222:16,19,25
223:1,14 240:14
242:17 268:13
274:11 276:11

**[benefits - brophy]**

**benefits** 15:7 255:17,19 258:6 258:16,17 259:25 260:5 262:20 263:11 263:14 264:8,10 264:12 265:6,11 265:13 266:5

**benjamin** 79:19 79:21,23

**best** 275:11 279:9 280:5

**better** 88:20 131:8 212:25 222:20 226:6 230:3

**beyond** 48:14 69:2 119:20 167:15 247:15

**big** 71:20

**bill** 6:4,4,18 139:3 143:19

**billed** 52:22 129:14,15

**billing** 53:6,8

**binary** 124:13 125:15 135:25 136:4 175:19

**binder** 85:10,11 85:12 127:10

**binders** 128:13 130:12

**binding** 244:19

**bio** 179:21 180:7,11 187:6 190:21 192:9,17

**biographical** 178:25 180:3

**biological** 227:5 231:2

**bipolar** 240:13

**birth** 34:19 88:5 124:19 137:6,13 246:15 252:19 254:4 257:22

**bit** 7:14 18:2 23:17 51:23 79:3 127:16 128:17 131:3 132:5 168:13,14 238:4 270:7

**blade** 250:25 251:5

**block** 76:23

**blockers** 216:13 216:19 217:14

**blood** 14:10

**blue** 250:17,25

**board** 26:18 27:7,11,13,15 27:16 50:3,3 65:24 70:12 72:18,24 73:13 73:22 74:3,9 75:24,25 76:10 146:3 147:18 148:6,8,9,10,11

148:16,22,23,24 149:2,3,5,6,7,7 149:10 150:17 150:22 158:7,10 159:24 160:4,5 160:6 167:1,1 177:16 190:16 203:20 210:5,8 210:16,25 212:4 212:5,8

**boards** 146:1 148:21

**bob** 241:25

**bodily** 124:14

**body** 130:24,24 131:1,3,7,8,11 131:12 149:18 150:5 194:14 265:12,16

**bones** 137:9

**book** 76:23

**boothe** 1:6 2:3

**boston** 181:19

**bottle** 251:25 252:1,10,10

**bottom** 184:3,14 184:19 255:8

**boulevard** 3:6

**box** 226:21

**brandt** 50:1 51:16 119:6,7,8 119:9,9

**bras** 130:12

**braziers** 21:17 128:13

**brazil** 185:5

**breadth** 67:18

**break** 8:20 10:11,12,13,15 15:19 62:4 65:8 69:19 71:23 123:11 136:13 137:14 196:23 198:19 207:16 238:6 239:5 248:24

**breakdown** 181:10,11

**breast** 254:22

**breasts** 256:19

**brief** 48:24 200:15

**briefing** 119:18

**briefly** 50:5

**briefs** 119:21,23 120:2

**bring** 159:5

**british** 154:25 155:4,5

**broad** 2:6

**broader** 25:21 122:4,7 173:21 204:25 250:11

**broadly** 167:18

**broken** 8:24

**brophy** 1:18

**[brought - care]** Page 293

brought 205:11
brown 242:7
budget 160:6
buenos 77:12,13
  79:7 171:8
bulletin 4:16
  20:9 29:1,5,11
  29:17,20,23
  30:2,4,6,9 31:9
  31:12,15,20,25
  32:3,9,13,19
  219:13 253:9
  276:23 277:2
bumps 70:9
bunch 229:2
business 103:12
busy 51:25
butler 2:15 3:5
butlersnow.com
  2:18,19 3:8
bylaws 158:7,8

**c**

c 2:1 3:1 5:1
  175:17 231:11
  231:18 238:9
  268:5 272:15
ca 1:21
calhoun 3:14
california 5:9
  5:11 17:5 81:3,5
  82:1 92:4
  101:25 103:23
  103:24,25

146:15,21 147:1
147:3 182:17,20
183:9,12 246:11
248:15 279:19
california's
  141:7
californians
  182:18
call 8:13 23:16
  65:21 108:20,23
  128:5 149:13
  170:24 206:20
  254:22
called 7:3,22
  21:11 67:23
  116:5 149:22
  242:9
calling 276:6
calls 108:11
  120:9 152:1
  153:6
cambridge
  35:11
campaign 122:4
canadian 149:6
  153:14
canadians
  181:12
candace 1:6 2:3
cantor 200:23
capacity 164:13
carceral 126:4
cardiovascular
  254:20 256:6,8

256:9
care 13:2 16:20
  17:6,11,16,21
  18:1 19:12,16
  26:12,17 28:11
  28:18,23 37:25
  39:10,12 42:17
  43:8,10,12,23
  45:7,25 50:9
  53:7 55:25
  56:13,22 57:1,2
  60:19,21 61:8
  63:5,8,20 65:4
  68:6 74:14,20
  74:23 75:25
  77:10,17 78:2,6
  78:8 79:24
  83:19 101:20
  107:8 116:8,17
  118:22 119:11
  120:5 121:14
  122:6 124:5,23
  124:25 127:22
  128:3 133:15,17
  140:13,16,21
  141:10,15,15,18
  141:21 143:9,12
  144:24 145:16
  145:20 146:24
  147:23 148:1,2
  149:12,14,15,19
  149:20,23 150:2
  150:5,18,20,21
  150:24 151:2,7

151:11,16,17,18
152:4,10,17,23
153:11,24 154:8
154:15 155:19
155:24 156:6,8
156:12,17 157:1
157:5,18,20,21
158:18,23,25
159:2,5,7,17,19
160:14,23 161:4
161:9,17 162:4
162:8,17,21,25
163:2,5,24
164:6,6,12,22
164:24 165:3,3
165:10 166:1,21
166:22 168:5
170:22 171:4
173:17 174:25
175:5 176:12,14
176:18,22 177:4
178:17,20
180:15 183:8
184:24 186:19
187:18,20 188:5
192:3 193:14
194:5,23 195:4
195:14 196:18
197:1,9,14,15
197:19 198:12
198:13,17 199:6
199:6,7,8,9,12
199:13,15,17,19
199:22,22,23

200:4,7,12
202:4 203:11,12
204:1,5,6,8,12
204:25 206:20
206:21 207:25
208:10 209:3,9
209:14,19,23
210:2,18 211:4
211:7,8,19,20
212:3,9 213:1
214:11,14
217:12,23,23
218:7,10 220:18
221:10 225:25
226:18 238:25
242:14 243:10
243:15,20
245:10 254:9
255:1 258:10,12
259:1,16,19
260:10,23
261:18 262:2,7
265:3 266:13
267:7,21 268:21
272:6,19,20
273:2,14,15
274:3
**career** 15:2 65:5
**carefully** 98:3
**caregivers** 39:9
40:23
**caring** 62:9
**carry** 47:23
60:16

**carrying** 31:19
32:2
**carved** 61:12
**case** 1:9 10:4,18
11:2,5 12:10,13
12:13,18 21:11
24:11 25:6
28:18 36:11
49:1,11,23 50:5
51:5,16 52:21
56:16 57:1,18
57:19 58:2,9,12
58:16,17,18,23
59:1,3,4,6,10,11
59:16 80:9 84:8
96:19 100:2,8
100:14,16,16,19
103:7 108:8,15
108:17 109:1,5
110:9 111:4,16
114:4 116:19,24
117:12,14,16,23
118:13 119:5,7
119:8,23 120:2
120:7 121:5,20
139:25 140:3,6
142:8,25 143:3
144:19 145:17
191:18 200:22
201:23 202:13
210:6 218:16
243:2,8 247:12
247:19,25,25
250:24 257:16

**caseload** 67:24
67:24
**cases** 49:19,25
50:8,12,13 51:1
51:13,24 52:4
52:24 53:13,23
53:24,25,25
54:5,6,12,19,24
55:1,4,5,17,21
55:23 56:6 57:4
57:6,7,8,9,12,20
67:22 104:7
113:24 114:2,4
114:7,8 116:4
116:12 117:4,6
118:4,5,21,25
119:4 120:20
121:1 224:6
247:7,20 270:13
272:25
**cass** 272:8,12,15
**cast** 122:9
**castrated**
226:20
**castration** 271:9
**casts** 122:13
**catch** 38:13 53:5
53:8
**category** 55:10
57:4 128:6
**cause** 51:22
77:16 78:5
94:15 105:13,16
124:14 136:22

191:25 192:6
202:9 239:25
240:18,20,22
241:1
**caused** 94:21
228:6
**causes** 216:22
**causing** 41:11
**cdc** 102:17
**cdcr** 102:17,23
248:3,8
**cdcr's** 102:22
**center** 50:21
51:10
**centers** 183:4
**central** 237:18
**century** 243:15
**certain** 42:22,23
67:17 121:21
147:6 158:18
164:19 165:4
200:6 202:21
206:20
**certainly** 15:3
42:16 43:4
72:25 83:17
109:23 117:15
118:5 124:2,5
127:12 136:13
155:13 162:2
163:19 166:14
182:14 229:23
247:20 253:4
272:20

**certainty**
215:14,21,21,23
216:16 263:15
273:1,11,16
274:2
**certificate** 279:1
280:1
**certification**
26:18,21,25
27:7,12,14,16
27:17 65:16,17
66:1,3,11 67:2,7
67:7,14,16
68:10,20,21,23
69:7,7,15
203:20
**certifications**
68:25
**certified** 5:14
65:13,14,19,20
65:21 66:10,13
66:13,20,24
68:2,7
**certify** 279:3
280:2
**cessation** 137:2
**cetera** 22:2
**challenged**
208:25
**challenging**
132:12
**change** 80:2
87:19,22 95:22
96:7 99:18

136:3 147:13
162:7 173:23
204:5,7 205:11
205:17 206:11
227:7 251:6
257:20 274:17
282:4,7,10,13
282:16,19
**changed** 73:24
107:24 130:18
133:24 172:11
209:8 253:21
**changes** 124:14
137:1 153:6
174:21 199:10
200:7 203:11
204:1,12 205:19
256:25 257:10
281:10 283:6
**changing** 95:15
100:25 101:18
130:11,11
205:22 218:12
223:22
**chapter** 140:25
141:2,3 147:21
147:22 148:2,3
149:16,16 150:3
165:4,5,5,6
167:6,7,8,9,11
167:13,25 169:5
169:7,19,22,25
169:25 170:1,2
170:5,7,17

172:2 173:19
174:1,9 175:15
175:16,19,19
176:18,19
177:20 182:2,3
184:25 186:6,7
187:1,1,16,17
187:23,25
188:11,20,21
189:2 191:25
194:18 195:16
195:20 196:12
196:20 197:4
203:8
**chapter's**
168:15
**chapters** 141:4
149:17 165:4,6
165:9 167:6
173:16 174:4,5
186:9 195:18,23
**character**
172:12
**characteristics**
34:23
**characterizing**
260:12
**charge** 31:6
53:12 77:9
**charged** 31:3,19
53:21,23
**charging** 53:14
54:5 57:5 76:15

**charity** 196:7
**chase** 221:8
239:4
**checkbox** 39:1
**checklist** 238:20
**chemically**
251:19
**chest** 85:10,11
85:12 136:14
244:19
**chicago** 169:15
181:19
**child** 151:21,21
165:4
**choose** 246:16
246:25 247:12
**chosen** 132:18
**chromosomes**
227:8
**chunk** 63:22
**circulated** 205:8
**circumstance**
42:20 121:12
207:9 239:2
**circumstances**
17:23 42:23
43:7,9 125:1,13
135:21 268:19
**cisgender** 63:9
84:10 89:20
120:17 135:2
222:24 246:25
247:1 251:11,12
251:17 273:4

**[citation - committee]**

citation  266:12 275:24

cite  91:10 99:24 271:14 275:12 275:18

cited  132:13 211:3,18,24 214:11 242:6 259:10,13 260:23 261:17 262:14 271:20 271:23 275:23

citizen  269:19

citizens  218:3

civil  2:5

claim  90:23 143:7

claiming  258:6 260:1,6

claims  143:2

clarify  169:20 180:22

clarity  8:15

clarity's  25:16

class  103:4

classification 104:8 147:17

classifications 236:23

clayton  1:10 2:11 3:2

clear  27:6 28:17 44:18 66:2 167:21 178:15

252:17 265:19

clearly  215:21

clerk  3:21 6:19

clinic  63:20 64:11,24,25 65:1,2

clinical  16:23,24 38:23 39:13 40:7,8 41:11 61:17 62:12,13 67:22 73:7 132:24 140:21 165:7 170:20 204:20 215:2,25 244:6,15,18,25 245:3 259:16

clinically  35:4 43:25 228:21

clinician  141:16 142:14,14 154:24 162:24 164:21 165:20 183:19 194:19 195:25 238:24 241:24 243:23 244:7 252:8

clinicians  39:17 40:24 72:22,25 75:21 108:4 143:10 154:19 155:10,14 156:4 160:23 168:23 197:13,14 229:18 244:16

clinics  39:19 63:24

clitoral  257:23

clitoris  257:20

close  63:19 202:5

closer  180:10

clothes  21:25 128:12

clothing  21:16 22:1 244:4

cme  79:12

coaching  233:24

coast  182:21

cocktail  40:5

cognitive 222:23 238:19

coined  241:25

coleman  1:5 2:2 273:9,13

collateral  39:8

collaterals 40:22

collection 110:10

collectively 182:13

color  251:5

colorado  103:4 103:23 104:2,7

come  15:14 17:25 20:12 24:5 28:4 34:5 50:25 77:17

86:22 110:18 170:19 191:9 244:10 255:6

comes  110:13 110:15 111:11 115:12 143:18 143:19 252:1

comfortable 41:4

coming  39:12 63:10 127:13 150:15 238:6

comment  173:1 173:25 174:2

commented 206:15

comments 171:15 173:19 174:6 177:1,21 177:22 190:3,4 191:4,7 276:10

commissary 252:21

committee  77:9 146:21,23 147:6 147:11,19,20,23 147:24 148:1 149:2,11,14,15 149:23,24 150:3 151:1,3 152:2,6 152:9,12,14 153:10,20 154:1 154:5,20 155:11 155:11 156:3

163:25 165:14
166:2,20,24
167:11,14 168:8
168:9,20,22
169:3,4,6,12
172:1,18,24
177:23 180:3,7
181:5,9,15,23
182:17 183:7,8
185:4,15,18,20
186:3,5,5 197:1
197:9,15,19
198:4,17 200:12
211:5

**committees**
146:18 147:12
182:8 196:17

**common** 124:11
137:10 216:2,4
216:4 217:22
221:4 270:4,5,9

**commonly**
17:20 46:3,12
126:11 140:24
212:20,21
238:21,23 273:3

**communication**
177:6,13

**communicatio...**
8:12 14:17
108:12 121:21
139:22

**communities**
157:4

**community** 17:6
17:11,16,21
141:18 168:23
169:3,10,16
173:21 176:13
182:16,23
185:20 194:2
195:17,19,24
196:1,19

**comorbid** 46:16
46:19 47:7,10
47:15 48:3,10

**comorbidities**
45:19 46:3
107:20 239:11
239:16,18,18,20
239:24 240:4,15
240:19

**comorbidity**
45:22,23 47:1
47:23 240:7

**compared** 92:9

**comparing**
98:21

**comparison**
199:9

**compensated**
77:12

**compensation**
76:7

**competitive**
125:8

**complained**
32:16 200:7

**complaint** 10:22
11:2,4,10,12,14
11:20,23 12:1,4
12:7 18:2,12
22:6,24 23:2,14
23:21 33:18,24
96:6 100:24
101:5 108:22
109:9 145:22

**complete** 8:23
115:4 283:8

**completed**
166:6,8 281:16

**completely**
137:1

**complicated**
66:8

**components**
131:25

**comprehension**
265:25

**comprehensive**
114:7,24

**concentration**
181:14

**concept** 220:24

**concern** 227:1

**concerning**
147:1

**concerns** 85:15
85:15 86:25
102:18 221:9
231:11 233:10
233:13 236:13

236:18 239:8

**conclude** 277:13

**concluded**
278:14

**conclusion**
120:9 208:15

**conclusions**
23:16 111:24

**concurrence**
121:16

**condemning**
164:19

**condition** 46:16
47:7,15,18,21
47:24 48:4,7,11
48:17 63:11
129:17 141:17
141:21

**conditioned**
230:19

**conditions** 46:1
46:9,19 47:10
116:23 168:16
170:4,23 226:2
226:3

**conduct** 109:14

**conducted** 14:5
14:15

**conducting**
229:2,15,19

**conference** 14:6
70:6,21 71:7
77:14,15 78:10
152:1 153:5

**[conferences - corporations]** Page 298

**conferences** 74:4 76:12 79:1 191:16

**confidential** 1:25 62:1,5,17 234:25

**confirm** 20:19 33:22 36:15 38:19

**confirmed** 91:13

**conflict** 105:20 166:5,9,14,19 210:10,11,17

**conflicts** 210:8

**confuse** 240:19

**confused** 9:7 151:14

**confusion** 9:12

**congruence** 130:24 131:1,3 131:7,11,12

**consensus** 151:3 159:6 170:19,21 211:10,13 215:2 215:7

**consent** 43:3 234:24 235:2 236:8 255:12 258:22

**consenting** 256:10

**consequence** 131:7

**consequences** 126:9,9 135:19

**consider** 25:19 36:8 100:8 121:4 254:23 265:25

**consideration** 42:9 46:2 86:13 205:22

**considered** 105:5 161:14 164:3 174:13 224:7

**consistent** 142:2

**constitute** 5:22

**consult** 87:10 218:15

**consultant** 80:24 81:6 122:25

**consultation** 15:24 16:4 64:12,13,15,18 81:10 147:15 156:1 176:10,15 231:12

**consulted** 81:3,5 176:8,22 177:4 205:24 223:18

**consulting** 64:17 101:25 232:25 246:11

**cont'd** 3:1

**contact** 48:6 54:17

**contacted** 54:16 108:14

**content** 48:18

**context** 35:19 35:25 36:4,7 104:9 144:10

**contexts** 36:2 238:17

**continue** 129:20 135:5,10 223:15 240:4

**continued** 201:24

**continuing** 53:7 66:22 67:17 71:8,11 78:18 230:15

**contraband** 84:13,16,17,20 84:24

**contract** 44:14

**contracted** 43:22 44:9,15 54:1

**contribute** 134:22,24 238:25 243:13

**contributed** 75:9,11

**contributions** 24:24 74:6 168:3

**contributor** 180:11

**contributors** 4:15 177:24 178:17 180:15 195:13 202:3 206:6,8

**controversial** 217:13

**controversies** 217:13

**convenience** 15:21

**convenient** 15:11

**conversation** 251:3

**conversations** 40:1,4 48:24

**convicted** 81:20

**cooper** 50:1 131:2

**cope** 226:6

**copies** 281:14

**coping** 222:20 222:21

**copy** 113:14 115:23 178:5 219:12 277:19 278:1,5

**core** 165:7

**corneil** 195:3

**corporations** 74:7 75:7

correct 10:24 14:6 23:24 28:2 45:20 49:12 90:6 110:19 111:20,24 112:4 112:6,14 113:14 114:14 115:23 120:21 121:14 123:14 129:21 131:11 134:10 134:25 137:22 138:13 144:7 146:4,16 149:12 157:25 166:3,6 170:12 178:17 183:9 192:10 193:22 194:1 201:1 207:25 219:12,14,17,20 221:5 226:11 234:11,14 241:15 259:3 265:16 266:13 273:9 274:17 283:8

corrected 123:19

correctional 84:5 104:18 245:12,13 248:4 248:9

corrections 3:13 3:22 6:7 19:18 20:10 29:2,19 30:10,13,15,23 30:24 31:5 44:13 57:25 81:4 82:1 83:4 83:11 84:21 95:9 96:3 100:20 104:15 109:15 122:22 122:24 123:1 143:4 176:16,19 176:22 177:3,8 177:12 219:14 232:9 283:6

correctly 42:2

counsel 3:12 6:17 10:4,6 25:9 25:11 48:19 49:6 96:17 108:12 136:17 138:23,24 139:17,19 207:16 234:9 235:9 279:10,13 280:7,10 281:14

counseled 206:25

count 183:13 189:8

counted 190:2

countries 191:21

country 99:10

county 81:6,16 82:13

couple 8:9 38:18 48:25 53:3 54:13 57:7,8,9 58:13 59:7 65:11 136:20 199:5

course 23:1 27:15 65:5 70:15 73:8 81:9 109:12 110:15 111:12

courses 70:6,22

court 1:1 8:5 12:10 43:14 116:6 119:8 121:2 123:2 125:19 138:1 143:24 201:12 239:5

courts 144:9,19

cover 8:1 65:11 123:10

cracks 109:4

create 65:16

created 29:17 152:8 194:13

creates 272:3

creation 65:22

credits 67:18

crisis 231:9

criteria 67:16 165:17

critics 198:13

cross 254:16 255:9 268:7,20

crosstalk 90:2 214:3 267:15

cruel 143:13,15

cultures 191:22

cure 128:22

cured 129:4

current 16:12 18:25 19:4 47:6 71:17 123:13 129:25 200:8

currently 16:15 18:21,24 19:12 20:1,24 22:15 26:4,7 27:6 32:22 36:21 43:11 44:3 54:6 54:23 72:7,10 218:6 241:9 249:13

cut 221:8 239:4 253:1

cv 1:10 113:14 113:17 114:11 114:22,24 180:8

cvs 167:4 187:4

**d**

d 1:10,20 2:11 3:2 4:1 5:1,7 151:9 232:21 237:22 281:4 282:1 283:1

d'marco  183:16
  183:20 185:1,9
  185:14
d.c.  169:15
damages  54:2
  57:6 80:8
dan  1:15 4:9,11
  4:13 5:6 6:11
  7:2 113:7
  277:14 281:5
  282:2,24 283:2
  283:4,12
danger  247:22
daniel  242:7
data  91:2,12,20
  91:25 97:10
  217:3 248:19
date  1:16 30:7
  102:7 104:4
  113:15 282:24
  283:12
david  3:20 5:25
day  216:8
  223:20 283:15
days  281:16
dean  195:3,7,9
debate  23:24
  228:14
debilitated
  254:13
debilitating
  253:25 254:13
decades  221:18
  223:4,4 241:22

