**Clayton Weiss Deposition, August 12, 2025**

| **Start Page: Line** | **End Page: Line** |
|---|---|
| 9:21 | 10:5 |
| 17:2 | 17:17 |
| 19:21 | 24:14 |
| 31:10 | 32:16 |
| 36:8 | 37:2 |
| 47:6 | 48:17 |
| 71:16 | 71:25 |
| 73:18 | 74:5 |
| 74:20 | 75:25 |
| 108:5 | 108:19 |
| 112:21 | 116:14 |
| 143:10 | 144:19 |
| 173:7 | 173:12 |

**In the Matter Of:**

KEOHANE vs DIXON

4:24-cv-434-AW-MAF

---

**CLAYTON WEISS**

*August 12, 2025*

*Vol. 1*

---

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

CASE NO. 4:24-cv-434-AW-MAF

REIYN KEOHANE, et al.,

Plaintiff,

vs.

RICKY D. DIXON, in his official capacity as
Secretary of the Florida Department of
Corrections, et al.,

Defendants.

_______________________________________________/

DEPOSITION OF

CLAYTON WEISS

VOLUME 1 (Pages 1 - 178)

Tuesday, August 12, 2025

10:33 a.m. - 4:21 p.m.

Florida Department of Corrections
501 South Calhoun Street
Tallahassee, Florida 32399

STENOGRAPHICALLY REPORTED BY:

KIMBERLY S. BARTHOLOMEW
Professional Stenographer

Job No: J13535535

might affect your ability to understand my questions or to give full, complete and accurate answers to my questions today?

A No.

Q Is there any other reason why you would not be able to give full, complete and accurate testimony here today?

A No.

Q Have you ever been deposed before?

A Yes. It was a very short deposition.

Q When was that?

A Oh, I believe that was about a year ago.

Q And what did the deposition concern?

A It was a labor issue. It was about a staff member who worked for the vendor who was alleging that she was improperly terminated.

Q Were there any other depositions other than that one?

A No.

Q How did you prepare for the deposition today?

A I reviewed some of the documents and I had some additional preparation with the outside counsel.

Q What documents did you review?

A Our HSBs, different iterations of the HSBs that led to the final HSB that we produced. I reviewed

the -- a list of or a number of emails that have been provided I believe to you all. And I believe that's it.

Q When you referenced docs that led to the HSB, what documents were you referring to?

A Different -- that we had different drafts of the HSB before we had a final version that then became the policy for the Department.

Q Okay. Did you talk to anyone other than counsel in preparation for the deposition?

A No.

Q Let's pull up your declaration, which is at ECF38-3. I think we can do a screen share for that.

MR. TILLEY: Or, actually, I guess, Kenneth, you said you have this in front of you?

MR. STEELY: Yeah, he has a copy in front of him. Yeah, if you're going to do that, then make it bigger.

MR. TILLEY: Okay. Let's take down the screen, then. Thank you.

BY MR. TILLEY:

Q All right. So let's look at paragraph two, which reads, quote, "I currently serve as the director of the Office of Health Services for the Florida Department of Corrections, FDC. In my role as director, I bear responsibility for overseeing the office of

health services, OHS, including final approval of health services bulletins and procedures related to the OHS. I have served as the director since June 16th, 2023."
Did I get that right?
A Yes.
Q Let's briefly discuss your educational and work background.
Can you start by walking me through your education since high school?
A Sure. After high school I enrolled at what was then called Broward Community College, now called Broward State College. And that's in the Fort Lauderdale, Florida area. And I received my associate's degree. I then went to Florida State University after that and obtained my bachelor's degree.
I then started working right after graduating high school -- sorry, college at Florida State. I took a job with the Centers for Disease Control and Prevention in what they called their public health apprenticeship or associate program, kind of a fellowship program, if you will, that they had. That's a two- to three-year program where they train people in kind of public health operations of management.
Within a couple years I took a job with the Florida Department of Health. This was in January of

2010 now with the Florida Department of Health at their state health office in Tallahassee, Florida. And over the -- from 2010 until 2023, in the summer of 2023 I worked for the Florida Department of Health in various capacities at various programmatic areas, and also at state and county health departments.

Q So you were at the same office from 2010 to 2023; is that right?

A No, sir. I worked in various -- a multitude. You know, the Florida Department of Health is a -- it's a state -- integrated state public health system that not only includes the central office, if you will, or the office in Tallahassee, Florida, the headquarters, but also includes 67 county health departments.

So during that stint, about 13 and a half years with the Florida Department of Health I worked at different times at both the state health office in Tallahassee, Florida, but also at the county health departments, specifically the Broward County Health Department down in Fort Lauderdale.

Q So it was spread over two different locations; is that right, or how many different places?

A Correct, yeah, two different locations.

Q Okay.

A Tallahassee at the headquarters from 2010 to

it's inherent in your role, or something else?

A Well, that certainly would be that I do not have either a medical degree or a degree in psychology or a dental degree. Certainly those are reasons why they cannot report to me clinically, but only administratively.

Q But if someone were in your same role who had a medical degree, would that be different, do you think? In other words, could they report to you clinically?

MR. STEELY: Object to the form.

Go ahead. You're good.

A You know, I guess that all depends on how the management would want to structure that. I will say if you had, you know, an MD in my role, it may not be appropriate, you know, I want to underline it may not be appropriate, for the dentist to report clinically to the MD.

