**Adam Wasserman Ph.D. Deposition, November 04, 2025**

| Start Page: Line | End Page: Line |
|---|---|
| 4:13 | 4:16 |
| 6:1 | 9:7 |
| 13:5 | 13:21 |
| 14:18 | 14:22 |
| 14:23 | 17:1 |
| 17:2 | 17:4 |
| 19:4 | 21:6 |
| 24:14 | 25:1 |
| 26:11 | 27:16 |
| 55:12 | 57:16 |
| 92:18 | 92:21 |
| 110:24 | 112:1 |
| 112:15 | 113:1 |
| 115:17 | 116:3 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
CASE NO: 4:24-cv-434-AW-MAF

REIYN KEOHANE, et al.,

Plaintiffs,

vs.

RICKY D. DIXON, in his office capacity as Secretary of the Florida Department of Corrections, et al.

Defendants.

ZOOM DEPOSITION OF:
ADAM WASSERMAN, Ph.D.

Taken on Behalf of the Plaintiffs

DATE TAKEN: Tuesday, November 4, 2025

TIME: 10:00 a.m. - 2:20 p.m.

PLACE: via Zoom videoconference

REPORTER: Lisa Adkins
Court Reporter

P R O C E E D I N G S

(Witness sworn.)

THE WITNESS: I do.

THE REPORTER: Thank you. You may begin.

ADAM WASSERMAN, Ph.D.,

called as a witness by the Plaintiffs, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. NOWLIN-SOHL:

Q. Good morning, Dr. Wasserman. My name is Li Nowlin-Sohl. I'm an attorney for the Plaintiffs in this matter.

Would you mind spelling your name for the record.

A. Adam -- A-d-a-m -- Lawrence -- L-a-w-r-e-n-c-e -- Wasserman -- W-a-s-s-e-r-m-a-n.

Q. Okay. And, Dr. Wasserman, have you been deposed before?

A. I have.

Q. Okay. Roughly, how many times?

A. One time.

Q. One time, okay.

And when was that?

A. Approximately, 2011, 2012.

Q. Okay. So it's been a little bit.

What was the subject matter of that deposition?
A. It had to do with substance abuse. Screening for persons that were receiving temporary assistance for needed family funding.
Q. Okay. Since it's been a little bit since you've been deposed, I'm just going to go over a few ground rule here.
So I'm going to ask you questions. Please respond verbally for purposes of the court reporter. It's important that we don't talk over each other as well so we have a clean transcript. If you don't understand anything that I'm saying or asking, please ask me to clarify.
Are you at all sick today?
A. I am not.
Q. Okay. And are you under a doctor's care for any illness or condition that might affect your ability to understand my questions or give full and accurate answers today?
A. I am not.
Q. Okay. Is there any other reason that you might not be able to give full, complete, and accurate testimony today?
A. No.
Q. Okay, thank you.

How did you prepare for this deposition, Dr. Wasserman?
A. I reviewed a number of documents. I reviewed the old procedure for gender dysphoria. I reviewed the current health services bulletin. I looked at the data I have access to related to the gender dysphoria population.
Q. And what kind of data is that?
A. Well, one of my roles that we'll get to is I'm over the mental health data for the office of health services. So that function goes to me and to my group, so I have access to the larger picture of the 89,000 plus inmates that we currently have in terms of their mental health and their needs. But, specifically, to the gen population that has been diagnosed with gender dysphoria, I maintain a list so that I can track to see what the changes are happening with them over time.
Q. Okay. And what kind of information is in that data?
A. So the dataset that I maintain has the department of the corrections number. It has the name of the individual. It has their current status. This was a process that was put into place for the gender dysphoria variance team. So I'm looking at very specific things in terms of where they are in process

for a variance request. And that includes people that are newly gained into the department of corrections, and individuals that have been in DC custody for a period of time. So it's more of a tracker and a way to kind of communicate what the status is of the individuals that are diagnosed.

Q. And you mentioned current status.

Is that, like, you know, diagnosed with gender dysphoria, or variance approved, or what do you mean by that?

A. Yeah, it's along the lines of that. We have a couple of different designations. So we have individuals that are, lets say, newly gained. And in those case -- I'll slow down for the court reporter. I apologize.

Nearly gained individuals we will identify those as persons that need to go through the formal evaluated process. So as you'll hear today and probably have heard otherwise, the multidisciplinary service team needs to do an evaluation to determine whether the diagnosis is present, and then to make recommendations in terms of their course of treatment; that's one type of a status. Another type of status could be that the person is -- needs to be scheduled for a variance, which that means they have to do a variance report to go and

talk about what the person's treatment progress has been.

