**Danny Martinez, M.D. 30(b)(6) Deposition, October 14, 2025**

| Start Page: Line | End Page: Line |
|---|---|
| 4:13 | 4:14 |
| 7:9 | 8:4 |
| 10:21 | 12:3 |
| 27:21 | 29:9 |
| 30:5 | 31:7 |
| 34:7 | 34:17 |
| 39:7 | 40:8 |
| 41:18 | 42:15 |
| 45:6 | 45:10 |
| 50:6 | 50:8 |
| 51:11 | 52:1 |
| 52:14 | 53:12 |
| 54:23 | 55:11 |
| 57:15 | 58:2 |
| 60:6 | 60:18 |
| 70:8 | 71:19 |
| 73:20 | 74:5 |
| 74:6 | 76:17 |
| 80:22 | 82:12 |
| 88:17 | 89:19 |

| | |
|---|---|
| 93:18 | 97:1 |
| 101:19 | 102:9 |
| 119:21 | 120:17 |
| 155:8 | 156:24 |
| 160:1 | 160:8 |
| 161:9 | 162:24 |
| 163:13 | 164:10 |
| 164:12 | 164:17 |
| 176:14 | 177:2 |
| 181:2 | 181:12 |
| 204:9 | 204:17 |

**In the Matter Of:**

KEOHANE vs DIXON

4:24-cv-00434-AW-MAF

---

**DANNY MARTINEZ M.D.**

*October 14, 2025*

*Vol. 1*

---

*30b6*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:24-cv-00434-AW-MAF

REIYN KEOHANE, et al.,

Plaintiffs,

vs.

RICKY D. DIXON, et al.,

Defendants.
_______________________________/

DEPOSITION OF
DANNY MARTINEZ, M.D.
VOLUME 1 OF 2

DATE: October 14, 2025
TIME: 11:39 a.m. - 6:24 p.m.
PLACE: Akerman LLP
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301

Examination of the witness taken before:

JEFFREY R. BABCOCK
Stenographer

DEPOSITION

COURT REPORTER: Do you swear or affirm the testimony you give in this case will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

Whereupon,

DANNY MARTINEZ, M.D.

having been duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. ANSCOMBE:

Q. Would you state your name for the record, please?

A. My name is Dr. Danny Martinez.

Q. Good morning, Dr. Martinez. My name is Anthony Anscombe. I'm one of the lawyers for the Plaintiffs in this case. We're here today to take a 30(B)(6) deposition of the Florida Department of Corrections, and you've been designated as a witness to testify on a number of topics. Do you agree that that's what we're doing here today?

A. That is what I was informed.

Q. How many times have you given deposition testimony?

A. Two times prior, I believe.

Q. How often have you had to testify at a court

proceeding?
A. Two times prior, to my knowledge.
Q. One of them was in connection with this case; correct?
A. Yes, sir. Last December.
Q. Any other -- what was the other occasion where you testified in court?
A. Had to do with a death in the prison system that was being investigated by the Florida Department of Law Enforcement.
Q. And --
A. I can't speak any more specifically about the case.
Q. Did it have anything to do with gender dysphoria?
A. No.
Q. The deposition that you gave, one of them -- well, strike that.
On the depositions that you've given, what have those concerned?
A. Well, it wasn't a deposition in December? What was it?
Q. It was a preliminary injunction hearing?
A. A preliminary injunction hearing. So, yes, in that -- again, last December I was called upon to discuss mainly our -- what was then our new policy regarding

transgender and the treatment of gender dysphoric inmates.

Q. Before today, have you ever had to testify in a proceeding such as what we have right now where we're in a conference room with a court reporter?

A. To my knowledge, no.

Q. Given that this is a relatively new experience for you, let me just give you some guidance here on how this goes. I'll be asking questions, you'll be providing the answers, and as we speak our court reporter here is taking down a transcript of everything that we say. He's only got so many fingers, so it's really important for you and me not to talk at the same time. You may anticipate how some of my questions are going to go wind up, and I may anticipate how some of your answers are going to wind up, but we both need to allow each other to finish speaking before we speak. Do you understand?

A. I understand.

Q. Because this is a written proceeding, our court reporter cannot take down a nod of the head or a shrug of the shoulders, and "uh-huh" can mean yes or no, you know, it looks the same when it's written down, so it's important to use full-word answers. Do you understand?

A. I understand.

Q. I'm going to be asking you your recollections about certain things. I don't want you to guess or

speculate. If you have a basis on which to answer or provide an estimate, I'm entitled to that, but please do not guess or speculate. Okay?
A. I understand.
Q. Likewise, if you don't understand one of my questions, let me know and I will try to rephrase it. Okay?
A. Yes.
Q. Dr. Martinez, who is your employer?
A. I'm employed by the State of Florida, specifically the Florida Department of Corrections.
Q. How long have you worked for the Florida Department of Corrections?
A. I began in my current position as the Chief of Medical Services in August of 2020.
Q. Where did you work before that?
A. Before that, I was at a metropolitan hospital in South Florida.
Q. Which hospital was that?
A. Previously known as Westchester General Hospital.
Q. And where is that?
A. That's in Miami, Florida.
Q. What did you do there?
A. I worked as a area of critical need resident in family medicine.

Q. How long were you at Westchester General Hospital?
A. I was there from January of 2018 to December of 2019.
Q. Did you bring a r sum today?
A. I did not, but I was emailed to produced it; I can produce that.
Q. Good. Do you think you can get it here before the end of the day today?
A. It's possible, yes.
Q. If we get it, maybe we could send it to Akerman, they could print it.
Where did you work before Westchester General Hospital?
THE WITNESS: You asked me to make a narrative. Would that be appropriate to talk about now?
MR. STEELY: I'm not sure -- just answer his question. I'm not certain. So go ahead.
BY MR. ANSCOMBE:
Q. Yeah. Maybe you just tell me where you worked previous to that.
A. I worked at Florida International University as a instructor in the health care risk management program. I was an adjunct professor there.

Q. How long were you in that position?
A. Approximately two years.
Q. And when you say you were working in risk management, what do you mean by that?
A. At that time, in order to work as a health care risk manager in the State of Florida, you had to, A, be certified -- there were -- there's University of Florida and Florida International University were two of the schools that offered the certification; and then you had to apply for a license here in Tallahassee which had additional requirements.
Q. Where did you work --
A. For the purposes of completion, that license was sunset. I cannot remember off the top of my head, but it's no longer an administrative license in the State of Florida.
Q. All right. So before Florida International University, where did you work?
A. I worked at a series of colleges, private institutions, in the South Florida area.
Q. Doing what?
A. Working as a professor, working as chairperson of Allied Health School. Later, I was an associate dean, and for two different periods, I was interim dean.
Q. Were these positions -- did these positions have

anything to do with health care?
A. They all had -- Allied Health, so pre-nursing, pre-occupational therapy, pre-physical therapy, pre-medical assisting. So it was entitled Teaching Anatomy, Physiology, Pathophysiology, Pharmacology.
Q. So how long -- so these were all schools that were associated with Allied Health?
A. Yes, sir.
Q. And over what period of time?
A. Going all the way back to 2006.
Q. Were you employed before 2006?
A. Yes.
Q. What were you doing?
A. At that point, I believe I was working for Central Brevard Medical Center.
Q. How long did you work at Brevard Medical Center?
A. Worked on and off there going all the way back to age 16, so just in different capacities.
Q. How old are you, sir?
A. Fifty-four.
Q. Do you have an M.D. degree?
A. Yes, sir.
Q. When did you get your M.D.?
A. October of twenty -- 1998.
Q. Where did you go to medical school?

A. Ibero-American University.
Q. Iberia?
A. Ibero-American University.
Q. And where is that?
A. That's in Santo Domingo, Dominican Republic.
Q. Did you do a residency after getting your M.D.?
A. I did a rotating internship.
Q. Where did you do that?
A. In San Juan, Puerto Rico. Saint Gerard Hospital.
Q. And when were you there?
A. I was there from July of 2014 to June of 2015.
Q. All right. So at any time between the time that you graduated from medical school up until the time that you started to work at the hospital in San Juan, were you licensed to practice medicine in the United States?
A. No.
Q. When did you first become licensed to practice medicine anywhere in the United States?
A. 2014.
Q. Do you have -- are you currently licensed to practice medicine?
A. Yes.
Q. Do you have a master's degree in public health?
A. Yes, I do.
Q. Where did you get that?

A. Florida International University.
Q. When did you get that?
A. August of 2003.
Q. Did you have any area of focus?
A. Epidemiology.
Q. Have you ever engaged in medical research of any variety?
A. Yes.
Q. What have you done?
A. To complete my master's degree, I worked with Dr. Janvier -- that's J-a-n-v-i-e-r, Gassana, G-a-s-s-a-n-a. He was my mentor. We did a research study on the pediatric population of Florida investigating lead poisoning through a federal grant from the NIH.
Q. And did that result in a published paper?
A. It did.
Q. What was the design of that study?
A. Well, it was an investigational study where we did water sampling all over the state. In summary, what we discovered is that 75 percent of all cases of lead poisoning in the state of Florida occurred in Miami-Dade County, and 75 percent of those cases occurred in just four zip codes. So the study was able to provide the evidence for additional grant money to go into those four neighborhoods and replace the water -- the water delivery

system.

Not to get off topic, but those neighborhoods were built after World War II for GIs coming to the area, so they were made with some of the cheapest materials possible. And at that point, those materials were 60, 70 years old, and that was found to be the source of the lead poisoning.

Q. Did that investigational study get published?

A. I believe it was published in -- I should know this. It's one of the CDC publications. I don't know if it was the weekly morbidity and mortality report. I think it was that one, but I can't be sure off the top of my head. But that was 22 years ago.

Q. If it was published, would that be listed on your CV?

A. No. I was not the principal author. Again, my mentor, Dr. Janvier Gassana, was the principal author, and he'd been working on that for some seven years before I was -- before he took me in as my mentor.

Q. Have you been involved in other medical research?

A. Not directly. We've -- you know, at both the hospitals I previously mentioned to you, we were asked to provide survey information and whatever is mandatory reporting to the county or the state or the federal government; but beyond that, no.

consensus.
BY MR. ANSCOMBE:
Q. As part of your MPH or your M.D. degree, did you have any training in biostatistics?
A. Yes.
Q. Where did you get that?
A. Through my MPH. There was a biostatistics course in medical school, but nothing as in-depth as my master's degree.
Q. All right. So we were talking about what you did to get ready for the -- testifying at trial, and you've described the process that you and Dr. Klein went through. Is there anything else that you reviewed to get ready for that testimony?
A. Again, my main goal was to remember, as well as I could, what we looked at, the studies we looked at, and how that affected the wording of the HSB, and again, my own comparison to what other state departments of correction were doing that we weren't doing that could better -- could improve the HSB compared to the old procedure. And I can give examples if you want.
Q. We will certainly get to that. For your testimony last year, was there anybody that you spoke to, other than counsel, to get ready to testify?
A. I would have spoken with Dr. Klein, just in terms

of recollecting which were the studies that -- for example, which of the studies that we found we felt had the most robust data; which ones had the most -- the largest pool of patients; and which ones were done for the longest amount of time. Again, reviewing the definition of gender dysphoria in the DSM-5 text revision -- yeah, that would have pretty much it.

