**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| REIYN KEOHANE, *et al.*, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | Case No. 4:24-cv-434-AW-MAF |
| | : | |
| RICKY D. DIXON, in his official capacity as Secretary of the Florida Department of Corrections; *et al.*, | : | |
| | : | |
| *Defendants.* | : | |

## TRIAL DEPOSITION DESIGNATIONS OF PLAINTIFFS

### Danny Martinez, M.D. Deposition, November 6, 2025

| Start Page: Line | End Page: Line |
|---|---|
| 6:10 | 6:16 |
| 10:5 | 11:8 |
| 11:19 | 11:21 |
| 13:3 | 13:15 |
| 24:14 | 25:5 |
| 26:25 | 27:3 |

| | |
|---|---|
| 49:10 | 49:22 |
| 50:13 | 51:23 |
| 56:21 | 57:4 |
| 60:4 | 61:8 |
| 67:18 | 72:15 |
| 72:17 | 74:16 |
| 90:22 | 91:7 |
| 92:19 | 93:25 |
| 106:19 | 106:23 |
| 114:19 | 115:11 |
| 143:24 | 144:8 |
| 148:9 | 148:15 |
| 151:19 | 152:20 |
| 154:6 | 155:3 |
| 157:16 | 158:13 |
| 159:8 | 159:21 |
| 162:12 | 164:20 |
| 185:2 | 185:18 |
| 200:12 | 204:24 |
| 205:25 | 208:13 |
| 208:14 | 211:15 |
| 214:3 | 217:16 |

| | |
|---|---|
| 218:23 | 219:8 |
| 225:4 | 228:6 |

# In the Matter Of:

REIYN KEOHANE vs RICKY D. DIXON

4:24-cv-434-AW-MAF

---

## DANNY MARTINEZ, M.D., MPH

*November 06, 2025*

---

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
CASE NO: 4:24-cv-434-AW-MAF

REIYN KEOHANE, et al.,

Plaintiffs,

vs.

RICKY D. DIXON, in his office capacity as Secretary of the Florida Department of Corrections, et al.,

Defendants.

ZOOM DEPOSITION OF:
DANNY MARTINEZ, M.D., MPH

Taken on Behalf of the Plaintiffs

DATE TAKEN: Thursday, November 6, 2025

TIME: 10:00 a.m. - 6:17 p.m.

PLACE: via Zoom videoconference

REPORTER: Lisa Adkins, Court Reporter

P R O C E E D I N G S

(Witness sworn.)

THE WITNESS: I do.

THE REPORTER: Thank you. You may begin.

DANNY MARTINEZ, M.D., MPH,

called as a witness by the Plaintiffs, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. NOWLIN-SOHL:

Q. Good morning, Dr. Martinez. My name is Li Nowlan-Sohl. I'm an attorney for the Plaintiffs in this matter.

Can you please state and spell your name for the record?

A. My name is Dr. Danny Martinez. It's Danny -- D-a-n-n-y. Martinez -- M-a-r-t-i-n-e-z.

Q. Okay. And you've been deposed three times before; is that correct?

A. This is the third.

Q. This is the third, okay.

And you understand that you're under oath today?

A. Yes.

Q. Okay. Is there any reason you're not able to testify fully, and accurately, and honestly today?

A. No.

Q. Okay. Have you reviewed your prior testimony in this matter, including your prior deposition declarations and transcript from the hearing?

A. Yes.

Q. Is there any of your prior sworn testimony that is inaccurate?

A. In my October 14th testimony there was some errors in the transcription that kept on referring to the psych provider or psych chief. I was referring to the psych medical director, I believe it was an error that occurred three times.

Q. Anything else?

A. Not that I'm aware of, no.

Q. So there's nothing that you want to change from any of that testimony?

A. Other than what I previously mentioned, no.

Q. Okay. You received your M.D. in 1998 from Iberoamerican University in the Dominican Republic, correct?

A. Yes.

Q. Okay. And you provided a CV in this matter related to your last deposition. That CV did not include any work experience prior to October of 2007.

Were you working between 1998 and 2007?

A. So an area of critical need is designated by the federal government. Human health and services designate areas where there's a low percentage per number of population of people of providers, whether that be medical providers, dental providers, or mental health providers.

So that hospital had that designation, and I did two years of training in a family medicine residency program there in Miami, Florida.

Q. Was the first time that you ever treated patients after graduating from medical school during your rotating internship at San Gerardo Hospital?

A. No.

Q. When was the first time?

A. After graduation in the Dominican Republic.

Q. In what capacity?

A. Seeing patients at a free clinic.

Q. Were you employed at the free clinic?

A. I was a volunteer.

Q. Okay. Were you volunteering in a capacity as a doctor?

A. Yes.

Q. Were you licensed in the Dominican Republic?

A. As an intern.

Q. Okay. So you were seeing patients as an intern

in the Dominican Republic?
A. Under supervision, yes.
Q. Okay. And how long did you do that for?
A. Approximately, a year.
Q. Okay. So between the internship in the Dominican Republic, Puerto Rico, and West Chester Hospital, is it fair to say you've seen patients for a total of about four years in your career?
A. That's accurate.
Q. Okay. And always as an intern or area of critical need resident?
A. Yes.
Q. And you've never provided treatment for gender dysphoria?
A. No.
Q. Are you licensed to practice medicine in Florida?
A. Yes.
Q. When did you first become licensed?
A. 2017.
Q. Okay. And is that an area of critical medical need license?
A. That's an area of critical need license, yes.
Q. Okay. Is that considered a temporary license?
A. It is a two-year license, and it has to be

renewed every two years like any other medical license.
Q. Okay. And does that limit where you can practice medicine?
A. I am limited to practicing medicine to areas of critical need inside the state of Florida.
Q. Okay. Did you ever meet the requirements to apply for a regular medical license?
A. No.
Q. Okay. Did you ever take any parts of the medical exam?
A. I am registered through the PR MLA.
Q. What is the PR MLA?
A. Puerto Rico Medical Licensing Exams.
Q. So does that mean you took the medical exam in Puerto Rico?
A. Yes.
Q. Are you board certified in anything?
A. No.
Q. Your current title at FDC is the chief of medical services, correct?
A. Yes.
Q. And how did you come to get the job as the chief of medical services?
A. I applied for it.
Q. How did you learn of the job?

A. It was on People First.
Q. Who did you interview with?
A. I interviewed with all the chiefs in the office of health services, and the director of health services who was Tom Reimers at the time.
Q. And Mr. Reimers is the predecessor to Mr. Clayton Weiss; is that correct?
A. Yes.
Q. Okay. And you report to Mr. Weiss now?
A. Yes.
Q. Okay. And Mr. Weiss is not a doctor?
A. No.
Q. Okay. And real quick. Going back to the licensing exam in Puerto Rico.
Did you pass that exam?
A. Yes.
Q. Okay. And in your role as chief medical officer, you do not work directly with patients, correct?
A. No.
Q. So Centurion of Florida is the contractor with the Florida Department of Corrections to provide medical care, correct?
A. Yes.
Q. Does your job description include involvement

with Centurion?
A. No.
Q. So I'd like to talk about procedure 40312.
Are you familiar with that procedure?
A. Yes.
Q. And you are a member of the gender dysphoria review team also known as the GDRT?
A. Yes.
Q. And in that role it involved approving hormone therapy?
A. Yes.
Q. Okay. And it also involved approving accommodations such as alternate canteen items, hair length, and bras?
A. Yes.
Q. And if I say accommodations, can we agree that I'm referring to, kind of, that scope of accommodations?
A. You just said accommodations twice.
Q. Okay. So if I say accommodations, do you understand that to include alternate canteen items, hair length, and bras?
A. Broadly, yes.
Q. And those accommodations are only provided if someone's had a gender dysphoria diagnosis, yes?
A. No.

MR. STEELY: Object to form.
A. No.
BY MS. NOWLIN-SOHL:
Q. Can you please explain?
A. So there are men who can be on certain medications for a long time. So, for example, there's a -- I don't want to get into the weeds here. But there's a potassium channel blocker that is a diuretic that's very commonly prescribed called spironolactone; it's side effect is gynecomastia, which is the breast tissue grows. Some people have to be on this medication because they have certain cardiac conditions.
Again, over time, that breast tissue can grow to the point where they would need a bra, and they would be given a pass for one. They have nothing to do with gender dysphoria.
Q. Okay. So --
A. And that's just one example.
Q. Okay.
A. Like, I can give you -- that's just someone example.
Q. So under procedure 40312 those accommodations are only provided if someone had a gender dysphoria diagnosis?
A. The alternative canteen was to be accessed by

A. Yes.

Q. And so as of August 12th, 2022, you had no edits or recommended changes for procedure 40312, correct?

A. What I'm indicating in this email is that the Standards of Care 8 published by WPATH had been prolonged. They had been stating that they were going to publish it, like, since, February of 2022. They kept on delaying it. And so when I was asked to edit the procedure, that standard of care had not been published.

This is an indication to the individual in charge of circulating -- at that time was Ms. Kessler. It was indicated to her that it would need to be revisited should the standards of care be published before the end of the year.

(Anne Wooding enters the Zoom videoconference.)

BY MS. NOWLIN-SOHL:

Q. Okay. So as of August 12th, 2022, you had no changes and were waiting on the Standards of Care 8?

A. Which, I believe, were published in late September or early October of that year, I believe, if memory serves correct.

Q. Okay. But it's accurate to say that as of August 12th, 2022, you had no edits or changes for procedure 40312?

A. No, knowing the changes were brewing, I was waiting to get access to the Standards of Care 8.
Q. Sorry, to clarify. You said no.
Does that mean you did have changes, or you did not have changes?
A. So, again, knowing that the Standards of Care 8 were going to be published, I knew that there were likely going to be changes to the procedure, but I could not foresee what they would be without having read the Standards of Care 8.
So, again, this is my indication to Ms. Kessler that this needed to be circulated again before the end of the year should Standards of Care 8 be published.
Q. Okay. But as of August 12th, 2022, there was no plan at that time to eliminate social accommodations?
MR. STEELY: Object to form.
A. So I can answer it this way. There was no plan. We had no idea what WPATH was going to publish.
BY MS. NOWLIN-SOHL:
Q. And there was no plan at that time to eliminate hormone therapy from the policy?
MR. STEELY: Object to form.
A. Again, there was no plan at that time. We were waiting for WPATH to publish Standards of Care 8.
From -- I can only add this. From the time

that I took the WPATH provider course from August of 2020 to December of 2020, during that course they mentioned it again, and again, and again. Standards 8 -- Standards of Care 8 were coming, and you can expect major changes.

BY MS. NOWLIN-SOHL:

Q. Okay. And at that time, was procedure 40312 relying on WPATH 7?

A. In part, yes.

Q. Okay. You and Dr. Kline first started drafting HSB 15523 in 2023, correct?

A. Again, the conversation predate her coming to the office of health services at Florida Department of Corrections.

Those conversation, to my mind, began December of 2020, with her predecessor Dr. Dean Aufderheide, and the then associate chief of mental health services Dr. Tammy Lander.

Q. All right. Well, my question wasn't actually about the conversation; it was about the drafting. So let me repeat that.

So you and Dr. Kline started drafting the HSB 15523 in 2003, correct? Sorry, 2023.

