**Suzonne Kline, Psy.D. Deposition, November 13, 2025**

| Start Page: Line | End Page: Line |
|---|---|
| 11:20 | 11:22 |
| 15:12 | 15:17 |
| 20:18 | 20:25 |
| 21:14 | 22:25 |
| 24:6 | 26:9 |
| 28:14 | 31:5 |
| 31:25 | 32:10 |
| 33:7 | 37:11 |
| 41:10 | 41:13 |
| 42:5 | 42:9 |
| 49:6 | 49:12 |
| 50:15 | 50:25 |
| 52:18 | 53:16 |
| 53:22 | 56:24 |
| 62:25 | 63:25 |
| 74:13 | 76:8 |
| 77:13 | 78:7 |
| 80:22 | 81:15 |
| 90:6 | 90:9 |
| 92:16 | 92:25 |

| | |
|---|---|
| 94:6 | 94:12 |
| 107:5 | 107:13 |
| 113:25 | 115:4 |
| 116:21 | 117:14 |
| 117:5 | 117:12 |
| 122:11 | 123:2 |
| 146:6 | 146:10 |
| 169:6 | 169:13 |
| 170:5 | 171:16 |
| 172:10 | 172:17 |
| 173:10 | 173:22 |
| 188:17 | 190:23 |
| 206:7 | 206:13 |
| 206:7 | 208:23 |
| 208:16 | 208:23 |
| 224:19 | 225:2 |
| 226:10 | 227:1 |
| 229:19 | 231:16 |
| 232:6 | 233:3 |
| 234:6 | 234:20 |
| 243:1 | 255:23 |
| 259:25 | 260:12 |

| | |
|---|---|
| 261:14 | 265:4 |
| 268:14 | 269:12 |
| 272:1 | 272:23 |
| 285:14 | 285:20 |
| 286:25 | 287:23 |

**In the Matter Of:**

REIYN KEOHANE vs RICKY D. DIXON

4:24-cv-434-AW-MAF

---

**SUZONNE KLINE, PSY.D.**

*November 13, 2025*

*Vol. I*

---

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

REIYN KEOHANE, et al.,

Plaintiffs,

vs. CASE NO. 4:24-cv-434-AW-MAF

RICKY D. DIXON, in his official capacity as Secretary of the Florida Department of Corrections, et al.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

SUZONNE KLINE, PSY.D.

(VOLUME I Pages 1-136)

TAKEN ON BEHALF OF THE PLAINTIFFS

November 13, 2025

9:54 a.m. - 12:37 p.m.

(All parties appeared via Zoom conference)

Laura Leal, Court Reporter
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

to FDC?

A. Sure. Would you like me to start from now and move backwards?

Q. However you prefer.

A. Okay. So prior to coming to FDC in May of 2022, I was a Psychological Services Director at Gaston Correctional Facility for Women. And prior to that, I was a psych administrator of what was called - at Wakulla Correctional Institution. It was called the STU, the Secure Treatment Unit, but then I also did a lot of work there with the entire residential continuum of care, excuse me. Prior to that, I was in private practice. I had a specialized practice doing risk assessments, expert witness testimony for several years. And prior to that I was appointed Administrator of Florida's Sexually Violent Predator Program. I was there for a number of years. And prior to that I was at Florida State Hospital where I was a clinical coordinator, you know, psychology supervisor, because I had come to Florida doing my doctoral internship at Florida State Hospital and then I stayed on to do my post-doc residency in forensics at Florida State Hospital.

Q. Okay. Thank you. And so I - I understand that prior to taking the position in May of 2022 at FDC -- which is your current position; is that correct?
A. Correct.
Q. -- that's where you started, then you had other positions within FDC, but at the facility level, Wakulla and --
A. Correct, but they weren't --
And, I'm sorry, I didn't mean to interrupt.
Q. That's all right, you're fine, go ahead.
A. I was working for the contractor, so the contractor, Centurion, works for FDC, so I wasn't employed by FDC.
Q. I see, thank you, but you worked in FDC facilities for Centurion?
A. Correct.
Q. But in May of 2022 you became employed by FDC in your current position?
A. Yes.
Q. Okay. And I take it from the positions described that you provided direct patient care during some of those roles that you

had; is that correct?
A. Yes, for sure.
Q. And was that a significant part of your --
Let me ask it differently.
Can you give an estimate of approximately how many patients you've seen as a psychologist?
A. Oh, wow, thousands, so --
Q. Gotcha. You don't need to quantify beyond that. I just didn't know how big of a part of responsibilities patient care was. It sounds like it was a significant part.
A. Yes.
Q. Okay. Do you have any experience providing treatment to patients with gender dysmorphia?
A. I have experience providing treatment for patients with gender dysmorphia, but specifically for their gender dysmorphia, but as I worked in different facilities, and especially Wakulla, Reiyn Keohane and several of the other ones I had, they were either on my unit or I interacted with them, so I provided services, but I wasn't the one providing the services related

Q. Approximately how many patients did you have with gender dysphoria?
A. Probably - I probably interacted with a dozen or less.
Q. Okay.
A. Five probably more, you know, if they were in my unit, there's usually a more chronic issue, so - and while I was at Gaston Correctional Facility for Women, I did do some of the referrals too for the GD program, so I would do the initial screens.
Q. I see. So other people were providing the therapy for gender dysphoria or treatment for gender dysphoria?
A. Correct.
Q. Did you ever have any training on gender dysphoria?
A. Prior to coming here, no.
Q. Okay.
A. No training.
Q. No training before you came to FDC. What about after you came to FDC?
A. So I've tried to get my hands on as much literature and trainings. I believe that Dean Aufderheide had a training with - it might

have been Stephen Levine that I watched. I know Centurion had like a training module that I looked at. They also had some guidelines. At the American Correctional Association, usually there's one or two sessions, if that's what you want to call them, on gender dysphoria, so I would sign up for those, that type of thing.

Q. And you mentioned doing expert witness work. I take it none of that had to do with gender dysphoria; am I correct?

A. Correct.

Q. Okay. So talking about your current role, you're the Chief of Mental Health; is that right?

A. Correct.

Q. Is that your title?

A. Correct, yes.

Q. And are you the top person in charge of mental health for the Florida Department of Corrections?

A. Yes.

Q. Okay. So there's no one above you focused on mental health?

A. No. I mean, I have a boss that I report to, but my position description, I'm the

highest ranking professional administrative position in mental health for Florida Department of Corrections.

Q. And who is your boss you report to?

A. That would be the Director of Health Services, Clayton Weiss.

Q. Okay. Great. And has he been your boss since you've been at FDC?

A. No, his - his predecessor, Tom Reimers, I worked with.

Q. Okay. And who reports to you?

A. To give you an exact number, probably 40 maybe. It's an estimate. So I probably have a staff here in the program office that might be 15, and then we have - I have contacted providers and I also have staff, FDC staff, that work in each of the facilities in our inpatient units. I have different teams that I run for quality assurance and public behavior risk management teams that all report to me, but through a chain, obviously.

Q. Understood. You mentioned a program office. What is that?

A. Well, I mean central office, so here, the location where I am today, but I have staff

were on time and that we were following the agenda and that type of thing.

Q. Okay. And are any of the folks who work in the central office sort of subject matter experts on gender dysphoria?

A. No.

Q. Okay.

A. No.

Q. So they were not people you went to for guidance in developing policy in this area?

A. No.

Q. Okay.

A. You're correct, yes.

Q. And I'd like to get an understanding of your responsibilities as Chief of Mental Health at FDC. I assume they are numerous. Can you describe your responsibilities as they pertain to patient care specifically?

A. So basically my position provides oversight for the patient care for all individuals in the Department of Corrections, so - and, you know, there's like 89,000 of them. Of that, about 25 percent have serious mental illness, so we focus a lot of efforts on those. And so we provide oversight to make sure the

contractor is meeting their - you know, their expectations per their contract, but that they're also following policies. I have what we call ombudsman that are in the inpatient units to make sure that there's no issues with patient care so that they can come to me directly if there's an issue with patient care, so we try to monitor that as well. Policy development, quality assurance, as I said, we have behavior risk management teams to kind of focus on areas that might be higher risk for vulnerabilities to make sure that we're doing all we can in those areas, and then a large part is also just being the - a point of contact for the leadership on anything mental health. So, you know, speaking in front of the Legislature, those type of responsibilities.

Q. Okay. And I'd like to understand a little bit about your - the relationship between you and the Centurion providers. My understanding is there is a contracted provider and that the people who are providing the mental health services to the population are Centurion staff; is that correct?

A. Correct.

Q. Okay.
A. Correct.
Q. And who - do you supervise those providers or do Centurion people supervise those providers?
A. No, Centurion supervises their own providers, but we have regular meetings with them so that we work in tandem, in coordination. It's a partnership. When they do well, we do well.
Q. Yeah.
A. So we're always, you know, making sure that - that we're helping each other as much as possible.
Q. And when you have regular meetings with Centurion, who are the folks at Centurion you meet with?
A. So it depends on the meeting. We have a biweekly meeting. We call it our operations meeting, I believe, so it would be Centurion leadership, not just for mental health, but it would be their legal, nursing, my boss is on that biweekly call. And then all our OHS leadership from here, so myself, Dr. Santiago, Dr. Martinez, Clayton Weiss. Grady Enlow is the Deputy. Frank Dichio, who's the contract manager for that

contract. So - and then we get in the room and discuss, you know, whatever issues are going on that we need to discuss. Outside --

Q. Okay.

I'm sorry, go ahead.

A. Sorry, outside of that we also have a leadership meeting with Centurion once a month, might be biweekly. No, I think it's once a month. So that would be focused on mental health where I would have Ruth Feltner on that call, along with Peggy, you know, Dr. Watkins-Ferrell, along with all of her regional directors, Matt Hornsby, and that would be my leadership team.

Q. Okay. And would Dr. Watkins-Ferrell be sort of your main point person to contact at Centurion for mental health?

A. Yeah, yeah, I have several people. It just depends on the issue, but, yes, I also contact sometimes because her position is - is just as - her duties are just as expansive as mine. If I can go to regional director, I'll speak directly with the regional director.

Q. But on issues of sort of FDC policy, would it be Dr. Watkins-Ferrell?

A. Oh, yes, yes, absolutely.

Q. Okay. Great.
A. Yes.
Q. Now, when health care decisions are made, mental health care decisions are made for people in custody of FDC, who is the final decisionmaker? Would it be a Centurion person or is FDC - you or other FDC personnel sometimes called in to make those decisions for treatment?
A. I think it depends. It could be both. If it's something that's outside of a policy where they're asking if it's an atypical case, we all get on like a call. We have case consultations, you know, quite frequently, but, ultimately, I mean, where the buck stops for any mental health or health care would be the director, would be Clayton Weiss if it reached his legal, but we try to resolve things and get things taken care of without having to go any higher, if that makes sense.
Q. Right. So in the ordinary course of things where there's no issue of deviation from policy, is it fair to say that the Centurion providers make those decisions on their own?
A. Yes, absolutely.
Q. Okay. And when you say that Mr. Weiss

is sort of the final decisionmaker, he's not a doctor or mental health professional, correct?
A. No, he is not.
Q. So you -
A. No.
Q. You're sort of the highest level person to make a decision about mental health care issues?
A. Correct, correct.
Q. Okay.
A. Maybe I misunderstood the question. So I try to give Centurion as much - they are the hands-on providers. They see these patients every day, so I defer to them. They have their clinical judgment. They're licensed, so they're the ones that make the day-to-day decisions in implementing the policies and, you know, our mental health system of care.
Q. Understood. So putting aside the day-to-day decisions, when you're looking at policy changes concerning mental health care, who is the final decisionmaker within FDC on that?
A. It depends on if it's a policy or an HSB.
Q. Okay. Tell me about that.

A. If it's HSB, right. The HSB would be my direct boss, which would be the Director of Health Services, and that would be Clayton Weiss. For policies, I believe - I believe it's the Chief of Staff, and that would be currently Tim Fitzgerald.

Q. Okay. So focusing on HSBs, Mr. Weiss is the final decisionmaker; is that correct?

A. Correct.

Q. Okay. But if it's a question of mental health care, he's not the person who would create the policy, right, because he's not an expert; is that fair to say?

A. Yes, yes. So he would use his - his experts. And if it was a medical thing, would use Dr. Martinez or Dr. Santiago, correct.

Q. But if it's a mental health thing, it would be you?

A. Correct.

Q. Okay. And when there are mental health policy changes, are you the person who drafts those policies or does somebody else draft them?

A. So I delegated Dr. Crawford, she's my Assistant Chief. She's the one that follows that

timeline. There's a whole process. You know, there's a large organization. So she keeps track of it and any additions we want to make, and then I review them before the final is - is submitted, but she handles a lot of those organizational and then the operational things.

Q. So she would be the - the drafter, but you would have to approve it?

A. Correct.

Q. Populate pages; is that correct?

A. Correct. Or she would come to me and say this policy needs a change or the contractor thinks we need to tweak this or that and so she would put it in the policy and then I would review it.

MS. COOPER: Okay. I'd like to - let's put up our first exhibit. It's FDC 23085. It's Procedure 403.012.

Thank you.

(Exhibit 1 was marked for Identification.)

BY MS. COOPER:

Q. So, Dr. Kline, this is the prior procedure on gender dysphoria that you mentioned earlier; is that right?

A. Yes, this is the 2019.

Sorry, my CVS glasses are not reaching that far.

Q. Oh. Let's make sure we can find a way for you to see it.

MS. COOPER: Is there something we can do to bring the screen closer for Dr. Kline?

MR. STEELY: Yeah, she just zoomed so that should help.

BY MS. COOPER:

Q. Okay. Can you see that, Dr. Kline?

A. Yes.

Q. Is that the prior Procedure 403.012?

A. Correct.

Q. Okay. And this was the policy or procedure that was in place prior to the change in September 2024, correct?

A. Yes.

Q. Okay. So you - for the first two years or so of your time as Chief of Mental Health, this was what was in place; is that right?

