**Tim Fitzgerald Deposition, December 10, 2025**

| Start Page: Line | End Page: Line |
|---|---|
| 6:12 | 6:18 |
| 7:2 | 7:4 |
| 11:7 | 11:14 |
| 12:9 | 12:13 |
| 13:23 | 14:6 |
| 14:15 | 14:21 |
| 15:4 | 15:5 |
| 15:8 | 15:11 |
| 15:19 | 15:20 |
| 15:23 | 16:1 |
| 18:11 | 18:12 |
| 18:17 | 19:2 |
| 23:17 | 24:4 |
| 24:19 | 25:9 |
| 26:19 | 28:4 |
| 30:4 | 30:6 |
| 30:9 | 30:17 |
| 34:15 | 35:4 |
| 36:22 | 36:24 |
| 37:1 | 37:1 |

| | |
|---|---|
| 39:15 | 39:24 |
| 40:2 | 40:3 |
| 40:14 | 40:22 |
| 41:14 | 41:21 |
| 41:24 | 41:24 |
| 42:1 | 42:9 |
| 43:6 | 43:25 |
| 47:23 | 48:23 |
| 49:1 | 49:1 |
| 49:17 | 50:4 |
| 50:8 | 50:9 |
| 50:12 | 50:12 |
| 50:22 | 50:25 |
| 51:2 | 51:2 |
| 57:10 | 57:19 |
| 58:9 | 58:13 |
| 62:16 | 64:14 |
| 64:24 | 65:19 |
| 68:23 | 69:5 |
| 69:8 | 69:8 |
| 71:17 | 72:7 |
| 73:24 | 76:19 |

| | |
|---|---|
| 76:23 | 76:24 |
| 77:22 | 79:1 |
| 79:4 | 79:15 |
| 80:17 | 80:22 |
| 80:25 | 81:1 |
| 82:18 | 83:5 |
| 87:8 | 87:11 |
| 90:18 | 91:1 |
| 91:3 | 92:14 |
| 94:11 | 94:24 |
| 95:1 | 95:24 |
| 96:20 | 97:7 |
| 97:12 | 98:15 |
| 98:18 | 98:25 |
| 99:12 | 99:14 |
| 99:21 | 100:12 |
| 100:15 | 101:6 |
| 101:12 | 101:17 |
| 101:20 | 101:20 |
| 102:7 | 102:14 |
| 102:16 | 102:16 |
| 103:9 | 103:15 |

| | |
|---|---|
| 103:17 | 105:9 |
| 105:22 | 105:25 |

**In the Matter Of:**

KEOHANE vs DIXON

4:24-cv-434

**TIM FITZGERALD**

*December 10, 2025*

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

---

REIYN KEOHANE, et al.,

Plaintiffs,

vs. Case No. 4:24-cv-434

RICKY D. DIXON, in his Official capacity as Secretary of the Florida Department of Corrections, et al.,

Defendants.
_____________________________/

REMOTE DEPOSITION OF:
TIM FITZGERALD

ON BEHALF OF: Defendants

DATE: December 10, 2025

TIME: 10:04 a.m. to 2:54 p.m.

LOCATION OF WITNESS: Crawfordville, Florida

---

REPORTED BY:
MICHELLE SMITH, RDR, FPR, LCR, CCR, CLR, CLVS, CDVS

P R O C E E D I N G S

Taken before R. Michelle Smith, Registered Diplomat Reporter, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

\- - -

Thereupon,
the following proceedings began at 10:04 a.m.
remotely via Zoom:

THE REPORTER: Would you raise your right hand, please?

THE WITNESS: Yes.

THE REPORTER: Do you solemnly swear that the testimony you shall give today will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

Thereupon:

MR. TIM FITZGERALD,

the witness, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ANSCOMBE:
Q. Would you state your name for the record, please.
A. Yes, Timothy Steven Fitzgerald, Jr.
Q. Mr. Fitzgerald, my name is Anthony Anscombe, I am one of the lawyers for the Plaintiffs in the class case. We're here today to take your deposition. Have you ever given a deposition before?
A. A long time ago.
Q. Can you estimate how long ago?
A. Fifteen, 20 years ago.
Q. What did that case involve?
A. Probably a criminal case back at a time when I was a police officer.
Q. So deposition, I will just remind you of a few ground rules which your counsel has probably already shared with you. This is a question and answer session, I'm asking questions and you are hopefully providing answers. As we speak, Michelle, our court reporter is taking down a transcript of everything that we say. Michelle only has so many fingers so her life is going to be a lot easier if you and I don't talk at the same time. If you anticipate how one of my questions is going to wind up, please let me finish asking the question before

you start your answer; similarly I'll try not to interrupt any of your answers, okay?

A. Yes, sir.

Q. Okay. This is a written proceeding, therefore it's important for you to give full word answers. Michelle can't take down a nod of the head or a shrug of the shoulders and uh-huh can mean yes or no but it looks the same on -- on the page, so good to use full word answers, and I may remind you of that, okay?

A. Yes, sir.

Q. During the course of the deposition I'm going to be asking you questions about things that transpired in the past. If you don't remember, that's a perfectly acceptable answer, I would just ask you not to guess or speculate. You've given an oath to tell the truth, that's the same oath that you would take in Court and so it's very important for you to give truthful and accurate answers today, understood?

A. Yes, sir.

Q. If there is any of my questions that you don't understand please let me know, I will rephrase them. Also if there is -- if you have a need to take a break at any point, please let me know, we

discuss, that's privileged information. But if we're just talking about your notice of deposition today, that's fine.

BY MR. ANSCOMBE:

Q. Mr. Fitzgerald, that may be somewhat difficult for you to understand as a lay person. What Mr. Steely has just suggested is that you not volunteer any details of conversations that you had with either him, his office or with the general counsel's office, but it's okay for you to just tell me whether the conversation of your deposition came up with somebody within the general counsel's office.

A. Could you rephrase the question? Between all of those objections I sort of lost track.

Q. Yeah. That's fine, unless Mr. Steely instructs you not to answer, you still need to answer, but the question boils down to: Did you have a discussion with the general counsel's office about the fact that you were going to have to testify?

A. Yes.

Q. When did that happen?

A. Last week.

Q. Did you do anything to -- well, actually, let me ask you this: Did you have a discussion with

Mike, do you know who Mike Harrell is?
A. Yes, I do know who Mike Harrell is.
Q. Who is he?
A. Mike Harrell works in the office of institutions, I think he is a -- a bureau chief or assistant bureau chief in institutions.
Q. Do you recall having a conversation with him within the last three months about whether you had had any contact with the Governor's office in relation to FDC's policies regarding gender dysphoria?
A. I did have a conversation with Mike Harrell regarding this case. I couldn't tell you how long ago that was. It --
Q. Do you have an estimate as to how long ago?
A. Within the last six weeks, so from November -- I don't think I talked to him in December, so it had to be in November.
Q. How long did that conversation last?
A. I want to say it was 30 minutes, give or take.
Q. In a general way can you describe what the topics of discussion were?
A. Mike asked -- was asking me questions

regarding -- regarding our gender dysphoria policy and any conversations I had with the Governor's office from what I can recall.

Q. Did you do anything to get ready for that discussion?

A. No.

Q. Who was present for that discussion?

A. It was just Mike and I.

Q. What information did you convey to him?

A. That I've not had any conversations with the Governor's office on our gender dysphoria policy or treatment.

Q. Did you do anything to inform yourself on that topic either before or after that conversation with Mr. Harrell?

MR. STEELY: Object to form. You can answer.

THE WITNESS: I did not do anything to prepare for myself for that conversation with Mike Harrell before that conversation. And the only thing I did to prepare myself on that information was after my conversation with Mike Harrell, was in conversation with my general counsel.

BY MR. ANSCOMBE:

Q. And that was the conversation that happened last week?
A. Yes.
Q. What did you do to get ready for the deposition today?
A. What I did was just have a conversation with my general counsel and Mr. Steely.
Q. When did that occur?
A. Most recent was yesterday.
Q. How many conversations did you have with Mr. Steely and your general counsel on this topic?
A. Yesterday and then I would say I had a conversation last week when I was notified that I would be here today.
Q. How long did the conversation last week take?
A. My conversation with them last week, 30, 45 minutes from what I can recall.
Q. How about yesterday?
A. Our conversation was about the same yesterday, 30, 45 minutes.
Q. Did you review any documents over the last week?
A. Yes, I have.

Q. What documents have you reviewed?
A. In working with the general counsel and Mr. Steely I reviewed e-mail documents.
Q. What did those e-mail documents reveal?
A. Can you be -- just conversations or e-mails that I was either on or sent.
Q. Okay. Do you remember how many e-mails you looked at? Let me rephrase the question. How many e-mails would you estimate that you reviewed?
A. I would say I reviewed maybe 15 documents that had e-mails in it.
Q. Did some of those e-mails include attachments?
A. Not that I reviewed.
Q. All right. Other than -- and then with respect to the e-mails, what was the subject matter of those e-mails?
A. The subject matter of those e-mails were PREA information or e-mails related to PREA, some of those e-mails were also related to the topic of gender dysphoria.
Q. Did those documents refresh your recollection?
MR. STEELY: Object to form. You can answer.