242:14 243:22
december  1:16
  5:8 138:13
  278:10 281:3
decide  202:9
decided  68:17
  80:2 136:2
decides  141:16
  158:5,10
deciding  141:11
decision  119:13
  119:19,21
  120:21,22
  121:13,25 122:7
  122:9,12,16
  159:7 172:13
  188:17 205:5,13
  212:2 253:22
decisions
  143:24 144:2
  147:6 261:15
declaration
  10:21,22,24,24
  49:3 58:19
  110:5 114:12,13
  242:6
declarations
  110:12,16
declare  283:4
decline  69:14,20
  69:25
decrease  93:21
  94:8 257:13

decreased  98:11
deemed  268:6
  268:15 283:6
deep  256:13,15
defendant  4:8
  113:1 115:21
  138:7 178:9
  219:9
defendant's
  113:6 138:2
  178:2 184:7
  195:4 219:8,12
  234:10 238:13
  265:21 267:5
  270:25
defendants  1:13
  2:11 3:2
defended  56:20
defense  53:24
  54:20,22 55:1
  56:15
define  17:14
  21:14 141:14
defined  21:21
  34:15 84:20
  144:9
defining  47:1,2
  47:3
definitely  10:12
definition  17:21
  22:4 35:10,13
  36:5 142:2
  243:5

definitions
  84:23 220:13,16
degree  102:4
  155:6,7 159:16
  185:25 226:21
  241:18
degrees  49:20
dekker  119:4
  208:4
delayed  205:14
deliberate
  144:16 145:3,13
deliberately
  145:16
deliver  214:9
delivered  159:2
  168:5 194:6
  213:16
delivery  192:22
delphi  151:7,9
  157:3 163:12
  171:10,10,23
  172:14 173:4,6
  173:23 174:2,5
  174:10,19 175:3
  185:15 188:15
  205:9,12,16,17
  206:6,9,9,12
  274:4
delusions
  253:21 254:10
demand  68:16
demonstrate
  258:17

**demonstrated** 69:6 98:5 223:7 225:10 252:18

**demonstrates** 98:9,14 217:3

**denied** 145:16 158:25 270:17

**denying** 143:12 144:22,23,24

**department** 3:12,21 6:7 19:17 20:9 29:1 29:18 30:10,13 30:15,22,24 31:5 44:13 51:8 80:25 81:4 82:1 83:10 84:21 95:9 96:2 100:20 109:15 122:22,24 123:1 141:7,7 143:4 176:15,22 177:7 177:12 219:14 232:9

**depend** 46:20

**depends** 42:20

**deponent** 281:13 283:3

**deposing** 281:13

**deposition** 1:15 4:13 5:6,20 7:12 7:13,15,18 8:3,7 8:9 9:17 10:11 10:20 11:7 24:8

48:20,24 49:5 57:14 112:14,18 114:3,10 118:13 138:12 175:14 201:25 202:9 274:13,20,22 277:14 279:1

**depositions** 7:20 12:17,21,23 13:1 109:18

**depressed** 47:11 226:5

**depression** 46:7 47:3 64:19 92:8 94:7 131:4 222:23 223:14 225:21,22 227:23 272:23

**depressive** 39:4 46:10 47:17,20 240:10

**deputy** 6:17

**derived** 59:20 60:10 61:5 62:9

**describe** 40:2 41:8 108:7

**described** 132:5 192:21 227:11

**describing** 274:4

**description** 4:7 187:7 237:23 255:17 259:19

**designate** 78:16

**designations** 214:20

**desire** 49:3

**desired** 252:7

**despite** 226:23

**detail** 11:12 86:23

**detailed** 28:10

**details** 29:10,16 31:4 45:7 150:19 203:8

**determination** 120:15 142:14 264:16,21

**determinations** 120:14

**determine** 96:20 142:15 188:11 241:17 244:16 252:10

**determined** 86:18 242:3,10

**determining** 244:8

**detransition** 135:23,25

**detransitioned** 55:14,18 198:17

**develop** 30:1 68:13 150:5

**developed** 150:18 157:20 170:16

**developing** 157:13 188:16 202:3

**development** 74:19

**developmental** 36:20

**devoted** 52:11 52:20 61:8 140:6,7

**diagnosed** 34:11 36:13 38:21 41:17 46:15 47:4,16 55:6 107:20 118:6 221:21 227:14

**diagnoses** 20:20 32:23 39:3

**diagnosing** 41:4 42:3

**diagnosis** 28:6 32:22 33:2,5,12 36:8,12,16 37:13 38:2,5,10 38:16,24 39:2 39:24 40:10 41:7,21,24 42:8 42:17,18 47:7 47:24 60:16,22 94:22 120:14 123:8,14 217:17 228:20 230:9 233:1 237:16

**[dialectical - distress]** Page 302

dialectical
  222:5
dictionary
  35:11
difference  35:9
  35:21,24 37:14
  41:9 81:12,15
  88:13 199:14
  214:23
different  8:9
  37:19 44:2 45:1
  49:20 84:10
  89:2 95:20 98:2
  98:3 101:21
  117:10 127:16
  128:9,18 131:19
  132:6 133:5,10
  133:11 145:10
  146:1 148:20,20
  153:3 159:3
  182:8 192:3
  196:19 199:5
  200:13 220:25
  251:9,20,22
  272:22
differently
  111:14
differing  162:20
  163:20
difficult  132:23
  133:5,9 134:6
  237:11
digital  279:8
  280:3

dimensions
  64:24,25 65:1
direct  68:15
  204:24
directly  40:12
  48:6 67:22
  76:22
directors  146:3
disability  50:21
  51:11
disagree  163:4
  180:21 181:2
  187:7,12 219:24
  220:2,6,9,10,12
  220:14,16,21
  221:13 227:12
  227:16 253:10
  253:12,18
  256:24 257:12
  258:4 261:2,12
  263:10 265:14
  265:19 268:4
disagreed
  163:15 172:2,8
  175:1,11 253:11
disagreement
  162:9 174:13
  175:20 259:17
disagreements
  161:24
disbanded
  194:10,13
discipline  27:12
  69:4

disclosed
  121:22
disclosure
  234:25
discount  53:9
discounted  70:8
  71:14
discrimination
  57:9 134:16
discriminatory
  120:16
discuss  126:6,8
  142:8 152:1
discussed  24:7
  40:9 67:23
  117:13 121:14
  130:2 153:7
discussion
  87:14 128:16
  252:6
discussions
  48:19 126:20
  127:10,12
  229:19
disease  254:20
  256:6,8
diseases  147:17
disfigurement
  254:21,22,24
  256:23
dismissed  54:14
  54:16 114:5
  224:23

dismissing
  262:20
disorder  39:4
  47:4,17,17,20
  48:16,16 107:4
  147:14 238:20
  240:10
disorders  39:3
  90:19 117:9
  240:14
disproportion...
  181:22
disproportion...
  90:24
dispute  118:9
  153:7
disruptive
  51:24
disseminated
  173:11
dissemination
  156:14
dissipate  137:2
distant  144:3
distinguish  63:8
distinguishing
  124:7
distortions
  222:23
distress  35:4
  37:18 41:11
  91:23 107:24
  108:4 130:4,22
  131:15,16,16

**[distress - dysphoria]** Page 303

133:4,6,9
134:13,25 135:6
135:16,16,22
221:14,16
224:12,15,19
225:11,14,17
226:21 227:22
227:25 228:17
228:19,21,23
229:5,9,14,20
229:25 230:2,5
230:8,11,18,20
230:22 241:10
241:13
**distressed** 226:8
**distributed**
250:17
**district** 1:1,2
119:8
**disturbance**
270:22
**diversity** 168:4
181:25 182:12
197:4
**division** 1:3
**divorce** 135:19
**dixon** 1:10 2:11
3:2 5:8 6:6
12:14 281:4
282:1 283:1
**doc** 152:8
**doctor's** 128:15
244:5

**doctorate**
154:23 155:7
**doctors** 33:12
55:15 133:22
**document** 20:7
20:13 23:21
95:6,10 122:19
137:24 138:10
138:15,19,20,22
151:23,24
152:19,24 153:4
164:25 187:21
190:10 197:6
201:15 202:7,10
205:14 260:10
260:11,15
264:23 265:4
**document's**
259:18
**documenting**
66:22
**documents** 9:17
9:19 10:1 109:7
109:11,16 139:1
139:6,10,14,16
139:19 219:16
244:11
**doe** 119:5 208:4
218:8
**doing** 39:20
40:7 51:21 52:6
63:19 64:10,11
64:11,18,19
109:6 130:12

165:10
**dollars** 75:18
76:18,21 79:14
**donated** 75:24
76:1,3,6
**donation** 74:11
**donors** 75:7
**doubt** 214:13
215:3
**downstream**
131:4
**dozen** 7:19,20
49:18
**dr** 5:6 6:11 7:10
24:2,11,13 25:3
25:5,8 26:13
131:14 137:21
191:10 199:2
200:23 219:11
231:25 239:4
249:6 257:9
265:25 274:10
276:19 277:14
**draft** 170:17
171:5 205:8
**drafting** 110:7
140:11
**draws** 8:25
**drive** 15:15
**dropped** 70:14
70:20
**dsm** 34:15 41:6
129:13 147:14
147:15 212:19

238:20
**dues** 74:4,16
75:1
**duly** 7:3 279:5
**dvts** 256:15
**dysphoria** 21:24
32:24 33:2,5,13
34:11,14,15
35:25 36:6,12
37:1,5,12 38:3,4
38:5,16,21,25
39:15,21,25
40:10 41:3,5,18
41:20 42:4,9
46:4,15 47:5,11
47:19 48:14
55:7 60:16,22
61:9 79:20
83:16 85:14,19
87:12 94:22
95:1 97:4
116:21 117:2,13
117:17,21 118:6
118:7,23 123:14
124:15,19
125:24 128:4,22
128:24 129:3,5
129:9,12,16,21
131:13,17 132:9
135:11 147:14
217:18 221:10
221:15,16,19,22
222:1,2,4,7,10
222:17,19 223:2

**[dysphoria - empowered]**

223:7,10,12,13
223:16,21,24
224:13,20
225:10,11,15,18
225:18,21,23
226:1,7,9,25,25
227:14,18,22,25
228:6,7,12,15
228:16,18,19,20
228:24,25 229:3
229:15,21,24
230:1,2,6,10,12
230:18,22 233:1
237:17 238:1
240:1,1,6,8,12
240:15,18,20,21
240:23,25 241:2
241:6,10,11,12
241:14,19,21
242:8,17,21
243:14,21
246:24 250:1,3
250:13 252:19
264:17,22 267:8
268:8,10,18
270:1,10,14
271:4
**dysphoric** 124:8
125:20 127:3
130:22 133:4
134:24 136:8
229:10 243:25
244:9 246:9,16

**e**

**e** 2:1,1 3:1,1 4:1
4:6 5:1,1 151:9
175:17 282:3,3
282:3
**earlier** 64:9
147:21 205:10
253:10 277:7
**earned** 79:11
**easier** 88:13
179:6
**east** 15:14
182:21
**eastern** 192:5
**easy** 15:16 66:4
190:18
**editor** 167:2,5
204:10
**editors** 167:2,3
167:3,5,12
168:22 170:25
172:12 173:18
203:13
**edits** 110:5
151:25 152:1
153:4
**education** 20:14
31:17 65:25
67:18 71:8,12
77:6 78:18
79:12 147:20
177:6

**educational**
24:25 78:16,22
79:10
**effect** 30:5
39:23 155:8
219:20 252:7
**effective** 128:24
223:7 225:10
241:21 242:10
**effectiveness**
131:24
**effects** 132:20
254:24 257:24
258:1 263:8
**effort** 20:18
86:7 100:24
181:23 197:6
213:7
**efforts** 95:9
275:11
**eight** 49:21 55:3
55:5,17 151:13
180:23,24
182:10
**eighth** 143:21
143:22,24,25
144:3,6
**either** 40:12
91:4 93:9 98:20
114:5 117:7
121:18 123:4
141:10 153:14
155:6 165:20,23
171:22 211:17

214:25 226:14
231:21 237:22
252:14 258:7
260:7
**elect** 130:1
**elected** 147:18
148:23,23,24
158:11 194:8,11
**elections** 148:20
**electronic** 14:2
213:20 214:1
**eleven** 148:15
148:16
**eligible** 65:19
158:5,9 172:23
**eliminated** 88:1
106:11,17,21,25
107:5 191:14
**email** 180:10
190:9 214:8
**emails** 200:22
200:24,25 201:6
201:6
**emotions** 222:20
**employed**
279:11,13 280:7
280:10
**employee**
279:13 280:9
**employment**
57:9 113:18,21
**empowered**
250:4,5,6

**[emr - evidence]**

| | | | |
|---|---|---|---|
| **emr** 38:25 | **entire** 151:3 | 171:3 172:19 | 249:16,21 |
| **enacted** 83:10 | 152:9 197:6 | 215:3 | **evaluated** 96:9 |
| 164:19 | 212:10 | **established** | 97:10 117:6 |
| **encourage** | **entitled** 143:9 | 236:21 | 217:20 247:19 |
| 229:18 | 192:15 234:24 | **estimate** 15:1 | 253:5 |
| **ended** 104:3 | **envision** 207:9 | 44:22,24 52:5,9 | **evaluates** 252:8 |
| 154:23 | **episode** 43:2 | 52:17 59:23 | **evaluation** |
| **endocrinologist** | 46:10 | 63:13 76:2 | 40:25 48:10 |
| 24:13 25:14,17 | **equal** 182:14 | 82:20 270:12 | 96:14 116:21 |
| 27:19 42:18 | **equipment** 14:9 | **estimates** 46:17 | 117:7 125:23 |
| **endocrinologi...** | 14:9,14 | 46:20,24 | 128:11 142:16 |
| 25:12 | **eradicate** 227:4 | **estradiol** 254:5 | 187:19 199:11 |
| **endocrinology** | 230:25 | 254:7,8 257:5,7 | 237:25 247:8 |
| 25:20,22,25 | **eric** 280:2,15 | 257:19 | 248:1 251:4 |
| 27:16 | **errata** 281:11 | **estrogen** 137:13 | **eventually** |
| **endorsement** | 281:13,15,16 | **et** 5:7,8 22:2 | 145:25 152:9 |
| 209:22 210:23 | **errors** 112:16 | 281:4,4 282:1,1 | 174:15 226:20 |
| **endorsing** | **es** 279:4 | 283:1,1 | **everybody's** |
| 101:15 | **escape** 95:23 | **ethical** 164:3 | 239:6 |
| **ends** 37:18 | 97:1 | **ethics** 163:25 | **everyday** 8:11 |
| 61:19 62:18 | **escapes** 95:16 | **eunuch** 175:14 | 145:4 |
| **enforcement** | **escaping** 95:20 | 175:17 | **evidence** 200:17 |
| 163:17 | **especially** 26:24 | **europe** 182:5 | 211:3,6,18 |
| **engage** 248:21 | 64:22 70:16 | 192:5 | 215:1,14,14,18 |
| **engaged** 94:3 | 126:6 182:4 | **european** | 215:18 216:11 |
| 118:18,20 164:2 | 186:23 | 153:14 | 216:22,23 |
| 271:9 | **esq** 281:1 | **europeans** | 221:15 224:20 |
| **enjoining** | **esquire** 2:4,13 | 181:12 | 224:22,25 |
| 119:10 | 2:14 3:4,11 | **evaluate** 20:23 | 225:17 250:11 |
| **enlarged** 256:19 | **essay** 192:15 | 36:11 38:4,20 | 260:12 261:14 |
| **enlargement** | 193:4 | 48:15 87:2,6 | 263:16,20 |
| 257:23 | **essentially** | 96:19 112:10 | 265:12,16 |
| **entered** 12:9 | 51:25 78:21 | 127:1 133:3 | 271:15 272:2,3 |
| | 143:14 148:21 | 220:18 247:18 | 272:17,18,19 |

273:12,16 274:2
**evidentiary**
5:19
**exacerbates**
94:25
**exact** 104:4
181:11 197:11
198:1
**exactly** 60:8
189:11 218:13
**exam** 65:16 66:3
66:10,16 67:2
67:10,13,15,16
68:3 117:7
**examination** 4:2
7:8 40:3,7,8
276:17
**examine** 249:24
**examined** 7:5
18:14
**examining**
40:21
**example** 15:20
43:1,6 46:11
74:13 85:8,10
86:16 88:4 92:2
92:3 97:6
124:18 127:4,10
127:24 128:25
129:2,15 135:18
165:9 209:17
216:12,14
217:18 220:1
221:3 222:6

230:10 234:23
241:23 251:9
252:25 261:25
262:23 272:8
**examples** 34:20
35:1 38:18
137:4 262:24
**exceedingly**
240:18
**except** 85:4
136:14 185:2
**exceptional**
224:6
**exchangeable**
242:19
**exclude** 110:21
111:3
**excluded** 182:7
**executive** 149:2
**exercised** 161:5
**exhibit** 4:9,11
4:13,15,16
112:20,25 113:1
113:4,6,17
114:14,15
115:18,20,21,23
138:2,7 178:2,9
178:16 184:8
195:4 219:8,9
219:12 234:10
238:13 265:21
267:5 270:25
276:19

**exists** 26:23
**expanded**
199:19
**expansion** 198:7
198:13
**expect** 97:23
161:25
**expectation**
163:19
**expelling**
161:14
**expenses** 75:22
76:8,9,13,19
78:17,19
**experience** 14:8
20:14 31:18
35:22 37:5,6,14
37:20 48:3
90:15 93:13
111:19 113:19
113:22 129:20
133:20 134:7,9
134:12 135:6,11
168:17 170:20
177:3 191:20
225:24 226:22
**experienced**
34:17,17 41:18
93:8,25 257:10
**experiences**
42:14 46:16
**experiencing**
35:2,3 36:22
41:15 129:11,16

131:15 229:10
253:20
**expert** 4:9,11
7:23,24 24:10
24:14,16 25:19
25:21 49:2,15
51:1,19 52:6,11
53:21 54:7 56:7
57:1,5 59:20
60:5 62:15
83:13,15 108:16
108:19 111:19
113:7 114:1,9
114:16 115:7,10
115:24 116:5,6
117:19 118:3,9
120:19,22,23
121:2 142:24
191:17 200:22
200:23 245:11
270:24 276:20
277:8
**expertise** 19:21
25:25 121:8
151:19 168:5
192:22
**experts** 29:25
**explain** 274:14
**explained** 71:20
**explanation**
172:21 258:11
**explanatory**
172:16

**express** 115:5
**expressed** 34:17
  93:17
**expulsion**
  161:12
**extended** 10:13
  37:16
**extent** 21:2
  23:16 108:11
  120:8 275:5,13
  275:21
**external** 134:8
  134:13 150:5
  205:9
**extremely** 51:25
  254:3

**f**

**face** 134:15,16
**facilities** 44:12
  82:2 104:24
  105:2
**facility** 43:22
  44:9,10 104:21
**fact** 44:21,25
  94:11,14,21
  117:22,24 164:4
  181:4 220:24
  221:17 236:2
  240:6,9 253:23
  262:15,21
**factor** 36:8
  124:7

**factors** 39:1
  40:9 133:5
  134:9,13 231:18
  232:3
**facts** 12:1 58:15
  111:20
**faculty** 63:25
  78:15
**fails** 281:18
**fair** 24:2,2 56:5
  64:4 163:3
  213:25
**fall** 22:3 55:9
**falls** 128:6
  141:20
**false** 11:19,20
**familiar** 13:22
  83:21 104:10
  109:13 141:2
  144:4 178:3
  211:9 218:2
  237:2
**family** 37:21
  40:16 73:4
  125:5 126:7
  134:15
**far** 39:18 53:14
  59:12 61:10
  75:10 118:1
  128:16 191:3
  194:15,20 203:7
  235:15
**fault** 178:13

**favor** 119:9
  123:3 207:1
**fdc** 6:7,14,17
  12:15,24 31:2
  32:16 43:18
  44:3,25 45:10
  81:23 235:23
  252:22
**fdc's** 108:5
**fdc.myflorida....**
  3:16
**federal** 50:3
**fedex** 214:9
**feedback** 156:14
  156:18 157:3
  172:7,11 173:11
  173:21 176:13
  177:14,18,19
  190:13,13
  203:13 204:6,9
  205:3,5
**feel** 34:2 227:24
  250:4,6 274:12
**feeling** 131:7,8
**feels** 192:16
  238:24 250:4
**fell** 109:4
**felt** 167:13
**female** 124:19
  125:9 137:5
  246:23 247:1,4
  247:21,24 248:4
  248:8,10,14,15
  248:22 250:3

251:24 252:9,24
  257:1,22
**females** 248:10
  248:14,20
  251:17
**feminine** 88:4
**fertility** 137:11
  137:12
**fewer** 226:7
**field** 24:24 25:1
  25:12,15,21
  26:2,14,14,20
  26:23 36:6
  168:4
**fields** 71:9
**fifth** 193:13
**figure** 136:5
**file** 85:22 86:2
  86:16
**filed** 12:13 13:7
  13:10 119:22
  120:1 200:16
**filing** 34:10
**final** 116:1
  199:16 204:22
  253:23
**finalized** 175:7
**finally** 223:23
**financial** 62:7
**financially**
  279:14 280:11
**financing**
  150:20

**[find - form]**

**find** 86:20 153:7 272:2
**fine** 23:12 239:23
**finish** 103:9,17 186:11 225:4
**finished** 65:23
**first** 7:3,14 10:19 11:9,22 11:22,23 28:5 32:24 41:24 51:5,16 55:16 79:4 89:3 92:13 102:4 108:7 130:7 133:21,25 171:9 173:16 219:11 239:12 239:17 240:3 270:20
**fit** 15:18
**fitting** 35:12
**five** 13:11,16 55:2 60:24 113:25 182:10 206:18 277:1
**fl** 3:15
**flavor** 46:23
**flexibility** 52:3
**flight** 97:6
**flip** 113:9
**florida** 1:2 3:12 3:21 6:6 19:17 20:2,9,16,25 21:4 22:20,21

28:12 29:1,9,10 29:15,18 30:10 30:13,14,22,23 31:5 33:11 45:7 80:14,15 81:21 81:22 83:10 84:21 92:14,18 92:21,24 93:3 93:10 95:5,9,19 96:2 99:14,18 100:19,25 101:9 101:17 104:1,23 105:5 107:25 109:9,11,14 119:4 121:10 143:3 148:12 180:16 207:23 209:2,8 218:3 218:11,13,15 219:14 232:8,12 246:14 251:11 258:25 260:10 260:17 261:24 262:2
**florida's** 105:1 208:5,8 255:1 261:17
**fluctuation** 70:4
**fluctuations** 70:24 71:20
**focus** 45:25,25 153:18 168:15 202:18 221:14 224:19 229:9,11

229:13,19,22,24 230:20
**focused** 45:24 186:10
**focusing** 121:8 187:8
**folks** 89:14 154:9 156:2 188:2,20 268:16
**follow** 15:20 160:23 164:22 165:3,9 206:6 277:15
**following** 86:13 161:8 164:5 167:18 227:2
**follows** 7:5 217:22
**footnote** 258:24
**force** 83:21,24 84:1,3,6,9
**foregoing** 279:3 279:4 280:4 283:5
**forensic** 81:1
**form** 10:5,7 17:8 18:24 21:5 22:17,25 23:8 24:18 27:10 28:14,20 29:7 32:22 35:18 36:17 38:25 42:11 56:10,17 56:24 60:25