Likewise, it may not be appropriate for a psychologist to report to a MD, because there are really three separate specialties of, you know, clinical training.

BY MR. TILLEY:

Q Are there any duties that you have that you did not list earlier? I'm trying to get a sense of the full scope of your duties, your current duties?

A Current duties? I don't think so.

Q Going back to your declaration in paragraph two, what does it mean to oversee OHS?

A Well, so oversight of the Office of Health Services, again, so administratively oversight of our programs. I have responsibility in statute to make sure that we have health services bulletins, standards, policies, you name it, that we make sure that we're reviewing and updating those as needed on a regular basis.

A big part of our work is, obviously, managing our health care system with our partner. We have a vendor-run comprehensive health care system, so we have a comprehensive contract currently with Centurion of Florida, so a lot of work includes engagement with them and, you know, problem solving and planning. We have, obviously, routine meetings with our vendor.

Just different issues that pop up where, you know, I mean, I guess we're currently spending a lot of time working on a project to include two new ambulatory surgical suits, medical units within our system so that we can increase capacity to be able to provide more and more health care services to inmates, you know, within our institutions behind the fence if you will rather than outside the gate.

I'm very interested right now in leading our team with how we can potentially reduce expenditures on drugs by potentially working with the Department of Health to become a 340B covered entity, so...

I mean, I think there's a lot of different areas that we get engaged in on a day to day, and kind of being engaged in those, myself personally being engaged in some of these, especially more administratively, administrative and management-type conversations, being more engaged in kind of logistics and planning, and getting to that place that we need to get to.

Q Anything else involved in oversight of OHS?

A I mean, not that I can think of right now.

Q You mentioned routine meetings with vendors. Are those regularly scheduled or you meant they just happen commonly enough to be routine, or something else?

A Well, they are scheduled. We have a biweekly meeting with our vendor, it's our Centurion operations meeting. So we have -- it's a routine meeting with them to go over items that we have.

We have, you know, kind of an agenda, if you will, to go over items, or we'll put new items on there, we'll have existing items where we're working on achieving something, and then items fall off of that,

too, if they've been completed or they've become irrelevant. So it's a normal check in and a way to keep us all, you know, on the same page, if you will, with --
Q When you say -- I'm sorry. Go ahead.
A Well, with their management as well as their -- kind of their discipline directors. So their chief medical officer will attend those meetings or their chief of nursing, their chief of dentistry. So they'll have all of their counterparts there as well.
Q When you say biweekly, do you mean twice a week or every two weeks?
A Sorry, yes, every two weeks.
Q Are those agendas recorded over an email, in a document form? How are they recorded?
A Sure. The agendas are -- they exist in an Excel format, and one of our staff members who runs that meeting, he is the contract manager, he sends out the agenda prior to the meeting. And he's kind of the central point person for the items that go on that agenda.
Q Going back to your declaration in paragraph two. What goes into your final approval in the HSBs and procedures related to the OHS?
A You know, I'll review -- I do -- you know, I review each of them. Obviously, a newer one, you know,

you're going to potentially see a little bit more formatting or issues that need to be adjusted. I mean, I'm -- whereas some of the existing policies that we've had, sometimes they need some more touching up. So I'll check formatting, some of the basic stuff, and send those items back.

If I see issues that aren't clear to me, then I'll send those items back to someone who can better answer the question I have. So sometimes I'll seek clarity on something.

Let's see. Sometimes there's a better way to write something. I may have helped with making things, from my opinion, more clear to the audience. So it's the final review, you know.

But by the time I've gotten it, it's been through a lot of folks. It's been through all of our discipline chiefs. It's been initiated, if you will, by, you know, kind of our responsible authorities. So kind of the key clinical person for that HSB.

And, again, they are a licensed healthcare provider whether they're a psychologist or they're a MD or they're a nurse or they're a dentist. So, you know, I'm certainly not that -- I'm not credentialed to really -- I mean, if I have -- I'm not credentialed to really challenge them on clinical guidance. That's

their -- you know, that's their training. That's why they went through all those years of medical school or dental school, or becoming a psychologist, and, obviously, all the additional training that they do each and every year to maintain their licenses, so...

Yeah, more -- not really getting into that detail, but making sure it's clean and that it's been through the appropriate process. And we've got a great team that does that as well. But, again, yeah, we want to make sure it goes through the right process and is able to be reviewed by all the parties.

And then we -- unless there are questions that I have or changes that are needed, we -- again, I'm the last line to say, okay, we're ready to publish, and then my signature goes on those HSBs.

Q So it sounds like, and let me know if this is accurate, it sounds like you'll review to see if it makes sense to you, but you're not going to be offering substantive comments, like if there is a statement that we're going to review the dosage of this every 25 days, you're not going to say, well, I think it should probably be 20 days, you're not going to make those kind of substantive comments; is that right?

A That's correct.