Thirdly. You have a situation where the person has been scheduled for a GDVT -- I apologize for the acronym -- review. And then the status can change to approved, if they're approved for a variance. We have individuals that the multidisciplinary service team determines they no longer meet criteria for the diagnosis; that's another category. The person doesn't want to be on cross-sex hormones; that's another category. End of sentence; that's another category.

So I think all things equal there's probably a dozen different categories that people can fall into, and it changes over time based upon their needs.

Q. Okay, thank you.

And that tracker, how is that saved?

Is that a spreadsheet? Is that a database? Something else?

A. It's a spreadsheet.

Q. Okay. And were there any other documents that you looked at to prepare for your deposition today?

A. I looked at the procedure 4040.001, which is the suicide and self-injury prevention procedure because we'll get to that I imagine at some point. That also falls into my jurisdiction of responsibility.

I reviewed the transcript of Director Clayton Weiss because I know that I was mentioned in his deposition. So I wanted to kind of see what portion that I was identified in so I could be responsive today.

Those are the major -- I reviewed the psychological autopsy of inmate, say, Smith, and the closure summary for Inmate Smith.

Q. Anything else?

A. Not that I recall. Those are the major things.

Q. Okay.

MS. NOWLIN-SOHL: Kenneth, do you know if we received that tracker in the production of documents? If not, I'd like to request that.

MR. STEELY: So we haven't produced that tracker because that tracker was prior to the ruling on class certification and it has all the other individual inmates on it.

As we discussed last time, we were going to give you a list of every inmate that is on the tracker. Their inmate name, number, and facility. This deals with the variance for hormone treatment, so I think we're kind of outside the realm of that now. But we're happy to discussed that at another time, if you'd like.

MS. NOWLIN-SOHL: Okay, yeah we can discuss

that later.

BY MS. NOWLIN-SOHL:

Q. Did you talk to anyone in preparation for your deposition today, Dr. Wasserman?

A. Yes, I spoke with Mr. Steely. I've spoken to Mr. Anderson a couple of times. I work very closely with the chief of mental health, Dr. Suzonne Kline. So she and I talked about, basically, the entire litigation as we currently understand it.

Q. Okay. And who is Mr. Anderson?

A. I'm sorry, Sean Anderson.

MR. STEELY: He's just off camera.

THE WITNESS: He's just off camera.

MS. NOWLIN-SOHL: Okay.

MR. STEELY: He's counsel for the department of corrections.

MS. NOWLIN-SOHL: Okay, is there anyone else off camera?

MR. STEELY: No.

MS. NOWLIN-SOHL: Okay.

BY MS. NOWLIN-SOHL:

Q. And then -- so you and Dr. Kline spoke about the litigation.

Anything in particular?

MR. STEELY: Object to form. There were -- I

spent time talking about those things related to the day-to-day operations of just tracking a group of individuals.

But with the shift from looking at the use of cross-sex hormonal treatment, which is what the variance team is looking at, to looking at, my understanding, accommodations, I haven't really had a role in that. So we really haven't had any sort of discussions on that, per se, because it's kind outside of my wheelhouse, so to speak.

Q. And how has the Court -- the Court's ruling impacted your work with relation to the GDVT?

MR. STEELY: Object to form. Go ahead and answer, if you can.

A. It hasn't because the variance team -- I'm still scheduling meetings. Since the variance is for the use of cross-sex hormonal treatment for persons that are coming up for, lets say, quote, unquote, a reevaluation to determine do they -- should they continue to receive cross-sex hormones, or you have people that are initiating. So are they getting approved to start cross-sex hormones for the first time.

The Court's ruling hasn't impacted this at all. The process continues to go. I continue to schedule meetings. We had one last week.

BY MS. NOWLIN-SOHL:
Q. Anything else you've done to prepare for today's deposition that I haven't covered already?
A. No.
Q. Okay. Can you tell me a little bit about your educational background?
A. My undergraduate was a BA in forensic psychology from the John Jay College of Criminal Justice, State University of New York.
From there I went to the -- the university changed names about five times in five years, but I'll tell you what the degrees are. So I received a Master's in clinical psychology from the Medical College of Pennsylvania, Hahnemann University. And then I got my doctorate in clinical psychology from MCP Hahnemann University, which is now part of Drexel.
I did my pre-doctoral psychology internship at Florida State Hospital in Chattahoochee, Florida. After completing that, I then stayed on, did a residency here and there, and then was continuously employed at Florida State Hospital for a number of years.
Q. And what was your role at Florida State Hospital?
A. Twofold. The first was -- I was the psychology coordinator for a civil transition unit; that's where

you have individuals that are committed under 916 -- Chapter 916 that are able to stepdown to the civil service, so they get more rights, more privileges, than they would have if they were on the forensic service. So I did that for approximately five years.