Q. All right. Let's look at deposition topic number 1.

A. Yes.

Q. This says, FDC's organizational structure and personnel responsible for overseeing and implementing evaluations and treatment of inmates for gender dysphoria, both personnel at FDC headquarters and at facilities in which Plaintiffs are housed.

Did I read that correctly?

A. You read that exactly, sir.

Q. Was there anything that you did to be prepared to testify on this?

A. Not that I'm aware of.

Q. What is the Florida Department of Corrections?

A. It is a correctional organization charged with housing inmates that have been adjudicated in court to have committed crimes in the state of Florida.

Q. Is it run by any particular branch of the

government of Florida?
A. The Florida Department of Corrections is a state agency, yes.
Q. And --
A. And the head of the Florida Department of Corrections is Secretary Ricky Dixon who is -- reports directly to the governor.
Q. And has Mr. Dixon been enrolled for as long as you've worked for FDC?
A. No.
Q. Who was enrolled before him?
A. Mr. Mark Inch was the secretary when I started in August of 2020.
Q. The secretary of the Florida Department of Corrections, that's somebody who's appointed by the governor?
A. Yes, sir.
Q. Who are the secretary's direct reports?
A. Top or down?
Q. Who are the people at the next rung down who report directly to the secretary?
A. As it pertains to myself, my direct boss is the Director of the Office of Health Services, and he would report directly to the secretary.
Q. And who is your boss?

A. My boss is the Director of the Office of Health Services of Florida Department of Corrections, Mr. Clayton Weiss. That's W-e-i-s-s.
Q. And so Mr. Weiss reports directly to Mr. Dixon?
A. Yes.
Q. What does Mr. Fitzpatrick do?
A. Mr. Fitzpatrick is the Chief of Staff of the Florida Department of Corrections. He also reports directly to the secretary.
Q. Is there anybody else who reports directly to the secretary?
A. That would be the assistant secretary, which would be Mr. Richard Comerford.
Q. And what his -- what's under his purview?
MR. STEELY: Object to form.
THE WITNESS: He's the assistant secretary.
BY MR. ANSCOMBE:
Q. Does anything to do with health or mental health services go through him?
A. Does anything with with mental health go through him? Not that I'm aware of.
Q. And does Mr. Weiss report to Mr. Fitzpatrick as well?
A. He would -- it's possible, yes. For certain matters, it is possible. Just to give you one obvious

example: During the pandemic, it was nearly daily conversation because of logistics and operation and movement of inmates to make sure that they were housed properly and not exposed to any harm.

Q. What is your job description?

A. I'm the Chief of Medical Services for the Florida Department of Corrections. I oversee the care that is provided to our aforementioned 88,000 inmates. I have employees under me, for example, the infection control nurse. We monitor any -- any infection, but specifically anything -- any infectious disease, so flu outbreak. Obviously, this was a very important role -- important person during the COVID pandemic. But also, unfortunately, we still have cases of tuberculosis in the State of Florida, and it's -- the correctional setting makes it challenging to treat these individuals. So it's just -- it's one of those problems that pops up and we follow that.

I work closely with our -- the Director of Pharmacy Services. We just recently were reviewing our HIV-positive population and their management and reviewing optimizing their health care. I also work with the quality improvement and quality management division. We review any incidents that occur in terms of personnel, making sure that everyone's doing their job, making sure,

also working with the infectious disease nurse, that infections are held properly; so, for example, in our elderly population, they don't have bed sores. If they have bed sores, it means that they're not being moved every two hours, so those nurses need to be reeducated. And we monitor wound care at all of our facilities that harbor our elderly inmate population.

I also deal with grievances, which the -- for full disclosure, the gender dysphoric population are very inclined to submitting grievances. They all have to be dealt with. They all have to be addressed. They cannot be ignored. That's a mandate that we have from the inspector general, so we -- I'm one of many; thankfully, there's a group of us that look at them -- but they ultimately will find their way to my desk.

I also deal with the compassionate release program, so there are those inmates who are deemed to be terminally ill and incapacitated. And there is an organization called FCOR, where the family, or internally, a CMR, Compassionate Medical Release application, can be written. We have to look at it and approve it to see if I believe that this person truly is terminally ill, and this person is not a threat to society.

But we do not have the final say. That recommendation goes to FCOR. FCOR has two attorneys, one arguing for,

one arguing against, and ultimately, it's an administrative judge that decides whether or not the inmate will be released or not.

Q. To whom does Dr. Klein report?

A. Dr. Klein also reports directly to Mr. Weiss, the Director of Health Services for the Florida Department of Corrections.

Q. I guess in terms of, you know, level or grade within the organization, are you and Dr. Klein roughly equivalent?

A. Again, I'm the Chief of Medical Services. She is the Chief of Mental Health Services.

Q. Is there -- I don't know, is there one of those that's, you know, more authoritative than the other, or are they just different?

MR. STEELY: Object to form.

THE WITNESS: One's physical health care. One's mental health care.

BY MR. ANSCOMBE:

Q. So she doesn't report to you?

A. No, she does not. But again, we work closely, specifically on this topic, when it comes to gender dysphoria. Again, I'm getting ahead of myself, but she is one of the three members of the Gender Dysphoria Variance Team.

Q. And the GDVT -- so the GDVT includes you, it includes Dr. Klein, and it includes --

A. Dr. Santiago, who is the chief clinical advisor for the Florida Department of Corrections.

Q. Anybody else?

A. No.

Q. So it doesn't include anybody from security; correct?

A. It does not; however, we notify security if they're receiving a new -- you know, a new intake that has a preliminary diagnosis of gender dysphoria. They're made aware for their own situational awareness.

Q. We're going to be talking a lot today about procedure 403.012 and HSB 15.05.23. Is there a difference in terms of administrative procedure or a legal difference of any variety between a procedure and an HSB?

MR. STEELY: Object to form.

THE WITNESS: Specifically --

BY MR. ANSCOMBE:

Q. Well, FDC had Procedure 403.012, and that was replaced by something called an HSB.

A. A Health Services Bulletin.

Q. Yeah. Right. So is there a difference between a procedure and a Health Services Bulletin?

A. Health Services Bulletin has more to do with

health care and/or mental health care. Procedures are just that: They're more geared toward, "in this situation, what would you do?" So you know, most of our procedures are operational-based, they're security-based, if -- you know, "In this situation, this is what you should do."

Q. Who has ultimate -- within FDC, who has ultimate authority over determining health care treatment policy?

A. So when it comes to all of our HSBs, Health Service Bulletins, and all of our procedures, they're reviewed annually by all of the chiefs in the Office of Health Services, and whether there are or they're not changes. It ultimately goes to the director, and the director signs off on every procedure and every HSB.

Q. And that's Mr. Weiss?

A. That is Clayton Weiss, the Director of Health Services.

Q. And who has ultimate authority on determining mental health policies?

A. Again, the most important person reviewing those policies would be the Chief of Mental Health Services, Dr. Klein, but those HSBs are included in the annual review. So, again, all of the chiefs will review it. She would -- obviously, as the Chief of Mental Health, she would have the biggest say. Everybody would need to

review it. Then it would land on the director's desk, and ultimately, he signs all of them.

Q. Can you think of an instance where he didn't sign a medical health service policy that --

A. By rule, he must approve all of them, and ultimately, his signature must be on all of them; so no.

MR. STEELY: Let him finish his question before you jump in.

THE WITNESS: I'm sorry.

BY MR. ANSCOMBE:

Q. Can you think of any occasion when he refused to sign?

A. I'm not aware.

Q. All right. So do you have any training in psychiatry or psychology?

A. Other than the rotations that I did at Westchester General Hospital, where we did have a robust wing and we did a lot of what is called Baker Acts. We had that capacity at that facility. So to that extent, I've dealt with what would typically come into an emergency room environment in a large metropolitan hospital.

Q. What is Baker Act?

A. Baker Act, there's many different names for it in different states -- in California, it's state law 5150 --

States, there's no formal training program. Again, the WPATH espouses to be the authority on this subject matter, and so they offer these courses as a means of educating those providers who are willing to provide care to this patient population.

To be clear, to be clear, I'm not an endocrinologist. I'm not a psychiatrist. I have never personally treated any patient with gender dysphoria. My only contact with that population was while I was in Puerto Rico. I worked at a institute called CEMI, which is C-E-M-I, Centro de Estudios Materno-Infantile, which means the Center for Maternal and Infant care. This was a department from the University of Puerto Rico School of Medicine that treated HIV-positive women, and particularly women who were pregnant and/or had recently given birth. It was one of two locations in the capital that they provided free health care service to the HIV population.

What does that have to do with this? Some of them were transgender. I had nothing to do with their transgender care. I just knew that that was one of their diagnoses, and we only treated their HIV.

Q. All right. Just in terms of your own experience as a clinician, is the work that you did in Puerto Rico and the work that you did at Westchester, are those the two periods where you actually saw patients?

A. Yes.
Q. Have you ever been engaged in private medical practice otherwise?
A. No.
Q. You don't see patients now?
A. I do not.
Q. At a facility level -- or strike that.
How many FDC facilities has gender dysphoric inmates?
A. I want to say seven but I would have -- I can get that answer for you. I believe seven.
Q. Who is in charge of the provision of medical services at each of those locations?
A. It would be the site -- what is termed a site medical director. So an SMD.
Q. And is that an employee of FDC?
A. No.
Q. Is that an employee of Centurion?
A. Yes. And then just to be clear, the state is divided into four regions, and each of those -- so every site's -- each one of those sites is going to have a site medical director; above them is the regional medical director. We have four regions. There's two regional medical directors for each one of the four regions.
Q. And those are also Centurion people?
A. Yes.