A. Again, the exact date that -- you know, was it day one or day zero as you're trying to define it, I

assume -- I don't remember. I don't recall.
Q. What --
A. The conversation was way before then.
Q. Okay. Well, forget about the drafting. I'm asking -- that happened in 2023.
I don't need the exact date, but that's the right year?
MR. STEELY: Object to form.
A. I don't recall specifically.
BY MS. NOWLIN-SOHL:
Q. So as you sit here today, you don't know which year you started drafting HSB 15523?
A. The exact date, no.
Q. I'm not asking for the exact date. I'm asking for the year.
A. Many, many conversation took place regarding how we would change the procedure. To my memory, those conversation began in December of 2020. When exactly we put those ideas down on paper when we started that process, I do not recall off the top of my head, no.
Q. Okay. So you do not know when the drafting of the HSB started?
MR. STEELY: Object to form.
A. Again, I do not recall the exact date.
Q. And the first drafts of the HSB did not allow

for hormone therapy or accommodations, correct?
A. To my recollection there was one draft that is consistent with that.
Q. Do you know roughly when that draft was?
A. It could have been the summer -- I don't recall exactly.
Q. Summer of 2023?
A. I answered this question in my previous testimony on October 14th, and I was presented with a document that had an 8 on it.
Q. Okay.
A. So, you know, I think I answered that.
Q. Okay. So you said there was at least one draft that did not allow for hormone therapy or accommodations.
Why did that draft not provide for those?
A. I'm sorry, can you complete that idea -- that question?
Why did that draft not provide for what?
Q. So you said there was at least one draft that did not provide -- provide for hormone therapy or accommodations.
Why did that draft not provide for hormone therapy or accommodations?
A. Again, the clinical literature at that time

began to change as to the treatment of gender dysphoria population.
And, again, I can point to Dr. Kaliebe's testimony where he is of the expert medical opinion that the true treatment is cognitive behavioral therapy.
Q. And so at the time of that draft, you thought the clinical literature showed that hormone therapy and accommodations were never medically necessary?
A. There was clinical research that suggested that, yes.
Q. Okay. And so that was a pretty significant change in policy and that was based on the clinical research at that time?
A. That is where we were with the draft at that moment, yes.
Q. Okay. At that time, did you think that hormone therapy was never medically necessary?
A. In the summer of '23?
Q. Yes.
A. I did not -- I did not think in all cases it was necessary, no. And, you know, our patient population suggests that because we have some gender dysphoric patients who, you know, have a level of education, and when they are told the long-term side effects of taking processed hormones, they, of their own

How are you doing Dr. Martinez?
Does it make sense to take a -- like, a short five-minute break, or would you like to keep going?
THE WITNESS: Five-minute break, please.
MS. NOWLIN-SOHL: Okay.
(A short recess is taken.)
BY MS. NOWLIN-SOHL:
Q. Dr. Martinez, we're back on the record. You understand that you're still under oath, correct?
A. Yes.
Q. Okay. And there was one question I asked earlier that I want to repeat to make sure that I understood correctly.
You do not provide care to patients at FDC, correct?
A. No.
Q. When you say no --
A. I do not.
Q. You do not provide care to patients?
A. No.
Q. Okay. Are you familiar with the law that Florida passed prohibiting state funds from being used on hormone therapy for gender dysphoria?
A. Yes.
Q. And if I refer to that law as SB 254, will you

understand what I'm talking about?

A. I don't know the exact name or number of the law but, generally speaking, I'm aware of the law that you're mentioning.

Q. Okay. It was Senate Bill 254 and it's now another statute.

But if I say SB 254, I'm referring to that law, okay?

A. Okay.

Q. All right. And after SB 254 passed there was discussions about FDC stopping providing hormones, correct?

MR. STEELY: Object to form.

A. So we spoke about the prior draft, yes.

BY MS. NOWLIN-SOHL:

Q. And was the prior draft in response to SB 254?

A. It would have been a factor, yes.

Q. And at that time, FDC's plan was to develop a mental health only treatment HSB?

A. There was one draft that excluded hormone therapy and excluded the alternative canteen, to my recollection.

Q. All right. I'm going to mark as Exhibit 5 a document that's been Bate stamped as CENT -- C-E-N-T -- production 021434. I believe that's Exhibit 5.

(Plaintiffs' Exhibit No. 5 is marked for identification.)

BY MS. NOWLIN-SOHL:

Q. Okay. So the bottom of this document is an email from Dr. John Lay to people at a Centurion. And then there's a response or forward from Timothy Rakas.

And Dr. John Lay is the statewide medical doctor for the state of Florida, correct?

A. Yes.

Q. And Grady -- refers to Grady Enlow, the deputy director of health service administration at FDC?

A. I'm assuming, yes.

Q. Okay. And so this email suggests that Grady Enlow had updated Dr. Lay that: FDC's plan at the time of this email is to continue medication treatment for gender dysphoria for six to 12 months to allow time to develop a comprehensive mental health plan. Patients will be tapered off their gender dysphoria medication at that time.

That was FDC's plan as of May 25, 2023, correct?

A. Again, that would have been the essence of one draft of the proposed change.

Q. So there was a time where that was the plan?

A. Briefly.

Q. So you mentioned conversation about changing the procedure going back to when you started in 2020.
And you've also said that you and Dr. Kline were mostly responsible for drafting the new HSB, correct?
A. Yes.
Q. And in a declaration that you submitted in this case, you said that you began working to update the procedures related to inmates diagnosed with gender dysphoria in March of 2023.
What work were you doing in March of 2023?
A. It would reflect in the email that you just showed. We were coming up with a draft that would be in accordance with Florida law that had been passed.
Q. And then in that same declaration you said you received approval, again, drafting revised procedures in May 2023.
From whom did you receive approval?
A. From the director.
Q. Is that Mr. Weiss?
A. It would have been Mr. Reimers. He was still with us, I believe, at that date. I believe Mr. Weiss did not begin until May or June of that year.
(Sadah Mishb enters the Zoom videoconference.)
BY MS. NOWLIN-SOHL:

Q. Okay. And you mentioned, you know, working on this draft and that the initial policy was a mental-health-only policy in response to the law.

Prior to the law, was the plan to have a mental-health-only treatment policy?

A. Prior to which plan?

Q. Prior to the law passing.

A. I don't recall exactly when, but there was a draft to that effect. I don't recall exactly when.

Q. Okay. So, Dr. Martinez, the earliest drafts of the HSB that we've received in this case are from June of 2023.

Are there earlier drafts?

A. Again, discussions began in December of 2020. That's my recollection.

Q. Dr. Martinez, do you understand what I mean when I say a draft of the policy?

A. I'm assuming a written document.

Q. Okay. And so were there any written drafts of the policy prior to June 2023?

A. I don't recall.

Q. And you said you weren't sure where you would have saved those drafts.

Is it pos- -- you mentioned possibly a share drive?

of the document request in this litigation?
A. Whatever was saved by me in the common drive is what would have been produced. If it -- you know, if it wasn't saved, then it wasn't saved.
Q. And what is the -- what is the common drive?
A. I'm not -- I'm not a -- I'm not a tech person. It's a drive where its purpose is to save documents.
Q. Did you have a folder related to the HSB where you saved documents?
A. Not to my recollection. Whatever edits, I would have forwarded them, again, to, at that time, Tracy Kessler.
But it should be noted whatever -- maybe this will had help clarify. So my portions, given the law, would have been deleting elements of the original procedure, and because this is mainly a mental health document, most of the edits would have been done by Dr. Kline.
Q. Okay. So --
A. The additions were all mental-health related. The deletions would have been medical. So that would have been the nature of those primary edits to the procedure.
Q. Okay. So are you saying that the drafting of this HSB started by taking 40312 as the foundation and

then deleting parts of it, versus creating a brand-new document?

A. It could be. There was also the -- at one point the idea of completely abandoning the procedure because, again, the conversation about editing it began December of 2020. And at one point, by my recollection, you know, there were suggestions like, well, you know, if this is so unruly, let's just start from scratch. So I recall that as one version, okay.

Q. Okay.

A. And there was -- it's not what we -- the product that we ultimately produced.

Q. The starting from scratch version was not the product that you ultimately produced?

A. No.

Q. So the product you ultimately produced was based off of an editing of procedure 40312?

A. You have a copy of it. You can see that a lot of the mental health remained -- from the procedure remained in the HSB.

Q. Okay. I'm going to mark as Exhibit 6, FDC officials 036256.

(Plaintiffs' Exhibit No. 6 is marked for identification.)

* * * * *

BY MS. NOWLIN-SOHL:

Q. And I will represent to you that the title of this document is GD HSB. And it was last modified on June 19th, 2023. And it was saved in a folder path indicating it was Adam Wasserman's, quote, GD HSB folder. He has said that that is a shared folder. This is not his document.

Did you create this document, Dr. Martinez?

A. I don't recall. Again, this was not the final work product so I don't -- I can't tell you exactly what I did or did not contribute to this. I don't recall.

Q. And I understand it's not the final work product, and I'm trying to understand if it's the first work product, and what your contributions were to the first work product.

Do you know if there were drafts prior to this draft that is dated June 19th, 2023?

A. It's possible. I don't know.

Q. Okay. And so looking at this document in this format, do you know whether you or Dr. Kline created the first written document of this HSB?

A. So, again, you know, the -- so the double Xs are to indicate that this is not a final product. And this could have just been work that was saved. Somebody started working, and they wanted to save their work and

so they saved this draft. That would be -- that would be my guess specifically because the last two numerical numbers are represented by double X, which is typical of something -- a work in progress.
Q. And who is that somebody that would have started the first draft, then?
A. I don't recall.
Q. Would it have been anyone other than you or Dr. Kline?
A. Not to my knowledge, no.
Q. So you don't remember if you were the first person to draft this or if it was Dr. Kline?
A. Again, my recollection is that conversation to edit this procedure began in December of 2020, which next month will mark five years. I don't -- I do not recall this specific minute in time, no.
Q. Okay. Dr. Martinez, for purposes of the conversation we're having right now, I'm focused exclusively on the drafting of the document. So we could set aside the conversation about it. I'm just trying to understand the actual writing of the documents and whether this is the first document, or if there are ones that existed prior to this.
A. So can you scroll to the end?
Q. (Complies.)

A. Yes, so you can see it's not signed and there's no effective date.

So, again, this would have been a draft. Again, the exact date of this draft is unknown to myself. And, again, given the fact that it's got the XX would indicate that this was -- this was -- someone was saving their work. Someone started this and they did not want to start from zero again, so they saved their work to be continued. Because -- what I can definitively say about this document whether there was a prior version of this document, I can't -- I don't recall. Was there a successor to this document, yes, this was not the final work product.

Q. And, Dr. Martinez, we've established that someone here, either you or Dr. Kline, that it wouldn't have been anyone else, yes?

A. That is correct.

Q. But you don't know if you wrote this draft of the policy or if Dr. Kline did?

MR. STEELY: Object to form. Asked and answered. You can answer.

A. It wouldn't -- I mean, it would have been myself or it would have been her. This would have been a working copy. Because, again, the number is not complete; it has an XX. There's no effective date and

it was not signed. So this was a work in progress is the most that I can say about this document.

BY MS. NOWLIN-SOHL:

Q. Okay. I'm showing you page 6 where it talks about treatment for gender dysphoria. It talks about mental health treatment and mental care. It says nothing about hormone therapy or social accommodations.