A. Correct.

Q. And under this policy or procedure, it provided that hormone therapy could be provided to patients when deemed medically necessary; is

that correct?
A. Correct.
Q. Okay. And that medical necessity was determined by the Centurion providers; is that correct?
A. Yes, it was determined by the Centurion providers and then we had a gender dysphoria review team that it would have to come up through for us to review and sign off on.
Q. Okay. So they would have to - the gender dysphoria review team would have to approve it; is that correct?
A. Correct.
Q. Yeah. And under this prior policy, 403.012, it provided for gender dysphoria accommodations when recommended by the mental health providers; is that correct?
A. Correct.
Q. Yeah. And they could - the mental health providers from Centurion could recommend gender dysphoria accommodations if they felt those could alleviate gender dysphoria for their patients?
A. Correct.
Q. And just to be clear to make sure

we're talking about the same thing, those kinds of accommodations included, say, for transgender women, access to female hair length standards; is that right?

A. Yes.

Q. And access to female undergarments?

A. Correct.

Q. And alternative canteen items?

A. Correct.

Q. That would be things like hygiene items; is that right?

A. Yes.

Q. And then similarly for transgender men, accommodations could include male undergarments?

A. Yes.

Q. Yeah. And canteen items that would be available for men?

A. Correct.

Q. And those accommodations also have to be reviewed by the gender dysphoria review team; is that right?

A. Yes.

Q. Okay. And so you were a member of the gender dysphoria review team; is that right?

A. Yes.
Q. And you signed, I think they were called, disposition memos approving hormone therapy and gender dysphoria accommodations for a number of inmates; is that correct?
A. Correct.
Q. Do you know approximately how many over those couple of years?
A. Let me see, we used to see, I don't know, 18 to 20. I would say over 50.
Q. Okay.
A. At least. That's a rough estimate, sorry.
Q. That's fine, that's fine. And under the prior Procedure 403.012, if individuals with gender dysphoria also had mental health comorbidities, were those treated as well?
A. I have to - yes, they should always be treated, so the answer to that is yes. I don't know. I didn't review this to see if it was specifically mentioned in the - the procedure.
Q. Understood. But apart from the procedure, the practice - there was nothing about the procedure that would preclude the mental health providers from providing treatment of

comorbidities; is that right?
A. Correct, correct.
Q. And treatment for comorbidities could include psychotherapy; is that correct?
A. Correct.
Q. Okay. And in your experience, were inmates with gender dysphoria often provided psychotherapy for comorbidities?
A. You know, that's a good question. I'm not sure I could answer that. I believe they were, but because we were focused on the gender dysphoria, I was - we were focusing on that particular part under the old policy, if that makes sense.
Q. Uh-huh.
A. So I would have to go back to each of their charts, but, you know, that's what we do here is provide psychotherapy and psychological mental health treatment. So I would - I would say yes, that they would be treated for everything that they presented with.
Q. And understood that - that you can't speak to what was in the particular charts of particular individuals, but just to be clear, nothing about the prior procedure interfered with

treating things like depression or anxiety or other comorbidities with psychotherapy for individuals with gender dysphoria?

A. You're correct.

Q. Okay. Now, I want to ask you about the conversation you had with Tim Fitzgerald in January of 2023 about FDC gender dysphoria policy. Do you recall that conversation that you had?

A. I don't recall the conversation. I saw the e-mail trial, so there must have been some type of conversation, but to be honest with you, I don't recall a conversation. And then he sent me an e-mail with I believe it was like - it might have even been like the studies from AHCA that I forwarded them, which I normally do, straight to, you know, my counterparts, but I didn't have any discussion after that with him.

Q. And just for the record, by AHCA, can you say what that stands for?

A. Agency - wait, Agency For Health Care Administration.

Q. Thank you.

A. Okay. Sorry, yes.

Q. Okay. No problem. I'd like to post

Exhibit - as an exhibit, FDC - actually, before I do that --

MS. COOPER: For the court reporter, just to clarify, did you mark the prior exhibit as Exhibit 1?

THE COURT REPORTER: Yes, ma'am.

MS. COOPER: Okay. Thank you. So I'd like to mark as 2 Bates No. FDC 43572. Thanks. And just for the record, I'm going to describe this as an - the top of the document is an e-mail from Suzonne Kline dated 1/13/23 to Stephanie Crawford. And then if we scroll down, we'll see there are - it's a chain of e-mails included in here. Okay.

(Exhibit 2 was marked for Identification.)

BY MS. COOPER:

Q. If we can focus in on the January 13, 2023 e-mail from you to Mr. Fitzgerald.

MS. COOPER: Thank you, Sam.

Oops. Yes. Okay.

BY MS. COOPER:

Q. Is this - this one is Page FDC OFFICIALS 043572. Is this an e-mail you wrote to Tim Fitzgerald on January 13, 2023?

A. Correct.
Q. Okay. And just to be clear, Tim Fitzgerald is the Chief of Staff for FDC?
A. Yes, yes, he is.
Q. Yeah. He's the person - he reports directly to Secretary Dixon?
A. Yes, correct.
Q. Okay. And here you mentioned:
"Good afternoon, Chief, as a follow-up to our discussion."
So this is the crux of the conversation --
A. Correct.
Q. -- that you just saw referenced?
A. Correct. There must have been a conversation and usually, you know, I have to keep, you know, our leadership happy if they're asking me for data, so I could follow it up with whatever data he was asking about.
Q. Okay. And the data it sounds like that you're providing here is about the number of inmates diagnosed with gender dysphoria and the number who are receiving hormone therapy, correct?
A. Correct.

Q. So did he ask you for that data?
A. I would be speculating, to be honest. I honestly don't recall the actual in-person conversation I had with him, but it would seem very reasonable that that's what he was asking for.
Q. Just based on what you wrote here, you're saying?
A. Right. So not trying to be difficult, just want to answer truthfully.
Q. And do you know why he was asking for that information about inmates with gender dysphoria and inmates receiving hormone therapy?
MR. STEELY: Object to form.
THE DOCTOR: No, I don't actually. I don't know what preempted it.
BY MR. STEELY:
Q. And you didn't know then, you're saying, and also you don't know now?
A. I don't recall is what I'm saying. Yeah, I literally - I don't recall what the discussion was or how it came about, if that makes sense.
Q. Okay. And if you look at the bottom of the e-mail that's after the mark

"Confidential," it says:

"I glanced at the case law briefly to get more charity in Florida. The issue of transgender hormone therapy treatment in prison was litigated in Keohane again Jones. In that case, the court ruled that FDC must provide Keohane with both hormone therapy and access to female clothing/grooming, both of which were described as the standard of care, or "consensus of medical and mental health community regarding the appropriate treatment for gender dysphoria." In my (humble) opinion, the judge in the Keohane case seemed biased against FDC and rather liberal in his opinions regarding transgender treatment. I'm going to look for more case law on the issue. I'm also going to follow-up with Florida DOH" --

Is that Department of Health?

A. Yes.

Q. Yes.

-- "to see what guidelines they use/recommend. Hopes this helps. Let me know if you need anything else at this time."

Why were you looking at the Keohane case and looking for research?

A. Well, I know that, I mean, the Chief obviously came to me. I just - I honestly don't remember what the conversation was. I've had so many conversations now about this topic. So this was still kind of early and when I was trying to get in to all of the different research literature. So I don't know, you know, specifically what I wrote that in response to and I'm just trying to be honest.

Q. Yeah.

A. And I routinely kept the data for our transgender inmates or our gender dysphoria inmates to make sure they didn't get lost and that we knew where they were.

Q. Yeah. And when you say this was early and you were looking for research, what - early, what do you mean by "early"?

A. So still, I mean, I came in May of 2022. And even in my first gender - GDRT meeting, which I think was in like July, maybe, Dr. Martinez - there had already been problems or people had already voiced concerns with the old procedure, but because I wasn't here, I didn't -

I wanted to sit with things the way they were and continue the way we were doing things until I could get up to speed. And I know that - I'm sure you're familiar with a lot of the research out there too. There's a lot to get up to speed with, so I felt I was still trying to tease apart and make my way through a lot of that research no matter what side it was on, if that makes sense. And --

Q. And what did --

I'm sorry, if you had more to say, go ahead.

A. No, it's okay.

Q. And what do you mean by the judge seeming rather liberal in his opinions regarding transgender treatment?

A. I think because at the time I was looking at it and reading it, and I do love to read case law, I felt personally, which is why I put "personally," that he seemed to think that gender-affirming care was the only way - how do I want to say this, was the only path for - for doing no harm or that was the only way of making it better, if that makes sense, but that was the consensus. And I didn't necessarily agree with

mentioned in there that gender dysphoria can be secondary to other conditions and that psychotherapy can be helpful in resolving these. And then there's been studies, and I trying to think. I don't have them memorized the way other people might, but like there's a study by Zucker. There's been studies by Beijing, I'm forgetting the Danish one, that show alternative therapies. De Vries is another one. He just recently published a study talking about psychotherapy and its usefulness in treating gender dysphoria. And, again, a lot of these patients come, you know, they've had difficult histories, so there's a lot of comorbidities. So nothing has singly said this one thing treats that one thing. It's usually psychotherapy can help when people have, you know, comorbid disorders. So psychotropic medication can help, you know, with anxiety, depression, that type of thing.

Q. Oh, understood, but the point I thought you were making was that psychotherapy can resolve the gender dysphoria. Are you saying these studies show that as well in addition to addressing the comorbidities?

MR. STEELY: Object to form.

THE DOCTOR: I hate to say the word "resolve" because when we talk about mental illness, I like to talk about maintenance or control - not control. They're different phrases, but I do think that it can be helpful in treating gender dysphoria, yes.
BY MR. STEELY:
Q. And to help, help somebody become --
A. Yes.
Q. I'm sorry, do you understand the research to show that psychotherapy could help end gender incongruence?
A. Yes.
Q. And those studies you mentioned by Zucker and Dhejne, I assume that's the Swedish study you're talking about D-E-J-H-N, [sic] or something like that; is that right?
A. Yeah, I meant - I probably said Beijing, so that Swedish study is a little bit separate, de Vries. I think it's D-E-V-R-I-E-S, maybe.
Q. Dr. Annelou de Vries?
A. Yeah.
Q. And those are studies on children and adolescents, correct?

A. Some of them, some of them were - actually, one of the studies, and maybe it wasn't those two, went up to look at transgender up to 70 years of age.

Q. And there are research - there's research on adults in your view that shows that psychotherapy can end gender incongruence for adults?

A. Can help alleviate, yes.

Q. Okay.

MS. COOPER: I'd like to put this exhibit aside and mark as Exhibit 3 FDC 43569.

And while we're getting that exhibit up, I have just a couple of more questions about your testimony that you just gave.

(Exhibit 3 was marked for Identification.)

BY MS. COOPER:

Q. You mentioned that there were concerns raised about the prior GD, or gender dysphoria procedure, when you first started at FDC in 2022. What concerns were raised?

A. I believe Dr. Martinez had some concerns just in general. He had taken a WPATH course and he had some concerns specifically

about social accommodations. I believe there was some security concerns about some of the items that they might have being weaponized and, again, these are all - this is my understanding, but Dr. Martinez was speaking for some of this, but, also, when I was reviewing the GDRT minutes just to try and get my bearings before my first meeting I had noticed that Dean Aufderheide and Tammy Lander, so Dean would have been my predecessor and Tammy Lander was the Assistant Chief who kind of covered in the interim before I came here. They had already been working on updates to the policy. I don't know specifically what they were. I didn't have access to those files, but when I was reviewing - this would have been back in like January of 2021, that Dean had on his agenda item to set up a meeting to discuss changes to the - to the policy. I didn't look at all of the agenda. I was just trying to gain my bearings, like I said. So I know that they had already been in the works before I - before my time here.

Q. So you don't know what - the nature of the changes they were considering?

A. I don't know specifically. I know

might have reviewed afterward.
Q. Okay.
A. I don't recall.
Q. Was he saying that he doesn't believe that accommodations help alleviate gender dysphoria?
A. I think it he was saying that they don't - they're not medically necessary. I don't think that - so I took that to mean that they might be helpful in certain cases.
Q. And what - what is the - what is your understanding of the term "medical necessity" as it is used in your work?
A. Yeah, so that's a very good question because I feel like people get stuck on semantics. And medical necessity I feel like is - and this is my personal opinion, it's more like used in legal work. I don't usually speak about medical necessity. We just try and treat people. And so, you know, medical necessity usually implies that there's a medical basis for something when, you know, gender dysphoria is a serious psychiatric condition and deserves to be treated like any other condition. So I think those would be - medical necessity would be those

items, treatment, medicines, interventions that would be required for a certain specific disorder.
Q. Uh-huh.
A. If that makes sense.
Q. Yeah. So when you were approving the - for example, approving hormone therapy under the prior policy that required a show of medical necessity, you would make the determination that hormone therapy was medically necessary for those patients, correct?
A. Correct.
Q. Yeah. And things could be medically necessary that are not medicines, right? Like psychotherapy could be medically necessary for a patient with a condition; is that correct?
A. Correct.
Q. Yeah. Okay. And so what is your understanding of why Dr. Martinez felt that accommodations were not medically necessary for individuals with gender dysphoria?
A. I think he would be a better one to ask about that, but I know that he has, you know - he just doesn't feel that that's something that's - that's needed in order to treat the

condition and that it might be - I don't want to bring up the term, like psychologically pleasing but not medically necessary.

Q. Okay.

A. Like --

Q. Where did you hear that term, "psychologically pleasing?" Was that from Dr. Levine?

A. Well, I first heard it there. I've actually heard it in other places too.

Q. Okay. And I guess, is it your understanding that under - that --

MS. COOPER: Let me scratch that.

BY MS. COOPER:

Q. It is your understanding that outside of prison for individuals with gender dysphoria, social transition is a recommended process to help alleviate dysphoria?

A. Yes, outside of prison.

Q. And just to be clear that we're talking about the same thing in terms of - by the term "social transition," would that mean things like dressing and grooming and identifying yourself consistent with your gender identity?

A. Correct.

Q. Yeah. Okay. And so that would be recommended for people outside of prison is your understanding?

A. Correct. I mean, I guess depending on who the person was going to, but I'm assuming somebody who ascribes to WPATH or any of the other, yes.