THE WITNESS: Can you ask the question again, sir?
BY MR. ANSCOMBE:
Q. Did those documents refresh your recollection on anything?
MR. STEELY: Object to form. You can answer if you can.
THE WITNESS: They -- those documents gave me context, they really did, they gave me a better understanding to be able to recall information.
BY MR. ANSCOMBE:
Q. Did you remember sending and receiving those e-mails?
MR. STEELY: Object to form.
THE WITNESS: No, I did not remember sending or receiving those e-mails.
BY MR. ANSCOMBE:
Q. When you looked at them did you remember sending and receiving them?
MR. STEELY: Same objection. Go ahead.
THE WITNESS: No. Obviously I sent them and received them because they were to me, but I have no recollection in -- in doing so, if that

answers your question.
BY MR. ANSCOMBE:
Q. Did the process of reviewing those e-mails suggest to you that the information you provided to Mike Harrell was inaccurate?
MR. STEELY: Object to form.
THE WITNESS: Can you ask that question again?
BY MR. ANSCOMBE:
Q. Earlier you talked about having provided some information to Mike Harrell, then you were provided some e-mails to review, did your review of those e-mails suggest to you that you had given inaccurate information to Mr. Harrell?
A. No.
Q. Other than e-mails, were there any other documents that you have reviewed relating to this case in the last week?
A. No.
Q. Other than your Counsel, did you speak with anybody to refresh your recollection on topics relating to this case?
A. No, sir.
Q. What is your understanding as to what this case is about?

A. My understanding with this case is inmate Keohone has concern with his treatment for gender dysphoria.

Q. Is that the -- what do you understand inmate Keohone's concerns to be?

A. I don't -- I have no idea what his concerns are, I just know that he has concerns on his treatment and that it has lead to this case.

Q. Is inmate Keohone the only Plaintiff in this case?

MR. STEELY: Object to form. Answer if you can.

THE WITNESS: I don't -- I don't know. That would be my understanding, but I could be wrong.

BY MR. ANSCOMBE:

Q. Have you read any testimony given by any FDC personnel in the context of this case?

A. No, sir.

Q. Has -- have any FDC personnel such as Dr. Kline, Dr. Martinez, Dr. Santiago, have any of them shared with you any information about this case?

MR. STEELY: Object to the form. You can answer if you can.

THE WITNESS: No, sir.
BY MR. ANSCOMBE:
Q. Have any of them described to you the depositions that they gave?
A. No, sir.
Q. How old are you, sir?
A. I'm 54, sir.
Q. Let's -- Ms. Norise, could you provide a -- put up onto the slide as Exhibit 1 our first exhibit.
(Exhibit Number 1 was marked for identification.)
BY MR. ANSCOMBE:
Q. And can you just very slowly scroll down on this. Thank you very much. You can return to the top.
Mr. Fitzgerald, do you recognize this?
A. I do not recognize that document, that's the first I've seen of it.
Q. As you look at the text of this document, do you recognize this as the text of your own LinkedIn posting?
A. That's information that I have or have had on my LinkedIn. I haven't looked at my LinkedIn, so I couldn't tell you if that's exactly what it says

right now, but that is some information that I have posted there before.

Q. I will represent to you that this is what currently appears on your LinkedIn. I would like to just get a little bit of background about you. I think it appears that you got a degree from Roger Williams college in Providence; is that correct?

A. I do have a degree from Roger Williams University.

Q. Okay. And you also attended Brandman University?

A. I also do have a degree from Brandman University, yes.

Q. Which degree did you receive first?

A. I received my administration of justice degree from Roger Williams first.

Q. And when did you get a degree from Brandman?

A. I got my degree from Brandman in August of 2017.

Q. Make it easy for you.

A. Thank you, I appreciate it.

Q. So did you have a career before you went to Roger Williams?

A. Yes, sir.
Q. What did you do?
A. At the time, I was in military.
Q. Okay. Maybe you could actually just give me a thumbnail of your occupational career after you graduated from high school up through the present, perhaps you could just give a very high level summary?
A. Yes, sir. I graduated -- I graduated high school in 1998. I worked at UPS there in Canton, Ohio on the reload shift. I was married, I went into the military and in the military I initially joined as a veterinary food inspector.
And then in 1998 I had switched over to the United States Army criminal investigation command and was trained as a special agent, investigations special agent. I was in the United States Army CID command from '98 all the way until I retired in 2017, in May of 2017.
And then after I retired I ran a company out of Washington, DC, which I think you have on my bio there, which was a law enforcement staff augmentation company. And then I was invited to come down to Florida to be the chief of staff of the Department of Corrections.

was?
A. No, sir.
Q. Do you have an understanding now as to what gender dysphoria is?
A. Yes, sir.
Q. What's your understanding?
A. My understanding of gender dysphoria is that it is a medical condition in which the individual has a -- has a problem with their birth of gender -- or their gender at birth, which causes them psychological distress.
Q. And how did you get that understanding?
A. Just a lot of at the point of what's in the -- what's in the -- what's in the media, what's on marketing, and then just learning about gender dysphoric inmates within the prison system.
Q. Is it fair to say that you have no medical training?
A. Yes.
Q. Is it fair --
A. If I can.
Q. Sure.
A. First aid training, medical training, do I have any -- could you -- I guess could you sort of help me out with the question, but --

Q. Yes.
A. I have medical training, first aid, first responder medical training, that is the limit of my medical training.
Q. Got it. Thanks for the clarification. How about do you have any expertise on mental health?
A. No, sir.
Q. Do you have any expertise in the area of healthcare administration or the provision of healthcare services?
A. Can you restate the question?
Q. Do you have any expertise in healthcare administration?
A. No, sir.
Q. All right. Sarah, could you scroll up to the top of this. All right. So let's look at the summary here. All right. Mr. Fitzgerald, as I look at the summary, in the second sentence of the first paragraph there's a statement:
"As a Governor's agency, I serve at the pleasure of the Department of Correction's secretary and a direct liaison to the staff within the executive office of the Governor."
Did I read that correctly?
A. Yes, sir.

Q. Is that an accurate statement of what you do as a professional at FDC?
A. That's an accurate statement of my status or position of employment.
Q. What does it mean to serve at the pleasure of the secretary of the Department of Corrections?
A. To serve at the pleasure is just I would say is a classification of a requirement being a SMS employee of the Department of Corrections, that the secretary can make a change in his chief of staff at any time without cause.
Q. What does SMS mean?
A. Senior management service.
Q. Is your position regarded as a political appointment?
A. No, my position is not a political appointment.
Q. And then you -- it says here that you are a direct liaison to the staff within the executive office of the Governor, what does it mean to be a liaison to the staff within the executive office of the Governor?
A. It means that I work back and forth directly with staff of the administration.

Q. And in a broad sense, what do you -- what do you work on with them?

A. That would be anything with policy budget or operations to the knowledge that I have.

Q. What -- what do you mean by policy?

A. A number of policies that the Governor's office wants their agencies to enact when it comes to human resources, administration, IT, communications, as well as policies.

Q. Are there particular people within the Governor's office that you interact with on a regular basis?

A. Yes.

Q. Who are those people now?

A. Those are people would be like the deputy chief of staff, people in the public safety unit and the office on policy and budget. Mostly those are the people I interact with.

Q. And has that been true over the time that you have been employed at FDC?

A. Yes.

Q. Who are the individuals who hold those positions at the current time?

A. At the current time my -- the deputy chief of staff for the executive office of the

Governor that over -- that oversees corrections is Brock Juarez.

Q. Juarez J-U-A-R -- how is his last name spelled?

A. I'm sorry, I couldn't tell you. Typical spelling of Juarez.

Q. W-A-R-E-Z maybe?

A. J-U-A.

Q. Yeah. Okay. All right. And then who are the people in policy and administration?

MR. STEELY: Object to form. You can answer.

THE WITNESS: The current two people I mainly deal with in policy and budget are in our public safety unit, which is Caitlin Dawkins, typical spelling. And her -- her budget analyst, her name is Nancy, I do not know Nancy's last name.

BY MR. ANSCOMBE:

Q. All right. So looking at the second paragraph of this statement again, looking at the second sentence:

"I liaise with, influence and foster partnerships among senior State business and community leaders, stakeholders and constituents through professional engagements to communicate,

coordinate and enhance awareness of the organization's priorities, interests and programs to promote mutually beneficial outcomes."

What does that mean, sir?

A. That means I maintain business relationships or I maintain relationships with people inside government like I named before, people within the profession, corrections profession, and people in the community to help them understand FDC's priorities and to be able to answer questions when they ask them.

Q. When you refer to -- when you refer to senior State leaders, who are you referring to there?

A. Those are the senior State leaders would be people that I just named in the Governor's office that I deal with. Also legislature members, representatives, senators and their staffs.

Q. And what does it mean to achieve alignment, I think I'm quoting this correctly, maybe not. Well, I'm sorry, what does it mean to coordinate and enhance awareness of the organization's priorities, interests and programs?

A. Once again, that's just having communications and conversations with people in

relationships to help them understand the organization's needs and interests in order to promote the outcomes of what the agency is supposed to do.

Q. This is probably mostly a semantic question but in this conversation we've talked about the Governor's office and then we've also talked about the executive office of the Governor, is there a difference between those?