63:17 69:11 70:2 79:2 85:1 85:23 86:5 87:8 89:11 91:16 93:4 94:16 95:12,17 96:12 96:22 97:13 99:7 100:22 102:10 106:9 107:10,16 110:24 116:9 122:2,14 124:10 128:7 129:6 130:6 132:2,10 142:11 144:1,11 144:20 145:6,18 152:25 158:20 159:12 160:24 161:18 163:6 164:23 176:24 198:9 199:25 200:9,19 201:14 202:6,24 203:5 204:2,14 206:7 207:2,12 208:11 208:17,23 209:10 210:3,13 213:2,18 215:19 217:10 218:4 220:4 221:11,23 222:11,12 224:17 227:19 228:8 230:7 233:11,17,19

234:20,23 235:1
235:3,6,12,20
236:15 237:14
237:17,21
245:21 246:3,19
247:2,15 248:5
248:16 250:9,19
252:12 253:3
257:2 259:11
261:1,20 262:16
263:25 265:17
266:18 269:9,20
271:16 275:4
**formal** 128:10
  151:6 153:2
**formally** 126:22
**formed** 110:22
  111:3 169:4
  182:9
**forms** 233:21
  234:2,5,13,16
  234:19 235:18
  238:2,3,9,12,16
  238:21,23,25
**forth** 111:16
  138:19
**forward** 55:22
  152:9,13
**found** 35:10
  81:1 92:7
**foundation** 2:5
  116:14 220:20
  233:22 236:16
  236:22 269:21

**founders** 80:5
**four** 114:10
  148:7,22,23,24
  148:25 149:2,25
  169:11 170:15
  223:20
**fourth** 169:10
  182:23
**francisco** 15:13
  15:16 63:20
  81:11 82:15
  169:18
**free** 34:2
**freedom** 126:10
**freely** 212:12
**frequency** 93:2
**frequently**
  136:4
**front** 234:10
  267:4
**full** 8:22 64:5
  73:13,17 158:11
  158:11 165:19
  192:18
**fully** 133:7
  137:6,7 258:1
**function** 230:3
**functioning**
  41:12
**fund** 78:15,16
  78:23 79:12
**funded** 74:15
  75:4 123:1

**funding** 73:25
  74:3 150:4,6
  158:3
**funds** 207:24
  208:9 209:4
**further** 18:2
  240:1,25 277:11
  279:12 280:9
**futility** 221:18
**future** 157:8

**g**

**g** 5:1
**gang** 105:25
  106:2
**gary** 1:11 2:12
  3:3
**gather** 109:7
**gay** 146:4,5
**gears** 19:25
**gei** 147:19
**gender** 21:23
  32:23 33:2,5,12
  34:11,13,15,17
  34:18,23,24,25
  35:22,22,24
  36:5,12 37:5,12
  37:15,24 38:2,4
  38:5,16,21,25
  39:14,15,21,25
  40:10 41:3,5,17
  41:20 42:4,8
  46:4,15 47:5,11
  47:19 48:14

50:9 55:6 60:16
60:22 61:9
79:19 83:16
85:13,19 87:12
88:10 92:4
94:22,25 95:20
97:4 116:21
117:2,13,17,21
118:5,6,23
119:11 120:5
123:14 124:8,15
125:20,24 127:3
128:4,22,23
129:3,4,9,11,16
129:21 130:22
131:13,17 132:8
133:4 134:24
135:11 136:3,8
136:9 147:14,14
193:15 194:23
195:5 217:18
221:6,7,10,15
221:16,19,22
222:1,2,3,7,10
222:17,18 223:2
223:2,3,7,10,12
223:13,15,21,24
224:13,19 225:9
225:11,15,18,18
225:18,21,23
226:1,7,9,24,25
227:14,18,22,25
228:5,7,12,14
228:16,18,18,20

228:24,25 229:3
229:10,15,21,24
230:1,2,6,10,12
230:18,22 233:1
237:16 238:1
240:1,1,6,8,12
240:15,18,20,21
240:22,25 241:1
241:5,9,11,12
241:14,19,20,25
242:8,16,21
243:1,6,14,21
243:25 244:8
246:9,16,23
247:13 250:1,3
250:13 252:19
254:10 264:17
264:21 267:8
268:8,9,18
270:1,9,14
271:3 273:1
**general**  3:12
6:17 29:9 46:13
63:21 83:18,18
89:15 90:21
91:25 92:9
109:13 148:24
159:25 162:16
173:1,12 175:22
187:18 200:16
201:11 203:11
204:1,4,13,16
205:4 218:7
269:5

**generalize**
198:14
**generally**  17:17
90:18,21 141:19
141:21 159:1
162:15,15 198:6
222:21 254:23
264:15
**genital**  199:12
199:13
**genitalia**  257:1
257:10
**geographic**
168:4 181:25
**geographical**
197:4
**george**  1:7 2:3
3:4 6:5
**george.wright**
3:8
**getting**  88:6
130:13 154:23
157:3 191:12,12
240:11 254:11
268:14
**gi**  75:15
**give**  9:24 38:9
38:15 41:20,24
43:3 46:23 52:8
56:2 82:20
127:4 133:22
137:4 204:6,9
216:10 223:25
262:23 276:11

**given**  52:14,17
71:22 75:12
80:4 111:18
131:18 158:19
158:23 166:14
166:15 270:13
273:3 283:9
**gives**  112:9
**glad**  236:12
**global**  65:25
69:25 77:6
147:19 177:6
184:24 185:4
186:4,5,24,25
186:25 187:17
187:22,23 188:2
188:4 197:5
**go**  8:25 18:1
24:6 28:5 38:24
39:1 58:6 66:22
74:4 76:11
78:25 81:20
89:2 99:15
101:21 108:12
117:15 123:7,8
125:11,16 126:5
126:10,21
128:14 156:21
157:24 171:9,22
172:13 173:23
183:5 185:8
186:7,16 192:11
213:5 219:22
220:6 226:8

231:7 244:4,4
255:20 264:15
265:3 267:20
276:15,20
**goal**  131:10
231:3 241:15
**god**  233:23
**goes**  30:12
184:25
**going**  8:1 11:1
13:16 16:9 18:1
18:1 20:12 22:8
23:3,5 28:4 42:1
44:21 50:25
70:5,21 73:12
103:13 108:10
112:24,25 113:3
114:16 118:1,1
118:11 133:1
136:18,21 138:1
151:11 174:5
182:4 186:13
196:22 200:1
206:12 221:18
227:7 228:15,16
229:2 253:8
276:11
**good**  5:2 6:3
7:10,11 63:21
65:10 136:19
204:20 238:5
**google**  151:23
152:8 179:16
190:10 195:1

**[government - heading]**                                    Page 311

| | | | |
|---|---|---|---|
| **government** 68:9,12 158:2 204:7 | **groups** 53:19 98:22 106:3 156:1,15 | **guilty** 81:1 | **hands** 93:8 |
| **governmental** 68:16 192:25 | **growth** 137:7 254:22 | **gun** 250:6,12 | **handwritten** 213:17,20 |
| **governments** 164:19 | **guaranteed** 106:7 | **gwaltney** 3:11 6:5,14,16,17,18 | **hanna** 1:18 |
| **grade** 215:23,23 216:3,3,25 217:2 224:23 258:11 259:15 | **guess** 44:7,12,21 44:22,25 49:3 63:7 65:18 66:13 100:6 109:11 126:13 140:9 148:20 168:10 181:18 186:2 189:5 213:5 219:11 230:19 251:5 254:21 | **h** | **happen** 77:21 78:1 134:18 135:19 231:14 |
| **gradually** 65:2 | | **h** 1:15 4:6,9,11 4:13 7:2 113:7 151:9 175:17 276:22 281:5 282:2,3,24 283:2,4,12 | **happened** 59:3 74:24 75:19 160:20 173:15 205:2,19 |
| **grandfathered** 66:15 | | **hair** 22:1,2 99:6 99:17 128:12 137:6 252:16,17 | **happening** 130:16 |
| **grant** 64:18 | | **haircuts** 22:11 | **happens** 39:9 |
| **granted** 160:11 186:19 | | **hairs** 45:4 | **harassing** 102:11 203:22 |
| **graph** 189:22 | | **half** 15:19 49:10 49:18 63:19,19 119:25,25 120:1 148:22 149:9 196:23 243:15 | **hard** 76:20 122:3 176:21 |
| **great** 15:21 216:6 233:24 | **guidance** 150:16 164:22 167:16 | | **harm** 55:11 89:24,25 90:12 91:14 92:24 93:25 94:3 106:25 222:4,6 271:9 |
| **greater** 90:21 | **guide** 171:4 | **hamnvik** 24:11 24:13 25:3,8 26:14 131:14 257:9 | |
| **greatest** 241:19 | **guideline** 77:9 149:11,13 | **hamnvik's** 25:5 | **harry** 79:19,21 79:23 |
| **green** 154:22 196:7 | **guidelines** 74:19 74:21 141:19 156:13,14,23 157:9,13,15 167:19 170:22 176:2 188:16 244:6,15,18,25 245:3 259:16 274:6 | **hand** 6:22 112:24 137:25 178:1 216:18 219:7 | **hazard** 44:12 |
| **ground** 8:1 | | | **he'll** 103:11 |
| **group** 75:16,17 105:8,11,19,20 150:2 152:5 153:4 159:3,5 163:21 171:9,24 172:18 176:12 | | **handful** 182:11 | **head** 8:12,12 36:9 57:21 155:22 |
| **groupings** 151:19 | | **handing** 115:16 | **heading** 193:14 193:21 |

**[health - hormone]** Page 312

**health** 4:16 18:6 19:2,4 20:8,14 20:19 25:24 26:24 27:2,2,3 27:25 28:8,25 29:4,20,22 30:1 30:4 31:8,8,11 31:14,20,24 32:3,8,13,19,22 39:12,22 40:8 40:13 55:15 67:5,8 71:11 73:18,19 92:2,5 92:6 116:16,22 126:6 130:14,18 131:4,21 132:19 132:22 141:1 144:25 147:16 147:22 148:3 149:16 151:20 151:21 154:9,13 154:21 156:2,5 165:6,21,24 168:8,14,16 169:25 170:4,23 173:13,22 179:19 181:21 183:3,4 185:19 186:5,7,25 187:1,22,23,25 188:2,5,10 189:2 190:23 191:13,25 192:7 192:24 193:15 194:24 195:5,25 196:5,8,10 205:24 206:2 216:12,20 219:13 221:7 226:2,3,24 227:9 228:11 232:19 236:5,10 236:23 253:8 255:1 258:6,10 258:16,17,25 260:1,5,10,23 261:18 262:2,7 262:20,22 263:11,15,23 264:8 265:3,6 265:11,13 266:12 267:7,20 272:20 276:23 277:2

**healthcare** 13:19 20:2,24 21:3 26:16 27:8 31:24 37:25 101:23 102:9 103:1 107:9,14 121:9 141:8 158:15 191:13 192:22 211:4 217:25 221:1,4 260:13

**healy** 274:1

**hear** 42:2 53:4 71:2 150:11,12 193:7 225:5

**heard** 36:4 45:19 54:17 144:15 162:2 211:12 215:13 218:18,21

**hearing** 6:21

**held** 126:25 147:9

**help** 97:5 216:19 228:5

**helped** 65:16 170:25

**helpful** 136:5 223:6 225:9

**hereto** 279:14 280:10 283:7

**hewett** 1:11 2:12 3:3

**hide** 88:23

**high** 46:18 215:18,20,23 216:3,6,11,16 216:22,23,25 217:2 271:15 272:1

**higher** 89:14 91:6 92:7 97:12 97:16 98:16 153:19 190:2 272:18 273:2

**highest** 181:14

**highly** 214:13 217:24

**hired** 74:17 83:18

**historically** 243:19

**histories** 18:10

**history** 36:20,20 36:20 39:6,8 221:17

**hiv** 63:20 64:11

**hold** 99:11 155:2 214:2 245:23 246:1 261:11 267:14 270:6

**holding** 83:1

**homosexuality** 212:18

**honest** 136:23

**hong** 77:19 149:5

**honoraria** 75:17

**hope** 275:15,17 275:17

**hopkins** 74:17 203:3

**hormone** 18:24 26:4,8 32:8 33:16,23 42:10 42:24 123:5,23 125:20,24 127:17,20 128:1 129:20 131:10 131:20 135:5,9 136:25 142:9

169:19,23 170:1
170:2 226:11,12
226:14 242:22
242:23 243:5
253:22 254:2
255:14,18,22
256:10,18 257:1
257:11,21,24
268:23,25 269:4
269:8,19
**hormones** 23:6
32:24 33:11,14
33:19 42:19
48:14 124:3,9
124:12,14,16,25
125:3,4,5,6,9,11
128:25 129:1,3
129:10,15
133:14,18 134:1
135:25 136:2
137:2,8 217:18
223:25 224:1,7
227:7 230:11,15
242:4,15 243:12
254:12,13,16
255:9 256:16
263:3,6,8
265:13 268:7,11
268:13,20
269:17 272:16
**horner** 1:11
2:12 3:3
**hospital** 43:16
64:16 75:16

223:19
**hospitalized**
53:3
**hospitals** 51:8
80:25 81:1
116:14 244:2
**hotel** 76:15,23
79:8
**hour** 15:15,19
49:10,10 53:21
54:5 57:5
136:18 196:22
**hourly** 50:11,14
51:3
**hours** 16:23,25
52:6,11,20,24
76:3,6 140:5,6,8
273:20 276:10
**house** 247:24
**housed** 246:14
246:25 247:5,21
**housing** 231:19
232:4,8,11,15
246:17,18 247:1
247:14 248:10
248:15,22
**hsb** 29:15 108:5
224:2 231:19
258:3 265:21
266:2,22 267:4
268:3
**huh** 8:14
**human** 194:4

**hundred** 75:18
76:21 166:23
171:16 189:6,6
200:11
**hundreds** 15:3
76:5,6,6
**huntsville** 2:17
**hypertension**
240:7
**hypotheticals**
207:20

**i**

**icd** 147:16
**idea** 110:1
170:10 195:11
265:8
**ideation** 46:7
**identical** 208:8
**identification**
113:2 115:22
125:15 138:8
178:10 219:10
**identified** 24:16
34:16 88:21
90:15 134:17
205:10 224:9
239:11,16
266:16 267:22
**identifies** 27:8
56:18 214:15
**identify** 6:1
37:24 88:13
105:18 111:23

112:1,16 193:25
219:23 239:7
266:9 275:3,12
275:23
**identifying**
133:7 197:8
**identity** 22:1
34:23 35:21
92:4 124:13
131:9 136:3,4
147:14 241:25
254:11
**illegal** 192:13
**illness** 36:21
45:23 53:3
64:17 124:23
226:16
**imaging** 38:19
38:22,23
**immediate**
40:16
**impact** 28:23
69:8 121:25
126:7 128:17
131:6 132:8
133:6,8 134:9
134:13 188:20
188:24 189:1,1
209:4 241:19
**impacted** 157:8
**impactful** 251:6
**impacting** 37:2
37:18

impacts 131:6 134:6 250:13

impair 43:3

impairing 41:11

impairment 35:5 228:22

implement 30:24

implementation 30:8 31:3 32:2 32:13,18 108:5 119:11

implemented 31:12,15

implementing 31:6

implication 265:12

implying 268:16

important 47:19 110:8 111:18,22 112:1 130:8 159:4

impose 199:7

improve 131:10 131:12 226:24 227:24 228:11

improved 262:22

improvement 159:19

improves 216:24

improving 171:19

incarcerated 13:6,10 20:2 21:19 28:12 33:17,19 43:24 44:4 45:2,11 57:11,17,22 58:4,24 59:16 82:23 83:16 88:17 89:8 90:16,25 91:14 91:22 92:11 93:3,9,14,18,22 94:4,15 106:18 106:21,25 107:5 107:9,15,21,25 143:8 226:15 254:18 271:2

incarceration 19:17,23 20:16 20:21 21:4 81:17 88:24 93:25 94:9,21 94:25 97:24 231:15 235:25

include 34:21 36:24 40:15 89:9,24 90:11 110:8 114:8,19 115:1,4 204:12 214:14 242:21 243:4 245:18 249:9 252:6

included 111:10 120:22 122:5 156:3 168:23

includes 40:8 156:13 157:2,3 173:6

including 36:20 40:22 75:24 154:2 159:15 236:22 258:6 260:1,2,6 263:23

income 59:20 60:5,9,12,20,23 61:5,14,16 62:8 62:11 63:4

incompatibility 35:16 36:1

incongruence 34:16,21 35:2,6 35:8,17,20 36:5 36:7

incorporate 142:19 173:21

incorporating 277:8

incorrectly 34:6

increase 94:7 97:6 107:14 108:4 257:4

increased 47:2 87:25 88:6,8 89:4,13,19 90:12 91:4,13

91:21 99:9 105:13,17 135:14 256:13

increases 91:23 93:2 135:16

increasing 37:17 64:21

indefinitely 129:1

independently 211:3

indiana 50:8,9

indicate 94:24 113:18 145:4 174:22 210:1

indicated 125:15

indicating 9:12

indication 195:9

indifference 144:16 145:9,13

individual 8:4 12:13 13:2 14:24 19:5,5,8 21:18 24:9,15 27:8 38:4 42:13 42:20 43:9 56:3 56:17,23 57:16 58:5 67:9 68:7 75:4 87:4 94:11 94:14 151:15 185:23 186:10 186:17,22 195:15 206:3

220:19 229:9,20 247:8 252:5 271:25 272:1

**individual's** 87:19 95:6,10 229:14 235:24

**individualized** 125:25

**individually** 30:11 231:7 255:20 266:3

**individuals** 13:7 13:9,12,14,16 31:18 37:5 55:18,19 56:9 60:21,22 61:9 62:9 63:6 69:15 72:12 74:7 84:9 84:11,25 87:18 89:4,8 90:15,24 91:3,14,15 93:9 97:11 98:10,15 118:22 145:20 148:17 153:22 154:12 158:15 158:19 166:20 167:16 169:5 188:5,9 193:25 197:18 198:5,8 199:9,20 212:1 212:23 221:21 224:3 226:10 229:2,3 238:1 269:12

**ineffective** 242:5

**infertility** 254:16 255:23 257:4

**influenced** 156:24

**information** 40:11 110:13,17 110:19,22 111:5 111:8,23 115:13 115:14 178:25 180:3 190:5,6 208:14 235:1,2 237:8,16 274:19

**informed** 43:3 246:10 255:12

**initial** 42:8 108:20 150:15 170:16 171:5 182:19

**initially** 11:16 125:11

**initiated** 29:19

**initiative** 65:25 77:6 147:20 177:7

**injured** 57:10 57:16,23 58:21 58:21

**injuries** 57:25

**injury** 55:11,12 58:24 59:2

**inmate** 85:8,9 85:22 86:2 87:22 88:4 89:19 95:6 98:6 99:1,6 145:1,1 231:22 232:4,18 251:13 253:6

**inmate's** 84:18 268:8

**inmates** 83:19 88:9 95:19 96:3 96:5 97:15 101:2 106:8 109:10 121:10 145:23 231:8,13 246:14 247:21 250:18 251:13

**inpatient** 43:11 43:15,18,21 44:3,8 45:2,7,9 45:16

**input** 147:12 196:18 209:14

**insanity** 81:2

**insert** 265:15

**inside** 81:25 82:11,12,15 83:6,22,25 84:3 84:21 85:21 87:21 91:5 92:14,18 232:8

**insisted** 203:11 204:1

**inspection** 234:25

**instances** 14:19 268:6,10,14

**institute** 30:15 104:15 156:7,11 156:11,22 157:7 157:23 167:19 173:5 175:24 176:1

**instituted** 16:9

**institution** 160:12

**institutional** 43:17 176:18 213:12 244:3,22

**institutions** 160:13,16

**insular** 176:12

**insurance** 129:14 141:7

**intake** 95:11

**intelligence** 238:18

**intend** 111:9

**intended** 5:17 87:19

**intensive** 223:18

**intent** 268:12

**intentional** 144:22 201:20

**intentionally** 145:15

**[interchangeably - june]** Page 316

**interchangeably** 35:16
**interest** 53:19 166:5,9,15,19 210:9,10,11,17
**interested** 156:2 279:15 280:11
**interesting** 29:14
**interests** 53:15 53:17
**intermittent** 17:1,1
**internal** 134:20 206:10
**international** 79:19 147:16 153:15 156:1 191:19
**internationally** 148:18 181:9
**interpretations** 200:24
**interpreted** 163:9
**interrupt** 102:1 103:12 136:18
**intersected** 170:3
**intervention** 125:17 130:8,13 130:14 135:17 136:5 217:22 224:25 225:8

230:25 231:9 245:7,8 251:1
**interventions** 36:25 131:20 132:6,8 133:10 133:11,13 193:25 216:1,7 217:2 224:23 239:22 244:19 252:5,15 258:18 272:22
**introducing** 207:20 258:11
**introductions** 7:14
**invariably** 8:21
**inversion** 242:9
**investigate** 11:25
**investigating** 41:3
**invoiced** 52:23
**invoices** 53:10
**involve** 55:6 58:24 117:17 118:21 142:13 251:3
**involved** 39:10 55:24 56:6 57:15 67:3 69:17 70:4 104:20 118:5 122:6 145:21 167:7 173:13,22

186:6,8,24 187:1,3 195:8
**involvement** 57:13 65:25 186:9 187:24 196:10,16 204:25 205:1
**involves** 14:4 141:9
**involving** 57:10
**isolation** 231:21
**issue** 23:9 24:5 58:8 88:21 164:18 188:15 212:17 254:17 274:5
**issues** 17:25 105:4 146:20,24 147:1 212:21 254:20 255:25 256:1,5 264:5
**it'd** 64:4
**it'll** 9:2
**item** 86:19
**items** 22:3 84:18 85:3,16 96:20
**iterations** 133:16 172:9 243:11