Q You referenced the discipline chiefs. Can you

name those individuals?
A Sure. So we have our chief clinical advisor. Her name is Dr. Kalem Santiago, and she is an MD. We have our chief of medical services, an MD. His name is Dr. Danny Martinez. We have our chief of psychology or our mental health chief. Her name is Dr. Suzonne Kline. We have our chief of pharmaceutical services. She is Dr. Renee Marcano, Rita Renee Marcano. We have our chief of dentistry, and he is Dr. Thomas Shields. And we have our chief of nursing services, I'm sorry, Dr. -- not doctor, Lisa Clark.
Q Can you spell the last one?
A Yes, sir. Lisa Clark, C-L-A-R-K.
Q Thanks. I just misheard you.
Will every discipline chief review every HSB?
A I think they do. I think every discipline chief does have the opportunity to review every single HSB, yes. So, you know, they may not spend as much time reviewing an HSB that's outside of their wheelhouse, if you will.
So, for example, if Dr. Shields is invited to review an HSB for -- or an update to an HSB for infirmary services, you know, I would imagine he may not spend a whole lot of time on that, because it's not necessarily at all related to his practice, his area,

which is dentistry. But I do believe they're offered the opportunity to review them.

Q I think you also referenced a chief clinical person for that HSB as someone to review. Can you tell me how that person is identified?

A Each HSB does have a responsible authority; is that what you're referencing to?

Q Yes.

A Correct. It's -- they're going to be identified based on the type of HSB. So if it's medical related, it's likely to be either Dr. Santiago or Dr. Martinez. If it's mental health related, it's likely to be Dr. Suzonne Kline. If it's dental, clearly it's going to be Dr. Tom Shields.

Nursing, nursing and medical kind of go hand in hand in terms of our HSBs, so I don't know that our chief of nursing is our responsible authority for any one of those HSBs.

But the responsible authority should be the person who is most clinically apt to, you know, know if there are any changes that are out there that need to be incorporated to an HSB. You know, is there new clinical guidance that changes something that we have in an HSB. Well, that would be -- so you want to have that type of individual being the responsible authority for that

specific HSB.
Q Am I interpreting correctly from your answer that the chief clinical or the responsible authority for an HSB is always a discipline chief?
A I would say likely. You know, I don't want to rule out, and I don't have a record of this, but I'm sure we do as the Office of Health Services, I can't rule out, sir, that maybe an assistant chief would be a responsible authority.
For example, our assistant chief of mental health is Dr. Stephanie Crawford. I can't rule out that she is not a responsible authority for one of the mental health, health services bulletins. But, again, I don't know that.
Q You mentioned it going -- an HSB going through a number of individuals before getting to you. Can you tell me all of who would see an HSB before it got to you?
A Yes, sir, I'll do my best here.
It's going to go through internally through OHS. It's going to go through a number of different, like I've mentioned, I'm pretty sure it goes through all of our section chiefs. It's going to, obviously, originate with the responsible authority. Who, if there are comments and questions, it goes back to that

individual.

But it will ultimately get its way to -- it will go to legal, so legal has a chance to review it. That's now external. It goes to -- we send it to the Corrections -- correctional medical authority. They have an opportunity as well to review it and provide input or ask questions.

We send it to our contractor-operated correctional facilities, the leadership over that section, which just recently, a couple years ago, came under the umbrella of the Department of Corrections, but prior to that was at Department of Management Services. But we always sent it to them so that they were at least aware of it and also had the opportunity to ask questions and provide any feedback.

So I got legal, I got CMA, I got them. And then, oh, obviously our vendor. We send it to our vendor, Centurion, they're important. We want to make sure they have the opportunity to review it, ask questions, provide feedback.

And then ultimately, after all that process goes on and works itself out, which can be quite a while. It can be, you know, days, weeks or months, you know, then they'll -- it will go to our deputy director for Office of Health Services, he reviews it. And then

instance, they'll work with our vendor to see how something would work, you know, operationally for them, and include that, potentially include, you know, that guidance into a document. They may engage legal, there may be something that pops up, hey, I want to run this by legal.

So I would assume that, yeah, they're probably engaging others to help create a policy that's going to work best for the Department.

Q In other words, before sending a draft to Centurion, for example, the vendor, they may be reaching out to Centurion to get feedback on an idea that they're thinking about incorporating into a draft HSB; is that right?

A Yes, absolutely. Yes. I mean, I know -- and maybe not for all policies. You know, I don't want to paint a big, broad brush here.

But there was a recent HSB we published that was around medical intensive beds. Our chief of nursing took lead on that HSB. But through that course she worked closely with Centurion, I believe, with their chief medical person, their chief medical officer, and she may have worked with one or two others with Centurion to work through that process, I'm pretty sure. I'm pretty sure she was working through that process

before I even -- well, to get to that product. So that probably by the time they did review it they were kind of aware what that policy was going to look like.

But in that case it made sense to work with them because, again, our vendor, you know, they're doing a lot of that work, they know the beds, in that case they know how many beds we have, they know the types of patients we have. It certainly makes sense to kind of work through some of that with them.

Q If there's a disagreement among the stakeholders as to the appropriate course of action with respect to a draft HSB, how do you resolve that issue?

A I mean, I think it all depends on what the issue is. It's hard to -- again, it's hard to paint a broad brush on something that may include a lot of nuance.

Q Is the efficacy of treatment ever a consideration that is involved in finding a resolution?

MR. STEELY: Object to form.

Go ahead.

A I'm trying to think if that's -- I can't recall that that's ever been something -- I don't think it has.

BY MR. TILLEY:

Q If there is a disagreement among stakeholders

as to the appropriate course of action, is cost ever a consideration involved in finding a resolution?

A I don't -- again, I don't think so either. I don't believe so. Not to my recollection.

Q If there is a disagreement among stakeholders as to the appropriate course of action, are security issues ever considerations that are involved in finding a resolution?