I then moved into quality assurance. So we were looking at the transient conditions of performance measures and also strategic planning. So that parlayed -- at that point in time, that pretty much parlayed a pathway to where I am today because a lot of the stuff that we might be talking about today is about data, and about performance, and about measuring performance.

So I went from providing clinical services under the supervision of a licensed psychologists, to looking at hospital processes and procedures while I was at that institution.

Q. And are you licensed yourself?

A. I am not.

Q. Okay. And have you ever provided care to patients on your own, so not in a supervised capacity?

A. Negative.

Q. Okay. And then when did you join the Florida Department of Corrections?

A. June of 2022.

Q. Okay. And what was your title when you joined?
A. That's -- I'm trying to think of -- we use working titles around here. I was a member of the data team, which is actually just a level below where I am right now. So I was in the positions that -- currently, I'm supervising those two positions. And as part of that it's -- I was running metrics and doing -- improving public record requests. I'd run data on that. If we had planning that we needed to do for a meeting, I would run data on that. So I was a data analyst.
Q. Okay. And what is your the current title?
A. So presently I am the suicide and self-injury prevention supervisor, which also embodies the data team underneath me.
Q. And when did you take on that role?
A. That, I took on, June 2023.
Q. And then -- so other than the data team, are there other people that you supervise?
A. No.
Q. Okay. And what are your responsibilities as the suicide and self-injury prevention supervisor?
A. There's a couple of administrative functions that I do. When I get a report that there is a death and suicide is suspected, I notify our contracted healthcare vendors and ask them to send out a

psychological service director, essentially, to complete psychological autopsy.

Thereafter, I make notifications in the cases of, lets say, Centurion, which is the majority of our -- our systems are statewide in the majority of our facilities. I reach out to the warden, and notify the warden and the health services administrator to make certain documents available, and to also be prepared to host the person that's going to be doing the psychological autopsy and that individuals may need to be requested for interviews. It's a small portion of this role that I have in terms of the supervisor.

The larger portion is kind of looking at the transient conditions of suicide across the state and across time. Same thing with self-injury. So I'm looking for the trends, the conditions, and I may even put that together in a brief for Dr. Kline, or for Director Weiss, or I may do presentations.

September is suicide awareness month. And I did two presentations in September statewide to FDC staff, as well as to our contracted providers. Just kind of updating them on suicide in FDC for the last five years.

So a lot of my job is just kind of advising the mental health team on what are we observing in terms of

self-injury. What are we observing in terms of suicide.
Q. Do you have any specialized training in gender dysphoria?
A. I do not.
Q. Okay. And who do you report to?
A. I report to the assistant chief of mental health, Dr. Stephanie Crawford.
Q. You mentioned that you also work with Dr. Kline.
Do you meet with Dr. Kline regularly?
A. I do.
Q. Okay. And how often?
A. Daily. Multiple times a day.
Q. Okay. And what are the purposes of those meetings -- potential meetings?
A. I hate to give you the answer that it varies, but it varies.
Actually, Dr. Kline and I have had a working experience since 2001. We've worked with each other in different capacities over the years. I'll use this as an example. You're aware of the HSB in terms of gender dysphoria variance. And I took on the responsibility for providing technical assistance to that group because it was needed. And I did that because I've had multiple years of working with Dr. Kline and knowing her style of

how she likes meetings to go, and we needed an efficient system in place.

So my job description talks about -- I'm over the suicide and self-injury and over the data team. But I'm also doing lift cited medical request analyses. I'm doing bill analyses. Reviewing contract language as it relates to performance measures.

I meet with her for a variety of reasons. Jack-of-all-trades and fortunately, I'm pretty good at some of those.

Q. So it sounds like you worked with her before you joined FDC.

Where did you work with her prior to that?

A. Well, I -- the year that I did my residency at Florida State Hospital, which would have been 2001, 2002, Dr. Kline was an intern at that time.