Q. Is there a difference in the structure with respect to mental health? Is there -- for example, who is in charge of the delivery of mental health services at those seven institutions?
A. Similarly, it would be a -- the site psychiatric director.
Q. And that would be somebody at Centurion?
A. That would be an employee of Centurion, yes.
Q. And --
A. It would not -- just so we're clear -- I apologize for interrupting -- these are two separate people.
Q. Right.
A. In all cases, it's two separate people. It's not the same person.
Q. Okay. All right. So it's two separate people. And is it the same two people in each of the four -- in other words, each of the quadrants within the state, is it the same two people? I mean, is it two people --
A. Okay, so --
Q. Yeah.
A. -- what I said earlier, the state is divided into four regions.
Q. Right.
A. Each region has two regional medical directors

that are over the Site Medical Director.
Q. All right.
A. It's the same hierarchy with mental health, but these are mental health people, these are medical people.
Q. Okay. All right. And so just doing the math, does that mean that there are eight Centurion regional medical directors within Florida?
A. Yes.
Q. And eight regional mental health directors within Florida?
A. That number, I don't know. I could find that out for you, but I don't know the exact number that they have in the entire state of Florida, no.
Q. But each prison has its own site mental health director?
A. Yes. And they would report to the regional mental health director.
Q. Do the wardens of the facilities have any role in or responsibility for the delivery of health care?
A. No.
Q. And I guess over the time that you have --
A. So, in the delivery of health care, the answer is no; however, there are situations where the warden would have to be informed. So if there's a person who tried to kill themselves; another example would be we have certain

inmates that repeatedly are involved in self-injury -- what's called self-injury behavior --
Q. Right.
A. -- okay, so the -- again, we've got a procedure for that.
Again, if -- and again, the difference between HSB and a procedure, that would be a good example. You know, "if this situation, do this." So the warden needs to be notified if the person is engaging, right, making sure that the site medical director, or whoever's there, is able to examine the individual and determine whether or not this injury is severe enough for them to go to outside hospital, for example.
But in the actual delivery of the health care, right, the warden is just notified of the situation.
Q. As we've talked here over the last, you know, number of minutes about the administration of health care services within FDC and the reporting change -- chain, has that structure changed over the time that you've been with FDC?
A. Well, the change was from the old procedure where we had the Gender Dysphoria Review Team versus the Gender Dysphoria Variance Team. So the members of the previous Gender Dysphoria Review Team did not include the chief clinical advisor. It did include myself, Chief of Medical

Services; it did include the Chief of Mental Health Services; and it did include an individual from security, mostly, Mr. Harrell who you spoke with earlier. And operations would have been present, Mr. Rusty McFarlane, and the PREA coordinator, I --

Q. I can find the name but --

A. So those are your --

Q. -- PREA coordinator would have been part of that team?

A. They would have been present. So again, in terms of whether or not the individual received the permanent diagnosis of gender dysphoria was spoken about amongst the clinicians, okay, but security was there to know exactly who those individuals are and where they can be housed safely. And the PREA coordinator was there to determine if they -- they use criteria to determine whether this person is likely to be a victim of that type of abuse inside the correctional setting. And that also can have an effect on where exactly this person will be housed, if given the permanent diagnosis.

Those individuals that I mentioned -- PREA coordinator and security and operations -- are not members of the now Gender Dysphoria Variance Team.

MR. ANSCOMBE: All right. Let's take a break. We'll go off the record and maybe we can get a

time assessment.

(Brief Recess.)

MR. ANSCOMBE: All right. We'll make a note of the time and start back up. It's exactly 12:30.

Dr. Martinez, we are continuing with your deposition.

BY MR. ANSCOMBE:

Q. What is gender dysphoria?

A. So gender dysphoria is a condition where an individual feels as they are not the sex that they were born with. So a born male who feels that they are in fact female, and vice-versa.

The DSM-5 text revised latest edition puts a time component that these feelings have to have occurred for at least six months, and they have to have resulted in a considerable degree of anxiety. There are other criteria, but it's a reformulation of what I've just said about three or four times.

Q. Is the basic idea that gender dysphoria occurs when a person feels a difference between their gender identity and the gender or the sex to which they were assigned at birth?

MR. STEELY: Object to form. Go ahead.

THE WITNESS: So they've moved away from the term "identity," okay? So prior to gender dysphoria,

it was gender identity disorder; and prior to that -- I'm talking 1970s and 1980s -- it was transsexualism. So the term has evolved, but the condition that the term is describing essentially has not changed.

BY MR. ANSCOMBE:

Q. Again, would it be fair to say that gender dysphoria is the mental distress and other mental symptoms that arise from an incongruity between the sex at birth and the gender with which a person identifies?

A. I would agree with that statement.

Q. What causes gender dysphoria?

A. To date, there's no known cause.

Q. Does autism spectrum disorder cause gender dysphoria?

A. So that we are aware, the following is true: in the community -- not in the correctional setting, out in the community -- most research has shown that almost exactly half of individuals with gender dysphoria, almost exactly half, have some form of autism, or at the very least, are on what's called the autism spectrum, okay, a group of conditions that have very similar signs and symptoms, but those have different causes.

So there seems to be a high prevalence in the community of people with both conditions, but that is not to say that autism causes the gender dysphoria.

Q. Do you agree with the statement that gender dysphoria is associated with autism spectrum disorder?

MR. STEELY: Object to form.

THE WITNESS: I would not agree.

BY MR. ANSCOMBE:

Q. Does fetal hormone imbalance cause gender dysphoria?

A. Fetal hormone imbalance can cause what is referred to as an intersex disorder, it can cause a developmental sexual disorder, DSD, but it does not cause gender dysphoria.

So, for example, we've heard the term "hermaphrodite." Now, the actual medical definition of a hermaphrodite is that the individual is born with both male and female genitalia. This condition, in reality, is extremely rare. When people refer to an individual as a hermaphrodite, normally it's a pseudo-hermaphrodite, okay? So this would be a person, for example, that, phenotypically, her physical appearance is female, but when we do an ultrasound of the ovaries, the ovaries are actually testicles, and she might be born with a pronounced clitoris that looks like the head of a penis.

That could be the direct result of a mother who, for example, might have been a weight lifter and she might have been taking steroids to build muscle, didn't know she

many more inmates with those three combination of diagnoses than we have gender dysphoric patients.
BY MR. ANSCOMBE:
Q. Well, those three conditions are expected attributes of gender dysphoria; correct?
MR. STEELY: Object to form.
BY MR. ANSCOMBE:
Q. Well, certainly depression and anxiety?
A. So, again, if you're talking causation, no. No. Again, if you look at case studies of this patient population, many of them suffer from depression, I would say almost all of them suffer from anxiety, and many of them also suffer from post-traumatic stress disorder, PTSD.
Q. Do social or media influences cause gender dysphoria?
A. So this does not relate to the correctional setting, but in the community setting, we have had what is called -- a phenomenon occur called rapid onset gender dysphoria, okay? And that is young people communicating to each other over social media that, collectively, all of the sudden, decide they're gender dysphoric and they need to be treated immediately.
Q. But that doesn't occur in the prison community; correct?

A. They don't have access to that type of communication.

Q. Do you agree that the etiologic basis of gender dysphoria is unknown?

A. Yes.

Q. Do you agree that gender dysphoria is a serious medical condition?

A. Yes.

Q. Is gender dysphoria a serious mental health condition?

A. I don't see how you could divorce the mental health aspect of gender dysphoria. Now, there are those who belong to the WPATH community that vociferously argue otherwise. From everything that I have read, I do not know -- if an individual's born with normal physiology and they're male, but they feel that they identify as female, then in my opinion -- and this is my own opinion, not FDC's opinion, my own opinion -- I do not see how you could remove this condition from the psychiatric realm.

Q. Well, the condition that I referred to is gender dysphoria, and I guess what I'm trying to find out is whether -- you've agreed that it's a serious medical condition and, you know, some might suggest that it was a mental health condition. And do you agree that it's also a mental health condition?

A. I believe it is a mental health condition.
Q. And do you believe it is a mental health condition that can have serious impacts on patients who have it?
A. Yes.
Q. Now, you've overseen -- or actually, I won't say "overseen," but hormone therapy has been delivered to inmates at -- within the Florida Department of Corrections for the whole time that you've been with FDC; correct?
A. Yes.
Q. What does -- what is the reason why gender dysphoric patients want hormone therapy?
MR. STEELY: Object to form.
THE WITNESS: If it's a male, who we would then refer to as a transgender female, mainly, it would be to acquire attributes of a more feminine figure.
BY MR. ANSCOMBE:
Q. And what about a female who wants to receive male hormones, why would a female want to receive male hormones?
MR. STEELY: Object to form.
THE WITNESS: Which we refer to as a transgender male, same -- the same exact reason: They would want to assume the body morphology of a more --

similar to a male.

MR. ANSCOMBE: Okay.

THE WITNESS: By "body morphology," I mean physical anatomic structure.

BY MR. ANSCOMBE:

Q. And is it your belief that the reason why a transgender man or a transgender woman would want to receive hormone therapy is to reduce the disparity between their gender identity and the gender or the sex that they were assigned at birth?

MR. STEELY: Object to form.

THE WITNESS: I'm not sure I understood that.

BY MR. ANSCOMBE:

Q. All right. A male patient -- or let's say a person born female who is gender dysphoric wants to look and feel like a man; correct?

MR. STEELY: Object to form.

THE WITNESS: Yes.

BY MR. ANSCOMBE:

Q. Right. And hormone therapy is one of the ways that they can accomplish that; correct?

A. So they are never going to become male.

Q. I understand that, and I think they understand that. My question is, is the reason that a female-born gender dysphoric patient would want male hormones is so

that they can look and feel more like a man?

MR. STEELY: Object to form.

THE WITNESS: Yes.

BY MR. ANSCOMBE:

Q. And, conversely, is the reason that a male-born gender dysphoric patient wants female hormones is to look and feel more like a woman?

MR. STEELY: Object to form.

THE WITNESS: I don't know if you added "feel" to your previous statement. I would agree with "look," but again, the born male is never going to be female; the born female is never going to be male.

BY MR. ANSCOMBE:

Q. The purpose of hormone therapy is to help those patients reduce the disparity between their gender identity and the one to which they aspire?

MR. STEELY: Object to form.

BY MR. ANSCOMBE:

Q. Let me start that one again. Isn't the purpose of hormone therapy to reduce the disparity between how a gender dysphoric looks and feels, as compared between their -- I'm going to get this question right if it kills me. I'm going to start this one again. All right.

Isn't the purpose of gender -- of hormone therapy to allow a transgender patient to feel more like the gender

with which they identify?
A. You mentioned the word "feel" again. I can't speak to that, although on a case-by-case basis, if you ask these patients and -- our patients in the correctional setting, if you ask them if they feel better, they will -- some of them subjectively say that. How do you prove that?
Now, understand, giving a male female hormones or giving a female male hormones is off-label use for those medications. Those medication were never intended for that purpose. They're being used for off-label use.
Q. That wasn't my question, sir.
A. If you're giving these medications for them to look more similar to the opposite sex, to a certain degree, you can achieve that with cross-sex hormones.
Q. Right. So they can --
A. But as far as feeling, you could only ask them and they could only give you a subjective response to that. And there's certainly been many examples where they didn't feel anything, and they say it. "I don't feel any different. I still feel depressed. I still feel anxious. I still have my PTSD."
Q. All right. So I'm asking about why they want to do it, right, why they want the hormone therapy. And you'll agree that at least one reason that they want

hormone therapy is so that they can look like the gender with which they identify?
MR. STEELY: Object to form.
THE WITNESS: Yes, I can agree with that statement.
BY MR. ANSCOMBE:
Q. And at least some of them who have undergone that will say that they feel more like the gender with which they identify; correct?
MR. STEELY: Object to form.
THE WITNESS: Some have, yes.
BY MR. ANSCOMBE:
Q. And so isn't the perceived mechanism of action here that the use of hormone therapy reduces the disparity between their gender identity and the one in the opposite sex?
MR. STEELY: Object to form.
THE WITNESS: Again, at least as far as our incarcerated population is concerned, that's a determination on a case-by-case basis.
BY MR. ANSCOMBE:
Q. Well, you know, you say it's a determination on a case-by-case basis, and maybe there are inmates who will say that, but isn't the general idea that the delivery of hormone therapy allows gender dysphoric inmates to live

and perceive themselves in a manner consistent with their gender identity?