So this draft of the HSB does not provide for hormone therapy or social accommodations, correct?

A. As you're reading it to me, that appears to be correct.

Q. Well, we can scan the rest of the document to see if I'm missing it.

So I'll slowly move through it. Please let me know if you see anything that indicates that hormone therapy would be provided under this draft HSB.

A. It would be more useful if you started from the beginning --

Q. Okay.

A. -- and go downwards.

Q. That's fair.

A. Thank you.

You can proceed to the next page.

Q. (Complies.)

A. You can proceed to the next page.

Q. (Complies.)
A. You can proceed to the next page.
No.
Q. And just to make the record clear. This policy does not provide for hormone therapy or social accommodations?
A. This work in progress does not mention that, no.
Q. Okay. And Section 5(C) says that patients diagnosed with gender dysphoria classified as an S-2 minimum, correct?
A. That is what it reads, yes.
Q. And S-2 is a mental health classification?
A. Yes.
Q. And an S-2 minimum is the same requirement that was under procedure 40312?
A. I would have to look at 40312 to be absolutely certain.
Q. Is that consistent with your recollection?
A. I would have to look at the procedure to be absolutely correct.
Q. I'm going to mark as Exhibit 7 Bates stamped FDC officials 032769.
(Plaintiffs' Exhibit No. 7 is marked for identification.)

BY MS. NOWLIN-SOHL:
Q. Okay. So this is another draft of the HSB; it is titled GD HSB underscore DK draft underscore 621 -- or, sorry, 62123. And it is saved in a file path that indicates it is Dr. Kline's.
Do you understand DK and the title to refer to Dr. Kline?
A. I do not.
Q. So you worked with Dr. Kline on preparing this document and I'm assuming shared drafts back-and-forth?
A. It's possible. It's probable.
Q. But you don't remember sharing drafts of this HSB with Dr. Kline where you two were the only authors on?
MR. STEELY: Object to form.
A. I can't tell you off the top of my head how Dr. Kline saves her documents, no.
BY MS. NOWLIN-SOHL:
Q. Okay. Well, I guess my question was: You and Dr. Kline exchanged drafts of this document while you were preparing it, correct?
A. That would be accurate, yes.
Q. Did she ever email you drafts?
A. It's possible. Again, that's not the normal procedure. The normal procedure is that I would receive

Q. What were those concerns?

A. Well, one of the concerns was how to titrate patients off of the wrong hormone therapy, off of hormone therapy.

Doing a review of the literature there was no -- there was no recommendation. And WPATH, neither in Standards of Care 7 or in Standards of Care 8, nowhere do they have a recommendation for detransitioning.

Q. Did you have any other concerns?

A. That was my primary concern; that there was no -- you know, there was no authority in the medical literature indicating if a patient on hormones were to detransition what was the effective dose. What was the effective time duration. What, if any, possible side effects would occur from doing so. There was simply nothing in the literature. That was my primary concern.

Q. You didn't have any concerns that hormone therapy might be medically necessary for some patients and that they wouldn't be able to get it under this draft policy?

MR. STEELY: Object to form.

A. Again, this is a work -- this is a draft in evolution. This is not a final work product. This is not ultimately the HSBs that we produced. This was the thinking at the time.

BY MS. NOWLIN-SOHL:
Q. Okay, and I understand that this is a draft. I guess I'm trying to understand the evolution and the thinking.
And so at the time of this draft, did you have any concerns that hormone therapy might be medically necessary for some patients and not permitted under this draft policy?
A. Ultimately, that's the conclusion that Dr. Kline and I arrived at. When exactly those concerns would have arisen, again, I don't recall exactly. And, again, this was a work in progress.
Q. And so how did you and Dr. Kline reach that conclusion?
A. Again, pouring over the available -- the most recent available literature on the subject of gender dysphoria.
Q. So when this HSB was ultimately announced in September of 2024, there was a script that was read to inmates about it, correct?
A. Yes, I wrote the script.
Q. Okay. Did you write the first draft of the that script?
A. I -- the final product was almost 100 percent mine.

Q. What about the first draft?
A. I don't recall.
Q. Okay. Well, you just said you wrote the script.
So were you the first one to prepare that?
A. I don't recall. I can just tell you that I wrote 90 -- like, 99 percent of what was actually the script.
Q. Okay. Let's mark as Exhibit 8, FDC officials 036260.
(Plaintiffs' Exhibit No. 8 is marked for identification.)
BY MS. NOWLIN-SOHL:
Q. Is this a draft of that script?
A. It's possible.
Q. Okay. Possible.
Does it look like a draft of that script to you?
A. It looks like any Word document of any that can be put up -- pulled out of a file. That was not the final format, so I -- I don't recall.
Q. Okay. Well, I understand it's not the final format. I asked if it was a draft. You said you wrote a document.
I'm asking does this look like --

A. I said --

Q. -- you drafted this?

A. -- that I wrote 99 percent of the final work product.

Q. Okay. Did you draft this?

A. I don't recall.

Q. Okay. So the title is document script dash hormones with MH edits, 7523.

Does that suggest to you that you wrote this script and Dr. Kline provided edits?

A. It could be. I don't recall.

Q. Okay.

A. I can only speak to the final work product. Again, this is -- this was a work in progress. This is not what was actually read to the inmates.

Q. And I understand that.

I guess I'm trying to understand how you could have done 90 percent of the drafting but not understand if you were involved -- or 90 percent of the final work product, but you're not sure if you were involved in this drafting.

A. I don't recall. Again, I can only speak to the final work product. And I wrote 99 percent of the final work product, which is what was actually read to the inmates.

Q. Okay. So the file name says 7523.
Does that suggest that the date of this document is July 25th, 2023?
A. It's possible.
Q. Well, Dr. Martinez, I'm not asking what's possible.
I'm asking: Does that suggest to you that this script, that you had a hand in drafting, was from July 5, 2023?
MR. STEELY: Object to form.
A. I can't speak to that. I don't know. It's possible.
BY MS. NOWLIN-SOHL:
Q. Okay. Can you read the first two sentences of this document?
A. Could you -- I'm at the end of this table. Can you amplify, so I have my own view.
Q. (Complies.)
A. A little bit more.
Q. (Complies.)
A. Due to recent laws enacted by the Florida Legislature, the Florida Department of Corrections, FDC is required to change some of its policies regarding treatment of gender dysphoria. FDC can no longer provide hormones to inmates for issues related to gender

dysphoria. There will be a transition period during which all inmates who are on hormones specifically for gender dysphoria will be weaned off these hormones.
Q. And recent laws refers to SB 254 that we were talking about earlier?
A. Yes.
Q. And so the draft explanation of the new policy that was going to be read to inmates said that FDC was going to be discontinuing hormones for gender dysphoria as a result of SB 254?
A. That's what this document says, yes.
Q. And you said you were responsible for 90 percent of the final script that was read.
Who else contributed to the script?
A. I said I was responsible for 99 percent of the final work product.
Q. Apologies.
So who else was responsible for contributing to the script?
A. That would have been Dr. Kline.
Q. Anyone else?
A. Not to my recollection.
Q. So either you or Dr. Kline wrote this document?
MR. STEELY: Object to form.
A. Again, I wrote 99 percent of the final work

product of what was actually read to the inmates. That 1 percent that I didn't write would probably have been written by Dr. Kline. I don't -- I don't recall. I don't recall this document.

And, again, the document was read in September of 2024 so, you know, there were significant changes to the final work product.

BY MS. NOWLIN-SOHL:

Q. Okay. But that wasn't quite my question.

My question is: If only you or Dr. Kline contributed to this script, is it logical to conclude that either you or Dr. Kline wrote this draft of the script?

MR. STEELY: Object to form.

A. That's accurate.

BY MS. NOWLIN-SOHL:

Q. All right, Martinez Exhibit 9. FDC officials 036723.

(Plaintiffs' Exhibit No. 9 is marked for identification.)

BY MS. NOWLIN-SOHL:

Q. So this is a deep-dive presentation that you said in your last deposition that was prepared by you and Dr. Kline, correct?

A. I'm only looking at the first page.

Q. (Scrolling.)
A. Yes, this looks like the same document.
Q. Okay. And you prepared this third slide?
A. Probably, yes.
Q. And you said probably, yes.
If it wasn't you; it was Dr. Kline?
A. Dr. Kline or someone in mental health would have provided the numbers on the second slide of this PowerPoint presentation.
Q. Okay. But as we sit here today, your understanding is that you provided this third slide?
A. In all likelihood, yes.
Q. Okay. And this was for a deep-dive presentation to, I think you said, Mr. Ricky Dixon, Mr. Richard Comerford, Dr. Tim Fitzgerald, Mr. Clayton Weiss, and possibly Michelle Glady; is that accurate?
A. Yes.
Q. Okay. And this presentation says that the new HSB -- this presentation is dated July 27, 2023, correct?
A. That's what it says, ma'am.
Q. And it says that the new policy will not provide hormones or accommodations; is that accurate?
A. Yes. On the fifth line, yes, it says that.
Q. Okay. And how did the people in the meeting

respond to the new policy prohibiting hormones and accommodations?

A. I don't recall.

Q. Was there any conversation during the presentation?

A. Other than -- so deep dives are meetings that we have with the secretary. The secretary is the head of all Florida Department of Corrections. Offices of health services is just one division within the agency that is the Florida Department of Correction.

So the purpose of the deep dive is to brief the secretary on any updates that we would have. We had been working on a new HSB for gender dysphoria, and so the purpose of this meeting would have been providing a brief summary of what we had -- what the work product looked like so far.

(Anne Wooding exits the Zoom videoconference.)

BY MS. NOWLIN-SOHL:

Q. Okay. Was there any conversation about what the work product looked like so far?

A. Yes, we would have informed the secretary of exactly what are on these slides.

Q. And did they say anything in response?

A. Not -- nothing significant, to my recollection, no.

Q. Okay. Did they express any concerns about a policy removing hormones and social accommodations?

A. Not that I recall.

Q. Did you express any concerns to them that you had about a policy removing hormones and accommodations?

A. No, not to my recollection. And that would not have been the purpose of the meeting.

The purpose of the meeting, again, would have been to update the secretary on where we were to edits to a new HSB to gender dysphoria. And that's where we were at that moment in time.

Q. Did Dr. Kline express any concerns about the policy prohibiting hormones and accommodations?

A. Not that I recall. But, again, that would not have been the purpose of that meeting.

Q. Did either you or Dr. Kline express any concern about the impacts and harms to the mental health of the patients that removing hormones and accommodations could have?

A. Regarding this meeting, I would say no. We did have conversations prior to the ultimate release of HSB -- of the new HSB in September of 2024. Prior to that, we did have a conversation regarding that.

But during this meeting, no, not to my recollection. And, again, that would not have been the

significant percentage of these patients do resolve their gender dysphoria. Gender dysphoria is not a permanent condition.

I don't know if I would have added it to this draft specifically. But letter D is my language that I added from the DSM-V Text Revision.

Q. All right. And then what was the motivation for including the possibility for hormone therapy?

A. Again, a review of the most current literature.

Q. Did you make that determination?

A. If I hadn't -- I mean, no. I don't make the determination of what is the most current literature on gender dysphoria. I read it, and I process it, and so does Dr. Kline and, you know, what we found to be most medically sound is what we included in this draft of the HSB.