Q. Yeah. And that's a commonly accepted treatment for gender dysphoria; is that correct?

MR. STEELY: Object to form.

THE DOCTOR: It is common.

BY MS. COOPER:

Q. Yeah. Okay.

A. Yeah.

Q. But you don't think - but it would not benefit individuals in prison to be able to socially transition the way it would benefit individuals outside of prison?

MR. STEELY: Object to form.

THE DOCTOR: No, I don't. I think that the prison population is fundamentally different. What I have been looking for, and I would love to see are studies done with samples using incarcerated adults so I'd have better evidence. The issue is

there's lots of evidence, and it's still a young field, and a field of evidence needs to matriculate, just like the sex offender, you know, 25 areas of expertise of sex offender research and it took decades for it to come to fruition, so it's coming. It's just at the moment all of the stuff that - that people relay on, and whether we're looking at litigation or this case or even when they're talking about it in research literature, are studies that are done on samples that aren't incarcerated. So it's like they're trying to extrapolate or generalize to a prison population and there's a lot of challenges in that just by nature of the environment.
BY MS. COOPER:
Q. Well, I understood that there may be questions about the challenges of implementing accommodations. Let's put those aside for a moment, but just focus sort on the health care needs. Is there any reason that the fact that somebody is incarcerated would make them any less likely to benefit from socially transitioning than someone who is not incarcerated?

MR. STEELY: Object to form.
THE DOCTOR: I think it depends on a case to case basis. Yeah, we have lifers in here, right? I mean, and they deserve the same amount of treatment, if not more, and we have to deal with the realistic adjustment in an incarcerated setting. So I think that providing people social transition items for transgender females in a male prison is problematic. It might not be helpful in helping them adjust to their new reality, if that makes sense.
BY MS. COOPER:
Q. But it might still help alleviate their gender dysphoria?
A. It could. It could help.
Q. Okay.
MS. COOPER: And if we can go put back up of what I think we're marking as Exhibit 3, FDC 43569.
BY MS. COOPER:
Q. Okay. This is an e-mail from Tim Fitzgerald to you dated January 12, 2023.
"Subject: Transgender Hormone Treatment." And I just want to read where

this - the substantive paragraph:

"I called you to discuss FDC policy on transgender hormone treatment. I was asked a question on our policy and need to provide an answer. Please call me on my cell as I am at out of the office."

Does this help trigger your recollection about the conversation you had or when you had it?

A. No. I mean, it helps me put it in perspective that somebody had asked him and he was calling me so that's probably why I was talking about it with him.

Q. Okay.

A. But it doesn't - to be honest, it doesn't jog my memory about what specifically we spoke about.

Q. Did he ask you what was FDC policy on treatment of gender dysphoria?

A. I'm - I'm assuming based on - I don't know if I want to - I mean, I don't want to speculate, but it would be reasonable based on this, which makes it - puts it in a better context that somebody had asked him and he was asking me. And so I probably told him what our

policy was and then I followed it up with the data he requested.

Q. And you focused in on he was asked a question. What question was he asked?

A. Well, I don't - I don't know. It says:

"I was asked a question on our policy."

It's coming from him. I don't --

Q. He didn't tell you?

A. I don't recall what the conversation was.

Q. Okay.

A. I genuinely do not recall that conversation with him.

Q. Do you recall who he was asked the question by?

A. No.

Q. Do you recall him mentioning anything about a present inquiry about FDC policy that was made to the Governor's office about transgender prison policy?

A. No, I don't recall that. We've had present inquiries before, other inquiries about our gender dysphoria policy.

Q. Okay. Did he mention that the Governor's press secretary reached out to FDC about their policy?
A. I do not recall.
Q. And then just - I'm trying to see if any of this can help jog your memory. Did he tell you that Governor Kristi Noem, then Governor Kristi Noem, had publically criticized Florida's policy concerning transgender inmates and the Governor was asking about it?
MS. COOPER: Object to form. She said she doesn't recall the conversation.
Just go ahead and answer if you can.
THE DOCTOR: I don't - I honestly don't recall, but I would want to say given this line of questioning that it would be unusual for Mr. Fitzgerald to give me that kind of information and I don't usually ask him who, you know, he's speaking to, if that makes sense.
BY MS. COOPER:
Q. Okay.
A. But I have no direct recollection of this conversation.
Q. Okay.

MS. COOPER: Okay. Let's post as Exhibit, I think we're on, 4, FDC 024865.

(Exhibit 4 was marked for Identification.)

THE DOCTOR: Maybe after this, can we take like a quick --

BY MS. COOPER:

Q. Sure.

A. -- break.

Q. Take a break? I'll just ask you a few questions about this.

A. Yeah, that's fine. I don't want to stop in the middle of something.

MS. COOPER: Okay. Sam, if I can ask you to slowly scroll from the top just so that Dr. Kline can see this, and I'll sort of narrate a little bit. If you can go back to the top, Sam.

BY MS. COOPER:

Q. This is an e-mail from Michelle Glady to Tim Fitzgerald, January 19, 2023. Do you know who Michelle Glady is?

A. Yes.

Q. And what is her role?

A. She's the assistant - wasn't it the Deputy Chief of Staff? He's the Chief of staff,

A. I don't believe so. That's - that's very new information to me.
Q. Okay. Okay. Fine.
A. He definitely didn't forward that.
Q. Sorry?
A. He definitely didn't forward that change to me. I've never seen that before.
Q. Understood. Does that help you remember if he - if he talked to you about this inquiry from the Governor's press office?
A. Yeah. I still can't remember the conversation. I mean, I genuinely can't. Again, whether it would be - it would be unusual for him to bring me into that kind of politics, if that makes sense.
Q. So he didn't mention to you any conversations with people with the Governor's office?
A. No.
Q. All right. This is a good - a good moment to take a break. How much time would you like? You want a short like restroom break, five minutes or --
A. Can we do 10? Would 10 be okay?
Q. 10 is fine, sure.

A. Okay. Perfect.
Q. Okay. Let's be back at back at, just say for ease, at 11:10. Okay?
A. Thank you.
(Recess from 10:59 a.m. - 11:11 a.m.)
BY MS. COOPER:
Q. So I just want to ask you a few more questions to see if they, you know, help jog your memory about your conversation with Mr. Fitzgerald. When you talked to him back in January of 2023, did he mention anyone from the Florida Agency For Health Care Administration, or AHCA?
A. I don't know if he mentioned it in the conversation. I think he forwarded me something from them that would have been in there. I don't know if we talked specifically about AHCA.
Q. Okay. Did he say anything about state policies prohibiting paying for hormone therapy?
A. No, I don't believe so, not at that time.
Q. At some later time did he?
A. No, I don't believe that was in that discussion at all.
Q. Okay. Did he mention anything about

pending legislation to prohibit funding for hormone therapy for gender dysphoria?
A. Again, I can't recall a conversation, but that doesn't jog my memory at all.
Q. Did you ever become aware at any point that there was legislation prohibiting state funding of hormone therapy for gender dysphoria?
A. I became aware of it. I'm not sure exactly when.
Q. Okay. Did you become aware of it before it actually was signed in to law?
A. Yes.
Q. How did you learn about it?
A. I can't remember if it was a discussion conflict that came up or I honestly can't recall how I became aware of it.
Q. Is that something was discussed between you and Dr. Martinez?
A. It could have been.
Q. Yeah.
A. Or it could have been with Tom Reimers, might have brought it to my attention.
Q. Yeah. And Tom Reimers was the predecessor to Mr. Weiss?
A. Correct.

Q. Do you remember anything about that conversation?
A. No.
Q. Yeah. Do you remember when it was?
A. No. Yeah, I don't want to speculate. I don't remember when that was.
Q. Do you remember if you -- well, scratch that. I'll come back to it.
Did Mr. Fitzgerald ask you to make changes in the policy concerning gender dysphoria?
A. No.
Q. And did he at any point ever ask you to make changes to the policy concerning gender dysphoria?
A. No.
Q. Okay. Did he ever suggest you might want to make changes in the policy?
A. No, he never even suggested something like that. I've never had a conversation with him about changing the policy.
Q. Okay. When we were looking at an e-mail between you, an e-mail chain between you and Mr. Fitzgerald earlier, we talked about a portion that discussed you doing legal research,

asking - specifically not asking about any attorney/client communications just to be clear.

BY MS. COOPER:

Q. So and it - if we scroll to the right a little bit more, it says that these are e-mails regarding current litigation. Do you understand what litigation that's referring to?

MS. COOPER: Again, objection.

I mean, if you - if you know that there's some current litigation that they're talking about in general in this time period, I mean, you can answer yes or no, but we're not going to get into communications that are marked privileged, so --

THE DOCTOR: I honestly don't remember what --

MR. STEELY: The time period she has up there, if you scroll back over, it was January 2023.

THE DOCTOR: So it jogged my memory a little bit as to what might have been in there, but I don't want to give away - how should I say this? I guess my opinion on

whatever I had to say about the case law was inaccurate, so other people were telling me --

BY MS. COOPER:

Q. Yeah. And I'm not asking you about what attorneys were telling you, for sure.

A. Yeah.

MS. COOPER: We can put that exhibit aside. I'd like to put up as Exhibit 6 FDC 3773.

(Exhibit 6 was marked for Identification.)

BY MS. COOPER:

Q. Okay. And this is a chain of e-mails. I want to focus in on the one that's January 18, 2023 from Mr. Fitzgerald to Dr. Kline.

Here we go.

MS. COOPER: Scroll up just a little bit more so we can see the whole thing.

BY MS. COOPER:

Q. Okay. So are you able to see that, Dr. Kline?

A. Yes.

Q. So just for the record describing this as a January 18, 2023 e-mail from Tim Fitzgerald to Dr. Kline with some people cc:ed. And it

says:

"Ma'am, please see link to ACHA report" -- A-C-H-A -- "there are a number hyperlinks in the report. They're acting General Counsel Andrew Sharen would be the POC to start the conversation. ACHA is in current litigation on the Florida official position and their rule of using state funds for gender-affirming care for adults. I believe that we should work with them and their experts as we update our policy in this area. Please see me if you have any questions."

So I think this may be an e-mail that you were referring to earlier about him sharing the AHCA report; is that correct?

A. Correct.

Q. Okay. And just for clarification for the record, he says "ACHA," but I assume he's referring to AHCA and that's just a typo, correct?

A. Correct.

Q. Okay.

MS. COOPER: Let's show Exhibit FDC 312136 and mark that as Exhibit 7.

(Exhibit 7 was marked for Identification.)

BY MS. COOPER:

Q. And this is a document titled "Florida Medicaid, Generally Accepted Professional Medical Standards determination on the Treatment of Gender Dysphoria, June 2022." Is this the AHCA report he forwarded to you?

A. Correct.

Q. Okay. And if you go to Page --

MS. COOPER: Can we scroll to Page 2?

Well, I think that's - the one that's - no, scroll back up.

Thank you, right there.

BY MS. COOPER:

Q. It references in the middle of the page various attachments, Attachment C, D, E, F, G. Do you see that?

A. Yes.

Q. Yeah. Are these the expert reports that Mr. Fitzgerald was referring to that are part of this report?

A. Actually, I don't know what he was referring to. I just took the report, you know, and read it in its entirety and including the reference section.

MR. STEELY: And if you can let her scroll all the way down.

MS. COOPER: Okay.

BY MS. COOPER.

Q. But these are the attachments to the report that are expert assessments; is that correct?

A. Correct.

Q. And you read those as well?

A. Yeah, I'm trying to - I know I read everything, so I just don't recall. It's been a while.

Q. Understood. Understood. So in the e-mail when he sent you this, he was - Mr. Fitzgerald was asking you to work with AHCA and their expert in updating FDC policy on trans care, right?

MR. STEELY: Object to form.

THE DOCTOR: Correct.

BY MS. COOPER:

Q. Did you do that?

A. No.

Q. Why not?

A. Because I felt like the information he had given me was sufficient. I didn't need to

consult with anybody. And it gave me a list of references that I could start with, again, in reading the research literature.
Q. And did you understand him to be suggesting that the FDC guidelines should be consistent with the AHCA guidelines?
A. I think that's fair to say.
Q. And did you - did you endeavor to make them consistent?
A. No.
Q. Why not?
A. I - I'm always - I always look at the evidence and evidence-based practice. So I just go where the evidence takes me, if that makes sense.
Q. Sure. So you never connected with Acting General Counsel Andrew Sharen about the FDC policy?
A. No.
Q. Okay. Did you talk to any of the AHCA experts when you were - or at any point, I should just ask.
A. No.
Q. No? Okay. So you - you recognize that Dr. - not doctor, sorry, Mr. Fitzgerald was

suggesting that the FDC policy align with the AHCA policy, but you did not do that because you follow the research. Just to understand that better, are you saying you disagreed with the conclusions of the AHCA report?

MR. STEELY: Object to form, mischaracterization.

You can answer.