A. Not in my mind, no.

Q. Okay. Do you -- you've been enrolled since 2019; correct?

A. Yes, November of 2019.

Q. How did you come to be employed by the Florida Department of Corrections?

A. The previous secretary asked if I would --

Q. Mark Inch?

A. Yes, sir, Mark Inch, asked if I would be interested in coming down to be his chief of staff.

Q. How did you know Mr. Inch?

A. Mr. Inch and I had served in the military together prior.

Q. And what was the -- was there an

application process to join FDC?
A. I'm sure there was but I don't recall -- I don't recall what it was.
Q. Did you have to be interviewed by anybody?
A. Yes, sir.
Q. Who interviewed you?
A. At the time, I was interviewed by the deputy chief of staff at that time --
Q. Was that Beau Beaubien -- I'm sorry, was that Beau Beaubien?
A. No, sir.
Q. Who was that?
A. At that time it was Stephanie Kopelousos.
Q. Anybody else that interviewed you?
A. No.
Q. Any understanding as to why you were interviewed by somebody within the Governor's office?
A. It is normal procedure back then that anybody who was being put into the chief of staff role or a senior role within the Governor's agency would have to have a conversation with their deputy chief of staff as far as I understood it.
Q. Did anything relating to transgender

inmates come up in any of the interview process?
A. No, sir.
Q. All right. So how often do you -- let me actually rephrase the question and start over. Do you have regular communications with the executive office of the Governor?
MR. STEELY: Object to form. You can answer.
THE WITNESS: I want to say yes but "regular" is a -- depending on what section of the Governor's office, so do I have regular conversations with budget and OPD, as of late, yes, because we're working agency budgets and agency requests and so there is a lot of conversations dealing with budget and strategic planning and legislative testimony. So I would say lately there is a lot of regular communication, meaning daily or weekly.
BY MR. ANSCOMBE:
Q. How often do you -- are you in contact with the deputy chief of staff of the Governor's office?
A. I have not spoken with Brock in over a month.
Q. Over the last year can you describe the -- how many times by providing an estimate

how many times you might have spoken to Mr. Juarez?

A. Normally I try to speak to him at least once or twice a month.

Q. And when you speak to him at that cadence, how -- how do those communications occur, in other words, do you call him, do you visit with him in person? Please describe.

MR. STEELY: Object to form. You can answer.

THE WITNESS: I try to meet with him in person but he's very busy and so it might go in person or it might be a telephone call.

BY MR. ANSCOMBE:

Q. Does anybody else attend those meetings?

A. Yes.

Q. Who is that?

A. If we go -- if there is an in-person meeting it would be -- I would go, secretary Dixon would go, and deputy secretary Comerford would go.

Q. And the cadence for those meeting would be once or twice a month?

A. That is what we try to do, yes.

Q. How long do those meetings last?

THE WITNESS: If we -- so if we replace an in-person meeting with a telephone call?

BY MR. ANSCOMBE:

Q. Yes.

A. That is just Brock and the same people that -- who attended before, the in-person meeting, and those meetings are just a tag up, maybe five minutes.

Q. Okay. Are any agendas prepared or kept for a meeting -- for any of the meetings with Mr. Juarez?

A. Right. The standard agenda covers like broad topics, so we would say operations where we talk about anything that's happening in the prison system or probation system. We would say contracts, right, do I have some contracts coming over for review or contracts that he's reviewed that he wants to talk about. And then communications would be is there anything in the press that he wants to talk about, that's the broad agenda.

Q. Does anybody keep notes of the meetings?

A. No.

Q. Is there a reason why not?

MR. STEELY: Object to form. You can

answer.

THE WITNESS: There's not a need to.

BY MR. ANSCOMBE:

Q. Why is that?

MR. STEELY: Same objection. Go ahead.

THE WITNESS: Most of the information is relevant, current information that we have in depth knowledge on, so taking notes would not be a requirement.

BY MR. ANSCOMBE:

Q. How long has Mr. Juarez been in his current role?

A. I do not know.

Q. How many other deputy chiefs of staff have you had regular meetings with along the lines that you have described just now?

A. Five.

Q. Could you please provide name them?

A. Stephanie Kopelousos was my first deputy chief of staff that I engaged with, I'll go in order.

Q. Thanks.

A. From oldest to most recent, so Stephanie was my first one.

Q. Next?
A. I'm trying to remember now, I told you it was going to be in order. Then I believe it was Beau Beaubien, then Melissa Smith, then Staucy [phonetic] and I apologize but I cannot say his last name, I do not recall his last name at this time, and then Bo.
Q. Brock you mean?
A. Oh, excuse me, yes, Brock. Thank you.
Q. Has your -- has the frequency and manner of your communications with those prior deputy chiefs been the same as what you've experienced with Mr. Juarez?
A. Yes, we try to schedule meetings monthly for regular cadence but not necessarily do those meetings happen because of the busyness or the workload of that deputy chief of staff at that time.
Q. Have -- during any of the meetings with any of the deputy chiefs of staff have you had conversations about the treatment of inmates with gender dysphoria?
MR. STEELY: Object to form. You can answer.
THE WITNESS: No.

BY MR. ANSCOMBE:
Q. Have you ever had conversations with any of the deputy chiefs of staff relating to the management of transgender inmates?
MR. STEELY: Object to form. You can answer.
THE WITNESS: No.
BY MR. ANSCOMBE:
Q. Have you had any conversations relating to any media coverage of the lawsuit that we're here on today?
MR. STEELY: Object to form.
THE WITNESS: No.
BY MR. ANSCOMBE:
Q. Have you ever had conversations with anybody in the executive office of the Governor relating to the treatment of gender transgender?
MR. STEELY: Object to form. You can answer.
THE WITNESS: No.
BY MR. ANSCOMBE:
Q. Have you ever had any conversations with anybody in the executive office of the Governor relating to the management of transgender inmates?
MR. STEELY: Object to form.

THE WITNESS: No, sir.
BY MR. ANSCOMBE:
Q. Have you ever had conversations with anybody in the Governor's office relating to this lawsuit?
MR. STEELY: Objection. Asked and answered. You can answer it.
THE WITNESS: No, sir.
BY MR. ANSCOMBE:
Q. Is the management of transgender inmates within -- a topic that's within your normal scope of duties?
A. No, sir.
Q. Is the treatment of gender dysphoria a topic that is within the normal scope of your duties at FDC?
A. No, sir.
Q. All right. Sarah, could you please post Exhibit Number 2.
(Exhibit Number 2 was marked for identification.)
BY MR. ANSCOMBE:
Q. All right. Mr. Fitzgerald, you will see that the first page of this document, this is a document that bears Bates Numbers FDC officials 43237

through 43256. The first page of this is an e-mail from Mike Harrell to you with a CC to Hope Gartman, and there is an attachment of 602.053 PDF, do you see that, sir?

A. Yes, sir.

Q. All right. And then Sarah, could you actually just scroll so that Mr. Fitzgerald can see the attachment? All right. Yeah, I'm not going to ask any questions about the content of the attachment right now, so I think that for the purposes of my questions, Mr. Fitzgerald has seen the things I want to ask him about.

MR. STEELY: So we know because it's going to be attached as an exhibit, if you can scroll to the end just so we --

MR. ANSCOMBE: Yeah, that's fine.

MR. STEELY: Thank you.

BY MR. ANSCOMBE:

Q. All right. So I think we can go back to the top. From the text of the e-mail from Mike Harrell to you, he states:

"Good afternoon, Chief, see attached as requested."

And then the subject line here is "procedure covering transgender inmates."

Do you, Mr. Fitzgerald -- can you tell us why you had requested this information from Mr. Harrell?

A. No, I can't.

Q. Okay. Let's take a -- well, if somebody -- if somebody in the Governor's office asked you, hey, how are we treating transgender inmates, who would you have gone to to ask for that kind of information?

MR. STEELY: Object to form. You can answer.

THE WITNESS: Can you restate the question?

BY MR. ANSCOMBE:

Q. If somebody within the executive office of the Governor asked you what policies do we have that address how we cover transgender gender inmates, to whom would you have referred a question like that?

A. If somebody asked me a question about how we -- about how we treated transgender inmates in the prison system, depending if it was how are they housed, I would have talked to institutions, Mike Harrell.

Q. Okay. And all right. So let's -- Sarah,

could you put up the Exhibit Number 3.

(Exhibit Number 3 was marked for identification.)

BY MR. ANSCOMBE:

Q. Exhibit Number 3 will be a multi page exhibit bearing Bates Numbers FDC officials 04325 through 043276.

All right. Mr. Fitzgerald, this is another multi page document. Sarah, can you just scroll down to the bottom rapidly so everybody can just make sure that I didn't put any funny pictures in the middle or anything. Very good. Mr. Fitzgerald, why did you send this policy -- well, strike that.

Do you see that this is an e-mail from you on May 6th of 2021 at -- at 11:57 a.m. to Beau Beaubien at the executive office of the Governor?

A. Yes.

Q. And does it appear from this that you transmitted to him the policy that you had just received from Mr. Harrell?

A. Yes.

Q. The subject line here is procedure covering transgender inmates. Do you have any understanding as to why you were interested in this

at the time?
MR. STEELY: Object to form.
THE WITNESS: Could you restate the question?
BY MR. ANSCOMBE:
Q. Do you have any understanding -- or strike that. Can you tell us why you were investigating procedure covering transgender inmates at this time?
MR. STEELY: Object to form. You can answer.
THE WITNESS: No.
BY MR. ANSCOMBE:
Q. Here you say to Mr. Beaubien, "Sir, see attached transgender inmate management is covered in the prison rape procedure 602.053, reference pages five, six, seven, and nine." Did I read that correctly?
A. Yes, sir.
Q. All right. Now, Mr. Harrell didn't give you those page numbers, did he?
MR. STEELY: Object to form. You can answer.
THE WITNESS: Not to my recollection.
BY MR. ANSCOMBE:

Q. Okay. So does that suggest to you that you had actually read the policy at the time that you sent it to Beau Beaubien?
A. Yes, I think you can infer that.
Q. Why did you read the policy?
A. So that Beau Beaubien wouldn't have to read a 19 page document and I could reference him to the section of that policy that he was obviously interested in.
Q. Why was he interested in it?
MR. STEELY: Object to form.
THE WITNESS: I don't know.
BY MR. ANSCOMBE:
Q. All right. We have had -- well, if it's all right, maybe we could just go -- well, why don't we take a short break right now, we've been going about an hour. Let's take five.
MR. STEELY: Good with that?
THE WITNESS: I can go on.
MR. STEELY: We're good to break or keep going.
BY MR. ANSCOMBE:
Q. All right. So let's go a few more minutes then. All right. So as you sit here today is it fair to say you have no recollection

whatsoever as to why Mr. Beaubien was after this information?