**j**

**jackson** 1:6 2:3
**jail** 58:22 80:23 81:6,13 82:13

82:16
**jails** 81:11,17,23
**jamison** 154:22 155:16
**january** 69:21 69:21 70:1,1,10 70:13
**jd** 155:9 193:20
**jeffcoat** 1:12 2:12 3:3
**jensen** 1:18
**jiska** 179:2,11
**job** 1:23 126:7 134:15
**jog** 59:2
**john** 195:3,7,9
**johns** 74:17 203:3
**join** 70:5 71:6 71:12,15
**joined** 6:13 164:10
**joining** 6:14 164:14
**jose** 169:17
**joshua** 184:3
**journal** 262:4,8
**journals** 112:2
**judgment** 52:10 59:19 76:17 78:24 97:4 145:5 181:4
**june** 51:22 77:22 259:21

| | | | |
|---|---|---|---|
| 260:18,24 262:7 | 282:1 283:1 | **kingdom** 50:3 | 59:17 63:10 |
| 262:14 266:13 | **kicked** 164:5 | 149:7 | 64:8 65:21 |
| 267:7,21 | **kind** 8:25 10:13 | **kirill** 191:17,17 | 66:21 68:1,5,19 |
| **jurisdiction** | 14:12 16:8 | **knew** 11:20 | 68:20,21,22 |
| 57:15 67:10 | 23:17 26:1 | 194:20 | 69:23,24 70:25 |
| **jurisdictions** | 30:12,14 35:1 | **know** 8:22 9:9 | 72:7,9,11,22 |
| 103:8 | 36:22 42:7 46:8 | 9:21 10:12 13:9 | 73:25 74:17 |
| **justice** 121:16 | 51:9 52:18 | 13:23 17:12 | 75:17 76:2,5,11 |
| 187:8 202:5,22 | 53:11 56:3,16 | 18:9,20,23,25 | 77:21 79:8,16 |
| **juveniles** 55:19 | 56:21 64:1 | 19:11,20,25 | 79:21 80:4 |
| 55:25 257:16 | 65:18 66:14,14 | 20:3,5,13 21:2,9 | 81:12,21,22,23 |
| | 66:17 67:6,7,18 | 22:3,6,10,11,14 | 81:24 82:22,25 |
| **k** | 67:21 69:1 | 22:18,19 23:4 | 83:3,17,17 |
| **kaiser** 116:14 | 77:18 100:21 | 23:17 24:15,19 | 84:16,20 85:17 |
| **karasic** 1:15 4:9 | 103:7 109:21 | 24:20,22,25 | 85:21 86:8,9,22 |
| 4:12,14 5:6 6:11 | 114:21 120:15 | 25:14 26:1 | 86:24 87:13 |
| 6:11 7:2,10 24:3 | 123:24 124:20 | 27:15 29:10,18 | 88:21 92:13,17 |
| 113:7 137:21 | 128:5 129:17 | 29:22,25 30:4,8 | 92:20,23 93:1,7 |
| 199:2 219:11 | 134:19 139:24 | 30:11,14 31:2,4 | 93:12,16,20,24 |
| 231:25 239:4 | 141:19 154:13 | 31:7,10,10,11 | 94:2,6,19,24 |
| 249:6 265:25 | 155:7,9 158:3 | 31:13,14,16,17 | 95:4,8,19,22 |
| 274:10 276:19 | 165:6 169:2 | 31:22 32:2,7,11 | 96:2,24 97:5,9,9 |
| 277:14 281:5 | 170:25 175:22 | 32:15,21 33:1,4 | 97:20,21,23 |
| 282:2,24 283:2 | 190:24 191:14 | 33:7,15 39:18 | 99:5,8 102:2 |
| 283:4,12 | 197:3 201:24 | 39:22 41:23,24 | 104:6,8,11 |
| **keep** 100:24 | 207:7,19 212:17 | 41:25 42:15 | 105:1,4,8,10,13 |
| 218:12 | 214:12 215:7 | 43:18 44:2,11 | 105:16,21,24 |
| **kelvin** 1:5 2:2 | 226:21 230:9 | 44:16,19,20,25 | 106:2,5,6,16,20 |
| **kenneth.steely** | 231:22 243:14 | 45:5,5,6,6,9,13 | 106:24 107:3,7 |
| 2:18 | 251:12 | 45:15 47:15,20 | 107:13,19,23 |
| **kentucky** 50:5 | **kinds** 196:15 | 47:22 48:18 | 108:2 109:3,12 |
| 120:23,23,24,25 | 226:23 261:15 | 49:20 52:9,20 | 109:13,23,24 |
| **keohane** 1:5 2:2 | 276:10 | 53:7 54:17 | 110:1,13 111:11 |
| 5:7 12:14 281:4 | | 57:20 58:12 | 111:13 114:5,21 |

115:12,14
119:22 122:20
122:25 124:1
126:21 127:5,7
127:11 129:9
130:15,18,19
132:16 134:22
135:22 140:8
141:2 142:13,22
143:2,12,18,20
144:9,18,22,23
145:9,11,15,19
145:20,21 147:2
149:9 150:6,19
150:23 151:6,13
152:3,13,22
154:12 155:16
155:20 156:24
158:21 159:2,5
159:25 161:3,11
161:11,15,24
162:2,3,9,12,13
162:18,19,20
163:9,10,20
164:4,7,11
165:16,17,23
166:8,11,14,15
166:18 167:24
172:21 174:6,15
174:16,17,18,20
175:20,23 176:2
176:3 177:5,5
177:12,15,16,17
177:19 179:17

179:18 180:15
181:10,11 182:5
182:13 183:1,15
183:18,20,24
185:5 186:1,20
187:2,15 188:1
188:4,14,23
189:3,6,8,11
190:3,9,9,18
191:3,13,14
192:5,13 193:2
194:15,20 195:8
195:13,18
197:11,20 198:1
198:18 201:5,9
203:6,7,8 205:1
205:12,15,18,19
205:25 206:5,23
207:15,17,20
208:7,14 209:2
209:6,7,11,17
209:21,24,25
210:8,11,16,25
211:7,14,16,16
211:22,25 212:1
212:9,23 213:3
213:6,7,16
215:16 217:19
217:21 218:8,11
218:23 223:12
225:19 226:15
227:6 230:12,13
230:19,21 231:6
231:17,20

232:14 234:19
234:22 235:9,10
235:13,15 237:5
237:12,17
238:24,25
240:13,22 241:1
241:4,7,20
242:14,19,24
243:7 245:9
247:9 248:13,19
249:13 251:2,6
251:10,16,19,22
252:5,7,13
256:4 259:17
264:13 268:22
270:16 271:8
275:6,7 276:2

**knowledge**
17:19 26:2
44:20 150:21
192:6 194:5
196:4,18 279:9
280:6

**known** 46:14
179:19 191:6
241:22

**kong** 77:19
149:5

**kruger** 185:5

**l**

**l** 151:9
**la** 3:7

**lab** 38:3,6,9,14
**label** 256:22
**labeled** 134:19
272:6
**labs** 127:25
**lack** 212:25
**ladapo** 119:5
208:4 218:8
**lady's** 250:16
**lambda** 50:20
51:14
**language** 74:14
265:16
**languages** 179:7
**lapse** 146:11
**laptops** 190:8
**large** 63:11 70:9
70:24 72:7 92:2
148:8 153:13
164:25
**larger** 149:15
176:13
**largest** 183:6,12
**laser** 250:17
**law** 3:21 6:19
29:15 50:21
51:10 53:19
118:10 154:23
155:5,7,7
185:25 207:1,10
207:16
**laws** 5:19 120:5
206:19 208:5,8
208:21,25 218:6

**[lawsuit - little]**

**lawsuit** 13:7,10 34:11 260:21 265:2

**lawyer** 154:25 155:4,6,9 194:4

**lawyers** 50:7,9 110:5 202:5,23

**layman's** 14:4

**lcsw** 73:7

**lcsws** 73:2

**lead** 141:3 147:21 148:2 149:16 167:7,11 188:21

**leader** 191:12 192:23

**leaders** 121:21

**leadership** 69:17 146:1

**leads** 167:6,25

**learned** 108:8

**led** 29:17 120:20 196:7

**left** 6:2 8:5 65:23,24 212:23 268:1

**legal** 23:4,16 50:20 51:14 102:18 109:25 120:9 121:11 142:23 143:5,7 193:1 246:12 281:23

**legally** 143:3

**legislatively** 208:16

**legislature** 194:9,10 208:14 208:20

**legislatures** 120:4

**legitimate** 188:15

**length** 22:2 41:6 82:25

**lesbian** 146:4,5

**leslie** 50:1

**lessen** 131:12

**lessened** 125:9

**letter** 199:11

**letters** 199:13

**letting** 55:16

**level** 41:10 107:23 130:4,22 131:15 133:4,6 145:4 154:11 171:13 174:12 189:25 195:23 215:7 218:10 229:5 249:18 272:16

**levels** 107:23 127:20 134:13 135:6

**lgbt** 146:20,20 146:25 147:1,7 191:14

**li** 2:4 6:9 281:1

**liaison** 64:12,15 64:18

**liason** 64:14

**liberties** 2:5

**library** 213:12

**licensed** 17:4 67:9 68:6 72:22 72:25 73:4,7 154:19 155:14 162:24 165:20 191:7

**licensing** 68:12 69:3 160:9

**licensure** 154:13 154:21

**life** 37:2,19 53:2 128:17 131:5 133:19,20 216:20,24

**light** 122:10,13

**likelihood** 98:6 99:2

**likely** 47:12,13 248:21

**limit** 118:22

**limitations** 199:8

**limited** 110:13 269:5

**limits** 123:4

**line** 65:7 161:3 196:22 282:4,7 282:10,13,16,19

**lines** 184:12,22

**linkedin** 187:5

**list** 96:19 114:2 114:12 116:13 118:12 153:13 177:24 178:16 178:22 190:3 238:9,22 249:9 252:21

**listed** 185:9 204:17 211:21 238:1,12 255:14 267:20 273:1

**listen** 98:2

**listened** 191:10

**listening** 6:5

**listing** 39:1 173:18

**lists** 164:10 255:10

**literature** 109:13 112:2 170:20 172:20 215:8,10 264:2

**litigation** 110:15 111:12 259:6,7

**little** 7:13 15:4 18:2,11 23:17 51:23 53:2 66:8 66:18 70:10 75:6 127:16 128:17 131:3 132:4 189:22

238:4 239:14
**live** 226:18
**lives** 271:10
**living** 37:23
43:6
**llp** 1:19 2:15 3:5
**lmft** 73:3
**lmfts** 73:2
**lnowlin** 2:8
281:2
**lobbyist** 159:22
160:2
**located** 45:13
**location** 1:18
77:3
**lock** 162:13
**lockstep** 162:13
**lodging** 76:18
**long** 49:9 77:1
99:5 146:10
178:19 190:11
190:21 221:17
238:23
**longer** 41:8,15
42:1,5 99:17
204:23 230:11
**look** 96:17
113:10 116:13
123:9 130:8
153:12 155:18
155:19,19
177:23 178:3,22
213:11 220:15
221:9 242:6,11

264:15 266:15
276:19
**looked** 100:14
164:16,17
177:24 195:2
**looking** 46:22
134:2 168:3
184:2,20,23
196:5 216:13,15
216:18 231:7
242:14
**looks** 128:8
185:3
**lose** 22:8 23:5
**loss** 134:15
137:12 216:23
**lot** 26:24 76:4
132:6 191:20
226:22
**lotion** 251:10,10
251:12,16,25
252:6,9,14
**lots** 153:5
**loud** 90:9
**lovedhal** 116:14
117:5
**low** 215:13,14
215:16,18,21
216:2,2 224:23
258:7,8,12,13
259:14,14 260:7
260:7 263:15,15
263:19,20,21
272:7,7,23

273:11,11,15,16
274:1
**lower** 53:11
131:14,16
174:15
**lowering** 124:20
137:6
**lunch** 10:13
123:11
**lunsford** 2:13
4:3 6:3,4,17 7:9
16:2 17:10
19:10 21:8
22:22 23:7,12
23:18,20 24:1,4
24:21 27:5,20
28:16,24 29:12
30:21 36:3 37:3
38:17 40:19
41:1 42:21
44:17 53:20
56:14 57:3 61:3
62:3 63:3 64:3
65:9,12 69:13
71:23 72:4,16
72:20 75:8
79:13 82:9
83:24 84:2 85:6
85:20 86:1,11
87:1,16 89:1,21
90:4,8 91:19
93:6 94:13,18
95:14,21 96:1
96:15 97:8 98:1

99:21 100:18
101:8,13 102:15
103:11,18
106:13,15
107:12,18
108:18 111:2
112:20,23
115:19 116:11
120:10,18 122:8
122:18 123:18
123:21 125:18
126:24 128:21
129:18 130:20
132:3 133:2
136:20,24
137:14,20 138:9
139:5,9,13
142:18 144:5,14
145:2,8,24
148:4 150:12,13
151:10 153:9
155:3 156:19
157:16 159:9,21
161:6,21 162:5
163:7 165:11
175:10 176:6
177:2 178:6,12
178:14 180:1,13
180:19,24 181:3
183:14 184:1,7
184:11,16,22
185:6,13,22
186:13,15
187:11 188:3,22

191:2 193:9,10
193:19 196:24
198:15 199:1
200:5,14 201:3
201:16 202:8,14
202:16 203:1,9
203:18,24
204:11 205:7
206:13 207:4,8
207:22 208:13
208:19 209:1,12
210:7,15 213:4
213:21 214:5
215:12 216:9
218:1,14 219:6
220:5,23 221:20
222:8,12,14
225:2,13 228:1
228:13 230:23
233:3,5,8,12,18
233:23 234:1,21
235:14 236:17
236:20,24
237:20 238:7,10
238:15 239:3
241:3 245:15,17
245:24 246:6,22
247:10 248:2,7
248:18,24 249:5
250:14,20 251:8
252:20 253:7
255:3 256:17
257:8 259:20
260:14 261:4,16

262:1 263:1,13
264:4,20 265:18
266:21,25 267:3
267:16,18 268:2
269:11 270:3,8
270:23 271:19
273:5,21,23
274:8 275:8,16
276:3,6,9,15
277:6 278:4,6,8

**m**

**m.d.** 1:15 4:10
4:12,14 7:2
113:8 203:20
281:5 282:2,24
283:2,4,12
**ma'am** 6:16
**maclean** 1:18
**made** 25:10
28:7 33:12 38:6
42:17,18 78:21
128:19 159:7
171:16 174:21
177:22 192:13
199:20 200:8
201:11,19 202:2
204:13 205:5,13
206:12 275:11
283:5
**maduro** 194:9
**maf** 1:10
**mail** 214:8

**main** 205:20
**maintain** 66:20
**maintained**
101:7 237:3
**maintaining**
124:14 144:25
**maintenance**
66:11 129:17
**major** 39:4
46:10 47:17,20
164:11 240:9
**majority** 15:5
72:18,24 74:15
122:16 136:16
154:18 212:5
**make** 8:8 9:2
18:5 21:20 23:7
24:1 34:6 39:3
44:18 65:7 86:7
120:14 159:18
167:20 172:12
192:5 196:23
215:21 237:11
244:12 245:22
245:25 246:4
276:10
**makes** 45:1 65:9
224:4
**makeup** 21:16
22:2 130:12
247:13
**making** 85:17
166:16

**male** 88:5 125:9
137:13 246:25
250:17 251:12
252:19 254:4
256:25
**malpractice**
53:24,25 54:4,6
54:19,24 55:1,9
56:6 57:1
145:10
**manage** 26:7
97:1,4
**managed** 99:9
99:13,17,18,20
**management**
83:13,16
**mandate** 208:16
**manic** 43:2
**manner** 5:20
86:17
**march** 15:4,5
16:25 102:13
**margin** 190:19
**margins** 187:9
**marin** 15:14
**mark** 62:5
112:24,25 113:3
138:1,5 178:7
**marked** 34:16
113:1 115:16,21
138:7 178:1,9
219:7,9 265:21
267:5 270:25

**marriage** 43:6 73:4

**maryland** 57:19 58:15,17,23 59:3,4,6,10 80:11

**masculinization** 137:9

**master's** 154:11 185:25 195:23 218:10

**matches** 131:8

**materially** 172:12

**materials** 208:3 211:18

**math** 60:19 124:2

**matter** 5:7 215:8

**mattered** 66:19 67:1

**matters** 255:14

**mcaleer** 1:18

**mcnab** 2:14 6:4

**md** 47:13

**mean** 11:18 23:19,20 24:23 26:16 35:7 41:13 43:14,15 43:20 44:1 45:4 66:4,6 76:20 83:15,20 85:8 86:12 92:1

98:18 101:2 102:7 106:10 117:18 127:4,15 140:16 144:21 145:3 153:15 160:13 162:6 166:13 175:2 179:1 180:2 182:2 186:21 188:8 190:7 192:21 210:10 215:16 228:15 229:12 237:4 238:14 240:7 242:17 247:11 260:15 264:1 276:7,9,10

**meaning** 44:8,8

**means** 5:21 43:16 88:19 105:1 144:18,22 184:19 215:16

**meant** 19:9 102:6 237:9

**measure** 39:21 130:21

**measured** 131:1

**measurement** 39:14

**measures** 92:6 95:4 131:3,4

**meats** 10:17

**medicaid** 208:4

**medical** 13:2 18:6,9,25 19:11 19:12,15,21 20:19,23 21:2 27:7 28:8 31:8 31:23 33:9 36:19,25 37:25 39:11 40:13 43:8,16 44:10 55:15 56:6,13 64:16 67:5,8 68:22,24 71:10 75:16 78:18 101:6,20 102:4 107:8 125:17 130:13 141:6,10 141:12,13,14,22 142:1,13 154:21 158:15 165:10 195:10 213:8 216:5 217:2 227:3 230:24 236:5,9 239:11 239:16,18,22,24 240:4,7 241:20 242:20,22 243:5 243:17,19 244:16,19 245:7 245:8 249:19 252:14 264:16

**medically** 127:2 141:15,22,25 142:10,12,15 143:9 249:22

250:7,21 252:2 252:11,14 253:2 268:6,11,15 269:1

**medication** 48:10 133:22 239:21 269:6

**medications** 16:18 18:17,20

**medicine** 156:7 156:12,23 157:7 157:23 167:19 173:5 175:24 176:1

**meet** 17:5 48:19 77:10,16,19 80:20

**meeting** 25:2 77:12,20,23,25 79:4 221:5

**meetings** 49:1,9 78:13 79:1

**megan** 2:14 6:4

**megan.everett** 2:19

**member** 58:25 73:11,16,17 74:3 146:7,12 146:15 147:18 148:22 149:5,7 149:7,8 158:5,9 158:17 161:11 161:14,16 162:23 163:5,16

163:22,23,23
165:15,18,19
167:1 181:24
182:23 186:3,4
188:6 212:16,18
**members** 40:16
70:8 72:12,18
72:24 73:2,9,10
73:20,23 75:5
76:11 105:25
147:2 148:10,14
148:16,24 149:2
149:4 153:10
158:11,23
160:18,20 161:2
161:7,8,25
162:15 165:22
165:23 166:8,15
167:10 168:1,3
168:11 172:23
178:24 180:2
181:15 182:10
182:11 188:16
210:16
**membership**
69:21,22,25
70:5,9,14,20,24
71:16 72:5,7,21
73:13,14,15
74:16 75:1
106:2 146:11
158:10,14 163:1
164:10 165:12
165:14 171:12

209:22 212:10
212:15,22
**memberships**
74:8
**memory** 59:2
**men** 251:11
252:1
**mendoza** 1:7
2:3
**mental** 13:19
18:6 19:2,4 20:1
20:14,19,24
21:2 26:24 27:1
27:2,3,3,8 28:8
31:8,24 32:22
37:25 39:11,21
40:8,13 55:15
67:5,8 92:6
107:8,14 116:15
116:22 124:23
126:6 130:14,18
131:4,21 132:19
132:21 141:1,8
147:21 148:2
149:16 151:20
151:21 154:9,13
154:21 158:15
165:5 168:8,14
168:16 169:25
170:4,23 186:7
187:25 188:10
189:2 190:23
191:24 216:12
216:20 221:1,4

226:1,2,16,24
227:9 228:11
232:19 236:5,9
236:23 258:6,16
258:17 260:1,5
260:13 262:20
262:22 263:11
263:15,23 264:8
265:6,11,13
272:20
**mentioned** 6:18
89:22,23 90:6
99:22 109:16
143:15 226:15
**mentor** 67:23
67:25
**mentoring**
66:16 67:20
**mentors** 67:23
**message** 214:9
**messenger**
214:9
**met** 7:12 13:12
48:23 49:6
59:15 67:21,23
77:11,15 78:4,5
80:17 152:3
167:12 172:4
191:11,11,16
**method** 261:19
**methods** 258:8
258:14,15,16
260:8 261:13,14
263:9,9,12,24

264:3,9,10,12
264:14 265:6,14
266:4
**microphones**
71:3
**midwest** 182:20
**military** 242:7
**minor** 40:16,18
136:14
**minority** 73:10
134:19
**minors** 14:22
119:12 120:5
208:4
**minute** 24:6
36:10 99:23
123:7 157:24
188:9 206:15
207:21
**minutes** 136:19
268:1 273:20
276:8
**misattributed**
200:25 201:8
202:1
**mischaracteri...**
207:13
**mischaracterize**
34:4 101:14
**mischaracteri...**
101:12 221:24
266:19
**miserable** 135:3

**misinformation** 122:5

**misinterpretat...** 202:1

**misleading** 224:11 262:19

**misrepresenta...** 201:12

**misrepresenta...** 201:19,21,23

**missed** 178:12 178:13

**missions** 192:2

**missouri** 177:11

**misstatement** 230:17

**misused** 252:25

**mix** 64:1

**mlaw** 184:4 185:24

**modalities** 241:18

**moderate** 272:7 272:17,18

**modern** 156:7,9

**modification** 175:6,11

**modified** 152:23 174:18,18

**money** 59:24 74:10 75:12 76:15 78:14,21 78:22,25 79:10 79:11 80:4

**monitor** 127:20

**month** 78:8 102:13

**months** 41:7,15 41:19,22 42:3,5

**montreal** 238:19

**mood** 48:15 90:18 91:22 93:2 94:8 107:4 117:9

**morning** 5:2 6:3 7:10,11

**morrison** 185:3

**mouth** 34:2 142:6

**move** 66:6 103:15 137:25

**moved** 248:10 248:21

**multicenter** 130:25

**multidisciplin...** 220:18,25 232:25

**multiple** 130:9 132:25

**muscle** 125:9

**n**

**n** 2:1 3:1 4:1 5:1 175:17

**nahman** 3:20 5:25

**nail** 85:22 86:2 86:16

**nails** 252:25

**name** 5:2 12:14 59:4 79:16 80:2 91:8,9,18 132:18 149:18 156:21 178:25 185:10 193:20 195:2 261:17 266:3

**name's** 6:3

**named** 6:7 12:6 13:2,6,17,20 18:3,6,10,13,15 18:18,20,23 19:1,3,13,16 20:1,15,20,25 21:3 22:5,7,15 28:5,7,11,19 31:22 32:4,7,11 32:15,21,23 33:1,4,15 34:9 36:11 45:15,16 47:22 80:1,17 80:21 82:23 83:1 93:7,12,16 93:20,24 94:2,6 105:10,21,24 107:7,13,19,24 108:2 139:22 145:16 196:6 209:4,8 241:5 247:11 249:14

249:17,23 268:22 271:8

**names** 19:11,15 57:20 155:20,22 179:4,6,17 201:7

**nan** 1:12 2:12 3:3

**narrowed** 139:3 139:8

**natasha** 1:6 2:3

**national** 104:14

**nclr** 50:20

**necessarily** 62:6 101:15 110:12 110:14 114:6 120:15 168:24

**necessary** 9:19 26:19,22 32:17 129:17 141:15 141:16,23 142:1 142:10,13,15 143:9 173:24 208:21 230:9 249:22,25 250:7 250:22 252:2,11 252:14 253:2 268:6,11,15 269:2 283:6