A Well, I don't know that we've had issues on that front. But to that point, I think there may be just -- in my opinion, it seems like the issues that pop up may be more process or logistical. And so that could include challenges that we are putting on security that we could resolve through a certain means. So I would think most of it would be around kind of logistical issues.

Q Could compliance with new laws or regulations be a consideration when resolving a disagreement among stakeholders as to how to -- whether to adopt a proposed HSB?

A I don't know about adopt. But, again, back to logistics. So we recently -- we had our agency bill passed in the last legislative session, that was House Bill 903, which changes the law, obviously, and allows the Department to be able to do capacity assessments at

our medical units.

Our medical units are now defined under laws, part of them, they're a health care facility. They previously had not been. They had been excluded, not purposely excluded. But a health care facility for our purposes based on the definition in statute, I think 765, was like a hospital or a nursing home.

So any time we had to do a capacity evaluation for an inmate who was potentially lacking capacity, they had to go to a health care facility. We'd have to send them to a hospital. So that's changed now.

And another change that occurred was when we go through a proxy process. So if that inmate now is evaluated at one of our institutions and is deemed to not have capacity as determined by a physician, or two physicians, if needed, then we go through the process to identify a proxy, unless the inmate already has a health care surrogate on file. If they don't, then there is that proxy process that is also laid out in Section 765. And the change for our bill is that if they extinguish that process, they find themselves to one of our ombudsmen, which is defined in the bill.

So we got into quite a bit of discussion with our vendor about, well, if the ombudsmen now is to become the proxy for this inmate, who at the moment does

Q Going back to your declaration in paragraph two, you referenced, "Procedures related to the OHS."
A Uh-huh.
Q Is that a reference to only quote/unquote procedures that you just referenced, or does it include HSBs and other things?
A The way that's written, I believe that would be procedures related to OHS. So that would be Department's procedures, which are slightly different than health services bulletins, because they do often times include, you know, components or activities that are related to security operations.
Q Does the final approval that we've talked about with respect to HSBs also -- is the process the same with respect to final approval of procedures related to the OHS?
A Procedures are treated differently. You know, their review process, I believe, is generated differently. It's from a different office. They, then, come to us, I believe, the same individual who tracks, generates all that activity for our health services bulletins also does the same thing for the procedures. Although, I don't think she initiates it. I think it goes to her to then initiate it for the Office of Health Services. And then once it goes through our process,

they get that back. Our health services gets it back over to the office that oversees. I believe those procedures have to be reviewed annually as well. They go to them, and then once that's finalized there is a different sign off on procedures for the Department.

Q And what is that process?

A The final sign off is the chief of staff with the Department. So I'm the final sign off on health services bulletins. Chief of staff is the final sign off on all departmental procedures. I believe all departmental procedures. I don't spend a whole lot of time looking at procedures that are outside the spectrum of health services, but...

Q Who is the chief of staff?

A Are you asking for his name?

Q Yes.

A Oh. Tim Fitzgerald, Timothy Fitzgerald.

Q The Deputy Secretary is Richard Comerford; is that correct?

A Yes.

Q Do you report to him?

A Yes.

Q Does he have a role in approving HSBs?

A No.

Q Have you ever discussed specific HSBs with

him?
A Not that I can recall.
Q I would like to show you a pdf of FDC's website, and specifically the health services page.
MR. TILLEY: We'll mark this as Exhibit 2?
MR. STEELY: Did you want to mark Exhibit 1 the Declaration?
MR. TILLEY: Yes.
(Plaintiffs' Exhibits 1 and 2 were marked for identification.)
MR. STEELY: Okay. Are you referring to the document that has apply now on it? I want to make sure I've got the right one.
MR. TILLEY: Yes. Thank you.
BY MR. TILLEY:
Q If you go down to the second page under organization, can you read those two paragraphs after organization and tell me if those are accurate?
A (Views document.) Do you want me to read them out loud?
Q No, to yourself.
A Yeah, that's accurate.
Q Who is the chief clinical advisor that is referenced there?
A Her name is Dr. Kalem Santiago.

Q And what does the website mean when it says she, quote, "Serves as the final professional authority for the Department"?
A She would serve as the final authority certainly for all issues medical, MD, if you will.
Q Does she have the authority to overrule you in any way?
A I mean, I don't know that she would overrule me, because I wouldn't rule something, I wouldn't come up with something that's -- that I'm not credentialed to do so.
But if I did, which would be a mistake on my part, because I'm not a licensed medical professional. But if I did come up with something, absolutely, I would certainly hope she would, quote, overrule me to make sure that the Department was going to put itself in the best path to move forward with something that was medical of nature that a licensed health care professional would need to have final say on, not a non-licensed mental -- not a non-licensed individual, such as myself.
Q Have you ever spoken or interacted with the FDC general counsel?
A Yes.
Q When?

BY MR. TILLEY:
Q Does a revision -- a revision always comes after a review; is that accurate?
A I mean, naturally, yes. The individual, as part of the review, may determine that a revision is necessary. But revisions aren't --
Q And the person making --
A -- revisions aren't necessary, but reviews are.
Q And the person making the determination whether to revise is who?
A I mean, ultimately, if it's a clinical issue, it's -- I mean, I think, you know, I'm pretty sure the responsible authority, if it's a clinical HSB, that individual who is a licensed health care professional or mental health care professional is going to take the feedback, take the suggestions, and they're going to figure out how to move forward.
Q Are there ever disagreements on whether a policy or procedure should be revised?
MR. STEELY: Object to form.
A Not that I can recall.
BY MR. TILLEY:
Q Are there ever disagreements about whether a new HSB should be created?