Probably about a year or two after she completed -- probably a year after she completed her internship, I brought her over to the unit that I was working on. So we had a couple years of working together at Florida State Hospital. She then became the administrator of the sexually violent predator program. This is around 2008. And when she took over that job, I went over to do quality assurance for that program. She joined the department -- the State of Florida Department

of Corrections in 2022 in May, and I came over in June.
Q. Okay. And you mentioned preparing briefs and information for Dr. Kline, as well as Mr. Weiss.
Did you prepare any briefing, kind of, the risks of self-harm or suicidality for patients with gender dysphoria?
A. No.
Q. No, okay.
Why not?
A. It's the -- there's multiple risk factors in terms of suicide and self-injury and gender dysphoria just happens to be one of the things.
But we have 89,000 persons in corrections right now. About 25 percent of those individuals have a mental disorder that we're providing services to. And approximately 270 some-odd-persons are diagnosed with gender dysphoria. I'm looking at the large picture. So we have not segmented the information to be that targeted towards a specific diagnosis.
Q. Okay.
A. And, to be perfectly honest, the suicide data doesn't lend itself to that. We don't have a high degree of suicide when it comes to the gender -- the persons diagnosed with gender dysphoria.
Q. What about self-harm?

A. We haven't stratified the data that way.

Q. Having looked at the data but not having stratified it, what is your impression about the rates of self-harm within the population of gender dysphoria?

MR. STEELY: Object to form. Go ahead.

A. Diagnosis isn't one of the things. We don't stratify by diagnosis. So we're at a level where the diagnosis isn't relevant to what we're currently doing in terms of activities for, lets say, self-injury prevention.

BY MS. NOWLIN-SOHL:

Q. Okay.

A. For this --

Q. Go ahead.

A. For this reason. There are individuals that don't have diagnoses but are self-harming. And there are individuals that take their life that don't have diagnoses.

When we look at the data from the total picture, we're focusing in on, lets say, situational changes that have occurred. So you can have somebody with a major depressive disorder -- and we have a lot of the inmates that have major depressive disorder, but a majority of them are not self-harming. So what we're doing is we're looking at the individual persons. Kind

of focusing on, what is their current status in terms of custody levels, security levels. They need supervision. We're kind of focused in on those things because it's a collaborative effort between mental health and, lets say, security in terms of informing on what the transient conditions are.

Q. Okay, thank you.

So as part of your responsibilities, formal or informal, are you involved in the element of any kind of policies?

So procedures at FDC or healthcare service bulletins?

A. So the procedure 40401, yes, I'm involved in that.

Q. And that's the suicide and self-harm prevention?

A. Yes.

Q. Okay. Have you been involved in any others?

A. No.

Q. Okay. So having been involved in the one you -- you said it's 404 -- sorry, what's the number?

A. Period, 001.

Q. Okay, thank you.

And what's the process for how that policy is typically, either developed, if you were there for that,

or updated?

A. So I am aware, which does not familiar -- I'm aware that the department has a procedure that controls the annual review or the creation of new health services bulletins and/or procedures.

If it's health services, then it's entirely encapsulated within the alms of health services. If it's a procedure, it's something that's crossing over different areas and that requires different level reviews. Which, the HSB process -- the final signature on that is Director, Clayton Weiss; whereas, on a procedure, the final signature is the chief of staff.

So I am aware that there is a process. And as a player in that process, it routes through the chief of mental health, if it's a mental health-related procedure -- HSB or procedure. And then in this particular one it would come to me for any sort of -- do I want to have any changes because of things we're observing in the field, or there's things that we need to do to kind of update it to like -- you know, maybe there are changes in practice that we need to incorporate into it. But that's kind of guided by a different portion of health services. They monitor the status of things.

So my role is to basically be a subject matter

expert for that procedure, and I do that by, basically, collaborating with our healthcare partners.

Q. And you said it's guided by a different portion of office of health services.

Who guides that?

A. So that would fall under the assistant director for office health services; that is, Grady Enlow. He has a team that's underneath him that's responsible for tracking the development or the progress for revising HSBs and procedures.

Q. Okay. I think earlier you said that as part of your preparation for this deposition you looked at the old procedure 403012; is that correct?

A. That is correct. Excuse me, that is correct.

Q. As an aside. One other housekeeping rule that I should have mentioned to you. If you ever need a break, please let me know. We can finish the question we're on, and we can take a break if you need -- you know, if you need one.

A. Thank you.

Q. Even if you need to take a drink of water.

Have you seen procedure 40312 prior to your preparation for this deposition?

A. No.

Q. No, okay.

A. Prior to -- yes. I'm sorry, yes.
Q. Okay. So in what capacity have you seen the procedure prior to your preparation?
A. I want to ask for a clarification, please, because what I understood was prior to preparation for today.
So I made myself familiar with the different sections of it in terms of preparing for today. But prior to the litigation itself it wasn't something -- it wasn't something that was in my area of concern, so I didn't review it. So I reviewed it just to be familiar with social accommodations so I would have something, if asked.
Q. Okay. So in your work you never worked with procedure 40312?
A. Correct.
Q. Okay. Did you have copies of that on your computer?
MR. STEELY: Object to form.
A. I do not recall. I mean, we're talking prior to prepping for -- let me -- I don't recall.
BY MS. NOWLIN-SOHL:
Q. Okay. Prior to HSB 15523 going into effect, what was your role in working with treatment for gender dysphoria?