MR. STEELY: Object to form.

THE WITNESS: So there have been studies that show up to a 45 percent, for lack of better term, buyer's remorse. Okay, up to 45 percent of persons who thought they had gender dysphoria get the diagnosis, receive the hormones, don't feel anything, might see some changes morphologically in their body, right -- they might lose their facial hair, might lose their chest hair -- but don't feel any different, so they de-transition. Rates of up to 45 percent have been reported in the last -- in the literature for the last two years, but going all the way back to WPATH's previous standard of care, Standard of Care 7, they cite numbers that high.

BY MR. ANSCOMBE:

Q. That's not the question that I asked. The question that I asked is whether the idea with hormone therapy is that it allows gender dysphoric people to live in a manner consistent with their gender identity; to present as members of the gender with which they identify?

MR. STEELY: Object to form.

THE WITNESS: So, again, the original purpose

of these medications was not for treating gender dysphoria. This is off-label use.
BY MR. ANSCOMBE:
Q. Well, the medications may not have been intended to treat gender dysphoria, but doctors prescribe things all the time off-label; correct?
MR. STEELY: Object to form.
THE WITNESS: From time to time, in certain situations. For example, therapeutic failure: If the patient has a certain condition and they keep on failing the first line of treatment, the second line of treatment, the third line of treatment, yes, you might attempt something that's off-label use.
BY MR. ANSCOMBE:
Q. All right. So I don't want to get into a lot of stuff about off-label use. What I want to find out is I want you to agree that the reason that trans -- or that gender dysphoric inmates, or people in the general population, want hormone therapy is so that they can look like the gender with which they identify?
MR. STEELY: Object to form. And you've asked this a lot of times, and you're trying to make him agree with you is what you said.
THE WITNESS: I answered that before.
BY MR. ANSCOMBE:

Q. Okay. And it was a yes?
A. And it was a yes.
Q. Fine. I don't need to ask it again. All right.
So now, let's talk about social transitioning accommodations. Why would a gender dysphoric person want social transitioning accommodations?
A. Define "social transitioning," please.
Q. Have you ever heard the phrase "social transitioning"?
A. Yes.
Q. Did you hear about it in your WPATH program?
A. I did.
Q. What's the definition that you heard there?
A. I don't know. And I don't mean to interrupt you, but as part of our literature review, what became immediately clear was that there is no agreed-upon definition for, quote, "transitioning." Transitioning appears to mean whatever the researchers wanted it to mean.
Q. All right. So --
A. And that's not me talking. That -- you know, you can do your independent research and I would be surprised if you would come to a different conclusion.
Q. Within the prison context at FDC, for a number of years, the program did permit social transitioning

accommodations; correct?
A. The program, through Procedure 403.012, provided what was called the alternative canteen. And inmates with gender dysphoria had access to certain items; for example, female hair brushes.
Q. They could also get things like -- if they were transgender women, they could get bras and panties; correct?
A. Yes.
Q. If they were transgender men, they could get boxers; correct?
A. Yes.
Q. Each population had the opportunity to obtain personal care items such as deodorants and shampoos that were consistent with their gender identity; correct?
A. They had access to the alternative canteen, which contained the items that you mentioned.
Q. And that's something that a lot of inmates requested; correct?
MR. STEELY: Object to form.
THE WITNESS: Some did, yes.
BY MR. ANSCOMBE:
Q. Well, you've got 80,000 people in the Florida Department of Corrections and you have a much smaller population of gender dysphoric inmates; true?

A. We have approximately 88,000 inmates in our custody, and again, we have exactly, as of October the 10th, 2025, 273 patients with a temporary -- that is to say a provisional -- or permanent diagnosis of gender dysphoria.

Q. Now, in the general population, is there a -- have you heard recommendations that part of a treatment program for gender dysphoria is to encourage patients to dress and present, on a personal level, as a member of the gender with which they identify?

A. I'm sorry, can you state that again?

MR. ANSCOMBE: Could you read the question back, please?

THE WITNESS: Sorry. I apologize.

(The preceding question was read back by the reporter.)

THE WITNESS: In the general population, that is to say not the correctional population, yes.

BY MR. ANSCOMBE:

Q. And do you have any understanding of the rationale for that?

A. Again, in the literature, the word "transition" or "transitioning" has a fluid definition. It seems to be what the researchers -- whatever it is that they think that means, but there's not one consistent definition of

"transitioning."
Q. Do you have any understanding of why a mental health counselor, for example, would tell a gender dysphoric patient that they should dress and present as a member of the gender with which they identify?
MR. STEELY: Object to form.
THE WITNESS: So that wasn't a recommendation. Under the old procedure, the -- if we're speaking -- you're asking me specifically about the Florida Department of Corrections?
MR. ANSCOMBE: No. No. No, I'm asking about general population now.
THE WITNESS: You're asking me why a mental health professional would recommend --
MR. ANSCOMBE: That a gender dysphoric patient dress and present as a member of the gender with which think identify.
MR. STEELY: I'm going to object here. I'm not certain where this is on the topics he was supposed to be prepared to talk about. There's nothing about the general population, there's nothing about gender dysphoria outside of prison. But if he can answer on what he knows, that's different, but that's not --
MR. ANSCOMBE: That's fine. We're going to

management of transgender inmates.
Did I read that correctly?
A. You have read that correctly.
Q. Right below that, there is a definition of "gender dysphoria." And this section says, Refers to discomfort or distress caused by a marked difference between an individual's expressed/experienced gender and the gender that others would assign to him or her. A DSM-5 diagnosis of gender dysphoria requires the condition be present for at least six-month duration and causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
Did I read that correctly?
A. You have read that correctly.
Q. And is that consistent with the definition of "gender dysphoria" that you gave me earlier?
A. For the most part.
Q. All right. I'd like you to go here to page 5.
A. Yes.
Q. All right. In the middle of the page, there's a Section 4, and that is entitled, General Treatment Principles. Did I read that correctly?
A. Yes.
Q. All right. So right below that in Subsection (a,) it states, Inmates diagnosed with gender dysphoria

shall have access to, 1, appropriate mental health treatment that includes, but may not be limited to, ambivalence and/or dysphoria regarding their gender identity and assists in better adjustment to incarceration.

Did I read that correctly?

A. Yes.

Q. Number 2, Evaluation for treatment hormone -- or I'm sorry, 2, evaluation for hormone therapy treatment; and 3, other treatment and accommodations, although limited to those determined to be medically necessary by the Gender Dysphoria Review Team.

Did I read that correctly?

A. Yes.

Q. All right. And so isn't this telling you that accommodations can be determined to be medically necessary by the Gender Dysphoria Review Team?

A. With the knowledge that was available to the then-Gender Dysphoria Review Team -- and again, this would be back in 2017 -- yes.

Q. If you look at Section (b) below that, there's also a statement, However, treatment and accommodations may be provided within correctional facilities to lessen gender dysphoria.

Did I read that correctly?

A. Yes.
Q. And doesn't that tell you that accommodations were part of treatment to lessen gender dysphoria?
MR. STEELY: Object to form.
THE WITNESS: Since 2017, referring to item 4(a)3, and 4(b), it has not been proven to be medically necessary to have said accommodations.
BY MR. ANSCOMBE:
Q. Move to strike the answer as non-responsive.
Dr. Martinez, I'm asking you doesn't that tell you that in 2017, that accommodations were regarded by Florida Department of Corrections as medically necessary as determined by the Gender Dysphoria Review Team?
A. I believe I couched my answer, within the context of 2017, I earlier replied in the affirmative.
Q. And so the answer would be affirmative here again?
A. In 2017, that was the thinking of the Gender Dysphoria Review Team, yes.
Q. All right. Thank you. You can put that one to the side. All right. Handing you what's been marked as Exhibit 3. Dr. Martinez, do you recognize this document?
(Exhibit Number 3 was marked for identification.)
THE WITNESS: I do.

BY MR. ANSCOMBE:
Q. What is it?
A. It is Procedure Number 403.012 issued July 13th, 2017, with effective date November 13th, 2019.
Q. Do you recognize this as the 2019 revision of the 2017 policy?
A. I will take your word for it. I was not -- again, I began with the Department in August of 2020.
Q. Is this the version of 403.012 that was in effect when you started?
A. Yes.
Q. All right. I'd like to direct your attention to several portions of this. Do you have an understanding as to who it was that authored this policy?
A. My understanding is that the major contributors to this policy were both the former Chief of Medical -- Mental Health Services, Dr. Dean Aufderheide, and the former Assistant Chief of Mental Health Services, Dr. Tammy Lander.
Q. And do you know whether there was input from anybody else?
A. Again, I -- I cannot.
Q. All right. So at the top of page 2, do you see the section entitled Purpose?
A. Yes.

Q. And there it says, To provide guidelines for a medical appraisal, mental health screening, evaluation, and treatment of inmates regarding -- or meeting criteria for a diagnosis of gender dysphoria.
Did I read that correctly?
A. Yes.
Q. And there's a definition of "gender dysphoria" which says, Where used herein, previously known as gender identity disorder, refers to discomfort or distress experienced by an individual because of a perceived discrepancy between the individual gender identity and the inmate's gender assigned at birth.
Did I read that correctly?
A. Yes.
Q. And is that consistent with the definition of "gender dysphoria" that you gave me at the beginning of our questioning after lunch?
A. So you can see that it's not identical. It is similar. It does not include a time component.
Q. If you see Section (4) there, gender -- there's a definition of "gender-affirming hormonal therapy." And that says -- that defines it as, Where used herein, this refers to prescribed medication to facilitate biological changes during transitioning.
Did I read that correctly?