Q. So you and Dr. Kline jointly made the decision to include the possibility for hormone therapy in this version of the draft?

A. We would have come to an agreement that -- yes.

Q. Do you recall having a conversation with Dr. Kline about including this?

A. We would have had many, many conversation. You know, again, my entry into this discussion was in December of 2020. When exactly she and I would have had

these conversation, I cannot say. But we talked about many different aspects of gender dysphoria.

Q. So the last draft that I showed you that did not have a clause providing for hormone therapy was dated 9/26/23 and had the word "final" in the final name. I'm not saying it was final, but that was the word in the final name.

This draft has --

A. Yes.

If I might stop you, please. Again, it was not dated, and it was not signed. It was not the final work product.

Q. I understand that, Dr. Martinez. I'm representing to you what the name of the document is.

Do you have any reason to dispute that that is the name of the document?

A. I have no reason to dispute that's the name of the document. I have reason to dispute that it was not the final edit.

Q. Okay, and I agree with you that it is not the final edit. So we can agree on that and set it aside.

Some the final name of the document says final. It has the date 9/26/23 in it. And does not provide for hormone therapy.

This version of the draft has the date 10/3/23

in it and does provide for hormone therapy.
What happened in those intervening days to cause hormone therapy to be added to this draft?
A. Again, you know, I specifically wanted some of the literature cited in the HSB. This is what we found in the most recent literature, which, you know, runs afoul of the spirit, if you will, of the law SB 254.
Q. Did you need to get permission from anybody to include that clause that goes against the spirit of SB 254?
A. What do you mean by permission?
Q. Did you need to ask anybody if you could include that?
A. No.
Q. Did you talk to anybody about including it?
A. So if memory serves correct, we were able to resolve -- we were able to come up with a solution for the legal matter of actually providing the hormones.
Q. And that had happened shortly after the law was passed, correct?
A. No.
MR. STEELY: Object to form. Yeah, I'm sorry, go ahead.
THE WITNESS: I apologize.
A. No. No, that -- there were many -- there was a

protracted length of time with discussions with our vendor as to whether they would be willing and/or capable of -- for a lack of a better term -- eating the cost of providing the treatment. That was -- that took a while to iron out. So those are the two largest changes from the prior edit.

BY MS. NOWLIN-SOHL:

Q. Do you recall when that agreement with the vendor was reached?

A. Those conversation were above my head. It is consistent with this timeline that we would have been informed -- by me, I mean Dr. Kline and myself -- that our vendor Centurion was willing to eat the cost of providing the treatment, right, which would provide us with a viable path to do both things. To be in compliance with Florida law, and to be in -- and to be in agreement with the most recent literature available on the treatment of gender dysphoria.

Q. Okay. So your understanding of the literature for gender dysphoria suggested that hormone therapy could be medically necessary, but that wasn't included in the policy until an agreement was reached with Centurion for them to pay for the hormone therapy?

A. So, again, those prior drafts were an attempt to be in compliance with Florida law. But the research

was available suggesting there's -- it is statically weak but, nonetheless, it is there to suggest that some of these patients will benefit from therapy.

Q. And so was the addition of hormone therapy to the HSB a result of Centurion agreeing to pay for the hormone therapy?

A. Again, that was part of the change. And I wouldn't say addition; it was a deletion as a result of the law.

Again, by our vendor Centurion agreeing to assume the cost of the cross-sex hormone therapy, we were able to proceed with this version, which is closer to the final work product.

Q. Okay. You said that Centurion was part of the reason.

Were there other reasons?

A. I've answered that. The medical literature -- the most recent medical literature.

Q. But the medical literature didn't change in the week between September 26th and October 3rd.

And so I guess I'm trying to understand were there other changes that happened between these drafts where hormone therapy was added?

A. Other than my concerns that I mentioned earlier, no.

Q. Okay. The agreement with Centurion, is that documented anywhere?
A. That I'm aware of, no.
Q. Were you part of those conversation with Centurion?
A. I was not.
Q. Who was?
A. I do not know.
Q. Okay.
MS. NOWLIN-SOHL: All right, I think we've gone for the additional 15, 20 minutes that I suggested.
Is now a good time to take a break?
THE WITNESS: Yes.
THE REPORTER: Is this a lunch break, or is this just a quick break?
MS. NOWLIN-SOHL: I defer to Dr. Martinez on that. I'm on the west coast. So I don't need lunch now, but if this makes sense for a lunch break we can take that now, or we can take a shorter break.
MR. STEELY: Thirty minutes good for lunch?
THE WITNESS: That's fine.
MR. STEELY: That works.
(A lunch recess is taken.)
BY MS. NOWLIN-SOHL:
Q. Dr. Martinez, welcome back. You understand

disorder being used it was called trans-sexualism. There's been an evolution of the term.

So I'm not understanding you when you say to cure transgenderism. If they have the diagnosis, they could be a candidate for hormone treatment; that would go to a variance. If the evidence suggests this patient would benefit from hormone therapy, the variance is granted. By granting the variance they're not -- the diagnosis of gender dysphoria is not taken away.

BY MS. NOWLIN-SOHL:

Q. Okay. So moving to the next line here, which is highlighted. It says: Such evidence shall be founded based on sound scientific methods and research that was subject to the formal review process.

Did you add this language?

A. If I did not add this language, Dr. Kline would have added this language. And, again, it's to reflect at that point the latest version of the DSM-V Text Revision, and the latest scientific literature on the subject.

Q. And the sound scientific methods and research refer only to randomized controlled trials?

A. No.

Q. So observational studies can constitute sound scientific methods and research?

A. If the sample size is large enough and the time of the observational study is done is long enough and inclusive enough, it's possible.

Q. And the formal peer-review process.

Does that mean a study published in a peer-reviewed medical journal?

A. That qualifies as one such example, yes.

Q. What are other examples?

A. For example, the Cass Review that was done in the United kingdom. For example, the McMaster University review that was paid for by Florida Medicaid that was done by researches at the university -- McMaster University in Canada.

Q. That was peer reviewed?

A. Both cases were peer reviewed of the literature, yes.

Q. Okay.

A. For leaders in the field.

Q. Okay. But that does not include letters to the editor in medical journals?

A. A letter to the editor would be an opinion; that's not considered a formal review process. That's not considered formal scientific literature.

Q. Okay. And so earlier you were talking about the studies done by Dr. Kaliebe and Dr. Cantor. There

were dozens that were studies on treatment for gender dysphoria in adults.

Were those peer-reviewed studies published in medical journals?

A. Yes, yes. For the most part, yes.

Q. Okay. And did they rely on --

A. They were not only published in scientific journals, they were also -- they were published in newspapers, they were published in magazines, they were published in articles on the Internet because of their findings, because of the change in recommendations for treatment that occurred around that time.

Q. Okay. So they were published.

Were they always peer reviewed?

A. I can't tell you if all of them were peer reviewed. Many of them were, yes.

Q. Okay.

A. But I can formally tell you the Cass Review was a formal peer review. I can formally tell you that the McMaster University study in Canada was done over a two-year period, again, for Florida Medicaid, was a formal peer-review process. Both of those were formal peer-review processes.

Q. And the Cass Review studied pediatric populations, correct?

please.

BY MS. NOWLIN-SOHL:

Q. I'm making sure I'm in the. . .you know what, I might have the wrong document up. Let me find the right one real quick.

Okay. One more. Back to Exhibit 10. And this is the one that was titled HSB 150523 draft final 9/26/23. And it was in Kline's folder.

And I think we talked about this Section 6(D) here where it says: In accordance with Section 28631 FS where the permit cannot expense state funds for sex reassignment prescriptions or procedures.

Consequently, every inmate, whether current or will be admitted who is on hormones specifically for gender dysphoria, will be evaluated to determine if the inmate can be safely weaned off these medications.

Do you remember talking about that earlier?

A. I recall that I brought it up, yes.

Q. Okay. So now going back to Exhibit 12. The same Section D is almost the same as the last version. But the first sentence and consequently referring to the law have been deleted.

Why was that deleted?

A. Again, because we hadn't figured out a way to be both in compliance with the law, and to be able to

provide hormones for this patient population as a treatment -- form of treatment.

Q. Okay. But it still says that people are going to be reevaluated and titrated off of the hormones, correct?

A. If the diagnosis is no longer warranted, that is correct.

Q. Was Section 28631 rescinded by the Florida Legislature?

A. Again, are you referring to SB 254 again?

Q. Yes, yes.

A. No, ma'am, it was not rescinded. But given the fact that we were able to provide the hormones -- and, again, after review of latest medical literature at that time, although the evidence was weak, there was still evidence that it provided some benefit to this patient population, we modified the HSB to reflect that and to be in compliance with the law.

Q. I believe you said previously in the 30(b)6 deposition that you never saw edits to the HSB from Centurion; is that correct?

A. To my recollection, no.

Q. Okay.

A. I never saw anything. And I'm not -- I had no conversation with them.

Q. Okay. Centurion did provide edits to the FDC. Do you know why you never saw them?
A. I can't -- I can't speak to that.
Q. Did you even know that they provided edits?
A. You're make me aware of this now.
Q. Did you ever speak to Clayton Weiss about edits from Centurion?
A. Not to my recollection, no.
Q. Did you ever speak to Dr. Kline about edits from Centurion?
A. Not to my recollection, no.
Q. So Centurion provides all of the healthcare to FDC patients, and you never saw any of their input on a significant policy change?
A. No, and that would be consistent with every other procedure or HSB that we have.
Q. And you personally didn't want their input as you developed this policy as somebody who does not provide care or treatment to patients with gender dysphoria?
MR. STEELY: Object to form.
A. Again, they're our vendor. They -- by the terms stipulated in our contract with them, they have to follow all of our HSBs and procedure; it would be atypical of them to chime in on any of our HSBs or any

of our procedures.
BY MS. NOWLIN-SOHL:
Q. I'll mark as Exhibit 13, FDC officials 045110.
(Plaintiffs' Exhibit No. 13 is marked for identification.)
BY MS. NOWLIN-SOHL:
Q. This is an email from Dr. Lay at Centurion to Clayton Weiss and Dr. Kline with a markup of the HSB 150523 draft, dated November 10th, 2023.
Have you ever seen this email?
A. I have not.
Q. Why wouldn't have Dr. Kline or Mr. Weiss shared these edits with you?
MR. STEELY: Object to form.
A. I mean, I don't know. I really can't speak to that. Other than this HSB is mainly a mental health HSB. So given that fact this would -- you know, that I would be excluded from an edit to a mental health -- largely excluded from a mental health HSB would not be extraordinary.
BY MS. NOWLIN-SOHL:
Q. It's primarily a mental health HSB.
Why did you spend hundreds of hours researching the literature for it?
A. Because that's part of my job as the chief of

A. I don't know.
Q. Who suggested that change?
A. I don't recall.
Q. Had the change in medical consensus occurred since July of 2023?
A. Since July of 2023. There was a lot of -- that summer, there were a lot of publications and literature, again, that were in contradiction with WPATH's Standards of Care 8, to my recollection.
Q. Didn't this HSB start developing because of the change in law?
MR. STEELY: Object to form.
A. Again, the procedure -- the conversation for editing and changing the procedure began in December of 2020. You know, again, which, you know, next month will make five years. Five years that -- from these events.
BY MS. NOWLIN-SOHL:
Q. Dr. Martinez, when I ask about the drafting, I'm talking about the writing of the document; not the conversation, but I think we've established that.
So did the drafting of this HSB and the actual writing of a policy occur because of the change in law?
MR. STEELY: Object to form.
A. What's you're showing me here is neither the policy, or the HSB, or the procedure.