THE DOCTOR: No, what I'm trying to say is at no time has Mr. Fitzgerald or anybody in leadership told me what to do with a policy, which I appreciate, because I'd hope that they appointed me to this position because one of my fortes is evidence-based practice in making sure I'm keeping up with the literature, and this is an important topic. So once he provided this to me, I felt I had all the information I needed. There was no need for me to consult --

BY MS. COOPER:

Q. Yeah.

A. I like to be --

Q. I'm sorry, can you repeat the last part, I'm sorry, I spoke over you.

A. I like to be as objective as possible.
Q. Yeah. And I think my question may not have been clear, so let me - let me try again. So the AHCA report ultimately concluded that Florida Medicaid will not pay for hormone therapy for gender dysphoria, right?
A. Correct.
Q. Because it determined that it was not medically necessary for treating gender dysphoria?
A. I can't remember exactly what they said. I want to say that it was more - they came to the conclusion it was more - more research was - was needed. It was insufficient. I don't think there was any - maybe there was a firm conclusion, but it just was saying there wasn't sufficient research to support.
Q. But you disagree with that conclusion?
A. I don't disagree with the - with the conclusion. I think that there's ongoing debate in the field.
Q. But you ultimately implemented a policy that allows hormone therapy and you have been signing approval for hormone therapy recognizing they're medically necessary for

patients, correct?
A. Correct.
Q. Yeah, so it's not your view that hormone therapy is not medically necessary for the treatment of gender dysphoria?
MR. STEELY: Objection.
BY MS. COOPER:
Q. And, actually, let me ask that differently. That was a double negative, that would have been confusing as heck. Let me --
A. Thank you, because I was like, what?
Q. So it is your view that hormone therapy can be medically necessary for some individuals with gender dysphoria?
A. Correct.
Q. Okay. When Mr. Fitzgerald sent you the AHCA report, you forwarded that to Dr. Martinez and Dr. Santiago, right?
A. Correct.
Q. Yeah. And did you talk with Dr. Martinez or Dr. Santiago about the AHCA report?
A. I don't believe I spoke with Dr. Santiago. And if I recall correctly, I believe Dr. Martinez sent something back to me, like he was already aware of this. He already had seen

it. And I can't remember what he - I think he provided me some additional, if I recall. I'm not a hundred percent sure.
Q. So by this point, again, looking at January 18, 2023, had you had any conversations with Dr. Santiago about gender dysphoria policy?
A. I don't think at that point I had.
Q. When do you think those conversations first began?
A. Probably would have come later towards when we were coming closer to our HSB.
Q. When you were drafting it?
A. Yeah.
Q. Okay.
A. He wasn't really involved in the drafting.
Q. Can you repeat that? I couldn't hear what you said.
A. Dr. Santiago wasn't really involved in the drafting of the policy.
Q. I'm sorry, did you say she was or was not?
A. Was not.
Q. Was not. Okay. Thank you. I was getting a misword there.

Q. Okay. In addition to Dr. Martinez and Dr. Santiago, did you share the e-mail from Mr. Fitzgerald with the AHCA report with Dr. Crawford?

A. I probably forwarded the - just the e-mail chain so she knew what was happening. I don't - I didn't have a conversation about the AHCA report.

Q. Okay. So here, again, looking at the language:

"Dr. Kline, after a brief search, I'm providing you with various materials."

Was his search prompted by Mr. Fitzgerald's e-mail?

A. That's probably a question better for him. I'm not sure.

Q. Okay. And whether in January of 2018 or at any - I say 2018, let me redo that.

Whether in January 2023 or at some later point, did you ever get the message that the Governor's office wanted an FDC policy change of any sort regarding gender dysphoria?

A. Did I ever get a message?

Q. Did you ever hear of that?

A. No.

Q. So as far as you're aware sitting here today, the Governor's office had no role in shaping the policy that you ultimately put in to place for gender dysphoria?
A. Correct, correct.
Q. Okay. Was the policy change prompted by security concerns?
A. No, I don't think it was prompted by security concerns. I think there were concerns, but, again, I think it was - there was more general concerns with the old policy that pre-dated me and that started our discussions.
Q. Okay.
A. About drafting a new HSB.
Q. So I understand from Dr. Martinez that pen hit paper in - or started to hit the paper in May of 2023, is that consistent with your memory?
A. His memory is much better than mine, so let me put that on record, so it sounds about right.
Q. Okay. You don't disagree that's what happened?
A. I do not disagree.
Q. Okay. And who was the first person to put pen to paper to start drafting the language

of the HSB? Was that you?
A. Probably me.
Q. Yeah. Okay. I understand he was involved, Dr. Martinez was involved as well, but the first draft would have been done by you?
A. Yes.
Q. Okay. Did counsel draft policy at all?
MR. STEELY: Object to form.
And if you're - I'm going to caution you not to discuss anything that you might have gotten from the General Counsel's Office or discussions from the General Counsel's Office. Those would be privileged.
THE DOCTOR: No.
BY MS. COOPER:
Q. They did not draft policy?
A. Uh-uh.
Q. So the decision to eliminate gender dysphoria accommodations in the -- Well, let me back up.
The final HSB does not provide for gender dysphoria accommodations, correct?
A. Correct.

Q. Yeah. And is it correct that that decision came from Dr. Martinez?
A. I think it came, I mean, I would say both of us. It came, you know, it started as an earlier conversation, like I said, that pre-dated me, and then the more we were looking in to the research, there was just not sufficient evidence to support the necessity of the accommodations. And I couldn't find any research applying it to an incarcerated population.
Q. So you agree with Dr. Martinez that - that gender dysphoria accommodations are not medically necessary for individuals with gender dysphoria?
A. In the incarcerated setting, correct.
Q. Okay. But I think you said earlier you recognize that gender dysphoria accommodations that enable inmates to socially transition can help some people in terms of alleviating their gender dysphoria?
MR. STEELY: Object to form.
You can answer.
THE DOCTOR: I'm thinking about it. I don't like absolutes or - yeah, it can be helpful.

BY MS. COOPER:

Q. So I'm trying to understand why then the policy is absolute that says no accommodations - gender dysphoria accommodations. Why not make it a case-by-case basis, which I understood it was before.

MR. STEELY: Object to form.

THE DOCTOR: Because the new HSBs focused solely on medical necessity. So there has not been established a medical necessity for accommodations. I feel like that that's one point. The second point is it becomes challenging in the incarcerated environment to provided those things. Like I spoke about earlier, mental health in a prison setting is - is different than a community in that our goal is always to help them adapt to the carceral environment and obtain optimal functioning and become productive members. And accommodations can be areas of vulnerabilities. Like I said, if you had a transgender female wearing female clothing in a male facility, that could increase their risk for, you know, vulnerability from predators, let's say.

BY MS. COOPER:
Q. Well, that would be from hormone therapy as well, right, developing breasts?
A. Correct, but that's not as visibly notable, I would say, as some of the other items.
Q. So is it - so what we're - did the security officials raise problems about gender dysphoria accommodations? Is that what prompted the policy change?
MR. STEELY: Object to form.
THE DOCTOR: That didn't prompt it, no.
BY MS. COOPER:
Q. No? Okay. And you mentioned there was a lack of research showing benefits of social transition in the carceral setting. I mean, do you only provide medical treatments if there's demonstrated benefits in the research in the carceral setting? Like for diabetes research, do you have to find research showing that insulin benefits people in the carceral setting?
A. No, but we're also talking, you know, apples and oranges. So that's an easier thing to implement in an incarcerated setting. This is something kind of completely different. There's

no other psychological disorder where we would allow people to have special privileges and dress in the opposite sex. And in a prison environment, implementing those kinds of things can be very difficult.

Q. Right, but I feel like I want to tease apart two issues. There's sort of the potential implementation security issues that I understand, what you're saying, you know, you did not prompt it, but you mention that as a separate topic. But as I understood from previous depositions, that even if there were a potential security issue, something deemed medically necessary would still be provided, correct?

A. Correct.

Q. Yeah.

A. Yes.

Q. Okay. So understanding why if somebody is in the carceral setting, they may not benefit from social transition the way somebody on the outside world might in terms of improving their mental health?

A. So let me try and answer it this way. Because the population here, it's not just the setting that's fundamentally different than your

Q. Okay. Now, I understand that the gender dysphoria review team stopped meeting in May of 2023; is that right?
A. Correct.
Q. And that was because of the law that took effect as B254?
A. No, actually that was because, I mean, it might have kind of happened together. I didn't feel right - we need to focus our efforts on the new HSB, the new policy that we've been talking about, and I knew that accommodations were probably coming out of that new HSB and I didn't feel that we should continue having these meetings and approving something for somebody that might get taken away --
Q. Okay.
A. 00 you know, within a very short period of time. So we were still operating under the old procedure, but our GDRT meetings were focused where Danny, myself, you know, Dr. Martinez and myself focused more on, again, reviewing as much literature as we could and starting to put pen to paper for the new HSB.
Q. But I understand that the meetings stopped, the GDRT stopped meeting. Is that not

right?

A. Yes, so that Dr. Martinez and myself could start meeting and - and focusing our energy on - on the new HSB.

Q. And once the GDRT stopped meeting in May of 2023, initiation of hormones was not approved for any other inmates up until after the HSB was passed in September of '24, correct?

A. Correct.

Q. Okay. So about a year-and-a-half they did not approve - nobody was approved for initiation of hormone therapy?

A. Correct.

Q. And that was not because of the statute that prohibited paying for hormone therapy?

A. No, because we --

MR. STEELY: Object to form.

THE DOCTOR: -- we had a bunch that was still taking the hormones, so it never got, you know, interrupted. They continued to received their hormones.

BY MS. COOPER:

Q. What was the reason for halting approval for new patients for that

year-and-a-half period?

A. Because our focus needed to be on the new policy, like I said, and that took a lot of time. I mean, it was hundreds of hours' worth of work and research and development. So - and between Dr. Martinez and myself, you know, I have a lot of competing priorities, so I needed to make sure I had enough time focused on this task. So I could not do both simultaneously, at least not both well.

Q. Did you stop approving patients for other mental health treatments for other conditions because you were busy with this policy?

A. No.

Q. Okay. Now, so is it because initiation of hormone therapy was halted from May 2023 until the new HSB September 30, 2024, is that the reason Plaintiff Sheila Diamond, legal name Kevin Coleman, had to wait more than a year-and-a-half after her approval to actually start hormone therapy?

MR. STEELY: Object to form.

THE DOCTOR: I haven't reviewed her case, so it's possible.

undergoing evaluation or treatment, we put a mental health hold on it. So classification or other people can't just come and transfer people without us knowing. And my issue was I was hesitant to take off of a hold for a gender dysphoria person and I didn't have a timeline when I could tell him this person will be completed by, if that makes sense.

Q. Gotcha. And - and you didn't have the timeline, because you didn't have the new policy in place yet; is that right?

A. Correct.

Q. Okay. I'd like to talk now about the development of the HSB. We've touched on it a little bit.

MR. STEELY: I'd like to note for record that the Dr. Kline was only able to see the first two pages of that four-page document. If you marked it as an exhibit, I just want to make sure that the record is clear.

MS. COOPER: Oh, happy to - actually, I don't think we'll need it, that's fine.

BY MS. COOPER:

Q. Okay. So I understand that you and

Dr. Martinez were involved in the development of what became the HSB at issue in this case. Was anybody else involved in developing the substance of the policy besides the two of you?
A. Not the substance I don't think. I know early on I had conversations with - with Tom Reimers just as guidance because I was new to this policy and have never done one in FDC before.
Q. Okay.
A. But not to the policy itself.
Q. Okay. And Dr. Santiago was not consulted at all about the policy substance?
A. No.
Q. Did she want to be consulted or did she want to be involved?
MS. COOPER: Object to form.
THE DOCTOR: Probably a question better left, you know, for her. I don't want to answer for her.
BY MS. COOPER:
Q. Okay. So you're not aware --
A. She didn't tell me, right.
Q. Would you say you were the lead drafter of the policy?

A. I think it was generally a co-effort. I know a lot of parts Dr. Martinez wrote a significant portion of it and that we reviewed, so I would say it was equal.

Q. Were there categories or parts of the policy that were his part and other parts that were yours that you could delineate?

A. No, I think we generally went through it all together, because we would literally be in the same room, like sitting together having a conversation, typing things up section by section.

Q. Okay. And you said something else would do the typing. You didn't do the typing?

A. No, I did not do the typing.

Q. That was Dr. Wasserman?

A. No, mostly for the new HSB it was Katy Fabian.

Q. And who had the final say on the substance of, you know, the - as between you and Dr. Martinez of the policy?

A. We both did. There was no final say.

Q. Okay.

A. And know it I have to say after that would be, you know, Clayton Weiss.

Q. Okay. Clayton Weiss, but he's not a doctor or a mental health professional?

A. Correct.

Q. Okay. And nobody was the designated responsible authority over the HSB?

A. Not that I'm aware of. It is, you know, we do have a policy about HSBs and responsible authorities and they're usually designated by the health services director, so no one has specifically said that you are the responsibility party, but I take ownership and so does Dr. Martinez. We take equal ownership.

Q. Yeah. And the reason I brought that up is I saw on another document that Dr. Martinez was identified as the responsible authority on the prior gender dysphoria policy, so I was wondering if that carried over that he remained the responsible authority or if that shifted to you.

A. I would love for him to remain the responsible authority. No, I don't think - I think we're both equally.

Q. So there was no designated responsible authority for this policy?

A. No, but we know that it's coming to

mental health and it's a mental health HSB, so I'm sure a lot of people think probably that I would be the responsible authority.

Q. Yeah. Is that unusual to not have a responsible authority for any policy?

A. I've never created a new policy here, so I'm not sure how that part of it works.

Q. Okay. Dr. Martinez mentioned that the medical and mental health leadership began working on changing the gender dysphoria policies in March of 2023. Is that consistent with your recollection?

MR. STEELY: Object to form.

THE DOCTOR: Yes, and I would even say it dates back further.

BY MS. COOPER:

Q. Okay.

A. If you're talking about while I've been here or before they were having conversations before I even arrived?

Q. And in Dr. Martinez's declaration, he said that the medical and mental health teams received approvals to begin drafting the revised policy in May of 2023; is that right?

A. Correct.

Q. Yeah. Who was the approval from?
A. I think it would have been Mr. Reimers saying that we can go ahead and start drafting it.
Q. And that was after the HSB 254, the law concerning hormone therapy, went in to effect?
A. I think they're all - I - I don't know which came first to be honest with, but I feel like they're related just because once that became state law, our prior policy was no longer compliant. So there might have been, you know, we need to start actually putting words on paper and starting to do - come with a new policy.
Q. And you say the prior policy was not compliant once the Statute SB 254 took effect, is that actually true or is that just what you thought at the time?
MR. STEELY: Object to form.
THE DOCTOR: Well, that's what I thought and still think.
BY MS. COOPER:
Q. And the reason I'm asking is I understand the initial draft you wrote making no provision for hormone therapy understanding that

that was required by the law, but then you subsequently or ultimately issued a policy that did make provision for hormone therapy in some cases. So I'm wondering, you know, if that is allowed, why wouldn't the prior policy be compliant too?

A. Because the prior policy didn't specify out like who's paying for it, that became like the issue, if that makes sense. So I thought we were no longer allowed to give hormones in general, but it was - you know, and then of course I was informed that it was just about state expenditures, so we didn't have that provision in our old policy.