A. That's an accurate statement.

Q. All right. Sarah, could you please put up the next Exhibit.

Before I ask you question about this one, sir, what was your understanding of what Mr. Beaubien's job responsibilities were as deputy chief of staff for the Governor?

A. All I would be able to confirm is that he was the deputy chief of staff when it came to correctional operations. I know he had other jobs in the Governor's office, I don't know what those were, or he had other responsibilities in the Governor's office but I don't know what those were.

Q. What where were his responsibilities with respect to the Department of Corrections?

A. My understanding is his responsibilities were just as a liaison from the Governor's office to the agency.

Q. Was one of his responsibilities to let the agency know what the Governor's policy objectives were?

A. I couldn't -- I would be assuming, I don't know that to be a fact.

Q. Do you know where Mr. Beaubien is now?

A. I believe Mr. Beaubien is an attorney for a firm here in Tallahassee, now.

Q. The name of that firm is Greenberg Traurig, and I won't put his bio under your nose but I will read to you a sentence from it, or two sentences:

"Prior to joining the firm, Beau served as deputy chief of staff and director of cabinet affairs in Florida Governor Ron DeSantis's administration. In this role, he oversaw all operations of the Office of Cabinet Affairs, and provided policy and operational oversight of a number of State agencies including the Department of State, Department of Corrections and Department of Juvenile Justice."

So if -- if he describes his role as providing a policy oversight of the Department of Corrections, would you have any reason to dispute that?

MR. STEELY: Object to form, you're reading off a document he hasn't seen but go ahead and answer if you can.

THE WITNESS: Can you ask the question

appear to you that he must have asked you for information about the procedures covering transgender inmates?

MR. STEELY: Object to form.

THE WITNESS: I think from the e-mails I've seen, he was asking about transgender inmates and it seems to me that it would have to be in line with something regarding the PREA, annual PREA report.

BY MR. ANSCOMBE:

Q. Okay. So the next e-mail here is maybe -- Sarah, maybe you could just scroll on this, this is a -- a conversation, maybe you could just on the e-mail you could just start at the bottom communication -- well, all right. Whoa, whoa. Yeah just at the very bottom of the e-mail and then just roll to the top.

So you see this, Mr. Fitzgerald, as we go along, you see that this is the -- where you have provided to -- or Mr. Harrell has provided you with the PREA policy?

And then if you go up, it shows you sending to it -- I'm sorry, it shows you asking Mr. Harrell and Hope Gartman how many transgender inmates do we have in the system. And then if you go up from

there, it looks like -- it looks like you provide an answer, or Mr. Harrell provides an answer to you, stating that they don't have a way to determine this number but he states there:

"However, in our last April 13, 2021 gender dysphoria team meeting of the 697 inmates being evaluated for gender dysphoria, 532 are considered transgender.

Judy has indicated OIT is working on a way to get a total count of transgender inmates in our system. I've included her in case I have misstated any of this information. I have also included two more procedures that are relevant to the management of transgender inmates, let me know if you have any additional questions."

Did I -- so I guess the first question, did I read that correctly?

A. Yes, sir.

Q. All right. Why did you want to know how many transgender inmates were in the Florida Department of Correction system?

A. I don't recall.

Q. Do you see that, that Mr. Harrell says that he included two more procedures that are relevant to the management of transgender

inmates -- well, I guess I should say do you see where he says that?

A. Yes, sir.

Q. All right. And then the attachments listed up there are 602.018 and 403.012, did I read those numbers correctly?

A. Yes, sir.

Q. All right. Sarah, could you just scroll down to show Mr. Fitzgerald what those policies are. All right. So the first one, hold on. So the first one is entitled contraband searches of inmates. Okay. And then scroll down. And then the second policy is 403.012 and this is entitled the identification and management of inmates diagnosed with gender dysphoria, do you see that, sir?

A. I do. Can you scroll down on that 403 for me?

Q. Yes, please scroll down, Sarah.

A. Thank you.

Q. All right. So let's go back up to the top of the document. Why did Mr. Harrell provide you with a copy of these two policies?

MR. STEELY: Object to form. You can answer.

THE WITNESS: I don't know.
BY MR. ANSCOMBE:
Q. All right. Sarah, maybe you could take us to the next policy -- I'm sorry, to the next Exhibit.
THE REPORTER: Okay. Just to confirm, the document we just went through was Exhibit 4 and this coming up is Exhibit 5?
MR. ANSCOMBE: Yes. And actually so just for the record Exhibit 4 is 23069 through 23090.
(Exhibit Number 4 was marked for identification.)
MR. ANSCOMBE: And Exhibit Number 5 is Bates pages 23092 through 23099 -- I'm sorry, 023100. All right.
(Exhibit Number 5 was marked for identification.)
BY MR. ANSCOMBE:
Q. Okay. Sarah, can you just scroll down on this so that Mr. Fitzgerald can see it. Okay. Let's go back up to the top.
Mr. Fitzgerald, do you see that you sent Mr. Beaubien a copy of policy 403.012?
A. Yes, sir.

Q. And this is only one of the two policies that Mr. Harrell had provided, do you have any understanding as to why you only provided this one?
A. No, sir.
Q. Why did you send this to Mr. Fitzgerald?
MR. STEELY: Object to form.
BY MR. ANSCOMBE:
Q. I'm sorry, you're Mr. Fitzgerald. Why did you send this to Mr. Beaubien?
MR. STEELY: Object to form. Asked and answered. You can answer.
THE WITNESS: I don't recall.
BY MR. ANSCOMBE:
Q. From context here is it fair to infer that you thought he would be interested in this?
MR. STEELY: Object to form.
THE WITNESS: Maybe. I don't recall.
BY MR. ANSCOMBE:
Q. Did you -- did you read this policy?
A. I don't recall if I read it or not.
Q. As you sit here today do you have any idea why the Governor's office was interested in reviewing a medical policy showing how transgender inmates were being treated?

MR. STEELY: Object to form.
THE WITNESS: I don't know.
BY MR. ANSCOMBE:
Q. Did you talk to Mr. Beaubien about any of these policies?
A. Not to my recollection.
Q. Incidentally there is no -- I'll represent to you we didn't see any e-mail from Mr. Beaubien where he asked for any of this information. Does that suggest to you that he must have asked this of you orally?
A. That's what I would assume.
Q. Okay. It wouldn't be unusual for him to make a verbal request of you to collect information and share it with him?
MR. STEELY: Object to form.
THE WITNESS: It's not unusual for the deputy chief of staff to call me.
BY MR. ANSCOMBE:
Q. All right. Let's provide the next Exhibit in order, which I think will be Exhibit 6.
(Exhibit Number 6 was marked for identification.)
BY MR. ANSCOMBE:

Q. All right. Maybe we can just start at the bottom and scroll up to the top so that Mr. Fitzgerald can see what this is.
Mr. Fitzgerald, does this appear to you to be a continuation of the e-mail chain from the prior -- from the previous day, this is May 7th of 2021?
MR. STEELY: I'm going to object that was a pretty fast scroll. If you can --
BY MR. ANSCOMBE:
Q. Yeah, that was -- I will concede that that was fast scrolling, maybe if we could just go a little slower on that, Sarah.
A. If you could just go down to the very first portion of that. Thank you, right there.
Q. Okay. All right. Let's go up to the next one.
A. You can go to the next one, please. You can go to the next one, please. Thank you. If you can go to the next one, please. Is there one above that? Thank you. Sir, can you ask your question again?
Q. Yes. Does this appear to you to be a continuation of the e-mail chain from the prior day where you were talking to go FDC personnel about

MR. STEELY: Object to the form. And Anthony, your video is still off, just so you know.
MR. ANSCOMBE: Sorry.
MR. STEELY: You can answer.
THE WITNESS: I believe it's fair to say I have no recollection.
BY MR. ANSCOMBE:
Q. Is it also fair to say you have no recollection of any conversation that you had with Mr. Beaubien at the time?
A. Can you be more specific?
Q. Is it fair to say you have no recollection of a conversation that you had with Mr. Beaubien at the time regarding policies involving transgender.
Inmates?
A. Yes, that's fair to say.
Q. Is it also fair to say that you have no idea as you sit here today what he did with any of the information you provided?
MR. STEELY: Object to form. You can answer.
THE WITNESS: I'm sorry, can you restate that question?
BY MR. ANSCOMBE:

Q. Yeah, is it also fair to say that as you sit here, you have no idea what if anything he did with the information that you provided to him?
A. That's correct.
Q. All right. Sarah, could you please put up the next exhibit?
THE REPORTER: It will be Exhibit 8?
MR. ANSCOMBE: Yes.
(Exhibit Number 8 was marked for identification.)
BY MR. ANSCOMBE:
Q. Let's go to the top real quick. All right.
So Mr. Fitzgerald, do you see at the top here there is a date of 1-19, of January 19 of 2023 and an e-mail from Michelle Glady to you, do you see that?
A. Yes, sir.
Q. All right. Sarah, I would like you to go down to the very bottom of this and let's get the first e-mail in the sequence, all right. Okay. All right.
The very first e-mail in this sequence is from somebody named Tyler O'Neil, Daily Signal to

media at txvalues.org. And then if you scroll up you'll see that the next e-mail is from Tyler O'Neil to Bryan Griffin and Jeremy Redfern.
And then the next e-mail up is from Bryan Griffin back to Tyler O'Neil, the date on these communications is January 10 of 2023, do you see that, sir?
A. Yes, sir. I see what you've described.
Q. All right. Is this a document that you have reviewed within the last week?
A. Yes, sir. Briefly.
Q. All right. Did you look at it yesterday?
A. I believe I did.
Q. All right. Let's go to the very bottom and I want to ask you some questions about the first message here. All right. So this e-mail chain starts on January 10th at 9:45 in the morning and Tyler O'Neil makes a media request of txvalues.org, do you happen to know what TX values is?
A. No, I don't, but I believe the e-mail's time is stamped 9:54, not 9:45.
Q. Okay. I'm sorry, a moment of dyslexia there. All right. So I'm going to read this out loud and I would like you to follow along, this is Tyler O'Neil, managing editor at the Daily Signal.