**necessity** 141:6 141:11,12,13,14 141:22 142:1,13 249:19 252:17

**need** 9:20,23 23:23 43:8 45:8 45:24 53:8 86:7 86:25 87:13 128:11 144:23 184:16 238:4 243:9 244:22 250:4,5

**needed** 26:2 101:20 124:21 143:12 152:4,16 242:4 252:7

**needing** 66:14 128:10 129:1

**needs** 43:23 88:19,22 144:24

**negative** 69:8 122:13 205:3

**negotiating** 139:17

**neither** 279:10 280:6

**neurologic** 254:20 256:1,5

**neurological** 255:25

**never** 56:25 58:6 65:20 66:2 66:11,19 75:12 82:10 83:3,6 117:13 135:24 154:24 179:16 179:22 183:13 195:14 207:16

218:21 226:18 242:9

**new** 2:7 28:22 57:18,22 58:8 59:1 80:7 95:5 96:8 109:10 110:13,17 115:13 145:23 181:19 182:22 194:13 199:7

**nice** 233:23

**nih** 130:25

**nine** 118:12,15 118:17 119:1,2 267:25

**nod** 8:12

**non** 47:13 53:15 53:18 73:9 84:10,24 91:15 124:13 125:15 136:4 155:10 161:7,8 172:23 175:18 191:7 192:25 194:19 202:18 244:18

**nonconfidential** 61:18 63:1

**nonconforming** 88:10

**nonprofit** 28:1 53:12,18 157:25

**nonverbal** 8:13

**nope** 266:7

**north** 3:6

**northern** 1:2 146:15,21,25 147:3

**notary** 5:10 279:18 283:13 283:19

**note** 281:10

**noted** 283:7

**notes** 139:24

**notice** 4:13 11:14,19 138:12 234:16

**notified** 255:13 255:13

**notify** 256:9

**nowlin** 2:4 4:4 6:9,9 17:8 21:5 22:17,25 23:10 23:15,19,23 24:18 27:10 28:14,20 29:7 35:18 36:17 42:11 44:5 56:10,24 60:25 63:17 65:6 69:11 70:2 79:2 85:1,23 86:5,14 87:8,23 89:11 90:7 91:16 93:4 94:16 95:12,17 95:24 96:12,22 97:13 99:7 100:11,22

101:11 102:10 103:9,16 106:9 107:10,16 108:10 110:24 116:9 120:8 122:2,14 124:10 126:15 128:7 129:6 130:6 132:2,10 139:2 139:7,11 142:11 144:1,11,20 145:6,18 152:25 158:20 159:12 160:24 161:18 161:22 163:6 164:23 176:24 178:5 180:5,17 180:22,25 183:10,23 184:6 184:9,14,18 185:12,16 186:11 187:10 187:14 188:13 191:1 193:17 196:21 198:9 199:25 200:9,19 201:14 202:6,12 202:24 203:5,16 203:22 204:2,14 206:7 207:2,6 207:12 208:11 208:17,23 209:10 210:3,13 213:2,18 215:19

217:10 218:4 219:2 220:4,20 221:11,23 222:11,13 224:17 225:4 227:19 228:8 230:7 233:2,4 233:11,17,20 234:20 235:12 236:15,19,21 237:14 238:14 245:21 246:3,19 247:2,15 248:5 248:16 250:9,19 250:23 252:12 253:3 256:11 257:2 259:11 261:1,7,20 262:16 263:25 265:17 266:18 267:12 269:9,20 271:16 274:7 275:4,13,25 276:4,7,13,16 276:18 277:10 277:18,20,24 278:2,9 281:1

**number** 8:11 52:10 129:23 146:1 153:19 164:15 178:24 181:11 183:12 189:20 190:1 197:11,12 198:1

203:14,15 217:4 217:7 219:13 220:12 221:12 230:5 240:23 254:1 269:7 271:1

**numbers** 69:18 69:23 70:10 71:18 182:14

**numeral** 220:7 220:11,14

**numerous** 133:5

**nurse** 73:8 218:9

**ny** 2:7

**o**

**o** 5:1

**oath** 137:22 199:3 249:7 260:22 262:13

**oaths** 5:11

**object** 17:8 21:5 22:17,25 24:18 27:10 28:14,20 29:7 35:18 36:17 42:11 56:10,24 60:25 63:17 69:11 70:2 79:2 85:1 85:23 86:5 87:8 89:11 90:7 91:16 93:4 94:16 95:12,17

96:12,22 97:13 99:7 100:22 102:10 106:9 107:10,16 108:11 110:24 116:9 120:8 122:2,14 124:10 128:7 129:6 130:6 132:2,10 142:11 144:1,11 144:20 145:6,18 152:25 158:20 159:12 160:24 161:18 163:6 164:23 176:24 198:9 199:25 200:9,19 201:14 202:6,24 203:5 204:2,14 206:7 207:2,12 208:11 208:17,23 209:10 210:3,13 213:2,18 215:19 217:10 218:4 220:4 221:11,23 222:11 224:17 227:19 228:8 230:7 233:11,17 234:20 235:12 236:15 237:14 239:1 245:21 246:3,19 247:2 247:15 248:5,16 250:9,19 252:12

253:3 257:2 259:11 261:1,20 262:16 263:25 265:17 266:18 268:9 269:9,20 271:16 275:4

**objected** 237:19 265:4

**objecting** 237:15 265:20

**objection** 5:12 6:21 10:5,7 44:5 86:14 87:23 95:24 100:11 101:11 126:15 139:2 152:20 161:22 180:5,17 183:10,23 185:12,16 187:10,14 188:13 191:1 203:22 204:16 207:6 219:2 220:17,20 231:8 232:20,23 236:19,20 237:1 237:18 246:2 250:23 256:11 275:13,25

**objection's** 23:24

**objections** 10:6 164:11

**objectively** 130:21
**obligated** 172:6
**observations** 276:23
**observing** 39:7 42:3
**obtain** 236:4
**obtaining** 235:23 236:9
**obvious** 77:20
**obviously** 8:3 10:23 68:22
**occasion** 135:14
**occasional** 125:1,2
**occasionally** 141:5 164:9
**occasions** 8:19 8:21 9:23 42:22 118:17 140:20 248:13 274:25
**occupants** 246:18
**occupational** 35:5 228:22
**occur** 46:3
**occurred** 55:11 77:2 170:17 171:6
**occurring** 39:21 116:22 117:9 168:15 170:4,23 226:1,2

**occurs** 46:12
**ocd** 47:17
**offer** 68:19 111:9 114:1 151:5
**offered** 57:4 116:6 125:19 231:8
**offering** 56:6 84:8 115:11
**office** 3:12 15:13
**officer** 5:2 6:12 6:20 7:6 15:25 19:7 27:1 30:19 38:12 40:17 53:16 57:25 64:13,25 70:17 71:2 72:14 74:21 82:5 83:4 83:23 84:1 85:11 90:1 94:12 99:11,15 112:22 115:18 123:17 136:17 138:5 147:24 150:11 151:8 155:2 156:9 157:10 161:19 175:8,16,25 178:7 179:3,8 179:11,14 193:7 214:2 215:9 219:4 225:5

238:5 239:13 245:13,23 246:1 254:6 256:14 257:6 260:2 261:11 263:5 264:18 266:23 267:2,14,25 270:6,21 272:10 272:13 273:19 277:18,22,25 278:3 279:1,2
**officers** 84:6 248:4,9,14
**official** 31:2 204:7
**officially** 65:14 277:16
**officials** 6:8 12:15,24 121:21 143:4
**officiated** 1:22
**oh** 24:12 71:4 73:7 82:7 120:3 120:12 149:22 151:9 156:22 159:25 169:10 169:24 175:13 178:12 179:5 182:22 184:13 192:20 200:2 212:14 220:15 233:23 239:15 245:22 260:3 270:21 273:22

**okay** 7:25 8:17 8:19 9:4,6,14,16 10:2,4,8,15,17 11:1 12:17 13:17,18 14:19 17:4,20,25 18:14 20:12 21:9 23:7,23 26:4 28:4,25 30:18 31:2 34:13 35:10 36:10 38:7 41:2 44:23 48:1,18 58:2,15 59:23 60:14,18 63:4 64:4 69:19 73:5 75:14 76:17 78:12 80:7,16 81:12,25 82:12 82:22 83:20 90:11 91:2,12 92:13 99:15 101:21 102:3,16 102:21,24 103:24 104:11 108:13 110:2 113:3 114:13,17 114:18 115:4,16 116:4,12,13 117:11 119:16 120:1,12 121:4 122:21 123:3,16 123:22 126:25 137:21 138:15

138:25 139:11
139:14,18,21,24
140:5,11,20
141:13 142:4,22
143:15,22
144:15 145:3,9
145:12,25 147:9
148:5 149:24
153:18 155:17
158:13 164:21
167:23 169:24
170:14 176:7,21
178:1,19 180:20
180:25 183:15
183:21 184:2,20
185:8 186:18,21
193:6,18 195:9
198:19 199:5
202:17 203:2,19
206:25 209:2,16
211:9 212:1
218:25 220:6,10
220:13,24 221:3
223:8 228:17
231:6,6,11
232:6,7,21,24
233:15 236:12
236:25 237:1,11
237:21,25 238:8
239:9 241:8
243:4 244:14,24
249:9 250:2,15
253:8 256:24
258:3 263:22

264:15 265:1,24
266:1 267:2,24
270:6,12,16
273:15,18,21
275:9 276:3,16
277:10,12,22,25
278:3
**old** 109:9
**omissions**
112:16
**once** 75:19
81:20 128:1
168:21 239:24
248:21
**one's** 34:16,18
34:21 35:21,22
94:21,25 95:15
132:18 134:9
227:5 231:1
**ones** 54:11
131:2 201:24
**ongoing** 128:25
129:15
**open** 165:23
**opine** 98:25
110:14 234:9
237:11
**opinion** 28:13
59:9,12 84:8
101:9 119:16
122:20 125:19
142:9,23 206:14
217:7 222:15
235:20 252:2

274:5
**opinions** 110:9
110:12,18,21
111:3,10,15
112:4,10 115:5
115:6,10 121:5
159:1,3 162:14
163:20 200:13
274:14 277:2,4
**opportunity**
173:14 274:13
**opposed** 88:22
164:8 175:19
199:12 251:25
**opposes** 158:18
**optimal** 159:17
**order** 8:8 9:19
26:19 27:7 30:1
33:13 38:3,20
43:8 62:6 67:13
71:13 112:4
128:11,15
157:14 162:23
165:17 220:18
277:19 278:1
**orders** 12:9
127:25 277:15
277:16
**organization**
51:20 66:21
68:9,16 70:7,25
71:5,6,13 75:3,4
75:16 78:5 80:1
80:2 102:19

146:7 147:16
158:8,12,22
159:11,14
161:10,12,25
162:22 183:22
**organizations**
50:17,19 51:2,6
68:19 71:11
109:25 156:2
157:14 176:8
192:23,25
210:24 214:12
**original** 77:18
79:16 80:5
152:24 204:21
**originally** 77:16
79:25 123:19
149:5
**originated** 29:6
**oslo** 79:5
**ought** 86:12
227:10
**outcome** 120:7
279:15 280:11
**outcomes** 132:1
**outline** 109:21
**outpatient**
232:22
**outside** 75:7
83:19 103:25
110:2 126:4
128:9 149:10
173:13 176:7
203:8 205:5

206:5,8 209:17 244:1,2,21

**overall** 60:20,23 94:8 131:24 175:4 228:6 247:13 253:13

**overlap** 133:10

**oversaw** 30:8

**oversee** 144:19

**overseeing** 248:14

**oversight** 160:11

**overview** 193:21

**overwhelming** 47:14 74:3 215:1

**overwhelmin...** 155:13,15 217:16

**own** 78:25 88:24 130:19 187:7 192:9 203:8 265:15

**ozempic** 216:22

**p**

**p** 2:1,1 3:1,1 5:1 151:9

**p.m.** 137:15,18 198:20,23 248:25 249:3 278:11,13

**page** 1:25 4:2,7 8:2 113:10,10 113:13 116:2 138:18,20 179:24 184:2,6 184:7,10,11,16 190:20,20 193:6 193:13,16 195:2 196:6 231:19 233:3,5 253:17 255:9 265:20 271:5,12,13 273:7,18,24 276:20 282:4,7 282:10,13,16,19

**pages** 277:1

**paid** 75:5,14 76:11,13 77:13

**pair** 171:1,1

**palm** 77:5

**pandemic** 78:3

**panic** 47:17 226:7

**paper** 132:16 157:23 176:2

**papers** 132:13

**paragraph** 172:19 192:19 219:22,22 220:11 235:21 237:22 253:14 253:15,16 271:2 271:6 273:6,24

**parallel** 67:7

**parents** 14:23 39:9 40:16,23 43:7

**park** 15:15

**parlance** 145:4

**parse** 131:24 132:7

**part** 21:18,23 38:1 43:23 44:9 48:12 61:5 64:9 85:18 96:14 97:3 100:7,13 100:15,16,24 101:5,16 103:4 105:5,11,18 111:4 121:20 126:2 133:8,9 134:19 147:5 152:21 153:2 156:6,13,16 159:11 163:1 172:15 173:4,5 173:8 175:6,8 175:18 176:9 177:13 182:18 187:16,21 192:7 196:20 197:13 197:14 204:23 204:23 205:20 206:9,16 207:17 218:16 219:17 228:18 230:9 237:19,19

239:23 240:17 243:1,10,10,14 243:17,18,20 244:16 245:10 245:18 246:12 249:25 251:4 253:20 255:12 272:3

**participants** 153:16 172:1

**participated** 15:1

**participation** 172:24

**particular** 20:13 26:18 28:18 46:21 47:8 48:1 55:10 55:10 120:16 135:17 138:10 140:22 141:16 171:4,17 174:9 200:20 216:10 240:24 249:17 252:15 259:5 269:23

**particularly** 35:20,23 39:9 49:5 116:17 137:8,12 205:23 226:13 254:3

**parties** 5:13 279:11,14 280:8 280:10

**partner** 125:4

**partners** 37:21

**parts** 130:9
134:7 149:4
153:3 168:6
174:24 253:18

**party** 40:6

**pass** 67:15,16

**passage** 67:12
68:3

**passed** 120:5
190:18 207:23
208:6,7 209:9

**past** 34:10 48:25
90:19 100:5
144:3 264:24

**patient** 14:21,24
14:24 15:12
16:4 39:10 40:1
40:3,12,21 41:5
41:17 42:4,24
43:1 46:14 47:6
47:8 48:2,7 85:4
85:5,8 116:25
117:1,7,20,20
123:13 124:12
124:22 125:2,7
125:20,24
126:14 127:3,6
127:25 130:22
133:4 142:16,17
159:16 222:16
222:18 223:18
226:16 229:10

236:8 239:1
243:25 244:9,17
250:15 251:4
256:9 269:5

**patient's** 40:12
131:15 132:5,8
229:5,20 236:5

**patients** 15:13
15:21 16:6,10
16:13,15 19:5
26:1,5,8,10,11
26:17 27:18,19
37:12 39:3
40:16,18 41:14
45:15 46:1
47:14 48:3,6
53:7 55:6 60:16
61:16 63:12,14
63:16 64:6,22
64:22 81:10
101:2 123:9,22
124:3,8 125:16
126:3,20 127:9
127:13,18,21
128:4 129:2,4,7
129:8,19,24
131:19 135:2,4
135:9,13,23
136:7,12,14,16
143:10 146:25
146:25 147:7
160:15 187:19
223:17 227:14
227:17 228:5

244:20 246:9,16
253:25 255:12
255:13 257:9
269:1,6,7

**pay** 76:10,15
79:9,12

**paying** 74:4
76:22

**payment** 74:25
140:2

**pediatrics**
209:14

**peer** 112:2

**peers** 37:15

**pending** 10:15
58:2,12

**pension** 60:13
60:14 62:15

**people** 6:13
15:12,17 16:17
20:4,5 23:3 25:1
25:14 26:25
28:23 35:24
41:8 42:13,16
43:5,24 44:14
47:10 57:8 63:8
63:9 64:2 68:24
70:5,15,19,24
71:4,5,6,12,15
71:21 74:4 75:5
81:1,18,18,19
83:17 85:14
87:15,24 88:10
88:11,17,23

90:21 91:7 92:9
97:20 101:19
124:5 125:14
126:4,10,11
128:10,14,25
129:14 130:10
130:17 132:17
132:18,22,25
134:2,7 136:1,1
137:13 143:9
149:10,24
151:19,20
154:18 155:13
156:4 158:14,24
159:3,6,8,20
162:8,15,19
163:2 164:10,15
165:2,8,9 167:8
167:13 168:5,12
168:15,17,24
170:3,22 171:16
172:7 173:12,21
176:11,13 177:7
177:11 179:15
179:18,22 181:7
181:8,20 182:3
182:14 183:3
185:2,4 186:24
187:3,9 189:7
189:11,14,21,23
189:25 191:12
191:12,15,20,20
191:22 192:24
195:1,19,21

196:10,18 197:6
197:8,12 198:2
198:3,10,13
200:11,12 201:7
203:14 207:16
212:6,7 216:20
217:15 221:25
222:19,24,25
223:12,13 224:5
225:9,20,21,25
226:12,13,15,23
227:6,22 240:3
240:5,13,13
242:4,17 243:8
244:11,22
245:10 247:13
252:19 254:2,4
254:10 257:13
257:22 258:21
259:19 268:13
271:2 272:23
273:4

**people's** 228:11

**percentage**
16:13 46:14
47:7 59:20 60:4
60:15,19,23
61:13,15,17
62:8 63:15 64:9
65:5 68:4 72:22
72:25 130:4
136:7 269:15

**perception**
122:1

**period** 37:16
41:4 42:8 51:18
88:24 148:25

**periodic** 16:16

**periods** 41:8
42:1 124:17

**permanent**
254:24 257:25

**permanently**
227:4 230:25

**permission**
128:10

**permit** 268:7

**permitted** 5:17
85:4

**persist** 41:3
228:15

**persists** 225:23
228:12

**person** 7:22
15:13,23 16:3,6
16:11,23,24
17:1,3 21:19,24
27:12 39:7 46:9
46:13 57:10,22
58:21,24 59:16
65:21 77:10,11
77:23,25 86:19
88:3 97:20
98:19 116:20
118:6 120:17,17
124:13 131:7
133:20 134:21
152:3,18 165:16

171:8 177:1
187:16,16 191:7
194:18 195:12
196:12,13
198:16 217:17
222:10 231:23
250:6 251:2
254:23

**person's** 85:19
128:17 133:6

**personal** 59:20
62:7 76:3

**personality**
240:14

**personally**
14:13 24:20
164:25

**personnel** 58:22

**persons** 253:20

**perspective** 56:3
96:10 121:24
196:19 200:21

**pertaining**
139:25

**pertinent** 26:3

**pflag** 50:4

**phafflin's**
242:11

**phd** 203:19

**philosophies**
162:4,20

**philosophy**
165:3

**phone** 108:23

**photo** 179:21
180:4,11

**phrase** 13:22
17:15 21:10,10
21:12,14,20
29:14 45:19
141:13,22,25
143:15 144:15
145:13 211:9,12
215:13 242:21
265:22 275:1

**phrases** 9:7,14
215:13

**physical** 40:11
57:25 89:9,18
91:4,7 92:14
93:8 98:7,17
99:2 106:8,12
137:1 216:15
227:5 231:1

**physically** 18:14
57:24 253:24
254:12

**physician** 17:22
25:23 56:7,11
56:16,20 68:6
73:9 79:24
206:25 207:10

**physicians** 73:1
73:9 108:3
147:7 217:4,8
218:15

**pick** 102:4
**picked** 167:13
**picking** 168:5
**pictures** 179:22
179:23,23
**pieces** 236:22
**pink** 250:16
251:25 252:10
**place** 28:22
32:25 55:16
102:7 200:3
**placed** 231:24
232:15
**placement**
231:20 232:4
**places** 77:7
181:20,21
**plaintiff** 32:7,15
33:4 116:16,25
241:5 249:17
270:16
**plaintiff's** 12:20
25:8 32:4,18
48:19 49:6 96:6
96:16 116:25
234:9 235:9
**plaintiffs** 1:8
2:2 6:10 12:7
13:3,6,17,20
18:3,7,10,13,15
18:18,21,23
19:1,3,5,8,13,16
19:22 20:1,15
20:20,25 21:3

22:5,7,15 24:10
24:16 28:5,7,11
28:19 31:23
32:11,21,23
33:1,10,16 34:9
36:11 45:16
47:23 54:21
80:18,21 82:23
83:1 93:7,12,16
93:20,24 94:2,6
96:11,18 105:10
105:21,24 107:8
107:14,19,24
108:3 118:18,20
119:10 120:19
139:22 143:2
145:17 209:5,8
232:14 247:12
247:19,19
249:10,14,23
268:23 271:8
**planned** 145:22
**please** 6:1,22
9:21 98:2 263:2
263:2 277:24
278:6
**plug** 99:12
**plus** 118:1
171:16 189:7
225:24
**pocket** 78:25
**point** 10:10
34:10 37:17
41:10 72:8

86:23 177:25
244:7 253:1
267:10
**pointing** 276:12
**points** 142:8
**policies** 84:13
100:3,8,14,21
102:17,17,25
103:22,25
118:14,20
164:19 218:11
244:25 245:12
**policy** 22:20,21
28:22 29:10
30:13,15,23,24
31:3,6 32:19
33:8 96:8 99:19
99:24 100:25
101:1,4,4,10,16
101:18,22 102:8
102:16 109:10
109:10 118:10
118:22 123:4
145:23 147:6
211:10,12,13
212:21 219:19
219:24 220:2,10
223:23 234:9,13
234:17 235:18
237:12 239:7
277:7
**politician** 194:7
**politics** 200:8