MR. STEELY: Object to form.
Go ahead.

A Not that I can -- not -- not really. Not anything of substance.

BY MR. TILLEY:

Q In paragraph three of your declaration you reference that you have knowledge of, quote, "Implementation of OHS polices and procedures through FDC staff and contracted medical and mental health providers."

Who is managing the implementation of OHS policies and procedures day to day?

A Centurion in terms of our health services bulletins.

Q And if there's a problem with -- anyone experiences with the implementation of an HSB, to whom is that problem raised?

A It may be something that they put on the agenda, the once every two-week meeting. Or they may email, they may email. They may -- I think it could come through a phone call. It depends. I think it all really depends. It could be a phone call from the chief medical officer to someone on the team. It could be let's add it to the agenda. I think it really depends on the problem and extent of the problem.

Q What roles do FDC staff play as compared to contracted vendors in implementing OHS policies and procedures?

A You know, I believe our role is to seek to make sure that we've got policies in place, language practices in place that make it clear for the vendor to know how to be able to operate so that they can plan with their resources to be able to be successful in fulfilling the standards that are laid out in our health services bulletins.

So, you know, part of the implementation is certainly going to include communication with our vendor, which we do, you know, to communicate -- again, part of our process is including them so that not only are they aware of it, they have the opportunity to provide feedback and help us -- help us write them so that they're clear to them and achievable for them.

Q Are OHS policies and procedures implemented in the same manner by all FDC staff and contractors?

MR. STEELY: Object to form.

A When you say are they implemented by all staff and procedures the same way, do you mean like are they -- are they followed to the T by, you know, a hundred percent of the staff the same way?

BY MR. TILLEY:

Q Yes.

A Well, we wish. We do, you know, we have our contract with Centurion. And in that contract we have over a hundred performance measures, all of which reside in predominantly health services bulletins, some in procedures.

So certainly we wish that we were seeing a hundred percent scores across the board when we do our contract monitoring. We have not achieved that milestone yet. You know, I don't know that we ever will. So, no, not everyone is scoring a hundred percent in terms of performance management with regards to achieving some of the standards that are embodied in our health services bulletins or procedures.

Q When you say not everyone, are you talking about there's a facility by facility score, if you will, or what did you mean by that?

A Sure. We do monitoring of all the facilities so we can look at -- I think that's the lowest level of granulation that we get to is at the facility, at the institution.

Q Do you record compliance on an HSB by HSB basis as well? Do you have that kind of granularity, too?

BY MR. TILLEY:
Q Did you review any emails or other documents related to the reasoning for revising the policies related to gender dysphoria?
A I may have reviewed some things very briefly, but those materials were, you know, much more thoroughly reviewed by Doctors Kline, Martinez. They are the clinical folks on this, and that's their -- that's their job to dig in to those kind of details and formulate their, you know, their best medical and psych opinions on how to move forward on this --
Q So were you -- I'm sorry. Go ahead.
A Up on this issue. That's how I ended that.
Q So when you did review the limited number of documents that you did, was it curiosity for your own edification? What was the reason, if you were going to be deferring in some amount to others?
A Yeah, again, I may have been exposed to some of these articles. But the amount of time that I spent reviewing them was very minimal, probably minimal to the point where I couldn't even come up with any sort of -- much of a statement on them.
Q Are there any --
A I deferred my -- certainly not that I -- you know, they're the ones responsible for developing

treatment, guidance and plans, and so forth. So I certainly respect their authority to move that process forward.

So I wasn't really interested in spending a whole lot of time that, frankly, was counterproductive for the agency when I could be spending other time on other items that I could have a greater impact on.

Q Counterproductive because you wouldn't have a significant role in providing substantive feedback?

A You know, it's their job to review clinical guidance, different research articles or whatever, whatever type of documentation that they're reviewing to formulate how to move forward on a particular clinical issue. So I didn't frankly see the need to delve into this particular topic.

Q Is it fair to say that HSB 15.05.23 replaced FDC procedure 403.012?

A I mean, it sounds like a fair statement. I have no reason to argue against that.

Q Is it common for an FDC procedure to be revised and then replaced with an HSB?

A Is it common? I mean, in my experience with the Department, I don't believe it is common. But, you know, I don't know what -- I haven't -- I've only seen it this one time.

Q Meaning, with respect to the HSB we're discussing?
A That's correct.
Q Who is Vicki Love?
A Vicki Love, she is the -- I believe her title is chief operating officer for Centurion.
Q And what role, if any, did she play in reviewing the whole procedure for the new HSB?
A I mean, I think she played some role in reviewing the HSB, and she certainly had access to the old procedure.
Q What role did she play?
A Again, Centurion -- Centurion is afforded, just like with all of our policies, they're afforded the opportunity to review, you know, updates to policies or HSBs or new HSBs or policies. So the opportunity to review and provide feedback.
Q So I don't want to put words in your mouth, but it sounds like you're saying you're aware that she would have had a role, but you may not be certain what exactly -- what exact role she played in this specific instance; is that accurate?
MR. STEELY: Object to form.
Go ahead.
A Yeah, I don't know -- I mean, I know she