A. I had no role.

Q. Okay. Do you have a work computer, Dr. Wasserman?

A. I do.

Q. Okay. And do you typically save documents on your work computer?

MR. STEELY: Object to form.

A. Yes.

BY MS. NOWLIN-SOHL:

Q. And do you have a folder on your computer called GD research 2023?

A. I do not recall.

Q. At any point during this litigation were you asked to provide documents to counsel to be produced?

A. Yes.

Q. Okay. And when you received that request, what did you do?

A. That -- for clarification. That request would have come from Dr. Kline to go -- if it was a request, it would have been a data-driven request.

So I would have, basically, looked at the data that was available for this population and then put it together to make it responsive to what was being asked for production.

Q. Okay. Did you have any documents on your

computer that already existed that you provided?
A. I do not recall.
Q. Okay. And so your understanding -- scratch that.
When did HSB 150523 go into effect?
A. October of 2024.
Q. Okay. And just for convenience, I'm going to refer to that one as the HSB throughout, and then we can refer to 404 as the self-harm policy; is that okay?
A. Yes.
Q. Okay, great, thank you.
And then -- so prior to the HSB going into effect, what was your understanding of what treatments were available to people who are transgender?
A. It wasn't merely a -- I don't want to suggest that I was so silent that I was unaware of the population. But it was not an area that I was pulling data for. I might have had a request from somebody else to package up something that was already available to them. But it wasn't something -- it's not a population at that point in time I was focused on. I had any sort of engagement involvement with. I'd be speculating on what my thoughts were back then because it wasn't an area of focus.
Q. Okay. Was it an area of focus for purposes of

suicide and self-harm prevention?
A. No, for the reason that I was alluding to earlier. Maybe not -- because diagnosis isn't necessarily a stratifier for our population -- within the FDC population.
There are -- if I was to have a specific type of chart, a Pareto chart, where you have percentages that are going in a line, and you have bar charts of the things that are -- the areas to kind of focus in on. Diagnosis itself is one of the smaller bars; it's not something that's kind of the low-hanging fruit.
So I don't look at the data that way because it's too fine of a gradation. Even with the self-injury population, it's too fine of a cut. There were larger things to be looking at. So I didn't look at that for this population.
Q. Okay. And separate from the diagnosis of gender dysphoria, do you have a marker within your dataset for people who identify as transgender or something --
A. Not --
Q. -- comparable?
A. Sorry. Not in the datasets that I maintain.
Q. Okay. Were you at all involved in the development of the HSB?

A. Negative.
Q. Okay. And when did you first hear that a new policy regarding treatment for gender dysphoria might be in the works?
A. I could say with certainty it would have been October of '24.
Q. But you don't know if you heard of it before then?
A. It was something that was being kept pretty close to, lets say, leadership; that's including Dr. Kline and Director Weiss. So I didn't have a need to know.
Q. Okay. So how did you know that the preparation of this new policy was being, kind of, held close?
A. So some of this is in the -- in answering this question. Since the day that I started -- and I believe the day that Dr. Kline started -- there have been discussions about modifying that procedure.
So we started several years ago, and it took up to 2024 for it to finally come to fruition. So it's kind of like the thing, if you're always hearing something about it, but it doesn't mean that anything has really happened. So when we're talking about the finalized product that became that HSB, October of '24 is when I became aware of it because everybody else

Would Dr. Kline ask for specific articles, kind of like you explained, or were there ever times where she asked you to kind of do research on your own and gather articles for her?

A. No, it would be specific. This, I'm confident in. If I was doing something that was a deep dive on a particular type of problem, I would be doing the search and then pulling down 5, 10, 15 different articles, and then kind of summarizing what those articles were speaking of.

I never got an assignment where I was asked to go -- basically, kind of do a literature review of the gender dysphoria condition because I knew how I kind of conduct research and that's -- I never did one for this topic.

Q. You never did any research for this topic other than pulling specific articles?

A. Correct.

Q. Okay. And when she would ask you for those articles, would she tell you why she wanted them?

A. No.

Q. Okay. Were you involved in the drafting or development of the HSB at all?

A. I was not.

(Anne Wooding enters the Zoom videoconference.)