A. Yes.
Q. What's your understanding of the term "gender-affirming"?
A. In this context, it's meant to give the patient a more physical appearance to the gender that they prefer.
Q. If you look down, there's a definition of the Multidisciplinary Services Team. Do you see that?
A. Yes.
Q. I'll read this for you. Multidisciplinary Services Team, MDST, where used herein, refers to staff representing different professions and disciplines which has the responsibility for ensuring access to necessary assessment, treatment, continuity of care, and services to inmates in accordance with their identified medical [sic] health needs, and which collaboratively develops, implements, reviews and revises an individualized services plan as needed.
Did I read that correctly?
A. Yes.
Q. And isn't it true that the role of the Multidisciplinary Services Team was to determine what was necessary for patients presenting with gender dysphoria?
A. The purpose was to -- you said the purpose of the MDST was to?
Q. Was to determine what kind of treatment and what

therapy and what -- whatever course would be necessary for the treatment of gender dysphoria.
A. Yes. But it would also include medical appraisal, preliminarily, to determine whether or not the individual had the diagnosis of gender dysphoria or not.
Q. Section 10 on page 3, there's a definition of "transition." Transitioning, where used herein, refers to the process during which transgender inmates may change their physical, social, and legal characteristics to the gender with which they identify. Transition may also be regarded as an ongoing process of physical change and psychological adaptation.
Did I read that correctly?
A. Yes.
Q. And so I think the next thing I wanted to look at is Section 3 on page 4. And do you see here that section 3 is entitled Treatment For Gender Dysphoria?
A. Yes.
Q. All right. And I'd like you to look at Section (d) of this, which is on page 5.
A. Yes.
Q. All right. And Section (d) says, Treatment interventions will focus on the ambivalence and/or dysphoria regarding gender identity, social transitioning, assisting with adjustment to incarceration, and community

reentry. Gender-affirming medication will be prescribed as clinically indicated.
Did I read that correctly?
A. Yes.
Q. All right. Doesn't that tell you that a key part of treatment for gender dysphoria was reducing the ambivalence and/or dysphoria regarding gender identity?
MR. STEELY: Object to form.
THE WITNESS: It is included there.
BY MR. ANSCOMBE:
Q. And doesn't this also tell you that social transitioning was a key part of the treatment for gender dysphoria?
MR. STEELY: Object to form.
THE WITNESS: When this version of Procedure 403.012 was written in 2019, that is what some of the literature suggested.
BY MR. ANSCOMBE:
Q. That wasn't exactly my question, Dr. Martinez. My question was doesn't this tell you that social transitioning and assistance with social transitioning was a key part of treatment for gender dysphoria under this program?
MR. STEELY: Object to form.
THE WITNESS: No. It says that that is what

the literature at the time was recommending as a form of intervention for this patient population.

BY MR. ANSCOMBE:

Q. Where does it say that?

A. Where does it say?

Q. Yeah. Well, you know, you said that that's what this says, so I'm asking where does it say that?

A. Okay, well, on the first page, it has July -- I'm sorry, November 13, 2019. This is a procedure, and just like our HSBs, they are reviewed annually. And if there's new information particularly for this diagnosis, or newer information, the procedure is adjusted to reflect that.

Q. All right. If you look at Section 4, you see Gender-Affirming Hormone Therapy?

A. Yes.

Q. It says, All gender-affirming hormonal therapy will be provided on a single-dose basis.

Did I read that correctly?

A. Yes.

Q. What does that mean?

A. What it means -- I'm not sure why you're asking what it means, but this would be -- again, it's a procedure. So in order to make the care of this population as simple as possible, they would get a single dose a day.

the chronic clinic; in this case, it would be the miscellaneous chronic clinic. And if they were in any chronic clinic -- so if you have hypertension, they put you in cardiology chronic clinic -- you would be seen at least once every six months as a result of being in that chronic clinic. That is what those 180 days are referring to as part of the procedure.

Q. And is one of the reasons for that so that hormone levels could be checked to see if they were in the normal range for a transgendered individual?

A. Generally, yes.

Q. All right. Section 5 describes Accommodations For Inmates With a Diagnosis of Gender Dysphoria. Do you see that on page 6?

A. Yes.

Q. And this policy states, in Subsection (a,) To assist in transitioning, facilities designated by the Department will, number 1, provide alternate canteen and quarterly order menus in addition to the menus available to other inmates at the facility.

All right. Does that tell you that these alternate canteen items were available to gender dysphoric patients who might want to obtain them?

A. That is what it says, yes.

Q. All right. Section (2) says, Allow inmates to

wear makeup inside the housing unit. Makeup will be removed prior to departing the housing unit.
Did I read that correctly?
A. Yes.
Q. All right. And so isn't it true that inmates wanting to wear makeup were able to do so between 2019 up until September 30th of 2024?
A. That is what the policy state -- the procedure states, yes.
Q. And so is it true that your earlier testimony that makeup was not allowed was incorrect?
A. In the female population was correct. At our female facilities, they are not allowed to wear makeup. That's what I was referring to.
Q. All right. Got it. At male facilities --
A. This would be the only exception, if that's what you're getting at, yes.
Q. Do you know of transgender males who ever asked to wear make-up?
MR. STEELY: Object to form.
BY MR. ANSCOMBE:
Q. To your knowledge, in your time at FDC, has a transgender male ever asked to wear makeup?
A. So, that's not how -- so the answer to your question is no, okay; that doesn't mean it didn't occur.

Q. Okay.
A. I just --
Q. You don't know?
A. The subject was never broached to me personally, that's number one. Number two, that's not how they would get makeup, okay. They would be -- as part of the Gender Dysphoria Review Team, right, they would receive the report from the MDST, and the MDST would make the determination of whether or not they would be a candidate for hormones, and the MDST would make a recommendation as to whether or not they should be allowed to grow their hair, and the MDST would make the recommendation as to whether they should have access to alternative canteen. The alternative canteen would contain said items.
So that is how that would occur. Then that report would have come to the Gender Dysphoria Review Team, and they would, on the weight of the evidence, decide whether to accept the recommendations from the MDST.
Q. All right. Section (a)4 -- or I'm sorry, Section (a)3 allows inmates to grow and style their hair in accordance with female hair standards; is that correct?
A. Yes, you read that correctly.
Q. And that was an accommodation that was allowed between 2019 and September 30th of last year?
A. November 13 of 2019 until September 30 of 2024;

that is correct.

Q. And also within that time, another accommodation that was allowed was to issue opposite gender inmate uniform and undergarments. Inmates will be issued approved style [sic,] but may purchase other types of undergarments independently from either the alternate canteen or quarterly menu. These items can be worn outside of the housing unit.

So that -- you agree that those were accommodations that were permitted during that period of time?

A. That is what Section 5(a) number 4 states in Procedure 403.012 issued in November of 2019.

Q. Another accommodation is found at Section (c.) Inmates may use preferred titles of Ms., Miss., Mrs., or Mr. in correspondence; however, the name at the time of commitment and DC number must be used.

Did I read that correctly?

A. Yes.

Q. So the ability to use the preferred titles, that was an accommodation that was provided?

MR. STEELY: Object to form.

THE WITNESS: I'm not sure why they include it as accommodation, but it is in the accommodation section of Procedure 403.012 issued in November of 2019.

BY MR. ANSCOMBE:
Q. Section (d) also says that, Facilities shall encourage staff to use gender-neutral forms of address for gender dysphoria inmates who request it.
Did I read that correctly?
A. Yes.
Q. And was that an accommodation that was permitted?
A. It is included in Section 5 of the procedure, yes.
Q. You can put that to the side.
MR. STEELY: Can we go off the record real quick?
(Discussion off the record. Brief recess. Proceedings continued in Volume 2.)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:24-cv-00434-AW-MAF

REIYN KEOHANE, et al.,

Plaintiffs,

vs.

RICKY D.DIXON, et al.,

Defendants.
_____________________________/

DEPOSITION OF
DANNY MARTINEZ, M.D.
VOLUME 2 OF 2

DATE: October 14, 2025
TIME: 11:39 a.m. - 6:24 p.m.
PLACE: Akerman LLP
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301

Examination of the witness taken before:

JEFFREY R. BABCOCK
Stenographer

DEPOSITION CONTINUED FROM VOLUME 1

EXAMINATION CONTINUED

BY MR. ANSCOMBE:

Q. All right. Dr. Martinez, I've handed you what has been marked as Exhibit 4. Do you recall seeing the email from Holly Buss to you dated 8/24 of 2020?

(Exhibit Number 4 was marked for identification.)

THE WITNESS: Yes. This is referring specifically -- I was about two weeks into my current position, and I had asked Dr. Aufderheide to send me anything that he had with regards to training regarding gender dysphoria evaluations. And Ms. Buss used to work under his team in mental health, and she would have passed this on to me.

BY MR. ANSCOMBE:

Q. Okay. And was one of the things that she passed on, the third page in this set here, FDC_officials_027461, Gender Dysphoria Review Team Dispositions?

A. Yes. This is, under the old policy, what would be the final page of the report provided by the MDST.

Q. And the final page of this exhibit is something called Florida Department of Corrections Accommodations Pass?

A. Correct. So that the rank-and-file correctional

officers who worked at the facilities where gender dysphoric patients were housed, they would know that the inmate was allowed these accommodations because they had passes for them.

Q. So for --

A. In the same way -- excuse me. In the same way as an inmate who has a cane or a wheelchair, they require a pass to have either item. They cannot be in possession of either if they don't have a current pass.

Q. All right. So the Gender Dysphoria Review Team Dispositions, this is a form that would be filled out by the Gender Dysphoria Review Team, and this would allow the granting of the accommodations set forth in numbers 1 through 5 -- or numbers 1 through 6?

A. And it includes whether or not hormone therapy is recommended, and whether an outside consultant is recommended, and whether any other considerations needed to be looked at regarding the specific case of the specific patient.

Q. And the signatures that would be required on this would be the FDC Chief of Mental Health Services?

A. Yes.

Q. That would be Dr. Klein?

A. In the current position, correct; but this is under the old policy.

Q. When did Dr. Klein take over from Dr. Aufderheide?
A. It would be speculation on my part. At least two years.
Q. The FDC Chief of Medical Services had to sign off; was that you?
A. That is myself. And it would have been my signature from the second half of August 2020 until today -- until the rescinding of this procedure, yes.
Q. FDC Chief of Security Operations?
A. I believe that's Mike Harrell.
Q. And then FDC Chief of Classification Management?
A. That would have been Rusty McLaughlin.
Q. And then the PREA Coordinator?
A. I believe her name is Julie Cardenas.
Q. All right. I'd like you to take a look at what I've marked as Exhibit 5. Dr. Martinez, do you recognize what this document is?
(Exhibit Number 5 was marked for identification.)
THE WITNESS: Yes.
BY MR. ANSCOMBE:
Q. What is this?
A. This would have been a report produced by the MDST regarding a inmate who has a preliminary diagnosis of

BY MR. ANSCOMBE:
Q. Don't put that one away -- actually here, let me just -- this one is -- all right, that's 5; right?
A. This is 5.
Q. All right. So let me look at -- so I'm sorry, this is -- actually, let me just ask you, is it possible to determine what the -- whether this review involves a transgender man or a transgender woman?
A. This review?
Q. Yes.
A. Given the fact that it's redacted, the answer is no.
Q. Let's just set that one aside for a minute.
A. Now, I can deduce from page 3, because upon interview, the inmate told Dr. Zuniga that he attempted to slice his penis and his testicles off, so that's a good --
Q. Okay.
A. -- indication that this is a male -- transgender female, male born at birth, and also in the last paragraph of -- third paragraph of page 3, Dr. Zuniga advised hormone therapy and female undergarments. So by those two descriptions, I would say yes, this was -- this patient, Exhibit 5, was male at birth.
Q. All right. Let me --
(Discussion off the record.)