This was in anticipation of rolling out the new HSB how we were going to inform the -- our transgender population of the change.

BY MS. NOWLIN-SOHL:

Q. That doesn't answer my question, Dr. Martinez.

A. I'm sorry, I'm lost. What is your question?

Q. Okay. So didn't the drafting of the writing of this HSB start because of the change in law?

MR. STEELY: Object to form. Asked and answered.

He's -- you're trying to break the place from where he said he started this progress to the actual writing. He's gone over that over and over all day today. But if you want to go ahead and answer, go ahead.

A. The conversations about editing this procedure began in December of 2020 well before the passing of law.

BY MS. NOWLIN-SOHL:

Q. Dr. Martinez, you understand the distinction between drafting a policy and having conversation about a policy?

A. You made it abundantly clear, yes.

Q. Okay. So I'm going to ask the question again about the drafting of the policy.

Didn't the drafting of the policy start developing because of the change in Florida law?

MR. STEELY: Same objection. You can answer

A. Did I actually put pen to paper at that moment, if you will, yes.

Q. Okay.

A. Our old procedure was not in compliance with Florida law. We were required to change it, yes.

Q. Did Centurion ever provide edits to this script?

A. I don't recall. It's possible. Again, at the end of the day it was a Centurion employee from mental health and an FDC employee from security that ultimately delivered the message to all of the gender dysphoria patients on the same day.

Q. Do you know whether it was a Centurion employee that ultimately ended up reading this script to the patients?

A. Do I have documented video evidence that it was a Centurion employee reading this to the gender dysphoria population, no, I do not.

My understanding is that either a Centurion employee or the FDC security employee would have read either or. Those were our instructions.

Again, this was not the final work product.

This is not what was read.
    Q. Were you aware that Centurion's counsel asked FDC's counsels to remove the words "recent changes from the medical consensus" from the script?
    A. I have no recollection.
    Q. So you've never heard that before?
    A. I have no recollection.
    Q. All right. Lets mark as Exhibit 18 Centurion production 00082.
        (Plaintiffs' Exhibit No. 18 is marked for identification.)
BY MS. NOWLIN-SOHL:
    Q. So this an email chain. We can start -- the second page is mostly blank.
        The first email is from Deana Johnson to -- at Centurion to Dan Johnson at FDC on September 20th, 2024. And then there are additional forwards.
        So in the middle of this paragraph Deana Johnson says: I am writing to ask your consideration of removal of the words, both recent changes in medical consensus, end quote.
        If FDC decides to provide a reason for this policy change in the announcement, Centurion requests either the removal of the concept that medical consensus has changed, or alternatively that FDC delivered this

that point did not include banning hormones, correct?

A. We looked at all studies that were available.

Again, you know, there's no study banning hormones regarding this subject matter. The studies are what forms of therapy, pharmacological or psychological, or otherwise, that would most benefit this patient population.

Q. That didn't really answer the question, Dr. Martinez.

The plan prior the law, the conversation you had been having, were not about banning hormone therapy or social accommodations, correct?

MR. STEELY: Object to form.

A. They didn't exclude those conversation. Again, because of studies that were coming out like the Cass Review and like the McMaster University research results that had come out.

Also there was the controversy surrounding the publication of WPATH Standards of Care 8. Originally, they had included limitations on the treatment of minors and teenagers, and the original publication was to include a limitation of the age of 16, okay.

As a result of an internal debate that was political in nature, they excluded that language from the ultimate text. Just to give you one example of the

flaws of WPATH's Standards of Care 8, okay. Once that was published -- again, all those previous societies and associations that pointed to the Standards of Care 7, WPATH, as the standard of care for gender dysphoria, half of those societies said, no, Standards of Care 8 is not the standard of care for gender dysphoria, and they came up with their own recommendations.

BY MS. NOWLIN-SOHL:

Q. Dr. Martinez, my question is: Was it your plan prior to SB 254 to ban hormone therapy and social accommodations?

A. Was it my plan, no. What I am saying is that there was medical literature to suggest that it was harmful. Not beneficial to the gender dysphoric community.

Q. And despite that literature, you now believe that hormone therapy can be medically necessary for some patients?

A. There is clinical research with weak statistical evidence that suggests just exactly that. And, therefore, we did not abandon that as a form of treatment.

Q. You've previously said that hormone therapy can be medically necessary, correct?

A. On an individual case-by-case basis it has been

our experience in reviewing these cases, yes. In an individual case-by-case basis it has improved the patient's behavior. It has, in some cases, stabilized their mood as well.

Q. And for at least the 67 people who have been granted variances, you've determined it is medically necessary?

A. We have agreed with the determination of the MDST. We agree with their recommendation.

Q. When I asked about impacts of SB 254 passing, I think you said one of them was that your procedure 40312 was not in compliance with that law; is that accurate?

A. Yes.

Q. And was that procedure paused?

A. You asked me that before. No.

(Megan McNab enters the Zoom videoconference.)

BY MS. NOWLIN-SOHL:

Q. Okay. I'm going to show you exhibit -- not an exhibit, sorry. FDC officials 030202.

This is a series of emails from July 2023. The subject HSB procedures -- HSB slash procedures; that referenced 40312.

Who is Iqra Ubaid?

A. So she took over for Ms. Tracy Kessler who had her position previously. Which, again, they are in

charge of the annual review of all the HSBs and procedures that have to be sent out to each of the chiefs for review and editing. They send it back to this individual. This individual then forwards it to the next person on the chain for review of the HSB procedure.

Q. And this email says that procedure 40312 is under litigation decisions and may possibly be rescind.

What does it mean for the procedure to be under litigation decisions?

A. What I mentioned earlier that there were court cases outside of the state of Florida regarding the treatment and care of patients with gender dysphoria.

Rescinded means that it would be, you know, retired, and it would be replaced by something else. Ultimately, it was replaced by the HSB 1505.23.

Q. So earlier I thought you said that the HSB publication was kind of delayed for the court decision.

So are you saying that those court decisions also were impacting 40312?

A. So we're not -- you know, we delayed the rescinding of the procedure until we were sure of when we're going to publish the HSB 1505.23. Because we had not published 1504.23, we did not rescind the procedure.

Q. Well, this is July of 2023.

So this is still somewhat early in the drafting process of the HSB, right?

MR. STEELY: Object to form.

A. It's consistent with the timeline that we've been talking about from the date the director signed on June 3rd of 2023. But I'm not sure what year asking me.

BY MS. NOWLIN-SOHL:

Q. I believe the document we showed with the director signing it was June 3rd of 2024.

And so my question is: The first drafts we looked at of the HSB are in June of 2023.

So you're still a ways off from a mere final draft of the HSB, right?

A. Again, we have to review all our policies and procedures on an annual basis. The conversation for changing or rescinding procedure 403.012 began in December of 2020. This is an snapshot of where we were at the end of July of 2023.

Q. Okay. And you said earlier that the GDRT stopped meeting in May of 2023, correct?

A. That's accurate.

Q. And that's because SB 254 was passed in May of 2023?

A. Again, we were in noncompliance with the law. Yes.

Q. So no one was approved for hormone therapy by the GDRT between May of 2023 and the release of the new HSB on September 30th of 2024?
A. So, no, there were approvals, just not through the GDRT.
Q. Who made those approvals?
A. So, for example, if we received inmates from the outside community that had the diagnosis and were receiving hormone therapy, we continued them on hormone treatment.
Q. For the entirety of that time period?
A. Yes.
Q. But for patients who are already within an FDC custody, nobody was approved to start hormone therapy during that time?
A. To my knowledge, no.
Q. And as a member of the GDRT, you would have known had somebody been approved to initiate hormone therapy?
A. Yes.
Q. When the HSB -- the final version came out, did anyone from FDC medical or mental health personnel express concerns about the new policies removal of accommodations?
A. Not that I'm aware of.

Q. Did any Centurion medical or mental health personnel express concerns about the new policies removal of accommodations?

A. Not that I'm aware.

Q. Did anyone raise concerns about the impact of the loss of accommodations on inmate patients?

A. I previously answered that question.

Dr. Kline and I had conversations as to -- and I answered this with Mr. Anscombe as well. We talked about, you prepare for the worst. You hope for the best.

So on the day that the message was released, we made sure that there was additional security and mental health providers available at all of the facilities that housed gender dysphoria inmates in case there would be a psychological emergency; in case there would be a decompensation in their mental health; in case they needed to be sent out to an outside hospital for psychiatric treatment.

Q. What about the ongoing impacts of not being provided accommodations?

MR. STEELY: Object to form. Go ahead.

A. What is the question?

Q. Did anyone raise concerns with you about the ongoing impacts of patients not being able to access

accommodations?
A. In terms of FDC employees or Centurion employees?
Q. Either.
A. Neither.
Q. You've seen evaluations done by Centurion providers noting the negative impacts of the loss of accommodations on patients mental health, though, haven't you?
A. Yes, that's part of the subjective history of the MDST report, yes.
Q. So you are aware of concerns about the impacts on patients due to the loss of accommodations?
A. Insofar as the patients are self-reporting and that is recorded on the MDST report, yes.
Q. What do you -- there was some emphasis on the self-reporting there.
Can you tell me about that?
A. You know, you come to see me and I ask you how you're doing today, and you say, Dr. Martinez, I feel lousy. I have a headache. You know, my mom just passed away. Et cetera, et cetera, et cetera. It's the whole self-reporting, what's going on within your life, your situation and, you know, that's part of the subjective part of any history.

Q. And subjective part of mental healthcare, generally, right?
A. Healthcare, generally.
Q. Okay. I think you also mentioned receiving -- I think the phrase was an avalanche of grievances.
After the new HSB many dealing with the loss of social accommodations, correct?
A. No, the majority of them in reality -- and it was a vociferous few. I kept on getting the same grievances from the same gender dysphoric inmates complaining that they had loss access to their hormones when they had not. That did not occur.
Q. Those grievances also include complaints around the loss of accommodations, right?
MR. STEELY: Object to form.
A. Yes, some of them did. But the great majority of them came from a very vocal few who were grieving that they were going to lose their access to hormones, which did not happen.
BY MS. NOWLIN-SOHL:
Q. And with regard to the self-reporting of the harms of the loss of social accommodations.
The evaluations done by the Centurion providers. Those providers are also providing their opinions on the impacts of the loss of accommodations on

these patients, correct?

A. No.

Q. So the Centurion providers are not listening to these patients and kind of making their own determinations as to whether these patients are being impacted by the loss of accommodations?

A. No, they are documenting the answers that the patient is giving them to subjective questions. They don't interject their own opinion into that narrative.

Q. So the mental health providers provide nothing beyond transcription services?

MR. STEELY: Object to form.

A. You brought up several versions of the HSB. There's pages long worth of psychological testing that they are directly involved in. The subjective part of the exam -- evaluation is only one part.