Q. But the new policy doesn't specify about who's paying for it, does it, the HSB?

A. Well, specifies that we're not paying for it, I guess.

Q. In the policy itself? I mean, I understand that you're not paying for it, but does - I haven't seen any language if we look at the policy together, because --

MS. COOPER: Can we put that up? It's Exhibit - somebody is going to find it before I do. Li, I'm going to ask if you

with the U.S. Constitution or a court
decision requires otherwise."
That's what you're referring to?
A. Yes, that's what I meant, that's what I was referring to.
Q. Okay. And I have been trying to understand what that means, because it says that the Department will comply unless the Constitution or court requires otherwise. What does that mean to you? You wrote this, right?
A. That section kind of morphed, so I can't say that I wrote that. It might have been Dr. Martinez, but my understanding is that we won't be expending funds to purchase them unless there's a case law, you know, some kind of decision that comes out that says that we have to - we need to purchase them.
Q. And has there been a decision that says you need to purchase them?
A. Not that I'm aware of.
Q. Okay. But yet the policy goes on to provide for variances to allow for hormone therapy. And I understand that many have been granted; is that correct?
A. Correct.

Q. So there hasn't been a decision to - a court decision requiring providing hormone therapy but you're still providing it; is that right?

A. Well, there's no - there's nothing saying we can't provide hormone therapy. The state law is specifically that we can't expend funds on purchasing the hormone therapy. So Centurion is paying for that so that we're not expending state funds.

Q. And so I understand Centurion is paying. If Centurion were to stop paying tomorrow, would you discontinue providing hormone therapy for patients?

MR. STEELY: Object to form, speculation.

THE DOCTOR: Yeah, I don't want to speculate. I don't - you know, I would - we'd have to figure out something else.

BY MS. COOPER:

Q. Do you mean you'd have to figure out another way to get them paid for?

A. Correct.

Q. Because you feel --

A. I'm not a lawyer. This is just my

being Chief of Mental Health, I would want to come up with another way of paying for them.

Q. Okay. I understand that policies undergo annual reviews at FDC; is that right?

A. Correct.

Q. And that included the former gender dysphoria policy?

A. Yes.

Q. Yeah. And I saw there was a review in 2022. It looks like it was in the summer of 2022; is that right?

A. Of the old policy?

Q. Yeah.

A. It could have been.

Q. Yeah.

MS. COOPER: Let's show Centurion Production 015294.

BY MS. COOPER:

Q. Okay. And this - there's a few e-mails in this chain. I want to direct your attention to this - it looks like the second one that says from -- Actually, no.

MS. COOPER: Can you scroll down further?

Go up a touch.

MR. STEELY: Can we see the whole document?

MS. COOPER: Sorry?

MR. STEELY: Can we see the whole document?

MS. COOPER: Oh, yeah, sure. You want to scroll through? Do you want to start from the bottom or the top?

THE DOCTOR: Yeah, either one. This is back with Tammy Lander, so I'm not as familiar with --

BY MS. COOPER:

Q. Yeah, some of them are sort of on other topics, but you're welcome to look at the whole thing.

MS. COOPER: You want to start at the top and scroll down because it's a little hard to see it the other way around, I think.

Can you go to the very top?

Okay. And if you can just do a scroll through just to let the Doctor --

THE DOCTOR: Yeah, go slow.

BY MS. COOPER:

Q. Yeah. This is the one that I want to

**In the Matter Of:**

REIYN KEOHANE vs RICKY D. DIXON

4:24-cv-434-AW-MAF

**SUZONNE KLINE, PSY.D.**

*November 13, 2025*

*Vol. II*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

REIYN KEOHANE, et al.,

Plaintiffs,

vs. CASE NO. 4:24-cv-434-AW-MAF

RICKY D. DIXON, in his official capacity as Secretary of the Florida Department of Corrections, et al.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

SUZONNE KLINE, PSY.D.

VOLUME II (Pages 137-308)

TAKEN ON BEHALF OF THE PLAINTIFFS

November 13, 2025

1:11 p.m. - 5:09 p.m.

(All parties appeared via Zoom conference)

Laura Leal, Court Reporter
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

that looks like I might have. I don't have a recollection of why I was asking the question.

BY MS. COOPER:

Q. At that time, September of 2022, did Dr. Martinez consider the WPATH SOC useful guidelines to consult for the treatment of gender dysphoria?

A. I think that's a question better asked of him.

Q. Well, do you know?

A. I don't know.

Q. Did you consider them useful guidelines at that time?

A. I reviewed them, and, yes, I would say I considered them useful.

Q. Do you still consider them useful?

A. I consider previous versions of them useful, yes.

Q. But not SOC8?

A. Well, I can't speak to that directly, because I have not read it as in-depth.

Q. Okay.

A. I briefly scanned it, so I don't want to speak to something I'm not as familiar with.

Q. Okay. And then do you know if WPATH and its latest iterations of the SOC continues to recommend hormone therapy when medically necessary for the treatment of gender dysphoria?

A. I believe that it does, yes.

Q. And do you know whether the WPATH in its current addition SOC8 continues to recommend or support social transition to help alleviate gender dysphoria?

A. I believe it does, yes.

Q. Did Dr. Martinez at the time back in '22 tell you that anything about the SOC8 led them to favor rescinding hormone therapy or gender dysphoria accommodations?

A. I don't recall him ever speaking with me about rescinding hormones. And he's - he's had issues with social accommodations since before Standards of 8 came out.

Q. Understood. Did he say anything about SOC8 that supported his view about rescinding accommodations?

A. I don't recall.

Q. Okay. We might have touched on this, but I apologize that I don't - I don't recall for sure. Prior to the law prohibiting state funding

of hormone therapy for gender dysphoria, had you or Dr. Martinez ever contemplated eliminating hormone therapy from the gender dysphoria policy?
A. Not before that time. I should say I don't recall having a discussion with him about rescinding hormones.
Q. Okay. Neither of you were seeking to eliminate such a policy prior to the statute in 2024?
MS. COOPER: Object to form.
BY MS. COOPER:
Q. I'm sorry, 2023.
MS. COOPER: Same objection.
Go ahead.
THE DOCTOR: I think that - I can't speak for him. I was - that was never my intention and I - I don't recall any vocalizations he's given or statements he said to me that would indicate that.
BY MS. COOPER:
Q. Okay.
MS. COOPER: Let's post as Exhibit - mark as Exhibit 14 FDC 33526.
MS. NOWLIN-SOJL: If - oh, never mind.
MS. COOPER: Okay. Thank you. And

286.31 F.S., do you understand that to be the same statute that we've been referring to as SB254 in its codified form?

A. Yes.

Q. Okay. Good. Just not to have some confusion about that. So here it appears that the draft is contemplating continuing hormone therapy for individuals who continue to have a diagnosis of gender dysphoria; is that correct?

A. Yes.

Q. And so the only people who this contemplates taking off of hormone therapy are those who no longer have that diagnosis; is that correct?

A. Correct.

Q. Okay. And who suggested moving to this framework?

A. Again, I think it was more of a group effort. We were trying to get to a certain place and let the - let the service team, the MDST, the patient's treatment provider, to be the one that are responsible for the majority of, you know, their clinical assessments.

Q. And at this point did you understand Centurion was willing to pay for hormone therapy

and that's why you were able to do it?
A. I was aware that they were - I wasn't privy to any of that - how that happened, but I believe I became aware of it and was trying to work it back in the policy, yes.
Q. Do you remember when you became aware that Centurion was willing to pay for hormones?
A. I don't know when. I know that Mr. Reimers had a call with Ruth Feltner or it might have been Vicki, and that's all I know, and that he informed me that they're willing to pay.
Q. How did you react when you heard that?
A. Well, I was thankful.
Q. Okay. So let's make sure I understand how this all unfolded. I understand from Dr. Martinez's testimony that - that you and he both felt that the research showed hormone therapy could be medically necessary for some patients with gender dysphoria and wanted to be able to continue providing that, but that the statute was a barrier, but when Centurion agreed to pay, that made it possible for you all to continue to provide hormone therapy; is that fair?
MR. STEELY: Object to form.
THE DOCTOR: Can you restate the

question and make sure I understand it correctly?
BY MS. COOPER:
Q. Sure. I'll break it up.
I understood from Dr. Martinez's testimony, as well as some of your earlier testimony, that the two of you both felt hormone therapy could be medically necessary for some individuals with gender dysphoria, correct?
A. Correct.
Q. But you both understood that SB254 was a barrier to continuing to provide that treatment, correct?
A. It was a challenge, yes.
Q. And that's why you drafted a policy initially that did not allow for hormone therapy?
A. Yes, that was us taking it on our initiative, though. I want to make sure I'm clear that it wasn't like, you know, I sought counsel or something to make that determination. I was trying to come up with something in the parameters that I thought, but, obviously, I - I was misreading --
Q. Right.
A. -- the statute from the beginning, so

--
Q. And but those drafts that did not allow for hormones, they were drafted that way because at that time you understood the statute to prohibit the provision of hormone therapy, correct?
A. Correct.
Q. Okay. But then once you learned that it only provided for --
Sorry, scratch that.
Once you learned that the statute only prohibited payment for hormone therapy and Centurion was willing to pay, you understood that you could continue to provide hormone therapy to inmates, correct?
A. Correct.
Q. Okay. And did FDC ask Centurion to pay for hormone therapy?
A. I was not privy to that phone call or how - who asked who, so I don't know.
Q. But your understanding it was a discussion between Mr. Reimers and people at Centurion?
A. Correct.
Q. Okay. Had you discussed what would

have happened if they hadn't agreed to pay?
A. I don't think we discussed it much. I was hopping that they would agree to pay and - and was - I don't want to say confident, but fairly confident given that how much hormones cost that they would be willing to do that.
Q. Because they're not very expensive, you mean?
A. Correct.
Q. Going forward, if Centurion decides its no longer willing to pay, would you need to discontinue hormone therapy?
MR. STEELY: Object to form.
THE DOCTOR: I wouldn't - I would try and find an alternate solution first. My first line of defense would not be to just discontinue hormones, no.
BY MS. COOPER:
Q. You would try to find someone else who could pay for it; is that right?
MR. STEELY: Objection.
THE DOCTOR: I would probably seek advice from counsel on how we could try and make this work.
BY MS. COOPER:

Q. Okay. Is it fair to say then that the idea of discontinuing hormones in your view would cause harm to patients with gender dysphoria?
MR. STEELY: Object to form.
THE DOCTOR: I think it depends. It depends on the patient, but, sure, that could be one of the - it's not going to be everybody.
BY MS. COOPER:
Q. Sure. Very good point. Let me rephrase that because, obviously, everybody has individual needs, but for some patients, taking away their hormone therapy could cause harm to their mental health?
MR. STEELY: Object to form.
THE DOCTOR: It could cause definitely some increased anxiety, and, yeah, I would say their mental health. They could have increased symptoms, mental health symptoms.
BY MS. COOPER:
Q. And exacerbation of gender dysphoria?
A. That could be one of the - yes.
Q. Have you in your experience at FDC seen some of the manifestations of untreated gender dysphoria?

MR. STEELY: Object to form.
THE DOCTOR: Have I personally seen it?
BY MS. COOPER:
Q. Or through your colleagues.
A. Yeah, I would have to probably defer that question to Centurion since they work very closely with them.
Q. Okay.
MS. COOPER: Okay. Let's post FDC 34298 and mark that as Exhibit 17.
THE COURT REPORTER: This would be 18.
(Exhibit 18 was marked for Identification.)
MS. COOPER: Oh, sorry, I apologize, my documents are not numbering properly. Thank you.
And for the record, I'll read, it says:
"September 19, 2024, Update regarding treatment for gender dysphoria for inmate patients."
BY MS. COOPER:
Q. Dr. Kline, is this the final version of that update that we were discussing earlier?
A. I'm not sure if it is since it says

studies, research literature. It's also a good place to go to find references. I like to go to original sources, so --
Q. Okay.
A. -- I usually use it more for that.
Q. Did anybody ask you to collect research related to this process?
A. No.
Q. That was just something you chose to undertake?
A. Yeah, for sure. I've done it every position I've held. I've just - that's evidence-based practice in my opinion.
Q. So I think you mentioned Centurion was provided a draft of the HSB to review and give feedback, correct?
A. Yes, I just can't remember which draft they were provided.
Q. Okay.
MS. COOPER: Let's mark as the next exhibit. I think we're on 20, if I'm not behind.
THE COURT REPORTER: 19.
MR. STEELY: You're ahead.
MS. COOPER: It looks like we have a

19 already.
MS. NOWLIN-SOHL: Was 33526 not 19?
MS. COOPER: That was 19, yeah.
(Exhibit 19 was marked for Identification.)
THE COURT REPORTER: Oh, I'm sorry.
MS. COOPER: Glad we clarified. So let's mark as 20 FDC 045110.
(Exhibit 20 was marked for Identification.)
BY MS. COOPER:
Q. Okay. And I'm showing you an e-mail from John Lay dated 11/10/23 to Clayton Weiss copying you and Dr. Kline, as well as Dr. Watkins-Ferrell and Vicki Love.
"Subject: Centurion responses to HSB 15.05.23 draft."
With an attachment:
"HSB 15.05.23, (CENT edits) 11/10/23."
Is this the feedback you got from Centurion on your draft?
MR. STEELY: She hasn't seen a --
MS. COOPER: Oh, I'm sorry. Can you scroll down and show the rest of the document? Thank you.
MR. STEELY: Thank you.
BY MS. COOPER:

Q. Okay. So is it the feedback Centurion provided on the draft of HSB they were given?
A. I believe so, yes.
Q. That was in November of 2023, correct, if we go back to the cover e-mail?
A. Correct, that would have been a prior version.
Q. Right. There's a lot of markup on that --
A. Yes.
Q. -- on that draft. Did you have a discussion with anyone at Centurion about their comments?
A. I don't know if we had a discussion with Centurion. I mean, I remember I believe Dr. Martinez, myself, and even Clayton Weiss, we reviewed them and agreed with some of them and I think we accepted some of them, but other than that, I don't remember, because, again, that was another prior version and we've had so many discussions about this.
Q. And when you talked to Dr. Martinez about the feedback, what was the reaction of the two of you to the feedback?
A. The reaction, meaning - maybe I'm not

understanding the question.