I'll stop. Do you know what the Daily Signal is?

A. I do not.

Q. It continues:

"I'm writing a story about the South Dakota Department of Corrections policy regarding transgender inmates, which leaves the decision of whether to place a male who claims to identify as female in a women's prison up to the discretion of the director on a case-by-case basis. The South Dakota Department of Corrections recognizes the World Professional Association for Transgender Health, WPATH standards of care rather than the standards of care being developed by the Florida Department of Health."

And then there's a link. Did I read that correctly as far as you can tell?

A. Can you read the last sentence there again for me, please?

Q. The South Dakota Department of Corrections recognizes the World Professional Association for Transgender Health, WPATH standards of care rather than the standards of care being developed at the Florida Department of Health?

A. Yes, you've read that paragraph

A. No. I do not recall.
Q. Let scroll up, Sarah. All right. Who are -- who are Bryan Griffin and Jeremy Redfern?
A. Well, I think Bryan Griffin is identified as the press secretary, executive office of the Governor. And Jeremy Redfern, I don't -- I don't know his position, unless it's in the body of that e-mail that would identify.
Q. Okay. Do you see that this e-mail from Tyler O'Neil to Brian and Jeremy is marked as high importance?
A. I do.
Q. Okay. And from this e-mail sequence -- actually, let's -- let's go up and this appears to be an e-mail from Bryan Griffin to Tyler O'Neil with a CC to Molly Best. Who is Molly Best?
A. Molly Best, when she was in my organization was deputy comm's [phonetic] or the press secretary.
Q. Brian Griffin was the press secretary within the executive office of the Governor?
A. I think that's what this e-mail identifies.
Q. Bryan Griffin states:
"Hi Tyler, our office has no response to

Governor Noem's spokesperson. The Governor wants conservative governors across America to work together for reform in the enactment of conservative policy through our Federalist system. Florida's prison policy is quite simple. Men are housed in men's facilities and women are housed in women's facilities. I am copying Molly Best with the Florida Department of Corrections should you need any policy citations or have further questions."

Did I read that correctly?

A. Yes, sir. Thank you.

Q. Now, what I would like is, let's keep this exhibit handy but right now, I would like Sarah, could you please put up the next exhibit in order, which will be Exhibit 9.

(Exhibit Number 9 was marked for identification.)

BY MR. ANSCOMBE:

Q. And this is Bates pages 43569, or it's just a single page document. All right. This is a -- an e-mail from you to Suzonne Kline with a CC to Thomas Reimers, transgender hormone treatment is the subject. And the date on this is January 12th, 2023 and this is at about 10:36 in the morning, do you see that, sir?

A. Yes, sir.
Q. You write to Ms. Kline, "Dr. Kline, I hope you are well. I called you to discuss FDC policy on transgender hormone treatment, I was asked a question on our policy and need to provide an answer. Please call me on my cell as I am out of the office today," and providing your cell. Do you see that?
A. Yes, sir. Thank you.
Q. What -- there's an indication here that you were asked a question on policy, who asked you the question and what was the question?
A. I don't recall what question I was asked and I don't recall anybody asking me the question or I don't recall the person who asked me the question.
Q. Do you recall being asked a question?
A. No, sir.
Q. Why didn't you write the question down when you e-mailed it to Dr. Kline?
MR. STEELY: Object to form. You can answer.
THE WITNESS: I have no idea.
BY MR. ANSCOMBE:
Q. Was it because you didn't want to put the

question in writing?
MR. STEELY: Object to form. You can answer.
THE WITNESS: No, sir.
BY MR. ANSCOMBE:
Q. Was your question to Dr. Kline related to the media inquiry received by the Governor's office two days before?
A. I don't know. I would assume not, because that question that went to the press was about how inmates are housed. This seems to be a question that was asked about hormone treatment, so if I was looking at the two, I would assume not, but I don't recall.
Q. Okay. Sarah, could you go back to the preceding Exhibit, Exhibit Number 8, put that one back up. All right. Let's -- actually that was in exactly the right place. Let's -- let's get Brian Griffin's response. Okay.
Did you provide any information to the executive office of the Governor that contributed to Mr. Griffin's response?
A. No.
Q. Have you ever talked to anybody within the executive office of the Governor about this media

inquiry?
A. No. Not that I can recall.
Q. Do you recall ever talking to anybody within the executive office of the Governor about the response given to Mr. O'Neil?
A. No. Not that I can recall.
Q. You did eventually see this response; correct?
A. Can you scroll up?
Q. Sarah, can you please scroll up. Do you see that on January 18th, Michelle Glady sent it to you?
A. Yes.
Q. What does F-Y-S-A mean?
A. For my situation alerts.
Q. What does that mean?
A. That means Ms. Glady sent me the below e-mail to make sure that I was aware of the request that came in.
Q. Let's go back down to the Governor's response, please. All right. Mr. Brian, was that -- yeah -- I'm sorry, Mr. Griffin, he states "The Governor wants conservative Governors across America to work together for reform."
So let me ask you there, what reform did you

understand that Governor DeSantis wanted in this situation?

MR. STEELY: Object to form. You can answer.

THE WITNESS: I have no understanding.

BY MR. ANSCOMBE:

Q. It also indicates that the Governor wants conservative Governors across America to work together for the enactment of conservative policies. What were the conservative policies being referred to here?

MR. STEELY: Same objection. You can answer.

THE WITNESS: I have no knowledge.

BY MR. ANSCOMBE:

Q. Did you have any understanding in 2023 of the Governor's views on transgender health?

A. Not to my recollection.

Q. In 2023 did you have any understanding as to whether the Governor even had positions regarding transgender health?

A. Not to my knowledge.

Q. In 2023 did you have any understanding as to whether the Governor had positions on the treatment of gender dysphoria?

MR. STEELY: Object to form. You can answer.

THE WITNESS: Not to my recollection.

BY MR. ANSCOMBE:

Q. Did you have any understanding on whether the Governor -- whether the Governor's administration had any views on the use of State funds to pay for the treatment of gender dysphoria?

A. Can you restate the question?

Q. In 2023 did you have any understanding whether the Governor's office had any positions regarding the use of State funds to pay for the treatment of gender dysphoria?

MR. STEELY: Object to form. You can answer.

THE WITNESS: Not to my recollection.

BY MR. ANSCOMBE:

Q. Do you know what hormone therapy is?

MR. STEELY: Object to form.

THE WITNESS: Generally, no.

BY MR. ANSCOMBE:

Q. Do you have an understanding that -- that hormones can be given to patients who have gender dysphoria that allow them to achieve the appearance of the gender with which they identify?

MR. STEELY: Object to form.

THE WITNESS: Can you restate the question sir?

BY MR. ANSCOMBE:

Q. Do you have an understanding that hormones can be used in patients with gender dysphoria to help them look like the gender which -- with which they identify?

A. Generally, no.

Q. All right. So when -- who is -- I'm sorry, who is Glady -- Michelle Gladys [sic]?

A. If you scroll up, Michelle Glady.

Q. Yeah. Yeah, who is she?

A. At the time, was director of communications.

Q. Okay. All right. So on the 18th of January she sent you the exchange between the Governor's office and Mr. O'Neil; correct?

A. Yes, sir.

Q. And it would have been your practice to read what she sent you; correct?

A. Yes, sir.

Q. Let's go down to that e-mail, preceding e-mail again. All right. So on January 18th when you saw this message and you read the words, the

Governor wants conservative Governors across America to work together for reform and the enactment of conservative policies through our Federalist system, when you read that, you had no idea what the press secretary was talking about; is that correct?

MR. STEELY: Objection. Objection asked and answered. You can respond.

THE WITNESS: That is correct.

BY MR. ANSCOMBE:

Q. And did you, when you -- when you received this message from the executive office of the Governor, did you ask anybody such as Michelle Glady or the Governor's press secretary what that meant?

MR. STEELY: Objection mischaracterization. You can answer.

THE WITNESS: Can you ask the question again, sir?

BY MR. ANSCOMBE:

Q. Yeah, when you read this message did you ask anybody what the press secretary was referring to when he said the Governor wants conservative Governors across America to work together for reform and the enactment of conservative policies through our Federalist system?