**population** 44:4
45:2,11 46:13
46:15,21 47:6,9
48:2 83:14 86:9
86:10 89:15
90:22 91:22,25
92:9,11 99:6
106:18,22 107:1
107:5 117:1,20
123:13 159:17
269:5,13,16
**portion** 31:11
61:18 62:1,17
63:1 74:10
78:16 121:19
183:6 274:16
**portions** 170:11
219:23 239:7
**portland** 77:5
**pose** 86:20
96:20
**posed** 87:3,7
89:7 96:10 99:5
**poses** 86:3 95:16
95:23
**posing** 86:17
95:19
**position** 64:5
126:25
**positions** 146:2
147:9
**positive** 69:7
122:10 132:19

possess 84:19
possession
84:18 85:22
possible 97:22
185:19 247:4
257:18
post 129:13
223:1 230:13
238:20
potential 126:9
207:9 239:25
240:18 241:1
255:14 271:5
power 204:5
practice 14:1,20
15:3,5 17:6,17
33:9 48:12
60:10,13,15,21
61:6,8,13,17
62:12,14 63:25
64:1 68:25 69:8
74:19,21 78:15
126:2,19 129:25
140:21 141:18
156:13,14,23,23
157:8,13,14
163:17 165:7
168:24 170:21
176:2 181:8
188:16 215:2
216:1,2,5
218:13 225:25
236:4 274:6

practicing
68:14 155:6,9
161:2 162:16
practitioner
69:6 73:18
practitioners
73:8 218:9
pre 78:22
preceded
243:19
precocious
216:14,19
predisposed
198:6
prefer 15:22
preparation
24:8 112:13,17
prepare 10:19
prepared 171:5
280:3
preparing 11:7
109:7 110:3
219:17
prescribe 26:4
126:2 127:17
prescribed
16:18 18:18
31:23 32:5,17
33:10,11 56:8
126:14 243:24
prescribing
33:12 126:23
257:11

prescription
126:19 244:3,5
244:21,22
prescriptions
26:7 127:19
presence 188:19
present 3:19
14:16,21,23
15:18 36:21
130:17 264:8
presented
177:20 212:10
presenting 39:4
258:5 259:25
260:5 263:11
265:5,11 266:5
268:18
press 252:25
pressing 89:18
pressure 14:10
presumably
54:16 99:13
228:24
presume 237:21
pretty 136:14
prevent 240:11
258:7,15 260:6
263:24 265:5
prevented 106:7
241:4
preventing
262:20
previous 101:1
101:4 115:2

261:23
previously 7:17
11:4 33:16
49:14,23
primarily 60:10
primary 26:11
34:22,22 42:17
45:25 65:15
66:17 127:22
128:2 193:14
194:23 195:4
principle 88:16
principles
162:16
print 178:2,16
213:22,23 214:8
printed 213:24
prior 11:6,6,7
33:8 34:10
40:13 64:5
133:16 221:24
235:23,24 236:5
236:9 259:6
266:19 274:20
279:4
prioritized 53:6
prison 43:22
44:9 58:22,25
80:8,11,23
81:13 83:7,13
83:22,25 84:3
85:17,22 86:9
87:21,25 91:5
92:15,18,21,24

**[prison - provide]**

93:9 95:5,20,23
96:4,21,25 99:9
99:17,20,22,25
100:3,5,9,17,21
101:22 102:8
103:20 104:9,12
105:6,14 106:6
106:6,11,16,20
106:24 107:3
128:18 144:10
192:12 223:22
243:8 244:1,10
244:25 245:19
246:5,7 247:6
252:22

**prisoner** 97:7
97:24

**prisoners** 97:2
247:24

**prisons** 33:11
44:15 45:5 50:3
50:4 80:13 81:5
81:19 128:9,9
244:1 247:22

**private** 60:13,15
60:20 64:1 74:6
74:7 126:18
129:25

**privately** 54:1

**probably** 17:2
46:20 55:3 60:2
63:18 77:21
124:1 141:4
155:18 164:1,1

174:4 217:21

**problem** 232:17
232:21,24
235:23

**problematic**
225:12 240:24

**procedural** 5:18

**procedure**
99:24 136:9,10

**procedures**
100:3

**proceed** 7:7
10:7 114:5
240:2

**proceeded**
49:20 57:13
59:17 114:3
118:25 119:2

**proceeding** 5:4
5:16,24 54:18
278:13 280:4

**proceedings**
279:3,4,5,8
280:5

**process** 9:1
21:23 23:4
26:22 29:16,19
37:20,22 38:1,2
38:24 68:10
115:12 123:8
130:17 150:25
151:3,7,8 156:8
156:12,17,20,23
157:2,3 163:12

163:22 164:2
166:2 167:1,3
171:6,10,23
172:15 173:4,6
173:6,24 174:2
174:24 175:2,3
175:4,7,11,23
175:23 176:3,4
176:10 177:14
177:16 180:9
182:8,19 185:15
188:15 205:20
206:6,9,9,10,17
209:18,25 210:6
211:25 232:18
274:4

**produced** 5:15

**profession**
17:18 71:11

**professional**
15:1 27:24 71:9
113:14,17,18
159:14 185:19
264:16

**professionals**
19:12,16,21
20:15 126:6
163:21 165:24

**professor**
196:17 241:24

**profit** 53:15

**program** 24:25
65:4,17 67:20

**programs** 71:12
71:14,21

**prohibits** 144:7

**project** 74:12

**promote** 268:25

**promulgated**
149:19 201:24

**pronouns**
132:19

**propensity**
242:1

**proper** 28:23
121:9 268:20

**propose** 151:25
152:19,20

**proposed** 24:10
24:16 54:7
110:5 153:4
210:21

**propositions**
275:22

**protective** 62:5
108:11

**protocol** 20:4
28:22 133:23
243:15,18

**protocols** 83:10

**proved** 253:24

**provide** 27:7
42:8 45:5 56:22
59:12 68:6 71:8
71:11 74:18
88:15 110:4
115:14 139:14

**[provide - publications]**

178:25 180:7 213:8 214:10 223:20,23 235:11,17 251:1 252:9,18 261:14 277:2

**provided** 10:18 19:16 20:20,24 21:3 22:19 28:19 31:7 43:21,24 44:12 63:5 69:9 71:1 73:6 87:4,11 88:18 96:25 109:20 116:16 124:5 139:16,18 142:2 144:25,25 167:25 180:3 199:24 209:14 211:17 224:12 231:12

**provider** 26:12 42:17 47:13 56:16,21 127:22 128:3 130:18 236:9

**providers** 26:16 44:16 55:15 67:8,8

**provides** 43:18 44:3,8 45:7

**providing** 9:16 13:2 17:7 19:12 26:17 43:11

63:20 87:14,14 88:2 143:10 158:14 194:5 245:4

**provision** 21:15 21:16 98:5,25 100:9 116:8 121:9 232:22 245:1,19 268:25 269:4

**provisions** 152:22 189:9 220:3 253:9,10 253:11

**proviso** 115:11 227:21

**psychiatric** 14:5 36:19 43:12,19 44:3 45:3,10,17 48:17 60:10 61:6 63:10 64:17 78:19 90:20 116:7 146:12,16,21,25 147:3,13 156:25 159:15 211:2 212:11,24 213:9 239:11,16,18,20 239:24 240:4 244:2

**psychiatrist** 17:4 27:13,17 36:15,19 47:9 63:23 64:24

153:25 154:7 168:9,9,19 169:14 242:7

**psychiatrists** 40:4 146:4,6 147:2 153:23 154:1,3 168:13 170:15

**psychiatry** 14:1 17:6 27:14 36:6 64:12,16

**psychoanalyst** 242:1

**psychological** 227:4 231:1

**psychologically** 253:24 254:12

**psychologist** 168:20 169:15 232:25

**psychologists** 73:2 154:4,5,10

**psychosis** 43:2

**psychostimul...** 16:7

**psychotherap...** 227:3 230:24 272:22

**psychotherapist** 48:8,9 169:2,17 195:20,23

**psychotherapi...** 73:1

**psychotherapy** 131:21 221:19 221:22 222:9,16 222:19 223:1,3 223:5,9,11,15 223:18,19 224:1 224:3,5 225:9 225:14,17,19,22 227:6,10,13,17 228:5 229:3,15 229:19,23 230:4 239:21 242:5,8 242:15,18 268:17

**psychotropic** 239:21

**ptsd** 47:20 90:19

**puberty** 216:13 216:13,14,19,19 217:14

**public** 53:15,18 121:25 160:12 160:15 173:1,12 173:17 279:18 283:19

**publication** 180:10 259:5,10 259:21 260:18 260:24 262:7,14 266:13,16 267:7 267:21

**publications** 91:6 114:19

115:1 168:18
**publicly** 161:17
161:20
**published**
150:19 157:19
157:21 167:16
168:13,14 242:7
**publishing**
173:2
**pull** 140:18,21
141:5 260:17
**pulled** 151:15
**pulling** 141:9
**punishment**
143:13,16 144:7
144:9
**purchase**
128:13
**purpose** 38:23
220:2,7 222:9
252:4 274:5
**purposes** 38:23
230:15 259:7
**pushed** 78:2
**put** 28:22 34:1
79:11 125:3
142:6 151:23
153:2,3 157:14
174:6 212:21
226:22 230:13
**putting** 224:24
225:8 227:2,2,8

**q**

**qualification**
26:19 69:1
**qualifications**
19:20 188:11
192:1
**qualified** 87:6,9
96:16,19 167:14
167:17 191:23
279:7
**qualifier** 144:24
230:14
**quality** 131:5
215:14,18,18
216:3,6,11,20
216:22,23,24
258:8,13 259:14
260:7 263:16,20
263:21 271:15
272:3,7,17,18
272:18,21,24
273:1,12,16
**question** 8:22
8:23,24 9:2,3,4
9:6,8,9,11,13,20
10:2,8,15 18:4
23:8,9,11 24:2,3
44:2,2,7 56:19
61:2,12 69:19
90:2 98:3 102:3
102:5 103:12,14
103:17 111:1
116:15 117:10

121:11 126:13
127:16 132:7
135:8 140:17
144:13 153:7
176:20,21 185:7
185:9 193:3
200:17 202:19
203:17,21
205:21 209:3
211:11 213:6,13
214:6 215:17
222:13 223:8
227:12 232:1
244:13,14 255:4
260:16 261:8
266:7 267:1,13
267:17,19
275:19 276:12
**question's** 98:2
102:1 176:20
202:17
**questioning**
65:7 196:22
**questions** 9:25
92:6 199:5
274:10 276:12
277:11
**quick** 108:11
178:8 200:1
**quickly** 123:10
268:22 270:19
**quite** 42:12 79:3
128:24 141:2
144:12 164:14

168:13,14
197:12 198:2
203:13,15
213:14,14 216:7
225:19 229:12
246:20 254:15
**quote** 26:14
192:15 200:8
202:4,5,22
**quoted** 121:19
**quoting** 202:7

**r**

**r** 2:1 3:1 5:1
190:21 282:3,3
**rabbit** 103:13
185:8 186:14
**raise** 6:22 10:6
**range** 46:23
162:3,6
**ranges** 161:24
**rare** 136:14
240:19 254:11
254:15 268:5,10
268:14,19
269:18,22,24
**rate** 14:11 50:11
50:14 51:3
53:11,12 67:12
68:3 71:14 93:1
98:21
**rates** 46:19 70:8
91:6 92:7,14,17
92:20,23

**[rather - recommending]**

**rather** 219:23 250:16,16

**razor** 250:16,17 250:25 251:5,7 252:16

**reached** 39:25

**reaching** 40:10 41:10 111:24 208:15 274:5

**read** 11:13,16 12:17 20:4 25:5 30:6 119:16,18 119:20 121:16 121:18 140:18 144:2 145:21 208:2,3,5 213:24 238:4 239:13 267:5 277:20,22 281:9 283:5

**reading** 22:6 184:12 187:4,5 200:15 260:15 265:24

**real** 108:10 133:19,20 191:17 200:1 268:22

**reality** 254:9

**really** 42:20 46:17 52:8,18 63:8 66:19 69:16 71:1 102:1 114:23

122:11 163:15 168:15 172:11 176:20 178:8 191:11 203:8 225:16 232:5 242:12 251:24 254:9

**reason** 69:24 74:24 81:2 88:14 124:11 179:20 180:21 181:1 187:6,12 235:15 275:2 281:11 282:6,9 282:12,15,18,21

**reasonable** 17:22 97:23 237:24

**reasons** 77:20 82:22 125:3 204:20

**rebuttal** 4:11 10:21,24 49:4 115:7,20,24

**recall** 11:24 25:2 29:16 30:6 30:7 53:14 58:20 59:1 73:21 76:13 77:18 104:4 108:24 119:20 121:17 140:19 155:12 212:7,16 259:12

**receipt** 281:17

**receive** 11:23 12:20 20:4 67:13 74:6 86:2 97:11 98:10,15 124:24 125:20 150:4 158:2 159:17 190:15 217:19 221:22 224:3 226:12 244:9,12,17 245:10 249:11 258:12 269:24 269:25 270:1 271:3 274:20

**received** 11:22 28:11 33:2,5,16 40:11 45:16 108:22 123:23 135:9 140:2 171:24 172:7 173:19 191:4 201:7 203:13 266:22

**receives** 69:6 73:25 95:5

**receiving** 18:21 18:24 20:1,6 28:23 32:4,16 33:19 101:2 107:8 124:9 129:3,19 131:19 132:6 134:1 165:10 198:11

222:16 226:11 241:5 268:23 269:6,8,12,16 269:16,19

**recent** 108:5 117:15 118:5 217:13 243:11

**recently** 119:14 262:12

**reciting** 111:20

**recognition** 87:12

**recognize** 37:14 113:4 138:10 222:22 247:7

**recollection** 59:14

**recommend** 25:8 42:24 164:21 165:9 214:19,25

**recommendati...** 25:11 141:20 172:20 199:15 214:16,17 215:5 215:22

**recommendati...** 157:7,13 170:19 170:21 171:11 171:19 199:16

**recommended** 214:17,23

**recommending** 100:20

**record** 5:4,5,13 6:2 8:8,16 71:25 72:1,3,6 137:16 137:17,19 198:21,22,24 202:11,12 249:1 249:2,4 277:17 278:11 279:9 280:5

**recorded** 5:20 5:24 8:4 279:6

**recording** 279:8 280:3

**recordings** 5:15

**records** 13:20 18:6,12 33:6 39:12 40:13,23 116:19 117:8 127:25 235:24 236:5,6,10

**reduce** 199:7 222:6 225:14 228:6

**reduced** 107:4 199:24 200:4 279:6

**reduces** 98:6 99:1

**reducing** 227:17 241:10,13

**reduction** 257:19

**refer** 13:5,16 20:8 35:23

114:16 140:13 140:24,25 232:18 237:21 242:24 244:18 244:20,24 245:3 245:11 262:3,8 266:2 270:20,24 271:2 273:9 274:25

**reference** 140:12 145:12 191:7 211:18 213:11 245:22 246:4 254:25 259:21,24 260:9 273:25

**referenced** 17:21 27:21 213:6 234:13,17 235:18,21 237:13,22 255:8 260:17 264:5,22 265:8 266:3,10 267:9 271:12 275:2 281:6

**references** 211:21 238:2 259:24 261:22 262:10,11 273:13 274:4

**referencing** 55:17 261:24

**referral** 232:17

**referrals** 231:13

**referred** 10:23 34:18 122:17 133:19 140:15 232:18 233:21 238:11

**referring** 12:12 12:13 13:6 17:12 20:7 26:15 35:21 42:9 114:14 122:16,19 133:12 156:20 187:17 201:4 215:20 231:20 231:21 245:7,7 253:14 256:4 258:9 260:11 261:21 264:13 275:7 276:2

**refers** 231:17,19 258:25

**reflect** 113:21 113:24

**reflective** 254:9

**reflects** 217:4 259:15

**reframing** 266:25

**refused** 56:17 56:22 57:2

**regard** 33:7 166:1 177:4 216:17

**regarding** 33:23 209:22 211:4 221:10 263:23 267:8 276:23

**regardless** 189:5

**regimented** 128:20

**regret** 254:2

**regretted** 253:23

**regulate** 160:15

**regulatory** 160:7

**rehabilitation** 81:4 82:2

**reimburse** 75:21 76:8,24 78:12

**reimbursed** 76:18 78:21

**reiyn** 1:5 2:2 5:7 281:4 282:1 283:1

**rejected** 204:10

**rejecting** 215:7

**rejection** 134:15

**rejoin** 70:15,21

**related** 37:18 60:21 63:5 90:19 91:23 117:19,20 118:9 118:14 132:14 135:11 141:11

Page 339

144:3 159:19 162:4 208:3 254:10 263:14 263:22 264:5 279:10 280:7

**relates** 49:5 100:4,9 101:23 102:8,25 207:24 209:16

**relating** 25:25 256:1

**relationships** 126:7

**relative** 279:13 280:9

**relatively** 48:23 123:10

**release** 78:2 234:25 235:2 237:16

**released** 78:7,9 203:4

**relevance** 62:8

**reliable** 215:17 261:19 262:15 262:21 263:8 264:9

**relied** 30:1 111:23 200:23 208:15 261:18

**relief** 223:20,24 227:23 243:13 252:18

**relieve** 221:19 222:2 223:7 242:8

**relieved** 223:3

**relieving** 124:15 222:6 225:17,20

**religious** 124:24 226:17

**reluctant** 125:10 163:16

**rely** 40:14 160:14 244:7 258:8,13 260:7 261:13,14 263:11,15 264:8 264:11 265:6 273:11,15

**relying** 112:3,8 266:4

**remember** 11:9 58:17,18,20 59:4 72:8 74:25 189:18 190:12 190:12 232:1 259:23

**remission** 47:16

**remote** 82:3,3,8

**remotely** 6:15 16:11 59:15

**removal** 252:17

**remove** 205:6 227:25 252:16

**removed** 171:22 212:19 228:2

**renewed** 70:11 70:13

**repeat** 15:25 23:10 30:20 56:19 61:1 82:5 90:2 94:12 110:25 135:8 179:3 270:21

**rephrase** 275:20

**report** 4:9,11 25:5 41:25 58:8 91:10 96:6 99:23 109:8,22 110:3,8 111:13 111:16,20 112:9 112:12,17 113:7 113:15 114:17 115:7,8,20,24 116:2 142:20 145:12 163:23 213:7 219:17 243:1 245:1,5,6 245:8,18 247:16 249:9 259:9 270:19,24 271:13,14,23 272:9,12,14 273:7 274:16,25 275:9 276:20 277:8

**reported** 94:7 108:3

**reporter** 5:3 8:5 239:5 277:14

**reporter's** 138:1

**reports** 10:18 42:4 46:18 109:24 110:10 111:6,10 140:7 140:10,11,15 141:23 142:1,8 245:11

**represent** 6:6 182:4

**representation** 181:22

**representative** 73:23 169:3,16 182:16 185:21 194:3 195:17,19 195:24

**representatives** 168:23 196:1

**represented** 181:5 183:2 197:1,3

**representing** 6:10 197:7

**republic** 53:16

**request** 68:15 139:4,8,8 204:13 277:15

**requested** 96:11 96:18 139:1 173:20 249:18 252:4 279:21

**requests** 138:19 138:20,22

139:15
require  15:23
  16:3 42:2,7
  126:19 212:5
  244:3
required  16:19
  68:13 71:8
  127:1 162:1
  212:2 283:13
requirement
  41:21 69:2
  133:17,25
  163:13 199:11
  228:20
requirements
  31:20 205:23
requires  102:3
  203:19 265:15
research  38:22
  39:20 64:18,19
  100:2,7 109:14
  132:12,23
  143:23 186:22
  218:25 267:6,20
researchers
  179:19
reserved  278:12
reside  72:12
resolution  114:3
  210:20
resolve  226:25
  242:9 253:23
resolved  239:25
  240:16

respect  28:7
  212:2
respectful  239:6
respiration
  14:11
respond  259:9
  259:13
responded
  110:6 179:16
responds
  225:22
response  8:16
  36:23 124:17
  139:15 231:13
responses  8:14
responsibility
  31:19
responsible
  166:16
responsive  9:3,3
rest  140:12
  154:9 167:10
restate  8:25
restrict  206:19
  218:9 268:13
restricted  209:3
restricting
  207:24
restrictions
  208:16 209:9
restrictive
  101:18
restricts  208:9

rests  216:11
result  31:24
  35:5 58:1 119:7
  136:25 254:16
  254:19 255:10
  257:10,21
resulted  32:3
results  8:24
retain  181:23
retained  49:11
  49:14 54:20,20
  80:8 113:25
  114:4 118:8
  142:24 159:22
  160:1
retention  51:19
  108:25 117:19
retentions  51:1
retired  51:23
  63:15 114:22
retirement
  60:11
return  101:9
  281:13,16
reverse  137:1,6
  137:7
reversed  119:14
  253:22 258:2
review  9:18,19
  10:1 11:12
  12:23 13:1 18:5
  28:6,10,18,25
  39:11 109:18
  117:8 138:22

140:22 156:5
  188:11 209:18
  215:22 216:16
  234:9 235:3
  238:3 242:11,12
  259:5 262:24
  263:3,6,8,10,18
  265:3 272:4,8
  272:12,16,21
  274:20,23
  279:21 281:7
reviewed  10:21
  11:2,4,9 12:9
  13:19 18:11,12
  18:17 28:21
  29:5 33:6 83:9
  84:13 101:22,24
  102:8,22,24
  103:22,25 112:2
  112:13,17
  116:19 138:24
  141:1 167:12
  171:8 200:21
  202:11 211:23
  219:16 234:2,5
  234:17 238:12
  238:17 252:21
  262:11 264:24
  274:21
reviewers  205:9
reviewing  40:23
  109:15
reviews  74:18
  141:6 157:5

**[reviews - saying]**                                                    Page 341

165:14 216:2
258:13,21 272:2
272:5
**revised** 174:19
238:18
**revising** 29:19
**revisions** 29:5
**ricky** 1:10 2:11
3:2 5:7 6:6
12:14 281:4
282:1 283:1
**right** 6:22 8:5
13:23 30:16,25
34:7 43:10
54:12 61:9
62:16 66:7 78:1
78:6 89:12
112:10 121:22
145:5 154:16
160:21,25 161:1
161:4,5 180:4
185:23 189:17
189:21 193:14
196:3 205:21
208:21 210:12
211:20 213:22
215:17 222:15
228:16,22
257:18 259:8
276:4
**rights** 50:21
51:11 143:19
187:8 191:14
192:10,14 194:4

**rise** 249:18
**risk** 87:25 88:1
88:6,9 89:4,12
89:13,17,18
90:6,12,17 91:4
91:13,21 95:23
96:10,21 97:1,6
97:12,16 98:11
98:16 99:9,19
105:14,17
106:17 137:12
255:14,22,25
256:7,10,13,16
256:18,21,25
257:4
**risks** 87:21 89:7
89:15,22 90:6
90:14,23 255:17
271:5
**ristori** 179:2,12
**rns** 73:8
**role** 28:17 37:24
146:23 147:5
166:24 193:14
194:23 195:4
227:9 242:9
**roles** 16:8
166:25
**roman** 220:7,11
220:14
**room** 215:6
**rooms** 76:23
**rosa** 1:21 5:9

**rouge** 3:7
**roughly** 60:18
79:14 277:1
**round** 172:14
205:16,17
**routine** 16:22
16:24 127:25
**royal** 250:17
**rule** 240:25
**ruled** 119:8
239:25 240:17
**rules** 5:19 8:1
**run** 38:3,9,18
83:20 160:15
**runs** 81:23
**russell** 132:16
**russia** 191:13,14
192:5,13,14,16
192:21,23 193:1
193:1

|  | s |  |
|---|---|---|

**s** 2:1 3:1 4:6 5:1
190:21 272:15
272:15 282:3
**s3** 237:3,4
**sabir** 190:21
191:4,10,17
**safely** 87:14
247:21
**safety** 85:15
86:8,25 88:17
88:25 97:1
106:7 247:9