was -- she had the opportunity to review --
BY MR. TILLEY:
Q But you're not aware --
A -- other members of her team. But I'm not aware of what she did in her review.
Q Who is Peggy Watkins Ferrell?
A She is the director of psychological services for Centurion.
Q And is your answer the same for her, that she would have had the opportunity to review --
A She did.
Q -- the HSB?
A She did, yes.
Q But you're not aware of any specific feedback she gave?
A No, I'm not aware of any specific feedback any one individual gave on that HSB.
Q You're not aware of any specific feedback that anyone anywhere gave?
A Yes, Centurion did provide feedback on the HSB.
Q And you're aware of what that feedback was?
A To a degree, yes. I don't --
Q And --
A It's a little while ago. I don't recollect

all of it.
Q What's the part that you do recollect?
A You know, I think that they wanted to, you know, largely keep things as they had been with the prior procedure.
Q And why was that?
A I don't really know why.
Q Did you hear anyone express a view as to why that might be?
A I think they were probably concerned about litigation.
Q Centurion was concerned about litigation?
A I believe so.
Q And what leads you to that belief?
A You know, I don't -- I don't have anything specific that I can reference. But, you know, the new policy represented a change, and it was a hot -- it's a hot button topic. And so, you know, I think that was the item that was, you know, kind of pertinent for them.
Q Did you discuss Centurion's feedback with anyone?
A Yes.
Q Who did you discuss that with?
A I probably spoke to our section chiefs, you know, back to our clinical team, predominantly again

Dr. Kline, Dr. Martinez. And I'm sure I would have talked to legal.
Q When you say the section chiefs, just so I'm keeping the terminology straight, when you say section chiefs, is that the same thing as discipline chiefs?
A Yes. I'm sorry. And specifically it would have been Doctors Kline and Martinez.
Q And when you say the clinical team, is that those same people?
A In that sense, yes, because they're the clinical folks that are relevant to the new health services bulletin.
Q And in your conversations with Doctors Martinez and Kline about Centurion's feedback, what did they say?
A I don't recall exactly what they said, but, you know -- yeah, I don't -- I think that they were short, pretty short with it, and I think they kind of lacked surprised to some degree on Centurion's response.
Q Did you say short? Is that what you said?
A Yeah, pretty short with their -- I don't recall us having a long or even a fairly long conversation at all about it.
Q And what was their short commentary?
A I think they just lacked surprise.

Q And why did they lack surprise?
MR. STEELY: Object to form.
A You know, that I don't really know.
BY MR. TILLEY:
Q Was it a conversation where you asked questions about what they said or you were just mostly listening?
A Again, I don't recall it being a very long conversation. It was kind of, again, let them know what feedback we did receive from them. I don't recall there being a whole lot from that conversation.
Q When you say, let them know what feedback we did receive, who letting who know?
A Me letting Doctors Kline and Martinez know.
Q So the Centurion feedback went to you and not to Doctors Martinez and Kline?
A Yes, I believe so.
Q Do they have interactions directly with Centurion?
A Yes.
Q Why would the feedback have gone to you and not to them with the specific feedback?
A You know, probably because I could -- you know, I provided them the draft, and for them maybe it made sense to see me as kind of the central point person

to be sensitive to that.

But at the same time, we work through a process with a multitude of folks to get to what we think is the best policy for treatment of gender dysphoria.

Q Are you aware of any communications that any government official involved with the development and implementation of the HSB had with private parties concerning any matter addressed in the HSB?

A With private parties?

Q Yes.

A Can you be more specific?

Q Sure. For example, during the campaign around Amendment 4 for the last year concerning abortion protections in the Florida Constitution, the state hired an individual from the Heritage Foundation to be part of a committee to review the financial impact of the amendment. So they were communicating with a private party, an outside actor, about this thing that was on the ballot.

So my question to you is, are you aware of any government officials that talk to outside folks, private parties, about any aspect of the HSB?

A No, I'm not.

Q Are you aware of any communications that

anyone at FDC involved with the development and implementation of the HSB had with any other government officials concerning any matter addressed on the HSB?
A No, I'm not.
Q Are you aware of any communications that anyone anywhere has had with the governor's office concerning the change in policy for the treatments of inmates with gender dysphoria?
MR. STEELY: Object to form.
Go ahead. You can answer.
A Yes. You know, this policy did have to be reviewed by the governor's office.
BY MR. TILLEY:
Q And why is that?
A Why is that?
Q Yes.
A Again, it's a hot button topic. It garners a lot of attention in the media and the news. So I suspect that's probably the reason.
Q And when you suspect, what leads you to suspect that?
A Kind of circular here because of the nature of the subject. You know, I mean, I guess I can empathize where if I worked for the governor's office, I would probably want to know what was going on with policies,

you know, that are involving controversial subjects, whether it's gender dysphoria or, you know, the death penalty, for example, or topics, anything that garners that sort of attention.

Q Well, what would be the point of having the conversation with the governor's office?

MR. STEELY: Object to form.

A You know, I don't know. I haven't had any conversations with the governor's office. I don't know what those meetings are like.

BY MR. TILLEY:

Q Who did have the conversations with the governor's office?

A I don't know all the players. I think, you know, I worked with legal on aspects of that. I think legal probably had some conversations with the governor's office.

Q Anyone other than legal that you're aware of who had conversations with the governor's office about this HSB?

A About the HSB? No, I don't think so. No. There may have been a conversation with the governor's office just to let them know, too, that we were implementing. That's it, to my knowledge.

Q Meaning, you were implementing the HSB?

know, that they have at the governor's office.