BY MS. NOWLIN-SOHL:
Q. Were you consulted for any parts of the HSB?
A. I do not recall.
Q. And you said earlier that you were only kind of aware with certainty that you became aware of the HSB in October of 2024; is that correct?
A. That is correct.
Q. And you never saw any drafts of the HSB prior to that?
A. That is correct.
Q. Okay.
All right, I'm going to show you a document that's Bates stamped FDC officials 036256.
Are you able to see this draft of the HSB?
A. I can see the draft, yes.
Q. Okay. So this was found on a folder on your computer titled GD HSB.
Do you know what that folder is?
A. That would be one of the aggregated folders.
Q. Okay. Do you know who provided you with this document?
A. It may not have been provided. It may have just been sitting on the network drive and I pulled it over to a common place.
Q. Okay. And so just to be sure.

You never saw any drafts of the HSB prior to the final version being announced?
A. That is correct.
Q. Okay. I'm going to share that document again.
We can go ahead and mark this draft as Exhibit 2.
(Plaintiffs' Exhibit No. 2 is marked for identification.)
BY MS. NOWLIN-SOHL:
Q. Okay. So here on Section B it says: Crisis intervention.
Are you able to see that?
A. I can see that.
Q. Okay. Why was procedure 404001 suicide and self-injury prevention included here?
MR. STEELY: Object to form.
A. I don't know.
BY MS. NOWLIN-SOHL:
Q. Okay. Do you think it's important for this procedure to be included in the heath service bulletin about gender dysphoria?
MR. STEELY: Object to form.
BY MS. NOWLIN-SOHL:
Q. You can still answer the question.
A. Where I'm going -- where my thoughts are going

on this is including it does not hurt for any situation to be advising folks to be aware of crisis and intervention service to be able to provide those services.

To my knowledge, this is the only HSB that has only identified diagnosis attached to it. So in my current role and capacity, if we had something for a different condition, we would likely include crisis intervention to just let people know to refer to that procedure.

But I wasn't involved in the creation of this so I can't speak to -- I know you're asking if I think it's a good idea. I think it's a good idea. But I think it's a good idea for any HSB that we're going to be referencing, Hey, pay attention to the procedure if it's a crisis.

Q. Are you aware of any other HSBs that reference procedure 4041?

A. I can't do chapter versus, but I know there were other -- the inpatient HSB -- the transfer HSB would speak to 40401. But I don't have that off the top of my head.

Q. Okay. Were there anticipated concerns about needing crisis intervention or suicide prevention as a result of this policy?

A. Not that I'm aware of.

Q. Dr. Wasserman, have you seen this document before?

A. I have not seen this document before.

Q. Okay. So this was in your folder titled GD HSB.

But it sounds like this is not something that you put there, but it was something that you collected?

A. Yes, ma'am.

Q. Okay.

A. I collected.

Q. So you mentioned I think now you -- now that the HSB is in place, you have a role with this population and with the GDVT, correct?

A. That is correct.

Q. Okay. And in that role, are you familiar with the final HSB?

A. I am.

Q. Okay. Any did the HSB require that all people who are diagnosed with gender dysphoria be reevaluated?

A. It might go beyond that. It's reevaluated for whichever variance or initiation. We have people that -- like, we gain today and if they have a diagnosis, or if they don't have a diagnosis of gender dysphoria, however they present to us, I'm going to say,

everything up until the point that the report has been written and what is the target symptoms for growth sex hormones.

Q. And for those templates is there anything on the face of the template, like, at the top, or the title on them that would distinguish whether it's for continuation or initiation?

(Anne Wooding exits the Zoom videoconference.)

A. Yes, it's the -- reevaluations does have the word reevaluation in it. And the initiation -- I don't know it off the top of my head. The initiations will say for the initiation of cross-sex hormones. So it's kind of gender dysphoria evaluation or reevaluation of cross-sex hormones or gender dysphoria evaluation for the initiation of cross-sex hormones.

Q. Are there any other templates being used for variances?

A. Not for variances.

Q. For anything else?

MR. STEELY: Object to form.

A. When Centurion goes -- and this is MDST level that I'm aware of it.

When they do the diagnosis, they're essentially using the old procedures appendix, the attachment, that had the report form in it. They are still doing that so

they can do the diagnoses because they find it valuable.
BY MS. NOWLIN-SOHL:
Q. And is there any plan to change the MDST using that appendix?
MR. STEELY: Object to form. You can answer.
A. I've discussed with Centurion if there are things that they feel are less valuable in terms of the time and the resources that go into those reports. They cover a wide swab of information, like military history.
For some of the individuals that may not be relevant. So -- and, ultimately, how does that translate into the diagnosis and the treatment recommendations. So we've had informal discussions. Hasn't been agendad of: Are there things that you guys want to take out? Because it's their template. They do whatever they want with it.
BY MS. NOWLIN-SOHL:
Q. So as of right know, there's no plan for FDC to develop a form for gender dysphoria diagnosis?
MR. STEELY: Object to form.
A. No.
Q. Do you know if the standards for evaluating a variance are different for a reevaluation versus an initiation?
A. Yes. I mean, the reevaluation that you have,

you're looking pre, post. Like, you've had a treatment response. What is that treatment response?