BY MR. ANSCOMBE:
Q. All right. Let me hand you -- this has been marked as Exhibit 6.
(Exhibit Number 6 was marked for identification.)
THE WITNESS: Are we going to got back to 5?
BY MR. ANSCOMBE:
Q. We may go back to 5, but you can turn it over for now, actually. Just take a moment. All right. Do you recognize what this document is, sir?
A. Yes.
Q. What is this?
A. This is Candace Jackson's evaluation, one of the Plaintiffs.
Q. And the date of this evaluation is -- report date is July 22 of 2022?
A. Yes.
Q. All right. So I'd like you to look at the page that ends FDC_Officials_022783. Do you see that? It's the --
A. 022783?
Q. Yes.
A. Yes.
Q. All right. Directing your attention to the section entitled Prognosis, it says here, Inmate Jackson's

mental health prognosis is likely to improve with participation in individual counseling and other therapeutic services which address his reported symptoms of depression and anxiety. Furthermore, his mental health prognosis is likely to improve once allowed to express his gender identity. It is noted that Inmate Jackson reported he has not received treatment in one to two months. Consistent treatment with a consistent counselor will likely aid in improving Inmate Jackson's overall functioning.

Did I read that correct --

A. Yes.

Q. -- correctly? All right.

When it says that his mental health prognosis is likely to improve once allowed to express his gender identity, does that refer to social transition accommodations?

A. Under the old policy, there was availability of the canteen items by the process that I described before.

Q. And so it was the view of this mental health professional that being able to use those alternative canteen items would improve his mental health prognosis; correct?

MR. STEELY: Object to form.

THE WITNESS: It's written in the evaluation

that that is what the mental health provider concluded; yes.
BY MR. ANSCOMBE:
Q. The next section is entitled Inmate's Request Pertinent to Gender Dysphoria. It says, At this time, Inmate Jackson is requesting access to male-stereotypical canteen items, i.e., male undergarments, deodorant and soap; the use of alternative pronouns, i.e. he and his; permission to cut his hair short, privacy during showers, and hormonal therapy.
Did I read that correctly?
A. Yes.
Q. And doesn't that suggest to you that -- well, do you read this to mean that Inmate Jackson believes that he would benefit from these accommodations as a method of treating his gender dysphoria?
MR. STEELY: Object to form.
THE WITNESS: I don't see why it wouldn't.
And again, under the old policy, this was available through the alternative canteen -- the old procedure.
BY MR. ANSCOMBE:
Q. All right. The next section is entitled Recommendations. And about halfway through that paragraph, there's a statement, Treatment can then shift to a focus on issues related to transitioning from female

to male, as well as developing healthy conflict management and emotional regulation skills and increasing coping skills.

Did I read that correctly?

A. Yes.

Q. And do you understand that to be a recommendation that permitting transitioning from female to male presentation was part of the recommended treatment for Mr. Jackson?

A. Yes.

Q. On the next page, which is the last page of this exhibit, here it states, It is recommended for Inmate Jackson to continue to have access to necessary medical and mental health treatment and services as needed in order to ameliorate his symptoms of depression and anxiety. As Inmate Jackson's symptoms also appear to meet criteria for gender dysphoria, the following accommodations listed below are recommended. And the boxes for hair length change was checked, alternative canteen items was checked, male undergarments was checked.

And so is it your interpretation of this document, Dr. Martinez, that the therapists here, Dr. Joshi and Dr. Cook, were recommending these transitioning accommodations as therapy and as treatment for gender dysphoria?

A. That is what it says on the page.

Q. All right. You can put that aside. Under Section 403.12, the procedure called for the MDST to make recommendations for treatment, and then the Gender Dysphoria Review Team would review and approve; is that correct?

A. The Gender Dysphoria -- the MDST, sorry, would meet and then the psych medical provider would review the MDST recommendations and the patient's medical record to see if there would be any contraindication for prescribing the available medications. If the psych medical director deemed that there was no contraindications, then the report would come to the GDRT.

Q. Okay. Do you remember the GDRT ever refusing to approve social transition accommodations?

A. Yes.

Q. How many times?

A. I couldn't say in total off the top of my head, no; but those would be individuals who did not meet the criteria for gender dysphoria.

Q. If somebody met the criteria for gender dysphoria, would the GDRT typically approve those accommodations?

A. Again, it was on a case-by-case basis, but I would say -- I could answer -- I could answer this

accurately: More often than not.
Q. As you sit here today, can you recall a circumstance where an inmate with gender dysphoria was denied social transitioning accommodations?
A. Again, the MDST would either recommend or not recommend access to the alternative canteen. So there were cases where the individual was recommended for hormones, but not for the alternative canteen; example would be someone who previously had been found with a weapon.
Q. Okay.
A. They would be, you know, apprehensive to allow a known individual who's, you know, used items for violent purposes, they would not have been approved.
Q. And that would have been Mr. Harrell who would have disapproved those items?
A. No. So when the GDRT team would meet, the opinion -- if security had opinions, okay -- and again, it would be special cases like that that would be brought up --
Q. Okay.
A. -- okay, and would be discussed as to whether this is a security risk or not. But, again, more often than not, access -- under the old procedure, access to the alternative canteen was more often the case than not. But

there were cases, like the example that I gave you, where it was considered potential security risk.
Q. Do you definitively recall that social transition accommodations were denied by the GDRT for security reasons?
A. Can I think of a specific individual?
Q. Any specific instance where that occurred.
A. So there were conversation of two occasions where items from the canteen list were, quote, "weaponized." So those individuals, their canteen privileges were taken away, so that's not exactly the scenario that you're asking me for, but that's the closest that I can think of.
Q. When the canteen items were weaponized, what were they and how were they weaponized?
A. If memory serves correct, they were both brushes where the handle could be removed and it had a sharp spine, so basically turning it into a shiv.
Q. Were Carter Jackson's social transition accommodations approved?
A. According to this report, yes. If we're referring to Candace Jackson, DC Number V29455, according to this document, yes.
Q. Handing you what's been marked as Exhibit Number 8. I'd like to ask you if you recognize that.
(Exhibit Number 8 was marked for

identification.)

THE WITNESS: I do.

BY MR. ANSCOMBE:

Q. What is this document?

A. This is the operational plan for implementation of HSB 15.05.23.

Q. What's the date of this document?

A. 9/24 of the year 2024.

Q. So this is approximately six days before the HSB 15.05.23 went into effect; correct?

A. Yes. Six days later would be September the 30th of 2024, the planned roll-out date, yes.

Q. All right. At the top of this page here, first page, there's a statement of purpose, and I want to read a sentence to you here. Due to recent changes in medical consensus, the Florida Department of Corrections is required to change some of its policies regarding treatment of gender dysphoria.

Did I read that correctly?

A. Yes.

Q. What was the change in medical consensus that led to the policy changes?

A. To be as brief as possible, the medical consensus had changed to focusing on medical necessity.

Q. What do you mean by "medical necessity"?

A. That the Florida Department of Corrections was required to provide medically necessary treatment for the gender dysphoria population.

Q. Does the Florida Department of Corrections attempt to provide care consistent with medical consensus?

A. There is no clear medical consensus when it comes to the treatment of gender dysphoria currently.

Q. I think you -- so is it your understanding that the reason for the change was that the Florida Department of Corrections was going to provide only care that was deemed, quote, "medically necessary," close quote?

MR. STEELY: Object to form.

THE WITNESS: We are federally mandated to provide medical care for all of our inmates, regardless of diagnosis and including gender dysphoria, under the definition of "medical necessity."

BY MR. ANSCOMBE:

Q. So what was the -- what were the recent changes in medical consensus that led to this change in policy?

A. Again, to be brief, the definition of "transitioning" was not clear in the literature, continued to be unclear exactly what that means, number one; and number two, it was therefore decided that there was no medical necessity with regard to the alternative canteen.

It was deemed not medically necessary.

Q. Who deemed that?

A. Again, after review of the literature and the inconsistent use of the term "transitioning," there's nothing in the medical literature that says transitioning is medically necessary.

Q. Who determined that?

A. Myself and Dr. Klein, the Chief of Mental Health Services.

Q. All right. So earlier, you told me that you don't know why a clinician would recommend that gender dysphoric patients dress and present as members of the opposite sex; correct?

MR. STEELY: Object to form.

THE WITNESS: With that -- with only that as my information, I could not answer that question. If I have no other information but that, I cannot answer that question.

BY MR. ANSCOMBE:

Q. And not having any idea why a mental health professional would recommend that gender dysphoric patients dress and present as members of the opposite sex, do you believe that you are qualified to offer an opinion about medical consensus?

MR. STEELY: Object to form.

Mischaracterization of what he said earlier, but go ahead.

THE WITNESS: So, out in the community, if, you know, this transgender/gender dysphoric patient were a member of the military, say, a social worker could recommend hormone and transitioning. It doesn't have be to an M.D. The bar is very low.

MR. ANSCOMBE: Okay.

THE WITNESS: I'm not claiming to be an expert, but the bar is very low.

BY MR. ANSCOMBE:

Q. So you're not an expert on why mental health professionals would recommend that gender dysphoric inmates engage in social transitioning?

MR. STEELY: Object to form.

THE WITNESS: I'm not an expert in -- I believe I answered that question earlier. I'm not a psychiatrist, I do not treat gender dysphoric patients, I'm not an endocrinologist. I'm not claiming to be.

BY MR. ANSCOMBE:

Q. Sitting here today, you have no idea what the psychological rationale would be for a mental health care provider to recommend that gender dysphoric patients dress and present as members of the opposite sex?

the topics that we have in front of us today.
Actually, I know it's not in any of the topics we have in front of us today.
BY MR. ANSCOMBE:
Q. You can still answer the question.
A. I have no idea what the Agency for Health Care administrators' instructions were to the research group at McMaster University. All I can speak to is that this is results of what they were asked to research, and these are the conclusions that they published, including the testimony from 2020 by Dr. James Cantor, the Canadian psychologist.
Q. All right. Other than the Cass Report and what you've said here about the AHCA report, is there anything that supports your belief that there has been a change in medical consensus with respect to the use of social transitioning accommodations as a treatment for gender dysphoria?
MR. STEELY: Object to form.
THE WITNESS: If you're referring to recently published literature that suggests exactly what you're saying -- are you referring to that, or what -- I'm not sure how to answer that question.
BY MR. ANSCOMBE:
Q. Well, in 2024, there was a statement about a

change in medical consensus, and I think you said that one of the changes that was made as a result of this policy was to get rid of social transitioning accommodations; correct?