But, ultimately, and far more importantly, at the very end of said report, they provide their clinical judgment as to whether this individual truly has a diagnosis of gender dysphoria, and whether they feel this individual would benefit, A, from starting treatment with cross-sex hormones or, B, continue treatment with cross-sex hormones. Ultimately, that is the most important part of the report.

And, again, this is the clinical judgment of

the mental health provider conducting the interview, which when -- if these reports reach the gender dysphoria variance team, that the part of the report that we put probably the most weight on.

But, no, they don't interject their personal feelings into a report. That's not -- that's not the standard of care.

BY MS. NOWLIN-SOHL:

Q. But they provide clinical impressions?

A. They make a determination as to whether or not they think this individual truly has the diagnose of gender dysphoria, and they make the determination as to whether or not they think they would benefit from starting cross-hormone therapy or continuing said therapy.

Q. Lets mark as Exhibit 19, FDC officials 043764.

(Plaintiffs' Exhibit No. 19 is marked for identification.)

BY MS. NOWLIN-SOHL:

Q. Okay. So this is a variance reevaluation, correct?

A. If you could scroll through it. I only see part of the first page.

Q. Let me know if you need me to zoom in more.

A. Please.

Q. (Complies.)
A. Thank you. Sorry, can you scroll up?
Q. (Complies.)
A. Little bit more.
Q. (Complies.)
A. Yes.
Q. Okay. And it's dated May 8th, 2025. Sorry, I moved too quickly, but it's right here.
Is that correct?
A. That's what it says.
Q. And you have no reason to believe that's not accurate?
A. I do not.
Q. Okay. And so here on page 5 in the second paragraph of Section 9 it says: Since the removal of GD accommodations, inmate patient has struggled with adapting the demands of prison. For example, inmate patient describes that going through the experience of having grown hair shaved involuntarily triggered an adverse reaction subsequently resulting in the TCU transfer ambition.
What is TCU?
A. Therapeutic care unit. It's a level of what's called the residential continued unit care.
Q. Okay. And so this form is saying that this

patient has struggled with the loss of accommodations, correct?

A. The clinical psychologist is providing a summary, again, of the self-reported answers that the patient gave indicating that they required a higher level of mental healthcare as a result of their adverse reaction, yes.

Q. Okay. Is there a section on this form for the clinical psychologist to recommend accommodations?

A. No.

Q. Why not?

A. We rescinded the alternative canteen, which was part of the old procedure.

Q. And you also rescinded the accommodation for hair length for transgender women?

A. Yes.

Q. And rescinded the accomodation for certain undergarment accommodations, correct?

A. There were set items available in the alternative canteen. The alternative canteen was eliminated with the rescinding of the old procedure.

Q. Were the items also available through laundry?

A. No.

Q. So the gender dysphoria variance team is referred to as the GDVT, yes?

A. Yes.
Q. And that includes the chief medical officer, the chief mental health officer, and the chief clinical advisor?
A. Yes.
Q. Anybody else?
A. No.
Q. The chief clinical advisor was not a member of the GDRT, correct?
A. So when I assumed my position in August of 2020, Dr. Santiago was no longer in that position. And it was not until the gender dysphoria variance team was created in September of 2024 that she has been reincorporated into this process.
Q. Was there ever a time that the chief clinical advisor was on the GDR team?
A. To my knowledge, no. But what happened was is that the chief clinical advisor, before Dr. Santiago left -- Dr. Santiago assumed the position of chief clinical advisor but there was not -- and she had my old position. She had -- my current position was her old position, chief of medical services.
So, in fact, for a period of a year, she was performing both duties until I was hired in.
Q. And why was she added to the GDVT?

A. It was felt that another -- three would be better than two. Three could, you know, resolve a deadlock.

Q. And the chief of security and pre-coordinator had been part of the GDRT.

Why were they not included on the GDVT?

A. Because, again, originally, when the old procedure was written, it was the result of litigation. And so it was written way back in 2017, prior to my arriving at FDC.

But my understanding is that it was heavily edited and rewritten multiple times over until the judge in that case was satisfied that it would provide treatment for this patient population. And the pre-coordinator and a member of security and ops were added to the group.

In effect, when this group met -- when the GDRT met, the previous group met, they really had a secondary role. The role was, number one, did this inmate patient evaluated for gender dysphoria, did they have a prehistory, okay, number one.

Number two. Were they evaluated by the pre-coordinator and/or her assistant to determine whether this individual had a high potential to be a victim of a pre-act.

Should the person be -- as a result of the team meeting, should the individual be deemed to have the diagnosis of gender dysphoria -- that's the reason why operations and security were there, right. What is the proper place to house the gender dysphoria patient. What's the proper level of security for this gender dysphoric patient. Given all the externalities. Their past history. Their past crimes. Their past behavior in past institutions. It was a way of keeping all three in the loop. It was an administrative task for them. They did not make any of the clinical decisions.

Q. Was there no need for the chief of security on the team now that accommodations were no longer provided?

A. To be present in the actual meetings, no. They received a report. They have a list of all transgender patients. They know exactly who they are, where they're housed.

And, again, the pre-coordinator receives any new intakes that we have. So she's aware of their past history to alert security of -- any additional security needed that might be required. Like, sitting in those meetings like they did in the past it was deemed unnecessary.

Q. So under the final HSB a variance is only

approved if it's deemed medically -- if hormone therapy is deemed medically necessary, correct?

A. That medical necessity is at the heart of the new HSB, yes.

Q. And so if somebody is approved, it's been deemed medically necessary for them?

A. On a case-by-case basis, as the recommendations come from the MDST, if we approve it, yes.

Q. And an approval for variance requires a new unanimous vote of the GDVT?

A. Yes.

Q. So anyone approved for hormone therapy reflects your determination that hormone therapy was medically necessary for them?

A. My determination, the chief of medical -- chief of medical services, and myself, and the chief clinical advisor, and the chief of mental health services all have to be in unanimous agreement.

The evidence provided by the MDST demonstrates that this individual would benefit from initiation or from continuation of cross-sex hormone therapy.

Q. How does it benefit people?

A. So, again, this is examined on a case-by-case basis. We have meticulously constructed our evaluations. We have a long battery of psychological

tests at our disposal, again, to determine, does this patient's past medical history coincide with the requirements of the diagnosis as elaborated in the DSM-V Text Revision. And does this individual with their comorbidities -- again, most of them have other psychiatric diagnoses -- are those well controlled. Is this individual stable on their psychotropic medication, if they're taking it. Are they compliant with their psychotropic medication. Are they going to see their mental health provider, whether in group or individual one-on-one sessions. We also look at what's called DRs. DRs are disciplinary reports.

So I have seen cases where prior to hormone treatment, the individual had 30-plus disciplinary reports attacking correctional officers. Arguing or attacking other inmates, or other types of disciplinary reports. And, you know, we go -- we approve them for hormones. We revisit the case and six months later, they've had one disciplinary report since starting hormones. That's just one example.

Again, we try to look at each individual holistically.

Q. Okay. Once the determination has been made to grant somebody a variance, they're either continuing or initiating hormones, does it help treat their gender

dysphoria because it brings their body more into alignment with their gender identity?

A. Certainly -- you know, we can probably find other reports where the patient would self-report that they feel more feminine, that they look more feminine, and that that is psychologically pleasing to them. But whether or not that is treating their gender dysphoria, you know, I can't say. I can't say.

I can point to things, like -- again, is there mood stabilized, all right. Are they less depressed. Are they less anxious. Are they -- you know, if they're in any type of program, are they sticking with their program. Are they getting their GED. Have they completed it. You know, any positive milestones that they're achieving after initiating the therapy, versus their behavior, their general mood, their level of anxiety, their level of depression prior to initiating therapy are the types of things that we look at.

Q. Did you, Dr. Kline, and Dr. Santiago meet in person to discuss the GDVTs or the variance determinations; is that correct?

A. Mostly, yes.

Q. Sometimes is it remote?

A. It can be on occasion.

Q. Is it ever decided over email?

A. I don't have that number off the top of my head. But, again, I can provide it for you if you need that number.

Q. Yes. And thank you in advance.

So if someone enters FDC custody today and has no prior diagnosis of gender dysphoria but say that they have stress about their gender identity and want to get a diagnosis, what would happen?

A. They would communicate back to mental health. Mental health would do a preliminary examination. If they feel that the patient is truthful, they will give a preliminary diagnosis of gender dysphoria and put them in queue to be evaluated. Their S level will be elevated, and they will receive additional psychotherapy.

Q. Was the provisional diagnosis of gender dysphoria removed under the HSB?

A. Not to my knowledge.

Q. So just to clarify on an earlier question I was asking about initiation of hormone therapy, and I just might have misspoke.

So has anyone been approved for a variance to initiate hormone therapy that wasn't previously recommended for hormone therapy under the prior procedure?

A. Yes.
Q. Okay, thank you.
Are you aware of any evidence that psychotherapy alone can treat gender dysphoria?
A. Well, specifically, the testimony and the articles listed in Dr. -- psychiatrist, Dr. Kaliebe's testimony.
Q. Are you aware of any studies?
A. Only the ones he listed in his references, no, not off the top of my head.
Q. You're not able to name any studies?
A. I would cite him as an author. I would cite the references that he mentioned in that section of his testimony, and I would also cite Dr. James Cantor, the clinical psychologist who also makes that recommendation. And I would also cite Dr. Stephen Levine, the psychiatrist that established the first transgender clinic in the United States.
Q. Have you read all of the studies that they cite in their expert testimony?
A. I reviewed them.
Q. Okay. What does it mean to review a study?
A. If not reading the entire study itself, you would read the abstract and the conclusion of the study.
Q. Okay. So it's your position that the studies

cited by Dr. Kaliebe, and Levine, and Cantor show that psychotherapy alone can treat gender dysphoria?

A. That would be Dr. Kaliebe's opinion. I think that both Dr. Cantor and Dr. Levine would be -- should be the basis for all gender dysphoric care. Should start with psychotherapy and specifically cognitive behavioral therapy.

Q. Do you agree with Dr. Kaliebe's position that psychotherapy alone can treat gender dysphoria?

A. I neither agree nor disagree.

Q. So you've reviewed all of the studies, but don't have an opinion on it?

A. Again, the studies that show that cross-sex hormones work are based on poor epidemiological studies. Very weak statistical analysis. Larger studies need to be done. More comprehensive studies need to be done. Studies like the Cass Review needs to be done on the adult population over the course of five to ten years to show whether this definitively improves the lives of this patient population.

Q. Are you aware of any studies that have been done that are high-quality evidence over the course of five to ten years showing that psychotherapy alone is an effective treatment for gender dysphoria?

A. Studies that are that long, I do not recall,

But that's the extent to which he's ever dealt directly with the Florida Department of Corrections that I'm aware of. And, again, it was before my time.

Q. Did Dr. Kaliebe -- apologies.

Did Dr. Kaliebe have any role in the development of the HSB?

A. No.

Q. Did Dr. Cantor?

A. Again, other than myself and Dr. Kline reading what they had published, which was a very different opinion from the Standards of Care 8 published by the WPATH, no.

Q. Is there a tracking mechanism for the GDVT's variance grants and denials?

A. Is there a tracking mechanism. I'm not -- I mean, if they report who's been evaluated and it was decided who did not receive the variance, is that what you mean?