Q. Yeah. What did you think of their feedback?

A. I mean, I think they had a lot of feedback, but they're also our provider, so, I mean, I expect them to be very involved.

Q. Okay. And if you look on Page 45112 at the top, see it says:

"G." --

And I'll read it:

"Gender-affirming items

"Accommodations: Department-approved gender specific items, either state issued or sold in the canteen that are not offered at the incarcerated individual's assigned facility, but are requested based on the individual's gender identity."

So they - it looks like they were suggesting putting back in to the policy gender dysphoria accommodations, correct?

A. Correct.

Q. But you declined to do that?

A. Correct.

Q. And did you have any discussion with anyone at Centurion about that issue?

A. I don't know if I did specifically about that issue. I mean, I had read their - they have a - a guidelines and their position is that that's not a gender dysphoria issue; that people with transgender should all be provided these, people who are transgender should all be. So it wasn't about mental health, so - and I was already fully aware of their position. So --

Q. And you had a conversation with Dr. Watkins-Ferrell of Centurion about their feedback on the policy, correct?

A. I'm sure that I did, but I honestly can't recall what was said during the - you know, during the call.

Q. Okay.

A. I didn't take notes or anything, but I'm sure that I would have gotten with her after this.

Q. And just to see if this helps jog your memory, did you have a conversation with her in Santa Rosa?

A. I think I did have a conversation with her during one of our audits about gender dysphoria.

Q. Yeah. And what did you discuss?

gender dysphoria.

Q. Oh, and I understand how that definitely explains the first sentence, right, the variance should be only considered after the complete of the treatment protocol. I wasn't clear. I meant to focus in on the part that says:

"An inmate may be assessed for cross-sex hormone therapy if the treating physician can demonstrate with documented evidence that such treatment may improve clinical outcomes by treating the etiological basis of the pathology."

Each doctor needs to demonstrate that there's a body of research showing that treatment will improve clinical outcomes by treating the etiological basis of gender dysphoria?

MR. STEELY: Object to form.

THE DOCTOR: So I --

MR. STEELY: Go ahead.

THE DOCTOR: I think the intent was, and the more we go through this I think of tweaking wording so it is more clear, there is obviously a body of research literature, it is what it is, but we individualize all

of our assessments. So, in other words, what research and research body of different studies apply to this individual that would support use of hormones for their gender dysphoria, if that makes sense.

BY MS. COOPER:

Q. Okay. I'm focusing a little bit on - I'm curious out the etiological basis language. Because I understand from testimony of some other FDC folks that folks all recognize that the etiological basis of gender dysphoria is not known. Would you agree with that?

A. Yes.

Q. And so why is this language in here saying that there's a requirement of showing evidence that treatment will improve the clinical outcomes by treating the etiological basis of gender dysphoria when it's not known?

A. Well, I think that that is kind of two separate issues. So just because we're not aware of the etiology doesn't mean it doesn't exist. There's like multiple pathways. So more one individual it would be one pathway, another individual could be a different pathway. So the provider would have to say this is the pathway we

think they're on, you know, all of the other comorbid disorders are well-controlled or treated so we think this is going to help this particular individual. I don't know how else to state that.

Q. Was there any discussion among, you know, you and Dr. Martinez and others or with folks at Centurion raising questions about what this means, this etiological basis language?

MR. STEELY: Object to form.

THE DOCTOR: I mean, I didn't have any discussions with Centurion about that. Dr. Martinez and I have discussed it.

BY MS. COOPER:

Q. Did you raise questions about it?

A. Well, I thought I understood it and I still feel like I do. I just - it's - I think that people sometimes get stuck on semantics and I don't understand it to mean that there's only one etiological basis, you know, that we're treating or that - that - that because it's unknown that it doesn't exist.

Q. Okay. Right. But it sounds like you all are accepting evidence from providers showing that hormone therapy can improve clinical outcomes of gender dysphoria, period, right? If

they can show that and meet the other requirements, they can get a variance; is that correct?

MR. STEELY: Object to form.

THE DOCTOR: Correct. The evidence is still weak, right? It's not as strong as we'd like it to be. I think that's a consensus in the research literature about low quality evidence, not peer reviewed, not long - you know, not long enough studied for a long term, but, again, with fields of study, there's a period of time for matriculation. It takes time to get to that point.

BY MS. COOPER:

Q. But you're accepting the research that the Centurion providers are giving showing that hormone therapy can improve clinical outcomes in granting variances, correct?

A. On individuals - yes, looking on individual cases.

Q. For a number of patients, correct?

A. Correct.

Q. I understand under the new policy anybody who is in the gender dysphoria program

gets an S3 destination; is that correct?
A. Correct.
Q. And prior to that, it was S2?
A. Correct.
Q. Yeah. Who decided on that change or proposed that change?
A. I think it was a joint decision, but I would say more me because I wanted to make sure that wherever they were housed that they had a full mental house staff there available to them.
Q. And being S3 means that you - an individual may have access to programs, correct?
A. It could. It depends. People are allowed access to programs as an S3, but the important thing to remember is that at S2 camps we don't have the same kind of mental health staff that we have at S3 camps. And I felt that making sure that we have enough sufficient mental health staff following them was most important.
Q. Did the folks at Centurion raise a concern about that change?
A. They might have raised a concern. I'm trying to think, because people were comfortable at some of the S2 camps, but it wasn't because of like programming or anything. They just didn't

demonstrate the efficacy of psychotherapy to address gender dysphoria?
A. Yes.
Q. So there's more --
A. There is sufficient - there is sufficient - there is evidence out there, but I've - probably four or five studies and one system particular review, I'm still looking for others.
Q. Yeah.
A. But also know that psychotherapy is very - traditionally has a very good solid research base for treating these types of issues.
Q. So if you were able to look at a body of research showing that effectiveness of psychotherapy to address gender dysphoria and a body of research examining the efficacy a form of therapy to treat gender dysphoria, is it your view that there's a more robust body of research supporting the psychotherapy than the hormone therapy?
A. No. I think that there's insufficient - I don't think there's sufficient to say that hormone therapy is the therapy of choice. It's the one that we have to go with. It's the

primary. Not that it can't be helpful and, obviously, it's medically necessary in certain cases, that's what I'm trying to say.

Q. I mentioned talking with Dr. Watkins-Ferrell about the new policy. Was Dr. Crawford involved in any discussions that you participated in with Dr. Watkins-Ferrell?

A. I don't - not that I recall.

Q. Okay.

A. I mean, I guess it's possible, but not that I recall.

Q. Did Dr. Crawford express any concerns with you about any of the changes in the GD policy?

A. Not to me.

Q. To anybody else?

A. I mean, that would be unlikely, but I just don't discuss it with her.

Q. Okay. So since the HSB took effect nine - September 30, 2024, gender dysphoria accommodations are no longer permitted, correct?

A. Under the new policy, correct.

Q. Yeah. Okay. And that medical and mental health staff were informed when the HSB was implemented that gender dysphoria

accommodations are no longer permitted?

A. Correct.

Q. So medical and mental health staff could not obtain accommodations for their patients even it they believed that those accommodations were medically necessary for their patients?

A. Well, they've never come to me with that. So we do things based on medical necessity. For example, some of the individuals would have breasts, have bra passes because there's a medical necessity for that.

Q. Right, if a mental health provider felt there was a medical necessity for, say, women's undergarments and a hair length standards because of the psychiatric harm of or psychological harm of denying it and brought that to your attention, could you approve accommodations for that patient under the current policy?

A. So the current policy doesn't provide for it, but it doesn't mean that people can't come to me if they think that there's a medical necessity and that we can look at things on an individual basis.

Q. Do they know that?

MR. STEELY: Object to form.

THE DOCTOR: They come to me when they have other --

BY MS. COOPER:

Q. Right.

A. -- questions or whenever they think there's anything that is off script or not in the policy, so I don't see why they wouldn't here.

Q. Well, there were - let's move on, then. When the HSB was implemented, all of the inmates who had GD accommodations passes have been rescinded, correct?

A. Correct.

Q. And the only reason was because of the new policy, correct?

MR. STEELY: Object to form.

THE DOCTOR: Well, the new policy that's based on medical necessity and the research literature, yes.

BY MS. COOPER:

Q. It was not an individual evaluation of each inmate and a determination made that they no longer need the accommodations, it was based on the policy change?

A. Correct.
Q. Okay. And when the policy was announced on September 30, 2024, all the inmates with gender dysphoria were told they had one month to get rid of all their accommodations and come in to compliance or they would face discipline, correct?
A. I don't remember. That would have been the security script, but I believe they could have it sent home and we would pay for it. They were given option of what they could do with it, but I believe they would have to come in to compliance within 30 days.
Q. Okay. Are you familiar with a document called an Action Plan for the rollout of HSB 15.05.23?
A. Is that the implementation plan or is that different?
Q. Well, yeah.
MS. COOPER: Let's post that. It's FDC 3768.
MR. STEELY: Are you going to mark this as an exhibit?
MS. COOPER: Yes, we are going to mark it as the Exhibit 22.

(Exhibit 22 was marked for Identification.)
BY MS. COOPER:
Q. You are familiar with this document called FDC 15.05.23 Action Plan?
A. Yes.
Q. Okay. Did you have a role in drafting it?
A. I believe this was drafted by Mr. Weiss.
Q. Okay. Did you have to approve it?
A. I don't know if approve it is the right word.
Q. Did you review it? Do you need me to make it bigger?
A. We had it up on the screen when we were going through who had to have various items. I remember that.
Q. So you saw it before it was put in to action?
A. Correct.
Q. Okay. If you look in the middle of the page, it says:
"Conduct group meetings with inmates on treatment for gender dysphoria. Inmate will be advised the alternate canteen and

quarterly order menus will be rescinded and they will have to provide with the grooming standards in accordance with their biological sex. Inmate will be given 30 days, 10/24/2024, to come into compliance with the grooming standards and to consume, dispose, or mail alternate canteen items home at FDC's expense."

So this document, the Action Plan, that was given to the staff?

A. I don't know, actually, if it was given to staff. I think that Mr. Weiss was the one that was keeping - that was like his action plan to make sure that we're marking off all the --

Q. I see.

A. So I don't know if that was shared.

Q. Okay.

MS. COOPER: Can we show and mark as Exhibit 23 FDC 3772.

(Exhibit 23 was marked for Identification.)

BY MS. COOPER:

Q. And this is a document entitled:

"Script regarding undergarments, hair and alternate canteen items."

You've seen this document before?
A. Yes, I believe I saw it one time.
Q. Before it was implemented?
A. Correct. This is a security form.
Q. And this document was read to inmates with gender dysphoria?
A. I believe it was read to them by either a chief or higher. I'm trying to recall.
Q. And were the mental health providers aware that the inmates were receiving this information?
A. I believe so. I believe it was happening on the same day that they were given the original script, you know, the mental health portion.
Q. Are you referring to an FAQ that was provided to staff?
A. No. I'm sorry, let me be more specific. When you said that phrasing of what Centurion had to say due to medical consensus or changes --
Q. The update document, yes.
A. -- yeah, I believe these two were supposed to be done in tandem.
Q. Okay. And mental health providers

were aware of this information being shared with inmates?
A. Yes.
Q. Okay. And this document - I don't know that we need to belabor it, but it makes clear that accommodations are being rescinded and they have to comply with the grooming requirements for the biological sex by 30 days, correct?
A. Correct.
Q. Okay. And then, also, I understand that the - and tell me if I have this wrong, that the medical pass that existed before, the GD accommodations pass, was no longer available after the HSB took effect, correct?
A. Correct.
Q. Yeah. And so there are medical passes for other things like orthopedic shoes, I gave an example.
A. Right.
Q. There could be other medical passes people get, correct?
A. This was an accommodations pass, not a medical pass.
Q. I'm sorry.

A. Yeah.
Q. I'm sorry, an accommodations pass, that's what I meant.
A. Correct. They're no longer available.
Q. Yeah. Okay.
MS. COOPER: And let's show and mark as - are we on 24? I believe, Exhibit 24, FDC 27662.
(Exhibit 24 was marked for Identification.)
BY MS. COOPER:
Q. Have you seen this document? It's called:
"Frequently asked questions regarding gender dysphoria for non-health care staff. September 19, 2024."
A. Yes, I have seen that. I'm not sure if that's a final version, but, yes, I have seen that.
Q. And in this document, again, without belaboring it, it makes clear that the gender dysphoria accommodations that used to be provided with respect to hair length, canteen items and undergarments are no longer available, correct?
A. Correct.
Q. Okay. And this was for non-health

care staff. So that's other people who work in the - in the prisons; is that right?
A. Correct.
MS. COOPER: We can take this down.
BY MS. COOPER:
Q. So all these documents that were written articulating that gender dysphoria accommodations are no longer permissible and that inmates need to comply with the clothing and grooming requirements of their biological sex, all of that information was made known to the inmates and the mental health staff. How would a psychologist or mental health provider know that despite this language saying that these are no longer available, they are, nevertheless, still available if they ask for them?
MR. STEELY: Object to form.
THE DOCTOR: It's not like they're available if they just request them. They have to show a medical basis. So - and it's never stopped before when they've had, you know, an unusual circumstance asking for clarification. We, you know, look at everything on an individual basis, but it's not provided and it would have to show

compelling evidence as to why for that particular patient that that thing was, you know, whatever it was they were requesting was medically necessary.

BY MS. COOPER:

Q. So after all this information was provided to inmates and staff, were the mental health providers or doctors ever informed that despite the very clear rule that gender dysphoria accommodations are no longer permissible and everybody's passes are rescinded, that you could, nevertheless, go and request those accommodations if you believe it's medically necessary? Did anybody ever communicate that to doctors or mental health staff?

MS. COOPER: Object to form, mischaracterization.

You can answer.

THE DOCTOR: Yeah, no, not in that way.