A. No, I asked no questions about that.
Q. All right. The message goes on and it says Florida's prison policy is quite simple, men are housed in men's facilities and women are housed in women's facilities, did I read that correctly?
A. Yes, sir. Thank you.
Q. What -- what did you interpret that to mean?
A. It just states the fact of our housing policy for inmates, sir.
Q. Did you infer from that, that it was the position of the governor's office that transgender women are really men, and that transgender men are really women?
A. No, sir.
Q. Did you interpret the statement some other way?
A. No, sir, I didn't interpret the statement at all.
Q. Let's go up. Why did Michelle Glady send this to you?
MR. STEELY: Object to form. You can answer.
THE WITNESS: It appears that she wanted me to be aware of a communication from the

Governor's office press secretary, sent to our press secretary is what I would infer.

BY MR. ANSCOMBE:

Q. Okay. Let's scroll up, please. All right. After receiving the message you say "Thank you. FLDOH policy only addresses youth, not adults. Any objections for me to share with Lance and Dr. Kline?"

Did I read that correctly?

A. Yes, sir.

Q. When you say thank you, does that suggest to you that you already knew that this e-mail was coming?

A. No, generally I say thank you as a polite way of a communication that somebody sent me something.

Q. Why did you tell her that Florida DOH policy only addresses youths, not adults?

A. I have no recollection of why I told her that.

Q. Why did you ask whether she had objections for sharing the information with Lance and Dr. Kline?

A. Normally I try to make sure that other people and staff are aware of subject areas being

discussed with synchronization and coordination of staff. And then my -- I don't try to assume that everything is free to share, so that would be my general comment to why I would ask that question but I have no specific recollection of why I would ask that question, just generally how I conduct business.

Q. Did -- could you scroll up, Sarah, please. Michelle Glady indicated she had no objections; correct?

A. That is as it appears, yes, sir.

Q. She told you that the next morning?

A. Yes, sir.

Q. Who is Lance?

A. Are you referring to Lance Neff?

Q. It's -- you are the one who was referring to Lance, so Lance Neff would be -- would be one; right?

A. Yes, sir. The only Lance that I would know would be Lance Neff, he was general counsel.

Q. Why did you want to provide the information to Lance Neff?

A. I don't recall why I specifically wanted to share that information with him, but generally speaking as my course of business is to just share

information across staff that might have an interest.

Q. Okay. Well, Mr. Neff would mostly be interested if there were legal implications for FDC; correct?

MR. STEELY: Object to form. You can answer.

THE WITNESS: Can you restate the question, sir?

BY MR. ANSCOMBE:

Q. What would Mr. Neff's interest be in this topic of conversation?

A. I don't know particularly what Lance's interest would be or specifically, but as the general counsel for the agency, I try to make him aware of many different topics.

Q. Why is that?

A. Normally with the general counsel it is because they're -- they have a broad involvement in every aspect of the agency.

Q. Is that to ensure that the agency complies with the law?

A. In a broad sense, yes.

Q. Going back to the conversation or going back to the e-mail exchange with Dr. Kline on

the -- on the 12th, did she call you?
A. Could you -- could you provide me a document to refresh my memory of exactly what you're talking about, sir?
Q. Yes. Sarah, can you go to that Exhibit. In this e-mail you ask Dr. Kline to call you, so my question is, did she call you?
A. I'm sure she did, but I don't recall it.
Q. Do you recall having a conversation with her on or about January 12th regarding transgender hormone treatment?
A. No, I don't.
Q. Why did you want to talk to her about transgender hormone treatment?
A. Inferring from the e-mail, I was asked a question and needed an answer.
Q. And as you sit here today you don't know what the question was or what the answers was; correct?
A. No, sir.
Q. Was -- did the -- did your conversation with Dr. Kline involve the need to enact conservative policies?
MR. STEELY: Object to form.
THE WITNESS: I don't think so.

Like I said, I don't -- I don't even remember if she called me or what that conversation was about.
BY MR. ANSCOMBE:
Q. Do you have a recollection that you had had conversations with people in the Governor's office about ways to re-evaluate FDC's policies with respect to transgender inmates?
A. I didn't have any policies regarding -- or I didn't have any conversations regarding those policies.
Q. Since you don't remember who asked you the question, is it fair to say that you can't say that it wasn't somebody at the Governor's office?
A. I think it's fair to say that I know that I didn't talk with anybody in the Governor's office about transgender policy or crafting of transgender policy, because it's not my normal course of business to be part of that.
BY MR. ANSCOMBE:
Q. Well, isn't --
A. So I would have no information to share.
Q. Isn't part of your --
A. Would be --

Q. I'm sorry, sir, go ahead.
A. Just generally speaking.
Q. Well, part of your job is to help ensure that there is alignment in policy between the Governor's office and the Florida Department of Corrections; right?
MR. STEELY: Object to form.
THE WITNESS: Normally and generally that is within my scope of responsibility. The transgender policy is not in my scope of responsibility.
BY MR. ANSCOMBE:
Q. But -- but ensuring alignment of policies is within scope; correct?
A. Generally, yes.
Q. Do you have any idea what Dr. Kline told you when you -- when you spoke with her?
A. I have no recollection of what she told me.
Q. All right. Let's go to the next Exhibit, please.
THE REPORTER: Exhibit 10.
(Exhibit 10 was marked for identification.)
BY MR. ANSCOMBE:

Q. Exhibit 10 is a -- bears Bates Numbers FDC Officials 043575 through 43577.
Sarah, could you start at the bottom and scroll up slowly so that Mr. Fitzgerald can see this. All right. Let's go to the -- well, let's just pause for a minute at the top. All right.
The -- the most recent part of this e-mail chain is January 13th, 2023 from you to Suzonne Kline where you say thank you, ma'am.
Did I read that correctly?
A. Yes, sir, thank you.
Q. All right. Let's go to the bottom of this. All right. Who is Katie Fabian, if you know?
A. Her e-mail signature block says she's the mental health quality assurance manager.
Q. Do you know -- have you ever met her, know anything about her?
A. I may have met her, but I have no recollection of her.
Q. Okay. All right. Sarah, could you scroll a tiny bit higher there. So on January 13th at 2:39 in the afternoon Katie Fabian sends information to Suzonne Kline:
"Dr. Kline, please see the stats below for

the inmates in the gender dysphoria program, 209 inmates diagnosed with gender dysphoria and approved to receive accomodation by the GDRT, 147 inmates currently approved to receive hormones by the GDRT."

Did I read that correctly?

A. Yes, sir, thank you.

Q. Who is Stephanie Crawford?

A. She's an employee of FDC, I don't know what her job title is or her responsibilities are.

Q. Okay. Sarah, can we go up, please. All right. So this is an e-mail from Suzonne Kline to you:

"Good afternoon, Chief. As a follow-up to our discussion, one, we currently have 209 inmates diagnosed with gender dysphoria and approved to receive accomodation by the GDRT; and two, 147 inmates are currently approved to receive hormones."

Did I read these things correctly?

A. Yes, sir, thank you.

Q. Does that refresh your recollection that you must have asked Dr. Kline how many inmates have gender dysphoria and how many were receiving

hormones?

MR. STEELY: Object to form. You can answer.

THE WITNESS: No, I don't remember asking Dr. Kline anything specifically regarding this e-mail.

BY MR. ANSCOMBE:

Q. From the context here would it be fair to assume that you must have asked her for that information?

A. I think from this e-mail is I had a conversation with Dr. Kline and she's giving me some information. I can't -- I can't infer when, where or how that conversation happened, because I don't remember it.

Q. Well, she indicates that this is a follow-up, so the discussion -- a follow-up to the discussion, so the discussion must have occurred in the preceding 24 hours; correct?

MR. STEELY: Object to form.

THE WITNESS: I would say the conversation -- I would infer that the conversation happened prior to January 13th at 3:53. I couldn't tell you if it was within 24 hours, 48 hours, 48 days, I have no idea.

BY MR. ANSCOMBE:
Q. Well, you had asked her the day before to call you; right?
A. I did ask her to call me the day before.
Q. All right. And so is it a fair assumption that sometime between the 12th and the 13th that she provided you with this information because she thought this was information that you were interested in?
A. Could you ask that question again, sir?
MR. ANSCOMBE: Michelle, could you read it back please?
(Pending question read back.)
BY MR. ANSCOMBE:
Q. I'll rephrase it.
Is it fair to assume that she provided this information to you at 3:53 p.m. on Friday January 13th because she thought this was information you would be interested based on a call that she had had with you on sometime between the 12th and the 13th?
MR. STEELY: Object to form, you can answer.
THE WITNESS: No, I don't think that's

fair to say, I wouldn't say that.
BY MR. ANSCOMBE:
Q. Other than on this occasion, in all of prior recorded history had Dr. Kline ever provided you with any information about the gender dysphoria program?
A. She may have.
Q. Do you know whether she did or are you just guessing?
MR. STEELY: Object to form.
THE WITNESS: I have a lot of conversations and so I would -- and I know we said I shouldn't speculate at the very beginning but I -- I would imagine since recorded history in time as you have stated, since Dr. Kline has worked for us, that she probably did in a conversation in the past provide me information about the scope of her responsibility as I talked to her in the hallway, at events and asked her how her work is going, so I imagine she would talk to me about her work generally speaking.
Q. Why did she tell you that she had glanced at the case law briefly to get more clarity?
A. I can't speculate why she informed me of that.

Q. What was she trying to get clarity on?
MR. STEELY: Object to form.
THE WITNESS: I have no idea.
BY MR. ANSCOMBE:
Q. Wasn't she trying to get clarity on something that you had asked her about in your on conversation on the 12th through the 13th?
MR. STEELY: Object to form.
THE WITNESS: Not that I can recall.
BY MR. ANSCOMBE:
Q. Do you see -- actually, let me ask you this: I've asked you -- and I'll just ask you again, do you have any understanding what hormone therapy is within the context of treating gender dysphoria?
A. Generally just what you described earlier.
Q. And do you have any understanding as to what accommodations are with respect to treating gender dysphoria?
A. Can you be more specific in your question?
Q. Have you -- have you ever heard of something called social transition accommodations?
A. Maybe once or twice.