253:5
**sake** 25:16
**sam** 6:19 184:25
**samuel** 3:21
6:14
**san** 15:13,15
63:20 81:10
82:15 169:17,18
**sanction** 68:9
160:17,19,22
161:8,11
**sanctioned**
203:3
**santa** 1:21 5:8
**sat** 7:21 66:2
166:20 170:14
**satisfied** 274:24
**save** 199:18
**savings** 60:11
**saw** 64:22
107:14 109:9
173:16
**saying** 23:22
30:12 41:14
48:2 61:15
72:14 86:15
88:22 95:18,22
98:18 100:13
126:17 154:25
155:4 175:4
189:21 199:21
201:10,10,17
207:19 221:21
224:20 232:2

238:11 243:16
254:21 258:25
261:9 263:17
264:7,7 268:14
269:10 271:22
**says** 224:18
228:17 231:18
239:10,10,19,23
255:9 258:5
259:25 265:10
265:23 266:5
268:5 276:22
**scale** 39:13,17
171:14 238:18
**scales** 39:22
130:23,24
**scenario** 55:13
132:5
**schedule** 15:19
16:12,18 52:1,3
**schizophrenia**
39:5
**scholarly** 112:2
262:3
**scientific** 156:20
259:22 262:8
275:22
**scope** 96:17
139:4,7 247:16
**score** 174:22
215:24
**scores** 216:3,3
217:1,2 224:24
258:11 259:15

**scoring** 205:10
**se** 136:3
**search** 139:1,6,9
**second** 47:4,21
78:1 99:12
192:18 240:17
**secondary**
34:22
**secretary** 6:6
12:14 143:4
205:24 206:2
**section** 141:10
141:11 151:4
188:2 189:15
191:4,8 194:22
195:3 220:14
221:9,10,13
224:2,8 227:9
231:18 233:7,9
233:10,13
236:13,18 238:1
238:2,4,9,12,14
239:9 253:17
255:8 260:4
268:5 276:22
**sections** 151:20
173:25 190:15
192:3 220:2
268:3
**security** 83:9
85:21 86:3 87:3
87:6,21 88:20
95:16 96:10,20
99:5 105:8,11

106:2
**see** 16:4,6,15
39:22 41:14,25
42:13,16,19
47:8,10,12,13
47:15 48:1,7,15
48:15 50:6
52:17 123:23
126:12 127:25
131:5 135:1
138:20 155:20
163:16 179:1,17
184:4 185:10
189:25 190:20
192:15 193:15
195:2 200:2
201:15 202:7
249:24 264:22
266:15 271:4
276:22
**seeing** 15:12
16:13 48:5,8,13
184:9 190:12
**seek** 87:18
173:1,11 209:25
210:23
**seeking** 37:25
69:15 217:18
249:14 269:12
**seem** 88:14
121:10 240:24
**seems** 97:18
237:24

**seen** 16:10,17
17:3 19:22
37:11 39:19
46:24,25 56:12
91:6 129:24
138:15 164:9
210:20 264:25
**sees** 202:10
**segregated**
150:1
**sehoole** 184:3
186:17,18,23
**sehoole's** 187:5
**select** 168:1,2
**selected** 167:2
168:18 180:8
**selection** 164:7
166:2 187:3
**self** 55:11 89:24
89:25 90:12
91:13 92:23
93:25 94:3
106:25 164:7
192:21 222:4,6
226:20 232:18
271:9,9
**send** 180:11
214:8
**sense** 45:6 65:7
65:10 192:5
196:23
**sensor** 14:10,11
14:11

**sent** 43:22 155:23 171:11 175:24,25 179:22 180:10 277:23 281:14

**sentence** 82:25 163:11 224:9,10 227:3,21 240:23 241:4 259:25 260:4 261:22 264:7 265:5,8 265:20

**separate** 67:6 74:7 150:3 169:22 170:1 175:19 180:9

**separately** 242:24

**separating** 133:8

**september** 78:10

**sequential** 130:16

**series** 9:17 138:19 152:1

**serve** 49:15 81:20 108:19 148:5

**served** 56:15 57:5 146:1,18 147:19 148:12 148:17 194:12

**services** 4:16 17:7 20:8 28:25 29:4,20,22 30:1 30:4 31:8,12,14 31:20,24 32:3,9 32:13,19 43:19 44:4 45:3,10,17 60:5 69:8 70:25 116:7 131:21 159:22 160:1 198:7 199:23 209:7 218:2 219:13 231:9,12 232:19,22 253:8 258:7 260:6 263:23 276:23 277:2

**serving** 148:8 252:3

**sessions** 66:23 229:15

**set** 7:17 35:1 67:15 90:20 111:16 115:10 138:19 150:15 157:6 188:18

**setting** 43:17 90:16,25 96:21 126:4 129:24,25 244:22

**settings** 87:25 127:14 132:24 143:11 244:3

**settled** 58:7,18 59:13,17 103:5

**seven** 149:21,22 151:14 154:16 154:17 160:5 168:11 169:5 174:13 180:23 180:23 182:3 190:2 273:19,20 276:9

**several** 27:21 54:4 64:10 82:19 89:2 149:3 154:5 238:2 255:10 271:5,12 275:2

**severe** 124:23

**severity** 37:8 39:14

**sex** 34:19 227:5 231:2 242:9 246:15 254:16 255:9 268:7,20

**sexology** 68:21

**sexual** 34:22,22 88:7 89:10,18 91:4,7 92:17 93:13,13 98:11 98:17 99:2 106:17 248:21

**sexually** 248:9 248:14

**shake** 8:12

**shane** 185:3

**shang** 273:25

**share** 37:20 47:14 63:11 90:21 153:13 247:14

**sharpened** 252:25

**sheer** 94:21

**sheet** 281:11

**short** 124:17 253:20 254:10

**shorter** 81:17

**show** 20:8 179:6 248:20 262:21 264:10,12

**showed** 263:18

**showing** 91:6 221:18

**shown** 91:21 97:15

**shows** 91:3

**shy** 159:13

**side** 2:16 7:22 120:2

**sign** 277:21,23 281:12

**signature** 113:10,13 116:1 278:12 279:16 280:14

**signed** 111:6 166:17,19 281:19

**significant** 35:4
228:21
**signing** 258:21
**signs** 42:23
**silence** 218:19
219:1
**silicon** 15:14
**similar** 17:23
36:1 37:13 39:2
63:8 208:8
236:2
**simple** 102:2
103:14 176:21
185:7 202:17
203:19 232:5
**simply** 48:2
89:8,9 94:11,14
203:21 214:6
228:2
**simultaneously**
130:9
**single** 52:11
117:19 176:4
198:16
**sit** 67:10 111:14
155:9
**sitting** 7:15
**situational**
231:18 232:3
**six** 34:20 41:7
41:15,19,22
42:3,5 49:21
238:15,15

**size** 257:19
**skills** 279:9
280:6
**skrmetti** 119:15
119:16,18,23
120:7,13,20,22
121:2,4,11,13
121:20,25 122:7
122:9,12,17
202:14
**slightly** 153:19
**small** 54:3 74:10
75:17 164:14
182:17 254:1
256:7 269:7,15
**smaller** 64:9
72:25 150:2
**smell** 251:22
**snow** 2:15 3:5
**soc8** 4:15
**social** 21:11,15
21:18,21,21
22:4,14 23:5
24:5 32:12 35:4
36:24 37:23
43:7 73:7 87:3,7
87:17 95:3
96:11,18 97:11
97:17,19 98:5
98:10,15,20
99:1 100:4,9
101:19 121:9
123:4 126:3,14
126:23 127:1,6

128:5 130:1,5
131:21 132:14
133:13,17,25
134:5 135:4
142:9 170:5,6,9
170:9,10,10
187:8 202:4,22
228:21 243:9,11
243:16,18,24
244:8,17,20
245:1,4,9,19
246:8,13 249:10
249:13,18,21
250:5
**socially** 126:5
126:10 130:10
132:22 133:21
135:10
**society** 146:16
146:19,21 147:4
187:9
**sohl** 2:4,8 4:4
6:9,9 17:8 21:5
22:17,25 23:10
23:15,19,23
24:18 27:10
28:14,20 29:7
35:18 36:17
42:11 44:5
56:10,24 60:25
63:17 65:6
69:11 70:2 79:2
85:1,23 86:5,14
87:8,23 89:11

90:7 91:16 93:4
94:16 95:12,17
95:24 96:12,22
97:13 99:7
100:11,22
101:11 102:10
103:9,16 106:9
107:10,16
108:10 110:24
116:9 120:8
122:2,14 124:10
126:15 128:7
129:6 130:6
132:2,10 139:2
139:7,11 142:11
144:1,11,20
145:6,18 152:25
158:20 159:12
160:24 161:18
161:22 163:6
164:23 176:24
178:5 180:5,17
180:22,25
183:10,23 184:6
184:9,14,18
185:12,16
186:11 187:10
187:14 188:13
191:1 193:17
196:21 198:9
199:25 200:9,19
201:14 202:6,12
202:24 203:5,16
203:22 204:2,14

206:7 207:2,6 207:12 208:11 208:17,23 209:10 210:3,13 213:2,18 215:19 217:10 218:4 219:2 220:4,20 221:11,23 222:11,13 224:17 225:4 227:19 228:8 230:7 233:2,4 233:11,17,20 234:20 235:12 236:15,19,21 237:14 238:14 245:21 246:3,19 247:2,15 248:5 248:16 250:9,19 250:23 252:12 253:3 256:11 257:2 259:11 261:1,7,20 262:16 263:25 265:17 266:18 267:12 269:9,20 271:16 274:7 275:4,13,25 276:4,7,13,16 276:18 277:10 277:18,20,24 278:2,9 281:1,2

**solely** 39:25

**solicit** 176:13
**solicited** 156:18 177:1 203:13 205:5
**soliciting** 177:14,17
**solicitor** 200:16 201:11
**solutions** 281:23
**somebody** 25:2 39:4 47:10 48:13 55:14 56:12 68:17 117:23 133:15 133:24 135:17 164:8 182:22 192:4,23 195:24 216:14 222:3 240:6,9,11 268:9
**someone's** 87:12 88:13 229:24
**sorry** 15:25 19:6 19:7 30:19,19 38:12 39:15 53:4 64:13 71:2 71:4 72:14 74:21 82:4,5 83:23 84:1 90:1 94:12 99:11,14 110:25 120:3 135:7 136:17 138:6 140:13 147:25 148:14

150:11 157:10 161:19 175:8 179:3,10,11 188:23 193:7 199:18 214:4 225:5 233:6 238:15 239:15 257:6,7 260:2 263:5 264:18 266:23 270:21 272:10,13
**sort** 38:11 43:2 43:8 73:15 117:6 125:17
**sound** 38:11
**sounds** 268:17
**sources** 29:25 39:8
**south** 3:14 194:6
**space** 68:18
**speak** 12:6 71:17
**speaking** 40:22 40:23
**special** 231:19 231:22 232:4,8 232:11,15
**specialties** 68:23,24
**specific** 27:17 50:25 74:12 109:11,20 132:14 134:5

150:4 162:11 204:17,18 205:6 217:1 229:9,14 271:18 273:6 275:3
**specifically** 48:24 97:17 170:8,22 184:21 184:23 232:10 266:9 275:23
**specifics** 145:20 210:6
**specifier** 129:13
**spectrum** 37:4,8
**speculate** 167:22 207:15
**speculation** 207:7
**spell** 158:8
**spent** 52:6 75:23 78:25 81:9
**spiral** 218:18 219:1
**split** 45:4
**spoke** 202:5,23
**spoken** 13:14 25:3 161:16
**spouse** 127:14
**springs** 77:5
**square** 2:16
**staff** 31:8 58:25 88:10 93:9 165:16 231:13 232:19

staffing 104:11
stage 171:23
stamp 210:23
stand 27:23
  119:13 277:4
standard 17:5
  17:11,16,21
  18:1 142:19
  145:10 151:15
  151:16 156:12
  204:12 263:9
standards 68:13
  74:13,19,23
  75:25 77:10,17
  78:2,6,8 83:22
  83:24 84:3,9
  96:3,5 121:14
  122:1,6,10,13
  133:16 140:13
  140:16,18,21
  141:10,18
  143:23 147:22
  148:1,2 149:12
  149:14,15,19,20
  149:22 150:2,5
  150:17,20,21,24
  150:25 151:2,7
  151:11,15,17,18
  151:18 152:4,10
  152:16,22
  153:11,19,24
  154:7,15 155:11
  155:11,19,23,24
  156:6,8,16

157:1,4,17,17
157:20,21 159:5
160:23 161:4,9
161:17 162:8,17
162:25 163:2,5
163:24 164:5,6
164:12,22,24
165:3 166:1,21
166:22 167:25
170:12 173:2,16
174:25 175:5
176:8,11,22
177:4 178:17,19
178:23 180:15
183:7,7,8
184:24 186:19
187:18,20 188:5
192:3 194:16
195:14 197:1,9
197:13,15,19
198:16 199:6,6
199:7,9,12,13
199:14,16,22,22
200:7,12 202:4
203:11,12 204:1
204:5,6,8,25
205:9,22 207:1
209:14,18,23
210:2,18 211:3
211:6,8,18,20
212:3,9 213:1
214:11,14 217:5
217:9,12,22,23
243:10 245:1

264:16,18,19
273:14,15
start 7:13 30:7
  49:2 64:23
  137:13 166:25
started 7:12
  16:7 32:24
  42:19 51:13
  52:2 55:25
  171:2
starting 41:9
  52:2
state 17:4 29:10
  35:11 50:8,23
  51:8 57:18,23
  58:8 80:7,11,13
  80:25 81:1,5,19
  92:3 99:24
  100:3 101:22
  102:8 103:6,20
  103:23,25 104:7
  118:10,10,14,19
  120:13 123:4
  141:6 180:16
  181:24 182:15
  197:7 200:16
  201:11 207:1,10
  207:16,24 208:9
  208:20 209:4
  218:3 223:19
  246:11 261:23
  279:19
stated 110:16

statement 33:20
  33:23 101:17
  115:4 163:13
  166:5,9,9,19
  170:7,8 171:15
  171:17,20,21
  172:11,13,14,19
  172:22 173:7
  174:18,19 176:4
  187:13 190:4
  200:15 202:2
  206:10,11
  214:18 220:7,7
  220:11 227:13
  227:16 231:4,5
  241:8 260:11
  261:23 262:19
  267:6
statement's
  200:18
statements
  40:15,17 89:2
  109:20 159:18
  164:18 166:15
  171:1,3,7,10,24
  172:10,17 173:9
  173:10 174:5,11
  174:14,16,20
  189:4,16 275:11
states 1:1 72:13
  72:19 101:24
  104:3 119:22,25
  120:1,4 149:10
  153:11 168:6

169:8 181:5,8 181:16,17 182:4 183:1,2 196:25 197:3 201:13 203:10,25 204:4 205:24 206:2,19 208:7 217:4,8 217:17 222:22 246:12

**statewide** 102:25

**statistics** 189:19 248:20

**status** 18:25 19:4

**statute** 207:23 208:2,9 209:2

**statutes** 143:5

**statutory** 118:22

**stay** 129:1 186:10

**steensma** 179:2 179:13,21

**stenographic** 5:21

**step** 68:17

**stickers** 112:21

**stipulation** 5:22 10:14

**stoller** 241:25

**stop** 162:13 216:13

**stopped** 64:17

**store** 244:4

**storey** 3:21 6:14 6:19

**street** 1:20 2:6 3:14

**strength** 125:10 214:15 215:8,9

**strep** 269:24,25 270:4,5,9,11,13

**stress** 134:19,20 134:22 238:20

**stressful** 135:18 135:21

**stripped** 177:21

**strong** 124:24 215:1,5 222:20 226:17

**stronger** 215:22

**strongly** 214:16

**structure** 109:21 110:1 128:10 175:20 204:7

**student** 73:20 73:22,23 165:22

**students** 165:24

**studied** 98:19 132:25

**studies** 38:19 69:5 91:2,12,20 94:19,24 97:15 130:24 203:2 211:23 213:5,9

213:17,19 214:10 215:1 216:4 242:12 258:5,15 259:10 259:13,22,25 260:5,17,23 261:6,13 262:14 262:20,21 263:10,14,17,18 263:22,23 264:7 264:9,11,22 265:5,8,10,10 265:22,23 266:3 266:5,9,16 267:9,20 271:12 271:20,22 272:6 273:16,25 274:2 274:3 275:1,2,3 275:18,22,24

**study** 46:21 91:18 98:4,9,14 98:20,24 130:25 131:18,23 223:5 261:17 264:2 271:14 272:1 273:9 275:3,10 275:12 276:12

**style** 128:12

**subject** 116:25 252:5

**subjective** 145:5

**submitted** 138:23 214:11

**subscribed** 283:14

**substantial** 70:4 163:15 173:22

**substantially** 92:7 208:8

**substitute** 223:25 224:1

**sued** 56:21 248:3,8

**suffered** 57:25

**suffering** 117:1 129:8

**sufficient** 10:1

**suggest** 214:19 214:24 215:4

**suggested** 204:18,19

**suggests** 228:16

**suicidal** 46:7

**suicidality** 91:13 92:8,21 93:17,21 131:5 223:14 226:6

**suicide** 55:11 89:13,15,23,24 90:6 92:8 258:7 260:7 263:24

**suicides** 106:21

**suing** 55:14

**suit** 103:5

**suitable** 35:12

**suite** 2:16 3:6

**[suits - take]**

suits  54:1
summary  59:9
  173:18
superfluous
  66:18
supervising
  67:22
supervision
  67:24
supervisor
  67:21 83:6
supplemental
  14:9
support  112:4
  152:24 198:6
  210:1 212:25
  275:10
supported
  275:22
supporting
  73:14,16 172:21
supportive
  198:11
supports  272:19
suppose  175:21
supposed  77:16
  77:17,19 110:18
  171:3,15,18
  173:9,10,11
  174:3,7,7 176:9
  186:25
suppress  97:21
supreme  121:2
  201:12

sure  8:8 9:2
  18:5 21:20 23:8
  24:1 34:6,8
  44:18 115:3
  127:15 144:12
  162:10 164:13
  166:16 167:20
  178:11 211:11
  211:15 213:14
  229:12 238:7
  239:9 246:20
  266:24
surgeon  203:10
  203:25 204:4,13
  204:16 205:4
surgeries
  129:10
surgery  133:14
  135:17,25 136:9
  136:15,15,16
  199:12,13
  223:23 230:11
  242:5,16,23
  243:1,6,12
surgical  136:10
  141:11 227:3
  230:25
surprise  182:25
  183:12 197:2
surprising
  176:11
surrounding
  143:24

survey  246:7
surveys  92:3,5
  132:21 134:4
susie  196:6
suspects  48:9
sustained  58:24
swear  6:21
sweden  168:10
switching  19:25
sworn  5:13 7:3
  279:5 283:14
symposia  75:6
symptom  230:6
symptoms  36:21
  37:4,9,11 39:22
  41:2,7,10,15,18
  41:22 42:1,3,5
  47:2,2 90:19,20
  91:22 93:17
  129:8,20 135:11
  135:13 223:1
  227:18,21 228:6
system  44:9
  81:7 84:14
  92:15,18,21,24
  95:5 99:25
  100:4 102:6
  104:8,12 105:6
  105:14 106:6,11
  106:16,20,24
  107:3 128:18,19
  205:10 214:15
  223:22 245:20

system's  100:21
systematic
  74:18 157:5
  215:22 216:1,16
  242:12 258:13
  258:20 262:24
  263:3,6,7,9,18
  272:2,4,5,8,11
  272:16,21
systematically
  182:7
systems  44:14
  96:4,25 99:9,18
  99:20,22 100:6
  100:9,15,17
  103:3,19,20
  106:6 243:8
  244:1,10 245:12
  245:14,15 246:5
  246:7,11

**t**

t  4:6 282:3,3
tail  71:16
take  5:4,10 9:18
  10:11,12 36:19
  53:7 60:20 65:7
  66:9,16 69:19
  71:13,23 95:9
  123:10 171:19
  172:6,10 196:23
  198:19 202:8
  225:25 248:24
  277:16

**taken** 5:7 8:20 46:2 55:2 279:3 279:12 280:8
**takes** 95:5
**talk** 11:1 18:3 36:4 59:18 60:15 87:10 123:7 127:5 146:2 151:13 186:18 233:9 245:9 251:1 256:12 271:4
**talked** 95:3 147:20 176:18
**talking** 24:8 26:13 49:1 57:12 72:5 110:9 127:11 150:8,9,14,15 154:14 156:22 180:23 187:22 187:23 191:18 193:24 199:19 212:13 224:8,8 233:7 253:10 257:14,16 269:6 270:7
**tallahassee** 1:3 3:15
**tamara** 193:13 193:20
**task** 170:19
**tattoo** 105:13

**tattoos** 105:16 105:18,22
**tax** 78:22
**taylor** 272:8,10 272:11
**team** 220:18,25 221:5 232:25
**teams** 221:6
**tease** 134:6
**technology** 5:25
**telehealth** 218:9
**telepsychiatry** 13:23,25 14:1,4 14:8,15,20,22 14:25 15:4,6,8 16:5,14,16,21 17:7
**tell** 7:4 142:7 207:10 218:12 229:4,5,8,13,16 229:22 232:10 235:17 262:10
**temperature** 14:11
**temporary** 125:14
**ten** 55:3,5,17 114:20 115:2 171:1,7,10,11 171:14,24 174:12 189:4,16 197:21
**tend** 15:21 198:11

**tended** 159:13
**tennessee** 120:25 121:3
**tens** 190:16
**term** 34:13 45:19 81:17 141:14 148:22 237:2 241:25 253:20 254:10
**terminology** 9:8 44:19 191:19,21 192:4,6 237:12
**terms** 14:5 17:6 22:11 28:8 33:8 33:8 36:8,12 38:2 47:23 54:11 55:20,23 77:3 83:19 95:16 97:4 109:21 116:7 119:10 130:4 131:25 137:11 162:3,13,20,21 167:19 214:16 216:20 222:20 222:20,21,22 227:11 232:21 237:25 244:11 246:8,13,17 247:8 249:17 256:4 257:14 264:14
**test** 38:6,9,14 133:19 265:24

**testicular** 257:13,19
**testified** 7:5 58:4 61:5 114:9 116:6,20,21,24 117:12,14,16 118:2 122:21,23 123:2,3 223:9 257:9
**testify** 116:5,18 223:9 260:22 262:13
**testifying** 7:21 279:5
**testimony** 34:7 52:6,12 53:22 56:7 59:21 101:12 114:1 207:13 221:24 266:19 281:9,17 283:8
**tests** 38:3
**text** 121:18 173:10 204:21 204:22 214:9 259:23
**texts** 172:16
**thank** 6:20 7:6 99:15 179:14 278:3,9
**theoreticals** 207:15
**theory** 218:18 219:1