Q You largely don't in general or largely don't with respect to this particular HSB?

A I guess both, you know. And certainly in general. I don't have any reason to think that they have many meetings at all talking about the HSB other than, you know, we're ready to implement.

Q How do you have knowledge about the fact that someone talked to the governor's office about this HSB?

A In terms of our -- are you referring to the conversation that legal would have had with an individual at the governor's office?

Q Whoever, that you have knowledge of, communicating with the governor's office?

MR. STEELY: I'm going to object if you're trying to get into any information he has got from legal, any conversations he has had with legal. That's going to be protected attorney/client.

Beyond that, if you have any information outside of any conversations you've had with legal, then you're free to answer.

A Well, I think as we were getting ready to implement, I think they just wanted a brief -- brief out. Again, they have weekly meetings. One of the items would have been just to brief them that we were

going to implement.

BY MR. TILLEY:

Q So there's the roll out, you had mentioned before the roll out conversation. When did the earlier conversation take place?

A I'm sorry, what's the earlier conversation you're referring to?

Q Sure. I understood from your prior testimony that there was more than one communication with the governor's office about this HSB. One of them was at the time of the impending roll out of the HSB, and there was another conversation prior to that.

And my question was, if that's accurate, when that prior conversation was?

A Okay. Okay. I don't know. I think there may have been only the one conversation that was just prior to roll out. I could be wrong. Like I said, I haven't been at any of these meetings. But I think there was only one meeting that leadership had to brief out that we were going to be implementing.

Q And did the governor's office have any feedback on the HSB?

A If they would have provided any feedback, I suspect they would have come to legal.

Q And without asking the contents of any

feedback, are you aware that there was feedback provided?

MR. STEELY: Object to form.

A Yes, I believe there was.

BY MR. TILLEY:

Q Just so I'm clear and lining up everything correctly, your testimony is that there was a conversation between FDC leadership and the governor's office around the time of the roll out of the HSB, and that the governor's office provided some feedback at that time; is that right?

MR. STEELY: Object to form.

You can answer.

A No, not at that meeting, to my knowledge.

BY MR. TILLEY:

Q When did the governor's office provide feedback on the HSB?

A To my knowledge, that feedback would have been provided with our general counsel's office.

Q And I'm asking about the timing.

A That would have occurred probably, you know, within the months when we were working to finalize our HSB.

Q Okay. I think I may have been intuiting something incorrect, because when I understood -- or

when I heard you say that there were conversations with the governor's office around the roll out of the HSB, I was in my mind thinking last fall, which would have been when the HSB came into effect. It sounds like you're talking about a different time; is that right?

A Correct. I think there is a two separate meetings. There's a meeting that our leadership goes to on a weekly basis. And at, I think, one of those meetings they briefed out that we were ready to implement.

And then there were other meetings that took place with our general counsel, our legal, with another counterpart in the governor's office to discuss our policy that we had been working on.

Q And when were those meetings?

A I don't know exactly when those meetings occurred. To my understanding, those aren't regularly scheduled -- well, I don't know. I honestly don't know about the timing of those meetings.

Q Did they occur after the implementation of the HSB?

A I don't know. I don't know if they occurred after the implementation.

Q But your testimony is that at one of those meetings, whenever they were, there was feedback

provided on the HSB from the governor's office?
A I believe so, yes.
Q And when you reference a counterpart, you talked about general counsel at FDC communicating with a counterpart in the governor's office, who was that counterpart?
A I think it would have been someone more on the legal end.
Q But you're not sure who it is?
A Correct.
Q And when you mentioned a routine meeting with the leadership of FDC and someone in the governor's office, when did that routine meeting take place where the HSB was mentioned?
A Yeah, our leadership meets weekly, typically on Mondays, with leadership -- you know, with staff at the governor's office. So it would have been -- probably it would have been one of those Monday meetings. The exact date I don't recall.
Q Do you know what year it would have been?
A It would have been shortly -- it would have been fairly quickly before -- or right around the time that we rolled it out, implemented the new policy.
Q So probably September, August?
A I have no reason to -- yeah.

Q I'm sorry, I spoke over you.
A No, I have no reason to dispute one of those two months.
Q And I'm not asserting, I'm just asking you.
A That sounds right, yeah, September or August.
Q Okay. Of 2024 we're talking about, right?
A Correct.
Q Who is the leadership that you're referring to when you talked about FDC leadership in these meetings, routine meetings with the governor's office?
A Our leadership would be the folks that typically go to the governor's office, include our secretary usually, to my understanding, our deputy secretary, our chief of staff, and potentially others.
Q And what others would be potentially there?
A You know, I think it depends sometimes on the subject. But, you know, I don't know. It could vary.
Q For the routine meeting last year where this HSB was raised with the governor's office, do you know who was at that meeting?
A I don't. Specifically, no.
Q Do you know if anyone was present who was not normally at those meetings?
A I don't.
Q How would the individuals who are at those

meetings come into possession of the information that they would present at the meetings to the governor's office? And I'm asking specifically about the HSB.

A Yeah. So at those meetings, at that particular meeting, I don't know that they would have taken any materials.

Q Sure. So my question is, if they're saying something about the HSB to the governor's office, the person who is saying that thing would have had to have learned the information that they're saying.

And so my question is, how would that person have come to having that information that they're then expressing at the meeting?

MR. STEELY: Object to form.