So I'm -- and on initiation -- if you have an initiation, they are looking at everything up until this point and what is the cross-sex hormone going to target in terms of gender dysphoria. Those are the different standards that they're evaluating just from the template itself. They defined it that way when they asked me to go and create the templates.

Q. And somebody who was on hormones at a different facility and comes in -- or in the community and comes into FDC custody, would they be considered under a reevaluation template or an initiation template?

A. They would most likely come in as a reevaluation since they had it prior to coming into FDC.

Q. Okay. Have you encountered any of those situations?

A. I know the answer is yes. One or two.

Q. So one or two people have come in from -- come into FDC custody on hormones since the HSB has been released and have been reevaluated for hormones to continue?

A. Correct.

Q. Okay. Do you know what the outcomes of those reevaluations were?

ramifications if they miss more?

MR. STEELY: Same objection. Go ahead.

A. It's individualized. I mean, if you're asking for a numeric cutoff I -- it's a question for Dr. Martinez, Dr. Santiago, and Dr. Klein. And then they would have a discussion on what the cutoff would be.

But we don't have a numeric cutoff. Probably something that -- Mike Anderson goes, you're answering a question you shouldn't answer.

Attending 52 weeks out of the year but not participating at all during those 52 weeks may be problema- -- as problematic as missing, you know, 51 out of 52 weeks. It's individualized. It's the -- what is treatment progress that the inmate is obtaining through psychotherapy is the important thing.

Q. And we were talking about conversations with Centurion that you had, you know, prior to January of 2024, and what they were communicating about -- you know, how to satisfy the variance requirements.

Did they also talk to you or have concerns about meeting the requirement of showing scientific research, showing that treatment will go to the ideological basis of gender dysphoria?

MR. STEELY: Object to form.

A. They asked what that section -- yes, yes.

BY MS. NOWLIN-SOHL:

Q. Can you tell me more about those conversations?

A. I provided guidance that if they were going to cite a particular study that used a psychological testing instrument -- so one of them that they used is a symptom checklist. That if the study cites improvement on the symptom checklist from time one to time two in this research study, that they probably showed get a symptom checklist to the person that they're providing services to so they can see which group do they fit in. Do they fit in closer to the pretreatment, or are they fit in closer to the posttreatment? Hopefully, they would fit in closer to the posttreatment.

So the guidance was how to basically use the toolset that they already have, which is their degrees, they're researchers, they're scientists, they're healthcare providers, and just apply it to that individual person sitting in front of them. That was the level of guidance.

Q. Was there anything else on the scientific research that you discussed with them?

A. No.

Q. We were talking earlier about the templates that were prepared for the variances.

Is there anything on that template that allows the Centurion providers to request the social accommodations for patients?
A. Negative.
Q. Why not?
A. It's not part of the gender dysphoria variance process.
Q. What do you mean by that?
A. It's not on the HSB.
Q. The HSB doesn't allow for social accommodations?
MR. STEELY: Object to form.
A. The HSB doesn't speak to social accommodations.
BY MS. NOWLIN-SOHL:
Q. And due to its silence that means they're not permitted?
MR. STEELY: Object to form.
A. The honest answer I have is, I don't have a role to play in that level of decision-making.
Q. And that wasn't quite my question.
My question was: The HSB doesn't speak to social accommodations and, therefore, they are not permitted, correct?
MR. STEELY: Object to form.
A. Under the current version of the HSB it's not

permitted.
BY MS. NOWLIN-SOHL:
Q. Okay. And so if the MDST recommended social accommodations on the variance request, they couldn't be granted?
MR. STEELY: Object to form.
A. That is my understanding.
Q. Have you had any conversations with Centurion providers about the impacts of the loss of social accommodations on their patients?
A. I have not.
Q. Have any providers expressed concerns to you about the loss of social accommodations?
A. To the best of my knowledge, no.
Q. Are you aware of any inmates who have had serious distress, or self-harm, or suicidal ideation as a result of the loss of accommodations?
A. As one element of a causal factor, yes.
Q. Can you tell me more about that?
A. The individual we spoke earlier in the morning that took their own life.
Q. And what is your understanding of how they were impacted by the loss of social accommodations?
A. That was one of the factors that was identified in the psychological autopsy as perhaps contributed to

the motivation to take her own life.