A. I said first that the focus was on medical necessity, and medical necessity being the goal, social transitioning -- to borrow your phrase, not mine, that's not what I would call it, I would simply call it transitioning -- has not been demonstrated to be medically necessary.

Q. So --

A. That's number one. Let me finish answering your question. Again, I emphasize seismic changes that occurred for the WPATH Standards of Care version 7 versus the WPATH Standards of Care 8, they de-psychopathologized gender dysphoria. They don't want it to be a psychological or psychiatric diagnosis. They want it to be a gender and, according to them, there's 16 different genders.

Q. Move to strike as non-responsive.

Dr. Martinez, did the WPATH 7th edition --

A. Standards of Care.

Q. -- Standards of Care, did it recognize social transition accommodations as useful in the treatment of gender dysphoria?

A. Yes.
MR. STEELY: Object to form.
THE WITNESS: Citing studies of very poor quality which were, again, pointed out in the Cass Review and in the Cochran Review, and in -- I can go on and on.
BY MR. ANSCOMBE:
Q. Did version 8 endorse the continued use of social transition accommodations?
A. Yes. And it went even further, which is why Dr. Cantor's testimony here is of such importance. They have decided to, from -- from Standards of Care 7 -- WPATH's Standard of Care 7 to WPATH's Standards of Care 8, they have decided to de-psychopathologize -- you are not required to get any mental health evaluation before initiating hormones is the recommendations of the Standards of Care 8.
Q. Okay.
A. You were asking me before -- again, if you're in the VA system -- not in our system, if you're in the VA system, a social worker can recommend that you receive hormones.
Q. A doctor has to prescribe it; right?
A. Doctor has to prescribe it, but it can be recommended by the social worker; meaning, that the

doctor -- it's up to the doctor whether they want to evaluate the patient to see if they really have gender dysphoria which, again, right, with just that information, if it were me, I would want to know more.

Q. Now, with respect to your answer prior to that one, I move to strike everything after the word "yes" as non-responsive.

With respect to the -- are you familiar with the National Commission on Correctional Health Care?

A. Yes.

Q. Does the NCCHC recommend the use of social transitioning accommodation as a therapy for gender dysphoria?

A. So I cannot answer that question. I can say that, in the past, they were one of the organizations that accepted WPATH's Standards of Care as the standard of care. And as you asked me earlier, both in Standards of Care 7 and Standards of Care 8 of WPATH, they both recommended -- your words -- social transitioning. They don't use "social transitioning." They just use "transitioning," and it is based on very weak clinical evidence.

Q. Does Centurion have its own guidelines on the treatment of gender dysphoric inmates?

A. Centurion is our vendor. Centurion is required

Q. Well, sir --
A. The researcher who was commissioned -- I don't mean to cut you off, I apologize. The researcher who was commissioned by WPATH at -- I believe her name is Dr. Anderson at Johns Hopkins University, published a big part of the -- her disagreement of WPATH's squashing her results.
Q. You've talked about randomized controlled clinical trials; right?
A. I believe I mentioned it once.
Q. Have you ever designed any?
A. Have I ever designed a randomized -- no. No, sir, I've not.
Q. Would it be ethical to do a randomized controlled study where half of the study population is not -- is assigned to receive something other than what is regarded as the standard of care?
MR. STEELY: Object to form.
THE WITNESS: When it comes to human experimentation, it would be unethical.
BY MR. ANSCOMBE:
Q. Thank you. All right. Let's --
A. Again, that would not be how you would do it in this case. You would do -- you would repeat the Cass Report and you would repeat the longitudinal study that

was done in Sweden starting today, and then taking a look at it at whatever end point you want: Ten years from now, eight years from now, whatever the case. You'd repeat either or both of those studies to get a definitive answer, and those studies simply have not been done. Unfortunately, the Swedish study was from -- followed patients from two thousand -- I'm sorry, 1973 to 2003.

Q. Did you show drafts of forty -- I'm sorry, did you show drafts of HSB 15.05.23 to anybody other than Dr. Klein?

A. Not to my knowledge.

Q. Did you ever share that policy with Centurion?

A. No.

Q. Did you consult Centurion in any way over the creation of that policy?

A. Only the specific examples that I gave you where I asked Dr. Klein to find studies for autism -- screen and a confirmatory study -- and to find studies for malingering, which were the MFAST and the MMPI.

Q. And if Centurion provided any comments on your policy, you never received those; is that correct?

A. They were never part of the process other than the two examples that I just told you now.

Q. Did you ever see any suggested revisions from Centurion?

A. That's not their -- that's not their role or their policy.

Q. And that wasn't my question. My question was did you ever see any suggested revisions from Centurion?

A. And I answered the question and I'll repeat my answer: That's not the procedure or the policy of Florida Department of Corrections. They do not edit any of our HSBs or policies. By contractual agreement, they must comply with all of our procedures and HSBs, and they do not edit any of them.

Q. Sir, did you ever see a version of your policy that was edited by Centurion?

A. No.

Q. And is that information that you didn't want to have just from the standpoint of people who practice in the medical field?

MR. STEELY: Object to form.

THE WITNESS: Is that something --

BY MR. ANSCOMBE:

Q. Well, in other words, if Centurion had suggestions on your policy, would their comments or their input matter to you in any way?

A. No. And the same would be true for any other procedure or HSB that we have.

MR. ANSCOMBE: All right. Could we pause

long enough for a quick time check?

(Brief pause.)

MR. ANSCOMBE: All right. Back on the record.

MR. STEELY: Can I get a copy?

MR. ANSCOMBE: Oh, yeah, sorry.

THE WITNESS: Should this be 10?

MR. STEELY: Yeah, it should be 10.

MR. ANSCOMBE: All right. I'm confused here. Let me put 10 over that.

(Exhibit Number 10 was marked for identification.)

BY MR. ANSCOMBE:

Q. Dr. Martinez, if you could put that on top?

A. Oh, okay.

Q. All right. Dr. Martinez, do you recognize this document?

A. I do.

Q. What is it?

A. It is HSB 15.05.23.

Q. And is this the final version?

A. I'm just reviewing my -- the annotations that I wanted on the final product. Yes, I believe this is -- this is the final product.

Q. All right. Dr. Martinez, the purpose of this

warranted. It would include all of that, but again, tailored to the individual needs of the patient.

Q. What is DC4-643A?

A. Where are you reading?

Q. This is top of page 2.

A. Top of page 2? That would be the -- it's just the -- we have over 700 forms, so -- they're hard to follow, so they're all given a number to identify them. But that's just the form where the individualized service plan is written on.

Q. And isn't it true that as of September 30th of last year, the individual services plan were written in a way that eliminated social transition accommodations as an area for recommended treatment?

A. They were -- you're asking me if the ISPs were changed?

Q. Well, I mean, it's a basic form; correct?

A. Correct. But -- so if -- under the old procedure, it would have -- it wouldn't have been this form. It would have been the form you saw at the very end of the evaluation where it said "passes." So they would get a pass for access to the alternative canteen.

Q. As of --

A. That's separate from the individualized service plan.

Q. As of September 30th of last year, is it true that Centurion mental health professionals no longer had the option to recommend social transition accommodations?

MR. STEELY: Object to form.

THE WITNESS: Again, I've answered that question. After that date, the individuals with gender dysphoria no longer had access to canteen -- alternative canteen items.

BY MR. ANSCOMBE:

Q. And that was as a result of your judgment and the judgment of the Florida Department of Corrections that those would no longer be provided; correct?

MR. STEELY: Object to form.

THE WITNESS: This was the determination that myself and Dr. Klein, the Chief of Mental Health Services, arrived at after looking at the preponderance of the evidence. These were hundreds of hours reading all of the sources that, you know, both WPATH lists in their 63 pages of references; many of which are the same that were in the Cass Review; many are the same in the report produced by McMaster University for the Agency for Health Care Administration. They all had their own laundry list of sources that they used. Again, many of them were the same.

So looking at the preponderance of that evidence, we arrived at this product.

BY MR. ANSCOMBE:

Q. Okay. So --

A. Which does, in fact, include hormones.

Q. All right. But it doesn't include social transition accommodations; correct?

A. It does not provide alternative canteen.

Q. And if after September 30th of last year, if therapists or mental health professionals at Centurion still thought that social transition accommodations would be beneficial to individual patients, you didn't want to hear about it --

MR. STEELY: Object to form.

MR. ANSCOMBE: -- is that true?

THE WITNESS: I didn't want to hear about it?

MR. ANSCOMBE: FDC didn't want to hear about it.

MR. STEELY: Object to form.

THE WITNESS: I don't know what you mean by that question.

MR. ANSCOMBE: Well --

THE WITNESS: I can answer this way: After that date, they could not issue a pass for access to the alternative canteen because the alternative

canteen was no longer available.

BY MR. ANSCOMBE:

Q. After that date, they could also no longer recommend social transaction accommodations; correct?

MR. STEELY: Object to form.

THE WITNESS: They could not issue a alternative canteen pass, because the alternative canteen was no longer available.

BY MR. ANSCOMBE:

Q. That wasn't my question. My question is, after that date, if somebody at Centurion wanted to recommend social transition accommodations for a gender dysphoric patient, that was no longer acceptable to the Florida Department of Corrections; true?

MR. STEELY: Object to form.

THE WITNESS: The alternative canteen was no longer available after that date.

BY MR. ANSCOMBE:

Q. All right. So they could recommend it, but you wouldn't provide it?

MR. STEELY: Object to form.

THE WITNESS: No pass was available for the alternative canteen because the alternative canteen was no longer available.

/ / / / /

BY MR. ANSCOMBE:

Q. If a -- let's say in December of last year, of 2024, if a therapist at Florida Department of Corrections thought that issuing or allowing social transition accommodations would be helpful to -- as a treatment for gender dysphoria, would FDC have allowed those accommodations?

A. Again, I can't answer that question. I can only say that, since September 30th of 2024, no Centurion employee has contacted me by phone call, text, or email recommending what you're suggesting for a gender dysphoric patient.

Q. Has it been made clear to -- well, I mean, you've said that Centurion is obligated to follow FDC's Health Services Bulletin; correct?

A. Under the stipulation of our contract with Centurion, they're required to follow all of our HSBs and procedures by contract, yes.