Q. I mean, is there a list of, kind of, the outcomes of these GDVT determinations?

A. Right.

So, yeah, I told you that we've -- 61 of them had been evaluated and have been approved for variance and are receiving hormone. Another four were denied, and I believe this is one of the four cases.

Q. And are all 65 of these outcomes listed in one document?

A. I mean, yes, it's in one document, yes.

Q. And what is --

A. Dr. Wasserman tracks this. Again, we track this because we have many people in queue for the evaluation and the reevaluation.

Q. And is that information shared with anyone beyond Dr. Wasserman and the GDVT?

A. To my knowledge, no. But Dr. Wasserman would be the better person to ask.

Q. Under the new HSB can a transgender woman receive permission to grow her hair long in accordance with FDC's hair length policy fore women?

MR. STEELY: Object to form.

A. No.

BY MS. NOWLIN-SOHL:

Q. And under the HSB can a transgender woman purchase female underwear?

A. No.

Q. Under the HSB can a transgender male receive or purchase boxer or briefs?

A. No.

Q. And under the new policy can a transgender person receive permission to receive alternate canteen

items?
A. So, again, I would just say we don't use transgender. We use gender dysphoria. But, no. The answer is no.
Q. And the answer is no for all of those even if the person's mental health provider believes that those things are necessary for the person's mental health?
MR. STEELY: Object to form.
A. To date, we've not received any recommendation from any of the MDST members to that effect.
Q. And so the question is: A person would not be able to receive any of those accommodations even if their mental health provider thought they were medically necessary for their health?
MR. STEELY: Object to form.
A. So as you pointed out in our HSB, right, they -- as part of the MDST evaluation, they would have to prove that it was medically necessary.
BY MS. NOWLIN-SOHL:
Q. So are you saying that if a mental health provider did recommend those accommodations, that they could be provided?
A. They would first have to demonstrate that it's medically necessary to wear boxer shorts or to grow hair. That being said, I've never prescribed hair

growth or boxer shorts to anyone.

Q. Have you ever written a prescription to anybody?

A. For hair growth or boxer shorts, no.

Q. For anything?

A. Yes.

Q. And so you're saying if they could demonstrate a medical necessity, they could get approval for those items?

A. Yes.

Q. Even though you just said under the policy they're not allowed?

A. I said that when we rescinded the old procedure, that eliminated the alternative canteen.

Q. I mean, I asked you specifically if a transgender woman could receive permission to grow her hair long in accordance with FDC's hair length policy for a woman and you said no.

Is that inaccurate testimony?

MR. STEELY: Object to form.

A. So, again -- and I really hate to be splitting hairs here. But I think you're asking me if a transgender female could grow their hair to female-allowed length; is that correct?

BY MS. NOWLIN-SOHL:

Q. Under the new policy, yes.

A. They would not be able to do that under the new policy. The current policy states that a born male must follow male grooming standards. A born female must follow female grooming standards in FDC.

Q. And that's true regardless of medical necessity?

MR. STEELY: Object to form.

A. Again, we look at each individual patient holistically. If the MDST can prove that these items are medically necessary, we have to take it into consideration.

BY MS. NOWLIN-SOHL:

Q. Even though the policy doesn't permit it?

A. We would have to take it into consideration if they prove medical necessity because the HSB is based on medical necessity.

Q. And there's nowhere in the variance template for somebody to recommend accommodations, correct?

A. Yes.

Q. And that's because the accommodations are not permitted under the HSB?

A. The alternative canteen that was available under the old procedure has been eliminated.

Q. And I think we established earlier when I was

talking about accommodations, I'm referring to more than just alternate canteen, right?

A. So we mentioned, I think, hair growth, I think you mentioned. Is that what you're getting at?

Q. Yes.

A. Yes, that -- under the old evaluation -- again, those accommodations would have been granted through a pass system. So that if the individual had those items on them, security would know that they have a pass that they were allowed have those items. Security would know that they had a pass to grow out their hair, yes.

Q. And those passes were rescinded as part of the new HSB?

A. They were rescinded because they were part of the old procedure, which was rescinded, yes.

Q. So those passes don't even exist anymore?

A. For access to an alternative canteen, no. For being allowed to grow hair to female standards for transgender female, no.

Q. Okay. So even if you determined that these accommodations are medically necessary, they're no longer exists the pass to provide to somebody to be able to receive those accommodations, correct?

A. Currently, yes.

Q. I'm going to Mark as Exhibit 23, FDC officials

003768.

(Plaintiffs' Exhibit No. 23 is marked for identification.)

BY MS. NOWLIN-SOHL:

Q. This is the HSB 150523 action plan, correct?

A. That's what it says, yes.

Q. Have you seen this document before?

A. I don't recall, but it's possible.

Q. Were you involved in implementing HSB 150523?

A. So insofar as the second part saying approved inmate script, Centurion. Again I was the principal author of that script.

Q. Okay. In the middle of this action plan there's an entry that says: Conduct group meetings.

And let me zoom in.

Do you see that?

A. I do.

Q. It says: Inmate will be advised that the alternative canteen and quarterly order menus will be rescinded, and they will have to comply with the grooming standard in accordance with their biological sex.

Do you see that?

A. Yes.

Q. Okay. So this is indicating that alternate

canteen and grooming accommodations are no longer available under the HSB?

A. Yes, but the actual date that this occurred was a week later on October 31st of 2024.

Q. Okay.

A. And didn't actually occur on the 24th; it occurred a week later.

Q. And inmate patients have 30 days to come into compliance with the grooming standards and to consume, dispose, or mail of their alternate canteen items, correct?

A. They had the option to mail those items home at -- with Florida Department of Corrections paying for the cost of doing so.

Q. But they had 30 days to come into compliance?

A. That is correct.

Q. Were any individualized assessments of medical necessity conducted during that 30-day period?

MR. STEELY: Object to form.

BY MS. NOWLIN-SOHL:

Q. Let me rephrase it.

Were any individualized assessments of medical necessity for the alternate canteen items and the grooming accommodations conducted during that period?

A. Yes.

Q. How so?
A. So specifically when it came to a bra pass, which you had not mention, that was another accommodation that had been provided by the old procedure.
I think I mentioned this before. But one of the medications that some of the transgender -- I'm sorry, the gender dysphoric population is on is a diuretic. A potassium-sparing diuretic called spironolactone, which has a side effect of growing breast tissue. We call it gynecomastia. There are some individuals who've been on that medication for a number of years. They would have -- they could have developed considerable breast tissue.
Q. Separate -- separate from the bra pass, which I think we've established were only provided for medical purposes.
Were there any evaluations -- individualized evaluations done for accommodations such as alternate canteen and hair length for gender dysphoria?
MR. STEELY: Object to form.
A. Again, they were all evaluated for the need for a medical bra.
BY MS. NOWLIN-SOHL:
Q. But not for alternate canteen, or hair length,

or for a nonmedical bra for gender dysphoria?
A. Again, the bra is offered to other individuals who were taking said medication for other health reasons that have nothing to do with gender dysphoria.
But, specifically, all the gender dysphoria patients were evaluated for the need for a medical bra.
Q. So setting aside the bra.
Were any of the patients with gender dysphoria evaluated for a need for alternate canteen items?
A. No.
Q. Were any of the patients with gender dysphoria evaluated for the need for alternate hair length?
A. No.
Q. All right, lets mark as Exhibit 24, FDC 003769.
(Plaintiffs' Exhibit No. 24 is marked for identification.)
BY MS. NOWLIN-SOHL:
Q. Dr. Martinez, is this a frequently asked questions document that was prepared in relation to the implementation of the new HSB?
A. Yes, I wrote this.
Q. Okay. And so here, roughly in the middle, you wrote that there would be no longer alternate canteen menus; is that correct?
A. Yes. And then you can see the corrected date

of September 30th. This was the actual script.

Q. Okay. And you wrote that: Any items retained after the 30-day deadline would be considered contraband?

A. That was after a lengthy conversations with security. That was the determination that was made, yes.

Q. What do you mean lengthy conversation with security?

What were those conversation?

A. What would be the consequences if they decided to keep the alternative canteen items.

Q. Okay.

A. So they could dispose of them, give them away, mail them back home. If they happen to have them after that date, the consequence would be that the inmate would receive a disciplinary report that they were in possession of contraband.

Q. All right. An then down here under 8 it says that: All inmates will be held to the Department's property requirement in possession limits in accordance with his or her biological sex. Correct?

A. Yes.

Q. And then here it talks about the state -- number 9. State issued clothing not in accordance with

someone's biological sex, and that they would have to return those items back to laundry.

Do you see that?

A. Again, this was for clarification for those items that were -- that had been previously in the alternative canteen, yes.

Q. So if somebody purchased -- isn't laundry separate from the canteen?

A. Not if you're buying opposite -- not if you're buying garments that are opposite your birth sex. It would have been available through the alternative canteen. It was just a second way of reinforcing that these were not considered excluded from the alternate canteen list.

Q. All right. But it says: State-issued clothing.

So there's also state-issued clothing for peoples -- conducive of peoples' general identity?

A. Correct.

Again, their state-issued if you're male. But if you're a transgender female, you would have had access to the alternative canteen state-issued female clothing, is what that's referring to.

Q. So this FAQ makes it clear that all accommodations -- so alternate canteen, and --

A. Hair length.
Q. -- clothing items, and hair length are being confiscated and would be considered contraband as a result of the new policy?
A. Yes.
Q. And the FAQ, who was that provided to?
A. Again, the intention would be that -- it would be received by a member of security, an FDC employee, who would read it, in the presence of a Centurion mental health provider, to all of the gender dysphoria inmates at the different locations throughout the state of Florida. They would all be read that statement at the same time, on the same day, at the same hour.
Q. Were the FAQ also be provided to staff?
A. Security and mental health are staff, so, yes.
Q. Was it distributed more widely to the Centurion medical and mental health providers?
A. I don't recall specifically who all it was sent to. But at that point, it was no longer a secret; that was the date that we were going to officially adopt the new HSB. And we wanted all of the gender dysphoric patients to be aware, again, on the same day, and at the same time. All at once. The intent was to prevent any rumors or misinformation.
I would simply add that, you know, within days,

I received grievances from gender dysphoric patients claiming that their hormones -- their access to hormones was being denied. That was not factually correct.

Q. All right. So I'm sharing, but not currently marking, this script regarding undergarment, hair, and alternate canteen items. It's Bates stamped FDC officials 003772. And it has a spot at the bottom for inmate's name and signature.

Is this the script that was read to the inmates?

A. This would have been a later script for those inmates that were voluntarily giving up any alternative canteen items or accommodations that they had. It's documented. And what was done with those items -- if they were given away, if they were disposed of, or if they were mailed home. That was the intent. This was the receipt. And I -- I don't know who was the author of this script.

Q. Was there any document that was prepared for the mental health and medical providers to let them know that HSB was coming or how to implement it?

A. Not that I'm aware of, no. Other than what you've seen here. What you showed here.

Q. So there was a formal action plan and operational plan to implement this policy, but there was

nothing provided to all of the providers actually implementing the policy?

MR. STEELY: Object to form.

A. The providers were not to implement this policy. I'm not following you.

BY MS. NOWLIN-SOHL:

Q. Don't the providers have to follow this policy?

A. Yes, they do but what you -- the second script that you showed is what security would present to the inmate if they were in possession of said alternative canteen items. This is a receipt saying that they had given them up so that they would not receive a DR later on. Again, I did not write that.