BY MS. COOPER:

Q. Well, in any way.

A. No, but we haven't done that with anything else with HSB procedures. They come to us when they come to us with questions with

experimental treatments or something else that they want to look at and we're happy to review it. Doesn't mean we're going to agree with them.

Q. Will they come to you when there's a clear statement saying it's not available to say can I have it anyway for my patient?

MR. STEELY: Object to form, mischaracterization.

BY MS. COOPER:

Q. I understand if there's areas of you uncertainty and acuity, but here in this policy it's pretty clear it's not permitted. How would a doctor know I can ask Dr. Kline for an exception if I can demonstrate medical necessity?

MS. COOPER: Form objection.

Answer if you can.

THE DOCTOR: Yeah, I'm not sure if I can answer that question, because I feel like they come to us, you know, just last week or two weeks ago, for example, Dr. Lay shared with me something, a new treatment, and something that was not in our policy on treating any of our substance abuse, but that one of their medications might be helpful in treating our self-injury and

They're the ones, the providers, and doing the clinical workup. They don't need us to confirm a GD diagnosis, that's all them. So they still have to do these evaluations. And it only comes up to us if they're asking us for hormones. So the only way I'd be able to tell if I read this report before, because it looks - I don't recall seeing this report, is if I cross-referenced it with the 70 that have come over - have come through or --

Q. Yeah. Okay. And - and this was obviously produced in discovery by FDC as it indicates at the bottom. Is it possible that this report would be done for some reason that would not be for approval for hormone therapy? I mean, it's making a request in it, right?

A. It is. I would - honestly, I mean, if we weren't having this conversation, the first person I would ask is would be Dr. Wasserman because he's kind of the gatekeeper.

Q. I see.

A. He receives the reports and crosses them off the list. And because I read so many reports, so I would check with him.

Q. Okay.

MS. COOPER: And if we can look at Page 019705 where the section is:

"Course of Gender Dysphoria Treatment and Patient Progress."

BY MS. COOPER:

Q. If you look at the first paragraph towards the bottom, it says:

"Additionally up until 9/30/2024, gender affirming accommodations, including alternate canteen items, permission to wear make-up inside the housing unit, growth style hair with accordance to female hair standards and gender-affirming uniform and undergarments were made available as deemed appropriate to individuals diagnosed with gender dysphoria."

And then if you scroll down to the fourth paragraph, call your attention to another part of it, the paragraph beginning "as noted," if you look at the last sentence, it says:

"The provision of social transition accommodations was eliminated in the September 30, 2024 update to the Florida Department of Corrections Health Services Bulletin."

That's all correct, right, what she's - what the doctor is stating here, correct?
A. Yes, correct.
Q. Isn't it your understanding that this doctor is aware that she could request accommodations despite saying this in her report?
MR. STEELY: Object to form.
THE DOCTOR: Let me see the second page again, the one that had the little checkboxes.
BY MS. COOPER:
Q. Age up? Page up one?
A. That one? I don't even know what's in there. Well, doesn't she have it marked in there?
Q. This is - I think this is reporting on past accommodations, it looks like, from the disposition in 2019.
A. Oh, so, I mean, I had no conversation directly with this provider, if that's what you're asking, so, no, I've had no conversations directly with this provider.
Q. Okay. But you agree this provider appears to be under the impression that this is not something that is available for her to

request for patients?
MR. STEELY: Object to form.
THE DOCTOR: Correct, it's not something that's currently available in the current version of the policy.
BY MS. COOPER:
Q. Okay. While we're looking at this report, if we can look at Page 019706. And I want to read from the first full paragraph - well, let's read the whole - just I don't want to take it out of context. Let's read whole paragraph:
"Since previous evaluation and approval for gender-affirming accommodations, inmate -- blank -- self-reported and records indicate a decrease in psychological emergencies and staff referrals. She has not had an inpatient admission since 2019. According to Ms. Akin, inmate -- blank -- "is doing great with her progress within the DTU treatment program. She is participating in all out of out of cell activities, including groups and individuals." She noted inmate -- blank -- "continues to have moments of

feeling depressed." Ms. Akin reported belief that inmate -- blank -- "mental health has improved substantially following approval for gender-affirming accommodation in FDC. She noted that she has been treating inmate -- blank -- for the past one year in DTU and during that time inmate -- blank -- has not had any inpatient admission, self-harm ideations or psych emergencies/staff referrals."

So this is the mental health provider who takes care of this patient is reporting that the accommodations improved the patient's mental health, correct?

MR. STEELY: Object to form.

THE DOCTOR: I mean, the way she has it written, so, you - you don't know who is necessarily - the patient is doing well in DTU could be a combination of factors, right?

BY MS. COOPER:

Q. But it's the professional opinion of the mental health provider that her mental health has approved following approval for gender-affirming accommodations?

A. Correct.
Q. And, yeah, does information like that has any of that information made its way to you that any of the mental health providers have seen these benefits from accommodations for their patients?
MR. STEELY: Object to form.
THE DOCTOR: Since not - no, not from the new policy, I haven't seen any of this language.
BY MS. COOPER:
Q. NO, no, but, in general, in your time at FDC, were you ever made aware that the accommodations have improved the mental health of some of the patients with gender dysphoria?
A. That - that they can help, yes.
Q. Yeah. Okay. And you were aware that Centurion psychologists who conducted the evaluations of inmates with gender dysphoria --
MS. COOPER: Actually, scratch that.
BY MS. COOPER:
Q. This was one example of one report, but are you aware that there are other psychologists who have conducted evaluations of inmates with gender dysphoria and recognized the

positive benefits of gender dysphoria
accommodations on the mental health of their
patients with gender dysphoria?
A. Well, it would make sense given our
old policy that they would make statements to
that effect so they can continue them. I think
that - I think that in and of itself --
Q. But --
Go ahead.
A. I don't think that they would just
write this in and of itself. They write it in
response to our policy and their transgender or
gender dysphoric patient, right, so that was
written whenever their first or initial or
however they were doing then. They write just
the same type of stuff with the reports we've
seen recently that they're doing better on the
hormones, you know, which they can have
accommodations, but they've been okay with not
having - with, you know, they're adjusting, that
kind of thing.
Q. So but my question is these are -
you're aware that it's not just Dr. Joshi in this
one, I'm sorry, not Dr. Joshi, Ms. Akin in this
one report observing the mental health benefits

of gender dysphoria accommodations for their patients, that there were other reports where mental health providers similarly in their professional opinion noted the benefit to the mental health of those accommodations, correct?

MR. STEELY: Object to form.

THE DOCTOR: I have seen reports where they have stated that - that the patient expresses satisfaction with the accommodations, yes, for sure.

BY MS. COOPER:

Q. That wasn't my question. Have you seen reports where that mental health providers offered their own professional judgment that they saw that the patient's mental health improved as a result of the accommodations?

A. I don't know if I can answer that specifically because I've read so many hundreds of reports, especially with, you know, in this group. So I'm trying to - I can't - I don't doubt that that's out there, but I can't recall specific instances. It wouldn't surprise me if that is the case.

Q. And you are aware that psychologists conducting evaluations after the HSB took effect

noted that for some of their patients the loss of gender dysphoria accommodations resulted in increased symptoms, including depression, cutting and suicidal ideations?

MR. STEELY: Object to form.

THE DOCTOR: I'm not aware of that. I mean, if it happened in a report that I might have read, I'm not aware - they didn't call me or tell me directly. They could have shared with Peggy Watkins-Ferrell, but nobody shared that with me.

BY MS. COOPER:

Q. Okay. Were you aware that at least some inmates needed to go to SHOS, S-H-O-S, or TCU, because of distress resulting from the loss of accommodations?

A. No, I was not - didn't reach my level, I was not aware.

MS. COOPER: Can we show FDC 43764? I believe we are at Exhibit 26.

(Exhibit 26 was marked for Identification.)

BY MS. COOPER:

Q. This is a document that says:

"Florida Department of Corrections Gender Dysphoria Diagnostic and Treatment

Evaluation."

MS. COOPER: Let's scroll down to get the date just for reference. If looks like it says May 8, 2025 by M. Taylor Mera, M-E-R-A, Psy.D, and a bunch of others.

Okay.

We can scroll up.

BY MS. COOPER:

Q. Is this one of the - well, actually, let's read the first Roman I.

"Reason for Evaluation."

Says:

"The Multi-Disciplinary Service Team, MDST, is submitting this report to the Gender Dysphoria Variance Team for Health Services Bulletin 15.05.23."

So is this something that would have come to you as a member of the GDVT?

A. Yes, that does look like a variance.

Q. Okay.

A. A request.

MS. COOPER: And if we can look at Page 04378 under the Section Roman IX.

Okay.

BY MS. COOPER:

Q. It says:

"Evidence for continued cross-sex hormonal treatment."

If you look at the second paragraph here, it says:

"Since the removal of GD accommodations, IM/P have struggled with adapting to the demands of prison. For example IM/P described that going through the experience of having grown hair - of having grown hair shaved involuntarily triggered an adverse reaction subsequently resulting in the TCU transfer and admission."

Were you aware of this situation?

A. Well, I reviewed the report. It looks like something that came to variance team, but without having a name or cross-referencing it, there are many reports that Adam - Dr. Wasserman has or that might return before they even get to my level because he knows they don't have the information I need containing or it's not presented in a way that is easy for us to get information. So I don't personally recall reading this, but it does look very familiar.

But what was the question about the fact that she had written in there about the GD accommodations?

Q. Yeah, were you aware that this doctor had written that since the removal of GD accommodations, that the individual has struggled and specifically mentions having her head shaved - hair shaved involuntarily triggered an adverse reaction subsequently resulting in the TCU transfer and admission? Were you aware of that?

A. Until you brought it up, no. Now, again, I don't remember reading this. I have no recollection of reading this, but it doesn't mean that it didn't come across my desk.

Q. Okay.

A. So I would have read it at the time and I would have taken that as one data point in returning the hormones.

Q. And what does TCU stand for, just for the record?

A. Transition Care Unit.

Q. And is that for individuals who are having mental health distress?

A. Yes, so it would be a higher level of care than what a general population inmate would be.

Q. Okay. So are you aware - or you were aware, this was presented to you, so you would have been informed that for at least this patient or this person having their hair forcibly shaved triggered a reaction that resulted in a TCU admission, correct?

MR. STEELY: Object to form, mischaracterization of the testimony.

THE DOCTOR: If I had read this, again, I have to cross-reference. There are many reports that might be submitted or that might be out there that have never come across my desk.

BY MS. COOPER:

Q. But you're not recalling any such situations of the loss of accommodations resulting in people being transferred to the TCU?

A. I mean, not specifically. I mean, I'm aware that they - you know, we expect them to have some anxiety, some increase in symptoms. I mean, nobody likes change, you know. It's difficult. So that's why we have mental health staff there to help them. And that's what we're there for, crisis intervention, you know, manage stress, depression. Doesn't have to be related

to gender dysphoria or accommodations, just at any time. We have procedures for that to help patients. TCU being one of them.

Q. And you're aware that psychologists who have conducted he evaluations indicated that for some patients their mental health is likely to improve if they are permitted gender dysphoria accommodations to allow them to feminize, yes? You've seen that?

A. Yes.

MR. STEELY: Object to form.

BY MS. COOPER:

Q. I'm sorry, I didn't hear.

MR. STEELY: I said object to form.

BY MS. COOPER:

Q. No, I'm sorry, Dr. Kline, I didn't hear what you said.

A. I have seen that in the prior reports under the old procedure, yes.

Q. These were the professional opinions of the mental health personnel who evaluated the inmates; is that right?

A. Yes.

Q. Okay.

A. After this section, can we have just

one more break?
Q. Yeah, yeah, I just have a few more questions.
A. That's fine. I'm not rushing you.
Q. So, I mean, I think you testified earlier that for some individuals, gender dysphoria accommodations to allow them to socially transition can help improve their mental health; is that correct?
A. For some, yeah, I think they would find it, you know, I don't want to use a term psychologically pleasing, but, yes, they would find it comforting.
Q. Would it improve their mental health?
A. It could in the short-term. There's no evidence to suggest that that's long-term. And, again, I feel like we're talking about what might be helpful versus what's medically necessary. You know, I mean, I'm trying to think of an analogy, like people use botox nowadays for headaches and it's very helpful, right? And that's a - it actually relieves the headache, but we don't offer that in a prison setting, I guess is what I'm trying to say. We have to think of alternatives.

Q. But if accommodations allowing social transition improves an individual's mental health, I am not sure why - what the distinction between helpful and medically necessary is in that context.

A. I guess in looking at the research, my concern would be that it might be temporarily pleasing, like they might report it being helpful, but it's not actually changing their condition, right? It's not changing their dysphoria.

Q. That's true of hormone --

A. Like any --

Hum.

Q. Isn't that true of hormone therapy as well?

A. Well, you could make that argument, but I'm trying to be - you know, I feel like we have a better argument with the hormones definitely than we do social transition items.

Q. Okay.

A. And I feel that we don't know the long-term benefits of that.

Q. Of the accommodations?

A. Right. Or any, really, but even

accommodations.

Q. So this is what I'm trying to get at, because you mentioned there was insufficient evidence or lack of evidence on hormone therapy benefits as well, so I'm wondering why do you all agree and - and sign variances supporting the medical necessity of hormone therapy for some of the patients with gender dysphoria, but I think you are saying it's never medically necessary to have accommodations to allow social transition to help alleviate gender dysphoria.

A. Because there's more - much more research on hormones, and this is a longer period of time from which you draw the research showing that it can be helpful and in community populations especially. Again, it's difficult applying these in a prison setting, so I would never want to say that just because the evidence isn't overwhelming that it doesn't mean - there is evidence of it, so - and that's - and we've been using it here. The accommodations case, I haven't seen any evidence to show that it's medically necessary.

Q. Have you --

A. Being helpful is different than

medically necessary. Them thinking it's pleasing is different than they absolutely need this or their gender dysphoria is going to implode or it's never going to get better, and that's not the case because they've been without accommodations now for a year and we have people doing very well, like that come through - I mean, just the ones I haven't seen, there's like 275, I think 70 have come through our variance. So I'm just trying to explain to you that, you know, so they have adjusted and they're still - and they're doing well.