Q. And what was your understanding as to what that meant?

A. I don't -- I don't understand specifically what that term means. I've just heard it used once or twice.

Q. Actually let's go to the very bottom e-mail of this e-mail chain here. Okay. Let's -- right there. So Katie Fabian says 209 inmates diagnosed with gender dysphoria had approved to receive accomodation by the GDRT. All right. Do you know what the GDRT is or was?

A. No, sir, I couldn't tell you what GDRT means.

Q. Have you ever heard of the gender dysphoria review team?

A. Just now, sir.

Q. Do you have any understanding as to what the word "accomodation" means in that sentence?

A. No, sir.

Q. Social -- I would like for you to assume for my questions here, that social transition accommodations are accommodations that the correctional institution allows to gender dysphoric inmates so that they can present and feel like members of the gender with which they

identify.

MR. STEELY: I'm going to object to him having to assume what you're trying to get him to assume. And that's a long statement.

MR. ANSCOMBE: Yeah.

BY MR. ANSCOMBE:

Q. For our conversation gender -- accommodations are what I just described. And specific examples of that would be things such as permitting inmates to wear their hair in a manner consistent with their gender identify, allowing them to wear undergarments consistent with their gender identity, and to receive canteen items such as soaps, deodorant, makeup, things of that variety in a manner consistent with their gender identity. In --

MR. STEELY: I'm going to object as well because he said he didn't know what accommodations were but you've provided him some information but he has already stated he didn't know what accommodations were, but go ahead.

BY MR. ANSCOMBE:

Q. Mr. Fitzgerald, having heard me describe what social transition accommodations are, do you recall having heard discussions on this topic?

MR. STEELY: Object to form.

THE WITNESS: I don't want to assume what was in Dr. Kline's thinking.
BY MR. ANSCOMBE:
Q. You received this information because you thanked her for it; correct?
A. What I did, if you scroll up, if I can review that, please.
Q. Yeah, please scroll up.
A. Yes, sir. It shows right there that I received it and typical general way of responding to people in the agency with appreciation.
Q. And it's also true that you didn't ask her any questions about what she was telling you or why; correct?
A. No, but I did not ask her any questions according to that e-mail.
Q. Do you remember asking her any questions verbally?
A. No. I do not recall.
Q. Do you recall that the Governor's office was interested in revoking hormone therapy for transgender inmates?
MR. STEELY: Object to form.
BY MR. ANSCOMBE:
Q. Let me rephrase the question.

A. Thank you.
Q. At this time was the Governor's office interested in revoking hormone therapy for transgender inmates?
MR. STEELY: Object to form.
THE WITNESS: Not that I recall.
BY MR. ANSCOMBE:
Q. At this time was the Governor's office interested in removing accommodations for gender dysphoric inmates?
A. Not -- not that I recall.
Q. Just one final statement by Dr. Kline in that e-mail was that she was going to follow up with the Florida Department of Health to see what guidelines they use or recommend, what was she talking about there? If you scroll down, Sarah, please. Yeah. There you go.
A. Can you ask the question again, sir, please?
Q. Why was she telling you that she was going to follow up with the Florida Department of Health to see what guidelines they use or recommend?
MR. STEELY: Object to form.
THE WITNESS: I don't know.

BY MR. ANSCOMBE:
Q. Is that something you asked her to do?
A. Not that I recall.
Q. Was the Governor's office interested in bringing FDC's policies with respect to gender dysphoria into line with those of the Florida Department of Health?
MR. STEELY: Object to form. You can answer.
THE WITNESS: Can you ask the question again, sir?
MR. ANSCOMBE: Michelle, could you read it back?
(Pending question read back.)
BY MR. ANSCOMBE:
Q. Do you still need me to rephrase the question, sir?
A. No, that's fine, not to my knowledge, I have no knowledge.
Q. Has the State of Florida enacted legislation that prohibits the use of State funds for in providing for hormone therapy for the treatment of gender dysphoria?
A. I do believe there is a law.
Q. When did you learn about that law?

A. I couldn't put a time or date on it, probably when it was enacted is what I would assume, which I don't even know when that happened.

Q. What did you do with the information that Dr. Kline provided to you?

A. I don't recall.

Q. All right. Sarah, could we go back to the Exhibit starting with Bates Number 24865. All right. This is five days after you'd had your previous exchange with Dr. Kline and at that point you ask for permission to share the media inquiry with Dr. Kline and with Lance, do you agree with that temporal sequence?

A. Yes, sir.

Q. Why on the 18th did you want to send this information to Lance and to Dr. Kline?

A. Specifically I don't recall why I wanted to share this information with them, but generally speaking I try to share information across the staff.

Q. You've also told Michelle Glady on that date that the Florida Department of Health policy only addresses youth, not adults. That's in the message immediately below that. Could you -- Sarah, could you just scroll down so he could see that. No,

no, I think you've got to go up, it's on the very first page. There we are.

How did you know that the Florida Department of Health policy only addresses adults?

A. I don't recall how I got that knowledge.

Q. I'm sorry, I should -- I made a mistake, I need to ask it again. How did you know that the Florida Department of Health policy only addresses youth and not adults?

A. I can't remember specifically how I had that knowledge back then in 2023.

Q. Did Dr. Kline -- did Dr. Kline provide that information to you?

A. No, not that I recall.

Q. All right. I would like to go to Exhibit 11 now. Sarah, can you pull up Exhibit Number 11.

(Exhibit Number 11 was marked for identification.)

BY MR. ANSCOMBE:

Q. All right. Exhibit Number 11 is an e-mail string that is 3773 through 3776. All right. Let's start at the bottom. All right. So do you see, sir, if we go from e-mail to e-mail here, that this is a continuation of the e-mail chain from the

13th?

MR. STEELY: Object to form.

THE WITNESS: Can I see the -- I would like to see the entire string of e-mails before I want to answer that question. Thank you so much. Can you hold it right there? Thank you.

BY MR. ANSCOMBE:

Q. All right. So I would like to direct your attention to the e-mail that you sent to Dr. Kline on the 18th. All right. This is an e-mail that you sent to her at 5:10 p.m. and you sent this to Dr. Kline with a CC to Lance Neff, Dorothy Burnsed, Richard Comerford and also to yourself. Let me just ask you, was Dorothy Burnsed an attorney at FDC?

A. Yes, Ms. Burnsed is an attorney.

Q. And who is Richard Comerford?

A. Richard Comerford currently is the deputy secretary.

Q. All right. You indicate in this:

"Ma'am, please see link to ACHA report. There are a number of hyperlinks in the report. Their acting general counsel Andrew Sheeran would be the POC to start the conversation. ACHA is in current litigation on the Florida official position

and their rule of using State funds for gender affirming care for adults. I believe we should work with them and their experts as we update our policy in this area. Please see me if you have more questions on the matter."

And then there's a link. Did I read that correctly, sir?

A. Yes, sir.

Q. Why did you send this message to Dr. Kline?

A. I have no specific recollection of why I specifically did, but just reading the context of the message is once again sharing information with her as it appears she is updating the policy.

Q. Well, hadn't they just updated the policy as of the end of 2022?

MR. STEELY: Object to form. You can answer.

THE WITNESS: I would have to look at the date of the policy. I don't know.

BY MR. ANSCOMBE:

Q. Weren't you asking in this e-mail that the policy be updated again?

MR. STEELY: Object to form. Mischaracterization. You can answer.

THE WITNESS: No, not that I -- I don't direct policies to be updated. They're updated annually or as law changes or information changes.

BY MR. ANSCOMBE:

Q. How about as the Government -- how about when the Governor's policy changes or to bring -- or to bring, where necessary to bring FDC policy in alignment with that of executive office of the Governor?

MR. STEELY: Object to the form.

THE WITNESS: Once again, I don't direct policy changes.

BY MR. ANSCOMBE:

Q. The Governor's office does though, don't they?

MR. STEELY: Object to form.

THE WITNESS: I couldn't -- I couldn't tell you what the Governor's office does when it comes to policy in their direction.

BY MR. ANSCOMBE:

Q. Isn't that part of your job?

A. Part of my -- what particular portion of my responsibilities are you discussing, sir?

Q. Well, isn't one of your jobs to act as a

liaison between the Governor's office and the Florida Department of Corrections to ensure that there is alignment on policy?

MR. STEELY: Object to form.

THE WITNESS: Thank you. Part of my responsibility with the Governor's office is to liaise on how we conduct business, yes.

BY MR. ANSCOMBE:

Q. All right. Sarah, could you go up to the top. No. No. No. Yeah, I just want to get the first part of this. What -- what is ACHA?

A. That's ACHA, and so it's the agency that's responsible for healthcare administration.

Q. Okay. That's a Florida agency; correct?

A. Yes, sir.

Q. Did you send her a copy of the ACHA report so that FDC could bring its transgender policy into alignment with that of ACHA?

A. I believe if you can scroll down, please. I believe it's plainly stated that I sent her that report so that she was aware of what ACHA was doing.

Q. Okay. With the goal that -- that FDC could be consistent with ACHA; correct?

MR. STEELY: Object to form.