**therapeutic**
193:21,24
**therapist** 48:13
56:12 73:4
154:10,11
196:14
**therapists** 26:24
218:10
**therapy** 18:24
26:5,8 32:8
33:16,23 42:10
42:25 123:5,23
125:21,24
127:17 128:1
129:20 131:10
131:20 135:5,10
136:25 142:9
169:19,23 170:1
170:2 221:13,16
222:1,2,5
224:11,11,15,18
224:21 226:11
226:13,14 227:4
230:17 242:2,22
242:23 243:6
253:23,24 254:2
255:15,23
256:10,19 257:1
257:11,21,24
268:23 269:1,5
269:8,19
**thing** 6:18 24:7
26:22 106:3
186:18 219:11

**things** 8:10 65:3
65:11 76:12
83:21 90:5
103:15 128:11
128:14,16,19
130:12,15 133:1
134:18,23 159:7
162:1 175:5
182:1 217:1
221:4 231:14
244:5 255:10
274:23
**think** 8:20,22
18:4 23:15
24:13 25:11,13
36:6 46:19
48:23 50:8 51:7
53:14 56:1
57:21 58:10,11
59:11,12,13,15
60:6,7 62:7
65:14 67:25
68:15,17 73:10
75:18 77:4
84:23 85:2 86:6
87:25 88:16
91:1 100:23
101:15,17 102:3
102:13 106:10
109:4,5 110:11
110:11 114:2
117:15,22,25
119:24 122:4,9
122:11,12,15

127:7 128:8
130:7 134:1
149:23 153:25
154:2,6,7,22,22
155:1,21 158:8
162:14 163:25
164:7,11 165:8
165:15,19
167:18,21 169:9
171:1,9 174:13
174:15 177:8
182:6,6 188:8
190:2,7,7
191:19,25 192:4
192:12 194:9,10
194:12,13
196:15 197:4,5
197:10 198:10
199:10 200:11
203:19 205:12
205:13,18
207:21 208:5
212:16,19
213:19 217:11
217:16,24
218:12 224:10
224:25 225:12
226:13 227:6,8
228:10 229:23
230:8,16 236:4
246:15 247:23
250:10,24 252:4
254:14,15,22
255:16 258:10

258:22,24 259:6
268:12,20 274:7
274:15 276:1,4
276:7,13
**thinking** 118:2
182:2
**third** 135:1
153:15
**thirds** 60:17,19
61:8,13 63:4,14
123:13,19,22,25
124:1 136:7,12
**thirty** 123:18
149:25
**thomas** 179:2
179:13,21
**thomas's** 121:16
**thought** 52:18
140:12 200:2
**thoughts** 277:7
**thousand** 72:16
**thousands**
76:17 79:14
**threat** 86:3,18
86:21 95:16
105:8,11 106:3
**threatening**
53:3
**threats** 85:21
87:3,6 99:5
**three** 48:23 49:6
55:24 72:15,16
101:24 102:6
119:2,3 131:24

149:1 170:15
178:23 184:12
189:6
**throat** 269:25
269:25 270:4,5
270:9,11,13
**thrombosis**
256:13,15
**thrown** 21:10
**tied** 29:15
**till** 9:1 242:13
**time** 1:17 5:25
7:14 9:18,21,24
9:24 10:1,6,10
11:9,17 15:18
16:22,24 37:16
41:4,6,24 42:1
51:18,23 64:5,8
64:21 65:23,24
71:22 72:2,23
73:12,22 75:23
75:24 76:1,3,21
77:1 78:4,6 79:4
81:9,20 82:18
95:10 101:22
102:6,7,7 108:7
109:6 110:7,23
111:5 124:17
130:13 131:25
133:1 136:19
137:15,18
146:11 150:22
152:11 159:23
173:16 177:16

186:14 190:11
198:20,23
199:18 206:1
210:9,17 211:1
212:15 215:25
218:7 236:13
238:4,6 239:6
249:3 274:7
275:5,14 276:6
281:18
**timeframe**
281:8
**timeline** 77:18
**times** 7:17,19
10:5 16:17
27:21 39:8
48:22 49:6,17
53:3 102:6
118:2,8,12,15
135:15 223:20
**timing** 126:21
**today** 111:8,15
138:13,16
218:13 262:13
277:4 278:10
**today's** 8:3,7,9
9:17 10:10,20
48:20 112:13
274:13,20,21
277:14
**together** 131:25
159:6
**told** 22:7,20,21
96:6 108:15

139:17 167:15
168:2 175:23
180:20
**tolerate** 222:21
**took** 124:22
152:3 167:3
**top** 36:9 57:21
155:22 184:15
184:18,19 271:5
**topic** 137:25
**topics** 67:19
140:22,24
187:21
**total** 61:17
62:11
**totality** 40:24
**touched** 71:3
**trails** 103:13
185:8 186:14
**trained** 84:5
241:24
**trainers** 76:14
**training** 20:14
31:7,17 70:6,22
75:15,20 77:2
88:20 190:23
229:1
**trainings** 71:7
74:5 75:5 76:10
76:14 77:4,6
177:7
**trans** 64:2,22
156:2,3,5
168:16 183:3,4

191:12 192:16
192:21 195:21
195:25 196:13
197:8 254:11
**transcriber**
280:1
**transcribing** 8:6
**transcript** 5:15
61:18 62:1,17
63:1 277:15,19
279:21 280:3,4
281:6,19 283:5
283:8
**transcriptionist**
279:7
**transgender**
21:24 25:24,25
26:17,25 27:9
27:18,19,25
46:13 50:21
51:10 56:8,18
56:22 57:10,16
58:21 60:21
61:16 62:9 63:6
63:9,12,16,24
64:6,21 65:2,4
68:7 73:19
79:24 83:19
84:9,24,24 85:3
85:5,9 87:4,18
87:24 88:5,11
88:23,23 89:3,7
89:14,19 90:15
90:20,24 91:3,7

91:14,15,21 92:9 97:10,15 97:20 98:6,10 98:15,19 99:1 101:19,23 102:9 102:25 105:4 109:10 117:23 120:17 124:3 127:13 134:17 134:21,24 158:15,19,24 159:19 165:21 169:2 170:22 173:13,22 176:14 179:19 181:21 192:7,10 192:14,24 194:1 195:15 196:5,8 196:10 197:9,12 197:18 198:2,6 198:7,11,12,12 199:8 206:3,20 207:25 208:10 209:3,9 211:4 217:17 220:19 222:25 226:17 242:4 246:23 247:4,21,24 248:10,13,20 250:2 251:24 252:9,24 259:19 272:5 274:3

**transient** 135:16

**transition** 21:18 21:21 36:25 37:23 38:1 55:16 125:12 126:5,11 129:13 132:15 133:8,14 133:17,21,21,25 134:5,7 170:9 226:18 230:14 243:11,18 244:20 245:10

**transitioned** 125:8 132:22 135:10,24

**transitioning** 21:22 130:5,11 131:22 134:2,3 134:9 135:5 170:6,10 243:16

**transitions** 134:14 135:20

**translates** 92:10

**translating** 74:13

**translation** 150:7,8,14

**transmission** 14:2,3

**transmitted** 8:4

**transpired** 175:6 205:20

**trauma** 90:19

**traumatic** 223:1 238:20

**travel** 75:21 76:8,9,18 79:14

**traveling** 78:13

**treat** 33:13 47:20 48:10 141:16 226:2 242:1 268:8

**treated** 19:22 20:15 34:24 195:14 240:5,5 240:8,10,15

**treating** 108:3 241:21

**treatment** 19:1 19:2 20:3,5 32:5 32:17,17 39:23 56:8,17 63:10 64:19 85:13,18 87:11 101:6 116:16,22 120:16 123:8 128:23,25 129:9 216:10 221:4 223:6,10 235:24 239:10 240:1,12 240:25 241:5,9 241:12,18,20 242:16,19,20,22 243:5,17,19 244:16 250:1 254:4,6 261:15 264:17,21 267:8 269:24,25 270:2 271:3 273:3

**treatments** 273:2

**trevor** 195:3

**triad** 243:9,11 243:20

**trial** 57:14 58:6 81:18 114:9 118:13 119:1,2

**tricky** 70:10

**tried** 131:23 226:18,18

**trip** 77:13

**true** 33:20 81:21 88:12 113:14 115:23 191:9 200:18 219:12 231:4,5 254:1 254:15 279:8 280:5 283:8

**trump** 50:3,4

**trustees** 212:4,5 212:8

**truth** 7:4,4,5

**truthfully** 9:20

**try** 8:20 159:5,6 172:10 173:20 197:16 230:17 232:5 239:6 268:12

**trying** 24:2 39:20,20 58:10 58:17,20 60:18 61:4 62:6 66:6 102:12 117:15

**[trying - united]**                                                                 Page 353

117:22,25 132:4
133:3 136:5,22
153:25 154:6
169:9 176:12
190:7 221:8
**tuesday** 1:16 5:8
**turkey** 168:9
**turn** 138:18
186:7 190:20
193:6,13 194:23
200:1 270:19
273:18 276:5
**twice** 179:21
**two** 6:13 14:2
16:18 34:20
50:7 54:12,23
54:25,25 60:17
60:19 61:8,13
63:4,14,24 77:4
77:6,7 78:5
89:22 90:5
98:22 104:1,4
119:4 123:12,19
123:22,25 124:1
136:7,12 141:4
148:20,23,25
149:1 154:2
166:25 167:2
179:6 182:18
184:22 189:6
199:13 276:14
**tx** 281:15
**type** 32:16
38:25 39:13,17

43:17 47:23
48:3 51:20 53:9
55:10,12 56:8
56:22 107:4
130:1 136:8
154:21 195:9
214:14 216:10
246:17 251:10
**types** 105:16
127:1 167:16
218:2
**typewriting**
279:7
**typical** 8:11
40:24 55:13
254:14
**typically** 14:17
14:18 15:23
16:3,20 26:11
39:25 40:13
41:8,14 42:7
69:1 79:10
149:3 196:1
272:6

**u**

**u** 175:17,17
**ucla** 241:24
**ucsf** 51:23 64:23
65:4 81:8
**uh** 8:14,14,14
**uk** 154:24 196:7
**unable** 271:3

**unanimous**
152:18,24
**uncertain**
151:20
**unclear** 16:8
**uncommon**
216:7 254:3,19
254:20 256:8
**under** 5:18 51:9
51:19 58:15
101:3,4 124:25
133:15 137:22
143:23 151:16
151:18 193:21
194:23 195:3,4
199:3 239:1,10
239:10 247:22
249:7 260:22
262:13
**undergarments**
21:17 22:12
**undergo** 253:22
254:4
**undergone**
136:8
**underlying**
88:16 118:9
**understand**
5:14 9:9 12:12
13:5 29:4 41:13
43:15 86:24
95:15 110:17
111:18,22 112:1
112:8 137:21

139:5 144:6
199:2 203:20
211:11 219:19
233:20 242:25
249:6 256:24
275:19
**understandable**
191:22
**understanding**
47:18 81:16
84:17 120:6,11
120:13 139:3
142:4,24 143:8
200:3 203:12
204:15,24 205:2
**understands**
43:14
**understood**
9:13 110:7
**undertake**
20:18 28:6,10
**undertaken**
58:25
**union** 2:5
**unit** 231:22
246:17,18 247:1
247:14 248:22
**united** 1:1 72:12
72:18 149:7,10
153:11 168:6
169:8 181:8,16
181:17 201:12
203:10,25 204:4
205:24 206:2

217:4,8,16
**units** 247:25
  248:11,15
**university** 64:5
  78:12,14 79:12
**unload** 250:12
**unloaded** 250:6
  250:12
**unreliable**
  258:8,14 260:8
  260:25 261:13
  263:11,24 264:3
  264:8,11,14
  265:6,13,14
  266:4,17 267:9
  267:22
**unusual** 143:13
  143:16
**updating**
  114:23
**use** 8:13 9:7,8
  14:13 21:9
  38:25 39:14,17
  45:1 71:5 83:21
  83:24 84:3,6,9
  86:19 127:7,10
  130:1 165:1
  205:9 207:24
  208:9 217:1,14
  234:24 239:1
  250:16 251:9
  255:9 257:7
  263:8,9,24
  264:9 265:14

268:7 275:11
**used** 9:14 14:9
  14:20 21:20
  35:6,16,20,25
  36:1,5,7 38:22
  86:17 95:19
  141:13 157:17
  174:25 192:7
  209:25 214:19
  214:21 220:25
  238:19,21,23,23
  243:21 258:17
  261:14 264:3
  272:8,12 281:19
**uses** 5:17 156:25
  156:25
**using** 14:8 24:12
  39:22 70:25
  128:5 132:18
  209:4
**usual** 33:9
**usually** 14:4
**utilize** 141:25
  156:7
**utilized** 21:17
  209:18 238:17
**utilizing** 220:17

|  | v |  |
| --- | --- | --- |

**v** 1:9 281:4
  282:1 283:1
**vagina** 257:20
**vaginoplasty**
  199:15

**vague** 23:17,18
  222:13
**validate** 20:19
**valley** 15:14
**variable** 46:18
**variance** 268:6
  268:19 270:17
**variances**
  253:13
**varied** 65:5
**variety** 196:15
**various** 10:18
  134:6,7 146:2
  206:19 220:25
**varying** 158:22
**vast** 15:5 72:24
  74:2,15 154:18
**vein** 256:13,15
**venezuela** 194:4
  194:6
**venezuelan**
  194:8
**verify** 12:3
  281:9
**veritext** 5:3
  281:14,23
**veritext.com.**
  281:15
**version** 183:8
**versus** 12:14
  47:3 84:24
  89:20 91:14
  94:21 124:9
  199:22 270:14

**vestiges** 227:5
  231:1
**victim** 98:7
**victimization**
  99:2
**video** 5:25 8:3
  14:6 200:1
  277:16
**videoconferen...**
  3:4,11,22
**videographer**
  3:20 71:24 72:2
  137:15,18
  198:20,23
  248:25 249:3
  277:13 278:7,10
**videos** 278:7
**videotaped** 1:15
**view** 15:7 32:18
  86:4 246:24
  250:8,21
**views** 158:22
  161:24 162:3,6
  162:14
**violate** 207:1,10
**violated** 143:6
**violence** 89:4,6
  89:9,10,10,13
  89:17,19,23
  90:5 91:4,5,7
  92:14,18 93:8
  93:14 97:12,16
  98:7,12,16,17
  98:17,22 99:3

**[violence - witness]**                                                      Page 355

105:14,17 106:8
106:12,17
**virginia** 177:9
**visible** 134:20
**visit** 15:20 16:11
16:17 80:7,11
232:11
**visited** 80:13
**visits** 17:1
**voice** 124:18,20
137:6
**volume** 257:14
**voluntary** 71:5
161:10
**vote** 73:23
152:16 153:2
171:13,14 174:9
174:22 185:14
186:19 188:5,7
188:17 189:3,8
189:19 190:14
194:15,20
209:21 210:5
212:2,5,13,14
212:15,16,21,25
214:12
**voted** 174:6,10
174:10,14 189:4
189:5,7,11,14
189:18,23,25
190:2 210:9,17
**votes** 206:10
**voting** 171:16
174:11

**vs** 5:7 50:3,4
116:14 119:4,5
208:4 218:8

**w**

**wait** 9:1 30:19
42:23,24 43:4,8
167:20 266:23
**waiting** 42:7
**want** 9:18 18:2
18:5 21:20 23:7
24:1 34:1,4,6
44:20,21 48:18
62:13 71:6,7
102:2,20 123:7
123:9 142:6,6
146:2 151:13
167:20,21 186:7
186:18 198:14
199:18 233:9
239:5 251:25
270:19,24
271:13,18
275:20
**wanted** 66:24
72:6 179:17
191:19
**wanting** 34:24
133:20 196:16
**warning** 42:23
**warranted**
43:25
**washington**
50:22,23 51:11

51:12,17 103:5
103:6,22 104:2
104:7 169:15
**waste** 186:14
**wasted** 236:12
**watergate** 195:8
**way** 14:2 36:1
36:13 40:2,5
62:4 95:20
101:21 114:3
117:20 122:11
130:21 132:7
135:25 163:10
163:15 167:10
174:7 184:25
209:8 210:4
227:24 258:23
265:25 269:23
**ways** 35:2 37:19
114:6 161:3
**we've** 95:3
130:2 136:18
139:3 196:22
241:22
**wealthy** 75:3
**wear** 21:25
22:11
**web** 212:12
**website** 164:16
164:17 178:3
**wechsler** 238:18
**weigh** 173:14
**weight** 216:23

**weiss** 1:10 2:11
3:2
**went** 30:5 56:12
59:12 65:20
72:6 77:7 78:15
79:4 103:6
125:4,5 127:24
128:1 150:7
151:14 152:9,13
177:17 203:7
205:15 236:12
**west** 2:16
**what'd** 157:10
**white** 252:1,9
**who've** 19:22
55:6,18 124:16
135:9 136:1
164:10
**wide** 176:10
**widely** 173:10
**wieda** 119:4
**william** 2:13
3:11 6:13,16
**william.gwalt...**
3:16
**willing** 108:16
**winter** 184:25
**wise** 236:4
**wish** 274:21
**witness** 5:13,14
6:21 7:3,23 17:9
19:8 21:7 22:18
23:1 24:10,14
24:17,19 27:3

27:11 28:15,21
29:8 35:19
36:18 38:14
40:20 42:12
44:7 49:15
53:18 54:8
56:11,15,25
61:1 63:18
64:15 65:1
69:12 70:3,19
71:4 72:17
74:23 79:3 82:7
85:2,12,24 86:6
86:15 87:9,24
89:12 91:17
93:5 94:17
95:13,18,25
96:13,23 97:14
99:8,13,16
100:13,23
102:11,12
106:10,14
107:11,17
108:13 110:25
111:19 116:5,10
117:23,24 118:9
120:12 122:3,15
123:20 124:11
126:17 128:8
129:7 130:7
132:11 139:12
142:12,24 144:2
144:12,21 145:7
145:19 147:25

151:9 153:1
156:11 157:12
158:21 159:13
160:25 161:23
164:24 175:17
176:1,25 178:11
179:5,10,13,15
180:6,18 181:1
183:11,24
184:13,20,23
185:17 187:15
188:14 193:18
198:10 200:2,10
200:20 202:15
202:25 203:6,23
204:3,15 206:8
207:3,7,14
208:12,18,24
209:11 210:4,14
213:3,19 214:4
215:11,20
217:11 218:5
219:5 220:21
221:12,25
224:18 225:7
227:20 228:10
230:8 233:6
235:13 237:15
238:8,16 239:15
245:16,22,25
246:4,20 247:3
247:17 248:6,17
250:10,24
252:13 253:4

254:8 256:12,15
257:3,7 259:12
260:3 261:2,9
261:12,21
262:17 263:7
264:1 266:20
269:10,22
271:17 272:11
272:15 273:22
275:6,15 276:1
277:12 279:4
281:8,10,12,18
**women** 254:11
**women's** 247:5
247:22
**wondering**
231:25
**word** 35:6,15
36:5 45:1 102:4
145:3 212:25
214:18 215:16
**worded** 258:22
**wording** 256:25
**words** 9:7,14
26:20 34:2,4
142:6 201:5
242:20 259:15
**work** 15:19 26:3
26:24 51:8,21
51:22 52:6 54:3
62:15 64:23
69:2 75:25 81:9
82:8 100:2,5,8
100:14,16,17

104:14,17 106:5
111:4 127:14
139:25 140:9
181:8 183:4
207:18 218:16
223:12
**worked** 26:1
49:22 50:1,2,4,5
50:6,16,20
52:24 80:23,24
83:3,6 148:17
196:7
**worker** 73:7
**working** 25:23
27:18,19 42:13
81:8 181:20
183:3 192:24
195:20 224:23
**works** 27:13
81:22 183:21
195:25 210:4
224:21
**world** 27:24
106:7,11,16,20
106:24 107:3
147:15 149:4
168:7 170:16
192:8
**worried** 60:14
**worry** 229:4,6
**would've** 58:13
66:4,17 151:16
172:4,5 174:4
189:5

## wpath - youth

**wpath** 4:15 24:25 26:21 27:21,23 28:1,4 65:13,15,24 66:3,12,20 67:2 68:7,13,17 69:6 69:17,18,20,22 69:25 70:4 71:10 72:5,18 72:21,24 73:2 73:10,11,25 74:3,6,13,17,23 75:9,14,21,21 75:23 76:3,6,8 76:19,22 77:11 78:5,13,20,25 79:4,16 80:3,5 121:21 122:1,5 122:6,10,13,17 140:13 147:10 147:12,15,19,25 148:6,11,16 149:19 150:4 156:25 157:24 158:6,18,23 159:10,13,18,22 160:1,7,9,11,14 160:17,19,22 161:7,14,16,25 162:15,23,25 163:2,5,14,22 163:24 164:5,10 164:18 165:13 165:18 172:23 173:1,13 178:17 200:7 202:3,21 203:3 205:8 207:1 210:23 211:16 213:7,16 214:8 217:5,9 217:12

**wpath's** 72:7 147:12 148:9,10 153:19 158:10 158:14 161:4,9 161:17 164:16 164:17 178:2 197:19 243:10

**wrap** 274:9
**wright** 3:4 6:5
**write** 127:19
**writing** 140:7 140:10 152:2,6
**written** 5:22 8:8 23:21 108:25 139:22 151:16
**wrong** 233:18
**wrote** 10:23 29:22 66:5 151:19 172:16 172:18,19 192:15 201:7

## x

**x** 4:1,6 279:21

## y

**yeah** 29:3 31:10 51:12 53:6 60:12 64:7 70:19 77:5 102:23 104:5 108:13 110:11 114:15 131:13 131:16 132:11 135:1 139:5 140:8 143:1 150:1,17 154:17 154:22 169:7,24 173:5 175:13 181:1,10,17 189:1,10 192:20 192:20,20,20 194:17 195:11 197:17 200:3 202:20 211:14 214:7 220:15 224:10 228:4,10 232:20 233:5 238:22 244:6 247:17 255:7,21 256:3 258:2 263:7 266:20 275:15 277:20

**year** 17:2 51:6 52:7,7,11,14,18 58:12 59:18 60:2 70:15 71:22 75:2 148:22,25 157:22 219:20 224:6 268:17 270:13

**years** 15:12 25:24 55:2 58:13 59:8 60:24 63:21 64:8,10 69:23 70:12 78:6 81:8 82:19 103:7 104:1,4 113:25 114:10,20 115:2 117:16 118:1 124:23 133:23 146:22 148:5,23 148:25 149:1 155:20 160:5 178:24 206:18 223:19 225:25 226:19

**yep** 136:20
**york** 2:7 57:18 57:22 58:8 59:1 80:7 181:19 182:22
**young** 55:25 56:2 136:1 217:14 272:23
**younger** 137:8
**youth** 63:24 65:2 131:1

**[zoom - zoom]**                                                    Page 358

| z |
|---|
| **zoom**   6:6,13 8:4 14:2 |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.