A Sure. You know, as a group, as we worked through this whole process, you know, beginning again -- I mean, certainly before I was here and while I was here we worked as a group, and we would have briefed out our leadership, you know, to let them know here is where we are, and we're ready to implement this on such and such a date or within the next few weeks, or whatever. And so brief them out and then let them determine any next steps that they need to do as well.

Q And are you aware of any particular conversations that went into the briefing for the

experiencing deterioration of mental health due to the loss of accommodations related to clothing and grooming standards or the alternate canteen items?
A No, I have not.
Q What about with respect to Reiyn Keohane, who is in in-patient mental health custody after her bras were taken away?
A No, I have not.
Q Do you think it's important to solicit feedback from those who deal with inmates directly to hear how FDC policies are being implemented?
A Yeah, I have no reason to have any issue with that. I can see where it can be helpful.
Q Is there a way it would be unhelpful?
A I think any time, you know, you're seeking data, you have to probably have an idea of how you're going to -- you know, what your plan of action would be.
But we don't -- you know, we don't typically do that with, you know, much of our other health services bulletins. You know, I think we try to orient them to: A, we want to produce something that meets the standard of care that's acceptable; and, B, we want to produce a policy that's achievable and clear for the vendor.
So most of our conversations are oriented

towards the vendor and what we can do to improve their life. And certainly they are the ones that interact on a daily basis with the inmates. So I would imagine that when they're thinking how we can improve their life, they are pretty patient centered as a group, Centurion. During that I would hope that they're using that feedback that they're receiving, and seeing with inmates that they're using that to help inform us of, you know, things we can do better.

Q Is anyone in FDC custody receiving access to accommodations related to clothing and grooming standards as they were under the prior procedure?

A Not that I'm aware of.

Q Is that even on the table for anyone ever to be able to receive such accommodations?

A Not that I'm aware of.

Q Why not?

A We have changed our -- I mean, not that I'm aware of. We have changed our policy, and we've rescinded the previous procedure. And we've implemented the new health services bulletin, and it appears to be working smoothly. And I haven't heard any reason to divert.

Q If someone at Centurion believed that it was medically necessary for an inmate with gender dysphoria

in a male facility to be able to access the female clothing and grooming standards, would that accommodation be provided?

A No.

Q Why not?

A Our position at the Department is that those -- those treatments, if you will, those items are not medically necessary. That's the position that, you know, Dr. Martinez and Dr. Kline have taken. And that's what the Department is going with.

Q So there is no variance available for clothing and grooming accommodations on a case-by-case basis?

MR. STEELY: Object to form.

A That's correct.

BY MR. TILLEY:

Q And there could be no individualized assessment that could permit that?

MR. STEELY: Object to form.

A That's correct.

BY MR. TILLEY:

Q How is the current policy relating to clothing and grooming standards being enforced?

A I think you'd have to ask someone from security operations that.

Q Okay. The same answer for how an officer

knows when someone's hair needs to be cut?
A Yes, sir.
Q Okay. I want to ask you about an email from John Lay. And we'll bring that up.
This is a 14-page document between you and Centurion. It starts at Bates number FDC Officials 026543. Do you recognize this email?
A (Views document.) Yes.
Q And just for the record, it's sent October 19th, 2023. Subject line reference is topical testosterone dosing.
I want to read from the first sentence. "In an effort to convert the last remaining gender dysphoria medication to KOP to be compliant with new state requirements, we will be transitioning from female to male gender dysphoria patients to topical testosterone."
What does KOP stand for?
A Keep on person.
Q That means the inmate can keep it with themself and doesn't need to seek it from an FDC staff member?
A An FDC staff member or in a medication line, correct. They're able to hold and maintain their medication.
Q What are the state requirements being referred

provider had determined that these items were medically necessary, is that anything that you would make a determination on for the Department?
A No, sir. I misspoke on that.
Q Okay. And do you know what process it would entail to determine whether an inmate would receive these items?
A I mean, I don't know that we have a process laid out. But given that a determination would be made by a clinician with Centurion, if they made that determination, I would think that they would reach out through their medical or their mental health group, and that that decision would potentially then come to Dr. Kline or Dr. Martinez, potentially Dr. Santiago, to determine the medical necessity of those types of products.
Q And if FDC clinical staff ultimately determined that something was medically necessary, do you believe that that would be provided to an inmate?
A You know, I don't know.
Q But that determination wouldn't fall to you?
A Correct.
Q And you wouldn't have any input on whether or not something that was determined medically necessary was provided?

A Correct.

MR. STEELY: Okay. That's all I've got.

MR. TILLEY: I'll ask just one followup question.

REDIRECT EXAMINATION

BY MR. TILLEY:

Q And your understanding of the variance process is that there is not a path through the variance process as you understand it that would permit someone an exception to the clothing and grooming standards and the alternate canteen items; is that correct?

A That's correct.

MR. TILLEY: All right. That's it for us.

MR. STEELY: I do want to read and sign. I know we may hold this open.

THE STENOGRAPHER: This is the court reporter. Did you need to order the transcript or do you want me to hold it for now?

MR. TILLEY: We will order it eventually. I don't know if there's a way to order part of it now and end add more on the end.

THE STENOGRAPHER: Do you don't to order it right now. I was asking because I put it on the record.

MR. TILLEY: We'll hold for off.

THE STENOGRAPHER: Okay. Thank you.

(The deposition was concluded at 4:21 p.m.)