Q. What were the other factors that were identified?

A. Signs of depression. There were -- in the absence of -- in terms of the cross-sex hormonal therapy. There were -- there was interpersonal conflict that the inmate had with another inmate immediately prior. There was intent because the individual had brought items in with them to carry out the suicide.

Q. All right. I'm going to show you a document that's been Bates stamped FDC officials 029253.

Are you able to see that?

A. Yes.

Q. Okay. And so it looks like Dr. Klein forwarded you an email on February 20th. And the forwarded email is a chain between Dr. Martinez and Dr. Lemus at Centurion, correct?

And that's the end of it.

A. Yeah. Scroll up all the way up, please, if you would.

Q. (Complies.)

A. Okay.

Q. Have you seen this email before?

A. I'm on the email chain.

Q. Do you recall seeing this email before?

A. Let me see the email from Dr. White.
Q. (Complies.)
A. Okay, thank you. Yes, I do.
Q. Okay. What's RMC?
A. Reception Medical Center.
Q. Do you know why this email was sent to Dr. Martinez and Kline and Mr. Weiss rather than to you as the point of contact?
A. No.
Q. Is this the kind of question that should go to you as the point of contact?
A. It's the type of question that should go to me as the point of contact.
Q. Do you know why it was directed to Dr. Martinez?
A. I mean, I'm speculating. But Dr. Lemus is the Centurion's chief of -- it's their medical director. You know, Dr. Lemus knows Dr. Martinez far more than he knows me.
Q. Do you know why Dr. Klein forwarded you this document?
A. Point of contact. Keep me in the loop.
Q. So to keep you in the loop but not to provide an answer?
A. Correct.

Scroll back up.
Q. (Complies.)
A. So this is February 20th.
And now let me see Dr. Klein's -- okay.
So that's that pretty contemporary. It oftentimes doesn't necessarily work out that way.
(Anne Wooding enters the Zoom videoconference.)
BY MS. NOWLIN-SOHL:
Q. Okay. So it looks like this patient was received at reception and was on hormone therapy and was seen the next day -- MH is mental health, correct?
A. Mental health, correct.
Q. And it was determined not to meet the criteria for gender dysphoria per the psychology resident.
Do you see that?
A. I do see that, yeah.
Q. Is that consistent with the HSB policies to have an initial evaluation done by a resident, and then the final determination made that the person does not have gender dysphoria based on that?
MR. STEELY: Object to form.
A. No.
BY MS. NOWLIN-SOHL:
Q. How so?
A. The multi-disciplinary service team is

responsible for making the diagnosis; not an individual person. There's testing that goes into it. The HSB wasn't followed in this case.

Q. Okay.

A. Which is where Dr. Martinez's statement is going.

Q. What do you mean by that?

A. Okay. The individual was gained on medication, and we had a psych resident that didn't follow the HSB. Dr. Martinez is going and saying, Continue the person on the medication because that's what the HBS is requiring. You're not going to change somebody until there's been a variance review. And they need to go through the whole gender dysphoria evaluation and have an MDST determination.

Q. Okay. So somebody that comes in on hormones should have the whole MDST determination and evaluation before determination is made on their diagnosis, as well as their hormones?

A. That is correct.

Q. Okay. My read of this email is that Dr. Martinez is saying that this person should be tapered off the hormone.

That is inconsistent with the HSB?

A. Well, I guess that's pointing out, as you read

the first part -- I'm straining my neck to read this.
Q. I can zoom in if it would be helpful.
A. Yeah, lets do that because I'm eyeballing what I'm eyeballing.
Q. (Complies.)
A. Okay, I'm agreeing with what Dr. Martinez is saying. They should be tapered off hormones because we don't have documentation indicating a diagnosis of gender dysphoria. So unless he can produce to us hospital records prior to county jail, he should be tapered off. But if they have produced medical records, they'll be continued.
Q. And so my question is: The tapering off of hormones based on that initial determination by one person is inconsistent with the HSB?
MR. STEELY: Object to form.
A. I'm kind of -- this is one of those cases that was difficult for the team. It was one of the first times that this had popped up. And this isn't the end of the -- this isn't how it ended up. So I'm trying to remember at that point in time what actually happened.
(Sarah Norise enters the Zoom videoconference.)
BY MS. NOWLIN-SOHL:
Q. How much time does it normally take to receive medical records from another institution or the