Q. And HSB 15.05.23 is the definitive statement on FDC's treatment of gender dysphoric patients; right?

A. Like all HSBs, this is reviewed on an annual basis, and if additional information were to come out in the future, we would take that into consideration in terms of editing this HSB --

Q. From where --

A. -- like we do with all of our other HSBs.
Q. From where Centurion is positioned, if they're following this procedure and the procedure doesn't allow for recommendations for social transitioning, then they wouldn't be permitted to even request social transitioning; correct?
MR. STEELY: Object to form.
THE WITNESS: Again, this HSB is based on medical necessity, and transitioning has not been proven to be a medical necessity.
BY MR. ANSCOMBE:
Q. Has transitioning been proven to assist with ameliorating the symptoms of gender dysphoria?
A. There's no strong clinical studies to demonstrate that. There are anecdotal and mainly survey-based studies which WPATH, both in Standards of Care 8 and previously Standards of Care 7, cite as evidence for such.
And I repeat, some of those studies are seven patients who were followed by survey for six months. Very, very weak and limited evidence.
Q. All right. I'd like to direct your attention to footnote 4, which is on page 3.
A. Yes.
Q. All right. Footnote 4 says, In the scientific research literature, there has been a gradual shift from

definitive gender-affirmative care which prioritizes access to medical interventions to a more conservative approach that addresses psychiatric co-morbidities and psychotherapeutically explores the developmental etiology of gender dysphoria.
Did I read that correctly?
A. Yes.
Q. And --
A. The lead author there is, again, Steven Levine who I mentioned earlier.
Q. And that's the principal source that you can think of for this proposition?
A. That's one of the principal sources, yes. He has over 50 years of psychiatric practice. He was the director of the psychiatric residency in Case Western Reserve University --
Q. I'm sorry, move to strike that --
A. He established the first transgender clinic in the United States, for the record.
Q. What does it mean to say "psychotherapeutically explore the etiology of gender dysphoria"?
A. That you begin by exploring the reason why the patient believes that they have gender dysphoria.
Q. And --
A. Specifically, he goes on to describe what's

that this is emphasizing a psychotherapeutic solution and investigation first.

BY MR. ANSCOMBE:

Q. Well, how is psychotherapy going to determine the etiologic basis of gender dysphoria?

A. By listening to the patient, by having conversations with the mental health provider to explore the reasons why they think they have gender dysphoria.

Q. And does -- well, actually let me ask you, does -- what answer could an inmate give to the question of why they think they have gender dysphoria that would enable treatment dedicated to the etiology of gender dysphoria?

MR. STEELY: Object to form.

THE WITNESS: What answer could a patient give -- that would presume the question. What is the question?

BY MR. ANSCOMBE:

Q. Well, you said -- sir, I think you said that the purpose of psychotherapy was to evaluate why -- one of the reasons was to evaluate why patients think they have gender dysphoria. Isn't that what you told me just a little while ago?

A. Yes, sir.

Q. All right. And is there any answer to that

question that a patient could give that would allow the etiology of their gender dysphoria to be ascertained?

A. I mean, I don't think that there's one answer to that question.

Q. Okay.

A. I think, like any other mental illness, it is probably multifactorial. You would have to look into the trauma history of the patient. You would have to look into the relationship of the patient to the parents and siblings. You'd have to look at their history of incarceration, if there was any violent behavior, were they the victims of violence themselves? Yeah, there's -- I don't think there's one answer to that question.

Q. Does hormone therapy ever treat those things that you just identified?

MR. STEELY: Object to form.

THE WITNESS: Again, I can only speak to the reports that we've received, and, again, clearly -- and just to point at one thing, and you can't point at one thing -- if you look at the disciplinary reports in some of these individuals, they've gone from 30 in a year, year and a half, to two. So clearly, there's some type of benefit. Specifically what that benefit is, you know, it hasn't been proven in clinical trials. But clearly, there's case studies that

demonstrate that, at least for some of these patients, there appears to be a benefit from that treatment.
BY MR. ANSCOMBE:
Q. The benefit of that treatment is directed to alleviating the symptoms of gender dysphoria as opposed to treating its etiologic basis; correct?
MR. STEELY: Object to form.
THE WITNESS: Again, it's difficult to make that determination with certainty, so you look at indirect factors like behavior. Is the patient now stable? If the answer is yes, then there has to be -- then logically -- logic would dictate that there's some benefit. But there are cases where the behavior's actually gotten worse.
BY MR. ANSCOMBE:
Q. All right. So let's just look at the next sentence. Such evidence must be based on sound scientific methods and research that were subject to the formal peer review process.
Did I read that correctly?
A. Yes. That's what's written on the page.
Q. All right. And you've stated, up above at the top of the page, that, Studies presenting the benefits to mental health, including those claiming that services prevent suicide, are either low or very low quality, and

rely on unreliable methods.

So isn't it your view, expressed here, that the evidence that needs to be submitted to obtain a variance doesn't even exist?

MR. STEELY: Object to form.

THE WITNESS: I'm saying that the evidence that exists currently is of low quality. That is not to say in the future, someone would repeat the Cass study in an adult age group and publish their findings four or five years out -- that is to say if Johns Hopkins is allowed to publish what they know from their gender studies -- and they provide some other evidence of high quality -- again, we would review this HSB, which by our own rule, we must review at least annually. And if's there's any change in the recommendations in the literature, we would take that into consideration in terms of editing this HSB.

BY MR. ANSCOMBE:

Q. Right now, that literature doesn't exist; correct?

A. What exist is of low quality.

Q. All right. And low-quality evidence is -- is that sufficient to show, quote, "through sound scientific methods," that the research -- strike that.

Is that low-quality evidence sufficient to meet the

a whole because you're losing them by the time you're publishing. That is a tremendous weakness.

Nevertheless, there have been studies of this format that claim that this treatment is able to stabilize these patients from a mental health perspective. So that's what's out there. That's what we have -- we have to accept that this is what they've been able to provide and that's what out there.

Q. Do any of the studies cited by Centurion identify the etiologic basis of gender dysphoria?

A. No, but there are a variety that speculate.

Q. And do the studies cited by Centurion demonstrate that the mechanism of action by which clinical outcomes are improved, you know, go to the etiology of gender dysphoria?

A. Again, you've lost me with "mechanism of action." We apply that to medications. So can you state that another way?

Q. Do any of the studies that Centurion has provided demonstrate that treatment improves clinical outcomes by treating the etiologic basis of gender dysphoria?

A. So you have studies that try to determine the etiology of gender dysphoria, and you have studies that have shown claimed improvements in terms of clinical outcomes. But that I'm aware, of one study that tries to

prove both, no, that hasn't come across my desk, no.
Q. So as of today, you're not aware of Centurion giving any citations to literature that shows that the administration of hormone therapy improves clinical outcomes by treating the etiologic basis of gender dysphoria; correct?
A. I think I answered that question, I think.
Q. And the answer is no; correct?
A. That show both in one study, no? Some have tried to identify cause, some have tried to demonstrate the clinical outcomes have improved as a result of the treatment, but any one study proving both, I'm not aware.
Q. Now, if FDC was actually enforcing this policy as written, isn't it true that FDC wouldn't have granted any variances --
MR. STEELY: Object --
MR. ANSCOMBE: -- as of today?
MR. STEELY: Object to form.
THE WITNESS: No, I don't come to that conclusion.
BY MR. ANSCOMBE:
Q. All right. Well, one reason to come to the conclusion is that, as you've said, you're not aware of anything in the U.S. Constitution that requires FDC to provide hormone therapy; correct?

MR. STEELY: Object to form.
THE WITNESS: I said that earlier, yes.
BY MR. ANSCOMBE:
Q. By the way, were you the one who wrote in the words, quote, "And (2,) if necessary, to comply with the U.S. Constitution or court decision"?
A. It would have been either myself or Dr. Klein.
Q. And is Dr. Klein a scholar on the U.S. Constitution?
A. No. She is a clinical psychologist, and again, she's the Chief of Mental Health Services. But my recollection is there was not one but two possible cases regarding transgender issues that could have been heard by the court. I don't know if they decided not to take them up, but at the time, there were -- if memory serves correct, there were at least two that were directly related to transgender care.
Q. FDC has issued 67 variances so far, even though there's nothing in the U.S. Constitution that requires it to provide that care; correct?
MR. STEELY: Object to form.
THE WITNESS: Yes.
BY MR. ANSCOMBE:
Q. Okay. And it's also provided 67 variances, even though Centurion has not provided it with any study that

Q. And when did that occur?
A. It happened after the policy. I can't give you an exact date, but we have indisputable video evidence that it had nothing to do with his gender dysphoria.
Q. What's that? In other words --
A. He got into an altercation with a former partner. He had walked into the area with the object he used to hang himself, so this was premeditated.
Q. Have there been any inmates who have engaged in self-harm since the policy went into effect.
A. I mentioned several times before, no. And none have had to go to outside hospital, and none have been put in SHOS, which is Self-Harm Observation Status, where someone has to look in on them every 15 minutes, 24 hours a day.
Q. Do you have -- or does FDC have plans to make future changes to provisions for hormone therapy?
A. HSB 15.05.23 is like any other Health Service Bulletin. Between our Health Services Bulletins, our procedures, and our forms, we have over 700 of them, and they are reviewed annually. Should there be a breakthrough, should there be a new recommendation, should there be a new treatment for this condition, we will review it and we will consider editing our HSB, as we do with all of our HSBs on an annual basis.

Q. At the moment, are there any plans to revise this HSB?

A. It will be reviewed.

Q. My question is are there any current plans to revise this HSB?

A. It will be reviewed, and if new clinical evidence is available, strong clinical research trials, we will edit accordingly.

Q. Are there any current plans to withdraw hormone therapy for transgender or gender dysphoric inmates?

A. None to my knowledge.

Q. Are there any plans to restore social transitioning accommodations?

A. Again, the basis of the HSB is focused on medical necessity, so to answer your question, no, there's no future plans to rehabilitate or return the alternative canteen.

Q. Are there any other HSBs that contain language similar to the language in this HSB which require a clinician to demonstrate that a particular therapy will improve clinical outcomes by treating the etiologic basis of the disorder?

MR. STEELY: Object to form. That wasn't a topic that was listed. But if you know the answer, you can --

THE WITNESS: Every single one of our HSBs bases its treatment on etiologic cause, every single one.

BY MR. ANSCOMBE:

Q. Do any of them use the same language that is used in this one?

A. Similar.

MR. STEELY: Object to form.

BY MR. ANSCOMBE:

Q. How is it phrased in other ones?

A. Cause.

Q. And you'll agree that there are plenty of therapies that are useful in alleviating medical conditions that don't treat the etiologic basis; correct?

MR. STEELY: Same objection. Go ahead.

THE WITNESS: So just as a general medical observation, you know, you have a cold, I give you an antipyretic to lower your temperature. It's not going to cure you. It's just going to make you feel a little bit better. I'm treating the symptomatolgy, if that's what you mean. There are many, many, many medications that only treat symptomatolgy; they're not a cure.

BY MR. ANSCOMBE:

Q. So --