Q. All right. I'm going to put Exhibit 23 back on the screen. The third line down says: Developed frequently asked questions document for nonhealthcare staff within institutions.

So is it fair to say that the FAQs went to all the nonhealthcare staff?

A. I told you before that it went to security. Who else outside of security -- I mean, that's the -- they are the major staff component in any facilities. So beyond them, I don't know who else. But that's pretty widely distributed.

Q. And so security includes the ground-level

correction officers?
A. That's what nonhealthcare staff implies, yes.
Q. Okay.
All right, lets mark as Exhibit 25, FDC official 019703.
(Plaintiffs' Exhibit No. 25 is marked for identification.)
BY MS. NOWLIN-SOHL:
Q. This document is titled diagnostic review and treatment recommendations. I'm just going to go the bottom of it to find the date. It's dated January 9th, 2025.
And are you able to tell from the format of this document that this was a variance application but one that was prior to the current template that is used by the GDVT?
A. Yes, it went through several iterations.
Several of the clinical psychologists did their own thing, and were produced very bad reports that we sent back. So, eventually, we -- the GDVT came together and we kind of hammered out what we wanted to see in the initial evaluations, but also the reevaluations. Certain information that we wanted to see.
The format is very different from what you see here, yes.

Q. Okay. And as a member of the GDVT, you would have reviewed this document?
A. Yes, in all probability.
Q. Okay. This is signed by a number of people. One of them is Amber Akins, a mental health provider.
Do you see that as the second signature?
And I can zoom in a little bit.
A. That's what it says, yes.
Q. Okay. Sorry, I lost my spot. I'm on the wrong page.
Okay. So here at the top of page 4, Ms. Akins reported belief that the inmate mental health had improved substantially following approval for gender affirming accommodation in FDC.
Do you see that?
A. I do.
Q. Okay. And that's Ms. Akins communicating her clinical impressions of the patient's mental health?
A. It would appear so, yes.
Q. And her clinical impression is that the patient's mental health has improved substantially following approval for gender affirming accommodations?
A. That's what it says, yes.
Q. And then at the top of that paragraph it says: Since her previous evaluation approval for gender

affirming accommodation, she's self-report and records indicate a decrease in psychological emergencies and staff referrals.
You also see that?
A. I do.
Q. Okay. And does that suggests to you that the social accommodations were beneficial in treating this patient?
A. I would suggest that from the self-reporting that is the impression that Ms. Akins had, given the self-report from the inmate patient, yes.
Q. And based on her clinical impressions?
A. To the extent that she described it there, yes.
Q. Okay.
A. It's not a clinical impression. She is writing the answers that the inmate gave to the question.
Q. Well, Dr. Martinez, I believe you just testified that this was her clinical impression.
A. Yes, you are correct.
Q. So at the time bottom of page 3 in the second to the last paragraph it says: The provision of social transition accommodations was eliminated in the September 30th, 2024 updates to the Florida Department of Corrections health services bulletin 150323. Mental health treatment of inmates with gender dysphoria.

Is that statement accurate?
A. That it is what it says there in the document.
Q. Is it an accurate statement?
A. Yes.
Q. And at any point have you told the providers that they are permitted to request social transition accommodations under the new policy?
A. Specifically, no.
Q. You said specifically no.
Have there been other communications that have implied that?
A. The implication would be the elimination of the alternative canteen where most of these accommodations came from.
Q. And the elimination of the hair length passes?
A. Correct.
Q. And all of the accommodation passes that were available under the prior procedure?
MR. STEELY: Object to form.
A. Not including bra passes.
BY MS. NOWLIN-SOHL:
Q. The medical bra pass?
A. We just call it a bra pass.
Q. There's not a separate and new pass for the medical bra pass?

A. Again, as I explained before, there are people who are taking spironolactone, a potassium-sparing diuretic, for other --

Q. I'm aware that people have the pass.

I guess I'm talking about the actual document itself. To the extent that people were given a document --

A. A new pass was not created. It's the same old bra pass. If you have an X -- if you were born male and you now have an excess of breast tissue -- depending on the size of the breasts -- and that's determined by the clinical provider -- they will provide the patient with a bra pass.

Q. Well, I thought we established the pass had actually been -- a physical pass had been rescinded?

A. No. The bra pass was not rescinded, no. And it was not part of the alternative canteen from the old procedure.

That is to say that prior to the change from the procedure of the HSB there were other patients for other medical reasons that required a bra pass, again, due to excessive breast tissue.

Q. Just to clarify.

At no point have medical or mental health providers been told that they can request accommodations

for alternate canteen or hair length if they think it's medically necessary?

MR. STEELY: Object to form.

A. That's an accurate statement. And I believe this is the third or fourth time you asked me -- different format. But, no. And the implications that there's no alternative canteen and that they have to conform to the hair length of sex at birth.

BY MS. NOWLIN-SOHL:

Q. Do you know if you were part of the GDVT that approved, I think it's Carter Jackson, for clothing and alternate canteen items?

A. It's likely, yes.

Q. Why do you think that those items will no longer help alleviate his gender dysphoria?

A. Again, because of clinical research that we have unearthed, which have been cited in multiple studies demonstrating that social transitioning does nothing to alleviate depression, anxiety, or suicidality in this patient population.

Q. And what are those studies?

A. Dopp -- D-o-p-p. Hall -- H-a-l-l. Thompson -- T-h-o-m-p-s-o-n. And Miroshedy Chenko. M-i-r-o-s-h-e-d-y C-h-e-n-k-o.

That also included -- those studies, too,

included mastectomies. Showed no alleviation of depression, anxiety, or suicidality.

Q. Did you learn of all of those studies from Dr. Kaliebe?

A. I did not.

Q. Where did you learn of them?

A. They were listed as part of the references that are included in the references that were in the study that was done by McMaster University, the Canadian -- they are a Canadian med-malice group out of that university that did a two-year meta-analysis of gender dysphoria for Florida Medicaid. They list 174 pages worth of references, and they -- those were there.

Q. All right. So earlier we were talking about the conversation that you've been having, and the research that you've been doing regarding a potential new policy.

Why did you begin exploring the possibility of removing social accommodations as part of FDC's policy?

A. Again, these conversation started in 20 -- December of 2020. At one point somewhere in between that four-year time span that we're referring to, there was a case of an transgender -- a gender dysphoric inmate who was extracted from her cell for a disciplinary report. And there was a sweep done of

A. Again, they list hair brush. So the exact item, and the name, and the make of the item -- again, I was not privy to that information. I can only tell you what I heard in conversation.
BY MS. NOWLIN-SOHL:
Q. Okay. But the hair brush that was available at the time had no handle?
MR. STEELY: Object to form.
A. The are -- again, it was -- whether it had a handle or not, it was transformed into a weapon. Similar to that of a letter opener.
Q. But you don't actually know what kind of hair brush was involved in the security incident?
A. I think I answered that before. No.
Q. And you never saw it?
A. I did not.
Q. Either of them?
A. I did not.
Q. Were there any security incidents related to female hair length?
A. So there had been conversations about hidden razors in hair that was longer than normal. There had been conversation about concerned hairpins.
Q. Were there any incidents, Dr. Martinez?
A. I cannot point to -- again, these were

conversations that security mentioned where trans -- where gender dysphoric inmates with access to the alternative canteen appeared to be weaponizing these objects. Specifically, with hair length, there were reports of hiding razor blades in the hair.

Q. There were conversation that it could happen, or there were reports of it happening?

A. It was reported to me that such item was removed from an inmate.

Q. Who had --

A. At the time --

Q. -- female hair length accommodation?

A. Yes, that is correct. That was hiding a razor blade in their hair.

Q. And who gave you that report?

A. Maybe it was Mike Harrell.

(Leslie Cooper exits the Zoom videoconference.)

BY MS. NOWLIN-SOHL:

Q. Maybe?

You don't remember if it was Mike Harrell?

A. That's correct.

Q. But you think it probably was?

A. It could have been.

Q. So when did you determine that social accommodations were no longer helpful for gender

dysphoria?
MR. STEELY: Object to form.
A. I don't recall exactly when I came upon each of those four studies. I don't know the exact date.
BY MS. NOWLIN-SOHL:
Q. And those four studies convinced you that social accommodations were no longer helpful for gender dysphoria?
MR. STEELY: Object to form.
A. I'm sorry, can you repeat the question?
Q. Those four were studies --
A. Yes.
Q. -- convinced you that social accommodations were no longer beneficial for gender dysphoria?
MR. STEELY: Object to form.
A. I would answer it this way. These were four studies done with a high degree of scientific validity that were looking at the undercurrent of all the research that WPATH's standards of care is supposed to be based on, which is suicidality. Again, these patients often carry comorbidities. Comorbidities like depression and anxiety.
In these particular four studies, they were looking to see if multiple various forms of social transitioning or social accommodations decreased

suicidality, depression, or anxiety. And these four studies showed no decrease across any of those three mental health diagnosis analyzed.

BY MS. NOWLIN-SOHL:

Q. You mentioned suicidality.

Can inmates -- or can people be experiencing significant distress without experiencing suicidality?

A. Yes.

Q. And that distress can also warrant treatment even if there's no suicidality?

A. Yes.

Q. And, similarly, someone can be experiencing significant distress without self-injuring or -- well, I'll just leave it at that.

Someone can be experiencing serious distress without self-injuring?

A. Yes.

Q. Can someone be experiencing serious distress without having a psych emergency?

A. A high school student cramming for their finals, yes.

Q. Is that the only example that you can think of?

I don't need them all, but is that limited to that exception?

A. No, I'm just trying to agree with what you're

saying.
Q. Okay. So as a general matter, you agree that somebody can be experiencing serious distress without having a psych emergency?
A. Or a diagnosis of gender dysphoria, for that matter, yes.
Q. Okay. I'm going to show you a document that has been Bate stamped FDC officials 037370.
Have you seen this document before?
A. I do not recall. Can you expand that, please? It's very small.
Q. And if you haven't seen it, I'm not going to spend much time on it. I'm just going to scroll through quickly.
A. I see a date of 2008 and 2009. That predates my time with -- at FDC by more than a decade. I'm not familiar with this document, no.
Q. Well, those dates are to citations not to the actual document itself, correct?
A. I can't answer that question.
Q. Okay. Well, the 2009 one -- this one here says lev 2009.
A. There's much more frequent and more current citations for WPATH.
I don't know why anybody would be citing

16-year-old research. The WPATH certainly doesn't.

Q. Your draft of the HSB cited the 1990 version of WPATH, didn't it?

A. In a draft looking at the last standard of care published by WPATH that used rigorous scientific methods, okay. We subsequently found later versions than 1990, which we ultimately cited.

But to answer your question, no, that document -- I don't believe I've ever seen that document before.

THE REPORTER: And you didn't mark that document as an exhibit, did you?

MS. NOWLIN-SOHL: I did not. Thank you.

BY MS. NOWLIN-SOHL:

Q. And you are aware that the final version of HSB also cites the 1990 version of the standard of care, correct?

A. I would need to take a second look at it.

Q. So this is the final version of the HSB. You can see the effective date is 9/30/2024.

Are you able to see Footnote 7?

A. I do.

Q. Okay. And does that cite the 1990 version of the WPATH standards of care?

A. Yes, it does. The fourth edition.