Q. Well, you could take the hormones away and you might find the same thing, but it doesn't mean it's not medically necessary, right? Or is it like if you take it away and they're not sort of suicidal, it's not medically necessary? I'm trying to understand the line.

A. I would think, no, that is a clear line. I mean, if we took it away and they didn't show any difference, then I would argue it's not medically necessary.

Q. Okay.

MS. COOPER: Why don't we take a break. This is a good breaking point. You

were looking for a break. Do you need like a ten-minute break at this point?

THE DOCTOR: Good.

MS. COOPER: Let go off the record. Thanks.

(Recess from 3:54 p.m. - 4:06 p.m.)

MS. COOPER: I'd like to mark as the next exhibit --

I'm sorry, give me one second. We can talk about this during the next break, but at our count, we're only at five hours and four minutes, so maybe we have a math error. We'll figure that out during break.

But the next Exhibit is 27. And it is FDC 36667. It's a document entitled:

"Florida Department of Corrections Psychological Evaluation for Gender Dysphoria."

And it says here testing dates 9/29/23 and 11/27/23.

(Exhibit 27 was marked for Identification.)

BY MS. COOPER:

Q. Do you see that at the top?

A. Yes.

Q. Okay. So this is an evaluation form

for a gender dysphoria for patient that was done by Dr. Joshi and Dr. Leacock; is that correct?

A. Yes, under the old procedure.

Q. Right. Okay.

MS. COOPER: Can we enlarge it just a little bit?

Thank you.

Can we turn to Page 36677?

Okay.

BY MS. COOPER:

Q. Now, under the section Diagnostic Impressions, and I want to call your attention to the bottom of the first paragraph.

MS. COOPER: Scroll down a little bit more.

Okay.

BY MS. COOPER:

Q. It looks like the last sentence says?

"Inmate Coleman's test scores are indicative of depression, anxiety and suicidal ideation, which are likely to do to her inability to feminize. It is likely her symptoms will improve if she is approved for accommodation to feminize during her incarceration."

And then if you continue and you scroll down just a little bit more:

"As it appears that Inmate Coleman's
symptoms of depression and anxiety are
related to her inability to feminize, a
depression or anxiety diagnosis is not
warranted at this time."

Okay. And then I want to just flag something on Page 36679 and then I'll have some questions for you.

MS. COOPER: Are we on 79? Yeah, scroll down a lit further.

Okay.

BY MS. COOPER:

Q. If you look right above the heading Prognosis, the last sentence, the evaluation says:

"If she is not allowed all available
accommodations for transgender individuals
during her incarceration, her mental health
may further decompensate leading to
additional distress and/or mental health
symptoms, i.e., depression, anxiety and
suicide ideations/attempt."

And then under Prognosis right below

that t says:
"Inmate Coleman reported a history of depression and anxiety related to her gender identity. Her mental health is likely to improve provided she is allowed her requested accommodations and is allowed to feminize and express her gender identity."
It goes on to say:
"She is also likely to improve with participation in individual counseling and other therapeutic services which address her symptoms of depression and anxiety as needed."
And then --
MR. STEELY: You all need to scroll down for us to see that part you just finished on.
MS. COOPER: Yeah, if we can scroll down to the next page where there's boxes checked under Recommendation.
A little bit lower.
Okay.
BY MS. COOPER:
Q. You can see here that the recommendation from the doctor were access to

hair length change, alternate canteen items, female undergarments and hormone therapy, correct?

A. Correct.

Q. Okay. So my understanding given the timing of this, if we scroll down to the first page, and looking at those dates again that the evaluation was done, looks like it was done over the course of two days, one September 29, 2023 and one 11/27/2023. And I understand this is in the window of time that you talked about earlier between May '23 and September of 2024 when the HSB took effect that the GDRT was not meeting and there was no approval for anything being provided, right, no hormones approved and no accommodations, correct?

A. Correct.

Q. Okay. Now, reading what we just read about the psychologist's analysis or evaluation and assessment that she would likely - her mental status would likely improve if she's provided the accommodations and it would likely decompensate if she is not, could this be a situation where access to gender dysphoria accommodations could be medically necessary for somebody?

A. So I would have to review the case in its entirety. Here I see results of testing, but I would want to see all of the testing and what other - you know, under the old policy they could go straight to hormones and say their depression and anxiety is related to this. Under the new policy you have to show that you have treated anxiety, you've treated depression, you know. We have established, well-established, well-validated treatment protocols for that. And so, then, afterwards, if they feel like they need hormones, however that might work, this is a hypothetical that I don't know if I can answer currently, if that makes sense. I'd have to know the patient, their history, what disorders they might have, or - all of that.

Q. So it sounds like you're saying this could be a scenario in which gender dysphoria accommodations could be medically necessary for an individual under certain circumstances?

A. No, that's not what I'm saying.

Q. Okay.

A. I'm saying a provider might think that they - that this might help them. It doesn't mean that it's medically necessary. We have

established treatment protocols for depression, anxiety, suicidal ideations, that don't involve accommodations is what I'm saying. So I don't know what other treatment. I mean, even in this report, it says "psychotherapy as needed." So they should be starting with the psychotherapy and stuff that we know works well.

Q. Yeah.

A. To see how much we can alleviate any of those symptoms.

Q. Well, we can look at this report, any reason to think psychotherapy wasn't happening already for this patient?

A. I mean, I'd have to read the whole report, but I think that the one thing that you read to me just said that psychotherapy as needed, that doesn't sound like somebody is actively engaged in weekly therapy.

Q. Yeah. So just to, okay, so your view is that gender dysphoria accommodations can never be medically necessary even if the mental health professional concludes that the inability to feminize is causing decompensation of their mental health?

A. I'm not saying never. I don't know a

hypothetical at the moment that would - that would say - that I would be in agreement with, but it doesn't mean it's not out there and it doesn't exist. They would just have to show it and present it differently than they did in this report. They would have to show that we treated depression, they're on medication for, you know, depression, anxiety; however, they've been involved in psychotherapy and these lingering symptoms or these other symptoms we now feel are just only related to the gender dysphoria, that's what I'm - what I'm saying. And this report doesn't say that.

Q. Okay. So hormone therapy you agree can alleviate gender dysphoria. Does it do that by conforming a person's appearance to their gender identity? Is that how it works?

A. Those are great questions for Dr. Martinez, because he's the medical doctor, but I would not disagree that it is appearance, so you're not changing anything. Hormones aren't prescribed for depression.

Q. Right.

A. They don't alleviate depression. They're not prescribed for anxiety and they're

not prescribed for suicidal ideations. So in that capacity helping align the patient's sense of self, their gender identity with their perceived identity, then, yes, it can be helpful and - in resolving that gender dysphoria.

Q. And so gender dysphoria accommodations also are to align the person's appearance with their gender identity, right? That's the purpose?

A. To address or present themselves outwardly as another to live like the opposite or the sex that they feel they are.

Q. Yeah. So I guess I'm still struggling to understand why the hormones that align your appearance to be consistent with your gender identity can be medically necessary to alleviate gender dysphoria, but accommodations to allow you to socially transition and outwardly appear consistent with your gender identity can't be medically necessary for the treatment of gender dysphoria.

A. I - I guess the best way I could answer that is there's not enough evidence that shows that it is medically necessary. So we come back to that.

Q. Yeah.

A. There's more evidence showing hormones might be helpful. There's longer studies and it's been researched over a longer period of time. And, then, of course, when you get in to social accommodations, you know, again, I don't want to get in to semantics, but you never know - there's not one operational definition of whether it's social accommodations or social transitioning, so it's hard to tease those out in studies, but there's nothing that I have seen or that I've reviewed, and I'm happy to review something that says that it is, that accommodations are medically necessary.

Q. Right. But there are studies that show it can help alleviate gender dysphoria, correct?

A. That it could be helpful, yes.

Q. In alleviating gender dysphoria?

A. I don't know if it actually alleviates the gender dysphoria. I'd have to go back and review, because I also want to say those same studies where we're looking at that, and they might have included hormones in there, they might have separated them out, there was still just as

much mental health issues after transition as there were before.

Q. So if your sense is there's just not research establishing the efficacy of again gender dysphoria accommodations or social transition to alleviate gender dysphoria, doesn't it follow that no matter what a doctor might, you know, argue about their patients, you're not going to approve accommodations as medically necessary because you don't believe they can be medically necessary; isn't that right?

A. No, I wouldn't agree with that. I'm a very reasonable person, so if somebody brought to me, but they have to have evidence. It wouldn't just be "I think this because I'm subscribing to this ideology or that ideology." It's all about the evidence. So if he can show me with evidence on any individual patient why this in particular is so medically necessary for their psychological well-being, then we're happy to review it.

Q. Okay.

A. But, again, I just want to clarify it, reviewing it doesn't always mean we are going to agree with it, and sometimes we have to agree to disagree.

Q. You're, I assume, are aware of a death by suicide of an inmate with gender dysphoria name Sage? I'm just using her first name here.
A. Yes, yes.
Q. Have you reviewed the psychological autopsy that was done?
A. Not recently. It's been a bit, several months.
Q. But you did?
A. Yes, I have, absolutely.
Q. And I've seen it. I understand it's a lengthy document, but you saw that the distress of loss of gender dysphoria accommodations after the HSB took effect was identified as one of the contributing factors to her decision to end her life, correct?
A. Right, I believe there were multiple compounding factors there. There was high risk there on - regardless of that, there was high risk.
Q. But that was identified as one the factors that contributed?
A. Yes.
Q. Okay. Did you discuss this at the time with other folks within FDC or Centurion?

A. Did I have a conversation with Peggy? No, I reviewed what they had - we have what is called a psych autopsy and then we have the closure summary, which is with Dr. Watkins-Ferrell and myself, so I don't know if I had a conversation directly with her about it.

Q. Did you talk to anybody about this - this situation?

A. I talked to Dr. Wasserman about it, but, you know, again, we're talking about policy and there were a lot of issues in that case, you know. They were prescribed what they were supposed to be prescribed, but, yet, there was a gap in receiving medication, so there were a lot of contributing factors, recent altercation with a, you know, partner, and just I feel like there were other signs there.

Q. And the person that conducted the psychological autopsy, what is their role within FDC?

A. So they are the regional - it will be assigned to one of the Regional Medical Health Directors from Centurion.

Q. So that person who wrote that psychological autopsy after, I guess,

Q. And am I right that the denials that have happened by the GDVT so far have all been requests for initiation as opposed to continuation?

A. They're documented on record. I believe one was for initiation. You know, I'm not sure. I - I - no, it wouldn't only be for initiation, because I remember one distinctly that was hoarding medications and. I don't know if it's the same person that also their lab results show they weren't taking the medication, so that could be one person or two out of the four. So that's at least one that was not an initiation.

Q. Got you, have you read the expert reports that were submitted by FDC's experts, Dr. Kalieb and Dr. Laidlaw?

A. Wow, like months ago. I don't even know when they were submitted.

Q. But you saw them at some point?

A. Yes, I did review them, but it's been a while.

Q. Was there anything in the reports you disagreed with?

A. I don't know if I can answer that,

because I can't recall the reports offhand. One was an endocrinologist and it got very deep detail. Yeah, without reviewing it, I'm happy to review it, but I can't recall off the top of my head if there was anything that I disagreed with.

Q. Okay. When inmates experience mental health distress for whatever reason, can that create security concerns?

A. Can that create - I mean, I guess it could if they were acting psychotic or if they were a danger and that would involve, you know, us enforcing security to get them to a safe - to get them in have a safe place.

Q. Would you agree that stabilizing people's mental health, it promotes prison security?

A. Absolutely.

Q. Okay.

A. Promotes the wellness of the institution.

Q. Okay. I saw in the documents produced there was a document called Psychological Violence Risk Assessment. Are you familiar with that form?

A. It depends if that's our risk

assessment that they do on the inpatient unit. Like when you use an HDR - HDR 20, but then there is also something called the BRA, the Behavior Risk Assessment. There's lots of -- I can't even speak this afternoon -- acronyms in DOC that I'm learning. So they're two separate things, but they do assess risk for violence.

Q. Okay. And have there ever been inmates with gender dysphoria for whom this kind of risk assessment was done since the change in policy?

A. So I'm not specific on what - when you're referring to. If you --

Q. Any time.

A. Anybody that goes in to inpatient would have this done, that's a requirement of being an inpatient.

Q. I see. But for people, there's not a risk assessment done for people in the general population?

A. No, this would be if you're inpatient or you're in the residential continuum of care, like our vulnerable population, so it's a risk, you know, yes.

Q. Would you agree that gender dysphoria

is a serious mental health conditions?
A. Yes.
Q. And would you agree gender dysphoria can cause serious distress?
A. Yes.
Q. Would you agree that some individuals with gender dysphoria attempt self-castration as a result of that distress?
A. Yes, I mean, there have been reports of people attempting to harm themselves. The one caveat I have is it's sometimes difficult, especially with people who self-injure, because they usually have such a traumatic history that's it's hard to tease apart - even though they are saying it's this way, there could be a lot of comorbidities going on, if that makes sense, so, but, yes.
Q. But when it's self-castration, is that generally attributed to the gender dysphoria?
A. If they're not psychotic.
Q. Yeah.
A. That's happened several times, actually.
Q. Okay.
MS. COOPER: Can we show as - I think

we're on Exhibit 29, FDC 30769.

(Exhibit 29 was marked for Identification.)

BY MS. COOPER:

Q. Okay. This is an e-mail from Lisa Peterson dated May 9, 2024 to Suzonne Kline and Stephanie Crawford. Have you seen this e-mail before?

A. My name is on it, but I don't recall it right off the top of my head.

Q. I'll just read it, maybe it will refresh this recollection.

"Good evening, we have a patient at Graceville whom I would like to staff with you if either of you have time tomorrow. We are considering a referral back to a higher level of care, but the individual was discharged from a CSU in February. There are gender dysphoria concerns and also continued self-hard relating to cutting on the testicles. Let me know when you're available."

I can stop there, I think. Do you recall hearing about this inmate?

A. I don't specifically recall, but I want to say this was the one that we did transfer