THE WITNESS: No, I wouldn't say that, sir.
BY MR. ANSCOMBE:
Q. Have you ever read the ACHA policy?
A. To my recollection, I don't remember reading the ACHA policy --
BY MR. ANSCOMBE:
Q. Do you have any understanding --
A. -- or --
Q. I'm sorry, I interrupted you.
A. I've never read the ACHA policy, so I -- if I may restate to be clear, I've never read the ACHA policy. If I read anything from ACHA, I might have read this communications press release.
Q. Did you have an understanding as to what the ACHA policy was with respect to gender affirming care for adults?
A. Very high level probably just based off of what this press release said.
Q. What was your understanding of ACHA's position?
A. I couldn't recall right now, to tell you, I don't know what it is.
Q. Wasn't and isn't ACHA's position that

hormone therapy is inconsistent with accepted medical practice for the treatment of gender dysphoria?

MR. STEELY: Object to form. You can answer.

THE WITNESS: I don't know if that's ACHA's current policy or not.

BY MR. ANSCOMBE:

Q. Was it ACHA's policy at the time?

A. I don't remember.

Q. Did you have an understanding at the time that you wrote this, that the agency for healthcare administration did not support gender affirming care for adults?

A. Can you rephrase the question, sir?

Q. Did you understand when you wrote this e-mail, that the agency for healthcare administration did not support gender affirming care for adults?

A. No. I don't think I understood that.

Q. What is gender affirming care?

A. I think what you have referenced, if I put together what you've referenced, it would hormone therapy and accommodations just based on our conversation today.

Q. At the time you used the phrase "gender

affirming care," did you have any idea what it meant?
A. Other than -- other than what's in that press release, probably not.
Q. And what's in the press release, didn't it indicate that the agency for healthcare administration did not support gender affirming care?
MR. STEELY: Object to form.
THE WITNESS: Not that I can recall today.
BY MR. ANSCOMBE:
Q. All right. Just going to the very start of that -- of that paragraph, you told Dr. Kline, their acting general counsel, Andrew Sheeran would be the POC to start the conversation, what conversation did you anticipate would be started?
A. Once again, I specifically don't recall, but if I look at the body of the e-mail, obviously it's for her to have a conversation regarding our policy.
Q. Why did you direct her to the acting general counsel?
A. I specifically don't recall. Obviously that person was the point of contact.
Q. Did that conversation ever occur?

A. Not to my knowledge, I have no knowledge of it.
Q. You stated in the second paragraph:
"I believe we should work with them and their experts as we update our policy in this area."
Why did you tell her that?
A. I specifically don't recall.
Q. This was an instruction to do so; correct?
A. I wouldn't agree with that, I would say it's my opinion.
Q. Well, it's your opinion as the deputy chief of staff, the liaison with the Governor's office and someone higher in the FDC hierarchy that this is what you thought should happen; right?
MR. STEELY: Objection mischaracterization, you can respond.
THE WITNESS: Once again, I don't have authority over that area, sir.
BY MR. ANSCOMBE:
Q. Why did you tell her to see you if he had more questions, or if "she" had more questions.
A. I think it's self evident just if she has any questions she can walk down the hall and see me.

Q. Does she -- is her office down the hall from yours?

A. Yes, it's on the other side of the building.

Q. Did you tell her that so she wouldn't put anything in writing?

MR. STEELY: Object to form. You can answer.

THE WITNESS: No, sir.

BY MR. ANSCOMBE:

Q. All right. Sarah, could you scroll up to the top of this. Does it appear to you that Dr. Kline shared your views with those of Dr. Santiago and Dr. Martinez?

MR. STEELY: Object to form. You can respond.

THE WITNESS: If I can review the e-mail?

BY MR. ANSCOMBE:

Q. Yeah, Sarah could you just scroll down there for a second. All right. Sir, right there you see that Dr. Kline provides an FYSA e-mail attaching your interchange with her to both Dr. -- to Dr. Santiago and to Dr. Martinez?

A. That appears to be the case, yes, sir.

Q. All right. And in response to that does it appear to you, let's go up, that Dr. Martinez provided to Dr. Kline information from the Endocrine Society, and then the Pediatric Endocrine Society, and then also a document with a list of scholarly references leading support to treating transgender patients.

And so my question is, based on your interchange with Dr. Kline, doesn't it appear to you that FDC began looking at updating its policy to address whatever issue it was that you had brought to their attention?

MR. STEELY: Object to form. Mischaracterization. You can answer.

THE WITNESS: No, I don't see that.

BY MR. ANSCOMBE:

Q. Based on your review of these documents is it -- does it refresh your recollection that at this time you are suggesting to the medical staff at FDC that it should update its policies with respect to treating gender dysphoria to eliminate hormone therapy and to eliminate social transition accommodations?

A. Can you be specific on the review of -- on what documents of review?

Q. The documents that we've looked at so far today.

A. Can you ask your question again? Thank you. Can you please ask your question again, now that I understand what documents you are referring to?

MR. ANSCOMBE: Michelle, could you read the question.

(Pending question read back.)

MR. ANSCOMBE:

Q. Tell you what, I'll start that question again. All right. Based on having reviewed these documents with me here today, is your recollection refreshed that you were communicating with medical personnel at FDC to encourage them to update FDC's gender dysphoria treatment plans to eliminate hormone therapy and social accommodations?

MR. STEELY: Object to the form. Mischaracterization. You can answer.

THE WITNESS: No.

BY MR. ANSCOMBE:

Q. And as you sit here today you have no recollection as to why you were involved in these discussions at all; correct?

MR. STEELY: Object to form

mischaracterization, you can respond.

THE WITNESS: Could you refresh -- or can you re-ask the question specifically on discussions? I'm not tracking to what you're talking about with discussions.

BY MR. ANSCOMBE:

Q. Well, we've seen a number of discussions from early January -- or from January of 2023, correct, we've just gone through some e-mails on that; right?

A. Correct, sir.

Q. All right. So having reviewed those e-mails, is it fair to say you have no recollection as to why you were being involved in that process?

MR. STEELY: Object to form.

THE WITNESS: That's correct, sir.

MR. ANSCOMBE: Sarah, can you put up the next Exhibit, please.

THE REPORTER: Mr. Anscombe, I have we are at two hours and 45 minutes about right now.

MR. ANSCOMBE: Tell you what, let's take a break now, let's take about a ten-minute break and then I'm going to come back with a few follow-up questions.

THE WITNESS: If we could continue I've got a tight schedule.

MR. ANSCOMBE: I need to take five minutes at least so.

MR. STEELY: Yeah.

MR. ANSCOMBE: Thanks.

(Brief break.)

BY MR. ANSCOMBE:

Q. Mr. Fitzgerald, the next Exhibit is -- I believe is Exhibit 12, this is Bates numbers 27756 through 27817. There is a one page e-mail transmission and then a slide deck that's attached, so this is the e-mail.

(Exhibit Number 12 was marked for identification.)

BY MR. ANSCOMBE:

Q. And then Sarah, just very quickly, I'm not going to ask you questions about the content of the slide deck but I would like you just to see, can you show the title of the slide deck, Sarah. All right. The care and management of transgender and gender dysphoric inmates, challenges and opportunities, Danny Martinez, chief of medical services.

And then Sarah, just please scroll down on

this very quickly. Okay. All right. So let's go back up to the top. If you see below, actually down below, let's get the first e-mail in this chain. All right. Danny Martinez sends to Tom Reimers, who is Tom Reimers, Thomas Reimers?

A. At that time, Tom Reimers was the director of health services.

Q. Okay. The predecessor to Clayton Weiss?

A. Yes, sir.

Q. Okay. And so Danny Martinez on January 20th, so this is one to two days after your previous interchanges, he provides to Tom Reimers a gender dysphoria program. And then you'll see if you scroll up, Sarah, that Tom Reimers provides that gender dysphoria program to you. And he says:

"Chief, I'll come down and give a little background on this, the session is scheduled for Sunday morning, January 29th. Thanks."

All right. So my question is, do you recall receiving this e-mail and this slide deck?

A. No, I don't recall receiving this e-mail or the slide deck.

Q. Do you recall Tom Reimers coming down to your office to talk to you about this slide deck?

A. No, sir.

Q. Do you remember him coming down to your office at all to talk about gender dysphoria?
A. No, sir.
Q. Do you have any reason to doubt that he actually did come down and talk to you about this?
A. No. I have no doubt but I'm sure he came down, he said he was coming down, but that would be speculation, I don't remember at all.
Q. Now, the official hours of the State of Florida government are probably Monday through -- Monday morning through Friday 8:00 to 5:00 something along those lines. Do you have any idea why there would be a Mr. -- or Dr. Martinez would be doing a session on Sunday morning the 29th of January of 2023 on gender dysphoria?
A. I believe the session he was talking about was referring to the American Corrections Association conference session.
Q. Why do you believe that?
A. Based on the slide deck.
Q. And so is this slide deck, is that a slide deck that you reviewed within the last week?
A. It was e-mailed, and the slide deck, yes, sir.

Q. So you flipped through the slide deck?
A. Briefly.
Q. Did it appear to you that the slide deck had been prepared perhaps more than a year earlier?
A. I don't recall, no, sir.
Q. Is there any reason --
A. I would have to review it again to be able to answer your question.
Q. Can you think of any reason why Danny Martinez would want to provide to the ACA, a slide presentation that was several years out of date?
MR. STEELY: Object to the form.
THE WITNESS: Could you ask the question again, sir?
BY MR. ANSCOMBE:
Q. Can you think of any reason why Danny Martinez would want to present to ACA a slide deck that was a couple of years out of date?
MR. STEELY: Same objection.
THE WITNESS: I have no knowledge, no.
BY MR. ANSCOMBE:
Q. Sarah, could you go to the first couple of pages of the slide deck. I'm sorry, just that